1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

JAYSON JEFFREY PENN,
7    MIKELL REEVE FRIES,
     SCOTT JAMES BRADY,
8    ROGER BORN AUSTIN,
     TIMOTHY R. MULRENIN,
9    WILLIAM VINCENT KANTOLA,
     JIMMIE LEE LITTLE,
10   WILLIAM WADE LOVETTE,
     GAR BRIAN ROBERTS,
11   RICKIE PATTERSON BLAKE,

12       Defendants

13   _____

                    REPORTER'S TRANSCRIPT
14              Excerpt of Trial to Jury
             Testimony of Michael Ledford, Vol. 3
15   _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17   Chief Judge, United States District Court for the District of

18   Colorado, commencing at 8:32 a.m., on the 10th day of November,

19   2021, in Courtroom A201, United States Courthouse, Denver,

20   Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                           APPEARANCES
 2              Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5    for Plaintiff.
 6              Anna Tryon Pletcher and Michael Tubach of
 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8    San Francisco, CA 94111-3823;
 9              Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10    N.W., Washington, DC 20006, appearing for Defendant Penn.
11              David Beller, Richard Kornfeld and Kelly Page of
12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13    CO 80202, appearing for Defendant Fries.
14              Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16               Laura Kuykendall and Megan Rahman of Troutman Pepper
17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18    appearing for Defendant Brady.
19              Michael Felberg of Reichman, Jorgensen, Lehman,
20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21    10017;
22
23
24
25
```

1                      APPEARANCES (Continued)

2             Laura F. Carwile of Reichman, Jorgensen, Lehman,

3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4    CA 94065; appearing for Defendant Austin.

5             Elizabeth B. Prewitt of Latham & Watkins, LLP,

6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7             Marci Gilligan LaBranche of Stimson, Stancil,

8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9    80218, appearing for Defendant Mulrenin.

10             James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16             Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19             John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

 1                APPEARANCES (Continued)

 2           Craig Allen Gillen and Anthony Charles Lake of

 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4   Atlanta, GA 30339;

 5           Richard L. Tegtmeier of Sherman & Howard, LLC,

 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7   for Defendant Roberts.

 8           Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                     PROCEEDINGS

16           THE COURT:  We are back on the record.  It looks like

17   all the defendants are present.

18           Overnight the Court received briefing on the issue

19   that we ended with yesterday after the jury was excused

20   regarding Government Exhibit 1547 and Defendant Exhibit E-570.

21   My view of that particular matter is that E-570 clearly has

22   hearsay statements of Mr. Austin.  However, I am going to keep

23   my ruling from yesterday and I am going to give the limiting

24   instruction as proposed by Mr. Penn in his brief.  Because the

25   statement I think is not --

1          MR. POLLACK:  We are having trouble hearing you.

2          THE COURT:  Because the statement is hearsay, it's not

3    coming in under a co-conspirator hearsay exception.  And as a

4    result of that, I don't think it can be used against the other

5    defendants.  Moreover, merely to declare it to be -- and I am

6    not sure I've seen a case that says this -- as a result of it

7    coming in as under the rule of completeness it is by definition

8    not hearsay and therefore couldn't be used against anyone -- or

9    can be used against everyone, I am not sure of that principle.

10   So I am going to give the limiting instruction as proposed in

11   Docket No. 814 on Page 3.

12          Are we ready?

13          Mr. Tubach?

14          MR. TUBACH:  We had proposed two in the event that the

15   government only introduced E-570 which encompasses the entirety

16   of the exchange.  I believe in a footnote I think there was the

17   alternative language if both documents were admitted, and I

18   just wanted to alert the Court to that.  They are essentially

19   identical.  It just breaks them out by either two documents or

20   one document.

21          THE COURT:  I see that, right.  I think that the

22   government was going to introduce 1547 and E-570.  All right.

23   I will give the alternative one that is being proposed in the

24   footnote on that same page of Docket No. 814.

25          Let's bring the jury in.

1          (Jury present.)

2          Good morning, ladies and gentlemen.  I hope you had a

3    good evening.

4          And we've got Mr. Ledford back.  Once he gets seated,

5    we will proceed with cross-examination.

6          Go ahead, Mr. Beller.

7          *MR. BELLER:*  Thank you.

8      (**Michael Ledford** was previously sworn.)

9                     **CROSS-EXAMINATION CONTINUED**

10   *BY MR. BELLER:*

11   *Q.*  Are you settled, Mr. Ledford?

12   *A.*  Yes.

13   *Q.*  Good morning, sir.

14   *A.*  Good morning.

15   *Q.*  Mr. Ledford, prior to me questioning you yesterday, is it

16   fair to say that you and I have never met?

17   *A.*  That is true.

18   *Q.*  And we have never spoken, right?

19   *A.*  No, we have not.

20   *Q.*  And you and I have not spoken between yesterday's

21   questioning and this morning's questioning, right?

22   *A.*  No, we have not.

23   *Q.*  Okay.  So I want to remind the jury where we left off

24   yesterday.  And I was asking you a little bit about

25   Government's Exhibit 9004.

Michael Ledford - Cross

1        MR. BELLER:  Is it possible to have that up and to

2   confirm, Judge?  I believe this is admitted and published.

3        THE COURT:  Yes, you may, and it may be published.

4        MR. BELLER:  Thank you.

5        And if we can zoom in on Mr. Ledford's e-mail at the

6   top.

7   BY MR. BELLER:

8   Q.  I am going to give you just a moment.  The jury has seen

9   this.  You have seen this a few times.  I am just trying to

10  orient you.  Do you recall this?

11  A.  I do.

12  Q.  So "You would be my second highest supplier with price by

13  only .0003 from the highest," right?

14  A.  Yes.

15  Q.  And the date on this e-mail, please?

16  A.  Is October the 1st, 2013.

17  Q.  Excuse me.  Will you say that again, please?

18  A.  October the 1st, 2013.

19  Q.  Okay.  This is after the first round of bids; is that

20  right?

21  A.  Yes.

22  Q.  So we had also spoken yesterday, Mr. Ledford, regarding

23  these PowerPoint presentations that you prepare for RSCS's use,

24  correct?

25  A.  Correct.

Michael Ledford - Cross

1   Q.  Sometimes the brand's use, sometimes the board's use, but

2   nonetheless use.

3   A.  Correct.

4           MR. BELLER:  Can we show only the witness, counsel and

5   the Court, please, F-815?

6   BY MR. BELLER:

7   Q.  Sir, I am handing you or on your screen and in your binder

8   is F-815.  Do you recognize that document, Mr. Ledford?

9   A.  Yes, I do.

10  Q.  Mr. Ledford, this is a document dated October the 29th of

11  2013; is that right?

12  A.  Yes.

13  Q.  So this document was drafted and finalized following the

14  round one bids?

15  A.  Yes.

16  Q.  And prior to the round two bids, correct?

17  A.  I believe that's correct.

18  Q.  And this document, similar to the others we talked about

19  yesterday, is something that RSCS or UFPC used in the ordinary

20  course of its business, correct?

21  A.  Correct.

22  Q.  Something that you all relied on in conducting its

23  business.

24  A.  Correct.

25  Q.  And insofar as you are aware, this is accurate and

Michael Ledford - Cross

1   reliable; is that right?

2   A.  Yes.

3         MR. BELLER:  Your Honor, at this time I would move for

4   the introduction and publishing of F-815.

5         THE COURT:  Any objection to the introduction of

6   F-815?

7         MR. TORZILLI:  No, Your Honor.

8         THE COURT:  F-815 will be admitted and may be

9   published.

10        MR. BELLER:  If we can turn to Page 6, please, and

11  publish Page 6 to the jury.

12  BY MR. BELLER:

13  Q.  As we were talking about, Mr. Ledford, this was put

14  together following the round one bids.  And you created a chart

15  in this particular document that summarized all of the round

16  one bids; is that right?

17  A.  Yes, that's correct.

18        MR. BELLER:  Okay.  And if we can zoom in on -- maybe

19  we can't.  It looks like it's already pretty large.

20  BY MR. BELLER:

21  Q.  Are you able to read that, Mr. Ledford?

22  A.  Yes, I am.

23  Q.  And at this time, Mr. Ledford, Claxton's round one bid was

24  .9627; is that correct?

25  A.  That's correct.

338

Michael Ledford - Cross

1   Q.  Is it fair to say that based upon the other suppliers that

2   are listed on this chart, Claxton after round one was, in fact,

3   the highest price, right?

4   A.  That appears correct.

5   Q.  Okay.  So it was not the second highest price.  It was the

6   highest price.

7   A.  Correct, but I am not sure if somebody had changed their

8   price in between that early October to late October.

9   Q.  Exactly where I'm going.  So it's possible that oftentimes

10  based on your directional guidance somebody will change their

11  price and even do it on the telephone, right?

12  A.  Yes.

13  Q.  And that's because when we look at this particular chart,

14  it shows Claxton is the highest.  And really if we add or

15  subtract .0003 to .9627, no one else is within that range,

16  right?

17  A.  That's correct.

18  Q.  And so bids not only happened via text message, but bids or

19  modifications of price also happened more casually such as on

20  the telephone with you.

21          MR. TORZILLI:  Objection, misstates prior testimony.

22          THE COURT:  Overruled.  He can answer.

23  A.  They definitely happened verbally.  I do not specifically

24  recall if anything happened over a text message.

25  BY MR. BELLER:

Michael Ledford - Cross

1    Q.  Sure.  We just don't know, right?

2    A.  Right.

3    Q.  And same thing with the telephone.  It may have happened on

4    the telephone.

5    A.  That is possible, yes.

6    Q.  But what we know is that if we put all of the e-mails

7    together, they don't necessarily line up with the numbers that

8    you have in this chart, right?

9    A.  That's correct.

10   Q.  And the numbers that you have in this chart at the time on

11   October 29th, 2013 insofar as you know were, in fact, true and

12   accurate, right?

13   A.  That's correct.

14   Q.  You're not putting false information into a chart that

15   you're using for your own internal purposes.

16   A.  That's right.

17   Q.  So this summarizes round one.  I want to talk to you --

18          MR. BELLER:  And we can remove this.  Thank you very

19   much.

20   BY MR. BELLER:

21   Q.  I want to talk to you now about the round two bidding that

22   happens in 2013 for the 2014 contract, okay?  Claxton submitted

23   a bid, and Claxton submitted a bid on I believe November the

24   5th of 2013.  Does that sound right to you?

25   A.  That does.

340

Michael Ledford - Cross

1    Q.  So only on your screen and in your binder I am showing you

2    Defense Exhibit A-612.

3           Mr. Ledford, do you recognize what is depicted in

4    A-612?

5    A.  Yes.

6    Q.  And is this a e-mail that purports to contain Claxton's

7    round two COB cost model?

8    A.  Yes, it is.

9    Q.  Otherwise known as an offer, right, or a bid?

10   A.  Yes.

11   Q.  E-mails such as this that would transmit a contract you

12   would agree with me is in the ordinary course of your business,

13   right?

14   A.  Yes.

15   Q.  And you rely on documents or e-mails such as this in

16   conducting your business, correct?

17   A.  Correct.

18   Q.  And insofar as you know, A-612 is an accurate and reliable

19   version of the e-mail that you received from Mr. Brady on

20   November the 5th of 2013; is that right?

21   A.  Yes.

22   Q.  Very good.  And this purports also to have an attachment

23   which is the round two price, right?

24   A.  Correct.

25   Q.  So I want to hand you next what is Defense Exhibit A-613.

Michael Ledford - Cross

1           Do you see A-613 in front of you?

2    *A.* Yes.

3    *Q.* Now, this is a multi-page document, so I want to take a

4    moment and just have the documents toggled through.

5           Have you had a chance to look at each page that was

6    shown?

7    *A.* Yes, I have.

8    *Q.* And does this also appear to coincide with A-612, the

9    e-mail cover sheet?

10   *A.* It appears that way, yes.

11   *Q.* And is this also, the contract itself, used in the ordinary

12   course of your business?

13   *A.* Yes, it would be.

14   *Q.* And do you rely on documents such as this or offers such as

15   this in conducting RSCS business?

16   *A.* Yes.

17   *Q.* And does this appear to be accurate and reliable or an

18   accurate and reliable version of what Mr. Brady sent to you on

19   November the 5th of 2013?

20   *A.* To the best of my knowledge, yes.

21          *MR. BELLER:* Your Honor, at this time I would move for

22   the introduction of A-612 and A-613 and request to publish.

23          *THE COURT:* All right.  Any objection to, first of

24   all, the admission of A-612?

25          *MR. TORZILLI:* No objection to A-612.

Michael Ledford - Cross

1          THE COURT:  Any objection to the admission of A-613?

2          MR. TORZILLI:  Just the question on A-613 is whether

3     just the printed version that appears here that's been

4     distributed as being admitted or whether the document in native

5     format is being admitted as well.

6          THE COURT:  Response as to A-613?

7          MR. BELLER:  Thank you, Your Honor.  As to A-613, I

8     believe for purposes of organization it may be easier to just

9     have the paper document.  And if that would be easier, that's

10    what I would be moving for.  If for some reason the government

11    would like the native version, I certainly have no objection to

12    that.

13         THE COURT:  Why don't we just assume right now that

14    the offer is the paper version.  Any objection?

15         MR. TORZILLI:  No objection.

16         THE COURT:  Then A-612 and A-613, not including the

17    native version, will be admitted and may be displayed.

18         MR. BELLER:  Thank you.  If we can publish, please.

19         THE COURT:  You may.

20    BY MR. BELLER:

21    Q.  Mr. Ledford, do you see A-613 on your screen?

22    A.  Yes, I do.

23    Q.  You would agree with me that on A-613 --

24         MR. TORZILLI:  Your Honor, the native is being

25    published and the native is not admitted into evidence per the

Michael Ledford - Cross

1    prior conversation.

2         THE COURT:  Yeah, I don't know if that's part of the

3    native.  It may be.  But other than the spreadsheet type

4    headings, I think that the text is the same as the paper

5    version, so I don't think that that would cause any

6    misunderstanding or prejudice.

7         MR. BELLER:  Thank you.

8    BY MR. BELLER:

9    Q.  So Mr. Ledford, based on A-613 you would agree with me that

10   the round two eight-piece price offer from Claxton Poultry is

11   .9503; is that right?

12   A.  That's correct.

13   Q.  And the dark meat price is .3050 back or subtracted from

14   the eight-piece price; is that right?

15   A.  Yes.

16   Q.  And the math on that, then, is .9503 minus 30 and a half,

17   and that equals .6453; is that right?

18   A.  That's correct.

19   Q.  In other words, 64.53 cents, right?

20   A.  Exactly.

21   Q.  Now, we spoke yesterday about the round one bid and a

22   little bit this morning about the round one bid.  And the round

23   one bid you would agree with me was .9627 on an eight-piece

24   price, right?

25   A.  That's correct.

Michael Ledford - Cross

1    Q.  Dark meat was 30 and a half back, correct?

2    A.  That's correct.

3         MR. BELLER:  So I want to show these as a

4    demonstrative.  This is not going to be admitted.  This is a

5    demonstrative only that puts these number into a spreadsheet.

6    And so I would offer I-221 to be used for demonstrative

7    purposes only.

8    BY MR. BELLER:

9    Q.  Before this is published, I am hoping that you can just

10   take a look at what's on your screen, please.

11        THE COURT:  And Mr. Beller, let me ask, is this a

12   multi-page document?

13        MR. BELLER:  It is, Your Honor.

14        THE COURT:  Are you offering both at this time for

15   demonstrative purposes only?

16        MR. BELLER:  That's correct, Your Honor.

17        THE COURT:  Okay.  Would you like a ruling now?  It

18   looks like Mr. Torzilli has had an opportunity to look at that.

19        Mr. Torzilli, any objection to the use of I-221 both

20   pages for demonstrative purposes only?

21        MR. TORZILLI:  Is this Page 1 of I-221 that's at issue

22   at the moment?

23        THE COURT:  No, I think it was both pages, assuming

24   that it's two pages.

25        MR. TORZILLI:  I have four sheets of paper -- five

345
Michael Ledford - Cross

1   sheets of paper in front of me including it looks like

2   information from exhibits that haven't been used yet today.

3          MR. BELLER:  If I may clarify, Your Honor.

4          THE COURT:  Go ahead.

5          MR. BELLER:  So at this point in the examination we

6   have covered round one and round two.  I-221 for demonstrative

7   purposes at this time, I am requesting only to publish Page 1,

8   and then I am going to follow up with Page 2 that reflects the

9   October round one and the November 5th round two.  To

10  Mr. Torzilli's point, I will be laying foundations for the

11  following documents and will then show those in successive

12  order once a proper foundation is laid.

13         THE COURT:  So we are just talking about Pages 1 and 2

14  at this time.  Any objection to the use of I-221, Pages 1 and 2

15  for demonstrative purposes only?

16         MR. TORZILLI:  No objections to Pages 1 and 2.

17         THE COURT:  Then those may be published to the jury as

18  demonstrative exhibits only.  So in other words, ladies and

19  gentlemen, once again they won't be going back to the jury for

20  purposes of deliberation, but may be shown to you for

21  demonstrative purposes.

22  BY MR. BELLER:

23  Q.  Mr. Ledford, what's on your screen is Demonstrative I-221.

24  Would you agree with me that that appropriately summarizes the

25  round one Claxton contract?

Michael Ledford - Cross

1   A.   Yes, I do.

2   Q.   Now, there's a third column on there that says dark meat

3   prices.   And the dark meat prices is .6577, right?

4   A.   Yes.

5   Q.   And that is taking that eight-piece price and subtracting

6   the 30 and a half dark meat price, correct?

7   A.   That is correct.

8   Q.   And so this shows the math, but you would agree with me the

9   math is generally not depicted on the actual contract?

10  A.   That is correct.

11  Q.   It's simply summarized as, for example, 30 and a half back,

12  right?

13  A.   Correct.

14  Q.   So that is the round one bid.   As we established, you

15  provide directional guidance to Mr. Brady saying in effect

16  you're too high.   Lower your price.   And then you get the round

17  two bid, right?

18  A.   Yes.

19       MR. BELLER:   So if we could have the next page of that

20  demonstrative, please.

21  BY MR. BELLER:

22  Q.   And this accurately reflects what Claxton does following

23  your guidance, and that is they lower their eight-piece price,

24  right?

25  A.   Yes.

347

Michael Ledford - Cross

1   Q.  Now, you would agree with me that formulaically 30 and a

2   half back did not change, correct?

3   A.  Correct.

4   Q.  So their 30 and a half back formula stayed the same, but by

5   changing their dark meat price, in effect they've also --

6   excuse me, by changing their eight-piece price, they have in

7   effect lowered their dark meat price, right?

8   A.  That is correct.

9   Q.  So for round two we have a lower eight-piece price and a

10  lower dark meat price, right?

11  A.  Yes.

12  Q.  Okay.  Fair to say that following this round on

13  November 5th -- we're now at round two -- you said in effect

14  not low enough.  I want it lower, correct?

15  A.  I do not recall what my feedback to round two was.

16  Q.  Do you recall giving feedback at all saying that you wanted

17  again lower prices?

18  A.  I do not recall.  However, I'm sure that I gave them

19  feedback, but I do not recall what that feedback was.

20  Q.  Completely understood.

21          MR. BELLER:  If we can show just to the witness,

22  please, Defendant's Exhibit A-622?  The witness, parties and

23  the Court, excuse me.

24  BY MR. BELLER:

25  Q.  Mr. Ledford, I believe on your screen is an exhibit marked

348

Michael Ledford - Cross

1  A-622.  Do you recognize A-622?

2  A.  Yes.

3  Q.  And does this appear to be an updated round three bid

4  submission from Claxton Poultry, specifically Scott Brady?

5  A.  Yes, that's correct.

6  Q.  Okay.  Let's go through some of these questions that you

7  are being accustomed to, okay?

8       Would you agree with me that A-622 is the type of

9  document that RSCS uses in the ordinary course of its business?

10 A.  Yes.

11 Q.  And would you agree with me that UFPC or RSCS relies on

12 this type of document in conducting its business?

13 A.  Yes.

14 Q.  And is this a fair, accurate and reliable depiction of the

15 e-mail that you received or the e-mail I should say that

16 Mr. Brady sent on November the 18th of 2013?

17 A.  Yes.

18 Q.  Also you have Defense Exhibit A-623.

19      Do you recognize what is depicted in A623?

20 A.  Yes.

21 Q.  Is it fair to say that that appears to be the e-mailed

22 attachment or bid that goes with A-622?

23 A.  Yes.

24 Q.  A-623 also is used in the ordinary course of RSCS's

25 business?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   RSCS relies on this document in conducting its business.

3    A.   Yes.

4    Q.   And this is a fair, accurate and reliable depiction; is

5    that correct?

6    A.   That's correct.

7    Q.   Next time I am going to let you ask all those questions,

8    okay?

9              MR. BELLER:   Your Honor, at this time I would move for

10   the introduction of A-622 and A-623.

11             THE COURT:   Any objection to the admission of those

12   exhibits?

13             MR. TORZILLI:   No objection.

14             THE COURT:   All right.   A-622 and A-623 will be

15   admitted.

16             MR. BELLER:   Thank you.

17             If we can publish A-623, Your Honor, please.

18             THE COURT:   You may.

19   BY MR. BELLER:

20   Q.   I know this is very small, but are you able to see A-623?

21   A.   Yes, I can.

22   Q.   And on A-623 this is Claxton Poultry's round three bid

23   submission, right?

24   A.   Yes.

25   Q.   Now, we were saying just a moment ago that you don't

Michael Ledford - Cross

1    remember the specific directional guidance that you gave,

2    right?

3    A.   That's correct.

4    Q.   But certainly you would anticipate that if a bid or an

5    offer came down, it came down because of some type of

6    direction, right?

7    A.   Yes.

8    Q.   So it would be unusual for a company whose role it is to

9    make money to simply reduce their price without being asked or

10   told to do so, right?

11   A.   That's a fair assumption.

12   Q.   So you would agree with me also that round three

13   November 18th, 2013, the eight-piece price is reduced further

14   to .9402, correct?

15   A.   Yes, that's correct.

16   Q.   Okay.  Dark meat, again the formula stays the same at 30

17   and a half back, right?

18   A.   Correct.

19   Q.   And if we do that math, it is .6352, right?

20   A.   Yes.

21        MR. BELLER:  Your Honor, I would ask for demonstrative

22   purposes to publish I-221, Page 3.

23        THE COURT:  Any objection, Mr. Torzilli, to the use of

24   Page 3 of that exhibit for demonstrative purposes only?

25        MR. TORZILLI:  No, Your Honor.

Michael Ledford - Cross

1          THE COURT:  That may be displayed to the jury for

2    demonstrative purposes only.

3          MR. BELLER:  Thank you.

4          If we can show Page 3, please.

5    BY MR. BELLER:

6    Q.  So we now have Page 1 that shows October 1st, Page 2 that

7    shows November 5th, and now we have Page 3 that shows

8    November 18th.  This time Claxton Poultry is at .9402 on its

9    eight-piece price, right?

10   A.  Yes.

11   Q.  And so in the month or month and a half, they have now made

12   a 2-cent concession from their first round roughly.

13   A.  Correct.

14   Q.  Right.  And again while the dark meat formula price has

15   stayed the same, by making that 2-cent concession on their

16   eight-piece, it has also pulled down that dark meat price every

17   time, right?

18   A.  That is correct.

19   Q.  Thank you.

20          Now, do you recall that on November 19th, the very

21   next day after round three, Claxton submits a fourth round to

22   you.  Do you recall that?

23   A.  I do not recall that.

24          MR. BELLER:  If we can show Mr. Ledford A-626.

25   BY MR. BELLER:

Michael Ledford - Cross

1   *Q.*   Mr. Ledford, do you have A-626 in front of you?

2   *A.*   Yes, I do.

3   *Q.*   Mr. Ledford, you would agree with me that this is an

4   extension of the prior day's e-mail that was depicted in A-612

5   with a round four offer, correct?

6   *A.*   Yes, that's correct.

7   *Q.*   And does this document, this e-mail, is it used in the

8   ordinary course of RSCS's business?

9   *A.*   Yes.

10  *Q.*   Does RSCS rely on this document in conducting its business?

11  *A.*   Yes.

12  *Q.*   And does this e-mail, this cover e-mail, appear to be

13  accurate and reliable?

14  *A.*   Yes.

15  *Q.*   Now I want you to turn to A-627.

16       Does A627 appear to be a round four offer having been

17  made by Claxton Poultry?

18  *A.*   Yes, it does.

19  *Q.*   And does this appear to be the attachment that is attached

20  to A-626?

21  *A.*   Yes, it does.

22  *Q.*   And just like A-626, would you agree with me that this

23  attachment is used or this document, excuse me, is used in the

24  ordinary course of business?

25  *A.*   Yes.

353

Michael Ledford - Cross

1   *Q.* That RSCS relies on this document in conducting its

2   business.

3   *A.* Yes.

4   *Q.* And that it is an accurate and reliable depiction of the

5   document that you received from Mr. Brady on November the 19th,

6   2013.

7   *A.* Yes.

8        *MR. BELLER:* Your Honor, at this time I would offer

9   Defense Exhibit A-626 and Defense Exhibit A-627 and ask to

10  publish.

11       *THE COURT:* Any objection to A-626 and A-627?

12       *MR. TORZILLI:* No, Your Honor.

13       *THE COURT:* Both will be admitted and may be

14  published.

15       *MR. BELLER:* Thank you.

16  *BY MR. BELLER:*

17  *Q.* So despite Claxton Poultry on November 18th, 2013 having

18  come down 2 cents from its original bid on October -- in

19  October of 2013, Claxton Poultry submits a fourth round in

20  November of 2013, right?

21  *A.* That's correct.

22  *Q.* A fourth round just a single day after round three, right?

23  *A.* Yes.

24  *Q.* Fair to say it's probably because you told them they needed

25  to come down even further than where they had been on November

Michael Ledford - Cross

1   the 18th, right?

2   A.  I think anything else would have been extremely rare.

3   Q.  Say that again, please?

4   A.  I think anything else would have been extremely rare.

5   Q.  Fair enough.  So on round four now, Claxton's eight-piece

6   price is .9275, right?

7   A.  Yes.

8   Q.  Their dark meat price again formulaically is .3050 back,

9   correct?

10  A.  Yes.

11  Q.  And that means when you do the math, the dark meat price is

12  now .6225, correct?

13  A.  That's correct.

14          MR. BELLER:  And if we can now publish for

15  demonstrative purposes only I-221, Page 4.

16          THE COURT:  Any objection to the use of Page 4 of

17  I-221 for demonstrative purposes?

18          MR. TORZILLI:  No, Your Honor.

19          THE COURT:  That may be published to the jury for use

20  as demonstrative purposes only.

21          MR. BELLER:  Very good.

22  BY MR. BELLER:

23  Q.  So you would agree with me that now we've looked at round

24  one, round two, round three, and what is depicted now is round

25  four on the table, right?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And so between October 2013 and November of 2013 based on

3    your directional guidance to Claxton Poultry, the eight-piece

4    price has come down now almost 4 cents, right?

5    A.   Yes.

6    Q.   And that means that the eight-piece price based on your

7    directional guidance has also come down 4 cents.

8    A.   Yes.

9         MR. BELLER:   Thank you.   We can remove that.

10   BY MR. BELLER:

11   Q.   Do you recall on November 19th, 2013 having a text exchange

12   with Mikell Fries?

13   A.   Not specifically, no.

14   Q.   Okay.   Do you recall -- was it your knowledge that Claxton

15   Poultry and Mikell Fries liked the bidding process the old way?

16   A.   Yes, I would agree with that.

17   Q.   Okay.   They liked it when you simply told them where to be

18   and they got there, right?

19   A.   I do not specifically recall that.

20   Q.   No problem.

21        Do you recall telling Mr. Fries that this bidding has

22   always been a moving target even in the past?

23   A.   I do vaguely remember something along those lines.

24   Q.   Do you recall Mr. Fries saying, "We mean no disrespect by

25   coming down slowly.   We just want all we can get"?

Michael Ledford - Cross

1          *MR. TORZILLI:*  Objection, calls for hearsay.

2          *THE COURT:*  Sustained.

3     *BY MR. BELLER:*

4     *Q.*  Yesterday I told you we were in the home stretch.  This

5     time I mean it, okay?  Just about done.

6          Mr. Torzilli asked you yesterday a little bit about

7     the possibility of plants closing.

