1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                     REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 22

15 _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 8:41 a.m., on the 6th day of December,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25    Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                            APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng,
 4   U.S. Department of Justice, 450 Fifth Street N.W., Washington,
 5   DC 20530, appearing for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8   San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10   N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13   CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18   appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21   10017;
22
23
24
25
```

```
 1              APPEARANCES (Continued)

 2         Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4  CA 94065; appearing for Defendant Austin.

 5         Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7         Marci Gilligan LaBranche of Stimson, Stancil,

 8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9  80218, appearing for Defendant Mulrenin.

10         James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12         Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14         Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16         Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19         John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

|     |                                                        |
| --- | ------------------------------------------------------ |
| 1   | APPEARANCES (Continued)                                |
| 2   | Craig Allen Gillen and Anthony Charles Lake of         |
| 3   | Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920, |
| 4   | Atlanta, GA 30339;                                     |
| 5   | Richard L. Tegtmeier of Sherman & Howard, LLC,         |
| 6   | 633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing |
| 7   | for Defendant Roberts.                                 |
| 8   | Barry J. Pollack of Robbins, Russell, Englert, Orseck  |
| 9   | & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington, |
| 10  | DC 20006;                                              |
| 11  | Wendy Johnson and Christopher Plumlee of  RMP, LLP,    |
| 12  | 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing |
| 13  | for the Defendant Blake.                               |
| 14  |                                                        |
| 15  | PROCEEDINGS                                            |
| 16  | THE COURT:  We are back on the record in 20-CR-152.    |
| 17  | We've had a bit of a hiatus and the defendants have provided a |
| 18  | new witness list which is considerably reduced.  Does it look |
| 19  | like anticipating resting as suggested tomorrow?  I think |
| 20  | generally that's what the exhibit or the witness list would |
| 21  | suggest.                                               |
| 22  | Does the government have an idea -- sorry, Mr. Fagg.    |
| 23  | MR. FAGG:  Sure, Your Honor.  In response to your      |
| 24  | question, I think it's possible that the defendants would rest |
| 25  | today.                                                 |

1          *THE COURT:*  Okay.  Thanks.  I appreciate that.

2          So that then begs the question of whether there is

3     going to be a rebuttal case.  Does the government have a

4     feeling for that at this time?

5          *MR. KOENIG:*  Well, of course it depends on what

6     happens, but I would imagine we maybe would be just adding a

7     few documents, introducing a few documents.  I don't think we

8     would have a witness or anything.

9          *THE COURT:*  Yes, so things are going to move fast.  So

10    I will try to pass out the Court's draft of the jury

11    instructions before noon today, give you a little bit of time

12    to look at them over the lunch hour.  We will meet this evening

13    at 5:15 or whenever we have a chance, but assuming that we

14    don't -- that the testimony goes until 5:00, we will take a

15    little bit of a break and then we will come back and start

16    working through the instructions.

17         If your favorite instruction is not included in the

18    packet, that doesn't mean that it won't necessarily be

19    included, but -- because this is a working draft, so that's

20    what we are going to be talking about this evening, okay?

21         Anything else that we should take up before we bring

22    the jury in?

23         *MR. KOENIG:*  Yes, Your Honor.  Thank you.  Two things.

24    First, we just as we walked in received a motion regarding the

25    admissibility of hearsay documents.  Obviously, we haven't had

 1   a chance to review those, but I don't know what's going to

 2   happen.

 3          THE COURT:  You are not a speed reader?

 4          MR. KOENIG:  No.  I try, but ...

 5          So anyway, I just don't know what's going to happen

 6   with, you know, are we going to have extensive side bars or

 7   hash this out now?  It would be nice to respond although they

 8   are resting today.  It's a little tough.

 9          THE COURT:  Side bars.

10          MR. KOENIG:  Okay.  And then the other thing is we

11   have not received any 26.2 statements for their witnesses.  I

12   don't know if there are any or -- we do believe we would be

13   entitled to those if they exist.

14          THE COURT:  Well, they know the rules.  If they don't

15   exist -- I am sure if they existed, they would be produced.

16          MR. KOENIG:  The only other thing I would mention just

17   for notice to the Court and to the defendants is that our

18   rebuttal expert is here.  I said we would not call any

19   witnesses.  I doubt we will call him, but he is here in the

20   courtroom just so that --

21          THE COURT:  And what would he be rebutting?

22          MR. KOENIG:  He is here.  I don't think there will be

23   anything.

24          THE COURT:  I see, just to be able to release him?

25          MR. KOENIG:  Just so you know he is in the courtroom

1    to observe in case he were to be called in rebuttal.

2            THE COURT:  Well, I think -- I am not sure, I can't

3    remember, but he was going to rebut presumably other experts or

4    another expert, right?

5            MR. KOENIG:  Yeah, although there were some documents

6    like the -- what's the -- the McKinsey report.  He wanted to

7    hear what was said about that if that were introduced and be

8    able to rebut that if necessary.  But I just -- I don't think

9    it's going to be an issue.

10           THE COURT:  I don't think it would be.  If the

11   McKinsey report comes in as something to be determined, I am

12   not sure how an expert could necessarily rebut it, especially

13   given the fact that the defendants intend on introducing it not

14   for the truth of the matters asserted, but for other reasons.

15   So I just can't see how an expert could rebut what it's being

16   offered for, once again assuming that it was admitted.  But you

17   might want to chat with whoever is going to be doing that, but

18   it would seem like it's unlikely the rebuttal expert would have

19   a proper basis for testifying.

20           Anything else?

21           MR. KOENIG:  Nothing that can't wait.

22           THE COURT:  Mr. Kornfeld?

23           MR. KORNFELD:  Good morning, Your Honor.  Just two

24   brief things.  One is I had raised with the Court and luckily

25   my sticky note reminds me that I raised this with the Court

1    before we broke for Thanksgiving the possibility of reminding

2    the jury about the burden prior to the defense case.

3        THE COURT:  I think I did that actually when we

4    dismissed them, if I recall, but maybe not.

5        MR. KORNFELD:  I think my memory is different.  And

6    obviously, I defer to yours, Your Honor, but I think you

7    indicated that you thought it was inappropriate at that time

8    because of the break and to remind you when we got back.

9        THE COURT:  I did say that, but I think when I

10   actually talked to the jury, I did, in fact, notify the jury

11   about the burden, namely that -- and specifically what did you

12   want me to remind the jury of?

13       MR. KORNFELD:  I think just that general, you know,

14   just the general burden, just a reminder that even though

15   effectively we are putting on a case, it's not the defense's

16   burden.

17       THE COURT:  Yes.  I will mention the fact that --

18   because I think I said to the jury that we would see whether

19   the defendants wish to present any evidence because they don't

20   have an obligation to do so, and I will do the same once again.

21       MR. KORNFELD:  Thank you.

22       And the second thing is obviously we all have been

23   having discussions with our clients regarding them testifying

24   or not.  I guess my request would be at the close of any -- or

25   when we are done with "substantive" witnesses, if we could at

4216

1    least have a brief break to have that final discussion.

2          *THE COURT:* At what point?  Before the defense rests?

3          *MR. KORNFELD:* Yes.

4          *THE COURT:* Yes.  Obviously, as you know, in federal

5    court the Court doesn't provide any type of advisement to that

6    effect, but obviously I think it's important.  And I will

7    certainly provide an opportunity for defense counsel to have

8    those conversations with their clients before the defendants

9    rest.

10         *MR. KORNFELD:* Thank you, Your Honor.

11         *THE COURT:* All right?

12         Okay.  Let's bring the jury in.

13         (Jury present.)

14         *THE COURT:* Good morning, ladies and gentlemen.  Nice

15   to see you again.  It's been a little bit of time since we saw

16   you last.  We have got a change of seasons.  We have at least

17   one Christmas sweater in evidence.

18         So you will recall that Wednesday before Thanksgiving

19   when we were last here the government rested.  And as I

20   instructed you at that time, that means that the government

21   finished its evidentiary case.  So then it shifts over to the

22   defendants to determine whether any of the defendants wish to

23   present evidence as well.  The defendants don't have any

24   obligation to present evidence.  The burden of proof rests with

25   the government.  The government has to prove its case, its

Darrell Bowlin - Direct

1    charge beyond a reasonable doubt.  So now we'll determine

2    whether or not the defendants or some of the defendants wish to

3    present evidence.

4            Any evidence on behalf of the defendants?

5            MS. PREWITT:  Yes, Your Honor.  On behalf of Timothy

6    Mulrenin, we have a witness.

7            THE COURT:  Okay.  We will proceed with that, then.

8            Ms. Prewitt, Mr. Mulrenin may call his first witness.

9            And Ms. Prewitt, who is that witness?

10           MS. PREWITT:  Darrell Bowlin.

11       (**Darrell Bowlin** was sworn.)

12           THE WITNESS:  I do.

13           COURT DEPUTY CLERK:  Please state your name and spell

14   your first and last name for the record.

15           THE WITNESS:  My name is Darrell Bowlin,

16   D-A-R-R-E-L-L, B-O-W-L-I-N.

17                        **DIRECT EXAMINATION**

18   BY MS. PREWITT:

19   Q.  Thank you, Mr. Bowlin.  I represent Timothy Mulrenin.  And

20   you know Mr. Mulrenin, don't you?

21           Okay.  Now, we have not met before today, have we?

22   A.  Not that I know of.

23   Q.  And you have met with the government more than once; isn't

24   that right?

25   A.  Yes, ma'am.

Darrell Bowlin - Direct

1   Q.  And the prosecutors sitting at this table, is that right,

2   or some of them at least?

3   A.  Yes, ma'am.

4   Q.  But this is the first time that you and I have spoken.

5   A.  Yes, ma'am.

6   Q.  So if I ask a question you don't understand, let me know

7   and I will rephrase it or we can have it read back by the court

8   reporter, okay?

9   A.  Yes, ma'am.

10  Q.  Now, I'm going to ask you questions about your involvement

11  in pricing chicken products at Tyson Foods, okay?  Just to

12  orient you, those are the questions that I am going to put to

13  you, okay?

14  A.  Yes, ma'am.

15  Q.  Now, I'll sort of skip to the punchline here.  Where do you

16  work?

17  A.  I work for Tyson Foods.

18  Q.  And what is your current position?

19  A.  Director and cut-out manager.  I manage the whole body

20  business in that category.

21  Q.  Now, under Tyson's organizational structure, what unit does

22  your position lie within?

23  A.  Small bird BU.

24  Q.  Is that a business unit?

25  A.  Yes, ma'am.

Darrell Bowlin - Direct

1    Q.  Now, and how is a business unit different from some of the

2    other departments at Tyson?  What does it do?

3    A.  The business unit owns the birds from a planning

4    perspective.  We also -- live weights, we control that.  We own

5    the birds.  We also own the pricing that we tell our

6    customers -- our sales team to go get.  There is multiple

7    things.  We have different mixes.  And ultimately I manage the

8    WOGs and the eight-piece primarily.

9           THE COURT:  Mr. Bowlin, do you mind, could you lean

10   forward just a bit so you can speak into the microphone a bit?

11          THE WITNESS:  Yes, sir.

12   BY MS. PREWITT:

13   Q.  Sorry.  With the masks it's a little hard sometimes, so if

14   you don't hear me, let me know, and otherwise raise your voice

15   so the jury can hear you.

16          So you mentioned you have a role in coming up with

17   pricing, is that right, for small birds?

18   A.  Ultimately we make the final decision on pricing.

19   Q.  Thank you.  And so how long have you held the position that

20   you have now as a cut-out manager at Tyson?

21   A.  I honestly don't know.  I have been in this role, similar

22   role maybe 10 years.

23   Q.  And then let's talk about the customers that you're

24   involved in coming up with pricing for.  What are the types of

25   customers?

Darrell Bowlin - Direct

1    A.  We have QSRs.  We have deli customers.  We have

2    distribution, food service type business as well.  We also do

3    boneless.  We do, I mean, the whole line.  We do a lot of the

4    different products.

5    Q.  Let's break it down.  QSRs, what are QSRs?

6    A.  I would consider a QSR -- when we use the term national

7    account, I would reference a Popeye's or a KFC or even a

8    Church's or even a Boston Market.

9    Q.  So with my questions, I am really going to focus on the

10   period from 2013 to 2019, okay?  So when I ask you questions,

11   that's the time period I am generally referring to, all right?

12   A.  Yes, ma'am.

13   Q.  Now, can you give us some examples -- let's walk through

14   the process by which prices to QSR customers are quoted, okay?

15   A.  Yes, ma'am.

16   Q.  I am going to ask you a few questions about your

17   involvement in that.  Which departments at Tyson or units are

18   involved in coming up with pricing to QSR accounts, QSR

19   customers, like the ones you mentioned?

20   A.  If we were doing an RFP, for example, we would engage our

21   pricing team.  We would engage our supply versus demand, our

22   demand planning team as well.  The BU would be in the middle of

23   it as well.  Sales would be collaborating as well.  You would

24   engage multiple groups to formalize a final supply versus

25   demand and also the pricing.

Darrell Bowlin - Direct

1    Q.   Would that also include forecasting, for example?

2    A.   Forecast is also in there as well.

3    Q.   And even though all those departments had a role in that

4    RFP pricing process, who owned and made the final decision?

5    A.   Ultimately, the BU had the final decision.

6    Q.   When you say BU, you are referring to what?

7    A.   The business unit.

8    Q.   Thank you.  Now, and the sales department does not function

9    within the business unit, does it?

10   A.   No, ma'am, they're separate.

11   Q.   I want to walk through each of these departments.  You

12   listed several that are involved in pricing at Tyson, okay?  So

13   we are just going to walk through some of them, if that's all

14   right.

15   A.   Yes, ma'am.

16   Q.   Now, let's talk about the pricing department.  You

17   mentioned the pricing department.  Who was in that unit

18   generally speaking over that period of time, 2013 to 2019

19   generally, and what did they do when it came to pricing and

20   contributing to this pricing decision?

21   A.   Keep in mind I did not remember their names until I get

22   prepping for this position -- or this testimony.  I would say

23   we were going back to the e-mails and I believe one of them was

24   Rollin Barnes.  We had Ritchey Collyar.  I also remember seeing

25   Shane Free.  These were people that represented the pricing

Darrell Bowlin - Direct

1   department back to the BU, the small bird BU.  So we would

2   engage them.  And they would look at our most recent cost

3   structures.  They would see where we were from a financial

4   perspective.  And then they would recommend this is the price

5   we need to go after.

6   Q.  And would it be fair to say that their role is to support

7   the business unit?

8   A.  Yes, ma'am.

9   Q.  You mentioned supply and demand production planning.  Who

10  do you recall being within that department who would have

11  helped provide input to your pricing decisions?

12  A.  Debbie Baker (ph), and I have been together for many years,

13  so that's the first name that comes to mind.  And she would

14  have managed the demand planning at that time.

15  Q.  So what would that entail, for example?

16  A.  Supply versus demand, taking our forecast, throwing it up

17  against our supply, and can we supply,  right?  Are we going to

18  be short or are we going to have excess, whatever that comes to

19  be.

20  Q.  Now, and moving forward you mentioned sales.  Broadly

21  speaking, what was sales role when it came to dealing with QSR

22  customers?

23  A.  They would meet with the customer and they would -- our

24  team, let me say that, our team would make the decisions on

25  pricing, for example, and then we would go back to the sales

Darrell Bowlin - Direct

1    team and ask them to go get that price.

2    Q.  So they would message the price to the customer; is that

3    right?

4    A.  Yes, ma'am.

5    Q.  Now, let's -- at the end of the day -- who was your boss

6    during this period of time I mentioned while you were working

7    within the business unit for small bird?

8    A.  I am remembering two names.  One of them would have been a

9    Charlie Solomon.  The other would have been a Steven Cullen.

10   Q.  And did you consult with them when it came to coming up

11   with pricing on occasion?

12   A.  Yes, ma'am.  On the QSRs it was not uncommon to engage

13   multiple groups and have multiple conversations, multiple

14   conversations.

15   Q.  Okay.  Now, moving forward, what would you tell -- what

16   information would you provide to the sales team to -- on price

17   in terms of what they could share with the customer?

18          MS. CALL:  Objection, hearsay.

19          THE COURT:  Overruled.

20   BY MS. PREWITT:

21   Q.  You can answer the question.

22   A.  Please repeat the question.

23   Q.  What would be the type of information that you would

24   provide to the sales team that they could then communicate to

25   the customer in terms of the price quote?

Darrell Bowlin - Direct

1   A.  So we would gather, we would have conversations.  Pricing

2   would come in and they would say "Hey, we recommend this

3   price."  More than not you would see more kick-back from our

4   sales team as far as taking price.  For whatever reason it

5   was -- it wasn't a black and white scenario where I said, "Hey,

6   go get 3 cents," and they said, "Yes, sir."  So they

7   represented the customer and they would kick back and give me

8   information that they believed to be true.

9   Q.  Tell me a little bit more about what you mean by that,

10  kick-back.  What was the push-back?  Is kick-back push-back?

11  That what you are referring to?

12  A.  There would be instances where, hey, if you go after a

13  3-cent price increase, you are at risk of losing 30 percent of

14  the business or, hey, if you're going in too high, why are you

15  going in too high, just things like that.  I would call it a

16  beat-down somewhat.

17  Q.  So the sales was trying to beat you down on the price

18  increases that you were trying to quote to the customers.

19  A.  That's what I remember more than the other.

20  Q.  Okay.  And do you have any understanding as to why they

21  would try to do that, beat you down to lower the price to the

22  customer?

23  A.  My perception was they were representing the customer.

24  Q.  How so?

25  A.  Meaning that was their account.  They were selling pounds

Darrell Bowlin - Direct

1    to the customer that they serviced.  And, I mean, there had

2    been times when I made the comment, "You work for Tyson Foods.

3    You don't work for KFC."  And what I mean by that is what we

4    are trying to do is go get price and I have to fight with my

5    own salespeople to get that pricing.  And that was my

6    frustration.

7    Q.  Because they kept trying to take the price lower; is that

8    right?

9    A.  Yes, ma'am.

10   Q.  And those conversations you were having where they were

11   trying to price lower involved Timothy Mulrenin and Brian

12   Roberts; is that right?

13   A.  I believe that to be true, yes.

14   Q.  I would like to show you -- you have a binder in front of

15   you, Mr. Bowlin.  Do you see it right there?

16   A.  Yes, ma'am.

17   Q.  And if you just flip open to -- it's going to have a tab

18   that says G-934.  Do you see that?

19   A.  Yes.

20   Q.  This is just for identification, not to present for the

21   jury, just for identification purposes for now.  Do you see

22   that, Mr. Bowlin?

23   A.  Yes, ma'am.

24   Q.  And if you would like a hard copy, we have a binder in

25   front of you in case that's easier for you.

4226

Darrell Bowlin - Direct

1   A.  I see.  Yes, ma'am.

2   Q.  Now, do you recognize what this document is?

3   A.  It looks like an organization chart for Tyson Foods at a

4   period of time.  I do recognize some of these people on here.

5   Q.  Okay.  Does this look to you to be a true and accurate

6   representation of the sales team within this chart?

7   A.  I believe that to be true, but I mean, I don't -- some of

8   these names I don't know either.

9   Q.  And was it the practice of Tyson Foods to create

10  organizational charts like this in the ordinary course of

11  business?

12  A.  Yes, ma'am.

13  Q.  And to update them from time to time to reflect the current

14  state of the organization; is that right?

15  A.  Yes, ma'am.  Positions may change and they may put a

16  different name in that bucket or that box.

17  Q.  And people within Tyson that had knowledge of these things

18  who was in what position made the entries on a chart like this.

19  That's how it was created.

20  A.  Yes, ma'am.

21  Q.  And was this -- and this is the type of document that

22  people at Tyson would refer to and rely upon in their ordinary

23  course of business; is that right?

24  A.  Yes, ma'am, I believe that to be true.

25          MS. PREWITT:  Your Honor, we move G-934 into evidence.

Darrell Bowlin - Direct

1          THE COURT:  Any objection to the admission of G-934?

2          MS. CALL:  Objection as to relevance.  There is no

3     indication as to what time period this chart reflects.

4          THE COURT:  Response?

5          MS. PREWITT:  I can ask a few questions of the

6     witness.

7          THE COURT:  That's fine.  It will be sustained for

8     now.

9     BY MS. PREWITT:

10    Q.  Now, is this -- does this chart more or less reflect the

11    sales unit that existed within the period of approximately

12    around 2013?

13    A.  I believe that to be true.  I don't know for sure, but I do

14    see salespeople on here.  I also see FSQA, senior directors.  I

15    don't see business units in here.  I see this more as a

16    different chart that represents some of our vice-presidents,

17    some of our senior vice-presidents.  And as I go through it, it

18    looks more like a sales and a QA and R&D as well.

19         MS. PREWITT:  I would renew the request to admit this

20    document.

21         THE COURT:  Any objection to the admission of G-934?

22         MS. CALL:  Just a foundation, Your Honor.  It doesn't

23    appear this witness has the ability to qualify this as a

24    business record.

25         MS. PREWITT:  There is a transmittal e-mail with a

Darrell Bowlin - Direct

1  date on it that goes with this.  I could show that to the

2  government if that would be helpful.

3       THE COURT:  Well, if you want to show it to the

4  witness, you can do something of that nature, but I will

5  sustain the objection for now.

6       MS. PREWITT:  In the interest of moving through this,

7  we will move on.  We don't need to display this to the jury.

8  BY MS. PREWITT:

9  Q.  I will just ask you questions about the sales team, okay,

10  Mr. Bowlin?  We will do that way.  How about that?

11  A.  Yes, ma'am.

12  Q.  So let me ask you about individuals that you recall who

13  were in the sales department during the time we discussed, 2013

14  through 2019.  Who do you recall was involved in the QSR

15  accounts where Tyson sold small bird?

16  A.  Again, prepping for this testimony, I mean, it would have

17  been Brian Roberts.  It would have been Tim Mulrenin, Carl

18  Pepper.  Those are the names that are coming to mind.  Andy

19  Lubert even.

20  Q.  Mr. Lubert?  What about Tim Scheiderer?

21  A.  Tim Scheiderer as well.

22  Q.  And how would you describe your relationship with

23  Mr. Mulrenin?

24  A.  We worked together.  He had the sales side.  I had the BU

25  side.  I wouldn't say that we were best friends at all.  I

Darrell Bowlin - Direct

1    mean, we were cordial to each other.

2    Q.   And how was your relationship with Mr. Brian Roberts?

3    A.   Pretty much the same.

4    Q.   Now, I am going to ask you specifically to focus on how you

5    interacted with the sales team when it came to working up price

6    quotes and costs.  Tell us more about the dynamic you described

7    earlier, sort of the push and pull.  Why was it the case to

8    your knowledge that sales was trying to get you to lower the

9    price for these QSR accounts?

10   A.   More than not.  I mean, that's what I remember near that

11   period of time.

12   Q.   Now, do you recall any salesperson at Tyson ever pushing or

13   urging you to increase prices with a QSR customer?

14   A.   I wouldn't say that it never happened, but I don't recall,

15   but I would not say that it never happened.

16   Q.   But do you have any recollection of that happening?

17   A.   No, ma'am, not at this time.

18   Q.   But you have a recollection of the sales pushing down

19   price?

20   A.   Yes, ma'am.

21   Q.   Did that happen every once in a while or frequently?

22   A.   It felt frequent.

23   Q.   Now, what would the motivation be for a salesperson at

24   Tyson to try to push down prices that you wanted to quote, push

25   back -- push down prices from what you wanted to quote to QSR

4230

Darrell Bowlin - Direct

1  customers?

2          *MS. CALL:*  Objection, foundation.

3          *THE COURT:*  Overruled.

4  *BY MS. PREWITT:*

5  *Q.*  You can answer.

6  *A.*  I would believe it was -- I did not know for sure how they

7  were graded on their bonuses or even their performance, but I

8  have accused them, "All you care about is pounds.  I have to

9  care about everything."

10  *Q.*  So when you say, "You only care about the pounds," what are

11  you referring to?

12  *A.*  I accused them of protecting their pounds.

13  *Q.*  Is that volume?

14  *A.*  Meaning the business that we're selling to those customers,

15  that they were held to a different standard than I was.

16  *Q.*  And the standard you were held to was what?

17  *A.*  We need to make money.

18  *Q.*  So it was price.

19  *A.*  Yes, ma'am.

20  *Q.*  Now, I want to focus now on your role developing prices to

21  quote to certain QSR customers, okay?  I am going to ask you

22  some questions about certain QSR customers.

23          Now, how did you come up -- I am sorry.  Let's -- you

24  are familiar with the QSR by the name of KFC, correct?

25  *A.*  Yes, ma'am.

4231

Darrell Bowlin - Direct

1    Q.   I'm going to focus my questions on that for now just so you

2    know where I am going.

3    A.   Yes, ma'am.

4    Q.   Now, do you recall developing a pricing model for a KFC

5    supply contract that would last from 2015 to 2018?

6    A.   I do recall that after reviewing the documents.

7    Q.   And who were the decision makers at Tyson in terms of

8    developing the pricing model for that annual supply contract?

9    A.   I believe you're referencing the one where Brandon Campbell

10   worked on a new cost model or an updated cost model for KFC

11   specifically.

12   Q.   Is that what you recall?

13   A.   That's what I -- yes, ma'am.  That's what I am referring

14   to.

15   Q.   And tell us about Mr. Campbell and what his role was.

16   A.   He would have managed a group of customers that would have

17   been -- I would have been the leader at that time, and I

18   believe Brandon Campbell would have had QSR accounts.  He would

19   have specific accounts that he was overseeing as well.  And

20   then there would have been someone else like a deli or even

21   food service, those type of roles.  But what I remember

22   specifically about that was he came to me and said, "Hey, this

23   cost model, this cost model is old."  It hadn't been updated in

24   several years.  "What do you think about going in and updating

25   some of the numbers?"  And I said "Heck yeah.  I mean, let's

Darrell Bowlin - Direct

1    get it as accurate as it can be."

2    Q.  And that's with respect to KFC.

3    A.  To KFC specifically.

4    Q.  And those negotiations took place around the summer of 2014

5    for the 2015 to '18 supply?

6    A.  That's what I remember reviewing those documents.

7    Q.  So it was Mr. Campbell who developed that model.

8    A.  He didn't develop that model.  That model was given to us

9    by the customer is what I believe.

10   Q.  By KFC?

11   A.  But through the years there is inputs that you can update.

12   And it felt like that model had been -- I don't know how many

13   years, maybe five years, and we hadn't even touched it.  And if

14   we had any cost implications, we haven't adjusted that as well.

15   Q.  So I think you said when he suggested that somehow that the

16   inputs should be changed to that model, I think you said, "Heck

17   yes"?

18   A.  Yes, ma'am.

19   Q.  Did I hear you correctly?

20   A.  Yes, ma'am.

21   Q.  Why was your reaction "Heck yes"?

22   A.  Because it gives us an opportunity to make money if we're

23   not making money, right?  If our cost has gone up 3 cents a

24   pound and we're not charging the customer for that additional

25   cost, then we lose that 3 cents.

Darrell Bowlin - Direct

1   *Q.*  So was that your sense at the time, that KFC -- that you

2   were not making money on the KFC account?

3   *A.*  There was a period of time when we were making some money,

4   and then I remember through the years that we stopped making

5   money.

6   *Q.*  And that was with KFC.

7   *A.*  That was with KFC specifically.

8   *Q.*  So why?  Why weren't you making money with the KFC

9   contract?

10  *A.*  Part of our e-mail and some of the other documents you may

11  not be referencing now, but part of it was due to the way you

12  got paid for KFC is you got paid on a green weight case weight.

13  It's green weight.  This product is also marinated and we were

14  not getting credit for all the pounds in the box at that time.

15  So part of our strategy was, hey, what if you change your model

16  to represent all pounds in the box, and that would mean we

17  would get paid more.

18  *Q.*  So at this point in time when you were trying to get --

19  change the model to reflect what was going into the box, what

20  was your view of KFC in terms of a customer?

21  *A.*  I didn't like them.

22  *Q.*  Why not?

23  *A.*  Because we weren't making money at the time.

24  *Q.*  Now, did you ever have conversations with anybody about the

25  fact that you didn't like them and you weren't making money at

4234

Darrell Bowlin - Direct

 1 | the time?

 2 | A.  I believe I have.

 3 | Q.  And what was your view about what should be done?

 4 | A.  Well, there were times where we had to -- I will say the

 5 | word maybe settle.  There were times where we had to settle in

 6 | the sense of we had to keep supplying them because we had the

 7 | birds and we needed to sell those birds.  If I am not able to

 8 | sell it to a different customer at a higher price, then I may

 9 | go in and settle and stay with this customer one more year

10 | depending on the contracts.

11 | Q.  But what did you want to do with KFC as a customer?

12 | A.  There has been times when I wanted to fire them, but I

13 | couldn't.

14 | Q.  On one occasion or more than one occasion?

15 | A.  At least three times, I believe.

16 | Q.  So you wanted to fire KFC because it wasn't a profitable

17 | account three times.

18 | A.  Yes, ma'am, I believe that to be true.

19 | Q.  Now, you talked to us about the desire to change the KFC

20 | model to make it more profitable occurring in the context of

21 | working up the pricing for this 2015 to 2018 supply contract.

22 | Do you recall that?

23 | A.  Yes, ma'am.

24 | Q.  Now, did that ever happen?  Was the model ever changed?

25 | A.  I don't believe it did, no, ma'am.

Darrell Bowlin - Direct

1   Q.  Now, do you recall when Mr. Campbell first came up with a

2   pricing model to submit -- that was going to be submitted to

3   KFC?

4   A.  Let me be clear.  That model was given to us, right, and

5   then we were trying to update it to where -- and then we also

6   showed them a different strategy or a different model, if you

7   want to call it, where we just looked at our price versus our

8   pounds and then the case weights as well.

9   Q.  Well, do you remember when Mr. Campbell first came up with

10  the pricing for the existing KFC model?  Do you remember that?

11  A.  Yes, ma'am.

12  Q.  When was that approximately?

13  A.  Well, again prepping for this testimony, it was around

14  2014, I believe.

15  Q.  Approximately what month?

16  A.  I think it was maybe June or July.

17  Q.  Now, it would help if I showed you a document to refresh

18  your recollection as to that date?

19  A.  Yes, ma'am.

20  Q.  Can you take a look at G-624?  Now, do you recall -- and

21  you can look away from that document once you feel you've had a

22  chance to review the document.  Take your time.

23  A.  Yes, ma'am.

24  Q.  Now, so looking away from the document, does that refresh

25  your recollection of the date that the pricing team,

Darrell Bowlin - Direct

1   Mr. Campbell, came up with the --

2   A.  I am sorry, I didn't even look at the date.

3   Q.  I am sorry?

4   A.  I did not even look at the date.  I apologize.

5   Q.  So you recalled it independently.

6   A.  No.  I am talking -- oh, yeah, as far as that goes.

7   Q.  Okay, thank you.  Now, what do you recall about who was

8   involved besides Mr. Campbell in coming up with this price?

9   Who from the pricing team or business unit was also involved?

10  A.  You would have had either Rollin Barnes or Ritchey Collyar.

11  You also would have had -- Brandon would have been involved

12  right in the middle of it.

13  Q.  Would Mr. Tim Mulrenin have been involved in coming up with

14  this pricing?

15  A.  I don't know that he would come up with it, no, ma'am.

16  Q.  But this model was developed outside the sales unit.

17  A.  Yes.  We were trying to change the model.

18  Q.  The business unit was trying to change the model.

19  A.  Yes, ma'am.

20  Q.  Now, what was the margin price increase that Tyson was

21  going with at this time to submit to KFC?

22  A.  They showed like a 19-cent price increase versus current.

23  Q.  Now, did the model ever change, the KFC model?

24  A.  Did we get to do that?

25  Q.  Did you ever get to do it, change the model?

Darrell Bowlin - Direct

1    A.   No.

2    Q.   So it didn't work.

3    A.   No.

4    Q.   You didn't convince KFC to change the model.

5    A.   Not to my knowledge.

6    Q.   Now, so what was the model that was proposed later on that

7    KFC rejected?  What were the features of it to your

8    recollection?

9    A.   Are you talking about no longer doing the moisture tare, no

10   longer doing the inject tare?

11   Q.   Is that what you recall as being the --

12   A.   That was the point of contention on the whole conversation.

13   Q.   Okay.  And that was what you were trying to change.

14   A.   Yes, ma'am.

15   Q.   And that didn't work?

16   A.   No, ma'am.

17   Q.   So to your recollection was a different pricing model

18   developed and sent that relied on the -- sorry.

19        To your knowledge was a different pricing model

20   submitted that was in conformity with what KFC expected, their

21   old model?

22   A.   Ultimately we just went back to doing what we were doing,

23   and that's what I believe to be true.

24   Q.   And do you remember what the price of -- what the price

25   increase was in the model that was submitted finally to KFC?

Darrell Bowlin - Direct

1   A.   Yeah.   If you got paid for every pound in the box, it was

2   going to be equal to 19 cents per pound, I believe, from what I

3   saw.

4   Q.   In essence the model that was reflected in -- the model in

5   June 2014 was the same as the one that was submitted later on

6   and finally to KFC.

7   A.   I am getting mixed up here.   There was a change.   We were

8   trying to change the model to where we got paid for everything

9   in the box.

10  Q.   But that didn't work.

11  A.   And that did not work.   So we went back to the original

12  price model that KFC came up with years ago.   We just kept

13  using that model.

14  Q.   Thank you.

15  A.   Yes, ma'am.

16  Q.   Now, throughout this process did any salesperson try to

17  push to increase the price quoted to KFC?

18  A.   I should never say never, right?   I just don't remember.

19  Q.   Do you think it happened?   Do you have any recollection of

20  that happening?

21  A.   I don't have any recollection, no, ma'am.

22  Q.   Would sales people pushing to increase a price to a

23  customer like KFC make sense to you based on your interactions

24  with the sales people at Tyson?

25  A.   I just don't remember them asking me to do that.

Darrell Bowlin - Direct

1    Q.   Now, moving on to Popeye's as a QSR customer, okay?  Now,

2    with respect to the 2018 and '19 annual supply contract, do you

3    remember that?  Do you remember --

4    A.   Yes, ma'am, after prepping for this testimony.

5    Q.   Now, I will ask you some questions about that.  When did

6    that -- when did those negotiations take place to your

7    recollection?

8    A.   I don't remember the dates, the months, per se.

9    Q.   Let me show you -- and it's in your binder if you want to

10   look at the hard copy -- just for your identification and

11   review G-800.  Do you see that document?

12   A.   Yes, ma'am.

13   Q.   Now, approximately when did those negotiations take place?

14   You can look away.  If it refreshes your recollection, just

15   look away from the document and answer the question, please.

16   A.   Wednesday the 23rd of August 2017.

17   Q.   That refreshes your recollection looking at the document?

18   A.   Yes, ma'am.

19   Q.   Now, what do you recall about what prompted these

20   negotiations in August 2017?

21   A.   What I recall, what I recall of this is 2017 Popeye's

22   was -- had a strategy to double their volume or double their --

23   yeah, volume over the next five years.  They did meet with us

24   at Tyson Foods and they told us their strategy.  And I am

25   taking you down a path here, I am sorry, but they shared their

Darrell Bowlin - Direct

1  strategies with us on doubling over the next five years.  And

2  what comes to mind is we were not -- we were -- my guess is --

3  or not guess, but during this period of time we knew that we

4  were not going to gain any more share on Popeye's and we were

5  trying to gain share on KFC.

6  Q.  Now, what, if any -- did the sales team have any reaction

7  in terms of the pressure coming from Popeye's to lower price?

8  Did they have a position?

9  A.  Say this again?

10 Q.  Did the sales team have a position and have a point of view

11 about whether prices should be lowered in response to the

12 request from Popeye's?

13 A.  I don't recall that type of conversation.

14 Q.  Now, who ultimately decided the price to be quoted?

15 A.  The business unit.

16 Q.  The business unit.

17 A.  Yes, ma'am.

18 Q.  Now, I am going to ask you some questions about cost

19 pass-throughs.  Is that a term you are familiar with?

20 A.  Yes, ma'am.

21 Q.  What are cost pass-throughs?

22 A.  It can be packaging.  It can be ingredients.  It can be,

23 you know, frozen versus fresh.  It can be multiple things.

24 Q.  Okay.  And would -- who would ask for these?  How would

25 this start that you would quote a cost pass-through?

Darrell Bowlin - Direct

1    A.  A customer would reach out to us and ask -- in this

2    scenario they would ask can you freeze the Church's

3    eight-piece, for example.  It's primarily fresh, and then they

4    wanted a frozen version of it as well.

5    Q.  So you are thinking about the freezer cost for Church's

6    Foods.

7    A.  Yes, ma'am.

8    Q.  That's an example.  So at what point in the life of a

9    contract would a customer ask you to price a cost like that?

10   A.  It can happen mid term.  It can happen, you know, a month

11   in.  It can happen a month -- by the end of it.  They made a

12   decision and they are changing something that's different than

13   what we are doing today.

14   Q.  And they are asking you to cost that, to price that.

15   A.  Yes, ma'am.

16   Q.  Did that include -- at Tyson would that cost be developed

17   by you or someone else?

18   A.  It would be multiple people, meaning the pricing team would

19   have a hand in it.

20   Q.  And the business unit?

21   A.  The business unit would be part of it to include the --

22   think about distribution, think about warehousing, things like

23   that as well.

24   Q.  So lots of different units within Tyson would be involved

25   in pricing a cost.

4242

Darrell Bowlin - Direct

1    A.   Yes, ma'am.

2    Q.   So who would pay for that cost?

3    A.   Ultimately the customer.

4    Q.   So would there be profit usually built into that cost?

5    A.   I don't think so, ma'am.  Usually we would just treat it as

6    a pass-through.  It was something different than what we were

7    doing today, and then I would expect them to cover that cost,

8    meaning the customer to cover that cost.

9    Q.   Okay.  Would the customers expect to see the backup for

10   that sometimes, how you came up with those costs?

11   A.   I am sure there has been times that that's been asked.

12   Q.   Because it was considered to be a straight pass-through; is

13   that right?

14   A.   I believe that to be true, ma'am.

15   Q.   Now, and so when it came to cost pass-throughs, do you have

16   any recollection of the sales team trying to push up the price

17   of a cost pass-through quoted to a customer?

18   A.   I don't -- I don't think so, no, ma'am.

19   Q.   Would that have made sense to you?  Would you expect that

20   to happen that the sales team would ask you to push up the cost

21   to a customer when it's a pass-through?

22   A.   I don't think so.  I don't think so.

23   Q.   But you have no recollection of something like that

24   happening?

25   A.   No, ma'am.

Darrell Bowlin - Direct

1    Q.   Okay.   Now, let me talk to you a bit about the Church's

2    freezing charge, right?   You mentioned that, right?

3    A.   Yes, ma'am.

4    Q.   Do you have a recollection of Church's asking for a cost

5    for a freezing charge?

6    A.   As I was prepping for this testimony, yes, ma'am.

7    Q.   It refreshed your recollection.

8    A.   It refreshed.

9    Q.   So let's talk about for just a little bit, let's talk about

10   freezing charges and what they are.   What is a freezing charge?

11   What goes into pricing that?   Could you just walk us through

12   that?

13   A.   Just the energy, so think about the energy you use to

14   freeze it.   Think about you have to put egg crates -- we call

15   them egg crates or egg shells that goes between the layers to

16   allow air flow to have a better freezing experience.   Also we

17   may have a different box.   You tend to want to do like a 6-inch

18   flat pack versus a 12-inch box type thing.   So there would be

19   handling and there would be freezing, the actual freezing

20   process, and then there would be more handling.   And then there

21   would be warehousing and then there would be shuttling.

22   Q.   So is it fair to say there would be many different folks at

23   Tyson who would be involved in trying to come up with a cost

24   estimate for that type of cost pass-through?

25   A.   Yes, ma'am.   I would make sure that -- our team would make

Darrell Bowlin - Direct

1    sure that we get the right people so we have the right cost.

2    Q.  Okay.  And so how would that work in terms of let's say

3    Church's is coming to Tyson and saying, hey, I want you to

4    quote a freezer cost pass-through for us.  How would that work?

5    Just walk us through the process, please.

6    A.  I believe I would have went through our pricing team first,

7    what's it going to cost to take this fresh and freeze it.

8    Think about all your packaging, think about everything, go

9    through the model and see what it's going to cost.

10   Q.  How would that be communicated?  How would folks within

11   Tyson communicate about figuring this out?

12   A.  Are you referencing an e-mail?

13   Q.  I mean, would e-mail be something that was used?

14   A.  Yes, ma'am.  E-mails was what I would have done, I am sure.

15   There may have been times where I pick up the phone and call

16   somebody, but in this reference I do know that we engaged on

17   e-mails and we got multiple departments involved as well.

18   Q.  And when e-mail was utilized to have these discussions

19   within Tyson, was it the understanding that these had to be

20   accurate because you were trying to come up with accurate cost

21   figures to provide that freezer pass-through cost?

22   A.  I wanted it to be accurate.

23   Q.  And the people who were sending the e-mails and receiving

24   them were the people who had knowledge about the various inputs

25   and the cost factors that were quoted in those e-mails, right?

Darrell Bowlin - Direct

1        *MS. CALL:*  Objection, leading.

2        *THE COURT:*  Sustained.

3        *MS. PREWITT:*  Now, let me move forward.

4        Can we pull up -- and this has been admitted into

5   evidence -- the Government Exhibit 127.

6        Mr. Bowlin, it's in your binder if it's more helpful

7   for you to read a printed copy versus what's on your screen.

8        *THE COURT:*  I don't show that as having been admitted,

9   127.

10       *MS. PREWITT:*  Well, I can certainly move through this,

11  then.

12  *BY MS. PREWITT:*

13  *Q.*  Taking a look at this document -- let me just pull back

14  from that.  Do you remember when a freezing cost was -- do you

15  remember that there was a freezer pass-through cost quoted in

16  December of 2012?

17  *A.*  Yes, ma'am, after review of the documents.

18  *Q.*  Independent of looking at the document you that

19  recollection.

20  *A.*  After reviewing the documents, that's what I see, yes,

21  ma'am.

22  *Q.*  And what was the freezing quote cost at the time that was

23  arrived at by the pricing team?

24  *A.*  4 cents.

25  *Q.*  So it was 4 cents.

Darrell Bowlin - Direct

1   A.   Yes, ma'am.

2   Q.   Now, and what was factored into that estimate?

3   A.   It would have been everything we discussed earlier, whether

4   it be the freezing cost, the packaging, the egg shells, the

5   labor, the housing, the shuttling.  Multiple things would have

6   gone into it.

7   Q.   And that would be -- more or less those kind of

8   considerations would be the same considerations if you were

9   quoting that type of cost to a customer over that period of

10  time.

11  A.   X, Y, Z, yes, ma'am.

12  Q.   Now, with respect to coming up with this type of pricing

13  that the pricing team came up with, that 4 cents freezing

14  charge for Church's, what involvement did sales have in coming

15  up with that cost quote?

16  A.   The 4 cents, I don't believe they had anything to do with

17  that 4 cent quote.

18  Q.   Did there come a time later on in the spring of 2013 -- so

19  now here we are in December 2012 moving forward to the spring

20  of 2013.  Did there come a time when Tyson again quoted a

21  freezer cost?

22  A.   I don't recollect that.

23  Q.   Okay.  Now, would that quote have been more than 4 cents or

24  less than 4 cents?

25  A.   On the scenario that we were talking about on the Church's

Darrell Bowlin - Direct

1  eight-piece, it wind up -- the true cost came in lower than 4

2  cents.

3  Q.  In terms of what you quoted was less than 4 cents.

4      MS. CALL:  Objection, foundation, any recollection of

5  this later.

6      THE COURT:  Overruled.  He can answer if he recalls.

7  A.  Ask your question again, please?

8  BY MS. PREWITT:

9  Q.  So with respect to the --

10     MS. PREWITT:  Actually, can we read back -- do you

11 mind reading back the question?

12     (The record was read by the court reporter.)

13 A.  In terms of what I quoted was less than 4 cents?

14 BY MS. PREWITT:

15 Q.  In the spring of 2013.

16 A.  Ultimately we went in with a cheaper price than 4 cents per

17 pound.

18 Q.  So less than your actually cost.

19 A.  Less than what I actually told them to begin with.

20 Q.  And did there come a time later on in the fall of 2013 when

21 Tyson again quoted Church's for freezing charge?  Do you recall

22 that that happened again?

23 A.  I don't recall.  I am getting confused on the ask and then

24 recalling as well.

25 Q.  Let me show you just to refresh your recollection if you

Darrell Bowlin - Direct

1    look at Exhibit G-320.  It's in the binder in front of you.

2    And just take your time.  And then when you have a chance to

3    review that, just, you know, look up and we'll continue.

4    A.  Yeah, I got confused on the dates and I apologize.  But to

5    me this is the same conversation that we were having in

6    reference to we landed on 2.7 cents versus 4 cents.

7    Q.  So the price actually quoted to the customer was 2.7 cents

8    instead of the actual cost of 4 cents?

9    A.  The actual cost was not 4 cents.  It was derived that we

10   were overstating the price.

11   Q.  But it's what they thought it was.  The belief was it was a

12   4-cent cost.

13   A.  Yes, ma'am.

14   Q.  And who quoted the 2.7 cents?

15   A.  We worked with our -- we worked directly with our sales

16   team, I believe Tim Mulrenin.

17   Q.  He is the one that quoted 2.7 cents?

18   A.  To our customer.

19   Q.  Which was lower than the estimated 4-cent cost?

20   A.  Yes, ma'am, because the true cost had come in below.

21        MS. PREWITT:  Your Honor, we would like to move into

22   evidence G-320.

23        THE COURT:  Any objection to the admission of G-320?

24        MS. CALL:  Yes, Your Honor.  I believe it's all

25   hearsay.

Darrell Bowlin - Direct

1          *THE COURT:*  Response?

2          *MS. PREWITT:*  I would be happy to take all that on,

3    Your Honor.  It's non-hearsay.  It also falls under several

4    different hearsay exceptions.  I have plenty to say on that.

5    And if you want to do a side bar, we can do that, or we can

6    work through it right now.

7          *THE COURT:*  We can do a side bar.

8       (At the bench:)

9          *THE COURT:*  Ms. Prewitt, go ahead.

10          *MS. PREWITT:*  Thank you, Your Honor.  If you take a

11    look at this document first of all just for context, Your

12    Honor, I want to point out that the government in their opening

13    specifically referenced the 2013 Church's freezing charge and

14    noted that Defendant Mulrenin and others conspired to raise

15    that price.  In addition, they talked repeatedly about a

16    pattern of responding to customer requests for quotes and then

17    circling up comparing notes to present a united front as to

18    lowering price.  So this is relevant.  It goes to the fact at

19    issue.

20          *THE COURT:*  I am sorry, Ms. Prewitt, but is the

21    microphone off, just because you are at the podium.

22          *MS. PREWITT:*  Ms. Call thankfully turned it off.

23          Just to provide context, what this e-mail shows is

24    that in October of 2013, Mr. Dean Bradley from Church's has

25    received a 4-cent freezing charge quote from Tyson.  He comes

Darrell Bowlin - Direct

1   back and says that I have other customers that are coming in at

2   prices of 2 to 3 cents.  There is a flurry of e-mails

3   internally involving Mr. Pepper, Mr. Mulrenin looking to get

4   that price down.  So it's specifically in response to this

5   pressure from the customer.

6          It is ultimately Mr. Mulrenin that actually buckles to

7   this pressure.  Instead of calling competitors as the

8   government is -- you know, has alleged in their indictment and

9   their proof they put on, he accedes to that request and

10  responds to competitive pressure.  So it's clearly relevant

11  with respect to the time period, the product, the economic.  It

12  rebuts the government's theory of the case.  So that's the

13  relevance piece.

14         On the admissibility piece I would say there are a

15  couple grounds here, Your Honor.  It's non-hearsay.  You will

16  see with Mr. Mulrenin, he says, "Can we go with 2.7 cents?"

17  That in and of itself is a question.  It's not an assertion.

18  So it is non-hearsay on that basis.  It's an important context

19  to show the relationship between how the pricing unit and the

20  sales team engages in response to pressure from customers like

21  this.  And it's relevant for effect on the listener because

22  Mr. Pepper after this, after hearing this from Mr. Mulrenin,

23  proposes a 3 percent -- 3-cent cost quote, in other words, a

24  reduction from what they had originally quoted to Church's.

25  It's also -- so it's effect on the listener and Mr. Pepper

Darrell Bowlin - Direct

1    acting in conformity and it helps explain that.

2         But also, Your Honor, I think this falls clearly

3    alternatively under 803(3), state of mind exception, in the

4    sense that it's a -- you have case law that's very helpful in

5    the 10th Circuit, *Faulkner v. Super Valu* stores, as well as

6    *U.S. v. Tome*.  And I can give Your Honor the citations to

7    those.  I have the cases here.  But it's -- the question of

8    "Can we go with 2.7 cents" expresses his insecurity, his belief

9    that he has to respond to competitive forces and his belief

10   about how he needs to act in the future.

11        There is nothing that's reflective, there is nothing

12   that goes to memory, so it has that indicia of reliability.  So

13   Your Honor, I think it also is a business record that would

14   fall as such.  You heard him talk about the fact that all of

15   these e-mails were developed as part of the pricing process.

16   They were relied upon in terms of providing quotes to customers

17   that Tyson would be held to.  And so there is that indicia of

18   reliability as well.  So that's my overview.

19        Thank you, Your Honor.

20        *THE COURT:*  Thank you.

21        Ms. Call?

22        *MS. CALL:*  Yes, Your Honor.  I will note there is 24

23   e-mails in this chain and I think that each and every one of

24   them are hearsay.  First as to relevance, I will just point out

25   that this e-mail is in October 2013, which is five months after

Darrell Bowlin - Direct

1    the allegations regarding Church's.  I haven't quite heard

2    anything as to how the defendants' actions and the defendants'

3    knowledge and the defendants' state of mind at that time

4    reflect on what it was five months earlier when they were

5    coordinating with their competitors.

6            As to the admissibility, however, I do think this is

7    frankly all hearsay.  It's the defendant's own statements, it's

8    co-conspirator statements, both rules that are not available

9    for the defendants to the admission of evidence under the

10   Federal Rules of Evidence.

11           As to their 803(3) argument regarding Defendant

12   Mulrenin's state of mind, it really seems like the argument is

13   that his state of mind is based on the truth of the matters

14   asserted in the underlying e-mails and really not a statement

15   of intent or motive or anything like that that falls within

16   what is squarely and typically held admissible under 803(3).

17   It simply isn't meant to show a defendant's state of mind

18   because, you know, saying he believes what he said under

19   803(3), I think there is just no argument that internal banter

20   within the company about various pricing decisions is going to

21   be a business record that's made and maintained in the normal

22   course of business, so I don't think that's proper either.  So

23   generally I think this is really all hearsay here.

24           THE COURT:  Ms. Prewitt, anything else?

25           MS. PREWITT:  Your Honor, I don't think you can say

Darrell Bowlin - Direct

1    all the discussions of all on the pricing team about what to

2    quote and be bound by a customer would be characterized

3    properly as banter, idle banter.  These are normal course

4    business discussions.  But, Your Honor, I think it's a 106

5    argument in that the e-mails below provide the context for

6    Mr. Mulrenin to express the need to respond to competitive

7    forces quoted -- in response to competitive forces that have

8    been cited by the customer.  And his whole, you know, response

9    in that e-mail reflects his belief and understanding, so it's

10   not being offered for the truth of the 2.7 cents.  It's his

11   belief that he needs to react and respond.

12        It's very similar to what we saw in *U.S. v. Tome*.  And

13   this is a sexual abuse case.  The declarant was expressing a

14   sense, an emotion of fear and concern based on circumstances.

15   It was that state of mind that was critical.  And the part that

16   was included under 803(3) was the part that was forward looking

17   and motivated future actions, not the identification of the

18   alleged assailant which was excluded.  And I think this

19   statement in and of itself merely expresses his belief at the

20   time.

21        *THE COURT:*  The objection will be sustained.  I do

22   find it's relevant despite what the government says about some

23   time periods.  Still, it might have some tendency to support or

24   contradict a matter at issue.  In terms of the question that

25   Mr. Mulrenin poses at the very top on Page 1 as not being

Darrell Bowlin - Direct

1    hearsay or frankly it being a state of mind, I don't find any

2    basis for either of those as being a hearsay exception.

3          I do agree with Ms. Call that the fact that

4    Mr. Mulrenin says "Think we can just go with 2.7 cents," any

5    statement by anyone may have some -- it was obviously motivated

6    for some reason, but I don't find that that particular question

7    is either a state of mind type of thing under 803(3) and, as

8    Ms. Call says, it's really a culmination of a lot of the

9    different e-mails in this very long e-mail chain and most of

10   which are totally hearsay.

11         But also I don't find any effect on the listener to be

12   relevant here.  In fact, Mr. Mulrenin as opposed to there being

13   some inference or relevance to his fear or concern or things of

14   that nature, he is just simply having a -- throughout this

15   everything he says is he is just asking questions in the normal

16   course of asking questions about some decision that he

17   ultimately is going to have to make, but that doesn't somehow

18   change it into a state of mind exception.

19         Moreover, this e-mail chain is not a business record

20   at all.  It is -- even though the witness testified that they

21   tried to make sure e-mails are accurate, accurate e-mails don't

22   constitute business exception in and of itself.  There has to

23   be some regular course of business, some type of duty.  This

24   type of back-and-forth regarding a business decision doesn't

25   fall within the business records exception, and I find no other

Darrell Bowlin - Direct

1    grounds for an exception here, so I will sustain the objection

2    as to hearsay.

3          MS. PREWITT:  Your Honor, may I submit briefing on

4    this issue?

5          THE COURT:  No.  I can't imagine this coming in in any

6    way, shape or form.  As the government pointed out, there are

7    26 different e-mails here and it's just not the type of

8    document that would come in under any of this.  I think I have

9    read that *Tome* case because it involves a sexual abuse case, so

10   that to me does not appear to have any relevance, so I will

11   sustain the objection.

12       (In open court:)

13         THE COURT:  The objection will be sustained.

14   BY MS. PREWITT:

15   Q.  So Mr. Bowlin, so sales came to you and it was when you

16   were pricing a cost pass-through, right?  In the circumstances

17   when you were working up the pricing for a cost pass-through,

18   if someone from the sales team came to you and said that a

19   competitor was quoting more for that cost pass-through, would

20   that have any influence on your decision?

21   A.  I don't believe that to be true.  I don't know that it

22   would impact me at the time.

23   Q.  But would you take that consideration, what other suppliers

24   were charging on a cost pass-through, would that cause you to

25   raise your cost pass-through price?

4256

Darrell Bowlin - Direct

1   A.   I am going to say historically we would not have.

2   Q.   And that's because you were trying to quote your true cost,

3   correct?

4   A.   Yes, ma'am.

5          MS. CALL:  Objection, leading.

6          THE COURT:  Overruled.

7   A.   We had to get -- we had to get the cost covered by the

8   customer.

9   BY MS. PREWITT:

10  Q.   Now, I would like to ask you about another type of cost

11  quote to Chick-fil-A.  Do you remember there being a request

12  for a cost quote for converting to no antibiotics ever for

13  Chick-fil-A?

14  A.   Yes, ma'am, I am familiar with that.

15  Q.   Okay.  So do you recall that Tyson provided a price with

16  respect to Chick-fil-A for that NAE?

17  A.   Just so you know, I do not manage the Chick-fil-A business.

18  That's someone else on our BU that manages it.

19  Q.   But you are aware of the pricing on that?

20  A.   I did see an e-mail while we were prepping as well.

21  Q.   And you have experience with quoting NAE conversion costs,

22  right?

23          MS. CALL:  Objection, leading.

24  A.   Yes, ma'am.

25          THE COURT:  Overruled.

Darrell Bowlin - Direct

1    *A.*  Yes, ma'am.

2    *BY MS. PREWITT:*

3    *Q.*  Now, which unit is responsible for coming up with that kind

4    of pricing at Tyson?

5    *A.*  Say that again, please?

6    *Q.*  Which unit is responsible for coming up with the costs to

7    convert NAEs that are quoted to customers like Chick-fil-A?

8    *A.*  We worked with our pricing group as well and we would

9    formulate the true cost for NAE.  And what I remember

10   specifically on NAE is we come up with a certain amount of cost

11   that we were -- that we would incur and then we were going to

12   pass that through to our customers.

13   *Q.*  Okay.  And are you familiar with what is called a live

14   weight cost assumption?

15   *A.*  Yes, ma'am, somewhat.

16   *Q.*  What is live weight?

17   *A.*  Live weight is the weight of the bird when you slaughter it

18   or the strategy that you want to grow the bird at, the weight

19   that you want to grow the bird at, that's live weight.

20   *Q.*  So that's before processing.

21   *A.*  Yes, ma'am.

22   *Q.*  So a finished price is not the same as a live weight price.

23   *A.*  No, ma'am.  I don't do live weight pricing, no, ma'am.

24   *Q.*  I am sorry?

25   *A.*  I don't do live weight pricing.  Everything we sell has

Darrell Bowlin - Direct

1    been processed.

2    Q.   Thank you.

3    A.   Yes, ma'am.

4    Q.   But a live weight price would be a starting point to come

5    up with the finished price, correct?

6    A.   Yes, ma'am.

7    Q.   Now, would knowing what other suppliers were charging or

8    quoting for a cost for NAE, would you have used that to decide

9    what you would quote for NAE cost?

10   A.   Early on the strategy was to determine what our true cost

11   was for NAE, and some of them was speculating because we didn't

12   have the true cost flowing through.  And we formulated a number

13   that we would incur once we went to NAE.

14   Q.   Based on your true costs.

15   A.   Well, you didn't have the true cost at that time.  You were

16   still waiting for the true cost, but you were strategizing and

17   saying, hey, our cost, it's going to be X.

18   Q.   Because at the time that Tyson was being asked to quote for

19   NAE, the specifications weren't really known.

20   A.   That's correct.  To my knowledge, that's correct.

21   Q.   Now, I just have a few more questions for you, maybe more

22   than a few.  I don't want to lead you on that you're leaving

23   just yet, sir.

24   A.   Yes, ma'am.

25   Q.   Now, was there ever a time when you and the sales team

Darrell Bowlin - Direct

1    disagreed over whether to keep a client because of

2    profitability?

3    A.  I don't know specifically.  Is it possible, yes, ma'am, but

4    I don't know specifically.

5    Q.  Did the sales team ever tell you that they had received

6    pricing information from competing suppliers?  Were you ever

7    told that?

8    A.  I don't believe that.  I don't believe I heard that, no,

9    ma'am.

10   Q.  And do you have any firsthand knowledge that anyone at

11   Tyson communicated with any competing suppliers on price to

12   coordinate prices or bids in any way?

13   A.  Not that I know of, ma'am.

14   Q.  But do you have any -- sitting here today, do you have any

15   recollection of that happening?

16   A.  Not that I know of.

17   Q.  So you have no knowledge.

18   A.  No, ma'am.

19           MS. PREWITT:  May I have a minute?

20           THE COURT:  Yes.

21           MS. PREWITT:  Thank you, Your Honor.

22           I have no further questions at this time.

23           THE COURT:  Thank you, Ms. Prewitt.

24           MS. PREWITT:  Thank you very much, Mr. Bowlin.

25           THE COURT:  Cross-examination by any other defendants.

Darrell Bowlin - Cross

1    Mr. Gillen?

2              MR. GILLEN:  Briefly, Your Honor.

3              THE COURT:  Go ahead.

4                        **CROSS-EXAMINATION**

5    BY MR. GILLEN:

6    Q.  Good morning.

7    A.  Good morning.

8    Q.  My name is Craig Gillen.  I represent Mr. Roberts.

9    A.  Okay.

10   Q.  Very briefly, a quick question here.

11             In terms of when Mr. Roberts was at Tyson, in terms of

12   his responsibility and area that he had for covering particular

13   stores, did he have any responsibility whatsoever for

14   Albertson's or for Super Valu, to your knowledge?

15   A.  I don't believe he had it.  That was a deli customer.

16   Q.  Excuse me?

17   A.  That was a deli customer, not a national account customer.

18   Q.  So that was a deli customer and he would not have any

19   responsibility for that.

20   A.  Not that I know of.

21             MR. GILLEN:  Thank you.

22             THE COURT:  Thank you, Mr. Gillen.

23             Any of the other defendants?

24             Mr. Beller, go ahead.

25                        **CROSS-EXAMINATION**

Darrell Bowlin - Cross

1    *BY MR. BELLER:*

2    Q.   Good morning, Mr. Bowlin.

3    A.   Good morning.

4    Q.   Just a couple questions for you.

5         You testified to the jury that Tyson has a business

6    unit for pricing and the pricing for the business unit is

7    separate from the sales unit, right?

8    A.   So you had a BU, a business unit, you had a pricing

9    department and then you had a sales group.

10   Q.   Understood.  And the sales unit does not decide or

11   influence the price of broiler chicken products.

12   A.   We collaborate, but ultimately it's the BU that makes the

13   final decision.

14   Q.   Very good.  And so that's because the sales unit is

15   responsible for the customer service.

16   A.   I believe that to be true, yes, sir.

17   Q.   All right.  Doing what is in the best interests of the

18   relationship with the customer, right?

19   A.   Yes, sir.

20   Q.   And that -- what is in the best interest of the

21   relationship with the customer is sometimes different than what

22   is in the best interest of the company and raising prices,

23   correct?

24   A.   You would believe, yes.

25   Q.   As far as you know, Mr. Bowlin, that's the way it works

Darrell Bowlin - Cross

1  across the entire broiler chicken industry with all the

2  suppliers, right?

3          MS. CALL:  Objection, foundation.

4  A.  I don't know.

5  BY MR. BELLER:

6  Q.  Do you know?

7  A.  I don't know how other companies manage their business.

8  Q.  Understood.  And while you may not know how other companies

9  manage their business, would it surprise you if that's the way

10 it works with other suppliers?

11 A.  You would think it would be similar.

12 Q.  You would think in the same way?  Is that what you said?

13 A.  It would be similar, but I don't know that to be true.

14 Understood.

15          MR. BELLER:  Thank you, Mr. Bowlin.

16          THE COURT:  Thank you, Mr. Beller.

17          Additional cross by defendants?

18          All right.  Cross-examination by the United States?

19                         **CROSS-EXAMINATION**

20 BY MS. CALL:

21 Q.  Good morning, Mr. Bowlin.

22 A.  Good morning.

23 Q.  So Mr. Bowlin, you testified that you've worked in several

24 different units at Tyson, correct?

25 A.  I have had several different roles, yes, ma'am.

Darrell Bowlin - Cross

 1   Q.  And in the time we've been talking about today, so 2013 to

 2   2019, that's when you were in the business unit?

 3   A.  Yes, ma'am, I believe that to be true.

 4   Q.  And as you testified, part of your role in the business

 5   unit was coming up with the margin for Tyson, correct?

 6   A.  Yes, ma'am.

 7   Q.  And margin, does that mean profit?

 8   A.  Yes, ma'am.

 9   Q.  Now, as I believe you just testified, that process of

10   coming up with the pricing, so a bid, that was a collaborative

11   process between different units at Tyson?

12   A.  Yes, ma'am.

13   Q.  Involved the pricing unit?

14   A.  Yes, ma'am.  You are talking and referencing the QSR

15   renegotiations?

16   Q.  Yes.

17   A.  Yes, ma'am, it was not uncommon to collaborate.

18   Q.  And with respect to those QSR negotiations, did you also

19   collaborate with the sales team?

20   A.  They would have been in the room, yes, ma'am.  I believe

21   that to be true.

22   Q.  You had meetings with them to talk about the pricing?

23   A.  Yes, ma'am, I am sure we did.

24   Q.  Now, once you landed on a price to submit to the customer,

25   is it correct it was sales' job to communicate that price to

Darrell Bowlin - Cross

1    the customer?

2    A.  Yes, ma'am.

3    Q.  And then Defendant Mulrenin here, he was in the sales

4    group?

5    A.  Yes, ma'am, I believe that.

6    Q.  And Defendant Roberts, he was in the sales team as well?

7    A.  Yes, ma'am.

8    Q.  Was there also an individual named Carl Pepper in the sales

9    team?

10   A.  Yes, ma'am.

11   Q.  Did Defendant Roberts supervise both Defendant Mulrenin and

12   Mr. Pepper?

13   A.  I believe he did.  I can't tell you for sure other than

14   looking at the org chart, but I believe he did.  Yes, I think

15   he was managing that group.

16   Q.  Now, as you said, these were separate units.  You weren't

17   in the sales team, right?

18   A.  No, ma'am.

19   Q.  You didn't sit in the same office as the sales team?

20   A.  No, ma'am.  When you say office, we have a building, right?

21   They were definitely over here and I was over on the other

22   side.

23   Q.  Different parts of the building?

24   A.  Yes, ma'am.

25   Q.  And when it comes to the negotiations with the customer,

4265

Darrell Bowlin - Cross

1   generally speaking -- well, let me rephrase.  You only ever

2   attended one meeting with a customer; is that right?

3   A.  I believe it was one time Kent from Popeye's came to our

4   business, our building, and I did meet with him.

5   Q.  So outside of that one meeting, you didn't attend other

6   meeting that were between the sales and the customers?

7   A.  Not that I know of, no, ma'am.

8   Q.  When the sales team had calls with their customers, you

9   weren't on those calls either, right?

10  A.  There may be a time or two, but I don't remember how many,

11  but surely there is probably one.  But no, ma'am, I don't

12  recall getting on all the sales calls every time they

13  communicated.

14  Q.  And when Defendant Mulrenin and Defendant Roberts had phone

15  calls with their competitors, you weren't on those phone calls

16  either; is that right?

17  A.  Not to my knowledge, no.

18  Q.  So you weren't privy to everything that the sales team did

19  in their role.

20  A.  No, ma'am.

21  Q.  Now, I want to talk generally speaking about this

22  negotiating process for QSR contracts.  So you said you

23  recommended a margin and then sales, they conveyed the price to

24  the customer, right?

25  A.  Yes, ma'am.

Darrell Bowlin - Cross

1  Q.  For a customer like KFC, that process, it generally

2  involves several rounds of negotiations, right?

3  A.  It's possible, yes, ma'am.

4  Q.  And would you agree with me that generally in those

5  negotiations the customer, they would ask for a lower price?

6  A.  Yes, ma'am.

7  Q.  And on the other side of the bargain table would you agree

8  with me that part of the sales team job was getting as high a

9  price as possible for Tyson?

10  A.  That would be their job I would say.

11  Q.  That would be their job?

12  A.  That's what I would ask them to do.

13  Q.  That's because Tyson, they are in the business of making a

14  profit, right?

15  A.  Yes, ma'am.

16  Q.  Let's talk about 2014.  In 2014 do you recall recommending

17  price increases for QSR customers?

18  A.  Again, going through the prepping for this testimony, yes,

19  ma'am, I remember having some of those conversations.

20  Q.  And were those price increases fairly significant?

21  A.  In that scenario, yes, ma'am, it was.

22  Q.  Now, I believe you testified on direct about a drain-back

23  tare and a marination tare that you were trying to eliminate;

24  is that correct?

25  A.  Yes.  I was trying to get paid for all pounds in the box.

Darrell Bowlin - Cross

1    Q.  And the price for what's in a box, that involves both a

2    price per pound and a case weight; is that correct?

3    A.  Yes, ma'am, in this scenario.

4    Q.  So is it right that to get like an apples-to-apples

5    comparison between two prices, you need to know both those

6    components, right?

7    A.  Yes, ma'am.

8    Q.  So when you were recommending changes to this marination,

9    would you agree with me that that was just another way to make

10   more of a profit on that KFC business?

11   A.  Yes, ma'am.

12   Q.  It was just another way to increase the price?

13   A.  Yes, ma'am.

14   Q.  Okay.  Now, when you recommended that price increase, is it

15   correct to say that you considered the fact that Tyson could

16   lose business to a competitor?

17   A.  At the time I would have.

18   Q.  And you testified on direct that even a 3-cent increase

19   would create that risk of loss of volume to a competitor?

20   A.  I have seen that happen, yes, ma'am.

21   Q.  And that increase in 2014, that was higher than 3 cents,

22   right?

23   A.  Yes, ma'am.  We were -- it was higher than that.

24   Q.  And that business with the QSR customers, like let's say

25   KFC, their business mattered to Tyson, right?

Darrell Bowlin - Cross

1   A.  Yes, ma'am, it mattered.

2   Q.  They were a relatively large customer?

3   A.  Yes, ma'am.

4   Q.  So in proposing those price increases, you considered the

5   risk that Tyson would lose business to a competitor?

6   A.  I would have.  I believe that to be true.

7   Q.  And that's just basic competition, right?

8   A.  Yes, ma'am.

9   Q.  Okay.  Now, the sales team, including Defendant Roberts and

10  Mulrenin in that year, they were the ones actually conveying

11  that price increase to KFC, right?

12  A.  Yes, ma'am, I believe that to be true.

13  Q.  So their job was to secure that price increase that you

14  were seeking?

15  A.  Yes, ma'am.

16  Q.  And as we established earlier, you don't know what steps

17  Defendant Roberts and Mulrenin took to ensure that they got

18  those price increases?

19  A.  No, ma'am, I don't know.

20  Q.  And that's because you weren't in the calls with their

21  customers, right?

22  A.  No, ma'am.

23  Q.  And you weren't in the meetings with their customers.

24  A.  No, ma'am.

25  Q.  And you weren't in the calls with their competitors.

Darrell Bowlin - Redirect

1    A.   No, ma'am.

2           MS. CALL:  All right.  No further questions.

3           THE COURT:  Thank you.

4           Redirect?

5                    **REDIRECT EXAMINATION**

6    BY MS. PREWITT:

7    Q.   You aren't aware of there being any calls between

8    Mr. Mulrenin and Mr. Roberts and their competitors in relation

9    to these contracts sitting here today, do you?

10   A.   Not that I know of.

11   Q.   Now, you testified in response to Ms. Call's questions

12   about sales being in the room when pricing quotes to customers

13   were being considered or discussed, correct?

14   A.   Okay.

15   Q.   Now, the business unit decided what the prices were going

16   to be, correct?

17   A.   Yes, ma'am, collaboration.

18   Q.   I am sorry?

19   A.   It was collaboration, as I said earlier.

20   Q.   But ultimately it was your --

21   A.   Ultimately the BU made the final call.

22   Q.   Thank you.  But there were many different units that were

23   involved in that discussion process, correct?

24   A.   Yes, ma'am.  There would have been multiple people.

25   Q.   So when Ms. Call asked you about the sales people providing

Darrell Bowlin - Redirect

1    the message of the quote of the prices that you came up with to

2    the customer, those were prices that you told them they could

3    quote, right?

4    A.   Yes, ma'am, I believe --

5           MS. CALL:  Objecting, leading.

6           THE COURT:  Sustained.

7    BY MS. PREWITT:

8    Q.   Whose job was it to ask -- whose job was it to seek --

9    determine price increases?

10   A.   Ultimately, the BU would on the price increase.

11   Q.   And so the message passed from the sales to the customer

12   was based on that decision.

13   A.   That would have been the number that we all agreed upon and

14   that's the direction that we were given.

15   Q.   In the business unit?

16   A.   From the business unit.

17   Q.   And you testified earlier that what the salespeople were

18   concerned about was pounds; isn't that right?

19   A.   That's how it felt, yes, ma'am.

20   Q.   And you believe that they were looking to get volume,

21   correct?

22          MS. CALL:  Objection, leading.

23          THE COURT:  Sustained.

24          MS. PREWITT:  I have no further questions.  Thank you

25   very much, Mr. Bowlin.

Darrell Bowlin - Redirect

1          THE WITNESS:  Yes, ma'am.

2          MS. PREWITT:  Safe travels.

3          THE WITNESS:  Thank you.

4          THE COURT:  Thank you, Ms. Prewitt.

5          Is the witness subject to recall?

6          MS. CALL:  No, Your Honor.

7          THE COURT:  Thank you, Mr. Bowlin.  You are excused.

8          THE WITNESS:  Thank you.

9          THE COURT:  Mr. Gillen, it looks like you are ready to

10   go, but maybe we should go ahead and take the mid-morning break

11   at this point because we are just about at that point.

12          Ladies and gentlemen, why don't we take our break now

13   and plan on reconvening at 10:30.  Keep the admonitions in

14   mind.  Reconvene at 10:30.  The jury is excused.

15          (Jury excused.)

16          We will be in recess.  Thank you.

17      (Recess at 10:08 a.m.)

18      (Reconvened at 10:34 a.m.)

19          THE COURT:  Mr. Gillen, were you just about to call a

20   witness?  You can have the witness come up to the witness stand

21   if that was the plan.

22          MR. GILLEN:  Thank you.  Brandon Campbell.

23          THE COURT:  Let's go ahead and get the jury.

24          (Jury present.)

25          THE COURT:  Mr. Gillen, did you have a witness to

Brandon Campbell - Direct

1   call?

2          *MR. GILLEN:*  Yes, Your Honor.  We would call Brandon

3   Campbell.

4       (**Brandon Campbell** was sworn.)

5          *THE WITNESS:*  Yes, I do.

6          *COURT DEPUTY CLERK:*  Please state your name and spell

7   your first and last name for the record.

8          *THE WITNESS:*  My name is Brandon Campbell.  It's

9   B-R-A-N-D-O-N; Campbell is C-A-M-P-B-E-L-L.

10                      **DIRECT EXAMINATION**

11  *BY MR. GILLEN:*

12  *Q.*  Good morning, Mr. Campbell.  How are you?

13  *A.*  Good morning.  Doing well, thank you.

14  *Q.*  I don't believe we have met, have we?

15  *A.*  No, we have not.

16  *Q.*  My name is Craig Gillen and I represent Brian Roberts.  I

17  have some questions for you today.

18  *A.*  Okay.

19  *Q.*  First of all, tell the jury where do you currently work?

20  *A.*  I am currently employed by Tyson Foods.

21  *Q.*  And how long have you worked there at Tyson Foods?

22  *A.*  I have worked at Tyson Foods since 2005.

23  *Q.*  How many roles have you had at Tyson, the different roles

24  that you have had there at Tyson?

25  *A.*  I can't remember the exact number, but in excess of five

Brandon Campbell - Direct

1    roles for sure.

2    Q.  Have you had any roles involving the pricing of chicken

3    products?

4    A.  Yes, I have.

5    Q.  Well, tell us about that.  Tell us a little bit about which

6    chicken products you have been involved with in terms of

7    pricing.

8    A.  Yes.  So I priced what we call our small bird products,

9    whole bird and bone-in and also dark meat, so I was responsible

10   for those in our pricing group.

11   Q.  I couldn't -- your last statement sort of fell off a bit.

12   A.  I am sorry, and dark meat, so small bird, bone-in products

13   and dark meat.

14   Q.  Now, what role, if any, do you play in the margin

15   management in pricing unit at Tyson?

16   A.  What did I play?

17   Q.  Yeah.

18   A.  I was responsible for -- in the 2014 period I was

19   responsible for creating the pricing models and updating the

20   pricing to submit to our customers.

21   Q.  How long had you been there in that particular position in

22   2014?

23   A.  I don't remember the exact time, but it was around a year

24   or so in that specific role.

25   Q.  And what specifically was your role there in that pricing

Brandon Campbell - Direct

1    unit regarding pricing?

2    A.  So my role was to actually create and update the pricing

3    models and to work with the business units on setting those

4    pricing strategies and what the pricing was to be able to

5    submit to customers.

6    Q.  So let's break this down a little bit.

7    A.  Sure.

8    Q.  So you mentioned the pricing unit.  That's where you

9    worked, correct?

10   A.  Yes, that is correct.

11   Q.  And then you mentioned the business unit.  Could you tell

12   us what that is, please?

13   A.  Sure.  The small bird business unit was the business unit

14   that was responsible for the profitability of the business, so

15   they actually in the end whenever somebody was accountable for

16   whether or not the business was successful and profitable, that

17   was the business that was held accountable for that.

18   Q.  What role -- how did you interact with the business unit in

19   your capacity of setting prices for chicken products?

20   A.  Sure.  So my role was to set the pricing, but it was in

21   alignment with the strategy from the business unit.  So the

22   business unit would set the margin goals of what they were

23   trying to accomplish from a total business standpoint.  My job

24   was to create the models and to look at what we believed fair

25   market value was, create the pricing, but in the end ultimately

Brandon Campbell - Direct

1    the business unit had the final approval on the pricing model

2    because it impacted the P and L directly that they had

3    responsibility for.

4    Q.  So break down a couple things there.  You gave us a lot of

5    information and I appreciate that.

6          You mention margins.  Tell the jury what you mean when

7    you talk about margins in your pricing unit.

8    A.  Yes.  So our business unit would set margin goals around

9    what level profitability that they were trying to accomplish

10   for the total business, and within that there is different size

11   of birds.  And so there would be margin goals associated with

12   the different size of birds based upon the availability.  So

13   the business unit would set those goals because they were the

14   ones who were setting the financial goals for the year and were

15   ultimately held accountable for the performance of the

16   business, so they would be the ones that set those goals.

17         My job would be to try to understand -- to create the

18   pricing model, look at external markets and set the pricing

19   strategy, but it was in alignment with what the overall goals

20   were that were set by the business unit because in the end they

21   had the ultimate decision rights around whether or not -- what

22   the pricing was.

23   Q.  Do you know what a QSR is?

24   A.  Yes, I am familiar with that term, a quick-service

25   restaurant.

Brandon Campbell - Direct

1    Q.  And give us some examples of companies that would fall into

2    the quick-service restaurant, the QSR label.

3    A.  Sure.  Some QSRs that we worked with would be KFC,

4    Popeye's, Church's, customers or clients like that.

5    Q.  Okay.  And would that fall into the area that you had

6    described to us in terms of your responsibility for pricing

7    within the pricing unit?

8    A.  Yes, that was my responsibility to price those accounts for

9    small bird products.

10   Q.  Now, you mentioned when you were describing the pricing

11   unit and the business unit, were those the units within Tyson

12   responsible for pricing chicken products for QSRs or places

13   like Kentucky Fried Chicken and Church's and Popeye's?

14   A.  Yes.  The pricing unit along with the business unit were

15   the groups that were responsible for setting the pricing.

16   Q.  Who would you communicate with within the business unit to

17   sort of get your marching orders, if that's the fair assessment

18   of what happened?

19   A.  Yes, and that is a fair assessment.  And it would be the

20   senior vice-president that was responsible for the business

21   unit.  And then he had a margin management team that was

22   responsible for different groups of products within him.  So it

23   was -- I would work directly with the margin manager for that

24   category, but ultimately the senior vice-president had the

25   ultimate authority on what the pricing was.

Brandon Campbell - Direct

1    Q.   Okay.  Now, explain to the jury how you went about -- the

2    process of creating pricing models to be submitted to these

3    places like KFC.

4    A.   Sure.  So KFC is an example, if I can just walk through

5    that as an example.

6    Q.   Sure.

7    A.   KFC had a cost-plus model.  And so I would get the request

8    from the sales team that we were going to need to update the

9    model.  I would go in and I would pull -- work with our

10   accounting team to get the actual cost for the cost-plus model.

11   I would also work with our business unit to understand what

12   those margin goals were that they had for the business.  And

13   then I would also look at external market factors, the

14   Urner-Barry, Georgia Dock, and kind of triangulate, if you

15   will, between here is what the business unit goals were for the

16   profitability.  Here is where we believe the market is.  And

17   then together I put that information together and build a

18   pricing model and update it.

19   Q.   Let's break it down so we can discuss it in a little more

20   detail.

21        So you mentioned the business unit would tell you what

22   the margin goals were; is that right?

23   A.   Yes, correct.

24   Q.   Is that profit margin?  Is that a fair term to use?

25   A.   Yes, profit margin would be a fair term.

Brandon Campbell - Direct

1   Q.  So is that step No. 1 that the business unit would then on

2   a specific potential bid like KFC or proposal like KFC would

3   give you a profit margin that they wanted you to hit?

4   A.  They would not give a specific profit margin for that exact

5   customer, but they would give a profit margin goal for their

6   business and for the bird sizes, if you will.  So if a customer

7   fell into that bird size, there would be a correlation between

8   that profit margin knowing that that customer is pulling from

9   that pool of birds, if that makes sense.

10  Q.  Let's break that down a little bit too.  So you mentioned

11  that the profit margin would apply to particular bird sizes.

12  Is that what you're saying?

13  A.  Yes, correct.

14  Q.  Explain to the jury what you mean when you talk about bird

15  sizes, if you would, please.

16  A.  Sure.  So whenever we target a live weight to grow for --

17  out of a particular complex, the live weights will follow a

18  normal distribution, a normal distribution.  And so depending

19  on where the size is of the bird -- we would usually look at

20  4-ounce increments of bird sizes.  And depending on the

21  availability of that 4-ounce increment in that bell curve would

22  let us know how much supply availability.  So if it was -- on

23  the bell curve if it was a size that didn't have as much

24  availability, there would be a higher profit margin expectation

25  than a bird size where there was more availability on that

Brandon Campbell - Direct

1    normal distribution.

2    Q.  Okay.  So this bell curve, would that -- you get a bell

3    curve for, say, for example, small birds; is that fair?

4    A.  Yes.  So you would target a live weight and then there

5    would be a normal distribution or bell curve of the live

6    weights that would come with that bird.

7    Q.  So you mentioned you're going to get some information from

8    the business unit about a profit margin that they want you to

9    hit, right?

10   A.  Yes, correct.

11   Q.  You mentioned that you would factor in other things other

12   than that.  And you went kind of fast.  Can you tell us some of

13   the things that you're going to be factoring in when you're

14   doing your magic there in the pricing unit?

15   A.  Sure.  So there was the business unit margin goals.  There

16   was also external markets, quoted markets.  Urner-Barry was one

17   of those that we would utilize.  Georgia Dock was another

18   quoted market we would utilize.

19   Q.  Let me pause right there because you mentioned two.

20        So tell the jury what you mean when you're talking

21   about those two entities and how they factored into what you

22   did.

23   A.  Okay.  So there was two quoted markets.  The Urner-Barry

24   was a publicly -- or a quoted market that we would get that had

25   different parts of the bird and it had the market value

Brandon Campbell - Direct

1    associated with those.  It would be updated daily.  And the

2    Georgia Dock was similar except for it would be the whole bird

3    or the WOG, and it would be what is the market value.  And I

4    don't remember the frequency it was updated, if it was weekly

5    or monthly, but those are two quoted markets that we would use

6    to have a sense of is the market increasing or is the market

7    decreasing on the commodity market.

8    Q.  So you would take that information.  You mentioned two

9    things now.  You mentioned the profit margin you got from the

10   business unit, correct?

11   A.  Yes, correct.

12   Q.  Then you have information that you were getting from the

13   outside community or from other sources outside of Tyson about

14   the marketplace itself, correct?

15   A.  Yes, that's correct.

16   Q.  And what other things factored into your analysis for when

17   you end up with your pricing model?

18   A.  The third component would be our track record of wins and

19   losses on previous bids.  And so you take a certain level of

20   pricing you are trying to get for a certain group of products.

21   And then if you were to win that bid or you lose that bid, you

22   use that as a database of information to -- as a third leg to

23   help you understand market value.  So if you continue to take

24   price increases and you are losing every bid, then that tells

25   us that we are too aggressive and that we're pricing our

Brandon Campbell - Direct

1   products too high for the market.  So that would be kind of the

2   third component is the track record of wins and losses on bids

3   of other business.

4   Q.  Well, did the sales team tell you what price that you

5   should set for bids to places like KFC?

6   A.  No, the sales team didn't give us the prices.  It was the

7   pricing group's responsibility along with the business unit's

8   responsibility to set the pricing goals.

9   Q.  Once you got the pricing goals after you did your work in

10  the pricing unit in conjunction with the business unit, what

11  did you do then with that information?

12  A.  So once we came up with the information, we would sit down

13  with our sales team and walk through the pricing model or the

14  changes in the price, what's the reason for the price, to

15  prepare them to have the conversation with the customer because

16  the sales team was -- their responsibility was to communicate

17  to the customer and to manage that relationship.

18  Q.  So you mentioned that you would meet with the sales team,

19  and their job was to manage the relationship.  What do you mean

20  by that?

21  A.  So they are the ones who are calling directly on the

22  customer or they're the ones who are going out and visiting the

23  customer's office, having a relationship with them, where they

24  are a trusted partner to the customer was what their role is

25  supposed to be.

Brandon Campbell - Direct

1  Q.  Well, let's talk about what the role wasn't supposed to be

2  or wasn't.

3  A.  Okay.

4  Q.  Was their job to set pricing for KFC?

5  A.  No.  The sales team's job was not to set pricing.

6  Q.  Okay.  Now, let's talk a little bit about the KFC matter.

7  And I am going to be focusing questions to you that deal with

8  the year 2014 regarding the KFC bid, okay?

9  A.  Okay.

10  Q.  So we're going to talk about that specifically, that

11  particular matter.

12         What role did the pricing unit have in developing the

13  KFC 2015 pricing model in the summer of 2014?

14  A.  It was the pricing team which was my responsibility to

15  create the pricing model for the KFC in the summer of 2014.

16  Q.  Now, was there someone working with you or were you the

17  individual who was responsible for working up that pricing

18  model in -- for the 2015 KFC contracts?

19  A.  No, it was myself.  I created, updated the model and did

20  all the work associated with the model.  That was my

21  responsibility.

22  Q.  Okay.  When you worked that up, to whom did you communicate

23  on the KFC matter within the business unit?

24  A.  So once I worked up the pricing model in alignment with the

25  BU's margin goals, then I worked with the business unit

Brandon Campbell - Direct

1   leaders, which at the time would have been Charlie Solomon,

2   Steven Cullen and Darrell Bowlin.

3   Q.   You mentioned Charlie Solomon.  Who is Charlie Solomon?

4   A.   Charlie Solomon was the senior vice-president of the small

5   bird business unit.

6   Q.   And what was his role in developing the pricing model for

7   KFC?

8   A.   Charlie Solomon was ultimately responsible for the profit

9   and margin, so he had to approve the pricing model that was to

10  be submitted to KFC.  He had the final authority and final say.

11  Q.   So you are the guy who created the model and did the

12  numbers on the model, right?

13  A.   Yes, that is correct.

14  Q.   You then send it to Mr. Solomon for approval?

15  A.   Yes, review it with Mr. Solomon and his team for approval.

16  Q.   And after that approval did that approval come down based

17  upon what your pricing model was for the KFC 2015 contract?

18  A.   Yes.  Mr. Solomon and team approved that pricing model to

19  be submitted.

20  Q.   You say "and team."  Were there others on Mr. Solomon's

21  team involved in that process?

22  A.   Yes.  There was Steven Cullen.  He was responsible for the

23  margin management team within Charlie Solomon's group.  And

24  Darrell Bowlin was the product manager or margin manager

25  specifically responsible for the KFC business, the birds that

Brandon Campbell - Direct

1   would have been used for the KFC business.

2   Q.  So you mentioned Mr. Bowlin, correct?

3   A.  Yes, correct.

4   Q.  And you said that he was responsible for the birds that

5   would have been within the KFC contract?

6   A.  Yes, correct.

7   Q.  What do you mean by that?

8   A.  So within Charlie's team he had his team broken up into

9   part responsibilities, so breast meat, dark meat and whole

10  birds.  So Mr. Bowlin had responsibility for the whole bird

11  products, which is what KFC utilized primarily.

12  Q.  Now, who is Andy Lubert?

13  A.  In this time frame Andy Lubert was a lead for our food

14  service commercial sales.

15  Q.  And who was Joey White?

16  A.  Joey White was my supervisor.  He led the pricing group.

17  Q.  So he was your supervisor.

18  A.  Yes, correct.

19  Q.  Now, what role, if any, did Mr. Bowlin play in developing

20  the pricing model for the KFC bid which took place in 2014?

21  A.  He was responsible -- Mr. Bowlin was responsible for the

22  margin goals of what they were trying to accomplish as a

23  business.  I was responsible for actually creating the model

24  itself.

25  Q.  Do you remember what the target profit margin was for the

Brandon Campbell - Direct

1   KFC contract in the early summer of 2014?

2   A.  I do not remember the specific margin target, no.

3   Q.  Now, when you -- you mentioned the profit margin would be

4   determined by -- are you given the profit margin?

5   A.  No.  I am given a margin percentage.

6   Q.  Now, in this pricing model what, if any, role did sales

7   play?  Did they tell you what the profit margin should be or

8   what the price should be?

9   A.  No, the sales did not provide that information.  That was

10  my responsibility along with the business unit.

11  Q.  I want to show you what has been --

12          MR. GILLEN:  Your Honor, may I approach the witness?

13          THE COURT:  Yes, absolutely.  Ms. Grimm will hand it

14  up.

15          MR. GILLEN:  And if we could see and not to be shown

16  to the jury at this time G-624, if we could put that up,

17  please.

18  BY MR. GILLEN:

19  Q.  Do you have 624 in front of you?

20  A.  Yes, I do.

21  Q.  Now, do you recognize this document?

22          MS. JOHNSON:  I apologize, our screen is not working.

23  If we could see the document.

24          THE COURT:  Yes.

25          MR. LAVINE:  Your Honor, our screen is not working

Brandon Campbell - Direct

1   either.

2          THE COURT:  Let's see if Mr. Fronzaglia can problem

3   solve.  We will work on it over lunch with IT.

4          Go ahead, Mr. Gillen.

5          MR. GILLEN:  Thank you, Your Honor.

6   BY MR. GILLEN:

7   Q.  Now, the document in 624, do you recognize that document,

8   Mr. Campbell?

9   A.  Yes, I recognize it.

10  Q.  Is this a document that was created by you?

11  A.  Yes, this is a document that would have been created by me.

12  Q.  And I want to -- without getting into the contents, I am

13  going to ask you whether or not this was a document created in

14  June of 2014.

15  A.  Yes, this was a document that would have been created in

16  June of 2014.

17  Q.  When you created this document, was this document made at

18  or near the time that it purports to have been made?

19  A.  Yes.  This document would be consistent with the time

20  reflected.

21  Q.  Now, did you personally create this document?

22  A.  Yes, I did personally create this document.

23  Q.  Is this a document that you had -- the information

24  contained herein that you had personal knowledge of?

25  A.  Yes, I have knowledge of the information in this document.

Brandon Campbell - Direct

1   Q.  In your capacity in working in the pricing unit, did you

2   have a business duty to convey financial information or pricing

3   models to others within Tyson?

4   A.  To other groups within Tyson?

5   Q.  To other individuals within Tyson.

6   A.  The pricing model I would communicate to both the business

7   unit and to the sales team to communicate to the customer.

8   Q.  So the answer would be yes?

9   A.  The answer would be yes.  Yes, I would have those

10  responsibilities.

11  Q.  And in terms of your communication of that sort of

12  information, was it your habit or practice to communicate such

13  business information electronically through e-mails?

14  A.  Yes.  That was a standard practice to communicate through

15  e-mails.

16  Q.  And the e-mails that you created, the information contained

17  in there, were they accurate to the best of your knowledge?

18  A.  To the best of my knowledge, they were accurate, yes.

19  Q.  This or e-mails generated by you in your capacity within

20  the pricing unit, were they documents that were kept in the

21  normal course of conducted business there at Tyson?

22  A.  Yes.  It was the standard practice for Tyson to retain the

23  e-mails.

24  Q.  And are these the types of information or the type of

25  information that you generated and created in G-624, is that

Brandon Campbell - Direct

1   the sort of information that the business of Tyson would rely

2   upon in the conduct of its business activities?

3   A.  Yes.  This is a standard process that we would use to

4   manage our business.

5   Q.  And for the purpose of memorializing or keeping access of

6   the records of how you conducted business, is this the sort of

7   document that you would keep electronically at Tyson for the

8   purpose of conducting Tyson's business?

9   A.  Yes.  These are the types of documents we would keep as a

10  historical record of conversations regarding pricing or

11  business.

12  Q.  And these documents to your knowledge are kept in the

13  regular course of Tyson's business, correct?

14  A.  Yes.  To my knowledge they are retained by Tyson.

15  Q.  And based upon what you see here in the document, would you

16  say that -- the document's contents and substance and other

17  distinctive characteristics, would you say that it's fair and

18  accurate about what you conveyed to others within Tyson back in

19  June of 2014?

20  A.  Yes.  This is a fair representation of what I communicated.

21          MR. GILLEN:  Your Honor, I tender Defendants' 624.

22          THE COURT:  All right.  Any objection to the admission

23  of G-624?

24          MS. CALL:  Hearsay.

25          THE COURT:  Objection will be overruled.  G-624 will

Brandon Campbell - Direct

1   be admitted.

2           MR. GILLEN:  Thank you, Your Honor.

3           If we may publish to the jury?

4           THE COURT:  You may.

5   BY MR. GILLEN:

6   Q.  I am going to walk you through this document, Mr. Campbell.

7   Referring to G-624, it is an e-mail -- and that is an e-mail

8   from you; is that accurate?

9   A.  Yes, that's correct.  It's an e-mail from me.

10  Q.  It indicates that it was sent -- well, the top would be

11  June the 9th, 2014; is that correct?

12  A.  Yes, that is correct.

13  Q.  Are you forwarding an e-mail that you had sent on June the

14  5th of 2014?

15  A.  Yes.  I am forwarding a previously sent e-mail on June 5th

16  on June 9th.

17  Q.  Now, the information that you are forwarding, it indicates

18  the subject is KFC 2015 Pricing Model.  Is that what this is?

19  A.  Yes, that is correct.

20  Q.  Is this an accurate description of what this document

21  contains?

22  A.  Yes.  That is representative of what the document contains.

23  Q.  And it is sent to a number of individuals.  You mentioned

24  Mr. Andy Lubert, correct?

25  A.  Yes, correct.

Brandon Campbell - Direct

1   Q.   And his position at Tyson at that time was what?

2   A.   He was over the food service commercial sales.

3   Q.   And Mr. Brian Roberts?

4   A.   He reported to Mr. Lubert in sales.

5   Q.   Charlie Solomon?

6   A.   Charlie Solomon was responsible for the small bird business

7   unit.

8   Q.   Steven Cullen?

9   A.   He reported to Charlie Solomon in the business unit.

10   Q.   And you've got Joey White?

11   A.   Joey White was my supervisor in pricing.

12   Q.   And Mr. Darrell Bowlin?

13   A.   He was the margin manager on Steven Cullen's team.

14   Q.   I am going to ask you about some of the information here

15   and what you meant.  It indicates, "The attached model would be

16   the proposed model for KFC for 2015 with the following

17   assumptions:  This equates to $0.19/lb price increase when you

18   do an 'apples-to-apples' comparison."

19        Is that a correct reading?

20   A.   Yes, that is correct.

21   Q.   And is the 19 cents the profit margin that you were

22   shooting for here?

23   A.   From this I can't speak to what the profit margin is, but

24   that's the increase in price that we were asking for.

25   Q.   Now, this was generated by whom?

Brandon Campbell - Direct

1   A.  This document was generated by me.

2   Q.  And the purpose of your sending it to all these other

3   gentlemen is what reason?

4   A.  It is communicating the pricing model that I worked up and

5   that we were going to be submitting out to KFC.

6   Q.  Okay.  Now, at this stage had you already received the

7   approval from the business unit regarding this model?

8   A.  I do not remember the timing on whether or not I already

9   had approval at this point, but it is fair to say that I would

10  not have communicated this model out to this team without the

11  business unit's approval.

12  Q.  Now, when we say the 19 cents, when we talk about an

13  increase, do you remember why there was going to be an increase

14  in the price to KFC?

15  A.  Yes.  The small bird business unit was not a profitable

16  business, so the entire business was looking to change the

17  profit level of the small bird business unit.  So the request

18  or the direction from the business unit was to expand our

19  margins on our small bird business unit to be able to get to a

20  more sustainable profit margin.

21  Q.  This document was created by you in June of 2014, correct?

22  A.  Yes, that is correct.

23  Q.  Now, at that time was there even a request by RSCS on

24  behalf of KFC for any sort of proposal for the 2015 contracts,

25  if you know?

Brandon Campbell - Direct

1    A.  I don't remember if there had been any conversations with

2    RSCS or not at that time.

3    Q.  But what we do know is that you in June of 2014 created

4    this model, correct?

5    A.  Yes, that is correct.

6    Q.  You say that there are following assumptions.  Can you

7    explain to us what you mean by these following assumptions?

8    A.  Sure.  Just walk through those?

9    Q.  Yes, please.

10   A.  So the bird size is the size of the WOG or without giblets,

11   the size of the bird we would be using to fulfill the KFC

12   volume.  The marination profile to the right of it is the

13   product.  25119-928, that's the product code that we were using

14   to represent what the marination profile and cost would look

15   like.  The marination level is the amount of marination that

16   would be injected into the bird up to 12 percent.  No moisture

17   drain-back tare and no marination tare was a change in the

18   model where we were requesting to no longer tare out the

19   moisture or marination in the proposed model.

20   Q.  Let's break that down and explain to the jury what we mean

21   by some of these terms.

22   A.  Okay.

23   Q.  When you are talking about the marination level, tell the

24   jury what we mean by that.

25   A.  Okay.  So you have a -- just a base chicken, a WOG, that

Brandon Campbell - Direct

1    has -- you know, it's been processed and there is nothing else

2    that's been done to it.  Whenever you inject it with

3    marination, it's how much marination pickup is allowed in that

4    product.  So each customer would have a level of how much

5    marination that you were able to put into the product.  So up

6    to 12 percent was KFC's requirement around how much marination

7    they expected to be injected into the product.

8    Q.   Is marination something that Tyson wanted to get paid for

9    or not?

10   A.   As a general statement, Tyson would want to be paid for

11   marination for all of our products.

12   Q.   Why?

13   A.   It's part of the profit margin.  It increases the bird size

14   and the case weight, so in turn it increases the profit margin.

15   Q.   Marinated bird, weighs more, more money.

16   A.   Yes, that is correct.

17   Q.   You have down here "No moisture drain-back tare."  Could

18   you explain to the jury what you meant by no moisture

19   drain-back tare, please.

20   A.   Yes.  So -- and I can't go into the specific details

21   because I don't remember, but I can speak at a high level.  The

22   moisture drain-back tare was a process of whenever a WOG or a

23   bird goes through a chiller, which is when they are being

24   cooled down, they gain moisture through that process because

25   they're being cleansed in a big vat of water.  In that process

Brandon Campbell - Direct

 1  they gain moisture.  And then there is a period of time where

 2  that moisture retention will come back out of the bird.  And so

 3  what KFC had was a drain-back tare where they would ask for a

 4  certain amount of product weight to be tared out to account for

 5  that drain-back out of the moisture pickup through the chilling

 6  process.

 7  Q.  Is the term "tare" just a fancy word for saying that they

 8  want to subtract from the weight in the box so that they are

 9  going to end up paying less for that box?

10  A.  Yes.  It subtracts the amount of weight in the box that

11  they would be paying for.

12  Q.  And did Tyson want to be paid for the weight in the box or

13  not the weight of the moisture in the box?

14  A.  Tyson would like to or desire to be paid for the moisture

15  in the box.

16  Q.  So this is what you did in June.  And do you remember how

17  you came up with the 19 cents?

18  A.  No, I do not remember the specific details.

19  Q.  I would like to show you without showing the jury what you

20  have in front of you as G-521, please.

21       Do you recognize that document?

22  A.  Yes, I recognize the document.

23  Q.  Is this a document that was created by you?

24  A.  Yes, this is a document that I created.

25  Q.  Is there a date on this document?

Brandon Campbell - Direct

1    A.   Yes, there is a date on the document.

2    Q.   When you generated or created this document, did you do so

3    on the date that is reflected on the document, 521?

4    A.   Yes, the date reflects the time that it was created.

5    Q.   Was this document made at or near the time it purports to

6    have been made, which would be June the 19th, 2014 at 20:40?

7    A.   Yes, that would be a correct representation of when it was

8    created.

9    Q.   Now, you mentioned this document was a document created by

10   you, correct?

11   A.   Yes, that is correct.

12   Q.   Is this a mechanism of wherein you would electronically

13   seek to give direction to individuals within Tyson about taking

14   certain matters or taking certain business actions reflective

15   of your work in the business model?

16   A.   Yes.  This is a means of communication around what the

17   expectations were coming out of my work.

18   Q.   And in your capacity in the pricing unit, did you have a

19   business duty to generate electronic directions to others

20   within Tyson in order that they may carry out the business of

21   Tyson effectively?

22   A.   Yes.  That was my responsibility.

23   Q.   Now, did you -- your means of communication with others

24   within Tyson, was that solely or principally through electronic

25   e-mails and other electronic data communication?

Brandon Campbell - Direct

1    *A.*  Electronic data communication was one method of

2    communication.  It was not the only method.

3    *Q.*  Now, here, is this the sort of document that would be kept

4    within Tyson in the regular course of Tyson's business?

5    *A.*  Yes, it is.

6    *Q.*  And be relied upon by others within Tyson to effectuate the

7    business duty of carrying on Tyson's -- the work and business

8    of Tyson?

9    *A.*  Yes, that is correct.

10   *Q.*  And was this e-mail generated as a communication that was

11   kept in the general practice of Tyson's regularly conducted

12   businesses activities?

13   *A.*  Yes, it was.

14   *Q.*  And are these documents such as this maintained and

15   shared -- excuse me, stored and maintained at Tyson?

16   *A.*  Yes, they are.

17   *Q.*  And based upon this, the contents that you have observed

18   here in your creation of this, does this document accurately

19   reflect directions that you gave to others concerning this

20   business model?

21   *A.*  Yes, it is accurate.

22        *MR. GILLEN:*  Your Honor, I would move for the

23   admission of G-521.

24        *THE COURT:*  Any objection to the admission of G-521?

25        *MS. CALL:*  Hearsay, and at the least certainly not a

Brandon Campbell - Direct

1    business record.

2           *THE COURT:*  The objections will be overruled.  G-521

3    will be admitted.

4           *MR. GILLEN:*  Thank you, Your Honor.

5           If we could publish G-521, please.

6           *THE COURT:*  You may.

7    *BY MR. GILLEN:*

8    *Q.*  Now, again this is an e-mail, is it not, Mr. Campbell?

9    *A.*  Yes, that is correct.

10   *Q.*  Generated by you?

11   *A.*  Yes, that is correct.

12   *Q.*  On June the 19th, 2014.

13   *A.*  Yes, that is correct.

14   *Q.*  Did you send this to Brian Roberts?

15   *A.*  Yes.

16   *Q.*  What was the subject matter of this e-mail communication?

17   *A.*  It was the KFC 2015 Pricing Model.

18   *Q.*  "And I want to ask you what you meant reading from 521,

19   Brian, this is where we want to be with KFC for next year.  Let

20   me know if you have any questions, or would like to discuss

21   further.  Thanks, Brandon."

22          Correct?

23   *A.*  Correct.

24   *Q.*  That was an e-mail to Mr. Roberts on the sales team,

25   correct?

Brandon Campbell - Direct

1    *A.*  Yes, that is correct.

2    *Q.*  Are you telling him in this e-mail that this model that you

3    have forwarded to him is where Tyson wanted to be with KFC for

4    the 2015 KFC contract?

5    *A.*  Yes, it is.

6    *Q.*  Now, when you're generating or you're communicating this

7    information to sales, are you asking them or are you telling

8    them, "This is the model.  If you got any questions, give me a

9    call"?

10   *A.*  No, I am telling them.

11   *Q.*  You are telling them, right?

12   *A.*  Yes, that is correct.

13   *Q.*  And you told Mr. Roberts that this is where Tyson needed to

14   be or wanted to be on the KFC contract for 2015.

15        *MS. CALL:*  Objection, hearsay and leading.

16        *THE COURT:*  Sustained as to leading.

17   *BY MR. GILLEN:*

18   *Q.*  So again the purpose of your telling -- or sending this to

19   Mr. Roberts was what?

20   *A.*  The purpose of me sending this to Mr. Roberts was to

21   communicate what the pricing model was for 2015 and what the

22   expectations were for him to communicate to the customer.

23   *Q.*  Now, I would like to have you look at what has been marked

24   as G-824, please.

25        Do you have 824 in front of you?

Brandon Campbell - Direct

1    A.   Yes, I do.

2    Q.   I would like to focus you on the middle of 824 and ask you

3    if you recognize that e-mail.

4    A.   Yes, I do.

5    Q.   Was this e-mail generated by you?

6    A.   Yes, it was generated by me.

7    Q.   Was it generated by you in the normal course of your

8    business within the pricing unit?

9    A.   Yes, it was.

10   Q.   Is there a date on the date in which you sent or generated

11   the e-mail in the middle of 824?

12   A.   Yes, July 9th.  There is a date.

13   Q.   And it is being sent to individuals within Tyson; is that

14   correct?

15   A.   Yes, that is correct.

16   Q.   Now, when you generated this, did you generate this

17   information in response to any inquiry from individuals within

18   the business unit about the KFC offer or the KFC proposal?

19   A.   Yes.  This was a response from a request from Charlie

20   Solomon.

21   Q.   Now, your e-mail was sent in response to a business e-mail

22   that you got from someone else?

23   A.   Yes, that is correct.

24   Q.   And who was that?

25   A.   It was from Charlie Solomon.

Brandon Campbell - Direct

1  Q.  Earlier you told the jury who Charlie Solomon was as it

2  relates to the KFC 2015 proposal.  Could you remind us again

3  who he is?

4  A.  Sure.  So Charlie Solomon is the senior vice-president over

5  the small bird business unit.  He was responsible for that

6  business.

7  Q.  Now, this communication that you received from Mr. Solomon

8  and that you responded to Mr. Solomon, is that the sort of

9  electronic communications within Tyson that you had a business

10  duty to conduct in order to communicate effectively about

11  information for Tyson to carry on its business?

12  A.  Yes.  This is how we would -- a method we would use to

13  communicate.

14  Q.  And was this the typical way in which you would communicate

15  and respond to electronic communications from Mr. Solomon in

16  the business unit?

17  A.  Yes.  This was typical.

18  Q.  Was this 824 an example of something that was typically

19  created by employees at Tyson to communicate effectively

20  electronically about Tyson's business?

21  A.  Yes, it is.

22  Q.  Was this document, 824, kept in the normal course of

23  Tyson's regularly conducted business activities?

24  A.  Yes.

25  Q.  And were the e-mails generated as a regular business

Brandon Campbell - Direct

1    practice of Tyson in terms of its business activities?

2    A.   Yes.

3    Q.   Are these communications stored and maintained by Tyson as

4    business records?

5    A.   Yes, they are.

6    Q.   And based upon this document's contents and substance,

7    would you say that this document appears to be what -- is what

8    it appears to be?

9    A.   Yes.  It looks to be reflective of what the content is.

10             MR. GILLEN:  Your Honor, I would tender G-824, please.

11             THE COURT:  Any objection to the admission of G-824?

12             MS. CALL:  Yes, Your Honor, hearsay.  There is three

13   different people's statements here, not a business record, and

14   the top e-mail at least, I don't see an exception to that.

15             THE COURT:  Response?

16             MR. GILLEN:  Your Honor, it is a business record in

17   that there is a business inquiry to the witness, Mr. Campbell,

18   and he is responding to that specific inquiry.  So we would

19   submit that it is a business record and all of it should be a

20   business record.  If the Court believes that the top e-mail,

21   which is a one-sentence response by Mr. Solomon, that's not

22   really why I am introducing it.  I think the whole thing is a

23   business record.  I would ask that it all be cut in, but I

24   don't really have much heartburn over redacting that top

25   sentence.

Brandon Campbell - Direct

 1          THE COURT:  All right.  The objection will be

 2    sustained in part.  The White e-mail that begins this is

 3    clearly hearsay information and would have been to be redacted.

 4    The next e-mail from Mr. Solomon which requests information

 5    is -- can be admitted, but not for the truth of the matter

 6    asserted, but rather for the effect on the listener.

 7    Mr. Campbell's response to that, I overrule the objection.

 8    It's not hearsay.  He has got personal knowledge.  The Solomon

 9    e-mail at the very top is also hearsay and would have to be

10    redacted.

11          MR. GILLEN:  Are we electronically capable of doing

12    the redaction the Court has directed as it relates to the top

13    of G-824 so that we may publish it now?

14          THE COURT:  And just to be clear, Mr. Solomon's e-mail

15    that Mr. Campbell is responding to is admissible, but not for

16    the truth of the matter asserted.  It was just whited out.  No,

17    that's too much.  And then the next page.  So that one page as

18    shown right now on the screen is admissible, but not

19    Mr. Solomon's e-mail for the truth of the matter asserted.

20          Is that what you want to tender, Mr. Gillen?

21          MR. GILLEN:  Yes, that's fine.  And if I understand

22    the Court's direction, we would then redact out the top, the

23    one sentence that is right at the top?

24          THE COURT:  Yes, as well as the header too.  As

25    currently it's fine right now as you are showing it to the

Brandon Campbell - Direct

 1    Court on the screen.  And the second page would need to go as

 2    well.

 3           MR. GILLEN:  So the second page of 824 is out and is

 4    not a part of the admitted --

 5           THE COURT:  That's correct.

 6           MR. GILLEN:  Thank you, Your Honor.

 7           THE COURT:  And as admitted, that may be displayed to

 8    the jury.

 9           Ladies and gentlemen, as you'll see in just a second,

10    the statement of Mr. Solomon, the e-mail from Mr. Solomon can

11    be considered, but not for the truth of the matter asserted,

12    but rather just for the effect on Mr. Campbell who responds to

13    it.

14           MR. GILLEN:  Thank you.  If we may publish to the

15    jury, and then I have some questions to ask you about the

16    e-mail.

17           THE COURT:  You may.

18    BY MR. GILLEN:

19    Q.  I want to ask you to what you responded from Mr. Solomon.

20    Do you see there where it says, "I need your help on a report"?

21    A.  Yes, I see that.

22    Q.  Again, Mr. Solomon is within the business unit; is that

23    correct?

24    A.  Yes, that is correct.

25    Q.  "Need a brief description of our pricing proposal to KFC,"

Brandon Campbell - Direct

 1   correct?

 2   A.   Correct.

 3   Q.   Is that a reference to the KFC proposal that you had been

 4   telling us about earlier concerning the bid for the 2015

 5   contract?

 6   A.   Yes.   This would be in reference to that.

 7   Q.   2. "Need to show margin current vs. planned with new

 8   increase."   Do you see that?

 9   A.   Yes, I see that.

10   Q.   Again, margin is the profit margin, correct?

11   A.   That is correct.

12   Q.   "Need a revised priorities report that shows two columns,

13   current and future with new KFC pricing in place.   Keep all

14   other customer pricing as is." And then, "Need by noon if

15   possible."

16        Correct?

17   A.   Yes, that is correct.

18   Q.   Mr. Solomon kind of put a little time pressure on you,

19   didn't he?

20   A.   He did.

21   Q.   Let's go up to where you respond.   And this takes place on

22   July the 9th, 2014.   Is that the date that's generated, is that

23   an accurate date that was generated on this e-mail?

24   A.   Yes, that is correct.

25   Q.   Again you say, "Attached is the new priority spreadsheet

Brandon Campbell - Direct

1  (NTGW only)."  What does NTGW mean?

2  *A.*  NTGW stands for net green weight.  It was a way we looked

3  at an apples-to-apples comparison around the price of like

4  items across other customers.

5  *Q.*  Okay.  Let's go down to the second paragraph here.  You

6  have, "KFC's pricing proposal is," and then it's got,

7  "$0.045/lb increase on a per pound basis. However, we are

8  requiring KFC to pay for all of the product in the case which

9  means that we will no longer apply a moisture or marination" --

10  is that pronounced "tare"?

11  *A.*  Tare, yes.

12  *Q.*  That's the part about subtracting out, right?

13  *A.*  Yes, that is correct.

14  *Q.*  "When you take into account the 7.5" -- is that 7.5 cents?

15  *A.*  7.5-pound.

16  *Q.*  7.5 cents per pound?

17  *A.*  No.  It says, "7.5 lb case weight increase."

18  *Q.*  Okay, "increase per case that we will be invoicing for

19  (with the same head)," and then it says, "the true price

20  increase is $0.19."  Do you see that.

21  *A.*  Yes, I see that.

22  *Q.*  So when you say in the phrase that you have here "the true

23  price increase," what do you mean -- tell the jury what you

24  mean by, the true price increase is $0.19."

25  *A.*  So KFC paid for their product by the case and so there was

Brandon Campbell - Direct

1    two components of the price increase.  There was a per-pound

2    price increase, which is the approximate 4-1/2 cent per-pound

3    increase, but then there was also a request to increase the

4    case weight.  So the per pound with the increased case weight

5    would take the entire price up.  If you compared it apples to

6    apples, it would be a 19-cent per pound effective increase that

7    they would be getting because they were not only paying for

8    more per pound, they would be paying for more actual product in

9    the box as well.

10   Q.  So did you meet your noon deadline on that?

11   A.  Looks like I missed it by six minutes.

12   Q.  Six minutes.  Anyway, you did a good job.  Let's now move

13   on.

14        So this was you sending -- responding to Mr. Solomon

15   in the business unit, right?

16   A.  Yes, that is correct.

17   Q.  Now I want to move forward and I want to move into August

18   of 2014.  And I want to show you some documents that have

19   already been admitted into evidence.

20        MR. GILLEN:  Your Honor, I will be showing the witness

21   1190 and 1191.

22        THE COURT:  Yes.  And both have been admitted and may

23   be published.

24        MR. GILLEN:  If we could publish 1190.

25   BY MR. GILLEN:

Brandon Campbell - Direct

1   *Q.*  1190 is an e-mail from Mr. Roberts to Mr. Eddington on

2   August the 11th, 2014.  Do you see that?

3   *A.*  Yes, I see that.

4   *Q.*  It says, "I think this is the model you need for

5   comparison.  What do you think the possibility is that we can

6   get some level of commitment on what you want to do by the end

7   of the week?"

8          Do you see that?

9   *A.*  Yes, I see that.

10  *Q.*  Now if you will turn to 1191 and I'd ask you to examine

11  this model that was sent and confirm that that was a model

12  generated by you or your pricing unit.

13  *A.*  Yes, this is a model that would have been generated by me

14  in the pricing group.

15  *Q.*  Is this sort of the model that you had been working on back

16  in June of 2014?

17  *A.*  Yes.  This is an iteration of that model.

18  *Q.*  Okay.  So again this model wasn't generated or created by

19  Brian Roberts, was it?

20  *A.*  No.  This model would have been created from me in the

21  pricing group.

22  *Q.*  And the pricing group sends these models to Mr. Roberts and

23  tells him to deliver the message to KFC, right?

24          *MS. CALL:*  Objection, leading.

25          *THE COURT:*  Sustained.

Brandon Campbell - Direct

1    *BY MR. GILLEN:*

2    *Q.*  What role, if any, once the model is generated does someone

3    from sales have regarding communicating the model to KFC

4    through RSCS?

5    *A.*  The responsibility of sales was to take the model and to

6    communicate it to RSCS.

7    *Q.*  Now, I want to ask you a little bit about this model

8    because in this model we have a -- on Page 2 we've got margin

9    of 16 cents; is that right?

10   *A.*  Yes, that's correct.

11   *Q.*  In your model that you sent in, does your model contain the

12   marination that Tyson wanted and the subtraction from the --

13   not putting in the subtraction on the moisture, the 48-hour

14   tare?

15   *A.*  Yes.  It included the removal of the 48-hour tare, as well

16   as 110 percent marination yield.

17   *Q.*  So we've got that, but under your model the money that KFC

18   would be paying would be a little bit more because you are

19   going to have the marination and you are not going to be

20   subtracting for the moisture, right?

21          *MS. CALL:*  Objection, leading.

22          *THE COURT:*  Overruled.  He can answer if he

23   understands.

24   *A.*  Could you restate the question?

25   *BY MR. GILLEN:*

Brandon Campbell - Direct

1   Q.  I'll do my best.

2   A.  I'm sorry.  I am just trying to make sure I understand the

3   question properly.

4   Q.  This model that you had sent to KFC, this model would have

5   Tyson being paid for the extra weight of the marinated chicken,

6   right?

7   A.  Yes, that is correct.

8   Q.  And would it -- and what you also indicated earlier is

9   there wouldn't be any subtraction for the moisture that -- the

10  48-hour moisture tare; is that true?

11  A.  It would be asking -- the proposal that we were looking at

12  is asking to include the marination and it's asking to remove

13  the drain-back tare, so both of those components would have

14  been factors in this model.

15  Q.  So would that have Tyson being paid more money for chicken

16  than without the marination and without subtracting from the

17  48-hour tare?

18  A.  Yes, yes.  It would result in the case weight being higher

19  which would result in a higher price for the case.

20  Q.  Now, I am going to ask you, you know, whether your

21  recollection is whether KFC through RSCS, whether they accepted

22  that unique model or that model that you had created regarding

23  the 48-hour tare and the marination.  Did they accept that?

24  A.  No, KFC did not accept it.

25  Q.  So KFC says no.  Is that your recollection?

Brandon Campbell - Direct

1   A.   Yes, that is correct.

2   Q.   Now, does the sales group come back to the pricing unit and

3   the business unit to figure out what to do next?

4   A.   The sales team comes back to the pricing group to give the

5   customer's response that no, KFC won't accept it.  So then

6   myself and the business unit have to restructure the pricing

7   model to be able to account for that change that KFC won't

8   accept.

9   Q.   Okay.  And so I want you to take a look, if you would, at

10  Tab G-570.  I am going to ask you to focus on the middle of the

11  document, G-570, and ask you if you recognize that e-mail.

12  A.   Yes, I recognize it.

13  Q.   Is that an e-mail that was generated by you?

14  A.   The bottom portion of the e-mail was generated by me.

15  Q.   And the date of the e-mail is August the 21st.  Is that

16  when you generated this e-mail?  Is that the time that you

17  generated it?

18  A.   Yes, that is.

19  Q.   And so your e-mail was generated or was it generated at or

20  near the time it purports to have been made?

21  A.   Yes.

22  Q.   Are you the individual who created this document?

23  A.   The bottom portion, yes.

24  Q.   Yeah.  And in your capacity that you described to us as in

25  the pricing unit, was it your business duty to convey to others

Brandon Campbell - Direct

1   what the offer would be to KFC after their declination on the

2   marination and the 48-hour tare?

3   A.   Yes.

4   Q.   I am sorry, I couldn't hear.

5   A.   Yes.

6   Q.   In that respect was it your business duty to communicate

7   the Tyson position regarding the response to KFC on the 2015

8   proposal?

9   A.   Could you restate the question?

10  Q.   I will redo it.

11       Was it your job to then respond back to individuals

12  within the sales unit to tell them what would need to be done

13  in response to the KFC denial of the marination and the 48-hour

14  tare?

15  A.   Yes.  That was my responsibility to come back with a

16  revised model around what we would need from a pricing

17  standpoint in response to KFC's request.

18  Q.   Was it a part of your business duty in conducting Tyson's

19  daily business opportunities to generate such directions to

20  other members of Tyson such as the sales unit?

21  A.   Yes, it was.

22  Q.   Was this sort of e-mail something that was kept in the

23  normal course of Tyson's business?

24  A.   Yes.

25  Q.   And is it something that Tyson, you and others at Tyson

Brandon Campbell - Direct

1    would rely upon in the conducting of Tyson's everyday business

2    activities?

3    A.   Yes.

4         MR. GILLEN:  Your Honor, I would tender G-570.

5         THE COURT:  Any objection to the admission of G-570?

6         MS. CALL:  Just that the top e-mail is hearsay.

7         THE COURT:  Response?

8         MR. GILLEN:  Your Honor, we would indicate or we would

9    argue that the top portion of 570 should be admitted as well

10   because it is reflective of the state of mind of the individual

11   who sent that e-mail, and therefore it should be admitted in

12   that respect.  It shows the state of mind of the sender of the

13   response back from Mr. Campbell when he sent out the directive.

14        THE COURT:  The government's objection will be

15   sustained.  It does not show state of mind, but Mr. Campbell's

16   e-mail which constitutes the lower half of the document is

17   admissible.  So if the document is redacted to remove

18   Mr. Roberts' e-mail, G-570 will be admitted.

19        Mr. Gillen, did you want to do that?  Did you want to

20   offer it in that fashion?

21        MR. GILLEN:  Yes, I do.  I offer 570 in that redacted

22   form pursuant to the Court's directions.

23        THE COURT:  That is admitted and it may be displayed.

24        MR. GILLEN:  Thank you, Your Honor.

25   BY MR. GILLEN:

Brandon Campbell - Direct

1    Q.  Now, 570, Mr. Campbell, is this an e-mail sent by you?

2    A.  Yes, it is.

3    Q.  And to whom was it sent?

4    A.  It was sent to Brian Roberts and Tim Mulrenin.

5    Q.  Were others copied on this e-mail?

6    A.  Yes, Charlie Solomon, Steven Cullen, Darrell Bowlin and Tim

7    Scheiderer.

8    Q.  I believe you have identified for the jury all of the

9    individuals with the exception I am not sure that you did Tim

10   Scheiderer.  Who is he?

11   A.  Tim Scheiderer was on the sales team.  He was a support to

12   the commercial team that he would help with bid requests and

13   customer requests, so he was support to the sales team.

14   Q.  So what you're saying here, Subject:  KFC Pricing Updated.

15   What did you mean by pricing updated?

16   A.  It would have been updated based on the latest changes in

17   the model.

18   Q.  So is this a situation where back it goes to you and you

19   take in the factors of the rejection from KFC on the proposal

20   from Tyson on the marination and the 48-hour tare, and you

21   generate another model?

22   A.  Yes, that is correct.

23   Q.  And did you do that in this case?

24   A.  Yes, I did.

25   Q.  And did you send the information to the sales team in order

Brandon Campbell - Direct

 1   for them to follow through or carry out the directives of Tyson

 2   in response to making the proposal to KFC?

 3            MS. CALL:  Objection, leading.

 4            THE COURT:  Sustained.

 5   BY MR. GILLEN:

 6   Q.  What was the purpose in your sending this e-mail to

 7   Mr. Roberts?

 8   A.  I sent the e-mail to Mr. Roberts and Mr. Mulrenin for them

 9   to communicate to KFC.

10   Q.  So you wanted this to go to KFC, correct?

11   A.  This was the updated pricing model, yes.

12   Q.  Let's read what it says.  "Attached is the updated pricing

13   model for KFC which accounts for leaving the current marination

14   tare in place."

15            Again, we've gone over this a little bit, but just

16   explain that sentence.  What are you saying here?

17   A.  It is continuing to tare out the marination so that would

18   drop the case weight rather than the proposed case weight

19   increase.

20   Q.  And then "The marination percentage has been dropped to

21   100 percent," correct?

22   A.  Yes, correct.

23   Q.  What do you mean by that, dropping it to 100 percent?

24   A.  That would have the same effect.  It's dropping the case

25   weight.  You are taring out that moisture percentage or the

Brandon Campbell - Direct

1    marination percentage.

2    Q.  Did the earlier model that you had have marination at

3    110 percent?

4    A.  Yes, that is correct.

5    Q.  So here it's going back to 100 percent.  In addition, the

6    margin has been increased to 19 cents per pound, correct?

7    A.  Yes, correct.

8    Q.  And that's the profit margin correct?

9    A.  Yes, profit margin.

10   Q.  Which delivers the same case price as was originally

11   presented, correct?

12   A.  Yes, correct.

13   Q.  What do you mean when you say this delivers the same case

14   price which was originally presented?

15   A.  It is going in and from the original model we had to change

16   the mechanics of the model because of the marination change and

17   the moisture drain-back change, but the actual case price is

18   the same case price that KFC would be requested to pay.

19   Q.  So this margin of 19 percent is kind of where you started

20   out at the beginning, but now you're back to it after the

21   change, right?

22   A.  Yes, just in a different format in the model.

23   Q.  If you could look at G-467.  And I'll ask you if you

24   recognize the document in G-467.

25   A.  Yes, I do.

Brandon Campbell - Direct

1    *Q.*  This was a document that was generated or created by you?

2    *A.*  Yes, it was.

3    *Q.*  Is the date on the document an accurate date on the date --

4    on or about the date that you generated this document?

5    *A.*  Yes, it is.

6    *Q.*  Is this an e-mail that was generated by you in the normal

7    course of activity for Tyson?

8    *A.*  Yes.

9    *Q.*  Was this generated, this e-mail, generated as part of your

10   business duties to convey information regarding the pricing

11   model on KFC?

12   *A.*  Yes.

13   *Q.*  And was it generated to others within Tyson so that they

14   would have knowledge of where we were on the KFC model for

15   2015?

16   *A.*  Yes.

17   *Q.*  Was this e-mail something that was kept in the ordinary

18   course of Tyson's business?

19   *A.*  Yes, it was.

20   *Q.*  And was it generated, this e-mail generated in the regular

21   practice that you had within the pricing unit to conduct as a

22   business duty your activities on behalf of Tyson and their

23   business activities?

24   *A.*  Yes, this was.

25        *MR. GILLEN:*  Your Honor, we would tender G-467.

Brandon Campbell - Direct

1          THE COURT:  Any objection to the admission of G-467?

2          MS. CALL:  No.

3          THE COURT:  G-467 will be admitted.

4          MR. GILLEN:  If we could publish this, please.

5          THE COURT:  You may.

6     BY MR. GILLEN:

7     Q.  Is this an e-mail you sent on September the 25th of 2014?

8     A.  Yes, it is.

9     Q.  And there are a number of people you sent it to.  Tim

10    Scheiderer I believe you have identified, correct?

11    A.  Yes, correct.

12    Q.  Mr. Bowlin, correct?

13    A.  Correct.

14    Q.  Mr. Cullen, correct?

15    A.  Correct.

16    Q.  Mr. Mulrenin, correct?

17    A.  Correct.

18    Q.  Mr. Pepper?

19    A.  Correct.

20    Q.  Mr. Roberts?

21    A.  Correct.

22    Q.  Charlie Solomon?

23    A.  Correct.

24    Q.  Amanda Craig, I don't believe you identified her.  What was

25    her role there at Tyson?

4318
Brandon Campbell - Direct

1    *A.* She was in margin management under Steven Cullen.

2    *Q.* And in this document you indicate that, "Attached is the

3    final KFC pricing model which includes segment pricing" and

4    "Here are a few highlights of the pricing changes."

5          Did you generate this and write this up?

6    *A.* Yes, I generated this.

7    *Q.* The first bullet says, "Increased margin from $0.1681 to

8    $0.1931." Do you see that?

9    *A.* I see that, yes.

10   *Q.* And is that a reference to the profit margin that would be

11   increased up to 19 cents -- 19.31 cents?

12   *A.* Yes. It's a reference to the profit margin, yes.

13   *Q.* And so you indicated in the last e-mail that we discussed

14   on the 19-cent margin that essentially here it's a tad bit more

15   than the 19-cent margin by .31 cents, right?

16   *A.* Yes, yes. It's .1931 versus the .19.

17   *Q.* And this was the direction -- or excuse me, strike that.

18         Was this e-mail your direction to the individuals

19   involved in the KFC -- the proposal of what the final Tyson

20   price would be?

21   *A.* Yes. This was submitting what is the final pricing model

22   for KFC.

23        *MR. GILLEN:* And then I believe we have -- If we can

24   have 10-4. I think what I am looking for is 10-4.

25   *BY MR. GILLEN:*

Brandon Campbell - Direct

 1   *Q.*  And this is a spreadsheet.  It's not in your binder.

     Sorry, Mr. Campbell.

 3          Indicated here do you see there where it says that the

 4   margin for the 2015 for Tyson is .1931?

 5   *A.*  Yes, I see that.

 6          *MR. GILLEN:*  I am sorry, Your Honor.  Can we publish

 7   it to the jury?  10-4 is in evidence.

 8          *THE COURT:*  Everyone agree?  I didn't have that marked

 9   down, but okay, yes, you may.

10   *BY MR. GILLEN:*

11   *Q.*  And here we see, Mr. Campbell, on this government exhibit

12   that the margin for Tyson for the final 2015 contract price is

13   .1931, correct?

14   *A.*  Correct.

15   *Q.*  Which is the number that you had in your last e-mail that

16   we went over, right?

17   *A.*  Yes, that is correct.

18   *Q.*  One quick question I had.  We are going to move away from

19   the KFC 2015 for just a second.

20          Were you involved at all in the Chick-fil-A never

21   antibiotics ever, NAE?

22   *A.*  I was involved in the conversations.  I didn't have direct

23   responsibility for the model, but I was involved in the

24   conversations.

25   *Q.*  Was that -- the pricing or whatever that was proposed to

Brandon Campbell - Direct

1    Chick-fil-A, was that done by the pricing unit or was it done

2    by the sales unit?

3    A.  It was done by the pricing team, my partner in pricing.

4           MR. GILLEN:  Your Honor, if I may have just a moment.

5           THE COURT:  Yes, you may.

6           MR. GILLEN:  Thank you.  Whenever you ask whether

7    there is a few more questions, there always is.  Just a few

8    more.

9    BY MR. GILLEN:

10   Q.  We have never met before, have we?

11   A.  No, not before today.

12   Q.  First time I spoke to you is when I began asking you

13   questions earlier, correct?

14   A.  Yes, that is correct.

15   Q.  But you have spoken with the government, haven't you?

16   A.  Yes, I have.

17          MS. CALL:  Objection, leading.

18          THE COURT:  Overruled.

19   BY MR. GILLEN:

20   Q.  You have spoken with the government, haven't you?

21   A.  Yes, I have.

22   Q.  And you spoke with them on how many occasions?

23   A.  Two occasions that I can remember.

24   Q.  Okay.  One back in 2020?

25   A.  Yes, that is correct.

Brandon Campbell - Cross

1    Q.  And the other when?

2    A.  Yesterday.

3    Q.  Now, one additional question.  In terms of communication, I

4    think you mentioned location earlier.  Was Mr. Roberts and

5    Mr. Mulrenin and Mr. Pepper, were they working in the same

6    office or did they have different offices?

7    A.  They had different offices.

8    Q.  Did they work in the same state or did they work in

9    different states?

10   A.  Different states.

11   Q.  Did they work in actually different regions of the country?

12   A.  Yes, different regions.

13             MR. GILLEN:  That's all I have.  Thank you.

14             THE COURT:  Thank you, Mr. Gillen.

15             Cross-examination by defendants, other defendants?

16             All right.  Cross-examination by the United States?

17                        **CROSS-EXAMINATION**

18   BY MS. CALL:

19   Q.  Good morning, Mr. Campbell.

20   A.  Good morning.

21   Q.  All right.  So you testified on direct, Mr. Campbell, that

22   you were in the pricing unit at Tyson Foods, correct?

23   A.  Yes, correct.

24   Q.  And in that role you developed the pricing model for

25   certain customers?

Brandon Campbell - Cross

1   A.  Yes, that is correct.

2   Q.  And those pricing models, they eventually make it into the

3   bids that get submitted to the customers?

4   A.  Yes, those pricing models are what are submitted to the

5   customers, yes.

6   Q.  Now, I believe you testified about kind of the interplay

7   between the three units, the business unit, the pricing unit

8   and the sales team, correct?

9   A.  Correct.

10  Q.  Is it correct that you would have meetings involving all

11  three of those groups when determining pricing?

12  A.  When communicating pricing, yes.  If you can maybe clarify

13  by the word determining.

14  Q.  When developing your pricing models, would you meet with

15  sales?

16  A.  I would meet with sales once we had the model created, yes.

17  Q.  And then when you were receiving feedback regarding how the

18  customer reacted, would you meet with sales as well?

19  A.  Yes.

20  Q.  And in those meetings would sales convey their

21  understanding of how -- I guess whether the customer would

22  accept the pricing that you proposed?

23  A.  Yes, they would communicate whether the customer accepted

24  or not.

25  Q.  And their role, is it correct, was to convey the pricing to

Brandon Campbell - Cross

1    the customer?

2    A.   Yes, that is correct.

3    Q.   And did you at times provide sales with a range of pricing

4    in which they could negotiate with the customer?

5    A.   At times, yes.  We would give a floor price, so there would

6    be a range that they could work with them, but they didn't have

7    the authority to drop below that floor.

8    Q.   Let's talk about some other factors that you considered in

9    developing your pricing models.  Did you consider the pricing

10   of feed in developing your pricing models?

11   A.   In pricing models in general, yes.

12   Q.   And let's talk about KFC as an example.

13   A.   Okay.

14   Q.   Was feed a component of their pricing model?

15   A.   Yes, it was.

16   Q.   When I say feed, would that include corn?

17   A.   Yes, it would.

18   Q.   Would it include soybean?

19   A.   Soybean meal.

20   Q.   Soybean meal?

21   A.   Meal, yes.

22   Q.   So if other factors stayed the same, if feed prices went

23   down, what would happen to the price of chicken?

24   A.   If all the components were the same and feed dropped, the

25   price would drop with it.

4324

Brandon Campbell - Cross

1   Q.  All right.  And would you agree that feed was a relatively

2   large component in that cost model for KFC?

3   A.  Yes.  It was 25 to 30 percent of the model.

4   Q.  And then in fact on a monthly basis the price would

5   actually fluctuate based on that feed component, correct?

6   A.  Yes, that is correct.

7   Q.  Now, let's move on to another factor you considered.  In

8   setting the prices and developing those pricing models, you

9   also would consider the risk of losing business to the

10  competition, correct?

11  A.  Yes, that is correct.

12  Q.  And so generally speaking if Tyson raised their prices,

13  they risked being undercut by competitors.

14  A.  Yes, that's a correct assumption.

15  Q.  And when that happened the risk would be that they would

16  lose business, correct?

17  A.  Yes.  If their price was higher than the competitors, there

18  was a risk that they would lose business, yes.

19  Q.  That's basically competition, correct?

20  A.  Yes, competition.

21  Q.  And that was -- competition was something that you

22  considered when developing your pricing models?

23  A.  Yes.  I considered whether or not we thought that we would

24  lose the business as a total in pricing models, yes.

25  Q.  As a matter of common sense, would you agree with me that

4325

Brandon Campbell - Cross

1    if Tyson and its competitors were all raising their prices,

2    that there would be less of a risk that you would lose

3    business?

4    A.   If everybody had higher prices, yes, there would be less

5    risk of losing business.

6    Q.   I want to talk about some of the other considerations in

7    developing your pricing models.  I think on direct examination

8    you mentioned the Urner-Barry and the Georgia Dock, correct?

9    A.   Yes, correct.

10   Q.   Let's talk about those in turn.  The Urner-Barry, did that

11   provide you competitors' bids for upcoming KFC business?

12   A.   No, it did not.

13   Q.   Did it tell you competitors' margins for upcoming KFC

14   business?

15   A.   No, it did not.

16   Q.   Did it tell you your competitors' current pricing for KFC

17   business?

18   A.   No, it did not.

19   Q.   Okay.  Now, same for Georgia Dock.  In looking at the

20   Georgia Dock, did that tell you your competitors' bids for

21   upcoming KFC business?

22   A.   No, it did not.

23   Q.   Did it tell you your competitors' margin for their KFC

24   business?

25   A.   No, it did not.

Brandon Campbell - Cross

1    Q.  Did it tell you your competitors' current pricing for KFC

2    business?

3    A.  No, it did not.

4    Q.  All right.  One more source I want to ask you about and

5    that's something called AgriStats.  Are you familiar with

6    AgriStats?

7    A.  I am familiar with AgriStats, yes.

8    Q.  Did you have access to AgriStats reports?

9    A.  I did have access to AgriStat reports.

10   Q.  And did other folks at Tyson involved in the pricing

11   process have access to AgriStats?

12   A.  Yes.  The business unit had access.

13   Q.  Now, would AgriStats tell you your competitors' bids for

14   upcoming KFC business?

15   A.  Not that I'm aware of, no.

16   Q.  Would AgriStats tell you your competitors' margins for KFC

17   business?

18   A.  Not that I'm aware of, no.

19   Q.  And would AgriStats tell you your competitors' current

20   pricing for KFC business?

21   A.  No, not that I'm aware of.

22   Q.  Are you aware of any industry source that would tell you

23   your competitors' upcoming bids?

24   A.  Can you be more specific on upcoming bids?

25   Q.  So let's say their bids for KFC, did you have any way of

Brandon Campbell - Cross

1    determining those that you were familiar with?

2    A.   The values?

3    Q.   The actual price numbers.

4    A.   No.

5    Q.   Now, I want to ask you briefly about shortages.  Are you

6    familiar at a high level with Tyson buying and selling product

7    from its competitors?

8    A.   Yes.

9    Q.   And from your understanding of that process, did that give

10   you knowledge of your competitors' bids?

11            MR. GILLEN:  Objection, outside the scope, Your Honor.

12            THE COURT:  Sustained.

13   BY MS. CALL:

14   Q.   I want to --

15            THE COURT:  Ms. Call, we are almost at noon.  If you

16   have a few more questions, that's fine.  I just wanted to give

17   you the heads-up.

18            MS. CALL:  Maybe five more minutes.  Would we prefer

19   to break now?

20            THE COURT:  I think we will break at noon, but if you

21   want to break now, we can now too.

22            MS. CALL:  I think now is a good time.

23            THE COURT:  Ladies and gentlemen, we will go ahead and

24   break for lunch.  Keep the admonitions in mind.  It's a little

25   bit colder outside today, so if you go outside, try to keep

Brandon Campbell - Cross

1    those yellow juror buttons visible.  And keep the admonitions

2    in mind.  Don't start talking about the case amongst

3    yourselves, of course.  The jury is excused.  We will reconvene

4    at 1:30.

5            (Jury excused.)

6            Mr. Campbell, you are excused until 1:30.  Thank you

7    very much.

8            All right.  My law clerk, Ms. Butler, will pass out

9    the draft of the jury instructions.  I have two copies for each

10   party, so those will be distributed.  Keep in mind the

11   following.  If you see words in brackets and bold within a

12   given instruction, it doesn't mean that we're going to give

13   that to the jury in that form.  Rather, it just simply means

14   it's something that we need to determine whether it happens or

15   not and therefore is a reminder to change it to conform to

16   whatever the evidence is.

17           Also keep in mind that the headings will not go back

18   to the jury.  The headings will be excluded, as well as the

19   footnotes.  The footnotes won't go back to the jury, of course,

20   either, all right?  So as I said, we will talk about these

21   tonight, but I wanted to give them to you so at least you might

22   have a chance to look over them during the lunch hour.

23           Anything else that we should take up at this time

24   before we break?

25           Mr. Tubach.

Brandon Campbell - Cross

1        MR. TUBACH:  Very briefly, Your Honor, what is the

2   Court thinking in terms of timing for closing arguments as well

3   as the length of time we might have?

4        THE COURT:  Those are all things that are coming up

5   now.  I didn't really have a chance to think it through because

6   I didn't know how long the government's rebuttal case may last

7   and I am not sure how -- to what extent we are on track for the

8   defense case ending today, but we obviously need to make sure

9   that the jury instructions are finalized.

10       So one thing that you should think about is how long

11  you think that process may last.  We aren't going to stay

12  particularly late tonight because the security guards basically

13  want us out of here, so one possibility would be if the

14  evidence all concludes but we haven't finalized the jury

15  instructions, we may need to tell the jurors not to come back

16  first thing or dismiss them early or something like that.  Then

17  we will get a much better sense of when everything is done and

18  if the jury instructions are done when we can start closings.

19  And then depending on how much time we have, we can figure out

20  how much time for closings.

21       So I am not sure if people have had an opportunity to

22  think about that yet, but it's something that we should think

23  about.  Obviously, doing the math -- this is what I was talking

24  about with the openings -- if we have half an hour and 10

25  defendants, we have five straight hours of openings.  And

Brandon Campbell - Cross

1    depending on what the request is for closings, that multiple is

2    a lot.  So it's something to think about.  I don't know if

3    you've had a chance to talk among the other defendants,

4    Mr. Tubach, on what your proposal is, but I would be interested

5    in that at this time if you have a suggestion.

6            MR. TUBACH:  I do, Your Honor.  We have discussed it

7    and I think we collectively would ask for 45 minutes each.

8            THE COURT:  And Mr. Pollack, usually Mr. Tubach is the

9    one that hands up the note to someone.

10           MR. TUBACH:  But I have a prerogative not to respond

11   to this one.

12           MR. POLLACK:  There is no math involved here, so I

13   didn't have to defer to Mr. Tubach.

14           MR. TUBACH:  We do think 45 minutes, Your Honor.

15           THE COURT:  Government's reaction to that?

16           MS. CALL:  I think that sounds fine, Your Honor.  In

17   terms of the government's time, I think we would estimate, and

18   obviously we have closing and rebuttal, but probably a total of

19   five.  And that would be in response to the eight, I think,

20   hours of defense closing, so I think probably the split would

21   be about four hours of closing and up to an hour of rebuttal --

22   sorry, not rebuttal -- yeah, rebuttal, but likely not that

23   long.

24           THE COURT:  I didn't quite understand that.  So

25   collectively how much time is the government asking for?

4331
Brandon Campbell - Cross

1              MS. CALL:  Five hours.

2              THE COURT:  Five hours?

3              MS. CALL:  Uh-huh.

4              THE COURT:  That seems grossly excessive I hate to

5    tell you.  That's a long, long, long time.  I will take it into

6    account and go ahead with what you think.

7              MS. CALL:  Respectfully, Your Honor, if the defendants

8    each take 45 minutes, the government does have to address the

9    case as to each particular defendant which will take some time,

10   so I think that a four-hour closing which then followed by

11   eight hours of defense closing does seem like an appropriate

12   balance.

13             THE COURT:  We don't have to kick this around too much

14   more, but Ms. Prewitt, I will let you get in a quick word and

15   then I will hear from Mr. Byrne.  Go ahead.

16             MS. PREWITT:  The government made a choice not to put

17   on substantive witnesses in this case.  And what they are

18   trying to do is what they are doing with the summary charts,

19   which is an end run around that at a point where we can't

20   confront it.  That is exactly what they are trying to do here.

21   It's excessive in terms of time, but it really speaks to how

22   they presented this case.  To have that amount of time in

23   argument, they could have done it through witnesses.  They

24   could have done it through evidence, and they chose not to.

25             THE COURT:  Mr. Byrne?

Brandon Campbell - Cross

1          MR. BYRNE:  Mine was more of a mathematical thing.  If

2     they do get more time -- we were actually thinking they would

3     get an hour and a half hour for rebuttal, but I think we would

4     want more time if they got -- more time than the 45 minutes,

5     but I don't know if I am speaking for everyone.

6          THE COURT:  Let me just warn everyone, there is

7     definitely a cost benefit to this.  I guarantee you the jury --

8     this is not that -- now, there are some moving parts and there

9     is no doubt about that and everyone will want to put things in

10    perspective, but, you know, you'll have people day dreaming if

11    it goes on for too long, you really will.  So I will take it

12    into account.  We will talk about it later.

13          Right now, though, we will break for lunch until 1:30,

14    all right?

15        (Recess at 12:06 p.m.)

16        (Reconvened at 1:32 p.m.)

17          THE COURT:  All right.  Maybe we can get our witness

18    back.  And in the meantime we can go ahead and get the jury.

19          Mr. Campbell, if you don't mind, you can just go back

20    up by the witness stand.  The jury will be in in just a moment.

21          Go ahead, Ms. Call.

22          MS. CALL:  Thank you.

23    BY MS. CALL:

24    Q.  Good afternoon, Mr. Campbell.

25    A.  Good afternoon.

4333

Brandon Campbell - Cross

1    Q.  I think just before we broke for lunch we very briefly

2    mentioned shortages.  Let me just ask you this.  In your

3    pricing role at Tyson --

4           MR. GILLEN:  Objection, Your Honor, outside the scope.

5    I think we already had a ruling on that.

6           THE COURT:  Let's hear the question first.  Go ahead.

7    BY MS. CALL:

8    Q.  In your pricing role at Tyson, you didn't use information

9    gathered from your sales to competitors to determine your

10   pricing, did you?

11          MR. GILLEN:  It's outside the scope, Your Honor.  She

12   began the question with shortages which was not part of the

13   direct.

14          THE COURT:  Overruled.

15   BY MS. CALL:

16   Q.  You can answer, Mr. Campbell.

17   A.  Did I consider shortages in my pricing?  I want to make

18   sure I understand that question properly.

19   Q.  Did you consider information learned from those shortages?

20   A.  No, I did not.

21   Q.  Thank you.  If we could go back to that negotiation process

22   for a customer like KFC.  So once you finalize the pricing

23   model, that would get sent to the sales team, correct?

24   A.  Yes.  Once the pricing model was finalized, it would be

25   sent to the sales team, correct.

Brandon Campbell - Cross

1   Q.  And Defendant Mulrenin, he was in the sales team?

2   A.  Mulrenin was on the sales team, correct.

3   Q.  And Defendant Brian Roberts was in the sale team?

4   A.  Yes, Brian Roberts was in the sales team.

5   Q.  Was there a man named Carl Pepper in the sales team as

6   well?

7   A.  Yes, Carl Pepper was part of the sales team.

8   Q.  So the three of them, they were in the same group?

9   A.  Yes, they were.

10  Q.  Was Brian Roberts a supervisor in that group?

11  A.  Yes, he was a supervisor.

12  Q.  And Timothy Mulrenin, did he hold a higher position than

13  Carl Pepper in that group?

14  A.  Yes, he held a higher role than Carl.

15  Q.  Now, back to the actual negotiations that we've talked

16  about roles.  Sales, they were the ones interfacing with the

17  customer, correct?

18  A.  Yes, that's correct.

19  Q.  You weren't in meetings with the customer, correct?

20  A.  Not to my knowledge.  I don't remember any meetings that I

21  was in with the customer.

22  Q.  And you weren't on -- take a moment if you need it.

23  A.  Sorry.  Excuse me.

24  Q.  You weren't on calls between the sales team and the

25  customers?

Brandon Campbell - Cross

 1 | A.  No, I was not.

 2 | Q.  All right.  So when you came up with a pricing model, sales

 3 | would take that and go out and get that price.  That was their

 4 | job?

 5 | A.  Yes.  Their job was to communicate that pricing model and

 6 | secure it with the customer.

 7 | Q.  And for a customer like KFC, that process usually involves

 8 | several rounds of negotiations, correct?

 9 | A.  Yes, that is correct.

10 | Q.  And in that process would you agree with me that a customer

11 | like KFC, that they would typically ask to lower pricing during

12 | negotiations?

13 | A.  In most -- yes.  In most instances that I can remember the

14 | customer would always want to come back and lower the price to

15 | some extent.

16 | Q.  Can you remember any instance where they asked to increase

17 | the price?

18 | A.  Not to my knowledge, I can't remember of any.

19 | Q.  And would you agree with me that sales' role in this

20 | process was to get as high a price as possible as they could

21 | for Tyson Foods; is that correct?

22 | A.  Their role was to achieve the pricing that was given to

23 | them, to accomplish that price.

24 | Q.  Okay.  So was that a yes?

25 | A.  Well, the way you worded it, said the highest price

Brandon Campbell - Cross

1    possible.  I just want to clarify the price that was given to

2    them is what they were trying to get, yes.

3    Q.   Okay.  Thank you.  Now, is it also your understanding that

4    the sales team, that their performance was tied to the volume

5    that they could get with those customers?

6    A.   That's my understanding.  I wasn't directly responsible for

7    their performance, but volume is what the overall sentiment in

8    the group was, if they accomplished it or not.

9    Q.   But like we said, in those negotiations you weren't in

10   their interactions with the customers.

11   A.   That's correct.

12   Q.   And you didn't even work at the same campus as Mr. Brian

13   Roberts or Mr. Mulrenin, did you?

14   A.   No, I did not.

15   Q.   And when they had calls with their competitors, you weren't

16   on those phone calls, were you?

17   A.   I am not aware of those phone calls taking place, but I

18   wasn't on any phone call like that.

19   Q.   Okay.  Let's talk specifically about 2014.  On direct

20   examination you testified a bit about the price increases that

21   Tyson achieved with fast-food customers in 2014?

22   A.   Yes.

23   Q.   And those price increases, they were fairly significant; is

24   that correct?

25   A.   Yes, I would say they were significant increases.

4337

Brandon Campbell - Cross

1   Q.  And because they were significant, would you agree with me

2   that there was a risk that Tyson would lose business to its

3   competitors?

4   A.  Yes, that was a risk with that large of a price increase.

5   Q.  And you testified on direct about a 19-cent increase that

6   you proposed back in June of 2014; is that right?

7   A.  Yes, that is correct.

8   Q.  All right.  And then all the way -- months later into

9   September, I think you were shown a document showing a 19-cent

10  increase around that time period as well?

11  A.  Yes, that's correct.

12  Q.  So in those multiple rounds of negotiations with KFC, the

13  increase Tyson was proposing stayed just about the same, right?

14  A.  Yes, that's correct.

15  Q.  All right.  Now, I think we talked about calls with

16  customers, calls with competitors.  You weren't there for any

17  face-to-face meetings that Defendant Brian Roberts had with

18  competitors, were you?

19  A.  I am not aware of those meetings taking place, but if they

20  did take place, no, I was not a part of those.

21  Q.  And so kind of to recap your testimony, so from June to

22  September in 2014, Tyson got that exact 19-cent price increase

23  that you first proposed after rounds of negotiations, right?

24  A.  I think the numbers were 19.31 versus 19, but yes, fairly

25  close.

Brandon Campbell - Redirect

1    *Q.* And at the end of the day, you really just don't know

2    exactly what steps Defendant Brian and Defendant Roberts took

3    to make sure that they could get that price increase from the

4    customer; is that correct?

5    *A.* I was not involved in those communications directly to the

6    customer, so I can't speak to those.

7         *MS. CALL:* Thank you. No further questions.

8         *THE COURT:* Thank you.

9         Redirect?

10                    **REDIRECT EXAMINATION**

11   *BY MR. GILLEN:*

12   *Q.* A few follow-up questions.

13        You were asked on cross-examination whether or not

14   there were occasions when you would meet with sales. And I

15   believe you indicated after your model was created by you, you

16   would meet with sales, correct?

17   *A.* After I had met with the business unit, yes.

18   *Q.* So after the business unit and the pricing unit agreed on

19   the model and the price, that's when you met with sales,

20   correct?

21        *MS. CALL:* Objection, leading.

22        *THE COURT:* Overruled.

23   *A.* Yes. It's whenever we would engage with sales once we

24   already had the model created and we knew what we were trying

25   to accomplish as a business.

Brandon Campbell - Redirect

1    *BY MR. GILLEN:*

2    Q.  And you indicated on cross-examination you were asked

3    whether there were occasions when you would give the sales team

4    a range, a small range.  Do you remember that on

5    cross-examination?

6    A.  Yes, I do.

7    Q.  That didn't happen with the KFC contract and negotiations

8    in 2014, did it?

9         *MS. CALL:*  Objection, leading.

10        *THE COURT:*  Overruled.

11   A.  No, that did not.

12   *BY MR. GILLEN:*

13   Q.  You gave them exactly what the pricing unit wanted and the

14   business unit wanted, correct?

15   A.  Yes, that is correct.

16   Q.  And their job was to go to KFC and to present it in a way

17   that it could try to close the deal, right?

18   A.  Yes.  It was their job to take that and to communicate it

19   and to close the deal to secure the price increase.

20   Q.  Any push-back from KFC would ultimately come back to you;

21   is that correct?

22   A.  Yes, that is correct.

23   Q.  And then if there were -- so when counsel just asked you

24   about negotiations, were the sales team really involved in

25   negotiations or in message passing back to you from KFC if that

Brandon Campbell - Redirect

1    were the case?

2    *A.*   KFC specifically?

3    *Q.*   Yes, KFC.

4    *A.*   KFC specifically, no, they would communicate the message

5    back to me and to the business unit.

6    *Q.*   So they weren't in the job of negotiating.  They were in

7    the job of message delivering, right?

8    *A.*   They were delivering the message.  And as KFC or a customer

9    would push back, then they would come back with that

10   information that we would then regroup between the business

11   unit and the pricing group.

12   *Q.*   And you were discussing about the job that the sales team

13   had and that they were to get the price given to them; is that

14   right?

15   *A.*   Yes.  Their job was to accomplish the price increase that

16   was given.

17   *Q.*   And that price in the KFC negotiations, that was formulated

18   by you with the business unit and given to sales to deliver the

19   message, right?

20   *A.*   Yes, that is correct.

21          *MR. GILLEN:*  No further questions, Your Honor.

22          *THE COURT:*  All right.  Thank you.

23          Is Mr. Campbell subject to recall?

24          *MS. CALL:*  No, Your Honor.

25          *THE COURT:*  Okay.  Thank you very much.  You are

4341
Brandon Campbell - Redirect

1    excused.

2              THE WITNESS:  Thank you.

3              THE COURT:  Defendants may call their next witness.

4         MR. POLLACK:  Thank you, Your Honor.  Mr. Blake calls

5    Brenda Ray.

6              MR. KOENIG:  Can we have a quick side bar?

7              THE COURT:  Yes.  If we can, why don't we hold up

8    Ms. Ray for just a minute and we will have our side bar.  I

9    think we were going to have Ms. Ray hold off for just a second

10   and we were going to do the side bar first.  That's what we

11   were trying to do.

12        (At the bench:)

13             THE COURT:  Mr. Koenig, go ahead.

14        MR. KOENIG:  Sure.  As Your Honor may remember,

15   Ms. Ray was determined to not have been compliant with the Plea

16   Agreement.  We agreed to give her an immunity letter if and

17   when she was called.  We have the letter.  We haven't executed

18   it because we wanted to wait to see if she was actually called.

19   I don't know how we want to do this, whether we want to just

20   execute it now and give it to her lawyer or the government will

21   definitely do that and we can do it afterwards.

22             THE COURT:  Has her attorney or Mr. Pollack for that

23   matter seen a copy of the letter that you intend to sign,

24   Mr. Koenig?

25             MR. KOENIG:  Yes.  I e-mailed it to them over the

Brandon Campbell - Redirect

 1 | weekend.

 2 |     THE COURT:  Okay.  Mr. Pollack, assuming that

 3 | Mr. Koenig then executes that letter, would you be prepared to

 4 | go forward?

 5 |     MR. POLLACK:  Yes, Your Honor.  And I don't take a

 6 | position one way or the other whether it needs to be executed

 7 | in advance of the testimony.  It's really between Mr. Koenig

 8 | and Ms. Ray's counsel, but I think he may have an interest in

 9 | having the executed letter in hand.

10 |     THE COURT:  Do we have an extra headset that we can

11 | supply Mister -- sorry, to Ms. Ray's attorney?

12 |     MR. POLLACK:  Mr. Rice, Your Honor.

13 |     THE COURT:  His name is Mr. Rice?

14 |     Mr. Rice, can you hear me?

15 |     MR. RICE:  I can, Your Honor.

16 |     THE COURT:  Mr. Rice, Mr. Koenig from the government

17 | just mentioned that he had e-mailed a draft immunity letter to

18 | you over the weekend regarding Ms. Ray.  He also indicated to

19 | me that he intends, given the fact that Ms. Ray is being

20 | called, to sign that particular letter.  Have you had a chance

21 | to see that letter, Mr. Rice?

22 |     MR. RICE:  I have, Your Honor, and that was my

23 | understanding, that we would get the signed letter.

24 |     THE COURT:  Okay.  And assuming that the letter is

25 | signed, which I think Mr. Koenig is about ready to do, does

Brandon Campbell - Redirect

1    that satisfy your concerns regarding immunity assuming that you

2    have some?

3              MR. RICE:  Yes, it does, Your Honor.

4              THE COURT:  Okay.

5              MR. FAGG:  Your Honor, very briefly, may I be heard on

6    this?

7              THE COURT:  Yes.  Mr. Fagg, go ahead.

8              MR. FAGG:  Thank you, Your Honor.  Maybe by way of

9    optics, I think it would make sense or we would request that

10   perhaps Mr. Koenig step outside of the courtroom to provide

11   that to Mr. Rice just so that there isn't some theater of

12   Mr. Rice being handed some mysterious document in front of the

13   jury.

14             THE COURT:  Yeah, I think if we can pull that off,

15   that might be a good way to do it.  Do you have a suggestion

16   how to do that, Mr. Koenig?  Maybe have one of your paralegals

17   come up to the table after you execute it and that person goes

18   out of the room and we just don't have an actual document

19   transfer?  Would that work?

20             MR. KOENIG:  Yeah.  We will hand it to Ms. Pearce.

21   The one thing I will say and the reason I keep looking back is

22   Ms. Sipperly also has to be the signatory, so I think.

23   Ms. Pearce can take the document to Ms. Sipperly, she can sign

24   it, and they can go give it out in the hallway.

25             THE COURT:  Does that satisfy your concern, Mr. Fagg?

Brenda Ray - Direct

1          MR. FAGG:  Yes, Your Honor.  Thank you.

2          THE COURT:  Anything else, Mr. Pollack on that?

3          MR. POLLACK:  No, Your Honor.  I am not intending to

4  raise the issue of immunity with the witness at all.  I assume

5  that the same is true for the government.  And the Court is not

6  going to be offering any commentary or instructions --

7          THE COURT:  No.

8          MR. POLLACK:  -- in that regard?

9          THE COURT:  Unless it comes up.  But obviously

10 Mr. Rice has an interest in making sure that there is a signed

11 letter, so we will make sure that that happens, then.

12          Okay.  Thank you very much, Mr. Rice.

13          MR. RICE:  Thank you, Your Honor.

14      (**Brenda Ray** was sworn.)

15          THE WITNESS:  I do.

16          COURT DEPUTY CLERK:  Please state your name and spell

17 your first and last name for the record.

18          THE WITNESS:  Brenda Ray, B-R-E-N-D-A, R-A-Y.

19                    **DIRECT EXAMINATION**

20 BY MR. POLLACK:

21 Q.  Ms. Ray, my name is Barry Pollack.  I represent Ric Blake.

22 I want to thank you for coming in.  I have just very few

23 questions for you.

24          Just to orient ourselves, I am going to be asking you

25 about something that occurred in August of 2012.  Where were

Brenda Ray - Direct

1   you employed in August of 2012?

2   *A.* Pilgrim's.

3        *MR. POLLACK:* Your Honor, I would like to publish to

4   the jury Government Exhibit 6198, which the government has

5   already introduced into evidence.

6        *THE COURT:* Yes, you may.

7   *BY MR. POLLACK:*

8   *Q.* And Ms. Ray, if you can either pull the microphone back or

9   get a little bit closer to it so everybody can hear you.

10       Can you see what's on the screen which is a document

11  that has been admitted into evidence as Government

12  Exhibit 6198?

13  *A.* Yes.

14       *MR. POLLACK:* Okay. And what I would like to do,

15  Brian, if we can, scroll to the bottom because this is an

16  e-mail chain, so I want to start with the first e-mail at the

17  bottom.

18  *BY MR. POLLACK:*

19  *Q.* Ms. Ray, this is an e-mail that you wrote, correct?

20  *A.* Yes.

21  *Q.* And the date of this e-mail is August 31st, 2012; is that

22  right?

23  *A.* Yes.

24  *Q.* And in the e-mail you say, "I received a call today from a

25  friendly competitor telling me it's all over the market that

Brenda Ray - Direct

1    Pilgrim's is taking contract pricing up."

2           Is that the first sentence there?

3           *MR. KOENIG:*  Objection, leading.

4           *THE COURT:*  He just called it to her attention.

5    Overruled.

6    *A.*  Yes.

7    *BY MR. POLLACK:*

8    *Q.*  And you are passing that information on to a number of

9    people, Mr. Alsberg, Mr. Joyner, Mr. Pate, Mr. Kasmier and

10   Justice.  Are those -- where do those people work or did they

11   work at that time?

12   *A.*  At Pilgrim's.

13   *Q.*  Okay.  So this is entirely an internal Pilgrim's

14   communication from you, as a Pilgrim's employee, to other

15   Pilgrim's employees?

16   *A.*  Correct.

17   *Q.*  And if we can scroll up to the next e-mail, one of the

18   recipients of the e-mail, of your e-mail, Mr. Pate, responds to

19   you.  Do you see that?

20   *A.*  Yes.

21   *Q.*  And Mr. Pate says.  "Thanks, who would that friendly

22   competitor be?"

23          And then did you respond to that question that

24   Mr. Pate posed?

25   *A.*  Yes.

Brenda Ray - Direct

1    *Q.* And if we can scroll up to the next e-mail, we have your

2    response. And you said, "George's," correct?

3    *A.* Correct.

4    *Q.* Who was it at George's who had called you to tell you that

5    it was all over the marketplace that Pilgrim's is taking

6    contract price up?

7    *A.* Greg Nelson.

8    *Q.* I am sorry, can you say that --

9    *A.* Greg Nelson.

10   *Q.* Greg Nelson. That was an employee of George's?

11   *A.* Correct.

12   *Q.* It was not Mr. Blake that you spoke to?

13   *A.* No.

14   *Q.* Did you know Mr. Blake?

15   *A.* I do not.

16   *Q.* And in July of this year, were you interviewed by the

17   prosecutors in this case?

18   *A.* Yes.

19   *Q.* And when you were interviewed by the prosecutors in this

20   case, did you tell them that the person at George's you spoke

21   to was Greg Nelson and that you did not know Mr. Blake?

22   *A.* Yes, I did.

23          *MR. POLLACK:* Thank you, Ms. Ray. I don't have any

24   other questions.

25          *THE COURT:* Thank you, Mr. Pollack.

Brenda Ray - Cross

1              Additional cross-examination?

2              Mr. Tubach, go ahead.

3                        **CROSS-EXAMINATION**

4    *BY MR. TUBACH:*

5    *Q.* Good afternoon, Ms. Ray.

6    *A.* Hello.

7    *Q.* My name is Michael Tubach.  I represent Jayson Penn.  I

8    just have a couple questions for you.

9              The e-mail that you wrote that's in Government

10   Exhibit 6198, this e-mail summarizes a phone call that you had

11   with Greg Nelson at George's, correct?

12   *A.* Yes.

13   *Q.* And he called you, right?

14   *A.* Yes.

15   *Q.* Your e-mail mentioned that Pilgrim's had taken up contract

16   pricing.  To what market or customer did that relate?

17   *A.* The northeast hallal market, the entire market in the

18   northeast.

19   *Q.* Northeast hallal?

20   *A.* It would be hallal, yes.

21   *Q.* Was Mr. Penn involved in any way in that decision to

22   increase that contract price?

23              *MR. KOENIG:* Objection, scope.

24              *MR. TUBACH:* I am asking about the e-mail that has

25   been subject of direct.

Brenda Ray - Cross

1          *THE COURT:*  Overruled.

2     *A.*  No.

3     *BY MR. TUBACH:*

4     *Q.*  In this conversation with Mr. Nelson, did you agree with

5     him in any way about increasing prices?

6     *A.*  No.

7     *Q.*  Was this conversation part of an agreement to fix prices?

8     *A.*  No.

9     *Q.*  Was it part of an agreement to rig bids?

10    *A.*  I am sorry?

11    *Q.*  Was it part of an agreement to rig a bid of any kind?

12    *A.*  No, sir.

13    *Q.*  And you sent this e-mail to people who basically worked on

14    your team; is that correct?

15    *A.*  That is correct.

16    *Q.*  You copied Jayson Penn?

17    *A.*  Correct.

18    *Q.*  Did you have any concerns at the time you wrote this e-mail

19    at all about whether there was anything illegal about your

20    conversation with Greg Nelson?

21    *A.*  No.  I considered it market intelligence.

22    *Q.*  Now, you were interviewed by the government lawyers as I

23    think Mr. Pollack elicited in July of this year, correct?

24    *A.*  Yes.

25    *Q.*  And they had never interviewed you before then, right?

Brenda Ray - Cross

1    A.   No.

2    Q.   And they showed you this e-mail and asked you questions

3    about it, right?

4    A.   Yes.

5    Q.   And they never contacted you about being a witness in this

6    trial, did they?

7    A.   No.

8          MR. TUBACH:   Thank you, ma'am.  I have no further

9    questions.

10         THE COURT:   Thank you.

11         Additional cross-examination by defendants?

12         All right.   Cross-examination by the United States?

13         MR. KOENIG:   Can we pull up the document again,

14   please?  Can we blow up the bottom e-mail, the original, and

15   publish it to the jury, please?

16         THE COURT:   You may.

17         MR. KOENIG:   The bottom e-mail, please.   There you go.

18                         **CROSS-EXAMINATION**

19   BY MR. KOENIG:

20   Q.   Ms. Ray, you were just asked if Jayson Penn had anything to

21   do with the pricing that was at issue here.   Do you remember

22   that?

23   A.   Yes.

24   Q.   And you said he didn't, correct?

25   A.   That is correct.

Brenda Ray - Cross

1    Q.   But you copied him on the e-mail anyway.

2    A.   That's correct.

3    Q.   Ms. Ray, was George's a competitor of Pilgrim's at that

4    time?

5    A.   They were.

6    Q.   And you were in communication with a competitor, then,

7    correct?

8    A.   That's correct.

9    Q.   And you were in communication about raising prices with a

10   competitor, weren't you?

11   A.   That's not correct.

12   Q.   Well, if we could just blow up the words -- you said, "I

13   received a call today from a friendly competitor;" is that

14   right?

15   A.   That is correct.

16   Q.   You wrote those words?

17   A.   Yes, I did.

18   Q.   Thanking us for taking the lead -- I am sorry, I skipped --

19   "telling me it's all over the market that Pilgrim's is taking

20   contract pricing up."

21            Are those your words?

22   A.   That's correct.

23   Q.   So you were in contact with a competitor about raising

24   prices.

25   A.   I was listening to a competitor tell me that it was in the

4352

Brenda Ray - Cross

1    marketplace that Pilgrim's was taking pricing up.

2    Q.  So it's a yes.

3    A.  If that's -- yes, then I guess that that's considered

4    discussing and in contact with.

5    Q.  The discussion was also that George's was going to follow,

6    correct?

7    A.  That's what I was told.

8    Q.  So Pilgrim's and George's taking prices up together.

9    A.  No.  Pilgrim's had taken a price increase in the

10   marketplace.  And the gentleman at George's indicated that

11   that's what he was hearing from the marketplace.  Pilgrim's had

12   already taken pricing up.  And the gentleman from George's was

13   saying, "That's what we're hearing," and then indicated they

14   were going to do the same.

15   Q.  So George's and Pilgrim's within the same relative time

16   period were taking prices up.

17   A.  I can't tell you specifically when Pilgrim's took the

18   pricing up, sir.  It was in 2012.  But we did take a price

19   increase.  And George's -- Greg Nelson at George's did call me

20   and say that it was in the marketplace that we took those

21   prices up and that they were going to do the same.

22          MR. KOENIG:  No further questions.

23          THE COURT:  Thank you.

24          Redirect?

25          MR. POLLACK:  Not on behalf of Mr. Blake.  Thank you,

1    Your Honor.

2            *MR. TUBACH:*  No, Your Honor.  Thank you.

3            *THE COURT:*  Ms. Ray, you are excused.  Thank you very

4    much.

5            *THE WITNESS:*  You are welcome.

6            *THE COURT:*  Defendants may call their next witness.

7            Ms. Johnson?

8            *MS. JOHNSON:*  Thank you, Your Honor.  Mr. Blake calls

9    Julie Lawrence.

10       (**Julie Lawrence** was sworn.)

11           *THE WITNESS:*  Yes.

12           *COURT DEPUTY CLERK:*  Please state your name and spell

13   your first and last name for the record.

14           *THE WITNESS:*  Julie Lawrence, J-U-L-I-E,

15   L-A-W-R-E-N-C-E.

16                    **DIRECT EXAMINATION**

17   *BY MS. JOHNSON:*

18   *Q.*  Good afternoon, Ms. Lawrence.

19   *A.*  Good afternoon.

20   *Q.*  This is the first time we have met in person; is that

21   correct?

22   *A.*  That is correct.

23   *Q.*  It's nice to meet you.  We have spoken on the phone one

24   time; is that right?

25   *A.*  Yes.

Julie Lawrence - Direct

1    Q.  Can you tell the jury where you are employed.

2    A.  I am employed at George's in Springdale, Arkansas.

3    Q.  And how long have you been employed at George's?

4    A.  Since March of 2018.

5    Q.  Please tell the jury a little bit about what your job title

6    and what your job description is.

7    A.  My title is director of talent management, so I oversee

8    recruitment, advertising, performance management, career

9    development, succession planning.

10   Q.  There is a term commonly known as HR or human resources.

11   Would you be part of that general group at George's?

12   A.  Yes.

13   Q.  And are you familiar with a computer system or program used

14   by George's for HR recordkeeping?

15   A.  Yes.

16   Q.  And what is that system called?

17   A.  Lawson.

18   Q.  L-A-W-S-O-N?

19   A.  Yes.

20   Q.  What kinds of records does it keep?

21   A.  It holds payroll records, employee data information,

22   vacation accruals, benefit information.

23   Q.  Has the system been updated since you've been with the

24   company?

25   A.  It was updated towards the end of 2018, so yes.  I was

4355

Julie Lawrence - Direct

1    there when it was updated.

2    Q.  Are you familiar with the old system?

3    A.  Yes.

4    Q.  Was it still Lawson?

5    A.  Yes.

6    Q.  Just an upgrade in '18?

7    A.  Correct.

8    Q.  Are the records that are kept in Lawson made during the

9    ordinary course of George's business?

10   A.  Yes.

11   Q.  And the records, are they made at or near the time of the

12   occurrence or event which they relate to?

13   A.  Yes.

14   Q.  And are they relied on by the company George's as true and

15   accurate records of the company, to the best of your knowledge?

16   A.  Yes.

17   Q.  Ms. Lawrence, recently were you or someone in your

18   department asked to search for a vacation record involving

19   Mr. Ric Blake for a specific day or week?

20   A.  Yes.

21   Q.  And what did you do in response to that request?

22   A.  When I received the request, I reached out to our Lawson

23   administrator.  She pulled the information.  I sent it on.  And

24   then I later went back in the system and verified the

25   information.

Julie Lawrence - Direct

1  *Q.* At this time I am going to show you what's been marked for

2  the purposes of identification as Defendant's Exhibit I-338.

3  It's a one-page document. And I know it's a little dull on the

4  screen. Are you able to see that record?

5  *A.* Yes.

6  *Q.* And what is this record?

7  *A.* This is a screen-shot out of Lawson and so it shows

8  vacation information on Mr. Blake.

9  *Q.* Now, I believe you just testified that once you received

10  this, you went back to the system and verified it. Can you

11  tell us what you did?

12  *A.* Yes. I logged into the Lawson system myself and pulled up

13  those dates and looked to make sure that the information was

14  accurate.

15  *Q.* And the document on the screen, is it a true and correct

16  copy of the HR record you pulled from the George's Lawson

17  system or you verified from the Lawson system I should say?

18  *A.* Yes, it is, correct.

19        *MS. JOHNSON:* Your Honor, we move to introduce Defense

20  Exhibit I-338.

21        *THE COURT:* Any objection to the admission of I-338?

22        *MR. KOENIG:* No objection.

23        *MS. JOHNSON:* Your Honor, may we publish to the jury?

24        *THE COURT:* I have got to admit it first.

25        *MS. JOHNSON:* I am sorry.

Julie Lawrence - Direct

1        THE COURT:  I-338 is admitted.  Now you can.

2        MS. JOHNSON:  My apologies, Your Honor.

3        THE COURT:  That's all right.

4   BY MS. JOHNSON:

5   Q.  On the bottom of this document, Ms. Lawrence, what does the

6   information tell you?

7   A.  So you have the date on the very left-hand side.  That's

8   the date that it was keyed into the system.  The type, ME

9   stands for manual entry.  That means somebody manually keyed it

10  in.  Status, the C means completed.  So it's been processed.

11  It's not a pending occurrence.  And then the description, those

12  are the dates Mr. Blake took and then the initials of the

13  payroll manager who keyed it in.

14  Q.  And I believe there is two dates that Mr. Blake took

15  vacation; is that correct?

16  A.  Yes.

17  Q.  Specifically with regard to the second date, can you read

18  those dates off?

19  A.  Yes, August 18, 2014 through August 22nd, 2014.

20  Q.  And then over on the right-hand side, does it appear that

21  40 hours of leave or vacation were deleted from Mr. Blake's

22  account?

23  A.  Yes.

24  Q.  And that -- does that equate to the C which means

25  completed?

Rhonda Warble - Direct

1    A.  Correct.

2           MS. JOHNSON:  Your Honor, I have no further questions.

3    Thank you.

4           THE COURT:  All right.  Thank you.

5           Cross-examination by defendants?

6           All right.  Cross-examination by the United States?

7           MR. KOENIG:  Nothing.

8           THE COURT:  Thank you very much, Ms. Lawrence.  You

9    are excused.

10          THE WITNESS:  Thank you.

11          THE COURT:  Defendants may call their next witness.

12          MS. JOHNSON:  Your Honor, Mr. Blake calls Rhonda

13   Warble.

14       (**Rhonda Warble** was sworn.)

15          THE WITNESS:  Yes.

16          COURT DEPUTY CLERK:  Please state your name and spell

17   your first and last name for the record.

18          THE WITNESS:  Rhonda Warble, R-H-O-N-D-A, W-A-R-B-L-E.

19                        **DIRECT EXAMINATION**

20   BY MS. JOHNSON:

21   Q.  Thank you, Ms. Warble, and good afternoon.

22   A.  Good afternoon.

23   Q.  You and I met yesterday or last night; is that correct?

24   A.  Yes.

25   Q.  And that's the first time we have met in person?

4359
                    Rhonda Warble - Direct

1   A.   Yes.

2   Q.   We've talked on the phone prior to that I believe once,

    maybe twice; is that correct?

4   A.   Yes.

5   Q.   And thank you for being here.

6        Please tell the jury where you are employed.

7   A.   George's Foods.

8   Q.   And in what location?

9   A.   Harrisonburg, Virginia.

10  Q.   And how long have you worked at George's?

11  A.   25 years.

12  Q.   What is your current title and tell us what your job

13  description is.

14  A.   Production planning manager, and I work in the supply chain

15  group.

16  Q.   So for those of us that don't work at a chicken supply

17  company, what do you do on a daily basis?

18  A.   It's my job to make sure that we cover customer orders.

19  Q.   With chicken, I assume.

20  A.   Correct, yes.

21  Q.   And do you know Mr. Ric Blake?

22  A.   Yes.

23  Q.   Did you work with Mr. Blake when he worked at George's?

24  A.   Yes.

25  Q.   And for how long did you work with Mr. Blake?

Rhonda Warble - Direct

1    A.  2001 until he retired.

2    Q.  Please tell the jury what your interaction was.  What did

3    your job require you to work with Mr. Blake, in what capacity?

4    A.  He was the national accounts manager.  And it was my job to

5    cover orders for his customers.  And if we were not able to

6    cover orders, then I would have to contact him and let him know

7    that we were going to be short and how he would want us to

8    proceed.

9    Q.  And that was my next question.  You are familiar with in

10   the industry shorts and covers?

11   A.  Yes.

12   Q.  And that's what you have just described.

13   A.  Yes.

14   Q.  So how would you typically find out -- explain to us how

15   you would find out if you were going to be short for particular

16   orders for customers.

17   A.  We would know based off of what size chicken we had coming

18   into the plant versus how our order quantity was.  So if our

19   orders were really high and our bird size was coming in, you

20   know, one way or the other depending on the customer, then we

21   would know if we were going to be able to meet the needs of the

22   order or not.

23   Q.  Okay.  I'm going to show you what's been marked as

24   Exhibit -- Defendant's Exhibit I-440.

25               Is that up on your screen?

4361
Rhonda Warble - Direct

1    A.   Yes.

2    Q.   Do you recognize this e-mail?

3    A.   Yes.  It has my name on it.

4    Q.   And did you receive this e-mail?

5    A.   Yes.

6    Q.   And in response to this e-mail, was it asking for you to

7    take some type of action?

8    A.   Yes.  It's telling me to -- or telling us --

9         MS. SWEENEY:  Objection.  She is reading a document

10   that's not in evidence.

11        THE COURT:  I am not sure that the witness is.

12   Overruled.

13   BY MS. JOHNSON:

14   Q.   What type of action were you going to take in response to

15   this e-mail?

16   A.   It's telling me to get on the phone the next day to see if

17   we could purchase some Popeye's so that we could cover an order

18   that looks like it must have been going to be short on.

19   Q.   And were you the only recipient of the e-mail?

20   A.   No.

21   Q.   Were others the recipient of this e-mail along with you?

22   A.   Yes.

23   Q.   Is this one example of how you come to know there are

24   shorts and what you need to do in response to it?

25   A.   Yes.

4362

Rhonda Warble - Direct

1    Q.   Okay.  So can you tell the jury sort of what the normal

2    process is.  If an ask comes in to you to buy chicken or you

3    are going to be short, tell the jury what you do as part of

4    your job responsibilities.

5    A.   I would call another chicken supplier to see if they had

6    any available chicken that we could purchase.  In this case, it

7    would have been Popeye's.

8    Q.   And who was one of the more common chicken suppliers that

9    you would call?

10   A.   Claxton.

11   Q.   And who was your contact person there?

12   A.   Scott Brady.

13   Q.   In situations like the one the e-mail is just describing or

14   you've just described to the jury involving shorts, covers,

15   having to call other suppliers, did that happen a lot during

16   your job?

17   A.   Yes.

18   Q.   Was it -- would you call it common or uncommon?

19   A.   Common.

20   Q.   Now, who else -- let's talk internally first.  Who else

21   would have participated in this situation where you were having

22   to cover shorts or reach out to other suppliers?

23   A.   Ric Blake, Darrell Keck, Greg Nelson were typically the

24   other three.

25   Q.   And just to explain to the jury, you've talked about

Rhonda Warble - Direct

1    Mr. Blake.  Who was Darrell Keck?

2    *A.*  He was at one time one of my supervisors.

3    *Q.*  Do you know -- if you don't that's fine -- but did you know

4    if he was also Mr. Blake's supervisor?

5    *A.*  Yes, I believe he was.

6    *Q.*  And similarly Greg Nelson, who was he?

7    *A.*  He was actually one of my supervisors also.

8    *Q.*  Okay.  Now, you told the jury you would get on the phone

9    and reach out to Mr. Brady at Claxton if you needed to cover a

10   short.  Did you have authority to make the purchase yourself?

11   *A.*  No.

12   *Q.*  And what would you do in response to -- the request to buy

13   chicken, who would you seek authority from?

14   *A.*  Either Ric Blake, Darrell Keck or Greg Nelson.

15   *Q.*  Okay.  Now, continue on with the process.  If you received

16   authority and you reached out to -- let's just say with Claxton

17   as the example.  At some point in the process did you learn the

18   pricing of the -- between you and Claxton the price of the

19   chicken that was being bought or sold?

20        *MS. SWEENEY:*  Objection, calls for hearsay.  And Your

21   Honor, if we may go on side bar.

22        *THE COURT:*  All right.

23      (At the bench:)

24        *THE COURT:*  Ms. Sweeney, go ahead.

25        *MS. SWEENEY:*  Yes, Your Honor.  From the documents the

4364

Rhonda Warble - Direct

1    government believes that the source of the pricing information

2    that Ms. Warble was asked about came from Defendant Brady which

3    would be hearsay that cannot be elicited by Defendant Blake.

4         THE COURT:  Ms. Johnson, what do you anticipate -- do

5    you anticipate that that is true, that the source of the

6    information is coming from a co-defendant?

7         MS. JOHNSON:  Your Honor, it is true the source of the

8    information about pricing comes from Mr. Brady on behalf of

9    Claxton.  We intend to introduce business records in the form

10   of purchase orders that contain that pricing information.  And

11   it's a business record and we are seeking to introduce them in

12   the ordinary course of business.

13        THE COURT:  Ms. Sweeney?

14        MS. SWEENEY:  Your Honor, the source of the

15   information, at least for the testimony that's being elicited,

16   would be from Mr. Brady.  I have not heard -- obviously, the

17   foundation is to the business records and what's on the

18   purchase orders themselves which may -- may or may not be

19   business records.  But in terms of the testimony that

20   Ms. Warble is -- the question is being asked, the government

21   believes it is based on hearsay.

22        THE COURT:  Well, it sounds like it may not be, but I

23   would ask Ms. Johnson to -- I will give her permission to lead

24   the witness just a little bit just so she doesn't accidentally

25   identify a person as opposed to a purchase order.

Rhonda Warble - Direct

1          *MS. JOHNSON:*  Thank you, Your Honor.

2      (In open court:)

3  *BY MS. JOHNSON:*

4  *Q.*  Now, back to our discussion about what you do when you have

5  to cover a short.  And I believe we were talking about you got

6  authority from someone else within George's to conduct the

7  sale.  And then you would receive information related to that

8  particular sale from Claxton; is that correct?

9  *A.*  Yes.

10  *Q.*  Would that involve the price for the particular

11  transaction?

12  *A.*  Yes.

13  *Q.*  Would it also involve case weights, for example?

14  *A.*  Yes.

15  *Q.*  Would it involve the specs, perhaps if it's -- what company

16  it's being sold for, for instance, KFC or Popeye's?

17  *A.*  Yes.

18  *Q.*  And once you got approval within your company and once the

19  details were worked out, would you then issue a purchase order

20  for that transaction?

21  *A.*  Yes.

22  *Q.*  I am going to show you, ma'am, what's been marked as

23  Defense Exhibit I-448.

24          Do you recognize this document?

25  *A.*  Yes.

Rhonda Warble - Direct

1    Q.  And what is this?

2    A.  This is the purchase order for a load of Popeye's that I

3    purchased from Claxton.

4    Q.  Okay.  And is your signature on the bottom of this

5    document?

6    A.  Yes.

7    Q.  And did you create or fill out the information on this

8    document?

9    A.  Yes.

10   Q.  And what -- again, the purchase order is used to purchase

11   chicken for a specific transaction; is that correct?

12   A.  Yes.

13   Q.  Is this a document that George's used and regularly kept in

14   their course of business?

15   A.  Yes.

16   Q.  Is it made at or near the time of a particular chicken

17   purchase?

18   A.  Yes.

19   Q.  And is it relied on not just by your department, but by

20   other departments in George's?

21   A.  Yes.

22   Q.  And what other departments would rely on this document?

23   A.  Our transportation department because they would have to

24   pick the load up from Claxton and deliver it to our plant and

25   our accounting department because they would have to pay the

Rhonda Warble - Direct

1    invoice.

2    Q.  And do you keep records of the purchase orders that you're

3    involved in?

4    A.  Yes.

5             MS. JOHNSON:  Your Honor, I would move to introduce

6    Exhibit I-448.

7             THE COURT:  Any objection to the admission of I-448?

8             MS. SWEENEY:  No objection.

9             THE COURT:  I-448 will be admitted.

10            MS. JOHNSON:  Thank you, Your Honor.  May I publish to

11   the jury?

12            THE COURT:  You may.

13   BY MS. JOHNSON:

14   Q.  What's the date on this document, Ms. Warble?

15   A.  March 27, 2014.

16   Q.  And was this document sent to Claxton?

17   A.  Yes.

18   Q.  And like you just described for us, does it contain what

19   type of chicken, Popeye's or KFC?

20   A.  Yes.

21   Q.  Is that what the PE stands for?

22   A.  Yes.

23   Q.  And what is being sold or bought, I should say, during this

24   order?

25   A.  Popeye's eight-piece chicken.

Rhonda Warble - Direct

1   *Q.*   Does it also include a case weight?

2   *A.*   Yes.

3   *Q.*   And then on the far right does it include the price per

4   pound?

5   *A.*   Yes.

6   *Q.*   What does "All Thursday kill" mean?

7   *A.*   That is the kill date that we accepted on the load based

8   off our customer's spec when they receive the product.

9   *Q.*   Just briefly, tell us what that has to do with the

10  timeliness of the purchase in respect to what your orders are.

11  *A.*   Popeye's has a spec on the amount of days left on the

12  chicken when it arrives at their restaurant or their

13  distribution center.  So we had to buy it a certain date so

14  that it still had the current amount of days left on it.

15  *Q.*   This purchase order, this transaction that you've just

16  described to the jury, was this a common occurrence in your job

17  duties?

18  *A.*   Yes.

19  *Q.*   And we've talked about that you reached out to Claxton a

20  lot and your contact person was Mr. Brady; is that right?

21  *A.*   Yes.

22  *Q.*   Did you reach out to other companies?

23  *A.*   I did, but not as often.

24  *Q.*   And who did you -- who were your points of contact at some

25  of the other companies that you recall?

Rhonda Warble - Direct

1    *A.*  The only name that I can remember is Bill Kantola at Koch

2    Foods.

3    *Q.*  And would you reach out to him for similar situations and

4    transactions?

5    *A.*  Yes.

6    *Q.*  I am going to show you another document at this time,

7    Defendant's Exhibit I-452.  I am going to ask the very same

8    series of questions.

9           What is this document?

10   *A.*  It's a purchase order for a load of KFC eight-piece from

11   Claxton.

12   *Q.*  And I believe it's a two-page document; is that correct?

13   *A.*  Yes.

14   *Q.*  And the same questions, Ms. Warble.  Is this your signature

15   at the bottom of the document?

16   *A.*  Yes.

17   *Q.*  Did you create and fill out the information on this

18   document?

19   *A.*  Yes.

20   *Q.*  And is this a purchase order used by George's to purchase

21   chicken from another supplier?

22   *A.*  Yes.

23   *Q.*  Is this a document that George's used and kept in the

24   regular course of business?

25   *A.*  Yes.

4370

Rhonda Warble - Direct

1   *Q.* And is it made at or near the time of the transaction for

2   the purchase of chicken?

3   *A.* Yes.

4   *Q.* Is it relied on by your department and other departments

5   within George's?

6   *A.* Yes.

7   *Q.* You told us accounting and traffic?

8   *A.* Transportation, yes.

9   *Q.* Do you keep records of the purchase orders that you create

10  and are involved in?

11  *A.* Yes.

12      *MS. JOHNSON:* Your Honor, at this time I move to

13  introduce Defense Exhibit I-452.

14      *THE COURT:* Any objection to the admission of I-452?

15      *MS. SWEENEY:* No objection.

16      *THE COURT:* I-452 will be admitted.

17      *MS. JOHNSON:* May I publish, Your Honor?

18      *THE COURT:* You may.

19  *BY MS. JOHNSON:*

20  *Q.* Ms. Warble at the top right of these documents, can you

21  tell the jury what's the date on this?

22  *A.* April 28, 2015.

23  *Q.* So the first document you looked at was from 2014.  This is

24  from 2015.  Again the same question, was this a common

25  occurrence for you to purchase chicken from outside suppliers

Rhonda Warble - Direct                                                    4371

1   in 2015?

2   *A.*   Yes.

3   *Q.*   One more of these.  At this time I am going to show you

4   what's been marked for identification as I-444 and ask if you

5   recognize this document.

6   *A.*   Yes.

7   *Q.*   Is this a purchase order?

8   *A.*   Yes.

9   *Q.*   And is it your signature at the bottom of the document?

10  *A.*   Yes.

11  *Q.*   Did you create or fill out the information on this

12  document?

13  *A.*   Yes.

14  *Q.*   And is this purchase order used to buy chicken from another

15  supplier?

16  *A.*   Yes.

17  *Q.*   Is this a document George's used and kept in the regular

18  course of its business?

19  *A.*   Yes.

20  *Q.*   Is it made at or near the time of the transaction for the

21  purchase of chicken?

22  *A.*   Yes.

23  *Q.*   Is it relied on by other George's departments, yours,

24  accounting and transportation?

25  *A.*   Yes.

4372

Rhonda Warble - Direct

1   Q.  Do you keep records of purchase orders that you create or

2   are involved in?

3   A.  Yes.

4        MS. JOHNSON:  Your Honor, at this time I move to

5   introduce I-444.

6        THE COURT:  Any objection to the admission of I-444?

7        MS. SWEENEY:  No objection.

8        THE COURT:  I-444 may be admitted.

9        MS. JOHNSON:  May I publish, Your Honor?

10        THE COURT:  You may.

11   BY MS. JOHNSON:

12   Q.  Is this a purchase order from 2016?

13   A.  Yes.

14   Q.  Same question similar to the other documents you've

15   reviewed.  Was this still a common occurrence in 2016?

16   A.  Yes.

17   Q.  And does this contain the spec, meaning it's KFC?

18   A.  Yes.

19   Q.  And a case weight?

20   A.  Yes.

21   Q.  And a price per pound?

22   A.  Yes.

23   Q.  Now, you mentioned that you kept records of the purchase

24   orders that you created.  What type of recordkeeping did you

25   engage in?

Rhonda Warble - Direct

 1   A.   I just made a simple Excel spreadsheet that listed when we

 2   purchased, who we purchased from, what we purchased and the

 3   dates and the pricing.

 4   Q.   Okay.  And was that just a running Excel spreadsheet?

 5   A.   Yes.

 6   Q.   And for what purpose did you keep that?

 7   A.   Just in case I got asked any questions about if we

 8   purchased on a certain day or whatever, just for my own

 9   records.

10   Q.   And would you have shared that within your company with

11   your colleagues?

12   A.   I could have, yes.

13   Q.   Now, this process of buying and selling to cover shorts or

14   excess, what type of communication did it usually involve?

15   Would there be e-mail traffic?

16   A.   Yes.

17   Q.   Would there be phone records?

18   A.   Yes.

19   Q.   And a transaction such as one of the purchase orders that

20   we have just shown the jury, would that take typically one call

21   or multiple calls?

22   A.   Multiple usually.

23   Q.   Just briefly can you explain what that process entailed?

24   A.   Sure.  I would contact -- in this instance with Claxton I

25   would contact Scott Brady and ask him if he had anything

4374

Rhonda Warble - Direct

1  available, KFC, Popeye's.  He would say yes --

2           MS. SWEENEY:  Objection, Your Honor, calls for

3  hearsay.

4           THE COURT:  Sustained.  If the witness could avoid

5  quoting what someone else told you which is hearsay.

6           THE WITNESS:  Yes, Your Honor.

7  BY MS. JOHNSON:

8  Q.  When you reached out, would you get details from Claxton?

9  A.  Yes.

10  Q.  About the specific purchase?

11  A.  Yes.

12  Q.  Upon receiving those details, what would you do internally?

13  A.  I would make a phone call or send an e-mail to Ric Blake or

14  Darrell Keck or Greg Nelson to get approval to purchase the

15  load.

16  Q.  Now, sometimes did it operate a different way?  Would you

17  ever receive information regarding shortages from your

18  supervisors?

19  A.  Yes.

20  Q.  From Mr. Blake or from Mr. Nelson?

21  A.  Yes.

22  Q.  Or Darrell Keck, I guess.

23  A.  Yes.

24  Q.  I am going to show you a series of records now, Ms. Warble.

25  We will start with Defense Exhibit I-337.  And I would ask you

Rhonda Warble - Direct

1   to scroll down to the bottom of the -- actually, the top of the

2   second page.  Is this your signature block?

3   A.   Yes.

4   Q.   And do you recognize this e-mail?

5   A.   Yes.

6   Q.   The e-mail at the bottom, is that an e-mail that was

7   generated by you or created by you?

8   A.   Yes.

9   Q.   And did you send this e-mail?

10   A.   Yes.

11   Q.   And did you send it to Mr. Scott Brady?

12   A.   Yes.

13   Q.   And was this e-mail involving some type of issue going on

14   at George's that's related to your job duties?

15   A.   Yes.

16   Q.   Was this e-mail generated at or near the time of the

17   business events that you are describing in this e-mail?

18   A.   Yes.

19   Q.   Without telling us exactly what you were seeking, did you

20   write this e-mail in order to elicit some action on the part of

21   Mr. Brady?

22   A.   Yes.

23   Q.   The date is 11/14/2014.  Was e-mail a common manner in

24   which you communicated to Claxton during that time?

25   A.   Yes.

4376

Rhonda Warble - Direct

1    Q.  And you have personal knowledge of the events that you

2    described in your e-mail?

3    A.  Yes.

4    Q.  And the events in this e-mail, would it be relied upon by

5    you and your superiors and the recipient in conducting the

6    business activities between the two companies?

7    A.  Yes.

8    Q.  And as the author of the e-mail, the information you put in

9    this e-mail, was it correct to the best of your knowledge?

10   A.  Yes.

11   Q.  And would a record of this type of communication be kept

12   and stored in the regular course of your business activities in

13   dealing with intercompany relationships like this?

14   A.  Yes.

15              MS. JOHNSON:  At this time we would move to introduce

16   Exhibit I-337.

17              THE COURT:  Any objection to the admission of Exhibit

18   I-337?

19              MS. SWEENEY:  The government objects to the top part

20   which is hearsay.

21              THE COURT:  Response?  By that you mean the --

22              MS. SWEENEY:  The e-mail from Defendant Brady.

23              MS. JOHNSON:  Your Honor, we are happy to redact that

24   part.

25              THE COURT:  As long as that part is redacted, the

Rhonda Warble - Direct

1    e-mail that contains Ms. Warble's e-mail will be admitted.

2         *MS. JOHNSON:*  I believe it has been redacted, Your

3    Honor.  May we publish to the jury?

4         *THE COURT:*  Yes, you may.

5    *BY MS. JOHNSON:*

6    *Q.*  Ms. Warble, tell the jury what's going on with this e-mail

7    and why you sent it to Mr. Brady.

8    *A.*  Okay.  I had purchased a load of chicken, and I don't

9    believe it says whether it was KFC or Popeye's, but they both

10   have piece count specs.  And the customer that we would have

11   sent this product to would have called someone on our sales

12   team to let them know that they were missing pieces out of

13   cases that they received from us.

14   *Q.*  So you're getting customer complaints about a load of

15   chicken that George's purchased from Claxton?  Have I got that

16   right?

17   *A.*  Yes.

18   *Q.*  And if you look at the bottom of the page, No. 2, we'll

19   start with that.

20        What is that referring to?

21   *A.*  I had booked a load to come in that particular morning that

22   had not arrived and it missed our trucks out to our customers,

23   so we weren't able to use that for that day's orders.

24   *Q.*  So is it fair to say you weren't really happy about that?

25   *A.*  Correct.

Rhonda Warble - Direct

1   *Q.* So that's one purchase, right?

2   *A.* Yes.

3   *Q.* Now, the purchase you mentioned in the middle of the e-mail

4   with the missing piece counts, is that a separate purchase?

5   *A.* Yes.

6   *Q.* And how do you know that?

7   *A.* Because it had already been delivered to the customer.

8   *Q.* And then finally, is there a third purchase referenced in

9   this e-mail?

10  *A.* Yes.

11  *Q.* And where is that?

12  *A.* At the bottom where it says, "With this situation and all

13  the complaints we are getting, we may need to cancel the out

14  Thursday load."

15  *Q.* And you are requesting to communicate with Mr. Brady about

16  what's going on with this, right?

17  *A.* Yes.

18  *Q.* Now, go back to No. 2 at the bottom.  You reference a load

19  you booked to come in this morning which was November 14?

20  *A.* Yes.

21  *Q.* When would that load have been booked?

22  *A.* More than likely the day before.

23  *Q.* So now I want to show you what I have marked as Defense

24  Exhibit I-442 and ask you a couple questions.  You testified

25  that e-mail was a common way that you communicated back and

4379

Rhonda Warble - Direct

1  forth with Claxton and other suppliers.  Would you also use the

2  telephone?

3  A.  Yes.

4  Q.  And again, like my question before, would you characterize

5  that as common or uncommon?

6  A.  Common.

7  Q.  Okay.

8      MS. JOHNSON:  Your Honor, I-442 is an excerpt of phone

9  records from Government's Exhibit GX-8003, which is thousands

10  of pages, and this is an excerpt.  We would ask to introduce

11  this at this time, I-442.

12      THE COURT:  Any objection to the admission of I-442?

13      MS. SWEENEY:  No objection.

14      THE COURT:  I-442 will be admitted.

15      MS. JOHNSON:  And, Your Honor, may we publish to the

16  jury?

17      THE COURT:  You may.

18  BY MS. JOHNSON:

19  Q.  At the top left do you recognize that number as being a

20  telephone number of Mr. Scott Brady?

21  A.  Yes.

22  Q.  And would you agree with me that these phone records appear

23  to be from November 9th through November 15th of 2012?

24  A.  Yes.

25  Q.  I would like to direct your attention to item -- you will

Rhonda Warble - Direct

1    see that on the left -- Item 3933.  It's a little more than

2    halfway down the page.  Do you see it?

3    A.  Yes.

4    Q.  And do you recognize the numbers involved in this call?

5    A.  Yes.

6    Q.  The number that starts 540-437, is that your number?

7    A.  Yes.

8    Q.  And when did this call occur?

9    A.  On November 13th, 2012.

10   Q.  And the time is UTC time?

11   A.  Yes.

12   Q.  Have you converted the UTC time to 9:28 a.m. Eastern time?

13   A.  Yes.

14   Q.  The next exhibit I would like to show you is Exhibit I-441.

15        MS. JOHNSON:  Your Honor, this is also an excerpt from

16   Government's Exhibit 8002 which has been previously admitted.

17   These are the phone records of Ric Blake's work number.  And we

18   would move to introduce I-441 at this time.

19        THE COURT:  Any objection to the admission of I-441?

20        MS. SWEENEY:  No objection.

21        THE COURT:  I-441 will be admitted and may be

22   published.

23        MS. JOHNSON:  Thank you, Your Honor.

24   BY MS. JOHNSON:

25   Q.  First off, do you recognize this as Ric Blake's office

Rhonda Warble - Direct

1    number there at the top?

2    *A.*  Yes.

3    *Q.*  Would you agree with me that these records, and it's a

4    two-page record, would appear to be from November 9th through

5    the 14th of 2012?

6    *A.*  Yes.

7    *Q.*  Now, turn to Page 2.  I would like to direct your attention

8    to Item 4235.

9          Do you see that item number?  I am sorry, 4253.

10   *A.*  Yes.

11   *Q.*  What is the date and time of this call?

12   *A.*  November 13, 2012, 9:40 a.m.

13   *Q.*  And would you agree you've converted that in your head,

14   which I am very impressed with, from UTC time?

15   *A.*  Yes.

16   *Q.*  Would you agree this record indicates this is a call

17   between you and Ric Blake?

18   *A.*  Yes.

19   *Q.*  That same exhibit a few items down, 4263, do you see

20   another call involving your number and Ric Blake's number?

21   *A.*  Yes.  I am sorry.

22   *Q.*  And at what time is that?  Does it show 18:47 UTC?

23   *A.*  Yes.

24   *Q.*  Would you agree with me that's 1:47 Eastern time?

25   *A.*  Yes, sorry.

Rhonda Warble - Direct

1   Q.  You're fine.  Finally on that same document entry No. 4266,

2   do you see another call between your number and Ric Blake's

3   office number?

4   A.  Yes.

5   Q.  And again would you agree with me that the time which shows

6   19:06 UTC time would be converted to 2:06 p.m. Eastern time?

7   A.  Yes.

8   Q.  Now I would like to show you what's been previously

9   admitted as Government's Exhibit 1426, which are the records of

10  another one of Scott Brady telephone numbers.

11         MS. JOHNSON:  And we would request to publish this to

12  the jury, Your Honor.

13         THE COURT:  What was the source of this one,

14  Ms. Johnson?

15         MS. JOHNSON:  Government Exhibit 1426 which was

16  previously admitted.

17         THE COURT:  Oh, previously -- hold on one second.

18  Yes, that has been admitted and may be published.

19         MS. JOHNSON:  Thank you, Your Honor.

20  BY MS. JOHNSON:

21  Q.  Same questions, Ms. Warble.  Do you see at the top, I

22  believe it says detail for Scott Brady.  Do you recognize this

23  as another one of Mr. Brady's telephone numbers?

24  A.  Yes.

25  Q.  Let's turn to the second page.  I want to discuss three

Rhonda Warble - Direct

1    calls.  Would you agree with me these records appear to be from

2    November 10th through November 17 of 2012?

3    A.  Yes.

4    Q.  There is a call on this Page 2 about six or so lines down

5    at 1:42 p.m.  Do you recognize your number as listed there?

6    A.  Yes.

7    Q.  And would you agree with me these records indicate that you

8    called Scott Brady on that date and time?

9    A.  Yes.

10   Q.  On that same record do you see an entry at 2:40 p.m.?

11   A.  Yes.

12   Q.  And do you also recognize your number there?

13   A.  Yes.

14   Q.  Would you agree this record indicates you again called

15   Scott Brady on November 13 at 2:40 p.m.?

16   A.  Yes.

17   Q.  Finally, on that same record, same Page 2, just two lines

18   down, there is a call at 2:43, just three minutes later.  Do

19   you see that call?

20   A.  Yes.

21   Q.  And would you agree that this record indicates Scott Brady

22   called you --

23   A.  Yes.

24   Q.  -- at 2:43 p.m. on November 13, 2012?

25   A.  Yes.

4384

Rhonda Warble - Direct

1  Q.  Having reviewed the calls described and that we just walked

2  through, is this representative of the type of calls that would

3  happen and occur during the purchase or sale of chicken between

4  you and Scott Brady at Claxton?

5  A.  Yes.

6  Q.  And the calls on these same dates between you and

7  Mr. Blake, are those indicative of calls that would have

8  happened for these sales and purchases of chicken?

9  A.  Yes.

10  Q.  The processes that you just described to the jury on how

11  George's interacts with other suppliers to handle shorts and

12  covers, is this a common occurrence for your job description

13  and duty during the years that we've discussed, which would be

14  '14, '15 and '16?

15  A.  Yes.

16  Q.  And during that time when you buy chicken from Claxton, you

17  learn their prices; is that correct?

18        MS. SWEENEY:  Objection, leading.

19        THE COURT:  Overruled.

20        MS. JOHNSON:  You can answer.

21  A.  Yes.

22  BY MS. JOHNSON:

23  Q.  Ms. Warble, did the government ever contact you and ask you

24  to explain these procedures to them?

25  A.  No.

Rhonda Warble - Cross

1    *Q.* And if they had, would you have told them just what you

2    told us today?

3    *A.* Yes.

4            *MS. JOHNSON:* Thank you. I have no further questions.

5            *THE COURT:* Thank you.

6            Cross-examination by other defendants?

7            All right. Cross-examination by the United States?

8                         **CROSS-EXAMINATION**

9    *BY MS. SWEENEY:*

10   *Q.* Good afternoon, Ms. Warble.

11   *A.* Hi.

12   *Q.* My name is Carolyn Sweeney and I represent the United

13   States. I am going to ask you some questions today, okay?

14   *A.* Okay.

15   *Q.* So you just told the Ladies and Gentlemen of the Jury about

16   some of your communications with competing chicken suppliers to

17   George's; isn't that right?

18   *A.* Yes.

19   *Q.* And you testified about how sometimes George's purchased

20   chicken from competing chicken suppliers when George's didn't

21   have enough chicken to supply its own customer, right?

22   *A.* Yes.

23   *Q.* So when George's purchased chicken to cover shortages,

24   let's say to KFC, George's would have to purchase chicken from

25   another current supplier to KFC; isn't that right?

Rhonda Warble - Cross

1   A.   Yes.

2   Q.   And you testified that as part of that purchase, you would

3   send that competing chicken supplier a purchase order, right?

4   A.   Yes.

5   Q.   Now, is it fair to say that your testimony was that you

6   weren't always covering purchases for Defendant Blake; is that

7   correct?

8   A.   I am sorry, can you repeat that?

9   Q.   Sure.  So you weren't always working with Defendant Blake

10  when you were covering George's shortages; isn't that right?

11  A.   Correct.

12  Q.   Sometimes he wasn't involved.  Sometimes you worked with

13  Mr. Nelson or Mr. Keck, right?

14  A.   Correct.

15  Q.   So talking about turning to the purchase orders themselves,

16  that usually described the amount of chicken that was being

17  purchased?

18  A.   Yes.

19  Q.   Usually the number of cases?

20  A.   Yes.

21  Q.   And the price that George's was paying.

22  A.   Yes.

23  Q.   And in the three examples that we looked at, that included

24  the price per pound, right?

25  A.   Yes.

4387

Rhonda Warble - Cross

1    Q.  Of the purchase orders that you created as part of your

2    job, did any of them have George's profit margin on them?

3    A.  No.

4    Q.  So you never included George's profit margin on purchase

5    orders, did you?

6    A.  No.

7    Q.  Now, when you would send a purchase order to someone you

8    were buying chicken from, you wouldn't attach George's current

9    contract with that customer with the purchase order, would you?

10   A.  No.

11   Q.  And they wouldn't -- the company you were buying chicken

12   from wouldn't send you their contract with the customer, would

13   they?

14   A.  No.

15   Q.  Because that wouldn't make any sense, right?

16   A.  No.

17   Q.  That information, the profit margin and the contract, those

18   aren't needed to fill the order, are they?

19   A.  No.

20   Q.  Now, Ms. Warble, do you understand that there is a time of

21   year generally when QSR, quick-service restaurant contracts are

22   negotiated?

23   A.  I was never involved in that, so I am not sure about that.

24   Q.  You understand that there were contracts for quick-service

25   restaurants?

Rhonda Warble - Cross

1    A.  Yes.

2         MS. JOHNSON:  Objection, Your Honor.  This is

3    exceeding the scope of direct.  There was no discussion

4    whatsoever about negotiations of bids.

5         THE COURT:  Sustained.

6    BY MS. SWEENEY:

7    Q.  Now, Ms. Warble, one last question about what you would

8    send with purchase orders.  You said you were not involved in

9    negotiations with contracts, correct?

10   A.  Correct.

11   Q.  So you would not include any bid that George's was going to

12   submit to a customer along with a purchase order, were you?

13        MS. JOHNSON:  Objection, asked and answered, and it's

14   beyond the scope of direct.

15        THE COURT:  Sustained.

16   BY MS. SWEENEY:

17   Q.  So Ms. Warble, you would agree with me that if a competing

18   chicken supplier were to have George's profit margin, that

19   information wouldn't come from purchase orders from covering

20   shortages, would it?

21   A.  No.

22   Q.  Would you agree with me that if a competing chicken

23   supplier were to have George's contract information, that also

24   wouldn't come from the covering shortages, would it?

25        MS. JOHNSON:  Same objection, Your Honor, beyond the

Rhonda Warble - Cross

1    scope of direct.

2            THE COURT:  Sustained.

3    BY MS. SWEENEY:

4    Q.  Ms. Warble, you testified about Defense Exhibit I-337.  I

5    believe -- do you have a paper copy in front of you?

6    A.  No, ma'am.

7            MS. SWEENEY:  If we could call up Defense Exhibit

8    I-337, please.  And that would be with the top part redacted,

9    please.

10           Your Honor, permission to publish?

11           THE COURT:  You may.

12   BY MS. SWEENEY:

13   Q.  Now, Ms. Warble, you testified that this is an example of a

14   time when George's was purchasing from Claxton and there were

15   pieces missing from what was purchased; is that right?

16   A.  Yes.

17   Q.  Did this involve at all -- would the conversations about

18   this involve dark meat prices?

19   A.  Without knowing what we actually purchased, I can't really

20   answer that it was dark meat or eight-piece.

21   Q.  Now, Ms. Warble, you talked about your responsibilities in

22   the process for George's filling shortages; is that right?

23   A.  Yes.

24   Q.  The time lines for filling shortages is usually fairly

25   quick; isn't that right?

Rhonda Warble - Cross

1    A.  Yes.

2    Q.  You'd learn about a problem and have to address it within a

3    matter of hours or days.  Is that fair to say?

4    A.  Yes.

5    Q.  And you typically couldn't wait a week or two weeks before

6    making those calls to start filling that shortage, right?

7    A.  Correct.

8    Q.  Now, you testified on direct that you worked at George's

9    for I believe you said about 25 years; is that right?

10   A.  Yes.

11   Q.  And you worked at -- in Virginia; is that right?

12   A.  Yes.

13   Q.  But you did work with Defendant Blake.

14   A.  Yes.

15   Q.  And he worked in Arkansas?

16   A.  Yes.

17   Q.  Have you called him on his office line before?

18   A.  Yes.

19   Q.  And you testified about some calls on his office line, that

20   you made to him on his office line; isn't that right?

21   A.  Yes.

22   Q.  And are you familiar with the fact that the George's office

23   line, there was a main number and then there was a series of

24   extensions to reach someone individually; isn't that correct?

25            MS. JOHNSON:  Objection, Your Honor.  There has been

Rhonda Warble - Cross

1    zero testimony on direct about George's main number.

2         *MS. SWEENEY:*  Your Honor, she testified about reaching

3    Defendant Blake at his office number, so we are just exploring

4    the process of how that actually works.

5         *THE COURT:*  Overruled.

6    *A.*  Can you repeat it, please?

7    *BY MS. SWEENEY:*

8    *Q.*  Sure.  So when you call -- when you are trying to reach

9    someone in the Arkansas office of George's, you would call a

10   main number and then be transferred through a system to get to

11   their actual desk phone; is that correct?

12   *A.*  At that time, yes.

13   *Q.*  And at that time you mean in 2014?

14   *A.*  Yes.

15   *Q.*  How about in 2015?

16   *A.*  Yes.

17   *Q.*  And in 2016?

18   *A.*  Yes.

19   *Q.*  So you couldn't just pick up the phone and dial one number

20   in order to reach someone's particular desk phone; is that

21   right?

22   *A.*  No.

23   *Q.*  And you have met Defendant Blake in person before, haven't

24   you?

25   *A.*  Yes.

4392

Rhonda Warble - Cross

1    Q.  You worked with him for a number of years?

2    A.  Yes.

3    Q.  And have you become familiar with his handwriting?

4    A.  No.

5            MS. JOHNSON:  Objection, Your Honor.  It exceeds the

6    scope of direct.

7            THE COURT:  Sustained.

8    BY MS. SWEENEY:

9    Q.  So you have been in the chicken business for about 25

10   years.  I believe you just said that again?

11   A.  Yes.

12   Q.  And you would agree with me that it would be wrong for one

13   chicken supplier to come to an understanding with another

14   chicken supplier about price behind the customer's back.

15           MS. JOHNSON:  Objection, Your Honor, exceeds the scope

16   of direct.

17           THE COURT:  Sustained.

18   BY MS. SWEENEY:

19   Q.  Ms. Warble, you testified about a number of calls that you

20   had with George's competitor suppliers; isn't that right?

21   A.  Yes.

22   Q.  For the purpose of covering shortages.

23   A.  Correct.

24   Q.  Is it fair to say that on those phone calls that you

25   testified about, you never coordinated price with competing

1   chicken suppliers behind the customer's back?

2   A.   No.

3   Q.   Because that would be wrong.

4           MS. JOHNSON:   Objection, Your Honor.

5           THE COURT:   Sustained.

6           MS. SWEENEY:   No further questions.

7           THE COURT:   Thank you.

8           Redirect?

9           MS. JOHNSON:   No, Your Honor.   Thank you.

10          THE COURT:   All right.   Is Ms. Warble subject to

11   recall?

12          MR. KOENIG:   No.

13          THE COURT:   Ms. Warble, you are excused.   Thank you

14   very much.

15          THE WITNESS:   Thank you.

16          THE COURT:   Defendants may call their next witness.

17          MR. BELLER:   Your Honor, if we may go side bar.   This

18   may be a good time for a break a little early.

19          THE COURT:   That's no problem.   Usual time, 20

20   minutes?

21          MR. BELLER:   I think that's appropriate.

22          THE COURT:   Ladies and gentlemen, why don't we go

23   ahead and take our break now.   Why don't we plan on reconvening

24   at 3:15.   If you can keep the admonitions in mind.   The jury is

25   excused.   Thank you.

1          *THE COURT:*  Mr. Beller, go ahead.

2          *MR. BELLER:*  Your Honor, I want to give an opportunity

3    for defendants to correct me.  I believe that that may have

4    been the last testimonial witness.  So this may be a good time

5    to take up a couple of different issues, one, to give counsel a

6    final opportunity to quickly discuss potential testimony with

7    our respective clients.  No. 2, Your Honor, I do believe that

8    several of the defendants may have documents that we would

9    offer without a sponsoring witness.  So how the Court wishes to

10   take that up I leave to the Court, but I want to set forth sort

11   of what I see coming this afternoon.

12         *THE COURT:*  I appreciate that, Mr. Beller.  Thank you.

13         Anyone else want to weigh in on that?

14         In terms of the documents, I know that we've received

15   a couple of requests, I think it may have been on behalf of

16   Mr. Penn, but there are a number of documents that may be

17   offered and recently on behalf of Mr. Little just a few minutes

18   before we came out this afternoon.

19         *MR. BELLER:*  And Your Honor, I have not filed these

20   with the Court.  I had anticipated a witness being called, but

21   ultimately was not called, but I don't think it's necessary.

22   For Mr. Fries we would be asking for F-915, 916 and 754 to be

23   admitted.  And I do believe that the government has received

24   all three of those.

25         *THE COURT:*  The heads-up regarding that?  Okay.

1          *MR. BELLER:*  I am sorry?

2          *THE COURT:*  The heads-up regarding that?

3          *MR. BELLER:*  Yes.  I believe those were documents that

4    had originally been anticipated through the testimony of

5    Mr. Eddington.  Since Mr. Eddington was not called, we would be

6    offering those.

7          *THE COURT:*  What were those numbers again, Mr. Beller?

8          *MR. BELLER:*  Yes, it was F-915, F-916.  For purposes

9    of the Court's, I guess, recordkeeping, those were both -- that

10   was Government's Exhibit 1937 and 1938 that coincides, and also

11   F-754.  And there is not a corresponding government's exhibit

12   number as to that one.  All three of these are RSCS documents,

13   Your Honor.

14         *THE COURT:*  Okay.  And then will -- so has the

15   government had a chance to think more about its rebuttal case?

16   Obviously, you know that there are at least some exhibits that

17   the defendants intend to move the admission of without a

18   sponsoring witness, so really the decision point is that we

19   could do those in one of two ways.  We could take them -- take

20   the objections as they come.  I think we would have the

21   scenario that we were trying avoid during the government's

22   case.  There is a chance that we might have some long side bars

23   and that may take some time.

24         The other option is that we could even break for the

25   day.  I hate to break for the day, but work through that and

4396

1   certainly work through jury instructions, and then come back

2   tomorrow, do the -- take up the issue of the admission of the

3   defendants' exhibits, which would be still in the defendants'

4   case, and then at the conclusion of that go into the

5   government's rebuttal case.  That's one proposal.

6        The other proposal is that we would just try to work

7   through -- maybe through a longer break try to work through the

8   exhibits that the defendants wish to offer and then see how

9   long that takes.  We don't necessarily have to do it with the

10  jury present, but we'd keep the jury around.

11       MR. KOENIG:  Your Honor, the government would

12  definitely prefer to try to wrap this up today if we could.

13  And I think we probably can.  Unlike when we were introducing

14  exhibits, there is not going to be multiple people popping up,

15  so I think it will go considerably faster that way.

16       THE COURT:  Okay.  How long -- what's our estimate?

17  How long do you think that might take?  We could inform the

18  jury that instead of them coming back at 3:15, they could maybe

19  come back at 4:00?  Let's assume the jury does come back at

20  4:00 and we know how it's going to go in terms of the admission

21  of these various exhibits, then would the government be able to

22  put on its rebuttal case at that time?

23       MR. KOENIG:  Yes, Your Honor.  I think it's just a

24  couple of documents perhaps.

25       THE COURT:  Right.

1          Mr. Pollack?

2          *MR. POLLACK:*  Yes, Your Honor.  I had one additional

3   issue I wanted to raise.  I want to move in as a party

4   admission testimony from Agent Taylor from the *James hearing*

5   where he is asked about what became summary Exhibit 14-2 and

6   the phone call and a text between Mr. Brady and Mr. Fries where

7   Mr. Brady says, "George's is 30 back."

8          And I asked the question:  So if Mr. Blake told

9   Mr. Brady in that phone call that George's is at 30 back, he

10  was giving the 2012 price of 30 back, not the current bid for

11  the next year of 28 back?

12         And the answer was:  I think that appears to be the

13  case, yes, sir.

14         So I would like to move that as a party admission.

15         *THE COURT:*  He is not a party.

16         *MR. POLLACK:*  He is a representative of the party.  He

17  is an agent of the party.

18         *THE COURT:*  He is not an agent of the party either.

19  He works for the FBI, not the Department of Justice or not in

20  the sense of the government attorneys or the United States.

21  You would have to provide me with some authority.  I have never

22  heard of a case agent statement coming in as a party admission.

23         *MR. POLLACK:*  If the Court would give me the

24  opportunity to provide some authority, I would like to do that.

25         *THE COURT:*  That's fine.

1          Mr. Gillen?

2          MR. GILLEN:  Very briefly.  If the government knows

3     what exhibits they are going to be using in rebuttal, it might

4     be helpful to identify them so that we will then be able to

5     raise whatever objections or articulate whatever objections we

6     have now.

7          THE COURT:  That would be a good -- they don't have

8     to, but if the government wants to do that, that might expedite

9     things.  And so if we -- so we have used up half of our time to

10    confer, for the defense attorneys to confer with their clients.

11    Would you still like 15 minutes, 20 minutes for that?  I don't

12    want to short-change you because obviously that's an important

13    issue as well.

14         MR. TUBACH:  Your Honor, we would need 15 or 20

15    minutes for that.  The only thing I was going to suggest is if

16    the only thing that's going to happen when the jury comes back

17    today is we will be moving into admission whatever documents

18    the Court admits, that certainly won't take very long.  And I

19    think we have about 15, 18 documents to get through.  We may

20    want to have the jury come back a little later than 4:00 so

21    they are not waiting around, but I guess if they are here

22    anyway, they might as well be in the jury room.

23         THE COURT:  Yeah, but on the other hand, I would

24    rather be more accurate with our prediction.  I think you are

25    right.  Maybe we should tell them to come back at 4:30.  So why

1   don't we do that.  I will have Ms. Grimm let the jurors know

2   that we are going to reconvene at 4:30.  If they want to leave

3   the courthouse, they can.  And then we will reconvene, why

4   don't we plan on 25 minutes after 3:00 for us to get together

5   and we will start to work through some of these exhibits, all

6   right?

7           The Court will be in recess.  Thank you.

8       (Recess at 3:05 p.m.)

9       (Reconvened at 3:30 p.m.)

10      THE COURT:  We are back on the record in 20-CR152.

11  The jury is not present.  Who wants to begin, then?

12          Mr. Tubach, go ahead.

13      MR. TUBACH:  Sure, I am happy to start.

14          We have offered -- and we filed a brief this morning,

15  and I apologize for the timing of that -- 11 documents into

16  evidence.  We have put the argument that we have in the brief

17  which is why we filed it.  I am happy to go through each one

18  individually and offer minor comments on each, but essentially

19  our arguments are as reflected in the brief that we filed.

20      THE COURT:  Right.  I haven't had a chance to

21  thoroughly go through it, so I think that maybe what we should

22  do is go through them one by one and perhaps we'll start off

23  with the government's response, assuming the government has had

24  a chance to take a look at Docket No. 898.

25      MS. CALL:  Yes, Your Honor.

4400

1          THE COURT:  Okay.  Why don't we then start off as

2     listed in that filing with Exhibit C-998.

3          MR. TUBACH:  Your Honor, I don't know if it matters.

4     I have a red light on the battery.  I can hear the Court fine.

5          THE COURT:  Red light means we should change that

6     battery, so that's a good idea.

7          MR. TUBACH:  We are green, Your Honor.

8          THE COURT:  Okay, great.

9          Ms. Call, go ahead.

10         MS. CALL:  Yes, Your Honor.  And I think this is going

11    to apply to several of these documents today, but this is just

12    one example where the defendants here are trying to introduce

13    essentially their own statements without them testifying and it

14    being their own hearsay statements.  A number of the

15    justifications that are given is that these are 803(3), which

16    is for a declarant's then existing state of mind.

17         I think here, as in other documents, we are really

18    eviscerating the purpose of 803(3) here because it's not

19    intended to introduce a defendant's self-serving statements to

20    justify or explain their actions, which is really what it seems

21    to be doing here, that they are attempting to introduce

22    Defendant Lovette's statements to explain his actions later in

23    the year in seeking price increases.  This doesn't really say

24    his state of mind.  It just says that Pilgrim's I think is

25    analyzing converting a small bird operation.  It's just

1    something that's happening at the time.

2         So they are introducing the statement really for the

3    truth of the matter asserted, not for state of mind, and

4    getting in a statement that would otherwise be inadmissible

5    under the hearsay rules.

6         THE COURT:  Mr. Tubach, go ahead.

7         MR. TUBACH:  Just briefly.  The concern with

8    self-serving defendants' statements coming in is really more in

9    the context of a sort of post-arrest or sort of "I didn't do

10   anything wrong" kind of statement after they realize they are

11   being investigated.  Here, this has nothing to do with that.

12   This is an e-mail.  And by the way, we handed physical copies

13   to Ms. Grimm.  I don't know if the Court has those.

14        THE COURT:  Yes, thank you.

15        MR. TUBACH:  The physical copies, the e-mail from

16   Mr. Lovette, for example, in Appendix A, C-998 is a statement

17   of his state of mind at the time.  There is nothing sort of

18   falsely exculpatory about it or anything like that.  It's

19   simply stating what his state of mind is about the reason for

20   what they're going to do, which is try to convert a plant from

21   small bird to either case ready or large bird debone.  And so

22   none of the concerns animating why courts have concerns about

23   sort of self-serving statements are present here and that's

24   true for a number of these.

25        And this goes directly to the issue of whether the

1    defendants, in this case Mr. Lovette, are increasing prices as

2    a result of a price-fixing conspiracy or because they have

3    other reasons why the prices went up.  This is absolutely

4    relevant to the state of mind of Mr. Lovette.

5            THE COURT:  Mr. Tubach, just because I haven't had a

6    chance to digest this completely, could you articulate what

7    limiting instructions you would suggest or what limitations

8    would be a part of the document if admitted as requested by

9    Mr. Penn?

10           MR. TUBACH:  Well, Your Honor -- for this document in

11   particular?

12           THE COURT:  Yes.  In other words, you say in the

13   brief, Docket No. 898, that Mr. Blackmon's statements would not

14   be admitted for the truth, but rather for their effect.  That's

15   what I mean, that type of limitation on the admission.

16           MR. TUBACH:  So Mr. Blackmon's e-mail at the bottom is

17   really just for context to show why it is that Mr. Blackmon and

18   Mr. Baker, why they are writing what they are writing which

19   sets up why Mr. Lovette is making his comments in his e-mail on

20   August 25th, 2014.  Without that it doesn't really make sense.

21   So those statements could be admitted for the limited purpose

22   of showing the effect on Mr. Lovette and why he made those

23   statements.  Frankly, everything above that we don't need into

24   evidence, but it's part of the e-mail, so we included it.

25           THE COURT:  Okay.  Ms. Call, I will give you the last

1    word.   Go ahead.

2          *MS. CALL:*  The only thing on that -- occasionally I

3    forget who represents who, but obviously 803(3) is relevant to

4    the declarant's then existing state of mind, which would be

5    Defendant Lovette.   This is being introduced by Defendant Penn

6    for an apparent purpose, I suppose, of his state of mind in

7    receiving this statement which really just seems to be hearsay

8    and not covered by that exception either way.

9          *THE COURT:*  Okay.   The objection will be sustained.

10   The statement by Mr. Lovette on August 25th of 2014, once

11   again, there is always some state of mind type thing that may,

12   if you read between the lines of a given e-mail, come into

13   play.   But this is really just for the substance of what is

14   stated.   That's hearsay.   And I don't find any exception would

15   cover that one, so I will reject C-998.

16         Let's go to the next one which is two documents, F-380

17   and F-381.

18         Mr. Tubach, do you want to lead on this one?

19         *MR. TUBACH:*  Just very briefly, Your Honor.   This is a

20   presentation made -- provided to RSCS on June 30 of 2014.   The

21   first document which is F-380 is simply the transmittal showing

22   that it went to Ms. Hester, who was one of the negotiators at

23   RSCS.   And then the presentation itself is being introduced for

24   the effect on the listener, in this case RSCS.

25         Within two weeks of receiving this presentation, which

1   is lengthy but among other things shows the shortage of small

2   birds and shows many other things including the difference

3   between big bird and small bird profitability, within two weeks

4   of getting this e-mail, RSCS sent an e-mail out to Pilgrim's

5   and others saying, you know, what do you need in terms of

6   margin and how does that compare to big bird profitability and

7   the other comments that we put in the brief here.

8           So the top five things that could cause price

9   variability and your thoughts concerning a three-year deal, so

10  we think this document is admissible to show the effect on RSCS

11  in negotiating in a way that RSCS had never negotiated

12  previously.

13          THE COURT:  Ms. Call, go ahead.

14          MS. CALL:  I think this really lacks the indicia of

15  reliability that is inherent in business records under the 10th

16  Circuit law for 803(6).  So in the 10th Circuit, you know, A,

17  you generally need someone to lay foundation, which clearly

18  isn't being done here.  But B, a business record has a

19  reliability because businesses rely on the accuracy of their

20  own records.

21          This is an argumentative presentation made by folks at

22  Pilgrim's to KFC.  So first, it's really not the kind of record

23  that Pilgrim's is relying on in any way because they are rather

24  using it to convince the customer of something or really tell

25  them a story about the status of the industry at that time.  So

1    I think one way, the argumentative nature, it makes it not

2    reliable as typical business records would be under 803(6).

3    But second, there seem to be just many layers of hearsay in

4    this document.  It relies on information from multiple sources.

5          And, of course, the 10th Circuit standard is that if a

6    business record uses a third party in creating its own business

7    record, like a hotel logbook having signatures from the

8    occupants, if they have sufficient interest in the accuracy or

9    the reliability of that information and if they verify it,

10   sure, it can sometimes be a business record.  But here, I was

11   just flipping through trying to count the number of sources, we

12   have AgriStats where so far in this trial I think most of the

13   testimony have been from folks who maybe saw it 10 years ago or

14   didn't use it like Mr. Campbell today.

15         EMI, which I don't know if there is any testimony

16   regarding, CME, the USDA, the Federal Accounting Service, there

17   is just information coming from so many sources that make this,

18   A, like not understandable to the jury without a witness; but

19   B, not reliable because it's really unclear how this

20   information was pulled, how it was put together, really

21   anything that would make it fall within the exception of a

22   business record.

23         And as for effect on the listener, I don't know that

24   there is really a demonstrated effect.  I understand what

25   Mr. Tubach said about KFC's reaction, but I don't think it is

4406

1  necessarily even tied to this presentation, rather perhaps to

2  the words that are actually exchanged in this meeting.

3          And frankly as the government understands it after

4  speaking to someone who was involved in this presentation, most

5  of these slides were never presented to RSCS. That person, of

6  course, has not testified. They were removed from the

7  defendants' witness list. But from the information the

8  government has at this time, KFC never saw most of this

9  information.

10          THE COURT: Mr. Tubach?

11          MR. TUBACH: We did suggest this would be reliable

12  under a business record and we made that argument in our brief.

13  We do think it has the indicia of reliability. Of course, we

14  recognize we don't have a live witness to sponsor it, but we do

15  think it has the kind of indicia of reliability that would

16  justify its admission as a business record.

17          But it is clearly admissible for the effect on the

18  listener. In that context it doesn't matter what the sources

19  of these are, the Georgia Dock, EMI, USDA. The question is did

20  this information that was provided to RSCS have an effect. And

21  the timing is such that we don't have to prove that this is the

22  sole factor in causing RSCS to negotiate in the way they did.

23  All we have to show is that it makes it -- it's probative. It

24  makes it a little more likely that this is -- that this

25  contributed to why RSCS negotiated in the way that they did.

1          *THE COURT:*  All right.  Objection will be sustained.

2     The KFC presentation is for one thing not a business record.

3     It does not have indicia of reliability.  It's not produced in

4     the regular course of business in a way that would make sure

5     that the information contained within it is accurate and

6     reliable.  It's a completely different type of document that

7     has some type of advocacy.  And it's also, as Ms. Call

8     indicated, pulled from a whole variety of sources which there

9     has been no testimony whatsoever in terms of what the

10    reliability of those sources are.

11          Moreover, in terms of whether or not this could be

12    admissible to demonstrate the effect on the listener, I also

13    reject that basis.  This is like a huge document with all sorts

14    of information.  The fact that it was transmitted and then

15    someone scheduled a meeting is not some type of an explanation

16    necessary for effect on the listener.  Who knows as a matter of

17    fact whether or not the information in the document had any

18    effect on the listener.  And the connection between what the

19    effect on the listener in any event is so indirect that I

20    reject that basis for its admission too, so I will sustain the

21    objection as to that document.

22          Mr. Tubach, do you want to take up C-781?

23          *MR. TUBACH:*  Sure, Your Honor.  This is a document

24    about which there has been some testimony in this trial.  This

25    is the McKinsey presentation to the RSCS board.  Mr. Olson, the

1    very first witness in this case, testified he had seen the

2    document before.  He recognized it as the McKinsey report that

3    was created for and shown to the RSCS board of directors during

4    a meeting that he attended along with Pete Suerken who was the

5    chief negotiator, the quarterback of the negotiating team as

6    one of the people at RSCS called him.  And he testified that

7    this presentation affected RSCS's strategy during his 2015

8    negotiation.  This is very clearly admissible as an effect on

9    the listener.

10           Some of the points made in the McKinsey slide go

11   directly to what RSCS did in the negotiations shortly after

12   getting this presentation.

13           THE COURT:  I can't remember, were there different

14   versions of the McKinsey report or was there just -- or was it

15   just a McKinsey report and that was what was presented?  I

16   can't remember Mr. Olson's testimony.

17           MR. TUBACH:  Your Honor, you have a good memory.  This

18   version is the final version that was presented.  He was

19   presented with a draft version, but this was the version that

20   we -- a few days before like he was given a sneak preview, but

21   then this is the version we showed him and he recognized this

22   as the document that he had seen as a board member.  And he

23   testified that RSCS relied on it in conducting its

24   negotiations.

25           THE COURT:  Were some pages or some graphs admitted?

1    For some reason I thought that maybe the jury saw some things

2    from the McKinsey report, but I am not sure.

3         MR. TUBACH:  I am not sure they saw pages of it, but

4    certainly the witness testified about a fair number of them.

5    And we do think this is admissible for the effect on the

6    listener.  And, you know, we know, for example, that shortly

7    after receiving this, they for the first time ever negotiated a

8    three-year contract, which is exactly what's in this

9    presentation, do a longer term contract.

10        Secondly, this talks about big bird/small bird

11   profitability, and that's exactly the way RSCS tells its

12   suppliers to determine what margin they need for the 2015

13   pricing is to look at big bird/small bird.  And these are --

14   these are items that were reflected directly in this

15   presentation at the RSCS board and the chief negotiator for

16   RSCS.

17        THE COURT:  Mr. Torzilli, go ahead.

18        MR. TORZILLI:  Coming out of the bullpen for this one.

19        So, Your Honor, first it seems like the defendants

20   have abandoned their argument that this is a business record,

21   and rightfully so.  It's not.  So they are falling back on a

22   nontruth purpose and it's admissible for nontruth purposes as

23   well.

24        First, Mr. Olson testified.  And to the extent there

25   was any effect on him, it was elicited, or the defendants had

1       an opportunity to elicit whatever effect that anything in here

2       had on him.  So I think admission of it on that basis would be

3       strictly cumulative and unnecessary.

4              The effect on the RSCS board I think is frankly

5       irrelevant.  Bob Lewis testified he was part of the negotiating

6       team.  He conducted the negotiations and was subject to

7       voluminous and extensive cross-examination.  So again, I think

8       it would be unnecessary and cumulative at best for it to be

9       admitted on that basis.

10             And then Mr. Suerken, Mr. Suerken was part of the RSCS

11      negotiating team.  Mr. Suerken was on the defendants' witness

12      list.  The defendants had an opportunity to call him and ask

13      him about what, if any, effect this presentation that McKinsey

14      made had on him.  They've forfeited that opportunity.

15             And also this is a voluminous document.  It's not like

16      an e-mail that gets responded to or a phone call that's

17      proximate to an e-mail where the effect on the listener is

18      proximate and you can tie it directly.  This is a tremendously

19      voluminous document that covers numerous topics across a

20      complicated and detailed industry.  So I think any connection

21      that could be made absent a sponsoring witness is just not

22      possible and for all those reasons it should be refused.

23             *THE COURT:*  All right.  Thank you, Mr. Torzilli.

24             Mr. Tubach?

25             *MR. TUBACH:*  Your Honor, just very briefly, I don't

4411

 1    think cumulative is a reason not to admit it.  Mr. Suerken

 2    wasn't just a member of the team.  He was at that presentation

 3    and was by the testimony in this case the quarterback of the

 4    negotiating team.  He led that team.  He was the one that gave

 5    strategic direction on what Bob Lewis would be doing.  Bob

 6    Lewis had just came out of retirement, having been in

 7    retirement for five years.  He wasn't deciding the strategy of

 8    RSCS.  Pete Suerken, the quarterback, was deciding the

 9    strategy, and he had heard and sat through this presentation.

10         *THE COURT:*  Real quick.

11         *MR. TORZILLI:*  Of course, just to be clear, obviously

12    the defendants don't need to call witnesses or put on a case,

13    but we did call Bob Lewis.  Bob Lewis was heavily involved,

14    worked closely with Pete Suerken.  And he as part of the team

15    did the negotiations and he was subject to extensive

16    cross-examination.

17         *THE COURT:*  Mr. Tubach, on Suerken is there something

18    in evidence right now that would be explained through the

19    admission of this document?  That's what I am worried about.

20    Obviously, Mr. Suerken hasn't testified.  But what would -- in

21    terms of like effect on the listener, effect on him, he was

22    subject to the presentation, what would the McKinsey report

23    help the jury with in that respect?

24         *MR. TUBACH:*  So Mr. Olson testified that Mr. Suerken

25    was there and heard the whole presentation, so I think that's

 1    covered.  And Mr. Olson recognized the document, so I think

 2    authenticity is not an issue.  The effect on the listener is

 3    that this presentation specifically talks about doing a

 4    long-term supply contract rather than a one-year contract,

 5    which is they had never done before in the history of RSCS

 6    negotiations.  And within less than a month of getting this

 7    document, they are proposing a multi-year contract.

 8         The second one is big bird/small bird profitability.

 9    You know, right after receiving this document, they're

10    negotiating with the suppliers about big bird/small bird

11    profitability and what the suppliers say they need relative to

12    big bird profitability to get their profits up to where they

13    were.  The inference is very strong that Mr. Suerken, who was

14    leading the strategic negotiations at RSCS, was affected by the

15    presentation they received.

16         THE COURT:  Mr. Feldberg may want to whisper in your

17    ear too.

18         MR. FELDBERG:  May I do my own?

19         THE COURT:  You can even do that.

20         MR. FELDBERG:  There is in evidence, and I don't have

21    the exhibit number in my head, but it's a memo from Mr. Austin

22    to Mr. Penn, I think it's dated August 29, 2014, reporting on a

23    meeting with Mr. Suerken.  I might have the date wrong, but I

24    know it's in August of 2014, reporting on -- it's a long e-mail

25    reporting on his meeting with Mr. Suerken.

1          And A, he mentions that Mr. Suerken recognizes that

2     there is going to be a price increase.  They are debating -- he

3     obviously wants the lower price increase than Pilgrim's has

4     proposed.  He has proposed I think 9 cents or something like

5     that.  And I think it also mentions the three-year contract.

6     So that is a piece of evidence I think that goes directly to

7     Your Honor's question what is there in evidence that reflects

8     how this report had an effect on Mr. Suerken.

9          THE COURT:  Okay.  Mr. Torzilli, did you have anything

10    else?

11         MR. TORZILLI:  Just one other point on this, because

12    now I'm getting concerned that what's going to happen here is

13    this is going to be admitted into evidence in its entirety, but

14    certainly it's riddled with embedded hearsay, including if you

15    take a look at, for example, slide four, who they consulted,

16    and you look at the right-hand side, who they consulted and

17    engaged for input and guidance.  And on the right-hand side you

18    have two suppliers, Tyson, leniency applicant in this case,

19    Pilgrim's Pride, who has pled guilty for its involvement in

20    this same conspiracy, and four charged defendants, two other

21    charged individuals and an uncharged co-conspirator.

22         And what has been talked about in the argument is a

23    miniscule part of this slide deck that, like I said, is

24    voluminous and covers numerous topics.  And I think it hasn't

25    been connected that the information in here necessarily had an

1    impact on the individual that they claim it did.

2              THE COURT:  Mr. Feldberg, go ahead.

3              MR. FELDBERG:  Thank you, Your Honor.

4              The exhibit I was referring to with a little help from

5    colleagues is Government's Exhibit 1247.  It's dated August 26,

6    2014.  It's from Mr. Austin to Mr. Penn.  It begins, "Here is a

7    rundown of discussion we had last Friday."  Heading, "Pete's

8    opening comments," clearly referring to Mr. Suerken.  "KFC has

9    to purchase as they are now for 2015 because they don't have

10   time to change and are evaluating where they need to be for

11   2016 and 2017, whether they need to stay in small birds or

12   leave small birds and go to a bigger bird and cut in more

13   pieces."

14             "They also know they need to work with Pilgrim's to

15   help them make those decisions and are committed to do so," et

16   cetera, et cetera.

17             "Pete offered 9 cents versus our 17.86."

18             All of this is a direct reaction to among other things

19   the McKinsey report.

20             THE COURT:  The objection is sustained.  The McKinsey

21   report is, No. 1, not a business record.  As I indicated with

22   the last slide deck that was offered, there is a variety of

23   information in the McKinsey report.  It's not a traditional

24   business record at all.  It doesn't have indicia of reliability

25   to it that would justify it coming in as a business record.

4415

 1          We've already had testimony about the effect that the

 2   McKinsey report had on Mr. Olson and on Mr. Lewis.  Both of

 3   them already testified about that.  In terms of Mr. Suerken,

 4   that connection in terms of effect on him, not only to the

 5   extent it could be, it could be inferred, and maybe even

 6   testified by Mr. Lewis or Mr. Olson, but in any event, it's

 7   speculative exactly what the effect of the McKinsey report

 8   would have.

 9          True, there was some cause and effect.  McKinsey

10   report comes out.  It has various types of information that

11   Mr. Olson and Mr. Lewis testified about.  And then things --

12   and then KFC does something, as Mr. Tubach said, which it

13   hadn't done before.  But that's already in evidence.  The

14   connection to Mr. Suerken, in particular the admission of the

15   entire McKinsey report is entirely speculative, so I will

16   exclude that exhibit.

17          B-912?

18          *MR. TUBACH:*  Yes, Your Honor.

19          For B-912 I believe we moved its admission on a

20   similar basis, that it's relevance for effect on the listener.

21   I don't mean to belabor the point.  The Court has heard it.  It

22   goes to show why it is that RSCS would have done what they did

23   in the negotiations.  They were asking suppliers to commit more

24   volume to them.  And the blunt response is we're not committing

25   any more volume at the current margins.  In fact, we're going

1   to convert a plant away from small bird unless we can get

2   margin increases.  And this would explain why it is that RSCS

3   asked the suppliers why they wanted to increase margins.

4           We don't have to prove that there is this one-to-one

5   correlation or this is a sole cause that RSCS would have done

6   something.  The question is, is there a reasonable inference

7   that it had an effect on the listener.  In this case the

8   listener is RSCS and the answer we believe is yes.

9           THE COURT:  Ms. Call, go ahead.

10          MS. CALL:  Yes, Your Honor.

11          This also just really appears to be hearsay.  And the

12  effect argument seems to be pretty attenuated that the argument

13  is that an e-mail from someone at George's to RSCS caused RSCS

14  to have an effect on what it did with Pilgrim's.  And frankly,

15  the first -- second sentence of this e-mail says, "George's

16  supply is adequate."  I understand the additional volume

17  argument, but I think this is all really being offered for the

18  truth saying there was a supply issue.  KFC believed there was

19  a supply issue and then do whatever it did with its contracts

20  this year.  And I think really this is essentially being

21  offered for its truth and it's hearsay that wouldn't be

22  admissible.

23          THE COURT:  Mr. Tubach, anything more?

24          MR. TUBACH:  No.

25          THE COURT:  I am going to sustain the objection as to

1    B-912 as well.  It's really not effect on the listener.  This

2    is being offered for the truth of the matter asserted.  The

3    portion that is coming from Mr. Nelson is all hearsay.  And

4    whatever effect I just don't think constitutes a genuine

5    exception to the hearsay given the nature of Mr. Nelson's

6    e-mail, so I will sustain the objection as to B-912.

7               E-898?

8               MR. TUBACH:  Your Honor, this is being offered -- I

9    believe the comment from Mr. Penn in this document is a

10   question, so it wouldn't be hearsay in any event.  It simply

11   goes to show what the scope of the -- what the internal

12   dialogue and discussion was within Pilgrim's in getting that

13   price -- the bid to RSCS on August 19.  And as we have argued

14   in our brief, we believe that this is admissible for that

15   reason.

16              THE COURT:  Okay.  Ms. Call?

17              MS. CALL:  I am trying to not become a record here,

18   but I do think this is hearsay.  This is a defendant's

19   statement and a co-conspirator statement.  And the argument

20   seems to be circular that one item is a question and

21   non-hearsay.  The other statement is just relevant context for

22   the question.  But something has to be offered to prove

23   something.  And I think it's clearly the statements in here are

24   being offered for the truth and they are hearsay for that

25   reason.

4418

1          THE COURT:  Mr. Tubach, anything else?

2          MR. TUBACH:  No, Your Honor.

3          THE COURT:  I am going to sustain the objection as to

4    hearsay.  Yeah, these are both -- we have got Mr. Penn and then

5    we've got a co-conspirator, Mr. McGuire.  And there are

6    questions, but the questions are, with the exception of

7    Mr. Penn's one question, although everything is a question with

8    a statement or a statement fall-back question.  And I don't

9    find any exception under the hearsay rules for statements like

10   that, so I will sustain the objection as to E-898.

11         A-187?

12         MR. TUBACH:  Your Honor, this has to do with the

13   conversion to no antibiotics ever for Chick-fil-A.  And this is

14   an e-mail that someone at Pilgrim's sent to Chick-fil-A.  The

15   e-mail has been authenticated, so there is no dispute that this

16   went to someone at Chick-fil-A.  This is the response to

17   Chick-fil-A's request for an estimate of what it would cost to

18   convert to NAE.  This is Pilgrim's official response to that.

19         We believe it is admissible for the same reasons that

20   other bids are admissible.  This isn't a formal bid.  It is a

21   formal response to a request from a customer to provide an

22   estimate of the cost.  But it's also important primarily not

23   for the truth, which is that it would actually cost $.3124 per

24   pound based on an 80 million pounds per year.

25         It's the date that's so important because it's

4419

1    January 22, 2014.  And what that date shows is Pilgrim's

2    communicated this information to Chick-fil-A months before the

3    government alleged there is any communication with anyone about

4    converting NAE to Chick-fil-A.  So it's -- we believe the

5    information is sufficiently reliable to be admitted as a

6    business record, but it's primarily the date that we're

7    interested in showing that this information was communicated to

8    Chick-fil-A that is the significance of this document.

9            THE COURT:  And as far as you know, Mr. Tubach, based

10   upon your review of the documents, is this Pilgrim's response?

11           MR. TUBACH:  Yes, this is the Pilgrim's response to

12   the request from Chick-fil-A for the estimate.

13           THE COURT:  Ms. Call?

14           MS. CALL:  I think one word that Mr. Tubach just said

15   and appears about five times in this document is the word

16   "estimate."  So A, this isn't a business record.  There is

17   nothing final about it.  It's not a contract.  It doesn't even

18   purport to be a bid of any kind.  But outside of that, it is an

19   estimate.  We have prepared an estimate.  We estimate the

20   increase in costs to be this.  We estimate that the production

21   could be changed within six months.

22           There is nothing final about this that, A, is relevant

23   because it doesn't then negate the fact that collusion could

24   have occurred as to pricing months later.  And so I think it

25   takes you outside of the business record.  It takes it outside

1    of relevance.  And it again, it's still hearsay.  This is a

2    co-conspirator who is charged in another case saying this.  And

3    nothing about timing I think creates a hearsay exception

4    either.

5         THE COURT:  Well, if this was the only response back

6    to Chick-fil-A regarding what they asked for, because no one is

7    going to say, oh, yeah, we'll give you a firm proposal right

8    now, the fact that they use the term estimate is to be

9    expected.  No one is going to commit.  But obviously

10   Chick-fil-A wanted to get some feedback.  So if this the

11   response, does that make a difference in terms of the hearsay

12   analysis?  I mean, why wouldn't it be treated the same way

13   as -- almost like a bid?  It's not a bid, but...

14        MS. CALL:  Can I have one moment to confer, Your

15   Honor?

16        THE COURT:  Sure.

17        MS. CALL:  Yes, Your Honor.

18        We are looking into the specifics here.  I believe

19   what Mr. Tubach represented was that this was an estimate

20   presented in response to the request for an estimate.  As

21   Mr. Skalak had testified, part of this NAE process was an

22   ongoing one involving a discovery one and an implementation

23   portion.

24        This timing is before Chick-fil-A ever issued its

25   press release about the NAE process and said it was going to

4421

1    take five years to really go into place.  So I don't think this

2    is really the pricing in any way.  We are looking to confirm

3    that.  But this just seems to be a preliminary estimate, and

4    once again, on that basis just isn't really relevant to

5    negating any aspect of the collusion months down the road.

6        THE COURT:  Mr. Tubach?

7        MR. TUBACH:  Your Honor, this was sent to Chick-fil-A

8    expressly at their request on this date.  They asked a number

9    of suppliers on the 17th of January to provide a response by

10   the 22nd, and that's exactly what Pilgrim's did.  It is akin to

11   a bid.  It is necessarily an estimate because Chick-fil-A

12   hasn't yet finalized exactly how it's going to do NAE, and the

13   Court has heard testimony about that, but it is clearly

14   directly in response to their request to get an estimate of

15   what it would cost.  And this is Pilgrim's response.

16       THE COURT:  And so what would be the hearsay

17   exception, then?  It's not -- because it doesn't have

18   independent legal significance.  It's not really a bid.

19       MR. TUBACH:  It could have independent legal

20   significance even if it's not a bid.

21       THE COURT:  Well, it's an estimate.

22       MR. TUBACH:  It's an estimate.  It's primarily offered

23   to show -- it's not hearsay because it's not being offered to

24   show the truth that they would actually do this on this date.

25   What it's being offered to do is to say that on January 22nd

1 this is what Pilgrim's sent to Chick-fil-A.  If the government

2 wants to stand up and say they were actually planning on

3 charging 75 cents a pound, they can do that.  Our whole point

4 is that this information went to Chick-fil-A on January 22nd,

5 which is key in terms of the timing, because it just -- it

6 throws off the government's entire case theory about this.

7    THE COURT:  Ms. Call, anything else?

8    MS. CALL:  Nothing further, Your Honor.

9    THE COURT:  I am going to admit it for a limited

10 purpose, namely not for the truth of the matter asserted, but

11 rather for purposes of demonstrating the date on which

12 Pilgrim's responded to the request from Chick-fil-A.

13    All right.  E-117?

14    MR. TUBACH:  Your Honor, E-117 is a document about

15 shorts and Tyson, and what this shows is simply the state of

16 mind of the people in this e-mail chain about their reasons for

17 adopting what the Court has heard about the Otis strategy.  And

18 this is essentially taking a long-term view of not covering

19 shorts for other suppliers even when the customer wants it and

20 in response trying to take all of their business.

21    And this is exactly what's reflected in these.  It's

22 not being offered for the truth of the statements being made in

23 here, but rather to show the state of mind of those who were

24 making it.

25    THE COURT:  Okay.  Ms. Call?

1          MS. CALL:  Once again, these are defendant and

2    co-conspirator statements and some other declarants if I go

3    maybe 10, 15 e-mails back in the chain from others at Pilgrim's

4    that I think are strictly going to be hearsay.  If you are even

5    believing that this is about shortages, you are taking it for

6    the truth of what's being asserted in here.  And I don't see

7    anything showing, you know, a state of mind.  I think the

8    argument that's being made is you can read their words, believe

9    truth of it and understand their state of mind based on what

10   they are saying at the time.  That's just not how 803(3) works.

11          THE COURT:  Mr. Tubach, anything else?

12          MR. TUBACH:  Nothing further, Your Honor.

13          THE COURT:  I agree with Ms. Call.  E-117 is a hearsay

14   document.  There's lots of different people as part of this

15   e-mail chain.  And I don't think that -- the jury would have to

16   accept the truth of the matters to glean anything about

17   someone's state of mind.  That's not the state of mind

18   exception.  And for that reason I am going to exclude E-117 as

19   hearsay.

20          How about E-003?

21          MR. TUBACH:  To save time, we made the same argument

22   with regard to the last document with respect to this one.

23   It's another document discussing the Otis principle and they

24   are going to, as they say in the document, "dropping Otis off

25   at AA class on March 9th."  We believe this is admissible for

1    the same reasons we articulated earlier.

2        THE COURT:  Okay.  And I will exclude E-003 for the

3    same reason I just articulated for E-117, except obviously

4    there is not as many people in that particular e-mail chain,

5    but I don't find any particular hearsay exception for that.

6        F-459?

7        MR. TUBACH:  F-459 is an e-mail string among

8    essentially three people, Mr. Sandri, the CFO at Pilgrim's,

9    Mr. Lovette and Mr. Penn.  And this is an e-mail string that

10   starts with Tyson's public earnings release and then there are

11   various statements about how much they dislike Tyson as well as

12   Sanderson and Wayne, all three of them competitors of

13   Pilgrim's.  This goes directly to the state of mind of Mr. Penn

14   and Mr. Lovette who are on trial here and it goes directly to

15   negate or is highly relevant to the state of mind and the

16   mental state required to enter into a Sherman Act violation.

17       They have alleged that these defendants, Mr. Penn and

18   Mr. Lovette, are in a conspiracy with Tyson and Sanderson, all

19   these chicken suppliers.  And here they are saying in the

20   middle of the supposed conspiracy, "I HATE that company and

21   everything about it!!!!"

22       "I hate Tyson but I hate Sanderson more!!"

23       Mr. Sandri:  "And I hate Wayne even more."

24       Now, Mr. Sandri's statements could be redacted because

25   his state of mind is perhaps not as relevant here, but

1    certainly as to Mr. Penn and Mr. Lovette those statements go

2    directly to their state of mind in the middle of the conspiracy

3    and are highly relevant to whether or not they entered into a

4    conspiracy with Tyson to fix prices.

5              THE COURT:  Once upon a time there were chuckles when

6    the government wanted to admit things that had a lot of

7    question marks or exclamation points.  How is it this

8    different?

9              MR. TUBACH:  Well, there are four exclamation points,

10   Your Honor, on one of them.  And that might --

11             THE COURT:  There are a lot of question marks on one

12   of them too.

13             MR. TUBACH:  In fact, Mr. Lovette uses four in two

14   e-mails, so that's actually eight.  I think we have perhaps

15   risen to the level of an excited utterance.

16             THE COURT:  You are not offering it as excited

17   utterance?

18             MR. TUBACH:  No, I am not, Your Honor.

19             THE COURT:  Go ahead, Ms. Call.

20             MS. CALL:  I do think Mr. Tubach is the one that says

21   he writes his e-mails in all caps all the time.

22             But regardless, 803(3), I understand Mr. Tubach's

23   argument that this goes to the defendants' state of mind in

24   committing this crime.  That said, the actual hearsay exception

25   we are talking about, 803(3), is state of mind such as motive,

 1    intent or plan.  And the statements here have really nothing to

 2    do with that and so don't fall under any hearsay exception.

 3              *THE COURT:*  Mr. Tubach?

 4              *MR. TUBACH:*  Your Honor, they go directly to the only

 5    state of mind that's relevant in this case, whether Mr. Lovette

 6    and Mr. Penn entered into a conspiracy knowingly and

 7    voluntarily to fix prices.  And this won't disprove that

 8    allegation by itself, but it is highly relevant of both of

 9    those defendants' state of mind again in the middle of the

10    conspiracy.

11              And, you know, the same thing to be said -- I will

12    just short-circuit this -- D-240 is exactly the same thing.

13    It's the next one where Mr. Penn is writing to Mr. Lovette

14    saying -- he is forwarding a report basically saying this is

15    the best week we've ever had as a company.  "We have much more

16    to get.  Personal mission is to send Sanderson into a tailspin.

17    No need to mess with Tyson because they have taken their own

18    poison pill with their new structure.  Foot on the throat.

19    Both of these boys will be going down."  It's inconceivable to

20    me that that isn't relevant to the issue of whether or not

21    Mr. Penn was in a conspiracy with Tyson at this very moment to

22    fix prices.

23              *THE COURT:*  Ms. Call, did you want to comment on the

24    next -- it's I think appropriate to take a look at the next

25    exhibit which is D-240.  Anything else on F-459 and/or D-240?

1          MS. CALL:  Just that the final point, and I take

2     Mr. Tubach's argument that, you know, you can use the words of

3     the defendants if you believe them to understand what they're

4     thinking at the time, but the exception that's 803(3) is has to

5     be a statement of the declarant's then existing state of mind.

6     And these -- absent considering the truth and what this says

7     about what they are thinking at the time, these are not

8     statements of their state of mind like saying "I was afraid" or

9     something like that that would make these fall within that

10    exception.

11          I also got handed a note that it's true, although I

12    don't know it's relevant to the hearsay exception, that you

13    don't have to like your co-conspirator to be in a conspiracy

14    with them, but regardless, I think this is all hearsay in both

15    of these exhibits.

16          THE COURT:  Actually, I am going to admit both of

17    those, although on F-459, that top e-mail from Mr. Sandri

18    should be redacted because his last word on the subject of

19    Wayne is irrelevant.  But I do think that the indicia of the

20    statements from Mr. Lovette and from Mr. Penn are

21    contemporaneous not just because of the multiple exclamation

22    points, but indicating what their feelings are regarding Tyson

23    and Sanderson at that time.  So I do think that this is one of

24    those rare instances where in an e-mail you could have some

25    type of clear state of mind, and for that reason I will admit

1   it as -- I will admit F-459 as redacted.

2        In terms of D-240, I will admit that for the same

3   reason.  It does not have exclamation points, but nonetheless

4   does indicate a clear kind of agenda, perhaps even what you

5   might call a vendetta.  And for that reason I think it's, once

6   again, an exception and I will allow in D-240 as well.

7        *MR. TUBACH:*  Thank you, Your Honor.  Those are all the

8   documents --

9        *THE COURT:*  With a limiting instruction that the jury

10  should consider it only for the -- Mr. Lovette and Mr. Penn's

11  state of mind as to F-459 and only as to Mr. Penn's state of

12  mind as to D-240.

13       *MR. TUBACH:*  Those are all the documents that we had.

14       *THE COURT:*  Thank you very much.

15       Mr. Byrne, did you want to do the documents or

16  document -- I can't remember -- that Mr. Little had?

17       *MR. BYRNE:*  Yes, Your Honor.  It's just F-170.  And

18  there is a couple, but I think Exhibit 3053, and correct me if

19  I'm wrong, is then stipulated to by the government as

20  admissible and authentic.  Is that correct, Ms. Call?

21       *MS. CALL:*  Yes.  You are referring to the contract,

22  correct?

23       *MR. BYRNE:*  Correct.

24       *THE COURT:*  So sorry, Mr. Byrne.  So we still have the

25  issue of Exhibit 3052, then, the cover?

1          MR. BYRNE:  Right.  So 3052 is just the transmittal

2     e-mail showing that, in fact, it's the signed e-mail that was

3     transmitted on March 5th of '14.  So we are just showing that

4     that was, in fact, transmitted back and it's the signed copy

5     that was sent back to Mr. Bradley.

6          THE COURT:  Any objection to 3052?

7          MS. CALL:  No, Your Honor.

8          MR. BYRNE:  Then the only other one is F-170.  And

9     that's an e-mail involving Mr. Bradley and Mr. Little.  There

10    is also an e-mail in there between Thomas Lane and Jimmie

11    Little.  And we argued in the papers that we filed that it's a

12    business record, but I think that's probably not a winning

13    argument, so I will instead argue -- which we also argued in

14    our papers -- that we are not offering it for the truth.

15         And the reason why this is important, we are offering

16    it to show the date that this freezer charge was discussed

17    between Mr. Bradley and Mr. Little, which is December 21st of

18    2012.  And the reason why this is relevant is because in the

19    government's summary chart dated -- the summary chart 1-1,

20    there is a suggestion here that starting on May 31st of '13,

21    that Dean Bradley asks for the freezer charge pricing to

22    Mr. Pepper and also to Pilgrim's.  And there are some phone

23    calls on the chart between Pepper and Little and then there is

24    a suggestion that they're coming up with this .025 to .03 on

25    the eight-piece dark meat.

4430

1          So there is a suggestion now by the government in the

2   summary chart that for the first time on May 31st, that there

3   is some collusion between Tyson and Pilgrim's and the .03 is

4   suggested to Dean Bradley.  And, in fact, this e-mail shows

5   that completely separate from any of that back in December 21st

6   of '12, in fact, that price was suggested to Dean Bradley by

7   Mr. Little.

8          So we are not offering it for the truth.  We are

9   offering it to show that, in fact, back on December 20th of

10  2012, there were discussions about that price.  And it's

11  directly relevant to show that, in fact, summary chart 1-1

12  completely misrepresents and is asking the jury to draw a

13  conclusion based upon insufficient evidence that, in fact, this

14  was concocted in May when, in fact, the proposal came a lot

15  earlier.

16          THE COURT:  Thank you, Mr. Byrne.

17          Ms. Call?

18          MS. CALL:  While I appreciate using the summary charts

19  as helpful aids here, I will say that the underlying evidence

20  does speak for itself here.  So this document is from December

21  of 2012 and represents some pricing discussion that happened.

22  From the evidence that's in already in this case, it's clear

23  that what happened in May is a totally separate discussion.

24          In Government's Exhibit 108, Dean Bradley at the

25  bottom of that e-mail reaches out to Defendant Little with a

1    new request about frozen product and he sends specifications

2    with that request.  He later makes the request for pricing

3    noting that Pilgrim's was not at this time after the date of

4    this e-mail six months later, five, depending on how you're

5    counting, Pilgrim's was not currently charging for frozen dark

6    meat.  And then he said, "What's going to happen with the

7    frozen eight-piece?"

8            So it's clear that whatever happened here in December

9    didn't lead to anything, but it's also a totally different

10   discussion.  So I don't believe this is relevant, A.  And B, I

11   don't believe I heard an argument how this is admissible in the

12   first place because it is all hearsay.

13           THE COURT:  Mr. Byrne?

14           MR. BYRNE:  108, if she is referring to 108, says

15   that, "In terms of pricing, traditionally Pilgrim's has based

16   the frozen dark meat price the same as the fresh dark meat,"

17   obviously referring to this previous incident.

18           But again, we are not offering it for the truth.  We

19   are offering it to show that the price was discussed back in

20   December of '12.  108 refers back to this exhibit or refers to

21   this exhibit not by name, but by the traditional pricing for

22   this.  And so it's not something that was concocted all of the

23   sudden in May of 2013.  But anyway it's not offered for the

24   truth of the matter.  It's offered to show the date.

25           THE COURT:  First of all, although Mr. Byrne did not

1    argue the business record argument, it is made in Docket

2    No. 899, which is the motion that he -- that Mr. Little filed

3    to admit certain documents without a sponsoring witness.  I

4    will reject that argument as not a business record and doesn't

5    meet the criteria for one.

6         In terms of the offer of it not for the truth of the

7    matter asserted but only for the date, I am also going to

8    reject that argument.  The date would only be comprehensible to

9    the jury and have any significance or relevance if they took

10   into account what the stated prices and so forth are.  That

11   would be for the truth of the matters asserted.  That's the

12   only basis on which the jury could conceive of relevance.  And

13   therefore, I do not find that it falls within a hearsay

14   exception for that and I will exclude that exhibit.

15        Let's see, did we have any more?  We have Mr. Pollack

16   with his issue.

17        Mr. Beller?  Then Mr. Beller has some that he

18   mentioned as well.

19        *MR. BELLER:*  Thank you, Your Honor.

20        And before I proceed with argument, if I may inquire

21   of the government as to whether they are going to be objecting

22   to these documents.

23        *THE COURT:*  That's a good inquiry.

24        *MR. TORZILLI:*  Some of them, yes.

25        *MR. BELLER:*  Okay.

1           *THE COURT:*  Why don't we take them one at a time, but

2   Mr. Torzilli, if one is not going to be objected to, if you

3   will let us know obviously.

4           Go ahead, Mr. Beller.

5           *MR. BELLER:*  So then I will start with 916.  Your

6   Honor, F-916 is a bid from Claxton to RSCS dated March the 2nd,

7   2017.  Exhibit F-915 is the cover e-mail that goes along with

8   the bid.  So I can take those in turn.

9           *THE COURT:*  Do you mind showing me 915?

10          *MR. BELLER:*  Your Honor, I will note I think the Court

11  might also have physical copies on its bench if that's easier.

12          *THE COURT:*  Perhaps, although Mr. Tubach presented me

13  with such a pile of ones, I've mixed them up.  I don't know if

14  I do.

15          *MR. BELLER:*  That's okay.  I have another set if that

16  would be easier on the Court, Your Honor.

17          *THE COURT:*  I just found them, yes.  I'm all set.

18  Thanks.

19          Mr. Torzilli, how about F-915?

20          *MR. TORZILLI:*  F-915, we object to the e-mails on

21  hearsay grounds.

22          *THE COURT:*  What about the very top one?

23          *MR. TORZILLI:*  The very top of 915?

24          *THE COURT:*  Yeah, that top e-mail.  It's from

25  Mr. Brady, but assuming that that transmits the bid -- and I'm

 1    not sure it does, Mr. Beller.  I am just guessing about that.

 2    But what about that part of it?

 3         *MR. TORZILLI:*  We would still have a hearsay objection

 4    to it.

 5         *THE COURT:*  Go ahead, Mr. Beller.  You can take them

 6    in whatever order you want.

 7         *MR. BELLER:*  Thank you, Your Honor.

 8         Your Honor, it's my position that F-916, the bid of

 9    March the 2nd, 2017, does, in fact, have independent legal

10    significance and as such is an exception to the hearsay rule.

11         Your Honor, as to F-915, the reason that I am offering

12    that is purely for consistency sake.  In going through the

13    transcripts over the course the last month, when contracts are

14    offered under the independent legal significance standard, the

15    cover e-mail has also been offered.  And the Court has ruled

16    and the government has argued that the e-mail even when

17    containing hearsay provides an overview of something attached.

18    And because the e-mail provides an overview of something

19    attached, it also has independent legal significance.

20         So both 915 and 916 are offered for that reason.  If

21    there is some concern regarding hearsay, certainly from my

22    perspective it is the date and that is March the 2nd of 2017

23    which contextualizes F-916, and that's really the reason why

24    F-915 would, I think, assist the jury and ultimately provide an

25    overview of what, in fact, is attached.

1      So my request to the Court is twofold.  No. 1 is that

2   both are admitted in their entirety as presented.  If for some

3   reason, however, the Court finds that F-915 is, in fact,

4   hearsay, I certainly would have no objection to redacting all

5   of the content and simply leaving the contact information, date

6   at the top noting, of course, that the attachments that are

7   reflected on F-915 coincides with the file name as stated on

8   F-916.

9           THE COURT:  Mr. Torzilli?

10          MR. TORZILLI:  For 915 our position would be the

11   content is completely hearsay and ought to be inadmissible.

12   Our position I think throughout this trial is that e-mail

13   header information such as To, From and Date information is not

14   hearsay because it's not an intended assertion by a person.

15          But on 916 even if the bid is viewed as being

16   independently legally significant and therefore not hearsay,

17   there is still a sponsoring witness issue.  And I think if one

18   thing we have learned over the past month plus is that it's

19   important to have a sponsoring witness sponsor at least bid

20   information because there's a lot to be gleaned from having a

21   live witness on the stand rather than having just a bid

22   submitted without a witness.  So we would also object on the

23   foundational ground that it's inappropriate to have this

24   admitted without a live witness.

25          THE COURT:  Okay.

1          MR. TORZILLI:  I will say that it looks like from this

2    that this was transmitted by Defendant Scott Brady to among

3    others Sara Fisher, who was a witness that was called by the

4    United States.

5          THE COURT:  Okay.  Anything more, Mr. Beller?

6          MR. BELLER:  Your Honor, only that I believe this was

7    offered through Ms. Fisher and the government objected at that

8    time that it was beyond the scope.  So there certainly was an

9    attempt to get it in through a sponsoring witness.  With that

10   said, the Court knows the history of this case.  I am not going

11   to insult anyone by going into the discussion regarding

12   sponsoring witness.  I do think that the arguments that were

13   made as well as the law of this particular case regarding all

14   other contracts in covering e-mails applies to this one as

15   well.

16         THE COURT:  So, Mr. Beller, what about the middle

17   e-mail from Mr. Brady?  We have Ms. Fisher asking, hey, we need

18   this information.  The bid seems to be a response.  But then we

19   have a somewhat explanatory e-mail from Mr. Brady in the middle

20   of it.

21         MR. BELLER:  And, Your Honor, my response would be I

22   believe that that still provides the overview of the contract

23   that's attached.  I certainly have no objection to redacting

24   that if, in fact, that will make the documents admissible under

25   the Court's orders.

1            *THE COURT:*  Mr. Torzilli, anything more from you?

2            *MR. TORZILLI:*  Nothing further.

3            *THE COURT:*  I will admit F-915 and also F-916.  F-915

4    I think is a bid.  It does have independent legal significance.

5    Mr. Torzilli's point about the consistency of arguments is a

6    good one, but it has not kept things that had independent legal

7    significance from coming in.  But I will order that the middle

8    e-mail from Mr. Brady be redacted.  I will explain to the jury

9    that Ms. Fisher's e-mail should not be considered for the truth

10   of the matter asserted, but rather for the effect on the

11   listener.  And I will allow the entirety of Mr. Brady's e-mail

12   at the top of the page including where he says, "Here is the

13   revised pricing for 2018" and his signature line and that part

14   of it.  That's fine.

15           *MR. BELLER:*  Thank you, Your Honor.  We will have that

16   prepared and ready.

17           *THE COURT:*  And let me just jot a few notes if you

18   don't mind.

19           Go ahead, Mr. Beller.

20           *MR. BELLER:*  I would note for the purpose of

21   scheduling as to 915, we will have that redacted.  It's not my

22   intention to take a bunch of time with publishing.  I do

23   believe it's important to at least publish that one long enough

24   for the Court to be able to advise regarding the limiting

25   instruction.

1          THE COURT:  915?

2          MR. BELLER:  915.

3          THE COURT:  That's fine.

4          MR. BELLER:  But otherwise, I am not going to publish.

5          THE COURT:  Understood.

6          MR. BELLER:  Can I please inquire of the government's

7   position as to F-754?

8          MR. TORZILLI:  No objection to F-754.

9          THE COURT:  All right.  Go ahead, Mr. Beller.

10         MR. BELLER:  And that's all, Your Honor, assuming that

11  that is introduced with no objection.

12         THE COURT:  Yes.  And the first page has been redacted

13  already, so there doesn't appear to be any objection.

14         MR. BELLER:  Very good.  Thank you, Judge.

15         THE COURT:  Mr. Pollack, go ahead.

16         MR. POLLACK:  Very briefly, Your Honor.

17         There were cases where courts have admitted statements

18  against the government as either a statement of the party under

19  801(d)(2)(A) or a statement made by an agent of the party under

20  801(d)(2)(D).  And I would cite the Court to U.S. v. Morgan,

21  581 F.2d 933, D.C. Circuit case from 1978; United States v.

22  Warren, 42 F.3d 647, another D.C. Circuit case, this one from

23  1994; and United States v. Kattar, K-A-T-T-A-R, 840 F.2d 118.

24  That's a First Circuit 1988 case.

25         In Warren, for example, it was a statement by a police

1    officer that was in a search warrant affidavit.  And courts

2    have allowed such statements when they have either been made or

3    adopted by the government.  I cannot say, Your Honor, that I

4    found a case precisely with this set of facts where it was a

5    case agent in testimony from a pretrial hearing, but I would

6    note that the reason that Agent Taylor is sitting at counsel

7    table is because he is a representative of a party.

8            The FBI is a component of the Department of Justice,

9    not a separate agency like the police officer and the

10   prosecutor in the Warren case.  The Department of Justice has

11   designated Agent Taylor as its case agent in this case.  And

12   the Department of Justice sponsored his testimony at the *James*

13   *hearing*, the testimony from which I am trying to introduce the

14   testimony and it is certainly reliable.  It was made under

15   oath.  The government had the opportunity to redirect.  And so

16   on these facts I think it does fit within the cases that say

17   that a statement is either made or adopted by the government

18   can be admitted either under 801(d)(2)(A) or 801(d)(2)(D).

19           *THE COURT:*  Thank you, Mr. Pollack.

20           Response by the government?

21           *MS. CALL:*  We are trying to read these cases as we are

22   sitting here, but I simply don't think, and especially if

23   Mr. Pollack couldn't find law to the effect of it, that a

24   statement of an agent at a hearing would qualify as a statement

25   admissible under 801(d)(2)(A).  I understand his arguments, but

1    I just don't think that is a recognized application of that

2    rule to these circumstances.  And if that were the case, I

3    mean, there would be a flood of Grand Jury transcripts, hearing

4    testimony, things just always coming into evidence absent an

5    agent to actually testify about it, and I just simply -- that

6    can't simply be the case of the law.

7         THE COURT:  Mr. Pollack, anything more?

8         MR. POLLACK:  No, Your Honor.  I will submit on that.

9         THE COURT:  The closest case I could find is *United*

10   *States v. Ballou*, B-A-L-L-O-U, an opinion from Judge Browning

11   in New Mexico reported at 59 F.Supp.3d 1038 from 2014 where

12   looking over it, I think he looked over the case law.  He noted

13   that The First Circuit citing specifically *Kattar* had taken a

14   different position than the 10th.

15        What he states is, "The Tenth Circuit has limited the

16   scope of Rule 801(d)(2)(D) in all cases, not just those

17   involving the United States to situations in which the

18   party-opponent controls the daily tasks of the declarant."

19        And there is not much case law in the 10th Circuit on

20   it.  I don't find that the circumstances here, even given the

21   fact that we had a situation in the *James* hearing where the

22   United States had a choice of witnesses, Special Agent Taylor

23   wasn't the logical -- he was the logical choice, but other

24   people could have done it too, so in that sense the United

25   States might have had more of an endorsing role in choosing him

1    to present the testimony.

2          Nonetheless, I think to have his testimony represent

3    the statement of a party-opponent I think goes too far.  I

4    don't think the 10th Circuit would adopt that particular view

5    of things.  And I think that if the 10th Circuit did, it would

6    certainly cause all sorts of -- well, the 10th Circuit can do

7    what it wants, obviously, but I think you would have a bizarre

8    situation where the witnesses would then tend to be, for

9    instance, state detectives or state officers because they

10   couldn't possibly be such a person because they don't work for

11   the Department of Justice.  I think you would get some strange

12   types of ways that parties would try to work around such a

13   thing.

14         But more naturally the fact that the government's

15   witness who happens to work for the FBI, a component of the

16   Department of Justice, would not make that person's statements

17   those of a party-opponent, so for that reason I will reject the

18   basis -- that basis for admitting the statements of Special

19   Agent Taylor.

20         MR. POLLACK:  Thank you, Your Honor.

21         THE COURT:  Are we ready to bring the jury back in?

22         Mr. Gillen, go ahead.

23         MR. GILLEN:  Your Honor, before you bring the jury

24   back in, I'd renew my request as to the identification of the

25   two documents the government says that they intend to

1    introduce.

2           THE COURT:  Oh, yes.  What documents is the United

3    States going to introduce?

4           MR. KOENIG:  We have decided not to.

5           THE COURT:  That answers that question.

6           MR. GILLEN:  Thank you, Your Honor.

7           THE COURT:  Are we ready for the jury?  We only have

8    about 20 minutes, but I think we can accomplish what we need to

9    in that period of time.

10          One big question -- sorry, Mr. Beller, if you hold off

11   for just one second -- would be so if the defendants rest today

12   and there is no rebuttal case, then we're done.  The next thing

13   would be when to have the jurors return.  And I know that you

14   haven't had very much time to look over the jury instructions,

15   but when do we think we would want the jury to return?  As I

16   said, we can't work tonight until midnight.  In fact, we can

17   only work until 6:00 o'clock.  The court security officers will

18   start peering through the windows at about 6:00.

19          So we won't be able to get too much done tonight.  And

20   therefore, if you anticipate lots of issues coming up in terms

21   of our jury instruction conference, then maybe we shouldn't

22   have the jury come back right away.  It also takes a long time

23   to manufacture all the copies and things of that nature too, so

24   there are a few mechanical things that we have to factor in as

25   well.  And we have to talk about the length of closings and all

1    those good things.

2          So any ideas or thoughts about when we should have the

3    jury return tomorrow?

4          MR. BELLER:  If I can inquire of everybody, how does

5    1:30 sound?  That would give us a little bit of time this

6    afternoon and then tomorrow morning to go through some of these

7    details.

8          MR. TUBACH:  For clarification, what would we be doing

9    at 1:30 tomorrow?

10         THE COURT:  Well, if we have the jury come back, they

11   would be listening to closings.

12         MR. TUBACH:  And the Court's practice, am I correct,

13   is to instruct the jury?

14         THE COURT:  First, so you can write your closing while

15   I am reading the instructions.

16         MR. TUBACH:  My request, and I haven't cleared this

17   with anyone, so I am sure I will find arrows in my back, my

18   request would be we do closing arguments starting Wednesday

19   morning.  Otherwise we are going to have this position where

20   there is like some arguments and then they come back the next

21   day.

22         THE COURT:  I don't think the jury would look a gift

23   horse in the mouth.  That's not such a bad -- because the

24   problem is that in order to catch the jurors before they came

25   in tomorrow, that would be like mid-morning, I am not sure we

1    would have that good of a sense.  So I don't think that that's

2    unreasonable.  And if every -- if the defendants rest today and

3    then we tell -- I ask the government if it has a rebuttal case,

4    the government says no and we're done, and then I tell the

5    jurors come back on Wednesday and we are going to be doing

6    closings, I think that they will be delighted and that would

7    not create a problem with them.

8         Ms. Prewitt?

9         MS. PREWITT:  The only thing is the length of the

10   government's closing.

11        THE COURT:  Yes.  We need to work that out.  I

12   wouldn't tell the jurors anything today about what to respect

13   in that regard.

14        MS. PREWITT:  But in terms of the risk of splitting

15   up.

16        THE COURT:  There is going to be some splitting, I

17   think, because I don't -- well, there could be some splitting,

18   you're right.  It wouldn't necessarily be any splitting.  We

19   will have to think about that, but I probably would have the

20   jurors come back at 8:30 regardless.

21        MS. PREWITT:  8:30 --

22        THE COURT:  Wednesday.  We could have them come in

23   extra early like at 8:00 to try to avoid splitting, but I think

24   that that's a bit speculative.  I haven't done the math on it

25   yet.  I probably would just have them come back regular time.

4445

1    We could cut the lunch hour down a little bit.  We could

2    possibly go a little bit later to fit it all in, but that's a

3    long day just sitting there listening to closings regardless,

4    but we can figure it out.

5            All right.  Anyone have anything, other suggestions?

6    Is that all right with the government if we have them come back

7    on Wednesday?

8            MR. KOENIG:  Yes.

9            THE COURT:  Mr. Beller?

10           MR. BELLER:  My final question is does the Court want

11   each one of us individually to stand up and rest?

12           THE COURT:  No, no.  You do not need to.  What I will

13   say is that any more additional evidence on behalf of the

14   defendants?  No.  Is this true for everyone?  Fine.  But we

15   don't need to go through that formality.

16           MR. BELLER:  Very good.  Thank you.

17           THE COURT:  Mr. Byrne?

18           MR. BYRNE:  There were a couple of exhibits, 3052,

19   3053 that were admitted with some other ones.  How do we do

20   that?

21           THE COURT:  I will have you move the admission of

22   them.  The ones we just ruled on?

23           MR. BYRNE:  Yes.

24           THE COURT:  Yeah, I will have you stand up and move

25   the admission of them and then I will indicate to the jury.

1    And I think that Mr. Beller wanted to show one, for instance,

2    for a brief period of time, so we will do all that in the

3    remaining 15 minutes.  We might have to go a little past 5:00,

4    but we'll do that.

5             MR. BYRNE:  We will do it quickly.  Thank you.

6             THE COURT:  Okay.  Are we ready, then, for the jury?

7    Let's bring the jury back in.

8             (Jury present.)

9             THE COURT:  All right.  The defendants may call their

10   next witness.  Additional witnesses or any additional evidence?

11            MR. TUBACH:  Yes, Your Honor.  Pursuant to the hearing

12   we just had, Mr. Penn would move the admission of Exhibit

13   A-187.

14            THE COURT:  All right.  And ladies and gentlemen,

15   while you were not present, I did go ahead and rule on that

16   one.  Exhibit A187 is admitted for the limited purpose of

17   showing the date on which Pilgrim's responded to the ABF

18   program request that it received from Chick-fil-A, all right?

19   So it's admitted just for the limited purpose of showing the

20   date on which Pilgrim's responded and for no other purpose.

21            MR. TUBACH:  Thank you, Your Honor.  We are not asking

22   to publish that to the jury at this time.

23            We also move the admission of F-459 as limited by the

24   Court's instruction.

25            THE COURT:  Yes.  Ladies and gentlemen, I have

1   admitted F459 for the limited purpose of showing Mr. Lovette's

2   and Mr. Penn's state of mind and for no other purpose.

3          *MR. TUBACH:*  And, Your Honor, the first portion I

4   believe has also been redacted.

5          *THE COURT:*  Yes.  The jury won't see that portion, but

6   you are right, that was redacted.

7          *MR. TUBACH:*  We would ask if we could show that to the

8   jury at this time.

9          *THE COURT:*  Yes, it may be.

10          *MR. TUBACH:*  If we could start at the bottom, please.

11          *THE COURT:*  Okay.

12          *MR. TUBACH:*  Thank you, Your Honor.

13          Mr. Penn also moves into evidence D-240.

14          *THE COURT:*  All right.  Ladies and gentlemen, by

15   previous ruling of the Court, D-240 is admitted for a limited

16   purpose, namely as to Mr. Penn's state of mind and for no other

17   purpose.

18          *MR. TUBACH:*  Thank you.  I would ask to publish that

19   to the jury.

20          *THE COURT:*  You may.

21          *MR. TUBACH:*  And for that we can simply publish the

22   top portion.  I don't think we need to publish all those names

23   at the bottom.

24          *THE COURT:*  Okay.

25          *MR. TUBACH:*  Thank you, Your Honor.  No further

1    documents.

2            THE COURT:  Thank you, Mr. Tubach.

3            Additional exhibits?  Mr. Feldberg.

4            MR. FELDBERG:  Thank you, Your Honor.  On behalf of

5    Mr. Austin, we offer E-014 which the parties have stipulated to

6    its authenticity and admissibility.  It's Pilgrim's 2016

7    contract for KFC.

8            THE COURT:  What was the number of that one again?

9            MR. FELDBERG:  E-014.

10           THE COURT:  Okay.  And that's correct, no objection?

11           MS. CALL:  Yes, Your Honor.

12           THE COURT:  E-014 is also admitted, ladies and

13   gentlemen.

14           All right.  And Mr. Byrne, go ahead.

15           MR. BYRNE:  Yes, Your Honor.  On behalf of Mr. Little,

16   we would ask that Exhibits 3052 and 3053 be admitted into

17   evidence.  I believe the government has stipulated.

18           THE COURT:  And what were those numbers again,

19   Mr. Byrne?  Sorry.

20           MR. BYRNE:  3052 and 3053.

21           THE COURT:  And both of those, ladies and gentlemen,

22   have been admitted.

23           And Mr. Beller, go ahead.

24           MR. BELLER:  Thank you, Your Honor.  On behalf of

25   Mikell Fries, we would move for the admission of F-754, the

1    2016-2017 contract with RSCS.

2           THE COURT:  By previous ruling, ladies and gentlemen,

3    F-754 has been admitted.

4           MR. BELLER:  Your Honor, we would also move for the

5    admission of F-916, a March bid -- excuse me, March of 2018 --

6    March of 2017 bid for 2018, excuse me, with RSCS.  Your Honor,

7    we would also move for the admission of 915 and request to

8    publish with the limiting instruction.

9           THE COURT:  Ladies and gentlemen, by previous ruling

10   F-916 has been admitted and F-915 is admitted.  It's an e-mail.

11   As to Ms. Fisher's statements, those are admitted not for the

12   truth of the matters asserted, but only for the effect on the

13   listener.  And that's the limiting instruction for that one.

14   And it may be published.

15          MR. BELLER:  Thank you.  And if we can just publish

16   that briefly.  And if we can highlight the bottom part, please,

17   for ease of reading.

18          THE COURT:  Okay.

19          MR. BELLER:  And the top part, please.  The top

20   header, please.

21          THE COURT:  Let's give it a little bit longer on the

22   second page.

23          MR. TORZILLI:  I am going to object to the publication

24   of the middle e-mail.

25          THE COURT:  That's not shown at the moment.

4450

1          Okay.  Everyone done with the second page?

2          Okay.  Now we can go to the top.

3          MR. BELLER:  Thank you.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.

6          All right.  Additional evidence on behalf of the

7     defendants?

8          All right.  Do the defendants rest?  If anyone does

9     not rest, you can let me know.

10         All right.  So ladies and gentlemen, at this point in

11    time the defendants have now concluded the evidentiary portion

12    of the defendants' case.  As I mentioned to you way back when

13    at the beginning of the case, the government has an opportunity

14    at this time to present rebuttal evidence, so I will inquire of

15    the United States.

16         Does the United States wish to present a rebuttal case

17    at this time?  Mr. Koenig?

18         MR. KOENIG:  We do not, Your Honor.  Thank you.

19         THE COURT:  Ladies and gentlemen, then that means that

20    the evidence in the case has concluded.  It's almost before

21    5:00 now.  Here is what we're going to do.  We need to prepare

22    the jury instructions.  Some people who have never been a juror

23    before may think, hey, how many instructions could there be?

24    There actually can be quite a few.  And we are going to work on

25    those tonight.  We are going to work on those tomorrow to make

1    sure that the instructions are ready to go.

2         Because I am not 100 percent sure how much time we're

3    going to need tomorrow, we can't stay really past 6:00 o'clock

4    tonight, I am going to ask that you return on Wednesday at

5    8:30.  When you return on Wednesday, you are going to -- we are

6    going to begin by you hearing the closing arguments of the

7    government and the defendants, all right, ladies and gentlemen?

8         So we are going to be off tomorrow and then have you

9    come in Wednesday at 8:30.  We are getting close to being -- to

10   the point when you are actually going to be able to deliberate

11   in this case, but we're not there yet.  So you have to keep

12   those admonitions firmly in mind.  Don't start talking to

13   people at home even though you may be anticipating that we're

14   getting close to being done.  Don't start, you know, telling

15   them things about the case that you shouldn't.  Don't let them

16   tell things to you about the case that you shouldn't be

17   hearing.  Don't start conferring with each other.  Because

18   until such point as I say, all right, ladies and gentlemen, I

19   am going to release you now to commence your deliberations, you

20   can't talk to each other about the case.

21        And also keep the other admonitions in mind too.

22   There may be things that you've -- terms that you've heard

23   throughout the course of the trial and you still haven't got an

24   explanation of what those are.  Once again, you can't look

25   those up.  The instructions may help you with some things, but

4452

1    with other things if you haven't found out about it, that's the

2    way it goes.  You can't look up any information about the

3    jury -- sorry, any information about the case that you may have

4    heard during the course of the trial.

5         You will remember that example that I mentioned about

6    the case involving the animal parts in Africa and one of the

7    jurors looked up information about, you know, from a satellite

8    map about the course of the river and it caused a mistrial.

9    And the question was whether the juror was going to have to pay

10   for the cost of the retrial.  We don't, obviously, want to get

11   into any type of situation like that.  So don't look up

12   anything.

13        And I hope you have a good evening, good day tomorrow.

14   I will see you back on Wednesday at 8:30.  The jury is excused.

15        (Jury excused.)

16        So why don't we do this.  Why don't we take a

17   15-minute break and then at 5:15 let's start talking through

18   the instructions a little bit.  We don't necessarily have to go

19   through them too comprehensively because we will be doing that

20   tomorrow, but I would like to go through them and if some

21   people have questions about things or, I don't know, we will

22   just get a start on it.

23        Mr. Pollack?

24        *MR. POLLACK:*  Before we move to jury instructions, and

25   I can do it either now or when we come back, on behalf of

1    Mr. Blake I would like to renew his motion under Rule 29.

2    Obviously, the Court has already seen the briefing.

3         THE COURT:  Why don't we do that, if you don't mind,

4    Mr. Pollack, just because I think we probably would want to

5    give each defendant an opportunity to do that.  It's been a

6    little bit of time since.  We can do that now or we can take a

7    break and right after the break do the same.

8         MR. POLLACK:  Whatever the Court's preference is.

9         THE COURT:  Why don't we take a break now and then

10   we'll do that, but that's a good order of business.  I

11   appreciate your bringing that up.

12        Mr. Koenig?

13        MR. KOENIG:  Would it be permissible to have one of

14   our other attorneys who has submitted an appearance or entered

15   an appearance do some arguing during the jury instructions?

16        THE COURT:  Yes, that's fine.  We will be in recess

17   then until 5:15.  Thank you.

18      (Recess at 5:00 p.m.)

19      (Reconvened at 5:15 p.m.)

20        THE COURT:  Mr. Beller?

21        MR. BELLER:  Your Honor, only if I can start by

22   addressing the time for closings.  Is that appropriate to do

23   now or do you want to wait?

24        THE COURT:  I thought we would maybe do the Rule 29

25   motions first, and then we'll shift over to jury instructions.

1      Mr. Pollack, unless you had a different suggestion, I

2 thought that we'd go just in order on the case caption.  And

3 this time I will try not to forget Mr. Lavine.

4      MR. POLLAK:  Fair enough, Your Honor.  Thank you.

5      THE COURT:  Any renewed Rule 29 motion on behalf of

6 Mr. Penn?

7      MR. TUBACH:  Yes, Your Honor.  Mr. Penn would renew

8 the Rule 29 that there is insufficient evidence to sustain a

9 conviction, and there was nothing that came in in our case or

10 the non-existent rebuttal case that would change what we

11 argued.  I won't we labor it.

12      THE COURT:  Thank you.

13      On behalf of Mr. Fries?

14      MR. KORNFELD:  Yes, Your Honor.  On behalf of

15 Mr. Fries, we also would renew our Rule 29 motion arguing that

16 there is insufficient evidence to sustain a conviction against

17 Mr. Fries and referring the Court to the arguments we made in

18 writing.  I think ours is pleading 875.  Thank you.

19      THE COURT:  Thank you, Mr. Kornfeld.

20      And on behalf of Mr. Brady?

21      MR. LAVINE:  Yes, Your Honor.  I would renew our.

22 Rule 29 motion.   We do not believe there is sufficient

23 evidence to sustain a conviction.  And we also adopt the

24 arguments we made in our written submission to the Court on the

25 Rule 29.

1          *THE COURT:*  Thank you, Mr. Lavine.

2          On behalf of Mr. Austin?

3          *MR. FELDBERG:*  Your Honor, we renew our motion for an

4   acquittal pursuant to Rule 29 of the Federal Rules of Criminal

5   Procedure and restate the arguments made in our written motion.

6   We assert once again that there is insufficient evidence to

7   sustain a conviction against Mr. Austin.

8          *THE COURT:*  Thank you, Mr. Feldberg.

9          And on behalf of Mr. Mulrenin?

10          *MS. PREWITT:*  Thank you, Your Honor.  On behalf of

11   Mr. Mulrenin, we renew our Rule 29 motion on the basis there is

12   insufficient evidence to sustain a conviction.  I will point

13   Your Honor's attention to the testimony today of Mr. Bowlin and

14   Mr. Campbell which I think severely calls into doubt the

15   evidence, even the minimal amount of evidence the government

16   has put in vis-a-vis Mr. Mulrenin.

17          *THE COURT:*  Thank you, Ms. Prewitt.

18          On behalf of Mr. Kantola?

19          *MS. HENRY:*  Thank you, Your Honor.

20          On behalf of Defendant Kantola, I renew the motion

21   under Rule 29 for judgment of acquittal for the grounds that

22   were stated in our written motion previously submitted

23   including insufficiency of the evidence, variance and the

24   unconstitutionality of these proceedings.  Thank you.

25          *THE COURT:*  Thank you, Ms. Henry.

1           On behalf of Mr. Little?

2           MR. BYRNE:  Yes, Your Honor.

3           On behalf of Mr. Little, we also renew our Rule 29

4    motion for the reasons stated in our briefs and also because of

5    the additional evidence that was and was not presented in the

6    case.  Thank you.

7           THE COURT:  Thank you, Mr. Byrne.

8           On behalf of Mr. Lovette?

9           MR. FAGG:  Thank you, Your Honor.  Now that the

10   evidence is closed in this case, on behalf of Mr. Lovette, we

11   do renew our Rule 29 motion for an acquittal for the reasons

12   that were stated on the record and that were supplemented by

13   our filing.

14          THE COURT:  Thank you, Mr. Fagg.

15          On behalf of Mr. Roberts?

16          MR. GILLEN:  Your Honor, on behalf of Mr. Roberts, we

17   would renew our Rule 29 motion for judgment of acquittal along

18   with the written materials we submitted.  And we would also

19   supplement orally our previous motion by arguing the following:

20          We had previously filed a motion with the Court

21   regarding a mistrial and argued a constructive variance.  The

22   Court ruled that in looking at whether or not there would be

23   evidence adduced at trial, the government's case in chief,

24   whether it was a variant from the charged Indictment, that our

25   argument for a constructive variance was premature and that it

1   was filed during the course of the government's case in chief,

2   which has now concluded.  The government's case is over.

3            We would state that the government has failed to show

4   a single conspiracy as alleged in the Indictment and at most

5   multiple -- small or multiple conspiracies of which Mr. Roberts

6   the evidence does not show that he was a part of that.  So we

7   would argue that in addition to our previous Rule 29 motion,

8   that as the Court noted in its order, that the defendant may

9   move for a judgment of acquittal under Rule 29 if the defendant

10  asserts the government despite alleging a single conspiracy

11  presented evidence only of multiple smaller conspiracies.  And

12  we believe that's what happened and we would renew that.

13           In addition, prior to trial we filed a motion to

14  dismiss the Indictment alleging among other things that the

15  government -- the allegations in the Indictment failed to show

16  that the charge against Mr. Roberts fit within the statute of

17  limitations.  And the Court denied our motion in that respect.

18  We would renew the motion in the following under Rule 29 and we

19  would argue that as we did in our pleadings, the charged

20  antitrust conspiracy was complete at the time of any sort of

21  alleged agreement in the Indictment and therefore the statute

22  would have run.

23           In addition, arguments made by the government for the

24  extension of the statute as it relates to whether or not there

25  were payments, for example, on the KFC 2015 contract did not

1    bear fruit in the evidence.  There is no evidence that was

2    introduced at trial by the government that payments were made

3    on the agreement that was entered into for the KFC 2015

4    contract.  As a result, their argument about extending the

5    statute of limitations falls.  And so we would argue that they

6    have -- the evidence as is now complete and there is not

7    sufficient evidence to warrant allowing the case to go to the

8    jury as it relates to Mr. Roberts on the statute of limitations

9    as well.

10             Thank you, Your Honor.

11             THE COURT:  Thank you, Mr. Gillen.

12             And on behalf of Mr. Blake?

13             MR. POLLAK:  Thank you, Your Honor.

14             Mr. Blake renews his motion for a judgment of

15   acquittal under Rule 29 at the close of all of the evidence in

16   the case.  Your Honor, obviously we have already briefed the

17   Rule 29 motion based on the government's case in chief and I

18   won't repeat those arguments here.  But the defense case which

19   was unrebutted by the government I think further negates what

20   was already a case that we believe was insufficient to prove

21   beyond a reasonable doubt that Mr. Blake knowingly joined the

22   conspiracy.

23             For example, the defense case negated any reasonable

24   inference that could be taken from the e-mail about George's

25   being a friendly competitor as being some suggestion that

1    Mr. Blake had somehow supplied competitive information to

2    Pilgrim's.  The defense case also negated any inference that

3    the call to the George's 1-800 number in the government's

4    summary chart 10-1 was a co-conspirator communication with

5    Mr. Blake, as the defense demonstrated that Mr. Blake was on

6    vacation when that call took place.

7         The defense case also showed the routine sharing from

8    supplier to supplier of case weights and current prices down to

9    the four decimal places through covers and short transactions

10   between suppliers.  Mr. Ledford testified that period prices

11   were of no use in trying to undermine a competitive bidding

12   process, but this also negates the suggestion that somehow that

13   information was secret.  It was obviously readily available.

14        So, Your Honor, we believe with the consideration of

15   the additional further evidence introduced in the defense that

16   there is insufficient evidence at the close of the case for any

17   rational juror to find beyond a reasonable doubt that Mr. Blake

18   knowingly and voluntarily joined any conspiracy to rig bids or

19   fix prices.

20        THE COURT:  Thank you, Mr. Pollack.

21        And I will take the Rule 29 motions, both those filed

22   at the close of the government's case, but also those

23   supplemented and/or renewed at the close of all the evidence, I

24   will reserve a decision as to those motions.

25        All right.  Mr. Beller, why don't we talk about the

1     length of closings.

2          *MR. BELLER:*  Only, Your Honor, I believe the

3     defendants are requesting 45 minutes each for closing.  It is

4     also in the interest of the defendants and I believe all the

5     parties, including the jurors, that the case be given to the

6     jury by Thursday, no later than Thursday, so that we are not

7     spilling over into Monday.  And for that reason it is my

8     request that the government be given equal time.  I recognize

9     that that's 45 minutes.  Understanding that there are 10

10    defendants, I would note for the Court that the Rule 29

11    motions, both in writing as well as articulated today, by and

12    large coincide with each other in terms of the defenses.

13         For that reason I do not believe that a lengthy period

14    of time for the government is necessarily warranted because as

15    much as we need individualization of each one of the

16    defendants, the facts as presented by the government are as to

17    a single conspiracy.  And because what they are doing is

18    articulating a single conspiracy to the jury, I don't believe

19    that a lengthy period of time is necessary to do so in order

20    again for the jury to have the case on Friday.

21         For that reason we are asking for the 45 minutes.  If

22    an additional 15 minutes is warranted to differentiate the

23    defendants, it's certainly understandable and the government,

24    of course, can use their time or divide their time however is

25    appropriate.  So that is the request that I am making as to the

1    division of time.

2            THE COURT:  Any other defendants have suggestions?

3    Otherwise, I will -- Ms. Prewitt, go ahead.

4            MS. PREWITT:  Your Honor, I would just say if the

5    government is going to have the extensive amount of time with

6    their closing, I don't think I would want to be constrained to

7    45 minutes on behalf of my client.  So I would just like to say

8    in my agreement to the 45 minutes that was posited was under

9    the assumption that the time allotment for the government would

10   be far less than what they have asked for.

11           THE COURT:  Okay.  Anyone else?

12           All right.  Ms. Call.

13           MS. CALL:  Of course, everyone knows here the

14   government is the one that bears the burden in this case.  And

15   I think suggesting that the government have an amount of time

16   that's necessary to rebut some of the arguments that have been

17   made by defendants is not what our burden is.  It's

18   establishing the existence of this conspiracy.  It's

19   establishing each defendant's participation.  And it's going to

20   take some time to do that.

21           You may recall before our break before Thanksgiving,

22   we showed the summary exhibits which summarize obviously a lot

23   of evidence to the jury.  And that alone, reading that I think

24   took almost an hour.  So if we were to want to just add a

25   sentence or two of argument around each of these like episodes,

1    if we call them that, I think it takes a fair amount of time.

2            We did confer today after our discussion this morning.

3    I think we can limit the closing to probably three hours, maybe

4    a little bit less, but we would still ask for a 3-hour time

5    period for the government to be able to argue the evidence in

6    this case.

7            THE COURT:  Any reactions to that anyone else wants to

8    make?

9            MS. PREWITT:  Your Honor, I would just say that Your

10   Honor admitted all of these summary charts so that they could

11   be conveniently evaluated by the jury.  That was supposed to be

12   a process to sort of assist the jury and they would go back to

13   the jury as part of that process.  And so, you know, the idea

14   that somehow there be additional time to go over with them to

15   add an additional hour doesn't strike as particularly fair.

16           THE COURT:  Here is what I am going to do.  I am going

17   to give the government two and a half hours total.  And then

18   the total for the defendants with 45 minutes, which I think is

19   a very reasonable request, is seven and a half hours.  So we

20   are going to spill into two days no matter what, unfortunately.

21   But as Mr. Beller said, the advantage despite that is that

22   we'll be done on Thursday.  We'll get it to the jury on

23   Thursday and that is a good thing.  So we will lap into

24   Thursday a little bit.

25           But I think that, for instance, with two and a half

1     hours the government would have, for instance, an hour in their

2     opening and then an hour and a half in rebuttal, which given

3     the fact that they would have to rebut seven and a half hours,

4     I think that that's fair.  I think that the government can do

5     that.  I think that that would not short-change them and so

6     that's what the limitations will be.

7               Once again, if people want me to give you a

8     heads-up -- you can think about this.  You don't need to tell

9     me today -- but if you want me to give you a heads-up when you

10    have five minutes left or something of that nature, I will be

11    happy to do that, or you can keep your own time.  It doesn't

12    matter to me, but if you want to do that, I can.

13              MR. LAVINE:  Your Honor, a question.  Would the jury

14    be able to deliberate on Friday?

15              THE COURT:  Yes.  That's a great question.  So the

16    jury won't be constrained by my schedule.  The jury can

17    deliberate on Friday and then throughout the following week.

18    Good question.

19              MR. BYRNE:  But do they know that they might have to

20    come on Friday?

21              THE COURT:  That's another really good question.

22    Yeah, they might not.  Actually, I would probably tell them

23    that they can if they want, but they would have to let us know.

24    But you're right because they may not be planning on that at

25    all, but they could if they wanted to.

1          *MR. BYRNE:*  They probably are not planning to because

2    they were told there was no court.

3          *THE COURT:*  Sure.  They might change their plans, but

4    yeah, they could if they wanted to, but if one person had other

5    plans, they wouldn't.  All right.

6          *MS. CALL:*  As far as the two and a half hours, is the

7    government free to determine the allocation of that between

8    closings?

9          *THE COURT:*  Yeah, however the government wants to do

10   it.

11         *MR. BYRNE:*  Although it's supposed to be rebuttal

12   closing, so --

13         *THE COURT:*  There is no case law to that effect,

14   Mr. Byrne.  There is like two state cases somewhere, but they

15   can divide it up however they want to.

16         *THE COURT:*  Why don't we talk about jury instructions.

17   Here is what I want to do.  First of all, if anyone has any

18   questions about what they regard as strange bracketing or

19   something of that nature, feel free to ask me.  Otherwise, I

20   think what we'll do is I would just like you to focus in on

21   some instructions that you think we are going to spend a lot of

22   time on tomorrow or that you want me to think about or here is

23   a case or do something of that nature.  Both sides can do that

24   because we only have really about 25 minutes left today.  So if

25   you can highlight some of those issues, then everyone can

4465

1    devote some attention overnight to that and that might make our

2    discussion tomorrow a bit more efficient.

3         Does the government have any instructions that are

4    particularly problematic or that you want me to think about?

5         MS. CHENG:  Yes, Your Honor.  This is Cecilia Cheng on

6    behalf of the government.

7         THE COURT:  Go ahead, Ms. Cheng.

8         MS. CHENG:  I have before me a list of some of the

9    instructions that we would like to discuss with the Court.  And

10   I think there are two in particular that I suspect we'll spend

11   some time on.  One is on Page 27 of the Court's proposed

12   instructions, and that's one related to evidence of multiple

13   conspiracies instead of one single overarching conspiracy.  And

14   for that particular instruction I would like to please direct

15   the Court to some of the Sherman Act specific cases on how the

16   10th Circuit has determined whether there are multiple

17   conspiracies compared to a single conspiracy.

18        And the first case is *Beachner*, which is at 729 F.2d

19   1278, and the other is *Mobile Materials*, which is at 881 F.2d

20   at 873.

21        THE COURT:  Okay.  And I do have the language in there

22   that the 10th Circuit has adopted about unless it was a

23   narrower conspiracy.

24        MS. CHENG:  That's right, Your Honor.  We do

25   appreciate that addition.  The reason that we wanted to

1    highlight the Sherman Act specific cases is that in those cases

2    the Court considered what the ultimate question was in the

3    situation where we are looking at a conspiracy that's comprised

4    of multiple agreements.  And in *Mobile Materials* the Court said

5    that there can be various agreements which facilitate the

6    objective of the conspiracy.  And the correct way to look at

7    the conspiracy the government would argue is not that each are

8    independent conspiracies, but that these are all different

9    means of facilitating one common overarching conspiracy.  And

10   *Mobile Materials* and *Beachner* talk about that point.

11        THE COURT:  Okay.  We can take a look at that.  Thank

12   you, Ms. Cheng.

13        Was there another instruction?

14        MS. CHENG:  There was one more instruction and that

15   one is part of the conspiracy instructions.  It's on Page 25 of

16   the Court's proposed instructions.  And it is the first full

17   paragraph which begins with, "The mere fact that some or all,"

18   and this is related to conscious parallelism.  And we'll spend

19   more time I am sure arguing this tomorrow, but basically we

20   don't believe that there is any evidence in the record that

21   would make an instruction like this appropriate at this moment

22   because there is -- unlike a typical case in which you would

23   have -- unlike a typical case in which the defendants could --

24   unlike a typical case in which the pricing would be public and

25   where different suppliers could copy each other's pricing, this

 1    is a situation where a lot of the pricing information is

 2    confidential.

 3              And the government was prohibited or the government

 4    was specifically not permitted to explain the confidential

 5    nature of some of these pricing lists.  And as a result, we

 6    believe at least at this moment we don't see an evidentiary

 7    basis for this instruction.  And we are happy to talk more

 8    about that tomorrow.

 9         THE COURT:  What about a situation where the

10    competitors exchanged prices, but had no agreement to do

11    anything about it?  They just, FYI, here is what we're going to

12    bid.

13         MS. CHENG:  Yes, Your Honor.  So I believe that is at

14    the bottom of your proposed instruction, of the Court's

15    proposed instruction on Page 25 which talks more specifically

16    not about conscious parallelism, but about the exchange of

17    price information.  And at least at this time the government

18    does not have an objection to that paragraph and we believe

19    that it would be --

20         THE COURT:  Right, but what -- if competitors did

21    exchange pricing in a legal way that wasn't a part of any

22    conspiratorial agreement, isn't it possible that one response

23    to that exchange of information would be conscious parallelism?

24         MS. CHENG:  I think it's certainly possible that

25    that's the case, but with the fact that we have in this

1    instance, these are confidential bilateral bids.  And so there

2    is not really as much of a situation where the defendants would

3    be able to properly and appropriately share these pricing lists

4    with each other.  At least we don't have evidence in the record

5    of such a thing.  It's quite different from *Lischewski*, for

6    example, where they could follow the leader through the pricing

7    list of tuna based on what they see on the shelf.

8         In this instance, we have one-on-one individualized

9    supplier specific bidding.  So for that reason we believe that

10   the facts are different.  And including an instruction that one

11   business may lawfully copy its competitors' price lists without

12   evidentiary support for that at least in the record that we've

13   seen would be confusing for the jury.

14        *THE COURT:*  Thank you, Ms. Cheng.

15        *MS. CHENG:*  Thank you.

16        And I believe that should be it.  Also one more quick

17   point which is on Page 33 of the Court's instructions related

18   to the statute of limitations, we would like to tomorrow if we

19   can and with the Court's permission propose some additional

20   sentences just to clarify that the receipt of -- that the

21   receipt of certain payments that were subject to price-fixing

22   would be considered one of the acts that would be in

23   furtherance and would be within the statute of limitations.

24        *THE COURT:*  Right.  So if anyone has any suggested

25   changes, it would be a good idea -- it would be very helpful to

1    come up with that instruction, a new version of that

2    instruction, maybe with those -- I am just saying this

3    generally.

4         MS. CHENG:  Certainly, Your Honor.  Would you prefer

5    we provide a red line copy?

6         THE COURT:  Yeah, red line copies would be great.  You

7    don't even need to have a clean copy.  The red line copy would

8    just be our working copy and that would be a good way for us to

9    follow along with what the proposed changes are.

10        MS. CHENG:  That sounds good.  And I can mention that

11   we do have a copy at least of the statute of limitations red

12   line.  We are happy to wait until tomorrow to pass it out.

13        THE COURT:  Now is good.  That would be helpful.  You

14   don't have to pass it out right at this moment, but maybe you

15   could give one my law clerk and the defendants once we recess.

16        MS. CHENG:  We'll do, Your Honor.  Thank you.

17        THE COURT:  Thank you, Ms. Cheng.

18        Mr. Pollack?

19        MR. POLLACK:  Would it be possible for the Court to

20   provide a Word version of the Court's present drafting

21   instructions so we can red line?

22        THE COURT:  I think so, but we would have to -- maybe

23   we could send it to one person for distribution?

24        MR. POLLACK:  That would be fine, Your Honor.

25        THE COURT:  Would you like to be that person?

1          *MR. POLLACK:*  I guess I just volunteered.

2          *THE COURT:*  You don't have to.  If there is a

3     divisional of labor already --

4          *MR. POLLACK:*  It's just fine, Your Honor.  I would be

5     more than happy to distribute it to all the parties.

6          *THE COURT:*  Yes.  We will endeavor to do so.  That

7     could be helpful.

8          Anything that the defendants wanted to highlight real

9     quick?  We don't have much time.  I don't want to really have

10    counter arguments because we can do a lot of that tomorrow.

11    But, for instance, if there is something that you want me to

12    focus on overnight, a particularly problematic one.

13          Mr. Gillen?

14          *MR. GILLEN:*  Not necessarily problematic.  Now the

15    evidence is closed, we were wondering whether the Court would

16    consider accepting defendants' theory of the case instructions

17    in the morning.

18          *THE COURT:*  Yes, good point.  And please submit those

19    as soon as you have a chance to put those together.

20          *MR. GILLEN:*  Thank you, Your Honor.  And we'll deal

21    tomorrow with the issue about whether they proved they received

22    the funds on the contract that was mentioned.

23          *THE COURT:*  Yeah, we will get bogged down on that one,

24    so we will take that up tomorrow.

25          *MR. KORNFELD:*  One thing I noticed on the elements

1    instruction, I don't know if it's a huge deal or a quirk, but

2    on Page 17 the last line, the last sentence says, "If, on the

3    other hand, you find from your consideration of all of the

4    evidence that any of these elements has not been proved beyond

5    a reasonable doubt, then you should find the defendant not

6    guilty."  And I am wondering if the "should" should be "must."

7           Should suggests that there is -- you know, that's what

8    they should do.  It doesn't mean they have to do it.  And I

9    think the law is it to the contrary, that if the government

10   fails in proving beyond a reasonable doubt any single element,

11   then they must as a matter of law find the defendant not guilty

12   or defendants not guilty.

13         *THE COURT:*  I am not sure what the 10th Circuit

14   pattern -- I think it's typically parallel, but I will take a

15   look.

16         *MR. KORNFELD:*  Frankly, Your Honor, I haven't had time

17   to look at the pattern either, but that just caught my

18   attention.

19         *THE COURT:*  Sure.  Yeah, that's a good thing to look

20   at.

21         *MR. KORNFELD:*  Thank you.

22         *THE COURT:*  Anything else that anyone wanted to call

23   to my attention to look at overnight?

24         Mr. Fagg?

25         *MS. PLETCHER:*  Your Honor, so the defendants just

1   haven't had time to sit down and collectively think about what

2   the issues are that we want to flag, so I think that's why you

3   are seeing a little bit of hesitation here.

4        THE COURT:  That's not a problem.  I just thought if

5   you happened to have caught something.  I think that I will

6   have my law clerk pass out a revised copy of the evidence on

7   multiple conspiracies because if, in fact, we go with the 10th

8   Circuit's cases that say that a narrower conspiracy could also

9   be the basis for a guilty verdict, then we get into the

10  unanimity issue, so this particular redraft has unanimity

11  language in it.  So you can take a look at that.  We can do

12  that at the very end, Ms. Butler.

13       All right.  Anything else that anyone wanted to bring

14  up before we recess?

15       Mr. Fagg, go ahead.

16       MR. FAGG:  Just briefly, Your Honor.  I am in the same

17  position as Ms. Pletcher in terms of where we are, but we do

18  have a concern about the instruction related to Robert Bryant.

19  We believe that there is too much weight that is -- that the

20  jury may take from the second paragraph of that instruction

21  where it says that "Mr. Bryant's testimony alone, if believed

22  by the jury, may be of sufficient weight to sustain a verdict."

23       THE COURT:  Sure.  I think that that's in the pattern

24  instruction, so because it's more of the theoretical

25  possibility, but I understand that it comes with a danger of

1    the jury thinking that, oh, well, maybe he is that important or

2    something of that nature.  So I think we will have to take a

3    look at the case law, make sure that we are grounded in the

4    case law as to that.

5         MR. FAGG:  Thank you, Your Honor.

6         The other one I just wanted to flag was the per se

7    violation which is on Page 19.  I don't believe that was an

8    instruction that was in either the government's or the

9    defendants' proposed instructions.  And we believe that it

10   articulates a standard that is different from the standard in

11   the law, and we are happy to provide some case law on that when

12   we return tomorrow.

13        THE COURT:  That's fine.

14        MR. FAGG:  Thank you, Your Honor.

15        THE COURT:  Thank you, Mr. Fagg.

16        Anyone else?

17        Ms. Cheng.

18        MS. CHENG:  Your Honor, one more item I wanted to flag

19   is we -- one thing that the government would like to talk about

20   tomorrow is the possible addition of a deliberate indifference

21   instruction, whether as a stand-alone instruction or as a

22   paragraph taken from the pattern instruction inserted into the

23   knowingly join instruction that the Court has proposed.

24        THE COURT:  Do you happen to have a draft of one at

25   this time?

1          *MS. CHENG:*  We do.  I don't have multiple copies, but

2      we can e-mail it to chambers after court and the defendants, of

3      course.

4          *THE COURT:*  That would be great, if you can do that.

5          *MS. CHENG:*  Related to that, would the Court prefer

6      that we e-mail red lines or would you want me to simply hand a

7      printed copy to one of the law clerks?

8          *THE COURT:*  A printed copy works great for us right

9      now.  I don't know if you have enough copies for the defendant.

10         *MS. CHENG:*  We do.

11         *THE COURT:*  If you have the copies, I think that

12     that's nice.

13         Ms. Call?

14         *MS. CALL:*  May I just raise a couple logistics points

15     I think would be helpful to talk about before tomorrow.  One is

16     exhibits for the jury because we do want to get our half

17     functioning printer working getting those out.  What is the

18     format that Your Honor would like those in?  Do you usually do

19     binders for the jury?

20         *THE COURT:*  Yes.  They should be in binder form.

21         But remind me, Ms. Butler, we are going to need to get

22     that evidence cart so that the -- everyone can take a look at

23     that tomorrow, the one that's assigned to me.  So as I was

24     explained to you when we were talking about some exhibits in

25     native format, that piece of equipment -- it's a little hard to

1    explain -- will enable the jury to display things on a screen.

2          The reason I want you to take a look at it is because

3    I want you to make sure to your own satisfaction that it

4    doesn't have any other type of information on it like from my

5    last trial or something of that nature.  It shouldn't, but I

6    want you to know exactly what the jury is going to have.  So if

7    you do have things in native format or I can't remember if we

8    had some other things that could not be reduced to paper, we

9    do, of course, have these super voluminous telephone records,

10   but those exhibits are going to have to be placed on a thumb

11   drive.

12         It doesn't necessarily have to be one exhibit per

13   thumb drive because I am worried we might have just bizarre --

14   we would look like the hotel keys behind some old-fashioned

15   counter, but it has to be clearly marked.  There would have to

16   be, for instance, a tag on the thumb drive indicating which

17   exhibits reside on that particular thumb drive, but that would

18   go back to the jury, then, too.

19         What I would contemplate, I don't know if we will have

20   time to do it tomorrow, but if we make good progress, it would

21   be great if we wade through our list of exhibits and make sure

22   that everyone's exhibit lists coincide with each other.  That

23   would be a good thing to do.  I usually do that after the jury

24   has been excused to deliberate, but it takes a long time.

25         And even if the jurors as I often predict start

1    deliberating right away, they don't systematically start

2    looking at exhibits.  They nonetheless wait for the exhibits

3    because they know they are coming so they want those exhibits.

4    So they -- I think they are sitting there wondering.  And it

5    would take us a long time to get through them all.  We can do

6    that.  And if there is not enough time for tomorrow because we

7    are spending it all talking about jury instructions, so be it,

8    but that's another job that we have.

9         MS. CALL:  Would it make sense during that time to

10   also ensure that agreements are the same as to redaction of the

11   documents?

12        THE COURT:  Yes.  We need to make sure that all those

13   redactions are made.  I have noted to the best of my ability

14   what redactions exist on various exhibits, but we should make

15   sure we have got those, because if they are going to be in a

16   notebook, they have to correctly reflect the redactions.

17        MS. CALL:  How many copies of the exhibits would the

18   jury be using, one set?

19        THE COURT:  One set.

20        MS. CALL:  Does the government submit theirs and the

21   defendants submit their set?

22        THE COURT:  No.  We are going to assemble it.  So one

23   of the things that Ms. Grimm will be doing is assembling those

24   exhibit books.  So she can do that, but she won't obviously be

25   able to manufacture the thumb drives, so that's something that

 1   will have to be supplied to the Court.

 2          *MS. CALL:*  Would it be helpful for tabs to be provided

 3   between the exhibits or --

 4          *THE COURT:*  That is a great question.  Why don't you

 5   ask Ms. Grimm tomorrow how she wants to do that.  Well, she is

 6   going to basically cannibalize the existing exhibit books, but

 7   to the extent they aren't up to speed, she may need help on

 8   that.

 9          *MS. CALL:*  The two others are with respect to closing.

10   One was a proposal that I wanted to see how your Court felt and

11   how the defendants felt.  Of course, the government's table is

12   now -- folks have to look through the government to see the

13   jury.  We were considering perhaps suggesting moving the

14   government's table, and I don't know how easy that is, to

15   another space in the room so since there is no longer a need to

16   confer with the witness.

17          *THE COURT:*  The problem is that all those electronic

18   devices on your table are all connected, not by magic, but to

19   the floor, so it's like the leash on your table.  So yeah,

20   there is very limited ability to move it.  Unfortunately, it is

21   just part and parcel of having a lot of parties.

22          *MS. CALL:*  The second item was a request --

23          *THE COURT:*  But the podium can obviously, just like

24   with opening, it can be rotated.  People don't need to stand

25   right in front of it as long as you are in that general area.

1          MS. CALL:  Second was a request -- I know you stated I

2     believe in the pretrial conference a predilection against

3     easels, but the government was wondering if it would be

4     permissible to have an easel.  I think the thought is to orient

5     the jury, especially if we are going through documents somewhat

6     quickly, to have our summaries up on an easel while we talk

7     about other evidence and they will be seeing the underlying

8     documents up on the screens.

9          THE COURT:  Ms. Butler, let's bring an easel down

10    tomorrow so we can demonstrate for Ms. Call the impracticality

11    of that.  Especially with this many people, it just won't work.

12    You would have to jack it up so high just to clear all of the

13    government attorneys' heads.  But if you have got it up real

14    high, then it wouldn't block everyone else's view.  But it's so

15    much better, I guarantee you, so much better to electronically

16    present whatever you want to present.  The easels just even in

17    a normal courtroom and with a normal number of people, they

18    just really don't work very well.  The writing has to be so

19    huge that it then limits how much you can put on them and then

20    defeats the purpose of even having one, so they are tricky.

21         MS. CALL:  We are trying to figure out a proper way to

22    orient the jury as we go through a many year time period.

23    Would it be permissible to give paper copies of the summaries

24    to the jury?

25         THE COURT:  No, I don't do paper copies during

4479

1    closings at all.  Time lines are tricky.  There is no great way

2    to do a time line.  You can try it on an easel, but the problem

3    is that normally if something is displayed to the jury, each --

4    at least one of the defense attorneys has a right to reposition

5    him or herself to see what's being shown to the jury.  And it

6    would cause like a seismic shift to try to get people over

7    there.  It's really just very impractical.

8              MS. CALL:  All right.  We will --

9              THE COURT:  Time lines are tricky.

10             MS. CALL:  Thank you.

11             THE COURT:  Anything else, Mr. Tubach?

12             MR. TUBACH:  Very briefly, on redactions we had spoken

13   at some length about the sort of global redactions we were

14   going to do on contract and that first page.

15             THE COURT:  And then we used an exhibit just today

16   that has the thing at the top, so we will have to change that

17   one a little bit.

18             MR. TUBACH:  We can do that with our exhibits.  We

19   just want to make sure the government is going to be redacting

20   the first page out of every contract it has.

21             THE COURT:  Oh, on the RSCS ones.

22             MS. CALL:  We will have to look back at how each one

23   was admitted, but I did want to note the confidentiality

24   footers on documents, it would be the government's position

25   that a limiting instruction would be appropriate and less

1    burdensome on the government to have to redact out --

2          THE COURT:  I think so.  They are kind of ubiquitous

3    and they have been seen a million times by everyone.  That's

4    why I included an instruction about them that we will have to

5    modify a little bit because in a couple of documents today they

6    appeared at the top.  But I think it may be -- we talked at one

7    point about redacting them off of every document and maybe the

8    defendants have that capability.  If they can, that's great,

9    but it may not be practical for every document which is why we

10   may need to have a jury instruction about that.

11         But going back to the RSCS one, take a look at that

12   because we are redacting that cover page.

13         MS. CALL:  All right.  We will.

14         THE COURT:  Mr. Gillen?

15         MR. GILLEN:  If time is permissible, would the Court

16   entertain some -- a briefing on the issue of the government's

17   proposed deliberate ignorance instruction?

18         THE COURT:  Oh, yeah, we will talk about that

19   tomorrow.  And if you want to submit something overnight,

20   please do so.

21         MR. TUBACH:  Briefly on those footers, we have already

22   redacted those.  We have done that uniformily.

23         THE COURT:  I think I will leave the instruction in

24   just in case there are some.  It may be cumbersome.  Even if

25   they appear on a few, the instruction may be -- and they have

1    seen that in a lot of the documents that have been published to

2    them.

3           MR. TUBACH:  We just want it uniform for the exhibits

4    that go back to the jury so they don't think, well, this wasn't

5    redacted so this really may be confidential and other stuff

6    that wasn't.  If the government needs assistance redacting the

7    footer, we will be happy to assist them with that.  It's not --

8           THE COURT:  But I know from experience just trying to

9    get a set of instructions copied and all the duplication, it

10   takes longer than you ever think.  And the fact that you have

11   done it already with those exhibits, that's great, but we'll

12   have to play it by ear is my only point.

13          All right.  Anything else to take up?

14          Ms. Call?

15          MS. CALL:  To make sure we fully understood, so for

16   the printed exhibits are going back to the jury, is it correct

17   Ms. Grimm will be using the already provided printed copies

18   unless there is a change to the redaction or should the

19   government and parties be providing new printed sets to provide

20   for Ms. Grimm to be able to organize?

21          THE COURT:  Ask Ms. Grimm.  I don't want to get in

22   trouble with Ms. Grimm.  After this case is all done, I will

23   still have to face the music with Ms. Grimm, so I don't want to

24   say anything.

25          MS. CALL:  As far as timing, would tomorrow be -- I

1    shouldn't overpromise.  When should we have those paper copies

2    delivered?  We will talk to her tomorrow, but then I assume --

3           THE COURT:  Sure, yeah, tomorrow is fine, at some

4    point tomorrow.

5           Okay.  Anything else?  All right.  So why don't we --

6    Mr. Byrne.

7           MR. BYRNE:  I just want to confirm that the clients,

8    if they do not want, do not have to be here tomorrow.

9           THE COURT:  That is exactly right.  Once again, I

10   don't regard the jury instruction conference as a critical

11   phase.  So if the defendants choose to not be present tomorrow

12   or present for just part of it or if they want to be present

13   for the whole thing, it's completely up to them, whatever they

14   choose to do.

15          MR. BYRNE:  Thank you, Your Honor.

16          THE COURT:  All right.  So why don't we do 8:30.  We

17   will start at 8:30 tomorrow.  The Court will be in recess.

18   Thank you.

19        (Recess at  6:00 p.m.)

20

21

22

23

24

25

1                        INDEX

2    WITNESSES

3        Darrell Bowlin

4            Direct Examination By Ms. Prewitt          4217

5            Cross-examination By Mr. Gillen            4260

6            Cross-examination By Mr. Beller            4261

7            Cross-examination By Ms. Call              4262

8            Redirect Examination By Ms. Prewitt        4269

9        Brandon Campbell

10           Direct Examination By Mr. Gillen           4272

11           Cross-examination By Ms. Call              4321

12           Redirect Examination By Mr. Gillen         4338

13       Brenda Ray

14           Direct Examination By Mr. Pollack          4344

15           Cross-examination By Mr. Tubach            4348

16           Cross-examination By Mr. Koenig            4350

17       Julie Lawrence

18           Direct Examination By Ms. Johnson          4353

19       Rhonda Warble

20           Direct Examination By Ms. Johnson          4358

21           Cross-examination By Ms. Sweeney           4385

22

23

24

25

1                        INDEX (Continued)

2                          EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    E-014                  4448

5    A-187                  4446

6    D-240                  4447

7    I-337                  4377

8    I-338                  4357

9    I-441                  4380

10   I-442                  4379

11   I-444                  4372

12   I-448                  4367

13   I-452                  4370

14   F-459                  4447

15   G-467                  4317

16   G-521                  4297

17   G-570                  4312

18   F-754                  4449

19   G-824                  4303

20   F-915                  4449

21   F-916                  4449

22   3052                   4448

23   3053                   4448

24

25

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 7th day of February, 2022.


S/Janet M. Coppock