IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

     Defendants

_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 25

_____

          Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 8:37 a.m., on the 9th day of December,

2021, in Courtroom A201, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                         APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli, Laura Butte, Jillian Rogowski  and Cecilia Cheng,
 4    U.S. Department of Justice, 450 Fifth Street N.W., Washington,
 5    DC 20530, appearing for Plaintiff.
 6          Anna Tryon Pletcher and Michael Tubach of
 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8    San Francisco, CA 94111-3823;
 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10    N.W., Washington, DC 20006, appearing for Defendant Penn.
11          David Beller, Richard Kornfeld and Kelly Page of
12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13    CO 80202, appearing for Defendant Fries.
14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16           Laura Kuykendall and Megan Rahman of Troutman Pepper
17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18    appearing for Defendant Brady.
19          Michael Felberg of Reichman, Jorgensen, Lehman,
20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21    10017;
22
23
24
25
```

1       APPEARANCES (Continued)

2               Laura F. Carwile of Reichman, Jorgensen, Lehman,

3       Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4       CA 94065; appearing for Defendant Austin.

5               Elizabeth B. Prewitt of Latham & Watkins, LLP,

6       555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7               Marci Gilligan LaBranche of Stimson, Stancil,

8       LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9       80218, appearing for Defendant Mulrenin.

10              James A. Backstrom, Counselor at Law, 1515 Market

11      Street, Suite 1200, Philadelphia, PA 19102-1932;

12              Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13      Bethesda, MD 20814, appearing for Defendant Kantola.

14              Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15      Street, Suite 1100, Los Angeles, CA 90017;

16              Dennis J. Canty, Canty Law Corporation,

17      1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18      appearing for Defendant Little.

19              John Anderson Fagg, Jr. and James McLoughlin of

20      Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21      Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1               APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3     Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4     Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6     633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7     for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9     & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10    DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12    5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13    for the Defendant Blake.

14

15                    PROCEEDINGS

16         THE COURT:  Anything to take up before we bring the

17    jury back in?

18         All right.  Let's get the jury.

19         (Jury present.)

20         THE COURT:  Good morning, ladies and gentlemen.  We

21    will continue with the closings.  And Mr. Mulrenin will go next

22    and Ms. Prewitt is ready to go.

23         Go ahead.

24         MS. PREWITT:  Thank you, Your Honor.

25                    **CLOSING ARGUMENT**

1          MS. PREWITT:  Ladies and Gentlemen of the Jury, when I

2     spoke to you six weeks ago, I previewed to you that the

3     government's case here was about story telling, not story

4     telling by any witness that they put on the stand that had

5     firsthand knowledge about Tim Mulrenin's participation in any

6     conspiracy, not by a single document that said in any way that

7     he participated in what they said he participated in.  Ladies

8     and gentlemen, this story, the story you have heard in the

9     course of this trial, the story that's been laid out by the

10    government here, is pure fiction.  It's their story.  It's not

11    about the facts that you've heard in this trial.

12         You have watched them tell this story, this fictional

13    story about Tim Mulrenin's participation in the charged

14    conspiracy.  It's a story that they have tried to sell you.

15    And ask yourself, if you have evidence, real evidence, evidence

16    beyond a reasonable doubt, how much selling do you actually

17    have to do?

18         The problem for the prosecution, the fundamental

19    problem they have is that the facts, the evidence, the reality

20    of the industry and his participation in it does not line up

21    with the story they are selling you.  You've come to learn that

22    what they have told you about Tim Mulrenin, a salesman at

23    Tyson, and the charged conspiracy overall is wildly off base.

24    It is totally wrong.  And while -- throughout, all the way

25    throughout, the government will carry the burden to prove its

 1    case beyond a reasonable doubt while Mr. Mulrenin is presumed

 2    innocent.

 3          You have learned, you have learned through evidence

 4    that we elicited that he did not and he could not commit the

 5    crime he is charged with, but yet we are here.  We are here and

 6    I am standing here defending him against these utterly baseless

 7    charges.  So I am here to tell you exactly all the ways, the

 8    ways that you know because you have seen the evidence, the

 9    government has fundamentally failed to meet their burden.

10          So let's take a step back.  Big picture.  Let's break

11    it down.  The story that you're being told here is that Tim

12    conspired with other chicken producers, suppliers including

13    Tyson's biggest rival, Pilgrim's.  You've heard about that and

14    you've seen how that just doesn't make sense.

15          Even though there was cooperation among suppliers,

16    they are part of a food distribution network, you have heard

17    about that.  You have heard about chicken shortages.  You have

18    heard about ingredient shortages and the need and the

19    expectation on behalf of customers that sometimes suppliers

20    would need to work together to keep it all rolling along.  You

21    heard about that.

22          But you also heard that the Tyson sales team,

23    especially Tim Mulrenin, was always competing and never

24    colluding.  We are going to go through some examples of that.

25    But time and time again what you see is that Tyson stakes out a

1     position.  They have a position in this industry.  They are a

2     lower price, aggressive competitor.  They are selling chicken,

3     more chicken at lower prices.  Volume is what they are after.

4          So let's think about this.  At the very same time the

5     government alleges in this period that Tyson conspired with

6     these other suppliers.  They are duking it out, competing to

7     sell more chicken at lower prices.  And let's look at some of

8     those e-mails and texts that Mr. Tubach talked about, e-mails

9     and texts, e-mails and texts at the moment, at the time,

10    contemporaneous communications between individuals at

11    Pilgrim's.  And what did they say?  They were railing against

12    Tyson for being the low cost, cheap chicken seller.

13         Now, mind you, this is the Otis principle, remember?

14    We have heard about that.  Otis is the town drunk.  That's

15    Tyson.  We heard about that even from Mr. Bryant.  We heard

16    about that.  We saw that in the documents.

17         Pilgrim's wanted to punish Tyson, punish them for

18    selling cheap chicken that led to shorts and then coming to

19    Pilgrim's to fill those shortages, to bail them out.  What did

20    Pilgrim's talk about?  Cutting off the booze.  No juice for

21    Otis.  Otis is Tyson.  These are words of combat.  These are

22    words of competition.  These are not words of collusion.

23         Out of the millions of documents that were created

24    over these eight years, there is not one single reference,

25    ladies and gentlemen, think about that, not one single

1    reference to Tim Mulrenin or anybody at Tyson Foods entering

2    into a conspiracy colluding in any way with anybody.  Instead,

3    you see reference after reference as Tyson being a fierce low

4    price competitor.

5         Where is the partnership in crime?  Where is the hint

6    or suggestion in all of these at-the-moment exchanges,

7    exchanges that are heated, exchanges when people are not

8    measuring their words.  Common sense tells us that if there was

9    really an agreement -- mind you, this is all happening at the

10   point in time when there are negotiations involving the KFC

11   2015 contract that the government says is there centerpiece.

12   You are being asked to judge their case based on that.

13        Look at these e-mails.  This is all happening.  If

14   there really was an agreement, an agreement the government said

15   was full force around this period of time, do you think someone

16   would have expressed some measure of disappointment that Tyson,

17   their partner in crime, was not playing nicely in the sand box?

18   Just even a hint of that?  There is nothing.

19        Remember what the government is telling you.  The

20   government is telling you that all 10 of these people, all 10

21   of these defendants here had an agreement with each other that

22   Pilgrim's employees were partners in crime with Otis.

23        Ladies and gentlemen, Tim's role at Tyson, you have

24   heard about that, and you have heard about that from witnesses

25   that we brought before you.  Tim Mulrenin's role at Tyson was

1    to sell chicken, and in this trial you learned that it just

2    didn't make sense for salesmen at Tyson to raise prices.  They

3    didn't have the authority to raise prices.

4         No motive, no means.  Ladies and gentlemen, these are

5    just basic concepts, things that you have to search for and

6    look for in every single criminal case, motive and means.  You

7    heard how Tyson had organizational division between sales

8    department and the pricing and business unit people.  Remember,

9    those are the folks that calculated the costs.  They calculated

10   the prices.  They are the ones who were the true negotiators

11   because they were in control.

12        You heard that pricing and sales group had these

13   different responsibilities.  Sales sells.  Pricing prices.  And

14   the costs and prices that the pricing unit and the business

15   unit came up with were based on lots of factors, but not one of

16   those factors included collusion.

17        You will recall that Darrell Bowlin who testified

18   before you under oath from the business unit and Brandon

19   Campbell, they talked about the role, the special role that

20   sales had as a messenger.  You will remember that Darrell

21   Bowlin from the pricing unit testified that salesmen like Tim

22   were evaluated based on volume, based on the pounds, the number

23   of chickens sold, not on the prices Tyson charged for them.

24        Bowlin talked about himself.  He said on the other

25   hand, I'm held to a different standard.  I am evaluated based

1    on the profitability of these QSR accounts.  He said

2    salespeople often ask pricing people to lower costs, lower

3    prices down from what the pricing people had come up with.  He

4    called it the beat-down.  And Tim Mulrenin and Brian Roberts

5    and other salesmen beat him down frequently to get more pounds

6    and more chicken.

7            What did he say, you don't work for Tyson Foods?  You

8    work for Tyson Foods.  You don't work for KFC.  Ladies and

9    gentlemen, you heard him take the stand.  You know what he

10   meant when he said that.  I had to fight with my own

11   salespeople to get pricing.  I will call it the beat-down.  How

12   often did the beat-downs happen?  They happened all the time.

13   They happened frequently.

14           Sales was not involved in the model.  He talked about

15   wanting to fire KFC because they are not profitable because

16   pound for pound Tyson was not making the money, not making the

17   margins it expected.  It was not making the margins it needed

18   for the small bird unit.  And you know from the testimony you

19   heard and from what you've seen it just didn't work the other

20   way around.  You didn't have Tyson salespeople pushing up

21   prices.  It's exactly the opposite of what the government is

22   trying to sell to you.

23           So what do they say about how the QSR annual contracts

24   at KFC are arrived at?  Well, we brought you the Tyson

25   insiders, the people who actually could testify to how things

1   worked in Tyson, the role of sales, the role of pricing.  And

2   what did we learn?  We learned that QSR customers like

3   Popeye's, like KFC, like Church's, like Chick-fil-A, that

4   salespeople were the messengers, that the business unit

5   decided.

6          They took the message from the salespeople that a

7   price was needed for a customer.  Here is the specifications

8   passed to us by the QSR, passed to us by KFC.  Business unit,

9   pricing team, give us a price.  Business unit decides the

10  margin they had to hit.  It is all about profitability.  What's

11  the point of selling chicken at a pound price where you are

12  losing money with every pound?  They set the price, the target

13  that had to be hit.  And the pricing unit, people like Brandon

14  Campbell, were the ones that decided through the model supplied

15  by the customer that had to be filled out what price had to be

16  charged to hit those profitability numbers.  And you heard

17  about that.

18         And then what happened next?  Go get that price.

19  That's what the salespeople were told.  You go get that price.

20  And that's what they did.  They passed it on to the customer.

21         Now, ladies and gentlemen, after all of this and the

22  point in time when the discussions are made and the pricing

23  people set the price, worked up the model that was to be

24  messaged to the customer, that's when the sales team were

25  entered into the room.  That's when they had input on the

1   process.  That's where, ladies and gentlemen, you know the

2   beat-down happened.  That's when sales was worried about losing

3   volume and so they were pushing back.

4         Let's not charge this high price because I don't want

5   to lose the volume because that's going to hurt my bottom line.

6   You heard him testify about -- not just Mr. Bowlin,

7   Mr. Campbell about how selling volume was something that the

8   salespeople cared about.  That's why there was kickback when

9   the pricing people came up with the price that they thought,

10  the sales team thought that they couldn't sell to the customer.

11  You have not been presented, ladies and gentlemen, with any

12  evidence whatsoever that anybody, not Tim, not Brian Roberts,

13  that anybody tried to push up that KFC contract, nothing.  But

14  that's what you're being sold.  If you push a higher price,

15  Mr. Bowlin testified, you could lose a customer and that would

16  really hurt the sales team.

17        Now, let's be clear about one thing.  We brought

18  Darrell Bowlin and Brandon Campbell to speak to you, but the

19  government interviewed them before.  It's their burden to make

20  their case, and they made a decision not to bring those

21  witnesses before you.  Do you think that Brandon Campbell and

22  Darrell Bowlin had something relevant to say about whether the

23  sales team could have participated in the conspiracy charged?

24  You are entitled to see more than the absolutely incomplete and

25  distorted picture, the picture that they are trying to sell to

```
 1  you.  So while it's government's burden always, we felt you

 2  deserve more.

 3          Now, throughout this trial you heard many examples of

 4  where Tyson and Tim Mulrenin specifically competed with a low

 5  price strategy to sell more chicken and stealing sales,

 6  stealing pounds from their supposed partners in crime.  You

 7  heard Darrell Bowlin's words, beat-down for pounds, sales

 8  pushing the business unit to lower price for more volume.  You

 9  heard about Tim Mulrenin's involvement in a contract for KFC in

10  2017 for the year 2018.  You will remember Sara Fisher.  I made

11  a joke that fell absolutely flat about chicken math, but what

12  we were trying to do was actually calculate what the value,

13  discount value of the proposal that Mr. Mulrenin was putting

14  forth on behalf of Tyson.

15          And what you learned from that was when you did the

16  math, it was millions of dollars in savings to Tyson -- savings

17  to KFC.  It was Tim who passed that message on.  That's

18  information, ladies and gentlemen, that you recall that I

19  brought out from Sara Fisher.  It was not something the

20  government brought out from her even though they put her on as

21  a witness and they had interviewed her several times before.

