**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. **JAYSON JEFFREY PENN,**
2. **MIKELL REEVE FRIES,**
3. **SCOTT JAMES BRADY,**
4. **ROGER BORN AUSTIN,**
8. **WILLIAM WADE LOVETTE,**

     Defendants.

---

**UNITED STATES' OPPOSITION TO DEFENDANTS' RULE 29
MOTIONS FOR JUDGMENT OF ACQUITTAL**

---

The government respectfully submits this opposition to the defendants' motions for judgment of acquittal pursuant to Fed. R. Crim. P. 29 (ECF 1207, 1210, 1212, 1214, 1215).[1] As the Court found with respect to the evidence presented in the first trial, ECF 932, when viewed in the light most favorable to the government, there is ample evidence for a rational jury to find beyond a reasonable doubt that each defendant knowingly joined a conspiracy to fix prices and rig bids for broiler chicken products sold

---

[1] Since the defendants filed their motions for judgment of acquittal, the government moved to dismiss with prejudice Count One of the Superseding Indictment against defendants Blake, Kantola, Little, Mulrenin, and Roberts, and the Court dismissed those charges with prejudice. ECF 1238, 1239. Accordingly, the motions by those defendants (ECF 1205, 1208, 1209, 1211, and 1213) are moot, and the government responds only to the motions by the remaining defendants.

in the United States. The defendants' motions, instead of identifying genuine gaps in proof as Rule 29 requires, once again misleadingly characterize the evidence and the law. The government has presented more than sufficient evidence from which a reasonable jury could find each defendant guilty. *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982) (holding that a court may "enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.").

## LEGAL STANDARD

A court evaluating a Rule 29 motion must determine if, "viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004); *United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir. 1971). Direct and circumstantial evidence, along with "the reasonable inferences to be drawn therefrom," must be viewed in the government's favor. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128 (1986). A "criminal conviction may be sustained on wholly circumstantial evidence." *Id.* at 1529. Rule 29 does not allow the weighing of conflicting evidence, witness credibility, or whether evidence was improperly admitted. *Delgado-Uribe*, 363 F.3d at 1081; *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994).

If the "defendants offer evidence," as they did in this second trial, the court "reviews the entire record"—again "in the light most favorable to the government"—in order to make its determination. *United States v. Schneider*, No. CR 07-10234-MLB,

2010 WL 11586742, at *1 (D. Kan. June 30, 2010) (citing *United States v. Delgado-Uribe*, 363 F.3d at 1083); and *United States v. Swanson*, 360 F.3d 1155, 1162 (10th Cir. 2004)). At this stage, a court enters a "judgment of acquittal only if the evidence that [the] defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *White*, 673 F.2d at 301; *see also Delgado-Uribe*, 363 F.3d at 1081.

## ELEMENTS OF THE OFFENSE

A *per se* violation of Section 1 of the Sherman Act for price fixing[2] comprises three elements: (1) a conspiracy existed between two or more competitors to fix prices; (2) the defendants knowingly joined the conspiracy; and (3) the conspiracy was in the flow of or substantially affected interstate commerce. ECF 932 (Order denying defendants' motions for judgment of acquittal in the first trial) at 4-5; ECF 1232 at 19. ECF 553 (Order denying defendants' motions to dismiss) at 4; 15 U.S.C. § 1; *United States v. Metro. Enters., Inc*., 728 F.2d 444, 449-51 (10th Cir. 1984).

As to the first element, the "essence of conspiracy is agreement," *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) (citation omitted), which the government can show by providing evidence that co-conspirators "tacitly came to a mutual understanding." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990). As this Court explained in its denial of the defendants' motions under Rule

---

[2] "Price fixing" as referenced in this brief includes agreements among competitors to fix, maintain, stabilize, and raise prices and other price-related terms, as well as to rig bids. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940); *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) ("[B]id rigging is a form of horizontal price fixing").

29 after the first trial, "[n]o formal agreement or words or writing is necessary—there are no magic words that demonstrate a conspiracy," ECF 932 at 5; the agreement can be proven by a "course of dealings." *Suntar Roofing, Inc.*, 897 F.2d at 474.

With regard to the second element, the government must prove each defendant "knew at least the essential objectives of the conspiracy," *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008). The government need not prove that each defendant knew of the "full extent of the conspiracy," *Metro. Enters.*, 728 F.2d at 451. Each defendant merely needs to share a "common purpose or design with his alleged coconspirators," *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (internal quotation omitted). For example, in a price-fixing conspiracy, a common purpose or design may be "to circumvent price competition and enhance profitability." *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 871 (10th Cir. 1989) (citation omitted).

For the third element, the government must show "the conspiracy charged in the indictment either occurred in the flow of interstate commerce or had a substantial effect on interstate commerce." ECF 932 at 5.

## ARGUMENT

In the re-trial, the government presented ample evidence for a reasonable jury to find each element of a Sherman Act Section 1 violation beyond a reasonable doubt. Two conspiracy insiders, Mr. Carl Pepper and Mr. Robert Bryant (salespersons from Tyson Foods and Pilgrim's Pride Corporation, respectively), testified at trial about their participation—and participation by co-conspirators—in the charged price-fixing conspiracy. The documentary evidence corroborates their testimony and further shows

each defendant's knowing and active participation.

I. **Substantial Evidence Established the Existence of a *Per Se* Unlawful Price-Fixing Conspiracy**

To avoid repetition, this section (Part I) focuses on Mr. Pepper's and Mr. Bryant's direct testimony of the existence of an overarching conspiracy, and the following section (Part II) focuses on each defendant's individual involvement.[3] The evidence in both sections considered together demonstrate that the government satisfied its burden with respect to the first element—*i.e.*, to show that a price-fixing conspiracy existed.

A. **Carl Pepper Testified About His Direct Coordination with Competitors on Bid Strategies**

Mr. Carl Pepper, a national sales account manager at Tyson during the conspiracy period (Real-time Transcript ("R. Tr.") Mar. 2, 2022 at 201:1-2), provided direct evidence of the conspiracy. He testified about several instances in which defendants and co-conspirators coordinated their offers to customers in response to pricing or price-related requests rather making independent decisions. For example, Mr. Pepper described several calls with current and former defendants at competing chicken suppliers in the summer of 2014 during negotiations for the KFC contract that went into effect in 2015. *See* R. Tr. Mar. 2, 2022 at 244:2-245:4; R. Tr. Mar. 3, 2022 at 38:8-39:16, 84:6-20. Specifically, Mr. Pepper described how after he learned of the

---

[3] Even absent the testimony of conspirator insider Carl Pepper, this Court found after the first trial that "the evidence [was] sufficient for a reasonable jury to find that the charged conspiracy existed and that each defendant knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it." ECF 932 at 29. Mr. Pepper's testimony regarding his and the defendants' participation in the conspiracy has only further strengthened the government's case in the re-trial.

substantial pricing increase Tyson was considering, he became concerned that Tyson

may lose business to a competitor. R. Tr. Mar. 2, 2022 at 37:9-17. Mr. Pepper described

how his supervisor then directed him to reach out to his competitors regarding the

proposed price increases. *Id.* at 38:9-11. Mr. Pepper then described several calls in

which he spoke with defendant Brady (Claxton), as well as co-conspirators Little

(Pilgrim's) and Blake (George's) and "asked them if there would be an understanding

between us that…there would be a substantial pricing increase." During these calls, Mr.

Pepper not only divulged Tyson's own plans for a pricing increase, but also confirmed

that these competitors were planning to ask for a substantial price increase together

with Tyson. R. Tr. Mar. 2, 2022 at 250:18-22. Mr. Pepper "trusted" these co-conspirators

to give him accurate information on anticipated pricing increases. R. Tr. Mar. 2, 2022 at

244:20-245:4.

Most importantly, Mr. Pepper described conversations with defendant Brady in

which Claxton agreed to ask for a substantial pricing increase along with Tyson. *See* R.

