IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    JAYSON JEFFREY PENN,
2.    MIKELL REEVE FRIES,
3.    SCOTT JAMES BRADY,
4.    ROGER BORN AUSTIN, and
5.    WILLIAM WADE LOVETTE

      Defendants.

## MOTION 9 – DEFENDANTS' JOINT MOTION *IN LIMINE* TO EXCLUDE GX 3025 AND GX 3038

Defendants, by and through undersigned counsel, respectfully move to exclude government exhibits ("GX") 3025 and 3038. Both documents contain charged "buzzwords" that the government intends to present to the jury without a witness—so without context. The context, however, proves neither document is relevant to the charged conspiracy. If these documents were relevant, and they are not, any relevance would be substantially outweighed by the unfair prejudice of encouraging the jury to speculate falsely about Mr. Lovette because he was sent these two emails, even though there is no evidence he reviewed them or responded to them. Most importantly, there is nothing evidencing a Sherman Act violation in either document. Both documents should be excluded pursuant to Federal Rules of Evidence 401 and 403.

## **BACKGROUND**

In GX 3025, Mr. Penn sends an email to Mr. Lovette in July 2013 stating, "Apparently your boy was not listening to your illegal spiel on forward pricing at the NCC." Mr. Penn then tells Mr. Lovette that "TSN submitted 8pc pricing to Albertsons and Supervalu for upcoming bid on grain pricing. Our price is 96 today TSN in mid 70's on $4.90 corn." (GX 3025.) In both prior trials, the government offered GX 3025 without a sponsoring witness. The government offered no evidence that the email was anything other than a joke, nor did the government offer any evidence that Mr. Lovette ever read the message, responded to it, or discussed it with anyone, including Mr. Penn. Further, the government introduced no communications before or after GX 3025 to allow any inference that the grain pricing came from a supplier, rather than another Pilgrim's employee or a customer. After the Court admitted the document into evidence, the government never mentioned GX 3025. (*See* Nov. 18, 2021 Off. Tr. 3587:19-3588:9.) Uncontroverted evidence presented by Defendants is an ample basis for the Court to reconsider and alter its prior ruling on the admissibility of GX 3025: Mike Brown, the President of the National Chicken Council ("NCC") at which Mr. Lovette gave the short welcome remarks that Mr. Penn referenced in the email, testified unequivocally and without contradiction that he and his staff drafted the welcome remarks, and that there was nothing illegal whatsoever in those remarks, which Mr. Lovette made to a room full of customers, competitors, media representatives, and lawyers.

GX 3038 is an internal Pilgrim's email chain among a large number of Pilgrim's employees regarding the earnings call script for the second quarter of 2014. One of the recipients, Charles von der Heyde, highlights a statement in the script regarding Pilgrim's market share in "small and big debonning [sic]" and asks, "wouldn't that be an eye opener for anti trust authorities." (GX

3038.)  Mr. Penn sends a reply to von der Heyde and Mr. Lovette stating in part: "We are already 40 pct of small bird market and can leverage that alone. Being 40 pct of BB market may be something we dont [sic] necessary want to tout." (*Id.*)  These comments have nothing to do with the charged conspiracy.  At most, they relate to a concern about potential market power in certain poultry segments, which raises an entirely different set of antitrust concerns regarding monopoly power than alleged agreements among competitors charged in this case.  The government also offers no indication that Mr. Lovette ever responded to this email, had any subsequent discussions relating to it, or even reviewed the email.  The government has not previously sought to introduce this document at the prior two trials, but listed the document on its exhibit lists.  (*See* ECF Nos. 908, 1221, 1268.)

## **ARGUMENT**

### I.     **GX 3025 AND GX 3038 ARE IRRELEVANT TO THE CHARGED CONSPIRACY.**

#### A.     **GX 3025 Does Not Make the Alleged Conspiracy or Anyone's Participation in It More Probable.**

Having introduced GX 3025 in both trials, the government had two chances to articulate its relevance to the charged conspiracy.  The government failed both times.  No witness testified regarding any "illegal spiel" mentioned in the document.  Nor did the government offer any evidence of the source or context for the grain pricing information that Mr. Penn sent to Mr. Lovette.  It is clear that the government is interested in this document only because of the reference to an "illegal spiel."  As explained, however, this reference is not evidence of any illegal conduct.

*1.     Mr. Penn's "illegal spiel" comment is unrelated to any charged conduct.*

In both trials, the government introduced Mr. Penn's reference to an "illegal spiel on forward pricing at the NCC" without offering any context.  (GX 3025.)  This strategy is

unsurprising because the context, which Defendants provided after admission of the document in the second trial, reveals that this statement has no nexus to the charged conspiracy or anyone's alleged participation in it.

