IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB
In Re: Penn II
UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

    Defendants

_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 3
_____

      Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 9:35 a.m., on the 24th day of February,

2022, in Courtroom A201, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES
 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3   Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4   Washington, DC 20530, appearing for Plaintiff.
 5          Anna Tryon Pletcher and Michael Tubach of
 6   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7   San Francisco, CA 94111-3823;
 8          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9   N.W., Washington, DC 20006, appearing for Defendant Penn.
10          David Beller, Richard Kornfeld and Kelly Page of
11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12   CO 80202, appearing for Defendant Fries.
13          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15           Laura Kuykendall and Megan Rahman of Troutman Pepper
16   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17   appearing for Defendant Brady.
18          Michael Felberg of Reichman, Jorgensen, Lehman,
19   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20   10017;
21
22
23
24
25
```

1                    APPEARANCES (Continued)

2             Laura F. Carwile of Reichman, Jorgensen, Lehman,

3  Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4  CA 94065; appearing for Defendant Austin.

5             Elizabeth B. Prewitt of Latham & Watkins, LLP,

6  555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7             Marci Gilligan LaBranche of Stimson, Stancil,

8  LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9  80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11  Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13  Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15  Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17  1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18  appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20  Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21  Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
 1                    APPEARANCES (Continued)

 2            Craig Allen Gillen and Anthony Charles Lake of

 3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

 4   Atlanta, GA 30339;

 5            Richard L. Tegtmeier of Sherman & Howard, LLC,

 6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

 7   for Defendant Roberts.

 8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

 9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11            Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                        PROCEEDINGS

16            THE COURT:  We finally have all the jurors present.

17   Anything before we bring the jury back in?

18            All right.  Let's bring the jury in.

19            (Jury present.)

20            THE COURT:  Good morning, ladies and gentlemen.

21            IT checked on those monitors so they should all be

22   working, but if you have any problems, raise your hand and let

23   me know.  And we will go ahead and resume with the opening

24   statements at this time.

25            All right.  Mr. Feldberg, go ahead.
```

1              **OPENING STATEMENT**

2         *MR. FELDBERG:*  Thank you, Your Honor.

3         Good morning.  I am Michael Feldberg.  My colleagues

4  Julie Withers, Laura Carwile, Parshad Brahmbhatt and I have the

5  privilege to represent Roger Austin in this criminal trial.

6         This is a criminal case.  This is as serious as it

7  gets.  The prosecutors have charged Mr. Austin with a felony.

8  This is the most frightening, terrible thing that has ever

9  happened to Roger because he is not guilty.  The prosecutors

10  have made a grave mistake.  They have looked at normal everyday

11  business activity and labeled it a crime.

12         Mr. Austin is presumed innocent.  And that presumption

13  remains until the end of the case and is only overcome by the

14  prosecution if they are able to prove beyond a reasonable doubt

15  that Roger knowingly entered into a conspiracy to agree to fix

16  prices or rig bids.  The presumption of innocence and the

17  requirement the prosecutors prove their case beyond a

18  reasonable doubt are fundamental principles of American

19  justice.  They protect us all.  If you have even one reasonable

20  doubt, Roger Austin is not guilty.

21         The prosecution will not be able to prove this beyond

22  a reasonable doubt for one simple reason.  Roger Austin did not

23  do it.  He did not enter into an agreement to fix prices or rig

24  bids.  Before telling you a little bit about him, I want to

25  outline the five major reasons why the evidence will show that

1    Roger is not guilty of the crime with which he is charged.

2          Roger did not enter into an agreement to fix prices or

3    rig bids because there was no agreement to fix prices or rig

4    bids.  The various competing suppliers' prices were different,

5    their profit margins were different and their strategies were

6    different.  Simply put, they competed against each other for

7    business.  What kind of price-fixing agreement could there be

8    if the suppliers were competing with each other and taking

9    business from each other?  Where is the restraint of trade that

10   the prosecutor talked about in his opening?

11         Pilgrim's Pride, the company Roger worked for, made

12   independent data-driven decisions on what it would bid.  Those

13   decisions were made by a team of executives and financial

14   analysts based at Pilgrim's headquarters in Greeley, Colorado,

15   who studied the numbers, prepared spreadsheets and analyzed

16   what was in Pilgrim's independent best interest.  If there

17   really was a conspiracy to fix prices or rig bids, none of this

18   work would have made sense.

19         Roger did not have authority to decide what Pilgrim's

20   would bid or what prices Pilgrim's would charge.  Those

21   decisions were made by his superiors and the financial analyst

22   team in Greeley.  Roger was living in Louisville, Kentucky, so

23   he could be close to his customer, KFC.  He was the customer

24   guy.  His job was to keep the customer happy, to make sure KFC

25   had all the chicken it needed.  He even ran an R and D support

 1    office for KFC in Louisville.  He was an advocate for his

 2    customer which often meant urging his superiors to charge lower

 3    prices.

 4           There was competition among the suppliers.  They

 5    competed vigorously with each other and took business away from

 6    each other.  For example, in the summer of 2014 when there was

 7    a shortage of smaller chickens, the size that KFC buys,

 8    Pilgrim's financial team raised its prices and, as a result,

 9    lost business to KFC.

10           Other suppliers, Pilgrim's competitors, made different

11    business decisions.  And as a result, KFC -- Pilgrim's lost KFC

12    volume and other suppliers increased KFC volume, as Mr. Tubach

13    showed you yesterday with a chart and as the chart that's now

14    on the screen demonstrates.  What kind of conspiracy is this

15    where Pilgrim's loses business?

16           And here is a key point that shows there was no

17    conspiracy.  2015 is the one year with a large price increase

18    because of the supply and demand factors I just described.  If

19    there was a price-fixing agreement, you would expect the

20    different suppliers' prices to be if not exactly the same, at

21    least very close.

22           The opposite happened.  The differences between the

23    competing suppliers' prices were larger than they had been in

24    prior years, a 5-1/2 cent spread.  Even the prosecutor told you

25    in his opening yesterday that even a fraction of a penny means

1   millions of dollars.  Does this sound like an agreement to fix

2   prices?  The suppliers are competing.  They are taking business

3   from each other.  The prices are all different.  And the spread

4   among prices is larger than it had been in previous years.

5           The prosecutor told you in his opening that this was a

6   conspiracy to raise prices, but that's not what the evidence

7   will show actually happened.  In 2015 prices went up because

8   there was a shortage of small birds that everybody in the

9   industry knew about including the customers.  In other years,

10  like 2014 and 2018, prices went down when there was abundant

11  supply.  And in 2018 at the end of the so-called conspiracy,

12  the price at which Pilgrim's sold chicken to KFC was actually

13  lower than it was in 2012 at the beginning of the so-called

14  conspiracy.  This isn't price-fixing.  It's the law of supply

15  and demand.

16          There will be no evidence that Roger Austin had

17  anything to gain from a conspiracy to agree to fix prices or

18  rig bids.  He had no motive.  There will be no evidence that he

19  had Pilgrim's stock options or that higher prices would result

20  in a big payday.  Does it make sense to you that someone would

21  risk his reputation, his career, his standing in the community

22  and his liberty if he did not expect some substantial benefit?

23          Now, what evidence does the prosecution have to try to

24  prove beyond a reasonable doubt that Roger knowingly entered

25  into a conspiracy to agree to fix prices or rig bids?  They

1    will likely argue that Roger made and received a lot of phone

2    calls with people who worked for other suppliers.  The evidence

3    will not show what Roger said on those calls, but the

4    prosecution wants you to speculate that something bad happened.

5              What do we say to that?  Of course Roger spoke with

6    other suppliers.  The evidence will show that there were lots

7    of reasons for him to do so.  Quite often one supplier would

8    run into a problem with a plant or a truck, so that supplier

9    would reach out to other suppliers to see if they could cover

10   the shortage.  Did Roger and other suppliers sometimes share

11   information?  Of course they sometimes did.  There is nothing

12   wrong with that.  The charge here is a conspiracy to fix prices

13   and rig bids, not a conspiracy to share information.  Sharing

14   information, even sharing prices is not against the law as long

15   as there is no agreement to fix prices.

16             The chicken business is a tough business.  The

17   evidence will show that there were tough negotiations for

18   millions of pounds or chicken.  A sophisticated professional

19   arm of KFC called RSCS negotiated with the suppliers and bought

20   all the chicken for every KFC.  Some employees of RSCS may tell

21   you that they wished the suppliers didn't communicate with each

22   other.  Of course.  All negotiators would rather have more

23   leverage and be able to play one supplier against another.

24             But there is nothing illegal about suppliers

25   exchanging pricing information as long as they make their own

1    decisions on their prices.  Every sensible business tries to

2    find out as much as it can about what its competitors are

3    doing, not because they are in a conspiracy, but because they

4    are trying to figure out their own best strategy to compete,

5    and that's what the evidence will show Pilgrim's did here.

6         The evidence will also show that KFC through its

7    buyers at RSCS regularly told the suppliers what the prices

8    should be.  There is no evidence that the suppliers agreed with

9    each other on prices, but to the contrary, there is a lot of

10   evidence that KFC told Pilgrim's what price it had to meet.

11        From time to time the suppliers communicated because

12   they wanted to know whether their customers were bluffing when

13   they said that other suppliers were cheaper.  There is nothing

14   wrong with trying to find out if a customer is bluffing.  The

15   customer might not like it because the supplier might call its

16   bluff, but that's part of normal business give and take.

17        And one more thing.  The evidence will show that when

18   Roger tried to gather information from multiple sources

19   including the customers themselves about what other suppliers

20   were doing, he explicitly told his bosses in Greeley that he

21   did not, he did not want them to think he was suggesting

22   meeting those prices.  This is an e-mail in Roger's own words

23   written at the time.  "We don't want them to think we're

24   suggesting meeting those prices."

25        He did not want his bosses to charge the same prices

1    as competitors.  He was using market intelligence in order to

2    help his company compete against other suppliers.  And that's

3    what the evidence will show really happened here.

4         To the extent the various suppliers spoke with each

5    other about prices, the information was a data point, just like

6    the information the suppliers got from customers, published

7    reports and historical information.  Like any business,

8    Pilgrim's wanted as much information as it could get about what

9    its customers were doing, not so that Pilgrim's could agree

10   with them to fix prices, but so that Pilgrim's could make what

11   it considered the best decisions in its own independent

12   interest.  And a lot of that information came from the

13   customers themselves.

14        The prosecutor said in his opening that in his words

15   this was blind bidding, but you will hear evidence that Mike

16   Ledford, the lead negotiator for RSCS, KFC's buying

17   cooperative, not only told Roger other suppliers' prices, but

18   that Mr. Ledford also told them that KFC wanted all the

19   suppliers at as close as possible to the same price even if it

20   meant a supplier moving to a higher price.

21        Now, why would KFC want that?  The evidence will show

22   that KFC wanted prices to be as close together as possible

23   because they had franchisees.  And they didn't want one

24   franchisee to have to pay more than the others.  They wanted

25   uniformity or as close to uniformity as they could get.

1          And what about the e-mail the prosecutor talked about

2   yesterday where Jason McGuire at Pilgrim's told his boss Jayson

3   Penn that, quote, "Roger did some checking around"?  Roger

4   didn't write that e-mail and it wasn't addressed to him.  There

5   is nothing to indicate who he checked around with.  And many of

6   the ranges listed in that e-mail turned out to be wrong.  But

7   even if he checked around with other suppliers, so what?  There

8   is nothing illegal about that.

9          There is no indication that Pilgrim's agreed with

10  other suppliers on what it was going to bid.  Pilgrim's, like

11  any business, wanted to know as much as it could about what

12  other suppliers were charging so Pilgrim's could make its own

13  decisions about what to bid, a decision, by the way, that was

14  made by others at Pilgrim's, not by Roger.

15         That's what they've got.  It doesn't begin to approach

16  proof beyond a reasonable doubt that Roger entered into a

17  conspiracy to agree to fix prices or rig bids.  There is no

18  evidence of an agreement to fix prices.  There is only

19  speculation and speculation is not proof.

20         Now, let me tell you a little bit about Roger Austin.

21  He is 65 years old, lives on a farm in Georgia, has been

22  married for 40 years, has two children and five grandchildren.

23  He worked in the poultry business for 40 years until he retired

24  in August 2018, long before any charges were filed in this

25  case.

1            During the years in question in this case, 2012 until

2    his retirement in 2018, Roger worked for Pilgrim's Pride where

3    he was one of many vice-presidents.  The evidence will show

4    that Roger was the customer guy for Pilgrim's.  His job was to

5    keep KFC happy and ensure that KFC had a continuous supply of

6    chicken.  He didn't have authority to set prices or determine

7    how Pilgrim's would bid for KFC's business.  He negotiated with

8    KFC, learned what KFC wanted and communicated that information

9    to Pilgrim's headquarters where a financial analytics group

10   analyzed all the data and instructed him what bids he could

11   offer to KFC.  As the evidence will show, Roger often disagreed

12   with the financial analytics group in Greeley and argued for

13   lower prices.  He was an advocate for his customer, KFC.

14           As you listen to the evidence, please consider these

15   facts.  The allegation is price-fixing, but the prices were all

16   different.  The suppliers competed with each other and took

17   business away from each other.  The circumstantial evidence, a

18   bunch of phone calls where we don't know what was said and a

19   handful of texts and e-mails spread out over eight years, all

20   that shows is that Roger was doing what any sensible business

21   person would do, trying to find out as much as he could about

22   what his competitors were doing, not to agree on price, but to

23   help Pilgrim's make its own independent decisions.

24           There was no agreement to fix prices or rig bids.

25   Each supplier's prices and margins were different every single

1   year.  Roger could not be part of a conspiracy to fix prices

2   because he had no authority to set prices.  Roger had no motive

3   to enter a conspiracy to agree to fix prices or rig bids.  What

4   happened here was simply a function of the ordinary laws of

5   supply and demand.  In one year the supply of chicken was tight

6   and prices went up.  In other years there was greater supply

7   and prices went down.

8            Now, there is a natural tendency to think that if the

9   Department of Justice charges someone with a serious crime, he

10  must have done something.  Even though the burden of proof is

11  on the prosecution to prove each defendant guilty beyond a

12  reasonable doubt, I suspect some of you may be thinking, there

13  must be something.  They're the government after all.  How

14  could they possibly make such a big mistake?  Here is how.

15           The evidence will show that before completely

16  overturning Roger's life and charging him with a serious crime,

17  a felony, based on a bunch of phone records and a handful of

18  texts and e-mails spread out over eight years, no one from the

19  prosecution sought to investigate and understand the business.

20           Before they brought charges in this case, the

21  prosecution interviewed virtually none of the key witnesses.

22  With all the vast resources of the United States Government,

23  they did not interview anyone at Pilgrim's until after charges

24  had been filed and they were searching for evidence to fit into

25  the theory that they had already decided on.  Was this a fair

1    investigation where the prosecution seeks to get both sides of

2    the story before making a decision to charge someone with a

3    felony or was it ready, fire and only then when it's too late

4    aim?

5            Here is another fact the prosecution didn't tell you.

6    KFC, the customer, got the prices it wanted.  Take a look at

7    one page of an RSCS PowerPoint from December 2012.  This is the

8    customer talking.  "We anticipated there may be a need to have

9    follow-up calls with a couple of suppliers, Tyson and

10   Pilgrim's.  However, they have come back generally in line with

11   where we asked them to get on their best and final numbers."

12           Finally, a word about the prosecution's so-called

13   insiders.  Carl Pepper from Tyson didn't have much to do with

14   Roger, so I will leave the discussion about him to others and

15   focus on Robbie Bryant, the so-called conspiracy insider from

16   Pilgrim's.  Please scrutinize Mr. Bryant's testimony with care.

17   Is he reliable?  Is he specific or vague?  Is what he says

18   corroborated?  Does he have a history of dishonesty?

19           What the prosecutor did not tell you is that

20   Mr. Bryant is an admitted liar.  He has lied to the prosecutors

21   and agents in this case on multiple occasions in his pretrial

22   interviews.  He lied to the government about things he has done

23   that have nothing to do with any of the issues in this case.

24   He lied to the government about things that do not involve

25   Roger or any of the other people on trial here.

1           The prosecutors and agents told Mr. Bryant that lying

2    to the government is a serious crime, a felony, but he lied to

3    them anyway.  Prosecutors haven't charged Mr. Bryant yet, but

4    they could.  They could charge him with a felony and they have

5    the sole discretion to do that.  And Mr. Bryant knows that, so

6    he has every incentive to say exactly what the prosecutors want

7    him to say so he can avoid being prosecuted himself for lying

8    to them about unrelated things.

9           He is the opposite of a reliable witness.  He is the

10   kind of witness who will say anything to you in order to

11   protect himself.  Basing a case on his testimony is the

12   definition of reasonable doubt.

13           *THE COURT:*  Two minutes, Mr. Feldberg.

14           *MR. FELDBERG:*  Thank you, Your Honor.

15           When you review the evidence and consider all the

16   questions this case raises, I submit to you that the

17   prosecution -- you will conclude that the prosecution has not

18   met its burden of proving beyond a reasonable doubt that Roger

19   Austin knowingly and intentionally entered into a conspiracy to

20   agree to fix prices or rig bids, and you will conclude

21   accurately that he is not guilty.

22           Thank you.

23           *THE COURT:*  Thank you, Mr. Feldberg.

24           Mr. Canty, go ahead.

25                          **OPENING STATEMENT**

1          *MR. CANTY:*  Thank you, Your Honor.

2          Ladies and gentlemen, this case is about the

3    government's misguided theory that there was an agreement among

4    these people to fix prices and their relentless insistence on

5    advancing that theory despite a mountain of evidence to the

6    contrary.  The theory is false.  The government's claim is

7    built on a very deliberate and extremely limited selection of

8    what to show you.  The government's case depends on putting

9    blinders on you, focusing your attention on some shiny objects

10   and keeping you from seeing the big picture.  The big picture

11   is this.  These men competed with one another.  They didn't

12   agree to fix a price.

13         I am Dennis Canty.  This is my colleague, Mark Byrne.

14   And we are here standing up for Jimmie Little.

15         Mr. Little spent his life working in the chicken

16   industry.  He started at the bottom working in a Church's

17   restaurant, worked his way up, became the owner of some

18   Church's franchises, eventually came to work at Pilgrim's

19   Pride.  He retired over seven years ago in 2016.  And at the

20   end of his career, he had a title of VP of sales, national

21   accounts, but it was really just a title.

22         He wasn't in charge of a division.  He didn't have a

23   department.  He didn't have a single person reporting to him.

24   He was a salesman and a customer service guy.  He was the main

25   point of contact for restaurant chains such as Church's

1    Chicken, a Florida outfit called Pollo Tropical which you will

2    hear a lot about, Chicken Express, Boston Market, Pizza Ranch.

3    You'll hear a lot in this trial about contracts with KFC and

4    Popeye's.  When you do, keep in mind Mr. Little was not the

5    main point of contact for KFC or Popeye's.  He had no

6    involvement whatsoever in contract negotiations for KFC and

7    Popeye's.

8         While we are talking about contract negotiations,

9    Mr. Little did not have authority to set prices.  There was a

10   team at Pilgrim's who decided what Pilgrim's price for chicken

11   would be.  You'll see e-mails where Mr. Little is asking

12   pricing team at Pilgrim's, can I get the pricing for this

13   account?  The pricing team provided Mr. Little with the pricing

14   information that he would use with his customers.  Contracts

15   were annual.  Contract negotiations happened once a year,

16   usually in the fall.

17        Mr. Little's No. 1 job was customer service.

18   Pilgrim's Pride shipped fresh chicken all over the country

19   every day.  Multiple customer service issues arise.  Mr. Little

20   would have to help solve problems.  Delivery trucks may be

21   late.  Chicken may be delivered that didn't meet customer

22   specs.  Chicken may be spoiled when it gets there.  And most

23   frequently as you have heard several times already, there were

24   issues of shortages, shorts.  To fix those problems, Mr. Little

25   had to make a lot of phone calls, sometimes to customers,

1    sometimes to distributors, and yes, sometimes to competitors.

2         How is the government going to convince you that these

3    men and Mr. Little are guilty of price-fixing?  The most

4    tantalizing and seductive things that they are going to show

5    you are conspiracy insiders and summary exhibits, and we are

6    going to talk about both of them.

7         You've heard that the government has insiders that are

8    going to talk to you about their participation in the alleged

9    conspiracy.  You may think of some figure on a video screen

10   with his face and his voice that is obscured to protect his

11   identity that came forward on his own to help the government in

12   their crusade for truth and justice.  No.  These witnesses did

13   not come forward.  The government went into their fabulous

14   theory and with their Indictment already in hand came to search

15   them out.

16        They sat down with these witnesses for many, many

17   interviews.  And over many, many interviews these witnesses did

18   not tell the government what they wanted to hear.  But the

19   pressure continued.  These witnesses knew that they too could

20   be prosecuted if they didn't tell the government the things

21   they wanted to hear and help them convict these guys.  The

22   evidence will show that the FBI and the rest of the government

23   used coercive interrogation tactics to extract from these

24   witnesses statements that the interrogators wanted to hear

25   without regard to whether those statements were actually true.

1              The government finally applied enough pressure that

2     these witnesses may now be willing to speak some magic words to

3     you, magic words like agreement.  If you hear these witnesses

4     say these words, ask yourselves, an agreement?  To do what

5     specifically?  Between whom specifically?  When and how was

6     this agreement made?  How was this agreement communicated?

7     Does this witness have any personal knowledge of such an

8     agreement or how it was communicated?  If the witness says he

9     entered into an agreement with someone else, who, when, how?

10    Does this witness even have the ability, the capacity to enter

11    into the agreement that he claims he entered into?

12             If the witnesses and their testimony get anywhere near

13    answering any of those questions, I'm sorry, but you have three

14    more.  Why didn't that witness say so in his first or second or

15    his 13th interview with the government?  What is the motivation

16    and the trigger behind the magical recollection?  Has the

17    witness been truthful in the course of the investigation?

18             There is another thing that the government did with

19    these witnesses over the course of so many interviews and they

20    are going to try to do it to you.  They are going to show you

21    evidence that a salesperson obtained information about a

22    competitor's price.  They are going to try to make you feel

23    like it was wrong and shady and unfair.  And then they are

24    going to try to convince you that getting the price information

25    is the crime for which these men are on trial.  Don't let them

1    do it.

2            You will see that learning a competitor's price is a

3    sensible and lawful business strategy.  It makes sense.  In

4    this industry and in any other, you want to know what your

5    competitors are charging if you want to compete.  And that's

6    what these men were doing.  They were competing.  And that's

7    what the evidence will show perhaps above anything else.

8            Let's talk about summary exhibits.  This is what they

9    look like.  They are going to present these to you saying that

10   they summarize evidence in the case.  They're a centerpiece of

11   the government's efforts to focus your attention on some of the

12   facts and not all of the facts.  You will learn that these were

13   put together by the government.  They selected information that

14   they liked from telephone records, text messages and e-mails.

15   You'll see that the government intentionally omits information

16   which would suggest any facts contrary to their theory.  They

17   put in some telephone calls and not others.  They put in some

18   e-mails, but not others.  We'll point out some important

19   examples.

20           Another feature of these summary exhibits is that they

21   group things together.  Through the grouping the government

22   suggests a factual connection between the calls and the e-mails

23   and the messages and the events.  These are the government's

24   groupings.  It is the government's view that the calls and

25   messages and the events are related to one another.  They want

149

1    you to adopt their view.

2         When they show them to you, please remember that they

3    don't include all the relevant evidence.  They don't even

4    include all the relevant phone calls or text messages.  Don't

5    be fooled by a colorful arts and crafts project that the

6    government put together for you out of slivers of

7    eight-year-old phone bills.

8         Another thing that the evidence in this case will

9    clearly show beyond a reasonable doubt is that I am no good at

10   PowerPoint, but this part is important, so I wanted to give it

11   a shot.  What I want to give you now are things to look for

12   that you are not going to see on any summary exhibit, an

13   outline of the evidence the government ignores, things you

14   don't see if you get obsessed by looking at a colorful chart of

15   who called who on what date.

16        When the government tells you that there was

17   price-fixing in connection with this contract or that contract,

18   look carefully at what happens.  Look at what happens before

19   the bidding process, during the bidding process and after the

20   bidding process.  What you're going to see are acts and events

21   and behavior that are entirely inconsistent with price-fixing

22   and instead prove to you that what was happening here was

23   competition.

24        What happens before the bidding process?  Independent

25   analysis and decision making.  You will see that the market

150

1    forces and the laws of supply and demand affect the price of

2    chicken.  And you will see independent analysis of these

3    factors and decisions around them made by each of the

4    competitors.

5          You'll also see different approaches and methods at

6    arriving at the final price, different pricing models where

7    they can do that.  You will see individual approaches to

8    buyers, and this is a very important point.  You will see

9    differences in the competitors regarding who each values as a

10   customer and how important it is to that competitor to retain

11   that business.

12         What happens during the bidding process?  Well,

13   different bids.  Some companies submit different bids.  Some

14   are higher than others.  You will see a significant range of

15   bids.  And you'll see as discussed earlier that there is a

16   range of bids, and instead of narrowing during events where

17   price-fixing is alleged, it actually widens.  You'll see some

18   suppliers submit bids earlier than others, sometimes before any

19   price-fixing communications are even alleged.

20         Competitor conduct.  You will see competitors try to

21   undercut each other and take business away from one another.

22   Buyers using competitive intelligence against suppliers.  The

23   government would have you believe that these men conspired to

24   drive prices up, but the reality is that in many situations

25   buyers routinely used pricing information from one supplier to

1    drive down the price of another.  It was a common business

2    strategy used by buyers.

3            You'll also see evidence that buyers wanted suppliers

4    to be in a tighter range.  It was better for them.  It was

5    better for their business.  What happens when the bidding

6    process is over?  You'll see different pricing or contract

7    terms.  The evidence will show that in the end suppliers wound

8    up with different contract prices in ranges that again widen

9    rather than narrow in events where price-fixing is alleged.

10           You'll see that the competitive bidding process

11   resulted in suppliers with lower bids taking volume, taking

12   business away from others who had higher bids.  The government

13   will try to prove that Mr. Little agreed to fix a price in

14   contract negotiations with Pollo Tropical.  We are going to see

15   that.  When we do see that, when they try that, consider the

16   evidence in the framework I am suggesting.

17           You'll see evidence that the pricing department at

18   Pilgrim's, not Mr. Little, conducted independent analysis and

19   arrived at a price.  You'll see that Pilgrim's approach to

20   calculating and presenting the price is different from its

21   competitor.  You'll see very different attitudes regarding the

22   importance of the Pollo Tropical business to each competitor.

23   You will see different bids submitted at different times.

24   You'll see Joe Brink, the buyer, trying to push the

25   competitors' prices together.  You'll see Jimmie Little's

1   competition write e-mails to Mr. Brink trying to undercut him.

2   In the end you will see different prices and different contract

3   terms.  Look at the evidence.  Look at the big picture.  What

4   you see is competition.  You don't see an agreement to fix a

5   price or rig a bid.

6           You may hear evidence regarding two events involving

7   Mr. Little and Church's Chicken, events surrounding a quality

8   assurance charge and a quote for a freezing charge.  The

9   government will claim that Mr. Pepper obtained pricing

10  information from Mr. Little.  You won't see any agreement to

11  fix a price.  Neither Mr. Little nor Mr. Pepper have any

12  pricing authority, so they can't agree on a price.  Both men go

13  back to their pricing teams at their respective companies.

14  Both companies independently analyze the requests and how they

15  are going to respond.  Each company does it differently and on

16  a different time frame, the signs of competition.

17          Ladies and gentlemen, please look at all the evidence.

18  The government gets to go first.  Please wait, make up your

19  minds after you have had a chance to hear all of the evidence.

20  You'll see the bigger picture.  You'll see the competition.

21          The government is going to keep on ignoring the

22  evidence in order to prove its misguided theory.  What they

23  said in opening makes me scratch my head.  It's like they don't

24  get it.  Let's look at what they said in their opening

25  statement:  Well, you're going to see in the evidence that it's

1    just like a rising tide lifts all boats, rising prices lift all

2    competitors.

3         Yes, yes, a rising tide lifts all boats.  The boats

4    didn't rise because they called each other and sent text

5    messages and said, okay, it's Saturday.  Good for you.  And

6    don't tell anybody about that inside conspirator over there.

7    The boats rose because there was a rising tide, an immeasurable

8    force of nature.  They came in and locked them up.  The boats

9    didn't agree to rise.  That's what happened in 2014 here in the

10    chicken industry.  Laws of nature, laws of supply and demand,

11    laws of economics, laws of chickenomics, chicken math, big

12    bird, small bird.  It was a really bad Mother's Day for the

13    colonel.

14         All this happened in 2014.  And as a result, prices

15    went up for everybody.  And yet the government sits here and

16    wants to ruin the lives of these men over a conspiracy, a

17    made-up conspiracy that never existed.  You, you all sitting in

18    those seats over the next few weeks, you are the reason that

19    this place is the land of the free.  Find them not guilty and

20    send them home.

21         *THE COURT:*  Thank you, Mr. Canty.

22         Next?  Mr. Gillen, go ahead.

23                  **OPENING STATEMENT**

24         *MR. GILLEN:*  Good morning.  My name is Craig Gillen,

25    and along with Anthony Lake and Richard Tegtmeier, we have the

1   privilege of representing Brian Roberts.  He along with

2   Mr. Mulrenin, they work together in Tyson, and they are charged

3   with this conspiracy.  As everyone in this room is, they are

4   not guilty.  There is no conspiracy.

5          What I am going to do today in my opening is I am

6   going to take some words from the prosecutor in his opening.  I

7   almost got up and cheered.  That would have been improper, but

8   there were two charts the government showed in their opening

9   statement which proves my point.  And I am going to go back --

10  I don't have their charts, but I am going to show you what they

11  said and you will remember it because it's very, very

12  important.

13         They told you that there was a secret club, a

14  conspiracy club.  And these people did a certain pattern and

15  the quote was over and over and over again you'll see the same

16  pattern.  And they said you'll see it in the 2014 KFC.  And

17  this is the pattern they told you about.  They said, well, the

18  regular pattern is that KFC would send out a request for a bid.

19  And then they would have -- the suppliers would have internal

20  meetings.  And then after those internal meetings, each

21  supplier would submit a bid.  That's what the government said

22  is the normal way it works.  The lower area here on your chart,

23  this is what they said is the pattern for the secret criminal

24  conspiracy.

25         They say -- this is important -- the customer sends

1    out a bid request.  That's No. 1.  No. 2, the conspirators get

2    together and they talk it up and they work and work together.

3    And then after they have decided what to do, they send it over

4    to their company for -- and then they send in the bid.  We are

5    going to look at the 2014 KFC model and show that is exactly

6    what Tyson did not do.

7            Now, before we get to that, let me talk a little bit

8    more about the process.  We have all heard about the horrible

9    situation with small bird in 2014.  It was bad.  KFC knew it.

10   And let's look at it from two sides.  KFC knew it was bad.  The

11   suppliers knew it was bad.  And it's not just the fact that

12   there was more demand from the other folks that were buying

13   small bird, but it was -- this is critical -- it's a

14   combination of two forces.  One, the more supply, but also the

15   fact that the economics was that if you had a small bird plant,

16   you made less, dramatically less money per pound on that bird

17   sale than if you had a big bird plant.

18           So what was happening?  You've seen some of the charts

19   in the earlier openings.  People were converting their small

20   bird plants to big bird plants because it made economic sense

21   so they could make more money.  What does that do?  Well, the

22   fewer the small bird plants, the fewer the small birds, the

23   bigger the problem for the KFCs of the world.  So that was the

24   market economics.  As a matter of fact, one of the government

25   witnesses I expect to be called in this case will say, you

1     know, in 2014 he wouldn't even be in the small bird business.

2     It made no sense.

3          And once you convert a plant from small bird to big

4     bird, you're not going back.  You're not going back.  You are

5     staying with the big bird.  So the market gets smaller and

6     smaller and smaller, that's the problem.  KFC on their side of

7     things, they knew it too.  And they were begging to buy chicken

8     the very summer that they are going to be negotiating, within

9     weeks of negotiating, the beginning of the negotiations with

10    these folks, they are begging people to buy chicken at $1.30 to

11    $1.40 per pound.  And a lot of times they couldn't get it even

12    at that rate.

13         Now, you say, what does that matter?  I don't know

14    what those numbers mean, Mr. Gillen.  Well, keep in mind that

15    the highest number at the end of the day was Pilgrim's and they

16    were like $1.08 in December when the final negotiations were

17    done.  So these people were begging to buy at $1.30 in the

18    summer.  And then they are complaining that the marketplace and

19    the economics, they end up buying at the highest rate of $1.08

20    in December.  That's the marketplace that we're looking at.

21         Now let's talk a little bit about what's going on

22    inside of Tyson.  Now we know that KFC has this problem.

23    Everybody does.  Inside of Tyson, you will learn about the

24    structure that was going on inside of Tyson.  Now, Tyson is a

25    company that -- let me just go over a little bit of this here.

157

1    This is an organizational structure.  And real fast on this,

2    you can see Brian Roberts is way down here.  He has got a nice

3    title, vice-president of sales for national accounts.  He

4    reported to Andy Lubert, who reported up and up and up.  And

5    down below Mr. Roberts is Mr. Mulrenin over here.  So you can

6    see where they stood on the org chart.

7        And what you will find out internally is how Tyson

8    went about fixing their prices.  You will learn that the small

9    bird business for Tyson was not profitable.  And they're in the

10   business of making a profit.  We know about how to convert big

11   bird and how that can do it for them.  And so Tyson's position

12   in 2014 is we're going to build a business model or a model to

13   buy this, and it's going to make a profit that we think is

14   commensurate with what we need or we won't sell it to them.

15       So what you have here is what's going on inside of

16   Tyson.  You're going to learn about they've got what they call

17   a business unit and a pricing unit.  Now, the business unit,

18   they are sort of in charge of the small bird.  They own the

19   birds, as they say.  They develop a strategy about what they

20   want for that -- for the contracts that are coming up.  They

21   then give that strategy to the pricing unit and that's Brandon

22   Campbell.

23       And what Mr. Campbell would do is Mr. Campbell would

24   then get together and he would then make a proposal and he

25   would then end up passing that along and telling the

1    salespeople what the model was going to be.  Now, the key thing

2    to remember here, remember sales did not set the price.  It was

3    set by Campbell and in conjunction with the business model.

4         Now, what other chart did I find that I was so happy

5    that the government decided to put up in their opening

6    statement?  This is a segment of the Pilgrim's chart that has

7    been talked about by the government and several people.  And

8    the reason why I really like this one is because the government

9    kept saying, you know, you'll see on these calls between August

10   the 11th and August the 18th, you'll see all of this activity

11   going on and they are talking back and forth and they are

12   calling each other.  They've got to be planning something.

13   They got to be conspiring and violating our law.  Don't you

14   think?  And they are going to say, we've got phone calls where

15   people from Tyson are calling around to other people.  They've

16   got to be guilty.