8     *A.*  Yes.

9     *Q.*  Do you recall that?

10    *A.*  Yes, I do.

11    *Q.*  And do you recall being asked about your knowledge of small

12    bird supply going into 2015?

13    *A.*  Yes.

14    *Q.*  Okay.  So I want to understand that a little bit better and

15    I want the jury to understand the cause of that just a little

16    bit better.

17         Is it fair to say -- I think we had established pretty

18    clearly yesterday that you know quite a bit about this market,

19    right?

20    *A.*  That's correct.

21    *Q.*  Quite a bit about the industry.

22    *A.*  Yes.

23    *Q.*  Fair to say that there is -- there are a lot of different

24    factors that go into pricing chicken.

25    *A.*  Yes.

Michael Ledford - Cross

1   *Q.*  Specifically broiler chicken, right?

2   *A.*  Yes.

3   *Q.*  There is a lot that goes into broiler chicken availability,

4   correct?

5   *A.*  Yes.

6   *Q.*  Such as there is a bit of a science, perhaps a guessing,

7   but there is a bit of a science for how long you may want to

8   raise or grow a chicken for it to achieve an ideal weight,

9   right?

10   *A.*  That's correct.

11   *Q.*  Now, I think this is common sense, but the longer you feed

12   a chicken, the larger it grows, right?

13   *A.*  That is correct.

14   *Q.*  Now, Claxton Poultry to your knowledge grows small birds,

15   right?

16   *A.*  Yes.

17   *Q.*  And two different sizes of small birds.

18   *A.*  That is correct.

19   *Q.*  So they grow one size for most QSR, and then they will

20   continue to feed that chicken just a little bit longer to get

21   just a little bit larger bird for other QSRs, right?

22   *A.*  That's correct.

23   *Q.*  Same breed.  It's just how much corn are you feeding them

24   and how long are you allowing them to live, right?

25   *A.*  Yes.

Michael Ledford - Cross

1   Q.  So when food -- when specifically corn and soybean meal is

2   really inexpensive, it makes sense to continue to feed and grow

3   the birds in order to allow them to grow larger, right?

4   A.  It certainly makes it more economical.

5   Q.  More economical because you can, for example, feed the bird

6   really inexpensive corn for two more weeks and have a much

7   larger bird after that two weeks, right?

8   A.  Yes.

9   Q.  On the other hand, when corn is really expensive, that may

10  not make sense to continue to feed these birds that expensive

11  corn and have them grow much larger, correct?

12  A.  That is certainly possible, yes.

13  Q.  And I think as we established, chicken producers sell their

14  product primarily by weight.

15  A.  Yes.

16  Q.  So if you can hold on to a chicken, feed it a cheap feed

17  for two more weeks, you may be really able to maximize profits,

18  right?

19  A.  Yes, but again there is a lot more factors that go -- it's

20  not quite that simple, but what you're saying is not wrong.

21  Q.  Completely understood.  And I recognize there is a whole

22  lot of factors that go into this.  But there is a correlation

23  between corn price and small bird versus large bird

24  profitability, right?

25  A.  Absolutely.

Michael Ledford - Cross

1   Q.  So when corn is cheap, there is a concern amongst buyers

2   that there may not be a great supply for that chicken.

3   A.  I don't know that I can necessarily agree with that.

4   Q.  Okay.  Completely understood.  That's all right.  So let's

5   break this down just a little bit more.  A small bird is

6   roughly going to be about 4 pounds, right?

7   A.  Correct.

8   Q.  A large bird is going to be 7, 8, 9 pounds.

9   A.  That's correct.

10  Q.  For our purposes that is a huge difference, correct?

11  A.  Yes.

12  Q.  Okay.  And only a couple week difference in grow time.

13  A.  Correct.

14  Q.  Now, the plants themselves are outfitted to be able to

15  produce or, you know, I guess manufacture, for lack of a better

16  term, either a small bird or a large bird, right?

17  A.  That is correct.

18  Q.  So when you have something -- and we won't get too graphic

19  here -- but when you have something like a deboning machine,

20  the deboning machine is designed to be able to debone a bird of

21  a certain size.

22      MR. TORZILLI:  Your Honor, I am going to object to

23  this going far outside of the scope of direct.

24      THE COURT:  I will overrule the objection.  Is there

25  much more on this topic?

Michael Ledford - Cross

1          MR. BELLER:  There is not, Your Honor.

2          THE COURT:  Go ahead.

3    BY MR. BELLER:

4    Q.  The machine is designed to manufacture or debone or

5    eviscerate a bird of a particular size?

6    A.  Yes.  They are set up for particular sizes.

7    Q.  So when a plant goes from a small bird plant to a large

8    bird plant, there is a large capital expenditure that the

9    producer needs to put into their plants to replace all of this

10   equipment, right?

11   A.  Yes.  They would have to completely retool the plant.

12   Q.  And if they retool the plant, that also means that it's

13   very expensive to go back and switch back to a small bird

14   plant; is that right?

15   A.  That is correct.

16   Q.  Okay.  Now, as we're talking about -- yesterday you were

17   asked about plants converting to large birds because of large

18   bird profitability.  So we've talked about some of the reasons,

19   and one of those reasons amongst many other factors is the cost

20   of corn.  And another reason is if there are problems in the

21   other meat markets, it may make chicken a cheaper, more readily

22   accessible protein, right?

23   A.  Yes.

24   Q.  And in 2014 if there is disease in pork, for example, pork

25   availability goes down, right?

Michael Ledford - Cross

1          MR. TORZILLI:  Your Honor, objection to scope again.

2          THE COURT:  Is it much more on this topic?

3          MR. BELLER:  Your Honor, I have six questions.

4          THE COURT:  Overruled.  He can answer.

5     BY MR. BELLER:

6     Q.  So if there is a disease in pork, for example, availability

7     of pork goes down and it becomes more expensive, right?

8     A.  Correct.

9     Q.  And all of these different factors played into the lack of

10    supply of chicken in 2014 going into 2015; is that right?

11    A.  Yes, they certainly would have been factors in that

12    equation.

13    Q.  So demand was high for chicken in 2014 going into 2015.

14    A.  Yes.

15    Q.  Supply was low, right?

16    A.  Yes.

17    Q.  And generally when there is high demand and low supply,

18    basic economics is price goes up, right?

19    A.  That is correct.

20    Q.  Fair to say -- last question on this topic -- that

21    suppliers in 2014 going into 2015 wanted to guarantee a supply

22    of chicken and incentivize suppliers to keep growing small

23    birds, right?

24          MR. TORZILLI:  Objection, foundation.

25          THE COURT:  He can answer if he knows.  Overruled.

Michael Ledford - Cross

1    A.  I would say that's correct.

2    BY MR. BELLER:

3    Q.  Thank you.  So I want to switch gears for just a moment and

4    ask you about your knowledge of the different chicken suppliers

5    and Claxton in particular, okay?

6            You're aware, aren't you, that Claxton Poultry has

7    been in business for 62 years?

8    A.  Yes, I am.

9    Q.  And supplied KFC with chicken for 28 of those 62 years.

10   A.  That sounds right.

11   Q.  You're aware that Claxton Poultry is approximately

12   1 percent of the chicken broiler market, right?

13           MR. TORZILLI:  Objection, relevance.

14           THE COURT:  Overruled.

15   A.  That is correct.

16   BY MR. BELLER:

17   Q.  It's a single plant?

18   A.  Yes.

19   Q.  It's a single plant with about 1700 employees, right?

20   A.  That sounds right.

21   Q.  The jury has heard about Mar-Jac Poultry.  Mar-Jac Poultry

22   has approximately 1300 employees; is that right?

23   A.  I am not sure what their employee count is.

24           MR. BELLER:  Your Honor, I believe that this is

25   entered into evidence.  It's F-813.

Michael Ledford - Cross

1          THE COURT:  It is.

2          MR. BELLER:  Your Honor, if we can publish that for

3    the jury, please.

4          THE COURT:  You may.

5    BY MR. BELLER:

6    Q.   I am going to switch gears and let me ask you about Koch

7    Foods.  Koch Foods has about 15,000 employees.  Does that sound

8    familiar?

9    A.   I do not recall.

10         MR. BELLER:  If I could have Page 132 of this exhibit,

11   please.  And this is F-813, Page 132.

12         MR. TORZILLI:  Your Honor, I am going to object to the

13   display of this.  This is hearsay embedded within the document

14   that's been admitted.  As I indicated in my objection yesterday

15   afternoon, this is inadmissible hearsay.

16         MR. BELLER:  If I may be heard.

17         THE COURT:  Go ahead.

18         MR. BELLER:  Your Honor, this is already in evidence.

19   This entire document is already in evidence, No. 1.  No. 2,

20   it's in evidence as a business record and as a business record

21   that's an exception to hearsay, so it cannot be hearsay within

22   hearsay.  And No. 3, the witness himself testified that he

23   drafted every single slide.

24         THE COURT:  I'm not sure if it was this document, but

25   this document was admitted, so this is an admitted page.  The

Michael Ledford - Cross

1    issue is really whether the witness has any foundation or why

2    it's being displayed to the witness.  We don't quite know that

3    yet, so the objection will be overruled.

4              MR. TORZILLI:  Your Honor, can we have a brief side

5    bar?

6              THE COURT:  Briefly, yes.

7          (At the bench:)

8              THE COURT:  Go ahead, Mr. Torzilli.

9              MR. TORZILLI:  Your Honor, this was a document where

10   we were handed it by the defendants as a six-page document, and

11   I indicated I have no objection to the admission of this

12   document into evidence based on what I was handed.  Then I

13   later learned that it was a voluminous over 100-page document

14   and then indicated upon reviewing it when Your Honor gave me

15   the opportunity to do so that it contained embedded hearsay

16   including what's being displayed now.  So I continue to object

17   to the embedded hearsay and just want to make the point that if

18   the defendants are going to hand us exhibits, that they need to

19   be complete.  It was a very misleading situation.  And I didn't

20   want to raise it in the presence of the jury, but I thought it

21   was appropriate to raise it now.

22             THE COURT:  Okay.  So noted.  We are still back to the

23   question of why this particular page is being displayed to the

24   witness, Mr. Beller.

25             MR. BELLER:  Thank you, Your Honor.  This particular

Michael Ledford - Cross

1   page is being shown to the witness because the witness had

2   indicated that he had a knowledge of all the different

3   suppliers.  He has been asked at length by the government, as

4   have all other witnesses, of their knowledge of the different

5   suppliers.  My question is simply how many employees does each

6   supplier have.  The witness indicated that he does not remember

7   off the top of his head.  That is different than the witness

8   saying he does not know.

9        This is something that is already admitted and

10  therefore it's certainly appropriate to publish.  And I am now

11  using it in order to refresh his recollection as to the

12  information that he himself said that he put into this

13  document.

14       THE COURT:  Okay.  It can be used -- it can be shown

15  to him for purposes of refreshing his memory and it can also be

16  published because it has been admitted.

17       Mr. Torzilli's point about documents that may be quite

18  voluminous handed to Mr. Torzilli or any other government

19  attorney with just a few pages, you know, obviously I think

20  it's a good idea to make sure that the government understands

21  that it may only be an excerpt.

22       All right.  Thank you.

23     (In open court:)

24       THE COURT:  The objection will be overruled.

25       Go ahead, Mr. Beller.

Michael Ledford - Cross

1   *BY MR. BELLER:*

2   Q.  So just a few moments ago -- I am going to come back to

3   this here, but just a few moments ago I asked you the question

4   as to -- I think I misspoke, so I want to go back and ask it

5   again.

6         It is buyers of poultry chicken that wanted to

7   guarantee supply in 2015 and incentivize suppliers to continue

8   growing small birds, right?

9         *MR. TORZILLI:*  Objection to the use of the term

10  buyers.  This is not an expert witness.  It's a fact witness.

11        *THE COURT:*  Overruled.  He can answer if he

12  understands the question.

13  A.  Yes, I would agree with that.

14  *BY MR. BELLER:*

15  Q.  Thank you.  So we were talking for just a moment about Koch

16  Foods, and I had asked you how many employees Koch Foods had.

17  You testified that you did not recall.  If you had the

18  opportunity to actually see that out of your PowerPoint

19  presentation, would that help refresh your recollection as to

20  about how many employees Koch Foods had?

21  A.  Yes.

22  Q.  You can go ahead and look at your screen.

23        You would agree with me that at the time of this

24  document Koch Foods had about 15,000 employees, right?

25  A.  Yes.

Michael Ledford - Cross

1          MR. BELLER:  Thank you.  That can come down.

2     BY MR. BELLER:

3     Q.  Same document.  You also said that you did not recall how

4     many employees Mar-Jac Foods had.  Would it help refresh your

5     recollection if you had the opportunity to review that portion

6     of your slide show?

7     A.  Yes.

8          MR. BELLER:  If I could have Page 137, please.  And

9     this can be published.  Thank you.

10    BY MR. BELLER:

11    Q.  Do you see that in front of you, Mr. Ledford?

12    A.  Yes.

13    Q.  Fair to say that Mar-Jac Poultry had about 1300 employees;

14    is that right?

15    A.  Yes.

16    Q.  Very good.  George's had about 4500 employees; is that

17    correct?

18    A.  Yeah, I do not recall.

19          MR. BELLER:  If we could have Page 131, please.

20    BY MR. BELLER:

21    Q.  Did that refresh your recollection?

22    A.  Yes, that is correct.

23    Q.  Fair to say about 4500 employees, right?

24    A.  Correct.

25    Q.  Let's do a couple more.  Pilgrim's Food had approximately

Michael Ledford - Cross

1  38,000 employees, right?

2  A.  That sounds correct based on their size, yes.

3  Q.  About 19 percent of the market?

4  A.  I would have said 20, so yes.

5  Q.  Very good.  And then one last one.  Tyson Foods, you would

6  agree with me that Tyson had about 115,000 employees, right?

7  A.  That sounds right.

8  Q.  And they were about 21 percent of the market.

9  A.  Yes, that's correct.

10  Q.  Now we're wrapping up.  A couple more topics.

11      You testified at length yesterday regarding

12  communications between suppliers and covers and shorts, so I

13  want to ask you a little bit more about that.  Would you agree

14  with me that Chick-fil-A, CFA, encourages interactions and

15  communications amongst the different suppliers?

16  A.  Yes, I agree.

17  Q.  And that is to improve the product specifications and share

18  best practices, right?

19  A.  Yes.

20  Q.  There are summits, for example, among different CFA

21  suppliers that are set up by CFA or Chick-fil-A to encourage

22  collaboration towards best practices, right?

23      MR. TORZILLI:  Your Honor, outside the scope regarding

24  Chick-fil-A information deduced on direct.

25      THE COURT:  Response?

Michael Ledford - Cross

1          MR. BELLER:  My response is that this witness was

2   asked several times yesterday regarding his expectations

3   amongst different suppliers for communications.  While there

4   was discussion about KFC, I do not believe that the government

5   limited their questions to KFC despite the fact that there were

6   multiple objections to the questions themselves.

7          THE COURT:  It's outside the scope.  I will allow just

8   two questions.

9   BY MR. BELLER:

10  Q.  So the question that I think was unanswered -- so I will do

11  it in one, Your Honor -- is there summits among CFA suppliers

12  that are set up by Chick-fil-A to encourage collaboration

13  towards best practices, right?

14  A.  Yes, that's correct.

15  Q.  Now, talking about covers and shorts, you would agree with

16  me that suppliers communicate with each other not just to cover

17  chicken, but also other ingredients, right?

18  A.  Yes, that's correct.

19  Q.  So if one supplier runs out of marinate or a particular

20  spice, they may need to purchase it from another supplier.

21  A.  That's correct.

22  Q.  And this happens with some frequency you would agree.

23  A.  Yes.

24  Q.  And you would also agree that this happens primarily via

25  telephone, right?

Michael Ledford - Cross

1   A.   I do not know.

2   Q.   Okay.  That's a little bit outside your knowledge on the

3   buyer's site; fair to say?

4   A.   Yes.

5   Q.   Last set of questions for you, and that is as you sit here

6   today, Mr. Ledford, testifying before this jury, you would

7   agree with me that you have no personal knowledge of Mr. Fries

8   agreeing with anyone to raise the prices of broiler chicken,

9   right?

10  A.   No, I do not have any knowledge of that.

11  Q.   Or Mr. Fries to fix prices.

12  A.   That's correct.

13  Q.   Or Mr. Fries to maintain prices of broiler chicken.

14  A.   That is correct.

15  Q.   As you sit here today, you have no personal knowledge that

16  Mr. Scott Brady agreed with anyone to raise the prices of

17  broiler chicken.

18  A.   No, I have no personal knowledge of that.

19  Q.   Or fix prices.

20  A.   No.

21  Q.   Or maintain prices.

22  A.   No.

23  Q.   Those same series of questions goes for every one of the

24  men sitting in this courtroom who are charged.  You have no

25  personal knowledge of any of them entering into an agreement to

Michael Ledford - Cross

1   raise, fix or maintain prices of broiler chicken.

2   A.   That is correct.

3           MR. BELLER:   Your Honor, I have no further questions.

4           Thank you for your time, Mr. Ledford.

5           THE COURT:   Thank you, Mr. Beller.

6           Additional cross-examination?   We will let Mr. Beller

7   clear the podium.

8           MR. BELLER:   Thank you, Your Honor.

9           THE COURT:   Mr. Feldberg, go ahead.

10          MR. FELDBERG:   Thank you, Your Honor.

11                           **CROSS-EXAMINATION**

12  BY MR. FELDBERG:

13  Q.   Mr. Ledford, good morning.   My name is Michael Feldberg.   I

14  am Roger Austin's lawyer.

15  A.   Good morning.

16  Q.   We have never met or spoken, have we?

17  A.   No, we have not.

18  Q.   Now, you testified on direct examination yesterday that

19  during your time at RSCS you purchased about a billion pounds a

20  year of chicken; is that correct?

21  A.   That's correct.

22  Q.   I don't think the jury's heard yet how that breaks down

23  between COB, supplemental dark and wings.   Could you tell us

24  roughly what percentage of the chicken you purchased was

25  chicken-on-the-bone eight-piece?

Michael Ledford - Cross

1   A.  To the best of my memory, my time there it was roughly 65

2   to 70 percent of the volume.

3   Q.  And how about supplemental dark, about what percentage of

4   your purchases were they?

5   A.  To the best of my memory, I would say that supplemental

6   dark meat was approximately 10 to 15 percent of that COB

7   number.  So if chicken on the bone was 700 million pounds a

8   year, it would have been roughly somewhere between 70 million

9   and a hundred million, the best I can recall.

10  Q.  And how about wings?

11  A.  Extremely small.  I do not even know how I would put a

12  number on it.  I don't recall.  It was a very small number.

13  Q.  Less than 1 percent of your purchases?

14  A.  I do not recall, but it was a very small number.

15  Q.  Let me see if a document would refresh your recollection.

16      MR. FELDBERG:  Could we call up, please, Government

17  Exhibit 1529, which I do not believe is admitted yet, so let's

18  not display it to the jury.

19      THE COURT:  That has been admitted.

20      MR. FELDBERG:  It has been admitted.

21  BY MR. FELDBERG:

22  Q.  Do you recognize Exhibit 1529, Mr. Ledford?

23  A.  Yes, I do.

24  Q.  And that was a round two bid submitted by Mr. Austin to you

25  on or about November 6, 2012, correct?

Michael Ledford - Cross

1    A.   That's correct.

2    Q.   Could you turn, sir, to the third page -- I am sorry,

3    Government Exhibit 1530, which is attached to it.

4              MR. FELDBERG:   Has that been admitted?

5              THE COURT:   It has.

6              MR. FELDBERG:   Thank you.

7    BY MR. FELDBERG:

8    Q.   If you would turn to the second page of Government

9    Exhibit 1530.

10             MR. FELDBERG:   And could we publish that to the jury?

11   It's the page after the page that says native document

12   placeholder.

13             THE COURT:   You may.

14             MR. FELDBERG:   Thank you.   And could we enlarge the

15   top box, please?

16   BY MR. FELDBERG:

17   Q.   Now, Mr. Ledford, that top box is Pilgrim's round two offer

18   for fresh chicken on the bone, correct?

19   A.   Correct.

20   Q.   And the annual capacity reflected in that is roughly a

21   little over 240 million pounds, correct?

22   A.   Yes, that's correct.

23   Q.   And of that 240 million pounds, how much is wings?

24   A.   Between the bulk and the precounted, it is -- they are

25   500,000 each, so a million.

Michael Ledford - Cross

1    *Q.*  1 million out of 240 million?

2    *A.*  That is correct.

3    *Q.*  Less than half a percent, correct?

4    *A.*  That's correct.

5          *MR. FELDBERG:*  Now, could we call up, please, Exhibit

6    F-810 which is already in evidence?  And could we turn to

7    Page 5 of Exhibit F-810?

8    *BY MR. FELDBERG:*

9    *Q.*  Mr. Ledford, you testified yesterday that this exhibit is a

10   PowerPoint that you created for internal purposes at RSCS,

11   correct?

12   *A.*  That's correct.

13   *Q.*  What is Page 5?

14   *A.*  Page 5 is an overall sort of a snapshot of the industry of

15   the top 25 suppliers.

16          *MR. FELDBERG:*  Could we display this to the jury, Your

17   Honor?

18          *THE COURT:*  Yes, you may.

19   *BY MR. FELDBERG:*

20   *Q.*  Okay.  Please continue, Mr. Ledford.

21   *A.*  Yes.  So then it also depicts like I believe highlighted in

22   yellow was who we did business with currently.  And the blue

23   dots were representing small bird chicken-on-the-bone

24   production.  The red dots were a debone production for us.

25   *Q.*  And does this rank the suppliers and the suppliers you did

Michael Ledford - Cross

1    business with by essentially volume of purchase?

2    A.   Yes.  It's ranked largest to smallest.

3    Q.   And Tyson is the largest?

4    A.   That's correct.

5    Q.   And in the second column from the right, it says Percent of

6    Total RTC.  What is RTC?

7    A.   Ready to cook.

8    Q.   And Tyson had about a little over 22 percent at that time?

9    A.   That's correct.

10   Q.   Pilgrim's was second at 17.4 percent?

11   A.   That's correct.

12   Q.   Where was Claxton?

13   A.   Claxton on this document is No. 20, which I believe is

14   .9 percent.

15   Q.   Less than 1 percent of the business.

16   A.   Of the industry.

17   Q.   Of the industry.

18   A.   Correct.

19   Q.   Thank you.  Now, you spoke yesterday both with Mr. Torzilli

20   and with Mr. Beller about RSCS's request in 2013 to the

21   suppliers for a 2-pound, 4-ounce bird.  Do you recall that

22   testimony?

23   A.   Yes, I do.

24   Q.   And you were shown Government Exhibit 1607, which I believe

25   is in evidence.  That's the e-mail you sent on March 5th, 2013

Michael Ledford - Cross

1    to all of the suppliers with whom you do business -- you did

2    business, and it included "When you get up off the floor

3    laughing" comment.

4    A.   Yes, correct.

5    Q.   A semi-serious comment.

6    A.   Well, I mean, the last part of that was serious.

7    Q.   Okay.  And that request was sent to all of the suppliers on

8    March 5th, 2013, correct?

9    A.   All suppliers that produced eight-piece for KFC.

10   Q.   But you made the same request to one supplier a week

11   earlier, didn't you?

12   A.   I do not recall.

13          MR. FELDBERG:  Could we call up, please, Defense

14   Exhibit F-058, not yet in evidence.

15   BY MR. FELDBERG:

16   Q.   Mr. Ledford, showing you what has been marked as F-058,

17   does that refresh your recollection that a week before

18   March 5th, 2013, you sent a similar request to one supplier?

19   A.   Yes, that's correct.

20   Q.   And let's -- to whom did you send that request a week

21   earlier?

22   A.   Roger Austin.

23   Q.   And you sent it to Mr. Austin and Mr. Austin alone a week

24   before you sent it to the other suppliers.

25   A.   Well, to be clear, this request is a little bit different.

Michael Ledford - Cross

1    The more involved with more questions that I believe it looks

2    like I sent to Mr. Austin -- or to the rest of the suppliers.

3    Q.  Is one of the questions that you asked Mr. Austin on

4    February 26, 2013, "How much in a 2-pound, 4-ounce size"?

5    A.  Yes, it is.

6              MR. TORZILLI:  Your Honor, objection to questions on a

7    document not in evidence.

8              MR. FELDBERG:  I was asking if it refreshes

9    recollection, Your Honor.  I may not have put that phrase into

10   every question.

11             THE COURT:  That will be overruled, but we'll have to

12   follow the formalities of refreshing recollection.

13             Go ahead.

14             MR. FELDBERG:  Understood.

15   BY MR. FELDBERG:

16   Q.  And Mr. Ledford, did Mr. Austin respond to your question

17   about how much Pilgrim's could produce in a 2-pound, 4-ounce

18   size?

19             MR. TORZILLI:  Objection.  May the document be taken

20   down?

21             MR. FELDBERG:  Sure.  No objection to that.

22   A.  I do not specifically recall.

23             MR. FELDBERG:  Well, let's take a look at Defense

24   Exhibit D-844 for identification, not for publication.

25   BY MR. FELDBERG:

Michael Ledford - Cross

1    *Q.*  And Mr. Ledford, inviting your attention to No. 2 toward

2    the bottom of the page, does that refresh your recollection

3    that Mr. Austin responded to your question about a 2-pound,

4    4-ounce size?

5    *A.*  Yes, it does.

6    *Q.*  What did he say?

7    *A.*  He said, "None."

8    *Q.*  And when did he say it?

9             *MR. TORZILLI:*  Same objection.

10   *BY MR. FELDBERG:*

11   *Q.*  Do you recall the date when he said "None"?

12   *A.*  No, I do not.

13   *Q.*  Does Exhibit D-844 refresh your recollection on the date

14   when Mr. Austin said "None"?

15   *A.*  Yes.

16   *Q.*  And what is that date?

17   *A.*  February 27th.

18   *Q.*  So if I understand you correctly, Mr. Ledford, Mr. Austin

19   of Pilgrim's said Pilgrim's could not produce chickens in a

20   2-pound, 4-ounce size on February 27th, days before you even

21   made the request to the other suppliers, correct?

22            *MR. TORZILLI:*  Objection, calls for hearsay.

23            *THE COURT:*  Overruled.

24   *A.*  I don't know that he said that he could not.  I would take

25   that response to mean that he did not have any available at

Michael Ledford - Cross

1   that time.

2   *BY MR. FELDBERG:*

3   *Q.*  And that was days before you even made the request of the

4   other suppliers, correct?

5   *A.*  That's correct.

6   *Q.*  So there couldn't possibly be any collusion because

7   Mr. Austin said he had none available before you even asked

8   anybody else, correct?

9        *MR. TORZILLI:*  Objection, foundation.

10       *THE COURT:*  Overruled.  He can answer that question.

11  *A.*  I do not know.

12  *BY MR. FELDBERG:*

13  *Q.*  But you do know that Mr. Austin said he had none available

14  on February 27 of 2013, and you didn't even ask the other

15  suppliers until nearly a week later on March 5th, correct?

16       *MR. TORZILLI:*  Objection, calls for hearsay.

17       *THE COURT:*  Overruled.

18  *A.*  Correct.

19  *BY MR. FELDBERG:*

20  *Q.*  In all of your meetings with the prosecutors and the

21  agents, did anyone bring this set of facts to your attention?

22  *A.*  I believe I was shown this document.

23  *Q.*  Were you asked about it on direct examination?

24  *A.*  No, I was not.

25       *MR. FELDBERG:*  Okay.  You can take down that document,

Michael Ledford - Cross

1   please.

2   *BY MR. FELDBERG:*

3   *Q.*   Now, Mr. Ledford, you spoke frequently with Mr. Austin when

4   you were at RSCS, correct?

5   *A.*   Yes, that's correct.

6   *Q.*   Sometimes about bids and contracts?

7   *A.*   Yes.

8   *Q.*   Sometimes about other subjects?

9   *A.*   Certainly.

10  *Q.*   Operational issues?

11  *A.*   Yes.

12  *Q.*   State of the industry?

13  *A.*   Yes.

14  *Q.*   Did you speak with him from time to time almost daily or

15  almost every business day?

16  *A.*   That was often the case, yes.

17  *Q.*   And that was not limited to bidding season, was it?   It was

18  all year round, correct?

19  *A.*   All year round.

20  *Q.*   And just like you testified to under questions from

21  Mr. Beller about Claxton, from time to time you told Roger,

22  Roger Austin, where Pilgrim's needed to be on pricing, correct?

23  *A.*   I do not specifically recall.

24  *Q.*   Well, let's see if we can look at a couple examples of

25  that.

Michael Ledford - Cross

1          MR. FELDBERG:  Let's take a look at Defense

2    Exhibit 509, which I don't believe is in evidence yet.

3          THE COURT:  Does that have a letter prefix?

4          MR. FELDBERG:  D-509, Your Honor.

5          THE COURT:  Okay.

6    BY MR. FELDBERG:

7    Q.  Mr. Ledford, showing you D-509, does that refresh your

8    recollection about an instance in which you told Mr. Austin in

9    substance what he needed to do on pricing?

10   A.  I believe here I am conveying to him that he would be the

11   highest price supplier per pound and per case and that I would