22          You also heard about Telly Smith at Golden Corral, how

23  Tyson's price was the low price, aggressive, and I am going to

24  quote him right here, the competitive price.  If you look in

25  the transcript, that's exactly what he said.  And he did that
```

1  to steal volume from his other supposed partners in crime.  How

2  does that make sense?

3       Now, you will see overall that the government's story

4  just doesn't match up with the reality, with the facts as you

5  have seen them, and how the chicken industry operated at the

6  time.  Again, not one document that even hints at an agreement.

7  Out of all the documents, all the texts, wouldn't there be

8  something, someone talking about something cozy, a

9  disappointment that a competitor didn't go along with the plan?

10  Nothing.

11       So let's look at the documents.  There are documents

12  the government says are the keystone of their case.  What do we

13  have?  We have got documents that discuss what prices other

14  suppliers might quote for a cost or what a competitor is

15  currently charging a customer, period pricing.  These key

16  documents and others are big fat nothings.

17       Ladies and gentlemen, you were shown yet another

18  summary chart on the government's closing that had all these

19  sort of key documents and these horrible Department of Motor

20  Vehicle pictures of the defendants listing what they thought

21  were their keystone piece of their case, their real kind of

22  smoking gun stuff.

23       Ladies and gentlemen, I will save you a little time

24  and, look, this is for you to evaluate, but we pulled up those

25  documents.  And I am just going to very quickly give you the

 1    CliffsNote version.  We have got Exhibit 1919.  This is most of

 2    the packet here.  This is Robbie Bryant's notes.  Robbie Bryant

 3    had absolutely zero to say about Tim Mulrenin.  Then we have

 4    the summary charts.  Ladies and gentlemen, you have heard and

 5    you will hear these are not worth the paper they are printed

 6    on.  This is about story telling, not about the truth.

 7          You will see some period pricing for Church's, no

 8    reference to till Mulrenin, something about Chick-fil-A 2015

 9    grain model, I don't recall hearing any evidence about that.

10    And then you have a wide -- 9714, a distribution, lots of folks

11    at Tyson getting e-mail from Tim about the fact that

12    Chick-fil-A is coming forward with this NAE process, and it's

13    such big news they are going to put out a press release.  So he

14    is saying, folks, don't go blabbing about that.  This is

15    actually a big deal for our customer, Chick-fil-A.

16          And then we have a bunch of texts and e-mails for

17    Popeye's.  I will talk to you about that in a minute.  I don't

18    really get that story.  It's about responding to the customer's

19    request to all of the suppliers to come down on price, meeting

20    the customer's request.  But okay, here you have them.  Just so

21    you know, they are all in the summary charts we just talked

22    about.

23          Then you have got a couple with RSCS, Government

24    Exhibit 1175, 1177, 1190, 9704.  These are two occasions where

25    Tim is cc'd on e-mails to the customer, to RSCS in 2014, and he

1    took notes in a meeting.  And then the customer asked him a

2    question about the contract that was already submitted.  There

3    you go.  By the way,that was characterized by the government as

4    loads of evidence about Tim Mulrenin's participation in the KFC

5    negotiations.

6         And then finally you have something about the Church's

7    freezing charge and the Church's quality assurance.  So that's

8    it.  Look at it for yourself.  It's for you to judge the

9    evidence, but those are the hot topics right there.  So let's

10   peel some of this apart.  We won't peel all of it apart.  We

11   will just hit the points we think are worth addressing.

12        Let's talk about the Church's freezing charge.  Here

13   again, you see the government leaves out critical parts of the

14   story.  It's one where you can see Tim Mulrenin specifically

15   pushing down prices.  You heard about Church's Chicken wanting

16   its suppliers to keep frozen chicken on hand.  And the

17   government is asking you to believe that Tim Mulrenin conspired

18   with someone he supervised, Carl Pepper.

19        What did Carl Pepper do?  He sourced information about

20   what other competitors might quote for that cost.  So let's get

21   back now to what Darrell Bowlin testified to about costs, about

22   this freezing charge.  He said it's a pass-through cost.  It's

23   not including profit.  They were actual costs.  And those costs

24   were set by the business unit pricing team.  The prosecutor did

25   not mention that at all in her closing and that's not

1   surprising.  It doesn't fit their story.

2         Sales could quote below the actual costs, but they

3   couldn't ever quote above it.  That is because they are

4   supposed to be about actual costs.  Bowlin testified, and you

5   yourself can judge his credibility, he would not increase a

6   cost quote to a customer because he heard that some other

7   supplier was looking to charge more.  That was true for all of

8   these cost pass-throughs to the customer.  It was true for the

9   Church's quality assurance cost as well as Chick-fil-A.

10         Ladies and gentlemen, this is part -- this story

11   reveals some of the broken promises the government has given

12   you.  The government told you in the opening that Tim and

13   others conspired to raise, "raise" freezing costs.  They argued

14   that's how Tyson ended up charging 3 cents in June of 2013,

15   through collusion, through an agreement.  That's their story.

16   Not a single witness testifying to that, but that's their

17   story.  There is no evidence that Tim Mulrenin or anybody

18   priced any cost through collusion.

19         More than that, what the government did not show you,

20   but that we did, was that Tyson's sales team each time pushed

21   to lower that freezing cost.  You heard from Darrell Bowlin

22   that the actual cost, ladies and gentlemen, the cost they

23   worked up was 4 cents, 4 cents per pound.  That was in place in

24   December 2012 before the episode the prosecutors talked to you

25   about.  And it was again the case and all the way through 2013.

1          But you will see if you look at their summary chart

2     that they leave that little fact out.  Why is that important?

3     It's important because at the period of time the government

4     alleges, Tim Mulrenin went down from the actual cost, didn't

5     raise it.  They beat down from the cost, the actual cost that

6     was quoted by the internal team.

7          It was Mr. Bowlin who's testified to you that it was,

8     in fact, Tim Mulrenin in the fall of 2013 wanted to charge the

9     customer not 4 cents, not 3 cents, but 2.7 cents.  Why is this

10    important?  It's important because what the prosecutors are

11    telling you is totally false.  When they leave out critical

12    facts like this, when they don't call critical witnesses, you

13    are entitled to ask yourselves why.

14         It's the same with respect to the quality assurance

15    cost.  It's a cost pass-through.  The government didn't even

16    establish that that was even submitted to Church's.  How can

17    Tyson conspire to fix the price of a cost it never passed on to

18    the customer?  Ask yourself, do you trust story telling that

19    leaves out facts like this?

20         Now, look, the government did not offer the testimony

21    of anyone to help explain how any supposed agreement that

22    involved Tim Mulrenin came to be, how it functioned, how he

23    participated.  Most of the witnesses testified here didn't

24    mention him at all.  Ladies and gentlemen, I will submit to you

25    I do not suffer from shyness and I do not lack passion in

4978

1   defending against these baseless charges, but there was almost

2   no reason for me to get on my feet during the course of this

3   trial.  There was nothing to confront.

4          The only insider witness the government put on the

5   stand was Robbie Bryant who had no mention, no reference to Tim

6   Mulrenin.  And remember, ladies and gentlemen, the government,

7   they choose the witnesses they put before you.  It is their

8   choice.

9          Let's look at all the individuals whose names you will

10  see in the documents admitted in this case, only documents that

11  referenced Tim Mulrenin.  The list includes many Tyson

12  employees, employees from customers, important customers you

13  have heard about.  In fact, in this trial you have heard that

14  there are 115,000 Tyson employees and the government didn't

15  give you one, didn't put one on the stand.  We had to do that.

16  And we did it not because we carry any burden, but because we

17  cared about the truth.

18         Not even Carl Pepper.  Ladies and gentlemen, think

19  about the documents they flashed in the front of you, the slide

20  shows without someone testifying to those documents, not Tim

21  Scheiderer, the other Tim in sales at Tyson.  They didn't call

22  anyone from Church's, not even Dean Bradley.  He is all over

23  these e-mails.  Not one witness from Popeye's, not even Kent

24  Kronaugue.  That whole episode with Popeye's, it all involved

25  Kent Kronaugue and him trying to push the suppliers down on

 1    price.

 2          And from Chick-fil-A you heard from the government's

 3    own witness, Meyer Skalak.  He wasn't the go-to guy.  He wasn't

 4    the person engaging with the suppliers.  He was levels above

 5    that.  David Rothmeier, David Rothmeier would have been the

 6    witness who could have spoken to that, but the government made

 7    a choice.  They didn't put him on the stand.  What about Pete

 8    Suerken or Rich Eddington, the primary negotiations for that

 9    KFC contract in 2014?  They didn't put them on the stand.

10          We in the defense brought the only witnesses to take

11    the stand, the ones that the government chose not to call.  It

12    Remember, the government can choose who they want to call.  It

13    has the exclusive power to provide immunity, and you saw that

14    with Robbie Bryant, to provide immunity so individuals who

15    testify truthfully do not have to worry about criminal

16    prosecution even where what they testify about is about

17    wrongdoing.  We called -- and the documents we called -- what

18    they had to say was backed up with the documents.

19          Let's move on to these charts because I want to deal

20    with that.  You have heard about how they are misleading.  It's

21    a hard sell.  It's a hard sell because they don't have the

22    evidence.  Let's look briefly at this 2015 to '18 COB

23    negotiations the government spent so much time talking about.

24    How do you know that Tim played almost no role in the

25    negotiations?  Well, you know that the whole sales team didn't

 1    play any real role in the negotiations.  You heard about that

 2    from Brandon Campbell.

 3             But specifically about Tim Mulrenin, the prosecutor

 4    said Tim Mulrenin was all over those negotiations, all over

 5    those documents.  Now, ladies and gentlemen, unless they've got

 6    something else that they haven't previewed to you, I just

 7    talked to you about those four documents.  But more than that,

 8    you can see from all this how hard the prosecutor is straining

 9    to write Tim Mulrenin and to write Tyson and to write Brian

10    Roberts into this story.

11             They ignore that their own witness, James Olson, never

12    referenced Tim Mulrenin; that Robert Lewis, their only witness

13    that they put on the stand, a man they pulled out of retirement

14    to negotiate that contract in 2015, did not even recall Tim

15    having any role in the negotiations in 2014.  But the

16    prosecutor went to great lengths to flip up ordinary business

17    course documents to kind of paint this picture that he was a

18    key player.

19             But you know from the witnesses who testified that

20    none of the salespeople actually were in those negotiations.

21    They were the messenger.  This was a big deal contract.  They

22    were losing money with Tyson.  The testimony that was ignored,

23    the testimony about Tyson holding firm in its negotiation was

24    because, as you heard, Tyson was losing money.  The KFC was

25    account was not profitable.  You heard Bowlin testify that he

4981

1   wanted to fire KFC three times, that Tyson was not making money

2   for what was in the box and they were willing to let KFC go.

3        But Bowlin testified that KFC did have some power.

4   Remember, they have power.  It's hard to replace a customer

5   that buys that much chicken on a whim.  So it's not like KFC

6   was this victim and they couldn't have some ability to

7   negotiate and we'll take whatever the suppliers give us.  But

8   there is a point at which it doesn't make business sense and

9   suppliers like Tyson are really willing to walk away if they

10  don't get the margin set by the business unit.

11       Now, let's look at the government's summary chart for

12  KFC 2014 negotiations.  Again, remember, judge the government

13  based on this.  This is their keystone evidence here.  The

14  prosecutors are selling you the story that all 10 defendants,

15  and you can see how hard they are working to write Tim Mulrenin

16  and Brian Roberts in, that they are all in it together.  The

17  government wants you to focus on four calls between Tim

18  Mulrenin and Brian Roberts, his supervisor.

19       But Tim Mulrenin, Brian Roberts and Carl Pepper talked

20  frequently.  You heard testimony and you can see from their

21  phone numbers, they work and live in different states.  They

22  have to -- they work together.  They are colleagues.  When you

23  look at the phone records, you will see that in August 2014

24  alone they spoke 74 times.  Brian Roberts and Tim Mulrenin

25  spoke 74 times.  If you put a calendar up on the wall of

1   August 2014 and you threw a dart at it, you are very likely to

2   hit a date that's going to have two or three calls between

3   co-workers who live in different states and need to work

4   together.

5         They talked about chicken a lot.  That was their job.

6   So the prosecutors are just going to ask you to assume that

7   these phone calls were conspiratorial without a witness, a

8   recording or a document, documents that even suggest that's

9   what they were talking about on those calls.  That's just total

10  speculation.

11        So let's focus on calls between Tim, Brady and --

12  Scott Brady and Tim Mulrenin because the prosecutor points to

13  six, six calls over three charts, summary charts, 10-1, 10-3

14  and 17-1.  If you take a look at the underlying records, what

15  it shows you is Scott Brady and Tim Mulrenin do talk.  Why?

16  You heard testimony.  They are both suppliers to Chick-fil-A.

17        What did Meyer Skalak tell you?  What did Mr. Ledford,

18  the current buyer for Chick-fil-A, say?  He said that they

19  expected them to speak, to cover shortages, to provide

20  ingredients.  This is like they are part of a group that has to

21  collaborate for the benefit of the customer.

22        Now, but the prosecutors want to assume these are

23  collusive calls because if they don't have calls with Tyson,

24  that kind of messes with their story of everybody in it all

25  together.  That's what the prosecutors were referring to, these

1  calls that we are talking about here.  This is what the

2  prosecutors are referring to when she said Tim Mulrenin was

3  working the phone lines, just bigging it up.  Think about that.

4  As part of your job, your job, you're required as a salesman

5  selling Chick-fil-A to get on phone conversations with another

6  supplier.  Tim Mulrenin, Scott Brady, remember the Chicken

7  Summit.  That's your job.  You must do that.

8          Those calls end up on a few pages of a hundred

9  thousand pages of phone records.  Then a prosecutor sitting

10  around a table just like this decides that the summary chart

11  will look more compelling, it will look better if we have some

12  from Tyson.  We got a hole.  We got to fill that one in.  After

13  all, Tyson is a major supplier to KFC.  So what do you do?  You

14  just go in those phone records, you find the date where it's

15  going to look good and you plug in some calls.  And then you

16  ask a jury to speculate despite all the facts that that was a

17  collusive call.

18          So they put aside the fact that sales had no role in

19  pricing whatsoever, that Tyson and Pilgrim's were basically at

20  each other's throats competing vigorously against one another,

21  and that there was far more reason that those calls were

22  legitimate than anything conspiratorial whatsoever.  And they

23  just put those on the chart just to make their conspiracy story

24  more complete.  Ladies and gentlemen, that is reaching, that is

25  contorting the facts and that is misleading.  And ladies and

1    gentlemen, it bears indicia of desperation.

2         So let's turn next to Chick-fil-A where the

3    prosecutors' allegations that suppliers were colluding on the

4    cost quote for that are just -- they are just completely off

5    base, and I will dispose of this pretty quickly.  The

6    prosecutors, you know, made the allegations about a conspiracy,

7    but you also heard that Chick-fil-A didn't set a specification.

8    This was a work in progress.  This was a moving target.  And

9    when the suppliers were asked to quote, even Chick-fil-A didn't

10   have a specification set.  It was an all new process and

11   suppliers and Chick-fil-A were kind of shooting in the dark,

12   but they wanted an estimate.  They wanted a quote.

13        Bowlin spoke to that as well.  He said that Tyson

14   would ask for a pass-through cost, but they didn't know what

15   the specification was yet.  Even with all that, the prosecutors

16   offer you evidence.  Their sum total of what they give you is a

17   text on April 18 that stated Tim at Tyson said they are at

18   2 cents live weight, but no finished product price was

19   obtained.

20        Ladies and gentlemen, live weight of a chicken is not

21   the same as a further processed cost.  You heard that from the

22   witnesses that testified before you.  It's common sense.  A

23   live weight chicken is not the same as the cut weight that goes

24   in a sandwich.  There is a process and 2 cents live weight is

25   the starting point.  And you can gather that from the text

1    itself.  Work in progress.  No one ever has Tyson's finished

2    price.  There was no evidence it was ever shared.  There was no

3    evidence that any forward looking price was ever shared.  The

4    government conspicuously ends its time on April 18th right

5    after this text.

6         You deserve to know why that is.  Because if you when

7    you look at the phone records, Government Exhibit 8000, what

8    you will see is that while the process of calculating this is

9    going on before the quote is ever offered to Chick-fil-A, there

10   are no more calls.  You would see a whole lot of empty, no more

11   discussions.  Doesn't that change that picture for you?  If you

12   know the cost calculations and the negotiations that they

13   really were, and he is asking for a cost quote, they are

14   continuing through this month and yet there are no phone calls.

15   Work in progress.

16        Now, and that's on top of the fact that you had

17   Darrell Bowlin testify that sales would not have had any

18   influence in pushing up a pass-through quote, and that's what

19   he said the NAE price was.  You can't fix a price you don't

20   have, ladies and gentlemen.  And that is another critical flaw

21   in the government's story is the fact that none of the supposed

22   co-conspirators ever had Tyson's final price.  Didn't have

23   their bid prices, final costs, just didn't have it.

24        Look at these documents.  You will see that even when

25   some companies are talking about prices, Tyson is nowhere in

1    sight.  They are the one missing and you saw examples of that.

2    You need to know prices to fix them.  Instead, we see Tyson

3    fighting for business, trying to steal volume from all these

4    suppliers with low prices.  In particular, that's what Tim

5    Mulrenin did.

6          And another fact that you should consider about the

7    Chick-fil-A account, the current buyer, Mike Ledford,

8    testified, and you heard him testify.  And I had just a few

9    questions for him.  You might remember it was probably one of

10   the briefer cross-examinations.  I didn't come up with the

11   glasses or a pen.  What did he say about Tim?  He said even

12   after reading the Indictment, the Indictment against Tim

13   Mulrenin, he has kept Tim Mulrenin on as a salesman for

14   Chick-fil-A.  Ask yourself what that means.  An incredibly

15   knowledgeable buyer who testified, and you can judge his

16   credibility, said that he consented, agreed that Tim Mulrenin

17   should stay on the account.

18         Now, let me say -- I have said a few words about the

19   Popeye's episode.  I won't say much more.  It's -- but what you

20   have is you've got Popeye's buyer trying to push supplies down

21   on price.  You heard Mr. Ledford talk about that.  It's a

22   negotiation tactic used by suppliers and you heard Pepper

23   talking about getting info from Popeye's.  And competitive

24   intelligence is something that's valuable.  It's legitimate.

25   There is nothing unlawful.  But there are parts of the facts

1     that don't align with the government's story, so they left them

2     off.

3            For example, they left off from the underlying phone

4     records a whole bunch of calls between Pepper and the buyer

5     right in that window.  And ask yourselves why that gets left

6     off.  And they ask you to reach the inference that it wasn't

7     the buyer providing the pricing.  It was the suppliers when

8     there is no witness that's taken the stand, no evidence that

9     that's the case.

10           So ladies and gentlemen, let's talk for a moment about

11    reasonable doubt.  You have heard in this court, you have heard

12    it from others, you will hear it again, and you are going to

13    hear it from me because it is so important.  It's the

14    government's burden to prove Tim Mulrenin is guilty beyond a

15    reasonable doubt.  It is their burden.  And what is reasonable

16    doubt?  It's a doubt based on reason and common sense, and it's

17    consideration of what you have before you and thinking about

18    what you should have before you.

19           Tim Mulrenin doesn't have to prove his innocence.  He

20    doesn't have to prove one shred of evidence at all, not at any

21    point in time, because it's always their burden.  And that

22    burden is high.  And that burden must be high because of

23    everything that's at stake.  And it's not just at stake for Tim

24    Mulrenin and it's not just at stake for all of the defendants

25    in this case.  It's at stake for all of us.

1          Ladies and gentlemen, there are many facts, many facts

2    that should create the real possibility in your mind that Tim

3    Mulrenin is not guilty.  Ladies and gentlemen, think about all

4    the things you've heard in this case.  One by one you will

5    recall facts that fundamentally call into question this story

6    that you have been sold from the very beginning.  If any one of

7    these facts creates that real possibility in your mind, and you

8    can have disagreements about what that real possibility is, the

9    important fact is that you, each one of you, had a belief that

10   there is a real possibility that Tim Mulrenin is not guilty.

11   That point, at that moment, the government has not proven its

12   case.  At that moment you must find Tim Mulrenin not guilty.

13          Now, ladies and gentlemen, I know that you will follow

14   the law.  I know you will consider the facts.  I know you will

15   weigh the evidence.  And I know you will hold the government to

16   its burden.  And that's really all that we can ask of you.  And

17   I know and we know that when you do, you will come to the only

18   conclusion that the facts and the law support, which is that

19   Tim Mulrenin is not guilty of the crime he was charged with.

20          Thank you very much.

21          *THE COURT:*  Thank you, Ms. Prewitt.

22          Mr. Kantola is going to go next.  And Ms. Henry?

23                          **CLOSING ARGUMENT**

24          *MS. HENRY:*  It's a long way from Halloween now, but

25   the prosecution is still trying to get you to see something

1    that is not there.  The prosecution is fixated, fixated on what

2    it claims is the result of a puzzle game, but the puzzle pieces

3    don't have the shape it claims.  And let me say again this is

4    not a game.  This could not be more serious, what you have in

5    front of you to do.

6         It's been a long six weeks and an agonizing one for

7    Mr. Kantola sitting here hearing how his life has been twisted

8    in what the prosecutors have said.  They talk about a pattern

9    of undercutting competitors.  Well, they say the pattern isn't

10   there, but that's nonsensical.  That's not what the evidence

11   shows and that sure doesn't apply to Mr. Kantola.

12        Now you've seen the evidence.  You've seen what I said

13   in opening it would show about Mr. Kantola, that he did not and

14   could not have entered into an eight-year price-fixing

15   agreement.  He and his employer competed aggressively for sales

16   to fill up the extra capacity that Koch Foods was investing,

17   and that this was a strategy that ended up undercutting

18   competitors and was different from any of the other suppliers.

19        I want to go to a few examples from the government's

20   own evidence.  Let's focus first on GX-1544 because this is

21   evidence that the government has said is key evidence to show

22   that Mr. Kantola entered into a conspiracy.  The document never

23   references Mr. Kantola and this is what it says about Koch:  We

24   are hearing that Claxton and Koch were pretty aggressive with

25   pricing as well as Tyson.

 1          Now, the government says that there were a batch of

 2    phone calls with Mr. Austin and Mr. Kantola before and after

 3    this, but what this shows is that Koch had already undercut

 4    Pilgrim's on pricing.  The concept that this document is what

 5    shows that Mr. Kantola was involved in a price-fixing

 6    conspiracy, that this is key evidence against him, I want to

 7    use the word dishonest.  I will settle instead for

 8    incomprehensible.

 9          Let's go to the next one, the government's witness,

10    Michael Ledford.  Koch Foods' owner is an outsider to the

11    industry from Chicago and known for being a cut-throw.  GX-948,

12    this was a miscellaneous e-mail that the government put in

13    about a customer being unhappy with Pilgrim's Pride.  And what

14    does the customer say?  I will transition all my business to

15    Tyson, Wayne and/or Koch if this continues because Koch stood

16    ready at all times to take more volume.

17          Next, GX10-4.  That's one you have seen and have seen

18    many times.  It's the one that shows Koch is the second lowest

19    price on the chart for the KFC 2015 contract.

20          Next.  And government witness Robert Lewis who talked

21    about how Koch Foods had gained volume on the key product for

22    KFC, on the key issue that was involved in the government's

23    concept of overdrive, and it took it at the expense of

24    Pilgrim's Pride as well as others.

25          So surely you noticed, as I mentioned in my opening,

1    most of what you saw and heard in this courtroom in the last

2    six weeks had nothing to do with Mr. Kantola.  Mr. Olson,

3    Golden Corral, Telly Smith, Pollo Tropical, Mr. Brink,

4    Chick-fil-A, Mr. Skalak, Sysco, Ms. Hoyt, each made clear that

5    they have never dealt with Mr. Kantola about the issues that

6    the government wanted to talk about.  The other summary charts,

7    the reduced weight, Popeye's, I am not sure what in the world

8    was in those charts, but whatever it is, it doesn't relate to

9    Mr. Kantola.

10         And then there is the Church's freezing costs and the

11   QA costs.  You may remember chart 1-1, that's the freezing

12   chart cost, because the government showed it again in its

13   closing, but you also may remember it from Ms. Evans'

14   testimony.  That's the one where the only link to Mr. Kantola

15   is a 50-second phone call to an office number, not his number,

16   an office number where it wasn't known how many of the 15,000

17   employees at Koch could be reached at that number.

18         And chart 2-2, that was the QA cost.  Nothing

19   connected Mr. Kantola or Koch to any of those QA issues related

20   to Church's.  But instead the government inserts into that

21   chart a document.  It's a document where Mr. Kantola tells a

22   colleague, look, Tyson came in with a low cost and it just took

23   the Church's 2013 contract with this low cost.  The government

24   told you in its closing that that showed that Mr. Kantola was

25   involved in a price-fixing conspiracy about QA costs.  It makes

1   no sense.

2           So in all of the government's summary charts, that out

3   of 16 million documents took snippets from about 300, it says,

4   of what it claims are the key evidence.  There are only three

5   documents attributed to Mr. Kantola.  That was one that Tyson

6   stole -- or it took the 2013 contract.  The other one is where

7   Mr. Kantola sends an e-mail to a colleague saying at the very

8   beginning of the 2013 contract negotiations for KFC that we are

9   going to see if we can get a little bit more for dark meat.

10  And then he says, I don't know if it will stick.  Now, that

11  part isn't on the chart, but we will get to that a little bit

12  more.  And the third document is in 2017.  And what does that

13  document say?  It says, Ms. Fisher, here is my bid.  That's it,

14  nothing more.

15          So let's look at what the government did not show.  No

16  one testified that he had agreed with Mr. Kantola about

17  price-fixing or bid-rigging.  Not a single document shows such

18  an agreement.  Mr. Kantola is a salesman.  And sure, he had

19  calls with other suppliers, and they are friends, people from

20  whom he bought and sold chicken, and in those conversations did

21  he talk about specifications, weights, prices?  Yeah, he did.

22  Current prices or prices to be charged.  And current prices you

23  heard a lot.  They are also called period prices.  And

24  Mr. Feldberg showed you Mr. Ledford's testimony about how he

25  didn't care if they were talking about those period prices.

 1    That was fine with him.

 2            Even some of those phone call patterns that they want

 3    to talk about, what they suggest is that somebody was looking

 4    for cover sales.  The prosecution in closing said that there

 5    was no legitimate reason for these calls really, but it would

 6    have had to be deaf not to hear that cover sales were a

 7    constant problem.  Even Mr. Bryant confirmed that.  And he also

 8    talked about how there were shortages throughout that entire

 9    summer of 2014.

10            Mr. Kantola clearly wasn't talking about prices,

11    intended prices, on those calls.  He wasn't talking about

12    Koch's prices or bids.  Yet the prosecution told you, you know

13    what was happening on those calls.  This is the agreement.

14    This is the conspiracy.  No evidence at all supports that

15    Mr. Kantola voluntarily and knowingly joined an eight-year

16    price-fixing conspiracy.  And as the Court instructed, that is

17    what the government charged and that is what it's required to

18    prove, and it has not done it.

19            So let's go to where the government has pointed for

20    Mr. Kantola at the KFC negotiations.  But unlike the

21    prosecution, let's talk about what actually happened.  There

22    was no alignment on pricing, no alignment on the

23    justifications.  I mean, Koch's justification was very -- the

24    suppliers all negotiated.  The bids were independently

25    formulated.

1          RSCS was satisfied with the bid results.  Sometimes

2   prices went up.  Sometimes they went up less than expected.

3   Sometimes they went up more than expected.  And sometimes they

4   went down.  And sometimes the suppliers even lowered their

5   prices when they didn't have to, when there was already a

6   contract in place for a higher price.  Does that make sense as

7   part of a conspiracy?

8          And Koch consistently sought additional volume and it

9   took market share at the expense of competitors.  And not one

10  of the negotiators, Mr. Lewis, Ms. Fisher, Mr. Ledford, had

11  thoughts that there was price-fixing going on.  Mr. Lewis even

12  testified that if there had been collusion, he would have

13  expected the prices to be closer.

14         Volume, Koch seeking additional volume is important.

15  The customer witnesses all explained how the risk of losing

16  volume was the way a supplier undercut a competitor.  Even

17  Mr. Bryant said this.  He said you couldn't have an agreement

18  except that that would be the key point of it, so that you

19  wouldn't lose market share.

20         Ms. Fisher said it extremely well because she was

21  asked by the government, well, you know, everybody is going to

22  get a contract, so what were they competing for?  And she said

23  very simply, they were competing for volume.  In each of the

24  three KFC negotiations discussed in the government's closing,

25  the prosecutor nonsensically asks you to speculate that a

4995

1    conspiracy existed.  The prosecutor -- prosecution's evidence

2    was that Pilgrim's Pride had documents that showed that the

3    suppliers had swapped prices, that was their word, swapped

4    prices.  But the prosecutor's premise is false.  It's wrong.

5    The government has an obligation to get it right.  It has the

6    burden of proof to show facts beyond a reasonable doubt.  But

7    it is wrong.

8         These are the documents that were in Pilgrim's Pride

9    internal competitive intelligence where they are trying to

10   figure out what they should independently charge.  There is one

11   for the 2013 contract.  There is the 2015 contract.  There is

12   the 2017 contract.  And apparently this may be the basis for

13   the government's fixation.  Who knows?  But the fact is none of

14   these numbers in these documents was Koch's number.  They are

15   not even aligned numbers.

16        But this is the basis that the prosecution is telling

17   you that you knew that those phone calls were about swapping

18   prices and coordinating pricing.  There is simply no basis to

19   say that.  And frankly, you have a right to feel insulted at

20   being told that you knew there was a price-fixing conspiracy

21   based on something so obviously false.  The prosecution is just

22   suffering from a bizarre fixation that has made it deaf and

23   blind to the facts.

24        Let's look more closely at the 2013 contract.  You

25   heard how the actual evidence showed that the government was

1    wrong even though it came in in a very disjointed process.  As

2    I asked Mr. Ledford, you know, this number, it was not .9561?

3    Well, the government hadn't shown you yet the competitive

4    intelligence chart on Pilgrim's, so it may or may not have made

5    a lot of sense, but this is what's going on.  We talked about

6    this, each of the proposals.  The price was not Koch's price.

7         And on this one we also talked about how Mr. Kantola

8    didn't even submit the bids here and didn't submit the

9    contract -- sign the contract.  He had to give the pricing to

10   Mr. MacKenzie.  And he had to give pricing to Mr. MacKenzie so

11   that he could put it in to do the submission.  And the

12   government wants to make an issue of that too and about the

13   fact that Mr. MacKenzie didn't know what Pilgrim's was charging

14   either on wing prices.

15        So let's go to the government's speculation about the

16   dark meat.  And again, this is a somewhat difficult slide, but

17   the red bar, the key point on the red bar is that's the first

18   round bid that occurred.  You will see despite all those phone

19   calls that the government wants to talk about, pricing was not

20   aligned.  Now, the government said and put on its chart that

21   this is the key evidence about Mr. Kantola.  What he put in

22   that e-mail, he also said, I'm not confident it will stick.

23   Now, that part the government did not put in the e-mail -- in

24   its chart, in its summary chart.  But that's another blatant

25   demonstration of this fixation and blindness to facts, to the

1    truth, to the evidence.

2           The prosecution said Mr. Kantola knew he could pull it

3    off because he had just been talking to four competitors.

4    Well, if he knew that, why did he say the exact opposite?  I

5    also think back to when I asked Mr. Ledford about whether Koch

6    was the only one of the incumbents to get an increase on dark

7    meat pricing.  And if you remember, we didn't go through it

8    step by step.  He told us how to do it and we did that for you.

9    He said, just compare the contracts.

10          Can we get up the next slide?

11          Koch got a very significant increase on dark meat.

12   That's what actually happened after the document that the

13   government put in its summary chart, again aggressive