Tr. Mar. 2, 2022 at 256:18-257:12 ("And towards the very end of them [the calls with

Claxton] we were still talking about that specific contract and that Claxton was also

going to agree to have a substantial pricing increase."). Mr. Pepper had similar

conversations with former defendants Little and Blake, in which Pilgrim's and George's,

respectively, agreed to a substantial pricing increase. *Id.* at 255:4-24 ("The conversation

with Jimmie Little was was [sic] Pilgrim's going -- do we have basically . . . an

agreement that Pilgrim's was going to have a substantial pricing increase like we were,

Tyson was. . . . My understanding towards the last conversation was that Pilgrim's was

going to have a substantial pricing increase just like Tyson was going to have a substantial pricing increase."); R. Tr. Mar. 3, 2022 at 43:10-44:8 ("The later part of the calls is basically are you going to do a substantial pricing increase and an understanding that they [George's] were going to do a substantial pricing increase along with Tyson Foods.").[4] As was his practice, Mr. Pepper reported the information he learned to his co-conspirators and supervisors, Mr. Mulrenin and Mr. Roberts. R. Tr. Mar. 3, 2022 at 156:11-21, 86:24-87:16.[5]

**B. Robert Bryant Testified About Conspirators' Coordination with Competitors on Bid Pricing and Strategy**

Likewise, Mr. Robert Bryant, divisional planner and later Pilgrim's fresh food unit's sales director, provided direct testimony of the conspiracy. He testified about Pilgrim's general practice of coordinating prices for fast food customers. Mr. Bryant also specifically described this coordination as it related to the 2014 and 2017 KFC contract negotiations. Mr. Bryant testified to multiple occasions where defendant Roger Austin engaged in a "two-way street" of (1) seeking competitors bids and negotiating strategies in order to finalize Pilgrim's bids; and (2) conveying Pilgrim's bids and negotiating

---

[4] Mr. Pepper's testimony on his phone calls with each specific defendant is described in more detail below.

[5] Mr. Pepper also testified to other collusive events, such as coordination among competitors with respect to Popeyes September 2015 big-box promotion (R. Tr. Mar. 3, 2022 at 112:18-114:17, 115:7-14), Church's request for pricing of dark meat (R. Tr. Mar. 3, 2022 at 129:24-130:9, 130:24-131:5), Popeyes' contract for 2017 for a price reduction and contract duration (R. Tr. Mar. 3, 2022 at 141:15-16, 142:9-16, 143:13-144:9, 146:5-19, 147:16-21, 152:20-25, 153:8-13), cost to provide Church's with frozen chicken (R. Tr. Mar. 3, 2022 at 161:16-19, 162:2-163:4, 163:24-164:8), and Church's quality-assurance costs (R. Tr. Mar. 3, 2022 at 170:8-9, 171:1-16, 173:3-17, 175:15-21, 176:22-177:4, 177:9-11).

strategies in order to ensure competitors priced in line with Pilgrim's. *See, e.g.,* R. Tr. Mar. 9, 2022 at 43:12-17. Importantly, Mr. Bryant described the purpose of these communications between competitors for fast-food business was one of two things, depending on the market at the time: "[t]he purpose was to either increase prices or limit a decrease in price together, you know, amongst the competitors." R. Tr. Mar. 8, 2022 at 163:24-164:18. He described multiple instances of information sharing as a means to that end, stating that he was aware of no other purpose for such exchanges. *Id.* at 171:3-7.[6]

In addition to describing the conspiratorial purpose of communications between competitors, Mr. Bryant refuted the notion that Pilgrim's and its competitors determined their bids independently. Mr. Bryant described (1) how he used competitors bid information to price in line, meaning within a range, with Pilgrim's competition; and (2) how he expected Pilgrim's competitors to do the same in return. *Id.* at 166:14-19 (explaining that if Pilgrim's and its competitors priced exactly the same, "it would be very obvious to the customer that we were discussing pricing information amongst the competitors"). *See also id.* at 169 3-11; R. Tr. Mar. 9, 2022 at 15:18-25. He described a "mutual trust or collaboration" between competitors for fast-food business that they would act together in their "mutual best interest" rather than to compete. R. Tr. Mar. 8, 2022 at 170:4-12; R. Tr. Mar. 9, 2022 at 43:23-44:5.

---

[6] Mr. Bryant also described other means and methods of conduct. For example, he described a general "cooperation" with competitors in the QSR group led by defendant Austin, including by helping competitors cover shortages. R. Tr. Mar. 10, 022 at 75:11-16. He contrasted this cooperation with the "hard nosed competition" utilized at times in other business segments. *Id. at* 75:15-17.

Simply put, Mr. Bryant trusted Pilgrim's competitors to bid in accordance with what they told defendant Austin and, in turn, trusted the competitors not to use Pilgrim's pricing information shared by defendant Austin to undercut Pilgrim's. R. Tr. Mar. 8, 2022 at 170:4-12 ("Q. Now, earlier you testified that for Wal-Mart business you didn't want your bid prices shared. So how do you reconcile that with what you are saying now knowing that they were shared in QSR channel? A. The QSR channel was just – was different than the other segments, so it was this mutual trust or collaboration that happened within that – that – the group of competitors. Q. So who was the mutual trust between? A. The very competitors."); *id.* at 170:13-19 ("Q. Okay. So did you have a concern that Pilgrim's competitors would use your bids for QSR business to undercut Pilgrim's? [objection overruled] A. No."); R. Tr. Mar. 9, 2022 at 43:12-17.[7]  The

---

[7] Customer witnesses made clear that the information exchange was itself improper, as it led to less competitive bids. Pete Suerken, former Executive Vice President at Restaurant Supply Chain Solutions ("RSCS"), explained that RSCS proceeded with a blind bidding process because it would defeat the purpose of a competitive negotiation if all the competitors talked to one another regarding their offers. *See* R. Tr. Mar. 1, 2022 at 250:15-19; R. Tr. Mar. 2, 2022 at 38:2-39:20. Sara Fisher, Senior Director of Distribution and former Director of Food Procurement at RSCS, explained that RSCS did not ask suppliers to share that information with each other during the 2017 negotiations. *See* R. Tr. Mar. 7, 2022 at 277:14-21; R. Tr. Mar. 8, 2022 7:12-16. Robert Lewis, a former buyer at KFC and RSCS, similarly testified that he expected everything in the negotiation process to be kept confidential between RSCS and the supplier, and that he never asked the defendants or any of the competing chicken suppliers to have emails, phone calls or text messages about their pricing proposals or negotiations with RSCS. R. Tr. Mar. 14, 2022 at 30:12-19, 32:18-33:5. Mike Ledford of RSCS also testified that RSCS used a closed system bidding process so no one could see competing suppliers' information in order to meet RSCS's objectives of a competitive bidding process. *See* R. Tr. Feb. 28, 2022 at 170:17-171:1. Joseph Brink of Pollo Tropical testified that Pollo Tropical asked suppliers to submit their bids individually in order to get the best pricing from each supplier. R. Tr. Mar. 10, 2022 at 86:4-8, 88:16-20.

reciprocal was true: Pilgrim's competitors trusted that their bids and pricing was being used for a common purpose—to fix prices. And they followed through: the competitors held up their ends of the bargain time and time again, sharing pricing in an effort to work together in their mutual best interest. As Mr. Bryant testified, "had we used that information to undercut or use it to try to take volume, then that information would have stopped." R. Tr. Mar. 8, 2022 at 166:11-13. Mr. Bryant's testimony alone established the course of dealing that demonstrates the conspiracy's existence.