Mr. Penn's "illegal spiel" remark refers to a speech Mr. Lovette had just delivered at the 2013 July Marketing Seminar of the NCC. The testimony of Mike Brown, the NCC's President, at the second trial establishes that Mr. Lovette was expected to give opening remarks at the seminar as the NCC's Chairman at the time. (DX B-849; Mar. 16, 2022 Tr. 164:14-165:6.[1]) The NCC prepared the remarks for Mr. Lovette, which were vetted by at least four NCC members, including its general counsel. (DX E-078; Mar. 16, 2022 Tr. 168:11-20, 169:1-14.) Mr. Lovette offered no edits to the speech and delivered it as written. (Mar. 16, 2022 Tr.170:2-13, 175:10-18.) In attendance for Mr. Lovette's speech were various employees of chicken purchasers, as well as media and NCC staff, including its general counsel. (*See id.* 157:13-16; 159:19-25, 161:12-19, 173:5-22.) Mr. Penn—who made the "illegal spiel" comment in the email—did not attend the meeting. (*Id.* 195:17-196:8.) The NCC's general counsel had no concerns with the speech or anything Mr. Lovette said or did during the rest of the seminar. (*Id.* 176:19-177:5.) This evidence—which was not available to the Court in the first trial or prior to the admission of the document in the second trial—is good reason for the Court to reconsider and to change its prior ruling on admissibility.

---

[1]  Mr. Lovette cites the unofficial, draft transcripts for the convenience of the Court. Mr. Lovette defers to the Court to the extent its recollection differs from what is included in the draft transcript.

With this evidence from the second trial, it is clear that Mr. Penn's "illegal spiel" comment has nothing to do with the charged conduct.  GX 3025 has no tendency to make the existence of the charged conspiracy, or anyone's participation in it, more probable.  *See* Fed. R. Evid. 401.

>    2.    *The fact that Mr. Penn sent Mr. Lovette an email with grain pricing information does not evidence an illegal conspiracy or anyone's participation in it.*

In the remainder of GX 3025, Mr. Penn notes that "TSN submitted 8pc pricing to Albertsons and Supervalu for upcoming bid on grain pricing," and he states that "Our pricing is 96 today TSN in mid 70's on $4.90 corn."  This information is irrelevant for several reasons.

*First*, this pricing relates to Albertsons, a supermarket customer that is outside of the QSR business segment.  (Mar. 8, 2022 Tr. 157:2-5.)  Since the government has now confined its charged conspiracy to QSRs (*Id*. 170:4-12; Mar. 9, 2022 Tr. 75:4-17), the superseding indictment makes no mention of Albertsons (ECF No. 101), and the government otherwise offered no evidence of price-fixing to Albertsons, information about grain pricing for this non-QSR customer is not relevant.  *See United States v. DeLeon*, 418 F. Supp. 3d 682, 826 (D.N.M. 2019) (excluding statements admissible in Trial 1 for a separate conspiracy "because they are irrelevant to the Trial 2 conspiracies and Defendants").

*Second*, there is no evidence, either before or after GX 3025, from which a jury can infer that this information came from a supplier, and not another Pilgrim's employee or customer.  (*See, e.g.*, Mar. 10, 2022 Tr. 126:15-25 (customer sharing another supplier's exact pricing with Pilgrim's employee).)  If the pricing information did come from a supplier, no inference can be drawn that Mr. Lovette was aware of the source of information or that the disclosure was in furtherance of the conspiracy.  The fact that Mr. Penn had Tyson's grain pricing information and shared it with Mr.

Lovette is not evidence of an illegal conspiracy because mere possession of this information is not illegal. (*See* ECF No. 1232 at Instruction No. 21 ("There may be legitimate reasons that would lead competitors to exchange price information other than fixing prices or rigging bids.").) The government offers nothing to suggest that Mr. Penn obtained or forwarded this information in furtherance of an illegal conspiracy to fix prices or rig bids charged in the superseding indictment.

*Finally*, the government submits no evidence that Mr. Lovette requested this information, ever discussed it with Mr. Penn, or even read the email. Without evidence that Mr. Lovette read the email, the fact that Mr. Lovette was sent an email from a colleague proves nothing and the document should not be admissible against Mr. Lovette. *See United States v. Bowline*, 674 F. App'x 781, 785 (10th Cir. 2016) (recognizing that more than mere knowledge of the purpose of a conspiracy is required); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 723 (E.D. Pa. 2011) ("[A]ctive participation, rather than merely passive presence, becomes key in inferring agreement to the conspiracy and potential liability.").

*            *            *

In sum, nothing about GX 3025 tends to make it more probable that a price-fixing and bid-rigging conspiracy existed, or that Mr. Lovette or Mr. Penn knew of, or knowingly participated in, the charged conspiracy.

### B.    GX 3038 Has Nothing to Do with QSRs or the Price-Fixing or Bid-Rigging Allegations.

Similarly, GX 3038 bears no connection to an alleged conspiracy to "fix prices and rig bids for broiler chicken products." (ECF No. 1232 Instruction No. 17.) GX 3038 concerns Pilgrim's big bird and small bird *debone* business units. (GX 3038 (reference to "small and big debonning [sic]" and "big bird deboner"). These business units are entirely separate from the fresh food

service unit, which is the unit serving QSRs.  (*See* Mar. 9, 2022 Tr. 149:24-150:7.)