17        Well, use your common sense.  When you come into the

18   courtroom, you don't have to leave your common sense downstairs

19   at the security gate.  You use your common sense to factor in

20   what really happened here.  Now, this segment here is the

21   market intelligence that was being passed around Pilgrim's on

22   August the 18th.  Keep in mind the bid was due on August the

23   19th.  You do not see, because Tyson was in no conspiracy and

24   these folks weren't in a conspiracy and they weren't even

25   sharing their numbers.  The only supplier not listed on the

1    August 18th Pilgrim's intelligence communication about what

2    everybody is doing is Tyson, those two folks over there, not on

3    their list.

4            And this is a government -- they used it in their

5    opening.  And I am using it in mine because it proves our point

6    beyond any doubt.  Now, why is that day so important?  Well,

7    the bidding was supposed to be on August -- get the bids in on

8    August the 19th.  Back to that model we talked about before

9    where I liked it where they talked about that secret conspiracy

10   society or club that you had to join.  The government told you

11   the first thing is you get -- they request for bid and then

12   there is the conspiracy and then there is the setting of the

13   bids.  This is the problem the government has.

14           You will learn that Tyson set its model for small bird

15   chicken for KFC in June of 2014, months before or several weeks

16   before even the bid request went out.  They fail on that point.

17   They fail on their model, the one they told you the pattern

18   shows over and over again.  Tyson had already -- the pricing

19   department had already told Roberts what, in fact, we were

20   going to be asking for and he had a different model.

21           The model that Pilgrim's was proposing had marination

22   issues, what we call tare back weight.  It was a different bid

23   even on the elements of what they were asking for in their

24   pricing.  It had nothing to do with any of the other folks in

25   this room.  We send our bid in on August the 11th.  We send our

1   bid in on August the 11th before all the flurry of the calls,

2   before all the things the government would have you speculate

3   and conjecture about someone being a felon in a conspiracy.  We

4   send our bid in on August the 11th.  That's exactly what we

5   did.

6          Now, we have -- what happened after we sent our bids

7   in, the second round of bids?  Finally we end up in a situation

8   where we sort of come to an agreement with KFC.  And, you know,

9   after that what do you think they want to do with us?  They

10  wanted to give us more business.  They wanted to give us more

11  loads, not less.  They wanted to give us more.  That's what

12  happened on those calls.  That's what happened.

13         When we have here a chart showing in June the number

14  that we were looking at in June set by the pricing department,

15  not by Roberts, not by Mulrenin, by the pricing department, it

16  was 19 cents.  We end up in December after all the

17  negotiations, after all -- we end up at 19 cents .3, virtually

18  exactly what the pricing department in June told us we needed

19  to do.

20         What you're going to have here is you're going to have

21  a situation where you're going to have -- we talked about two

22  people, Pepper and Bryant.  You know, it's interesting that why

23  do you need to interview somebody for hours and hours with a

24  room full of federal prosecutors and FBI agents until they get

25  it right as far as the government was concerned?  It's like a

1    pressure cooker.  Because the one thing you're going to learn

2    here is Mr. Pepper and Mr. Roberts -- excuse me, Mr. Bryant,

3    did not want to be out here wearing masks sitting in their

4    suits waiting anxiously for their fate to be decided by 12

5    members of a jury.

6         And the only people that have the power to make that

7    happen to them is the people sitting right there.  And they

8    kept meeting with them.  It's not good enough.  You got to come

9    back.  You're doing better.  Not good enough.  You got to come

10   back.  You got to come back.  Bryant, 20 times.  He admits

11   lying to them about other things on several occasions, which is

12   felony, felony, felony, felony; but all, Mr. Bryant, is

13   forgiven if you just say what we want.  Just sing the song that

14   we've already written.

15        You look at Mr. Pepper, Mr. Pepper who for two and a

16   half years would meet with them and hope that he would, you

17   know, not end up in a situation out here with these folks, two

18   and a half years meeting after meeting.  No, no, no, not good

19   enough.  You've got to say the magic words.  And if you do,

20   then you can go to sleep at night knowing that we are not going

21   to put you over here.  That's what happened.  That's what

22   happened with Mr. Pepper.  That's what happened Mr. Bryant.

23        And you'll see these folks and judge for yourselves.

24   You will see the finished project.  I mean, can you imagine if

25   you worked on a project and you had 20 days to work on a

1   project or 20 times you had to meet with people and work on it

2   and practice it and practice it, and you're going to see the

3   product of these folks' fine work over perhaps hundreds of

4   hours grinding these people into a situation where they will

5   say the magic word.

6          Now, the situation regarding alleging a conspiracy

7   between Tyson and Pilgrim's is laughable, frankly, if it

8   weren't so serious.  You'll find out during the course of this

9   2014 period when the government would have you believe that

10  they were all in this secret club, the secret conspiracy club,

11  that Pilgrim's is running around on other projects like Golden

12  Corral speculating and wondering what the Tyson price was and

13  being upset because they thought they had undercut or were

14  under them and they were guessing and speculating.  And you

15  know what the term was they used for Tyson because they thought

16  they were selling their chicken too cheap?  They're morons.

17  They're morons.

18         Now, we're not taking offense from the Pilgrim's

19  perspective for that because it shows we were competing with

20  them.  They were competing with us.  That's the way it went.

21  That is exactly the way that it went.  You'll see time and

22  again references to we're not going to give them anything.

23  We're not going to help them.  If they get a bid, they have to

24  buy chicken from other folks because they can't fulfill their

25  cheap chicken contract they had.  What did Pilgrim's say?  No,

163

1    no way.  We're not doing it.  Not 1 micron is the phrase that

2    was used.  And that's okay.  They didn't like us.  We didn't

3    like them.  We were competing.

4         But at the same time you've got to be in a situation,

5    as everyone as has said here, about finding out what was going

6    on in the industry, what's going on.  And the context regarding

7    ranges in terms of prices and market intelligence is exactly

8    what smart business people do.  That's exactly what smart

9    business people do.

10        So you have got a situation where you've got their

11   centerpiece case, the KFC, where under their model that they

12   said was the pattern, they say, okay, you've got to send out

13   the bid.  Well, we set our price before our bid was even sent

14   out.  Oh, then there has got to be discussions before a price

15   was sent out.  There were no discussions before the Tyson price

16   was sent out.  That's exactly the problem that we have here.

17        The government, when they have the hammer, they've got

18   the hammer.  And they can take a square peg.  And you pound on

19   it hard enough, see if you can get it in the round hole.  And

20   that's what they've done with their theory about trying to make

21   these folks into criminals, into felons, into conspirators.

22   It's just not the way it worked.

23        *THE COURT:*  Two minutes, Mr. Gillen.

24        *MR. GILLEN:*  Thank you, Your Honor.

25        And back to the part about common sense, back to the

1    part about common sense, and boy, thank goodness for the jury

2    system in the United States of America where jurors make these

3    decisions and not bureaucrats or government officials or FBI

4    agents or federal prosecutors, but you, use your common sense

5    and ask yourself this.  If Tyson and Pilgrim's were in a

6    conspiracy with all these other folks, at the end of the day on

7    the KFC model, there was a 2-1/2 cent difference between the

8    profit margin that was on the chart from Pilgrim's and for

9    Tyson, 2-1/2 cents.  Over the course of a three-year contract,

10   that is worth tens of millions of dollars, tens of millions of

11   dollars more for Pilgrim's than for Tyson.

12          What fool is going to enter into a conspiracy with

13   their top competitor in saying, no, no, no, no.  You're such a

14   nice guy, you make all the money.  I'll sit down here and you

15   make the tens of millions of dollars more than me on -- at

16   least on the profit margin as you project out these sales.

17   Does that make sense?  Of course, it doesn't make sense.  Use

18   your common sense, please.

19          And I thank you for the attention that you have given

20   to me and to all of my other colleagues here in their opening

21   statements.  At the end of this case, I will be back up here.

22   I will ask you to return a verdict that speaks the truth, a

23   verdict of not guilty for Brian Roberts.

24          Thank you very much.

25          THE COURT:  Thank you, Mr. Gillen.

1          Ms. Prewitt?

2          *MS. PREWITT:*  Thank you, Your Honor.

3          On behalf of Mr. Mulrenin, we will be reserving the

4    opening statement to the close of the government's case.

5          *THE COURT:*  All right.  Thank you.

6          Ms. Henry?

7                        **OPENING STATEMENT**

8          *MS. HENRY:*  Good morning.  My name is Roxann Henry.

9    And let me introduce you again to Mr. James Backstrom with whom

10   I have the honor to represent Mr. Bill Kantola.

11         Let's look at what the evidence will show and what it

12   will not show with regard to the government's evidence because

13   it is chuck full of inconsistencies and gaps that create

14   reasonable doubt that Mr. Kantola voluntarily, willingly,

15   intentionally entered into any price-fixing agreement.  At the

16   end of the trial, common sense will tell you the fact, the fact

17   that he did not.

18         Who is Mr. Kantola?  The prosecution put up its slide

19   that almost made it seem like Mr. Kantola and Koch Foods were

20   the same thing.  That would be funny if this were a laughing

21   matter, but it's not.  Mr. Kantola is here on trial for a

22   felony.  And he is not Koch Foods.  He is a salesman, one of

23   many at the company, and he had no authority to set the

24   company's prices.  His job was to sell chicken, service

25   customers, and no one even at the company reported to him.

166

1          And while Mr. Kantola did not set prices or decide

2    strategy, he was proud to work with customers to implement Koch

3    Foods' strategy.  That strategy was very different for many of

4    these other suppliers, and it directly conflicts with what the

5    government has told you that the suppliers were agreeing on.

6    That strategy was decided by Koch's owner who had decided to

7    invest to expand capacity for small bird fast-food customers.

8          And Mr. Kantola needed to sell more chicken to help

9    with that to fill the capacity, to take sales away from the

10   competition.  Mr. Kantola did use the phone and that is the

11   only thing he is on trial for doing.  There were no meetings

12   among competitors to agree on prices.  You are not going to

13   hear any of that.  There are no multi-party phone calls.  There

14   is no recording or video of folks agreeing on prices.  And no

15   witness is going to describe to you any phone call where

16   Mr. Kantola agreed on a price or a price level, not one call

17   over the eight-year time frame.

18          Instead, the evidence will show that Mr. Kantola and

19   those on the phone with him did not and could not agree on

20   prices.  None of the folks Mr. Kantola talked with had the

21   authority to set pricing.  And there were good reasons for

22   calls.  Moreover, calls don't set a price when the price has

23   already been submitted.  This evidence alone raises more than

24   reasonable doubts about the theory the government concocted,

25   but the facts of what actually happened destroy any notion that

1   Mr. Kantola ever had a call that involved an agreement to fix

2   prices.

3          As you've already heard, buying and selling chicken is

4   a good reason for phone calls and you do have to talk about

5   specs.  We call them specifications, prices, weights, all of

6   that.  When a truck has turned over, folks still get to eat

7   chicken because someone covers for the shortage.  Asking have

8   you heard back yet, we're trying to keep score or being

9   surprised that someone undercut you, that's not evidence of a

10  salesman engaging in an agreement to fix prices.

11         I don't know what type of exclusive clubs the

12  prosecutors know, but that doesn't sound like much of a club

13  and without a single meeting.  The government has the burden

14  and they cannot meet it.  As the evidence is presented, what we

15  ask is that you watch closely to what actually happened, what

16  actually was said, what actually was done.  And look carefully

17  at what was not done and what does not make sense.

18         You've heard of these summary charts.  They are charts

19  of snippets and they won't show you that.  When a document is

20  culled to give you a feeling of collusion and then you learn

21  that in the rest of the document it talks about aggressive

22  competition from Koch and others, that's reasonable doubt about

23  a concocted theory.  The cherry-picking shows how the

24  government's theory requires you to be deaf and blind to facts,

25  to what actually happened.

168

1           Another sample, Koch's proposal for the KFC 2013
2    contract.  Early on Mr. Kantola tells a colleague at his
3    company that the decision has been made to increase the price
4    of dark meat by a little bit, an ordinary internal document.
5    He also says, not shown on the charts, that he is really not
6    sure it will work.  Well, what actually happened?  After the
7    proposal is submitted, Koch immediately lowers the price and is
8    awarded -- it is the only supplier awarded a significant
9    increase in volume of that dark meat.  Well, that's not
10   price-fixing, but you will hear that is what the government
11   claims.
12          So the lesson from this is that when you see these
13   snippet charts, ask what happened after that?  What is being
14   hidden?  Look carefully at the numbers.  The government relies
15   heavily upon a couple of documents where one supplier,
16   Pilgrim's Pride, has what the government says is bid pricing
17   for others.
18          The government put up the slide and Mr. Gillen showed
19   it to you again.  It plugs in a 14 to 16-cent increase for
20   Koch, but the prosecutors are repeatedly wrong about this
21   critical most fundamental premise of their theory.  The numbers
22   don't match Koch's actual numbers.  Koch was never at a 14 to
23   16-cent increase.  Obviously, it doesn't make sense that
24   Mr. Kantola fixed prices over eight years by providing wrong
25   numbers.  That wouldn't show a price-fixing agreement.  But

1    there is also no evidence Mr. Kantola provided those numbers.

2            Now, there is a lot of ways a supplier can back into a

3    number for competition, but someone just guessed wrong or maybe

4    the customer bluffed or someone else said something somewhere.

5    You'll see during the trial, I will point to numbers that just

6    don't match what the government is trying to make you believe.

7            Similarly, you'll see a statement, a salesman telling

8    his boss he thinks Koch will not move on its pricing when the

9    fact is that actually Koch negotiated and lowered its price.

10   Whatever the basis for psyching out these ideas and even if it

11   had come from gossip, the guess is wrong.  It's just wrong.

12   And these are only some of the ways the government is wrong.

13   At the end of the trial, I'll point out others.

14           And could Mr. Kantola have intentionally, willfully

15   understood that anything that he was doing could be agreeing to

16   fix prices?  For that you will need to look at the evidence

17   from the perspective of Mr. Kantola, what he would have seen,

18   what he would have heard.

19           The government focused in its opening on the 2015

20   price increase, so let's look at the evidence on that from

21   Mr. Kantola's viewpoint.  You've heard a lot of this already.

22   Let me put it into perspective here.  Big bird profitability

23   hugely more than for small birds.  Mother's Day disaster.

24   Tight supply.  KFC then tells Mr. Kantola how scared it is

25   about the small bird supply.  Next, KFC asks Koch for a

1    proposal and specifically asks Koch to compare its

2    profitability with that for big birds, what do you need

3    compared to big birds.

4         Meanwhile, Koch's owner is choosing to invest in small

5    bird capacity and decides upon pricing to support -- to give

6    financial support for that investment.  Mr. Kantola's job is to

7    help fill the extra capacity.  He explains to KFC how Koch's

8    offer is a win-win, sustainable supply source, and it will be a

9    solution to their problems.

10        KFC comes back.  And it does complain about the price,

11   which you will also hear it always does, but it offers -- but

12   it tells Mr. Kantola we are making good progress and offers --

13   asks, actually, how much more volume might you be able to sell

14   us?  Koch negotiates and lowers its price.  Now, what does

15   common sense tell you about how much to lower the price?

16   Enough to get the extra capacity, to get the extra sales, and

17   that's exactly what happens.  This is the result for Koch for

18   that negotiation.

19        Koch received an extra -- this is the extra amount --

20   about five -- half a million pounds per week, 25 million extra

21   pounds of chicken annually over a three-year contract.  That's

22   75 million pounds of chicken.  That's a huge lot.  Who would

23   make a deal to say, okay, Koch, you can have this.  There is no

24   way Mr. Kantola could have seen this as price-fixing.  He saw

25   his company making an independent pricing decision, yet the

1    government showcased this particular negotiation in its opening

2    to describe its concocted theory.

3         Mr. Kantola's objective was to sell more chicken and

4    that is what he did at the expense of the very competitors the

5    government claims he talked to about an agreement.  And make no

6    mistake.  The government understands that it isn't price-fixing

7    when you're -- when the goal is to undercut a competitor.

8    Remember in the opening when the government said the point of

9    the club was to avoid duking it out.  Well, you've just heard a

10   lot about the duking it out.  They just want you to forget that

11   happened, but that is the evidence.  You will need to separate

12   fact from fiction repeatedly.

13        Another example will be the witnesses the government

14   describes as insiders.  You'll find yourself asking, inside to

15   what?  You'll hear about the government's tactics on these

16   witnesses.  Mr. Bryant will tell you a lot about what he

17   assumes, what he understands, what he believes or expects might

18   have happened, but he has no actual knowledge of any

19   price-fixing involving any of the gentlemen in this room.

20        He never spoke to Mr. Kantola about agreeing on prices

21   nor heard anyone else talk with him about agreeing on prices.

22   In this trial you will see one person about whom there will be

23   evidence beyond a reasonable doubt that that individual is a

24   criminal and that individual is guilty of more than one crime.

25   That individual is not a single one of these gentlemen.  It is

1   Mr. Bryant.  And he is desperate to please the prosecutors to

2   avoid prosecution.

3          You have heard before but it bears repeating, the

4   sharing of price information, even if it were by agreement, is

5   not illegal.  A shared understanding of everyone in the chicken

6   business that prices are going to increase because of supply

7   and demand is not illegal.  It's not price-fixing.  The

8   evidence of a company independently setting its prices whether

9   or not it received information from a competitor, that

10  independent determination of pricing is the opposite of

11  price-fixing.

12         Now, you have seen the government's pictures with the

13  room full of people from one company deciding prices.  And

14  Mr. Gillen showed it to you again.  That makes the point.

15  Individual companies set their own prices.  Regardless of

16  whether there were phone calls or where the information came

17  from, the documents you'll see will show those independent

18  determinations.  And you'll see how Koch and others undercut

19  competitors.  And the insiders don't say anything to the

20  contrary.

21         As you go through the evidence, if you put it in

22  buckets for each of the individuals here, which is a difficult,

23  but it's a very important job, what you will see regarding

24  Mr. Kantola is that most of the evidence doesn't even relate to

25  him.  It has nothing to do with him.

1              THE COURT:  Two minutes.

2              MS. HENRY:  There is not any evidence that Mr. Kantola

3     even ever had another supplier's bid price or that he gave

4     Koch's to another supplier.  Koch's strategy to invest in

5     capacity for small bird fast-food chickens required it to grow

6     its sales.  And Mr. Kantola repeatedly explained that unique

7     approach to customers to make the win-win sustainable supply

8     that was the result.  Mr. Kantola could not and did not agree

9     to fix prices.

10             Doubts based in fundamental common sense will whittle

11    the government's evidence.  Instead of any agreement among

12    suppliers, the evidence will confirm that Mr. Kantola talked

13    with friends, customers and suppliers, often both in the same

14    person.  He helped proudly with Koch's strategy to invest and

15    grow sales of chicken at the expense of competitors, at the

16    expense of some of these very salesmen in this room.  And he

17    did not agree to fix prices.

18             Based on the facts, you will see that Mr. Kantola is

19    not guilty.  Thank you.

20             THE COURT:  Thank you, Ms. Henry.

21             Ladies and gentlemen.  It's 11:00 o'clock.  Why don't

22    we go ahead and take a 15-minute break at this time.  It's been

23    a little while.  And plan on reconvening at 11:15, all right?

24    11:15.  The jury is excused.

25             (Jury excused.)

174

```
 1              Anything to take up?  We will be in recess, then,
 2    until 11:15.  Thank you.
 3         (Recess at 11:00 a.m.)
 4         (Reconvened at 11:20 a.m.)
 5              THE COURT:  All right.  Let's bring the jury back in.
 6              MR. KOENIG:  Can I raise one question, please?
 7              THE COURT:  Yes.
 8              MR. KOENIG:  In looking at the clock and knowing we
 9    got a late start, I assume we'll start Agent Taylor, but I just
10    wondered are we planning to go beyond noon?
11              THE COURT:  No, I am not.  I think we will start with
12    Special Agent Taylor assuming that we -- and are we going to
13    have another opening?
14              MS. JOHNSON:  Yes, Your Honor.
15              THE COURT:  Okay, yeah, great.  Just to keep the
16    timing into account, but yeah, I think we will go ahead and
17    start Special Agent Taylor and then but we will break right at
18    noon.
19              MR. KOENIG:  So around then I will look for a good
20    breaking point, around noon.
21              THE COURT:  Yeah, that's right.  I will -- in fact, if
22    you don't seem to be aware of the clock, I will suggest that
23    maybe you find a good breaking point, okay?
24              Let's bring the jury in.
25              (Jury present.)
```

1          THE COURT:  Ms. Johnson, go ahead.

2          MS. JOHNSON:  May it please the Court, counsel.

3          Thank you, ladies and gentlemen.  Thank you for

4   agreeing to be one of the most important parts of our justice

5   system.  Thank you for taking your oath seriously.  Judge

6   Brimmer is the judge of the law.  You all are judges of the

7   facts.  And your presence here tells us all that you have

8   agreed to listen to all the evidence, to review all the facts

9   and analyze them 10 times against 10 separate men, not a group

10  of men, not a group of companies, 10 individual men.  Hang in

11  there with me.  I want to tell you about my client.

12         My name is Wendy Johnson.  And it's my honor to stand

13  before you and tell you that along with my colleagues, Barry

14  Pollack and Chris Plumlee, we represent Ric Blake.

15         Mr. Blake is 73 years old.  He lives with his family

16  in Fayetteville, Arkansas.  He is retired now and he has been

17  since August of 2018.  Mr. Blake worked for George's, a

18  family-owned chicken producer located in Springdale, Arkansas.

19  From his first day until his last, Mr. Blake was a salesman for

20  George's.  He had various titles such as sales manager,

21  director of national accounts, but he was always one of

22  George's sales guys.

23         Mr. Blake had certain accounts that he was responsible

24  for, and for those accounts he was the day-to-day customer

25  service person.  Some of his accounts were Popeye's, KFC and

1    Zaxby's among others.  Mr. Blake was the point person

2    responsible for overseeing the accounts and making sure or at

3    least trying to make sure his customers were happy.

4         He sought to ensure chicken orders were fulfilled,

5    shipments of product were on time to restaurants, the quality

6    of product met the particular specifications for each company

7    and so on.  If a truck was late with a fresh chicken order to

8    KFC, Mr. Blake would hear about it.  Mr. Blake would likely

9    hear about it as well if an order didn't make it to Popeye's.

10        He took care of customer accounts on a daily basis

11   during his time at George's.  What Mr. Blake did not do, he did

12   not negotiate bids.  He did not sign contracts for bids.  He

13   did not decide how George's would start the bidding process for

14   any given year.  He had no say in whether George's would

15   increase or decrease their bids during the negotiations.

16        He was not authorized to approve promotional discounts

17   and he did not negotiate the final contract price or sign the

18   contracts.  Why?  Because he was not an executive, he had no

19   authority to do so.  At no time during his entire employment

20   with George's did Mr. Blake have authority to negotiate bids on

21   behalf of the company.  It wasn't his job.  Those tasks were

22   well above his pay grade.

23        The government wants you to believe that Mr. Blake

24   agreed with the nine other men in this room to fix bids and

25   raise prices over the course of almost eight years.  If

1    Mr. Blake had no authority to even negotiate those bids, how is

2    this possible?  The answer is simple.  It's not possible.  The

3    evidence will show you just what I have told you.  Mr. Blake

4    lacked authority to do what he is accused of doing.

5          The evidence will also show you that he had never even

6    spoken to, text or e-mailed half the men in this room.  So why

7    is he here?  Mr. Blake is here because the government cannot or

8    will not understand the difference between current prices set

9    already under an existing contract and bids for future

10   contracts.  These are two very different things, but the

11   government wants you to think they have the same meaning.

12   Please listen closely to the facts throughout this trial.

13         Let's discuss the difference in prices and bids.

14   You've heard some about this already from my colleagues, but

15   once a chicken supplier becomes an approved bidder for a

16   company like KFC or Popeye's, they are invited to submit a bid

17   for a future year, sometimes two or three years.  The companies

18   will begin the negotiation process with the customers and will

19   eventually arrive at a price per pound of chicken and a set

20   volume, for instance, the number of truckloads they will

21   produce in a given week.

22         Unlike most industries, though, most, if not all the

23   suppliers who participate in the bid process actually are

24   awarded a contract.  Those contracts are for certain amounts of

25   volume at a certain price.  When a contract is finalized, the

1    supplier and customer agree on what the supplier will charge

2    for almost all of the cost of producing chicken and agree on a

3    margin or profit the supplier will receive.  But there are a

4    few cost items that fluctuate every month and this is

5    important.

6           The fluctuation is primarily based on the cost of

7    feed, grain, soybean, et cetera.  So the actual price of the

8    chicken can fluctuate every four weeks or month or period as

9    you are going to come to hear it called.  That change is simply

10   based on the change in feed cost.  The other cost, the margin,

11   the profit stays the same.

12          The evidence will show you that Mr. Blake for years

13   kept track of these monthly period prices and how they

14   fluctuated for both his company and his competitors.  Many

15   years ago one of his supervisors asked him to begin keeping

16   track of where George's was in relation to their competitors.

17   He was asked to gather this market intelligence so George's

18   could see where they stacked up against their competitors.

19          So he did.  He gathered this information in several

20   different ways.  He primarily got pricing information from a

21   distribution company who bought chicken from all -- from

22   various suppliers so they would necessarily know the period

23   prices.  Mr. Blake also got information from talking with his

24   competitors about their period prices.  Another way he got this

25   information was from the sales between the chicken suppliers.

1    And you've heard some about this already.  It's an interesting

2    and unique fact of the chicken industry, one the government

3    again fails to understand or acknowledge.

4          Remember, we are dealing with the fresh product of

5    chicken.  Suppliers have to assess on a weekly basis the amount

6    of chicken that is processed and then determine if they have

7    enough to fill their customer orders.  If George's determines

8    that it does not have enough chicken for a particular order,

9    they start looking to find another source of supply.  The last

10   thing you want is an unhappy customer.

11         Many times George's would reach out to a competitor, a

12   Claxton or Tyson or some other supplier, for example, and ask

13   them if they had surplus that they could buy to produce

14   their -- and fill their orders; or if one company had extra, a

15   surplus of chicken, they might call around to their competitors

16   and see if anyone needed chicken.  These sales like in any

17   industry involved purchase orders, invoices, things that you

18   are all going to be familiar with, and those will become

19   relevant and important.

20         They would memorialize the specifics, the type of

21   product, the quantity bought and sold and the price per pound.

22   At the time of these sales the companies necessarily knew their

23   competitors' price.  This process known as covering shorts was

24   common in the industry.  Despite these facts, the government

25   would have you believe that this period pricing information was

1    secret and that because Mr. Blake kept track of competitors'

2    period prices, he must have also obtained competitor

3    information about bids for future contracts, quite a leap.

4         Mr. Blake could not have been aligning bids.  He was

5    not even exchanging information about bids for future

6    contracts.  The only information he exchanged was about current

7    period prices under existing contracts.  These are two

8    completely separate concepts, prices versus bids.

9         Pay close attention, ladies and gentlemen, to the

10   evidence when considering prices and bids.  There will be no

11   evidence, no evidence, no George's company e-mail presented to

12   you, no text from Ric Blake to his supervisors, no witness

13   testimony that you will hear that shows this period pricing

14   information that Mr. Blake tracked was ever, ever used by his

15   supervisors in the bid negotiation process, none.  You will

16   also hear from customers that they were not concerned that the

17   suppliers knew each other's period prices because, their words,

18   period prices had no meaningful impact on what the competitor

19   was going to bid in the future.

20        Ladies and gentlemen, competitors may share and

21   discuss their pricing information with each other and they may

22   discuss their bid information with each other and they may

23   discuss discounts.  That is all okay.  What is illegal is for

24   competitors to agree among themselves about what each is going

25   to bid on future contracts, to align their bids.

1          You will see no document in this case, no e-mail, no

2     text where Ric Blake shared information with a competitor about

3     what George's was bidding for a future contract.  You will see

4     no document in this case, no e-mail, no text where Mr. Blake

5     received information about what a competitor was bidding for a

6     future contract.  You will see no document in this case where

7     Mr. Blake passed on bid information to his supervisors, the

8     ones that could set the prices.

9          The government produced 16 million documents in

10    discovery in this case.  Believe me, if there were any of these

11    documents, they would be showing them to you.  They aren't

12    there because there was no alignment.  This didn't happen.

13         You're going to actually see the bids that George's

14    submitted for the years in question.  They are very different

15    from competitors' bids.  This, ladies and gentlemen, is the

16    actual end of the story, if you will.  With this evidence you

17    will see bids were not aligned.  This chart shows you where

18    George's bids are year after year as compared to their

19    competitors.

20         Throughout the trial you will see in black and white

21    the actual bids for the years in question.  Pay close attention

22    to these bids, what the actual numbers, the facts, reveal.

23    They reveal George's had a very different strategy and approach

24    to the bidding process.  The evidence will show you that for

25    years George's bids have been habitually on the lower end as

1    compared to its competitors.

2          Think about this.  If George's had entered into an

3    agreement to fix prices and raise prices, wouldn't you expect

4    them to fix their bid at the high end at least some?  If as the

5    government told you in their opening that a rising tide lifts

6    all boats, it looks like George's completely, completely missed

7    the boat.

8          Review the evidence.  It will lead you to the obvious

9    truth.  George's bids were lower than competitors because they

10   sought a different strategy.  They sought to increase volume.

11   And to gain more volume, they were willing to bid at a lower

12   price.  That was their strategy, their approach, which was

13   different from their competitors.

14         Not only that, ladies and gentlemen, but the evidence

15   will show you that George's contract prices over the course of

16   this alleged conspiracy were lower at the end in 2018 than they

17   were in 2013.  You'll see every one of these contracts and you

18   can judge for yourself, but remember this moment.  Remember,

19   you were told at the very beginning, there was no conspiracy to

20   rig bids and raise prices.

21         Let's talk about what evidence the government will

22   present to try and prove Mr. Blake was sharing or receiving

23   information about bids.  Carl Pepper, you have heard his name.

24   Guess what?  He was a Tyson sales guy.  You will hear that he,

25   like Mr. Blake, had absolutely no authority to negotiate bids

1      for his company.  You will hear that Mr. Pepper was interviewed
2      12 times by the government.  He was cooperating with them.  You
3      will hear that after the 12th interview, something changed.
4      The cooperation ceased.  The government was no longer
5      interested in Mr. Pepper's testimony.  Why is that?  Please
6      listen closely to what Mr. Pepper said up until that time.

7            And then after some time the government suddenly
8      reengages with Mr. Pepper.  They offered to let him cooperate
9      once again and he was provided immunity.  Realize this protects
10     him from the threat of prosecution.  He gets a free pass.  He
11     has now been interviewed several more times after he has been
12     reengaged.  The government wants you to believe that the 15th
13     or the 18th or the 20th time is the charm, but listen to his
14     words, ladies and gentlemen, listen closely, and you judge for
15     yourself his credibility.

16           Ask yourself if Mr. Pepper were telling the truth, if
17     he and Mr. Blake discussed and agreed on things like future bid
18     information and not just current period prices, why is there
19     not a single document where Mr. Blake passed on this secret
20     valuable information on to the people at George's who set their
21     bids?  Why aren't the fruits of these discussions revealed in
22     the George's contracts you just saw?  The evidence or the lack
23     thereof will be telling.

24           Robbie Bryant.  We expect the evidence to show that
25     Mr. Bryant doesn't know Mr. Blake.  He literally may have said

1    hello to him once.  But listen what the government attempts to

2    do.  They attempt to widen Mr. Bryant's testimonial net by

3    asking Mr. Bryant to testify about competitors and the various

4    companies with no specificity, all the companies.  But these

5    aren't companies.  These are men.  Mr. Blake is not a company.

6    He is an individual.  And the vague nonspecific testimony of an

7    admitted liar who doesn't even know him should not be

8    considered against him.

9         Telephone calls.  Mr. Blake often communicated with

10   others in the chicken business, and you have heard a lot about

11   that already.  I am here to tell you, you are going to hear a

12   lot more.  The government will ask you to infer that these

13   calls all had to be bad, nefarious and sharing information

14   about George's bids, but you will not hear recordings of these

15   calls.  We expect the evidence to show actually that many of

16   these calls happened when George's was in a shorts or cover

17   situation like we just talked about.

18        The evidence will show, you will see evidence that

19   there are absolutely legitimate reasons for Mr. Blake to speak

20   with salesmen from other companies.  But the government wants

21   you to completely disregard that, which falls right into the

22   next point, summary charts.

23        The government may utilize what they call summary

24   charts.  They are pieced together by the very government

25   lawyers who sit before you to try to prove their case.  But

1   ladies and gentlemen, pay very close attention to what is

2   included and what is missing in these charts.  You are the sole

3   judges of the evidence presented to you.  Pay attention and

4   determine whether these charts portray a complete picture of

5   what happened or determine if merely placing select items in a

6   chart necessarily paints that true picture.

7          The evidence will show there is much, much more to the

8   story that you should hear.  Ladies and gentlemen, you will see

9   over and over throughout the government's case it wants you to

10  meld current prices, period prices with future bid, just like

11  they want you to meld all the defendants together with words

12  like "they" without clearly defining for you who "they" is,

13  much less proving it beyond a reasonable doubt.

14          *THE COURT:*  Two minutes, Ms. Johnson.

15          *MS. JOHNSON:*  Thank you, Your Honor.

16          Testimony like "It's my understanding this involved

17  all of them," is insufficient to prove anything beyond a

18  reasonable doubt.  Hold them to their burden.  The government

19  will put on its evidence first.  You will hear from numerous

20  witnesses, including Mr. Pepper and Mr. Bryant, and you will

21  have to explicitly judge their credibility and their motive to

22  tell a certain story a certain way.  You will have to judge the

23  government's charts and ask yourself whether they tell the full

24  story.  But even taking the government's case, you will not

25  hear any testimony or see any evidence that Mr. Blake could set

1   George's bids or that he provided bid information to his bosses

2   at George's.  You will see no text, no e-mail that Mr. Blake

3   shared competitor information or even discussed George's bids.

4         The evidence will show you that Mr. Pepper and

5   Mr. Blake could talk all day every day, but their discussions

6   could not make an agreement because they, neither one had

7   authority to do so.  They were the sales guys.  They talked to

8   a lot of other sales guys.  They gathered market intelligence,

9   much like in many other businesses.  That was their job.  They

10  couldn't align bids ever and they didn't.

11        At the end of the day, the evidence will prove to you

12  exactly what I am telling you.  Mr. Blake kept track of what

13  his competitors' current prices were.  He would share current

14  period prices with competitors, but that is very different from

15  sharing bids for future contracts.  And talking about bids is

16  even very different from agreeing to align those bids.  At the

17  end of the government's case, ask yourself, do the bids and the

18  contracts that you saw, and you'll see much more of, do they

19  even align at all?  Do the strategies align at all?  I submit

20  the evidence will show you they do not.