12   have to move volume away at that current pricing.

13         MR. FELDBERG:  Your Honor, we offer -- withdrawn.

14   BY MR. FELDBERG:

15   Q.  Mr. Ledford, this is -- the bulk of this document is an

16   e-mail that you sent to Mr. Austin on November 4th, 2011,

17   correct?

18   A.  Correct.

19         MR. FELDBERG:  Your Honor, we offer D-509 other than

20   the very top which is a response from Mr. Austin.

21         THE COURT:  Any objection to the admission of D-509?

22         MR. TORZILLI:  I am looking at it on the screen.  If

23   it's the document that he is asking to be moved into evidence

24   which doesn't have a sticker on it, we object on hearsay

25   grounds.

Michael Ledford - Cross

1           *THE COURT:*  Response?

2           *MR. FELDBERG:*  This is Mr. Ledford's e-mail to

3    Mr. Austin which -- well, let me ask a foundational question.

4           *THE COURT:*  Go ahead.

5    *BY MR. FELDBERG:*

6    *Q.*  Mr. Ledford, did you from time to time send e-mails like

7    Exhibit D-509?

8    *A.*  Yes.

9    *Q.*  Was it the regular practice -- was it your regular practice

10   and the regular practice of RSCS to send e-mails of this sort?

11   *A.*  Yes.

12   *Q.*  Were they kept in the ordinary course of business?

13   *A.*  Yes.

14   *Q.*  When you sent e-mails like this, were you intending for

15   them to be relied upon?

16   *A.*  Yes.

17          *MR. FELDBERG:*  We offer it, Your Honor, again without

18   the response at the top of the page.

19          *MR. TORZILLI:*  Same objection.  This is hearsay.

20          *THE COURT:*  Sustained.  The lower part of the e-mail

21   is all an e-mail from Mr. Austin, not just the top.  The e-mail

22   from Mr. Ledford is just a small portion in the middle.  It's

23   hearsay and the objection is sustained.

24   *BY MR. FELDBERG:*

25   *Q.*  But you did tell Mr. Austin on November 4th, 2011 that he

Michael Ledford - Cross

1   was the highest price supplier per pound and per case, and you

2   would have to definitely move volume at current pricing,

3   correct?

4        MR. TORZILLI:  Objection, calls for hearsay.

5        THE COURT:  Sustained.

6        MR. FELDBERG:  Well, let's take a look at Exhibit

7   E-577, again not in evidence.

8   BY MR. FELDBERG:

9   Q.  Do you recall speaking with Mr. Austin on November 28,

10  2012?

11  A.  Not specifically.

12  Q.  Do you recall telling Mr. Austin in November of 2012 that

13  Pilgrim's was the second highest priced producer on eight-piece

14  COB?

15  A.  I do not recall.

16       MR. FELDBERG:  Could we display just to the witness

17  and the parties and the Court Exhibit E-577?

18       MR. TORZILLI:  Your Honor, may I ask for a paper copy

19  from defense counsel?

20       THE COURT:  Yes.

21  BY MR. FELDBERG:

22  Q.  Mr. Ledford, does Exhibit E-577 refresh your recollection

23  about a conversation that you had with Mr. Austin in late

24  November 2012?

25  A.  It doesn't refresh my recollection, but I see that it's his

Michael Ledford - Cross

1   notes and a summary of his take on the conversation, but I

2   can't vouch for the accuracy.

3   Q.  Do you have any recollection yourself of your conversation

4   with Mr. Austin in late November of 2012?

5   A.  Not of this specific conversation.

6          MR. FELDBERG:  We can take that down.

7   BY MR. FELDBERG:

8   Q.  But didn't you tell Mr. Austin from time to time that

9   Pilgrim's was the highest price or the second highest price

10  supplier?

11  A.  Yes, I am sure that I did.

12  Q.  And did you tell him from time to time that unless

13  Pilgrim's lowered its price, you would take volume away from

14  Pilgrim's?

15  A.  Yes, I am sure that I said that phrase to him over the

16  years, yes.

17  Q.  And when you said that, Mr. Austin on behalf of Pilgrim's

18  would often come back with a lower price, correct?

19  A.  Yes.  That would not have been uncommon.

20  Q.  He took guidance from you, correct?

21  A.  Yes.

22         MR. FELDBERG:  Your Honor, with the Court's

23  permission, we would like to attempt to create a demonstrative

24  based on information in the contracts to try to distill some of

25  that information for the jury.  And with the Court's

Michael Ledford - Cross

1    permission, Ms. Carwile will go to the document projector.

2           *THE COURT:*  Yes, she can.  However, to the extent I

3    don't know that Ms. Carwile is using some type of permanent

4    marker to write on pieces of paper that may soak through the

5    paper and harm our document viewer -- it sounds like

6    Ms. Carwile is ready to prevent that, but that was my only

7    concern.  She can go to the document viewer if that's what

8    you're intending to do.

9           *MR. FELDBERG:*  Thank you, Your Honor.

10          *MS. CARWILE:*  Thank you.

11   *BY MR. FELDBERG:*

12   *Q.*  Mr. Ledford, are you -- withdrawn.

13          When you were at RSCS, were you familiar with the

14   contracts submitted by the -- entered into by the various

15   suppliers with RSCS for the years 2012, 2013 and 2014?

16   *A.*  Yes.

17   *Q.*  And did you review all of those contracts?

18   *A.*  Yes.

19   *Q.*  And I think -- did you sign most or all of them?

20   *A.*  Yes.

21   *Q.*  And was it the regular practice of RSCS to keep contracts

22   with suppliers in the ordinary course of business?

23   *A.*  Yes.

24   *Q.*  And did RSCS rely on those contracts?

25   *A.*  Yes.

Michael Ledford - Cross

1        MR. FELDBERG:  Okay.  Let's take a look -- and I am

2   going to try to do this in alphabetical order -- at Exhibit

3   F-742, which as far as I know is not yet in evidence.  And

4   could we call that up on the screen, but not yet publish it to

5   the jury?

6        MR. TORZILLI:  Your Honor, may I ask defense counsel

7   for a paper copy?

8        THE COURT:  Yes.  Let's try to get Mr. Torzilli paper

9   copies of these because it's difficult to look on the screen.

10  BY MR. FELDBERG:

11  Q.  Do you recognize F-742, Mr. Ledford?

12  A.  Yes, I do.

13  Q.  What is it?

14  A.  It is a contract exhibit between UFPC and Case Farms.

15  Q.  For what year?

16  A.  2013.

17  Q.  And did you sign this contract, Mr. Ledford?

18  A.  Yes, I did.

19  Q.  And it was kept in the ordinary course of business?

20  A.  Yes.

21        MR. FELDBERG:  We offer it, Your Honor.

22        THE COURT:  Any objection to the admission of F-742?

23        MR. TORZILLI:  No, Your Honor.

24        THE COURT:  F-742 will be admitted.

25  BY MR. FELDBERG:

Michael Ledford - Cross

1    *Q.* And Mr. Ledford, what is the FOB price for Case for

2    eight-piece COB in Exhibit F-742?

3    *A.* .9618.

4           *MR. FELDBERG:* Could we display this to the jury,

5    please?

6           *THE COURT:* You may.

7           *MR. FELDBERG:* Could we enlarge the line that says

8    Total FOB Plant Cost?

9           Your Honor, with the Court's permission, could

10   Ms. Carwile write .9618 in the box for Case for 2013?

11          *THE COURT:* Yes, she may.  I think it might be a good

12   idea for purposes of this procedure to ask the witness whether

13   it would be fair for Ms. Carwile to then note that number in

14   the -- in a particular box.

15   *BY MR. FELDBERG:*

16   *Q.* Mr. Ledford, would it be fair for my colleague,

17   Ms. Carwile, to note .9618 as the FOB price for eight-piece COB

18   for Case in the 2013 contract on a demonstrative?

19   *A.* Yes, it would.

20          *MR. FELDBERG:* Okay.  Good enough.  We will display

21   the demonstrative once we get a few numbers up there.

22          *THE COURT:* That's fine.

23   *BY MR. FELDBERG:*

24   *Q.* Now let's turn to the Case contract.

25          *MR. FELDBERG:* Let's turn to Exhibit F-743, which I

Michael Ledford - Cross

1    believe, Your Honor, has been admitted.

2           THE COURT:  Yes, it has.

3           MR. FELDBERG:  Can we display that to the jury,

4    please?

5           THE COURT:  Yes, you may.

6    BY MR. FELDBERG:

7    Q.  And turning to the second page of the exhibit, Mr. Ledford,

8    what is the FOB plant cost for eight-piece COB for Case for the

9    year 2014?

10   A.  .9202.

11          MR. FELDBERG:  Could we enlarge that line for the

12   jury, please?

13   BY MR. FELDBERG:

14   Q.  And would it be fair for Ms. Carwile to write .9202 as

15   Case's contract price for 2014?

16   A.  Yes, it would.

17   Q.  Case didn't bid for 2012, did it?

18   A.  I do not recall specifically.  That sounds directionally

19   accurate, though.

20   Q.  Let's turn to Claxton.

21          MR. FELDBERG:  Could we call up, please, Exhibit

22   F-750, and just not yet to the jury.

23   BY MR. FELDBERG:

24   Q.  Do you recognize F-750?

25   A.  Yes.

Michael Ledford - Cross

1   *Q.*  What is it?

2   *A.*  It is the exhibit to the contract for the 2012 calendar

3   year between UFPC or RSCS and Claxton Poultry.

4   *Q.*  Did you sign it?

5   *A.*  Yes.

6   *Q.*  Was it kept in the ordinary course of business?

7   *A.*  Yes.

8          *MR. FELDBERG:*  We offer F-750, Your Honor.

9          *THE COURT:*  Any objection to F-750?

10          *MR. TORZILLI:*  No, Your Honor.

11          *THE COURT:*  F-750 will be admitted.

12   *BY MR. FELDBERG:*

13   *Q.*  Now, Mr. Ledford, could you turn to the page of Exhibit

14   F-750 that tells us the cost, the FOB cost for eight-piece COB.

15   Can you identify that?

16   *A.*  Yes.

17   *Q.*  And what is it?

18   *A.*  .9618.

19   *Q.*  .9618.  And would it be fair for Ms. Carwile to write that

20   on the demonstrative?

21   *A.*  Yes.

22   *Q.*  Let's turn to Claxton 2013.

23          *MR. FELDBERG:*  Let's take a look -- let's call up

24   Government Exhibit 1503, which I believe is in evidence, Your

25   Honor.  And could we publish that to the jury, please?

Michael Ledford - Cross

1          THE COURT:  Let me just check.  Yes, that is in and

2    may be displayed.

3    BY MR. FELDBERG:

4    Q.  What was Claxton's COB price for the year 2013?

5    A.  .9625.

6    Q.  And would it be fair for Ms. Carwile to write that on the

7    demonstrative?

8    A.  Yes.

9    Q.  Let's look at Claxton 2014.  Can we call up, please,

10   Exhibit 1728, which I believe has been admitted, Your Honor.

11          THE COURT:  It has been.  It may be displayed.

12          MR. FELDBERG:  Thank you.

13   BY MR. FELDBERG:

14   Q.  Could we turn to the third page of the exhibit to a line

15   that says Total FOB Plant Cost.  Do you see that, Mr. Ledford?

16   A.  Yes.

17   Q.  What was Claxton's total FOB plant cost for the year 2014?

18   A.  .9275.

19   Q.  Now let's turn to George's.

20          MR. FELDBERG:  Call up, please, Defense Exhibit F-759,

21   which I do not believe is in evidence.

22   BY MR. FELDBERG:

23   Q.  Do you recognize this document, Mr. Ledford?

24   A.  Yes, I do.

25   Q.  What is it?

Michael Ledford - Cross

1   *A.*  It is the exhibit to the contract for 2012 between UFPC or

2   RSCS and George's.

3   *Q.*  Did you sign this?

4   *A.*  Yes, I did.

5   *Q.*  Was it kept in the ordinary course of business at RSCS?

6   *A.*  Yes, it was.

7        *MR. FELDBERG:*  Your Honor, we'd move Exhibit F-759

8   into evidence.

9        *THE COURT:*  Any objection to the admission of F-759?

10        *MR. TORZILLI:*  Can we have a brief side bar, Your

11   Honor?

12        *THE COURT:*  Yes.

13     (At the bench:)

14        *THE COURT:*  Go ahead, Mr. Torzilli.

15        *MR. TORZILLI:*  Your Honor, we don't necessarily have

16   an objection to this, but I do want to point out this contract

17   was signed in 2011, which means that the negotiations occurred

18   in 2011.  And it's my understanding throughout this trial and

19   prior to it that the defendants were saying things prior to

20   2012 were not relevant.  And this indicates to me that the

21   defendants are opening the door to information that occurred in

22   2011 to be entirely relevant to the case that the United States

23   is attempting to prove.

24        *THE COURT:*  Response, Mr. Feldberg?

25        *MR. FELDBERG:*  We are not opening the door, Your

Michael Ledford - Cross

1    Honor.  The indictment charges a crime from 2012 to 2019.  This

2    is the contract for 2012 for one of the suppliers.

3         THE COURT:  It would seem, Mr. Torzilli, that if what

4    Mr. Feldberg is doing is simply establishing the 2012 price

5    even though it may have been negotiated in 2011, that that

6    seems like an appropriate purpose.  Why would it open any type

7    of door?

8         MR. TORZILLI:  But the negotiations that occurred --

9    that led up to this contract occurred in 2011.  And if there is

10   going to be an indication that the contract that was arrived at

11   in 2012 was somehow not a competitive -- or was not tainted by

12   the conspiracy, I think that gives us an opportunity to

13   potentially add evidence to indicate that collusion did indeed

14   occur in 2011 and that the prices that were arrived at in

15   contracts such as this one that was signed in 2011 were the

16   result of any competitive conspiratorial actions.

17        THE COURT:  Well, once again, it seems like so far

18   Mr. Feldberg is just establishing the price.  That in and of

19   itself doesn't seem to open any door.  This is simply what the

20   price is in 2012.

21        Anything else on that, Mr. Feldberg?

22        MR. FELDBERG:  No, Your Honor.

23        THE COURT:  Okay.  Thank you.

24        MR. BELLER:  Your Honor, I certainly have no objection

25   to Mr. Feldberg entering this document in and agree with the

Michael Ledford - Cross

1   Court's ruling.  With that said, I do believe the case law is

2   for opening the door that if one defendant fails to object,

3   that the door is also open for that defendant.  And so I agree,

4   I do not believe that this opens the door, but to the extent

5   that there is a future ruling and that it did, I would simply

6   note my objection and ask Mr. Torzilli to limit any additional

7   evidence -- any additional argument only to the defendant who

8   opened that particular door.  And this is just simply a record

9   necessary under the case law.

10          THE COURT:  Right.  We have the understanding that one

11  objection serves for all, so one objection would serve for all.

12  Mr. Feldberg made that response and that would apply to all,

13  all right?  Thank you.

14      (In open court:)

15          THE COURT:  Go ahead, Mr. Feldberg.

16          MR. FELDBERG:  Your Honor, we would move the admission

17  of Defense Exhibit F-759.

18          THE COURT:  Any additional objections?

19          MR. TORZILLI:  Nothing further, Your Honor.

20          THE COURT:  So the objection was overruled.  F-759

21  will be admitted.

22  BY MR. FELDBERG:

23  Q.  And Mr. Ledford, could you identify in this contract the

24  FOB plant cost in this particular contract, the Claxton

25  contract -- I am sorry, the George's contact for 2012?

Michael Ledford - Cross

1   *A.*  .9686.

2   *Q.*  And would it be fair for Ms. Carwile to write that price on

3   the demonstrative?

4   *A.*  Yes.

5   *Q.*  And I neglected to ask you if it would be fair for

6   Ms. Carwile to write the Claxton 2014 price on the

7   demonstrative.

8   *A.*  Yes, it would.

9   *Q.*  Okay.  Thank you.

10        *MR. FELDBERG:*  Now, turning to 2013, could we call up,

11  please, Government Exhibit 1515, which I believe has been

12  admitted, Your Honor.

13        *THE COURT:*  It has been admitted and may be displayed.

14        *MR. FELDBERG:*  Thank you.

15  *BY MR. FELDBERG:*

16  *Q.*  Mr. Ledford, Exhibit 1515 in evidence is the George's

17  contract for 2013, correct?

18  *A.*  Yes.

19  *Q.*  And what's the FOB plant cost for chicken on the bone?

20  *A.*  .9622.

21  *Q.*  And would it be fair if Ms. Carwile wrote that on the

22  demonstrative?

23  *A.*  Yes.

24        *MR. FELDBERG:*  And let's look at 2014 and Government

25  Exhibit 1112 -- I am sorry, 1120, which I believe has been

Michael Ledford - Cross

1 admitted.

2          THE COURT:  It has been and may be displayed.

3          MR. FELDBERG:  Thank you.

4 BY MR. FELDBERG:

5 Q.  Showing you Exhibit 1120, is that the George's contract for

6 2014?

7 A.  Yes.

8 Q.  What's the FOB price for eight-piece for George's in 2014?

9 A.  .9215.

10 Q.  Would it be fair for Ms. Carwile to put that on the

11 demonstrative?

12 A.  Yes.

13 Q.  We are turning to Koch.

14          MR. FELDBERG:  Could we call up, please, Defense

15 Exhibit F-768, not in evidence at this time.

16 BY MR. FELDBERG:

17 Q.  Do you recognize it, Mr. Ledford?

18 A.  Yes.

19 Q.  What is it?

20 A.  It's a contract between RSCS and UFPC and Koch Foods for

21 the 2012 calendar year.

22          MR. TORZILLI:  Your Honor, may I ask defense counsel

23 for a copy?

24          THE COURT:  Yes.

25 BY MR. FELDBERG:

Michael Ledford - Cross

1  *Q.*  Do you recognize it, Mr. Ledford?

2  *A.*  Yes.

3  *Q.*  Did you sign it?

4  *A.*  Yes.

5  *Q.*  Was this contract kept in the ordinary course of RSCS's

6  business?

7  *A.*  Yes.

8  *Q.*  And was it the regular practice of RSCS to make and keep

9  contracts like this?

10  *A.*  Yes.

11       *MR. FELDBERG:*  We offer into evidence, Your Honor,

12  F-768.

13       *THE COURT:*  Any objection to F-768?

14       *MR. TORZILLI:*  Same objection as expressed at side

15  bar.

16       *THE COURT:*  That will be overruled and F-768 will be

17  admitted.

18  *BY MR. FELDBERG:*

19  *Q.*  What was Koch's eight-piece COB price for 2012?

20  *A.*  .9397.

21  *Q.*  Would it be fair for Ms. Carwile to write that on the

22  demonstrative?

23  *A.*  Yes.

24       *MR. FELDBERG:*  Let's turn to Exhibit F-769, not yet in

25  evidence, I believe.

Michael Ledford - Cross

1    BY MR. FELDBERG:

2    Q.  Do you recognize Exhibit F-769, Mr. Ledford?

3    A.  Yes.

4    Q.  What is it?

5    A.  It is Koch's exhibit to the contract for 2013.

6    Q.  And did you sign this contract?

7    A.  Yes, I did.

8    Q.  Was it kept in the ordinary course of RSCS's business?

9    A.  Yes.

10          MR. FELDBERG:  We move F-769 into evidence.

11          THE COURT:  Any objection to F-769?

12          MR. TORZILLI:  No objection.

13          THE COURT:  F-769 will be admitted.

14          MS. HENRY:  Your Honor, I think it may have already

15   been admitted as Government Exhibit 1551.

16          THE COURT:  Ms. Henry, what was that exhibit number

17   again?

18          MS. HENRY:  1551.

19          THE COURT:  Let's just double-check because we want to

20   avoid admitting duplicates, if possible.

21          I don't show 1551 is in, so let's go back, then, to

22   769.

23          And Mr. Torzilli, no objection, was that correct?

24          MR. TORZILLI:  We have no objection.

25          THE COURT:  F-769 will be admitted.

Michael Ledford - Cross

1          MR. FELDBERG:  Thank you, Your Honor.

2          THE COURT:  And may be published.

3   BY MR. FELDBERG:

4   Q.  Mr. Ledford, what was Koch's eight-piece COB price for

5   2013?

6   A.  .9662.

7   Q.  Could Ms. Carwile fairly write that on her demonstrative?

8   A.  Yes.

9   Q.  And let's look at Koch for 2014.

10         MR. FELDBERG:  Let's call up Government Exhibit 1122,

11  which I believe is already admitted, Your Honor.

12         THE COURT:  Yes, it is.

13         MR. FELDBERG:  Could we display that to the jury?

14         THE COURT:  Yes.

15  BY MR. FELDBERG:

16  Q.  Mr. Ledford, do you recognize 1122?

17  A.  Yes.

18  Q.  And that's Koch's contract for 2014, correct?

19  A.  Correct.

20  Q.  What was their eight-piece price in 2014?

21  A.  .9219.

22  Q.  I would like to say that we're getting into the home

23  stretch, but not quite yet.

24         Let's turn to Mar-Jac.

25         MR. FELDBERG:  Could we call up, please, Defense

Michael Ledford - Cross

1    Exhibit F-777, not in evidence at this time.

2    *BY MR. FELDBERG:*

3    Q.  Excuse me, Mr. Ledford.  I neglected to ask if it would be

4    fair for Ms. Carwile to write on her demonstrative the price

5    for Koch in 2014.

6    A.  Yes.

7    Q.  Thank you.  Looking at Exhibit F-777, do you recognize it?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a contract for Mar-Jac for 2012.

11   Q.  Did you sign it?

12   A.  Yes.

13   Q.  Was it kept in the ordinary course of RSCS's business?

14   A.  Yes.

15         MR. FELDBERG:  We move the admission of F-777 into

16   evidence, Your Honor.

17         THE COURT:  Any objection to F-777?

18         MR. TORZILLI:  Same objection as expressed at side

19   bar.

20         THE COURT:  That objection will be overruled for the

21   same reasons.  F-777 will be admitted.

22   *BY MR. FELDBERG:*

23   Q.  What was Mar-Jac's COB price for 2012, sir?

24   A.  .9687.

25   Q.  And would it be fair for Ms. Carwile to write that on the

Michael Ledford - Cross

1  demonstrative?

2  A.  Yes.

3        MR. FELDBERG:  Let's turn to 2013 and call up Defense

4  Exhibit F-778.  I do not believe this is in evidence at this

5  time.

6  BY MR. FELDBERG:

7  Q.  Do you recognize F-778, sir?

8  A.  Yes.

9  Q.  Can you tell us what it is?

10  A.  It's a contract with Mar-Jac for 2013.

11  Q.  Did you sign it?

12  A.  Yes.

13  Q.  Was it kept in the ordinary course of RSCS's business?

14  A.  Yes.

15        MR. FELDBERG:  We offer it into evidence, Your Honor.

16        THE COURT:  Any objection to the admission of F-778?

17        MR. TORZILLI:  No, Your Honor.

18        THE COURT:  F-778 will be admitted.

19  BY MR. FELDBERG:

20  Q.  What was Mar-Jac's eight-piece price for 2013?

21  A.  .9675.

22  Q.  And may Ms. Carwile fairly write that on the demonstrative?

23  A.  Yes.

24  Q.  Let's look at 2014.

25        MR. FELDBERG:  Could we call up Government Exhibit

Michael Ledford - Cross

1    1124, which I believe is in evidence, Your Honor.

2              THE COURT:  It is and may be displayed.

3              MR. FELDBERG:  Thank you.

4    BY MR. FELDBERG:

5    Q.  Government Exhibit 1124 is Mar-Jac's contract for 2014,

6    correct?

7    A.  This is dated after I left.

8    Q.  But nonetheless, it's in evidence, Mr. Ledford.  Could you

9    tell us what Mar-Jac's eight-piece price was for 2014?

10   A.  So I am a little bit confused because the date on it is the

11   summer of '14, which would lead me to believe it was the '15

12   contract.  If I could see the top of it, that would maybe help.

13             MR. FELDBERG:  Can you show Mr. Ledford the first

14   page?

15   A.  Okay.  That helps.

16   BY MR. FELDBERG:

17   Q.  And can you now identify Mar-Jac's eight-piece cost for

18   2014?

19   A.  Yes.  .9254.

20   Q.  May Ms. Carwile write that on the demonstrative?

21   A.  Yes.

22   Q.  Now, there is another company that you did business with

23   for a while called Marshall Durbin, correct?

24   A.  Correct.

25   Q.  They were acquired by Mar-Jac at some point?

Michael Ledford - Cross

1    A.   Correct.

2    Q.   Was that during your tenure at RSCS?

3    A.   Yes.

4    Q.   Do you recall when Marshall Durbin was acquired by Mar-Jac?

5    A.   Exactly, I am not -- I know -- I could give you a range,

6    but I do not remember the exact year.

7    Q.   What's the range?

8    A.   Somewhere between 2012 and 2014.

9    Q.   Prior to that acquisition Marshall Durbin was an

10   independent company, correct?

11   A.   That's correct.

12   Q.   And RSCS purchased chicken from Marshall Durbin?

13   A.   That's correct.

14        MR. FELDBERG:  Let's look at Exhibit F-786 not yet in

15   evidence.

16   BY MR. FELDBERG:

17   Q.   Do you recognize this document, sir?

18   A.   Yes, I did.

19   Q.   What is it?

20   A.   It's a contract with Marshall Durbin for the 2013 calendar

21   year.  I am sorry, for the 2012 calendar year.

22   Q.   Did you sign it?

23   A.   Yes.

24   Q.   Was it kept in the ordinary course of business?

25   A.   Yes.

Michael Ledford - Cross

1          MR. FELDBERG:  We move it into evidence, Your Honor.

2          THE COURT:  Any objection to the admission of F-786?

3          MR. TORZILLI:  No, Your Honor.

4          THE COURT:  F-786 will be admitted.

5    BY MR. FELDBERG:

6    Q.  What was Marshall Durbin's eight-piece COB price in the

7    2012 contract?

8    A.  .9625.

9    Q.  May Ms. Carwile write that on the demonstrative?

10   A.  Yes.

11   Q.  And let's look at Marshall Durbin in 2013.

12         MR. TORZILLI:  Your Honor, may I ask for paper copies?

13         THE COURT:  Yes.

14         MR. TORZILLI:  Thank you.

15         MR. FELDBERG:  And call up F-787, not in evidence at

16   this time.

17   BY MR. FELDBERG:

18   Q.  Do you recognize it, Mr. Ledford?

19   A.  Yes.

20   Q.  What is it?

21   A.  This is the Marshall Durbin contract for 2013.

22   Q.  Did you sign it?

23   A.  Yes.

24   Q.  Was it kept in the ordinary course of RSCS's business?

25   A.  Yes.

Michael Ledford - Cross

1          MR. FELDBERG:  We move F-787 into evidence, Your

2     Honor.

3          THE COURT:  Any objection to the admission of F-787?

4          MR. TORZILLI:  No objection.

5          THE COURT:  F-787 will be admitted.

6     BY MR. FELDBERG:

7     Q.  What was Marshall Durbin's 2013 eight-piece price?

8     A.  .9683.

9     Q.  May Ms. Carwile write that number in the appropriate spot

10    on the demonstrative?

11    A.  Yes.

12         MR. FELDBERG:  And turning to 2014, could we call up,

13    please, Defense Exhibit F-788, which I believe has been

14    admitted, Your Honor.

15         THE COURT:  That has been.

16         MR. FELDBERG:  May we display that to the jury?

17         THE COURT:  Yes.

18    BY MR. FELDBERG:

19    Q.  Mr. Ledford, I am showing you what is in evidence as F-788.

20    This is the Marshall Durbin contract for 2014, correct?

21    A.  Yes.

22    Q.  And you signed it, correct?

23    A.  Correct.

24    Q.  What was their FOB price?

25    A.  .9204.

Michael Ledford - Cross

1   *Q.* May Ms. Carwile write that on the demonstrative?

2   *A.* Yes.

3   *Q.* Just two more.

4           *THE COURT:* Actually, it's 10:15, Mr. Feldberg.  Would

5   now be an appropriate spot for the recess?

6           *MR. FELDBERG:* Fine.  Thank you, Your Honor.

7           *THE COURT:* Ladies and gentlemen, we will take our

8   mid-morning break.  Plan on reconvening 25 minutes to 11:00.

9   The jury is excused.  Thank you.

10          (Jury excused.)

11          *THE COURT:* Mr. Ledford, you are excused until after

12  the break.  Thank you.

13          All right.  It's my intention right before we dismiss

14  or excuse the jury for lunch to let them know that they are off

15  on Friday.  Anyone feel differently about that?  It seems like

16  we would have a full day on Friday of going over exhibits, but

17  for their planning purposes I think that would be appropriate

18  to let them know that, okay?

19          All right.  We will be in recess, then, until 25 of

20  11:00. Thank you.

21      (Recess at 10:17 a.m.)

22      (Reconvened at 10:37 a.m.)

23          *MS. SWEENEY:* The government has one thing to raise

24  before you bring the jury back in.  I related to --

25          *MS. PREWITT:* Should we be doing that with the witness

Michael Ledford - Cross

1    present or maybe transceivers?

2            THE COURT:  Transceivers.

3       (At the bench:)

4            THE COURT:  Go ahead.

5            MS. SWEENEY:  Thank you, Your Honor.

6            This is information that we just have been authorized

7    to share.  It's about the witness after Mr. Ledford,

8    Mr. Skalak.  As I mentioned yesterday, there was some health

9    concerns.  I just have been authorized to share he was

10   diagnosed with cancer.  The diagnosis he received on the first

11   day of trial here.  The government learned of it last week,

12   although we knew of the possibility back in early October which

13   we did share with defense counsel.

14           His surgery is coming up and we've learned last night

15   and confirmed just in this break that he is not available to

16   testify after Tuesday, but he is available on Monday.  So I

17   wanted to raise with the Court that if -- we do not know how

18   long Mr. Ledford's cross-examination will take, but we would

19   ask either that Mr. Skalak start testifying regardless of where

20   we are Monday morning in order to enable him to return to his

21   home in Atlanta after Monday's court day.  His direct testimony

22   at least is relatively short, less than an hour.

23           Otherwise, I wanted to raise this at this point, if

24   Your Honor wanted to consider if Monday would not -- if you

25   didn't think it would be appropriate, to perhaps use a few

407

Michael Ledford - Cross

1    hours on Friday for that testimony.  Like I said, the

2    government's direct is relatively short of this witness, but I

3    just wanted to raise this to -- I wanted to make you aware of

4    this.  And we just received authority to share information with

5    yourself and with defense counsel at the break.

6         THE COURT:  Okay.  Do the defendants -- I know it's

7    difficult because it's not like you necessarily talk about how

8    long the cumulative cross is going to take, but if we took

9    Mr. Skalak out of order, assuming that Mr. Ledford's cross and

10   redirect is not done, but rather if we started on Monday

11   morning with Mr. Skalak, do we anticipate that he would be

12   done?  It does seem like he has a pressing need to be finished

13   on Monday.

14        MR. BELLER:  Your Honor, this is David Beller

15   speaking.  I am taking the primary responsibility for

16   cross-examination of Mr. Skalak and so I can speak only on

17   behalf of myself, and that is I am imagining his

18   cross-examination is probably one to two hours.  I do believe

19   that I am going to be covering the vast majority of topics.  I

20   don't believe that the rest of the defendants are going to have

21   anything nearly as substantive, so that does mean that based on

22   my very loose calculations, that I think that that is

23   appropriate.  But it was my understanding of the order that

24   Mr. Skalak was going to be taking the stand today following

25   Mr. Ledford's examination.  Is that not right?

Michael Ledford - Cross

1          THE COURT:  Response, Ms. Sweeney?

2          MS. SWEENEY:  Mr. Skalak is here and certainly ready

3    to take the stand today.  The only reason I raised it was just