14   competition to take volume, and it undercut other competitors.

15   Mr. Ledford was truly knowledgeable about the chicken supply

16   industry.  Again, when you're thinking about the blindness, the

17   government in its closing never once, not once mentioned

18   Mr. Ledford.  That's a fixation in blindness problem.

19          Now, as I told you would happen when I was talking in

20   my opening, the government didn't talk much about the 2014 KFC

21   contract because prices decreased.  But the prosecution did

22   focus on the 2015 contract's price increase.  It also has a

23   willful blindness problem.  Once again, the government is just

24   wrong.  Koch was never increasing its prices by 14 to 16 cents.

25   And it's important to think about how many times the government

1    emphasized how important a penny was, that that's a lot of

2    money.

3              Also on this chart I want to point out, because I

4    think it's very important, how three of the suppliers in the

5    Pilgrim's competitive intelligence documents and summary, three

6    of them are plugged in with the same plugged numbers.  Now,

7    they all ultimately have different prices.  But don't you think

8    the fact that they have a plugged number for three of them

9    would have tipped somebody off that those numbers weren't

10   coming from those suppliers in those phone calls?  Well, even

11   if they were or even if some of the numbers had come in, the

12   evidence also clearly showed that the purpose of having that

13   information was to independently formulate the bid at

14   Pilgrim's.

15             And this happens in the sales world all the time.

16   They make educated guesses about what the competition might be

17   doing.  Mr. Brink talked about how he helped with those

18   educated guesses.  He got Pilgrim's price increase, and he

19   immediately then went to another supplier, told them about the

20   increase, told them the exact amount of the increase, told them

21   that Pilgrim's wasn't budging, and that he was unhappy.  Well,

22   that gets around pretty quickly when your customers are out

23   there telling you that sort of thing.  It's not difficult to

24   make an educated guess, especially with all the market

25   conditions that were out there.

1            Now, the law is clear that when you consider the fate

2    of an individual and what that person would have understood,

3    it's important to look at the evidence from the standpoint of

4    that individual.  You will remember we asked you in opening to

5    stand in the shoes of Mr. Kantola and think about that as the

6    evidence came in because, as the Judge instructed you, you have

7    to consider the evidence separately for each individual.  So

8    with the lights on and standing in the shoes of Mr. Kantola,

9    it's impossible to see how he could have understood that his

10   going about his job selling chicken and trying to get more

11   sales at a win-win price, how that could constitute being part

12   of a conspiracy.

13           His job was to get more sales and his life has been

14   turned over.  He has been ripped out of his life to be here as

15   a defendant.  But I now want you to think back on his life

16   seven, eight years ago, because this is the perspective that

17   you need to keep in mind.  It's not difficult.  A lot of this

18   we have gone over and you have heard about a whole lot.

19           Big bird/small bird profitability.  In 2014, it was

20   all over the place.  Common knowledge.  KFC has its Mother's

21   Day disaster.  There is tight supply.  You've heard all the

22   comments about near panic mode.  And RSCS starts off its RFP

23   process and what's the first thing it does?  It signals that

24   you should think about your needed profitability compared to

25   big bird profitability.  That's what the document said.

 1          And Mr. Lewis, who had trouble remembering some

 2   things, remembered some things also very clearly.  He

 3   remembered that he had talked to Mr. Kantola explicitly about

 4   how RSCS was concerned and very upset about the profitability

 5   difference and that that was a big thing for them at the time.

 6   He remembered how Koch's owner was making investments and how

 7   he was working with Mr. Kantola on the Chattanooga facility to

 8   maybe grow capacity there.  The Gadsden facility was being

 9   changed about and converted to have some more capacity, and

10   that all that required a financial commitment and a financial

11   support for that work, and that Koch needed extra sales to fill

12   that capacity.

13          And this basically was an offer to KFC that it would

14   get a sustainable source of supply.  Koch's proposal matched

15   all that.  And what happened after he submitted his relatively

16   high price?  RSCS responds, we're making good progress.  They

17   offer him more loads.  Koch continues to negotiate and even

18   gives a lower price.  And the result was a win-win for both

19   Koch and for KFC.

20          And you've seen this before.  I won't spend a lot of

21   time on it.  This is the one that shows that Koch is the second

22   highest on the government's chart.  And you will remember also

23   when I went to the viewer during Mr. Lewis' testimony and we

24   wrote out and made the arithmetic, Koch got about a

25   500,000 pounds per week increase.  That's a lot of chicken.

1   And you also remember how this undercut Pilgrim's because RSCS

2   wanted to punish Pilgrim's for its high price.  And that was

3   the overdrive conspiracy.  That?

4         But the 2017 negotiations truly top off the absurdity

5   of the government's case and show the government wrong once

6   again.  On the left we have Robbie Bryant's notations.  And

7   again, you'll remember how I went through with Ms. Fisher

8   saying, "And that's not 1.0125," because nothing that Koch did

9   was ever 1.0125.  And I'll point out it wasn't even Koch's

10  current price.  It wasn't Koch's number.

11        The proposal here, it's important here to look at

12  those dates because all these phone calls that the government

13  says, oh, yeah, you can know in those phone calls that they

14  were swapping prices, well, Mr. Kantola had presented his price

15  long before Mr. Bryant wrote down what he says was the future

16  price.  You're left to wonder how did we come to be in this

17  courtroom?  Well, initially you might think that Mr. Bryant had

18  something to do with this.  No, that wouldn't be true.  The

19  government didn't talk to Mr. Bryant until they had already

20  brought the charges against these individuals.

21        The government charged these individuals with a

22  felony, and apparently only then and with a determined fixation

23  and blindness for the facts went about trying to put together

24  its case.  What it based its case on was wrong.  You likely

25  noticed a lot of this in the questioning and use of Mr. Bryant,

 1    but it pointedly explains the government's process.

 2         Now, in closing for the first time you heard the

 3    government try and walk away, take a few steps back, because

 4    they kind of knew they were in trouble on this concept that

 5    Mr. Bryant had talked about future pricing.  It didn't make any

 6    sense, what they said there, and it didn't make any sense they

 7    didn't address the other problems.  But do you remember the

 8    government used the term "future pricing" in its questioning of

 9    Mr. Bryant about 30 times.  They were desperate to try and get

10    across that message.  This is just a tiny, tiny amount of the

11    examples.

12         The future pricing information from competitors.

13         What is the purpose in providing you with the future

14    pricing bid information?

15         You all talked about it was the pricing for

16    competitors.  Is that future pricing?

17         That was my understanding.

18         And that's its price per pound, then the individual

19    company's price.  And that's future pricing.

20         That was my understanding, yes.

21         But the prosecutors knew, they knew it was not future

22    pricing.  This methodology for presenting the well-rehearsed

23    opening testimony of Mr. Bryant permeated every aspect of the

24    government's use of him.  The testimony the government asked

25    for was all about his expectations, understandings, which were

 1    really code for just plain guesswork to satisfy the demands of

 2    the prosecutor.

 3           Mr. Bryant was wrong.  Understandings and expectations

 4    are not knowledge.  This is not evidence.  This is not facts.

 5    Mr. Bryant didn't use the term price-fixing in his 20

 6    interviews.  He told Mr. Feldberg that the government got him

 7    to say that in this courtroom.  And he said, I didn't use that

 8    exact term.  I think the way I expressed it was just the

 9    actions that took place.  So what were those actions and what

10    did you see?

11           Mr. Lavine and Mr. Feldberg have already gone through

12    most of this.  I'm not going to repeat everything here.  You

13    know that Mr. Bryant even said after overhearing these two

14    phone calls he couldn't even remember which was which, whether

15    one was with Brady or Kantola, but all he knew about them was

16    something about was said on the call, "The price is the price.

17    How many loads do you want?"  That's it.  That's not a

18    conspiracy.

19           He heard his boss say something about, "Get the word

20    out to the industry."  And, of course, the government made a

21    huge point.  Now, the industry means only the competitors,

22    right?  Well, do you remember in my cross-examination of

23    Mr. Bryant, I asked him:  Customers, brokers, distributors,

24    suppliers, these all have a place in the industry.

25           He said:  Yeah, uh-huh.

1          They all have a role to play in the industry.

2          Uh-huh.

3          Of course, I wasn't the government asking the question

4   about being the industry, was I?  I hadn't rehearsed him.  And

5   then the linchpin of everything that he based his understanding

6   on was his belief that this stuff was future pricing

7   apparently.  And in response to the prosecutor asking

8   Mr. Bryant his understanding of the terms of his immunity

9   agreement, he said, "If I don't fully cooperate, that this

10  agreement would be void."  He would be sitting in one of these

11  chairs.

12          Just think back to how the prosecution in its closing

13  told you that you know that there was price-fixing going on and

14  consider how Mr. Bryant would have dealt with 20 interviews

15  when he knew they could make him a defendant at any time.  In

16  making the most momentous decision that will probably ever be

17  made about Mr. Kantola's life, I want you to think about how

18  much trust to put on the snippets the government has presented

19  and how many layers upon layers and layers of guesswork they

20  want you to make and how the government is wrong.  It's been

21  consistently wrong.  That's not evidence.  That's not common

22  sense.

23          Remember what the Judge instructed about making

24  inferences only upon proven facts.  That's what he instructed

25  you, that inferences are to be made only on the basis of proven

1   facts.  All those driver's license pictures and candyland

2   charts, connections, in your consideration of Mr. Kantola, we

3   ask you to look at the facts and what actually happened.

4        Competition happened and some intense negotiations.

5   The evidence has made clear what I explained in my opening,

6   what little evidence there was about Mr. Kantola showed him

7   going about his job as a salesman in an ordinary life, talking

8   with friends and suppliers, but competing aggressively to get

9   the extra sales needed to fill that extra capacity that Koch

10  was investing in.

11       The prosecution offered no evidence that he had any

12  motive to fix prices.  In its closing, the prosecution said he

13  did it for money and then showed you what was in Exhibit 901

14  and said oh, look, they got price increases and he boasted

15  about price increases.  Well, there is two problems with that.

16  No. 1, Mr. Kantola is not Koch.  He is one of 15,000 employees,

17  and he is not even a decision maker on the pricing.

18       And second, Exhibit 901 is about revenue, not prices.

19  So what the prosecutor actually showed you was how Mr. Koch --

20  Mr. Kantola had helped Koch increase the volume of its sales.

21  That's what that document shows you and how he helped to take

22  sales away from competitors.  This is just another example of a

23  fixation and blindness to the facts.  To convict Mr. Kantola,

24  you must find that he knowingly and voluntarily joined into the

25  alleged eight-year price-fixing agreement and there is no basis

1    for that.

2         I also am going to refer you to the Judge's

3    instructions and I encourage you to review them again,

4    particularly No. 17 and 18.  It is the agreement to act

5    together to eliminate competition that constitutes the crime.

6    Independent decision making is the opposite of collusion and

7    information exchanges are okay in the absence of a price-fixing

8    or bid-rigging agreement.  The Judge's instructions are what

9    the law is.

10        And think about that concept of agreement that the

11   government has presented.  Who made this amorphous agreement?

12   Well, no one apparently.  It certainly wasn't Mr. Kantola and

13   the people he was talking to because those people didn't even

14   have the authority to set the prices.  They haven't given any

15   answers there.  How was it made?  Well, I have no idea.  There

16   is no answer.  What were the terms?

17        The only issue that's come out here on that is this

18   concept that Mr. Bryant said that any terms would have to be

19   that you wouldn't undercut or take volume away from a competing

20   supplier.  Well, we've just seen Koch Foods did that all the

21   time.  Mr. Kantola helped with that.  That was his job.  This

22   alone is reasonable doubt.

23        The government has to get it right.  It bears the

24   burden of proof.  We ask you to right this wrong.  Put yourself

25   in Mr. Kantola's shoes.  You can see here a man who is going

1    about his sales job and then his life is turned on its head.

2    Try to put yourself in his seat over there and listen to how

3    his life has been twisted.  He's counting on you for his

4    future.  The evidence is utterly insufficient to find beyond a

5    reasonable doubt Mr. Kantola guilty of the criminal felony

6    alleged.  He is not guilty and we respectfully request that you

7    render a verdict of not guilty.

8         Thank you.

9         THE COURT:  Thank you, Ms. Henry.

10        Ladies and gentlemen, why don't we go ahead and take

11   our mid-morning break at this time.  We will have 15 minutes.

12   Why don't we plan on reconvening at 10:15.  The jury is

13   excused.

14        (Jury excused.)

15        We will be in recess.  Thank you.

16    (Recess at 10:00 a.m.)

17    (Reconvened at 10:15 a.m.)

18        THE COURT:  Mr. Byrne?

19        MR. BYRNE:  I will just ask if I could use a little

20   bit of Ms. Henry's time since she didn't use all of hers and

21   since I gave some of mine to Mr. Tubach.

22        THE COURT:  Yes.  Because of some time savings by

23   Ms. Prewitt and Ms. Henry, I upped both Mr. Gillen and

24   Mr. Byrne to their full complement.

25        MR. GILLEN:  Your Honor, not to be selfish or greedy,

1    but she had five minutes.  May I have the five rather than the

2    two that I gave to Mr. Tubach?

3          THE COURT:  With the available minutes allocation, you

4    are both upped back to 45, but that's it.  There is not any

5    extra.

6          MR. GILLEN:  No harm in asking.

7          THE COURT:  Okay.

8          (Jury present.)

9          THE COURT:  Ladies and gentlemen, Mr. Little will go

10   next.  Mr. Byrne?

11         MR. BYRNE:  Thank you, Your Honor.

12                         **CLOSING ARGUMENT**

13         MR. BYRNE:  Good morning, Ladies and Gentlemen of the

14   Jury.  My name is Mark Byrne, and along with Dennis Canty it is

15   our privilege and honor to represent Jimmie Little.

16         This has been a long trial.  There have been many

17   witnesses and numerous exhibits.  Oftentimes the testimony in

18   this case has been tedious and I must admit maybe even a little

19   bit boring.  But this is very important because Mr. Little is

20   on trial, along with the other defendants, for violating

21   federal criminal laws.  This is a very serious charge with very

22   serious ramifications.

23         Already Mr. Little's life has been upended.  He

24   retired in September of 2016.  He has kept up with his friends,

25   but he has had nothing to do with selling chicken since then.

1   He was charged in October of 2020 and he has been living under

2   the cloud of the charges since then.  And for this trial he has

3   been forced to leave his home and his wife in Fort Worth,

4   Texas, and travel to Denver risking COVID.  And he has been

5   forced to sit in this courtroom and listen to the government

6   attempt to paint Mr. Little as a bad person, as a criminal.

7         But now Mr. Little's fate is in your hands.  You, not

8   the government, now are in charge.  This is your decision to

9   make.  And it should be based upon all of the evidence

10   presented during the trial, not just the evidence that the

11   government wants you to see, but also the evidence that the

12   government tried to keep from you to keep you from seeing.

13         Before we get into the evidence, I want to go over

14   something very important.  Some of the other lawyers have

15   already talked about this.  The Judge has instructed you that

16   each defendant must be considered individually.  Specifically,

17   the judge has told you that the rights of each defendant in

18   this case are separate and distinct.  You must consider,

19   separately consider the evidence against each defendant and

20   return a separate verdict for each.

21         Your verdict as to one defendant, whether it is guilty

22   or not guilty, should not affect your verdict as to any other

23   defendant.  In other words, although all the defendants are

24   charged in the same conspiracy, you must consider the evidence

25   against each defendant separately to determine whether he

1   joined the conspiracy, whether he participated in the

2   conspiracy, whether he withdrew from the conspiracy.

3          Now, I want to talk for a second about opening

4   statements.  I want to remind you about the opening statements

5   in this case.  They were a long time ago, but they are

6   important to remember.  Why?  Because the opening statements

7   are like a road map of what the evidence is supposed to show.

8   Even though the opening statements are not evidence, they are

9   like a promise.  So let's go through the opening statements as

10  they relate to Mr. Little.

11         First, let's talk about the government's opening

12  statement.  Let's look at what Mr. Koenig said during his

13  opening statement to see whether the government kept its

14  promises.  Mr. Koenig said that it's all going to come together

15  like puzzle pieces to form a picture that will be crystal

16  clear.  Some of the other lawyers have said that.

17         Really?  Do you think this has been crystal clear?  I

18  don't think so.  The government left out pieces of the puzzle.

19  And when they were confronted with pieces that didn't fit, they

20  just tried to force them together.  When you actually look at

21  the evidence that was presented at trial, all of it, it is

22  clear that the pieces do not fit together, at least not in the

23  way the government promised you they would.

24         Now I want to remind you of what Mr. Little said in

25  our opening statement.  We said that Mr. Little provided

1   customer service for some of Pilgrim's Pride's national

2   accounts.  These accounts included Church's, Pollo Tropical and

3   some others.  We also said that importantly KFC was not one of

4   his accounts.  We said that the evidence will show that

5   Mr. Little had no involvement whatsoever in pricing or contract

6   negotiations for KFC.  And as I will discuss in more detail,

7   this is what the evidence at trial has established.  We kept

8   this promise.

9        We also said that Mr. Little did not have pricing

10  authority for any of Pilgrim's accounts.  He was given the

11  price by Pilgrim's financial analysts and he communicated that

12  pricing information to his customers.  This is what the

13  evidence at trial established.  We have kept that promise.

14       In our opening statements we spoke about shorts and we

15  said that covering shorts was a reason competing chicken

16  suppliers spoke with one another.  You heard several witnesses,

17  both government and defense witnesses, who testified about

18  that.  This is undisputed.  And we said that that is the reason

19  why Mr. Little would speak with other chicken suppliers, that

20  is a reason, and it had nothing to do with conspiring to set

21  prices.  So we kept that promise from our opening statement.

22       And finally, we said that the evidence at trial will

23  not show beyond a reasonable doubt that Mr. Little entered into

24  an agreement with anyone in this courtroom or anyone else to

25  fix prices or to rig bids.  And it's going to be up to you to

1   make sure that we absolutely keep that promise.  We kept our

2   promises, but the government didn't keep its promises.  In

3   fact, they fell far short.

4        I am going to walk you through how the actual evidence

5   that came out in the trial shows that Mr. Little is not guilty.

6   So what is the evidence against Mr. Little?  What has the

7   government presented and, more importantly, what has the

8   government left out?  The government called nine fact

9   witnesses, but only two witnesses mentioned Mr. Little, Robbie

10  Bryant and Joe Brink.  The government introduced about 500

11  exhibits, not including phone tolls and summary exhibits.  Only

12  20 have Mr. Little's name on it.  That's 4 percent.

13       There is no evidence that Mr. Little entered into any

14  conspiracy at all, let alone the big huge conspiracy that the

15  government alleges and must prove in order for you to convict

16  any of the defendants, including Mr. Little.  I am going to

17  focus in on the summary charts because that's what the

18  government did in its closing statement.  But before I do that,

19  I want to caution you about the summary charts and other

20  counsel have cautioned you also, as they should.

21       Remember, Ms. Evans testified that she was told

22  exactly what to put into the charts, and the only thing she did

23  was to make sure that the snippets in the summary charts

24  appeared in the underlying documents.  But who gave her the

25  things to put into the summary charts?  The government lawyers.

 1    They cherry-picked, and that word has been used a lot, or

 2    phrase, they cherry-picked what they wanted to include so the

 3    puzzle pieces that they selected would fit into the picture

 4    that they want you to see, their picture, but not the real

 5    picture.

 6          The evidence has shown, and as other lawyers have

 7    already pointed out during their closing arguments, there are

 8    numerous pieces to this puzzle that have been left out,

 9    numerous pieces of the puzzle that aren't in the summary

10    charts.  As to the summary charts, the Judge also has

11    instructed you, and some of the other lawyers have talked about

12    this, you must give a summary exhibit entire weight, some

13    weight or no weight at all depending upon your assessment of

14    the underlying material and the accuracy of the summary.

15          So if you do look at these summary charts when you are

16    back deliberating in the jury room, remember, they are

17    incomplete.  There is no doubt about that.  They leave out some

18    very important pieces of the puzzle.  So let's go through the

19    summary charts that referenced Mr. Little.

20          First, let's start with summary chart 5-1.  Maybe we

21    can put that up on the screen.  So I am going to start with

22    this incident because it's the one that the government alleged

23    most involves Mr. Little.  And maybe the government considers

24    it their best evidence against Mr. Little, but if this is the

25    government's best evidence against Mr. Little, then it betrays

1    how weak their case is against him.

2              So what's 5-1 all about?  This is the Joe Brink/Pollo

3    Tropical incident.  You remember Joe Brink, right?  Joe Brink

4    is the Pollo Tropical buyer who thinks that small bird and big

5    bird chickens are different species.  Do you remember that?

6    Ladies and Gentlemen of the Jury, in the last four weeks, you

7    have learned more about chickens than Joe Brink knows, and he

8    has been doing this for many years as a buyer no less.  Joe

9    Brink also thinks that the one and only factor driving the

10   price of chicken is grain prices.  And since he thought grain

11   prices were going down in 2015, then chicken prices should have

12   gone down as well.

13             But you know that there are many factors that go into

14   the price of chicken, including supply and demand, and grain

15   price is only one of them.  And you know that bigger chickens

16   are fed more than smaller chickens and allowed to live longer.

17   That's why they are bigger, not because they are different

18   species.

19             So what's going on with Joe Brink?  What's the bottom

20   line with Joe Brink?  Joe Brink was upset because he couldn't

21   get the price he wanted.  He was upset that he didn't have the

22   bargaining power that he had had in prior years.  So he made up

23   a story that Jimmie Little of Pilgrim's and Walter Cooper at

24   Claxton were conspiring to set prices.  The government put him

25   on the stand to tell this story even though it wasn't true.

 1    Let me explain.

 2            So 5-1 is up.  The government wants you to believe

 3    that Mr. Little and Walter Cooper at Claxton conspired to

 4    increase the prices Pilgrim's and Claxton charged Pollo

 5    Tropical.  They have some e-mails and phone calls and they

 6    string these together in their chart, 5-1, and they come up

 7    with a story that they say shows this conspiracy.  But let's

 8    look at what actually happened and what the evidence shows,

 9    including what the government did not include on the summary

10    chart.

11            First, let's talk about the September 22nd call.

12    Mr. Brink testified that on September 22nd Mr. Cooper submitted

13    Claxton's initial bid.  The government emphasized this in their

14    closing argument yesterday.  And they showed you Exhibit 9740

15    which has the "price is the price," language in it.  And then

16    they doubled down on what was said during the September 22nd

17    phone call between Brink and Little.

18            Let's look at Exhibit 9740 and let's look at the first

19    excerpt.  There we go.  In this initial e-mail, Mr. Cooper

20    provides a bid for split WOGs with $1.07 per pound delivered

21    which represented a 19-cent increase over the prior year's

22    contract price.  Later in this exchange, Mr. Cooper clearly

23    demonstrates that Claxton is competing with Pilgrim's for the

24    Pollo Tropical business, not colluding to fix a price, but I

25    will talk more about that later.

1          Now let's look further up at this e-mail.  During his

2     testimony the government focused on Mr. Cooper's use of the

3     phrase "The price is the price" with no consideration or

4     explanation, "Take it or leave it."  That's what's highlighted

5     here, although there is a lot more highlighted.  Then the

6     government asked Mr. Brink a series of questions about how he

7     heard the phrase "The price is the price," from Mr. Little on

8     the same day, September 22nd, in a conference call with his

9     CFO.

10         Mr. Brink said that Mr. Little also gave him a price

11    during that September 22nd call, a 19-cent increase over the

12    prior year.  Joe Brink also said that Mr. Little said, "The

13    price is the price," just like in this e-mail here, and that

14    gave Mr. Little -- I am sorry, Mr. Little gave him until

15    2:00 p.m. to accept that number, 2:00 p.m., take it or leave

16    it.  Brink testified that Pollo Tropical's CFO also was on the

17    call, as I said.

18         What the government wants you to believe is that

19    Mr. Cooper and Mr. Little had talked and that they were so

20    synced up that they were using the same phrases and submitted

21    the same 19-cent increase on the same day.  That is what the

22    government would have you believe.  It's a good story, right?

23    But we know the story is false.  And the government knew it was

24    false or should have known it was false before they put

25    Mr. Brink on the stand to answer those questions.

 1          Now, the government also should have known it was

 2    false yesterday when they highlighted it in their closing

 3    statements.  How can we be sure that Joe Brink lied?  How can

 4    we be sure about that?  Well, the government met with Joe Brink

 5    seven times before his testimony.  The last time was the day

 6    before he testified.  That time the day before he testified was

 7    the first time that they had ever discussed with Mr. Brink this

 8    September 22nd phone call, the first time it ever came up, the

 9    day before he testified.

10          But before they ever put Mr. Brink on the stand, they

11    had already put stickers on the documents, on the exhibits,

12    government stickers.  And they put some of these on the summary

13    chart 5-1, although the government didn't include all of the

14    relevant information.

15          So let's look at these government documents.  First of

16    all, if we can show Exhibit 563, it's an e-mail from Mr. Little

17    to Tim Stiller and Tommy Lane at Pilgrim's.  These are two of

18    Pilgrim's pricing guys.  This says on September 22nd, I need

19    pricing, 2015 pricing for splits and breast.  So Jimmie Little

20    is asking on September 22nd the pricing guys at Pilgrim's for

21    the pricing for Pollo Tropical for splits and breast.  On

22    September 22nd he doesn't have the pricing.  He doesn't have a

23    price to give to Joe Brink.  He had to get it from a Pilgrim's

24    pricing guy, not from Walter Cooper, which is what the

25    government wants you to believe, but from the Pilgrim's pricing

1    guys.

2            Second, now let's look at Exhibit 564.  This is

3    referenced on the chart.  But let's look at the entire e-mail.

4    Maybe we can enlarge that a little bit, not just the portion

5    the government put on the chart.  After his call with

6    Mr. Brink, Mr. Little e-mails his co-worker, Mr. Boarman, about

7    his discussion with Mr. Brink.  He says, Joe didn't handle the

8    15 to 22-cent increase well as expected.  Note that Mr. Little

9    did not say the 19-cent increase I told him.  He referred to a

10   range because the Pilgrim's pricing people hadn't given

11   Mr. Little a final number yet.

12           Then Mr. Little says, I'm guessing that we will be

13   about 16 cents up on splits.  Mr. Little turned out to be

14   wrong, but note that Mr. Little doesn't know.  He says to

15   Bowman, I'm guessing.  Note also that Mr. Little doesn't tell

16   Boarman that he gave Joe Brink until 2:00 p.m. that day to

17   accept the offer.  In fact, Mr. Little goes on to say, I should

18   have the final number in the a.m.  So it's clear that

19   Mr. Little did not have a number to give to Joe Brink on the

20   call earlier that day, and he didn't give him a 2:00 p.m.

21   deadline to accept a non-existent number.

22           Third, let's look at Exhibit 542.  The following day

23   on September 23rd, Tim Stiller sent an e-mail to Jason McGuire.

24   Both of these guys were in the pricing group at Pilgrim's.  And

25   he says, Should have PT -- Pollo Tropical -- to Jimmie today.

1    Probably go up about 50 cents on boneless.  So not only does

2    Mr. Little not have the price yet, the Pilgrim's pricing guys

3    don't even have the pricing yet.  They are still calculating

4    it.  Mr. Little is getting the price from the Pilgrim's pricing

5    guys, not Walter Cooper at Claxton.

6         Fourth, let's look at Exhibit 566, the first

7    highlighted portion, if we could.  On September 29, seven days

8    after the September 22nd phone call, Mr. Little provides

9    Mr. Brink with an actual price for splits, $1.02 FOB.  The

10   price provided is FOB and Little notes that he will provide

11   delivered pricing once they have distribution.  This isn't even

12   a 19-cent increase.  So as of September 29, there still wasn't

13   a final price let alone a 19 percent increase.

14        But there is more.  Let's look again at 566, the same

15   exhibit, but a different portion of it.  This portion of the

16   e-mail chain is not on the government's chart.  On October 1,

17   Mr. Little e-mails Joe Brink and he says, Joe, what's a good

18   number to call you at?  I have the freight.

19        And then the following day he e-mails Brink that the

20   freight on Kelly's is .05125, if we can show that.  This is

21   when Mr. Little provides the delivered price that does reflect

22   a 19-cent increase from the prior contract price.  This

23   evidence is clear and completely contradicts Mr. Brink's

24   testimony and the government's narrative about the

25   September 22nd call.  Mr. Little provides the price on

1    October 2nd, not September 22nd.

2          Now, one last thing.  Why didn't the government call

3    the CFO who supposedly was on this call?  If she was on the

4    call, and we are not sure if she ever was, she could have

5    corroborated exactly what Joe Brink said.  The government

6    didn't call her.

7          So what else happens with Pollo Tropical?  There is a

8    couple of other important things.  Joe Brink provides

9    competitor information to Mr. Little and to Walter Cooper.  The

10   government wants you to believe that Mr. Little called

11   Mr. Cooper and agreed on what to charge Pollo Tropical for

12   chicken in 2015, but there is a problem with that theory.

13   There is another puzzle piece that doesn't conveniently fit.

14   It's the fact that it is Joe Brink who tells chicken suppliers

15   what each other's prices are.  And he does so so that prices

16   will be lower and he does so so that the price will be the

17   same, because that's better for Pollo Tropical.  It's part of

18   Joe Brink's business strategy.

19         The government knew it was part his business strategy.

20   They knew that because Mr. Brink told them so when they met

21   with him.  They knew because that's -- because that's what we

22   all can see him doing with Mr. Little in Government

23   Exhibit 566.  They also knew that because that's what we all

24   can see him doing with Mr. Cooper in Government Exhibit 9740.

25   Mr. Brink's statements in both of those exhibits conflict with

1    the story the government is trying to tell.

2           So let's look back at Exhibit 566.  Mr. Brink tells

3    Mr. Little that he has competitor pricing at 1.02 delivered and

4    then three times in this e-mail demands that Pilgrim's match

5    the price of competitors.  Of course, Mr. Brink was lying to

6    Mr. Little.  Mr. Brink had no such price, but Mr. Brink asked

7    Mr. Little to match his imaginary competitors' price.

8           So now let's look at the next excerpt on 566.

9    Mr. Brink says, Your competitors have submitted pricing that

10   matches you, but it was delivered pricing.  He then says, Your

11   pricing below should be delivered to current final destination

12   points and then you match your competitors.  And then again he

13   talks about this in the next excerpt.  Mr. Brink says,

14   Pilgrim's needs to match to show compromise.  And finally, in

15   another part of this e-mail string, he says, Pilgrim's needs to

16   match pricing from your competitors.

17          So to use Mr. Koenig's words in the opening statement,

18   it is crystal clear what Mr. Brink is telling Mr. Little.

19   Mr. Brink is telling Mr. Little what his competitors' prices is

20   and telling him that Pilgrim's must match the price.  But that

21   doesn't fit the government's narrative.  So what do they do?

22   They ask Mr. Brink on the stand, what was he referring to when

23   he said, Then you match your competitors?  And Mr. Brink comes

24   up with a new lie.  You heard his testimony.  Mr. Brink says

25   that he meant Pilgrim's should tell him the final delivered

1    pricing so that he could match up his final cost and he could

2    match apples to apples.  It's nonsense.  It's a lie.  And the

3    government asks the question because they wanted you to hear

4    that as part of their narrative.

5         This is similar to what we see Mr. Brink doing with

6    Mr. Cooper in Government Exhibit 9740.

7         If you can put that up.

8         In 9740 Mr. Brink tells Mr. Cooper of Claxton what

9    Pilgrim's price is.  This is another of Mr. Brink's lies

10   because he doesn't actually have a price from Pilgrim's yet,

11   but he tells Mr. Cooper that Pilgrim's is basically at 19 in

12   order to get Mr. Cooper to lower Claxton's price.  This doesn't

13   fit with the government's story that the competitors called

14   each other and exchanged information, so they tried to explain

15   it away.

16        They asked Mr. Brink, how typical was it for you to

17   explicitly mention one supplier when you are negotiating with