### C. Documentary Evidence Corroborates Mr. Pepper and Mr. Bryant's Testimony

As discussed, Mr. Pepper and Mr. Bryant's testimony alone is sufficient to establish the existence of the conspiracy. *See, e.g.*, ECF 932 at 6 (Order denying Rule 29 motions) ("The testimony of government witness Robbie Bryant . . . is sufficient to support a finding beyond a reasonable doubt that a conspiracy existed between [competitors] to rig bids and fix prices."). However, documents reflecting a repeated course of dealing corroborate their testimony. The documentary evidence shows a course of dealing where, year after year, defendants Austin, Brady, and other co-conspirators shared their bids and bidding strategy with an understanding that the information would be used to work together, not to compete. *See*, e.g. GX 1427 (2012: defendant Austin telling defendant Brady "to raise our prices"); GX 1734 (2013: defendant Brady reporting that "Roger [Austin] is at .30 back and not moving); GX 1238 (2014: defendant Brady reporting that defendant Austin had told him Pilgrims would not come down on their KFC bid and that "Koch is not moving either"); GX 1856 (2017: conspirator Tim Stiller directing defendant Austin to "tell the industry we are going to

hold").

The defendants' briefs recycle assertions that there is no agreement and that their conduct reflects only information exchange. *See* ECF 1207 (Brady) at 12-14; ECF 1210 (Austin) at 3-4; ECF 1212 (Fries) at 9-10, 12-14; ECF 1214 (Penn) at 6-7; ECF 1215 (Lovette) at 7, 11-13. These failed claims miss the mark and misrepresent the evidence. As this Court explained in rejecting the same argument the first time, the "indictment does not allege that, because defendants shared pricing information, they participated in a conspiracy. Rather, it states that the defendants agreed to rig prices and, to that end, shared pricing information." ECF 553 at 8-9. In other words, it "is illegal if the information sharing is 'part of the sum of the acts which are relied upon to effectuate the conspiracy.'" *Id.* at 9 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946)). Based on all the evidence in the record, including the documentary evidence described in Part II, a rational jury could easily conclude that the defendants in fact shared prices in furtherance of a common unlawful goal: to raise prices, stabilize prices, or prevent price decreases.

Indeed, both witnesses detailed several instances in which competing chicken suppliers succeeded in raising prices or limiting price decrease through their conspiratorial communications. The success provides further evidence that the goal of the conspiracy was not to undercut competitors, but instead to suppress or eliminate competition.

### D. Summary of Mr. Bryant and Mr. Pepper's Testimony Relating to Specific Negotiations Affected by the Conspiracy

*KFC 2014*: Specifically, Mr. Bryant and Mr. Pepper both testified how they and their conspirators worked together in 2014 to ensure they would obtain significant price increases to quick-service restaurants ("QSRs" or fast-food companies). Both witnesses learned of a plan in the summer of 2014 to increase prices to QSRs at their respective companies. R. Tr. Mar. 8, 2022 at 190:18-191:11; R. Tr. Mar. 3, 2022 at 250:23-251:5. Mr. Pepper's testimony regarding these negotiations is further described *supra* in Section I(A).

Mr. Bryant testified that Pilgrim's planned to "blitz" its customers by visiting several customers in a short period and delivering the message that, given the decrease in supply and profitability of small birds, Pilgrim's needed to increase prices. R. Tr. Mar. 8, 2022 at 190:18-191:11. Mr. Bryant recalled that the "blitz" initially referred to the QSR group and later morphed into all customers. *Id.* at 191:13-16. During one such meeting, Mr. McGuire, referencing the PowerPoint presentation shown to customers, instructed defendant Roger Austin to "put this out to the industry," with the term industry referring to Pilgrim's competitors. *Id.* at 194:2-9, 195:9-11, 196:14-21.

At the time of the customer blitz, Mr. Bryant did not know the precise magnitude of Pilgrim's anticipated price increase, but he later learned that specifically for KFC, Pilgrim's was seeking a 15-20 cents per pound increase—a much greater increase than he had ever seen in his career—and as a result, Mr. Bryant was concerned that Pilgrim's would lose business. *Id.* at 202:7-203:2.

After defendant Austin submitted Pilgrim's first-round bid to KFC proposing a

12

nearly .18-cent price increase, GX 1105, Mr. Bryant's concerns were assuaged by an email, GX 1066, from Mr. McGuire where defendant Austin had confirmed that Pilgrim's competitors sought similar price increases, to KFC's surprise. R. Tr. Mar. 8, 2022 at 210:16-214:7. As Mr. Bryant testified, his understanding that competitors were following through with seeking historic price increases along with Pilgrim's gave Mr. Bryant and others "reassurance that we didn't have to concede on price." *Id.* at 215:24-216:11. And indeed, at a KFC customer meeting days after the initial bid submission, defendant Austin delivered the message to KFC that there would be no negotiation on price. *Id.* at 216:22-217:2.

Around the time of this meeting, Mr. Bryant overheard defendant Austin confirm Pilgrim's negotiating position with two competitors: defendant Scott Brady of Claxton Poultry and co-conspirator Bill Kantola of Koch Foods. *Id.* at 217:20-218:21. On one such call, defendant Austin said words to the effect of, "I just told them the price is the price. I just need to know how many loads you want at that price." *Id.* at 218:1-5. Mr. Bryant understood these conversations to refer to Pilgrim's refusal to negotiate with KFC—that is, defendant Austin reported to Brady and Kantola that Pilgrim's was not budging on price. Mr. Bryant understood that defendant Austin refused to negotiate with KFC because he knew that Pilgrim's competitors were raising prices together with Pilgrim's. *Id.* at 219:11-15. And at the end of the day, as Mr. Bryant testified, Pilgrim's and its competitors for KFC did in fact receive significant price increases in 2014. *Id.* at 240:3-21.

*__KFC 2017__*: Mr. Bryant testified about how the chicken suppliers for KFC again coordinated—this time to limit price decreases —when the price increases obtained in 2014 came up for renegotiation. R. Tr. Mar. 9, 2022 at 21:3-12 ("Q. And what was your purpose, Mr. Bryant, in asking Defendant Austin to get competitors' bid information? A. To limit the amount of price decrease."). Prior to Pilgrim's initial pre-bid meeting, on January 17, defendant Austin reported to Mr. Bryant that Claxton would meet with RSCS "Thursday and i will get a blow by blow Friday morning. Koch meets with them in Friday." GX 1882. Mr. Bryant understood defendant Austin to mean that he would speak with defendant Brady and co-conspirator Bill Kantola after they met with RSCS and have a conversation about the contents of their meetings. R. Tr. Mar. 8, 2022 at 247:8-23.

When Mr. Bryant and others from Pilgrim's later met with KFC and RSCS, they did not disclose that they had already learned what occurred at Claxton's and Koch's meetings. *Id.* at 253:8-16. Mr. Bryant explained that such information from the competition was important because "[i]t would give us an indication of what KFC had told our competitors and what their position was with our competitors and if it differed from the position that they took with Pilgrim's." *Id.* at 248:11-14. Mr. Bryant later instructed defendant Austin to figure out where Pilgrim's needed to be on pricing to fall within a range amongst its competitors. Mr. Bryant asked "Roger to help [him] determine where [their] bid submission to KFC needed to be to place [them] second highest in price amongst [their] competitors." *Id.* at 249:11-13.

Based on Mr. Bryant's testimony, a jury hardly needs to draw much of an

inference to conclude that a conspiracy existed.  This evidence, combined with the many statements and actions of the defendants described in Part II, makes clear that there was a conspiracy among competing broiler chicken suppliers.[8]

## II.   Each Defendant Knowingly Joined the Price-Fixing Conspiracy

_Roger Austin_. Defendant Austin was Vice President of Fresh Foodservice at Pilgrim's during the conspiracy period. GX 1882. His knowing membership in the conspiracy is established by documentary evidence and Mr. Bryant's testimony.