Moreover, GX 3038 does not relate to price-fixing and bid-rigging because no price or bid is discussed or otherwise referenced in the document.  The internal Pilgrim's discussion in GX 3038 is one in which non-lawyers ask whether there will be any potential antitrust concern raised in response to Pilgrim's reference to being a "market leader" in a draft earnings call script. (GX 3038.)  The government has never claimed that the purpose of the charged conspiracy was to obtain a monopoly and does not charge a violation of Section 2 of the Sherman Act.  *See* 15 U.S.C. § 2.

Simply put, this email discusses a business unit that is not at issue in this case, makes no reference to any conduct, and references a potential antitrust concern (monopolization) that is irrelevant to the charged conspiracy.  The mere fact that the email contains a reference to "anti trust authorities" does not make it relevant to the government's case.[2]  On the other hand, the reference to "anti trust" is a classic trigger for jury confusion and speculation that is the concern of Rule 403.  It should be excluded.

## II.   ANY MINIMAL THEORETICAL RELEVANCE OF GX 3025 AND GX 3038 IS SUBSTANTIALLY OUTWEIGHED BY THE RISK OF UNFAIR PREJUDICE TO DEFENDANTS.

For both GX 3025 and GX 3038, any slight relevance that the government might argue is substantially outweighed by the unfair prejudice Defendants will face if the jury can consider tangential email communications that include passing references to fraught terms like "illegal" and "anti trust authorities."

Courts frequently exclude statements that include trigger words or phrases that may encourage jury speculation adverse to a defendant.  *See, e.g.*, *United States v. Sena*, No. 19-CR-

---

[2]  There is also no evidence that Mr. Lovette ever reviewed the email or responded to it.

01432, 2021 WL 4129247, at *2 (D.N.M. Sept. 9, 2021) (barring the government's use of "victim" because "the jury has the responsibility of deciding whether a crime occurred" and such a term "carrie[d] the risk of improperly influencing the jury's decision"); *United States v. Watts*, 934 F. Supp. 2d 451, 482 (E.D.N.Y. 2013) (excluding terms "shell company" or "shell corporation" because they "could be perceived to have a pejorative meaning"); *United States v. Agnes*, 581 F. Supp. 462, 477 (E.D. Pa. 1984) (prohibiting testimony that actions "constituted embezzling or the earmarks of embezzling" due to the "substantial impact the criminal term 'embezzlement' may have had on the jury").

For example, in *Abbott Lab'ys v. Sandoz, Inc.*, plaintiff sought to exclude defendant's use of the term "monopoly," "milking the brand," and "milking strategy" because "invocation of such terms would unfairly prejudice [plaintiff] under Rule 403 by suggesting that [plaintiff's] enforcement of patent rights is unfair or unlawful and improperly inviting the jury to view [plaintiff] in a negative light." 743 F. Supp. 2d 762, 773 (N.D. Ill. 2010). The defendant justified use of these terms in part because they "derive[d] from [plaintiff's] internal documents, and because they [were] the names of [plaintiff's] strategy." *Id.* The court sided with the plaintiff and excluded use of the terms. *Id.*; *cf. Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 193 (S.D.N.Y. 2008) (granting motion to exclude references to admissible evidence as "securities fraud, "illegal," "insider trading, "insider information, and "market manipulation").

The same reasoning applies here. When there is a balancing of the potential relevance versus the unfair prejudice with respect to both exhibits, there can be no question the scales tilt decisively toward exclusion. Both terms "illegal" and "anti trust authorities" have pejorative connotations. If the government were allowed to show these documents to the jury without

providing any context—which is what the government intends to do—the jury may wrongly infer that Defendants have done something wrong by sending (or, in Mr. Lovette's case, passively receiving) these emails without any evidence to support that conclusion.  GX 3025 and GX 3038 carry "the risk of improperly influencing the jury's decision" against Defendants regardless of the evidence (or lack thereof) admitted against them.  *Sena*, 2021 WL 4129247, at *2.  The documents are unfairly prejudicial and should be excluded.

## **CONCLUSION**

For all of these reasons, Defendants respectfully request that the Court exclude GX 3025 and GX 3038.

Dated:  May 9, 2022

Respectfully submitted,

*s/ John A. Fagg, Jr.*
John A. Fagg, Jr.
MOORE & VAN ALLEN PLLC
Attorney for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
johnfagg@mvalaw.com

*s/ Michael F. Tubach*
Michael F. Tubach
O'MELVENY & MYERS LLP
Attorney for Jayson Jeffrey Penn
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
(415) 984-8700
mtubach@omm.com

*s/ Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
rick@rklawpc.com

*s/ Michael S. Feldberg*
Michael S. Feldberg
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
Attorney for Roger Born Austin
750 Third Avenue, Suite 2400
New York, NY 10017
(212) 381-1965
mfeldberg@reichmanjorgensen.com

*s/ Bryan Lavine*
Bryan Lavine
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Attorney for Scott James Brady
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3170
bryan.lavine@troutman.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ John A. Fagg, Jr.*