21        Ladies and gentlemen, proof beyond a reasonable doubt

22  is a high burden, one of the greatest tenets of our American

23  justice system.  Do not allow the government to hide behind

24  unclear, undefined accusations and stories and interviews that

25  morph into magic words after 15 or 18 tries.  They will attempt

1    to lump all these men together into a "where there is smoke,

2    there must be fire" accusation.  They're here, they must have

3    done something is not the burden.  Proof beyond a reasonable

4    doubt is.  Hold the government to their burden.  If you do so,

5    it will be clear that burden has not been met.

6         One of my colleagues yesterday said actions speak

7    louder than words and that's so true.  But the loudest of all

8    are facts, black and white documents, bid contracts that are

9    not aligned.  They speak the loudest of all.

10        After all the evidence has been presented to you, my

11   colleague, Barry Pollack, will come back and get to speak with

12   you.  He will ask you to find Mr. Blake not guilty.  And after

13   hearing all the evidence, it will be clear to you Mr. Blake is

14   just that, not guilty.

15        Thank you.

16        *THE COURT:*  Thank you, Ms. Johnson.

17        All right.  Ladies and gentlemen, that has concluded

18   the openings, although as you have heard, Mr. Mulrenin has

19   reserved his opening statement.

20        So we are now going to start the evidentiary portion

21   of the trial.  One thing I wanted to let you know, and that is

22   before trial I authorized the fact that one objection by one of

23   the defense lawyers works for all the rest of the defendants.

24   If we had a different system, then in order for a given defense

25   attorney to protect his client's rights, he would have to

LaNard Taylor - Direct

1    object too and we would have -- potentially we would have 10

2    objections every time.  And that would be cumbersome and

3    somewhat impractical, so instead one objection stands for all.

4    That will help things go more quickly.

5          However, that doesn't mean you might not have a couple

6    objections because, of course, if someone wants to make a

7    different objection, that attorney can, of course, do so, okay?

8          All right.  At this time the United States may call

9    its first witness.

10          MR. KOENIG:  Your Honor, the government calls Special

11   Agent LaNard Taylor.

12          THE COURT:  Special Agent Taylor, if you will please

13   come forward and stand next to the witness stand there,

14   Ms. Grimm will administer an oath to you.

15       (**LaNard Taylor** was sworn.)

16          THE WITNESS:  I do.

17          COURT DEPUTY CLERK:  Please state your name and spell

18   your first and last name for the record.

19          THE WITNESS:  LaNard Taylor, L-a-N-A-R-D, T-A-Y-L-O-R.

20                    **DIRECT EXAMINATION**

21   BY MR. KOENIG:

22   Q.  Good morning, Agent Taylor.

23   A.  Good morning.

24   Q.  Where are you employed?

25   A.  The Federal Bureau of Investigation, commonly referred to

LaNard Taylor - Direct

1  as the FBI.

2  *Q.* And what do you do at the FBI?

3  *A.* I am a criminal investigator, otherwise known as a special

4  agent.

5  *Q.* How long have you been an FBI agent?

6  *A.* Just under six years.

7  *Q.* Is the FBI your first job in law enforcement?

8  *A.* It is not.

9  *Q.* What other law enforcement positions have you held?

10 *A.* I was a police officer in the city of Tampa, Florida for

11 four years.

12 *Q.* And what kind of crimes did you investigate as a police

13 officer?

14 *A.* As a police officer you are going to investigate -- I

15 investigated all types of crimes whether it be crimes against

16 people, property, frauds.  You name it, that's what we

17 investigated.

18 *Q.* And what did you do after you were a police officer in

19 Tampa?

20 *A.* I was hired by the FBI.

21 *Q.* And did that require any sort of special training?

22 *A.* It did.

23 *Q.* Could you describe for the jury that type of training?

24 *A.* Sure.  All new agents for the FBI are required to go

25 through a new agent training in Quantico, Virginia, which

LaNard Taylor - Direct

1    consists of over 800 hours of practical and classroom training.

2    Q.  What sort of classroom training?  We'll start with that.

3    A.  We have classroom training from everything from general

4    knowledge about the FBI, about the components of the FBI, case

5    management, interview interrogation, legal training.  But then

6    we also -- you said the classroom portion, so yeah, we have a

7    ton of classroom.  And I am sure I am missing something.

8    Q.  Could you speak a little bit to what case management, what

9    you mean by that?

10   A.  Sure.  So case management is, you know, quite frankly how

11   it sounds, just the managing of an FBI case, what it takes

12   from, you know, gathering evidence, whether it be interviewing

13   witnesses and how to store those witness reports, what's

14   contained in your report, that type of thing.

15   Q.  Do they teach you how to develop a case file?

16   A.  Yes.

17   Q.  What is a case file?

18   A.  Our case files, I mean, we have a system in place by which

19   we -- a case file.  Each case that the FBI investigates is

20   assigned a number and every relevant piece of evidence, no

21   matter what it is, would be assigned to that number in the same

22   place.

23   Q.  Then you graduated from Quantico; is that right?  I am

24   sorry.  I skipped ahead.  I apologize.

25           You mentioned there was a classroom component and then

191
LaNard Taylor - Direct

1    a tactical component.  Could you explain what the tactical

2    component, what you meant by that?

3    A.  Sure.  I believe I said practical.

4    Q.  Practical?

5    A.  Yeah, practical, which consists of a lot of practical

6    exercises where they try to in a training environment as best

7    that they can give us some type of real life scenarios.  And

8    that does include a tactical portion as well where you are

9    learning defensive tactics, driving, firearms, search warrant

10   executions, a variety of things that we learn on our practical

11   matter.

12   Q.  All right.  So what was your -- then you graduated from

13   Quantico, correct?

14   A.  Yes, I did.

15   Q.  And what was your first assignment out of Quantico?

16   A.  I was assigned to the Los Angeles field office, Palm

17   Springs resident agency, otherwise known as like a satellite

18   office of the LA field office.

19   Q.  And what kind of cases did you work in Palm Springs?

20   A.  Because Palm Springs is a smaller office, there was only at

21   the time about four, five of us in that office.  We were

22   responsible for working all criminal matters, but primarily my

23   responsibility was violent crimes and gangs.  But again, I

24   worked white collar cases out there to include public

25   corruption, romance scams, domestic terrorism.  We worked

192

LaNard Taylor - Direct

1   everything because there was only a handful of us.

2   Q.   And how long were you in the Palm Springs office?

3   A.   Almost two years.

4   Q.   And then what was your next assignment?

5   A.   I transferred to Los Angeles, our headquarter city or our

6   main building for the Los Angeles field office to the public

7   corruption squad.

8   Q.   So I take it, then, you worked on public corruption cases.

9   A.   That is correct.

10  Q.   Could you explain to the jury what that involves, what kind

11  of cases those are?

12  A.   Sure.  Public corruption cases consists of investigating

13  domestic, which is local, state or federal public officials.

14  We also investigated election crimes and we also investigated

15  fraud against the government.  And the public officials can

16  include anybody from politicians, law enforcement officers, you

17  name it, whatever government official.

18  Q.   And how long did you work in the LA office?

19  A.   I was in LA for a year.

20  Q.   In the course of those three years, the two in Palm

21  Springs, one in LA, what sort of investigative techniques did

22  you use for your investigations?

23  A.   Well, like I said, I investigated a lot of different types

24  of cases, but at their core all of -- mostly all of our

25  investigations include the same types of techniques.  So we are

LaNard Taylor - Direct

1   talking interviews, search warrant executions, subpoenas,

2   reviewing documents, seizing evidence whether it be phones or

3   other digital evidence.  So all of our cases usually comprise

4   of the same types of -- at least at their core the same types

5   of investigative techniques.

6   Q.   After you left the Los Angeles field office, did you have a

7   next assignment?

8   A.   I did.

9   Q.   And what was that?

10  A.   I was selected to come to my current unit, which is the

11  International Corruption Unit.

12  Q.   The International Corruption Unit.  Does that have a

13  shorter name that we can use?

14  A.   Yes, ICU.

15  Q.   ICU, okay.  How did you get assigned from Los Angeles to

16  the ICU?

17  A.   The process goes -- I had to apply for the unit.  It's not

18  like a regular squad transfer that you would see in any other

19  office.  I had to apply.  I had to interview in front of a

20  panel.  And I was selected after my interview and after, you

21  know, they ranked us and all that type of stuff and I was

22  selected after that.

23  Q.   When you say it wasn't like a regular transfer, what do you

24  mean by that?

25  A.   Well, a lot of it is office dependent, but in LA

194

LaNard Taylor - Direct

1    particularly, because that's where I worked, moving from squad

2    to squad doesn't require an interview, doesn't require

3    applications.  Some of it is seniority based.  Other movements

4    are because the office wants to change personnel, so it's not

5    like a selection process, whereas the ICU is an actual

6    application and a selection process.

7    Q.   It's more rigorous.  Is that what you're --

8    A.   I would say so.

9    Q.   Okay.  What does the ICU do?

10   A.   We are the unit in the FBI that's responsible primarily for

11   investigating cases of the Foreign Corrupt Practices Act.

12   Q.   I am sorry, I could not hear.  The what?

13   A.   Foreign Corrupt Practices Act.  We also investigate

14   violations of kleptocracy laws and antitrust laws.

15   Q.   If you could just briefly explain what is the Foreign

16   Corrupt Practices Act investigations?  What are those?

17   A.   They are commonly referred to as foreign bribery.  So it's

18   when a United States entity, whether a person or a company,

19   bribes a foreign official to obtain something of value, so some

20   type of contract or some other benefit.

21   Q.   And what is kleptocracy?

22   A.   It's when government officials -- in our case we focused on

23   around the world, other parts of the world.  When the

24   government officials steal money from their -- the people of

25   their country, my unit is the unit that's responsible for

195

LaNard Taylor - Direct

1   identifying that, investigating it and then where appropriate

2   seizing that money with the goal of ultimately repatriating it

3   back to the citizens of the country in which it was stolen

4   from.

5   Q.  What's the connection to the United States in those cases?

6   A.  I am sorry.  Well, in all of our cases there is some type

7   of U.S. nexus where those foreign officials are laundering that

8   money through the U.S. financial system.

9   Q.  And then finally the ICU I think you mentioned does

10  antitrust investigations; is that right?

11  A.  That's right.  Most offices have -- all the offices can

12  investigate antitrust, but our unit, we are primarily

13  responsible for the antitrust violations.

14  Q.  All right.  And what are the types of antitrust violations

15  that are investigated?

16  A.  Price-fixing, bid-rigging, market --

17          THE COURT:  Hold on.  One second Special Agent Taylor.

18          Mr. McLoughlin?

19          MR. McLOUGHLIN:  Objection, Your Honor, relevancy and

20  form.

21          THE COURT:  Overruled.

22  A.  Price-fixing, bid-rigging and market allocation.

23  BY MR. KOENIG:

24  Q.  All right.  How long have you been in the ICU?

25  A.  For three years, almost three years.

196

LaNard Taylor - Direct

1   Q.  And in the time -- did there come a time while you were in

2   the ICU that you were assigned to investigate possible

3   antitrust violations in the broiler chicken industry?

4   A.  Yes, sir.

5   Q.  And is that investigation the subject of your testimony

6   today?

7   A.  Yes, sir.

8   Q.  When were you assigned that investigation?

9   A.  I believe it was July of 2019.

10  Q.  Had the investigation been going on for a while before

11  that?

12  A.  Yes, it had.

13  Q.  And in the course of the investigation, did you have law

14  enforcement partners outside of FBI?

15  A.  Yes, sir.

16  Q.  And who were they?

17  A.  The United States Department of Commerce Office of

18  Inspector General.  They were already on the case at least a

19  year or two prior to us joining.  And the United States

20  Department of Agriculture Office of Inspector General.

21  Q.  What time period was under investigation?

22  A.  When I joined the case, the time period that had already

23  been established by the -- by the Department of Commerce and

24  the Antitrust Division was primarily focused on the 2012 to

25  2019 time frame.

LaNard Taylor - Direct

1    Q.  All right.  Thank you.  What type of evidence was the

2    investigation primarily looking for?

3    A.  In general, I will say we were looking for obviously

4    evidence that potentially constituted violations of antitrust

5    laws.

6    Q.  Sure.  And were there types, specific kinds of evidence you

7    were looking for?

8    A.  In this case, yes, sir.

9    Q.  Okay.  What primarily was that?

10          MR. McLOUGHLIN:  Objection, Your Honor.  To the extent

11   he is saying the conduct -- the witness said conduct that

12   constitutes violations of the antitrust laws, this becomes a

13   legal opinion from a person who is not a lawyer and not

14   qualified.  So the question is improper for that ground, lack

15   of foundation, form, and he is not qualified to give that

16   opinion.

17          THE COURT:  Each and both objections is overruled.  It

18   doesn't take someone being a lawyer to be able to investigate

19   financial crimes.

20          Mr. Koenig, could you look for a convenient stopping

21   point?

22          MR. KOENIG:  I think this will be fine.

23          THE COURT:  Ladies and gentlemen, it's noon now, so we

24   will go ahead and take our luncheon recess at this time.  Keep

25   the admonitions in mind.  If you go outside and go to a

LaNard Taylor - Direct

1    restaurant, for example, try to keep those yellow juror buttons

2    visible.  Obviously, there are lots of people in the courtroom.

3    There are witnesses who aren't in the courtroom.  They don't

4    know you.  So good idea to try to keep those visible if at all

5    possible.  Don't look up any information.  And we'll reconvene

6    at 1:30.

7              The jury is excused.

8              (Jury excused.)

9              Special Agent Taylor, you can go ahead and resume your

10   seat at counsel table.

11             Anything that we should take up over the lunch break?

12   I know that Mr. McLoughlin had mentioned there is an

13   outstanding motion regarding the summary exhibits, but it

14   doesn't sound like it's going to come up.  But if there is a

15   thought that it is, then let me know.

16             Mr. Tubach?

17             *MR. TUBACH:*  I believe the government has represented

18   they are going to ask Agent Taylor about the summary exhibits.

19   I don't know if it's going to be anything more than did you

20   prepare summary exhibits, which we know he didn't because we

21   know the paralegal, Rachel Evans, did.  If there is going to be

22   any testimony about it, l do think we need to resolve those

23   issues.

24             *THE COURT:*  That's what I mean.  Would that be a

25   correct characterization, Mr. Koenig?

LaNard Taylor - Direct

1        MR. KOENIG:  Not exactly.  We aren't going to show him

2   the exhibits.  All we are going to say is just like we say

3   after an interview, did you write a report?  Yes.  You know, as

4   evidence was gathered, did you participate in building summary

5   exhibits?  Yes.  It's very cursory, high-level testimony.

6        THE COURT:  Mr. Tubach?

7        MR. TUBACH:  That's simply not accurate and we can't

8   cross-examine him about.  The testimony at the last trial was

9   unequivocal that it was Rachel Evans who put those charts

10  together.  And now he is going to give sort of the FBI

11  imprimatur on these summary charts without us being able to

12  cross-examine him about that.

13       THE COURT:  Well, here is the problem.  It got alluded

14  to yesterday when there was a reference to *Brooks*.  Special

15  Agent Taylor is an overview witness.  I am going to hold him to

16  that high-level overview.  If on cross-examination there is an

17  attempt to get him to be granular, that may very well open the

18  door to him turning into something else.  So you're right, but

19  you know, perhaps asking him for a little bit more detail about

20  exactly what he did with the summary exhibits may be

21  appropriate, but you know, there needs to be concern for that

22  opening the door issue.

23       MR. TUBACH:  I completely agree, Your Honor.  My point

24  is they shouldn't be asking about the summary exhibits at all.

25       THE COURT:  Well, if he had some role, perhaps.  I

LaNard Taylor - Direct

1   mean, yeah, I understand your point, but there is going to

2   be -- I am just identifying that there is a bit of a balance

3   going on here and we'll see how it plays out.

4            All right.  Anything else we should take up?

5            We will be in recess until 1:30.  Thank you.

6        (Recess at 12:05 p.m.)

7        (Reconvened at 1:35 p.m.)

8        THE COURT:  Anything before we bring the jury in,

9   Mr. Fagg?

10       MR. FAGG:  Yes, Your Honor.  I did want to raise one

11  issue before Mr. Sangalis testifies and he is scheduled to

12  testify today.  So I wasn't sure if now would be the

13  appropriate time to do that.

14       THE COURT:  Probably, as long as it doesn't take too

15  long.  I don't want to condition the jury to think we are not

16  ready on time.

17       MR. FAGG:  I understand, Your Honor.

18            This is with respect to two of the exhibits or several

19  of the exhibits that the government is going to seek to admit

20  through Mr. Sangalis, the first of which is government

21  Exhibit 9166.  And I have a paper copy, but we can also pull it

22  up.  This is the Pilgrim's board meeting minutes.  And I

23  believe the government intends to offer this because on the

24  next to the last page it talks about Mr. Lovette's compensation

25  structure.

LaNard Taylor - Direct

1            And, Your Honor, this particular document I believe

2    actually shows his -- how his compensation would be calculated

3    including his bonus, which we believe is within the -- what

4    Your Honor had ruled would be admissible at the prior trial, so

5    we are prepared to stipulate to the admissibility of this

6    particular document.  But what the government also seeks to

7    admit is Exhibit 9168 which is an 8-K, which basically talks

8    about Mr. Lovette's compensation for the year 2011.  And it

9    attaches his offer letter.  And there is --

10            THE COURT:  Oh, the offer letter.

11            MR. FAGG:  His offer letter when he joined Pilgrim's

12   Pride.  And this document, Your Honor, if we look at the third

13   page, it has the actual disclosure.  This is talking about

14   his -- precisely the type of information that the Court has

15   said was excluded, his base salary, his sign-on bonus, the fact

16   that Pilgrim's was going to purchase his house in Arkansas in

17   order for him to move here.  And there really is no -- and then

18   some restricted shares he would receive.  There is no relevance

19   to any of this information.  It is simply his underlying

20   compensation and the amount that he received.

21            And, you know, as you go through this document, there

22   are a number of -- the attachment to it which begins on the

23   Bates No. 6109 is actually the offer letter that I mentioned.

24   And there is no information in here, Your Honor, that talks

25   about how Mr. Lovette's compensation would be structured in a

LaNard Taylor - Direct

 1   way that is relevant to this case.  And if it would be helpful

 2   for Your Honor, I am happy to pass up a paper copy of this.

 3        THE COURT:  Yeah, that might be handy just because I

 4   have a feeling that when the government responds, it might be

 5   good to be able to look at it.  Go ahead.

 6        MR. FAGG:  And so, Your Honor, with this particular

 7   document there are a number of prejudicial -- unfairly

 8   prejudicial items in there.  I talked about the first several

 9   pages.  If we go to Page 6109, this is the first page of his

10   offer letter.  There is discussion in here about compliance

11   with Pilgrim's policies and procedures, its code of conduct

12   which the Court has ruled is inadmissible.

13        If we go to the next page, it talks about his annual

14   salary.  And the government has redacted the actual amount of

15   his salary.  But what's important here, Your Honor, is that if

16   you look at on Page 6110 and 2 under Compensation B, it talks

17   about how this is his performance applicable to 2011.  And we

18   talked a little bit about this at the last trial and the

19   government ultimately withdrew this exhibit.

20        One, 2011 is outside of the time period of the

21   Indictment.  It's outside of the time period Mr. Koenig has

22   talked about and Special Agent Taylor has testified about

23   already and is simply irrelevant.  It also talks about what

24   Mr. Lovette's guaranteed compensation is going to be here and

25   it's not going to be less than a certain amount, so it's just

LaNard Taylor - Direct

1    irrelevant.

2         On the next page it talks about one-time bonuses.  And

3    I am sorry, before I move off of 6110, what 6110 importantly

4    says, Your Honor, in the last paragraph is that for the years

5    after 2011, Mr. Lovette's compensation will be set by the board

6    in a way that aligns with the company's annual budget and will

7    be based on objective and subjective performance factors that

8    the board decides on.  It doesn't say what those are.  What we

9    have in the board meeting minutes in 9166 are those factors.

10   And we are prepared to stipulate to the admissibility of those

11   meeting minutes from 2013, so that's the time period that's

12   relevant to the Indictment.

13        And then again on the subsequent pages it talks about

14   his one-time bonus.  It talks about the purchase of his house.

15   It talks about an award of shares.  And then, Your Honor, there

16   are some provisions in here, particularly in 6112, which talks

17   about termination for cause.  And it is undisputed that

18   Mr. Lovette retired from Pilgrim's in 2019.  He was never

19   terminated.  He left for his own reasons for retiring.  It had

20   nothing to do with this case.

21        And this information in there being about him retiring

22   for cause is entirely relevant and could confuse the jury or

23   cause the jury to speculate that somehow or another it might be

24   relevant.  So I suspect what the government is going to say is

25   that the reason why they want it in is because of the formula

LaNard Taylor - Direct

1   that is shown on Page 6110.

2          But again, that is for one year, for 2011.  It's

3   outside of the period of the Indictment.  And it contains these

4   raw numbers which is exactly what the Court ruled would not be

5   admissible and could be unfairly prejudicial to Mr. Lovette,

6   and the order was as it relates to Mr. Penn as well.  And so I

7   wanted to raise this before Mr. Sangalis got up there to

8   testify to try and avoid a long side bar about this.

9          There is a related document, Your Honor, that the

10  government is seeking to admit which is Exhibit 98 --

11          THE COURT:  Mr. Fagg, we just don't have time to do

12  this.  We should have taken this up at like 1:15 or something

13  because this is just going too long.  And I don't want to -- as

14  I said, I want the jury to be ready and they won't be ready if

15  we're not ready.  So my suggestion is that before Mr. Sangalis

16  testifies, we may need to do a long side bar depending on where

17  we are in terms of the mid-afternoon break.

18          MR. FAGG:  Sure.  Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Fagg.

20          Mr. McLoughlin?

21          MR. McLOUGHLIN:  Your Honor, understanding your

22  instruction, at 1:08 this afternoon we received an e-mail from

23  the government with summary charts, seven of which it was

24  represented to us have been modified.  At 1:23 this afternoon

25  we received another e-mail that may indicate as to what the

LaNard Taylor - Direct

1    changes in the charts are.  Special Agent Taylor is supposed to

2    testify according to the government about summary exhibits.

3         The deadline for exhibits was January 14th, if I

4    recall correctly.  All of these are summary charts that at

5    least originally were used in the first trial.  There is no

6    explanation as to why we are still getting changes.  I can't

7    tell you what those changes are.

8         What we would ask, Your Honor, is that given the

9    government's failure to meet the January 14th deadline and

10   their continual modification of these, including while a man is

11   on the stand who is supposed to be testifying about them, that

12   they be barred from asking Agent Taylor about any summary

13   charts because we have not had time to review changes and they

14   be instructed to provide us the final versions of those charts

15   which are subject to a motion to exclude as we speak by the end

16   of the day.

17        Thank you.

18        THE COURT:  All right.  I will not bar the government

19   from asking Special Agent Taylor about that.  But to the extent

20   that, you know, he knows or has participated in changes that

21   were just identified, you know, that could be a problem.  We

22   will just have to see.  And I think that tonight after the jury

23   is dismissed we will need to take up the summary exhibit issue

24   to try to wade through that.

25        Mr. Pollack?

LaNard Taylor - Direct

1          MR. POLLACK:  Very briefly, Your Honor.  We have

2     received from the government and continue to receive *Jencks*

3     material about the summary charts related to Ms. *Evans*.  We

4     have not received any *Jencks* material from Agent Taylor.  So if

5     Agent Taylor is going to testify about the summary charts, I

6     would just like you to inquire of the government if there is

7     any *Jencks* material we should be receiving before we

8     cross-examine.

9          THE COURT:  I will pose that question to the

10    government.  Any *Jencks* material regarding summary exhibits

11    that should be identified in regard to Special Agent Taylor?

12          MS. CALL:  No, Your Honor.

13          THE COURT:  All right.  Let's bring the jury in.

14          (Jury present.)

15          THE COURT:  Go ahead, Mr. Koenig.

16    BY MR. KOENIG:

17    Q.  Special Agent Taylor, I asked you a question before we left

18    and then there was an objection and you never answered, so I am

19    going to read it back again.

20          So what type of evidence was the investigation

21    primarily looking for?

22    A.  Primarily we focused on communications between individuals

23    at one chicken supplier and another chicken supplier where they

24    talked about pricing, where they talked about, you know,

25    anything of, you know, coordination of pricing.  We also looked

LaNard Taylor - Direct

1    at communications about -- within one company where they

2    referred to communications about pricing.  We also looked at

3    communications about what companies did with that pricing once

4    they received it.  So that would be primarily -- granted, we

5    looked at a ton of different documents, whether it be bids,

6    contracts, whatever the case may be, but those were the primary

7    ones.

8    Q.  And so as part of the investigation, did you use any

9    investigative techniques or tools to accomplish what you just

10   said you were looking for?

11   A.  Can you ask the question -- ask your question again?

12   Q.  Sure.  You said that there was certain types of evidence

13   that the investigation was looking for primarily, right?

14   A.  Right.

15   Q.  How did you go about doing that?  I mean, what

16   investigative tools did you use to search for the evidence that

17   you just mentioned?

18   A.  If I understand your question correctly, we -- when I say

19   we, I mean the entire investigative team -- we housed a large

20   part of it -- well, all of the documents in one --

21   Q.  How did you get the documents is what I am asking.

22   A.  I gotcha, okay.  We received documents through various

23   means, various forms of legal process, subpoenas, search

24   warrants.  That's generally how we received documents from

25   entities.

LaNard Taylor - Direct

1   Q.  Were investigations part of your -- interviews part of your

2   investigative toolbox?

3   A.  Yes, sir.

4   Q.  And in conducting the investigation, you -- well, let me

5   back up.  You mentioned that you received training in various

6   investigative tools at Quantico, correct?

7   A.  That's right, yes, sir.

8   Q.  And throughout your experience you implemented those

9   techniques --

10  A.  Yes, sir.

11  Q.  -- in this investigation?

12  A.  Yes, sir.

13  Q.  Did you apply the experience and training that you had

14  previous to this investigation in using those investigative

15  tools?

16  A.  Yes, sir.

17  Q.  Okay.  All right.  I would like to start with the

18  subpoenas.  Could you just explain to the jury what a subpoena

19  is?

20  A.  A subpoena is a form of legal process where the government

21  seeks to get evidence from a person or entity or -- yeah,

22  essentially that's what a subpoena is.

23  Q.  And without naming any specific entities, what types of

24  entities were subpoenas served on in this investigation?

25  A.  There were quite a bit, but subpoenas were served to

LaNard Taylor - Direct

1    chicken suppliers, customers within the broiler chicken market,

2    phone providers, cloud-based service providers.

3    Q.   I am sorry, could you say that again?

4    A.   Like cloud providers such as Apple, Google, those type of

5    cloud-based service providers.

6    Q.   And so let's right now focus on subpoenas to chicken

7    suppliers.  What kind of documents did you receive from those

8    subpoenas?

9    A.   As I mentioned just a few moments ago, we received

10   communications, so that was in the form of e-mails, text

11   messages.  We received, you know, an array of documents that

12   were -- whether it was bid information, contracts, human

13   resource files, the variety of documents that are almost

14   endless.

15   Q.   Do you recall when the subpoenas were served on the chicken

16   supplier companies?

17   A.   Well, there have been a number of them.  They have been

18   served throughout my entire time on the investigation which is

19   almost three years.

20   Q.   And when did you start in the investigation?

21   A.   2019.

22   Q.   Okay.  And approximately how many documents did the

23   investigation receive from those subpoenas?

24   A.   Approximately, 15 million.  I think it was somewhere just

25   short of 15 million.

210

LaNard Taylor - Direct

1   Q.   When -- so you served the subpoenas and the companies

2   provided the documents.   How did they provide them?   In what

3   sort of format?

4   A.   Most often the documents were provided in electronic

5   format.   We did get some in physical format, but most often we

6   received the documents in electronic format.

7   Q.   Okay.   Were -- who was provided the -- let me back up.

8   That's not a well-worded question.

9         Were some of the subpoena responses, the documents,

10  served directly to the FBI?

11  A.   Yes.

12  Q.   Which ones were those?

13  A.   The -- well, there was, of course, some of the chicken

14  suppliers where it would be human resources files, I received

15  those directly.   All of the phone -- the majority of the phone

16  service providers, I got those documents directly.   The

17  cloud-based service providers, I got those directly.   And again

18  I am sure I am missing some others, but yeah, there was a

19  number of documents that the FBI got directly.

20  Q.   For the phone companies what was the nature of the

21  documents you received?

22  A.   The telephone providers provided us with multiple call

23  records, so often first it was like toll records.   So they

24  would show us phone calls in and out for a particular phone

25  number.   They show us different types of activity, who the

LaNard Taylor - Direct

1    subscriber was, who was on the billing for that particular

2    number and a host of other things that they may provide.

3    Q.   And approximately what volume of phone records did you

4    receive?

5    A.   There were a lot of numbers, but I would say they were

6    hundreds of thousands of pages of phone records that we

7    received.

8    Q.   Hundreds of thousands of pages?

9    A.   I am sure, yes.

10   Q.   If documents weren't provided to you from the subpoenas,

11   who were they -- who were the remaining documents produced to?

12   A.   There were a number of subpoenas that were served through

13   the Department of Justice through the antitrust division.  And

14   many of those -- yeah, many of those instances the attorneys,

15   the government attorneys were working with counsel for whatever

16   company or whatever person or whoever the subpoena was served

17   to.  And they were served directly from the department to that

18   entity through their legal counsel.

19   Q.   And when documents were received in electronic form, I

20   think this is what you started to answer before, what happened

21   to them next?

22   A.   They were housed centrally for the investigative team in a

23   document review platform.  And like I said, the ones that were

24   received physically, they were scanned and housed in that same

25   document review platform.

LaNard Taylor - Direct

1    Q.  And what was the purpose of putting them in a document

2    review platform?

3    A.  Well, as you can imagine with almost 15 million documents,

4    it's extremely difficult to review that volume of documents.

5    So it was important for us to have one central repository, for

6    lack of a better term, whereby the investigative team was able

7    to go in, look at the documents, search different parameters of

8    the documents and confer about those documents all in one place

9    as opposed to pulling them from different places.

10   Q.  And what sort of searching did the review software allow?

11   A.  The review software allows searching, a lot of searching.

12   And I am sure I am going to miss a lot of them, but we were

13   able to search by, for instance, a communication or e-mail, you

14   are able to search by who sent the e-mail, who received the

15   e-mail, times of communications or any other documents, times

16   they were created, key words in that document.  There is a ton

17   of different parameters by, you know, you can plug and play and

18   be able to search those documents.

19   Q.  And did you review all the documents yourself?

20   A.  I did not.

21   Q.  Why not?

22   A.  Like I said, with that volume of documents, I think it's

23   pretty impractical for one person to review.

24   Q.  Okay.  So it was more of a team effort; is that fair?

25   A.  It was absolutely a team effort.

LaNard Taylor - Direct

1    Q.  What -- when you are looking at the document review

2    software, what do the documents look like?

3    A.  Well, when we reviewed them, they were in a PDF format.

4    Q.  Okay.

5    A.  Most of them, I am sorry.  Most of them were in a PDF form.

6    Some of them were in native form, so an Excel form or Excel

7    chart or something like that, but the majority were in a PDF

8    format.

9    Q.  So let's just take e-mail as an example.  When you are

10   looking at an e-mail on the review software, what do you see?

11   A.  I see an e-mail pretty much how I would view did on my own

12   computer, just in a PDF format.  So I am going to see the

13   e-mail header information, where the e-mail came from, who it

14   went to, the time the e-mail was transmitted, the subject line.

15   Any attachments in the body of the e-mail I would see, which

16   would include any e-mail signature or anything like that.  So

17   it was pretty easy to read because it looks like e-mails we

18   look at every day.

19   Q.  Do the documents have any sort of unique identifiers?

20   A.  Yes, they did.

21   Q.  Can you describe those, please?

22   A.  When we received the documents from various companies, they

23   are assigned a unique identifier by the company that we

24   received it from.  And that kind of helps us keep track of them

25   and know where the documents came from.  And more often than

LaNard Taylor - Direct

1   not they are in the bottom right corner.  They have -- each

2   page of that document has a unique identifier.

3   Q.  Okay.  Can you just describe like an example if it's from

4   company XYZ what the Bates number might look like?

5   A.  If it's from company XYZ, it would say XYZ and a unique

6   number after, six or seven digits, however many digits there

7   are after that number -- after that company name.

8   Q.  As part of the subpoenas, did you collect or did the

9   investigation, I should say, collect any text messages?

10  A.  Yes.

11  Q.  And not naming specific names, but they were the text

12  messages of who?

13  A.  Mainly employees of different chicken suppliers.

14  Q.  And I am going to ask you a similar question with respect

15  as I did with e-mails.  When you get the text messages into the

16  review software, what do they look like?

17  A.  Again, they were in -- many of them were in a PDF format.

18  It just depended on the way the company produced it to us.

19  Some of them were in a PDF format where each message was just

20  its own separate PDF document.  And then some of them were in

21  an Excel form where we were able to look at all of the text

22  messages at once from any -- from a given person.

23  Q.  So it wasn't like when you picked up your iPhone.  It

24  didn't look like that.

25  A.  It was not.

LaNard Taylor - Direct

1    *Q.*  And did you get -- were there people that you didn't get

2    text messages for?

3    *A.*  Yes.

4    *Q.*  More than one?

5    *A.*  Yes.

6    *Q.*  The company just didn't produce them?

7    *A.*  Yes.

8    *Q.*  Okay.  So you mentioned the types of evidence you are

9    primarily looking for.  Did you find any evidence like the type

10   you described?

11   *A.*  Yes, sir.

12   *Q.*  And when you found those, what did you do next?

13   *A.*  Well, it depended on the actual document or the evidence.

14   In most instances when you find a document in which we talked

15   about earlier, whether it be a communication between one person

16   or another, it is important.  And what we did was we tried to

17   gain a more holistic picture of that communication and try to

18   put it in context.  So we kind of took a step back and tried to

19   piece that puzzle together, see what calls transpired around

20   that time, what other communications happened around that time,

21   if there were any other pricing events happening around that

22   time and kind of just paint a picture of context of what

23   happened with that particular communication.

24   *Q.*  And why is that?

25   *A.*  Well, as an investigator I believe it's important for me,

1   but moreover the entire investigative team, to not only just to

2   prove things, but to disprove things.  So if things -- you

3   know, in order to understand what was going on around a time of

4   a particular communication, we have to then look at other

5   things that surround it because not every communication is

6   going to be, you know, something of evidence.

7   Q.  And so were there times when you found a communication of

8   interest and built out the picture and it turned out to be

9   nothing?

10  A.  Plenty of times, yes.

11  Q.  Sure.  Okay.  You mentioned the phone call records.  Do you

12  remember that?

13  A.  Yes.

14  Q.  Did you listen to any of those calls or record any of those

15  calls?