4    we don't know how much longer the cross of Mr. Ledford will

5    take.

6          THE COURT:  Okay.  Anyone think that were we to start

7    the direct of Mr. Skalak on Monday morning first thing, that

8    it's unlikely that we would finish with him by the end of the

9    day on Monday?

10         MS. PREWITT:  Elizabeth Prewitt for Mr. Mulrenin.

11   What I am hearing is that we may be able to get through -- if

12   we go right after Mr. Ledford, we may be able to complete

13   Mr. Skalak today, so that would mean he wouldn't need to come

14   back on Monday.  Of course, I can't promise that, Your Honor,

15   but that is my understanding.

16         THE COURT:  Right.  We're just thinking about worst

17   case scenario, and that's why if what's being posited is if he

18   could, you know, if we could make sure he is done on Monday.

19   It sounds like we probably can, and, in fact, maybe we can

20   start Mr. Skalak today which would, of course, improve our odds

21   of finishing him by end of the day on Monday.

22         MS. PREWITT:  Your Honor, I am trying to recall what

23   the order of showing documents would be, but if that is going

24   to be postponed until Monday, in fact we could just move

25   forward with Mr. Skalak, that would give us the greatest chance

Michael Ledford - Cross

1    of completion.

2             THE COURT:  Of course, that's true as well.  So that

3    probably should be taken into account by the government as

4    well.  That would be a means of getting him up and down more

5    quickly.

6             MS. SWEENEY:  Of course, Your Honor, and that's

7    something that we had talked about and conferred internally.

8    We just wanted to raise worst case scenario not knowing how

9    long the cross-examination of Mr. Ledford would take.

10            THE COURT:  It sounds like worst case scenario we

11   should be able to finish him by end of the day on Monday.

12            MS. SWEENEY:  Thank you, Your Honor.

13        (In open court:)

14            THE COURT:  Let's go ahead and bring the jury back in.

15            (Jury present.)

16        Mr. Feldberg, go ahead.

17            MR. FELDBERG:  Thank you, Your Honor.

18   BY MR. FELDBERG:

19   Q.  Two more companies, Mr. Ledford.

20            MR. FELDBERG:  Let's call up Defense Exhibit F-790,

21   not in evidence.

22   BY MR. FELDBERG:

23   Q.  Do you recognize F-790, sir?

24   A.  Yes.

25   Q.  What is it?

Michael Ledford - Cross

1   *A.*  It is the exhibit to the contract for eight-piece for the

2   2012 calendar year with Pilgrim's.

3   *Q.*  And did you sign this contract?

4   *A.*  Yes, I did.

5   *Q.*  Was it kept in the ordinary course of RSCS's business?

6   *A.*  Yes.

7        *MR. FELDBERG:*  We move into evidence F-790.

8        *THE COURT:*  Any objection to the admission of F-790?

9        *MR. TORZILLI:*  Same objection as expressed at side bar

10  before the break.

11       *THE COURT:*  That will be overruled for the same

12  reasons.  F-790 will be admitted.

13       *MR. FELDBERG:*  Could we display it to the jury, Your

14  Honor?

15       *THE COURT:*  Yes.

16  *BY MR. FELDBERG:*

17  *Q.*  And what was the eight-piece COB cost to RSCS in the

18  Pilgrim's 2012 contract, sir?

19  *A.*  .9678.

20  *Q.*  And may Ms. Carwile write that on the chart?

21  *A.*  Yes.

22  *Q.*  Now, just to be clear, the total FOB plant cost in this and

23  other contracts is the cost to RSCS, correct?

24  *A.*  It is the FOB cost.

25  *Q.*  Can we explain to the jury what an FOB cost is?

Michael Ledford - Cross

1    *A.*  Yes.  It's without freight.  It's free onboard is what it

2    stands for.  You have to add -- before it gets to a restaurant,

3    there would be freight to get it to a distribution center.  And

4    then distribution charges to get it from the distribution

5    center delivered to the restaurant.

6    *Q.*  And those freight charges would vary depending on the

7    distance that had to be traveled.

8    *A.*  Correct.

9    *Q.*  Correct?

10   *A.*  Correct.

11        *MR. FELDBERG:*  Let's turn to 2013 for Pilgrim's and

12   call up Government Exhibit 1552, which I believe is in

13   evidence, Your Honor.

14        *THE COURT:*  Yes, that is.

15        *MR. FELDBERG:*  May we display it?

16        *THE COURT:*  You may.

17   *BY MR. FELDBERG:*

18   *Q.*  Mr. Ledford, what was the eight-piece FOB plant cost for

19   the Pilgrim's 2013 contract?

20   *A.*  .9703.

21   *Q.*  And may Ms. Carwile put that number on the chart?

22   *A.*  Yes.

23        *MR. FELDBERG:*  Let's look at 2014 and call up

24   Government Exhibit 1552, which I believe is in evidence.

25        *THE COURT:*  1552 was the one that you just showed, I

Michael Ledford - Cross

1    believe.

2              *MR. FELDBERG:*  I think you are right, Your Honor.  My

3    mistake.  Let's call up 1729.

4              *THE COURT:*  That is in evidence and may be displayed.

5              *MR. FELDBERG:*  Thank you.

6    *BY MR. FELDBERG:*

7    *Q.*  Mr. Ledford, Government Exhibit 1729 is the Pilgrim's

8    contract for 2014, correct?

9    *A.*  Yes.

10   *Q.*  And what's the eight-piece cost?

11   *A.*  .9250.

12   *Q.*  May Ms. Carwile write that?

13   *A.*  Yes.

14             *MR. FELDBERG:*  Okay.  Let's turn to Tyson and call up

15   Defense Exhibit F-798, not in evidence as far as I know.

16   *BY MR. FELDBERG:*

17   *Q.*  Do you recognize F-798, sir?

18   *A.*  Yes.

19   *Q.*  What is it?

20   *A.*  It's the Tyson contract for 2012.

21   *Q.*  Did you sign it?

22   *A.*  Yes.

23   *Q.*  Was it kept in the ordinary course of RSCS's business?

24   *A.*  Yes.

25   *Q.*  What was Tyson's eight-piece price for 2012?

Michael Ledford - Cross

1    *A.* .9723.

2    *Q.* May Ms. Carwile write that on the chart?

3    *A.* Yes.

4    *Q.* Let's look at --

5         *MR. TORZILLI:* Objection. The document is not in

6    evidence.

7         *THE COURT:* That's true.

8         *MR. FELDBERG:* You're right. We offer the admission

9    of F-798, Your Honor.

10        *THE COURT:* Any objection to the admission of F-798?

11        *MR. TORZILLI:* Objection expressed at side bar before

12   the break.

13        *THE COURT:* Overruled for the same reason that I ruled

14   at the side bar. F-798 will be admitted.

15        *MR. FELDBERG:* And let's take a look at 2013, Defense

16   Exhibit F-799, which I do not believe is in evidence.

17   *BY MR. FELDBERG:*

18   *Q.* Do you recognize this document, sir?

19   *A.* Yes.

20   *Q.* What is it?

21   *A.* Tyson contract for 2013.

22   *Q.* Did you sign it?

23   *A.* Yes, I did sign it.

24   *Q.* Was it kept in the ordinary course of RSCS's business?

25   *A.* Yes.

Michael Ledford - Cross

1      MR. FELDBERG:  We offer F-799, Your Honor.

2      THE COURT:  Any objection to the admission of F-799?

3      MR. TORZILLI:  No objection.

4      THE COURT:  F-799 will be admitted.

5  BY MR. FELDBERG:

6  Q.  What was Tyson's eight-piece price to RSCS for 2013?

7  A.  .9681.

8  Q.  May Ms. Carwile write that on the chart?

9  A.  Yes.

10     MR. FELDBERG:  Finally, can we call up, please,

11  Defense Exhibit H-654, not in evidence.

12  BY MR. FELDBERG:

13  Q.  Do you know what this document is, Mr. Ledford?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's the exhibit to the contract for Tyson for the 2014

17  calendar year.

18  Q.  Now, this document is not signed, is it?

19  A.  It is not.

20  Q.  Do you have a recollection of signing this document back

21  when you were working at RSCS?

22  A.  This particular one?  Not exactly.  In the normal course of

23  business, I would have signed the contract.

24  Q.  We have not been able to locate a signed copy of the Tyson

25  2014 contract.

Michael Ledford - Cross

1      Does this appear to you to be the Tyson 2014 contract?

2  *A.*  Yes, it does.

3      *MR. FELDBERG:*  We offer it.

4  *BY MR. FELDBERG:*

5  *Q.*  And was the Tyson 2014 contract kept in the ordinary course

6  of RSCS's business?

7      *MR. TORZILLI:*  Objection.  This is an unsigned

8  contract.  It's not produced by RSCS according to the

9  production Bates stamp, so I object as he has no foundation to

10 be answering that question.

11     *THE COURT:*  He can answer if he knows.  Overruled.

12 *A.*  Based on the formatting, especially the header at the top,

13 I would answer yes.

14     *MR. FELDBERG:*  We offer H-654 into evidence, Your

15 Honor.

16     *THE COURT:*  Any objection to the admission of H-654?

17     *MR. TORZILLI:*  It's hearsay.  Yes.

18     *THE COURT:*  I will sustain the objection on

19 foundation.  You can ask him additional foundation questions.

20 *BY MR. FELDBERG:*

21 *Q.*  Well, Mr. Ledford, do you have any reason to doubt that

22 this is the contract between Tyson and RSCS for 2014?

23 *A.*  I cannot think of any.

24 *Q.*  And in particular does the eight-piece price for Tyson look

25 familiar to you based on your experience at RSCS?

Michael Ledford - Cross

1    *A.*  I will need to see the next page to be able to answer it.

2    *Q.*  Sorry.

3         *MR. FELDBERG:*  Could we go to the next page?

4    *A.*  That looks directionally accurate.

5         *MR. FELDBERG:*  We offer it, Your Honor.

6         *THE COURT:*  Any objection to the admission of H-654?

7         *MR. TORZILLI:*  Your Honor, may I have a moment to

8    confer?

9         *THE COURT:*  Yes.

10        *MR. TORZILLI:*  Your Honor, we object to the admission

11   and will add that perhaps if there is a cover e-mail associated

12   with this document, that that might provide the appropriate

13   documentation for its admissibility.

14        *THE COURT:*  Let's do a side bar real quick.

15       (At the bench:)

16        *THE COURT:*  So it would seem unusual that we would not

17   have, for instance, a signed copy of this or that it wouldn't

18   appear on the government exhibit list.

19        Mr. Torzilli, do you happen to know whether there is a

20   RSCS Bates stamp numbered version of this?

21        *MR. TORZILLI:*  We have not been able to locate one,

22   Your Honor.  And I will just note to refresh everyone's

23   recollection on this, this was an issue that came up with

24   Mr. Lewis' summary exhibit on the cross-examination of him

25   regarding period one pricing for 2014 versus contract pricing

Michael Ledford - Cross

1   for 2014.

2          THE COURT:  Okay.  Mr. Feldberg, anything else to add?

3          MR. FELDBERG:  No, Your Honor.  Well, yes, Your Honor.

4   First, I agree with Mr. Torzilli.  We have not been able to

5   find a signed copy of this for whatever reason.  Second, I

6   think we can come up with some e-mails and perhaps Your Honor

7   might take this subject to objection.  I don't have it at hand.

8          THE COURT:  Mr. Torzilli, do you recall, was a cover

9   e-mail we'll call it used in connection with Mr. Lewis?

10          MR. TORZILLI:  It was not.

11          THE COURT:  Okay.  All right.

12          MR. TUBACH:  Your Honor, this is Michael Tubach.  We

13   can supply the cover e-mail that would show that this is

14   communications between Tyson and RSCS to show that this was the

15   contract that was submitted.  We've searched high and low for

16   the signed version and just haven't found it.

17          THE COURT:  All right.

18          MS. PREWITT:  Elizabeth Prewitt for Mr. Mulrenin.

19   This was, in fact, authenticated by the custodian.

20          THE COURT:  Authenticated under some different exhibit

21   number presumably?

22          MS. PREWITT:  I will have to check, Your Honor, but I

23   believe it was under a defense exhibit number.

24          THE COURT:  That would be unusual just because

25   typically the government provided a packet of exhibits, none of

Michael Ledford - Cross

 1    which were defense exhibit numbers.

 2         *MS. PREWITT:*  Your Honor will recall on

 3    cross-examination I provided a set of defense exhibit numbers

 4    and she went through the authentication process for those

 5    exhibits.

 6         *THE COURT:*  Which witness was that?

 7         *MS. PREWITT:*  Ms. Arens, Your Honor.

 8         *THE COURT:*  Ms. Arens was the -- oh, she was a Tyson

 9    person, right?

10         *MS. PREWITT:*  Correct, Your Honor.

11         *THE COURT:*  Okay, got it.

12         *MR. TORZILLI:*  Just to be clear, our objection is not

13    to the authenticity under 901, but essentially to hearsay and

14    foundation.

15         *THE COURT:*  Okay.  Well, I think that the -- I think

16    we are going to need the cover e-mail and then it can be

17    offered at that time once we have a chance to take a look at

18    that.

19         *MR. FELDBERG:*  That's fine, Your Honor.

20         *THE COURT:*  Thank you.

21       (In open court:)

22         *THE COURT:*  The objection will be sustained.

23    *BY MR. FELDBERG:*

24    Q.  Okay.  We will leave Tyson 2014 aside for the moment.

25         *MR. FELDBERG:*  Could we call up, please, not yet in

Michael Ledford - Cross

1   evidence I-241, which is the chart that Ms. Carwile has been

2   creating from the testimony.

3           Your Honor, we have been calling I-241 a

4   demonstrative, but we would also like to offer it as a summary

5   exhibit pursuant to Rule 1006.

6           THE COURT:  Any objection to the admission of I-241?

7           MR. TORZILLI:  Yeah, we object to this being a summary

8   exhibit.  We weren't provided notice of it and haven't had an

9   opportunity to fully evaluate it.  And it's missing, as we just

10  discussed, missing information.

11          THE COURT:  The danger of offering it now,

12  Mr. Feldberg, is that once it's admitted, it's more or less

13  fixed in content, but it can be offered at this time.

14          MR. FELDBERG:  Well, in that case, Your Honor, until

15  we fill in the missing box, why don't we use it as a

16  demonstrative.  And may we display it to the jury?

17          THE COURT:  Any objection to displaying to the jury at

18  this time only for demonstrative purposes?

19          MR. TORZILLI:  No objection.

20          THE COURT:  All right.  It may be.

21  BY MR. FELDBERG:

22  Q.  Mr. Ledford, Exhibit I-241 is displayed in front of you,

23  correct?

24  A.  Yes.

25  Q.  And that has the eight-piece COB contracts for all of the

Michael Ledford - Cross

1    suppliers that RSCS purchased eight-piece chicken from in 2012,

2    2013, 2014, except we don't yet have Tyson for 2014, correct?

3    A.   Correct.

4    Q.   Those prices are all different, aren't they?

5    A.   Yes, they are.

6    Q.   Now, you testified that you purchased about a billion

7    pounds a year of chicken during your time at RSCS, correct?

8    A.   Yes.

9    Q.   What's a 1 cent difference in price amount to over a

10    billion pounds a year?

11    A.   I believe that would be $10 million, unless I have the

12    decimal point off there.

13            THE COURT:  Mr. Ledford, we have a calculator.  I am

14    not suggesting that you are off, but I am just saying if you

15    wanted to use one, you could.

16            THE WITNESS:  Okay.  Thank you.

17    BY MR. FELDBERG:

18    Q.   So if you look, for example, at the difference in price

19    between Pilgrim's and Claxton in let's say 2013, that's about

20    78 -- it's 78/100ths of a cent, correct?

21    A.   Correct.

22    Q.   Now, given the volume of purchase -- of chicken that you

23    purchased from Pilgrim's, do you have any idea what that

24    difference would amount to?

25    A.   I do not recall.

Michael Ledford - Cross

1   Q.   Okay.  We looked at a document that showed you do you

2   recall purchasing about 170 million pounds of eight-piece from

3   Pilgrim's?

4   A.   Yes, that's correct.

5   Q.   Maybe using the calculator, what's 170 million times a

6   difference of 78/100ths of a cent?

7   A.   1.3 million.

8   Q.   And you testified that you wanted the suppliers in as tight

9   a range as possible, correct?

10  A.   That's correct.

11  Q.   But despite that the prices were all different, weren't

12  they?

13  A.   Yes.

14  Q.   Now let's look at the direction of prices from 2013 to

15  2014.  Do you see that?

16  A.   Yes.

17  Q.   What was the direction?

18  A.   They came down approximately 4 cents per pound.

19  Q.   And each company had a different price in 2013 and 2014,

20  but the general direction going to 2014 was down, correct?

21  A.   Correct.

22  Q.   Do you recall the reasons for that?

23  A.   I do not recall the reasons?

24  Q.   Were market factors such that you were able to obtain

25  reduced prices in 2014 down from 2013?

Michael Ledford - Cross

1    A.   Yes, that's a fair statement.

2    Q.   In your experience, Mr. Ledford, were market forces a

3    contributor to the direction of prices?

4    A.   Yes.

5    Q.   It's the law of supply and demand, isn't it?

6    A.   Exactly.

7    Q.   When -- as Mr. Beller asked you, when supply is tight and

8    demand is high, prices tend to go up, correct?

9    A.   Exactly.

10   Q.   When supply is abundant and there is less demand, prices

11   tend to go down, correct?

12   A.   Generally speaking, yes.

13           MR. FELDBERG:   Could we call up, please, Exhibit

14   F-808, which I believe is in evidence, and turn to Page 47.

15           Could we display that to the jury, Your Honor?

16           THE COURT:   Yes.   It is in evidence and may be

17   displayed.

18   BY MR. FELDBERG:

19   Q.   Just to refresh your recollection, sir, F-808 is a

20   PowerPoint that you prepared in December of 2012.   Do you

21   recall that?

22   A.   Yes, I do.

23   Q.   Let's take a look at Page 47.   What is Page 47?

24   A.   Page 47 is a recommendation of the business awards we were

25   proposing to make for the upcoming year.

Michael Ledford - Cross

1  Q.  The first column lists the various suppliers, correct?

2  A.  Correct.

3  Q.  The second column lists their share of your business in

4  2012, correct?

5  A.  That's correct.

6  Q.  And then the next column says 2013 Reco Share.  Do you see

7  that?

8  A.  Yes.

9  Q.  What does reco share mean?

10  A.  Recommendation.

11  Q.  The last two columns going from left to right are the

12  number of pounds in 2012 and the number of pounds in 2013,

13  correct?

14  A.  Correct.

15  Q.  For Pilgrim's you recommended reducing their share from 27

16  to 26, correct?

17  A.  Correct.

18  Q.  And you also recommended reducing their pounds from

19  203,616,200 to just under 185 million, correct?

20  A.  That is correct.

21  Q.  And is that what happened?

22  A.  Yes.

23  Q.  And, in fact, did RSCS reduce its volume of purchases from

24  Tyson each year going from 2012 to 2014?

25  A.  Tyson?

Michael Ledford - Cross

1   Q.   My mistake.  I apologize.  Did RSCS reduce its volume of

2   purchases from Pilgrim's each year 2012 to 2014?

3   A.   I believe that is correct.

4   Q.   And one of the reasons for that was that KFC was closing

5   stores, correct?

6   A.   Correct.

7   Q.   And another reason was that you were taking volume away

8   from your higher priced suppliers and reallocating it to your

9   lower priced suppliers, correct?

10  A.   That is correct.

11  Q.   That's competition, correct?

12  A.   That is correct.

13        MR. FELDBERG:  Could we call up F-808 again, please?

14  That's in evidence.  And turn to Page 16.

15  BY MR. FELDBERG:

16  Q.   Mr. Ledford, could you tell the jury what Page 16 of this

17  document is?

18  A.   Yes.  It is a bar graph that represents all the different

19  round bids for this particular negotiation year for

20  eight-piece.

21  Q.   And is it fair to say that the bar graph demonstrates in

22  different colors each supplier's 2012 contract and round one,

23  round two and round three bid?

24  A.   Yes.

25  Q.   So the blue is the 2012 contract price, correct?

Michael Ledford - Cross

1    A.   Correct.

2    Q.   The maroon is the round one bid?

3    A.   Correct.

4    Q.   The green is the round two bid?

5    A.   Correct.

6    Q.   And the -- I think it's purple is the round three bid,

7    correct?

8    A.   Correct.

9    Q.   Sir, would it be fair to say that with the exception of

10   Claxton, each supplier's bid came down from its first bid to

11   its last bid?

12   A.   That is correct.

13   Q.   And would it be fair to say -- well, Case Farms maintained

14   its bid from round one to round two and then reduced it in

15   round three, correct?

16   A.   Correct.

17   Q.   Claxton maintained its bid, correct?

18   A.   Correct.

19   Q.   And each of the other companies each round reduced its bid.

20   A.   That is correct.

21   Q.   And is one of the reasons as far as you know because you

22   urged each company to reduce its bid?

23   A.   As far as I know, it's because I provided them feedback.

24   Q.   And that feedback told them they better reduce their bid or

25   they would lose volume, correct?

426

Michael Ledford - Cross

1    *A.*  For some of them, yes.

2    *Q.*  And they responded, did they not?

3    *A.*  Yes, they did.

4    *Q.*  You were interviewed a number of times by the prosecutors

5    and agents, were you not?

6    *A.*  Yes.

7    *Q.*  Do you recall being interviewed on October 18th of this

8    year?

9    *A.*  Yes.

10   *Q.*  And did you tell the prosecutors and agents in that

11   interview that if the suppliers communicated with each other,

12   it would deleverage RSCS's position?

13   *A.*  I'm not a hundred percent sure if that's what I said.

14          *MR. FELDBERG:*  Is there a way we could call up -- not

15   for the jury -- Defense Exhibit I-189?  And could we highlight,

16   please, for the witness the second paragraph on the first page.

17          *MR. TORZILLI:*  I am going to object to the

18   highlighting per Your Honor's previous instructions about the

19   use of highlighting.

20          *MR. FELDBERG:*  I should have said enlarge.  I just

21   want the witness to be able to read it to refresh his

22   recollection.

23          *THE COURT:*  Yes, and not any highlighting.  You may do

24   that.

25   *BY MR. FELDBERG:*

1    Q.  Mr. Ledford, can you read to yourself the paragraph that's

2    been enlarged?

3         MR. FELDBERG:  I am sorry, I think I have the wrong

4    paragraph.

5         Could you enlarge the third paragraph, please?

6    A.  Okay.

7         MR. FELDBERG:  We can take that down now.

8    BY MR. FELDBERG:

9    Q.  Mr. Ledford, does reading that paragraph refresh your

10   recollection about your discussion with the prosecutors on

11   October 18?

12   A.  Yes, it does.

13   Q.  And did you tell them on that date that RSCS did not want

14   the suppliers to communicate with each other because it would

15   have deleveraged RSCS's position?

16   A.  Yes, I do recall using the term deleverage, yes.

17   Q.  What did you mean by that?

18   A.  Take leverage away or, you know, in the negotiation

19   obviously each side has different points of leverage and those

20   are different from year to year.  And, you know, typically

21   speaking, we had a lot of leverage because we had a lot of

22   buying power.  So what I meant by that if they were speaking, I

23   would take some of that leverage away from our position, give

24   more power in the negotiations to the suppliers.

25   Q.  So what you were talking about in your desire that the

1  suppliers not communicate with each other was leverage,

2  correct?

3  A.  Yes.

4  Q.  Whether the buyer had more leverage or the supplier had

5  more leverage.

6  A.  That's correct.

7  Q.  And you preferred to have more leverage, correct?

8  A.  Of course.

9  Q.  In the course of your work on the buyer's side both for

10 RSCS and Chick-fil-A, do you have occasion to speak with other

11 buyers of chicken products?

12 A.  Yes.

13 Q.  And do you do that regularly?

14 A.  What would your definition of regularly be?

15 Q.  More than a half dozen times a year.

16 A.  With some, yes; with some, no.

17 Q.  And is one of the reasons you communicate with other

18 purchasers of chicken to get a sense of the marketplace?

19       MR. TORZILLI:  Your Honor, may we have a side bar?

20       THE COURT:  Yes.

21    (At the bench:)

22       THE COURT:  Go ahead, Mr. Torzilli.

23       MR. TORZILLI:  We filed a motion in limine on this

24 very issue to exclude evidence and arguments suggesting that

25 buyers are victims of the charged conspiracy and were somehow

Michael Ledford - Cross

1    complicit or somehow facilitated the conspiracy.  And I think

2    Mr. Feldberg's questions are going into the teeth of precisely

3    what we had moved to exclude.

4            THE COURT:  Response, Mr. Feldberg?

5            MR. FELDBERG:  That's not where we are going with

6    this, Your Honor.  The government's entire theory of this case

7    is that competitors speaking with each other is somehow wrong.

8    All we are showing is that it is not anything unusual,

9    untoward, wrong, illegal, inappropriate, whatever word the

10   government wants to use, for competitors to speak with each

11   other.

12           THE COURT:  Mr. Torzilli?

13           MR. TORZILLI:  Our view is that the communications

14   involving bidding, pricing proposals, negotiation information

15   is at the core of what facilitates the charged conspiracy as

16   opposed to, you know, higher level, more generalized

17   information about maybe market trends.  So I think there is a

18   distinction between the price information that's at the core of

19   our case and other information that might be discussed between

20   market participants that's innocuous.

21           MR. FELDBERG:  That's argument, Your Honor.  If the

22   government has a basis for it, it is free to make that

23   argument, but they have elicited from witnesses that

24   communication among competitors is -- I think one witness said

25   immoral, other witnesses have said inappropriate.  And the fact

Michael Ledford - Cross

1   of the matter is it's normal.  And we're not going to get into

2   what details of what the discussions were, just the fact that

3   they occurred.

4         THE COURT:  This is beyond the scope and it's

5   irrelevant.  It's not that the defendants can't put that on

6   potentially in their case, but the RSCS witnesses have

7   testified that they don't want their suppliers talking with one

8   another and they've explained the reasons why.  So to have him

9   testify about his Chick-fil-A experience or some experience

10  outside of RSCS would not be relevant and it is beyond the

11  scope.  And for that reason, the objection will be sustained.

12        MR. FELDBERG:  Your Honor, if I limited the questions

13  to his time at RSCS, would that be agreeable?

14        THE COURT:  Yeah, that's relevant, and I don't see any

15  problem with that as long as he is talking about RSCS.  Once

16  again, if he is being asked during his time at RSCS was he --

17  did he know how people outside of RSCS did business with other

18  chicken suppliers, that would not be relevant.

19        MR. FELDBERG:  Just so I am clear, I may ask him if he

20  communicated with competitors, with his competitors during his

21  time at RSCS.

22        THE COURT:  Right.  In other words, what competitors

23  are you talking about?

24        MR. FELDBERG:  The principal one would be

25  Mr. Kronaugue from SMS.

431

Michael Ledford - Cross

1              THE COURT:  Oh, I see.   To learn how SMS did business?

2              MR. FELDBERG:  I wasn't planning on going into the

3    details of what they communicated about market conditions, but

4    just the fact that they communicated and communicated

5    regularly.   There are hundreds of texts between them.

6              MR. TUBACH:  This goes directly to the government's

7    theory which is that if competitors on our side of the table

8    were talking, it must have been conspiratorial; but, in fact,

9    if people on the other side of the table were talking to each

10   other as well, that was not.

11             THE COURT:  Mr. Torzilli, response?

12             MR. TORZILLI:  Yes, but the fundamental differences in

13   the questions we were asking and the focus of our case were

14   communications about bids, pricing proposals, negotiations on

15   contracts as opposed to just general communications between

16   people who know each other and are in the same business, so I

17   think there is a fundamental distinction in the nature of the

18   communications that we view as relevant relative to what the

19   defendants view as relevant.

20             MR. FAGG:  John Fagg.  Briefly in response to that,

21   the government is going to ask this jury to make inference

22   after inference after inference about what the communications

23   were about, and I think that this line of questioning is simply

24   that there are other reasons for communications.

25             MS. PREWITT:  Elizabeth Prewitt for Mr. Mulrenin.  As

Michael Ledford - Cross

1    Your Honor is aware, there are going to be various summary

2    charts that are going to put in so you see the number of

3    communications and the duration, so I think this is definitely

4    a relevant issue to inquire into.

5              MR. TUBACH:  Michael Tubach.  Again just to amplify

6    briefly, we believe that Mr. Ledford and Mr. Kronaugue had well

7    over a thousand phone calls with each other and text

8    communications during the charged conspiracy.  This is not a

9    one-off communication.

10             THE COURT:  Mr. Torzilli, let me ask you this.  Will

11   the government be putting in evidence about communications

12   involving Mr. Kronaugue?

13             MR. TORZILLI:  Evidence of communications of

14   Mr. Kronaugue only if he testifies and is on the defendants'

15   witness list.

16             THE COURT:  I still think this is beyond the scope,

17   but for the sake of efficiency and that's looming larger, how

18   many questions would you have, Mr. Feldberg, for Mr. Ledford on

19   this particular topic?

20             MR. FELDBERG:  Less than half a dozen.

21             THE COURT:  Response, Mr. Torzilli?

22             MR. TORZILLI:  We still object as we've previously

23   indicated.  I don't think it's relevant and it is indeed out of

24   the scope of anything that was covered on direct exam.

25             THE COURT:  Well, I think if you -- if we stick with

Michael Ledford - Cross