18   another supplier?  And Mr. Brink said, Typically we don't like

19   doing it.  But that also was a lie.  It was his business

20   strategy to do that.  You heard him testify to that on

21   cross-examination.  Not only was it the business strategy he

22   used in negotiations for the 2015 contract, but it was also the

23   business strategy he used against Claxton and Pilgrim's in

24   negotiations for the 2014 contract.

25        Remember his testimony.  He was shown his own e-mails

1   from that time period and he admitted that he told Pilgrim's

2   representative, Mr. Boarman, his competitors' exact prices to

3   the penny in order to drive Pilgrim's price down.  He got the

4   same price of 88 cents per pound for split WOGs from both

5   companies for that year.

6           The government wants you to believe that competitors

7   called each other and shared pricing information, but the

8   evidence shows that in any contract negotiation, any competitor

9   could learn about where the competition was simply by talking

10  to their customer, Joe Brink.

11          There is one more thing that Pollo Tropical incident

12  shows, chart 5-1.  It shows competition, not collusion.  The

13  government also wants you to believe that Mr. Little and

14  Mr. Cooper conspired to fix the price of chicken to be sold to

15  Pollo Tropical in 2015.  But what the evidence shows is that

16  Claxton was competing with Pilgrim's for Pollo Tropical's

17  business, not colluding or conspiring with Pilgrim's.  Some of

18  the best evidence of this is in Government's Exhibit 9740,

19  which we have already been showing you, but let's look at it

20  again.

21          In excerpt No. 1, Mr. Cooper gives Mr. Brink a price

22  and tells Mr. Brink that Claxton would like more volume.  You

23  see bullet point No. 3 here right in the middle of that page,

24  it says, Increase in volume between 500K to 1 million# pounds,

25  on the splits.  Then Mr. Brink complains a little bit further

1    up in the e-mail, "This is a larger increase," meaning the

2    price presumably, "than Pilgrim's."  Of course, he had no idea

3    what Pilgrim's price was yet.

4          So now if you could display the next excerpt.

5          Mr. Cooper replies with an e-mail that is best

6    paraphrased -- it's a long e-mail, but, Yes, we are more

7    expensive than Pilgrim's, but we are different from Pilgrim's.

8    We are better than Pilgrim's and here is why.  And he goes on

9    and gives some reasons.

10         So even if you accept that Mr. Cooper has market

11   intelligence about what Pilgrim's might do, what's he doing

12   with that information?  He is competing with Pilgrim's.  He

13   wants to take business away from Pilgrim's.  That's what he is

14   trying to do.

15         So what was the result of this competitive behavior,

16   this supposed conspiracy to fix prices and rig bids with

17   respect to Pollo Tropical?  There were different bids.

18   Pilgrim's initial bid was FOB pricing.  Claxton's was

19   delivered.  They were timed differently.  Claxton had submitted

20   its pricing while Mr. Little was still asking Tim Stiller at

21   Pilgrim's for a price.  And Pilgrim's and Claxton finished with

22   different pricing.

23         Claxton stair-stepped its pricing while Pilgrim's

24   refused to do so.  This meant that Pollo Tropical did not pay

25   Claxton a 19-cent increase.  It did not pay Claxton what it

1    paid Pilgrim's.  Pilgrim's unwillingness to lower its prices in

2    response to Brink's demands was not because there was an

3    agreement between suppliers to fix prices.  There was a

4    shortage of small birds.  You heard that.  Demand for those

5    birds outstripped the available supply.  Pilgrim's knew that if

6    Pollo Tropical did not agree to buy chicken at the offered

7    price, there were many other buyers who would.

8         So what's the take-away from all this?  First of all,

9    Joe Brink doesn't know anything about the chicken business, but

10   more importantly, he was upset about not getting paid the price

11   he wanted.  So he lied about his conference call with

12   Mr. Little.  He lied about his business strategy of asking

13   competitors to match each other's prices.  There was

14   competition between Claxton and Pilgrim's, not collusion, which

15   resulted in the final 2015 contract pricing that was different.

16   And finally, what's important here also is that the government

17   went along with Mr. Brink's false narrative because it fit the

18   theory of their case.

19        So now I'm going to turn to some other summary charts

20   that deal with Mr. Little.  And those are the KFC or three of

21   the KFC summary charts, 10-1, 14-1 and 17-1.  There are other

22   summary charts relating to KFC, but Mr. Little isn't mentioned

23   in those, mainly because he doesn't have anything to do with

24   KFC.  And it's amazing that he was mentioned in these three and

25   I will explain why.

1          So in its closing the government doubled down on their

2    reliance on the 2014 KFC incident relating to the pricing for

3    '15.  In the closing, the government said 2-14 is all you need.

4    And then she said that this is when the conspiracy went into

5    overdrive, the same thing that Mr. Koenig said in the opening.

6    This apparently is their theme.  So we know from the evidence

7    that Mr. Little had nothing to do with KFC negotiations.

8          Look at Exhibit 1055, if we can put that up.  This is

9    the August 1st, 2014 PowerPoint.  If we can go to Page 2.  This

10   lists Pilgrim's KFC fresh food service team.  Mr. Little is not

11   on that team.

12         Let's also look at Exhibit 1542.  This is

13   Mr. Ledford's e-mail setting up the Pilgrim's KFC negotiation

14   call.  Mr. Little is not on that list as well.  These are just

15   examples of the fact that Mr. Little was not involved in KFC

16   contract negotiations.  We also know this from the testimony of

17   the government's own witnesses.

18         The government called Mr. Olson, Mr. Lewis and

19   Mr. Ledford.  They each identified the Pilgrim's employees who

20   worked on the KFC account.  Mr. Little was not one of them.

21   Even Robbie Bryant testified about Mr. Little's accounts and

22   KFC was not one of them.  The government's attempt to insert

23   Mr. Little into the KFC negotiation fails.

24         All the government can do and show is that Mr. Little

25   had a few phone calls with suppliers during the time period of

1     the KFC negotiation, but we know that Mr. Little spoke to other

2     suppliers.  It was part of his job.  The government has not

3     established that the calls had anything to do with the KFC

4     contract negotiations.

5            So let's look at summary Exhibit 10-1.  This is the

6     big one.  This is the overdrive one, apparently.  This relates

7     to KFC negotiations in August of 2014 for the 2015 contract.

8     The chart includes a call from Pepper to Little on 8/15.  On

9     8/18 there is a call from Little to Kantola and a call from

10    Little to Pepper, and then Little spoke to Austin three times

11    on August 18.

12           In the summary chart on August 18th, so I think that's

13    towards the end if we can go to Page 3 -- actually, the one

14    above that, I think.  This is the checking around, right.  So

15    McGuire sends an e-mail saying, Roger did some checking around,

16    and he lists price ranges for several suppliers.  The

17    government wants you to conclude that Mr. Austin's checking

18    around means he was checking around with other suppliers and

19    Mr. Little was one of the people that Mr. Austin used to check

20    around.  That's it.  That's all the evidence involving

21    Mr. Little in this incident.

22           So first of all, is that proof beyond a reasonable

23    doubt?  It doesn't prove anything.  Second of all,

24    Mr. Kantola's lawyer, Ms. Henry, just explained to you in her

25    closing argument that the information listed for Koch doesn't

1    match their bid.  So if Mr. Little had reached out to Kantola

2    to get their bid, which was supposedly what these phone calls

3    were about, then why is this information not accurate?

4           Third, what's missing from this?  And this has been

5    discussed already.  Tyson, Tyson is missing from this.  If

6    Mr. Little was tasked with gathering information from Carl

7    Pepper regarding Tyson, why isn't Tyson included on this list?

8           What else do we know about Tyson and the KFC

9    negotiations?  We heard from Brandon Campbell, one of the

10   pricing guys at Tyson.  Mr. Campbell testified that he and his

11   pricing team, not any sales guys, set the prices, including the

12   2015 KFC Tyson contract.  And importantly, Tyson's bid was

13   submitted on August 11, four days before the first phone call

14   between Mr. Little and Carl Pepper.

15          What else did Mr. Campbell's testimony reveal?  That

16   Carl Pepper was not on any of the Tyson e-mails leading up to

17   and following the August 11 Tyson bid.  Let's take a quick look

18   at some of those e-mails that he discussed during his

19   testimony, Mr. Campbell.

20          First, let's look at G-624, if we could put that up.

21   On June 5th Mr. Campbell sends a proposed 2015 KFC pricing

22   model to other Tyson pricing people.  And then on June 9 he

23   forwards it to Tim Scheiderer and Tim Mulrenin.  Who is not on

24   either e-mail?  Carl Pepper.

25          Now if we can put on G-521.  This has the same

1    June 5th e-mail as the previous exhibit, but Campbell sends it

2    on June 19 to Brian Roberts.  But look who again is not on

3    these e-mails, carl Pepper.

4           Now let's put up 1190.  This is the e-mail where

5    Roberts sends Tyson's bid to Rich Eddington at RSCS on KFC.

6    This is on August 11.  The bid is in.  No Carl Pepper.  This is

7    the only Tyson document on 10-1 and it does not include Carl

8    Pepper.  There is no exhibit reference on 10-1 that includes

9    Pepper or indicates that Pepper in any way is involved in these

10   KFC negotiations.

11          And finally, let's look at G-570.  This is the

12   August 21 e-mail from Campbell about the reduced marination

13   percent and how that impacted Tyson's KFC pricing.  Again, look

14   who is and who isn't on this e-mail.  No Carl Pepper.  Not one

15   of the KFC witnesses that you've heard in this case has

16   identified Carl Pepper as someone involved in the KFC

17   negotiations in 2014.  The three witnesses, Mr. Olson, Mr.

18   Lewis and Mr. Ledford, identified Mr. Roberts and Mr. Mulrenin,

19   not Carl Pepper, as the Tyson KFC people.

20          So what purpose would have been served for Mr. Little

21   to call Carl Pepper about KFC if there is no evidence showing

22   that Pepper was even involved in the KFC negotiations?  The

23   evidence before you indicates that Pepper had no information

24   about Tyson's 2015 KFC bid.  The evidence before you shows that

25   Pepper had no information about that bid to share with

1    Mr. Little on the telephone.

2           So what would Mr. Little have been talking to Carl

3    Pepper about on the August 15 and August 18 as shown in the

4    chart?  We don't know, but surely it was not about KFC pricing.

5    So the KFC incidents don't involve Mr. Little.  The government

6    hasn't established that he is involved in any of these

7    incidents, much less that he entered into an agreement to fix

8    prices and rig bids with respect to KFC or anything else.

9           So now let's look at the last two incidents involving

10   Mr. Little, the Church's freezing charge and the Church's

11   quality assurance or QA requirement.  First, let's look at the

12   freezing charge on 1-1.  This is about frozen chicken that

13   Church's wanted from Pilgrim's and Tyson perhaps others and

14   Church's request to know how much it would cost to buy frozen

15   chicken.  This was not part of the existing contract.  Church's

16   was asking the suppliers to do something additional.  Church's

17   wanted to have frozen chicken on hand in case of weather issues

18   or shortages.

19          Other lawyers for other defendants have discussed this

20   freezing charge, so I won't belabor it.  Ms. Mulrenin's lawyer,

21   Ms. Prewitt, did a great job of explaining why there was no

22   collusion about this freezer cost.  I do want to touch on it,

23   though, slightly, because in their closing statement the

24   government said that it is evidence of Mr. Little's

25   participation in the conspiracy.

1          The chart shows e-mails between Dean Bradley at

2     Church's and Carl Pepper and others at Tyson.  Now,

3     Exhibit 120, the first entry on the chart, reflects Bradley's

4     request for Carl Pepper at Tyson.  But what the chart doesn't

5     show is that Bradley made the very same request of Mr. Little

6     at Pilgrim's.

7          Let's look at Exhibit 109, which isn't on the summary

8     chart, presumably because the government doesn't want you to

9     see it.  The initial request came in on May 9.  And Little

10    says, "I've got our folks working on it."  This is the second

11    part that's highlighted, if you can move up.  It says, I've got

12    our folks working on it.  "Our folks" are the pricing guys at

13    Pilgrim's.  So then some time goes by.  Mr. Bradley follows up.

14    And on May 31st, Mr. Little sends an e-mail to Tommy Lane, a

15    pricing guy at Pilgrim's, at 12:19 p.m.  He says, "Tommy, when

16    will we have this pricing?"

17         So Mr. Little doesn't have pricing and doesn't know

18    what it will be.  And Tommy Lane e-mails Mr. Little back and

19    says, "We'll have something on Monday."  And Mr. Little says,

20    "Thanks."  That's right above that.  So Mr. Little had to wait

21    until Monday to get pricing from Tommy Lane at Pilgrim's.

22         The summary chart then includes calls between Pepper

23    and Kantola at Koch and Pepper and Mr. Little.  And in an

24    e-mail from Pepper to Mulrenin and Roberts where Pepper

25    provides information about Pilgrim's and Koch's freezing

1   charges, but what follows shows that Pepper and Little didn't

2   reach any agreement during the call.  The evidence shows that

3   Pilgrim's and Tyson were going to independently evaluate their

4   own cost.

5          The last entry on the chart, the chart 1-1, is

6   June 3rd.  That's Exhibit 114.  And it has Roberts responding

7   to Pepper's May 31 e-mail saying, "I want to discuss this

8   before we submit.  I want to understand what the storage

9   expectation is."  So Tyson has to analyze this to figure it

10  out.

11         And then what isn't on the chart, if you could show

12  114, the highlighted portion, it shows even further that Tyson

13  is going to independently analyze the freezing charge.  "Is

14  this a cut, freeze and ship deal and then the distributor

15  stores in frozen state or are we going to have it longer than a

16  month frozen?"  This shows that Tyson is going to take a long,

17  hard look at this.

18         In their closing, the government showed you

19  Exhibit 108 which is not on the chart.  In 108 Mr. Little tells

20  Dean Bradley, "I'll have pricing for you on Monday.  There will

21  need to be a freezing charge for both."  The government asserts

22  that Pepper and Kantola and Little agreed during their calls to

23  charge a freezing cost do Church's and that was communicated to

24  Dean Bradley.  The government seems to be suggesting that it

25  was possible that there may not have been a freezer charge at

1    all.  So the conspiracy maybe was to impose a freezer charge or

2    to impose a freezer charge with a certain amount?  It's

3    unclear.  Either way, there was no conspiracy.

4         Because remember you also heard from Darrell Bowlin.

5    Mr. Bowlin from Tyson testified that he was involved in

6    calculating the Tyson freezer charge for Church's.  Bowlin and

7    his pricing team calculated the freezing charge, which was a

8    straight pass-through cost that would be paid by the customer.

9    He testified that Church's initially requested pricing for

10   frozen chicken in December of 2012, six months before this

11   request, and that Tyson had calculated its cost at 4 cents.

12        He went on to testify that Tyson eventually determined

13   in the fall of 2013 that Tyson's cost was actually lower than

14   they initially thought, and they provided a quote of 2.7 cents

15   to Church's.  The charge was a result of the pricing department

16   at Tyson calculating what the cost would be, not any agreement

17   between salespeople.

18        Was Mr. Bowlin lying?  You saw him testify.  Of

19   course, he wasn't.  But in order for you to believe the

20   government, in order for you to find that Mr. Little and others

21   did something wrong with respect to this Church's freezing

22   cost, you would have to conclude that Mr. Little and Mr. Pepper

23   entered into an agreement to fix the freezer cost back at the

24   end of May and early June.  You would have to ignore the

25   e-mails leading up to those dates and you would have to ignore

1    the testimony of Mr. Bowlin, and all because the government is

2    desperate to include evidence of price-fixing.

3           So finally, quickly, let's look at the Church's QA

4    requirements chart which is 2-1.  This incident is about

5    Church's adding new quality assurance requirements after the

6    2014 contract with Church's suppliers had already been

7    negotiated.  So what's the real take-away from this chart?

8    That some chicken suppliers were upset that Church's added on

9    new QA requirements after the contract had been negotiated.

10   There are no allegations that there was any bid-rigging or

11   price-fixing with respect to the underlying contract, but the

12   additional requirements would result in some nuisance cost.  So

13   they groused and they complained about it.

14          But then what happened?  Nothing happened.  Pilgrim's

15   never tried to charge Church's for any costs associated with

16   the QA requirements.  There is no evidence of that.  Where is

17   the evidence of an agreement?  And most importantly, where is

18   the evidence that a QA charge was ever imposed or added to the

19   Church's contract by Tyson, Koch or Pilgrim's or any other

20   chicken supplier?  The government has presented no evidence

21   that there was any such charge ever added on.

22          *THE COURT:*  Five minutes, Mr. Byrne.

23          *MR. BYRNE:*  It's not illegal for Mr. Little to share

24   information with a competitor.  The only evidence the

25   government has offered with respect to Church's is that

1   Mr. Little shared some information related to Pilgrim's.  There

2   is no evidence that anyone ever acted upon that information.

3   There is no evidence of any agreement between Mr. Pepper and

4   Mr. Little to fix a price.

5            So in sum, the government's charts don't sustain the

6   government's burden of proving beyond a reasonable doubt that

7   Mr. Little entered into any agreement with anyone to rig bids

8   or to fix prices.  He spoke with other suppliers.  Sure, he

9   did.  He spoke about many things.  There is nothing illegal

10  about speaking to other suppliers.  And the Court has told you

11  that there is nothing illegal about sharing pricing

12  information, even assuming Mr. Little did any of that.  The

13  charts don't support the government's theory of their case.

14           The only other evidence that the government offered

15  you came from Robbie Bryant.  He was interviewed by the

16  government 20 times prior to his testimony.  After all those

17  interviews, all he could say about Mr. Little was that

18  Mr. Little spoke with somebody at Tyson and somebody at Holmes

19  with whom he shared pricing information.  That's it.  But then

20  we heard Mr. Brink testify that during the 2014 Pilgrim's Pollo

21  Tropical negotiations, Holmes' bid was 10 cents less than

22  Pilgrim's, so clearly there was no agreement between Mr. Little

23  and Holmes to fix prices.

24           Mr. Bryant provided even less detail about

25  Mr. Little's supposed agreement with someone at Tyson.  He had

1    no information about when or with whom Mr. Little supposedly

2    agreed with Tyson on anything.  Mr. Bryant's testimony is

3    woefully inadequate to establish that Mr. Little was part of

4    any agreement to fix prices or bids.  But importantly, note

5    that Mr. Bryant did confirm that Mr. Little regularly called

6    other suppliers to cover shorts and there was nothing wrong

7    with that.  In fact, the covering of shorts was for the purpose

8    of helping out customers.

9         So while we are on the subject of phone calls, the

10   Court has instructed you that the obstruction count against

11   Mr. Little is no longer before you and you are not to speculate

12   why.  And I am not asking to speculate, but in the government's

13   opening statement Mr. Koenig said there will be evidence

14   presented at trial that Mr. Little lied to federal agents by

15   denying that he talked to other suppliers and he lied about

16   having phone calls with competitors and he obstructed justice.

17   At trial you heard no evidence of any of that, no evidence of

18   any lies, no evidence of any obstruction of justice.  This is

19   just another example of the government breaking their promise

20   to you, promising things that they didn't prove at trial that

21   they didn't even try.

22        So what's going on here?  What's this all about?  Why

23   is Mr. Little even sitting here?  Why is he charged with this

24   crime?  The government just got it wrong.  Mr. Little is not

25   guilty of entering into any conspiracy to fix prices or rig

1  bids.  The evidence isn't there.  The puzzle pieces, to use

2  Mr. Koenig's words, don't fit together, especially when you

3  consider the pieces the government didn't want you to see.

4  This case is about the government trying to force a square peg

5  into a round hole.  And no matter how hard they try to force

6  it, it remains a square peg and it remains a round hole.

7        It is outrageous that Mr. Little was charged with this

8  alleged crime.  During his time at Pilgrim's Mr. Little

9  developed relationships with his customers and took pride in

10  his reputation.  Then the government charged him with

11  bid-rigging and price-fixing, basically cheating his customers

12  and lying to federal agents.  His friends, his family, his

13  former colleagues read all about this in the newspaper.  Now we

14  see the evidence the government has offered about his role in

15  this supposed conspiracy.

16        It's outrageous that Mr. Little has had to live since

17  October of 2020 under the shadow of these charges.  It's

18  outrageous that Mr. Little has had to leave his home and his

19  wife in Texas, fly back and forth during Covid to attend this

20  trial.  It's outrageous that Mr. Little is facing a federal

21  criminal conviction because of the government's actions in this

22  case.

23        You, Ladies and Gentlemen of the Jury, have the power

24  to remedy the injustice that the government has already

25  committed against Mr. Little.  Mr. Little is a hard-working,

1    honest man who spent his entire adult life selling chicken.  He

2    retired after a long and distinguished career in the fall of

3    2016 and he hasn't worked since.  He didn't do anything wrong.

4    He hasn't committed any crimes.  And he certainly doesn't

5    deserve what the government has done to him.  He is not a

6    criminal.  He is not a guilty.

7          We are confident that you, Ladies and Gentlemen of the

8    Jury, will see through the smoke and the mirrors that the

9    government has presented to you in this case.  We are confident

10   that you will see the correct puzzle picture in this case, the

11   picture that the government didn't want you to see.  And we are

12   confident that you will return a verdict of not guilty as to

13   Mr. Little, and then justice will be done in this case.

14         Thank you.

15         *THE COURT:*  Thank you, Mr. Byrne.

16         All right.  Mr. Lovette is going to go next.  And

17   Ms. Nielsen?

18         *MS. NIELSEN:*  Thank you, Your Honor.

19                       **CLOSING ARGUMENT**

20         *MS. NIELSEN:*  Bill Lovette isn't in this courtroom

21   today facing a federal felony crime because of actual evidence.

22   He is here solely because of his position and title of CEO of

23   Pilgrim's Pride.  But Bill Lovette isn't just a figurehead.  He

24   isn't a title.  He isn't a company.  In this case, Bill Lovette

25   is being accused by the government of committing a federal

1    crime.  And in a case like this, Bill Lovette is simply a

2    person, just like all of us, responsible for his own actions

3    and to be judged solely on the evidence of his own individual

4    actions.

5            Pilgrim's the company isn't on trial here and I don't

6    represent Pilgrim's.  This isn't a case about corporate

7    liability.  Bill Lovette was the CEO of Pilgrim's before he

8    retired in 2019, but you judge him here in this federal

9    courtroom, not by his title, not by his position, not by the

10   company that he worked for, but based only on evidence.  The

11   only question you have before you is:  Did the government prove

12   beyond a reasonable doubt that Mr. Lovette knowingly entered

13   into a conspiracy to rig bids and fix the price of chicken?

14   The answer is a resounding no, not even close.

15           You, the jury, have the awesome and the sole and the

16   final authority to make the determination that Bill Lovette did

17   not commit a crime.  How do you get to that verdict, that

18   decision that Mr. Lovette is not guilty?  By following the law

19   and the instruction that Judge Brimmer gave you.  If you follow

20   the law and you follow the instructions, you will find Bill

21   Lovette not guilty.  Why?  Because the government has

22   absolutely zero evidence that Mr. Lovette knowingly agreed with

23   any competitor at all to rig bids or fix the price of chicken.

24           Let's talk about the lack of evidence against

25   Mr. Lovette.  Look, this is an incredibly serious matter for

5040

1    him.  He stands accused of committing a felony offense.  You

2    sat through this trial for six weeks now, and I think it's fair

3    to say, where's the beef?  Seriously, where is it?  Where is

4    the evidence against Mr. Lovette?

5            The government has not presented one single witness

6    who testified that Mr. Lovette was part of a conspiracy to rig

7    bids or fix the price of chicken, not a single one.  Throughout

8    this entire trial Bill Lovette was mentioned as if in passing

9    by only two government witnesses in their direct testimony,

10   two, Mr. Lewis and Mr. Bryant.

11           What did these two witnesses testify about Bill

12   Lovette?  The totality of the government's witness testimony

13   against Mr. Lovette was that he was the CEO until he retired in

14   2019 and that Jayson Penn reported to him.  That's it, totally

15   meaningless to prove a charge of conspiracy against Bill

16   Lovette.  Yet you heard the prosecutor get up here yesterday

17   and categorize Bill Lovette as a supervisor, the government

18   just lumping him in because of his role.  Ms. Call said all the

19   supervisors did this.  Nothing could be further from the truth.

20           And you, the members of the jury that have to decide

21   this man's fate, you deserve and you demand better from the

22   government.  It seems easy for them to get up here and say

23   Mr. Lovette was an active and enthusiastic member of a

24   conspiracy.  But when you speak for the United States

25   Government, you better have evidence to back that up.

1            Think about that for a second.  Here we are at the end

2   of a six-week-long trial and the government presented you

3   exactly zero testimony implicating Mr. Lovette in a conspiracy

4   to rig bids or fix the price of chicken, zero.

5            Now, when we asked the government witnesses actual

6   meaningful, substantive questions of the government witnesses,

7   here is what the government witnesses said about Mr. Lovette.

8   One, Mr. Lovette did not participate in any bidding process.

9   Two, they had no contact with Mr. Lovette during bidding

10  negotiations.  And three, they had no information that Bill

11  Lovette participated in any agreement to rig bids or fix the

12  price of chicken.

13           Now, you heard testimony that Pilgrim's had 38,000

14  employees, yet the government called only one Pilgrim's

15  witness, Robert Bryant.  Robert Bryant was a long-time

16  Pilgrim's employee.  The government asked Mr. Bryant

17  specifically about who participated in this alleged conspiracy.

18  When the government asked the one Pilgrim's employee about who

19  participated in the alleged conspiracy, he did not name Bill

20  Lovette, not in this courtroom and not in the 20 times that the

21  government interviewed him before trial.

22           Let's think about that for a second.  The government's

23  one and only fact witness, a man who worked at Pilgrim's Pride

24  for years, did not name Bill Lovette as someone who was engaged

25  in the alleged conspiracy.  And remember, Bill Lovette has

1   no -- I am sorry, Robert Bryant has no allegiance to Bill

2   Lovette.  Bill Lovette retired from Pilgrim's nearly three

3   years ago.  It's simple.  Robert Bryant didn't name Bill

4   Lovette because Bill Lovette was never involved in any

5   agreement with competitors to rig bids or fix the price of

6   chicken.

7          With regard to Bill Lovette, the government is asking

8   you to purely speculate, really just to guess that somehow or

9   another simply because Bill Lovette was the CEO, he could have

10   been part of a secret agreement with competitors and that he

11   could have been calling the shots on specific bids according to

12   some plan with all these different companies, companies that

13   Bill Lovette wanted to beat.

14          You don't have to guess at what was in Bill Lovette's

15   mind when it came to agreeing with competitors.  Read Bill

16   Lovette's words.  "We should not help them one micron."

17          And let's show you what the government was afraid to

18   present to you.  If we could pull up Government Exhibit D-240.

19   Do you think that Jayson Penn would be sending an e-mail to

20   Bill Lovette in 2014, the time this supposed conspiracy was in

21   overdrive, telling his boss, Mr. Lovette, to keep their foot on

22   the throat of Pilgrim's competitors if Bill Lovette was

23   participating in or directing a conspiracy with competitors?

24   You don't have to speculate about what was in Bill Lovette's

25   mind.  It's right there in plain words.

1          The government's story that Bill Lovette was

2    encouraging a price-fixing conspiracy is a manufactured

3    fictitious story and the opposite of what we see in his own

4    words.  As you know, the government has the power to call

5    witnesses to try to explain their theory.  As it relates to

6    Bill Lovette, they didn't call any.  Ask yourself why.  Because

7    there is no witness against Bill Lovette, because he didn't do

8    what the government is alleging.

9          So instead the government has tried to present this

10   case by a false narrative that they've tried to weave together

11   with their charts that they themselves created with an obvious

12   agenda.  Yesterday in the government's closing, they went

13   through their so-called key evidence.  Let's address what the

14   government calls their so-called key evidence against

15   Mr. Lovette.

16         The government started their closing with showing you

17   chart 10-2, the 2014 KFC negotiation, so let's address that

18   first.  And let's pull up the actual e-mail from the chart.

19   Let's talk about what Bill Lovette's involvement was here and

20   what the underlying evidence actually shows.  Jayson Penn

21   forwards an e-mail to Bill Lovette that recaps Mr. Austin's

22   negotiations with RSCS.  Nowhere in Mr. Austin's recap does it

23   talk about coordination with other suppliers, much less an

24   agreement.

25         As it related to the negotiation, Jayson Penn told

 1    Bill Lovette that he told Roger to proceed.  That's the e-mail

 2    the government asks you to believe is somehow problematic for

 3    Mr. Lovette.  There is no problem here.  This is an e-mail

 4    between employees at the same company with no reference to any

 5    competitors and no reference to an agreement.

 6           So what happens next?  Roger Austin does exactly what

 7    Mr. Penn told him to do.  Roger Austin has a conversation with

 8    RSCS.  Nothing wrong with that, nothing unusual.  So let's

 9    circle back to the e-mail for a moment and what the government

10    left off their chart because it's important.  What the

11    government left off their chart was this part.  "I'm sure Todd

12    will call you or Steve will call Bill after I hold firm."  Who

13    is Steve?  As you heard, Steve McCormick is the president and

14    CEO of RSCS.  So you look at the chart and you listen to the

15    prosecution's argument yesterday, and they try to make a big

16    deal out of Mr. Lovette's call to Mr. Austin later that day.

17           But what is the call about?  As Ms. Call said

18    yesterday, the simplest explanation is usually correct.  Here

19    the simplest and most obvious explanation is that Mr. Lovette,

20    expecting a call from the CEO and president of RSCS,

21    Mr. Lovette called Mr. Austin to prepare for that call.  There

22    is nothing suspicious or wrong with that.  That's called being

23    prepared.

24           And let's look at the timing here.  Mr. Penn had

25    already told Mr. Austin to proceed with his negotiation with

1    RSCS.  Mr. Austin had already done that.  And then Mr. Lovette

2    calls his co-worker, Mr. Austin.  The government wants you to

3    do some type of mental gymnastics here to believe that

4    Mr. Lovette's call was suspicious.  It most certainly was not.

5    The only thing suspicious here is why the government left that

6    e-mail and the information in the e-mail off their so-called

7    summary chart.

8            Even if Mr. Lovette read and discussed every single

9    word of the e-mail with Roger Austin, it still amounts to zero,

10   zero evidence that there was a conspiracy and zero evidence

11   that Mr. Lovette knew of any conspiracy with competitors and

12   zero evidence that Mr. Lovette was voluntarily and

13   intentionally participating in any conspiracy with competitors.

14           Look, what the government is asking you to do is

15   something that Judge Brimmer's instructions say you can't and

16   you deserve better.  Let's look at Instruction 17.  What it

17   says is that where circumstantial evidence is just as

18   consistent with unilateral action as with concerted action, it

19   does not, standing alone, support an inference of antitrust

20   conspiracy.

21           Well, the government's case against Bill Lovette is

22   purely circumstantial.  I know this instruction is kind of

23   confusing, but let's talk about what it means.  What it means

24   is that when evidence is just as consistent with unilateral

25   action, meaning action and decisions made by and within

1    Pilgrim's alone, as it is with concerted action, meaning

2    actions and decisions made with competitors, this does not

3    support an inference of antitrust conspiracy.

4           So when the government keeps asking you to speculate

5    based on circumstantial evidence that Bill Lovette's call had

6    to do with concerted action with competitors, but the evidence

7    in fact is just that Bill Lovette was communicating with

8    Pilgrim's employees in Pilgrim's best interest, you cannot

9    infer that as evidence of an antitrust conspiracy.  So let's

10   cross this off.  10-2 is no evidence of Bill Lovette knowingly

11   joining in a conspiracy with competitors to rig bids or fix the

12   price of chicken.

13          Next, let's look at government's chart 10-1, another

14   chart the government said is there key evidence against Bill

15   Lovette.  This is a four-page chart, but if we could please

16   turn to Page 3 of 4 where Bill Lovette is nearly mentioned.

17   You see an e-mail from Jayson Penn to another Pilgrim's

18   employee saying, "Will review with Bill in a.m."

19          Let's look at the e-mail itself.  And if we could pull

20   up Exhibit 1074.  And again, to be sure, you can see that this

21   e-mail wasn't even sent to Bill Lovette.  This e-mail covers

22   two topics.  Primarily it discusses Pilgrim's own cost model

23   and margin analysis related to the KFC negotiation.  And this

24   e-mail also includes a possible range of competitor pricing,

25   competitive intelligence.  Even if we assume that Jayson Penn

1   did meet with Bill Lovette the next morning and even if we

2   assume they discussed the entire e-mail word by word, there is

3   nothing illegal about it.

4           Look at instruction 18.  It is not illegal for a

5   competitor to obtain, rely upon, and act on pricing and other

6   information received from competitors.  So this is a big goose

7   egg.  Let's cross this one off as well.

8           Next, let's put up summary chart 18-3.  This is three

9   years later in 2017.  There is a text message between two

10  Pilgrim's employees that kind of similar to the last e-mail

11  says, "Come to BL office.  Let's discuss KFC."  Ms. Call in her

12  closing says you betcha they're going to talk about the earlier

13  phone calls.  You betcha translates to members of the jury,

14  please guess specifically what was said.  Guess that Bill

15  Lovette was there and met.  Guess what they talked about and