At the outset, the jury saw direct evidence of defendant Austin asking competitors to raise prices to be in line with Pilgrim's. Immediately before defendant Austin submitted Pilgrim's bid to KFC for the 2013 calendar year, he reached out to defendant Brady and not only shared Pilgrim's pricing, but also expressly told defendant Brady to increase Claxton's prices to Pilgrim's level. As defendant Brady reported to defendant Fries, Austin "said to raise our [Claxton's] prices, on wings he is market and market plus .10." GX 15 (GX 1427). Defendant Brady planned to let defendant Austin know that Claxton was "trying" to increase its prices. _Id_. Viewed in the light most

---

[8] Moreover, despite assertions to the contrary in their supplemental briefing (_see_ ECF 1246, 1247, 1248, 1249, 1250), evidence introduced in the defendants' case does not and cannot defeat the overwhelming evidence of the conspiracy's existence. Each of the defendants' witnesses either lacked first-hand knowledge of collusive communications or could not account for any of them. For example, the defendants' expert witness, Edward Snyder, did not (and could not) opine on collusive communications among competitors. Rather, Professor Snyder's work was focused on the extent to which there were provable damages from the charged conspiracy in the form of higher prices. Another defense witness, Greg Finch, likewise was uninvolved in many of the collusive communications put before him and hence could not opine on the states of mind of his co-conspirators. When the entire record (including the defendants' evidence) is viewed in the light most favorable to the government, as it must be at this stage, the defendants' motions should be rejected.

favorable to the government, that exchange shows an explicit agreement—at defendant Austin's behest—among competitors to raise and maintain prices against a common customer. Similarly, when KFC requested in 2013 that its suppliers provide a reduced-weight product, defendant Brady reported, he "talked with roger [Austin] about the KFC sizes and he [defendant Austin] *is in agreement with us*." GX 1615 (emphasis added).

Defendant Austin's knowledge of the conspiracy's goals—to suppress or eliminate competition—is corroborated by Mr. Bryant's testimony. Mr. Bryant testified that defendant Austin would "use his network of contacts to…give [Bryant] guidance on what to do on price." R. Tr. Mar. 9, 2022 at 15:3-17; *see also* GX 1919.[9]

Mr. Bryant testified of an instance in which he, too, directly asked defendant Austin to "see if he could find out from our competitors where their pricing was going to be and help [Bryant] determine where [Pilgrim's] pricing needed to be before we submitted the bid." R. Tr. Mar. 8, 2022 at 249:4-18. Specifically, Mr. Bryant said to defendant Austin in January 2017 that he "would like to know where we need to be #2 in price [in bidding for a customer] if you can find out." GX 1882. Defendant Austin then made phone calls to competitors, (GX 18 (GX 1959)), and gave Mr. Bryant each company's price on both eight-piece and dark meat during a phone conversation. R. Tr. Mar. 9, 2022 at 9:2-10:12. Mr. Bryant used that information "to limit the amount of price

---

[9] Any claim that GX 1919 contains current pricing rather than future bids is irrelevant because Mr. Bryant testified that the conspiracy's goal in 2017 was to limit price decreases, and that other suppliers, including defendant Brady from Claxton and Tyson, had submitted bids for the next calendar year that was the same as their current pricing. R. Tr. Mar. 10, 2022 at 62:8-63-11, 65:8-69-4; GX-1930 (Tyson); F-852 (Brady for Claxton).

decrease" to Pilgrim's and its competitors, with the understanding that competitors would act in concert with Pilgrim's. *Id*. at 21:3-12.

The record also includes numerous calls among defendant Austin and his competitors, including calls mere hours before key bids were submitted. Cast in the light most favorable to the government, it is clear those calls were made to increase or hold firm on prices alongside Pilgrim's competitors. For example, as part of the "blitz" to raise prices in 2014, defendant Austin reached out directly to defendant Brady and co-conspirator Ric Blake in the days before initial bids were due to KFC on August 19, 2014. *See* GX 10 (GX 1236); GX 9264 (Austin's contact list associating George's number with co-conspirator Mr. Blake).

Defendant Austin also received competitor information from his subordinate, co-conspirator Jimmie Little during these negotiations. With regard to KFC, Mr. Pepper testified to sharing Tyson's plan to seek a substantial pricing increase with Mr. Little. The tolls corroborate Mr. Pepper's conversations with defendant Little on August 15th (the day Tyson was set to receive feedback on its initial bid, GX 1175) and 18th (the day before Pilgrim's first round bid was due). GX 1233, 1235. Defendant Little also spoke to coconspirator Kantola in this same window. GX 1235. Shortly thereafter, Little connected with his supervisor, defendant Austin, who managed the KFC accounts. GX 10 (GX 1235).

This chain of calls was not presented in isolation, rather, the government presented evidence of two very significant emails to defendant Penn directly following the calls that occurred between competitors and a final call wherein defendant Austin

reported the information he learned to his conspirator Mr. McGuire. The first email of Mr. McGuire's—mere minutes after his August 18th call with defendant Austin—attached a spreadsheet showing several competitors' current and "new" margins. Those "new" margins represented the profit lines competitors intended to (and did) submit in their bids the very next day—information that would not be shared with competitors in a truly competitive environment. GX 10 (GX 1035, 1036-1). The second email—the "Roger did some checking around" email, GX 10 (GX 9744)—lays out competitors' anticipated price increases (including for Claxton and George's), which defendant Penn later reviewed with defendant Lovette. GX 10 (GX 1074); *see also* GX 1035, 1036. These emails reporting the competitors' future price increases confirm the goal of collecting that information was not to undercut competitors, but instead for Pilgrim's to increase prices together with its competitors: As Mr. McGuire put it, the conspirators used the competitors proposed price increase to place themselves as " the leader" with their bid. GX 10 (GX 9744).

Defendant Austin's commitment to achieving a historic price increase for Pilgrim's along with its competitors did not stop after the initial round of bidding—the evidence showed he diligently kept up with his competitors to ensure all followed through on the agreement. On August 20th, after the initial bids were submitted, defendant Austin confirmed that the competitions pricing increased substantially along with Pilgrim's. GX 1066. Just two later on August 22nd, defendant Austin again synced up with defendants Kantola and Brady by informing them he was holding strong against KFC's desire to negotiate below Pilgrim's first-round bid. Specifically, defendant Austin

told his competitors that he took a "the price is the price" stance. R. Tr. Mar. 8, 2022 at 218:1-5. Lest a whole week pass without checking in with his conspirators, again days later on August 26th defendant Austin confirmed with defendant Brady (Claxton) that he would continue to hold strong in the industry's (Pilgrim's and its competitors) joint undertaking to secure historic price increases. As defendant Brady reported to defendant Fries: "I talked to roger [Austin] about KFC and Greeley [Pilgrim's headquarters] told him [Austin] not to come down on price. He called bob [Lewis] today and told him." GX 11 (GX 1238). Finally, once more as negotiations with KFC came to a close, on September 3, 2014, defendant Austin reassured his competitor, defendant Brady, that Pilgrim's would not budge. GX 12 (GX 1238).

Defendant Austin engaged regularly in that course of dealing—*i.e.*, getting the "pulse" from competitors during active negotiations in order to hold firm or increase Pilgrim's prices together with its competition. *See Am. Tobacco Co.*, 328 U.S. at 809-10 (Sherman Act conspiracy "may be found in a course of dealings or other circumstances"); *Suntar Roofing, Inc*., 897 F.2d at 474 (Sherman Act violation may be disclosed by members' "course of dealings."); *Beachner Const. Co.*, 729 F.2d 1278, 1283 (10th Cir. 1984) ("It is enough that the participating parties have a tacit understanding based upon a long course of conduct.").

For example, on November 28, 2012, defendant Austin told defendant Penn that RSCS was resisting Pilgrim's pricing and explained he would be "having some other discussions today to get the pulse." GX 1544. And he followed through: defendant Austin had calls that same day with his competitors, including defendant Brady, co-

conspirators Ric Blake and Bill Kantola, and Eric Oare (then at Marshall Durbin, another competitor). GX 16 (GX 1428, 1442). Defendant Austin reported what he learned—his competitors' upcoming 8-piece quotes—to conspirator Mr. Scott Tucker, who reported it up to defendant Penn, who in turn reported up to defendant Lovette. GX 16 (GX 1546, 1522, 1523).