16  A.  No, sir.

17  Q.  Why not?

18  A.  It was impossible because I was investigating in 2019 and

19  many of these phone calls occurred in 2012, 2013, 2014.  So

20  it's just not possible.

21  Q.  As part of the investigation, were there interviews

22  conducted?

23  A.  Yes, sir.

24  Q.  Ball park, how many?

25  A.  I am sure a couple hundred, probably in excess of 200 I am

LaNard Taylor - Direct

1    sure.

2    Q.   200?

3    A.   I am sure.  It's probably -- I don't know an exact number,

4    but I am sure it was a couple hundred.

5    Q.   And did you attend any of those interviews?

6    A.   Yes, sir.

7    Q.   How many, like just proportionate-wise?

8    A.   I would say probably at least half of them I attended, if

9    not more than that.

10   Q.   What was the process for the interviews?  Well, how did the

11   interviews work in the investigation?

12   A.   What exactly do you mean?  Can you ask your question --

13   Q.   Well, what's the setting?

14   A.   Well, it depended on the interview.  This case was unique

15   in that many of our interviews were coordinated between the

16   antitrust division, the government attorneys and legal counsel

17   for whoever the person -- whoever the interviewee was.  And

18   that happened a lot in this investigation because there were

19   lawyers to lawyers talk.  And then there were a number of

20   interviews in which we as agents, we went and approached an

21   interviewee ourselves.  And we commonly refer to it as a

22   knock-and-talk where we went to that person's house or place of

23   business and asked to interview them there.

24   Q.   Well, let's stick with at first the former category, the

25   ones where the people are represented.

218
LaNard Taylor - Direct

1   *A.*   Yes.

2   *Q.*   And where do those interviews take place with represented

3   persons?

4   *A.*   Well, just like most things in the world these days,

5   pre-pandemic they took place in a conference room, typically in

6   Washington DC at the antitrust division.  And that consisted

7   of, you know, attorneys, paralegals, agents, the interviewee,

8   their counsel, and that's typically where those took place.

9   But then post-pandemic, then we moved a lot of those to a

10  virtual format, so Zoom and Microsoft Teams.

11  *Q.*   And when did the virtual interviews start approximately?

12  *A.*   As soon as the pandemic started, so beginning of 2020.

13  *Q.*   With the interviews of represented persons, was it -- could

14  you describe who was typically in the room?  Was it just the

15  interviewee or did they have other people with them?

16  *A.*   Yeah.  So yeah, as I think I just said, the interviewee, if

17  they were represented, then obviously their attorneys were

18  there with them and then us as agents, myself, agents from the

19  Department of Commerce, Office of Inspector General USDA,

20  Office of Inspector General, government attorneys, government

21  paralegals.  All of us were in a room, pretty sizable

22  conference room for those type of interviews.

23  *Q.*   All right.  If we could go then to the type of

24  interviews -- well, I actually want to stop and stick with the

25  first kind.  What was your role in the interviews of

LaNard Taylor - Direct

1    represented persons?

2    A.  My role was the same as it would be in any interview.  I

3    asked questions of the interviewee and, I mean, that would be

4    my role in any interview that I partake in.

5    Q.  Are you the only person asking questions?

6    A.  I am not, not in those interviews, no.

7    Q.  Did anybody take notes?

8    A.  Yes.

9    Q.  Was that sometimes your role?

10   A.  Many times that was my role, yes.

11   Q.  And what -- why did you take notes?

12   A.  Because as an agent, it's important for us to memorialize

13   essentially a summary of what was, you know, talked about in

14   that interview.  It's not a transcript, so I can't, you know,

15   type every single word that was said, but we memorialize that

16   and create a permanent record, a permanent government record of

17   those interviews.

18   Q.  So you create a report of some sort?

19   A.  Yes, sir.

20   Q.  And what did you do with those interview reports after they

21   were written?  Well, you draft an interview report, right?  And

22   then what happens next?  What happened next?

23   A.  When I drafted my interview reports, I collaborated with

24   whatever other agent that was there and that is pretty typical.

25   Actually, that's standard from when more than one agent goes on

LaNard Taylor - Direct

1    the interview.  Whoever was also on the interview as agents,

2    they are essentially a coauthor of that interview, so they have

3    to review it too.

4         So we conferred about the interview to make sure, you

5    know, we are both -- you know, we talk about the interview and

6    make sure we are both recalling it.  And then I draft an

7    interview report or the other agent drafts the interview report

8    and I send that for supervisory approval.

9    Q.  Okay.  And what does supervisory approval entail?

10   A.  It's when my supervisor reviews it, reviews the interview

11   report.  And he goes through and he will do like a quality

12   assurance check, if you will, before he signs off.  And it goes

13   to our case file after that.

14   Q.  All right.  Anybody else you talk about the interview with?

15   A.  Yeah, of course.  I talked about the interview with the

16   entire investigative team, whoever is there.  That's the

17   essence of the team.  We talk about everything that would have

18   happened in the interview.

19   Q.  Okay.  So after you got supervisory approval for your

20   interview reports, then what happened to the interview reports?

21   A.  Our interview reports at the FBI -- and I can only speak

22   for the FBI.  I can't speak for the other investigative

23   agencies -- but our interview reports go into our report system

24   under that case number that I explained earlier.  And then at

25   some point we turn all the interviews to include the notes, if

221

LaNard Taylor - Direct

1    there were any notes drafted, we turn those over to the

2    antitrust division through the discovery process.

3    Q.  How many interview reports would you say you wrote ball

4    park?

5    A.  Again, I can't give you an exact number.  I know it's

6    probably in excess of 50, probably closer to it.

7    Q.  Who else wrote interview reports?

8    A.  Every other agent that was there.  So while we had multiple

9    FBI agents, their written reports, Department of Commerce,

10   USDA.  There was a bunch of agents that have written these

11   reports.

12   Q.  All right.  Now, the second category of interview types

13   that you described was called a knock-and-talk you said?

14   A.  That's right.

15   Q.  Can you explain what that type of interview is?

16   A.  Sure.  Basically what it sounds like where we knock.

17   Generally when we're at somebody's residence we knock on their

18   door and we ask to talk to them.

19   Q.  Can you repeat that?  If I could ask you a favor.  You are

20   talking a little fast.

21   A.  Okay.

22   Q.  Could you slow down a little?

23   A.  Yes, sir.  So we would knock on someone's door and ask to

24   talk to them.  So the interviews are voluntary.  We knock on

25   the door.  We identify ourselves, let them know where we work,

LaNard Taylor - Direct

1    and we would, you know, ask to talk to them.

2    Q.  All right.  So you knock on the door.  They answer.  You

3    ask if you can talk to them.  And generally what happens

4    next -- happened next?

5    A.  Either they say yes or they say no.  So if they say yes,

6    then we interview them.  If they say no, then we go on our way.

7    Q.  They typically invite you in?

8    A.  Sometimes, depending on the interviewee.  Sometimes they

9    will invite us in.  Some of them bring us into their home, sit

10   us on the couch or the kitchen table.  Others talk to us on the

11   porch.  So it just depends on whatever comfort level that

12   person has.

13   Q.  And when you interviewed people in the knock-and-talks, did

14   you give them any advisements in terms of, you know, this is

15   voluntary or any laws they needed to know about, that kind of

16   thing?

17   A.  Yes, sir.

18   Q.  Could you describe that, please?

19   A.  Most times we, once we identify ourselves, we make it clear

20   to them that this is a voluntary interview.  They can stop it.

21   And, you know, at some point during the interview either myself

22   or another agent, whoever is there, and many times, not every

23   single interview, but many times we instruct or let them know

24   that it would be a crime to lie to a federal agent.

25   Q.  And then how long typically did those interviews go?

LaNard Taylor - Direct

1   A.  Again, it depended.  It depended on the interviewee.  Some

2   of them took hours and some of them -- you know, it just

3   depended on the interviewee.  Some folks when they talk to us,

4   they are on their way to work and they only have a 30-minute

5   time slot to talk to us, so it just depended.

6   Q.  When you did the knock-and-talk interviews, did you ever

7   record them?

8   A.  Yes, sir.

9   Q.  And did the people who you were interviewing know that they

10  were being recorded?

11  A.  No, sir.

12  Q.  All right.  Did you need approval to record people without

13  them knowing?

14  A.  Yes, sir.

15  Q.  And from whom?

16  A.  My supervisor.

17  Q.  All right.  So did you have supervisor approval for every

18  recorded interview that you did?

19  A.  Yes, sir.

20  Q.  What factors go into whether or not you decide to record an

21  interview?

22  A.  There are a number --

23          MR. KORNFELD:  Excuse me.  Objection, Your Honor.  The

24  witness testified that the supervisor gives the approval, and

25  now the witness is talking about his own process of approval.

LaNard Taylor - Direct

1        THE COURT:  Hold on.  Are you going to rephrase the

2    question?

3            MR. KOENIG:  Yes.

4        THE COURT:  I will sustain the objection and

5    Mr. Koenig can rephrase it.

6    BY MR. KOENIG:

7    Q.  Do you have an understanding as to what factors go into

8    whether a recorded interview is approved?

9    A.  Yes.

10   Q.  And what is the basis for that understanding?

11   A.  Because I am --

12           MR. McLOUGHLIN:  Objection, Your Honor, lack of

13   foundation.

14           THE COURT:  Overruled.

15           MR. McLOUGHLIN:  He can't speak to what a supervisor

16   thought.

17           THE COURT:  He obviously would know the criteria if he

18   needs to seek approval in order to obtain it.  Overruled.

19   BY MR. KOENIG:

20   Q.  What's the basis?

21   A.  Because I am the one that seeks the approval from the

22   supervisor and explains it to them, the variables that I am

23   considering.

24   Q.  I couldn't hear you.  You were talking too fast there.

25   A.  I am the one that seeks the approval, and I would justify

LaNard Taylor - Direct

1    to the supervisor the variables that I am considering for their

2    approval.

3    Q.   So what is your understanding of the factors that justify

4    approval of a recorded interview?

5    A.   There are a number of them.  And when I -- when I seek the

6    authorization, I would explain to the supervisor that whether

7    it's the potential length of the interview, so if an interview

8    is going to be several hours, that might be a consideration.

9    The volume of interviews we are doing at the time.  So if we

10   are doing -- like, for instance, there was at one point we were

11   in different states, I am doing five, six interviews back to

12   back within a day or two.  That could be a consideration.  You

13   know, there is a ton of different factors that would go into

14   it, but those are just a few.

15   Q.   You mentioned different states.  Let me back up.  So you

16   mentioned length, number of them.  Does subject matter ever

17   play into it?

18   A.   It does.

19   Q.   And how so?

20   A.   Generally if there is a very complex or more complex topic

21   or subject area, you may want to record that so you can

22   reference that later on.

23   Q.   And why didn't you -- instead of recording people without

24   them knowing, why didn't you just throw a tape-recorder on the

25   table and say, "Do you mind if I record you"?

LaNard Taylor - Direct

1    *A.*   Yeah.  So as you can imagine, if the FBI comes to your

2    house and put a large tape-recorder on the table, it may, you

3    know, affect somebody's truthfulness with us.  It may affect --

4    they may not want to tell us everything.  So those are reasons

5    you just -- I mean, I think a tape-recorder on the table may be

6    intimidating to some folks, so those are reasons you probably

7    would avoid doing that.

8    *Q.*   Did the fact that you recorded someone mean that they did

9    something wrong?

10   *A.*   Absolutely not.

11   *Q.*   Okay.  And then after you recorded the interviews, what did

12   you do with the recordings?

13   *A.*   So once we record the interviews, the interviews themselves

14   become evidence.  And we -- we go through the chain of custody

15   process like we would do with any piece of evidence in the case

16   where we take them back to our electronics evidence folks at

17   the FBI.  They do the download and then they put them into the

18   case file and create a permanent record of it.

19   *Q.*   And why do you go through that process?

20   *A.*   Again, it is important for us to, one, maintain a chain of

21   custody; but then, two, to store these evidentiary items in a

22   safe place in an FBI facility creating a record for it whereby

23   we are able to -- not just myself, but any case agent or

24   anybody else that comes after me are able to access that.

25   *Q.*   For the recorded interviews, did you write reports?

LaNard Taylor - Direct

1    *A.*   Yes, sir.

2    *Q.*   Were those of the same nature as the other type of

3    interview reports?

4    *A.*   Most often they were not.   They were not the same.

5    *Q.*   How did they differ?

6    *A.*   When I recorded an interview, many times I may, you know,

7    only write a couple lines.   But I would reference that there is

8    a recording of the interview and the reader of this report

9    should refer to the recording of the interview.

10   *Q.*   When you did the interviews in this case regardless of

11   which kind, whether a represented person or a knock-and-talk,

12   was any of those people in custody?

13   *A.*   No, sir.

14   *Q.*   Were any of those people not able to leave at any time?

15   *A.*   No, sir.

16   *Q.*   Did you use any coercive interrogative techniques?

17   *A.*   No, sir.

18   *Q.*   Were there people that you interviewed multiple times?

19   *A.*   Yes, sir.

20   *Q.*   And why?

21   *A.*   Well, it's important to get all the information you can,

22   right?   So sometimes one interview is not enough.   Sometimes it

23   may take two, three, four, 10 interviews, or there is sometimes

24   that you interview somebody and they say something that you

25   want to corroborate.   So you go back, you corroborate it and

228

LaNard Taylor - Direct

1   you go interview them again.  There is things you find out

2   throughout the course of the investigation that you want to go

3   back to that person again.  So in an effort to be as thorough

4   as possible, there are times where you need to interview

5   somebody multiple times.

6   Q.  How many -- let's just dwell on the knock-and-talks for a

7   minute.  How many different states would you say you went to

8   conducting knock-and-talks in this investigation?

9   A.  I don't know an exact number, but seven, eight, nine,

10  somewhere around there.

11  Q.  And over what course -- what period of time?

12  A.  Throughout the entire investigation from 2019 all the way

13  up until a couple weeks ago.

14  Q.  All right.  And just to clarify, I don't know if I heard

15  right.  Did you say you would interview someone multiple times

16  to corroborate or cooperate?  I couldn't tell what that word

17  was.

18  A.  Well, I believe what I said was -- I said corroborate.

19  But, I mean, if they said something that was -- that we were

20  able to verify, that's important in the investigation, so we

21  would then go verify that.  And if we had additional questions

22  we needed to follow up on, then we would do that.

23  Q.  Okay.  And one last investigative technique you mentioned

24  was search warrants, correct?

25  A.  Yes, sir.

LaNard Taylor - Direct

1   *Q.*  Did you execute any search warrants?

2   *A.*  We did.

3   *Q.*  What does a search warrant allow you to do?

4   *A.*  A search warrant allows us, being the FBI in this case, to

5   seize evidence from a person, individual or residence, a

6   vehicle.  You know, it's authorized by a magistrate judge and

7   that judge allows us to seize evidence.

8   *Q.*  And how many search warrants did you execute in this case?

9   *A.*  Again, I can't give you an exact number, but I am sure it

10  was in excess of 10.

11  *Q.*  Were they all where you, you know, go up to somebody's

12  house or something or were there different kinds?

13  *A.*  Yes, sir.  There were different types of search warrants.

14  So some of these search warrants were to companies where, like

15  I said earlier, a cloud service provider where they will accept

16  service of that search warrant through e-mail, so we were able

17  to do that.  And then we get the evidence electronically.  And

18  in many instances there were search warrants that were

19  performed at someone's residence.

20  *Q.*  All right.  What types of evidence did you get as a result

21  of the search warrants?

22  *A.*  Documents, electronic evidence to include phones,

23  computers.

24  *Q.*  I am sorry?

25  *A.*  Documents, electronic evidence including phones, computers,

LaNard Taylor - Direct

1    tablets.

2    Q.  And then after you seized, say, an electronic device or

3    documents, what do you do -- what did you do with those?

4    A.  The chain of custody process is the same that I explained

5    for the electronic -- I am sorry, the recordings.  We returned

6    those back to the FBI office.  In my case that would be the

7    Washington field office.  We submitted those into evidence,

8    created the chain of custody.  And in most instances and when

9    it came to the electronic devices, we have a specialized unit

10   of the FBI that then will do the extraction and extract the

11   data off of the electronic device.

12   Q.  What is that unit called?

13   A.  We call them CART, so the cellular analysis response team,

14   I believe.  I believe that was the name of it.  Don't quote me

15   on the exact name, but it's the CART team.

16   Q.  CART team?

17   A.  I am sorry, computer analysis.

18   Q.  Now, in the course of preparing for this trial, did you put

19   together -- or let me rephrase, did the team assemble any sort

20   of summaries or time lines or anything like that?

21   A.  Yes, sir.

22   Q.  And did you have a role in that?

23   A.  Yes, sir, I did.

24   Q.  What was your role?

25   A.  I identified documents.  I identified communications.  I

LaNard Taylor - Direct

1   suggested things be added.  I suggested things be removed.  I

2   verified them, you know, for accuracy.  That was my role.

3   Q.  And in the time since you last reviewed the summaries, are

4   you aware of there being any changes since then?

5   A.  Yes, sir.

6   Q.  Did you have a role in those subsequent changes?

7   A.  No, sir.

8   Q.  So when was the last time you would say you reviewed the

9   summaries?

10  A.  Toward the end of last year, so we are what -- October,

11  November, December.

12  Q.  Of 2021?

13  A.  2021, yes.

14  Q.  I just want to circle back.  When did you say this

15  investigation started?

16  A.  It started before me.  I can't give you an exact day, but

17  my understanding was at least a year or two before I started.

18  So I started in 2019, so maybe 2017.

19  Q.  All right.  And when was -- were charges brought in this

20  case?

21  A.  The first charges were brought in 2020, the summer of --

22  June of 2020.

23  Q.  Had any investigation been done before June of 2020?

24  A.  Yes, sir.

25  Q.  How much?

LaNard Taylor - Direct

1    *A.*  Well --

2           *MR. KORNFELD:*  Objection, Your Honor.  That's a vague

3    question.  Lacks foundation.  The agent didn't come on until

4    '19.

5           *THE COURT:*  I will sustain it on foundation grounds,

6    if you can lay foundation.

7           *MR. KOENIG:*  Sure.

8    *BY MR. KOENIG:*

9    *Q.*  You came on in the investigation in the summer of 2019,

10   correct?

11   *A.*  Yes.

12   *Q.*  Between the summer of 2019 and June of 2020 when the case

13   was charged, did you personally take investigative steps in

14   this investigation?

15   *A.*  Yes, sir.

16   *Q.*  Can you describe some of those investigative steps?

17          *MR. McLOUGHLIN:*  Objection, asked and answered.  We

18   have been through that quite a bit, I believe.

19          *THE COURT:*  Overruled.

20   *A.*  They are the investigative steps that we've talked about,

21   so countless interviews, serving subpoenas, reviewing

22   documents, reviewing digital devices, all the things that we've

23   talked about.

24   *BY MR. KOENIG:*

25   *Q.*  And that was before the charge in 2020?

LaNard Taylor - Cross

1    *A.  That is correct.*

2          *MR. KOENIG:*  May I have one moment, please?

3          *THE COURT:*  Yes.

4    *BY MR. KOENIG:*

5    *Q.*  The interviews that you mentioned from summer of 2019 to

6    June of 2020, who -- not names, but who were the types of

7    people you interviewed?

8    *A.*  Individuals that worked at chicken suppliers.  We

9    interviewed individuals that worked at buying cooperatives,

10   individuals that worked at customer -- broiler chicken

11   customers.  And I am sure there was others, but those are the

12   main categories.

13   *Q.*  The distributors?

14   *A.*  We did.

15          *MR. KOENIG:*  No further questions.

16          *THE COURT:*  Thank you.

17          Cross-examination?

18          Ms. Pletcher, go ahead.

19          *MS. PLETCHER:*  Thank you, Your Honor.

20                         **CROSS-EXAMINATION**

21   *BY MS. PLETCHER:*

22   *Q.*  Good afternoon, Agent Taylor.

23   *A.*  Good afternoon.

24   *Q.*  My name is Anna Pletcher and I represent Jayson Penn.

25          Agent Taylor, you have been an FBI agent for just

LaNard Taylor - Cross

1   under six years you said?

2   A.   Yes, ma'am.

3   Q.   Before that you were a city police officer.

4   A.   That is correct.

5   Q.   Working in Tampa, Florida?

6   A.   Yes, ma'am.

7   Q.   And then you joined the FBI.

8   A.   Yes, ma'am.

9   Q.   So at the FBI you said that you had about 800 hundred hours

10  of general training; is that right?

11  A.   I am sure it was over that, but that was just in the

12  academy.  Obviously I have had countless hours since then in

13  continuing education and in-service and things like that.

14  Q.   So at the academy during your 800 hours, how many of those

15  hours were dedicated to training on price-fixing?

16  A.   Yeah, I am not certain that we actually specifically talked

17  about price-fixing.

18  Q.   So then after the academy you said that you were detailed

19  to Palm Springs; is that right?

20  A.   That was my first assignment, yes, ma'am.

21  Q.   And while you were in Palm Springs, how many price-fixing

22  cases did you work on?

23  A.   I did not work price-fixing in Palm Springs.

24  Q.   After Palm Springs you went to a public corruption unit in

25  LA?

LaNard Taylor - Cross

1    *A.*   That is correct.

2    *Q.*   And how many price-fixing cases did you work on there?

3    *A.*   None.

4    *Q.*   Isn't it true, Agent Taylor, that this is the first

5    price-fixing investigation that you have worked on?

6    *A.*   That is true.

7    *Q.*   And this is the first time you are a lead case agent on an

8    antitrust investigation.

9    *A.*   I don't know which one came first, so there is another.  I

10   do have other ATR cases.  So I don't know if this was the first

11   one or the second one, so I can't give you an exact answer,

12   but ...

13   *Q.*   As a special agent, it's your job to investigate potential

14   crimes?

15   *A.*   Yes, ma'am, that's part of my job.

16   *Q.*   And your focus is on discovering all of the relevant facts.

17   *A.*   I would say all the facts we possibly can, not just the

18   relevant ones; because some of them may be irrelevant, but it's

19   important still to discovery those too.

20   *Q.*   Right.  So not just those facts that might fit with the

21   theory that a crime was committed.

22   *A.*   Of course not.

23   *Q.*   So is it fair to say that the investigation in this case

24   began around May 2017?

25   *A.*   Again, I didn't come on until 2019, so I can't tell you the

LaNard Taylor - Cross

 1  exact day that it started before I arrived.

 2  Q.  Because you were not on the case when the investigation

 3  began, right?

 4  A.  That's correct.

 5  Q.  But the first interview in which you participated in was

 6  July 2019?

 7  A.  Sounds about right.

 8  Q.  And that was when you started on the case.

 9  A.  That is -- yes, yes, ma'am.

10  Q.  About two years after the investigation began.  Does that

11  sound right?

12  A.  Sure.

13  Q.  You knew when you started the investigation that it was

14  already underway when you joined?

15  A.  That is correct, yes, ma'am.

16  Q.  And to familiarize yourself with the investigation up to

17  that point, presumably you reviewed interviews that had already

18  been conducted?

19  A.  Yes, ma'am.

20  Q.  I want to be clear on who else in addition to the FBI was

21  working on this investigation because you said that there were

22  other government agencies involved; is that right?

23  A.  That's right, yes, ma'am.

24  Q.  The Department of Commerce Office of Inspector General?

25  A.  Yes, ma'am.

LaNard Taylor - Cross

1   Q.   The Department of Agriculture Office of Inspector General?

2   A.   Yes, ma'am.

3   Q.   And, of course, the Department of Justice attorneys and

4   other DOJ personnel?

5   A.   The antitrust division attorneys, yes.

6   Q.   They were all involved in this investigation.

7   A.   That's correct.

8   Q.   Agent Taylor, you said that there had been about 15 million

9   documents gathered by the government from various sources in

10  this investigation?

11  A.   Approximately, yes, ma'am.  I think it was just under

12  15 million, but somewhere in that ball park.

13  Q.   14.8, does that sound right?

14  A.   I thought it was 14.7, but it could be 14.8.

15  Q.   Is it fair to say millions of documents were obtained by

16  the government from chicken supplier companies that employed

17  the men who are on trial here today?

18  A.   Yes, ma'am.

19  Q.   And tens of thousands or maybe even hundreds of thousands

20  were obtained by the government from other chicken companies

21  that did not employ the men who are sitting here today?

22  A.   That's correct, yes, ma'am.

23  Q.   Hundreds of thousands of pages were obtained by the

24  government from telephone companies.

25  A.   I am sorry, are you asking me?

LaNard Taylor - Cross

1    Q.   Yes.  Is that correct?

2    A.   Yes, that's correct.

3    Q.   And thousands of documents were obtained by the government

4    from companies that had contracts to purchase chicken from the

5    companies that employed the men on trial here today.

6    A.   I just want to make sure.  You are asking me that question?

7    Q.   That's the question.

8    A.   Okay.  Yes, yes.

9    Q.   Some of those 14.7 million documents were obtained by the

10   government from third parties?

11   A.   Yes.  And I am not trying to be a smart aleck.  I just -- I

12   am not sure if you are asking me a question or if you are

13   making a statement, so that's why I am just trying to tread

14   lightly.

15   Q.   That's a question to you.

16   A.   Yes.

17   Q.   And the government obtained those documents through you

18   mentioned subpoenas; is that right?

19   A.   That is right, yes, ma'am.

20   Q.   Also we know as compulsory process?

21   A.   Sure.

22   Q.   And that's because you, as the government, have the ability

23   to demand that entities produce documents that you ask for.

24   A.   I can't say that.  I don't know what the -- yeah.  That

25   would be a question better suited for attorneys at the

LaNard Taylor - Cross

1    government because I can't demand anything.

2    Q.  So the government has the power to ask for basically

3    whatever it wants, right, through a subpoena?

4    A.  That's right.  We can ask for whatever.

5    Q.  Did you subpoena text messages from chicken purchasers?

6    A.  Purchasers?  I am not sure.  I am not sure about

7    purchasers.

8    Q.  Chicken purchasing companies.

9    A.  You mean customers?

10   Q.  Yes, customers of the chicken suppliers who we have heard

11   so much about.

12   A.  It's possible.  But again, remember a lot of the subpoenas

13   were served by the antitrust division through counsel, so it's

14   possible, but I can't say for sure whether it was or it was not

15   requested.

16   Q.  So you wouldn't necessarily know if subpoenas -- all of the

17   subpoenas that went out requesting documents?

18   A.  Well, that's right.  I wouldn't know every subpoena that

19   went out, that's correct.

20   Q.  Because the government attorneys sent out some of those

21   subpoenas.

22   A.  That is correct.

23   Q.  Would you agree, Agent Taylor, that this is a very complex

24   investigation?

25   A.  No, I would not agree that it is complex.

240

LaNard Taylor - Cross

1    Q.  Well, certainly the chicken industry is complex.

2    A.  That part is true, yes.

3    Q.  It's a multi-billion dollar industry; isn't that right?

4    A.  That is right.

5    Q.  There are many different types of chicken products,

6    correct?

7    A.  Correct.

8    Q.  The supply chain is very complicated; is that right?

9    A.  My understanding is it is, yes.

10   Q.  There are many chicken suppliers who supply all these

11   different types of products?

12   A.  Yes.

13   Q.  And the chicken industry, it operates across the nation and

14   internationally, right?

15   A.  That is right, yes, ma'am.

16   Q.  So in the investigation of an industry that complex, it's

17   especially important to get a thorough understanding of the

18   facts; would you agree?

19   A.  I absolutely agree.

20   Q.  And in this investigation which cover at least eight years,

21   it's also particularly important to get a thorough

22   understanding of the facts.  Do you agree?

23   A.  Yes, ma'am.

24   Q.  So one technique that you could use as an FBI agent to

25   investigate complex cases is a wiretap; isn't that right?

LaNard Taylor - Cross

1    *A.*  You could if the case dictated that, but not all cases

2    dictate that.

3    *Q.*  So a wiretap is when an investigating agent secretly

4    monitors the communications of someone they suspect might be

5    engaging in illegal behavior.

6    *A.*  That is for current and future behavior, yes, not past

7    behavior.

8    *Q.*  So to do that type of monitoring might involve, say,

9    putting a recording device on someone's phone?

10   *A.*  Yes.

11   *Q.*  You have done wiretaps in your career, Agent Taylor; is

12   that right?

13   *A.*  I have.

14   *Q.*  So you know how they work.

15   *A.*  I do.

16   *Q.*  And you know that wiretaps can be valuable investigative

17   techniques because they might capture evidence of a crime in

18   action; isn't that right?

19   *A.*  Absolutely.

20   *Q.*  Or it may also reveal that there is no criminal activity;

21   isn't that right?

22   *A.*  Absolutely, it could.

23   *Q.*  But there were not any wiretaps used in this investigation;

24   isn't that right?

25   *A.*  That's right.  It was in the past.  As I said, that's not

LaNard Taylor - Cross

1    possible.

2    Q.   I just want to remind myself here, Agent Taylor, this

3    investigation started in approximately 2017; is that correct?

4    A.   That is correct.

5    Q.   And at the outset of your direct examination, you said that

6    the years that were the focus of the investigation goes up to

7    2019; isn't that right?

8    A.   At least, yes, ma'am.

9    Q.   Thank you.  Agent Taylor, another investigative technique

10   that FBI agents may use in a complex case is surveillance;

11   isn't that right?

12   A.   That's correct.

13   Q.   Surveillance involves agents keeping watch over someone

14   they suspect might be engaging in illegal behavior; is that

15   correct?

16   A.   That's part of it, yes.

17   Q.   So, for example, an agent may go to the neighborhood where

18   someone lives and watch their home to see who is coming and

19   going; is that right?

20   A.   Yes, ma'am, that could be a part of it.

21   Q.   Or maybe agents would follow someone to or from business

22   meetings to see who they are meeting with, correct?

23   A.   Sure, yes, ma'am.

24   Q.   And surveillance is a valuable investigative technique

25   because agents could observe someone's conduct firsthand,

LaNard Taylor - Cross

1    right?

2    *A.*   If their conduct is ongoing and in the future, absolutely.

3    *Q.*   Isn't it true that there was no surveillance conducted in

4    this investigation?

5    *A.*   That is -- I take that back.  That is not true.  But it

6    sounds like if I am understanding your question and what you're

7    talking about, coming and going from business meetings and

8    someone's houses, if you are talking about that, that is

9    correct.  But there was surveillance conducted, just not in

10   that form.

11   *Q.*   So let's talk about interviews.  Agent Taylor, interviewing

12   people who might have relevant facts is an investigative

13   technique that you did use in this investigation, right?

14   *A.*   That is correct.

15   *Q.*   Now, that's an important technique because you want to talk

16   to people who have firsthand knowledge of the facts, right?

17   *A.*   Not everybody has firsthand.  Some people have secondhand,

18   some people have thirdhand, but it's important for us to talk

19   to them too.

20   *Q.*   In this case it was important to interview people who

21   worked for companies that supply chicken, right?

22   *A.*   Yes, ma'am.

23   *Q.*   And that's because they can tell you how the chicken

24   industry works, correct?

25   *A.*   Yes.

LaNard Taylor - Cross

1    Q.   They could tell you how chickens are raised, right?

2    A.   They can, yes, ma'am.

3    Q.   They could tell you how they are processed?

4    A.   Yes, ma'am.

5    Q.   They could tell you about the various different types of

6    chicken products?

7    A.   Yes, ma'am.

8    Q.   They can tell you how those products were priced; is that

9    right?

10   A.   They could, yes, ma'am.

11   Q.   They could tell you who their customers are, correct?

12   A.   They can.

13   Q.   They could tell you how they negotiate with those customers

14   as well?

15   A.   Yes, ma'am.

16   Q.   And they could tell you if they were aware of anyone

17   agreeing to fix prices, correct?

18   A.   They could, yes.

19   Q.   They could also tell you if they were not aware of anyone

20   agreeing to fix prices.

21   A.   Anyone could tell me that, yes, ma'am.

22   Q.   That information from knowledgeable witnesses is important

23   because you go into an investigation with an open mind; is that

24   right?

25   A.   I agree; yes, ma'am.

LaNard Taylor - Cross

1    Q.  And you go where the facts lead you.

2    A.  Absolutely.

3    Q.  Now, you said the initial charges in this case were brought

4    in June 2020; is that correct?

5    A.  That is correct.

6    Q.  And you said before that time you had done, quote,

7    countless interviews; is that right?

8    A.  That's right.

9    Q.  Isn't it true, Agent Taylor, before 2020 you and the other

10   agents in this case had conducted a total of only 24

11   interviews?

12   A.  If you've counted them, then I will accept your

13   representation, but I can't give you an exact number.

14   Q.  Well, I have counted them and there are 24.

15   A.  Okay.

16   Q.  Of those 24 interviews, seven of those people interviewed

17   were employees of the same chicken supply company.  Does that

18   sound right to you?

19   A.  I do not know that.

20   Q.  Agent Taylor, I am going to hand up to you in just a

21   moment -- Agent Taylor, I have just handed you a binder with

22   the first set of approximately 40 interview reports.  So you

23   will notice they are in chronological order, so you can see

24   which ones were done before June 2020.  And please take your

25   time looking through them to see if it is correct that seven of

LaNard Taylor - Cross

1    the people interviewed were employees of the same chicken

2    supply company.

3    A.  That looks to be correct just based on the index or the

4    table of content up front.

5    Q.  Thank you.  Now, one of those individuals you had

6    interviewed three times; is that correct?

7    A.  Yes, ma'am.

8    Q.  Thank you.  You can put that binder aside for a moment,

9    Agent Taylor.

10          So the binder is filled with interview reports, and

11   that's what I would like to ask you about next.

12   A.  Okay.

13          MR. KOENIG:  Your Honor, can we get a copy of the

14   binder she is talking about?

15          THE COURT:  Absolutely.

16   BY MS. PLETCHER:

17   Q.  Agent Taylor, we are going to talk about notes.

18   A.  Okay.

19   Q.  Is it standard practice for an agent who is present at an

20   interview to take notes?

21   A.  It depends on the agent.  It depends on the investigation.

22   But it is common that that happens, yes.

23   Q.  Someone, some agent at an interview, if there is maybe one

24   or more, at least one will take notes.

25   A.  Typically, but not always.

LaNard Taylor - Cross

1   Q.   The notes that agents take at these interviews, they are a

2   summary of what was said at the interview; is that right?

3   A.   Yes.  I can only speak for my own notes.  Yes.

4   Q.   At some point at the end of an interview, is it standard

5   practice for you or the other agents who might have been

6   present to draft a report?

7   A.   Again, speaking for myself, yes.

8   Q.   And speaking for yourself when you draft a report, that

9   report is drawn from the notes that you took at the interview?

10   A.   The notes are used as a -- to help recall things from the

11   interview, but my own recollection of the interview is what

12   drafts the report.

13   Q.   The purpose of this report is to record all of the relevant

14   information conveyed by the interviewee?

15   A.   It's not possible to record everything, but -- all the

16   information, but as best as we can, we attempt to summarize

17   what was said.