```
 1   the scope of the direct, there is a danger that Mr. Ledford is

 2   going to have to be brought back.  Once again, if you want to

 3   maintain a scope objection, that's certainly fine, but dragging

 4   people back in I have a feeling will have a negative impact on

 5   the overall efficiency of the case.  What do you want to do?

 6           MR. TORZILLI:  Your Honor, if it's six questions and

 7   five minutes, I think we wouldn't have a scope objection.  We

 8   still have a relevance objection.

 9           THE COURT:  I am going to overrule the relevance

10   objection.  And I won't prejudice Mr. Torzilli from making a

11   scope objection if there are too many questions on a particular

12   topic, but otherwise because Mr. Torzilli is allowing some

13   limited questions as to this topic, the fact that it exceeds

14   the scope will not be an issue for now, all right?

15           Thank you.

16           MR. TUBACH:  The Court's indulgence for one moment.

17      (In open court:)

18   BY MR. FELDBERG:

19   Q.  Mr. Ledford, during your experience at RSCS, did you from

20   time to time speak with other chicken suppliers?

21           MR. TORZILLI:  Objection to use of the term chicken

22   suppliers in that question.

23   BY MR. FELDBERG:

24   Q.  Other purchasers of chicken, you are correct.  Thank you.

25   A.  Yes.
```

434

Michael Ledford - Cross

1   Q.   Was one of them Mr. Kronaugue from SMS?

2   A.   Yes.

3   Q.   How often did you and Mr. Kronaugue speak with each other?

4   A.   I probably would speak to Mr. Kronaugue once a week, maybe

5   once every other week on average.

6   Q.   Would you tell the jury what SMS is?

7   A.   SMS is a purchasing co-op for Popeye's.

8   Q.   And would you speak with Mr. Kronaugue once a week or so on

9   average to discuss market conditions?

10  A.   Typically not.

11  Q.   What would you generally discuss?

12  A.   Mr. Kronaugue is my best friend.  Typically speaking our

13  conversations once a week are personal in nature.

14  Q.   Did you ever discuss market conditions with Mr. Kronaugue?

15  A.   Can you tell me more about what you mean when you say

16  market conditions?

17  Q.   Supply, demand, that sort of thing.

18  A.   Supply and demand, I don't remember a specific example

19  about supply and demand, but it would stand to reason that it's

20  probably come up over the years.

21  Q.   Now, you testified on direct examination, Mr. Ledford, that

22  KFC was losing volume every year during your time at RSCS,

23  correct?

24  A.   Correct.

25  Q.   And it was closing some stores?

Michael Ledford - Cross

1   A.   Correct.

2   Q.   And its business was in decline, correct?

3   A.   Correct.

4   Q.   And you left in 2014, correct?

5   A.   Correct.

6   Q.   And you joined Chick-fil-A.

7   A.   Yes.

8   Q.   And Chick-fil-A's business has been increasing, correct?

9   A.   That's correct.

10  Q.   And you testified that Chick-fil-A has a different

11  philosophy of purchasing chicken than RSCS had, correct?

12  A.   Yes.

13  Q.   And could you remind us what those differences were -- are,

14  excuse me.

15  A.   Yeah, so at RSCS price was, you know, very high, if not at

16  the top of the list, during negotiations.  At Chick-fil-A our

17  philosophy is more of we want a fair price from the suppliers.

18  We want them to make a margin.  We want to make a margin.  We

19  want both sides to be happy with the contracts we enter into

20  because we want them to grow with us and add volume year over

21  year.  And if you're beating them down, so to speak, and they

22  are not happy with the deal, they are less likely to want to

23  grow that business and grow as we grow.

24  Q.   Now, does that make in your view Chick-fil-A a more

25  attractive customer for suppliers?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Why?

3    A.   Because we are growing.  We are one of the few brands that

4    is growing.  Typically speaking, we have been growing at double

5    digit numbers year over year, and as well we value

6    relationships with the suppliers.  We talk about it as it's

7    results and relationships with the suppliers and we treat them

8    like true partners, and so yes, I would say that's correct.

9    Q.   So if Pilgrim's lost volume with Kentucky Fried Chicken,

10   would it have the opportunity to make up that lost volume with

11   Chick-fil-A?

12   A.   I believe that would be a possibility, yes.

13   Q.   And Chick-fil-A was not as focused as RSCS on the lowest

14   possible price, correct?

15   A.   I wouldn't use the term focused.  I would just say it

16   wasn't as important.

17   Q.   So not only would it be possible for Pilgrim's to make up

18   for any lost KFC volume with Chick-fil-A, but it would also be

19   possible that Pilgrim's could do so at a more advantageous

20   price for Pilgrim's, correct?

21   A.   That would be a possibility.

22   Q.   Now, you mentioned in your testimony that at some of the

23   meetings you had with suppliers you had representatives of

24   franchisees present, correct?

25   A.   Correct.

437

Michael Ledford - Cross

1   Q.  Why were franchisees invited to meetings that RSCS had with

2   suppliers?

3   A.  That particular year that we did that, that was part of the

4   recommendation made by PriceWaterhouseCoopers.

5   Q.  And did they give you a reason for the recommendation?

6   A.  They believed, if my memory serves me correctly, that it

7   added some more weight to the negotiation.

8   Q.  When you were at RSCS, Mr. Ledford, it was important to

9   keep the franchisees happy, was it not?

10  A.  Yes.

11  Q.  They were the ultimate owners of the business, correct?

12  A.  That is correct.

13  Q.  And they were the ultimate purchasers of the chicken,

14  correct?

15  A.  That's correct.

16  Q.  Could we -- I want to turn back to the Tyson issue.

17          MR. FELDBERG:  Could we call up, please, Exhibit

18  H-972, not in evidence?

19  BY MR. FELDBERG:

20  Q.  Mr. Ledford, do you recognize Exhibit H-792 for

21  identification?

22  A.  Yes.

23  Q.  What is it?

24  A.  It is an e-mail from Mark Oechsli at UFPC to Brian Roberts

25  at Tyson dated 2014 that is attaching the exhibits for the

Michael Ledford - Cross

1  contract for Tyson.

2          *MR. FELDBERG:*  Could we pull up H-971 for

3  identification?

4  *BY MR. FELDBERG:*

5  *Q.*  Do you recognize 971?

6  *A.*  Yes.

7  *Q.*  And what is that?

8  *A.*  To the best of my knowledge, it is an exhibit that was

9  attached to that previous e-mail.

10 *Q.*  So 971 is the SBRA exhibits that were sent by Mr. Oeschli

11 on December 11, 2013, correct?

12 *A.*  It appears so, yes.

13         *MR. FELDBERG:*  We offer 971 into evidence, Your Honor.

14         *THE COURT:*  Any objection to the admission of H-971?

15         *MR. TORZILLI:*  May I have a moment to confer?

16         *THE COURT:*  Yes.

17         *MR. TORZILLI:*  Thank you, Your Honor.

18         *THE COURT:*  Go ahead.

19         *MR. TORZILLI:*  No objections to H-971.

20         *THE COURT:*  All right.  Then H-971 will be admitted.

21         *MR. FELDBERG:*  Could we display 971 to the jury, Your

22 Honor?

23         *THE COURT:*  Yes.

24 *BY MR. FELDBERG:*

25 *Q.*  Mr. Ledford, what was the contract price for Tyson for 2014

1   for eight-piece COB?

2   A.  .9299.

3   Q.  And would it be fair for Ms. Carwile to fill in that box on

4   the chart sheet she has been making, I-241?

5   A.  Yes.

6   Q.  Thank you.

7        MR. FELDBERG:  Could we call up, please, Government

8   Exhibit 1544, which I believe is in evidence, Your Honor.

9        THE COURT:  I do not show that's in.

10        MS. CALL:  Your Honor, I believe this is one of the

11   documents we discussed yesterday morning.

12        MR. FELDBERG:  Your Honor, I will withdraw that

13   request.

14        THE COURT:  Okay.

15        MR. FELDBERG:  Could we call up, please, Defense

16   exhibit D-530?  I don't believe this is in evidence.

17   BY MR. FELDBERG:

18   Q.  Do you recognize 530, sir?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's an e-mail from Roger Austin to Mark Oechsli.

22   Q.  And is this a transmittal of a round two bid for 2013?

23   A.  I have no idea.

24   Q.  Fair enough.

25        MR. FELDBERG:  Let's call up DX, Defense Exhibit

Michael Ledford - Cross

1   D-329, again not in evidence.

2   *BY MR. FELDBERG:*

3   Q.   Do you recognize Defense Exhibit D-329, sir?

4   A.   Yes.

5   Q.   What is it?

6   A.   It's an e-mail from Roger Austin to myself and Mark

7   Oechsli.

8   Q.   And what is Mr. Austin communicating?

9   A.   He has attached the 2014 COB model.

10  Q.   And that's in November of 2013, correct?

11  A.   Correct.

12  Q.   That's the round two model?

13  A.   I'm not sure exactly what round.  I know it would not be

14  round one that late in the year.  I am not sure if it's round

15  two or not.

16       MR. FELDBERG:   And could we call up, please, Defense

17  Exhibit D-330, not in evidence.

18  *BY MR. FELDBERG:*

19  Q.   Do you recognize D-330, sir?

20  A.   I do not recognize this cover sheet.  I am sorry.

21  Q.   Could you go to the next page, please?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's a cost model for chicken on the bone, summary page.

25  Q.   Is that Pilgrim's round two bid for 2013?

Michael Ledford - Cross

1    A.  To the best of my memory, yes.

2    Q.  And was that the cost model that was transmitted in

3    Mr. Austin's November 20th, 2013 e-mail, D-329?

4    A.  It appears that way, yes.

5         MR. FELDBERG:  Your Honor, we offer D-330.

6         THE COURT:  Any objection to the admission of Exhibit

7    D-330?

8         MR. TORZILLI:  I do, Your Honor.  It says, at least

9    the native file that's being displayed, it says it's period one

10   as opposed to a pricing proposal or a bid submission.

11        THE COURT:  Response, Mr. Feldberg?

12        MR. FELDBERG:  May I confer, Your Honor?

13        THE COURT:  Yes.  If he would.

14        MR. FELDBERG:  May I ask a foundation question?

15        THE COURT:  Of course.

16   BY MR. FELDBERG:

17   Q.  Mr. Ledford, in your experience at RSCS, were bids from

18   time to time expressed as period one bids rather than contract

19   year bids?

20   A.  I do not recall.

21   Q.  Okay.  Fair enough.

22        MR. FELDBERG:  We will offer it, Your Honor, as a

23   period one bid for 2014.

24        THE COURT:  Any objection to the admission of D-330?

25        MR. TORZILLI:  Same objection.

Michael Ledford - Cross

1        THE COURT:  All right.  If you could ask a few more

2    foundation questions, Mr. Feldberg.  Sustained.

3    BY MR. FELDBERG:

4    Q.  Mr. Ledford, what do you recognize 330 to be?

5    A.  It's a summary sheet of all the prices for chicken on the

6    bone.

7    Q.  I am sorry, I didn't hear the last thing you said.

8    A.  For chicken on the bone.

9    Q.  And that is a proposal or a model from Pilgrim's to RSCS,

10   correct?

11   A.  I'm not sure if this is a proposal since it says period one

12   on it or if it was just them turning in their period one

13   pricing which was more of a billing exercise than it was a

14   negotiation.  You know, it would have just been a submittal if

15   it was period, so I am not sure if this was period or if it was

16   a proposal.

17   Q.  Fair enough.  Typically would you get a period -- I think

18   you said billing statement in November of 2013 for the period

19   December 29th?

20   A.  No.  Typically I would not.

21   Q.  Typically that would be a model?

22   A.  Typically it would in November, yes.

23   Q.  And since this was transmitted to you -- to you on

24   November 20 of 2013, does that lead you to conclude that this

25   is a model?

Michael Ledford - Cross

1    *A.*  I think that would be a fair assumption.

2            *MR. FELDBERG:*  We offer it, Your Honor.

3            *THE COURT:*  Any objection to Exhibit D-330?

4            *MR. TORZILLI:*  May I ask for a copy of D-329?

5            *THE COURT:*  Yes.

6            *MR. TORZILLI:*  No objection to D-330.

7            *THE COURT:*  D-330 will be admitted.

8    *BY MR. FELDBERG:*

9    *Q.*  Mr. Ledford, what is the price or proposal for supplemental

10   dark meat in D-330?

11   *A.*  Eight-piece price lists 30 and a half cents.

12   *Q.*  Do you recall whether that was a change from Pilgrim's

13   prior bid on dark?

14   *A.*  I do not recall.

15   *Q.*  Fair enough.  We'll come back to that.

16           *MR. FELDBERG:*  Your Honor, at this time I have no

17   further questions.

18           *THE COURT:*  Thank you very much.

19           *MR. FELDBERG:*  Oh, one second.  I am reminded that I

20   would now like to offer Exhibit I-241 as a summary exhibit.

21           *THE COURT:*  Okay.  Under 1006?

22           *MR. FELDBERG:*  Under 1006, Your Honor.

23           *THE COURT:*  Any objection to the admission of I-221

24   under Rule 1006?

25           *MR. TORZILLI:*  Yes, Your Honor.  We haven't had an

Michael Ledford - Cross

1    opportunity to fully study it and to verify that it does indeed

2    accurately reflect the underlying information.

3        THE COURT:  Well, the underlying information was

4    examined in court, but that makes it an inappropriate exhibit

5    under 1006 anyway since it could be conveniently compiled in

6    court, so the objection will be sustained.

7        MR. FELDBERG:  Thank you, Your Honor.

8        THE COURT:  Additional cross-examination?

9        Mr. Fagg, go ahead.

10                     **CROSS-EXAMINATION**

11   BY MR. FAGG:

12   Q.  Good morning, Mr. Ledford.

13   A.  Good morning.

14   Q.  My name is John Fagg and I represent Bill Lovette.  I just

15   have a few questions for you today and will be brief and

16   hopefully not ask you about any documents and not ask you to

17   refresh your recollection.

18       So you've worked, sir, in the chicken industry for

19   more than two decades, correct?

20   A.  That's correct.

21   Q.  And you worked on the supply side of the industry, correct?

22   A.  Yes.

23   Q.  And you worked on the buy side of the industry as well,

24   correct?

25   A.  Yes.

Michael Ledford - Cross

1  Q.  And on the buy side, sir, you've worked for some of the

2  biggest players in the industry, yes?

3  A.  Correct.

4  Q.  And so based on your experience in this arena, I would like

5  to ask you just a couple of fundamental questions, okay?

6  A.  Okay.

7  Q.  At the end of the day ensuring continued supply of small

8  birds is paramount in the industry, yes?

9  A.  It is certainly paramount in my previous two employers,

10  yes.

11  Q.  And your previous employers you mean Chick-fil-A?

12  A.  Chick-fil-A and RSCS, yes.

13  Q.  And there was a risk of perhaps having interrupted supply

14  in 2014, right?

15  A.  Yes.

16  Q.  And one result of that heightened risk was that there would

17  need to be a premium paid for small bird chickens in 2014,

18  correct, going into 2015?

19  A.  Clarifying question.  Are you talking about for the 2015

20  calendar year or the 2014 calendar year?

21  Q.  2014 going into the 2015 calendar year.

22  A.  So to the best of my knowledge, you know, I wasn't

23  involved, obviously, at RSCS.  I had left at that time.  And I

24  do not recall feeling that same pressure at Chick-fil-A that I

25  had for tight supply while I was at RSCS in that 2014 calendar

Michael Ledford - Cross

1    year.

2    *Q.*  But you knew when you were at Chick-fil-A, did you not,

3    that supply was down for small birds?

4    *A.*  For small birds in general, yes, I do recall that, yes.

5    *Q.*  And demand was up, right?

6    *A.*  Yes, that's correct.

7    *Q.*  And a result of a decreased supply and increased demand is

8    a premium price.

9    *A.*  Typically speaking, yes, that's how supply and demand

10   works.

11          *MR. FAGG:*  Thank you.  No other questions.

12          *THE COURT:*  Thank you, Mr. Fagg.

13          Ms. Prewitt, go ahead.

14                    **CROSS-EXAMINATION**

15   *BY MS. PREWITT:*

16   *Q.*  Hello, Mr. Ledford.  My name is Elizabeth Prewitt and I

17   represent Tim Mulrenin.  And look, I didn't bring any paper to

18   the podium.  I didn't bring my reading glasses, so I think at

19   least my intention is to ask you a few questions, if that's

20   okay.

21   *A.*  Yes.

22   *Q.*  So you know Mr. Mulrenin and he was a salesperson with

23   respect to RSCS while he was at Tyson, correct?

24   *A.*  Correct.

25   *Q.*  And you know him as a salesperson to Chick-fil-A while he

Michael Ledford - Cross

1    was at Tyson as well, right?

2    A.   Correct.

3    Q.   And you also know him as a salesperson on behalf of Perdue,

4    another chicken supplier, servicing Chick-fil-A, correct?

5    A.   That is correct.

6    Q.   And he currently is acting in a sales capacity and

7    interfacing with you on behalf of Perdue to supply to

8    Chick-fil-A, correct?

9    A.   That is correct.

10   Q.   And, in fact, isn't it the case that you specifically

11   consented to agree that Mr. Mulrenin would continue to service

12   the Chick-fil-A account while at Perdue; is that right?

13   A.   Yes, that is correct.

14   Q.   And he currently serves in that capacity and interacts with

15   you as a salesman on behalf of Perdue to supply chicken

16   products to Chick-fil-A.

17   A.   That's correct.

18        MS. PREWITT:  That's all I have, Your Honor.

19        THE COURT:  Thank you, Ms. Prewitt.

20        Mr. Pollack, go ahead, or whoever.

21                        **CROSS-EXAMINATION**

22   BY MR. POLLACK:

23   Q.   Good morning, Mr. Ledford.

24   A.   Good morning.

25   Q.   Give me just a second here.

Michael Ledford - Cross

1         Mr. Ledford, you have been asked a number of questions

2   about suppliers covering shorts with each other.  I want to go

3   back to that topic just for one issue.  You had said earlier in

4   your testimony that you understood that when one supplier

5   purchased KFC chicken from another KFC supplier, they might

6   learn some information about the selling supplier's current

7   contract price with you, current period price.

8   A.  Yes, I believe I said that was a possibility, yes.

9   Q.  But you weren't concerned about that possibility, correct?

10   A.  No, I was not.

11   Q.  Because a supplier simply knowing a current period price of

12   another supplier would not have an impact on the

13   competitiveness of the bid process to obtain future contracts

14   in response to RFPs.

15   A.  Correct.  My view was there was enough that was -- that

16   could fluctuate from period to period among supplier to

17   supplier, that it would not necessary be an apples to apples

18   with what was going on during the negotiation.

19   Q.  And therefore wouldn't have any meaningful impact on the

20   negotiation.

21   A.  Correct.

22   Q.  With respect to George's, Mr. Ledford, Ric Blake was your

23   primary day-to-day contact at George's?

24   A.  That is correct.

25   Q.  But when it came to pricing negotiations, Mr. Blake's

Michael Ledford - Cross

1   superiors would become involved; is that correct?

2   A.   Yes, that's correct.

3   Q.   Specifically with respect to pricing negotiations, you

4   interacted with a gentleman by the name of Darrell Keck?

5   A.   Yes.

6   Q.   And you understood that Mr. Keck was Mr. Blake's boss?

7   A.   That is correct.

8   Q.   And when it came to pricing negotiations, Charles George

9   also got involved; is that correct?

10  A.   Yes.

11  Q.   And you knew that Charles George was part of the George's

12  family, correct?

13  A.   Absolutely.

14  Q.   George's, I believe he is in the fourth generation of

15  George's to own George's chicken?

16  A.   I believe that's correct.

17  Q.   And I believe he had the title of CEO or co-CEO with his

18  brother?

19  A.   Yes, that's correct.

20  Q.   He was at least two levels above Mr. Blake.

21  A.   At least, yes.

22  Q.   And with respect again to the pricing negotiations, would

23  it be fair to say that while you knew that Mr. George was

24  involved, your primary point of contact for pricing

25  negotiations was Darrell Keck.

450

Michael Ledford - Cross

1  *A.*  Actually, to the best of my recollection, I would put

2  Mr. Keck and Mr. George equally involved in the negotiations

3  and in charge of them on the George's end.

4  *Q.*  Fair enough.

5      *MR. POLLACK:*  Now, I would like to display, Your

6  Honor, F-759, which I believe Mr. Feldberg introduced into

7  evidence.

8      *THE COURT:*  Let me just check it.

9      *MR. POLLACK:*  Certainly, Your Honor.

10     *THE COURT:*  It has been admitted.

11     *MR. POLLACK:*  If I could go ahead and display F-759.

12     *THE COURT:*  You may.

13 *BY MR. POLLACK:*

14 *Q.*  This is the George's contract that was entered into late in

15 2011 to cover the 2012 calendar year; is that correct?

16 *A.*  Yes.

17 *Q.*  And the contract is signed by Mr. Keck?

18 *A.*  Yes.

19 *Q.*  But from your experience he would not enter into that

20 contract without the approval of Mr. George?

21 *A.*  Yes, that's correct.

22 *Q.*  And can you tell us for the 2012 calendar year what was

23 George's contract price for COB, chicken on the bone, FOB, free

24 onboard.  If you need the next page, let us know.

25 *A.*  .9686.

Michael Ledford - Cross

1   Q.  And the price for dark meat.  And again, if you need the

2   page to be turned, just let us know.

3   A.  It was 30 back of the eight-piece market, eight-piece

4   price.

5   Q.  And what I would like to do, Mr. Ledford, is start my own

6   demonstrative exhibit which I have premarked as I-201.

7          MR. POLLACK:  It is a one-page document, Your Honor,

8   but what I'll do is sort of display each part of it as I talk

9   about it, if that's all right.

10          THE COURT:  That's fine.

11          MR. POLLACK:  If we can just show the top of it and

12   then the first line relating to 2011 and the 2012 contract

13   prices.  Can I display that to the jury, Your Honor?

14          THE COURT:  For demonstrative purposes?

15          MR. POLLACK:  Yes, for demonstrative purposes only.

16          THE COURT:  Any objection, Mr. Torzilli, to the

17   display of that line for demonstrative purposes?

18          MR. TORZILLI:  No objection to that.

19          THE COURT:  It may be.

20          MR. POLLACK:  Thank you.

21   BY MR. POLLACK:

22   Q.  I have to apologize because it's not in color and I don't

23   have any cartoons, but we will work with it.  Does that

24   accurately reflect the information for the 2012 contract year?

25   A.  Yes.

452

Michael Ledford - Cross

1    *Q.*  Okay.

2         *MR. POLLACK:*  And then if I can go to 9710 which is in

3    evidence introduced by the government during your direct

4    examination.

5         May I display that, Your Honor?

6         *THE COURT:*  One moment.  Yes, you may.

7    *BY MR. POLLACK:*

8    *Q.*  And this is the -- this sort of starts the bidding season,

9    if you will, for the 2013-year; is that correct?

10   *A.*  Yes, that's correct.

11   *Q.*  And this goes out from UFPC which is RSCS's predecessor in

12   September of 2012, correct?

13   *A.*  Yes.

14   *Q.*  So the 2012 contract that we just looked at is still in

15   effect and now we're starting the bidding for the 2013

16   contract; is that correct?

17   *A.*  Yes.

18   *Q.*  And this happens to be the one that went out to Mr. Austin

19   at Pilgrim's?

20   *A.*  Yes.

21   *Q.*  The government asked if the same or similar ones went out

22   to all the other suppliers; is that correct?

23   *A.*  That's correct.

24   *Q.*  But I don't believe they actually showed you the one that

25   went to George's.

Michael Ledford - Cross

1    A.   I don't recall that.

2          MR. POLLACK:  I am going to ask if I can just for the

3    witness to display what I have marked as H-855, is that

4    correct, or is it -- I am sorry, it might be B -- no, it is H;

5    is that correct?

6          THE COURT:  It's H.

7          MR. TORZILLI:  Your Honor, I have H-855 handed to me

8    by defense counsel.

9          THE COURT:  Right.

10         MR. POLLACK:  Okay.  We are correct.  I just had it

11   wrong in my notes.  I apologize.

12   BY MR. POLLACK:

13   Q.   Can you identify, please, what is H-855?

14   A.   It is an invitation to Darrell Keck at George's inviting

15   them to be part of the RFP process for the 2013 calendar year.

16   Q.   From your company?

17   A.   Yes.

18   Q.   And you recognize this as a document your company routinely

19   sent out and maintained?

20   A.   Yes.

21         MR. POLLACK:  I'd move the admission of H-855.

22         THE COURT:  Any objection to H-855?

23         MR. TORZILLI:  Without objection.

24         THE COURT:  H-855 will be admitted.

25         MR. POLLACK:  Can I display that to the jury, Your

Michael Ledford - Cross

1    Honor?

2            THE COURT:  Yes, you may.

3    BY MR. POLLACK:

4    Q.  So this is just like the one that went to Pilgrim's.  It

5    goes out on the same date, September 26, 2012, correct?

6    A.  Correct.

7    Q.  But this one goes to George's.

8    A.  Correct.

9    Q.  And with respect to George's in particular, it goes to

10   Mr. Keck.

11   A.  That's correct.

12   Q.  Mr. Blake is not even copied on this, correct?

13   A.  No, he is not.

14           MR. POLLACK:  And I would like to go to 1406.  And

15   maybe you can do 1406 and 1407 side by side, and I believe they

16   were also both admitted by the government.

17           THE COURT:  1406, yes.  I don't show 1407 as being in.

18           MR. POLLACK:  1407 is the attachment to 1406.  Maybe

19   the government gave it a different number.

20           MR. TORZILLI:  Your Honor, I believe defense counsel

21   my be referring to Exhibit 9690.

22           THE COURT:  9690 is in.

23           MR. POLLACK:  We can use 9690.  I think 9690 is the

24   native version of what the government had marked as 1407, but

25   they only gave us a copy of 1407, not a copy of the native

Michael Ledford - Cross

1  version.

2          THE COURT:  9690 includes the native version, but

3  there is a paper copy too.

4          MR. POLLACK:  Other than that cover sheet, is there an

5  actual -- okay, that will work.  That will work.

6          Thank you, Your Honor.  I appreciate the assistance.

7  Thank you, Mr. Torzilli.

8  BY MR. POLLACK:

9  Q.  So this is --

10          MR. TORZILLI:  Just a point of clarification, what's

11  on the screen is 1406 as opposed to 9690.

12          THE COURT:  He wanted to do it side by side I think

13  was the intent.

14          Go ahead Mr. Pollack.  Actually, Mr. Pollack, we are

15  just at noon now, but if you want to ask a question or two.

16          MR. POLLACK:  We can go ahead and take our lunch break

17  and take this up because this will start another line of

18  questions.

19          THE COURT:  Okay.  Ladies and gentlemen, let me

20  explain something to you about our schedule.  In our continuing

21  effort to try to handle objections to the admission of exhibits

22  outside of your presence so that you're not sitting there

23  listening to white noise, we are going to devote Friday to that

24  effort, which means that you're not going to need to come in on

25  Friday, okay?  And we tried to do that so it would be most

Michael Ledford - Cross

1    convenient to you.  So that will give you -- we won't have any

2    court tomorrow.  It's Veterans Day.  So that will give you four

3    days off, all right?  So I want to mention that to you now so

4    in the event you wanted to do a little planning, you could do

5    so, all right?  But we will go through the rest of today and

6    then we'll start up again on Monday, but I just wanted to let

7    you know that in advance, all right?

8            Over the lunch hour, ladies and gentlemen, keep the

9    admonitions in mind.  Keep your yellow juror buttons visible.

10   The jury is excused for lunch.  Thank you.

11           We will reconvene at 1:30.

12           (Jury excused.)

13       THE COURT:  Mr. Ledford, you are excused until 1:30.

14   Thank you.

15           Anything to take up at this time before we break?

16       MR. BYRNE:  Your Honor, I just wanted to alert the

17   Court we filed a document about an hour ago.  It's Docket No.

18   819, in anticipation of Mr. Brink perhaps testifying this

19   afternoon because it could come up with him and Ms. Hoyt, so I

20   just wanted to alert you and the government that that's on

21   file.

22       THE COURT:  Okay.

23       MR. BYRNE:  I don't know if we will get to Mr. Brink

24   or not.

25       THE COURT:  Do we anticipate getting to Mr. Brink

Michael Ledford - Cross

1   potentially?

2          MS. SWEENEY:  If we finish Mr. Skalak today, then

3   Mr. Brink would be the witness after him.

4          THE COURT:  Okay.  I will look for that.

5          MR. BYRNE:  Thank you.  It's not very long.  Thank

6   you.

7          THE COURT:  Anything else to take up at this time?

8          MS. CALL:  One quick process question, Your Honor.

9   The government received two additional certifications for

10  self-authenticating devices.  Would you prefer we admit them or

11  offer them into evidence at the relevant time or file a

12  supplement to our motion regarding self-authenticating

13  evidence?  This is related to cellular device extraction.

14         THE COURT:  You could do it either way, but if you

15  would make sure to provide those to everyone including the

16  Court so that I can be familiar with it.

17         We will be in recess until 1:30.

18     (Recess at 12:02 p.m.)

19     (Reconvened at 1:31 p.m.)

20         THE COURT:  Let's go ahead and get the jury.

21     (Jury present.)

22         THE COURT:  Go ahead, Mr. Pollack.

23         MR. POLLACK:  Thank you, Your Honor.

24  BY MR. POLLACK:

25  Q.  Good afternoon.

Michael Ledford - Cross

1    A.  Good afternoon.

2    Q.  Let me just pick up with where we left off before the lunch

3    break.

4         So September 26, 2012, your company, UFPC, sends out

5    the invitation for the first round bids, right?

6    A.  Correct.

7    Q.  And we saw that invitation go to Mr. Keck, correct?

8    A.  Correct.

9    Q.  And it asked for a response by October 10th, 2012; is that

10   right?

11   A.  Yes.

12        MR. POLLACK:  Okay.  So if we can put up side by side

13   and publish to the jury, Your Honor, 1406, which I think is

14   already in evidence but I don't think the government displayed

15   to the jury, and 9690, which was the attachment to 1406, which

16   I think is not only in evidence, but was displayed.

17        THE COURT:  You may.

18        MR. POLLACK:  So if we can put those up for the jury.

19   Great.

20   BY MR. POLLACK:

21   Q.  So Mr. Ledford, am I correct that this is Mr. Keck

22   responding to UFPC's invitation and this is George's first

23   round bid?

24   A.  That is correct .

25   Q.  And on the cover e-mail Mr. Blake is copied, correct?

Michael Ledford - Cross

1   *A.*   Yes.

2   *Q.*   But the e-mail is coming from Mr. Keck.

3   *A.*   That's correct.

4   *Q.*   And if we look at the attachment, what was the FOB price or

5   bid, the offer that George's was making in this first round?

6   *A.*   .9694.

7   *Q.*   And what was the bid or the offer that they were making for

8   dark meat?

9   *A.*   Eight-piece minus 28 cents per pound.

10          *MR. POLLACK:*   And if we can then go back to the

11   demonstrative, I-201, and show that to the jury, please, if we

12   can.

13          *THE COURT:*   The entire thing?