16  guess specifically what was said.

17          Again, I remind you to look at Instruction 17.  Where

18  evidence is just as consistent with unilateral action as with

19  concerted action, it does not support an inference of an

20  antitrust conspiracy.  And as you've heard from Judge Brimmer,

21  the jury instructions tell you, you can't speculate.  Your job

22  isn't to guess.  It was the government's job, the government's

23  job alone, to present actual evidence so you don't have to

24  guess.  They failed.

25          I mean, come on, a text message of Pilgrim's employees

1    saying come to Bill's office to discuss a customer?  Cross it

2    off.  This is zero evidence of a conspiracy with competitors

3    and cannot be evidence that Bill Lovette agreed to do anything,

4    much less agree to join a conspiracy.

5            Let's pull up the next chart that the government

6    mentions as their key evidence against Bill Lovette, 14-3.

7    What we see here is that with no context Mr. Penn forwards an

8    e-mail to Mr. Lovette with the subject Price Reduction Impact

9    KFC.  Let's look at what the underlying e-mail says.  All it

10   says is, "Please see the attached spreadsheet showing the

11   impact of reducing eight-piece price and also proposed numbers

12   on the FP wings."

13           Here again are employees of Pilgrim's forwarding

14   Mr. Lovette Pilgrim's own internal analysis.  In Mr. Penn's

15   e-mail to Mr. Lovette, he doesn't say anything or ask

16   Mr. Lovette to do anything.  Again, remember Instructions 17

17   and 18.  Even if we assume that Mr. Lovette reviewed this, the

18   fact that a Pilgrim's employee forwarded a spreadsheet to

19   Mr. Lovette that had competitor pricing is not illegal because

20   remember what Instruction 18 says.  The mere exchange of

21   information, even regarding price, or to be more accurate in

22   this instance, the mere unsolicited receipt of competitor price

23   information is not illegal.

24           Look at the e-mail.  There is no agreement.  And that

25   is one of the elements that the government not only has to

1    show, but has to prove, must prove beyond a reasonable doubt.

2    Cross it off.  There is no evidence of an agreement.  There is

3    nothing illegal, another zero.

4            Next let's pull up Government Exhibit 20-1.  This is

5    the "not one micron."  These are e-mails between Pilgrim's

6    employees only, not with any competitors, where Bill Lovette is

7    for lack of a better word kind of bad mouthing Tyson.  And as

8    Ms. Prewitt told you, Tyson's model was based on volume.

9    Pilgrim's model was based on profitability.  Pilgrim's was

10   willing to walk away from business.

11           What the Pilgrim's employees are complaining about

12   here is that Tyson was beating them on volume.  But then when

13   Tyson didn't have the volume, they asked Pilgrim's to cover

14   their shorts.  I'm glad the government put this on one of their

15   charts because you want to know Bill Lovette's view of

16   competitors?  Here it is.  Not going to help one micron.  Bill

17   Lovette isn't interested in helping his competitors.  He wants

18   to do what's best for Pilgrim's.  And the government's own

19   witness, Robert Bryant, testified this Otis strategy that is

20   discussed in this e-mail applied not only to Tyson, but was a

21   strategy that Pilgrim's used with other competitors as well.

22           At its core what this is is just the government

23   engaging in old-fashioned mud-slinging, trying to make Bill

24   Lovette look bad to make up for their complete and utter lack

25   of evidence that he has ever engaged in or directed

1    anti-competitive behavior.  Don't be fooled by the government's

2    tactic.  Cross this off the list.

3            Let's pull up the last of what the government says is

4    its so-called key evidence against Mr. Lovette, 4-1.  These are

5    the text messages where Pilgrim's employees are making fun of

6    Golden Corral, a company they apparently didn't like very much.

7    These sarcastic text messages about a nonkey customer is the

8    government's key evidence?  Seriously?  You can see the sarcasm

9    right there on the page.  "We must have them," meaning Golden

10   Corral.  "We will officially call for an all company panic if

11   you don't lower prices to them.  I'm trying to call my

12   therapist on their emergency weekend number.  I am really

13   afraid."

14           Don't let the government trick you into thinking Bill

15   Lovette's sarcasm is evidence of anything other than them

16   trying to make him look bad.  Cross off the last of the

17   so-called key evidence against Bill Lovette.  Total them all

18   up.  What are you left with?  Zero.  That's the end of the

19   government's summary charts that the government themselves has

20   identified as their key evidence against Bill Lovette.

21           So let's look at what the government has to prove.

22   And if you could pull up Instruction 20.  Before you may

23   convict a defendant, the evidence must establish that the

24   defendant knowingly joined the conspiracy with the intent to

25   advance the objective of the conspiracy - here, price-fixing

1    and bid-rigging for broiler chicken products.  The government

2    has given you zero evidence that Bill Lovette did that and it's

3    not even close.

4           We just went through every piece of evidence that the

5    government called their key evidence and it was zero.  Now,

6    because they have zero evidence that Bill Lovette rigged bids

7    or fixed prices for broiler chicken products, they again are

8    trying to trick you.  And that's why they point to 803.  This

9    single e-mail, random e-mail, which is from Joe Grendys to Bill

10   Lovette, is about a widespread rumor that Sysco is going to

11   change its payment terms to 65 days.  This is absolutely

12   ridiculous and has nothing to do whatsoever with the alleged

13   objective of the charged conspiracy to rig bids and fix prices

14   of broiler chicken products as described in Judge Brimmer's

15   instruction.

16          Really, what on earth does Sysco's attempt to impose

17   longer payment terms to its thousands of suppliers across the

18   board for products like spoons and paper towels, cups, what

19   does that have to do with Bill Lovette's alleged involvement in

20   a conspiracy to fix the price of chicken products?  Zero,

21   nothing.  The government knew this had nothing to do with any

22   bid, any request for pricing, any RFP for chicken.

23          And Melissa Hoyt, the government's own witness,

24   confirmed this.  Melissa Hoyt, the Sysco employee, testified

25   under oath that Sysco's company-wide mandate to extend payment

1    terms was not related to or tied to any specific bid, any RFP

2    or price negotiation for broiler chicken products, not related,

3    not tied to the only objective of this charged conspiracy,

4    rigging bids and fixing prices for broiler chicken products,

5    nothing.

6         This even has nothing to do with QSRs which this

7    entire trial for six weeks has been about.  And if that wasn't

8    enough, the government knew this whole e-mail exchange was a

9    zero when it comes to showing any sort of an agreement.

10        Can we pull up government Exhibit 803, please?

11        First of all, in her closing argument yesterday,

12   Ms. Call, the prosecutor, told you that Mr. Lovette, "reached

13   out" to his competitor, Mr. Grendys.  As you can see from the

14   e-mail, that's simply not true.  Mr. Grendys e-mails

15   Mr. Lovette out of the blue.  Let's walk through this.  Joe

16   Grendys writes, "Have you heard that Sysco is going to the

17   65-day terms with their suppliers?"  Again, what Mr. Grendys

18   was referring to is this widespread market-wide rumor that he

19   and Bill Lovette have heard.  Bill Lovette stated, "Yes, we

20   told them no."

21        But we know from the evidence that's not accurate.

22   First, we know that a 65-day term was never even communicated

23   to anyone at Pilgrim's because Ms. Hoyt herself told you a

24   65-day term was unrealistic.  The term was always -- the only

25   term communicated from Sysco to Pilgrim's on April 25th was 14

1    days.  We also know from Ms. Hoyt that Bill Lovette was not

2    even involved in the Sysco payment term negotiation.  If Bill

3    Lovette had been involved, he would have known that the term

4    Sysco proposed five days before he responded to this e-mail

5    from Joe Grendys was actually 14 days, not 65.

6          Also when Bill Lovette says we told Sysco no, we also

7    know that's not the case.  The Pilgrim's employees who are

8    actually involved in the negotiation with Sysco on payment

9    terms never told Sysco no.  To the contrary, Pilgrim's, in

10   fact, quickly negotiated with Sysco about their new payment

11   terms and reached an agreement.  Did Koch follow the same

12   strategy as Pilgrim's?  Not at all.  We also know there is not

13   one shred of evidence that Mr. Lovette and Mr. Grendys ever

14   communicated about this again.  This was one quick random

15   e-mail that Mr. Lovette received and responded to.

16         The government has all the e-mails.  The government

17   has put all the phone records into evidence.  These two men

18   never communicated about this again.  And the employees of

19   Pilgrim's and Koch never communicated about it, period.

20   Looking back at the e-mail, what is it that Mr. Lovette

21   supposedly agreed to?  They don't disclose their actual payment

22   terms.  They don't disclose any chicken prices.

23         The government wants you to believe that to tell

24   Mr. Grendys if Pilgrim's decided to negotiate with Sysco about

25   payment terms it had never received is a felony.  So let's

5054

1  break this down one more time.  Pilgrim's never received 65-day

2  terms.  Bill Lovette never reached out to anyone.  He never

3  communicated with Mr. Grendys about payment terms again.

4  Pilgrim's, in fact, negotiated with Sysco right away.  Koch

5  Foods did not.  Is that the way a so-called agreement is

6  supposed to work?  The reality is there is no agreement here.

7  Again, don't be fooled by the government's tactic.

8         This e-mail has absolutely zero to do with an

9  allegation that Bill Lovette was involved in a conspiracy to

10  rig bids or fix the price of chicken.  It's just another thinly

11  veiled attempt by the government to try to have you see

12  something and think something that is not there.  This evidence

13  is actually less than zero, fantasy land.  There is no scenario

14  where this e-mail exchange is proof beyond a reasonable doubt

15  that Bill Lovette knowingly joined an eight-year-long single

16  conspiracy, the object being to rig bids or fix the price of

17  broiler chicken products.

18         So that's it for the government's so-called key

19  evidence.  That's the best the government can come up with to

20  Bill Lovette.  Well, Mr. Lovette has nothing to hide.  So let's

21  just close out the last two documents so that we've talked

22  about every single e-mail or text in the entire case that

23  involves or even mentions Bill Lovette.

24         One is the e-mail that Mr. Tubach addressed yesterday

25  where Mr. Penn sent an e-mail to Mr. Lovette that uses the

1    phrase "illegal spiel."  This is merely a sound bite that the

2    government wants you to focus on with zero context.  The

3    government has offered no evidence what this e-mail is

4    referring to or what Mr. Lovette supposedly said at the NCC or

5    whether this entire e-mail is just more sarcasm.

6         What you do know from the evidence is that NCC is the

7    National Chicken Council, national, a large national trade

8    organization where Mr. Lovette may have said something to a

9    large audience in a speech at a National Chicken Council event.

10   In evaluating this document, remember who has the burden here.

11   It's the government.  There is nothing in the record regarding

12   what Mr. Lovette said.  There is nothing in the record to

13   provide you any context regarding the pricing information

14   referenced in the e-mail.

15        At best, what you are left with is a question mark

16   about what the heck this is about.  But when you use your

17   common sense, it seems unreasonable that Bill Lovette would be

18   making an illegal spiel in front of a national and public

19   audience, and what is much more likely is this is just sarcasm.

20        The final document where Bill Lovette is even

21   mentioned makes absolutely no sense.  And the government's

22   inclusion of it on one of their charts is pretty outrageous.

23        Let's pull up government summary chart 9-1.

24        The government didn't identify this document as one of

25   its key documents because maybe they figured it out it would be

1    foolish to claim that Mr. Lovette was agreeing to anything

2    based on this chart.  Let's actually look at the e-mail that's

3    included on this chart and put up Exhibit 920.

4          The first e-mail is from Mr. Skalak of Chick-fil-A and

5    he is informing a bunch of suppliers that Chick-fil-A has hired

6    Mr. Ledford from RSCS.  Mr. Gay, a Pilgrim's employee, forwards

7    along Mr. Skalak's e-mail to Bill Lovette and writes, "FYI if

8    you haven't already heard."  The government left off

9    Mr. Lovette's e-mail on their chart, but let's read

10   Mr. Lovette's words.  This is all Mr. Lovette says.  "Yes, I

11   had.  What is your view on this?"  Bill Lovette is simply

12   asking another Pilgrim's employee what his opinion is about

13   Mr. Ledford's move to Chick-fil-A.  Obviously, there is nothing

14   criminal about Mr. Lovette's question.

15         Is this conversation between two Pilgrim's employees

16   about Mr. Ledford's move evidence of a conspiracy between

17   competitors?  Obviously not.  So now I have covered -- and I

18   appreciate your patience.  I know it's a lot of detail -- but I

19   have covered everything that the government presented as their

20   key evidence against Mr. Lovette, and now we have run down

21   every single e-mail and text in the case where Bill Lovette is

22   even mentioned.  That's it, a big fat zero.

23         Ladies and gentlemen, the prosecutor here is not just

24   the government, not any government.  It is the United States

25   Government, the United States Government that has all the

1    resources, the United States Government that has the FBI and

2    thousands of special agents and prosecutors to conduct the most

3    thorough and sophisticated investigations and prosecutions in

4    the world.  You've come here day after day, given the

5    government your attention and patience as the government put on

6    their case.  Yes, this is a unique case.  There is 10 separate

7    defendants.  But what is not unique and what will never change

8    because it is fundamental to our system of justice is that the

9    government has to present proof beyond a reasonable doubt to

10    each individual.

11         The government with all of its incredible resources

12    and manpower and time has given you zero evidence that Bill

13    Lovette was engaged in a conspiracy.  The reason the government

14    has not presented proof beyond a reasonable doubt is because it

15    doesn't exist.

16         I'm going to sit down now and you may be relieved, but

17    I've got to tell you, I don't want to.  And I hope you can

18    understand why.  Bill Lovette was lumped into this criminal

19    case not based on incriminating evidence that he engaged in a

20    conspiracy to rig bids or fix the price of chicken, but because

21    of his position and his title in a company.  And this isn't

22    just a long antitrust case involving 10 defendants.  One of

23    those individuals, Bill Lovette, is my client.

24         In this unique and incredibly important setting, a

25    federal courtroom, you don't have to do what the government

1    wants you to do.  Instead, your obligation and your duty is to

2    follow the law that Judge Brimmer has given to you.  The

3    government has not proven beyond a reasonable doubt that Bill

4    Lovette knowingly, and that means voluntarily and

5    intentionally, was a member of this alleged conspiracy to rig

6    bids and fix the prices of broiler chicken products.  It's not

7    even close.

8         I recognize you have a big task in front of you, but

9    as to Bill Lovette, it's pretty simple.  Zero evidence means

10   not guilty.  Hold the government to its burden, follow the law

11   and return a verdict that Bill Lovette is not guilty.

12        Thank you.

13        *THE COURT:*  Thank you, Ms. Nielsen.

14        Ladies and gentlemen, we are going to go ahead and

15   take our lunch break now a little bit early, but we will plan

16   on reconvening at 1:00.  By my calculation, we may be going

17   until about 3:15, but I think we might take a break before

18   that, just a short break in the afternoon before that, all

19   right?

20        Keep the admonitions in mind.  Remember, although we

21   are close, we are not there yet.  And be back at 1:00 o'clock.

22   The jury is excused.

23        (Jury excused.)

24        Ms. Grimm passed out to you a spreadsheet of the

25   admitted exhibits.  So what I would like you to do is take a

 1    hard look at those lists and see how they compare to yours.

 2    Once I excuse the jury to begin its deliberation, what I would

 3    like to do is get confirmation from everybody that her lists

 4    are accurate.  And then assuming that they are, I am going to

 5    mark them as court exhibits and then they will be the record in

 6    the event of an appeal.

 7         What I don't want to do is what I would normally do in

 8    a trial with fewer exhibits which is go through them all.  I

 9    think if we can agree on those lists, I think I can spare all

10    the attorneys that.  I think the attorneys have already taken a

11    careful look at the notebooks, but I will confirm that on the

12    record as well, so I appreciate everyone doing that in advance.

13         Anything that we should take up at this time?

14         All right.  We will be in recess until 1:00 p.m.

15    Thank you.

16       (Recess at 11:49 a.m.)

17       (Reconvened at 1:05 p.m.)

18         THE COURT:  All right.  Let's bring the jury back in.

19         (Jury present.)

20         THE COURT:  Ladies and gentlemen, Mr. Roberts will go

21    next, and Mr. Gillen is ready to go.

22         MR. GILLEN:  Thank you, Your Honor.

23                        **CLOSING ARGUMENT**

24         MR. GILLEN:  Not a man in this courtroom is guilty of

25    conspiracy to fix or set prices, not one single man.  That

1    certainly applies to Brian Roberts as the evidence has shown

2    that he was not a member of a conspiracy.  He didn't knowingly

3    attempt to join or participate in a conspiracy, and I am going

4    to be focusing on Brian Roberts in my remarks to you.

5          Now, as you have heard, you have actually 10 separate

6    trials.  You are going to be reaching verdicts separately as it

7    relates to each and every individual.  Now, Brian Roberts is --

8    I have the privilege of representing him and will be addressing

9    him specifically here this afternoon.

10          Can I see the first slide?  Brian Roberts.  Dozens of

11   witnesses testified, but not a single witness testified that

12   Brian Roberts ever gave out any Tyson pricing information or

13   agreed with anybody to fix prices or rig bids.  16 million

14   documents have been produced in the case.  Hundreds of

15   documents have been introduced.  Not a single document shows

16   that Brian Roberts gave out any Tyson pricing information or

17   agreed with anyone to fix or rig bids, period.

18          Now, we have seen in the course of this trial, we have

19   seen that -- and you have learned in the instructions, probably

20   a big surprise to you when you learned in the instructions from

21   the Court that it's actually not a violation in of itself or an

22   unlawful act for competitors to share pricing information if

23   they make decisions about their ultimate pricing based upon

24   independent decisions in the interests of their respective

25   employer or supplier.  That had to be a shock to you to hear

1    that because all we have heard from the government in the

2    course of the last several weeks is did someone talk to

3    somebody else about what somebody else's price was.  And now

4    today you find out in the instructions from the Court, you find

5    out -- actually yesterday you find out that that is actually

6    not a violation of the law.

7            Now, let's just go a little bit farther.  As it

8    applies to Brian Roberts, he didn't even do that.  They don't

9    have information where Brian Roberts gave Tyson information,

10   pricing information to anybody, nobody.

11           Now, we're going to focus on what the government calls

12   its centerpiece, the centerpiece of their case, the KFC

13   negotiations.  And that's fine with us, frankly, because after

14   we march through these documents that you have seen, you will

15   know beyond any doubt that Brian Roberts and Tim Mulrenin in

16   the Tyson camp were not involved in any conspiracy with KFC for

17   a number of different reasons.

18           At the beginning of this trial, I asked you to

19   remember one number, the No. 19.  I asked you to remember that

20   number because I knew that it was going to be coming up and it

21   was going to be important and that we would be focusing on it.

22   And why is it important?  The reason why that number is

23   important is because what the government didn't tell you in

24   their case is that back in June of 2014 before any bids go out,

25   before KFC or RSCS asked for bids, Tyson had a plan internally

1    with what they were going to do with KFC.  They had a plan.

2    And it focused on that No. 19 that you have seen in the

3    documents.  So we are going to go through and we are going to

4    march through some of these documents.

5           Now, the government yesterday talked about 2014, and

6    this is what they said about the fine men in this room.  They

7    said that they robbed.  That's the word they used.  They robbed

8    people and that they cheated and that's just wrong.  And

9    frankly, it's reckless.  And what we are going to show you in

10   this presentation is not only is it wrong, but they knew it was

11   wrong.

12          Now, they also tell you that the e-mails and the texts

13   will show you what their telephone calls in their charts were

14   really up to.  We are going to get into that and show you as it

15   relates to Brian Roberts, that's just not true.  Now, what we

16   are going to do is start off with inside of Tyson, look inside

17   of Tyson to see what was going on inside of Tyson.  Then after

18   we march through those documents, I am then going to show you

19   from the government's perspective looking out from their charts

20   and all the other inferences and conclusions and reckless

21   statements that they have made about these fine men, we will

22   attack their charts through the texts and the e-mails.

23          And then on the third level, I am going to show you

24   what was going on during -- government counsel said yesterday

25   that 2014, the whole year that they were coordinating and they

1    were conspiring together, the whole year.  We're going to see

2    what was going on.  You have seen some of it, what was going on

3    inside -- or excuse me, within 2014 when these people, these

4    suppliers are battling with one another.

5         Let's take a look at -- here we have the first slide.

6    We have an analysis of what the structure is inside Tyson,

7    small bird business unit.  We learned about that.  Brian

8    Campbell testified about the issues concerning small bird unit

9    being responsible for profitability.  The pricing unit's role

10   was to set the pricing, align it with that strategy.  Charlie

11   Solomon was the senior vice-president of the small bird unit.

12   And the small bird unit would give the business unit profit

13   margin goals.  Bowlin who testified in this court was

14   responsible for margin goals.  That's what the structure was.

15   Notice here there is nobody from sales involved in this.

16        The government said, what was the reason for the

17   increases?  Why did they increase in 2014?  Well, you heard

18   from the witnesses from Tyson, Mr. Bowlin and Mr. Campbell, why

19   they did.  Mr. Bowlin testified, look, I wanted to fire KFC as

20   a client three times.  Mr. Campbell who created the business

21   model said, yes, the small bird unit was not a profitable

22   business, so the entire business was looking to change the

23   profit level of the small bird business unit.  So the request

24   or the direction from the business unit was to expand our

25   margins on our small bird business unit to be able to make a

1     substantial profit margin.  That, Mr. Government, is why Tyson

2     had the business model that was created, because they were

3     losing money on small bird.

4          This doesn't come from anybody other than the

5     witnesses from the stand.  And you know what's the scary part

6     of all this?  Is they knew it before we came in this courtroom.

7     They knew it before we came in this courtroom because they

8     interviewed Brandon Campbell in 2020.  Do you think they put

9     him on the stand?  No.  Do you think they put Bowlin on the

10    stand?  No.  And I think you know why, because it didn't fit

11    their theory of what they wanted to believe and that is that

12    Brian Roberts was the man responsible.

13         All right.  So what happens here?  This chart here

14    begins the process of Brandon Campbell in June of -- June

15    the 5th of 2014 sending out to Brian Roberts and Mr. Roberts'

16    boss the business model or the pricing model for KFC in June,

17    in June.  And he's got down here the increase is going to be 19

18    cents.  This equates to a 19 cents per pound increase.  That's

19    the number I wanted you to remember.  And the reason I wanted

20    you to remember it is because that's the number that they were

21    using in their business model created by with Brandon Campbell.

22         Brandon Campbell is telling Mr. Roberts, who he

23    described -- the sales -- they were the messengers.  And he is

24    telling the messenger this is where we want to be with KFC for

25    the next year.  And in that example he is going back over that

1  model.  Now, remember what Campbell said.  He is reporting to

2  Solomon and Solomon is the guy who is going to be making the

3  final decision because Solomon is in charge of the small bird

4  unit.

5       So what's happening here in July before there are any,

6  any even requests for bids on KFC, internally Tyson has worked

7  up their game plan for what they're going to do.  And what

8  happened here is that Mr. Solomon is telling Mr. Campbell, hey,

9  I need you to tell me where we stand on this.  Give me a

10  comparison of where we stand on the small bird profit margin,

11  where the current margin is and what the projected margin is.

12  This is the man, Charlie Solomon, is going to be making the

13  decision after Campbell builds the model.  What's important is

14  who isn't making the decisions.  The people not making the

15  decisions are the people sitting over in that chair,

16  Mr. Roberts and Mr. Mulrenin.  They are not making decisions.

17       What happens is that there is a request, so there is a

18  request on August the 7th from KFC, send in your proposals.

19  Get them in by August the 19th.  We want to see them by August

20  the 19th.  Okay.  Well, what RSCS doesn't know is that Tyson

21  has already created their model.  They created it back in June

22  when Brandon Campbell put it together and it got approved by

23  Charlie Solomon.

24       What happens then?  Okay, on August the 11th, eight

25  days before the thing is due, Brian Roberts sends in the model

1     that was created by Brandon Campbell.  What do you think about

2     the possibility of getting some commitment on you by the end of

3     the week?  They wanted to got a commitment from KFC before the

4     other people even put a bid in.  And the government would have

5     you believe that there was a conspiracy to fix prices when

6     we're trying to jump in there and get a deal with KFC before

7     the others even bid.

8          Now, what happens?  Mr. Campbell looked at the model

9     that was sent in on August the 11th and he said, yeah, I'm the

10     one who generated that model.  That's my work.  I did that back

11     in June.  And then we sent it in to -- on August the 11th.  So

12     what happens?  It gets sent in.  And Mr. Campbell testifies

13     that's the document that was created by him.

14          Now, there is a little bit of a twist here because if

15     you look down -- I highlighted the margin and the profit margin

16     is 16.  And the reason that is is what happens is Mr. Campbell,

17     remember they wanted to put the marination issue in there.

18     They wanted to weigh the bird after it had been marinated, and

19     they didn't want to have to take away for the loss of the fluid

20     from the bird after 48 hours.  That marination and the 48-hour

21     drain created a unique, a unique model for Tyson as opposed to

22     all of these other companies that were bidding for KFC

23     business.  That was unique to them.

24          And because of the difference the chicken is going to

25     weigh more, so their profit margin was actually here at 16.

1    But we'll find out really, it's really 19 cents, that same

2    number that he had back in June.  Because what happens is that

3    the -- it's sent in.  Mr. Eddington comes back and says, gee,

4    what are you doing here to me, Mr. Roberts?  Look at this.  You

5    want to try to get me fired here?

6             And then, see, the government didn't read you this

7    part.  They would have you actually think that he was worried

8    about getting fired which is nonsense.  What Eddington says is

9    seriously, recap the reality of this.  He wasn't serious.  He

10   was being facetious with Mr. Roberts on that.  But anyway, now

11   the KFC dance has begun.  And what is KFC going to do with this

12   unique model sent in by Tyson before anybody else?  We tried to

13   beat them all to the gun.  We wanted to get a deal, not

14   collude, but compete.  We wanted to get a deal before they even

15   got the other guy's request.

16            So what happens next?  Well, Tyson -- KFC says no, we

17   don't want it.  We're not going to -- we're not going to go

18   with that unique model that you generated for us.  The answer

19   is no.  So what happens?  Just like what Mr. Campbell told you.

20   And, you know, it's so distressing that these people didn't

21   call Mr. Campbell so that he could -- so that they could put

22   him up because they knew -- they've known since 2020 what he

23   had to say.  But oh, no, it's better to maybe have him set it

24   out so that you wouldn't know that he is the one who created

25   the models.  He is the one who told Brian Roberts what to do

5068

1    and how to deliver it.  And he is the one who would not allow

2    any discretion at all in this deal on the sale with KFC.

3          And as he told you from his testimony, the bottom line

4    is, he goes, okay.  They said no.  What happens next?  Now, KFC

5    doesn't know all this.  But what happens next is that Brandon

6    Campbell is then sending the attached updated model and giving

7    more directions to Mr. Roberts to go and do his job and deliver

8    the message.  The messenger, hate to say it, sorry, Brian,

9    glorified messenger on this one.  But Campbell is calling the

10   shots.

11         So the rigidity, the government says, oh, now, this

12   shows that Tyson had to be conspiring because they never came

13   down on their price.  They had to be criminals because they

14   didn't come down.  That is so distressing and disturbing

15   because they knew that Campbell had already set with the

16   business unit exactly what Tyson was going to do through the

17   entire process from June until December.  It never changed.

18         And so he sends it off, and then here we have

19   Mr. Campbell sending out the attached final KFC pricing for

20   2015.  And what does he say?  Increase margin from .1681 to

21   .1931 on the eight-piece.  Why is that?  Again, no marination

22   and that 48-hour drain had been taken off, so now we're back to

23   exactly the plan, what they called the true price that they had

24   back in June.  And that is what was directed and that's what

25   happened.

1             And what do you have in the contract here?  That's the

2     contract from the Government's Exhibit where .1931 is what

3     was -- is what happened there.  And you know what?  We then

4     see -- here is a government exhibit talking about where

5     everyone leveled out.  .1931 is basically the target date for

6     Tyson back in June.  And they get -- and Mr. Roberts does

7     exactly what he's told.  He delivers the message.  And

8     ultimately they get exactly what they wanted because they were

9     tired of losing money on the small bird business.  That wasn't

10    a decision made by Mr. Roberts.  It was a decision made by the

11    business unit and the pricing unit.

12            And they -- hey, if they can't make a profit, then,

13    you know, we'll go somewhere else.  This wasn't conspiracy.

14    This wasn't collusion.  It's like if we can't make money

15    selling small bird to these people, then we'll go somewhere

16    else.  And the difference between .1931 and Pilgrim's, they're

17    the two big companies, .2171 was their profit margin, that's

18    about 2-1/2 cents difference.

19            The difference in 2-1/2 cents of profit margin over a

20    three-year contract is millions and millions and millions of

21    dollars.  Please use your common sense.  Do you really think

22    that Mr. Roberts and Mr. Mulrenin or Tyson would enter into a

23    conspiracy with Pilgrim's, their big adversary, and say I got a

24    great idea.  Why don't you make all the money.  I've got a

25    great idea.  This time you make the millions and millions and

1    millions of dollars more than us.  What a great idea.  So I

2    enter into a conspiracy where my No. 1 adversary is making all

3    the money or making millions of dollars more than me.  Use your

4    common sense.  You do not have to leave your common sense at

5    the security gate when you come into this building.  The great

6    gift that you bring is the collective life experiences as

7    citizens of this country and applying that common sense to

8    facts like this.  Use your common sense.

9         Now we are going to get into what the government is

10   saying.  This is there 10-1 where the government said we know

11   from the text what was said.  In a very candidly, very reckless

12   way, the government was attributing yesterday comments about

13   this is what was said in a call between so and so and so and

14   so.  This is what was said.  They were trying to fix the

15   prices.  This is what they were trying to do.

16        Well, the bottom line here is that, you know, you've

17   got on the Tyson bid which was submitted on August the 11th,

18   we've got down.  Then we've got a bunch of phone calls.  And a

19   lot of these phone calls, they've got like zero seconds on

20   them, a couple seconds, but they have to put it down.  Remember

21   when Ms. Evans said who made the decision about not putting the

22   amount -- the duration of the call?  The prosecutors.  They

23   didn't want you to know that some of these calls lasted, you

24   know, zero seconds, two seconds.  Maybe they just thought that

25   wasn't important for you to know.

 1           So now we have got calls.  Keep in mind now all these

 2    calls on the 15th, are they really calls in which there is

 3    going to be some sort of collusion?  We've already submitted

 4    our price.  We have already submitted our bid.  And it was

 5    unique to us.  So we look through this and the government says,

 6    oh, we know what they were saying.  They were saying bad

 7    things.  Well, we see on 10-1 -- actually, the back part of

 8    10-1, we have seen this.  You have seen this quite a bit.

 9    That's the market intelligence collected within Pilgrim's.

10           What's the important thing here?  They said well,

11    Mr. Roberts was talking to Mr. Penn on August the 15th.  If

12    Mr. Roberts and Mr. Penn were talking about pricing and Tyson's

13    pricing, don't you think -- use your common sense.  Don't you

14    think that there would be something in here where Tyson's

15    numbers would be in here?  Please use your common sense.  Of

16    course, they would be here.  But the government tells us

17    through the texts and through the e-mails you will learn what

18    the calls were about.  Well, we did learn what the calls were

19    not about, Mr. Government, and that is they weren't talking

20    about Tyson's pricing.

21           Same thing, got -- this is another e-mail where it's

22    the market intelligence from Pilgrim's.  No Tyson's because

23    there is no conspiracy, there is no collusion, and we didn't

24    give out our information.  Same thing on a Pilgrim's ledger

25    sheet, same thing, no Tyson's, no conspiracy, no collusion.  We

1    didn't give it out.

2          But they say, yeah, but you also talked with -- you

3    were talking with Scott Brady.  You know, what about that?  You

4    had conversations with Scott Brady.  Well, this is -- this

5    particular government exhibit, 1238, that takes place in a text