As another example, in 2017, defendant Austin said that he planned to "do some scouting tomorrow and see what the pulse is" regarding whether suppliers planned to charge KFC for a request to switch to using no human antibiotics. GX 18 (GX 1849). Defendant Austin then spoke on the phone with defendant Brady, and co-conspirators Messrs. Blake, Kantola, and Tench. GX 18 (GX 1961).

This course of dealing between defendant Austin and his competitors year after year establishes the purpose of the conspiracy was to fix prices and rig bids. Sharing bids, pricing strategy, and negotiating positions was a means to that end. Not only did Mr. Bryant testify in detail about defendant Austin's communications with competitors and how the information was used to raise and maintain prices at Pilgrim's. R. Tr. Mar. 8, 2022 at 163:24-164:18. But defendant Austin's course of dealing demonstrates the conspiratorial purpose: year after year defendant Austin shared and received prices and price strategies, including on multiple occasions telling his competitors when Pilgrim's was "not moving" on price, with an understanding that the information would be used to work together on prices, and not to compete.

From this and substantial additional evidence in the record, a rational jury could

conclude defendant Austin knowingly joined the unlawful price-fixing conspiracy.[10]

_Bill Lovette and Jayson Penn_. Defendants Penn and Lovette were high-level executives of Pilgrim's: defendant Penn was Executive Vice President for most of the conspiracy period, and he reported to defendant Lovette, the CEO. _See_ R. Tr. Mar. 8, 2022 at 179:4-181:17; GX 3028. Viewed in the light most favorable to the government, the evidence demonstrates that both defendants knew of the goals of the conspiracy and voluntarily became part of it.

That defendant Penn knew of the essential objectives of the conspiracy is clear from the documentary evidence. In August 2012, defendant Penn received an email from a subordinate at Pilgrim's, who said she "received a call today from a friendly competitor telling [her] it's all over the market that Pilgrim's is taking contract pricing up." GX 3037. The "friendly competitor" _thanked_ Pilgrim's "for taking the lead" and assured

---

[10] Despite clear evidence of collusive activity, defendant Austin attempts to argue in his supplemental motion for acquittal that each supplier engaged in independent decision making. ECF 1246. Defendant Austin points first to spreadsheets he introduced, which show that Pilgrim's price for the KFC contract was derived from pricing team forecasts and other processes, _id_. at 4-5—but, does not mention that Pilgrim's margin figures in those models were never entered until in the mist of the coordination on August 15th and August 18th that are evidenced by the phone records and documents. GX 10, 1035, 1036, 1074. Those documents show coordination of the price increase overall as well as the margin figure specifically (the largest driver in the price increases that year). The cost changes Austin cites are simply a red herring. Regardless, even if true, such facts do not negate the government's theory and supporting evidence: _i.e._, that pricing decisions were ultimately made or influenced by illegal coordination with competitors. Defendant Austin also points to testimony of three witnesses from other suppliers on whether Pilgrim's _competitors_ reached independent decisions on price. _Id_. at 5-8 (describing testimony of Greg Finch, Darrell Bowlin, and Brandon Campbell). Even if true, such evidence has limited value because none of the testimony engages with nor explains away any of defendant Austin's collusive communications.

Pilgrim's that "they are following as are others." *Id*. Rather than expressing confusion or disavowing involvement, defendant Penn forwarded the message to another subordinate and coconspirator, Mr. McGuire, saying "FYI. Do not fwd. not exactly a legal conversation." *Id*. This consciousness of guilt demonstrates that defendant Penn was aware the aims of the conspiracy were not innocuous; rather, he knew that the ultimate goal of the conspiracy was to "tak[e] contract pricing up," (GX 3037) with competitors, not to compete. *See United States v. Brown*, 943 F.2d 1246, 1251-52 (10th Cir. 1991) (holding a jury could reasonably infer that a defendant had joined a conspiracy when evidence showed he was aware of criminal conduct, did not object, and participated in its concealment).[11]

And there was a sequel: On August 7, 2014, immediately before Pilgrim's achieved historic price increases, defendant Penn forwarded yet another message to Mr. McGuire, with a note that "In 2013 I had a few owners of small bird companies thank us via me for getting our act together. I guess it will happen again…good work. Forward…" GX 1056. It requires common sense, not a "staggering set of inferential leaps," ECF 1214 at 9, for a jury to conclude that competitors were thanking defendant Penn for leading contract prices up, rather than down.

There is also direct evidence that defendants Penn and Lovette knowingly joined

---

[11] Defendant Penn's submits in his supplemental briefing that based on the testimony of co-conspirator Brenda Ray, her conversation with a "friendly competitor" had to do with halal meat, a product not subject to the charged conspiracy and the conversation, per Ms. Ray, had nothing to do with a conspiracy. *See* ECF 1250 at 6. However, a reasonable jury could readily conclude that this email demonstrates defendant Penn's knowledge of the conspiracy to increase prices and that he had no objection to his subordinates engaging in such conduct.

the conspiracy and acted in furtherance of it. The government presented evidence that defendant Penn encouraged subordinates to participate in the conspiracy and personally reached out to his contacts—all with defendant Lovette's knowledge and encouragement.

First, in 2012 defendant Penn received a detailed spreadsheet reporting the status of Pilgrim's competitors' bids in the middle of KFC negotiations. GX 1522, 1523. Defendant Penn forwarded the bid information up to defendant Lovette to ensure that Pilgrim's top-level decision-making was in line—or in an understood range—with the competition.

And the pattern: defendant Austin and others directly coordinating with competitors and reporting the highlights up to Penn and Lovette, continued in the next round of KFC negotiations.  In the days leading up to the August 19, 2014 KFC initial bid deadline in which Pilgrim's and its competitors together submitted historic, profit-driven price increases of a strikingly similar magnitude, Defendant Penn and at least eight of his co-conspirators exchanged a flurry of inter-competitor calls.

In particular, defendant Penn directly exchanged at least three calls with his personal contact and co-conspirator Brian Roberts (Tyson), on August 15, 2014. GX 10 (GX 1231). Defendant Penn was also in contact with his subordinates, defendant Austin and Mr. McGuire, during the time period from August 15th to 19th, when Pilgrim's was determining the magnitude of its price increase for KFC. On August 19th, 2014, Penn's direct report, Mr. McGuire reported to Penn and others that "Roger [Austin] did some checking around today," sharing "the range of the total increases(margin [sic] and

costs)" Pilgrim's competitors—Koch, Case, Claxton, George's, and Mar-Jac—were planning to submit for KFC's business. GX 10 (GX 9744, 1074). Rather than questioning the evident source of the information (*i.e.*, defendant Austin's conversations "checking around" with competitors) defendant Penn discussed how Pilgrim's should make use of the information with defendant Lovette. *See* GX 10 (GX 1074) (defendant Penn saying he "[w]ill review with Bill [Lovette] in am" and "[w]ill advise" Mr. McGuire on next steps). As the key decisionmakers for this contract, defendant Penn and Lovette thereafter approved the submission of Pilgrim's bid seeking a nearly 20% price increase, GX 1105, with the understanding that their competition would follow through and seek increases in line with Pilgrim's.

A short time later, as the KFC negotiations came to a head, defendant Penn personally confirmed Pilgrim's price increase with an executive at another competitor— Pete Martin at Mar-Jac—as noted by Mr. Martin's handwritten notes that he "Talked to Jason [sic] Penn +8 cent … margin." GX 1030.[12] Following this call and the calls and emails noted above, Pilgrim's held strong with its competition to extract significant price increases together from KFC.