18   Q.   So you certainly would include all the important facts.

19   A.   We attempt to, yes.  But obviously we are not perfect and

20   we can't, you know, write down every single thing.

21   Q.   Now, the purpose of these reports is -- I am sorry.  Let me

22   start that question again.  It was important to you in writing

23   your reports to accurately record the relevant information to

24   the best of your ability?

25   A.   To the best of my ability, yes, ma'am.

LaNard Taylor - Cross

1    Q.  Isn't it true, Agent Taylor, that prosecutors in this case

2    in particular review those notes -- review your report before

3    it becomes final?

4    A.  That does not happen every time, no.

5    Q.  It does happen sometimes.

6    A.  Sometimes we share our interviews with them, but it's not

7    all the time and it's not required.

8    Q.  But sometimes they suggest changes.

9    A.  No.  As I said, the interview report is mine.  So we talk

10   about something that occurred in the interview.  Maybe, you

11   know, they may ask, hey, do you remember this?  Do you remember

12   that?  And if I don't remember it, it won't go in the report.

13   Q.  And then you give that final report to the prosecutors?

14   A.  Through the discovery process once my supervisor has

15   approved it, yes, ma'am.

16   Q.  And those reports are turned over to defense counsel.

17   A.  That's my understanding, yes.

18   Q.  The best practice is for you to draft the report soon after

19   the interview; would you agree?

20   A.  Yes, yes.

21   Q.  While the details are still fresh in your mind, right?

22   A.  Sure.

23   Q.  But sometimes in this case there would be a delay of a few

24   days before the report is completed?

25   A.  That happened in every case.

LaNard Taylor - Cross

1   Q.   Sometimes that delay could stretch into weeks?

2   A.   It could, yes.

3   Q.   Sometimes six weeks?

4   A.   It could take months sometimes.  It just depends on what's

5   happening at the time.

6   Q.   Agent Taylor, between June 2020 when first charges were

7   brought and today, you and the other agents have conducted you

8   said over 200 interviews; is that right?

9   A.   I was trying to be very particular about not giving you an

10  exact number, but 200 is a number that I've heard and I would

11  not be surprised if it's over that.

12  Q.   Does the number 243 sound right to you?

13  A.   I can't give you an exact number, but I am sure it's

14  probably over 200, so I wouldn't dispute that.

15  Q.   The fact that more than 200 interviews were conducted,

16  though, does not necessarily mean that the government

17  interviewed more than 200 different people, right?

18  A.   That is correct.

19  Q.   You and the other agents interviewed just over 100

20  individuals.  Does that number sound right?

21  A.   I can't -- I don't know.

22  Q.   If some of those people were interviewed once or twice?

23  A.   Sure.

24  Q.   Others three or four times?

25  A.   Yes, ma'am.

LaNard Taylor - Cross

1   Q.  Two of those individuals were interviewed 19 times.  Is

2   that number correct?

3   A.  I don't know about 19, but there were at least two

4   individuals I interviewed a number of times, yes.

5   Q.  More than 15 times.

6   A.  I am sure, yes.

7   Q.  In the interviews that you conducted, there were always at

8   least two investigative agents present, correct?

9   A.  That's not true, no.

10  Q.  Well, lawyers were often present as well; is that right?

11  A.  Often.  But remember we are talking two different -- we had

12  multiple types of interviews.  So if you are talking where

13  somebody was represented by counsel, then the answer is

14  absolutely yes.

15  Q.  Lawyers in this room from the Department of Justice were

16  present for many of those 200-plus interviews?

17  A.  And other attorneys, yes.

18  Q.  Right.  Sometimes private attorneys for the interviewees

19  were also present?

20  A.  They would be representing their client, yes.

21  Q.  Isn't it true, Agent Taylor, that some of the interviews

22  conducted in this investigation had as many as 20 agents,

23  government attorneys and staff and private attorneys in the

24  room at the same time?

25  A.  Just to be clear, you said 20 agents; no.  You mean 20

LaNard Taylor - Cross

1    people in the room, that is quite possible, but not 20 agents,

2    no.

3    Q.  My question was some of the interviews had as many as 20

4    agents, government attorneys and staff and private attorneys

5    together in the room.

6    A.  Yeah.  I think I understand your question, but I want to

7    make sure I draw a distinction between that because there were

8    not 20 agents.  There were 20 people in the room.  That

9    included agents, attorneys, private counsel, yes.  But when I

10   hear 20 agents, I just want to make sure that's clear.

11   Q.  Some of the interviews in this investigation were conducted

12   in the offices of the Department of Justice; is that right?

13   A.  That's right, yes, ma'am.

14   Q.  In a conference room?

15   A.  Yes, ma'am.

16   Q.  With the government agents and lawyers present?

17   A.  There were no government agents, but government lawyers,

18   yes, ma'am.

19   Q.  You yourself are a government agent.

20   A.  Other than me, of course, yes.

21   Q.  There is a big conference room table?

22   A.  Yes.

23   Q.  And all these agents and lawyers are around this table; is

24   that right?

25   A.  That is right.

LaNard Taylor - Cross

1   Q.   And there is one person who is being interviewed who is

2   also sitting there?

3   A.   With their counsel, yes.

4   Q.   Many of these interrogations the lawyers did the majority

5   of the questioning on behalf of the government?

6   A.   To be clear, they are not interrogations.  They were

7   interviews.

8   Q.   And the lawyers did the majority of the questioning for the

9   government?

10   A.   That is -- they did a lot of the questioning, yes, ma'am.

11   Q.   There were other times some of these interviews were

12   conducted at the home of the person who you wanted to

13   interview?

14   A.   Yes, ma'am, very much.

15   Q.   And you called these knock-and-talks?

16   A.   They can be referred to them as such, yes, ma'am.

17   Q.   During these knock-and-talks that you conducted, you always

18   had another person present with you to conduct the interview?

19   A.   Yes, ma'am.

20   Q.   Sometimes that was an agent?

21   A.   Every time that was an agent on a knock-and-talk, yes.

22   Q.   Sometimes Department of Justice attorneys were with you as

23   well.

24   A.   I do not remember an instance where a government attorney

25   attended a knock-and-talk with me.

LaNard Taylor - Cross

1   *Q.*  Now, during these knock-and-talks, you would knock on the

2   door sometimes as early as 6:00 or 7:00 in the morning?

3   *A.*  No, ma'am.  For starters, I don't go to interviews 6:00 or

4   7:00 o'clock in the morning.  The only thing we do at 6:00 is

5   generally search warrants; but the interviews, knock-and-talks

6   are generally later than that.

7   *Q.*  Sometimes the person who opens the door is a family member?

8   *A.*  Sure, sometimes, could be.

9   *Q.*  Spouse?

10  *A.*  Could be, yes.

11  *Q.*  Child?

12  *A.*  Could be, yes, ma'am.

13  *Q.*  And you are asked to be invited into their home?

14  *A.*  No, ma'am.  Normally we ask to talk to them.  And many

15  times they are generous enough to invite us into their home to

16  talk.

17  *Q.*  And they are not expecting you when you knock on the door,

18  are they?

19  *A.*  That's the purpose of it, yes, ma'am.

20  *Q.*  Sometimes if they do invite you into their home, you would

21  conduct these interviews in their living room?

22  *A.*  Sure, yes, ma'am.

23  *Q.*  Sometimes family is present?

24  *A.*  In the house, yes, ma'am, but generally not in the

25  interview.

LaNard Taylor - Cross

1    *Q.*  On some of these occasions, Agent Taylor, when you went

2    into someone's home, you recorded them; isn't that right?

3    *A.*  That is correct.

4    *Q.*  And you did not ask for their consent?

5    *A.*  I did not.

6    *Q.*  But you do know how to ask for a consent to record; isn't

7    that right?

8    *A.*  I had to ask my supervisor for consent through our

9    policies, not to ask the interviewee, but I have to get

10   supervisory approval.

11   *Q.*  Isn't it true on two occasions during this investigation

12   agents did ask for permission to record?

13   *A.*  I am not aware of that.  That may not have been my

14   recording that you're referring to.

15   *Q.*  So Agent Taylor, I am going to ask you in your binder to

16   look at Tab No. 9 without mentioning any specific names.

17   *A.*  Okay.

18        *MS. PLETCHER:*  Let me get a copy for the government.

19        *MR. KOENIG:*  Your Honor, may I object and have a side

20   bar?

21        *THE COURT:*  Yes.

22      (At the bench:)

23        *THE COURT:*  Go ahead, Mr. Koenig.

24        *MR. KOENIG:*  Your Honor, before -- granted, I don't

25   know the question Ms. Pletcher is going to ask.  However, this

LaNard Taylor - Cross

1    is an interview report from before, well before Agent Taylor

2    was on the investigation, and I just don't see how there is any

3    relevance at all to this.

4              THE COURT:  Ms. Pletcher?

5              MS. PLETCHER:  Yes, Your Honor.  He said he reviewed

6    the reports prior to his joining the investigation, and I am

7    making the simple point that it is possible to ask him to

8    record and give consent.

9              THE COURT:  I don't believe that that was your

10   question.  Is that going to be your question?

11             MS. PLETCHER:  That's where I am going with this.

12             THE COURT:  My question to you is, is that going to be

13   your question, whether it's possible to ask to do an interview

14   and request consent or -- sorry, to record an interview and

15   beforehand ask consent?

16             MS. PLETCHER:  It is.

17             MR. KOENIG:  I guess I don't see why you would need a

18   document to ask that question.

19             MS. PLETCHER:  So I started to ask the question and

20   then he said he wasn't aware of that happening, so this is

21   impeachment to show that actually did happen.

22             THE COURT:  Well, once again, the issue that

23   Mr. Koenig has raised is his lack of personal knowledge.  You

24   are right, he did answer the question that he reviewed some of

25   the interview reports, but it seems like then you're asking

LaNard Taylor - Cross

1    him -- you know, are you asking him about this particular

2    report and whether he is aware of it?  Otherwise, how come he

3    can't be asked a general question?

4            MS. PLETCHER:  Yes.  I am going to ask him if he

5    reviewed this report, and he said he reviewed all of them; and

6    if he had, that this report shows that it can be recorded with

7    consent.

8            THE COURT:  Anything else, Mr. Koenig?

9            MR. KOENIG:  No, Your Honor.

10           MR. McLOUGHLIN:  Your Honor, this is Jim McLoughlin.

11   One point here.  The government has proffered this witness as

12   someone who gives an overview of the investigation from its

13   beginning and as the lead case agent has talked about many

14   things he did not do.  I think the government cannot have it

15   both ways, that when it is to their advantage, he can talk

16   generally about what other people did, but when he is being

17   cross-examined, it is only his personal knowledge and

18   experience.

19           THE COURT:  Well --

20           MR. McLOUGHLIN:  For consistency the government should

21   not be entitled to make --

22           THE COURT:  There is no inconsistency.  He hasn't

23   testified about what went on before.  And now he is

24   specifically being asked about some knowledge of a document and

25   supposedly even perhaps being impeached about some document

LaNard Taylor - Cross

1    that was apparently written before he was even involved.

2    That's dangerous ground, but we will go ahead and hear what the

3    question is.

4            All right.  Thank you.

5        (In open court:)

6    BY MS. PLETCHER:

7    Q.  Agent Taylor, I would ask you to refer to Tab 9.

8    A.  Yes, ma'am.

9    Q.  Is this one of the reports that you reviewed prior to your

10   joining the investigation?

11   A.  I don't specifically remember this report, but I am sure I

12   looked at it.

13   Q.  Agent Taylor, isn't it true that -- that it is possible and

14   actually did occur in this case that individuals recorded

15   and/or asked for and gave their consent?

16           MR. KOENIG:  Objection, hearsay.

17           THE COURT:  I will sustain it.  Lack of foundation.

18   BY MS. PLETCHER:

19   Q.  Agent Taylor, are you aware of any situations during this

20   investigation where people were interviewed and recorded, but

21   gave their consent to be recorded?

22   A.  No, I'm not.

23   Q.  Agent Taylor, you testified that there were many occasions

24   where you went to your supervisor to ask for permission to

25   secretly record interviewees; is that correct?

LaNard Taylor - Cross

1  A.  That is correct.

2  Q.  Is it true you did that on five occasions?

3  A.  Possibly.  I don't know how many times it was.

4  Q.  On those occasions those were knock-and-talks?

5  A.  I believe so, yes, ma'am.

6  Q.  Where people invited you into their homes?

7  A.  I believe -- I believe on all those occasions, yes, ma'am.

8  Q.  And you secretly recorded them.

9  A.  You call it a secret.  We know it as covert recording.

10         MS. PLETCHER:  May I have a minute, please, Your

11  Honor?

12         THE COURT:  Yes.

13  BY MS. PLETCHER:

14  Q.  Agent Taylor, I wanted to clarify one point.  You said on

15  direct examination that you advised interviewees during your

16  knock-and-talks that lying to a federal agent is a crime; is

17  that right?

18  A.  I believe what I said is not every interview, but in many

19  interviews we did, not every single one.

20  Q.  Did you advise interviewees that lying to federal agents

21  was a crime during interviews that were conducted at the

22  offices of the Department of Justice?

23  A.  I am sure we did.  I can't say everyone, but I am sure it

24  happened at those too.

25  Q.  So even when an interviewee is represented by an attorney,

LaNard Taylor - Cross

1  you also advised them that lying to a federal agent is a crime.

2  A.  Again, not every interview, but that very well may have

3  happened, yes, ma'am.

4        MS. PLETCHER:  No further questions, Your Honor.

5        THE COURT:  Thank you, Ms. Pletcher.

6        Additional cross?

7        MR. McLOUGHLIN:  Your Honor, could we have a minute?

8  Is it time for a break?

9        THE COURT:  Not quite time for a break.

10       MR. McLOUGHLIN:  Can we have a minute nonetheless?

11 One minute?

12       THE COURT:  Sorry, Mr. McLoughlin, I don't quite

13 understand.  Do you mean for defense counsel to step outside?

14       MR. McLOUGHLIN:  No, no, just to chat.

15       THE COURT:  Of course.  Go ahead.

16       Mr. McLoughlin, go ahead.

17                    **CROSS-EXAMINATION**

18 BY MR. McLOUGHLIN:

19 Q.  Good afternoon, Special Agent Taylor.  I am Jim McLoughlin

20 and I represent Mr. Lovette.

21 A.  Good afternoon, sir.

22 Q.  Good afternoon.

23       So there are a couple things I want to just clarify.

24 I wasn't able to take complete notes.  When you were talking

25 about the interviews, you indicated that every agent there

LaNard Taylor - Cross

1    would do a report is what I understood.  And I wasn't clear

2    whether you were saying if there were three agents in an

3    interview, all three did a report or every agent in the

4    investigation at some time or another did a report and there

5    was one report per interview.  Which is it or is it something

6    else?

7    A.  It is the latter.  There is only one report for -- there is

8    only one report and one set of notes for an interview.

9    Q.  So one of the purposes of having one report where all of

10   the agents consult is to make the report as accurate as

11   possible because you have the recollection of various people,

12   correct?

13   A.  That is one of the reasons, yes, sir.

14   Q.  Now, you were talking about the way the reports were

15   prepared and talking about clarity and making sure you get all

16   the important points.  And you said you could only speak for

17   your own notes and you could only speak for yourself.  Do you

18   recall saying that?

19   A.  I do.

20   Q.  Okay.  In fact, isn't it part of the FBI training that

21   everyone is trained to make those reports as accurate with

22   respect to everything in them as possible?

23   A.  Well, yes, yes, sir.  I mean, that's the purpose of it is

24   to try to make it as accurate as you possibly can, yes, sir.

25   Q.  So every agent is also trained to capture the most

LaNard Taylor - Cross

 1   important and significant information.  Isn't that also part of

 2   the training?

 3   A.  Well, I can't say that because what you may consider

 4   significant and important somebody else may not.  So when

 5   you're writing notes, as you just said, with your own notes

 6   it's impossible to capture everything.  So, I mean, like I

 7   said, what you may consider significant somebody else may not.

 8   Q.  Well, can we agree, sir, that during an antitrust

 9   investigation the important stuff is the stuff about a

10   violation of the antitrust laws?  Is that fair?

11   A.  Sure, yeah, to me, yes.

12   Q.  So if there is important information conveyed about a

13   violation of the antitrust laws, that would meet the definition

14   of something that should be in the report, doesn't it?

15   A.  Again, I am only talking about myself because you are

16   asking me about things of importance.  And again, what I

17   consider may have been a highlight for somebody, somebody else

18   may not.  Another agent may not.

19   Q.  I am talking about FBI training, sir.  Aren't you trained

20   to capture the important information about the crime you are

21   investigating?  That's a yes or no about the training.

22   A.  Well, yeah, in the training you are trained to capture

23   things in interviews, yes.

24   Q.  So if the agent is doing it correctly and as he or she was

25   trained, they would capture all the important information,

LaNard Taylor - Cross

1   right, about the crime?

2   A.  Well, sir, I can't say that.  No, I can't agree with that.

3   Because once again, what you may think is important the next

4   agent may not think is important, so I am not saying they are

5   doing it incorrectly, though.

6   Q.  Can we agree that it would be whatever that agent based on

7   his or her training and the instructions from the lawyers who

8   are working with them have told them was important?  Can we

9   agree with that?

10  A.  I would also add their experience in there too.

11  Q.  Terrific.  Thank you.  Now, another issue that I wanted to

12  get clear about because you said most.  You said when we

13  identify ourselves -- or most times when we identified

14  ourselves, we told them, being the person you went to

15  interview, that it was voluntary.  There were instances when

16  you did not say that; isn't that correct?

17  A.  I don't know that, no, sir.  I don't remember that.

18  Q.  So is your testimony you said it every time or was your

19  prior testimony where you said most times the correct answer?

20  A.  I said most times because as we talked about, it's been

21  over 200 interviews.  I can't say every single time -- we did

22  one thing every single time.

23  Q.  Okay.  And is it your testimony that no one ever in your

24  presence, yourself or another agent, ever said to someone you

25  did a knock-and-talk, "May we come in and talk to you," in

263

LaNard Taylor - Cross

1    words or substance?

2    A.   No, that's not my testimony.   I am not saying that that

3    never happened nor would I say never or ever because I can't --

4    over 200 interviews, I can't say that.

5    Q.   So your testimony in which you said you didn't ask to come

6    in is not really accurate, correct?   Because if I understand

7    you now, you can't say you never said can we come in.

8    A.   I think we are confusing words.   I don't know exactly what

9    I said, but I am pretty sure I didn't say never.   Maybe I said

10   generally, but I don't know exactly what the words that I used,

11   but I am fairly certain I would not have said never.

12   Q.   Okay.   Now, I want to ask you a little bit, and I am going

13   to plow some ground that has already been plowed, but I want to

14   get to a particular point.   You said there were 14.7 or

15   14.8 million documents that were obtained.

16   A.   Somewhere in that ball park, yes, sir.

17   Q.   Does that include the telephone records or are they on top

18   of the 14.8?

19   A.   My understanding is that includes the telephone records.

20   Q.   Great.   So 14.8 million documents.   And that's not pages.

21   Pages is actually more than that, isn't it?

22   A.   I am thinking we are talking pages.

23   Q.   Pages, okay, documents.   So 14.8 million documents.   Do you

24   have any idea if you put them in this area out here how high

25   that would stack if we just did it from the rail?

LaNard Taylor - Cross

1    A.  No, sir.

2              MR. KOENIG:  Objection, relevance.

3              THE COURT:  Overruled.

4    A.  No, I don't.  I have no idea.

5    BY MR. McLOUGHLIN:

6    Q.  It would fill this room, wouldn't it?

7    A.  Sir, I have no idea.

8    Q.  There were so many documents that you and others involved

9    in the investigation had to use special software to go through

10   those documents as you testified, correct?

11   A.  No, sir.  We didn't have to use special software.  It's the

12   same software we used for any antitrust case no matter how

13   large it is.

14   Q.  Great.  And is that one of those softwares called

15   Relativity?

16   A.  Yes, sir.

17   Q.  And did you not have to get training on Relativity to work

18   on this investigation?

19   A.  Yes, sir.

20   Q.  And that's because Relativity, although it's got a

21   reasonably friendly user interface, is fairly complicated in

22   how you use it, correct?

23   A.  It is, yes, sir.

24   Q.  And the more documents you have in that database, the more

25   complex it gets, correct?

LaNard Taylor - Cross

1   *A.*   I'm not so sure about that.  I mean, a document is a

2   document no matter how many there are in there, but the search

3   parameters no matter how many documents are in there are pretty

4   complex.

5   *Q.*   That's where I was headed.  Because if you have the wrong

6   search parameters, you can get a million documents that aren't

7   really helpful.

8   *A.*   Absolutely.

9   *Q.*   Great.  And in addition to that, you did some 243

10  interviews, you being the government, yes?

11  *A.*   I did not say that number, but I am sure it was in excess

12  of 200.

13  *Q.*   Great.  In addition to that, you did search warrants where

14  you took people's computers and cellphones and gave them to

15  experts to extract the data, right?

16  *A.*   Yes, sir.

17  *Q.*   Okay.  And in addition to the several hundred interviews,

18  the search warrants, the 14.7 or 14.8 million documents, what

19  else did you do to investigate, you being the government?  I

20  apologize.  I should be more specific.

21  *A.*   Well, there is a lot of things.  Utilized lab resources.  I

22  mean, we did a lot of investigating, so I can't give you every

23  single investigative technique.  The consensual recordings.

24  There was a lot of different investigative techniques.

25  *Q.*   What are the other ones?

LaNard Taylor - Cross

1   A.  I just told you I can't remember exactly.  I just gave you

2   two additional ones.

3   Q.  Give me generally every one you can remember.

4   A.  I just told you the two I remember.  I can't give you all

5   of the investigative techniques, but there are a number of

6   them.

7   Q.  And you think there are others you don't remember?

8   A.  There could be, sure.

9   Q.  You said at least twice in your testimony that there were

10  countless interviews, correct?

11  A.  I said countless I believe once, and I believe Ms. Pletcher

12  repeated what I said to her.

13  Q.  Actually, do you recall that you had said it earlier on

14  your direct testimony?

15  A.  It's possible.

16  Q.  Yeah.  And have you ever been on an investigation like this

17  where at the end of it 10 individuals were indicted and on

18  trial like this?

19  A.  Yes.

20  Q.  That is a white collar case.

21  A.  Yes.

22  Q.  So you've had a case with this many documents, this many

23  interviews.

24  A.  Not this many documents, but you are talking about

25  defendants.  When was I was on the public corruption squad in

267

LaNard Taylor - Cross

1    LA, we did have a number of defendants on a public corruption

2    case, yes, sir.

3    Q.  I am talking about the number of the documents, the number

4    of interviews, the use of the computers, the search warrants,

5    ultimately the number of defendants.  How many comparable

6    investigations have you been on in your six years?

7    A.  The number of documents as to what sets this case apart,

8    but everything else you just said as far as interviews,

9    defendants, all that, I have been on investigations that

10   required that.

11   Q.  Great.

12   A.  Actually, I take that back.  Yes, I have been on an

13   investigation where there have been more than this many

14   defendants, more than this many interviews and quite more than

15   this many documents.

16   Q.  So I want to be clear.  With almost $15 million, 240

17   interviews, 10 defendants, search warrants, your testimony is

18   that this investigation is not complex.

19   A.  The investigation is not.  Are you talking about the

20   subject matter?

21   Q.  Yes.

22   A.  The investigation, as I said in my direct, all of my

23   investigations are comprised of generally the same amounts

24   of -- the same types of investigative techniques.  So the

25   investigations are not, you know, hard or complex, although the

LaNard Taylor - Cross

1  subject matter may be.

2  Q.  So I just want to be clear because I am intrigued by this

3  notion that this investigation wasn't complex.  So an

4  investigation that uses the same techniques that has three

5  interviews, 12 documents and one defendant where you do a

6  search warrant and a knock-and-talk is in your mind no more

7  complex than this investigation because you are using the same

8  techniques?  Is that your testimony?

9  A.  You are asking me for my opinion.  My opinion --

10  Q.  I am not asking you for your opinion, sir.  I am asking you

11  for your understanding and experience.  It's not an opinion

12  question.

13  A.  My understanding and my experience is -- I mean, that's

14  what formulates my opinion, so maybe I am just not

15  understanding what you are asking me.  Can you ask me the

16  question again?

17  Q.  Sure.  Is it your testimony that an investigation with 10

18  documents and three interviews and one defendant and one search

19  warrant is no more complex than this case?

20  A.  Yes.  I mean, an interview is an interview.  Just because

21  you do more of them doesn't make the case more complex.  It

22  just makes it more interviews.

23  Q.  Okay.

24      THE COURT:  Mr. McLoughlin, if you could look for a

25  convenient breaking spot.

LaNard Taylor - Cross

1            *MR. McLOUGHLIN:*  Yes, Your Honor.  I think this is

2   one.

3            *THE COURT:*  Okay, great.

4            Ladies and gentlemen, we will go ahead and take our

5   mid-afternoon break at this time.  We will plan on reconvening

6   at 3:30.

7            Mr. Kramer?

8            *JUROR:*  Can I have a word with you, please?

9            *THE COURT:*  There is almost no way to have a word with

10  me, but you can have a word with everyone without the rest of

11  the jury, but everyone else.

12           *JUROR:*  Sure.  I would like to ask that question, if I

13  may.

14           *THE COURT:*  We could do a side bar if you want.

15           *JUROR:*  Sure.

16           *THE COURT:*  The rest of the jury is excused and we

17  will do a side bar with Mr. Kramer.

18           (Jury excused.)

19     (At the bench:)

20           *THE COURT:*  Mr. Kramer, can you hear me?

21           *JUROR:*  Yes, I can hear you.  Can you hear me?

22           *THE COURT:*  Great.

23           Let me see if the attorneys -- Mr. Kornfeld,

24  Mr. Koenig can.

25           Yeah, go ahead.

1           JUROR:  Yeah.  So essentially I am just trying to

2    understand what's expected of me and what information I am

3    supposed to be allowed to use.  So basically it's been

4    summarized at a very high level what the charges are and what

5    laws have been violated, but obviously I have no background in

6    this.  I don't know what actually makes up a violation of these

7    laws without having read the Sherman Act.  I feel like I just

8    am lacking enough information to be able to make a judgment

9    about anything so far.

10          So is there an opportunity for me to ask questions

11   about the laws or should I expect to be educated more about it

12   as we go forward?  I feel currently like I am missing some of

13   the context to help understand some of the evidence that's

14   being presented.

15          THE COURT:  Yeah.  First of all, Mr. Kramer, the fact

16   that you haven't made a judgment yet is exactly what I

17   instructed you is a good thing.  You know, jurors shouldn't be

18   drawing conclusions, especially with the first witness.  So you

19   may recall from the introductory instruction that I read the

20   elements of the Sherman Act charge in this particular case.

21   That was just to give you -- and if you don't remember, that's

22   not a problem.  At the end of the case, I will give you

23   detailed instructions on the law.

24          So your role is just to sit there, pay attention and

25   to try to keep an open mind.  And then at the end of the case

LaNard Taylor - Cross

 1    after you have heard all the evidence, then I'll instruct the

 2    jury.  And then you'll go back to deliberate with your fellow

 3    jurors.

 4         But right now the fact that you may not have a

 5    background in this area, we wouldn't expect any juror to.  It

 6    would just be sheer coincidence, but that's not required.  All

 7    the evidence will come in.  It's the attorneys' job to inform

 8    each of the jurors of the meaning of various things and then

 9    I'll give you the instructions on the law.  Does that answer

10    your question, Mr. Kramer?

11         *JUROR:*  Yeah, that mostly answers it.  It's more in

12    the details of like, for example, the term agreement was used a

13    lot.  Was there an agreement between parties?  It's hard to

14    know if that can be an implied agreement, an explicit

15    agreement, whether they have to actually act on that agreement

16    or the agreement itself was made.  Is that the type of details

17    you are saying will be provided at the end of the case?

18         *THE COURT:*  Maybe, maybe not.  Once again, to the

19    extent that the evidence resolves those issues or the

20    instructions provide guidance to the jury on those issues may

21    depend.  But to the extent that certain things aren't answered,

22    then the jury still has to apply the burden of proof.  And so

23    that's also a factor that comes into play when a jury is

24    deliberating.

25         So once again, way too early for us to predict any of

LaNard Taylor - Cross

1    those things.  The fact that those things are swirling in your

2    mind is natural, but it's just premature.  We'll have to wait

3    until the end of the case.  Does that answer your question,

4    Mr. Kramer?

5              JUROR:  Yes.

6              THE COURT:  Great.  Thank you, Mr. Kramer.  You can go

7    on break now.

8              JUROR:  Okay.

9              THE COURT:  Thank you.

10             (Juror excused.)

11             THE COURT:  We will be in recess, then, until 3:30.

12        (Recess at 3:21 p.m.)

13        (Reconvened at 3:35 p.m.)

14             THE COURT:  Mr. Koenig?

15             MR. KOENIG:  Two quick things.  First, I don't know

16   and perhaps maybe the Court can inquire how long the cross is

17   going to continue.  There is the issue of Mr. Barela who is in

18   the witness room.  And so I don't know if we need to break this

19   part or not, but --

20             THE COURT:  Well, I don't want to break it in the

21   middle of Mr. McLoughlin's cross.

22             MR. McLOUGHLIN:  I think, Your Honor, we can represent

23   to the Court that we will be done with the cross-examination

24   relatively quickly and Mr. Barela getting on should not be an

25   issue.

LaNard Taylor - Cross

1          THE COURT:  And you don't have much redirect, I take

2     it, with Special Agent Taylor?

3          MR. KOENIG:  No.

4          THE COURT:  Thank you, Mr. McLoughlin.

5          Are we ready for the jury?  Let's bring the jury in.

6          (Jury present.)

7          THE COURT:  Mr. McLoughlin, go ahead.

8     BY MR. McLOUGHLIN:

9     Q.  Good afternoon again, Special Agent Taylor.

10          Special Agent Taylor, did you or anyone in your

11    presence ever say to someone who was being interviewed in words

12    or substance, "The train is leaving the station.  People may be

13    charged.  And if you don't cooperate now, then you're at higher

14    risk that something might happen, but we're happy to talk to

15    you."

16    A.  Wow.  That was a lot.  I don't know that I have -- I

17    certainly have not used those words, "The train is leaving the

18    station," but anybody else in my presence, I don't recall that

19    being said.  But I do know that we have explained to people the

20    gravity of the situation that they face based on their conduct

21    and give them the choice whether they want to talk to us or

22    not, if I am answering your question.  I am not sure I am.

23    Q.  Yes.  So in other words, you are facing a grave situation.

24    You can talk to us in which case you will make the situation

25    better, but if you don't, you're facing a grave situation.

LaNard Taylor - Cross

1    *A.*  That's not what I said.

2    *Q.*  I am sorry.  I apologize.

3    *A.*  I didn't say, "You will make the situation better if you

4    talk to us."  At least from my perspective if I approach

5    somebody who does have culpability or they are in some type of

6    grave situation, I may explain to them like, "Hey, this is what

7    we know.  We know you were involved in this.  You can choose to

8    talk to us or not."  I don't tell them, "If you don't talk to

9    me, it's going to be bad for you."  That wouldn't be

10   appropriate and I don't think I would do that.

11   *Q.*  Did anyone in this investigation do that in your presence

12   that you can recall?

13   *A.*  Not that I'm aware.  I can't recall anything like that.

14   *Q.*  And is it true that some individuals in connection with

15   this investigation were told that if they cooperated, they

16   could receive immunity.  But if they did not, they would not

17   get it?

18   *A.*  To be clear, I am not aware of any immunity talks.  That

19   would be an attorney thing.  As far as immunity, I would never

20   tell somebody they are going to get immunity because it is not

21   something that I would be involved in.

22   *Q.*  I didn't ask you, sir, what you said.  I am asking you as

23   lead case agent, aren't you aware that in this investigation

24   various individuals were told that they would -- could get

25   immunity if they cooperated with the government?  But if they

LaNard Taylor - Cross

1   didn't, then they wouldn't?

2           MR. KOENIG:  Objection, hearsay.

3           THE COURT:  Sustained.

4   BY MR. McLOUGHLIN:

5   Q.  Did anyone ever communicate that in words or substance in

6   your presence, sir?

7           MR. KOENIG:  Same objection.

8           MR. McLOUGHLIN:  It's not hearsay, Your Honor.

9           THE COURT:  I am going to allow that question if he

10  has personal knowledge.

11  A.  No, sir.

12  BY MR. McLOUGHLIN:

13  Q.  Did anyone during the course of the investigation in their

14  furtherance of their official duties inform you that such a

15  conversation had taken place?

16  A.  I am not aware of any conversations that the lawyers had

17  with other lawyers, so no, sir.

18  Q.  You just don't know one way or the other.

19  A.  That is correct.

20          MR. McLOUGHLIN:  Thank you.  No more questions.

21          THE COURT:  Thank you, Mr. McLoughlin.

22          Additional cross?

23          Mr. Kornfeld.

24  BY MR. KORNFELD:

25  Q.  Good afternoon, Agent Taylor.

LaNard Taylor - Cross

1   *A.*  Good afternoon, sir.

2   *Q.*  I just want to ask you, you have been asked a lot about

3   interviews.  My understanding in this case is some of the

4   240-some odd interviews were recorded.  Most weren't, correct?

5   *A.*  That's correct, yes, sir.

6   *Q.*  And of the ones that were recorded, most, to your

7   knowledge, were recorded by you or a fellow agent in the

8   knock-and-talk situation as opposed to the conference table

9   situation.

10  *A.*  The ones that I am aware of I recorded, not another agent,

11  and they were in a knock-and-talk scenario, yes, sir.

12  *Q.*  And if I understood your testimony, the ones that you

13  recorded in the knock-and-talk scenario were without the

14  interviewee's knowledge, correct?

15  *A.*  That is correct, yes, sir.

16  *Q.*  And at the risk of asking you a question probably the whole

17  courtroom knows the answer to, is it fair to say that a

18  recorded interview is the most accurate reflection that there

19  can be in an interview because it literally captures every

20  single word by both the interviewer and the interviewee?

21  *A.*  Generally I would say that, but you also got to factor in

22  if there is quality issues with the recording.  It could not be

23  the most accurate because maybe you can't hear what they are

24  saying.

25  *Q.*  Yeah, fair enough.  But assuming that the technology is

277

LaNard Taylor - Cross

1   working, it's more accurate.  I don't care how good a note

2   taker you are.  It's more accurate than notes, right?

3   A.  I agree with that, yes, sir.

4   Q.  And I think you said earlier as a note taker, you do your

5   best to capture what you think is important, but you're not

6   capturing every word, right?

7   A.  That's right, yes, sir.

8   Q.  And there is a subjective element.  I mean, maybe if I am

9   taking notes and you're taking notes, maybe I might think

10  something is important but you may miss and vice versa,

11  correct?

12  A.  Sure, yes, sir.

13  Q.  And that's why if I'm the note taker before I do the

14  report, per your policy if I am an agent, I am checking in with

15  you just basically to say, hey, Agent Taylor, here is my

16  recollection.  Did I miss anything?