14          *MR. POLLACK:*   No, again we are following along, so we

15   are just going to show the part that we saw before, but now we

16   are going to add in the round one bid.

17          *THE COURT:*   Any objection to the display of what may

18   appear on the screen?   I am not sure if you can see that,

19   Mr. Torzilli.

20          *MR. TORZILLI:*   No objection to what appears on the

21   screen.

22          *THE COURT:*   All right.   And that may be displayed for

23   demonstrative purposes.

24          *MR. POLLACK:*   Thank you, Your Honor.

25   *BY MR. POLLACK:*

460

Michael Ledford - Cross

1  Q.  So Mr. Ledford, if you can see that, am I correct George's

2  round one bid was .9694?

3  A.  Yes.

4  Q.  And 28 back for dark meat.

5  A.  Yes.

6  Q.  And if you compare that to what their contract price was

7  for 2012, the contract that's in existences at the time that

8  they are making this bid, they are actually proposing an

9  increase in price, correct?

10  A.  Correct.

11  Q.  An increase in price for the eight-piece, correct?

12  A.  Yes.

13  Q.  And then not only that, but the dark meat they are only

14  going to give you 28 cents less instead of 30 cents left, so

15  it's kind of a double whammy on the dark meat because it's

16  going to be less back from a higher number, correct?

17  A.  Correct.

18  Q.  And after George's made that first round proposal, do you

19  recall just a couple of days later having some correspondence

20  with Mr. Keck?

21  A.  I do not recall.

22       MR. POLLACK:  If I can put up just for Mr. Ledford and

23  counsel and, of course, the Court B-936.

24  BY MR. POLLACK:

25  Q.  Mr. Ledford, tell me when you have had an opportunity to

Michael Ledford - Cross

1    review that.

2    A.  Okay.

3         MR. POLLACK:  I apologize.  I think I did not give

4    Mr. Torzilli a copy.

5    BY MR. POLLACK:

6    Q.  Mr. Ledford, do you recognize this as an e-mail exchange

7    that you had with Mr. Keck a couple of days after Mr. Keck had

8    submitted George's first round bid?

9    A.  Yes.

10   Q.  And Mr. Keck was asking some questions, maybe seeking some

11   guidance from you; is that fair?

12   A.  Yes.

13   Q.  And you responded with some feedback; is that correct?

14   A.  Yes, I did.

15        MR. POLLACK:  Your Honor, I would like to move the

16   admission of 936 not for the truth of what is asserted there,

17   but to show who the participants are in the conversation and

18   the feedback that would then have an effect on the listeners.

19        THE COURT:  And not for the truth as to either of the

20   two e-mails?

21        MR. POLLACK:  Correct, not to the truth as to any of

22   the statements in either e-mail.

23        THE COURT:  All right.  Any objection to B-936 for

24   that limited purpose?

25        MR. TORZILLI:  Your Honor, it is hearsay, but if it's

Michael Ledford - Cross

1    only being admitted for the nontruth purpose that was

2    described, we have no objection to it being admitted for that

3    limited purpose.

4          THE COURT:  So Mr. Pollack, not for the truth of the

5    matter, but rather you indicated for those persons who were

6    parties to the communications.

7          MR. POLLACK:  That's correct, Your Honor.

8          THE COURT:  Okay.  Ladies and gentlemen, then for that

9    limited purpose, I will admit B-936.

10         MR. POLLACK:  And if we may publish it to the jury,

11   Your Honor.

12         THE COURT:  You may.

13   BY MR. POLLACK:

14   Q.  And again the bottom e-mail is from you -- from Mr. Keck to

15   you a couple of days after he had submitted the first round

16   bid, correct?

17   A.  Yes.

18   Q.  And then you respond with some feedback in response to

19   Mr. Keck's questions; is that correct?

20   A.  That is correct.

21   Q.  And the response goes directly to Mr. Keck, correct?

22   A.  Yes.

23   Q.  But you also copy a number of people in your organization,

24   UFPC.

25   A.  Yes.

Michael Ledford - Cross

1    Q.  You copy Mr. Blake.

2    A.  Yes.

3    Q.  You copied Greg Nelson.  Who was Greg Nelson?

4    A.  Greg Nelson was another member of the George's sales team

5    out of their Virginia office.

6    Q.  Do you know if Mr. Nelson was at Mr. Blake's level or above

7    Mr. Blake?

8    A.  I believe he was at the same level as Mr. Blake.

9    Q.  And then you also copied Charles George, correct?

10   A.  Correct.

11   Q.  And that is on October 12th, correct?

12   A.  Yes.

13         MR. POLLACK:  Let's go then to 1439 which is in

14   evidence.

15         And if we can show that to the jury, Your Honor.

16         THE COURT:  Yes, you may.

17   BY MR. POLLACK:

18   Q.  And this is the invitation for a second round of bids that

19   went out to all the suppliers, correct?

20   A.  Correct.

21   Q.  And the government happened to show you the one that went

22   to Mr. Austin at Pilgrim's?

23   A.  Correct.

24         MR. POLLACK:  Let me show you Government Exhibit 1405,

25   which I do not believe is in evidence yet.

Michael Ledford - Cross

1          *THE COURT:*  That's correct.

2     *BY MR. POLLACK:*

3     Q.  And this is an e-mail chain.  Mr. Ledford, if you could

4     start at the bottom of that chain.

5          *MR. POLLACK:*  And Brian, if you can help us out on

6     that.

7     *BY MR. POLLACK:*

8     Q.  Do you recognize the first e-mail in the chain,

9     Mr. Ledford, to be UFPC's invitation for a second round of

10    bids, but this one being the one that went to George's?

11    A.  Yes.

12    Q.  Specifically to Mr. Keck.

13    A.  Correct.

14    Q.  Mr. Blake is not copied on that e-mail.

15    A.  No, he is not.

16    Q.  And then there is a series of e-mails above that where you

17    and Mr. Keck exchange e-mails where Mr. Keck is asking to

18    schedule a telephone call to discuss your reaction to the first

19    round bid.

20         *MR. TORZILLI:*  Your Honor, I object.  The document has

21    not been received into evidence.

22         *MR. POLLACK:*  I am not quoting from it.  I am asking

23    about the subject matter.

24         *THE COURT:*  Any objection to that?

25         *MR. TORZILLI:*  No objection if it's foundational-type

1    questions.

2            THE COURT:  All right.  Go ahead.  Overruled.

3    BY MR. POLLACK:

4    Q.  And I correctly characterized the nature of this

5    correspondence?

6    A.  Yes, you did.

7    Q.  And you recognize this correspondence?

8    A.  Yes, I do.

9            MR. POLLACK:  Your Honor, I would like -- well, let me

10   do it this way.

11   BY MR. POLLACK:

12   Q.  The initial e-mail, the bid invitation, that's something

13   that UFPC would send out in the ordinary course of its

14   business?

15   A.  Yes.

16           MR. POLLACK:  What I would like to do is move the

17   admission of 1405.  For the bottom e-mail I would like to move

18   it in as a business record is the basis for admission.  For the

19   subsequent e-mails again it is not for the truth of any matter

20   asserted in any of those e-mails.  It is both for to show who

21   was having the communications and the effect on the

22   participants to those communications.

23           THE COURT:  Any objection to the admission of 1405

24   under those limited purposes?

25           MR. TORZILLI:  No objection to -- moment to confer,

1   Your Honor?

2          THE COURT:  Yes.

3          MR. TORZILLI:  Your Honor, no objection to the

4   admission of the initial e-mail in 1405.  And then for the

5   subsequent e-mails no objection for them being admissible for

6   the recipients or the participants in the e-mails, but we do

7   object to the effect of the recipients on foundational grounds.

8          THE COURT:  All right.  I will admit it, the initial

9   invitation for all purposes.  And as to the remainder of the

10  e-mails, I will admit it only for the limited purposes of

11  indicating who received or responded, but not for the truth of

12  the matter asserted.  And let's see, what was the other part of

13  it?  Not for the effect on the listener either.

14         MR. POLLACK:  Thank you, Your Honor.  May we publish

15  it to the jury?

16         THE COURT:  You may.

17  BY MR. POLLACK:

18  Q.  So again, Mr. Ledford, the bottom is just the invitation

19  for the second round similar, if not identical, to what you

20  sent to Pilgrim's we've already looked at, right?

21  A.  Correct.

22  Q.  And then Mr. Keck writes to you and to others at UFPC?

23  A.  Yes.

24  Q.  And he does not copy Mr. Blake.

25  A.  No, he does not.

Michael Ledford - Cross

1    Q.  And then you have a follow-up with him.  You don't copy

2    Mr. Blake, correct?

3    A.  No, I do not.

4    Q.  And do you recall having a phone call with Mr. Keck in this

5    time frame?

6    A.  I do not recall.

7            MR. POLLACK:  Your Honor, I would like to show the

8    witness what I have marked as C-072, not in evidence, for the

9    purposes at the moment to refresh his recollection.

10           THE COURT:  You may.

11   BY MR. POLLACK:

12   Q.  And let me know when you have had a chance to look at it,

13   and then I am going to ask you a question about it.

14   A.  Okay.

15   Q.  And to be clear, this is a calendar invite, correct?

16   A.  Yes.

17   Q.  It is not your calendar invite.

18   A.  No, it is not.

19   Q.  But it is a calendar invite for the George's participants

20   in a call with UFPC on November 8th, 2012?

21   A.  Yes.

22   Q.  Does that refresh your recollection as to whether or not

23   you had a telephone call on or about November 8th after the

24   second round request for invitations went out on November 7?

25   A.  Based on this, it appears that I did.

Michael Ledford - Cross

1    Q.  Do you recall, Mr. Ledford, in a call with representatives

2    from George's on or about November 8th, 2012, providing some

3    guidance to them with respect to the first round bid, their

4    first round bid?

5    A.  I do not specifically recall that.

6    Q.  Does that sound like something you would have done?

7    A.  It sounds like that's what we would have discussed in the

8    calendar invite, yes.

9    Q.  And specifically do you recall telling the representatives

10   at George's that they needed to find 63 points from their first

11   round bid?

12   A.  I do not recall that.

13   Q.  If I use the phrase 63 points, do you know what that means?

14   A.  Yes.

15   Q.  Explain what it would mean to find 63 points.

16   A.  That would mean to find .63 cents per pound, so a little

17   over a half a penny per pound on the price to come down.

18   Q.  It would be an indication that you are seeking a price

19   reduction of 63/100ths of a cent?

20   A.  That's correct.

21   Q.  And would that relate to the COB product, the eight-piece?

22   A.  It would stand to reason, yes.

23   Q.  Do you recall giving guidance with respect to the dark meat

24   price?  We just saw that their first round bid was 28 back?

25   A.  I do not recall specifically, no.

Michael Ledford - Cross

1   Q.  I am trying to break it up.  You do recall that their first

2   round bid we just looked at was 30 cents back, correct?

3   A.  Yes, I do.

4   Q.  And so now my question is do you recall giving them -- I

5   apologize.  I messed that up.

6   A.  28 cents.

7   Q.  28 cents back.

8   A.  I recall 28 cents.

9   Q.  The current 2012 contract price was 30 back.

10  A.  Correct.

11  Q.  The first round bid was 28 back.

12  A.  That's right.

13  Q.  Okay.  Do you recall giving them guidance that you wanted

14  them to get to 31 back?

15  A.  I do not recall that.

16        MR. POLLACK:  Your Honor, I would like to show the

17  witness two documents, what have been marked as exhibits --

18  Government Exhibits 1510 and 1511.  I do not believe they are

19  in evidence.  I was just asking to show them to the witness to

20  see if they refresh his recollection.

21        THE COURT:  Right.  They are not in evidence and they

22  can be displayed for refreshing purposes.

23  BY MR. POLLACK:

24  Q.  Again, I am going to give you a minute to take a look at

25  it.  After you have had a chance, let me know, and I will ask

Michael Ledford - Cross

1  you a question or two about it.

2  A.  Okay.

3  Q.  And again to be clear what you are looking at is you are

4  looking at a cover e-mail and some handwritten notes, correct?

5  A.  Correct .

6  Q.  And it is not your e-mail.  You are not on the e-mail

7  chain, correct?

8  A.  Correct.

9  Q.  And they are not your notes, correct?

10  A.  Correct.

11  Q.  But they purport to be notes of a call with UFPC.  Does

12  looking at them refresh your recollection as to whether or not

13  you conveyed to the representatives of George's that they

14  needed to find 63 points?

15  A.  No, I don't believe I could speak to the accuracy of

16  Darrell Keck's notes.

17  Q.  You just don't recall one way or the other?

18  A.  No, I do not.

19  Q.  Is that the kind of guidance that you would see yourself

20  giving?

21  A.  I would surely expect that I would have told him that 28

22  cents was too high on the dark meat.

23  Q.  Well, does this refresh your recollection that you told him

24  that you wanted to get to 31 cents back?

25  A.  I do not remember a specific target.

Michael Ledford - Cross

 1  *Q.* Again, would it be consistent or inconsistent with your

 2  general practice to give that kind of guidance?

 3  *A.* It would be consistent.

 4  *Q.* Would be consistent.

 5  *A.* Yes.

 6  *Q.* Thank you. Did George's then submit a second round bid on

 7  November 14, 2012?

 8  *A.* I am not sure of the date, but I am sure they submitted a

 9  round two bid.

10      *MR. POLLACK:* Your Honor, I am going to ask the

11  witness to look at what I have marked as C-024 and an

12  attachment to C-024 which I have marked as C-024-1.

13      *THE COURT:* Is it C-024-1?

14      *MR. POLLACK:* C-024-1, yes, Your Honor. And then

15  there is also a native version of C-024-1 which -- how do we

16  have the native version marked or do we, Brian?

17      *THE COURT:* C-024-1, if we use the practice we have

18  done in the past with some other documents that also have a

19  native version, we could just note that it would include the

20  native version if C-024-1 also has a paper version. Up to you.

21      *MR. POLLACK:* Your Honor, what I would propose to do

22  is show the witness C-024 and the electronic version or native

23  version of C-024-1, but what I will seek to admit is the paper

24  version of C-024-1 which is simply a PDF of the native version.

25  I have provided that PDF to the government.

Michael Ledford - Cross

1           THE COURT:  That's fine.

2           MR. POLLACK:  So let's go ahead and show the witness,

3    if we can, both the cover, C-024, and then the native version

4    of C-024-1.

5           MR. TORZILLI:  Your Honor, may I and defense counsel

6    for a copy of C-024?

7           MR. POLLACK:  I am sorry.  I thought I had given that

8    to you.  I have entirely too much paper.

9           Brian, if you can go ahead and put it up on the

10   screen.

11          I am sorry, Mr. Torzilli.  I don't seem to have a

12   paper copy.

13          THE COURT:  Mr. Quinn has got one.

14          MR. POLLACK:  I magically have a paper copy.

15          MR. TORZILLI:  Thank you.

16          MR. POLLACK:  Thank you.

17          Can we give Mr. Ledford C-024 and C-024-1 side by

18   side?  I apologize.  I see the problem here.  I wasn't supposed

19   to give you C-024.  I was supposed to give you C-023.  Let

20   me -- let me start again, Your Honor.  C-023 is the cover

21   e-mail.  C-024 is the PDF of the electronic version.  C-024-1

22   is the native version.

23          THE COURT:  Okay.  Makes sense.

24          MR. POLLACK:  So what we really need is to give

25   Mr. Ledford C-023 and C-024-1 side by side.

473

Michael Ledford - Cross

1   *BY MR. POLLACK:*

2   *Q.*  Mr. Ledford, have you had a chance to take a look at that?

3   *A.*  Yes.

4   *Q.*  Can you confirm for us that C-023 is Mr. Keck's e-mail to

5   UFPC submitting George's second round bid?

6   *A.*  Yes.

7   *Q.*  And the attachment C-024-1 is -- C-024-1 is the attachment.

8   *A.*  Yes.

9   *Q.*  And you relied on these documents in the course of your

10  business.

11  *A.*  Yes.

12         *MR. POLLACK:*  With that, Your Honor, I would move the

13  admission of C-023 -- C-023 and C-024, C-024 being the paper

14  version of C-024-1.

15         *THE COURT:*  Any objection to the admission of C-023?

16         *MR. TORZILLI:*  No, Your Honor.

17         *THE COURT:*  C-023 will be admitted.

18         Any objection to the admission of C-024, the PDF

19  version?

20         *MR. TORZILLI:*  No objection.

21         *THE COURT:*  That will be admitted as well.

22         And any objection to the admission of C-024-1, the

23  native version of C-024?

24         *MR. POLLACK:*  Your Honor, I will if the government

25  wishes me to, but I was not seeking to admit C-024-1.

Michael Ledford - Cross

1      THE COURT:  Yeah, I think you mentioned that.  So

2   C-024-1 not offered at this time.

3          No objection to C-024?

4      MR. TORZILLI:  No objection to C-024 and no insistence

5   on the admission of C-024-1.

6      THE COURT:  Okay.

7      MR. POLLACK:  With all of that may I publish C-023 and

8   C-024 side by side?

9      THE COURT:  You may.

10      MR. POLLACK:  Publish to the jury.

11      THE COURT:  Yes.

12  BY MR. POLLACK:

13  Q.  And again, Mr. Keck is the one who makes the submission,

14  correct?

15  A.  Yes, that's correct.

16  Q.  Copies Mr. Blake, but the communication is coming from

17  Mr. Keck.

18  A.  Correct.

19  Q.  And the second round bid that Mr. Keck submits for

20  George's -- when you are able to read it, Mr. Ledford, you can

21  tell us what is George's second round bid for eight-piece COB?

22  A.  .9632.

23  Q.  And what is the second round bid that George's submits for

24  dark meat?

25  A.  Eight-piece minus 30.

Michael Ledford - Cross

1        MR. POLLACK:  And by the way, on the submission I

2   mentioned that -- we're done.

3        So let's go back, then, to the demonstrative, I-201,

4   and at this time let's add in the round two bid for George's

5   that Mr. Keck submitted.  It's on the screen for the

6   government.

7        May I publish to the jury the demonstrative now

8   showing the round two bid?

9        THE COURT:  Any objection to that?

10       MR. TORZILLI:  No objection to publication.

11       THE COURT:  Then for demonstrative purposes the

12  demonstrative which was I-201 including the round two bid may

13  be shown to the jury.

14  BY MR. POLLACK:

15  Q.  And in the round two bid, the bid submitted by Mr. Keck has

16  come down from the first bid that he submitted, correct?

17  A.  Correct.

18  Q.  And I had asked you if you recalled giving him guidance

19  that you wanted him to find 63 points?

20  A.  Correct.

21  Q.  How many points did George's find between round one and

22  round two?

23  A.  62 points.

24  Q.  In other words, George's second round submission was 62

25  points or 62/100 of a cent less than their first round bid.

476

Michael Ledford - Cross

1   A.   That's correct.

2   Q.   And you recall I asked if you had given them guidance if

3   you were trying to get to 31 back on the dark meat?

4   A.   Yes.

5   Q.   And the first round bid that George's submitted was 28 back

6   on the dark meat.  Where was their second round bid?

7   A.   30 back.

8   Q.   And so the 30 back would be 30 back from a price that is

9   already 62 points lower than the earlier price.

10  A.   Correct.

11  Q.   So it's kind of a double whammy in reverse.  They are going

12  to give you an extra 2 cents off on dark meat, but that extra 2

13  cents is off a price that's already come down .62, correct?

14  A.   Yes, correct.

15  Q.   Now, you're in a negotiation with the supplier, correct?

16  A.   Correct.

17  Q.   In this case George's.

18  A.   Correct.

19  Q.   And in any negotiation one side might not get a hundred

20  percent of what it wants, correct?

21  A.   Correct.

22  Q.   But if you wanted 63 points and you got 62 points, George's

23  met you 62/63 of the way there, correct?

24  A.   In that example, that would be correct, yes.

25  Q.   Now, we can go back to the side by side, the C-023 and the

477

Michael Ledford - Cross

1   C-024 or C-024-1, whichever one you have.

2         *MR. POLLACK:*  I would like to publish this back to the

3   jury, if I can.

4         *THE COURT:*  Yes, you can.

5   *BY MR. POLLACK:*

6   *Q.*  The e-mail goes out on November 14th, correct?

7   *A.*  Correct.

8   *Q.*  That's when this bid is submitted, correct?

9   *A.*  Correct.

10  *Q.*  So let me ask you, Mr. Blake is cc'd on the e-mail.

11  *A.*  Yes.

12  *Q.*  So it's fair to say that as of November 14 Mr. Blake knows

13  that George's second round bid is .9632 and 30 back, right?

14  *A.*  Yes.

15  *Q.*  Do you know one way or the other whether Mr. George knew

16  that at any point prior to getting copied on this e-mail?

17  *A.*  Mr. Blake or Mr. George?

18  *Q.*  Mr. Blake.

19  *A.*  No, I am not aware of any knowledge he would have had.

20  *Q.*  The preceding day, November 13, at that time the current

21  contract price for dark meat was 30 back, correct?

22  *A.*  Correct.

23  *Q.*  The pending bid for dark meat for George's was 28 back,

24  correct?

25  *A.*  That is correct.

478

Michael Ledford - Cross

1  Q.  On the 13th the current information would be 28 back,

2  correct?

3  A.  Correct.

4  Q.  And the past -- I am sorry, the current bid would be 28

5  back, correct?

6  A.  Correct.

7  Q.  The contract price would be 30 back.

8  A.  Correct.

9  Q.  Do you recall, Mr. Ledford, after this second round

10  submission by Mr. Keck giving George's further guidance?

11  A.  I do not recall.

12  Q.  Specifically do you recall telling Mr. Keck that you wanted

13  him to find another 15 points?

14  A.  I do not recall.

15  Q.  Would that be consistent or inconsistent with your general

16  practice?

17  A.  I don't know.

18  Q.  I am going to show you what's been marked for

19  identification at this point as C-025.  And again take as much

20  time with that as you need, Mr. Ledford.  But specifically the

21  part I want to direct you to is the paragraph near the bottom

22  of the e-mail that starts with, "On November 28th."

23  A.  Okay.

24  Q.  Does that refresh your recollection as to whether you gave

25  further directional guidance to George's following their second

Michael Ledford - Cross

1   round submission?

2   A.  Yes, it does.

3   Q.  And specifically does it refresh your recollection that you

4   gave them guidance that you were looking for another 15 points?

5   A.  Yes.  It says, "Passing on 15 points for a cost savings."

6          MR. TORZILLI:  Objection.  The witness is reading from

7   a document that's not in evidence.

8          THE COURT:  True, but it wasn't in response to a

9   question.  It was volunteered.  But Mr. Pollack can ask the

10  next question.

11         MR. POLLACK:  Thank you, Your Honor.

12  BY MR. POLLACK:

13  Q.  Do you recall Mr. Keck -- that George's submitted a third

14  round bid?  You don't need to look at the document.  I am just

15  asking if you recall.

16  A.  I do not recall.

17  Q.  And I am going to show you C-020, C-020.

18         MR. POLLACK:  If you want, Brian, can you put that

19  side by side with -- I believe it would be C-020-1, or you may

20  have C-021-1.

21         Again, Your Honor, trying to follow the same sequence

22  here, C-020 is the cover e-mail.  C-021 is a PDF of the native

23  Excel attachment to C-020.  And C-021-1 is the Excel

24  spreadsheet.

25         THE COURT:  But not in native format C-021-1 is --

Michael Ledford - Cross

1          MR. POLLACK:  C-021-1 is the native, I believe.  C-021

2     is the PDF of the native.  Do I have it backwards?

3          THE COURT:  I think that was true with the previous

4     exhibit as well.

5          MR. POLLACK:  There is a method to my madness

6     somewhere.

7          THE COURT:  I think that C-024 -- this is going back a

8     little bit -- but I think that C-024 was the native and I think

9     that C-024-1 is the PDF.  I have seen lots of heads shaking

10    back in your IT wing, so with that clarification would then

11    C-021 be the native and C-021-1 would be the PDF printout.

12         MR. POLLACK:  You can just ignore me and look for the

13    head shaking because it is certainly more reliable evidence.

14         THE COURT:  With that clarification, let's hear from

15    Mr. Torzilli.

16         MR. TORZILLI:  If I may ask defense counsel for a copy

17    of C-021.

18         THE COURT:  That's the native version.  C-021?

19         MR. TORZILLI:  Thank you, Your Honor.

20         THE COURT:  Go ahead, Mr. Pollack.

21         MR. POLLACK:  I hope we have now moved into evidence

22    both the cover sheet and the attachment, and if we can publish

23    to the jury the two side by side.

24         THE COURT:  I don't think we have.

25         MR. POLLACK:  I move into admission C-020.

481

Michael Ledford - Cross

1          THE COURT:  Let's do that one right now.  Any

2     objection to C-020?

3          MR. TORZILLI:  No objection.

4          THE COURT:  C-020 will be admitted.

5          MR. POLLACK:  And C-021-1.

6          THE COURT:  Which is the PDF version of the printout?

7          Any objection to the admission of C-021-1?

8          MR. TORZILLI:  My only objection is there is no

9     production or Bates number on this.  If we can have that be at

10    least a representation from counsel as to what Bates number is

11    associated with the attachment.

12         MR. POLLACK:  It is a PDF of the Excel spreadsheet.  I

13    don't know if the spreadsheet itself has a Bates number

14    affiliated with it.

15         THE COURT:  It looks like, Mr. Torzilli, there is not

16    a Bates stamp number associated with the native format, and

17    therefore the printout does not bear one either.

18         MR. TORZILLI:  Then I do object on authenticity

19    grounds.

20         THE COURT:  All right.  Response?

21         MR. POLLACK:  Allow me to lay a little additional

22    foundation, Your Honor?

23         THE COURT:  Absolutely.  Go ahead.

24    BY MR. POLLACK:

25    Q.  Do you have both the e-mail and the attachment in front of

1    you on the screen?

2    A.   Yes.

3    Q.   Do you recognize the format of the attachment?

4    A.   Yes, I do.

5    Q.   Would it help to see the second page of it or do you

6    recognize it as is?

7    A.   No, I recognize it as is.

8    Q.   Does it appear to you to be the attachment to the e-mail

9    that is the round three submission of George's for the 2012

10   bidding season for the 2013 contract?

11   A.   Yes, it does.

12          MR. POLLACK:  Your Honor, with that I would re-move

13   its admission.

14          THE COURT:  Any objection to the admission of C-021-1?

15          MR. TORZILLI:  Same objection, authenticity grounds.

16          THE COURT:  I am going to overrule the objection.  I

17   will admit C-021-1.  The witness was able to identify that

18   particular exhibit based on -- to his knowledge.

19          MR. POLLACK:  With that, Your Honor, if we can publish

20   for the jury C-020 side by side with C-021-1.

21          THE COURT:  Yes.  And sorry, Mr. Pollack.  Before we

22   do that, why don't we -- I hate to do this, but why don't we go

23   back to C-024.  Did you want to reverse your order of offers on

24   that because right now the paper version, C-024-1, has not been

25   admitted, but the native was.

Michael Ledford - Cross

1        MR. POLLACK:  Yes, Your Honor, if we could substitute

2   C-024-1 for C-024.

3        THE COURT:  Any objection to that, Mr. Torzilli?

4        MR. TORZILLI:  There is no objection to that.

5        THE COURT:  I so will admit C-024-1 and we will deem

6   C-024 the native version withdrawn.

7        Go ahead, Mr. Pollack.  And you may publish those two.

8        MR. POLLACK:  Thank you, Your Honor.

9   BY MR. POLLACK:

10  Q.  Mr. Ledford, let's start with the cover e-mail.

11       Again, the e-mail is from Mr. Keck?

12  A.  That is correct.

13  Q.  And Mr. Keck copies Mr. Blake, correct?

14  A.  Yes.

15  Q.  Copies Mr. Nelson, correct?

16  A.  Yes.

17  Q.  And copies Charles George, correct?

18  A.  Yes.

19  Q.  And the round three submission is for what price on the

20  eight-piece COB?

21  A.  .9632.

22  Q.  Is that the second round or the third round?

23  A.  The third round.  I am sorry, I am reading the wrong

24  column.

25  Q.  You had me worried for a second there.

Michael Ledford - Cross

1    *A.* .9617.

2    *Q.* Okay. And are they still 30 back on dark?

3    *A.* Yes, they are.

4         *MR. POLLACK:* So if we can go back, then, to the

5    demonstrative I-201 and again just go down the next line so we

6    can now see the round three submission.

7         Your Honor, that's available to the government. I

8    would like to publish that to the jury.

9         *THE COURT:* Any objection to displaying the

10   demonstrative I-201 now including the third round information?

11        *MR. TORZILLI:* No objection.

12        *THE COURT:* All right. That may be displayed for

13   demonstrative purposes.

14        *MR. POLLACK:* Thank you, Your Honor.

15   *BY MR. POLLACK:*

16   *Q.* Mr. Ledford, you said a moment ago after your memory was

17   refreshed that you recall giving George's guidance after round

18   two that you wanted them to find another 15 points, correct?

19   *A.* That's correct.

20   *Q.* How many points did they find between round two and round

21   three?

22   *A.* 15.

23   *Q.* That's because they dropped their price from .9632 to

24   .9617, a 15-point deferential?

25   *A.* Correct.

Michael Ledford - Cross

1    Q.  In other words, on this one you didn't get 62/63 of what

2    you were looking for.  You got a hundred percent of what you

3    were looking for.

4    A.  Correct.

5    Q.  And the 30 back remained consistent.

6    A.  It did.

7    Q.  But that actually means that they also reduced the price of

8    dark meat because now it's 30 back from the price that's 15

9    points lower.

10   A.  Yes.

11   Q.  And the round three submission -- tell me if you need to go

12   back and look at that again -- but that was submitted on

13   December 3rd, 2012?

14   A.  That's correct.

15        MR. POLLACK:  Let me go ahead and pull up 1514 and

16   1515.  And I believe that both of these were admitted into

17   evidence.

18        THE COURT:  Not 1514.

19        MR. POLLACK:  It was not?  Okay.

20        I believe -- if you can go ahead and show Mr. Ledford

21   1514.

22   BY MR. POLLACK:

23   Q.  I believe the government asked you about 1514.  Maybe they

24   didn't move it into admission, but 1514 is a cover e-mail and

25   it enclosed 1515.

486
Michael Ledford - Cross

1          MR. POLLACK:  So maybe we can put 1515 side by side at

2   the moment just for the witness.

3   BY MR. POLLACK:

4   Q.  Do you recognize the e-mail, Mr. Ledford, as an e-mail to

5   you enclosing the signed contract for the 2013 year?

6   A.  Yes.

7   Q.  And an e-mail such as that and the contract attached to it,

8   those are documents that you typically receive in the course of

9   your business?

10  A.  Yes.

11  Q.  And you rely on?

12  A.  Yes.

13          MR. POLLACK:  With that I move the admission of 1514.

14          THE COURT:  Any objection to the admission of

15  Exhibit 1514?