6    between Mr. Fries and Mr. Brady where they apparently are

7    talking about market intelligence.  What are we missing here?

8    We are missing where they are talking about any information at

9    all about Tyson because the government would have you believe

10   on August the 11th and August the 15th that Roberts and Brady

11   were talking about Tyson pricing or colluding and conspiring.

12   Nothing here.  There we have the time line laying it all out

13   starting off 19 cents per pound.  That's our plan.  That's what

14   we get as our profit margin at the end of the day.

15         And what do we have here?  We have here in 4-1, we

16   have a -- and why do we have this in?  What was going on during

17   the summer and fall of 2014 to show you that Tyson and

18   Pilgrim's weren't pals and they didn't collude or conspire?

19   Well, here it is right here.  They are talking about Golden

20   Corral, which we're not even involved in, and they are saying,

21   well, gee, .30 back in line where we priced.  Want to add

22   anything.  They were wondering who -- any rumors out of Tyson.

23   Buyer said we were 7 cents high, so that must be Tyson's price.

24   They're morons.

25         If we were conspiring with these people, they wouldn't

5073

1    be guessing in October about what our prices were on Golden

2    Corral.  They guessed here because they didn't know, because we

3    didn't engage in a conspiracy with them.  We didn't even give

4    them their pricing.

5         We go on, there is more and more.  We've seen this

6    before concerning the drought this year, the sort of trashing,

7    we would never help you one micron, trashing their new

8    customers who they just increased distribution at cheap prices.

9    Boy, Pilgrim's is mad.  Tyson is charging cheap prices.  And

10   this is during the same period of time that this government has

11   charged that we were involved in a conspiracy with KFC.  And

12   now they are complaining about cheap prices.

13        We've seen more and more of this and on it goes

14   throughout.  This is the one where they are talking about "I

15   hate Tyson," this sort of stuff.  And here is another one.

16   This goes back to 2012.  Because they were talking about 2012

17   and there is a request by Mr. Penn, do we have Tyson price

18   idea?  And the government didn't focus on this when they were

19   doing their little chart.  "I can give you an educated guess,"

20   said Mr. Austin.  An educated guess because he didn't know

21   because it wasn't a conspiracy.

22        So on we go.  Here is another one again, and this is a

23   KFC 2012, another example of here is -- this is a Pilgrim's

24   communication.  Market intelligence, once again, they've got

25   five companies on market intelligence.  The only company they

1   don't have is the company they hate, is the company they are

2   mad at for selling cheap chicken, Tyson.

3          And here, this is an example of kind of how these

4   charges can be misleading.  They say, oh, well, look here, this

5   had to do with the -- what are we going to charge Church's or

6   quote them on frozen.  And their chart, which is 1-1, they had

7   Mr. Roberts when he is asked about this from Carl Pepper, I

8   want to discuss this before we submit.  I want to understand

9   what the storage expectation is.  But that's not the whole

10  thing.  See, they left out some other stuff in there.  I am

11  sure it was by mistake.

12         Because this is what Mr. Roberts was really concerned

13  about.  "I want to understand what storage expectation is.  Is

14  this a cut, freeze and ship deal and then the distributor

15  stores in frozen state or are we going to have it longer than a

16  month?"  He didn't care about what others were going to be

17  charging.  He wanted to know whether Tyson was going to be the

18  frozen bank for Church's Chicken.  Was it going to be there

19  longer than a month?  Tell me.  What are we going to have to

20  do?

21         We have heard a lot on the frozen issue addressed

22  eloquently by counsel for Mr. Mulrenin and Mr. Little.  And we

23  know, we know that as we know from Mr. Bowlin, that was a

24  pass-through just like on the QA.  That wasn't determined by

25  the sales team.  It was a pass-through.  This wasn't during any

1    kind of bid process.  This was an add-on expense of what they

2    wanted to know what we were going to do.  And you saw that

3    Mr. Mulrenin kind of said, we've got to do something.  If you

4    tell them 4 cents, we've got to get lower.  So Mr. Mulrenin had

5    Tyson go below their cost.  Conspiracy?  Collusion?  Crime?

6          And here is an example of what they do.  They throw

7    out the Scott Brady e-mail that says don't forget about me and

8    he's got some cryptic marks here.  The thing about that, I will

9    say this.  What does that tell you?  No. 1, this wasn't during

10   any bid process.  No. 2, if they wanted to have someone tell

11   you what that meant, get up here and put a witness on the stand

12   and go into what these things mean.  And No. 3, the Judge --

13   No. 3, Mr. Roberts never asked for this, never responded to it

14   because, believe me, if he responded to it, you would have seen

15   it.  It would have been blown up here, Mr. Roberts' response to

16   this cryptic e-mail not even during a bid.

17         Here is another example of how desperate, desperate

18   the government has become, and it's sad to see the Department

19   of Justice stoop this low.  Oh, well, look at this.  Apparently

20   a boy was out listening to the illegal spiel on forward pricing

21   at the NCC.  Tyson submitted the pricing to Albertson's and

22   Super Valu for upcoming bid on grain pricing.  Subject, Brian

23   Roberts.  I guess, well, gee, Mr. Roberts wasn't agreeing to

24   your illegal spiel.

25         They didn't do any investigation on this.  They didn't

1   check out what Mr. Lovette said.  And you know what else they

2   didn't check out?  Because they didn't care.  They only care

3   about the word "illegal" so they could throw it up here and

4   create and dazzle you with that word.  You heard from

5   Mr. Bowlin that Brian Roberts didn't even handle the accounts

6   for Albertson's and Super Valu.  They are deli.  He doesn't

7   even handle it.  That doesn't stop them from throwing it up

8   there and trying to create a false image of reality because the

9   Department of Justice should be about seeking truth.  Is that

10  so difficult?

11          Now, here we have another one.  This one is an

12  example -- the government said, oh, look, he had discretion in

13  pricing.  Roberts.  Popeye's is done.  Here is the agreed upon

14  prices and almost a 14 cent increase.  Yes, Brandon I changed

15  the margin line.  Aha.  So Mr. Roberts can set prices.  What

16  did Mr. Campbell say in this courtroom on Monday?  He said on

17  occasions we would give the sales unit a narrow range, a narrow

18  range to negotiate.  Well, that's an example of that.  But what

19  he said unequivocally time and time again on the KFC deal,

20  sales had no discretion whatsoever.

21          Now, we've seen an awful lot of strange things happen

22  here in this case.  They have called no witnesses other than,

23  frankly, they call -- Mr. Olson comes in and Mr. Olson said,

24  oh, yeah, well, I had dinner in October of 2014 with

25  Mr. Roberts and he wouldn't give me a deal on some financing.

1    Well, I had to press him.

2         Mr. Olson, you weren't involved at all and had no

3    responsibility whatsoever for negotiating the KFC 2015 prices;

4    isn't that right?

5         Yeah.

6         He had to admit that's right.  He just wanted to get

7    some, as he said, creative financing on some of the ships for

8    his franchises.  That's all he said.  He admitted he was not

9    involved.  Yesterday, I am sure it was a misstatement when

10   counsel said he was involved in negotiations in 2015 on KFC.

11   That is wrong.

12        Now, again we have got Bryant.  Bryant doesn't even

13   mention, frankly doesn't even mention Brian Roberts.  Everyone

14   talks about Bryant.  We have gone on and on and on about

15   Bryant.  But the bottom line is Bryant has nothing to say,

16   frankly, about Brian Roberts or Tim Mulrenin or a whole bunch

17   of other people in this courtroom.  And we have gone through

18   the 20 interviews he has had and the ever-changing story, the

19   ever-changing story.  It sounds like a novel.

20        Well, it actually is a fiction, a piece of fiction

21   that they created for your -- I hope not your entertainment,

22   but for your listening.  In any event, use that common sense.

23   You have got to use the common sense in this case.  And common

24   sense, gee, the government would have us believe that Brian

25   Roberts is guilty on the 2015 matter.  Well, gee,

5078

1    Mr. Government, why haven't -- why didn't you tell them that

2    the KFC price inside Tyson was set not by Mr. Roberts, but by

3    Brandon Campbell and Charlie Solomon back in June?  Why didn't

4    you tell them, Mr. Government, that Brian Roberts had no

5    discretion whatsoever in changing or altering the negotiations?

6    It wasn't even negotiations.  It was message delivering.

7            Why, Mr. Government, if common sense tells us if we

8    are going do conspire with people, why would we submit our bid

9    early?  Why would we get it in eight days early and why would

10   we say let's work a deal now if we can?  Why, Mr. Government,

11   didn't you tell us in your case that Tyson had a unique

12   business model for KFC different from the others?

13           And why, Mr. Government, didn't you tell us that Tyson

14   wanted to close early before anybody?  How could they be

15   conspiring with these people they are trying to beat them to

16   the draw?  We want to get the business and get the deal.  Why,

17   Mr. Government, would you possibly expect us, the jury, to

18   believe that Tyson, Mr. Roberts, Mr. Mulrenin, anybody with

19   walking around sense is going to enter into a conspiracy with

20   their No. 1 adversary, Pilgrim's, or anybody else so that they

21   can make all the money, so that they can make 2-1/2 cents more

22   on their profit margin and they can make millions and millions

23   of dollars more than us over a three-year contract?  Does that

24   make sense?  No, it doesn't.  Use your common sense.  Please,

25   use your common sense.

1           As to frozen, you've heard it.  It's a pass-through.

2    Mr. Bowlin told you about that.  And whether Mr. Pepper got

3    market intelligence is irrelevant for the issue of the fact

4    that sales did not set the prices on frozen or on QA.  That's

5    something that was done internally.

6           You know, it's -- this case has been disturbing.  It's

7    been disturbing at so many levels.  And I wonder, I wonder why

8    the government would do some of the things they've done,

9    attribute contents of conversations that they don't have

10   recordings of that they tell you this is what was said when

11   they know that's not true.  Why would they do that?  Why would

12   they go and make their summary charts and leave things out?

13   Why would they not give you the full context that you've seen

14   from the defense?  Why would they do that?  Why would they do

15   that?

16          It reminds me of football.  Some of you folks might be

17   football fans, the hail Mary pass.  You've got one last play.

18   You're down by three or four points, and you're just going to

19   chuck it in the end zone and hope somebody on your team can

20   catch it.  That's what the government has done in this case.

21   Hail Mary passes hoping that somebody in the morass -- and I

22   have to tell you this has been a blizzard of documents and a

23   blizzard of information.  And we thank you all, everyone in

24   this courtroom thanks you for the attention that you have given

25   to an amazingly complex industry and an amazingly -- an

1    abundance of and a blizzard of documents.  But what they have

2    done here in the blizzard of documents is take 16 million

3    documents and chop them up in a patchwork that fits the theory

4    that they had before they came into this courtroom to fix their

5    theory about how they could convict these people.

6         And we've seen what they didn't want you to see.  Boy,

7    I hope that frightens you.  It frightens me.  All the people on

8    those e-mails that were above Mr. Roberts, the Charlie

9    Solomons, Andy Lubert, all those folks who were his superiors

10   who were involved in the decision making to set these prices

11   and stick with them, why did they not bring them into this

12   courtroom?  Why are they afraid of the truth?  I thought they

13   were supposed to be seeking the truth.

14        You know, this is not a corporate case.  These people

15   are not corporations, people thrown around phrases of Pilgrim's

16   and Tyson and Mar-Jac and all that.  And you begin to become

17   numb to the fact that this case is not about -- there is no

18   corporate representative here that reports back to the board

19   about what happened here.  Behind these masks in this courtroom

20   are human beings, human beings with lives that they want that

21   were upended by this Indictment, human beings.

22        This is the real world.  It's not a hail Mary game.

23   It's the real world and it has real consequences for both.  We

24   talk about Brian Roberts and we've heard he's the messenger.

25   And Campbell tells you he's the messenger.  And we've all heard

1   the expression, hey, don't shoot messenger.  We have all heard

2   that expression.  But here the government didn't shoot the

3   messenger.  They indicted the messenger.  And frankly, I think

4   he might have been better off getting shot because the stain of

5   being indicted in this society, the stain of that will not be

6   removed.  You cannot remove that.

7       This trial is a perfect example of why we need a jury

8   system in the United States of America.  It is a perfect

9   example of why the Department of Justice cannot say I find

10  Brian Roberts guilty as charged, grab him, take him away.

11  That's not the United States of America.  Here in the United

12  States of America they have all sorts of power.  This is a

13  powerful group of folks.  They can give people immunity.  They

14  can seek indictments.  They can change their lives for the

15  worst.  They have all of that power, but in the United States

16  of America, they are not all powerful.  They can do all sorts

17  of things, but this is one thing they can't do.

18      They can drag us in here.  They can parade us around.

19  They can put up what they consider to be their version of the

20  truth, but their power stops right there at the jury box.  They

21  are powerless beyond that rail.  That's where these people lose

22  their power because the power is with you.  You must decide

23  whether they have proven their case beyond a reasonable doubt.

24  You must decide whether or not they have overcome the burden of

25  proof.  That is the power that you have and they don't have.

1   Thank goodness.  Thank goodness we live in this country where

2   their power is turned off at that jury box rail.

3          THE COURT:  Five minutes, Mr. Gillen.

4          MR. GILLEN:  Thank you, Your Honor.

5          Now, I wasn't expecting the government, because of how

6   we have seen them try this case and what they've put up and how

7   they have handled -- or not called people that they know would

8   help out or tell the truth to the jury about what happened, I

9   couldn't expect them to have a reasonable expectation of

10  presumption of innocence or proof beyond a reasonable doubt.

11  That might be too much to ask of them in this case, but it's

12  not too much to ask of you and we are asking it of you.

13         You use your power to hold them to the burden that

14  this Court has instructed you.  You hold them to that burden.

15  And when that happens and when you say to yourself back there,

16  gee, I wonder why they did this or that and didn't do this, the

17  power is with you.

18         Now, we have come to the part of the trial in my

19  closing where it is the most nervous, anxious time for a trial

20  lawyer because now I have to sit down.  And when I sit down, I

21  can't get back up.  When I sit down and the government ends up

22  getting up for their rebuttal, I can't say jump up say, hold

23  it.  What about this?  What about that?  Why didn't you tell

24  them this?  That's wrong.  You shouldn't have said that.  I

25  can't do that.  We will be silent when we sit down.

1          So I would pass that responsibility into the jury box

2     and ask you people in the jury room, what would the defense

3     have said?  What would Penn's attorney have said?  What would

4     Roberts' attorney have said?  What would any of these attorneys

5     have said to the rebuttal argument that they cannot answer?  We

6     need you in the jury room to raise those issues because we

7     cannot speak anymore.  It will be in your hands.

8          We have talked about -- in this case we have talked

9     about what has happened to these folks, why they are here.

10    It's shocking that they are.  Well, I'll say this.  These folks

11    have gone through a lot.  Mr. Brian Roberts has gone through a

12    lot.  It's been painful, as you can imagine, for everyone here.

13    Let me say this.  You are not responsible for the consequences

14    of your verdict.  You are responsible for the truth of it.  It

15    is time this nightmare ended.  Return a verdict that speaks the

16    truth, a verdict of not guilty for Brian Roberts.

17          Thank you very much.

18          *THE COURT:*  Thank you, Mr. Gillen.

19          We now have Mr. Blake.  And Ms. Johnson.

20          *MS. JOHNSON:*  Thank you, Your Honor.

21          Your Honor, may I proceed?

22          *THE COURT:*  Yes.

23                              **CLOSING ARGUMENT**

24          *MS. JOHNSON:*  Thank you, ladies and gentlemen.

25          This was hard.  Thank you for all you've done thus far

1    to make our system of justice work.  I am asking you to

2    continue that hard work, to have the courage of your

3    convictions and to hold the government accountable for what

4    they have put before you, hold them accountable for what they

5    have put Mr. Blake through.

6            Honestly, Mr. Blake and I would much rather have spent

7    the last several weeks at a football game cheering on our

8    beloved Arkansas Razorbacks, but I will tell you myself and my

9    colleagues, we are honored to be a part of team Blake and to

10   sit beside him in this trial and to bring to you now the truth.

11           The evidence presented by the government is

12   insufficient.  It's insufficient to support a conviction

13   against our client.  The evidence we put before you once we got

14   the chance sheds significant light on the case and shows you

15   how wrong the government is.  We are asking you to find

16   Mr. Blake not guilty.

17           Way back in October, October 27th, my colleague,

18   Mr. Pollack, spoke to you during opening statements and he

19   asked you, why is our client, Mr. Blake, here in this courtroom

20   and not back home with his family in Arkansas?  It is now six

21   weeks later, and I trust you will all join me and Mr. Pollack

22   in asking the very same question.  Why is Mr. Blake even here?

23   I'll tell you why.

24           One, the government is unable or unwilling to

25   understand the chicken industry generally and Mr. Blake's role

1    as a salesman specifically.  Two, just as Mr. Pollack told you

2    in opening, the government is unable or unwilling to understand

3    the difference between period pricing and bids.  Three, the

4    government developed a narrative, a CliffsNotes version of a

5    story they wanted you to hear and refused to objectively look

6    at all the facts that they had at their disposal, especially

7    those facts that directly refute their narrative.  And I say

8    this with full apologies to CliffsNotes.  They are actually

9    true.

10          What does the government have to prove beyond a

11   reasonable doubt?  One, there was a conspiracy involving

12   bid-rigging and price-fixing.  Two, Mr. Blake knowingly, that

13   is voluntarily and intentionally, became a member of the

14   conspiracy, knowing its goal and attending to help accomplish

15   it.  These are important words.  Please keep them in mind when

16   you begin your deliberations.

17          And with these elements as our backdrop, let's talk

18   about what the government has told you they would prove and

19   then let's look at what they have actually shown you.  And more

20   importantly, let's talk about what the government has not shown

21   you.

22          Mr. Koenig, the government's attorney, told you the

23   following things in opening that you would see in this trial.

24   Let's go back to his words and see if what he told you is

25   anything close to what's actually been presented.  Mr. Koenig

5086

 1    said you would hear from KFC, Pollo Tropical, Golden Corral,

 2    Chick-fil-A, Sysco, and a pattern would emerge.  Remember those

 3    names and let's look in just a minute for this supposed

 4    pattern.

 5            For 2014, Mr. Koenig told you "they," remember that

 6    word, they agreed on 15 cents or ball park before they

 7    submitted their price increase on KFC.  Time and time again

 8    beginning with opening statement Mr. Koenig and the other

 9    government lawyers tried their dead level best to ask every one

10    of their questions in the form of they.  Right, Mr. Witness?

11    All of them?  Right, Ms. Witness?  All together, Mr. Witness;

12    is that right?  This was done on purpose.  They intentionally

13    tried to lump all the defendants together over and over in an

14    attempt to condition you to do the same.  But that's not what

15    the evidence established, ladies and gentlemen.  And it's also

16    the exact opposite of what the law requires.

17            In instruction No. 12 the Judge told you that the

18    rights of each defendant are separate and distinct.  He told

19    you that you must separately consider the evidence against each

20    defendant.  Mr. Koenig said it's all going to come together

21    like puzzle pieces to form a picture that will be crystal

22    clear.  Look at the picture and the patterns that form right in

23    front of you.  It will be clear as day.  So ladies and

24    gentlemen, I would ask let's do that right now.

25            The total number of government witnesses in this case,

1    30.   Let's remove the custodial witnesses.  They were before

2    you to authenticate and introduce documents.  None of them

3    testified factually about Mr. Blake.  We are left with 10 fact

4    witnesses.  Let's examine how many of those discussed

5    Mr. Blake.  First Ms. Evans, the government paralegal.  Of

6    course, she said she didn't know Mr. Blake.  She didn't know

7    anything about the case.  The government chose to take their

8    entire presentation out of the hands of experienced federal

9    agents and drop it in the lap of a paralegal who had only

10   worked on this case for two weeks before she had to testify.  I

11   almost feel sorry for Ms. Evans having been put in that

12   position by the government, but I don't.

13        I feel sorry for you all, ladies and gentlemen, and

14   even more so, I feel sorry for my client.  The intentional

15   choices of the government prevented you from getting to hear

16   the whole story.  Why do you think they did that?  I submit to

17   you the government prefers to control the narrative.  Let you

18   see only what they want you to see and not allow you the

19   opportunity to see the entire picture with all the puzzle

20   pieces so you can make an informed decision.

21        Melissa Hoyt from Sysco, doesn't know Mr. Blake, had

22   never worked with him.  There are no documents in evidence that

23   indicated George's was involved in any of the allegations

24   involving Sysco.

25        Telly Smith, Golden Corral, he too didn't know

1    Mr. Blake, but there was some interesting things with Telly

2    Smith's testimony, if you can remember with me.  When

3    Mr. Koenig asked him what companies were involved in the

4    bidding process for 2015, he included George's on the stand.

5    But on cross-examination Mr. Smith admitted that in each and

6    every interview with the government, in September, in October,

7    in November the day before he testified he never included

8    George's.  Why?  Because George's was not involved in the

9    bidding process with Golden Corral.

10          Remember my colleague, Mr. Pollack, pulled up

11   Government Exhibit 480.  It was Golden Corral's bid information

12   for 2015.  Mr. Telly Smith said, you're right, no George's.

13   Why is this important?  Because again the government is trying

14   to lump George's and Mr. Blake by association into their

15   allegations of wrongdoing.  I can assure you if there is one

16   single document showing Mr. Blake or George's involvement, the

17   government would have pointed it out to you.  They didn't

18   because there is no such evidence.  To suggest George's and

19   Mr. Blake by association was involved in any alleged wrongdoing

20   involving Golden Corral is reckless.  It's disingenuous and

21   it's wrong.

22          Joe Brink, Pollo Tropical, does not know Mr. Blake.

23   Pollo Tropical does no business with George's.

24          Meyer Skalak, Chick-fil-A, does not know Mr. Blake.

25   Chick-fil-A does no business with George's.

1          Remember just a few minutes ago we talked about that

2   pattern involving all the companies that Mr. Koenig told you

3   about in their opening statement.  What has been shown at trial

4   doesn't look anything like a pattern.  Despite the government's

5   best effort to throw George's name in, George's did zero

6   business with these companies with the exception of KFC.

7   Mr. Koenig was trying to establish -- could not involve

8   George's and most certainly could not involve Mr. Blake.

9          Robert Bryant, the witness who admitted to lying to

10  the government numerous times, but yet they still called him as

11  a witness and they gave him immunity.  Mr. Bryant told you he

12  did not know Mr. Blake.  He may have said hello once, but

13  doesn't know him, yet he was just fine taking the stand

14  carefully crafting his words in response to the government's

15  questions so that perhaps you, the jury, might just want

16  Mr. Blake in with the rest.

17         What do I mean by that?  There was zero evidence he

18  knew anything about Mr. Blake, zero evidence he had any bad or

19  negative information about George's, but again remember with me

20  the government lawyer tried and tried to get Mr. Bryant to

21  answer all the questions as if all defendants were involved.

22         They were all together, the competitors?

23         Yes.

24         Together?

25         Yes, together.

1           This type of vague question and answer went on and on

2      and on.  Why did Mr. Bryant answer this way?  Because he wants

3      immunity.  He is cooperating with the government.  But why not

4      be more specific about what he knew?  Because this way it

5      allows the government to get up here and argue to you they were

6      all together in this alleged conspiracy because Robert Bryant

7      told you.  But he didn't tell you one single thing about Ric

8      Blake or George's.

9           Does the government really want to ignore the obvious

10     truth and have you assume that any of Robert Bryant's testimony

11     is relative to Mr. Blake?  We shall see.  They presented

12     testimony to you in this vague, all encompassing matter.  Let's

13     wait and see if when they get back up to speak, they admit the

14     truth which is Robert Bryant's testimony, if you find it

15     credible at all, has absolutely no relevance to whether

16     Mr. Blake knowingly joined a conspiracy.

17          Finally, and there has been much time spent on the

18     documents by my colleagues, let's discuss Exhibit 1919.

19     Remember Mr. Bryant's notes?  When Mr. Bryant was on the stand,

20     he stated the numbers for the other suppliers were their

21     intended bids for 2017 contracts and not current prices.  And

22     he was sure of it.  George's number was listed at .9652.

23          Oh, and by the way, Mr. Bryant testified that

24     Pilgrim's had a due date of Friday, January 27th, 2017 for

25     their bid.  He testified that he assumed all other suppliers

1   had that same due date.  In fact, what we learned later from

2   Sara Fisher, George's didn't even meet with RSCS to begin their

3   bid negotiations until February 13th or 14th of that year.

4   Mr. Bryant didn't know our client and I am not sure why he told

5   you what he did, but the number on his notes, it's period

6   price, not a bid.

7           In closing, the government finally acknowledges these

8   may be not future prices and may have been period prices.  They

9   were period prices, but even in closing argument, Ms. Call

10  tried her best not to acknowledge that.  And then she tried to

11  tell you it doesn't matter.  It didn't matter that the

12  government's star witness was dead wrong on a key point.  It

13  did not matter that these were period prices even though the

14  government's own witness, Mr. Ledford said he was not concerned

15  if competitors knew each other's prices because having that

16  knowledge did not impact competitive bidding.  That suggests to

17  you it does matter.  Facts are important and true facts are

18  even more important.

19          Oh, and by the way, you know who else didn't know

20  Mr. Blake?  Phone records in evidence suggest that one-half of

21  these alleged co-conspirators do not know him.  There are zero

22  calls with Mr. Blake and these individuals for the entire

23  seven-year period at issue.  The government would have you

24  believe that Mr. Blake entered a conspiracy with men he had

25  never spoken to to engage in bid-rigging and price-fixing

1    involving Pollo Tropical, Chick-fil-A, Golden Corral, companies

2    that his company had no business interest with.  Does that even

3    make sense?

4         Let's discuss the four government witnesses, four out

5    of 30 who could even tell you they knew Mr. Blake.  What did

6    they say?  Mr. James Olson, one of the very first witnesses

7    after the custodian, we know Mr. Olson is mistaken about this

8    2014 meeting for two reasons.  For one, he confirmed that he

9    did not negotiate prices for RSCS that year.  He was not a part

10   of the negotiation team.

11        Second, on cross-examination he testified that Gary

12   Rancatore, the president of Mr. Olson's distribution company,

13   was also present at the meeting.  But Mr. Olson then admitted

14   that he had sold his distribution company in July of that year,

15   months before these alleged meetings were supposed to have

16   taken place.  Mr. Olson, who didn't even remember the state in

17   which the meeting occurred, is clearly confused on his years.

18   This meeting obviously did not occur in 2014 which is why there

19   isn't a single calendar invite, e-mail, phone call or text

20   message verifying it ever took place.

21        Sara Fisher testified regarding the KFC 2017 contract

22   negotiations.  She told you that a George's vice-president or

23   above was required to sign a contract, and she knew Mr. Blake

24   was not a vice-president or above.  She admitted Mr. Blake was

25   more of a middle man or middle person like she was.  She knew

1    that Mr. Blake needed approval from his supervisor for a

2    bidding event.  But do you remember the inference the

3    government tried to present to you?  Remember their chart,

4    18-2?  When the e-mail was sent requesting meetings with the

5    suppliers and how the government focused on the fact that

6    Mr. Blake was the only recipient of the calendar invite,

7    remember the testimony?

8         On direct Ms. Fisher was asked if Mr. Blake was their

9    main contact and she said yes.  The government's lawyer,

10   Ms. Sweeney, then made sure to point out on this chart that

11   Mr. Blake was the only one on the meeting invite.  But then

12   remember what happened on cross-examination?  What did we show

13   you?  An e-mail, Exhibit I-067, which makes it so clear that

14   not only was Mr. Blake not only the only one in attendance,

15   that he couldn't even accept the planner without seeking

16   approval from Charles George, the CEO of George's.

17        The government interviewed Ms. Fisher five times.

18   They clearly discussed the meetings related to the 2017

19   negotiation.  And not once did they discuss who was really at

20   the meeting.  It didn't fit their narrative.  They chose not to

21   tell you the rest of the story.

22        Robert Lewis.  Mr. Lewis testified regarding KFC 2012

23   negotiations.  He testified that Darrell Keck was his primary

24   contact along with Ric Blake and Charles George, the CEO.

25   Mr. Lewis gave directional guidance to suppliers to get them to

lower their price.  He told you it was common to try and get

the supplier process within a tight range to keep KFC

franchisees from complaining that one was paying higher cost

over the other.  Most importantly, in 2015 he told you George's

had the lowest profit margin.  Remember, this was after the

conspiracy went into overdrive according to the government.

Mr. Ledford, Mr. Ledford testified regarding the KFC

2012 negotiation.  He was a government witness who worked at

the buying arm of KFC, if you will recall, and then later

Chick-fil-A.  And even though he was a government witness and

was on the stand for two days, in their closing argument the

government never mentioned his name.  He was their witness.

But because his testimony was a giant puzzle piece that did not

meet their crystal clear narrative, they simply ignored it and

they are wanting you to do the same.

What about Ledford?  What did he say that the

government would like you to forget?  Ric Blake's supervisors

negotiated the pricing, not Mr. Blake.  He testified that

product shortages are fairly frequent and require

communications directly between the suppliers.  He was not

concerned about suppliers learning each other's period pricing

because it had no impact on bid negotiations.  He was fine with

suppliers covering shortages because it was one less thing he

had to do.

Bids versus prices.  The government has introduced

1    Exhibit 6088 and 6089, which is a spreadsheet containing period

2    pricing for George's and other suppliers from 2009 to 2016.

3    Accompanying this spreadsheet is an internal e-mail from

4    Mr. Blake to his boss, Darrell Keck.  As Mr. Pollack discussed

5    in opening statement, there is a significant difference between

6    bid information for a future contract and current or historical

7    price information that is already set after the contract is in

8    effect.  Mr. Blake tracked price information of historical and

9    current prices.

10         But as Mike Ledford and others have testified

11   throughout this trial, there is nothing wrong with tracking

12   this information.  In fact, Mr. Ledford said he saw no way that

13   current or historical pricing could be used to inform an

14   upcoming decision on a future bid.  Specifically he said -- and

15   you can see Mr. Ledford's transcript and recall his

16   testimony -- he was unconcerned about suppliers knowing each

17   other's period pricing.  He felt it would have no meaningful

18   impact on bid negotiations.

19         Like several of my colleagues, I would also ask you to

20   recall Jury Instruction No. 18.  It's been discussed quite a

21   bit already, but the language is especially important to the

22   facts of this case and to Mr. Blake specifically.  Mere

23   exchanges of information, even regarding price, are not

24   necessarily illegal in the absence of additional evidence that

25   an agreement to engage in unlawful conduct resulted or was part

1    of the information exchange.

2         The government will suggest to you this spreadsheet

3    was used to monitor compliance with an agreement.  The only

4    person who said that was Robert Bryant who has never spoken to

5    Mr. Blake and has no idea what Mr. Blake did with the

6    spreadsheet.  There is no evidence this spreadsheet was used in

7    any way by anyone.  It certainly was not shared to other

8    suppliers.  It was not referenced in a single George's document

9    after it was sent to Darrell Keck, Mr. Blake's supervisor.  And

10   don't you know if it had been sent to anyone and used in any

11   way, the government would have certainly pointed that out.

12        The government has tried and failed to make this topic

13   look like it's improper.  The government says the fact

14   Mr. Blake tracked period pricing is somehow evidence he was

15   part of a conspiracy.  Let's examine that a little further.

16   Mr. Blake tracked period prices starting back in 2009, years

17   before the government contends this conspiracy started.  Does

18   it make sense that tracking period prices is a conspiratorial

19   act when Mr. Blake was doing it years before the government

20   says the conspiracy started?  Mr. Austin was tracking period

21   prices as far back as 1999, a decade earlier.  Plainly the fact

22   that someone was tracking their competitors' period price and

23   past price is not evidence of a conspiracy the government

24   charges.

25        Mr. Blake's spreadsheet is in evidence.  You'll take

1    it back to the jury room.  I encourage you to review it.  Year

2    after year it shows that George's was consistently the cheapest