Defendant Lovette also participated in the conspiracy with a clear understanding

---

[12] Defendant Penn incorrectly claims that his call with Pete Martin had to do with corn and soybean meal only (*see* ECF 1250 at 7-8). Co-conspirator Martin's notes, of course, reflect competitors' bid pricing—corroborated by actual underlying bids—that he received based on conversations with competitors, including defendant Penn and Fries. *See* GX 1030 (containing pricing information for Pilgrim's, Tyson, and Claxton); GX 9672 (defendant Penn's phone record reflecting a call with Pete Martin). It is inconsequential that the numbers Penn shared—while Pilgrim's was in the middle of negotiations with RSCS—did not match either the number they had already submitted nor the price they landed on well later at the close of negotiations.

of its aims. The government put forth evidence, when viewed in the light most favorable to the government, that defendant Lovette expressly agreed with Joe Grendys, CEO of Pilgrim's competitor Koch, to say "NO!" to Sysco's proposal for 65-day payment terms. GX 803. But in general, as the CEO, defendant Lovette did not need to reach out directly to Pilgrim's competitors; instead, he depended on subordinates to be his boots on the ground. *See United States v. Lischewski*, 860 F. App'x 512, 515 (9th Cir. 2021) (upholding instruction in Sherman Act criminal case that the jury "could find [the defendant] 'knowingly participate[d] in effecting the illegal conspiracy by . . . indirectly or directly authorizing, ordering, or helping a subordinate perpetrate the crime.'"). For example, the evidence showed first in 2012 defendant Lovette authorizing defendant Austin's coordination through his receipt of reports on the conspiracy's functioning and presumptively, through his clear final authority on KFC pricing, authorizing Pilgrim's bid based on his understanding of the assurances given by Pilgrim's competitors. GX 1522, 1523.

Again in 2014, defendant Lovette was continuously kept up to speed on (1) the initial coordination necessary to get Pilgrim's competitors on board before the initial bid, as well as (2) the coordination necessary to hold strong and actually achieve the historic KFC price increases. GX 1074, 1051, 1237. First, defendant Penn reported Pilgrim's competitors' planned price increases to defendant Lovette preceding the initial bid deadline, this year in person rather than via email. *Compare* GX 1074 (Penn saying he "[w]ill review with Bill [Lovette] in am"), *with* GX 1522 (forwarding competitor "quotes" to Lovette over email). After KFC first threatened business, Defendant Lovette personally

reached out to defendant Austin with a lengthy call. GX 11 (GX 1237).[13]  After the call,

Austin spoke with defendant Brady, who reported in a text message, "I talked to roger

[Austin] about KFC and Greeley [Pilgrim's headquarters] told him not to come down on

price." GX 11 (GX 1237, 1238). A reasonable jury could conclude that in that call (which

followed weeks' worth of coordination), defendant Lovette directed Roger Austin to hold

strong, knowing of defendant Austin's continued coordination with the competition to do

the same. And, because an executive who "'authorizes, orders, or helps perpetrate' a

conspiracy 'knowingly participates' in that conspiracy," *Lischewski*, 860 F. App'x at 515

(quoting *United States v. Brown*, 936 F.2d 1042, 1047-48 (9th Cir. 1991)), the jury can

readily infer defendant Lovette's knowing joinder. *See also Brown*, 936 F.2d at 1048

(executives can be criminally liable under Section 1 of the Sherman Act if they

"knowingly consented to their subordinates' participation in the conspiracy").[14]

    This same pattern and course of dealing involving defendant Lovette continued

again in 2017, when conspirator Tim Stiller met with defendant Penn in "BL" (Bill

---

[13] Defendant Lovette's supplemental briefing indicates that the "Defense evidence rebuts the conjecture" that this call "was about an agreement." ECF 1249 at 3. The defense did no such thing. There is no defense evidence to the contrary, and in any event the defense nowhere addressed the prior email where defendant Penn informed defendant Lovette that he told defendant Austin to proceed (GX 1051). *See* ECF 1249 at 3-4, 12-13.

[14] In his supplemental briefing, defendant Lovette points to co-conspirator Brenda Ray's red herring testimony that defendant Lovette implemented a fair market pricing strategy for Pilgrim's upon becoming CEO, *see* ECF 1249 at 3, 8, and that she was unaware of Pilgrim's communicating with another supplier about the Sysco payment terms (ECF 1249 at 14-15). But this testimony does not negate the direct evidence that defendant Lovette knowingly entered into an agreement with Koch CEO, Mr. Grendys about payment terms (*see* GX 803) and depended on his subordinates to implement the price-fixing conspiracy (*see* GX 11 (GX 1237)).

Lovette's) office to "discuss KFC", GX 1864, the day after defendant Austin told the "industry" that Pilgrims was "going to hold" on its KFC price at Stiller's direction. GX 1856, 1960.

The evidence is therefore sufficient to show that defendants Penn and Lovette not only participated directly in the conspiracy, but also approved and encouraged subordinates to participate in the conspiracy.[15]

_Mikell Fries and Scott Brady_. During the conspiracy period, defendant Brady was a Vice President of Claxton,[16] and defendant Fries became the President. The evidence in the record establishes that both defendants agreed to fix prices to suppress or eliminate competition. As described earlier, during negotiations with KFC in 2012, defendant Brady reported via text message to defendant Fries that he "talked to roger [Austin from Pilgrim's] . . . He said to raise our prices, on wings he is market and market plus .10." Rather than repudiating this invitation, defendant Fries responded, "Tell him we are trying!" Defendant Brady replied, "Will do." GX 15 (GX 1427). That exchange standing alone is strong evidence of their participation in an unlawful agreement.

This agreement is precisely the kind of evidence which shows defendants Brady and Fries knowingly effectuated the objectives of the conspiracy, _see Mobile Materials_,

---

[15] Defendants Penn and Lovette's reliance on testimony from individuals with no personal knowledge of the existence of a conspiracy—such as Professor Snyder and other defense witnesses Rich Eddington and Kent Kronauge—does nothing to disprove the existence of a conspiracy to fix prices and rig bids or that defendants Penn and Lovette knowingly entered into the conspiracy. _See_ ECF 1249 at 7-9; ECF 1250 at 10, 14.

[16] Although defendant Brady argues that he did not have pricing authority, ECF 1207 at 6 n.3, it is unrefuted that Brady had the authority to bind Claxton to a contract worth approximately $70 million with UFPC. R. Tr. Mar. 1, 2022 at 239:3-17.

881 F.2d at 873 (permitting "testimony about the various agreements which facilitated the objective of the conspiracy"). It also directly contradicts defendants Brady's and Fries' assertions that there is no direct evidence that either defendant knowingly joined the conspiracy, so the government relies on "guilt by association" to establish their participation in the conspiracy. ECF 1212 (Fries) at 12-15; ECF 1207 (Brady) at 4-11.

Brady's and Fries' membership in the conspiracy can also be inferred from a course of conduct—*i.e.*, their repeated exchange of price information with their competitors, with the understanding that they and their competitors would raise and maintain prices together rather than use the information to compete. For example, a day after KFC's purchasing cooperative gave feedback for the first round of submissions for dark meat supply in 2013, defendant Brady coordinated with Claxton's competitors before responding to the customer. GX 17 (GX 1700). After reporting that he would reach out to competitors, defendant Brady did just that as demonstrated by calls with co-conspirators Mulrenin, Little, Kantola, and Gay—with a call to Fries in between. GX 17 (GX 9720, 9716, 9722, 9721). That coordination in response to customer feedback continued again later that year. On November 19, 2013, the day after KFC's purchasing cooperative expressed disappointment with Pilgrim's pricing, defendant Brady contacted defendant Austin and subsequently reassured defendant Fries that "Roger [Austin] is at .30 back and not moving." GX 17 (GX 1734). Defendant Fries used his knowledge that Pilgrim's was holding firm to keep Claxton's own prices firm, rather than to undercut his competitor; he told defendant Brady to "Stay .305 then." *Id*. Defendant Brady submitted final bids later that day. GX 17 (A-626, A-627).