17  A.  Yes, sir.

18  Q.  Because you guys want to be as accurate as possible, right?

19  A.  We try to be, yes, sir.

20  Q.  And you would agree with me, would you not, that in a

21  scenario where an interview is not recorded, if there are notes

22  and a report, those are effectively the sole official record,

23  right?

24  A.  They are the summary of the interview which are official

25  record, yes, sir.

LaNard Taylor - Cross

1    *Q.*  And in the absence of a recording -- well, let's back up.

2    If I understood your testimony, there is only one set of -- if

3    there are a set of notes, there is only one set of notes,

4    right?

5    *A.*  There should be, yes, sir.

6    *Q.*  And if there is a report, there is only one report,

7    correct?

8    *A.*  Well, not exactly.  And I will give you this example.

9    There was an instance in which two different agents took half

10   of the interview, so there would be two reports for the same

11   interview, but one took one part and one took the other part.

12   But absent that type of, you know, breakup of the interview,

13   then sure, there would be one report.

14   *Q.*  Fair enough.  Because the point is -- the goal is that

15   there is a record, not that there is competing records.

16   Because if there were two reports of the whole interview and

17   some person like me gets up and says, hey, agent so and so, how

18   come your report says this and agent -- the other agent's

19   report says that, I mean, you are trying to have a single

20   record of what was said.

21   *A.*  Yes, sir.

22   *Q.*  And in the case of interviews that are not recorded, I

23   understand there is an approval process.  But the bottom line,

24   there is nothing preventing -- if you wanted to, you could

25   record all 240-some odd interviews, right?

279
LaNard Taylor - Cross

1    A.  Not quite, no, sir.

2    Q.  Because of a policy or because of -- I mean, don't we all

3    walk around, those of us carrying a cellphone, aren't we

4    effectively walking around with recording devices?

5    A.  Yeah, but we don't use the iPhone or any type of cellular

6    phone as our recording devices, though.

7    Q.  But you are the FBI, right?  Like this isn't calling in

8    helicopters.  You can have a recording device if you -- when

9    you need one you've got one available.

10   A.  Yes.  But I think the question you asked -- maybe I

11   understood it incorrectly -- you said you could theoretically

12   record every interview you did, and I don't know that's

13   actually accurate.

14   Q.  Well, let me break it down.  If you have a recording device

15   on you, the ones you use, they are not -- you talked earlier

16   about putting some big thing on the table.  I mean, the ones

17   I've seen nowadays are this big, right?

18   A.  Could be.

19   Q.  Okay.  So, I mean, it's not like a production to bring in a

20   recording device, right?

21   A.  That's right, yes, sir.

22   Q.  And it's not a production or you don't have to be too tech

23   savvy to hit record, do you?

24   A.  No, you don't.

25   Q.  Okay.

LaNard Taylor - Redirect

1    A.  Depends on who you are.

2    Q.  Well, yeah, I am the wrong guy to be asking that question.

3            But the bottom line is if you have a recording device

4    available to you and if you know how to use it, you can again

5    at the risk of asking the obvious, you can record an interview.

6    A.  You could, though to your point there are factors that

7    would go into that whether you should or not, but...  So it's

8    not as black and white as it sounds like, oh, you can just

9    record every interview.  There are factors that you need to

10   consider before you actually record an interview.

11   Q.  Right.  But if your goal is at the end of the day to have

12   as accurate of a reflection as possible of each and every

13   interview, we've already established that the best way to do

14   that is a recording versus note-taking and report taking,

15   correct?

16   A.  When appropriate, yes.

17           MR. KORNFELD:  Thank you, sir.

18           THE COURT:  Thank you, Mr. Kornfeld.

19           Additional cross?

20           All right.  Redirect?

21                    **REDIRECT EXAMINATION**

22   BY MR. KOENIG:

23   Q.  Agent Taylor, I would like to pick back up right where

24   Mr. Kornfeld left off.

25           In terms of -- is it important in your experience to

281
LaNard Taylor - Redirect

 1   be able to later review the contents of an interview?

 2   A.  Yes, sir.

 3   Q.  And is there -- what format, if you are going to review the

 4   contents of an interview, would you prefer to look at or use?

 5   A.  I am sorry?  Go ahead.

 6   Q.  Or use is what I mean.

 7   A.  To look at, I would prefer to look at it in a report format

 8   because the recordings, especially if you have too many of

 9   them, to sit there and listen to a two-hour and three-hour

10   interview over and over again could pose some challenges.

11   Q.  And your reports, how are they saved?  When you do a

12   summary interview report, how are they saved?

13   A.  The reports are saved in our report writing system or our

14   case management system, and then they are later downloaded like

15   a PDF version.  So you can review it on your phone.  You can

16   review it on your computer, a tablet.  Whatever government

17   device you have, you can review it.

18   Q.  Are they generally tech searchable?

19   A.  Yes.

20   Q.  And then can you explain if you want to search through

21   recorded interviews, what would you have to do?

22   A.  You would have to listen to the entire thing.

23   Q.  So why is it that you would rather look at a report of an

24   interview than have a recording?

25   A.  Well, one, you can't search a recording unless you have

LaNard Taylor - Redirect

1    some, you know, crazy sophisticated transcript or a transcript

2    or something like that.  But I would rather look at the report

3    because, No. 1, I can search it.  No. 2, it's just -- it's a

4    lot easier.  I can do that on my phone.  I can do it on a

5    tablet.  It's just much more user friendly as opposed to having

6    to get a disc.  Because believe it or not, we still have to get

7    them downloaded to discs.  So I would have to get them on a

8    disc, get a disc player and then play them and save them on a

9    computer and do all that for 200 and some interviews.  It just

10   doesn't seem practical.

11   Q.  Is it fair to say FBI policy is to either record or write a

12   report or something else, the default I guess?

13   A.  The only thing that we are required to do is make a

14   notation that the interview occurred.  There is no requirement

15   unless a person is in custody.  That's the only requirement we

16   have to record.  Outside of that, that's why I was trying to

17   explain that there was variables, whether it makes sense or

18   whether you should record an interview or not, but the policy

19   doesn't say you have to record an interview aside from the

20   in-custody interviews.

21   Q.  And I think you said on direct exam nobody was in custody

22   that you interviewed in this case.

23   A.  That's correct.

24   Q.  You were asked also about -- I think by Mr. McLoughlin

25   about it's important to get certain key things in the report

LaNard Taylor - Redirect

1    when you're investigating.  Do you recall that?

2    A.  Yes, sir.

3    Q.  Could you explain, is the process of interviewing and

4    putting together evidence, is that an incremental process where

5    you sort of, you know, you do some -- when you first join a

6    case -- so scratch that first question.  When you first join a

7    case, how would you describe your knowledge of the facts

8    relative to a year and a half or a year later?

9    A.  Well, obviously when you first join a case, especially one

10   that's already been in existences prior to you getting there,

11   it's certainly challenging to try to catch up and read all the

12   reports if you can even read all the reports prior to you.

13   Obviously, in this case we are talking millions of documents,

14   so it's not possible to read everything.

15           Now, once I have been involved in the case for a year,

16   year and a half, two years or three years in this instance and

17   I have been at the interviews, I have been around the

18   witnesses, I have talked to customers, then I get a better

19   understanding of the case and of the variable or the different

20   complexities in the industry.  I get a better understanding of

21   that throughout my involvement in the investigation.

22   Q.  And how, if at all, does that change perhaps the -- what

23   you take down in the interviews?

24   A.  Yeah.  It changes it greatly because without knowing

25   anything, if I am coming in without any knowledge, you know, I

LaNard Taylor - Redirect

1   really don't know what's important enough to take down.

2   Somebody may say something that's significant, but I don't know

3   it's significant because I haven't been around the case.

4   However, now I have been around the case for three years, it

5   may be something that's small that somebody says, but I know

6   that's important, so of course I would write that down.

7   *Q.*   Is that unique to antitrust investigations?

8   *A.*   That is every single investigation you ever work as an

9   agent.

10   *Q.*   And then when you write a report, do you give that to the

11   witnesses afterwards?

12   *A.*   I do not, no.

13   *Q.*   All right.  And just one last question.  When you write a

14   report, are they the interviewee's words you are recording or

15   your understanding of his words or something else?

16   *A.*   The report is a summary of my recollection of the

17   interview.  They are not -- unless I put quotation marks around

18   something, then I would obviously be quoting them.  Short of

19   that, it's a summary of the dialogue that transpired during the

20   investigation.  So they are not that person's words unless they

21   are in quotations, of course.

22          *MR. KOENIG:*  One moment, please.

23          *THE COURT:*  Yes.

24          *MR. KOENIG:*  No further questions.

25          *THE COURT:*  Thank you, Agent Taylor.  You may resume

Lawrence Barela - Direct

```
 1    your seat.

 2            The United States may call its next witness.

 3            MR. TUBACH:  I am just going to retrieve the binder.

 4            THE COURT:  Yes, you may.  Ms. Grimm has it.

 5            MR. TUBACH:  Thank you.

 6            THE COURT:  Go ahead, Mr. Torzilli.

 7            MR. TORZILLI:  Thank you, Your Honor.  The United

 8    States calls Mr. Larry Barela.

 9        (Lawrence Barela was sworn.)

10            THE WITNESS:  Yes.

11            COURT DEPUTY CLERK:  Please state your name and spell

12    your first and last name for the record.

13            THE WITNESS:  Lawrence Barela.  Last name is

14    B-A-R-E-L-A.  First name is L-A-W-R-E-N-C-E.  I go by Larry.

15            MR. TORZILLI:  Your Honor, may I approach with

16    binders?

17            THE COURT:  Yes.

18            MR. TORZILLI:  Thank you.

19                      DIRECT EXAMINATION

20    BY MR. TORZILLI:

21    Q.  Good afternoon, Mr. Barela.

22    A.  Good afternoon.

23    Q.  Where do you work?

24    A.  Open Text, Incorporated.

25    Q.  Can you lean into the microphone a little bit more to
```

Lawrence Barela - Direct                                    286

 1   project?

 2   A.  Sure.  I work for Open Text, Incorporated.

 3   Q.  Where is your office located, sir?

 4   A.  Here in Denver at 1860 Blake Street.

 5   Q.  What do you do for Open Text?

 6   A.  I am a e-discovery consultant.

 7   Q.  Can you tell us what e-discovery is, please?

 8   A.  It's the electronic aspect of identifying, collecting,

 9   producing electronically stored documents usually for

10   litigation or investigation.

11   Q.  How long have you been at Open Text?

12   A.  Open Text for three years.  Our company was acquired back

13   in 2018.  And prior to that I worked for Catalyst for about,

14   oh, 19 years, so 21 years.

15   Q.  So you've worked in the e-discovery field for about 21

16   years?

17   A.  Yes.

18   Q.  Are you familiar with Mar-Jac Poultry?

19   A.  Yes.

20   Q.  How are you familiar with Mar-Jac Poultry?

21   A.  So Open Text has an e-discovery platform called Insight.

22   And we host electronic documents for Mar-Jac Poultry that

23   they've uploaded and we host those in our platform.

24   Q.  Can you explain what hosting documents means in this

25   context, please, sir?

Lawrence Barela - Direct

1   A.  The documents that are collected for these matters are

2   uploaded to our site.  Documents are then reviewed by, you

3   know, staff and attorneys and tagged, marked up using the

4   platform that's hosting.

5   Q.  Can you describe the process of uploading documents to your

6   site?

7   A.  So our customers will have an FTP site, which is really

8   just a secure website where they can upload documents if

9   they've got the appropriate credentials.

10  Q.  What does FTP stand for, please?

11  A.  File transfer protocol.

12  Q.  And you said it's a secure site.  Can you explain what

13  security measures are in place?

14  A.  Primarily user name and password.  So with the user name

15  and password you can upload the documents.

16  Q.  Are you familiar with the term Bates number?

17  A.  Yes.

18  Q.  What's a Bates number?

19  A.  That's the number that we will generally place on every

20  document to uniquely identify the documents that are in the

21  platform.

22  Q.  Was Bates numbering applied to the documents received from

23  Mar-Jac and hosted on your site?

24  A.  Yes.

25  Q.  And in your experience is Bates numbering a reliable way to

Lawrence Barela - Direct

1    keep track of voluminous documents?

2    A.   Yes.

3    Q.   You have a binder in front of you, sir; is that right?

4    A.   Yes.

5    Q.   If you could open it up to the very, very first page.

6    A.   I am there.

7    Q.   And do you see a document there that's been marked as

8    Government Exhibit 9982?

9    A.   Yes.

10   Q.   Do you recognize Government Exhibit 9982?

11   A.   I am just making sure that this list here, 99 -- I am not

12   sure.  You can take a look at this with me, but this list of

13   government exhibit numbers, 9998 or 9999.  I am not seeing 82,

14   though.

15   Q.   Excuse me?

16   A.   Can you take a look at this list?  I don't know if I have

17   that document on this.  Oh, I am really sorry.  It's here.

18   Okay.

19   Q.   Did you receive copies of documents that are listed on

20   Government Exhibit 9982 ahead of your testifying here today?

21   A.   Yes.

22   Q.   And what did you do with the documents when you received

23   them?

24   A.   So I took each of the documents.  I retrieved or grabbed

25   the Bates number from the documents.  I then logged into our

Lawrence Barela - Direct

1    Insight platform.  I performed a search for that Bates number

2    and retrieved each document.

3    Q.  And then what did you do once you retrieved each document?

4    A.  I compared the document to the documents that are listed

5    here, a side-by-side comparison of each document, the printed

6    copy that I was given to the copy that was on the Insight

7    platform.

8    Q.  If you could turn to Tab No. 1 in your binder.  Are you

9    there?

10   A.  Yes.

11   Q.  And for identification purposes, you have there a document

12   that's been marked as Government Exhibit 1030; is that right?

13   A.  That's correct.

14   Q.  Is this a document that you performed the process that just

15   described on?

16   A.  Yes.

17   Q.  And what, if anything, did you conclude after you conducted

18   the comparison process you just described?

19   A.  That the document shown here exactly match the document

20   that we had in our platform.

21   Q.  Could you turn to Tab No. 2 in your binder.  Are you there?

22   A.  Yes.

23   Q.  And you have a document that's been marked as 1030-2; is

24   that right?

25   A.  Correct.

Lawrence Barela - Direct
290

1    *Q.* Can you explain what Government's Exhibit 1030-2 is?

2    *A.* This is a list of metadata.  Metadata is the properties of

3    the document.  So I've got multiple metadata fields which are

4    listed in the left column and the values of -- that the field

5    of data are showing in the right-hand column.

6    *Q.* What document does the metadata that appears on Government

7    Exhibit 1030-2 relate to?

8    *A.* This relates to the document that's Bates numbered

9    MarJac_0000865503.

10   *Q.* Is that also marked as Government Exhibit 1030?

11   *A.* Yes.

12   *Q.* And did you look for the information that appears in

13   Government's Exhibit 1030-2 in the Insight platform?

14   *A.* The metadata?

15   *Q.* Yes.

16   *A.* Yes, as shown in the Insight platform.

17   *Q.* Did you compare the information that appears on

18   Government's Exhibit 1030-2 to the information that's

19   associated with Government's Exhibit 1030 on the Insight

20   platform?

21   *A.* Yes.

22   *Q.* And what did you determine after you conducted that

23   comparison?

24   *A.* That the metadata matched.

25   *Q.* If you could turn to Tab 3.

Lawrence Barela - Direct

1   A.   I'm there.

2   Q.   That's Government Exhibit 9135.  Do you have that?

3   A.   Yes.

4   Q.   Is this a document that you conducted the comparison

5   process you described?

6   A.   Yes.

7   Q.   And what did you conclude after you conducted the

8   comparison process?

9   A.   That the printed document matched what we had in our

10   system.

11   Q.   Would you turn to Tab 4, please.  Are you there?

12   A.   Yes.

13   Q.   That's Government Exhibit 9136.

14   A.   Yes.

15   Q.   And is this a document that you conducted the comparison

16   process on?

17   A.   Yes.

18   Q.   And what did you conclude?

19   A.   That the document, the printed document matched what was in

20   our platform.

21   Q.   Can you look at the remainder of the documents in your

22   binder and let me know whether you conducted the comparison

23   process that you described; and if so, what the result of that

24   was.

25   A.   So Tab No. 5, Exhibit 9138, this is a document that I

Lawrence Barela - Direct

1    looked at, a side-by-side comparison with what was in our

2    platform and the same result.  The document matched what was in

3    the platform.  Tab No. 7, Exhibit 9897, was also a document

4    that I looked at and it matched to what we had in our platform.

5    Next tab, Exhibit 9898, and this document also matched what was

6    in our platform.  Tab No. 9, Exhibit 9899, this is also a

7    document I looked at in the platform and compared it and it did

8    match.  Tab No. 10 --

9    Q.  Mr. Barela, if you could just speak up a little more and

10   into the microphone.

11   A.  Next tab is Tab 10, Exhibit 9900.  And this is another

12   document that I compared the printed version to the version in

13   our platform and they matched.  Tab No. 11, Exhibit 9901,

14   another document I looked at and compared to our platform.

15   They matched.  Exhibit 9902, this is another document I looked

16   at in our platform, compared it to this printed version and it

17   was the same.  Next exhibit, 9904, also a document I looked at

18   and compared this document to the one on the platform.  It

19   matched.  And then the last exhibit, 9905, was also another

20   document that I looked at and matched the printed version to

21   the version on the platform, and it matched.

22            MR. TORZILLI:  Thank you, Mr. Barela.

23            Your Honor, a moment to confer?

24            THE COURT:  You may.

25   BY MR. TORZILLI:

Lawrence Barela - Cross

1    Q.  Sir, can I now refer you back to the very first page in the

2    binder in front of you?

3    A.  Yes.

4    Q.  That's a document that's marked as Government Exhibit 9982?

5    A.  Yes, I'm there.

6    Q.  And is this the list of documents by government exhibit

7    number and Bates number that you just walked us through?

8    A.  Yes.

9    Q.  Okay.  And I just want to go back and clarify a couple of

10   the tab numbers that you were referring to.  So if you could go

11   to Tab 8.

12   A.  Okay.

13   Q.  What government exhibit number is behind Tab 8?

14   A.  9899.

15   Q.  And if you could do the same for Tab 12.

16        THE COURT:  Mr. Torzilli, given the fact that he

17   identified each of the documents by exhibit number, I don't

18   know if the tab numbers are relevant.

19        MR. TORZILLI:  Sure, Your Honor.  Thank you.

20        Thank you Mr. Barela.  We have nothing further.

21        THE COURT:  Thank you.

22        Cross-examination.  Mr. Tubach?

23                        **CROSS-EXAMINATION**

24   BY MR. TUBACH:

25   Q.  Good afternoon, Mr. Barela.

Lawrence Barela - Cross

1    A.  Hello.

2    Q.  Let me make sure I understand your process.  You are

3    basically a document hosting and review company, correct?

4    A.  Correct.

5    Q.  And so you give a client a user name and password, right?

6    A.  Yes.

7    Q.  And that client then loads up to an FTP site.  So whoever

8    uses that user name and password loads documents up to an FTP

9    site, right?

10   A.  That's correct.

11   Q.  And that automatically gets transferred into your review

12   platform called Insight.

13   A.  Yes.

14   Q.  What you just testified about is that the physical papers

15   you are looking at there in front of you are the same thing as

16   what was loaded up to the platform, right?

17   A.  Correct.

18   Q.  Your company and you don't have any control over what's

19   actually getting loaded up to that platform, right?

20   A.  We don't.

21   Q.  You have no personal knowledge of what those documents are?

22   A.  Correct.

23   Q.  If someone did pages and pages of a smiley face and loaded

24   them up to the FTP site, you would transfer them over to the

25   review platform, right?

Lawrence Barela - Cross

1    *A.*  They would go up like any document, yes.

2    *Q.*  And you don't know where those documents came from to get

3    loaded up to the FTC site, right?

4    *A.*  Yes.

5    *Q.*  You don't know who collected them?

6    *A.*  Right.

7    *Q.*  You don't know why they collected them?

8    *A.*  Correct.

9    *Q.*  You don't know anything about the contents of those

10   documents, right?

11   *A.*  Right.

12   *Q.*  All you can really tell us is that the document that's in

13   front of you is the document that's on the website, right?

14   *A.*  Yes.

15   *Q.*  And particularly on the handwriting here, there is a lot of

16   these documents you looked at that have handwriting on them,

17   right?

18   *A.*  Yes.

19   *Q.*  You don't have any personal knowledge of who wrote any of

20   that stuff, right?

21   *A.*  I don't.

22        *MR. TUBACH:*  I have no further questions, Your Honor.

23   Actually, I do have one more question.  I apologize.

24   *BY MR. TUBACH:*

25   *Q.*  There is one document that's different than the others,

Lawrence Barela - Cross

1    though right, Exhibit 1030-2?  That's not a document that was

2    loaded up to the platform, was it?  It should be Tab 2, I

3    think, in your binder.

4    A.   Correct.  This is not a document that was uploaded.

5    Q.   This is just a list of metadata that's associated with a

6    document --

7    A.   1030.

8    Q.   1030, right?

9    A.   Yes.

10   Q.   There is some fields in here that your company has created,

11   correct?

12   A.   Correct.

13   Q.   Like the doc ID number, that Bates number you talked about?

14   A.   Yes.

15   Q.   And there are other fields that you didn't create.

16   A.   Correct.

17   Q.   Those are fields you got from the client, correct?

18   A.   Correct.

19   Q.   And one of those is custodian, right?

20   A.   Yes.

21   Q.   And you don't have any personal knowledge about how the

22   custodian field there gets created, right?

23   A.   No.

24        MR. TUBACH:  Thank you.  I have nothing further, Your

25   Honor.

Lawrence Barela - Redirect

1          THE COURT:  Thank you, Mr. Tubach.

2          Additional cross-examination?

3          All right.  Redirect?

4          MR. TORZILLI:  Thank you, Your Honor.

5                     **REDIRECT EXAMINATION**

6    BY MR. TORZILLI:

7    Q.  Just one question, sir.

8          You were asked on cross-examination about handwriting

9    within the set of documents that you reviewed.  My question is

10   simply whether when you conducted the comparison that led you

11   to conclude that the documents printed in front of you match

12   the documents on your system, whether that review also included

13   looking at the handwriting content of the documents.

14   A.  Oh, yes, yes.  I really just look at the documents as an

15   image.  So the image that we have matched the image that was

16   printed.  So I wouldn't know if this is handwriting or if it is

17   just a fancy font that is used.  It's really just -- it's all

18   images.  We are comparing images.

19         MR. TORZILLI:  Thank you, sir.  Nothing further, Your

20   Honor.

21         THE COURT:  Thank you.

22         Is Mr. Barela subject to recall?  Okay.  Mr. Barela,

23   thank you very much.  You are excused.

24         THE WITNESS:  Thank you.

25         THE COURT:  The United States may call their next

Lawrence Barela - Redirect

1   witness.

2          MS. CALL:  Can we have a brief side bar?

3          THE COURT:  You may.

4       (At the bench:)

5          THE COURT:  Go ahead, Ms. Call.

6          MS. CALL:  Yes.  I just wanted to flag with respect to

7   timing for the end of the day, our next witness is

8   Mr. Sangalis.  And I know Mr. Fagg had tabled a discussion on a

9   document there.  After that is Ms. Becker, who is the one who

10  is supposed to be joining by VTC.  I think her counsel actually

11  had tried to join via VTC a couple minutes ago to get on and I

12  think they may have been kicked off.  We wanted to check on if

13  Ms. Becker is ready if she does get called and what we should

14  instruct her to do; but B, wanted to figure out if we want to

15  have argument on the documents with respect to Sangalis or on

16  the pending motion with respect to Ms. Becker before she

17  testifies.

18         THE COURT:  Well, I think that the additional argument

19  as to the issues that Mr. Fagg raised would probably take us

20  longer.  If Ms. Becker is queued up, it might be a good idea to

21  do her because I think we can talk about those issues fairly

22  quickly right now.

23         MS. CALL:  My understanding is she is available and we

24  can have someone on our team call her attorney and make sure

25  they get connected up to the VTC.

Lawrence Barela - Redirect

1          THE COURT:  Okay.  Then why don't we plan on doing

2     that.  Why don't you, if you can have someone on your team

3     communicate with Ms. Becker's attorney to call in, and

4     Ms. Butler can let Ms. Grimm know about that.  And then why

5     don't we hear argument on the motion that was filed in regard

6     to the government's use of some documents other than

7     Exhibit 1030.  I can't remember who filed that motion, but

8     whoever.

9          Mr. Tubach, go ahead.

10         MR. TUBACH:  Yes, Your Honor.  Thank you.

11         We do object to showing the witness any documents

12    other than Exhibit 1030 as is clear from the -- what the

13    government represented previously.  It appears that this

14    witness has not been interviewed by the government previously

15    and they are trying to get her to identify Government

16    Exhibit 1030 as Pete Martin's handwriting.

17         THE COURT:  Let's try to shortcut this a little bit.

18    Let me ask Ms. Call the following, and that is, Ms. Call, any

19    objection to your showing Ms. Becker Exhibit 1030 first?

20         MS. CALL:  I suppose it depends on what first means.

21    We, of course, have to establish her familiarity with

22    handwriting first based on specific articulable facts.  And we

23    do think these other documents are a part of that basis of her

24    familiarity because she is, in fact, copied on them and sent

25    them.  I don't have an opposition to first discussing her

Lawrence Barela - Redirect

1    familiarity before showing 1030, but then, yes, I will move on

2    to the other documents after that.

3         THE COURT:  Okay.  So in other words, it sounds like,

4    Ms. Call, separate and apart from showing Ms. Becker any

5    examples of handwriting, you would lay some foundation

6    regarding her familiarity with Mr. Martin's handwriting.  But

7    then you are agreeing that you would show Ms. Becker as an

8    example of handwriting or a document with handwriting

9    Exhibit 1030 first?

10        MS. CALL:  I may have spoke too soon, Your Honor.

11        Frankly, I will note that the law that is cited in

12   Mr. Penn's motion is not the law.  They misconstrue *Iriele* with

13   some cases including *Samet* which did not affirm a decision to

14   strike authentication testimony about handwriting that could

15   not be given without the aid of known examples.  The district

16   court had done that in the underlying case.  The Circuit Court

17   in that case actually affirmed agent testimony about

18   handwriting using samples.  So I think if you were solely

19   relying on Mr. Penn's motion, it may have been a little unclear

20   what the standard is.

21        And, in fact, many lay witnesses frequently use known

22   samples in testifying and laying foundation for handwriting.

23   That is what law enforcement agents often do.  And it's the

24   exact same standard that applies to other lay witnesses because

25   they are bound by the same rules, 901 and 701, in their

301
Lawrence Barela - Redirect

1   testimony.

2           I will note, and maybe this was something that could

3   have more clarification, first of all regarding the

4   representations in the government's filings, establishing

5   foundation and authenticity of known samples is a part of

6   authenticating 1030.  So to the extent we said Ms. Becker's

7   testimony is relevant to authenticating 1030, that includes

8   laying foundation and laying, you know, laying foundation and

9   showing her familiarity with other samples of handwriting; but

10  not only she, but the jury can do the comparison for themselves

11  as well.

12          As far as these samples go and the documents we'll be

13  showing her, we are not going to be asking her to compare, you

14  know, parts of the handwriting in the various documents to the

15  extent that's what counsel was concerned about.  It's more so

16  establishing, yes, these were the kind of documents I reviewed.

17  Yes, I in the course of my work was familiar with these, like

18  laying business records foundation for a number of them, but

19  kind of using that in eliciting her testimony and understanding

20  of kind of what her role was and what her familiarity is with

21  this handwriting.  But like I said, we'll do it on a testimony

22  only basis at first before showing her any documents.

23          *MR. TUBACH:*  Your Honor, I think that's a very long

24  way of saying no to your question, which is the government

25  should not be allowed to show Ms. Becker any document other

Lawrence Barela - Redirect

1    than Exhibit 1030 first.  If they want to show her other

2    documents after that, that's fine.  But what they are trying to

3    do in this case is take a witness who hasn't seen this person's

4    handwriting for years and try to basically prime them and

5    refresh their recollection showing a bunch of documents with

6    handwriting on them that has Pete Martin's signature on it, and

7    then show her 1030 and ask whether that might be Pete Martin's

8    handwriting.  That's exactly what's not allowed, which if she

9    doesn't currently remember the handwriting, then she shouldn't

10   be refreshed at trial.

11        THE COURT:  Well, I haven't seen a case that talks

12   about refreshing of recollection.  That could be appropriate.

13   But on the other hand, you need a foundation for refreshing of

14   recollection anyway.  And I think in order to try to avoid her

15   memory being built from documents she is just looking at that

16   contain Mr. Martin's name on them, it's appropriate that she be

17   shown 1030 first.

18        Now, we'll have to see what happens then, but I don't

19   see any prejudice to the government for showing 1030 first.

20   And that obviates the problem of potential inappropriate

21   gaining of knowledge on the witness stand from taking a look at

22   documents that she may infer or associate a given handwriting

23   that she doesn't recall with the name of her former boss.  All

24   right?  That's my ruling on that document.

25        It doesn't mean that you can't show her the other

Lawrence Barela - Redirect

1    documents and it doesn't mean that her memory can't necessarily

2    be refreshed, but I do think that requiring the government to

3    show her in terms of the handwriting 1030 first is an

4    appropriate way to avoid a potential problem of her gaining the

5    information about the handwriting simply through those earlier

6    documents.

7         MS. CALL:  May I inquire, Your Honor?  If she

8    testifies as to being familiar with his handwriting and seeing

9    that on numerous occasions, is your ruling that she even after

10   testifying to that, that she would not be able to be shown

11   other samples of handwriting before viewing 1030?

12        THE COURT:  Because she may testify that she knows his

13   handwriting, you know, a hundred percent, no problem.  But then

14   what's the prejudice to the government of simply showing 1030?

15   She can answer yes or no.

16        MS. CALL:  I think there is a distinction that, you

17   know, what the law requires is familiarity for a lay witness,

18   and that's what creates that helpfulness under Rule 701 as

19   opposed to just what it is the jury can do as their own fact

20   finders.  However, you know, as counsel is noting, I think

21   folks -- you know, if I look at handwriting for the first time

22   and especially something I have never seen, there is still an

23   ability.  And I don't see -- I haven't seen any law to the

24   contrary including what is cited in Defendant Penn's motion to

25   say that you can't refresh your recollection, of, oh, yes, this

Lawrence Barela - Redirect

1    is his handwriting.  I remember it because I have seen the

2    signature a thousand times, as I just testified, and giving her

3    that ability and that more confidence in her testimony at least

4    and refreshing her recollection before seeing something that

5    she may have never seen before.

6         And I will point out I just don't think there is any

7    law saying, you know, you can't look at known samples.  It's

8    what witnesses do all the time on the stand and I don't see a

9    problem with it.  And I just imagine it being a little

10   inefficient with a witness who hasn't seen this handwriting in

11   some time to go, you know, to the unknown first.

12        THE COURT:  Well, of course the problem here is that

13   the government does not have a known sample of his handwriting

14   because if the government did, it could simply introduce 1030

15   and have it -- and have the jury compare it.  But in any event,

16   the witness' memory is not a memory of his handwriting

17   associated with the name.  It's presumably, you know, whether

18   she has some memory of his handwriting.  And that's why it

19   would seem to me that her memory wouldn't -- you know, it's

20   difficult to figure out what refreshing means in that context.

21        If refreshing means handwriting within a name

22   associated with it, I'm not sure that that's refreshing as to

23   what the handwriting looks like as opposed to using a name to

24   help her associate a given style of handwriting with the name.

25        MS. CALL:  All right, Your Honor.  We can move in that

Lawrence Barela - Redirect

1   order with 1030 first.  But I will note just to be clear on the

2   known sample, we do have known samples.  And those are all of

3   the other documents that counsel cited that we had planned to

4   show Ms. Becker because they are known samples she can

5   authenticate them and they are documents she can lay the

6   foundation for.

7          And as we put in our trial brief, you know, the

8   standard for a known sample is not someone saying this is Pete

9   Martin's handwriting.  It's a document created under

10  circumstances indicating its genuineness that includes, for

11  example, a signed contract with a signature to which Ms. Becker

12  could lay foundation as to the circumstances surrounding its

13  genuineness.

14         THE COURT:  I will let Mr. Tubach respond briefly to

15  that.  He has declined the opportunity.  We will proceed in

16  that fashion.  Do you happen to know, Ms. Call, whether there

17  is any luck in reaching Ms. Becker's attorney?

18         MS. CALL:  Let me see if I can get an update from the

19  folks right here.  My understanding is they are in the process

20  of logging onto the VTC.  I understand her attorney and the

21  witness are in two different locations, so it may take a little

22  longer.

23         THE COURT:  Ms. Call, would you like for me to

24  indicate -- to end this bench conference and then indicate to

25  the jury that a witness who is going to be testifying by VTC is

Lawrence Barela - Redirect

1    in the process of connecting?

2            *MS. CALL:*  Yes.  I think that would be appropriate.

3            *THE COURT:*  Okay.  I will do so.  Thank you.

4        (In open court:)

5            Ladies and gentlemen, we have a witness who is going

6    to be -- let me ask, Ms. Becker, can you hear me?  We can't

7    hear you, Ms. Becker.  Do you have a button on your computer

8    there that says mute probably?

9            *THE WITNESS:*  Does that help?

10           *THE COURT:*  That helps tremendously.

11           And Ms. Barron, are you an attorney representing

12   Ms. Becker?

13           *MS. BARRON:*  Yes, Your Honor.

14           *THE COURT:*  If either of you have any trouble hearing

15   what is being said from this end because of some sort of

16   technical issue, wave your hands or do something just to

17   indicate that for some reason you can't hear us, all right?

18           *MS. BARRON:*  Thank you, Your Honor.

19           *THE COURT:*  Ms. Call, I assume, then, the United

20   States is calling Ms. Becker at this time?

21           *MS. CALL:*  Yes.  The United States calls Ms. Becker at

22   this time.

23           *THE COURT:*  Ms. Becker, could you please raise your

24   right hand.  I am going to have my courtroom deputy at this

25   time administer an oath to you.

Florence Becker - Direct

1          (**Florence Becker** was sworn.)

2                    *THE WITNESS:*  I do.

3                    *THE COURT:*  And Ms. Becker, could you please spell

4     your first and last names for the record?

5                    *THE WITNESS:*  F-L-O-R-E-N-C-E, B-E-C-K-E-R.

6                    *THE COURT:*  Thank you.  Now I am going to have

7     Ms. Call, the government attorney, go ahead and ask some

8     questions of you.

9                    Go ahead, Ms. Call.

10                   *MS. CALL:*  Thank you.

11                       **DIRECT EXAMINATION**

12    BY MS. CALL:

13    *Q.*  Ms. Becker, can you hear me from this microphone?

14    *A.*  Yes, I can.