16          MR. TORZILLI:  No objection.

17          THE COURT:  1514 will be admitted.

18          MR. POLLACK:  And if we can publish for the jury 1514

19  and 1515 side by side.

20          THE COURT:  Yes.

21  BY MR. POLLACK:

22  Q.  And so this contract signed by George's, which is the

23  culmination of the negotiation process that we've been talking

24  about, is sent to you by Mr. Blake on the 17th of December, is

25  that correct, 2012?

Michael Ledford - Cross

1    A.   That is correct.

2    Q.   And he copies Mr. Keck?

3    A.   Yes.

4    Q.   And again -- well, he says, "Per your request" meaning you,

5    Mike, have asked me for a signed copy?

6    A.   Correct.

7    Q.   And as your day-to-day contact at George's, he provides it

8    to you.

9    A.   Correct.

10   Q.   But there is no negotiation of price in this document,

11   correct?

12   A.   Not at this point, no.

13   Q.   The price has already been negotiated.

14   A.   Correct.

15   Q.   And the 1515 which is the signed contract, who is that

16   signed by?

17   A.   Darrell Keck.

18   Q.   And the final contract price for COB is what?

19   A.   .9622.

20   Q.   And the final contract price for dark meat is what?  And if

21   you need to turn the page.

22   A.   I need to see another page to see that.  I believe it's one

23   more.  It's the eight-piece price less 30 cents.

24   Q.   Or 30 back as we have been referring to it?

25   A.   Yes.

Michael Ledford - Cross

1          MR. POLLACK:  In that case can we please go back to

2    the Demonstrative I-201 now revealing the 2013 contract prices?

3          And, Your Honor, may I show that to the jury?

4          THE COURT:  Any objection to displaying that new

5    information combined with the other in I-201?

6          MR. TORZILLI:  No objection.

7          THE COURT:  That may be displayed to the jury for

8    demonstrative purposes.

9    BY MR. POLLACK:

10   Q.  And the final contract price you said is .9622, so it's

11   actually up .005 from the third round bid, correct?

12   A.  Correct.

13   Q.  And that represents I believe you discussed with one of the

14   other lawyers a supplier fee?

15   A.  I believe it was an accrual of some sort that we had to pay

16   for -- we put that in place to pay for the consultants is my

17   memory.

18   Q.  In any event, that extra .05 does not go to George's,

19   correct?

20   A.  No, it does not.

21   Q.  So what George's really keeps is the .9617?

22   A.  Correct.

23         MR. POLLACK:  And if we can go down -- let's not do

24   this yet for the jury -- the last line for the government.

25         Can I now publish I-201 to the jury in its entirety?

1          THE COURT:  Any objection, Mr. Torzilli?

2          MR. TORZILLI:  There is no objection.

3          THE COURT:  Then the entirety of I-201 may be

4   displayed to the jury, once again, ladies and gentlemen, for

5   demonstrative purposes only.

6   BY MR. POLLACK:

7   Q.  And I have put down here, Mr. Ledford, the change from

8   prior year.  What I am trying to do is compare the 2013

9   contract price that you have now negotiated with George's with

10  the 2012 contract that they had in place.  And I show that the

11  price came down 64 points.

12  A.  Correct.

13  Q.  But if we're going to compare apples to apples, it really

14  came down 69 cents because George's doesn't get that last five

15  we were talking about, correct?

16  A.  That is correct.

17  Q.  And on dark meat I say it's the same because it was 30 back

18  under the 2012 contract and it's going to be 30 back under the

19  2013 contract, correct?

20  A.  Right.  The formula is the same.

21  Q.  The formula is the same, but in reality they have also

22  lowered the price of dark meat because it's going to be 69

23  points less because white meat, the COB is going to be 69 cents

24  less.

25  A.  That is correct.

Michael Ledford - Cross

1          MR. POLLACK:  Your Honor, I would like to move the

2    admission of C-025.

3          THE COURT:  Any objection to the admission of C-025?

4          MR. TORZILLI:  Hearsay.

5          THE COURT:  Response, Mr. Pollack?

6          MR. POLLACK:  Your Honor, I am not admitting it for

7    the truth.  I am admitting it for Mr. Blake's state of mind.

8    This is what Mr. Blake was told as to why the negotiation went

9    the way that it went and why the bids were what they were.

10          THE COURT:  Any objection to the admission of C-025

11    with that limitation as to the -- I guess that's to the exhibit

12    as a whole.

13          MR. TORZILLI:  Yes.

14          MR. POLLACK:  I think the bottom portion of the

15    exhibit would be a business record, but it's the top portion

16    that is relevant here, Your Honor.

17          THE COURT:  I was just going to ask if it's a one-page

18    exhibit.

19          MR. TORZILLI:  We object to both on hearsay grounds.

20    As to the limited purpose, there has been no foundation

21    established for the limited purpose for which counsel is

22    offering it into evidence.

23          THE COURT:  Response, Mr. Pollack?

24          MR. POLLACK:  It went to Mr. Blake.  It's clearly

25    relevant to his state of mind.  If you need to hear more, we

Michael Ledford - Cross

1    might want to do it by side bar, Your Honor.

2          THE COURT:  Well, I don't need to hear any more.

3    Sustained, hearsay.

4          MR. POLLACK:  Your Honor, I would like to be heard, if

5    I may.

6          THE COURT:  You may.

7        (At the bench:)

8          THE COURT:  Mr. Pollack, go ahead.

9          MR. POLLACK:  Your Honor, one of the issues in this

10   case is whether Mr. Blake knowingly joined the conspiracy and

11   whether he believed that the prices in this particular

12   negotiation moved the way they did, the bids moved the way they

13   did because of collusion between the competitors because the

14   competitors were conferring with each other about how much to

15   bid and aligning their bids.

16         This is the information that was conveyed to Mr. Blake

17   about why the bids moved the way that they did for a completely

18   non-collusive purpose.  They were moving directly in response

19   to the customer's request.  Whether or not the information in

20   this is true or not true is not relevant.  What is relevant is

21   this is what Mr. Blake was told.  It clearly is relevant to his

22   state of mind regardless of the truth.

23         THE COURT:  I am just reading the portion of the

24   document from Mr. Keck.

25         Okay.  Response, Mr. Torzilli?

Michael Ledford - Cross

1          MR. TORZILLI:  Sure, Your Honor.  I think this is very

2     much -- this is pretty clearly hearsay as to the state of mind

3     point.  As I said, I don't think there is any foundation for

4     that other than the fact that Mr. Blake was on the -- was on

5     the e-mail.  And this wasn't -- other than that, it's not

6     803(3) admissible either because we are not talking about the

7     declarant's state of mind.  We are talking about a recipient's

8     state of mind.

9          MR. POLLACK:  Your Honor, if I might respond to that.

10          THE COURT:  Yes.  Go ahead.

11          MR. POLLACK:  By definition it is not hearsay if it is

12     not being offered for the truth, so there is no hearsay

13     objection.  Mr. Keck could have been lying to Mr. Blake.

14     Mr. Keck may have reached these prices because he colluded with

15     somebody.  It may be a complete fabrication.  It's obviously

16     relevant.  If Mr. Keck is telling him the truth this is how the

17     prices were reached or he is lying this is how the prices were

18     reached, either way it is highly relevant to Mr. Blake's state

19     of mind, what Mr. Blake knew about how these prices were

20     reached, which is not only relevant, it really is the issue in

21     this case.

22          THE COURT:  Go ahead, Mr. Torzilli.

23          MR. TORZILLI:  Your Honor, if I may back up to my

24     foundation objection.  Defense counsel is indicating this is

25     relevant to what Mr. Blake knew, but other than being cc'd on

Michael Ledford - Cross

1    this e-mail and being cc'd on this e-mail, there is no

2    indication that he knew the information contained in this

3    message from Mr. Keck.

4        MR. POLLACK:  Your Honor, the fact that he is cc'd on

5    the e-mail is pretty good evidence that it was communicated to

6    him, particularly in light of Mr. Ledford's testimony

7    recognizing the document, saying it was typical that Mr. Blake

8    was cc'd even though he was not the lead person on the

9    negotiations because he was the day-to-day person for that

10   relationship.  The government can certainly challenge whether

11   or not Mr. Blake received it.  They can argue that.  It may not

12   be dispositive about whether he received it, but it is

13   certainly relevant as to his state of mind.

14       THE COURT:  It's some evidence and that's usually

15   sufficient.

16       Mr. Pollack, let me ask you this.  Did you -- it

17   doesn't seem like this particular exhibit has much to do with

18   Mr. Ledford.  Did you intend to ask him any additional

19   questions assuming that I admitted it?

20       MR. POLLACK:  Your Honor, it is recounting the

21   negotiations with Mr. Ledford.  Mr. Ledford testified that he

22   recalled giving directional guidance.  He did not recall

23   specifically that he had said find 63 points after round one,

24   but he said that was consistent with his business practice.  He

25   specifically did recall saying find 15 points after round two,

Michael Ledford - Cross

1    so he has already verified that Mr. Keck is accurate about that

2    piece of information.

3           So I was not intending to ask him any additional

4    questions.  I think the foundation is laid that this is

5    certainly Mr. Keck recounting the back-and-forth between

6    George's and Mr. Ledford that led to the course of bidding and

7    the contract that ultimately resulted.

8           THE COURT:  Okay.  Here is what I am going to do with

9    this particular exhibit, and that is I am going to reserve

10   ruling on it since, Mr. Pollack, you are not going to ask

11   Mr. Ledford any additional questions.  From what I have heard

12   from Mr. Pollack, I think that he may have an appropriate

13   point, but I would like over the afternoon break perhaps to try

14   to look up -- do some research.  So I will reserve ruling at

15   this time.

16          Does that in any way affect your cross-examination of

17   Mr. Ledford, Mr. Pollack?

18          MR. POLLACK:  It doesn't in that I could continue and

19   conclude with cross-examination.  I just don't want to be

20   prejudiced that I have completed my cross-examination.  If the

21   Court were to decide that some additional foundation needs to

22   be laid through Mr. Ledford, I need to bring him back for that

23   purpose and reopen my cross for that purpose.

24          THE COURT:  Yeah, I don't think that my ruling would

25   involve laying additional foundation.  I think that that has

495

Michael Ledford - Cross

1   already been accomplished, all right?  So that will be the

2   ruling.  I will try to look at this issue over the afternoon

3   break and then be in a position to rule on that.  Thank you.

4       (In open court:)

5           THE COURT:  I will reserve ruling on C-025.

6           MR. POLLACK:  Thank you, Your Honor.

7           I would like to call up F-808 which is already in

8   evidence, and if we can publish to the jury initially just the

9   cover page so that we know what we're looking at.

10          THE COURT:  Let me just double-check that.  I think

11  you are right.  Yes, you may.

12          MR. POLLACK:  Thank you, Your Honor.

13  BY MR. POLLACK:

14  Q.  And Mr. Ledford, do you recall this document?

15  A.  Yes.

16  Q.  This is a document that you created to sort of summarize

17  the 2012 negotiation season that we've been discussing that led

18  to the 2013 contracts?

19  A.  That's correct.

20  Q.  And if we can go to Page 11 of that document, I think

21  you've been shown this as well.  Do you remember this page?

22  A.  Yes, I do.

23  Q.  And it is comparing, is it not, each of the suppliers'

24  eight-piece COB price under the 2013 contracts that you had

25  negotiated with what their price had been under the 2012

Michael Ledford - Cross

 1  contract; is that correct?

 2  A.  That is correct.

 3  Q.  And you testified to this before, but this was a successful

 4  negotiation for UFPC because the suppliers all as a rule came

 5  down in their price, correct?

 6  A.  Correct.

 7  Q.  And of the suppliers that's listed there, is it fair to say

 8  of all the suppliers George's came down the most?

 9  A.  That is correct.

10  Q.  And just so we are all in the same place, I am looking at

11  the first column after the suppliers' names.  Is that what you

12  were looking at?

13  A.  Yes, it is.

14  Q.  And we saw that George's came down .024, correct?

15  A.  Correct.

16  Q.  And the next highest is what, .016?

17  A.  Yes.

18  Q.  Okay.  And on average the suppliers came down .011?

19  A.  Correct.

20  Q.  Is that right?

21  A.  Yes.

22  Q.  And so George's came down more than two times, almost two

23  and a half times what the average supplier came down; is that

24  correct?

25  A.  Yes.

Michael Ledford - Cross

1        MR. POLLACK:  Thank you, Mr. Ledford.  I don't have

2   anything further.

3        THE COURT:  Thank you, Mr. Pollack.

4        Ms. Henry?

5                    **CROSS-EXAMINATION**

6   BY MS. HENRY:

7   Q.  Mr. Ledford, my name is Roxann Henry and I represent

8   Mr. William Kantola.

9   A.  Good afternoon.

10       MS. HENRY:  If we could pull up Government Exhibit

11  1410 and Government Exhibit 9691.

12  BY MS. HENRY:

13  Q.  Mr. Ledford, I believe you were asked about these on your

14  direct testimony.  And this is the first proposal that was

15  submitted by Koch Foods related to the negotiations for the

16  2013 contract; is that correct?

17  A.  Yes.

18  Q.  And this was the one that you said was submitted early in

19  the process at the same time as the RFIs were due?

20  A.  Yes.

21  Q.  Who submitted this?

22  A.  Bruce MacKenzie.

23  Q.  And Mr. MacKenzie was responsible for the further processed

24  products that you worked with, right?

25  A.  That's correct.

498
Michael Ledford - Cross

1    Q.  And that would include hot wings?

2    A.  Yes.

3    Q.  Now, I think you also testified that you worked with

4    Mr. Bill Kantola as well, right?

5    A.  That's correct.

6    Q.  And he would have worked on the fresh products?

7    A.  That's correct.

8    Q.  And this bid, if we look at the Government Exhibit 9691 --

9    you may need to look at the second page or maybe even the

10   third.  Let's turn to the third on that.  And that was the bid

11   for fresh products, wasn't it?

12   A.  Yes.

13   Q.  So you understood that Mr. Bill Kantola had to give those

14   prices to Mr. MacKenzie, right?

15   A.  Yes.

16   Q.  And what was the price for the COB eight-piece?

17   A.  .9710.

18   Q.  And that was not .9561, right?

19   A.  That is not .9561.

20        MS. HENRY:  Let me turn -- if we could pull up F-769.

21   And this has already been admitted, so can we publish it also

22   to the jury?

23        THE COURT:  Let me just check that.  It has been and

24   you may.

25   BY MS. HENRY:

Michael Ledford - Cross

1   Q.  And this is the 2013 contract for Koch Foods?

2   A.  Yes, it is.

3   Q.  Who signed the bid?  Excuse me, who signed the contract?

4   Is that Mr. Bruce MacKenzie?

5   A.  It appears so, yes.

6   Q.  And you signed it on behalf of RSCS?

7   A.  Yes, I did.

8   Q.  And what was the price for the COB eight-piece?

9   A.  .9662.

10  Q.  And that also was not .9561, was it?

11  A.  No, it is not.

12  Q.  Let's turn to Page 4 of the contract.

13          What was the price for the dark meat?

14  A.  30 and a half back.

15  Q.  And that was 30 and a half back of the eight-piece, right?

16  A.  Yes.

17  Q.  And that was not 30 back.  That was 30 and --

18  A.  30 and a half.

19  Q.  30 and a half.

20      MS. HENRY:  Can we turn to Page 6?

21  BY MS. HENRY:

22  Q.  What was the volume of the dark meat?

23  A.  490,000 pounds per week.

24  Q.  Do you recall that that was 50,000 pounds more per week

25  than Koch had from 2012?

Michael Ledford - Cross

1   A.   I do not recall.

2   Q.   Let's see if we can help you out.

3        MS. HENRY:   Can we pull up F-768?  And that also has

4   already been admitted, I believe, if we can publish that.

5        THE COURT:   Yes, it has been.  You may publish it.

6        MS. HENRY:   If we could go to Page 6.

7   BY MS. HENRY:

8   Q.   My math is never really good, but is that 50,000 pounds?

9   A.   Yes, ma'am.

10  Q.   All right.  Now, do you recall that Koch was the only

11  supplier to increase its dark meat volume from 2012 to 2013?

12  A.   I do not recall.

13  Q.   Do you recall that Pilgrim's lost dark meat volume?

14  A.   I do not recall.

15  Q.   Rather than go through each individual contract since I

16  think they are already in evidence, is it fair to say that we

17  could just look at the 2012 contracts and the 2013 contracts

18  and compare the numbers?

19  A.   Yes.

20  Q.   Okay.  We will save you that effort.

21       Now, between the first round proposals really early on

22  and the contract, I believe you testified that there was a

23  second round bid step in between.

24  A.   Yes.

25  Q.   And I think on direct you testified that that -- those were

501

Michael Ledford - Cross

1   due on November 14, 2012.

2   A.   That sounds right, yes.

3   Q.   Now, do you remember that by the second round you had

4   already convinced Koch to lower its proposal on the dark meat?

5   A.   I do not recall.

6   Q.   Let's see if we can help out on that.

7           MS. HENRY:   Can we pull up F-808?   And I believe that

8   has also already been admitted into evidence.

9           THE COURT:   It has and it may be displayed.

10          MS. HENRY:   Let's turn to Page 18.

11  BY MS. HENRY:

12  Q.   Now, this shows the different proposals for dark meat and

13  the different rounds of them, correct?

14  A.   Correct.

15  Q.   And this shows that Koch had lowered its price on the dark

16  meat from round one to round two.

17  A.   Yes.

18  Q.   Now, you've talked a bit already about how you got folks to

19  lower prices.   I think you said that sometimes you told them

20  where they needed to be.

21  A.   Yes, that's a possibility, yes.

22  Q.   And sometimes you may have given them the lowest price you

23  had with a please-beat-it-or-match-it type concept?

24  A.   I don't know specifically if I ever said please beat it or

25  match it, but...

502

Michael Ledford - Cross

1   Q.  But you would have given them lowest price sometimes.

2   A.  I gave them feedback, yes.

3   Q.  Now, on direct you testified about moving from RSCS to CFA,

4   to Chick-fil-A.

5   A.  Yes.

6   Q.  You never dealt with Mr. Kantola in any pricing or bidding

7   context at all after you moved to Chick-fil-A, did you?

8   A.  Never.

9   Q.  In fact, when you joined Chick-fil-A, Koch Foods had

10   already been disqualified as a supplier and had been

11   unsuccessful in its attempt in 2015 to requalify; isn't that

12   true?

13   A.  You could describe it that way, yes.

14   Q.  It wasn't selling to Chick-fil-A.

15   A.  They did for a period of time in 2015.  We bought product

16   from them and then disapproved them.

17   Q.  You also know that Koch Foods' owner is an outsider to the

18   industry from Chicago and known for being cut throat?

19          MR. TORZILLI:  Objection, foundation.

20          THE COURT:  He can answer if he knows.

21   A.  Yes, that's an accurate description.

22   BY MS. HENRY:

23   Q.  And you understood that Mr. Kantola didn't have the final

24   call on prices.

25   A.  That's correct.

Michael Ledford - Cross

1          MS. HENRY:  Thank you very much.  I have nothing

2     further.

3          THE COURT:  Thank you, Ms. Henry.

4          Additional cross-examination?

5          Mr. Tubach?

6          MR. TUBACH:  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8     BY MR. TUBACH:

9     Q.  Good news, Mr. Ledford.  I think I am batting clean-up.

10    You have been extraordinarily patient.  My name is Michael

11    Tubach.  I represent Jayson Penn.  I just have a couple

12    questions for you.

13    A.  Okay.

14    Q.  You had testified in response to some of the questions of

15    the lawyers here that you would give this directional feedback.

16    I just want to ask you a couple questions, maybe show you some

17    documents about that.

18          MR. TUBACH:  Could we please have D-546?

19          Request permission to hand this up to the witness and

20    the Court.

21          THE COURT:  Yes, you may.

22    BY MR. TUBACH:

23    Q.  Mr. Ledford, why don't you take a look at D-546 and let me

24    know when you have had a chance to review it.

25    A.  Okay.

Michael Ledford - Cross

1    *Q.*  Did you have a chance to read that, Mr. Ledford?

2    *A.*  Yes.

3    *Q.*  This is an e-mail that you sent to Mr. Austin at Pilgrim's

4    on December 4, 2012?

5    *A.*  Correct.

6    *Q.*  Do you recall sending this e-mail?

7    *A.*  I do.

8    *Q.*  And you talked about directional guidance.  In the

9    Paragraph 1, is that the sort of directional guidance that you

10   testified about earlier that you would give to suppliers to try

11   to get them to lower their price?

12        *MR. TORZILLI:*  Objection.  The document is not in

13   evidence.

14        *THE COURT:*  Overruled.  He can answer.

15   *A.*  I actually would call this a little bit more specific than

16   directional guidance.  At this point we were, as I say below,

17   we were wanting to wrap this up yesterday.  I was really

18   getting down to brass tacks with Roger and telling him exactly

19   where I wanted him to be.

20        *MR. TUBACH:*  Your Honor, I would move into evidence

21   D-546 not for the truth of the matter asserted, but for the

22   effect on the listener, in this case Roger Austin at Pilgrim's

23   Pride.

24        *THE COURT:*  Any objection to Exhibit D-546 for that

25   purpose?

Michael Ledford - Cross

1        MR. TORZILLI:  The relevance of the effect on the

2    listener hasn't been established.

3        MR. TUBACH:  It's highly relevant, Your Honor.  The

4    witness testified that this was the individual he negotiated

5    with at Pilgrim's.  He is giving him direct feedback on what

6    his bid should be.  That's directly relevant to Mr. Austin's

7    state of mind in terms of responding.

8        THE COURT:  Any objection to the admission of D-546

9    just for all purposes given the fact that Mr. Ledford was

10   the -- appears to be the author of it?

11       MR. TORZILLI:  Can we have a brief side bar?

12       THE COURT:  Yes.

13     (At the bench:)

14       THE COURT:  Go ahead, Mr. Torzilli.

15       MR. TORZILLI:  Just on the issue of effect on the

16   listener, I just want to understand.  I mean, our objection on

17   effect on the listener is if there is no subsequent act by the

18   listener, it seems that there is no relevance to what effect it

19   might have had on the recipient of an e-mail or the listener of

20   a statement, so we would object to that.  And then as to all

21   purposes we would object on hearsay grounds.

22       THE COURT:  Okay.  Mr. Tubach?

23       MR. TUBACH:  Your Honor, I don't have to establish

24   through this witness what the effect on the listener is.  We

25   can do that with other evidence.  As the Court indicated,

Michael Ledford - Cross

1    Mr. Ledford is here and can be easily cross-examined about his

2    own statements in this document.

3            THE COURT:  Yeah, this is of the same type of

4    information that has been -- not that this estops the

5    government, but we have got the author of the document here and

6    he has recognized it.  He recalls this particular exhibit.  Of

7    course, Mr. Tubach hasn't offered it for all purposes, but I

8    have made that inquiry to you in open court.

9            MR. TUBACH:  I will do so, Your Honor.

10           THE COURT:  Okay.  Any further response on that,

11   Mr. Torzilli?

12           MR. TORZILLI:  Nothing further, Your Honor.

13           THE COURT:  Yeah, I do happen to agree with

14   Mr. Torzilli's point about the effect on the listener.  There

15   is nothing that we need to explain at this point in time, but I

16   do think that it is admissible as a statement of Mr. Ledford

17   who is available for cross-examination -- or examination, all

18   right?

19           Thank you.

20       (In open court:)

21           MR. TUBACH:  I will revive my motion to move D-546

22   into evidence.

23           THE COURT:  Do you maintain the objections,

24   Mr. Torzilli?

25           MR. TORZILLI:  Yes, Your Honor.

Michael Ledford - Cross

1         THE COURT:  Objections will be overruled.  D-546 will

2    be admitted without limitation as to the purpose for which the

3    jury can consider it.

4         MR. TUBACH:  Thank you, Your Honor.  May I publish

5    that to the jury?

6         THE COURT:  You may.

7    BY MR. TUBACH:

8    Q.  Mr. Ledford, you said earlier this was more specific than

9    the directional guidance you talked about previously because I

10   believe you said you were getting down to brass tacks, right?

11   A.  Correct.

12   Q.  When you get down to brass tacks, you are going to let

13   Mr. Austin know exactly where you want Pilgrim's to be, right?

14   A.  Correct .

15   Q.  So let's read the first bullet point there.  You said, "We

16   are disappointed to say the least that you did not adjust wing

17   price." Just to stop there.  You expressed your disappointment

18   frequently in the negotiations.  Is that a fair statement?

19   A.  That's a fair statement.

20   Q.  And going on, "You are 80 cents higher than the best price

21   and 48 cents higher than the average price.  I'm at a loss as

22   to how to handle you on this one.  Perhaps we take you out of

23   centers that buy wings?"

24        Let me ask you, 80 cents higher than the best price,

25   that would tell Mr. Austin exactly what the lowest price was

508

Michael Ledford - Cross

1  that you had for wings if he knew what his own price was, which

2  presumably he did, right?

3  A.  That's correct.

4  Q.  And you also would be able to figure out exactly what the

5  average price was given that he knew his own price, correct?

6  A.  That's correct.

7  Q.  And that's, in fact, exactly what you wanted him to know,

8  right?

9  A.  Exactly.

10  Q.  And in that last part of bullet point 1, what you were

11  telling him is essentially if you don't change your price and

12  lower it, I'm going to take volume away from you, right?

13  A.  That is correct.

14  Q.  In fact even more so, "take you out of centers that buy

15  wings," that essentially saying we are not going to buy any

16  wings from you; is that fair?

17  A.  That's fair.

18  Q.  Bullet point No. 2, you said "Livers."  This is talking

19  about the livers that Pilgrim's was proposing to sell, right?

20  A.  Correct.

21  Q.  "A 3 cent increase when nobody else has raised a single

22  price of a liver or gizzard will be a tough one.  Go ahead and

23  tell Bruce what you are doing.  He may shoot you."

24         I assume you did not mean that literally?

25  A.  No.  I believe I am talking about Bruce Bagshaw, who is a

509

Michael Ledford - Cross

1  KFC franchisee.

2  Q.  Was he particularly interested in livers and gizzards?

3  A.  Bruce Bagshaw talked to me about livers at least once a

4  week.

5  Q.  I am just going to ask you because I am curious.   Why?

6  A.  That's a great question.  He had a very keen interest in

7  livers and gizzards.

8  Q.  I think I am going to leave it right there.   Thank you.

9        And Mr. Austin knew who Bruce was?

10  A.  Yes, he did.

11  Q.  Based on his interest in the livers and the gizzards?

12  A.  And based on his relationship with Bruce Bagshaw personally

13  as well.

14        MR. TUBACH:  If we can turn to E-799.

15        May I approach, Your Honor?

16        THE COURT:  You may.

17  BY MR. TUBACH:

18  Q.  Apologize for the small print there.  Why don't you take a

19  look at E-799.  I will have a couple questions for you.

20  A.  Okay.

21  Q.  This is an e-mail exchange between you and Mr. Austin,

22  correct?

23  A.  Correct.

24  Q.  And this took place on November 19, 2013?

25  A.  Correct.

510

Michael Ledford - Cross

1   *Q.*  And it related to the negotiations for the 2014 contract;

2   is that fair?

3   *A.*  That's fair.

4   *Q.*  Is it fair to say that in this e-mail you are giving

5   Mr. Austin very specific feedback on where you want Pilgrim's

6   to go in its next bid?

7   *A.*  That's correct.

8   *Q.*  And you recall sending this e-mail on November 19, the top

9   one?

10  *A.*  I do.

11  *Q.*  Okay.  And presumably you recall sending the other one.

12  Some of the ones aren't as relevant at the bottom of the page,

13  but you recall receiving those?

14  *A.*  Yes.

15  *Q.*  And you recall receiving them from Mr. Austin?

16  *A.*  Yes.

17          *MR. TUBACH:*  I would move E-799 into evidence.

18          *THE COURT:*  Any objection to E-799?

19          *MR. TORZILLI:*  It's hearsay.

20          *THE COURT:*  Response?

21          *MR. TUBACH:*  Same argument as in the prior e-mail we

22  just talked about.  The witness is here.  He can be

23  cross-examined.  He recalls sending it.  And I do believe it is

24  effect on the listener.

25          *THE COURT:*  Objection sustained.

Michael Ledford - Cross

1          *MR. TUBACH:*  I am sorry?

2          *THE COURT:*  Sustained.

3     BY MR. TUBACH:

4     Q.  Do you recall, though, on November 19 -- if you are done

5     looking at the document.  Do you recall on November 19, 2013

6     you told Mr. Austin that you wanted Pilgrim's to go to 31 back

7     for dark meat?

8     A.  Yes.

9     Q.  Okay.  And their price was 30 back, right?

10    A.  I believe that's correct, yes.

11    Q.  And you were asking them to basically drop their price a

12    penny, right?

13    A.  Yes.

14    Q.  Now, you knew at this time that the other bids that you had

15    were between 30 and a half back and 32 back?  Do you recall

16    that?

17    A.  I remember the 32.  I don't remember if the other bids

18    started at 30 or 30 and a half.

19    Q.  I will get you a document on that in a second.

20          Do you recall telling Mr. Austin that on the main

21    piece, the purple COB fried, that you wanted him to go down a

22    penny and a half?

23    A.  Yes.

24    Q.  And again just so we understand, so the jury understands,

25    when we say purple, we are talking about the main product, the

1   fried eight-piece chicken on the bone?

2   *A.*   That's correct.

3   *Q.*   And orange is the grilled chicken.

4   *A.*   Correct.

5   *Q.*   And KFC sold a lot more of the fried than the grilled?

6   *A.*   Yes.

7   *Q.*   So this whole time we have been talking about COB prices,

8   we have been talking about purple chicken, right?

9   *A.*   That's correct.

10          *MR. TUBACH:*   Why don't we take a look at C-969.

11          Permission to approach, Your Honor.

12          *THE COURT:*   You may.

13   *BY MR. TUBACH:*

14   *Q.*   Ignoring those two e-mails, Mr. Ledford, I understand this