3    or one of the very cheapest competitors for KFC chicken on the

4    bone, year after year.  If Mr. Blake was using this spreadsheet

5    as an enforcement mechanism to monitor compliance, which, of

6    course, he wasn't, the No. 1 company out of compliance and not

7    abiding by any agreement to keep prices high was his own

8    company, George's.  Please review that document.

9          Rhonda Warble.  You heard from the government witness

10   Mr. Ledford how he felt about period pricing and shorts and

11   covers.  Then you got to hear from Ms. Warble.  She was one of

12   the very few fact witnesses that actually gave you insight into

13   everydays activity of the chicken industry from the supplier

14   side.  She explained so clearly what her job entailed, that she

15   frequently had shorts and cover situations.  She told you she

16   was involved a lot, in a lot of transactions, especially with

17   Claxton.

18         She characterized these short and cover situations as

19   common and frequent.  She told you she dealt externally with

20   Mr. Scott Brady most of the time, but also dealt with

21   Mr. Kantola.  Internally she worked with Mr. Blake and others

22   on the sales team when she needed to buy or sell chicken.

23   These purchase orders necessarily had the price per pound, the

24   case weights, the specs, KFC or Popeye's, and on the face of

25   the very document.  That makes sense, though, doesn't it?  You

1   have to know those things in order to buy and sell chicken.

2        This information was readily available to Mr. Blake

3   from George's invoices and records as they routinely bought and

4   sold chicken to other companies during which they would learn

5   their prices because someone had to pay for the chicken.

6   Ms. Warble testified that she kept a spreadsheet regarding all

7   the purchase orders that she was involved with.  She said she

8   likely would have shared that information with her colleagues

9   in the sales department.  There was nothing secret about this

10  information, and as I discussed, no evidence that this

11  information was used by Mr. Blake in any improper manner.

12        Then there was Brenda Ray.  Ms. Ray, who worked at

13  Pilgrim's, talked to you about an e-mail she sent to her

14  Pilgrim's colleagues.  It was about receiving information from

15  a friendly competitor.  Remember that?  The friendly competitor

16  she said was George's.  But the reason we called her as a

17  witness is because when she came here, she told you she doesn't

18  know Ric Blake.  She has never talked to him.

19        The reason we called her is because not only did she

20  tell you that, she had told the government that in their

21  previous interview.  They knew it before trial started.  Yet

22  the government was perfectly fine putting that e-mail in

23  evidence knowing they were leaving for you the inference that

24  the information was, one, somehow bad or wrong; and two, that

25  it came from our client, Mr. Blake.  You see, there is nobody

1    else in this courtroom from George's, so the inference had to

2    go toward Mr. Blake.  We had to clear that up.  It was wrong.

3            But the government doesn't seem to care about the true

4    facts.  Ms. Call in her closing argument seemed to doubt

5    Ms. Ray's credibility and encouraged you to do the same.

6    That's funny when the government is resting their case brought

7    against these 10 men in large part on the shoulders of Robbie

8    Bryant, an admitted liar.

9            Let's step back and analyze the government's basic

10   theory of the case in relationship to Mr. Blake and George's.

11   George's bids over the alleged conspiracy show they are not

12   aligned with anyone.  In the government's closing, the

13   prosecutor told you that the way the charged conspiracy worked

14   was that salespeople like Mr. Blake, who did not themselves

15   have authority to set bids, would gather information about

16   their competitors' bids and then have to pass that information

17   on to those at their company who set bids so the bids of the

18   competitors would be aligned.

19           The government is correct.  For the government's

20   conspiracy theory to work, Mr. Blake would have had to gather

21   information about what his competitors were bidding and then

22   pass that information on to his superiors who set the prices

23   for George's, Darrell Keck and Charles George.  Even if you

24   believe somehow that Mr. Blake may have shared with competitors

25   what George's was bidding, there is not one single e-mail or

1    text that shows Mr. Blake obtaining any information from

2    competitors about what they were bidding.

3         Next step.  There is not one single e-mail, text,

4    phone call that provides any evidence that Mr. Blake passed on

5    the competitor information he would have learned to Mr. Keck or

6    Mr. George in 15 million documents, ladies and gentlemen.  I

7    promise you if the government had that information, it would be

8    on the forefront before you.

9         If Mr. Blake was in a conspiracy to rig bids and fix

10   prices and he learned competitor information in any of the

11   calls in the government's charts, according to the pattern that

12   the government says you should see clearly, what would you

13   expect?  The next thing you would see is a call from Mr. Blake

14   directly to his superiors to pass that information along or an

15   e-mail or a text.  The government showed you none of this,

16   none.  The very thing the government itself said would have to

17   happen if Mr. Blake was part of this conspiracy never happened.

18        Let's talk briefly about what the facts in the form of

19   numbers show in this case.  F-808.  These are 2012 negotiations

20   for the 2013 contract prices.  If you look in the second

21   column, change from 2012, look at the very bottom.  The average

22   for all suppliers is 1.1 cents.  Look up to George's, 2.4

23   cents, more than two and a half times the average they were

24   lower.  Those bids are not aligned.

25        Next, KFC contract prices for 2014.  Remember back in

1   opening, Mr. Koenig told you they agreed on 15 cents ball park

2   and they wouldn't budge.  Look at George's.  Amount of

3   increase, 10.92 cents.  That's not 15.  That's not aligned.

4       Finally, KFC pricing by year over the entire

5   conspiracy that's been alleged by the government.  This is

6   fascinating.  Look at 2018.  George's price .9455 was lower

7   than when this alleged conspiracy began seven years prior.  If

8   that was a conspiracy to raise prices, they are the worst

9   conspirators ever in the history of the earth.

10      Now I would like to discuss the government's summary

11  charts.  14-2.  The government, had they talked to Ms. Warble,

12  would have known there were several sales of chicken going on

13  between George's and Claxton on this very day.  There are seven

14  calls and we've highlighted them that were not a part of the

15  government's chart.  And this is important.  These calls were

16  between Ms. Warble, Mr. Blake, Mr. Brady, and they all came

17  before the one call between Mr. Blake and Mr. Brady that the

18  government showed you, only that one call.

19      We've added them for you here, but please note this.

20  Ladies and gentlemen, while the government's chart will be

21  going back with you to the jury room, this information won't,

22  so I would urge you to please remember it, jot down a note,

23  something.  You have heard uncontroverted testimony that these

24  individuals were involved in selling chicken on this day.  It

25  is completely reasonable that they would have discussed the

1    company's current chicken prices.

2           On this day George's price was 30 back.  For the

3    government not to include these calls is an unfair

4    representation of what took place on this day.  30 back was

5    George's 2012 contract price.  That's when they were operating

6    under.  28 back was their bid they had already submitted.  They

7    had already submitted the bid for the next year's price at 28

8    back.  On this day with these chicken sales their cost was 30

9    back.  Now, George's then later submitted a bid of 30 back, the

10   next day I believe.  But what's important to know, there is not

11   one shred of evidence, because the government would have shown

12   you, no evidence that Mr. Blake even knew anything about that.

13   Again, the government just doesn't understand the facts or they

14   are deliberately keeping them from you.

15          14-3, again the government is not telling the whole

16   story.  We are showing you the first page of the government's

17   chart.  And you have heard a lot about this.  Mr. Austin, there

18   is a text or an e-mail that says, "I will also be having some

19   other discussions today to get the pulse."  First, I want to

20   point out in Ms. Call's closing, she misstated their own chart.

21   Mr. Austin didn't call Mr. Blake.  It was the other way around.

22   And this is a small, but it's an important point, ladies and

23   gentlemen.

24          To believe the government's narrative, you would have

25   to believe that Mr. Blake actually called Mr. Austin to have

1    his pulse taken.  How would he know how to do that?  Second,

2    look at what our chart shows you.  Who was the first person

3    Mr. Austin called to take the pulse?  Mary Hester from RSCS,

4    not once, but three times.  And then Mr. Austin called Mike

5    Ledford, who we know shared price information with suppliers

6    because he told us he did.

7         Right after talking to Mr. Ledford, Mr. Austin sent

8    the text to Mr. Penn, "I have better information."  It's pretty

9    clear the information came from the customer, but the

10   government left these calls out.  Does this cause you to

11   hesitate and wonder, am I seeing everything I need to see?  Is

12   there more to the story?

13        18-3.  This is the text and it all centers around this

14   one text involving "Need you to tell industry we are going to

15   hold."  You've heard a lot about that.  We don't know the

16   context.  Mr. Blake doesn't, our team doesn't.  We don't know

17   what that means.  But we know what it doesn't mean.  George's

18   did nothing that looks like holding.  Look at the prices that

19   resulted from this negotiation.  George's lowered their price

20   not once, but twice.  The government wants you to infer,

21   remember that all the chicken suppliers were instructed to

22   hold.  Mr. Blake's company, George's, did not hold.

23        7-1.  Again, let's look at what the government showed

24   you and then let's look at the rest of the story.  The

25   government wants you to infer that Mr. Pepper, when he said,

1    "Got a general idea of what George's is doing," that

2    information had to have come from Mr. Blake.  They want you

3    just to accept their narrative.  But first, they have one call

4    out of order, so let's fix it.  The Kronaugue/Pepper call on

5    the government's chart needs to actually be shown where it

6    should be, which is at 1:41.  Look closely at this chart.  It

7    will go back with you.  The calls we are adding and putting in

8    the right place, they won't, so make a note of that.  Look

9    where it is when you put it in its correct location.  It

10   immediately precedes the text series, "Got a general idea." I

11   submit to you that information likely came from Kent Kronaugue,

12   the customer.

13        You've heard testimony from Mike Ledford and others

14   who said they shared general information, got a general idea.

15   This sounds more like it came from Mr. Kronaugue.  And now look

16   what the government left off, another call between

17   Mr. Kronaugue and Mr. Pepper at 5:43, minutes before the second

18   text series.  Here Pepper admits he got additional information

19   from Kronaugue.

20        Ladies and gentlemen, why does the government continue

21   to get things wrong, leave important information off these

22   charts, charts they want you to rely on in order to convict

23   these men?  It's inexcusable.  But also does it make you pause

24   and wonder what other calls did they leave out?  If so, ladies

25   and gentlemen, that in and of itself is reasonable doubt.

1          10-3.  This is the 2014 KFC bid, the most important

2     negotiation to the government.  The government's main focus has

3     been to show you that every defendant was involved in

4     bid-rigging and price-fixing.  The government can list all the

5     calls they want to.  They can suggest and infer all they want

6     to.  But you know what doesn't change the facts?  Their own

7     chart in this case, their own chart tells you exactly how much

8     information Mr. Blake was sharing.  They had Mr. Blake on here

9     and a call that you don't know anything about, but they want

10     you to think it's about sharing information.  But look at the

11     next to the last box on the second page.

12          Mr. Brady is talking about Robert Lewis, who you will

13     recall worked at RSCS and came here to testify.  Mr. Brady

14     says, "Told Bob we would go down .02.  He said someone moved

15     down .04.  It has to be George's or he is bluffing."  After all

16     the working the phones, as the government said, their own chart

17     shows you in black and white that George's price is unknown by

18     the competitors.  They introduced this chart in an attempt to

19     convict our client of bid-rigging and price-fixing and their

20     own evidence disproves it.

21          Finally, 10-1.  We are still in the overdrive bidding

22     event, the main event.  And there is a reason we left this for

23     last.  The government's quest for conviction exceeds all

24     boundaries in this chart.  First, the government initially

25     wanted you to believe their inference that Mr. Austin called

1   Mr. Blake on the George's 1-800 line to discuss bid-rigging and

2   price-fixing.  There is no other reason to put this on the

3   call -- on the chart.  That seems kind of odd, doesn't it,

4   particularly if this call involves secret nefarious

5   conversations.  Not sure you'd want to use the 1-800 number.

6          Side note, though, ladies and gentlemen.  Mr. Austin

7   knows Mr. Blake's cellphone number.  The government's charts

8   and their own phone records prove that.  But you see, this call

9   happened one day before the bids were due, so the government's

10  narrative dictates it had to go in the chart.  But then once

11  again, the facts came out, didn't they?  You heard

12  uncontroverted testimony that Mr. Blake was out of the office

13  on vacation on this very day.  And even after seeing and

14  hearing that evidence, the government kept this call on their

15  chart.  Maybe you would forget?  I don't know.  Don't forget.

16         See, it was on August 18th when you've heard a lot

17  about that Roger did some checking around e-mail.  So see, this

18  call is on August 18th.  It fits their narrative.  Their

19  narrative is more important than the facts of this case.

20  Yesterday Ms. Call could not bring herself to fully acknowledge

21  this uncontroverted fact.  She said to you in her closing, you

22  have seen some evidence Blake may have actually been out of the

23  office, but what's important is that's who Mr. Austin called.

24  Wow.

25         And then Ms. Call suggests to you that it doesn't

1    matter.  It doesn't matter they were wrong.  It doesn't matter

2    they didn't fully investigate or check their facts.  Ms. Call

3    says it doesn't even matter because Mr. Blake -- they would

4    have gotten the information from Mr. Pepper, an earlier call.

5         So let's look at that.  Guess what?  Let's look again

6    at the government's own chart.  Stay with me on this one

7    because it's rich.  To believe the government now because

8    they've had to switch horses because we proved about the

9    vacation, to believe the government now, you have to believe

10   that Pepper and Blake talked on August 15th, three days before.

11   Then Mr. Pepper would have talked to Mr. Little or Mr. Brady.

12   Then Mr. Austin would have talked to one of them and, according

13   to Ms. Call, got the secret bid information.

14        But do you notice one thing?  Tyson's bid isn't on the

15   chart.  So in order to believe this, Mr. Pepper from Tyson

16   shared George's information, but not his own company's.  So if

17   Mr. Pepper is conspiring with others to share George's

18   information, but don't you want -- I'm sorry, if you don't want

19   to perform the evidentiary gymnastics that we just went

20   through, perhaps we should just consider again what calls were

21   left off the chart.

22        THE COURT:  Five minutes, Ms. Johnson.

23        MS. JOHNSON:  Thank you, Your Honor.

24        At 9:03 on the same day, Mr. Austin was checking

25   around.  The first call he made was to Steven Campisano at

1    RSCS.  He could have gotten this information from RSCS.  Just

2    like the previous charge, the government has not provided you

3    with access to all the information.  They just want to control

4    the narrative.  So many questions to ask in just this one

5    chart, so many reasons to pause, to hesitate and wonder.

6         Ladies and gentlemen, the government doesn't get to

7    get things wrong.  They don't get to leave things out.  They

8    don't get to only tell you part of the story, not when they are

9    trying to convict our clients of a serious crime and ruin their

10   lives.  They should be held to the highest standard.  Our laws,

11   our system of justice demands it.  The government has near

12   unlimited resources and unfettered access to information as

13   evidenced by the 15 million documents produced in this case.

14   They don't get to tell you only part of the story.  That's just

15   not right.  It certainly isn't just.  And it should cause you

16   to pause and hesitate and ask, what is going on with this?

17        Throughout this ordeal, I find it so incredible that

18   the government is even prosecuting Mr. Blake because there is

19   no evidence whatsoever he did anything wrong.  But I realize

20   they are not stopping.  They know there is no evidence, and

21   even after that, they are not admitting they made a mistake.

22   They are not admitting they indicted our client before knowing

23   anything about the chicken industry or anything about

24   Mr. Blake's job as a salesman, a job he proudly held for 26

25   years before he retired in August of 2018.

1          And literally the only thing that's between Mr. Blake

2    and the government is you, ladies and gentlemen.  This is why

3    you can't rely on the mere existence of a phone call without

4    proof as to what was said.  But that's literally all the

5    evidence they have, 14 phone calls, for which none of us know

6    what or what was not said.  They are just asking you to trust

7    them and find him guilty.  But you can't convict Mr. Blake on

8    pure speculation and that's just what the government asks you

9    to do.

10          We are nearing the end of the trial, ladies and

11    gentlemen.  After the government speaks to you one more time,

12    you will begin deliberations.  Regarding our client, Mr. Blake,

13    nothing that the government told you they would prove beyond a

14    reasonable doubt have they proven.  There is no clear picture

15    of a conspiracy.  The government's puzzle is missing so many

16    pieces, that frankly it should be thrown away, discarded like

17    the puzzles in our homes when there are missing pieces.  They

18    are no longer usable.  They don't show a complete picture.

19          The government wants you to use that puzzle and just

20    imagine the rest of the pieces are there.  What a distorted

21    picture that would be.  That isn't justice.  That is a failure

22    on the government's part.  That equates to not guilty, period,

23    end of story.

24          What we've experienced during the past six weeks is a

25    win-at-all-cost mentality by the government.  I am asking you,

1    the jury, to do what the government has refused to do, seek the

2    truth.  Our justice system demands it.  Our founding father,

3    John Adams, said, "Facts are stubborn things; and whatever may

4    be our wishes, our inclinations, or the dictates of our

5    passion, they cannot alter the state of facts and evidence."

6           The government has shown you its inclination is to

7    seek convictions at all costs regardless of the facts.  I am

8    asking you on behalf of our client, Mr. Blake, be stubborn in

9    your search for the truth.  Why is Mr. Blake here in this

10   courtroom?  He shouldn't be.  He should be home with his family

11   in Arkansas.  We respectfully ask that you find him not guilty.

12          Thank you.

13          THE COURT:  Thank you, Ms. Johnson.

14          Ladies and gentlemen, let's go ahead and take -- we

15   will go ahead and take 15 minutes, and then after that we will

16   hear the government's rebuttal argument.  So why don't we plan

17   on reconvening five minutes of 3:00.  The jury is excused.

18          Jury excused.

19          We will be in recess.  Thank you.

20      (Recess at 2:39 p.m.)

21      (Reconvened at 2:57 p.m.)

22          THE COURT:  All right.  Let's go ahead and bring the

23   jury back in.

24          (Jury present.)

25          THE COURT:  We will hear the government's rebuttal

1    argument at this time.

2          Mr. Koenig, go ahead.

3          *MR. KOENIG:*  Thank you, Your Honor.

4                         **REBUTTAL ARGUMENT**

5          *MR. KOENIG:*  Ladies and gentlemen, you've heard a lot

6    about puzzles today and we talked about that back in October.

7    And I told you that the evidence in this case would come

8    together like pieces of a puzzle to form a picture, a picture

9    of the 10 defendants in this room from five competing chicken

10   companies scheming behind their customers' backs to raise

11   prices or maintain prices.  And they did it for years and they

12   did it for money.

13         Now you have seen the text messages, the e-mails, the

14   phone records.  You have heard from the witnesses.  You have

15   heard from a conspiracy insider.  And you've seen the pattern,

16   the request by a customer for pricing, and then the defendants

17   working the phones, calling each other, calling other

18   competitors.  Then you see the texts, the e-mails, reporting

19   back, and then the submission of a fixed price or a rigged bid.

20         Yesterday Ms. Call summarized that evidence for you

21   and she showed you how the puzzle pieces fit together and the

22   picture that was formed demonstrating beyond a reasonable doubt

23   that each defendant in this room conspired together to rig bids

24   and to fix prices.  You also patiently listened to 10 defense

25   teams stand up and try to explain all that evidence away.  I am

5112

1    here now to address their efforts.  I only have a limited

2    amount of time to respond to over a day of defense arguments,

3    so I am only going to hit the high points.  But no matter what

4    spin defendants try to put on documents and testimony that I

5    don't have time to address, don't lose sight of the fact that

6    as a general matter, the simplest interpretation of evidence is

7    generally correct.

8         Let's take, for example, the theory of Defendant

9    Penn's not exactly illegal conversation e-mail.  Let's pull up

10   Exhibit 3037, if we could.  Now, Mr. Tubach, he explained you

11   should believe Ms. Ray.  She was just talking about some sort

12   of market intelligence and that there was no conspiracy.  And

13   so that when Defendant Penn forwarded that e-mail to

14   Mr. McGuire and said, "Do not forward, not exactly a legal

15   conversation," it was all just a big misunderstanding about

16   what Ms. Ray was saying.  And since he was wrong, there was no

17   conspiracy.

18        The government's theory is that you should read this

19   e-mail for what it says, for what its words say.  The

20   government's theory is that Ms. Ray's e-mail reported on a

21   conspiracy and defendant knew it because he sent it saying, "Do

22   not forward, not exactly a legal conversation."  He forwarded

23   it to be used, but saying be careful.  The government's theory

24   does not require mental gymnastics.  Mr. Tubach's theory

25   requires you to be Simone Biles.  Just remember the evidence is

1  the evidence.  The picture remains and it's as clear as day.

2          One more thing before I get started.  You heard some

3  colorful attacks on the government's team from I think almost

4  every single defense lawyer.  And I am not going to dignify

5  them with a response other than to share a saying that's in the

6  legal community.  If the law is on your side, pound the law.

7  If the facts are on your side, pound the facts.  And if neither

8  is on your side, pound the table.  That is exactly what's going

9  on here.  The law is clear.  It is illegal to conspire to rig

10  bids and fix prices.

11          It is illegal to share pricing information if there is

12  an agreement to rig bids and fix prices.  And the facts are

13  clear.  Every defendant in this room did just that.  So don't

14  let their theatrics distract you from what is really important,

15  the law and the facts.

16          Let's talk about the law.  Now, you were read a long

17  list of instructions and they are very important.  And you've

18  seen snippets here and there, and I may show you a snippet or

19  two.  But please, especially for the ones we saw snippets,

20  whether I am putting it up or the defense lawyers put it up,

21  read the whole thing.  It's all a big instruction.  You can't

22  just take snippets out of context.

23          And one way that's been done here, you have seen

24  portions of Instruction 18 put up on the screen.  Can we pull

25  that up, second to the last paragraph?  You have heard a lot

1    about that instruction.  It's been paraded around as if it's a

2    free pass to do anything at all.  Call your competitors.  Get

3    the prices.  Use the prices.  Anything goes.  But what gets

4    lost in the shuffle is the agreement piece.

5         The defendants treat the agreement piece, the mutual

6    understanding, like it's some sort of separate and unrelated

7    concept as if the government needs to prove an understanding

8    separate and apart from the numerous calls, from the fact of

9    the sharing over and over, from the evidence of how the bids

10   were -- prices were used.  That's not true.

11        When competitors share prices, especially future bids

12   and prices, you should ask yourself why.  Why would someone

13   share closely held prices with a competitor, information that

14   could be used to steal business?  The answer I submit to you is

15   that they wouldn't unless they have an understanding that the

16   prices and bids would not be used for that purpose, unless they

17   had an understanding that there was a mutual benefit.

18        You may have heard the phrase that a rising tied lifts

19   all boats.  Competitors who would just as soon see each other

20   go out of business would not agree to share prices unless they

21   had an understanding that the information would be used to form

22   some sort of united front or be somehow mutually beneficial to

23   raise prices, to resist decreases.  And you heard Mr. Bryant

24   tell you that.

25        You also heard Mr. Feldberg say exactly right.  Here

1     is what he said.  It was all about leverage.  If the suppliers

2     communicated with each other, they could gain leverage in the

3     negotiation.  He nailed it.  The defendants' actions allowed

4     them to form a united front against their customers.  That's

5     what they did.

6            The very fact of the repeated communications and the

7     exchange of prices and bids without fear of significant

8     undercutting proves the agreement, the mutual understanding.

9     And when prices are higher than they should be, everybody wins

10    except the customer.  They're cheated.  They're left holding

11    the bag.  And that's exactly why we have antitrust laws, to

12    protect competition, to make sure competitors don't prey on

13    their customers, to grab more money.  And you've seen the

14    amounts of money at issue.  It is enormous.  So don't be fooled

15    by the defendants' attempt to use Instruction 18 as a free pass

16    to justify virtually everything they've done.

17           I want to go to another part of Instruction 18.

18    You've been told about -- by a number of defense counsel that

19    when prices aren't identical, you should conclude that there is

20    no price-fixing or bid-rigging.  That is not so.  Let's pull up

21    Instruction 18, the first paragraph.  A price-fixing -- this is

22    the second sentence, if you could highlight that, Ms. Pearce,

23    please.

24           A price-fixing conspiracy is commonly thought of as an

25    agreement to establish the same price; however, prices may be

1    fixed in other ways.  Prices are fixed if the range or level of

2    prices or pricing strategy is agreed upon.  They are fixed

3    because they are agreed on.  Thus, an agreement among

4    competitors to raise or lower a price, to set or avoid certain

5    price promotions, to set a maximum price, to stabilize price,

6    to set a price or price range or to maintain a price is

7    illegal.

8          And you heard Mr. Bryant testify that when he fixed

9    prices with Mar-Jac for US Foods, they deliberately did not

10   submit the increased pricing at the same time or at the exact

11   same level.  And you know why.  He told you, but you would know

12   why anyway.  It's too obvious.  They don't want to get caught.

13   It's common sense.

14         And what about the KFC pricing in the 2014

15   negotiations?  Why weren't those submitted identically?  Well,

16   you have heard that it's a cost-plus margin or cost-plus profit

17   model.  Each supplier has different costs, so their prices are

18   going to be different.  What was similar?  Their price

19   increases.  Let's pull up the "Roger did some checking around"

20   e-mail, Exhibit 1074.  And look at those margins.  They are all

21   very, very similar.  And look at what Tyson -- or I am sorry,

22   Pilgrim's was going to submit based on that.  1616, very

23   similar, not identical, very similar.

24         And on this note, Mr. Gillen just asked why would

25   Tyson fix prices with Pilgrim's if they were going to be behind

1    by 2 cents?  As I said, the cost structure was different.  I

2    think Mr. Gillen went into that plenty.  But it all comes down

3    to this rising tide concept.  You don't have to be exactly the

4    same.  When the tide goes up, all boats are lifted, and that's

5    why they were colluding.

6            Let's next pull up Instruction 17 and let's go to the

7    second to the last paragraph.  Here is what it says.  In

8    determining whether a conspiracy has been proved, you must view

9    the evidence as a whole and not piecemeal.  Can we go to two

10   paragraphs before that?  First full paragraph:  When

11   circumstantial evidence is just as consistent with unilateral

12   action as with concerted action, it does not, standing alone,

13   support an inference of antitrust conspiracy.

14           You've heard me and everybody else talk about the

15   evidence in this case being like a puzzle.  The defendants have

16   been up here arguing about small pieces of the puzzle.  They

17   say, well, it was a text here, an e-mail there, a phone record

18   around the corner, but you didn't see this phone number or this

19   text message.  That's how they characterized the government's

20   case.  They are looking at a single puzzle piece and saying, I

21   can't see the picture, so there must not be one.  That's not

22   how puzzles work.  We all know that.

23           Let's look up Government Exhibit 10-1 at Page 2.

24           May I approach the screen?

25           *THE COURT:*  Yes.

1        MR. KOENIG:  Does this -- can we go to Page 2?  We are

2   not on 10-1 anymore.  My apologies.  I want to do 10-1.  Let's

3   go to the first page, actually, first.  Customer requests,

4   phone call, phone call, phone call.  Next page, phone call,

5   phone call, phone call, phone call.  And then McGuire calls

6   Austin.  Next page.  And then there is this:  Roger did some

7   checking around.

8        Does that strike you as a text here, an e-mail there,

9   a phone call over there?  Not even close.  Summary exhibits are

10  not misleading.  They show you the facts in context and they

11  are compelling.  You can see the pictures, the patterns,

12  requests for pricing, working the phones, texts, e-mails,

13  reporting back, submissions of fixed prices and rigged bids.

14  But if there is any question, go to the underlying exhibits

15  that are cited in the summary exhibits.  Go to the documents

16  the defendants claim we left off.  You will see it changes

17  nothing.  The facts are the facts.

18        Now, I would like to talk about Instructions 30 to 39.

19  These are the defendants' theories of the case.  Let me be

20  100 percent clear.  Those are not coming from the Court.  Those

21  are the defendants' words.  They are theories and theories

22  alone.  You are free to read through them.

23        MS. NIELSEN:  Judge, I am going to object.  Those are

24  the Courts' instructions.

25        THE COURT:  True, but it is the defendants' theory of

1    the case.

2           Go ahead.

3           MR. KOENIG:  You are free to read through them, but

4    they do not pan out.  Here is one example.

5           Can we pull up Exhibit 32, please?

6           Let's look at the last sentence.  This is Defendant

7    Brady's theory of the case dealing with the statute of

8    limitations.  Further, the government has not proven that

9    Mr. Brady committed any conspiratorial act inside the time

10   period allowed by the statute of limitations.  That is not the

11   law and that is not the facts.  A conspirator does not need to

12   commit personally any conspiratorial act in a limitations

13   period.

14          Let's look at Instruction No. 24.  And do you see --

15   yeah.  One or more members of the conspiracy performed some

16   act, not that each defendant personally committed some act, one

17   of the conspirators.  And in any event, you've seen the calls

18   between Defendant Austin and Brady in 2017.  You remember I am

19   going to get the blow-by-blow?  That's within the period.  So

20   Defendant Brady's sentence does not, in his theory of the case,

21   does not pan out.

22          What you should focus on are the law as the Judge

23   instructed and the facts that are in evidence.  We've done so

24   with the law, the instructions.  Now let's dig into the facts a

25   little more.  Can you please pull up -- actually Government

1    Exhibit 10-1 at Page 3?  In the second entry is the "Roger did

2    some checking around" e-mail, one of those several versions

3    that are in evidence.

4         You heard -- one of the things you heard from

5    Mr. Tubach is, honestly, nobody knows where this information

6    came from.  Really.  Defendant Austin knows where they came

7    from.  You saw all the calls, the call to McGuire who is the

8    author of that e-mail.  And it's not just Defendant Austin who

9    knows where those prices came from.  Every single defendant in

10   this room knows where they came from.  And most importantly,

11   you all know where those prices came from.  It couldn't have

12   been RSCS or KFC's doing.  The prices -- the bids weren't even

13   due yet, so they didn't even have them.

14        But in any event, you heard from Bob Lewis, who was

15   the RSCS negotiator in 2014.  He said the bids were

16   confidential and it would be morally wrong to share

17   competitors' bids, so they certainly weren't from him.

18        You also heard from Mike Ledford, 2012, same position.

19   He gave directional guidance.  Let's pull up 1544.  The

20   defendants made a lot about how Mr. Ledford would give prices

21   to four decimal places.  If we can highlight right under the

22   fresh and blow it up.  One other one was .0010 higher than us.

23   We think that was Marshall Durbin.  The next one was .0054

24   below us.  That's four decimal places, but that's not giving

25   prices.  And what Mr. Ledford said is that he would do this

1    directional stuff as a negotiating tactic and he did not

2    identify who, so they didn't come from him.

3            You heard Mr. Campbell, a defense witness, say there

4    were no industry sources for future bids and prices of this

5    sort.  That means the only place those prices could have come

6    from is competitors, full stop.  And if the defendants' theory

7    of the case were correct and unsubmitted bids and future prices

8    could have come from somewhere other than competitors, why call

9    each other?  Why the texts?  Why the e-mails?  Why the

10   patterns?  Why utter the words "Roger did some checking

11   around?"  Did he check around by going down to the library and

12   reading a trade publication?  Of course not.  He checked around

13   by calling competitors.  And the defense wants you to suspend,

14   disbelieve, suspend your common sense.  You know exactly where

15   those prices came from.  Everyone in that room knows where

16   those prices came from.

17           There has been a lot of talk about independent

18   decisions.  It's just a price exchange and then independent

19   decisions.  They exchanged their prices, future prices, and

20   without any mutual understanding that their competitors would

21   undercut them, they made independent decisions.  If that were

22   true, nobody could ever agree to anything.  The final decision