Similarly, too, during the 2014 KFC negotiations, defendant Brady had several calls with competitors in the period from August 15-19, 2014, immediately before the bid for KFC was due, for the purpose of increasing prices with competitors. He had three calls with co-conspirator Mr. Roberts on August 15; one call with Mr. Mulrenin; and one call with Mr. Pepper. GX 10 (GX 1231, 1232, 1234). On August 18, defendant Brady had yet more calls with his competitors; with Pilgrim's employees, including defendant Austin and Mr. Gay. GX 10 (GX 1236, 1239). Mr. Pepper testified that he spoke with defendant Brady regarding the substantial price increase for the KFC contract, and "that Claxton was also going to agree to have a substantial price increase." R. Tr. Mar. 2, 2022 at 244:12-18, 256:18-22, 257:9-12. Moreover, the content of the other calls with competitors is readily inferred from the inclusion of Claxton's anticipated price and margin increases in the "Roger did some checking around" email and margin spreadsheet. GX 1074, 1035, 1036. Defendant Brady continued to keep tabs on his competitors' sticking to their guns by speaking to defendant Austin on August 22nd, and both co-conspirator Kantola and defendant Austin on August 26 and 27th, after which he told defendant Fries: "I talked to roger [Austin] about KFC and Greeley [Pilgrim's] told him not to come down on price . . ." and "Koch is not moving either." GX 11 (GX 1238). Defendant Fries reciprocated, adding that "Tinch…are [not] agreeing to anything today, just listening," based on his conversation earlier that day with Greg Tench (Mar-Jac). GX 11 (GX 1238).

This coordination by the defendants at Claxton continued in 2014 as negotiations with KFC came to a head. On August 29, 2014, Mr. Lewis of RSCS emailed suppliers to

notify them that RSCS was finalizing commitments and pricing for KFC for 2015. GX 12

(GX 1160). On that same day, defendant Fries himself spoke to Pete Martin at Mar Jac

– as reflected by phone records and the reference to Claxton's bid price and price

increase in GX 1030. Finally, on September 3, when final pricing was due, defendant

Brady had at least five calls with co-conspirator Bill Kantola, three calls with defendant

Austin, and three calls with co-conspirator Tim Mulrenin. The content of those calls also

is readily apparent: defendant Brady reported to Fries that "Roger [Austin] and bill

[Kantola] are not moving." GX 12 (GX 1238).

Viewed in the light most favorable to the government,[17] the above

---

[17] Defendants Brady and Fries' supplemental briefings focus on defense witness testimony from witnesses Greg Finch, Rich Eddington, Kent Kronauge, and Edward Snyder. *See generally* ECF 1247 and 1248. Viewed in the light most favorable to the government, and in all other lights, testimony from these witnesses did not and could not directly negate defendants Brady and Fries' participation in the conspiracy.

Mr. Finch is the Chief Financial Officer of Claxton, who testified that Mr. Brady and Mr. Fries did not participate in the conspiracy but did not present any concrete evidence that they could not have participated or did not participate. For example, Mr. Finch testified generally about covering shortages and period pricing, but did not present any concrete evidence showing that a particular shortage was the sole or even definitive reason for any particular phone call on any of the government's summary charts. He of course could not do so as he had no personal knowledge of the calls. Moreover, Mr. Finch testified that while he had responsibility to input Claxton's actual costs into cost plus pricing models, he or a member of his team sent those models to defendant Brady and sometimes defendant Fries for review before they were sent to the customer. *See* R. Tr. Mar. 16, 2022 at 249:6-14, 260:23-261:4; R. Tr. Mar. 17, 2022 at R. Tr. Mar. 17, 2022 at 3:23-4:5. Mr. Finch further testified that defendant Fries had the final authority to make changes on the margin or a pricing formula. R. Tr. Mar. 17, 2022 at 129:8-21.

Mr. Eddington and Mr. Kronauge are customers, neither of whom would have been privy to the inner workings of the charged conspiracy. Edward Snyder—the most egregious example—is an economist whose testimony and analysis focused on certain sets of data; he did not rely upon any of the conspiratorial emails or text messages

communications were not merely defendant Fries "engaging in the legal practice of obtaining information about competitors' prices." ECF 1212 (Fries) at 9. Rather, they were a means to an end: the routine methods by which the defendants reassured each other to raise or to hold firm on price increases against a common customer. As such, a jury could conclude that both defendants Fries and Brady participated in the conspiracy.[18]

*****************************

The evidence described above plainly establishes, both the existence of the charged conspiracy, and that each defendant was a knowing participant. Throughout their motions for acquittal, the defendants claim they did not knowingly join the conspiracy, and repeatedly characterize the evidence in their favor as "consistent" with independent conduct or competition. ECF 1207 (Brady) at 13-14; ECF 1210 (Austin) at 7-8; ECF 1212 (Fries) at 9-12; ECF 1214 (Penn) at 13-14; ECF 1215 (Lovette) at 2, 11. But the Tenth Circuit and others have wholly rejected that as a standard in assessing a

---

between Mr. Fries and Mr. Brady, or between Mr. Fries or Mr. Brady and his competitors.

[18] Defendants Brady and Fries' arguments that (1) defendant Brady did not have pricing authority (ECF 1248 at 8) and that (2) Claxton lowered its prices, and therefore defendants Brady and Fries did not agree to fix prices (ECF 1247 at 3, n.2; ECF 1248 at 4), ignore Tenth Circuit law. It "is the agreement to act together that constitutes the crime. Whether the agreement is actually carried out or whether it succeeds or fails does not matter." ECF 1232 at 22 (Jury Instruction No. 20). Lack of pricing authority (and factual impossibility generally) is not a defense to conspiracy. *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 224 n.59 (1940) ("[I]t is well established that a person 'may be guilty of conspiring, although incapable of committing the objective offense.'" (quoting *United States v. Rabinowich*, 238 U.S. 78, 86 (1915))); *United States v. Martinez*, 900 F.3d 721, 730 (5th Cir. 2018).

Rule 29 motion. *See, e.g.*, *Hooks*, 780 F.2d at 1530–32. "It is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." *United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006), *abrogated on other grounds by United States v. DiFalco*, 837 F.3d 1207 (11th Cir. 2016). At this stage, a court should not usurp the role of the jury as fact finder unless the evidence is so "nonexistent or so meager" that only an irrational jury could find guilt. *White*, 673 F.2d at 301. Those are not the facts here. As described above, the jury saw substantial evidence that—through express agreement, a course of dealing, or other circumstances—each one of the ten defendants knowingly joined the conspiracy.

## III.    The Evidence Proves a Single Overarching Conspiracy

Furthermore, the government proved one single, overarching conspiracy. As the government briefed in its first response to the motions for acquittal, *see* ECF 900, the mere fact that conspirators "participated in numerous separate transactions does not convert a single conspiracy to multiple conspiracies." *United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997) (internal citations omitted).[19] Rather, the ultimate

---

[19] Evidence about various distinct contracts does not establish multiple conspiracies, but instead shows the many ways the conspiracy was effectuated and connects each of the defendants to the overarching conspiracy. *See Mobile Materials*, 881 F.2d at 873 (rejecting defendants' argument that jury was misled by evidence of "unrelated" jobs, as "testimony about the *various agreements which facilitated the objective* of the conspiracy was permissible") (emphasis added). As in *Mobile Materials*, the evidence in this case reflects "significant overlap in personnel, method of operation, and purpose." *Id*. at 872 (internal quotations omitted).

question in assessing whether there is a single conspiracy is whether the record "is sufficient to establish that [all conspirators] had a *single, common and continuing objective*" *Beachner Const. Co.*, 729 F.2d at 1281 (quoting *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 976 (10th Cir. 1970), *cert. denied*, 400 U.S. 829 (1970)) (emphasis in original). In Sherman Act cases, the common objective may be to suppress or eliminate competition. *See Beachner Const. Co.*, 729 F.2d at 1283 (overarching "common objective" can be "to eliminate price competition and ensure higher individual profits."); *Mobile Materials*881 F.2d at 871-72 (shared purpose may be "to circumvent price competition and enhance profitability."). Mr. Bryant's and Mr. Pepper's testimony, as well as the many documents in the record (discussed above), make clear that the shared goal of the conspiracy was to circumvent or eliminate price competition.