15    *Q.*  All right.  And can you see me looking at the right video

16    screen where you see me here?

17    *A.*  I can't -- wave your hand if you don't mind.

18    *Q.*  I am standing at the podium.

19    *A.*  Yes.  Thank you.  I see you now.

20    *Q.*  Thank you, Ms. Becker.

21                   All right.  So Ms. Becker, I guess to get started,

22    where are you located right now just for the record?

23    *A.*  In Gainesville, Georgia.

24    *Q.*  All right.  And before we get started, have you and I ever

25    met before, Ms. Becker?

Florence Becker - Direct

1    A.   I do not believe so.

2    Q.   And have we ever spoken before on the phone?

3    A.   I do not believe so.

4    Q.   Have you spoken to anyone from the Department of Justice or

5    law enforcement with respect to a price-fixing investigation?

6    A.   No.

7    Q.   All right.  And is it correct, do you have documents in

8    front of you today that were provided by your counsel that may

9    be referred to during your testimony?

10   A.   Yes.

11   Q.   You are not looking at those at this very moment, are you?

12   A.   I have not laid eyes on them.

13   Q.   Thank you, Ms. Becker.

14            Now, did you work in the poultry -- the chicken

15   industry at one point?

16   A.   I did, from July 4th, 1997 to December 31st, 2018.

17   Q.   So over 20 years in the industry?

18   A.   21 years.

19   Q.   And then what happened in 2018, Ms. Becker?

20   A.   I retired.  Oh, in 2018?  I am sorry.  Yes, I retired.

21   Q.   All right.  Now, what chicken company or companies did you

22   work for?

23   A.   I worked for Mar-Jac Poultry.

24   Q.   And is Mar-Jac a chicken supplier or a customer?

25   A.   They are a fully integrated chicken producer.

Florence Becker - Direct

1    Q.  Would you describe what that means, Ms. Becker?

2    A.  Yes, ma'am.  It means from the egg to the chicken to the --

3    let's see, from the egg to the growers to the chicken to the

4    table.  We control the entire process.  The growers are not

5    employed by Mar-Jac.  They are regularly contracted by Mar-Jac.

6    Other than that, we control the process.

7    Q.  Thank you.  And for folks who don't know the term, what is

8    a grower?

9    A.  A grower is a poultry farmer.

10   Q.  Thank you, Ms. Becker.  Now, when you worked for Mar-Jac,

11   where did you physically work?  Were you in an office?

12   A.  Yes.

13   Q.  Where was that?

14   A.  In the administrative office in Gainesville, Georgia.

15   Q.  All right.  When you say admin office, was that its own

16   building?

17   A.  No.  It was part of the poultry processing plant.

18   Q.  All right.  About how many people worked in that building?

19   A.  1200.

20   Q.  1200 people in one building, then?

21   A.  Yes.

22   Q.  All right.  And what was your position, Ms. Becker?

23   A.  I was an executive assistant.

24   Q.  Who were you an executive assistant to?

25   A.  To Doug Carnes originally, who was the vice-president of

310

Florence Becker - Direct

1    operations at that time, and to Pete Martin, who was the

2    complex manager at that time.  Later Pete was promoted.  Doug

3    retired.

4    Q.  When you say at that time, could you perhaps describe when

5    you worked for certain individuals?

6    A.  Well, I began employment on July 4th, 1997, and was working

7    for both of them at that point in time.  I do not remember the

8    exact date that Doug retired and Pete became the vice-president

9    of operations, but I worked for both of them, and I always

10   worked for Pete.

11   Q.  So did you work for Mr. Pete Martin from 1997 until your

12   retirement?

13   A.  I did.

14   Q.  Could you describe your responsibilities as his executive

15   assistant?

16   A.  Yes.  About 50 percent of my time was spent providing

17   clerical assistance you might say.  The other 50 percent was

18   spent providing accounting services to the company.

19   Q.  As a part of that job and those responsibilities, did you

20   become familiar with customers of Mar-Jac?

21   A.  Not very much.  The sales department was down the hall.  I

22   did not deal very much with customers.

23   Q.  Okay.  Where were your bosses' offices, Mr. Carnes and

24   Mr. Martin?

25   A.  On either side of my office.

Florence Becker - Direct

1   Q.  All right.  So right next door?

2   A.  Yes, one on one side with an open door and the other right

3   next door but down the hall.

4   Q.  All right.  I know things are a little bit different these

5   days, but did the three of you typically work in the office

6   from day to day?

7   A.  Yes, yes.  In the early days certainly, yes.

8   Q.  And speaking of those early days, when you first started

9   did you have a computer?

10  A.  Yes.  It wasn't that long ago.

11  Q.  It feels like a long time these days.  But did you, in

12  addition to doing work electronically, did you work with hard

13  copy documents from time to time?

14  A.  Yes.

15  Q.  And as a part of that, did you become -- or did you from

16  time to time have the opportunity to see the handwriting of

17  your supervisors?

18  A.  Yes.

19  Q.  Okay.  Now, the supervisors you had, are you still in touch

20  with either of them at this time?

21  A.  Only in passing.  Occasionally I will go to a Christmas

22  party, the company Christmas party, and I will see them there.

23  Occasionally I will be on the phone and someone will walk by

24  and someone will say, "I'm talking to Flo," and they'll say,

25  "Hi," but not much more than that.

Florence Becker - Direct

1   Q.  Do you have any family members who still work at the

2   company?

3   A.  I do.  My daughter took my place there when I retired.

4   Q.  All right.  Does your daughter now work for Mr. Martin?

5   A.  She does, yes.

6   Q.  Now, what is Martin's current position at Mar-Jac?

7   A.  I am sorry?

8   Q.  What is Mr. Martin's current position?

9   A.  Okay.  He actually did retire, but it did not sit well.  He

10  is now executive vice-president of new business development.

11  Q.  All right.  Now, I want to ask a little more about just the

12  nature of your interactions with him.  Did you prepare

13  documents for Mr. Martin in your capacity as an assistant?

14  A.  Sure.

15  Q.  What kinds?

16  A.  Quarterly we had board meetings and there would be project

17  status reports that were updates on certain projects, expansion

18  projects, et cetera, improvement projects, that I would take

19  from handwritten form and type them.

20  Q.  And who handwrote those before you typed them?

21  A.  It depends on the subject matter.  It could have been the

22  complex manager.  It could have been someone from Alabama or

23  Mississippi operations.  It could have been a supervisor out in

24  the office.  There were different -- that was a busy time.

25  Q.  Was it a part of your job to provide documents for either

Florence Becker - Direct

1  of your supervisors' signatures?

2  A.  Yes, I am sure there were.  I can't recall right off the

3  top of my head, but I'm sure there were.

4  Q.  I suppose when I say either, would that include Mr. Martin?

5  A.  Yes.

6  Q.  And would it include Mr. Carnes?

7  A.  Yes.

8  Q.  I know we all have different kinds of bosses.  From time to

9  time would you receive handwritten edits to documents from

10  either of your bosses?

11  A.  Yes.

12  Q.  Including Mr. Martin?

13  A.  Yes.

14  Q.  And have you reviewed documents that he has signed in the

15  past?

16  A.  Once I prepared a document and he signed it, I don't think

17  I would have reviewed it afterwards.

18  Q.  All right.  About how many times in the, I guess, over 20

19  years that you worked for Mr. Martin would you say you had the

20  opportunity, if you were to make a ball park guess, to see his

21  handwriting?

22  A.  Many, many times.

23  Q.  More than 10?

24  A.  Oh, yes.

25  Q.  More than 50?

314

Florence Becker - Direct

1    *A.*  Yes.

2    *Q.*  All right.  And did Mr. Martin keep any kind of notebook?

3    *A.*  He had a calendar on his desk that he would make notes on.

4    *Q.*  Anything else?

5    *A.*  He wrote out -- he was a bi-vocational Baptist minister, so

6    he wrote out his sermons on file folders.

7    *Q.*  And then turning to the year 2014, whose executive

8    assistant were you during that year?

9    *A.*  Okay.  I don't remember Doug's exact date of retirement,

10   but it would have been either Doug or Pete.

11   *Q.*  All right.  And when you say either Doug or Pete, were you

12   working just for one of them at a time or were there times when

13   you worked for both of them?

14   *A.*  Oh, I worked for both of them, yes.

15   *Q.*  So in 2014 do you believe --

16   *A.*  Excuse me.  I am sorry.  In 2014 Doug would have already

17   been retired, so I would have been working for Pete and Joel

18   Williams.

19   *Q.*  And who is Mr. Williams?

20   *A.*  He was -- he is -- well, at that point in time he was the

21   complex manager.

22   *Q.*  All right.

23   *A.*  And Pete had been promoted to vice-president of operations.

24   *Q.*  You predicted my next question, Ms. Becker.

25          I would like you to take a look at one of the

Florence Becker - Direct

1    documents you have in front of you.  It should have an exhibit

2    sticker in the lower right-hand side.  It will be yellow and

3    square and it says Government Exhibit 1030.

4    A.   Okay.  The last page -- I have it.

5    Q.   Could you please take a minute and review that document and

6    you can tell me when you're done.

7    A.   Okay.  It was a corn and soy meal, soybean meal -- it looks

8    like notes from when he was placing an order for our corn and

9    soy meal.

10   Q.   And Ms. Becker, when you say he was placing an order, do

11   you have an understanding as to who wrote this document?

12   A.   I would -- from 2014, I would expect it would be Pete.  I

13   could not guarantee it, but I would expect it would be.

14   Q.   What makes you expect that this would have been written by

15   Mr. Pete Martin?

16   A.   Because at that point in time he -- 2014, it could have

17   been Joel just timewise.  But he and Joel would have been

18   talking with Mark McEwen about the soybean meal and corn

19   orders.  We didn't price them out for ourselves.  We priced

20   them out for one of our customers.

21   Q.   Who is Mr. Mark McEwen?

22   A.   He was our grain broker.

23   Q.   And you said -- when you said he and Joel would have been

24   talking with Mr. McEwen, who were the two individuals you were

25   referring to?

Florence Becker - Direct                                          316

1   *A.*  Pete Martin and Joel Williams.

2   *Q.*  Is there anyone else at Mar-Jac that you knew that spoke to

3   Mr. McEwen around that time frame?

4   *A.*  Well, I personally did on a number of occasions if no one

5   else was there to do it.  I had instructions on how to order

6   that, the grain.

7   *Q.*  All right.  And then let me ask you about a couple other

8   individuals.  Does the name Steve Campisano, is that familiar

9   to you?

10  *A.*  No.  I am afraid it is not.

11  *Q.*  All right.  How about Maysville?

12  *A.*  Oh, yes.  We had a feed mill in Maysville.

13  *Q.*  When you say we, you mean Mar-Jac had a feed matter

14  Maysville?

15  *A.*  Yes.  Mar-Jac built a feed mill in Maysville, Georgia.

16  *Q.*  Are you familiar with anyone named Mitch Mitchell?

17  *A.*  No, I'm not.

18  *Q.*  How about a company called Tyson?

19  *A.*  Oh, yes, yes, very familiar with Tyson.

20  *Q.*  What is Tyson?

21  *A.*  Tyson is another -- a major poultry producer.

22  *Q.*  Were they a competitor of Mar-Jac's?

23  *A.*  You could say because we were both in the chicken -- in the

24  poultry industry.  You could say that we're competitors, but we

25  had different markets.  Mar-Jac had a niche market.  It wasn't

Florence Becker - Direct

1   quite the same as Tyson who sells in grocery stores.  Mar-Jac

2   never does, so...

3   Q.  All right.  How about with respect to -- let me ask you

4   about a specific customer.  Did Mar-Jac sell to KFC?

5   A.  Yes.

6   Q.  And are you familiar with whether Tyson sold to KFC?

7         MR. TUBACH:  Your Honor, lack of foundation.

8   A.  I am not familiar with that.

9         THE COURT:  Hold on.  The objection is overruled.

10  BY MS. CALL:

11  Q.  And Ms. Becker, I will try to stop you.  If there is an

12  objection from an attorney in the courtroom, if you can, and

13  the judge can tell you this, but you may stop answering the

14  question until the Judge rules.  I realize it's a little

15  difficult in the VTC setting.

16  A.  It is difficult, but I can't tell you all enough how much I

17  appreciate being able to testify from here.  Whoever had part

18  of that decision, I am so grateful.

19  Q.  All right, Ms. Becker.  It is snowing here, so if you like

20  that.

21        Are you familiar with someone named Jayson Penn?

22  A.  No.

23  Q.  And how about -- let me ask the question.  Are you familiar

24  with a company called Pilgrim's Pride?

25  A.  Yes.

Florence Becker - Direct

1    *Q.* Was Pilgrim's Pride a competitor of Mar-Jac's?

2    *A.* Yes, I would say they were.  Again, not quite the same

3    market, but in the same industry.

4    *Q.* Now, there is one more company.  Are you familiar with a

5    company called Claxton?

6    *A.* Yes.

7    *Q.* And was Claxton a competitor of Mar-Jac for KFC in

8    particular?

9    *A.* I believe -- I am not positive of this.  I know Claxton.  I

10   don't know that they sold to KFC.

11   *Q.* Now, I want you, Ms. Martin (sic), to look back -- are you

12   familiar with someone named Tommy Francis?

13   *A.* Yes.

14   *Q.* Who is he?

15   *A.* He is in our sales -- the Mar-Jac poultry sales department.

16   *Q.* And did he work there in 2014?

17   *A.* Yes.

18   *Q.* All right.  Now, Ms. Becker, I want you to look back at

19   Exhibit 1030.  And I am going to ask you a couple questions,

20   but the first one is just based -- looking at the document and

21   the handwriting on it, do you have any opinion based on your

22   familiarity with the handwriting of numerous individuals from

23   your role as to whose handwriting is on that document?

24   *A.* I cannot positively identify the handwriting.  It could be

25   Pete, but I have been gone from there for three years.  It's

Florence Becker - Direct

1    not exactly -- the loops aren't exactly the same, so I cannot

2    positively identify it.

3    Q.  Could you perhaps describe some of your thinking?  I mean,

4    I know I realize you are not saying you are a hundred percent

5    certain.  But what thoughts are going through your head as to

6    that handwriting?

7           MR. TUBACH:  Objection, vague and ambiguous.

8           THE COURT:  I will sustain that objection.  If you

9    could ask her a more specific question.

10   BY MS. CALL:

11   Q.  Is there anything you recognize about the handwriting?

12   A.  It -- I just couldn't -- I have got a Bible right here

13   beside me and I could not swear on it that it is any particular

14   person's handwriting.  Is it similar?  It is somewhat similar

15   to Pete, but again it's not exact, as far as I remember it, and

16   I am sorry about that.

17   Q.  Of course, Ms. Becker.  I am just asking for your

18   recollection.  So when you say -- just to be clear, when you

19   say it's somewhat similar to Pete's, are you saying it's

20   similar to Pete Martin's?

21   A.  Yes.

22   Q.  Now, aside from the handwriting just looking at the kind of

23   circumstances of what's contained in the document you're

24   looking at, from your experience at Mar-Jac, do you have an

25   opinion as to who wrote that document?

Florence Becker - Direct

1    MR. BELLER:  Object, Your Honor.  I believe there is a

2  lack of foundation, and it's speculative given her prior

3  testimony here.

4    THE COURT:  Could you clarify?  I am going to sustain

5  the objection.  Could you clarify what you're asking her to

6  base that answer on, whether it's the handwriting or whether

7  it's something else about that document.

8  BY MS. CALL:

9  Q.  Yes.  Ms. Martin (sic), based on the words appearing in the

10  document, do you have an opinion as to who wrote it?

11    MR. TUBACH:  Asked and answered.

12    MR. McLOUGHLIN:  And I think under Rule 902 that's not

13  a proper basis for asking such an opinion.

14    MR. BELLER:  Your Honor, I would simply add I believe

15  this is also a 701 issue.

16    THE COURT:  I will overrule both objections.  If she

17  can tell based upon the words, the typewritten words in the

18  document, she can answer.

19  A.  Well, there aren't any typewritten words in this document.

20  It's handwritten.  And there are names in here that I do not

21  recognize which also makes me a little suspect.  There are

22  several names in here that I do not recognize.

23  BY MS. CALL:

24  Q.  Are you ruling out yourself as a potential author of this

25  document?

Florence Becker - Direct

1    *A.*  I promise you I did not write this.

2    *Q.*  All right.  I know I asked you about some of the terms you

3    may be seeing in that document.  Are there any other terms you

4    do recognize?

5    *A.*  Well, I understand what the document is.  It's about corn

6    and soybean meal purchases.

7    *Q.*  Ms. Becker, are you referring to a certain portion of the

8    document when you say that?

9    *A.*  I think it's all about it.  I don't know that.  I mean --

10   and that honestly was not an area of my expertise.  I had some

11   specific instructions on occasion.  If no one else was there, I

12   would get the thing done, but -- and it had to do with KFC.  I

13   mean, they were the ones that would place special orders with

14   us for their corn and soybean meal.

15   *Q.*  Let me ask you this, Ms. Becker.  Did the term margin have

16   relevance to corn and soybean purchasing?

17           *MR. TUBACH:*  Your Honor, lack of foundation.

18           *THE COURT:*  Sustained.

19   *BY MS. CALL:*

20   *Q.*  Do you have an understanding as to the meaning of the term

21   margin?

22   *A.*  I am afraid I do not.

23   *Q.*  All right.  Do you have an understanding of the terms used

24   in corn and soybean purchasing?

25   *A.*  Only on a marginal level.  I'm sorry.

Florence Becker - Direct

1    Q.  Well, Ms. Becker, if you could describe what

2    characteristics make you believe that this document is about

3    corn and soybean purchasing.

4           MR. BELLER:  Your Honor, I am going to object under

5    701 and also lack of foundation.

6           THE COURT:  I am going to sustain the objection.

7           MR. McLOUGHLIN:  Your Honor, again 901(2) but also

8    702, because now what the government is asking this witness is

9    an opinion of her professional experience with respect to a

10   technical aspect -- I don't have the document in front of me --

11   of the margin in the context of soy and corn.  That is not a

12   701 lay witness opinion.  That is an expert opinion under 702.

13   And we are in a very, very different place.

14          THE COURT:  I sustained the objection of Mr. Beller.

15          Go ahead, Ms. Call.

16          MS. CALL:  And I do believe 901(2)(b)(4) would be the

17   applicable rule for this line of questioning, but I will move

18   on.

19   BY MS. CALL:

20   Q.  Ms. Becker, would seeing documents that you have seen in

21   the past in your time at Mar-Jac perhaps refresh your

22   recollection as to the handwriting of certain individuals?

23   A.  I mean, I can't say that it would or would not.  It could.

24   Again, I have been gone from Mar-Jac for three years, and I am

25   closing in on 70 years old and I don't take Prevagen.

Florence Becker - Direct

1   *Q.*  So it may, Ms. Becker?

2   *A.*  I suppose it could.

3   *Q.*  All right.  There are a couple documents in front of you.

4   Could you find the ones marked Government Exhibit 9899 and then

5   9900?

6          *MR. McLOUGHLIN:*  Your Honor, while the witness is

7   reviewing it, under 901(2) the witness' familiarity may not be

8   acquired for the current litigation.  And if we are talking

9   about giving this witness documents again where the author may

10  not be apparent, we are in the category of creating or

11  refreshing familiarity for purposes that is acquired in

12  litigation and I think it's a violation.  I think we already

13  have asked and answered questions.  And this kind of refreshing

14  again with these kind of documents as to who it is or who it's

15  not is not really contemplated by 901(2).

16         *THE COURT:*  I am going to overrule the objection.  I

17  haven't found anything regarding refreshing recollection.  But

18  like any other witness, I think that memory can be refreshed.

19  It can't be acquired.  You are right about that,

20  Mr. McLoughlin.

21         *MR. McLOUGHLIN:*  And my point, Your Honor -- thank you

22  for clarifying that for me -- is that in this circumstance

23  there is no distinction that can reasonably be drawn between

24  the two.

25         *THE COURT:*  I disagree.  Based upon the witness'

Florence Becker - Direct

1    answer concerning the possibility that 1030 could be

2    Mr. Martin's handwriting, it's at least possible that her

3    memory could be refreshed as to what is his handwriting.  The

4    objection is overruled.

5    BY MS. CALL:

6    Q.  Ms. Becker, have you found exhibits marked 9899 and 9900?

7    A.  I have not found them.  And I am just going to write that

8    down, 9899 and nine --

9    Q.  9900.  And take your time.

10    A.  I am sorry, I was listening to you guys and I lost my...

11    Okay.  Okay.  All right.  Okay.  I have the documents in hand.

12    Q.  Could you look first at 9899?

13    A.  Yes.

14    Q.  What is it?

15    A.  This is to me from langotti@darpro.

16    Q.  When when you say it is to you, Ms. Becker, what name is in

17    the To line there?  Are you looking at the first or the second

18    e-mail, I guess?

19    A.  Oh, this is from me to langotti -- excuse me, from me to

20    langotti@darpro.

21    Q.  All right.  And could you please now look at Government

22    Exhibit 9900?

23    A.  Yes.  Is there something in particular I am to be looking

24    for?

25    Q.  Starting with the first page, what is this document,

Florence Becker - Direct

1    Ms. Becker?

2    *A.*   It's -- it states it's a Poultry Processing Agreement from

3    Mar-Jac Poultry of Hattiesburg, Mississippi.

4    *Q.*   In your role at Mar-Jac, Ms. Becker, are you familiar with

5    how Mar-Jac maintains its contracts?

6    *A.*   No, not really.

7    *Q.*   In your role in -- in your attachment here, do you recall

8    why you would have been e-mailing a document like this?

9              *MR. TUBACH:*  Objection, lacks foundation.

10             *THE COURT:*  Sustained.

11   *A.*   I am sure I e-mailed it because I was asked to.

12             *THE COURT:*  Ms. Becker, this is Judge Brimmer.  I

13   sustained that objection, so Ms. Call will ask you a new

14   question.

15             *THE WITNESS:*  Okay.

16             *MS. CALL:*  One moment, Your Honor.

17   *BY MS. CALL:*

18   *Q.*   Ms. Becker, could you turn back to 9899?  Is there an

19   attachment to your e-mail there?

20   *A.*   No.

21   *Q.*   Are you looking at the top e-mail in the chain that is from

22   you, is there an attachment marked there?

23             *MR. TUBACH:*  Objection, Your Honor.  Objection --

24   *A.*   There is an attachment.

25             *THE COURT:*  Hold on, Ms. Becker.  There was another

Florence Becker - Direct

1   objection.  I know you can't really hear, though.  We apologize

2   about that.

3            Sorry, Mr. Tubach.  Go ahead.

4            MR. TUBACH:  She is just reading from the document.

5   That's not -- there is a lack of foundation.

6            THE COURT:  Sustained.

7   BY MS. CALL:

8   Q.  All right.  Ms. Becker, could you flip to Government's

9   Exhibit 9900 one more time?  And could you review the pages of

10  that document and tell me when you're done?

11  A.  Okay.  It appears to be an --

12           MR. TUBACH:  There is no question.

13           THE COURT:  Hold on, Ms. Becker.  That was just a yes

14  or no question.

15  BY MS. CALL:

16  Q.  Are you done reviewing, Ms. Becker?

17  A.  Well, no.  I have not read the whole thing.  That would

18  take a little bit of time.

19  Q.  Could you just skim through the pages and look at the

20  nature of the information on them without reading every word?

21  A.  Yes.  It appears to be --

22           MR. TUBACH:  Objection.  There is no question pending.

23  BY MS. CALL:

24  Q.  Ms. Becker, what is this document?

25  A.  An offal agreement is an agreement we make with a company

1    to handle our waste products, blood and feathers and the many

2    other unsalable products that you get from chicken.

3    Q.  I meant to ask you not to go into the details, Ms. Becker.

4    Is there handwriting on this document?

5    A.  Yes, there is some handwriting.

6    Q.  All right.  Do you have an opinion as to whose handwriting

7    is on this document?

8    A.  As it is signed by Pete, it is Pete Martin.  It may well be

9    his writing.  I cannot guarantee that.

10   Q.  In your experience at Mar-Jac, did people other than Pete

11   Martin sign documents in his name?

12   A.  It certainly could happen.  I have done it myself.

13   Q.  When you signed documents for Mr. Martin, was there a

14   process you used, Ms. Becker, to indicate that it was signed by

15   anyone other than Mr. Martin?

16   A.  No.

17   Q.  All right.  Anything about the signature there that is

18   familiar to you?

19   A.  It could be his signature.  Again, I could not guarantee

20   that.  It's been a while.

21   Q.  Do you believe it to be your handwriting, Ms. Becker?

22   A.  No.

23   Q.  All right.  I am going to ask you about one more document,

24   Ms. Becker.

25            Can you turn to Government Exhibit 1935?

328

1          THE COURT:  We are actually right at 5:00.  I don't

2     think we will finish today.  Would now be a convenient breaking

3     point?

4          MS. CALL:  This would be a good point, Your Honor.

5          THE COURT:  So Ms. Becker and Ms. Barron, can

6     Ms. Becker be available tomorrow at 8:30 when we resume --

7     Monday, sorry, 8:30 Monday?

8          MR. TUBACH:  Your Honor, 8:30 mountain time.

9          THE COURT:  Mountain time.

10         THE WITNESS:  10:30 my time, right?

11         THE COURT:  Yes.

12         MS. BARRON:  Yes, Your Honor, we can be available.

13         THE COURT:  Thank you for that clarification.

14         It's 5:00 o'clock in Denver now, obviously later where

15    you are.  We are going to go ahead and end for the day.  So on

16    Monday at 8:30 Denver time we will resume.  Thank you very much

17    for appearing today and you are excused for today's purposes.

18         And ladies and gentlemen, we are going to recess at

19    this time too.  So as we pointed out, we have no trial

20    tomorrow, but we will resume on Monday.  So make sure -- I

21    think the weather is supposed to be good, but leave early so

22    that we can get started on time.

23         Once again, keep vigilant about not letting people

24    talk to you about the case.  Don't, you know, purposefully

25    certainly look up any information.  But also just in case for

1    some reason you see something that may be related to this case

2    in the media, avert your eyes, stop your ears, change the

3    channel, whatever you he need to do.

4            I hope you have a good three days.  The jury excused.

5    Thank you.

6            (Jury excused.)

7            THE COURT:  Please be seated.

8            So it sounds like we have a couple of issues to take

9    up, and my anticipation is it may not be real quick.  It may

10   take us a little while to get through them because one thing

11   that we are going to talk about are the summary exhibits.  And

12   I am not sure, but it could take a little bit longer.  Would

13   you like to take a 10-minute break before we launch into those

14   topics?

15           MR. BELLER:  One issue that's just a bit more

16   pressing?

17           THE COURT:  Yes.

18           MR. BELLER:  And that is my concern that Ms. Becker

19   may not have been advised regarding a sequestration order.  And

20   she now is at home with exhibits in front of her.  And we are

21   off the record and she is going to have these over the weekend.

22   So I would ask that the government instruct either -- well, in

23   this case Ms. Becker's lawyer immediately that she is not to

24   review these documents again until Monday morning.

25           THE COURT:  Yeah, I think that that is a good idea.

330

1    So maybe if one of the members of the government team -- well,

2    I think we'll probably take a break.  Do people want to day a

3    break?  During that break that would be appropriate given the

4    fact that I couldn't tell, it didn't look like she was

5    necessarily breaking the seal on a document, but she did

6    indicate that she had not seen them.  So that would be a good

7    directive to her.

8         Anything else before we take a break?  And why don't

9    we plan on reconvening at 5:15.  The Court will be in recess.

10        (Recess at 5:05 p.m.)

11        (Reconvened at 5:18 p.m.)

12        THE COURT:  All right.  We are back on the record in

13   20-CR-152.  The jury is not present.  Let's hope not

14   auspiciously we have got our first jury question.  It says,

15   ASK - juror No. 1 -- meaning perhaps it's from Juror No. 1 --

16   given this trial of 10 individuals, can cross-examiners

17   identify who they represent (or do they collaborate efforts to

18   save time?)  [as with the objections if redundant]?

19        I think that for the jurors, you know, so many people,

20   a sea of suits, people getting up, talking, and it's true, the

21   cross-examiners have not identified who they represent.  And I

22   think it's -- it's confusing for the jurors.  They don't quite

23   understand yet who people are and they wonder what they should

24   know.  So to the extent that it may help them out, it may make

25   sense to make a little extra effort to do that.

1          MR. TUBACH:  Your Honor, my recollection is that for

2     each of the cross-examiners, at least for the ones I recall,

3     the lawyer did say, "I am Anna Pletcher and I represent Jayson

4     Penn."  We are happy to do that, at least for Mr. Penn.  I

5     think it's a little different in terms of objections.  I think

6     doing that for every objection is going to take a lot of time.

7          THE COURT:  And this just identifies the

8     cross-examiners.

9          MR. TUBACH:  Yeah, I guess the reference to objections

10    is only as a cross-reference to -- yeah, that's right.

11         MR. KORNFELD:  Your Honor, I certainly understand

12    that.  And I didn't identify myself and that was in a sense

13    purposeful.  We are trying to be more efficient this trial on

14    the defense side and not have a parade.  Obviously, you've got

15    to do what you've got to do for your client, but we are

16    coordinating these cross-examinations.

17         So the facts are the facts.  And if they are elicited

18    by Mr. Tubach, they go for everyone, if they are elicited by me

19    or whomever.  But I don't want the jury to have the

20    misimpression that if I don't ask the question, then it doesn't

21    count for Mr. Fries or, you know, et cetera, et cetera.  So I

22    am sure the Court has dealt with this before, but I just raise

23    that concern.  And maybe I am overthinking it and maybe it's

24    just, okay, here is who I am and in a week they will know who

25    all of us are, but I am a little nervous about that.

1          THE COURT:  I am going to have a general observation

2     that there are many things about this trial that I have never

3     dealt with before, but, yeah, I don't think we should read too

4     much into the question.  I think that it's just -- it's like

5     with Mr. Kramer's questions.  At the very beginning of the

6     trial they are a little bit overwhelmed.  And when they hear 11

7     openings in a row, they hear so many facts and they don't have

8     a good feel.  They are a little bit nervous about what all they

9     are supposed to remember.

10          So Mr. Tubach may be right that people have been doing

11    a good job with that.  Once again, I don't think that I need to

12    necessarily do anything more than on Monday I will try to

13    remember to mention to the jurors that in regard to the note,

14    that people will try to do that, but that it may be difficult

15    at the very beginning of the case to remember who everyone is

16    and who they represent, but the attorneys will try to make sure

17    that they identify themselves.  But if I remember this, I'll

18    say they won't be doing that on the objections.  That would be

19    very awkward to do that.

20          All right.  Why don't we plunge into -- why don't we

21    continue with Mr. Fagg's point regarding some of the Lovette

22    compensation issues.

23          MR. FAGG:  Thank you, Your Honor.

24          Just to reset a little bit on what our position is,

25    the board meeting exhibits give the government exactly what it

333

1    needs as it relates to the structure of Mr. Lovette's

2    compensation.  And this other document that's the 8-K and his

3    employment agreement --

4            THE COURT:  We had talked about that before.  So maybe

5    you would -- not to cut you off or anything, Mr. Fagg, but why

6    don't we get the government's reaction to that and why it's

7    coming back.

8            MR. FAGG:  Sure.

9            THE COURT:  Mr. Torzilli, go ahead.

10           MR. TORZILLI:  Thank you, Your Honor.

11           Just a couple of brief points on it, Your Honor.

12   First is to respond to the time frame issue.  And the

13   employment agreement in the 2011 8-K is relevant because

14   Mr. Lovette had knowingly joined the conspiracy in late 2011,

15   and this relates to that precise time period.  And the knowing

16   joinder of the conspiracy in 2011 was a finding that the Court

17   made as a result of the *James* hearing, so we think it's

18   relevant on -- certainly on that basis.

19           The second point is what the board minutes don't have

20   that's very relevant to the motive issue that goes to knowing

21   participation in the conspiracy, that element of the crime, is

22   the number of shares of stock, because the number of shares of

23   stock provides the motive to fix the prices, to increase the

24   bottom line of the company, to raise the wealth of the

25   individual who is the owner of the shares.  So I think the

1    share piece which is in the employment agreement, but is not in

2    the minutes the board, would be an aspect of the motive issue

3    that we would want to have 9168 be.

4        THE COURT:  I can't remember now because I was just

5    looking at the board minutes on the screen.  But what's -- just

6    real briefly, what's the formula again?  It's based on shares?

7        MR. TORZILLI:  I am sorry, Your Honor?

8        THE COURT:  In the board minutes it has the formula.

9    Is it based on shares or is it tied to shares?

10        MR. TUBACH:  I have an extra copy if you would like to

11    see it.

12        THE COURT:  You can hand it up, Mr. Tubach.

13    Mr. Tubach handed to me Government Exhibit 9166.

14        MR. TORZILLI:  Bates number ending 622.  So that's the

15    formula for the bonus amount, and it's our understanding that

16    that is to be paid in cash rather than stock.

17        THE COURT:  Why do you think it is to be paid in

18    stock?  Because it says Bonus Amount, (% of Salary).  And that

19    goes back to the 8-K, then, or --

20        MR. TORZILLI:  The 8-K point, though, is a different

21    point.  The 8-K point is it provides within the employment

22    agreement that some of the compensation or what's received by

23    the individual is shares of stock.  So that is separate from

24    the information contained in the board minutes.  The

25    information contained in the board minutes is the incentive

1   payment for the performance of the company for a given year.

2   The formula is paid in cash.  The formula that's expressed in

3   the board minutes is ultimately paid in cash, which is

4   different from the share issue that's reflected.

5           THE COURT:  Let's go back to Mr. Fagg, and then I will

6   obviously let you have an opportunity again, Mr. Torzilli, to

7   address the objection.

8           MR. FAGG:  Thank you, Your Honor.

9           In the employment agreement that is in Exhibit

10  No. 9168, that was a one-time grant of stock awards that

11  Mr. Lovette received upon joining the company.  And

12  Mr. Torzilli is exactly right that the compensation structure

13  for Mr. Lovette ongoing each year would be based upon the

14  performance of the overall company according to this formula

15  that's set out in the board meeting minutes.

16          And the notion that somehow or another this document

17  that has all of this other information in it that the Court has

18  ruled should be excluded should now somehow or another come in,

19  I don't know, perhaps redacted with only a stock grant to him

20  in 2011 -- there was a one-time stock grant.  Seems highly

21  irrelevant.  It seems like that is not something that is tied

22  directly to the sale of chicken products.  The stock price can

23  be based on any number of things.

24          I think that even his compensation structure is not

25  tied so directly as the government alleges to the sale of the

1    products that are at issue here, but the stock price is a leap

2    too far for this document to be admissible.