15   is a document you probably have never seen before.  I would

16   just ask you trying to refresh your recollection about the

17   spread of the bids that you had right around November 20th of

18   2013, so why don't you read that bottom e-mail and put it away,

19   and I will ask you a question.

20   *A.*   Okay.

21   *Q.*   Have you had a chance to look at that?

22   *A.*   Yes.

23   *Q.*   And do you recall speaking to Mr. Austin on November 20th,

24   2013?

25   *A.*   Not specifically, no.

513
Michael Ledford - Cross

1  Q.  Do you have any reason to think you didn't speak with him?

2  A.  I do not.

3  Q.  And that's what you usually would have done in the course

4  of these negotiations?

5  A.  Yes.

6  Q.  And does this document refresh your recollection that the

7  bids that you had were between 30 and a half back and 32 back?

8  A.  I am sorry, it does not.  I can't validate Mr. Austin's

9  notes.

10  Q.  Fair enough.  Do you recall that was roughly the range that

11  you had even if you don't have the exact numbers in mind?

12  A.  Again, I am not sure if it would have started at 30 or 30

13  and a half.  That's the only discrepancy I am not sure of.

14  Q.  I got it.  So what you are not unsure of now is either the

15  spread was 30 to 32 back or 30 and a half to 32 back.

16  A.  That's correct.

17  Q.  And you were asking Pilgrim's to go to 31 back, right?

18  A.  I believe that's correct, yes.

19  Q.  You can put that document aside, sir.

20       MR. TUBACH:  I would like to move to D-588 and 589, if

21  I could.

22       Permission to approach, Your Honor?

23       THE COURT:  You may.

24  BY MR. TUBACH:

25  Q.  Take a look at Exhibit 588, D-588, and D-589.  Let me know

Michael Ledford - Cross

1  when you have had a chance to look at it.

2  *A.*  Okay.

3  *Q.*  Have you had a chance?

4  *A.*  Yes.

5  *Q.*  Sorry.  I didn't realize you were done.

6        D-588 is an e-mail from Mr. Austin to Mr. Oeschli on

7  November 20th, 2013, correct?

8  *A.*  Yes.

9  *Q.*  Or Mr. Oeschli I believe it's pronounced.

10  *A.*  Yes.

11  *Q.*  Mr. Oeschli, he worked with you at UFPC?

12  *A.*  Yes.

13  *Q.*  And attached to that is a bid, do you see that, D-589?

14  *A.*  Yes.

15  *Q.*  And is this bid one that you would expect to receive in the

16  ordinary course of your business?

17  *A.*  Yes.

18  *Q.*  And the submission of this to Mr. Oeschli, you would have

19  expected this to be shared with you.

20  *A.*  Absolutely.

21  *Q.*  So you expect you received D-589 on or about November 20,

22  2013?

23  *A.*  That is correct.

24  *Q.*  And I believe you have been asked this several times today.

25        You used D-589 in the ordinary course of business?

Michael Ledford - Cross

1   A.   Yes.

2   Q.   And it was reliable in that you used it and relied on it in

3   formulating your strategy for negotiations?

4   A.   That's correct.

5            MR. TUBACH:  I move into evidence D-588 and 589.

6            THE COURT:  Any objection to the admission of D-588?

7            MR. TORZILLI:  No objection.

8            THE COURT:  D-588 will be admitted.

9            Any objection to admission of D-589?

10           And Mr. Tubach, is it just the paper version?

11           MR. TUBACH:  This is just the paper version, Your

12   Honor, and we can either -- I will include both, but it's

13   really the second page that I am interested in.

14           THE COURT:  Any objection to the admission of D-589,

15   paper version?

16           MR. TORZILLI:  No objection.

17           THE COURT:  That will be admitted as well.

18           MR. TUBACH:  Thank you.

19   BY MR. TUBACH:

20   Q.   Sir, could you take a look at 589?

21           Can you tell us what the bid was that Mr. Austin sent

22   to Mr. Oeschli on November 20, 2013 for dark meat?

23   A.   62 cents.

24   Q.   How did that compare to the price of COB, the purple?

25   A.   It was 30 and a half back of eight-piece.

516

Michael Ledford - Cross

1    *Q.*  So basically based on this document, Pilgrim's split the

2    difference between 30 and 31.

3    *A.*  Yes.

4    *Q.*  That seem like a fair compromise to you?

5    *A.*  I don't believe I would have accepted it if it hadn't have

6    been.

7    *Q.*  Okay.  Understood.  Thank you.

8            *MR. TUBACH:*  Let me turn to G-605 and 606.

9            Permission to approach?

10           *THE COURT:*  You may.

11   *BY MR. TUBACH:*

12   *Q.*  Take a look at G-605 and G-606 and let me know when you

13   have had the opportunity to review this.

14   *A.*  Yes.

15   *Q.*  G-605 is an e-mail sent from Mr. Scheiderer at Tyson to a

16   number of people at UFPC -- Mr. Oeschli and Ms. Hester.  Do you

17   see that?

18   *A.*  Yes.

19   *Q.*  What was Ms. Hester's role at this time at UFPC?

20   *A.*  She was director of further processed poultry purchasing.

21   *Q.*  And Mr. Oeschli I believe you talked about already.

22   *A.*  Yes.

23   *Q.*  Attached to G-605 is a bid, what's called Summary Round Two

24   from Tyson.  That's G-606.  Do you see that?

25   *A.*  Yes.

Michael Ledford - Cross

1    Q.  Same questions.  Is this the kind of document that you

2    would have received as a result of your role at UFPC?

3    A.  Yes.

4    Q.  And you would have relied on the e-mail and the attachment

5    to understand Tyson's second round bid and you use that in the

6    ordinary course of your business?

7    A.  Yes.

8         MR. TUBACH:  With that I would move G-605 and G-606

9    into evidence.

10        THE COURT:  Any objection to the admission of G-605?

11        MR. TORZILLI:  No, Your Honor.

12        THE COURT:  G-605 will be admitted.

13        Any objection to the paper version of G-606?

14        MR. TORZILLI:  No objection.

15        THE COURT:  And the paper version, G-606, will be

16   admitted as well.

17        MR. TUBACH:  If we could publish G-606 to the jury,

18   please, Your Honor.

19        THE COURT:  You may.

20   BY MR. TUBACH:

21   Q.  And turn to the part that has the injected eight-piece

22   price.

23   A.  Okay.

24   Q.  And Mr. Ledford, what is the eight-piece price that Tyson

25   proposed to UFPC on November 14, 2012?

518

Michael Ledford - Cross

1   A.   .9876.

2   Q.   .9876 per pound, right?

3   A.   Correct.

4   Q.   Thank you, sir.  You can put that document aside.

5            MR. TUBACH:  Show the witness I-242 and 243.

6            THE COURT:  I am sorry, I-242?

7            MR. TUBACH:  Yes, Your Honor, and I-243.

8            THE COURT:  Okay.

9            MR. TUBACH:  May I have permission to approach?

10           THE COURT:  Yes.

11  BY MR. TUBACH:

12  Q.   Mr. Ledford, I am going to run through the rest of these

13  documents relatively quickly.  I will have you take a look at

14  it and then I will have the same questions I have had for you

15  with a lot of these documents.

16           Have you had a chance to look at I-242 and 243?

17  A.   Yes.

18  Q.   Is this a bid -- 242 is an e-mail from Tim Scheiderer to

19  PoultryPurchasing@UFPC.com and Mr. Oeschli, correct?

20  A.   Yes.

21  Q.   And PoultryPurchasing@UFPC.com, was that an e-mail address

22  to which suppliers could send their bids?

23  A.   Yes.

24  Q.   It wasn't a particular person.  Does it sort of go to a

25  group?

Michael Ledford - Cross

1   A.   I believe every member of the poultry purchase team at RSCS

2   or UFPC had access to that e-mail account.

3   Q.   Understood.  Thank you, sir.

4        And attached to I-242 was I-243, the bid that Tyson

5   submitted?

6   A.   Yes.

7   Q.   As to I-242 and 243, were these documents that you relied

8   on in the ordinary course of your business at UFPC?

9   A.   Yes.

10       MR. TUBACH:  I move the admission of I-242 and 243.

11       THE COURT:  Any objection to those exhibits?

12       MR. TORZILLI:  No, Your Honor.

13       THE COURT:  I-242 will be admitted.  I-243, paper

14   version, will be admitted as well.

15       MR. TUBACH:  G-600 and G-601.

16       Permission to approach, Your Honor?

17       THE COURT:  Yes.

18   BY MR. TUBACH:

19   Q.   Do you have G-600 and G-601 in front of you?

20   A.   Yes.

21   Q.   Have you had a chance to look at them?

22   A.   Yes.

23   Q.   This is an e-mail from Mr. Scheiderer on December 4, 2012

24   to you, correct?

25   A.   Correct.

Michael Ledford - Cross

1   Q.  And it attaches a bid for round three for 2013 contract

2   pricing, right?

3   A.  Yes.

4   Q.  Did you receive Exhibit G-600 -- yeah, 600 and 601, did you

5   receive those in the ordinary course of your business?

6   A.  Yes.

7   Q.  And you relied on them in the course of your work you did

8   there?

9   A.  Yes.

10  Q.  You believe them to be accurate and reliable?

11  A.  Yes.

12          MR. TUBACH:  I move the admission of G-600 and 601.

13          THE COURT:  Any objection to those exhibits?

14          MR. TORZILLI:  No objection.

15          THE COURT:  G-600 will be admitted and G-601, paper

16  version only, will be admitted as well.

17          Mr. Tubach, we are at the time for the mid-afternoon

18  break.  Can we take that now?

19          MR. TUBACH:  Absolutely.

20          THE COURT:  Ladies and gentlemen, we will go ahead and

21  break for the mid-afternoon break.  We will plan on reconvening

22  at 25 minutes until 4:00.  The jury is excused.

23          (Jury excused.)

24          Mr. Ledford, you are excused until after the break.

25  Thank you.

Michael Ledford - Cross

1          Let me mention a couple of things real quick.

2   Assuming that the people in the overflow courtroom haven't left

3   already to go on break, I am thinking about closing down the

4   overflow room.  Our audit yesterday was just about two or three

5   people in there.  It uses up one of our Codex, some bandwidth

6   and requires a little bit of monitoring, so I would propose to

7   do that.  But if anyone can still hear me in the overflow

8   courtroom or if anyone know who may be using it and want to

9   confer with them, I am open to feedback on that, but my

10  proposal would be that we stop doing that.

11         Also when we -- at the end of the day -- I don't have

12  too much time to spend at 5:00, but one thing that we should

13  talk about is, first of all, I want to make sure I have a list

14  of the exhibits that we'll talk about on Friday.  Second, I

15  would like to talk about dates when the United States believes

16  it can respond to some of the recently filed documents, okay?

17         Mr. McLoughlin, go ahead.

18         *MR. McLOUGHLIN:*  Your Honor, I just want to apologize

19  to the Court and to everyone for the interruption.  That was

20  not a cellphone going off.  That was hit the wrong browser tab

21  on the way to be LexisNexis and then a panic attack about just

22  what happened.

23         *THE COURT:*  Understood.  Thank you very much.

24         *MR. McLOUGHLIN:*  Apologies.

25         *THE COURT:*  No problem.  We will be in recess until 25

Michael Ledford - Cross

 1   of.   Thank you.

 2        (Recess at 3:20 p.m.)

 3        (Reconvened at 3:40 p.m.)

 4        THE COURT:  Mr. Tubach -- we have Mr. Ledford.  Let's

 5   bring the jury back in.

 6        MR. TUBACH:  Your Honor, just to speed things up, the

 7   last five I am going to do I believe Ms. Grimm handed copies.

 8        THE COURT:  Yes, I think I have them.  Yes, thank you.

 9        (Jury present.)

10   BY MR. TUBACH:

11   Q.  Mr. Ledford, on the break we took the liberty of putting

12   five more sets of bids in front of you.  If you can take a look

13   at C-475 and C478, they should be the first ones on the pile.

14   Take a look at those and tell me when you have had a chance to

15   look at them.

16   A.  Okay.

17   Q.  And is this a bid you received?  It went to

18   PoultryPurchasing@UFPC from Mr. Bruce MacKenzie at Koch on

19   November 5th, 2013?

20   A.  Yes, it is.

21   Q.  Is that the e-mail that's C-475?

22   A.  Yes.

23   Q.  And C-478 is the bid that's attached?

24   A.  Yeah.

25   Q.  And is this a document that you used in the ordinary course

Michael Ledford - Cross

1   of business at RSCS in conducting your business?

2   A.   Yes.

3            MR. TUBACH:   I move C-475 and C-478 into evidence.

4            THE COURT:   Any objection to those exhibits?

5            MR. TORZILLI:   No objection.

6            THE COURT:   C-475 will be admitted.   C-478 in paper

7   version will be admitted as well.

8            MR. TUBACH:   Thank you, Your Honor.

9   BY MR. TUBACH:

10  Q.   Turn to the next one, Mr. Ledford, if you would, C-480 and

11  C-482.   Same questions.   This is -- C-480 is an e-mail you

12  received on November 18, 2013 from Mr. MacKenzie at Koch to

13  PoultryPurchasing@UFPC.com, correct?

14  A.   Yes.

15  Q.   Attached to that is a bid, C-482?

16  A.   Yes.

17  Q.   Is this an e-mail and bid you received and used in the

18  ordinary course of your business?

19  A.   Yes.

20           MR. TUBACH:   I move C-480 and C482 into evidence.

21           THE COURT:   Any objection to those exhibits?

22           MR. TORZILLI:   No objection.

23           THE COURT:   C-480 will be admitted and C-482 will be

24  admitted in paper version only.

25  BY MR. TUBACH:

524
Michael Ledford - Cross

1    Q.  Mr. Ledford, take a look at C-882 and 883, the next one in

2    the pile.  Do you see that?

3    A.  Yes.

4    Q.  C-882 is an e-mail from Mr. Tench at Mar-Jac to

5    PoultryPurchasing@UFPC.com, correct?

6    A.  Yes.

7    Q.  Dated 11/18/2013?

8    A.  Yes.

9    Q.  And attached to that is a bid that is C-883.

10   A.  Yes.

11   Q.  Did you use these documents in the course of your business?

12   A.  Yes.

13          MR. TUBACH:  Move C-882 and 883 into evidence.

14          THE COURT:  Any objection to those exhibits?

15          MR. TORZILLI:  No objection, Your Honor.

16          THE COURT:  All right.  C-882 and C-883, paper version

17   only, will be admitted.

18   BY MR. TUBACH:

19   Q.  The next one, Mr. Ledford, is A-114 and A-115.  Do you see

20   those?

21   A.  Yes.

22   Q.  A-114 is an e-mail from Mr. Mitch Mitchell at Case Foods to

23   Mary_Hester@UFPC.com.  Subject:  Revised FOB sheet, dated

24   November 20 of 2013.  Do you see that?

25   A.  Yes.

Michael Ledford - Cross

1   *Q.* Attached to that is A-115, which is the revised bid

2   submission?

3   *A.* Yes.

4   *Q.* Did you use these documents in the ordinary course of your

5   business?

6   *A.* Yes.

7        *MR. TUBACH:* I move A-114 and A-115 into evidence.

8        *THE COURT:* Any objection to the admission of A-114

9   and A-115?

10        *MR. TORZILLI:* No objection to these.

11        *THE COURT:* All right. A-114 will be admitted and

12   A-115 in its paper version will be admitted as well.

13   *BY MR. TUBACH:*

14   *Q.* And finally, Mr. Ledford, turn to D-530 and D-531. Do you

15   have that in front of you?

16   *A.* Yes.

17   *Q.* D-530 is an e-mail from Mr. Austin to Mark_Oeschli@UFPC.com

18   dated November 13, 2012. Do you see that?

19   *A.* Yes.

20   *Q.* And attached to that is a bid submission from Pilgrim's

21   Pride. Do you see that?

22   *A.* Yes.

23   *Q.* Did you use these documents in the ordinary course of your

24   business?

25   *A.* Yes.

1          *MR. TUBACH:*  I move D-530 and D-531.

2          *THE COURT:*  Any objection to the admission of D-530

3    and D-531?

4          *MR. TORZILLI:*  No, sir.

5          *THE COURT:*  All right.  Both will be admitted, D-531

6    in paper version only.

7          *MR. TUBACH:*  Mr. Ledford, we may have set the record

8    for 10 quickest documents ever admitted into evidence.

9          Thank you, sir.  I have no further questions.

10         *THE COURT:*  And I think Mr. Tubach is right.

11   Everyone's had a chance.  Oh, Mr. Gillen.

12         *MR. GILLEN:*  Your Honor, on behalf of Mr. Roberts, we

13   have no questions of Mr. Ledford.

14         *THE COURT:*  Mr. Tubach was correct.

15         Okay.  Redirect?

16         *MR. TORZILLI:*  Thank you, Your Honor.

17                      **REDIRECT EXAMINATION**

18   *BY MR. TORZILLI:*

19   *Q.*  Good afternoon, Mr. Ledford.

20   *A.*  Good afternoon.

21   *Q.*  I am going to make this as brief as I possibly can.

22         Yesterday afternoon you were asked on

23   cross-examination a question to the effect of if you knew the

24   suppliers were talking to one another, you were asked whether

25   it was fair to say that you would cut volume from them.  Do you

527

Michael Ledford - Redirect

1  remember that question?

2  A.  Yes, I do.

3  Q.  Do you remember your answer?

4  A.  I believe so.

5  Q.  What was your answer?

6  A.  I believe I said I would.

7  Q.  Would that have included if suppliers were talking about

8  period pricing?

9  A.  No, I don't believe so.

10 Q.  Okay.  What were you talking about when you were responding

11 that it would have been a possibility that you would have cut

12 volume if you knew suppliers were talking to each other?

13 A.  During the negotiation cycle.

14 Q.  And why would it have been a possibility that you would

15 have cut their volume?

16 A.  Really that's the only thing I would have had at my

17 disposal to really act upon with the suppliers in that case.

18 Q.  And why would you have wanted to act upon them if they were

19 talking to each other under those circumstances?

20 A.  Because I would not have wanted them talking during the

21 negotiation to artificially make the price higher than it

22 should have been.  I would have wanted their best price that

23 they came up with as an individual company.

24 Q.  You were also asked on cross-examination, I believe it was

25 this morning, about the possibility of collusion.  Do you

528

Michael Ledford - Redirect

1   remember that?

2   *A.* Yes, I believe so.

3   *Q.* Did you ever expect that your chicken suppliers would have

4   colluded with one another on any aspect of their dealings with

5   you at RSCS?

6          *MR. FELDBERG:* Objection. It assumes a fact not in

7   evidence.

8          *MR. TUBACH:* Lacks foundation.

9          *THE COURT:* Overruled. He can answer.

10  *A.* I don't know that I would say any aspects because we

11  certainly wanted them to talk about quality, wanted them to

12  talk about best practices and things of that nature.

13  *BY MR. TORZILLI:*

14  *Q.* Other than the quality and best practices and things of

15  that nature, would you have expected them to collude in any

16  aspect?

17         *MR. TUBACH:* Same objection.

18         *THE COURT:* Overruled.

19  *A.* No, that would not have been my expectation.

20  *BY MR. TORZILLI:*

21  *Q.* Why not?

22  *A.* Again, I was wanting their best price. And when doing

23  negotiations, I didn't want them getting together to come up

24  with what my price should be.

25  *Q.* And why is that?

529

Michael Ledford - Redirect

1   A.   Because I wanted the best price I could get.

2   Q.   Sir, on cross-examination you were asked about leverage and

3   deleveraging your negotiations.  Do you remember that?

4   A.   Yes.

5   Q.   I believe you had said suppliers talking to one another

6   would deleverage your negotiations?

7   A.   Yes.

8   Q.   Could you explain why?

9   A.   I believe it's very similar to the previous question.  If

10   they were talking and deciding to stand the ground, so to

11   speak, and not come down as I was trying to negotiate them to

12   come down, that would give me less leverage in that situation

13   and put more power in the negotiations in their ball court.

14   Q.   Does competition between chicken suppliers give you

15   leverage in your price negotiations with them?

16   A.   Yes.

17   Q.   And what, if any, impact does that have on your ability to

18   negotiate the best price you can?

19   A.   Competition is key to creating -- enabling us to have the

20   best price we can.

21   Q.   Thank you.

22        MR. TORZILLI:  I would like to ask that Exhibit A-288

23   which I believe has been received into evidence be displayed.

24        THE COURT:  It has and you may.

25        MR. TORZILLI:  Thank you, Your Honor.

530

Michael Ledford - Redirect

1   *BY MR. TORZILLI:*

2   Q.  Sir, on the screen in front of you is what's been marked

3   and received into evidence as Exhibit A-288.  Do you recognize

4   it?

5   A.  Yes, I do.

6   Q.  What is it?

7   A.  It is a feedback to Claxton on round one of negotiations

8   for 2014.

9   Q.  How was the feedback that's contained in this exhibit

10  conveyed to the people at Claxton?

11  A.  It was conveyed as a percentage from competitive price.

12  Q.  And can you explain what that means?

13  A.  Yes.  Typically speaking, we would pick -- competitive

14  price would be one of three things.  It would either be the

15  lowest price we had on a bid for that round.  In some cases it

16  was actually the second lowest.  Typically speaking if that

17  happened, the scenario was we had invited a non-incumbent to

18  bid, in other words, somebody that didn't already have the

19  business.  And sometimes their bids would be extremely low,

20  like not even in the same ball park.  So then you kind of threw

21  that out and said they didn't really know what they were

22  bidding on clearly if that price was that low.  So that's the

23  case where it could have been the second price.  Then on

24  occasion it might have actually been the average price that we

25  had.

Michael Ledford - Redirect

1   Q.  What was the purpose of providing the feedback that's

2   contained in A-288?

3   A.  To get a lower price.

4   Q.  Can you turn to Tab 16 of your binder?  There you should

5   fine an exhibit marked as Government Exhibit 1700-1, and it has

6   redactions on the top third of the page.

7         Do you recognize the unredacted portion of 1700-1?

8   A.  Yes.

9   Q.  What is it?

10  A.  It is an e-mail from Mark Oechsli to Scott Brady, and I am

11  copied on it and other members of the poultry purchasing team.

12  Q.  Is this the cover e-mail that included as an attachment

13  what we just looked at, A-288?

14  A.  I believe so, yes.

15        MR. TORZILLI:  Your Honor, at this time the government

16  moves 1700-1 into evidence.

17        THE COURT:  Any objection to the admission of 1700-1?

18        MR. BELLER:  No objection.

19        THE COURT:  That exhibit will be admitted.

20        MR. TORZILLI:  And permission to publish?

21        THE COURT:  You may.

22  BY MR. TORZILLI:

23  Q.  Mr. Ledford, can you explain what's going on in the e-mail

24  that's in 1700-1?

25  A.  Yes.  Mark was telling Scott Brady that, "See attached

 1   feedback from the Round 1 Poultry RFP."  And then he goes on to

 2   say, "We will be sending a request for additional information

 3   tomorrow."

 4   *Q.*  Did anyone at RSCS to your knowledge ever ask Mr. Brady to

 5   call any of his competitors to discuss the information

 6   contained in this e-mail or in the attachment?

 7   *A.*  No.

 8           *MR. TORZILLI:*  Your Honor, a moment to confer.

 9           *THE COURT:*  Yes.

10   *BY MR. TORZILLI:*

11   *Q.*  Why not, Mr. Ledford?

12           *MR. BELLER:*  Objection.  He is asking him to testify

13   as to whether or not he has knowledge, so it's speculation and

14   it's now multiple layers of hearsay.  And he is asking him to

15   speculate on something that didn't happen.

16           *THE COURT:*  Response?

17           *MR. TORZILLI:*  I am asking him the reason for his

18   previous answer.

19           *THE COURT:*  Sustained.

20   *BY MR. TORZILLI:*

21   *Q.*  Sir, do you know whether Mr. Brady called competitors to

22   discuss the information contained in Government Exhibit 1700-1

23   or the attachment marked as A-288?

24   *A.*  No, I do not have personal knowledge of that.

25   *Q.*  Why not?

533

1          MR. BELLER:  Objection.  He testified that he has no

2     knowledge and the question is why don't you have knowledge.

3     And so I would object to relevance and foundation and

4     speculation.

5          THE COURT:  Sustained.

6     BY MR. TORZILLI:

7     Q.  Did you ever become aware of Mr. Brady having contacted any

8     of his competitors regarding information contained in

9     government Exhibit 1700-1 or the attachment A-288?

10         MR. BELLER:  Objection, asked and answered.

11         MR. TUBACH:  And it's hearsay.  And if we could have a

12    side bar on this, please.

13         THE COURT:  Yes.

14       (At the bench:)

15         THE COURT:  Mr. Torzilli, can you hear me?

16         MR. TORZILLI:  Yes, sir.

17         THE COURT:  Mr. Tubach go ahead.

18         MR. TUBACH:  I believe what the government is trying

19    to elicit here is that Mr. Ledford may have read the indictment

20    and maybe talked to his lawyer about what's in the indictment

21    or what's in the evidence in this case.  It's entirely

22    inappropriate to elicit that kind of hearsay post hoc evidence

23    about what Mr. Ledford may know now.  If there is any such

24    evidence, it will come in at trial.

25         THE COURT:  All right.  And Mr. Torzilli, what do you

1    anticipate that Mr. Ledford will say?

2         *MR. TORZILLI:*  I anticipate he will say he has no

3    knowledge or information about Mr. Brady calling competitors.

4    As you can see from the unredacted version of this, Mr. Brady

5    says, I will make a few calls.  And we have phone records that

6    indicate he called competitors on this day, and I think that

7    gives us reason to -- very good reason to believe he was

8    discussing exactly this with those competitors.

9         So it seems appropriate for us to be asking whether

10   the customer, who in this case Mr. Ledford, was asked about

11   whether he shared information with any of his competitors and

12   including Mr. Kronaugue, but whether the communications that

13   Mr. Brady was intending to do as indicated in the top portion

14   of this e-mail or that he, in fact, did with the -- as

15   indicated by the phone records, whether it was done behind

16   Mr. Ledford's back or not.

17        *THE COURT:*  So I am not quite following it.  So when

18   you say the top portion of the e-mail, are you talking about

19   the portion that's been redacted on this exhibit?

20        *MR. TORZILLI:*  It's been redacted on this exhibit,

21   that's right.  And unredacted it indicates that Mr. Brady is

22   communicating with his boss, Mr. Fries, saying, I will make

23   some calls.  And then there are phone records indicating that

24   Mr. Brady called competitors, including at least one defendant,

25   later in this same day.

1          MR. FAGG:  Your Honor, this is John Fagg.

2          THE COURT:  Go ahead.

3          MR. FAGG:  That question is asked and answered.  He

4    has already asked him this question and he says he doesn't

5    know.  We also object that this line of questioning just

6    amounts to argument on behalf of the government.

7          THE COURT:  Well, I am going to sustain the objection.

8    The nature of the question, No. 1, I think Mr. Fagg may be

9    right that he has already indicated he doesn't know; but No. 2,

10   I think that there is a very high probability that the witness

11   will misunderstand the question and may answer in a way that

12   would simply recite some type of hearsay statement that he

13   gained after litigation was filed, so I think there is a real

14   danger that there would be something prejudicial coming from

15   him.  Given the fact that the government -- especially given

16   the fact that the government anticipates that his answer to the

17   question would be no anyway.  All right?

18         MR. TORZILLI:  That's fair.  Your Honor, may I ask him

19   one last question just to confirm that he has no knowledge of

20   Mr. Brady making any phone calls regarding the content of the

21   e-mail and the attachment?

22         THE COURT:  Given the fact he has already indicated he

23   doesn't have knowledge of the competitors doing such a thing,

24   it seems like the question may presume something not in

25   evidence, and for that reason there would likely be an

1   objection that would be sustained in any event.

2           MR. TUBACH:  He was asked that precise question

3   already and gave the answer no, so it just would be repeating

4   the same question he just asked the witness.

5           THE COURT:  Anything else, Mr. Torzilli?

6           MR. TORZILLI:  No, Your Honor.

7       (In open court:)

8           MR. TORZILLI:  Thank you, Your Honor.  The government

9   has no further questions.

10          THE COURT:  Mr. Ledford, that means that you can go

11  home.  You are excused at this time.  Thank you very much.

12          Let me just ask, Mr. Ledford, is he subject to recall?

13  No?  Okay.  Thank you, Mr. Ledford.

14                              INDEX

15  WITNESSES

16     Michael Ledford

17          Cross-Examination Continued By Mr. Beller      334

18          Cross-examination By Mr. Feldberg             371

19          Cross-examination By Mr. Fagg                 444

20          Cross-examination By Ms. Prewitt              446

21          Cross-examination By Mr. Pollack              447

22          Cross-examination By Ms. Henry                497

23          Cross-examination By Mr. Tubach               503

24          Redirect Examination By Mr. Torzilli          526

25

1                            INDEX (Continued)

2                                EXHIBITS

3     Exhibit        Offered    Received   Refused   Reserved   Withdrawn

4     C-020                     481

5     C-021-1                   482

6     C-023                     473

7     C-024                     473                                483

8     C-024-1                   483

9     A-114                     525

10    A-115                     525

11    I-242                     519

12    I-243                     519

13    D-330                     443

14    C-475                     523

15    C-478                     523

16    C-480                     523

17    C-482                     523

18    D-530                     526

19    D-531                     526

20    D-546                     507

21    D-588                     515

22    D-589                     515

23    G-600                     520

24    G-601                     520

25    G-605                     517

1           INDEX (Continued)

2              EXHIBITS

3  | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
4  | G-606 | | 517 | | | |
5  | A-612 | | 342 | | | |
6  | A-613 | | 342 | | | |
7  | A-622 | | 349 | | | |
8  | A-623 | | 349 | | | |
9  | A-626 | | 353 | | | |
10 | A-627 | | 353 | | | |
11 | F-742 | | 386 | | | |
12 | F-750 | | 389 | | | |
13 | F-759 | | 393 | | | |
14 | F-768 | | 396 | | | |
15 | F-769 | | 397 | | | |
16 | F-777 | | 399 | | | |
17 | F-778 | | 400 | | | |
18 | F-786 | | 403 | | | |
19 | F-787 | | 404 | | | |
20 | F-790 | | 410 | | | |
21 | F-798 | | 413 | | | |
22 | F-799 | | 414 | | | |
23 | F-815 | | 337 | | | |
24 | H-855 | | 453 | | | |
25 | C-882 | | 524 | | | |

1                         INDEX (Continued)

2                              EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    C-883                   524

5    B-936                   462

6    H-971                   438

7    1405                    466

8    1514                    486

9    1700-1                  531

10                    REPORTER'S CERTIFICATE

11        I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.   Dated

13   at Denver, Colorado, this 3rd day of December, 2021.

14

15                              S/Janet M. Coppock

16

17

18

19

20

21

22

23

24

25