23   is not whether to agree.  The agreement, the mutual

24   understanding is already there.  The final decision is whether

25   to act on the agreement, whether to click send on your bid.

1    That's an independent decision, but that doesn't mean there

2    wasn't an agreement.

3            Once the defendants had their common strategy and game

4    plan in place, they just went back to implement, probably some

5    independent decisions there.  But think about Government

6    Exhibit 1074, Jason McGuire said "Considering we wanted to be

7    the leader," right below all those prices.  Is that independent

8    decision making?  Not hardly.  The fact is the defendants are

9    trying to sell you a bridge they don't own.  It wasn't an

10   innocent exchange of future bids and prices.  It was a

11   necessary first step to carry out the defendants' agreement and

12   mutual understanding.

13           And Mr. Bryant told you it was not a mere price

14   exchange.  He said there was an agreement, a mutual

15   understanding, a two-way street.  There was no fear of being

16   undercut.  But you don't need any of that.  You have it in the

17   documents, the patterns, and in your common sense.  It was a

18   conspiracy.

19           You've heard a lot about current and future pricing.

20   The defendants would have you believe there is a meaningful

21   difference.  Mr. Bryant told you that pricing, current pricing

22   could be used to rig bids and fix prices.  In KFC, 2017, they

23   were trying to resist the price decreases.  I want you to think

24   about that.  When competitors were resisting prices or price

25   decreases, it meant they were trying to keep their prices as

1    close to current prices as possible, so knowing what other

2    competitors' current prices are was very valuable.

3         What the defense counsel told you about the prices in

4    Mr. Bryant's notebook that appear at Government Exhibit 1919,

5    those are the prices he received from Defendant Austin during

6    the 2017 negotiations.  That's what his understanding was.  If

7    he was mistaken, fine.  What's the difference?  I just

8    explained how current pricing -- and Mr. Bryant explained more

9    importantly that current prices are very important when you are

10   resisting decreases.

11        And in spite of what the defendants have told you

12   about Mr. Ledford, he was just okay with it, everything going

13   back and forth.  You heard from Sara Fisher, Melissa Hoyt,

14   Telly Smith, Bob Lewis, Joe Brink, exchanging current prices

15   was a definite no-no.  Don't fall for the argument that the

16   customers' opinions aren't relevant.  Their views are highly

17   relevant as to how current prices could be misused and why they

18   didn't want suppliers to share them.

19        We have talked a lot about supply and demand in this

20   case.  Look, the government doesn't dispute that there was a

21   shortage of small birds.  Some price increase may have been

22   warranted, but a crisis that would justify a historic price

23   increase?  You've been told that the government didn't bother

24   to learn about the chicken industry in its investigation,

25   although that's not true.  The government called many chicken

1   industry veterans as witnesses to testify to the conspiracy's

2   imposition of historically high prices.  Bob Lewis, Ms. Henry

3   reminded you on cross that he was a legend, worked in the

4   industry for decades.

5           Mr. Bryant started as a janitor, worked his way up to

6   director of sales.  Joe Brink of Pollo Tropical, Telly Smith

7   worked at Golden Corral for 31 years.  They are knowledgeable,

8   seasoned and incredibly experienced in purchasing chicken.

9   What did those veterans in the chicken industry tell you about

10  prices in the 2014 negotiation?  Mr. Lewis said that he was

11  shocked and surprised about the magnitude that the competitors

12  proposed.  He called the price increases the highest he ever

13  recalled seeing in his long career.  And while he expected some

14  increase, he never expected the sky-high prices that the

15  competitors proposed.

16          Mr. Bryant testified that he thought the price

17  increase was warranted, maybe a nickel, but he thought 20 cents

18  was out of proportion and risked losing volume.  Mr. Brink,

19  Mr. Smith, they actually thought the prices were going to go

20  lower.  The details of their perspectives varied, but one thing

21  is true from each of their testimonies that you heard.  The

22  historic price increases that these competitors imposed in 2014

23  was unexpected.  It was out of the blue for some of the most

24  knowledgeable people in the industry.

25          If KFC should have expected the massive price increase

1    based on supply and demand, why the e-mail between Mr. McGuire

2    and Mr. Austin saying that they crapped their pants?  The fact

3    is the suppliers were playing on their customers' fears.  They

4    blitzed their customers.  You heard that term.  It was Chicken

5    Little saying the sky is falling.  Customers had chicken in the

6    name, Kentucky Fried Chicken, Church's Chicken, Chick-fil-A.

7    Mr. Tubach said this was Defcon 5 because if they run out of

8    chicken, it's all over.  That's the fear they played on them.

9         The defendants couldn't let a good crisis go to waste

10   and they didn't.  If it was supply and demand, again, why all

11   the calls?  Why the texts?  Why the patterns?  Coincidence?

12   Happenstance?  You would need to ignore all the evidence of

13   coordination you have seen to believe that.

14        I would like to also address defendants' claim that

15   the government has been playing hide the ball by introducing

16   documents without sponsoring witnesses.  First of all, did you

17   really want more witnesses?  How long have we been here?  But

18   ask yourself why more witnesses when the documents speak for

19   themselves, when the defendants' own statements speak for

20   themselves?  The only reason the defendants wanted more

21   witnesses was to muddy the waters like they did with Ms. Ray

22   and lead you to believe that the documents don't really mean

23   what they say.  The fact is the documents, the defendants and

24   the co-conspirators' own words are far more valuable than any

25   witness testimony.

1          Let's talk about the small bird/big bird thing for a

2     second.  You've heard defendants say that RSCS wanted to give

3     this big bird profitability bump.  There is scant evidence of

4     that in the record and it doesn't make any sense.  Why would

5     they want to give higher prices?  But just like supply and

6     demand, the defendants here took advantage of a market

7     condition and not just individually.

8          Look at Claxton.  They have one plant and no intention

9     of converting to big bird.  Defendant Fries, Ms. Call showed

10    you this the other day, yesterday, Defendant Fries said to the

11    Claxton board during the negotiation, he said that big birds

12    were a fad.  No intention to switch.  He and Defendant Brady

13    had no business adding big bird profitability to their margin.

14    They were doing it because they knew their competitors were

15    doing the same thing and they could get away with it.

16         Let's talk about the issue of caving.  The defendants

17    have argued that there is no collusion because sometimes in the

18    negotiations one competitor will cave a little.  If you start

19    here and go up here and then one caves a little bit, you are

20    still a heck of a lot farther up than you were before.  And

21    that doesn't excuse anything.

22         Look at Instruction 18.  It is no defense that some or

23    all of the defendants actually competed with each other in some

24    manner or that they did not conspire to eliminate all

25    competition.

1          Defendants would have you believe otherwise.  If there

2     was just a smidge of competition, game over they say.  Not

3     true.  But even so, caving was expected, but it didn't mean the

4     competitor was out of the conspiracy.  We can look at

5     Government Exhibit 4-1, 1:16 p.m. and 1:17.  We know Mar-Jac,

6     their biggest supplier, is .02 higher and they are not going to

7     negotiate.  Then Penn says, good deal.  Last time they did cave

8     a cent or two.  Next page.  Mar-Jac is a solid competitor

9     because they weren't going to cave.  And by the way, that is

10    the end of the text string.  We didn't hide anything.  It's

11    been there the whole time.

12         Let's contrast that with the Wal-Mart/King Soopers

13    conduct where Tyson had decided actually to compete.  And by

14    the way, Mr. Gillen, you heard him say that Brian Roberts was

15    not in the deli part of the business or the grocery store part

16    of the business, so it's not him that was deciding not to

17    compete -- or deciding to compete.  How did Defendants Lovette

18    and Penn react?  Ms. Prewitt said if there was an agreement,

19    you would think somebody would have complained that Tyson

20    wasn't playing nice in the sandbox, the collusion sandbox.

21    That is exactly what happened.

22         If you look at Government Exhibit 2005, Defendant Penn

23    was so angry that Tyson was competing, that he said the

24    customers need to feel the pain.  The customers need to feel

25    the pain because Pilgrim's competitor, Tyson, decided to

5128

1    actually compete hard and win business from Pilgrim's.  He then

2    suggested to Defendant Lovette, they are not going to fill

3    their shortages, so they can start making decisions

4    commensurate with a profitable venture and not a philanthropic

5    organization.

6         Why wouldn't they love for Tyson to go belly up?

7    Shouldn't they be ecstatic that Tyson is not making money?  The

8    fact is they wanted Tyson to stay in the fold.  They wanted

9    them to be more profitable and to raise their price to benefit

10   Pilgrim's.  Now, how did -- what did Defendant Lovette say in

11   response?  Does he say, We need to compete harder.  We need to

12   work harder to win that business back.  We have got to lower

13   our prices.  That would be the competitive thing to do, compete

14   harder.  Respond to the competition.

15        Instead, he agreed with Penn.  He said, We should not

16   help them one micron.  Make Tyson and their customers suffer.

17   Make Tyson -- and their customer suffers, that Tyson learns its

18   lesson and stops pricing chicken so competitively.  Tyson

19   wasn't playing nice this one time in the collusion sandbox, and

20   that's what tells you there was an agreement, a mutual

21   understanding.  That's why Defendants Lovette and Penn were so

22   irate.

23        And if there is any lingering doubt, look at

24   Government Exhibit 2000.  TSN, this is Defendant Penn to

25   Defendant Lovette, TSN took this strategy of not worrying about

1    what the competition was doing and it led to the unraveling of

2    a competitive advantage.  Have to keep our enemies close and

3    ensure that we are not zigging when the competition is

4    successfully zagging.  Keep our enemies, the competitors close,

5    so that we are not zigging when they're zagging.

6         In other words, they wanted to be on the same page as

7    their competitor.  And it didn't happen this time and they got

8    really mad.  The fact is the defense lawyers' arguments just

9    don't hold water.  The evidence is the evidence, and the

10   picture it shows is that all 10 defendants in this courtroom

11   colluded, conspired, cheated behind their customers' back for

12   years all to get more money.

13        *THE COURT:*  Five minutes, Mr. Koenig.

14        *MR. KOENIG:*  Again, the defendants try to look at

15   individual puzzle pieces and claim that because you can't see

16   the whole picture from that piece, there is no picture to see.

17   Use your common sense.  View the puzzle pieces together.  The

18   picture is unmistakable and the conclusion you should reach is

19   that all 10 defendants are guilty as charged.

20        Thank you.

21        *THE COURT:*  Thank you, Mr. Koenig.

22        Ladies and gentlemen, let me give you some information

23   about your deliberations because in just a minute I am going to

24   excuse you to begin deliberating.  First of all, a court

25   security officer is going to be posted outside of the door of

1    the jury room.  That is not to keep you in, okay?  You can take

2    a break anytime you want.  The court security officer's job is

3    to make sure you are not accidentally or inadvertently

4    interrupted by someone who may not know you are back there

5    deliberating.  The court security officer will, however,

6    collect your telephones while you're in deliberating.  That

7    doesn't mean you can't make a phone call.  Anytime you want,

8    you can suspend your deliberation.  People can go out, make

9    phone calls, okay?

10          You will be able -- we don't have too much time left

11   today, but just assuming that you are deliberating next week,

12   and that is you can basically set your schedule.  When you want

13   to take a break, you can take a break.  However, today and

14   subsequent days I will bring you back in at 5:00 o'clock if you

15   haven't reached a verdict and excuse you at that time.  So

16   today, for instance, I will bring you back in at 5:00 o'clock

17   and dismiss you and give you a few more admonitions.

18          Keep in mind, ladies and gentlemen, as I mentioned to

19   you yesterday and before that there is no time limit on your

20   deliberations.  You can have as much time as you need to reach

21   a verdict.  You do have to make sure that everyone is present

22   in order to deliberate.  So, for instance, if one person were

23   to excuse him or herself, you need to stop deliberating, wait

24   until that person is back, so that all 12 of you are together

25   in order to deliberate.

 1          Also, ladies and gentlemen, even though I am about

 2   ready to let that admonition against you deliberating or talk

 3   amongst yourselves, all those other ones still apply.  You

 4   can't look up any information through outside sources.  You

 5   can't get information.  You can't ask anyone else to do that

 6   type of thing.  You have to basically use the exhibits and what

 7   you recall of the testimony as your sources of information in

 8   this case.

 9          When you reach a verdict, the foreperson should be the

10   one who completes the verdict form.  You haven't seen the

11   verdict form, but Ms. Grimm will send it back to you.  I will

12   just send you back one copy of the form.  If for some reason

13   you accidentally write on it or make a mistake or something,

14   just send a note out to and we'll send a new blank verdict form

15   back to you.  But the foreperson should retain the verdict

16   form, assuming you reach a verdict, and then that verdict form

17   will be presented to the court security officer in court who

18   will then hand it up to me and then I will go ahead and read

19   the verdict.

20          The exhibits will be brought in to you shortly.  Most

21   of them will be in paper form, but as you heard during the

22   course of the trial, some of them are electronic too.  So there

23   will be some thumb drives that have tabs on them that will

24   indicate which exhibits are in the thumb drive.  And as I think

25   you have noticed, you've got to -- I think we call it an

1  evidence cart back in the jury room that you can use to plug

2  the thumb drive into and view the electronic exhibits.

3        Don't, ladies and gentlemen, bring in your own devices

4  to do that even if you have something that's a lot better.  You

5  may definitely have something a lot better, but don't bring

6  those in.  The evidence cart that you have got back there we

7  know is clean.  It doesn't have any extraneous information on

8  it, so you can use that.  If for some reason it's not working

9  or you are having difficulty with it, once again, just send out

10  a note through the court security officer and we will endeavor

11  to correct that problem or give you some additional guidance on

12  how it works or whatever.

13        All right.  And then at this time, ladies and

14  gentlemen, I will ask that the court security officers would

15  please come forward and Ms. Grimm will administer an oath to

16  them.

17        (Court security officers were sworn.)

18        *COURT SECURITY OFFICER:*  Yes, I do.

19        *COURT SECURITY OFFICER:*  Yes, I do.

20        *THE COURT:*  All right.  Ladies and gentlemen, one

21  other thing.  You will recall way back on I think the first day

22  I indicated that two of you were alternates.  You will also

23  recall that one of you became sick, Ms. Ramsey, and as a

24  result, one of the alternates, the first alternate has taken

25  her place.  But there is still one alternate, and Ms. Perez,

 1    that is you as it turns out.

 2            Ms. Perez, do you happen to have anything back in the

 3    jury room?

 4            *JUROR:*  Like my backpack and stuff.

 5            *THE COURT:*  So I am going to excuse all of you, the

 6    regular jurors to deliberate.  But Ms. Perez, if you could get

 7    your belongings and then can you come back into the courtroom.

 8    I have a few additional admonitions to you, okay?

 9            *JUROR:*  Okay.

10            *THE COURT:*  Okay, great.  Ladies and gentlemen, at

11    this time the jury excused to deliberate.  One other thing,

12    ladies and gentlemen, and that is you can -- if you leave your

13    note -- your note pads, if you took notes, and also your

14    instructions, leave those in the jury room overnight.  They

15    won't be disturbed.  The cleaning people won't even be going

16    back there.  So you can leave them there, but don't take them

17    home.

18            The jury is excused.

19            (Jury excused to deliberate.)

20            Mr. Tubach, was there a concern over the alternate?

21            *MR. TUBACH:*  I didn't hear you, but that was the

22    alternate.

23            *THE COURT:*  I predicted there could be some agitation,

24    so I am glad you came through.

25            (Alternate juror present.)

1          Ms. Perez, it's always hard and especially in a long

2   and complicated trial like this to tell the alternate that all

3   of the sudden he or she is the alternate because -- and believe

4   me, I really appreciate all of your time and attention.  It has

5   I know been a big sacrifice, so I really appreciate your

6   service.

7          If we didn't have alternates, you could see what would

8   happen.  If one of the jurors got sick and we didn't have a

9   certain number of jurors, we would have to declare a mistrial

10  or something.  So it's vital to have alternates and I really

11  appreciate your service in this case.

12         I would like to ask a favor of you and that is the

13  following.  There is at least a theoretic possibility that one

14  of the 12 could between now and some other time become ill; and

15  if so, there is a possibility of substituting in the alternate

16  at that time.  They would have to start their deliberations all

17  over again.  But I am wondering whether you would be willing,

18  Ms. Perez, to follow those same admonitions that you have been

19  following throughout the trial until such time as we let you

20  know that a verdict has been reached or that we are done with

21  the case.  Would you be willing to do that?

22         *JUROR:*  Yes.

23         *THE COURT:*  And you said yes, right?

24         *JUROR:*  Yes.

25         *THE COURT:*  Thank you very much, Ms. Perez.  I really

1    appreciate your doing that.  What we will do is as soon as we

2    know the answer to those questions like a verdict, we will

3    contact you right away and let you know that you don't have to

4    follow the admonitions any longer, all right?

5              JUROR:  Okay.

6              THE COURT:  Great.  Thank you so much.  Ms. Perez, at

7    this time I will have Ms. Grimm let you out, but then you are

8    excused and we'll contact you then, all right?  Thank you very

9    much.

10             I want to say one other thing, Ms. Perez.  We didn't

11   single you out.  Before the trial I just picked a seat number.

12   And whoever was sitting in that seat was the second alternate

13   and it happened to be you.  So it was just the luck of the

14   draw, all right?  Thank you, Ms. Perez.

15             (Alternate juror excused.)

16             Let us now -- does anyone want to bring up anything at

17   this time?  Otherwise, I was going to take a look at those

18   exhibit lists and we will go over those exhibits.

19             Mr. Pollack?

20             MR. POLLACK:  I just had a housekeeping question.

21   Given that the court reporter did not record the instructions

22   as they were given, I am wondering the Court instruction

23   packet, will that be filed through ECF or marked as an exhibit?

24   How will that be made part of the record?

25             COURT DEPUTY CLERK:  It will be filed.

1      THE COURT:  It will be filed, but we will have to keep

2   one caveat in place and that is that one interlineated change

3   that was made to Instruction -- I can't remember -- 31 maybe it

4   was.  That's the only -- yes, it will be.

5      MR. POLLACK:  Thank you.

6      THE COURT:  So let's take a look at the two

7   spreadsheets that Ms. Grimm passed out to you this morning.

8   One of them is marked Government's Admitted Exhibits Final.

9   Let me -- if you haven't figured it out, under the column

10  Other/Comments, there is the word LI.  That means a limiting

11  instruction.  And the page reference is to -- is that the

12  unofficial transcript, Ms. Grimm?

13     COURT DEPUTY CLERK:  It's unofficial.

14     THE COURT:  It's to the unofficial transcript where

15  the limiting instruction was read to the jury, but it also

16  indicates redactions that were made to some of them.  Some of

17  the exhibits were noted as being withdrawn.  And I should also

18  note that Excel, which is the spreadsheet that was -- or the

19  program used to create this spreadsheet, treats any exhibit

20  with a dash and sorts it strangely.  That's why those are all

21  lumped into the back.

22         You will notice that for many of the government's

23  summaries, they are listed twice, one as a demonstrative and

24  one without that indication.  Of course, as we know, they were

25  first admitted as a demonstrative, but after that they were

1    admitted.  Ms. Grimm has told me that other than those which

2    were admitted as more than demonstrative exhibits, the other

3    ones that were admitted solely as demonstratives have been

4    removed from the exhibit books.  But if anyone wants to

5    double-check on that, you should do so right after we finish

6    talking because, as far as I know, according to Ms. Grimm, you

7    had an opportunity to check those books and they contain only

8    admitted exhibits and all of the admitted exhibits.  So I

9    believe that the notebooks and also the thumb drives which have

10   been checked by counsel are ready to go.

11        Any disagreement on either of those two points, that

12   you had an opportunity to check the exhibit notebooks that will

13   go back to the jury and also an opportunity to double-check the

14   thumb drive?

15        MR. TORZILLI:  No disagreement from the government,

16   Your Honor.

17        THE COURT:  And no defendants have indicated

18   disagreement either.  So now let's focus on the spreadsheet

19   marked Government's Admitted Exhibits Final.  Anyone have any

20   corrections to that particular list?  No one has indicated any

21   objections or corrections to that.

22        MR. TORZILLI:  Can I just -- and I can come up to the

23   podium just to confirm a point because it does say at the title

24   of it is Government Exhibit -- Admitted Exhibits Final.  As you

25   said a moment ago, Your Honor, there are some entries, I think,

5138

1    for the government exhibits, it's only Government Exhibit 9168

2    which is withdrawn.  So just to be confirming a point and to be

3    clear, although it was admitted, it was withdrawn and it is not

4    in the binders that are prepared to go back with the jury.

5           THE COURT:  Yeah, that's a good point.  If it was

6    withdrawn, it's been withdrawn.  It's not an exhibit and is not

7    part of the notebook.

8           I am going to mark the Government's Exhibits Admitted

9    Final, that spreadsheet, Court Exhibit 2 and make that part of

10   the record.

11          Let's take a look at the next spreadsheet.  This is

12   marked Defendants' Admitted Exhibits Final.  Have both sides

13   had an opportunity to review that list; and if so, any

14   corrections that need to be made to that?

15          Mr. Torzilli?

16          MR. TORZILLI:  Thank you, Your Honor.  We've had an

17   opportunity to review it.  I just want to make one point just

18   for clarification.  There are on the defendants' flash drive

19   that has the native files of exhibits, there are nine exhibits,

20   and I will read those off in a second, that are on that flash

21   drive, but those were exhibits that were admitted in paper form

22   only and not as natives, but the government does not object to

23   them being sent back to the jury in native form.  And those

24   exhibits also appear in paper form in the binder.

25          THE COURT:  And the tag on the thumb drive indicates

1  which exhibits appear on the thumb drive correctly; is that

2  right?

3       *COURT DEPUTY CLERK:*  No, there is not a listing of

4  exhibits on this.

5       *THE COURT:*  We will have to make sure that the thumb

6  drives bear a tag that tells the jury what's on the thumb

7  drive, so that will somehow need to be corrected.  Even if we

8  just handwrite it in, that's fine to do that.  Mr. Torzilli,

9  would you like to take a look at that?  Why don't we,

10 Ms. Grimm, do you mind showing that to him and then we can show

11 it to anyone else that is curious, but we should make sure the

12 jury knows what's on it.

13      *MR. TORZILLI:*  It will need to be written on -- it

14 looks like there is a tag on there, but the actual exhibits,

15 the letter number combination needs to be handwritten in there

16 perhaps.

17      *THE COURT:*  Okay.  So let me get some feedback on

18 Mr. Torzilli's point about those apparent nine exhibits that

19 were admitted in paper, but apparently are on the thumb drive

20 as natives as well, which he, meaning the government, has no

21 objection to.  Was that right?  Or is it there are more than

22 nine, but there are in addition to the rest of them nine

23 exhibits that need that criteria?

24      *MR. TORZILLI:*  The latter, Your Honor.  I think there

25 might be 20 files on there.  I might be mistaken about that,

1    but there are nine.  And if you don't mind, Your Honor,

2    indulging me just for a second, I can read those off so the

3    record is clear.  The nine that I am talking about as being

4    admitted in paper form only and not in native that we don't

5    object going to the jury in native are A-115, A-613, C-482,

6    C- --

7            THE COURT:  I am sorry, hold on one second.  What was

8    it?

9            MR. TORZILLI:  C-482.

10           THE COURT:  Okay.

11           MR. TORZILLI:  C-883, D-531, D-589, G-601.

12           THE COURT:  Hold on one second.  What was that one

13   again?

14           MR. TORZILLI:  G-601, G-606 and I-243.

15           THE COURT:  Okay.  So you may want to -- if anyone

16   wants to double-check those to figure that out or confirm or do

17   what you need to do, that's fine.  Anyone want to do that?

18           MR. TUBACH:  Your Honor, we have done so and it's

19   fine, thank you.

20           THE COURT:  Anyone else want the opportunity to

21   double-check it?  All right.  Then I think given the fact that

22   the record has been made on it, we're fine.  I just wanted to

23   make sure everyone had the chance to double-check on that.  Any

24   objection to my marking the Defendants' Admitted Exhibits Final

25   as Court Exhibit 3, assuming that there are no corrections to

1   it?

2           Mr. Feldberg?

3           *MR. FELDBERG:*  Your Honor, we are just looking again

4   at the list.  We thought we saw this on it before, but I am not

5   seeing D-839 on the defendants' exhibit list and maybe I am

6   missing it.  It is?  Okay.  My apologies.  We were looking at

7   it electronically and we must have the wrong version.  Thank

8   you.

9           *THE COURT:*  Mr. Fagg, go ahead.

10          *MR. FAGG:*  There may be just a flipping of exhibits

11  here inadvertently with respect to a limiting instruction.  I

12  believe that the Court identified B, as in boy, 963 as having a

13  limiting instruction and did not list a limiting instruction

14  for B-936 and believe that those should be flipped.  I believe,

15  Your Honor, that B-936 has a limiting instruction from

16  November 10th from at least on the unofficial transcript it's

17  at 126, Page 126, Lines 4 through 9, and then on the same day

18  Exhibit B-963 was admitted without a limiting instruction.

19          *THE COURT:*  Yes, I show that B-936 does have a

20  limiting instruction.  It was not admitted for the truth of the

21  matter, but only to identify the parties to the communication.

22  Does that match your --

23          *MR. FAGG:*  Yes, Your Honor.

24          *THE COURT:*  So what you are saying is that that should

25  be the limiting instruction for B-936, but not for 963.

5142

1          MR. FAGG:  Correct.

2          THE COURT:  Okay.  I think that that is -- at least

3    for 963 that would be correct.  Ms. Grimm, do you have a chance

4    to double-check that transcript?

5          COURT DEPUTY CLERK:  Let me check it.

6          MR. TUBACH:  Your Honor, while we are waiting, I

7    believe there may be two limiting instructions in the

8    government list that we had just identified that hadn't been

9    included.  We are trying to check on the pages where those

10   would have been given.

11         THE COURT:  And, of course, for the jury's purposes

12   limiting instructions don't really matter.  They have to

13   remember them, but it is good for an appellate record.  And as

14   long as those are being noted, we might as well try and make

15   sure the list is accurate, so I appreciate it.

16         MR. TUBACH:  I believe it's Exhibits 563 and 1882.

17         THE COURT:  What was the second one?

18         MR. TUBACH:  1882.

19         THE COURT:  Why don't we do this.  Why don't we go

20   ahead and send -- I will -- I think we will go into recess.  We

21   will have Ms. Grimm take the exhibits and the thumb drives back

22   and then after the jury is excused, assuming that the attorneys

23   have had a chance to double-check on those things, we can

24   correct the lists, all right?

25         All right.  So I will have Ms. Grimm take the thumb

1    drives and the exhibit books back.  We will be in recess.  Keep

2    in mind, ladies and gentlemen, that we will bring the jury back

3    in at 5:00 to dismiss the jury until Monday, all right?  The

4    Court will be in recess.  Thank you.

5         (Recess at 4:05 p.m.)

6         (Reconvened at 5:02 p.m.)

7         THE COURT:  Anything to take up before we bring the

8    jury back in?

9         MR. FELDBERG:  I just had a question and it may be

10   that it's already been dealt with.  Is it the Court's

11   preference that counsel be in the courtroom at all times while

12   the jury is deliberating?

13        THE COURT:  No.  Here is the thing.  I would like you

14   to be within 15 minutes away.  And for purposes of a verdict,

15   that would include the clients as well, obviously, but I don't

16   know how long -- how far away people would be.  But make sure

17   Ms. Grimm has a good working telephone number for every

18   member -- for one member of the team.

19        MR. KORNFELD:  We figured that out.

20        THE COURT:  Yes, right, because who knows, we may get

21   a bunch of questions or whatever.

22        MR. FELDBERG:  Thank you, Your Honor.

23        THE COURT:  Another thing is I am going to tell the

24   jury they can decide themselves when to come in on Monday, as

25   long as it's between 8:00 and 9:00, in those ranges, but we

1    will dismiss them at 5:00 o'clock every day.

2          *MR. POLLACK:*  Is it your practice, Your Honor, to come

3    into the courtroom each morning when they start?

4          *THE COURT:*  No, you won't even know that.  You won't

5    be present for that.  They will come and start deliberating,

6    but we will always see them at 5:00.

7          *MR. BYRNE:*  That's my question.  So we are supposed to

8    come back every day at 5:00 to dismiss them?  If there are just

9    questions, clients don't have to come if they don't want to?

10          *THE COURT:*  I think they should be here.  I think they

11    should be here because the question could be important,

12    obviously.

13          *MR. BYRNE:*  Usually they are.

14          *THE COURT:*  Yeah, right.

15          Okay.  Let's bring the jury in.  Thank you.  Please be

16    seated.

17          (Jury present.)

18          Ladies and gentlemen, I am going to go ahead and

19    dismiss you for the day.  Of course, you are not deliberating

20    tomorrow, so you will be coming in on Monday.  I am going to

21    allow you to choose a little bit of a range when to come in.

22    So anytime between 8:00 and 9:00, so.  If you want to come in

23    more at 9:00, beat some traffic or 8:00, beat some traffic,

24    whatever you want to do, you can choose.

25          You won't be coming in here initially, so you should

1     assemble in the jury room.  Once you are all assembled, then

2     you can commence your deliberation.  As I mentioned to you when

3     I excused you to start deliberating, I will bring you back each

4     day at 5:00 o'clock just like we are doing now to dismiss you.

5            On Monday the Court will provide lunch for you.  This

6     is a tradition that we do while a jury is deliberating, so it

7     will be provided for you back in the jury room.  This does not

8     mean that you have to actually eat that lunch.  You may take a

9     look at it and decide I can do better, but on the other hand,

10    you can at least see.  I am not sure what it is, but maybe

11    Ms. Grimm knows a little more about that.  But we will do that

12    for you.  And it doesn't mean that -- we are not suggesting

13    that you work through lunch either.  You can decide that for

14    yourself as well, but we will do that on Monday and each

15    successive day too, okay?  During the next three days follow

16    all those admonitions that I mentioned to you before, and I

17    hope you have a good weekend.

18           All right.  The jury is excused.

19           (Jury excused.)

20           So it's my understanding that between when we last

21    went into recess and now there has been an opportunity to make

22    some corrections to the exhibit list; is that right?  Ms. Grimm

23    is not here, so I am relying upon -- Mr. Torzilli?

24           *MR. TORZILLI:*  That is correct.

25           *THE COURT:*  Okay.  Has everyone had an opportunity to

1      take a look, then, at the corrected lists?  Okay.  Any

2      objections to the Court then marking the government's as Court

3      Exhibit 2 and the defendants' admitted exhibits as Court

4      Exhibit 3 given the fact that they appear to be a correct

5      reflection of everything that has been admitted?

6              *MR. TORZILLI:*  No objection from the government, Your

7      Honor.

8              *THE COURT:*  All right.  And you don't have to stand

9      up, but if you all take silence, you can stand on that.

10             We have a first note from the jury.

11             Okay.  Here is the question:  No Excel on evidence

12     computer.  Can't view some documents.

13             Can we get Post Its?

14             I think that's a separate question.  So my suggestion

15     will be this.  Are they waiting for the answer?  They are not

16     waiting, okay.  My suggestion is that we do this.  As to the

17     first question, once again, let me read that to you, No Excel

18     on evidence computer.  Can't view some documents," is that I

19     have IT load Excel onto the machine.

20             And to the second question:  Can we get Post Its?  The

21     answer would be:  Yes.  What size?

22             I won't give them a choice of color, but we will give

23     them a choice of size.  Okay.  And I will just handwrite that

24     out.  I will give you a copy of my note back to them as I will

25     with any note that I send back to them.  And I'll give it to

1    Ms. Grimm to provide to the jury on Monday morning, all right?

2           Anything else that we should discuss today before we

3    recess?

4           All right.  We will be in recess, then, until either a

5    question or until 5:00 p.m. on Monday, all right?

6           Court will be in recess.

7       (Recess at 5:10 p.m.)

8                            INDEX

9    CLOSING ARGUMENT

10     By Ms. Prewitt                                    4964

11     By Ms. Henry                                      4988

12     By Mr. Byrne                                      5008

13     By Ms. Nielsen                                    5038

14     By Mr. Gillen                                     5059

15     By Ms. Johnson                                    5083

16     Rebuttal Argument By Mr. Koenig                   5111

17                    REPORTER'S CERTIFICATE

18      I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.  Dated

20   at Denver, Colorado, this 21st day of February, 2022.

21

22                         S/Janet M. Coppock

23

24

25