    In addition to proving a shared common objective, *see Beachner Const. Co.*, 729 F.2d at 1281-82, the government demonstrated several other indications that there is only a single conspiracy: (1) there was a "common method" or course of dealing among competitors, such that a defendant would call competitors to discuss negotiating positions during key periods of the bidding process; (2) there was "common . . . jargon" used by conspirators, including repeated references to "the industry," meaning competing suppliers; (3) the participating conspirators "took no precautions and expressed no fear when approaching a fellow [conspirator]," to share price information in service of the common objective; and (4) "the . . . scheme was self-perpetuating in nature and could be 'plugged into' at any time," as the evidence showed the scheme

lasted for at least seven years. *See Beachner Const. Co.*, 729 F.2d at 1282-83; *see also In re Grand Jury Proceedings*, 797 F.2d 1377, 1384-85 (6th Cir. 1986).

Crucially, evidence at trial demonstrated interdependence among the co-conspirators—*i.e.*, that "the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *United States v. Pickel*, 863 F.3d 1240, 1253 (10th Cir. 2017) (internal citations omitted). Cast in the light most favorable to the government, the evidence shows each supplier was confident in submitting price increases only based on a belief that its competitors would follow or not undercut it. The mutual benefits of the conspiracy—to obtain higher prices or stabilize prices for the competitors—could not fully be realized unless competitors participated. When confronted with a threat to what the defendants believed were unfavorable prices or price-related terms (including terms of sale, as in the case of Sysco), they tapped into the network of competitors to resist or fight against the threat together. This mutual benefit and interdependence demonstrate a common objective and a single conspiracy.

## IV.   The Prior Hung Juries Are Irrelevant

Defendants Brady and Fries baselessly argue in their supplemental briefings (*see* ECF 1247 at 2 and ECF 1248 at 2) that because two prior trials have resulted in hung juries, no reasonable jury could convict them of having joined a price fixing conspiracy. This premise has been uniformly rejected by courts that have considered the issue because "hung juries, including multiple hung juries, do not have any

significance that might benefit the defendant, a defendant has no right to argue that because the jury was deadlocked, the prosecution's evidence must have been insufficient." *United States v. Bailin*, 977 F.2d 270, 280 (7th Cir. 1992).

Rather, the outcome of the two prior trials is irrelevant to the Court's determination of the instant motions, as the law remains that a hung jury serves as no basis for an acquittal. The Supreme Court in *Arizona v. Washington*, 434 U.S. 497, 509, describes the fallacy of any argument otherwise: "[t]he argument that a jury's inability to agree…requires acquittal, has been uniformly rejected in this country." Such is true because even "a sample of two particular juries hardly dictates what a reasonable jury *may* do." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir.1992).

In fact, actual real-world experience with juries proves that the premise argued by defendants Brady and Fries is incorrect. There are numerous convictions affirmed on appeal were guilty verdicts were not reached until after two or more hung juries. *United States v. Gunter*, 546 F.2d 861(10th Cir. 1976), *cert. denied*, 430 U.S. 947 (1977) (convicting six defendants in their third trial following two hung juries and noting that where each defendant has separate counsel "some jury confusion would appear to be inevitable"); *see also United States v. Castellanos,* 478 F.2d 749 (2nd Cir. 1973); *United States v. Jones*, 122 F.3d 1058 (2d Cir. 1997); *United States v. Jackson*, 658 F.3d 145, 153 (2d Cir. 2011); *Gov't of Virgin Islands v. Smith*, 558 F.2d 691, 696, 14 V.I. 42, 52 (3d Cir. 1977); *United States v. Ndame*, 87 F.3d 114 (4th Cir.1996); *United States v. Hall*, 551 F.3d 257, 270 (4th Cir. 2009); *United States v. Taylor*, 489 F. App'x 34, 38 (6th Cir. 2012); *United States v. Quijada*, 588 F.2d 1253, 1254 (9th Cir. 1978).

Because defendant Fries' position is wholly unsupported by the case law and real-world experience, he instead cites to an inapposite case in support of his argument that the Court should consider the prior juries' lack of findings. However, *United States v. Fuller,* relied on by defendant Fries, (1) had no relation to a mistrial or hung jury, and (2) actually affirmed a district court's *denial* of defendants' motion for a judgment of acquittal, and therefore, at best, contradicts his argument. 751 F.3d 1150, 1153 (10th Cir. 2014) (cited at ECF 1247 at 2).

Regardless of how to best read the tea leaves underlying both juries' continued refusal to convict or acquit either of defendant Brady or Fries, the nature and strength of the evidence in this case has remained nearly constant since: (1) two grand juries found probable cause that each defendant committed the crime charged, (2) the Court denied each defendant's motion to dismiss the Indictment—which quotes heavily from just a portion of the evidence admitted at trial, (3) Pilgrim's Pride—the employer of three of the remaining defendants—pled guilty to its participation in the conspiracy at issue here, (4) Tyson Foods admitted guilt in the course of its disclosures to the United States, and (5) the Court denied each defendant's motion for a judgment of acquittal following the initial trial in this case. The evidence supporting all these prior findings is similar, if not less than, the evidence presented at trial and goes well beyond the standard to deny the defendants' current motions for acquittal.

## V.     The Conspiracy Was in the Flow of or Substantially Affected Interstate Commerce

Finally, the defendants do not challenge the interstate commerce element in their motions for acquittal, *see* ECF 1207, 1210, 1212, 1214, 1215, and a rational jury could

conclude beyond a reasonable doubt that the element has been met.[20] Witnesses testified that broiler chicken products were shipped across state lines. *See, e.g.*, R. Tr. Mar. 1, 2022 at 243:12-14; R. Tr. Mar. 2, 2022 at 224:19-225:9. Mr. Pepper also testified that he worked in Arkansas, co-conspirator Mr. Mulrenin worked in Delaware, and co-conspirator Mr. Roberts worked in Georgia, and the three communicated with each other from those different states. R. Tr. Mar. 3, 2022 at 59:8-23.[21]

## CONCLUSION

Based on the evidence in the record and fair inferences drawn from that evidence, a rational jury may find each defendant guilty beyond a reasonable doubt. For that reason, the government respectfully requests that defendant Penn, Austin, Fries, Brady, and Lovette's motions for acquittal pursuant to Rule 29 be denied.

Dated: April 15, 2022                   Respectfully submitted,

/s/ *Heather D. Call*
HEATHER CALL
MICHAEL KOENIG
PAUL TORZILLI
CAROLYN SWEENEY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 598-2623

---

[20] With respect to venue, the defendants stipulated to venue (*see* R. Tr. Mar. 22, 2022 at 127:6-128:19), and the government has introduced sufficient evidence from which the jury could find venue by a preponderance of the evidence. For example, Mr. Bryant testified that Pilgrim's is headquartered in Greeley, Colorado, and that he and defendants Penn and Lovette, as well as co-conspirators Jason McGuire and Tim Stiller, worked from Greeley. R. Tr. Mar. 9, 2022 at 44:13-45:9.

[21] Mr. Pepper also testified that there is a whole lot of chicken floating around out there in America. R. Tr. Mar. 3, 2022 at 207:20-24.

Email: heather.call@usdoj.gov
*Attorneys for the United States*