3              THE COURT:  All right.  Thank you, Mr. Fagg.

4              Mr. Tubach was going to -- anything else?

5              MR. FAGG:  Sure, Your Honor.  The point there is that

6    if with the stock, if he receives an award of stock, to the

7    extent it is relevant -- and I don't believe it is relevant.  I

8    think it's too tangential -- but it would only be relevant if

9    he continued to hold that stock.  And there isn't anything in

10   here that talks about how long he has to hold the shares that

11   he was awarded.

12             THE COURT:  Mr. Torzilli, go ahead.

13             MR. TORZILLI:  The basic point is he owned the stock

14   at least from this period of time.  There is no indication when

15   he relinquished it.  And that provides the motive to want to

16   fix prices to boost the revenue of the company and ultimately

17   the bottom line and the share price and to reap the benefits as

18   a shareholder.  That started in 2011 because that's the date

19   that he joined the conspiracy or at least the date upon which

20   he had knowingly joined the conspiracy, so it seems like it's

21   perfectly within the realm of evidence that's relevant to

22   helping to prove his knowing participation in the conspiracy.

23             MR. FAGG:  Your Honor, one last point on that.

24             THE COURT:  Yeah, go ahead.  Were you done,

25   Mr. Torzilli?

1           *MR. TORZILLI:*  Yes, sir.

2           *THE COURT:*  Okay, great.

3           *MR. FAGG:*  Just the last point, Your Honor.  It's the

4     government's burden here on all of these issues.  And there is

5     no witness who is going to testify as to whether or not

6     Mr. Lovette owned stock in Pilgrim's Pride at any point after

7     these were awarded to him.  And the government's assumption

8     that he owned them and held them for any length of time is

9     simply that.

10          *THE COURT:*  Just so I am clear about Mr. Lovette's

11    position, is his position that as to the 8-K -- I can't

12    remember what exhibit number that is -- that it needs to be

13    further redacted or that under no circumstances can it be

14    admissible even if redacted?

15          *MR. FAGG:*  Your Honor, it's the latter.  You would

16    have to redact basically this entire document.  And then there

17    would be one line about an award of shares.  And I think the

18    award of shares, how many shares he would be awarded goes to

19    the issue that Your Honor has already ruled is inadmissible

20    regarding his compensation -- his specific compensation or his

21    financial circumstances.

22              And so it would make this document incredibly -- it

23    would raise all kinds of questions for the jury about what is

24    the rest of this document about.  And simply it would be -- I

25    don't know how many page document here, it would be a 21-page

1   document with two lines in there that are of marginal, if any

2   probative value.  And it would just cause the jury to speculate

3   about, well, what's the rest of this all about?  Why am I not

4   being shown it?  Especially when we think about there is no

5   evidence that he held this stock for any period of time.

6         And I think importantly, Your Honor, here we have the

7   other exhibit, the board meeting minutes, which we are willing

8   to stipulate are admissible that go to the very issue that the

9   Court ruled would be allowed in this court, which is the

10  structure of Mr. Lovette's compensation, not the actual

11  compensation itself.

12        THE COURT:  Thank you, Mr. Fagg.

13        Mr. Torzilli, I will give you the last word.  Go

14  ahead.

15        MR. TORZILLI:  On the 8-K employment agreement, I

16  think in terms of the redaction, it wouldn't be necessary to

17  have the entirety or near entirety of the document redacted, I

18  think just in a number of targeted places potentially to remove

19  information that might be 403, unfairly prejudicial, but the

20  document could otherwise be admitted into evidence.

21        And I think there is no question that an 8-K and an

22  employment agreement attached to an 8-K would be otherwise

23  admissible.  It would be 803(6) business record and we would

24  have an individual who would testify to the foundation of that.

25  So I don't agree that everything except for one or two lines

1    needs to be redacted in order for it to be in a form that would

2    satisfy any sort of 403 issues.

3            THE COURT:  Okay.  But from the government's position,

4    what information in Exhibit 9168 would go to the issue of an

5    incentive for Mr. Lovette to price-fix because it would

6    potentially increase his compensation?

7            MR. TORZILLI:  The receipt of shares of stock.

8            THE COURT:  Okay.  But there is no disagreement by the

9    government with the point that Mr. Fagg made that it was a

10   one-time award stock award or grant or something.

11           MR. TORZILLI:  There is no disagreement.  That's our

12   understanding and that's our reading of the employment

13   agreement.

14           THE COURT:  Anything else?

15           Okay.  I am going to rule that 9168 shall be excluded.

16   I just don't think that that issue of, you know, a one-time

17   stock grant without any further information about Mr. Lovette's

18   stock ownership from that point forward is relevant.  Moreover,

19   I am worried that it crosses over into much more prejudice than

20   probative value because I previously ruled that it's not

21   admissible to prove the amount of the -- you know, their

22   compensation, the fact that Mr. Lovette may be well

23   compensated.

24           Rather, the issue is the incentive that he may have to

25   price-fix because that would help increase his compensation.

340

1    That information is in 9166.  Those are the board meeting

2    minutes.  Mr. Sangalis in a previous trial laid the foundation

3    for that in any event.  That would demonstrate that incentive

4    and the incentive is what the government is after.  So I think

5    that that information is going to come in in any event, and for

6    that reason the probative value of 9168 is further diminished.

7            Let's -- Mr. Tubach?

8            MR. TUBACH:  Your Honor, sorry.  There is two more

9    exhibits that Mr. Sangalis -- the government apparently wants

10   to ask Mr. Sangalis about.  The other also relates to

11   compensation.  That's why Mr. Lovette and I would were debating

12   who would stand up.

13           Government Exhibit 9874, which I can hand up a copy to

14   the Court, this is a printout in native format.  This is just

15   pure comp information -- and this is -- this is a printout of a

16   long spreadsheet that goes across, so every time you turn the

17   page it's just another set of columns to the right.  And what

18   this document is is just actual compensation information about

19   the defendants and other individuals who have been indicted.  I

20   guess I give the government points for persistence, but the

21   Court has been very clear that this evidence is not coming in.

22   I just -- why is this on the -- why are we dealing with this

23   now?  I am just confused, obviously.

24           THE COURT:  Yeah.  There is another exhibit too?  We

25   don't have to take that up now, but why don't we ask

1    Mr. Torzilli assuming that he is the appropriate person.

2         *MR. TORZILLI:*  May I have a moment to confer?

3         *THE COURT:*  Yes.

4         *MR. TORZILLI:*  If I may, Your Honor, the government is

5    willing to withdraw the exhibit we just mentioned, that was

6    just mentioned, 9874, and the other exhibit in Mr. Sangalis'

7    set of exhibits that relates to antitrust compliance training.

8         *THE COURT:*  As what's that?

9         *MR. TORZILLI:*  The other exhibit that relates to

10   antitrust compliance training.

11        *MR. TUBACH:*  That was the other document I was going

12   to talk about.  That's exhibit just for the record --

13        *THE COURT:*  There is some handwriting on it.  That may

14   be yours, Mr. Tubach.

15        *MR. TUBACH:*  I apologize.  The other exhibit just for

16   the record the government is withdrawing is 3034 which is a

17   handwriting of people signing into an antitrust compliance

18   training in 2019.  Thank you.

19        *THE COURT:*  Mr. Feldberg?

20        *MR. FELDBERG:*  I hate to bring this up so late in the

21   day, but there are two other exhibits in the Sangalis materials

22   which the government has changed its mind a couple times of

23   today whether they are going to offer or not.  The last I heard

24   they are planning to offer them, 9504 and 9505, which are as

25   best we can tell not business records and not relevant.  I

1    don't have an extra copy to hand up, I apologize.

2              THE COURT:  It's being displayed on the screen,

3    Mr. Feldberg.

4              MR. FELDBERG:  Thank you.

5              9504 looks like a receipt from something called ella

6    and another receipt from Burger something and another receipt

7    Courtyard by Marriott.  Unless I am missing it, nothing

8    indicates who the receipts are for.  I may be missing it, but I

9    can't immediately identify it.

10             The second page are some other receipts from some

11   other places.  The third page is a receipt from Courtyard of

12   Marriott that does have Roger's name on it, but these are not

13   Pilgrim's business records.  These are, if anything, business

14   records of the various establishments.  Same thing with the

15   fourth page, Hampden Inn.

16             9505, similar problems, some receipts.  In some cases

17   they say Austin.  In some cases they don't.  The third page is

18   a -- looks like a travel agency document.  The only name on

19   here is David Andrew Dodds.  I don't know who that is.  I don't

20   think that name has come up yet in the case.  And that looks

21   like it's the third, fourth and fifth pages of 9505.  So we

22   object on business records and relevance.

23             THE COURT:  Mr. Torzilli?

24             MR. FELDBERG:  We have copies if the Court would

25   prefer hard copies.

343

1          THE COURT:  That's all right.  I had a chance to take

2     a look at them to some extent, but I appreciate that,

3     Ms. Carwile.  I may need to take a look at those.

4          MR. TORZILLI:  Two points, Your Honor.

5          First, I think any objection on 803(6) grounds is

6     probably premature because we haven't called Mr. Sangalis.  But

7     in any event, these two exhibits were admitted into evidence at

8     the last trial through --

9          THE COURT:  I can't remember.  I remember some

10    receipts, but I don't recall these particular ones.

11         MR. TORZILLI:  These are receipts, but the way in

12    which they are business records, of course, is that Roger

13    Austin submitted them to get reimbursed because these were

14    business trips he took in 2014, in the summer of 2014, and they

15    are relevant to where he was at important times during the

16    conspiracy.

17         THE COURT:  Okay.

18         Mr. Feldberg?

19         MR. FELDBERG:  First of all, at least three pages, if

20    they relate to anybody, relate to David Andrew Dodds.

21         THE COURT:  What about that one, Mr. Torzilli?  That

22    person has a Pilgrim's e-mail address.  Do you know who that

23    person is?

24         MR. TORZILLI:  I don't, but it's -- I don't, but it's

25    my expectation that Mr. Sangalis is going to be laying the

1    business record foundation and would be in a position to have

2    the personal knowledge to be able to explain what these records

3    are.

4         THE COURT:  Anything else, Mr. Feldberg?  I think we

5    will have to see.

6         MR. FELDBERG:  Okay.  I just didn't want to interrupt

7    Mr. Sangalis' testimony if we could clear it up now, but if we

8    can deal with it then --

9         THE COURT:  That sounds good.

10        Should we then take up summary -- Mr. Koenig?

11        MR. KOENIG:  Maybe I missed it.  Did this get marked

12   as a court exhibit, the jury note?

13        THE COURT:  I will go ahead and mark it as Court

14   Exhibit 1, and we will keep a record and have it labeled in

15   that fashion.

16        Mr. Beller?

17        MR. BELLER:  Your Honor I am responding to Mr. Koenig,

18   not what the Court has requested regarding summary exhibits.

19   Do you want me to wait?

20        THE COURT:  No, go ahead.

21        MR. BELLER:  Your Honor, I think the Court needs to

22   answer the jury directly.  And so I would respectfully propose

23   that the Court, as to Question No. 1, answer that:  Yes.

24        And as to Question No. 2 that is in parentheticals,

25   also answer:  Yes.  To save time, all testimony and exhibits

1   are relevant as to all individuals unless the Court instructs

2   you otherwise.

3          And I am happy to tender my handwritten request to the

4   Court as a proposed instruction to be given back.  My concern

5   is that the jurors are trying to figure out which responses to

6   questions are assigned to which individual defendants and may

7   not appreciate that all testimony is applicable as to

8   everybody, of course, with the limiting instructions that the

9   Court may give as to certain testimony, so that's my respectful

10  request to the Court.

11         Your Honor, as to Mr. Kramer's earlier question to the

12  Court, I think we can make short order of this, but I would

13  respectfully renew the request for an introductory instruction

14  noting that the Court has already denied that request, but I

15  believe that --

16         THE COURT:  I have already -- I am sorry, what that

17  request?

18         MR. BELLER:  Denied that request, Your Honor.  That

19  was the request that was briefed as to offer an introductory

20  instruction to the jury regarding the definition of agreement

21  and price-fixing.  The Court denied that through a written

22  order.  But given the fact that a juror has now asked, I would

23  simply renew that request.

24         THE COURT:  I will deny that request at this time.  I

25  don't think it's -- Mr. Kramer was insightful about some of the

346

1    issues, but those issues will have to be answered through the

2    evidence and through the instructions.  And I don't believe

3    that any attempt to try to answer those now or provide

4    additional information would by any means in reality answer the

5    questions because we're just at the very, very beginning of the

6    case.

7              Yeah, you can go ahead and tender that.  And if people

8    want to think about it over the weekend, too, in terms of how

9    we proceed, I will think about that.  Let's take that up first

10   thing on Monday morning.  Maybe we can meet just a few minutes

11   early, plan on meeting at 8:20.

12        *MR. BELLER:*  Do you want me to give this to you or

13   rather should I file it?

14        *THE COURT:*  You can give it to Ms. Grimm unless the

15   other counsel want copies of it, in which case we will have

16   Ms. Grimm or I can have Ms. Butler make a copy of it.

17        *MR. BELLER:*  We will take a quick photograph of it.

18        *THE COURT:*  Sure.  Use the modern methods.

19        *THE COURT:*  Mr. Pollack?

20        *MR. POLLACK:*  Your Honor, I was going to address the

21   juror note.  So if you are going to take that up Monday

22   morning, I don't need to address it now.

23        *THE COURT:*  If you have some thoughts on that now, Mr.

24   Pollack, we would certainly appreciate that.  That way I can

25   think about it too.

1          MR. POLLACK:  I do this with great hesitation, but I

2     disagree with Mr. Beller.  I can't believe I just said that.

3          THE COURT:  I had the same concerns.  I think it might

4     be a little -- I was a little bit concerned about that aspect

5     of Mr. Beller's suggestion because -- but you can better

6     articulate it than I do, but there may not be unanimity, so go

7     ahead.

8          MR. POLLACK:  The instruction on the second part of

9     the note seemed to suggest to the jury that the Court was

10    instructing them that all evidence is relevant as to all

11    defendants and, of course, that's not true.  And it is the

12    jury's determination, not the Court's determination and

13    certainly not something the Court directs the jury on.  So I

14    think it needs to be that counsel represents an individual

15    defendant, but when any -- and as you said, the first part will

16    identify themselves and we'll attempt to do that consistently,

17    but then an answer is to be considered by the jury to the

18    extent it is -- what relevance it has, if any, with respect to

19    each of the defendants.

20         THE COURT:  Right.  I think we have to be very careful

21    not to suggest to the jury that they have to apply things in a

22    particular way because obviously the jury instructions at the

23    end of the case will tell them just the opposite.  It's up to

24    them.  They are the judges of the facts.  So we can think about

25    that.

348

1          Once again, I don't -- I think it's appropriate to

2    respond to the question, but I don't think we need to overthink

3    it or further confuse the jurors because they now think, oh,

4    boy, I've got so much to worry about.  But let's think about

5    that over the weekend.  And then I will -- they will be looking

6    for some response from the Court and we'll give one.

7          MR. POLLACK:  To be clear, I certainly do not object

8    to the Court responding to the note.  It was just the

9    particular suggestion that I had some concerns about.

10          THE COURT:  Thanks, Mr. Pollack.

11          Mr. Koenig?

12          MR. KOENIG:  Just to put the government's position on

13    the record.

14          THE COURT:  Yes.

15          MR. KOENIG:  I do think we would say just answer yes

16    and yes.  I am sure everyone in this room remembers we did a

17    lot of talking about juror questions last time and trying to

18    read in what they were really getting at, and I feel like

19    that's a dangerous game.  So I would just answer yes to both.

20          THE COURT:  To both, yeah.  Okay.  Thank you,

21    Mr. Koenig.

22          All right.  Let's -- it's getting later and later.

23    Why don't we take up summary exhibits.  Anyone want to start?

24    Why don't we take it bit by bit.  So if you want to follow the

25    way it's outlined in the defendants' motion, we can do that, or

1    whatever way you think may make sense.

2          Mr. Tubach, go ahead.

3          *MR. TUBACH:*  I am happy to do that, Your Honor.

4          And the first and perhaps the easiest, not to

5    incentivize the Court, but the easiest way to dispose of all of

6    this is that the government's new summary exhibits are simply

7    untimely.  The Court issued an order saying --

8          *THE COURT:*  Well, they can't necessarily be completely

9    untimely because the government has to respond to new rulings,

10   so there would being some changes regardless.

11         *MR. TUBACH:*  And I would be happy to take the friendly

12   amendment that they can make changes to anything that the Court

13   has ruled on subsequent to January 14th.  But that's not even

14   remotely what these changes are all about.  The government has

15   just basically decided to do a do-over and to do a do-over

16   without even abiding by the Court's order.  The Court's order

17   said January 14th give us your trial exhibits.  They didn't do

18   it.  They handed us a flash drive on February 10th and then

19   send us a misleading e-mail three days later purporting to

20   summarize what those changes were that were entirely

21   inaccurate.

22         The Court's order has to mean something.  And if the

23   Court wants to say, which I completely understand, January 14

24   came and went, but hey, look on February 10th or whatever I

25   issued an order that said X, Y and Z, and so they get to amend

1    their exhibits to reflect that order, that makes perfect sense.

2    But any other changes don't.

3            That's simply their trial strategy.  Their trial

4    strategy was due January 14th as to these summary exhibits and

5    they just blew the deadline.  They didn't just blow the

6    deadline.  They just ignored it.  They sent these summary

7    exhibits to us in a flash drive on the day of the pretrial

8    conference.  They just handed it to us as though they get to

9    decide when their trial exhibits are due.  They don't.  The

10   Court does.

11           THE COURT:  Why don't we take up that point first.

12           Ms. Call?

13           MS. CALL:  Yes, Your Honor.  And there was some strong

14   language there.  I don't believe the government's e-mail was in

15   any way misleading and bullet by bullet detailed every change

16   we made.  I believe the government maybe missed one change and

17   did not particularly tell the defendants that one row changed

18   height when it was printed from Excel to PDF, and I apologize

19   for that error if that caused people a lot of concern.

20           But regardless, you know, the deadline for exhibits, I

21   don't know that there was a particular statement as to

22   summaries.  You know, we identified the summaries by number and

23   they are materially the same as what was introduced at the last

24   trial.

25           THE COURT:  They are exhibits, so obviously that

1   deadline would apply to them too.

2       MS. CALL:  Uh-huh.  The government had been in

3   correspondence with the defendants about summaries.  They had

4   made a request for what summaries we would introduce.  And we

5   had said that we were -- and this is I think -- I can't

6   remember if it was before or after January 14th we told them we

7   would be sending them revised summaries.  I will note we did

8   say that by February 4th and we missed that by a couple days.

9   So I will say just it wasn't unexpected and we had been in

10  communication about our intention to revise the summaries

11  around that January 14th deadline.

12      On top of that, as Your Honor noted, we kind of do

13  need to be able to amend the summaries, and I think anything

14  moving forward is just that.

15      THE COURT:  Obviously, that's not controversial.  The

16  real question is other changes.

17      MS. CALL:  Uh-huh.  You know, I can't frankly even

18  point to how many there were.  I think the main thing perhaps

19  between January 14 and February 10 would be the color change

20  and maybe five additions.  We certainly did not intend to blow

21  the deadline.

22      I will note that if Your Honor does want to hold us to

23  what was submitted on January 14th, I think the defendants

24  should be set to the same standard which never provided a

25  summary exhibit.  But I just think we perhaps didn't appreciate

1   the deadline of the 14th applying to final versions of summary

2   exhibits as well.

3          THE COURT:  Okay.  Why don't we take up the other

4   issues.

5          Mr. Tubach, go ahead.  Do you want to do color?

6          MR. TUBACH:  Sure, yeah, color is great.  I just have

7   to correct one thing.  The idea that the only thing we are

8   complaining about is they didn't tell us there is a height

9   change?  That's just ridiculous, honestly.

10         THE COURT:  I haven't had a chance to do a

11  line-by-line comparison.  But what would you characterize as

12  the most significant?

13         MR. TUBACH:  There are dozens and dozens of changes.

14  Here is the most significant one.  They added the "Do not

15  forward, not exactly a legal conversation," e-mail between

16  Brenda Ray that then gets forwarded to Mr. Penn.  Mr. Penn

17  forwards it on to someone else.  They added that to 14-1.

18         14-1 is an exhibit that deals entirely with KFC

19  pricing in 2012.  And with the exception of the e-mail that

20  they added, it covers a 12-day period that starts with the

21  request for the KFC pricing for bids from KFC and ends when the

22  bids are submitted, September 28th to October 10th.  The only

23  change they added to that is to add the "Do not forward, not

24  exactly a legal conversation."

25         That was a month earlier.  It has nothing to do with

1    KFC.  Brenda Ray doesn't even work in the business unit that

2    sells to KFC.  And there is undisputed testimony from the last

3    trial that that had to do with the halal market in the

4    northeast.  They didn't even tell us that they made that

5    change.  They told us the only change they made to that exhibit

6    was to add calls on October 8th.

7         And so we have since the time they disclosed these

8    initially, we have been getting seriatim new versions of these

9    exhibits.  We just got another one this afternoon when court

10   was starting.  We got one earlier.  And unfortunately, given

11   the misrepresentations about what the changes are -- I am not

12   saying they are intentional.  I don't know how they didn't tell

13   us that they were adding one of the more salient exhibits in

14   this case -- but with them not telling us what the changes

15   actually are, every time they give us a new version we have to

16   go through every single one and find changes because we -- what

17   the changes they are telling us they are making just aren't

18   accurate.  And to add that substantial exhibit to 14-1 when

19   it's got no basis to be in there is pure argument.

20        THE COURT:  Thank you, Mr. Tubach.

21        Ms. Call, anything more on Mr. Tubach's last point?

22        MS. CALL:  I think -- I might be looking at the wrong

23   thing, but I said we left off one addition.  I think that was

24   it that Mr. Tubach pointed to, so it certainly was not

25   intentional.  And then as to, I guess, the relevance point, you

354

1     know, the government chooses what goes in the summaries.   They

2     provide context.   It's from the approximate same time frame.

3     And the defendant's state of mind, which clearly Exhibit 3037

4     goes to as to Defendant Penn at this time in 2012, it is

5     relevant as to other events even if it's about a different

6     customer.

7          MR. TUBACH:   It might be relevant, Your Honor, if

8     Mr. Penn were mentioned ever again in Exhibit 14-1.  He is not.

9     Never again is he mentioned in 14-1 except the one e-mail that

10    they added.

11         THE COURT:   I think I am prepared to rule on this one.

12    Ms. Call is right that, you know, if we applied a drop-dead

13    strict liability standard to January 14th, it may just come

14    back to bite different people, but also the defendants have

15    been dealing with small changes that keep going on during the

16    trial and they are at all hours.   And the summary exhibits I

17    think are difficult to have to go through all the time.

18         And while the changes may not be too significant, and

19    maybe they've been inadvertent, I haven't heard that they are

20    particularly critical or material either.   And I don't -- I

21    agree with Mr. Tubach on the adding that one e-mail to it.   I

22    don't think that would survive a review on it anyway.   So I am

23    going to -- I guess what I am looking for is I am not going to

24    back it up to January 14th, but is there a date that happened

25    sometime after January 14th but before trial that would be the

355

1    appropriate demarcation for no more changes?

2         *MS. CALL:*  So I believe I am trying to remember the

3    sets.  What was provided on February 10th, which is probably

4    it, since then we have sent, I think, two more which were all

5    this week, but I can't recall if the first one was before trial

6    or not.  And I will note there were changes made in the last 24

7    hours that were simply correcting some typos that happened in

8    changing over, I think, the color scheme or something.  So it

9    may not be of interest to anyone to, you know, back pass those

10   changes because they frankly make them more accurate.  But I

11   would assume substantive changes in terms of adding phone calls

12   or adding any new exhibits, we could go back to the

13   February 10th ones.

14        *THE COURT:*  Address that issue if you are familiar

15   with it, Mr. Tubach.  So what if I adopted no changes after the

16   February 10th changes?

17        *MR. TUBACH:*  Your Honor, we would need to go back and

18   look at those.  Honestly, there have been so many versions

19   since then that we have been dealing with.  If the Court is

20   inclined not to hold the government to the January 14 date,

21   that would be the only other date.  You could hold them to the

22   February 4 date that they gave us, but, of course, they didn't

23   send us the exhibits then.

24        The only other date that would actually come up, the

25   next date would be February 10.  We'd need to go back and look

356

1    at that and see what's on there.  Obviously, the exhibit we

2    just talked about would come off per the Court's ruling just

3    now, but we would have to go back and do that.  All of us I

4    think have been on iteration five or six and it's just going to

5    take a little time.

6         THE COURT:  Ms. Henry, I will allow you to chime in.

7    Go ahead.

8         MS. HENRY:  Your Honor, I just want to make the point

9    that the exhibits were admitted at the last trial under certain

10   exhibit numbers.  And we can't have an appellate record that

11   has the same exhibit number on two different exhibits.  And so

12   these are new exhibits.  There is no concept that they are just

13   a revision of an exhibit that has been admitted into the court.

14   That just is not a concept that makes any sense.  And we need

15   to have new exhibit -- I mean, we just need to recognize that

16   this is not an issue of just sort of revising things.  These

17   are new exhibits.  And they have a date.

18        I have some other issues with regard to the actual

19   exhibits with regard to two or three documents that are in the

20   exhibits that relate to exhibits that have not yet been

21   offered, but that -- but I don't want to get into that if

22   that's not -- it's pretty late at night.

23        THE COURT:  Yeah, I have a feeling the clock would

24   tick over to 7:00 p.m. if we were, but what I want to do is

25   stick to just the motion to exclude the summary exhibits.  So

357

1    we will stick within the scope of that, but we will have to

2    take that up another time.

3           MS. HENRY:  But we do need to deal with this issue.

4           THE COURT:  I think that's a good point, Ms. Henry.  I

5    do.

6           MR. TUBACH:  Your Honor, the Court's order with

7    respect to January 14th specifically required the government to

8    provide these exhibits.  It did not require the defense to

9    provide their summary exhibits by January 14th I do not

10   believe.

11          THE COURT:  I can't remember exactly what it said.  I

12   am sure I didn't order the defendants to provide summary

13   exhibits because the defendants haven't indicated that they

14   have any, so I wouldn't have said that.

15          MR. TUBACH:  Exactly.  We do think the January 14 date

16   is the right one.  All these color changes --

17          THE COURT:  We are going to take up color now.  Unless

18   someone gives me a good reason to not adopt the February 10,

19   that's what I am going to do.

20          MR. TUBACH:  Our motion to exclude was based on the

21   ones we got on February 10, so...

22          THE COURT:  Mr. Fagg?

23          MR. FAGG:  Your Honor, I think I would ask the Court's

24   indulgence for a little bit of time on that as we try and

25   consider them.  The government has given us different

1   iterations of those exhibits since that time and there are

2   additions and subtractions since that time.  And as Mr. Tubach

3   indicated, it is difficult to know which ones are which.  There

4   are corrections, but perhaps -- so if it's possible for us to

5   consider this over the course of the weekend.

6        THE COURT:  Well, what we are talking about right now

7   is timeliness, not the substantive objections.  So just on the

8   issue of timelessness, what I am prepared to do is to declare

9   the government's amendments as of February 10th timely.  That

10  doesn't mean that we don't have other issues to work out.  And

11  as Ms. Henry said, she has got some issues too, but it was just

12  on the timeliness objection.

13        MR. FAGG:  Sure.  I understand, Your Honor.  I think

14  even still there it's difficult to know in our own head when we

15  received what, but I understand the Court needs to make a

16  decision on it.

17        THE COURT:  Mr. Pollack?

18        MR. POLLACK:  I just want to respond to the Court's

19  comment about the Court is not aware if the defense is going to

20  have summary exhibits.  At least speaking on behalf of

21  Mr. Blake, I suspect that we might.  And we did put on our

22  witness list we would have a summary witness.  Of course, we

23  are differently situated than the government because until we

24  hear the government's case, we don't know what evidence we are

25  going to be putting on or summarizing, but I just don't want to

1   leave the Court with the impression that we don't intend to use

2   summary exhibits because we may well.  So if the Court wants to

3   deal with that with the deadline, that's fine.

4        THE COURT:  You said that you also anticipate having a

5   summary witness.  Are you intending to have a summary witness

6   and summary exhibits?

7        MR. POLLACK:  Correct.  We would put the summary

8   exhibits in through the summary witness.

9        THE COURT:  Oh, okay.

10        MS. CALL:  If I perhaps may inquire, and this might be

11   of the defense parties for clarification.  The Court's order on

12   Docket 925, which I believe is what we are referring to with

13   respect to timeliness, just asks the parties to file their

14   exhibit lists by January 14th without reference to summaries.

15   But I could perhaps be missing a different order if we are

16   discussing another one.

17        THE COURT:  Yeah, I am not sure.  But I am going to --

18   I am going to declare the government's February 10th revisions

19   to be timely; after that not.

20        Let's take up the color scheme.  I have read the

21   briefing on it and I have looked at the color copies on it.  I

22   would say this, that I don't believe that the new color scheme

23   could be interpreted as a new form of unduly prejudicial or

24   even prejudicial signaling.  I think that a juror's impression

25   of the color scheme would probably be that it was not done with

360

1    the benefit of a graphic artist or any type of...

2         If anything, it's all sorts of strange clashing colors

3    and so forth and so on, but I don't see that it really looks

4    like some overtly signaling type of thing, so I am going to

5    overrule the objection as to the color scheme.

6         What else do we need to take up, Mr. Tubach?

7         MR. TUBACH:  There are a number of other changes.  And

8    I honestly don't know if the government has at this point taken

9    some of them off in some of the later iterations as a result of

10   our objections.  14-1 is the one we had talked about and the

11   Court has already ruled on that.  There is also 14-3, the

12   government made revisions to that, and also to Government

13   Exhibit 2-1 and 3-1 and others.  If the Court wants to hear

14   argument specifically about all those, I am happy to do each

15   one separately.

16        THE COURT:  Let's see what Ms. Call has on that.

17        MS. CALL:  I may have a proposal that could create

18   some efficiencies.  So at the time that these were submitted on

19   February 10th, the supplemental *James* rulings were still

20   pending, so there were certain documents added to the summary

21   exhibits that we anticipated getting into evidence.  That has

22   since been ruled on either positively or negatively which we

23   then removed.  So some of the opposition, I believe, in the

24   defendants' motions was moot because we later now removed it

25   based on the Court's ruling.

1          So I think respectfully maybe my proposal for an

2    efficiency matter is the government could maybe tomorrow file

3    updated summaries that are based on the additions made as of

4    February 10th with removals based on the Court's prior rulings

5    as we had done in the subsequent versions.

6          THE COURT:  Actually, I think that's a pretty good

7    suggestion even though it sounds like another iteration, which

8    it is.  Nonetheless, it's inevitable.  We have got to do that

9    so we see where the baseline or the copy that we're working

10   with.

11         MR. TUBACH:  If we can get that by tomorrow, Your

12   Honor, we could then look to see what remains and then perhaps

13   early on Monday take anything up with the Court that it wanted

14   to take up or at the lunch hour or at the Court's leisure.

15         THE COURT:  I think we probably inevitably are going

16   to have to do that, but I think that would be much more

17   efficient.

18         Let's take up Ms. Henry's point about the numbering

19   because we have been attempting to preserve exhibit numbers

20   from the last trial.  And implicit in that is not just

21   preserving the number; it has to be the same exhibit.  And

22   because the summaries are changing in a number of respects, how

23   are we going to deal with that issue, Ms. Call?

24         MS. CALL:  I think that is a good question to raise.

25   So we had, you know, had the thinking of maintaining the

1  exhibit number because of similarities between or substantial

2  similarities between the summaries.  We could provide a totally

3  new number or even add a dash one and create some sort of

4  record of it relating back, although that does seem a little

5  bit complex in numbering scheme.

6       THE COURT:  My suggestion, you can think about it.

7  And when you submit the new ones, I would -- why don't you go

8  ahead and submit the new numbering system, but adding a dash

9  one I think is pointless.  Why don't we start with a whole new

10  system.  There are any number of ones you could think of, but

11  some type of consecutive numbering system would work just fine.

12       MS. CALL:  We will come up with a proposal.  I will

13  note that the numbering did tie into the numbering scheme for

14  the remainder of the government's exhibits, so it's a little

15  more complex.

16       THE COURT:  Yeah, well, that is true, but I don't

17  think adding a dash one -- it would become a bit much.

18       MS. CALL:  May I inquire?  Perhaps just Government's

19  Exhibit 1, 2, since those actually don't exist yet in our

20  exhibit numbering scheme.

21       THE COURT:  That sounds nice.

22       MS. CALL:  Thank you, Your Honor.

23       Mr. Tubach?

24       MR. TUBACH:  Two requests on that.  One, if they are

25  going to change the numbering, which I think does makes sense,

363

1    if we could get a comparison so they can tell us this is what

2    used to be 14-1 and now it's exhibit whatever so we don't have

3    to do that.  That's first.

4            Second, it would be nice if we could get a summary of

5    the changes that they are making between what was introduced at

6    trial in the first trial and what they are now saying they want

7    to use as exhibits.  It takes an enormous amount of time --

8    these are 40 or 50 of these things -- to go through every item.

9    It would be nice to have them when they file the new document

10   tomorrow, to tell us what are the changes they are making.

11           THE COURT:  What about that, Ms. Call?

12           MS. CALL:  Well, first there are 20 summaries.  But

13   second, I think we can do that.  It's largely the e-mail we

14   sent defendants already on February 14th, but yes, we could do

15   that.

16           THE COURT:  Okay.  So what time tomorrow can you do

17   that?  Anyone going to be working Friday after 5:00?  Is

18   midnight fine?

19           MS. CALL:  We could do it by 9:00 p.m. if that's --

20           THE COURT:  Why don't we have it by the end of the day

21   tomorrow.

22           MS. CALL:  End of the day tomorrow, is that midnight

23   or is that --

24           THE COURT:  That's midnight.

25           MS. CALL:  Thank you.

1          *THE COURT:*  Anything else we should take up today?

2          So Monday morning 8:20 we are going to work on our

3     response to the question.  And then potentially barring some

4     other issue cropping up, we'll try to wrestle with summary

5     exhibits, okay?

6          All right.  The Court will be in recess.  Thank you.

7          (Recess at 6:14 p.m.)

8                              INDEX

9     OPENING STATEMENT

10        By Mr. Feldberg                              132

11        By Mr. Canty                                 144

12        By Mr. Gillen                                153

13        By Ms. Henry                                 165

14    WITNESSES

15        LaNard Taylor

16            Direct Examination By Mr. Koenig         188

17            Cross-examination By Ms. Pletcher        233

18            Cross-examination By Mr. McLoughlin      259

19            Redirect Examination By Mr. Koenig       280

20        Lawrence Barela

21            Direct Examination By Mr. Torzilli       285

22            Cross-examination By Mr. Tubach          293

23            Redirect Examination By Mr. Torzilli     297

24        Florence Becker

25            Direct Examination By Ms. Call

1                    REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above-entitled matter.  Dated

4   at Denver, Colorado, this 15th day of May, 2022.

5

6                              S/Janet M. Coppock

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25