```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Criminal Action No. 20-CR-00152-PAB
 3    In Re: Penn II
      UNITED STATES OF AMERICA,
 4
          Plaintiff,
 5
      vs.
 6
      JAYSON JEFFREY PENN,
 7    MIKELL REEVE FRIES,
      SCOTT JAMES BRADY,
 8    ROGER BORN AUSTIN,
      TIMOTHY R. MULRENIN,
 9    WILLIAM VINCENT KANTOLA,
      JIMMIE LEE LITTLE,
10    WILLIAM WADE LOVETTE,
      GARY BRIAN ROBERTS,
11    RICKIE PATTERSON BLAKE,

12        Defendants
      _____
13
                     REPORTER'S TRANSCRIPT
14                   Trial to Jury, Vol. 13
      _____
15

16            Proceedings before the HONORABLE PHILIP A. BRIMMER,

17    Chief Judge, United States District Court for the District of

18    Colorado, commencing at 9:01 a.m., on the 15th day of March,

19    2022, in Courtroom A201, United States Courthouse, Denver,

20    Colorado.

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A257, Denver, Colorado, 80294, (303) 335-2106
```

```
 1                         APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
 4    Washington, DC 20530, appearing for Plaintiff.
 5            Anna Tryon Pletcher and Michael Tubach of
 6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 7    San Francisco, CA 94111-3823;
 8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
 9    N.W., Washington, DC 20006, appearing for Defendant Penn.
10            David Beller, Richard Kornfeld and Kelly Page of
11    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
12    CO 80202, appearing for Defendant Fries.
13            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
14    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
15             Laura Kuykendall and Megan Rahman of Troutman Pepper
16    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
17    appearing for Defendant Brady.
18            Michael Felberg of Reichman, Jorgensen, Lehman,
19    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
20    10017;
21
22
23
24
25
```

```
 1                    APPEARANCES (Continued)

 2           Laura F. Carwile of Reichman, Jorgensen, Lehman,

 3    Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

 4    CA 94065; appearing for Defendant Austin.

 5           Elizabeth B. Prewitt of Latham & Watkins, LLP,

 6    555 11th Street, N.W., Suite 1000, Washington, DC 20004;

 7           Marci Gilligan LaBranche of Stimson, Stancil,

 8    LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

 9    80218, appearing for Defendant Mulrenin.

10           James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12           Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14           Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16           Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19           John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25
```

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3  Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4  Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6  633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7  for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9  & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10 DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12 5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13 for the Defendant Blake.

14

15                   PROCEEDINGS

16         THE COURT:  Unfortunately, a late start, but I am glad

17 we got the problems resolved hopefully.  This microphone seems

18 unusually live.

19         Why don't we get the witness.

20         Mr. Torzilli, go ahead.  Maybe we can postpone the

21 getting of the witness.

22         MR. TORZILLI:  So, Your Honor, we learned at 8:25 a.m.

23 that the defendants intend to call their expert a week early,

24 earlier than expected, and we understand that that owes to some

25 nebulous combination of moving him up and cutting witnesses

1    that were ahead of him on the existing witness list.  We've

2    asked the defendants for an actual witness list to be filed

3    immediately, and we ask that the defendants be ordered to file

4    that no later than noon today.  We need to have a witness list

5    to understand what witnesses they are going to be calling and

6    when they are going to be called.

7              THE COURT:  Okay.  Response?

8              Ms. Pletcher?

9              MS. PLETCHER:  Thank you, Your Honor.

10             Briefly with respect to Professor Snyder, he is in

11   town.  We do expect to put him on the stand on Thursday.  We

12   are disclosing everything we need to disclose to the government

13   within the next hour.  Mr. Torzilli and I have been discussing

14   that.

15             Mr. Snyder may also be appearing in the courtroom at

16   various points to listen to testimony.  I will leave it to

17   others to talk about the witness list, but I did want to let

18   the Court know the status of Professor Snyder.

19             THE COURT:  Is that the only change?  Because, once

20   again, if a witness list is provided to the government and now

21   all of the sudden it's substantially changing and moving an

22   expert up into a different week is a substantial change, then

23   what good is the witness list?

24             MS. PLETCHER:  I understand that.  Your Honor, with

25   respect to Professor Snyder, he did have a personal issue come

1    up that was a very serious family issue, and that was what

2    necessitated the change in his schedule.  For the next two

3    days, it's my understanding, unless anyone tells me

4    differently, that the witness list as disclosed is correct.

5         *THE COURT:*  What about the rest of it?  Because, once

6    again, my practice standards require that you produce a witness

7    list and estimations.  And, you know, the defendants have

8    enjoyed the benefit of the government's witness list in both

9    trials, and to have a witness list that is just constantly

10   changing is -- just throws the government off unfairly, and it

11   cannot happen.

12        *MS. PLETCHER:*  I understand, Your Honor.  Thank you.

13        *MR. TORZILLI:*  Thank you, Your Honor.

14        So we look forward to receiving every bit, every

15   scrap, every detail of disclosure within the hour.  I will also

16   say, Your Honor, we haven't looked at what they are going to

17   disclose, but if they are going to call their expert a week

18   early and call him on Thursday, we may need to ask for a delay

19   of the trial in order to assimilate the information to be able

20   to conduct a reasonable and complete cross-examination of

21   Professor Snyder.  We are obviously not there yet because we

22   haven't seen anything from them, but certainly that would be a

23   reasonable likelihood of that occurring.

24        *THE COURT:*  Well, we'll see.  If there is some

25   emergency, then maybe not, but, once again, there is going to

1    be some reason for the -- his moving up so dramatically.

2         MR. TORZILLI:  And two other things to raise just

3    briefly, Your Honor.  We filed a motion for the 26.2

4    disclosures.  We have received, I think, if not nothing, nearly

5    close to nothing.  And we asked for a motion to compel

6    summaries, and we have received either nothing or next to

7    nothing, so we'd ask that the defendants be ordered to

8    immediately produce all of that information.

9         THE COURT:  Any Rule 26 disclosures to provide?

10   Anything like that?  That's the second part of that motion.

11        MS. CALL:  On that note, one of the witnesses on the

12   witness list still doesn't have a name, so we would at least

13   request that.

14        THE COURT:  Well, it looks like that's a custodian.

15        MS. CALL:  Sponsored for the summary exhibits, I

16   believe.

17        THE COURT:  Yes.  Yeah, well, we need a name for that

18   person.  Who is that?

19        MS. JOHNSON:  Your Honor, I don't believe that person

20   is being called.

21        THE COURT:  Okay.

22        MS. CALL:  I think Mr. Feldberg is about to provide

23   some information.  We did receive word this morning that

24   Defendant Mulrenin's team is no longer planning to seek

25   admission of the summaries we discussed yesterday, but

1    Defendant Austin's team does have summaries.  I don't know if

2    they are the same or different or if any other defendant has

3    summaries.

4           This is part of the government's request that we need

5    some certainty, some advance notice of who and what is being

6    offered and what the volume of this information is.  We did

7    learn from Defendant Austin this morning they plan to provide

8    theirs tonight for a witness we understand will be called next

9    week, but we don't know who that is.

10           THE COURT:  Mr. Feldberg?

11           MR. FELDBERG:  Your Honor, Ms. Call and I had an

12    opportunity to confer this morning.  What she said is correct.

13    We may be using some summary exhibits.  We will disclose them

14    by tonight at the latest.  Whether we are going to end up using

15    them or not, we will disclose them, and we will disclose the

16    name of the witness.

17           THE COURT:  Okay.  Once again, these disclosures,

18    every day is the same story, tonight, tonight, tonight, but

19    it's got to happen.

20           Mr. Gillen?

21           MR. GILLEN:  Your Honor, Team Roberts may have one

22    summary chart.  I think we can probably make a decision about

23    whether we are going to do that or not by noon and inform the

24    government of that, but there has been -- obviously, there were

25    a lot of summary charts that had been contemplated that are no

1    longer on the table for the respective folks, so I think by

2    noon we can -- we will say yes or no.

3         THE COURT:  Right.  If it's yes, when will the

4    government get it?

5         MR. GILLEN:  I am sorry, Your Honor?

6         THE COURT:  If the answer is yes that you are going to

7    use it, when will the government get it?

8         MR. GILLEN:  This evening.

9         THE COURT:  Okay.  Mr. Torzilli, anything else?

10        MR. TORZILLI:  No, Your Honor.

11        THE COURT:  Okay.  Let us get the witness.  Let us

12   bring the jury back in.

13        Are we going to display through the document viewer?

14        MR. TORZILLI:  We now have it on our laptop, so we can

15   display it.

16        THE COURT:  Just a reminder, everybody, phones off.

17   Yesterday was not a good day.  They don't have to be off, but

18   they need to be silenced.

19        (Jury present.)

20        THE COURT:  Good morning, Ladies and Gentlemen.  Sorry

21   for the delay.  We had one of those baffling technical problems

22   that never happen except today, so we had our three IT people

23   who were trying to figure that one out, but luckily we did get

24   it figured out.

25        So, Mr. Torzilli, go ahead.

Robert Lewis - Redirect

1          MR. TORZILLI:  Thank you, Your Honor.

2                    **REDIRECT EXAMINATION CONTINUED**

3     BY MR. TORZILLI:

4     Q.  Good morning, Mr. Lewis.

5     A.  Good morning.

6     Q.  How are you?

7     A.  Very well, thank you.

8     Q.  Good.

9          MR. TORZILLI:  Your Honor, permission to call up for

10    the witness, counsel, and the Court Defense Exhibit H-684,

11    slide 6.

12         THE COURT:  Yes, you may.

13         MR. TORZILLI:  And permission to call up side by side

14    with that Government's Exhibit 10023.

15         THE COURT:  And I can't remember, Mr. Torzilli, did

16    you move the admission of that; or was it for demonstrative

17    or --

18         MR. TORZILLI:  At the moment, Your Honor, it's for

19    demonstrative purposes only.

20         THE COURT:  Any new objections as to that?  All right.

21    You may do so.

22         MR. TORZILLI:  Thank you.

23    BY MR. TORZILLI:

24    Q.  Mr. Lewis, can you see up on your screen two charts side by

25    side?

2844

Robert Lewis - Redirect

1   A.   Yes.

2   Q.   My first question for you is, can you verify that the

3   numbers depicted on both of those charts are the same numbers?

4   A.   They are the same.

5   Q.   Are the numbers in the same place on each chart going from

6   left to right?

7   A.   Yes, they are.

8   Q.   Okay.  And then do you see on the bottom of the chart there

9   are names of suppliers down at the bottom?

10  A.   Yes.

11  Q.   And are the names of the suppliers the same and in the same

12  positions on each chart?

13  A.   Yes.

14  Q.   Does each chart compare the August 14 bids with RSCS with

15  the 2015 contract prices?

16  A.   Yes, they do.

17  Q.   Is Government's Exhibit 10023, so the chart on the right,

18  another way to look at the same information contained in

19  Defense Exhibit H-684, slide 6, the chart on the left?

20  A.   Yes.

21       MR. TORZILLI:  Your Honor, the government moves to

22  admit Government's Exhibit 10023.

23       THE COURT:  Any objection to 10023?  Mr. Pollack?

24       MR. POLLACK:  Yes.  This is not a summary that is

25  helpful to the jury.  There is already in evidence a summary

Robert Lewis - Redirect

1    that presents what the government concedes is the exact same

2    information.  The government simply wants to portray it in a

3    way that minimizes the differences, but the numbers are exactly

4    the same whether it's the first chart or the second chart, so

5    this chart is complete argument.  It's not a summary chart.

6    The information has already been summarized.

7            THE COURT:  The objection is overruled.  Sorry.

8            MR. KORNFELD:  Your Honor, I was just going to object

9    that it's cumulative.

10           THE COURT:  Both objections will be overruled.

11   Exhibit 10023 is no less argumentative than H-484 and will be

12   admitted not just for demonstrative purposes, but for all

13   purposes.

14           MR. TORZILLI:  Thank you, Your Honor.

15           Permission to publish?

16           THE COURT:  Yes, you may.

17   BY MR. TORZILLI:

18   Q.  So, Mr. Lewis, if I can focus you in on the columns on each

19   of the charts that pertain to George's.  Do you see those?

20   A.  Yes.

21   Q.  Okay.  Which of those charts makes the difference between

22   the August 2014 bid and the 2015 contract price look bigger?

23           MR. POLLACK:  Objection, Your Honor, relevance.  The

24   difference is the same.  It doesn't matter which one makes it

25   look bigger.

Robert Lewis - Redirect

1          THE COURT:  Overruled.

2          MR. TORZILLI:  You can answer, sir.

3    A.  The chart on the left.

4    BY MR. TORZILLI:

5    Q.  Okay.  And which one makes it look smaller?

6    A.  The chart on the right.

7    Q.  Okay.  Now, you testified yesterday that when you

8    negotiated with George's, you negotiated I think you said an

9    approximate 5 percent price decrease from the initial proposal

10   in the contract.  Is that your testimony?

11   A.  Yes.

12   Q.  Which of the two sets of bars better represents in your

13   view the 5 percent decrease that you personally negotiated with

14   George's?

15   A.  The chart on the right.

16   Q.  Okay.  Thank you, sir.

17          MR. TORZILLI:  We can take those exhibits down.

18   BY MR. TORZILLI:

19   Q.  So, Mr. Lewis, regardless of the charts, when all was said

20   and done, how big was the price increase that you negotiated,

21   that you agreed to with these chicken suppliers at the

22   conclusion of your 2014 negotiations?

23   A.  The average increase was approximately 15 cents per pound,

24   which based on the annual consumption of chicken on the bone

25   increased the KFC system cost by roughly $60 million.

Robert Lewis - Redirect

1   Q.  That's the average.  Do you have an understanding of what

2   the range of increases was?

3   A.  15 to 20.

4   Q.  15 to 20 cents?

5   A.  Roughly, yes.

6   Q.  Was that true for all of the suppliers that we've talked

7   about during your testimony?

8   A.  Yes.

9   Q.  So Pilgrim's?

10  A.  Yes.

11  Q.  Claxton?

12  A.  Yes.

13  Q.  Tyson?

14      MR. LAVINE:  Object to the leading nature of the

15  questions, Your Honor.

16      THE COURT:  Overruled.

17  BY MR. TORZILLI:

18  Q.  Tyson?

19  A.  Yes.

20  Q.  Koch?

21  A.  Yes.

22  Q.  Mar-Jac?

23  A.  Yes.

24  Q.  George's?

25  A.  Yes.

Robert Lewis - Redirect

1      MR. POLLACK:  Your Honor, can we have a brief side

2  bar?

3      THE COURT:  Sure.

4    (At the bench:)

5      THE COURT:  Go ahead, Mr. Pollack.

6      MR. POLLACK:  Your Honor, that last piece of testimony

7  was simply false.  Mr. Lewis looked at the actual numbers and

8  testified on direct that George's increase was a little bit

9  less than 11 cents.  Mr. Torzilli has just asked him and gotten

10  him to testify that George's increase was 15 cents.  It is

11  simply false, and the Court should not allow that testimony to

12  stand and allow the government to elicit what it knows to be

13  false testimony.

14      THE COURT:  Mr. Torzilli?

15      MR. TORZILLI:  That's his recollection of what

16  occurred.

17      MR. POLLACK:  Your Honor, we looked at the actual

18  documents yesterday.  To the extent that that's a recollection,

19  it is a false recollection.  I would ask that the Court

20  strike -- instruct the jury to disregard that answer and to

21  strike it.  Mr. Torzilli knows that it is a false recollection,

22  and it is misleading to the jury for him to elicit a knowingly

23  false recollection.  At a bare minimum, I would want to recross

24  and show him the actual documents to show him that George's

25  increase was exactly as he said yesterday, less than 11 cents.

Robert Lewis - Redirect

 1          THE COURT:  Well, yeah, I understand your point,

 2     Mr. Pollack, but I am not going to be the policer of what the

 3     truth is.  It's something that's going to have to -- the jury

 4     is going to have to resolve, and, of course, you will be able

 5     to argue it in closings.  Objection will be overruled.

 6          MR. TORZILLI:  One other point, if I may, Your Honor,

 7     there is also a question about what the increase is relative

 8     to.  Don't forget in the prior proceeding we had in a summary

 9     we are not using here but shows significantly higher increases

10     when you look at it compared to the final period, so the final

11     period pricing, Period 13.  So if you think of it in terms of

12     Period 13 to the contract price that starts Period 1, '15, the

13     price increases are at or above, frankly, what Mr. Lewis just

14     testified to across all the suppliers.

15          THE COURT:  Okay.  Well --

16          MS. HENRY:  Your Honor, I just want to be certain that

17     for Defendant Kantola as well that the issue of the falsity on

18     the documents is also noted.  And with regard to the Period 13

19     prices, the testimony at the last trial was that Mr. Lewis

20     explicitly said that those numbers were not available at the

21     time of the bid submissions, that he had not looked at those

22     numbers, and that he accepted that they were there for dramatic

23     effect only on the behest of the government.

24          THE COURT:  Okay.  Thank you.

25          (In open court:)

Robert Lewis - Redirect

1            MR. TORZILLI:  Your Honor, moment to confer?

2            THE COURT:  Yes.

3       BY MR. TORZILLI:

4       Q.  Mr. Lewis, I want to go back to one thing we were talking

5       about late in the day yesterday that I had asked you and I said

6       I would circle back around to.

7            I was asking you about the transactions, the purchases

8       that you had negotiated, the ones that you agreed to that were

9       at prices that were above the contract price.  Do you remember

10      that?

11      A.  Yes.

12      Q.  And I think you had said you paid $1.30 per pound, maybe

13      even up to $1.45 per pound; is that correct?

14      A.  That's correct.

15      Q.  My question for you is whether it made business sense from

16      your perspective to pay those types of prices, so $1.30 to

17      $1.45 a pound, for the three-year contract that you were then

18      going to negotiate with the suppliers.

19      A.  It did not.

20      Q.  Okay.  Could you explain why not?

21      A.  Well, the prices that we paid for those incremental loads

22      was in a desperate situation.  We were running out of product.

23      We were about to close stores.  And we agreed that it was real

24      worth the effort to pay a premium for less than 1 percent of

25      the total consumption just to protect ourselves.

Robert Lewis - Redirect

1    Q.  Thank you.

2          Now, I want to ask you a little bit about -- clarify

3    the time line now of the George's bid and your meeting.

4          MR. TORZILLI:  So if we could start by calling up

5    Government's Exhibit 1221, which I believe is in evidence, and

6    permission to publish that to the jury.

7          THE COURT:  You mean 1221-1?

8          MR. TORZILLI:  Yes, Your Honor, thank you, 1221-1.

9          THE COURT:  You may.

10         MR. TORZILLI:  Thank you.

11   BY MR. TORZILLI:

12   Q.  On your screen, Mr. Lewis, is Government's Exhibit 1221-1.

13   Can you remind us what this is?

14   A.  This is an e-mail from myself to Darrel Keck.

15   Q.  What's the date of the e-mail that you wrote to Mr. Keck?

16   A.  August 12, 2014.

17   Q.  What does it relate to?

18   A.  I'm sorry?

19   Q.  What does the e-mail relate to, or what's the basic point

20   or subject?

21   A.  It's a follow-up to our meeting that was held that morning.

22   Q.  When did the meeting occur?

23   A.  August 12th, 2014.

24   Q.  Was there a deadline that you provided to Mr. Keck in your

25   e-mail?

Robert Lewis - Redirect

1    *A.*   Yes.

2    *Q.*   What date was the deadline?

3    *A.*   August 19.

4    *Q.*   And what were you expecting Mr. Keck to provide by that

5    deadline?

6    *A.*   His proposal along with answers to the various questions we

7    had asked and were highlighted in the body of the e-mail.

8    *Q.*   And by his "proposal," what did you mean?

9    *A.*   His FOB plant price and his volume that he was willing to

10   provide.

11   *Q.*   What company did Mr. Keck work for at the time?

12   *A.*   George's.

13        *MR. TORZILLI:*   Thank you.  We can set this exhibit

14   aside, and if we could call up Government's Exhibit 1004,

15   which, Your Honor, I believe is in evidence, and permission to

16   publish -- I am sorry, 1007.

17        *THE COURT:*   Yes, you may.

18        *MR. TORZILLI:*   Thank you, Your Honor.

19   BY MR. TORZILLI:

20   *Q.*  Mr. Lewis, on your screen now is Government's Exhibit 1007.

21   What is this?

22   *A.*  This is an e-mail from Darrel Keck to myself that was sent

23   on August the 19th, 2014.

24   *Q.*   Does it attach anything?

25   *A.*   It appears that the chicken-on-the-bone presentation was

Robert Lewis - Redirect

1    attached.

2    Q.  You had said a moment ago that the deadline for the

3    proposal, the deadline you gave Mr. Keck was August 19th.   Is

4    this the submission that included that proposal?

5    A.  Yes.

6    Q.  Who's the first person listed on the CC line of the e-mail

7    Mr. Keck sent to you?

8    A.  Ric Blake.

9        MR. TORZILLI:  We can take that exhibit down.

10   BY MR. TORZILLI:

11   Q.  I want to ask you about some questions you were asked on

12   cross-examination by Defendant Lovette's attorney,

13   Mr. McLoughlin.  He was asking you about whether or not you

14   conducted any market analysis in the summer of 2014.  Do you

15   recall that?

16   A.  Yes.

17   Q.  And as part of that discussion, you gave an answer to the

18   effect of you didn't do an extensive review of the market, but

19   you were aware of the shortage of small bird and that suppliers

20   claim there was a much larger margin on big bird.  Do you

21   remember that answer that you gave?

22   A.  Yes.

23   Q.  You do?  Okay.

24       Sir, just a yes-or-no question for you is, did you

25   ever ask any of those suppliers to discuss with each other

Robert Lewis - Redirect

1    their message to RSCS relating to their claim that there was a

2    much larger margin of big bird as a way to justify their price

3    increase?

4            *MS. HENRY:*  Objection, lack of foundation that they

5    were all asking that.

6            *THE COURT:*  Overruled.

7    *BY MR. TORZILLI:*

8    *Q.*  You can answer, sir.

9    *A.*  No.

10           *MR. TORZILLI:*  Moment to confer?

11           *THE COURT:*  Yes.

12           *MR. TORZILLI:*  Nothing further, Your Honor.  Thank

13   you.

14           *THE COURT:*  All right.  Is Mr. Lewis subject to

15   recall?

16           All right.  Mr. Lewis, thank you very much.  You are

17   excused.

18           *THE WITNESS:*  Thank you, Judge.

19           *THE COURT:*  Ms. Call, go ahead.

20           *MS. CALL:*  Yes, Your Honor.  The government has

21   several documents to offer and publish at this time.

22           *THE COURT:*  Go ahead.

23           *MS. CALL:*  The first is one that is not subject to a

24   prior ruling, and that is Government's Exhibit 10584, if --

25   Ms. Golshonara, if you can pull that up.  That is being offered

Robert Lewis - Redirect

1    under 801(d)(2)(A).

2        MR. FAGG:  Your Honor, we have an objection to this

3    document.

4        THE COURT:  Okay.  Let's go ahead and pull it up and

5    we'll -- Ms. Call, what's the exhibit number again?

6        MS. CALL:  It's 10584.

7        THE COURT:  Is what is being displayed the entirety?

8        MS. CALL:  It is, Your Honor.

9        THE COURT:  And, Mr. Fagg, did you want to have a side

10   bar on that?

11       MR. FAGG:  Yes, Your Honor.  Thank you.

12      (At the bench:)

13       THE COURT:  Mr. Fagg, go ahead.

14       MR. FAGG:  Thank you, Your Honor.

15       I understand that this is being offered under

16   801(d)(2)(A), but in order to be admissible under 801(d)(2)(A),

17   the document still has to be relevant.  And this document is

18   simply completely irrelevant.  It's an e-mail from a vendor

19   that works for Cobb-Vantress, who we have never heard anything

20   about, and Chuck Snipes, we have never heard anything about,

21   who is inviting Mr. Lovette to go play golf at Pebble Beach.

22   And the document is entirely irrelevant.

23       THE COURT:  Let's stop right there, Mr. Fagg.  Let's

24   get a response from Ms. Call, and I will give you another

25   opportunity.

Robert Lewis - Redirect

1          Ms. Call?

2          MS. CALL:  Yes, Your Honor.  The relevance of the

3   document, Defendant Lovette's management style.  You will see

4   in the document he discusses how he is a micromanager.  You

5   know, with Mr. Lovette being a supervisor for Pilgrim's, that's

6   entirely relevant that the jury understand the nature of his

7   supervisory style.

8          We have many documents in evidence about meetings with

9   Lovette, come to the oval office, where there is communications

10  with competitors or spreadsheets getting sent to

11  Defendant Lovette containing competitor prices or

12  Defendant Penn saying, We will discuss with Bill in a.m. after

13  receiving competitors' price increases for the 2014 year.

14         And the jury does deserve to understand what the

15  nature of the communications with Defendant Lovette, not just

16  being a yay-or-nay, five-second conversation, and that his

17  management style did include this very detail-oriented way of

18  doing things, and we think this is relevant information that

19  the jury should understand.

20         THE COURT:  Anything more on that point, Mr. Fagg?

21         MR. FAGG:  Yes, Your Honor.  What this e-mail is

22  talking about with respect to Mr. Lovette is he says, We're

23  working on a trip to Brazil, and we have the Tyson de Mex

24  integration.  He is talking about being a micromanager of the

25  corporate structure and the types of things that a CEO do

Robert Lewis - Redirect

1    dealing with, as we all know, JBS in Brazil, the parent

2    company, talking about an M and A transaction.

3          And to suggest that he is a micromanager somehow for

4    chicken contracts because he is talking about the exact type of

5    work a CEO would be doing is simply irrelevant.  He even talks

6    about we have a delayer corporate structure.  What they are

7    talking about here are these things that have nothing to do

8    with micromanaging anything that's related to this case

9    whatsoever.  There is no reference anywhere into this about

10   pricing or bids.  I mean, it's with a supplier who deals with

11   breeding of chickens, so it just -- it's not a relevant

12   document.

13         And under *United States v. Minners*, which is 362

14   F.Appx 931, which is a 10th Circuit case from January 26 of

15   2010, there the 10th Circuit found for a statement of a

16   defendant to be admissible under 801(d)(2)(A) the statement

17   must still be relevant.

18         And we have other arguments as well why this document

19   should not come in, Your Honor, and I am happy to address those

20   separately, but we think this closes the door.

21         *THE COURT:*  Okay.  Ms. Call, last word?

22         *MS. CALL:*  Yes, Your Honor.

23         Of course, Mr. Fagg was pointing to parts of the

24   e-mail about the substance of the context of the

25   communications, but I think that the statement by

Robert Lewis - Redirect

1  Defendant Lovette that he is a self-identified micromanager who

2  loves having his hands in a lot of detailed stuff, as he said,

3  is entirely relevant to his management style.

4      He managed defendants.  He was the supervisor of

5  Defendant Penn in this courtroom.  He indirectly supervised

6  others.  He talks about the organizational structure being

7  delayered, and you see this structure in the courtroom among

8  the four defendants, and we think it's entirely relevant here.

9      THE COURT:  I am going to exclude it.  I think it's

10  irrelevant.  It's such a tenuous connection, just because there

11  is a statement in there about him being a micromanager, you

12  know, in terms of any relevance to this case.  But also this is

13  a document talking about playing Pebble Beach and all sorts of

14  things of that nature, which I think is -- would prejudice

15  Mr. Lovette by talking about trips and Pebble Beach and playing

16  golf and things of that nature, but it just has such minimal

17  relevance.  In fact, I don't think it has any relevance.  That

18  even though it is a statement of Mr. Lovette, it is an

19  irrelevant document, so I will exclude it.

20      Thank you.

21   (In open court:)

22      THE COURT:  The objection will be sustained.

23      MS. CALL:  All right.  I believe the rest are all

24  subject to prior ruling starting with Government's Exhibit

25  9991.

Robert Lewis - Redirect

1          THE COURT:  All right.

2          MS. CALL:  Which is also offered under 801(d)(2)(A)

3   and will be subject to a limiting instruction.

4          THE COURT:  Any additional objections as to

5   Exhibit 9991?

6          All right.  Ladies and Gentlemen, that exhibit will be

7   admitted.  However, Ladies and Gentlemen, this exhibit can only

8   be considered by you against Mr. Lovette, against Mr. Lovette.

9          MS. CALL:  Permission to publish?

10         THE COURT:  You may.  All right.

11         MS. CALL:  The government next offers but does not

12   seek to publish at this time Exhibit 424.

13         THE COURT:  Any objection to the admission of

14   Exhibit 424?

15         MS. HENRY:  Can we have it displayed on the monitor?

16         THE COURT:  Yes.  I think it's up now.  If we could go

17   past the first page.  There we go.

18         MR. TUBACH:  Your Honor, 424 or 424-1?  We are having

19   both displayed sort of alternately.

20         MS. CALL:  One moment, Your Honor.

21         THE COURT:  Sure.

22         MS. CALL:  We may need to come back on this one,

23   Your Honor, if we can move on.

24         THE COURT:  All right.  I will consider the motion

25   withdrawn for the time being.

Robert Lewis - Redirect

1              Go ahead.

2              *MS. CALL:*  The next will be the government's summary

3   Exhibit 4.

4              *THE COURT:*  All right.  Any additional objections to

5   Exhibit 4?

6              Ladies and Gentlemen, once again, this is a summary

7   exhibit, so over the objection of the defendants I have

8   admitted that because they may -- a summary exhibit such as

9   this may assist you in understanding evidence that has been

10  presented, but a summary is not evidence of the material it

11  summarizes and is only as valid and reliable as the underlying

12  material it seeks to summarize.  You may give a summary exhibit

13  entire weight, some weight, or no weight at all depending on

14  your assessments of the underlying material and the accuracy of

15  the summary.

16             Ms. Call, you may display the first page of

17  Government's Exhibit 4.

18             *MS. CALL:*  Thank you, Your Honor.

19             *THE COURT:*  All right.  Next page.  All right.

20             *MS. CALL:*  If we could turn to page 3.

21             *THE COURT:*  All right.

22             *MS. CALL:*  Next if we could turn back to 424, and this

23  is subject to prior ruling on 1031-1.  And, Ms. Golshanara, if

24  you could pull up 424 for the parties, please.

25             *THE COURT:*  I am sorry, Ms. Call.  Did you say it was

Robert Lewis - Redirect

1    subject to a limiting instruction?

2           *MS. CALL:*  No limiting instruction, just a prior

3    ruling on the admissibility in ECF-1031.

4           *THE COURT:*  Any objection to the admission of 424?

5           *MR. TUBACH:*  Other than previously stated, Your Honor.

6           *THE COURT:*  Okay, yes, obviously, other than that.

7    Then 424 will be admitted.

8           *MS. CALL:*  All right.  Now, there is several documents

9    I believe previously admitted we would like to publish starting

10   with Government's Exhibit 449.

11          *THE COURT:*  You may.

12          *MR. TUBACH:*  Can we have a side bar, please?

13          *MS. CALL:*  If it reduces the necessity, I will be

14   publishing 9707, 9708 after this.

15          *MR. TUBACH:*  I don't think that solves the issue.

16      (At the bench:)

17          *THE COURT:*  Mr. Tubach, go ahead.

18          *MR. TUBACH:*  Your Honor, I believe this text string

19   that the government is about to start introducing started

20   before Exhibit 449.  We would ask that if this text string is

21   going to be displayed to the jury now, the entire text string

22   starting at the beginning of the text string, not in the middle

23   where the government is starting.

24          *THE COURT:*  Ms. Call?

25          *MS. CALL:*  Yes, Your Honor.  If Mr. Tubach is just

Robert Lewis - Redirect

1    referring to the one text message in Government's Exhibit 448,

2    I am happy to display that now.

3         THE COURT:  Okay.  So, Mr. Tubach, let's assume that

4    the government first displays 448 and also displays those other

5    documents that Ms. Call alluded to, anything else?

6         MR. TUBACH:  No, Your Honor.  I believe the text

7    string starts with the Fabio Sandri text, and so I just want to

8    make sure that's where we are starting.  I don't have 448 up in

9    front of me, so I can't evaluate that.  I believe it starts

10   earlier than prior to one text from 449, though.

11        THE COURT:  Ms. Call?  I can't tell from the exhibit

12   list.

13        MS. CALL:  Let me look, Your Honor.  Give me one

14   moment.

15        MR. TUBACH:  I believe in the last trial it was also

16   done incompletely and not starting in the middle.  Now I am

17   looking at 448.  They are related subject matter-wise, but they

18   are actually different people on the text.  So text 448 is

19   between Mr. Penn and Mr. Stiller, and 449 is different than in

20   the first trial.  I believe the photograph was included as well

21   in the very initial text.

22        The Court has hopefully forgotten this, but I think we

23   had an argument about whether or not the government had to

24   include a photo of Golden Corral food.  We need to start with

25   the Fabio Sandri text and then move forward.

Robert Lewis - Redirect

1          MS. CALL:  Your Honor, I don't believe that was part

2    of the Court's ruling in this trial.  There was a rule of

3    completeness ruling regarding 449, and that is Government's

4    Exhibit 9707 and 9708.  9708 is a screen-shot from someone's

5    phone containing the key measure indications, and those are

6    what the government was intending to publish just after 449

7    because that is the chronological order of those conversations.

8          I don't believe the photograph of Golden Corral food

9    was contained in the rulings for this trial nor has it been

10   admitted into evidence yet.

11         MR. TUBACH:  We would object to the admission of the

12   document and publishing to the jury because it's incomplete and

13   misleading.  I just assumed Ms. Call was going to be doing the

14   same thing as she did in the last trial, which is start this

15   text string when it starts, which is obvious animus towards

16   Golden Corral -- for some reason with Golden Corral food, and

17   now she is starting in the middle of the text string, and she

18   is going to jump to other text strings and include the last one

19   from Mr. Penn.  That is not remotely close to a complete

20   recitation of this text string.

21         THE COURT:  Ms. Call?

22         MS. CALL:  Can I inquire to Mr. Tubach of the exhibit

23   number of the exhibit he was referencing?

24         MR. TUBACH:  I will need to pull it up.  I don't have

25   it exactly here.  I believe we are all familiar with the text

2864

1    from Mr. Sandri.  I can pull it up if the Court can give me a

2    few minutes, but it seems like we are spending a lot of time

3    talking about this now.

4            THE COURT:  Yeah, but I think Ms. Call is just trying

5    to identify the exhibit.  I thought that the photos were

6    included in an e-mail string, so I don't know.

7            MS. CALL:  Relevance-wise, Your Honor, Mr. Sandri I

8    don't believe is on this message, so I am trying to determine

9    if this is the same conversation that Mr. Tubach is referring

10   to.

11           MR. FAGG:  He is absolutely included on there.  If you

12   look at Exhibit 449, he is.  It's to Bill Lovette and

13   Mr. Sandri.  And I had certainly the same understanding that

14   Mr. Tubach did, that these were all to be introduced together

15   based on everything we went through at the last trial.

16           THE COURT:  Yeah, Exhibit 50 indicates that it's a

17   text to Mr. Sandri as well.

18           MS. CALL:  I am just looking at the briefing we did

19   before this trial on these exact exhibits to cover issues like

20   this months ago.  And with respect to Exhibit 449, the Court

21   ruled that Exhibits 9707 and 9708, which is exactly what the

22   government was planning to publish next, should be admitted

23   alongside this for under the rule of completeness, and that is

24   exactly what the defendants requested in their motion.

25           So this is an entirely new objection that they are

Robert Lewis - Redirect

1    raising that they didn't raise in the pretrial rulings on

2    these.  They were for the very purpose of, you know, trying to

3    not necessitate this.

4         *MR. TUBACH:*  I have the Government's exhibit numbers

5    for the first two texts.  It's 9712, 9713, and 9711.  And we

6    object to the admission of 449 and the subsequent texts in the

7    absence of the admission of those documents and those being

8    published to the jury at the same time.

9         *THE COURT:*  I will let Ms. Call try to take a look at

10   those real quick.

11        *MS. CALL:*  I have no opposition to publishing those

12   before these, Your Honor.

13        *THE COURT:*  Thank you.

14      (In open court:)

15        *THE COURT:*  Ms. Call, which one do you want to start

16   with, then?

17        *MS. CALL:*  Let's start with Government's Exhibit --

18   offering Government's Exhibit 9711.

19        *THE COURT:*  Any objection to the admission of

20   Exhibit 9711?  That exhibit will be admitted.

21        *MS. CALL:*  Permission to publish.

22        *THE COURT:*  You may.  All right.

23        *MS. CALL:*  Next is Government's Exhibit 9712, and I

24   believe its attachment is Exhibit 9713.

25        *THE COURT:*  Any objection to the admission of Exhibits

Robert Lewis - Redirect

1   9712 and 9713?  Both will be admitted.

2          MS. CALL:  Permission to publish side by side?

3          THE COURT:  You may.  All right.

4          MS. CALL:  Next the government would seek to publish

5   Government's Exhibit 449.

6          THE COURT:  You may.

7          MS. CALL:  Thank you.

8          THE COURT:  All right.

9          MS. CALL:  The next is Government's Exhibit 450

10  previously admitted.  And permission to publish?

11         THE COURT:  You may.  Is this subject to a limiting

12  instruction?

13         MS. CALL:  Yes, Your Honor, my apologies.

14         THE COURT:  Ladies and Gentlemen, this exhibit,

15  Exhibit 450, can only be considered for its effect on the

16  listener, not for the truth of the matters asserted.  All

17  right.

18         MS. CALL:  Next previously admitted, permission to

19  publish, 9707.

20         THE COURT:  9707?

21         MS. CALL:  Yes, Your Honor.  And 9708, the attachment,

22  will be right after that.

23         THE COURT:  It may be.

24         MS. CALL:  Permission to publish 9707 and 9708 side by

25  side?

Robert Lewis - Redirect

1          THE COURT:  Yes, you may.  All right.

2          MS. CALL:  The next is a string of 15 exhibits that is

3     a text message string that are Exhibits 433 through 447, all

4     previously admitted, I believe.

5          THE COURT:  You may display those.

6          MS. CALL:  We will start with Exhibit 433, if you

7     could publish that, Ms. Golshanara.

8          THE COURT:  All right.

9          MS. CALL:  Permission to publish 434?

10         THE COURT:  You may.  All right.

11         MS. CALL:  Permission to publish 435?

12         THE COURT:  Okay.

13         MS. CALL:  436?

14         THE COURT:  You may.

15         MS. CALL:  Permission to publish 437?

16         THE COURT:  You may.  All right.

17         MS. CALL:  438.

18         THE COURT:  You may.  All right.

19         MS. CALL:  Permission to publish 439?

20         THE COURT:  You may.  All right.

21         MS. CALL:  Now 440.

22         THE COURT:  You may.  All right.

23         MS. CALL:  Permission to publish 441?

24         THE COURT:  You may.  All right.

25         MS. CALL:  Permission to publish 442.

2868

Robert Lewis - Redirect

1          THE COURT:  You may.  All right.

2          MS. CALL:  443.

3          THE COURT:  You may.  All right.

4          MS. CALL:  Government's Exhibit 444?

5          THE COURT:  You may.  All right.

6          MS. CALL:  445?

7          THE COURT:  You may.  All right.

8          MS. CALL:  446?

9          THE COURT:  You may.  All right.

10          MS. CALL:  And now 447.

11          THE COURT:  You may.  All right.

12          MS. CALL:  Now the government seeks to offer and

13  publish another summary exhibit, Government's Exhibit 9.

14          THE COURT:  Any additional objections as to Exhibit 9?

15          Exhibit 9 will be admitted.

16          Ladies and Gentlemen, as Ms. Call has mentioned, this

17  is another summary exhibit.  The same admonition that I gave

18  you to Exhibit 4 applies to this summary exhibit.  You may

19  display that exhibit.

20          MS. CALL:  Thank you, Your Honor.

21          THE COURT:  All right.

22          MS. CALL:  The government now seeks to publish

23  previously admitted Exhibit 9714, which I believe is subject to

24  a limiting instruction.

25          THE COURT:  Ladies and Gentlemen, as to Exhibit 9714,

Robert Lewis - Redirect

1    that has been admitted, but the jury may consider that exhibit

2    against Mr. Mulrenin only, Mr. Mulrenin only.

3              You may display it.

4              MS. CALL:  Thank you, Your Honor.  There is actually

5    an attachment, 9715, if we could publish that as well side by

6    side.  And I believe it is subject to the same limiting

7    instruction.

8              THE COURT:  You may publish it side by side.

9              Ladies and Gentlemen, Exhibit 9715, same limiting

10   instruction.  You may consider it against Mr. Mulrenin only.

11             JUROR:  Your Honor, we can't really see this.

12             MS. CALL:  Perhaps we can do one at a time.

13   Ms. Golshanara, perhaps you could do 9714 and zoom in on the

14   content of the e-mail, please.

15             THE COURT:  All right.

16             MS. CALL:  If we can now publish 9715.

17             THE COURT:  You may.

18             MS. CALL:  Thank you.

19             THE COURT:  All right.

20             MS. CALL:  Permission to publish Exhibit 982, which

21   was previously admitted.

22             THE COURT:  982?

23             MS. CALL:  Yes.

24             THE COURT:  You may.

25             MS. CALL:  Thank you.

Robert Lewis - Redirect

1              *THE COURT:*  All right.

2              *MS. CALL:*  The government now offers and seeks to

3    publish another summary exhibit, Exhibit 10.

4              *THE COURT:*  Any additional objections as to

5    Exhibit 10?  Exhibit 10 will be admitted.

6              Ladies and Gentlemen, once again, this is one of those

7    summary exhibits, same admonitions as for the other summary

8    exhibits.  Exhibit 10 may be published.

9              *MS. CALL:*  Thank you, Your Honor.

10             *THE COURT:*  All right.

11             *MS. CALL:*  This one is five pages.  Ms. Golshanara, if

12   you could go to the second page.

13             *THE COURT:*  All right.

14             *MS. CALL:*  If we could turn to page 3, please.

15             *THE COURT:*  All right.

16             *MS. CALL:*  If we can turn to page 4, please.

17             *THE COURT:*  All right.

18             *MS. CALL:*  And now the last page of Government's

19   Exhibit 10, please.

20             *THE COURT:*  All right.

21             *MS. CALL:*  The government now offers but doesn't seek

22   to publish Government's Exhibit 900, which is I believe subject

23   to an 803(6) agreement between the parties.

24             *THE COURT:*  Any objection to the admission of

25   Exhibit 900?  Exhibit 900 will be admitted.

Robert Lewis - Redirect

1    And then after this one, we will go ahead and take our

2    mid-morning break.  Even though, Ladies and Gentlemen, we got a

3    late start, normally we might go until 10:30, but I am a little

4    bit concerned that the people in the courtroom may have been

5    dutifully waiting around to see if the IT problem got fixed,

6    and so they may need a break.

7        MS. CALL:  So the next one to publish would be

8    Government's Exhibit 1177, which was previously admitted and

9    subject to a limiting instruction.

10       THE COURT:  Okay.  We will take 1177, then we'll take

11   the break.

12       Ladies and Gentlemen, Exhibit 1177 has been admitted.

13   However, it is subject to a limiting instruction; namely, this

14   exhibit can be considered against Mr. Mulrenin only,

15   Mr. Mulrenin only.

16       MS. CALL:  Permission to publish?

17       THE COURT:  You may.

18       MS. CALL:  Thank you.

19       THE COURT:  All right.

20       MS. CALL:  Not to sound like the prelude to a

21   commercial break, but I think there's about six more after the

22   break.

23       THE COURT:  Ladies and Gentlemen, we will go ahead and

24   take the mid-morning break.  Why don't we plan on reconvening

25   at 10:35.  The jury is excused.

Robert Lewis - Redirect

1         We will be in recess.  Thank you.

2       (Recess at 10:22 a.m. until 10:37 p.m.)

3         MS. CALL:  Over the break, we received word that now

4   Defendant Austin's counsel do not plan to admit summaries, but

5   they cannot speak on behalf of all 10.  From what the

6   government knows right now, Defendant Mulrenin will not be

7   offering summary exhibits; Defendant Austin will not;

8   Defendant Roberts will be deciding by noon; and we haven't

9   heard from the other defendants.

10        MR. POLLACK:  Your Honor, I have an issue that I would

11  like to raise with the Court.  Specifically on behalf of

12  Mr. Blake, I would like to move for a mistrial.  And I don't do

13  that lightly.  I would like to be heard on it, but I am

14  conscious of the fact the jury is waiting.  I tried to raise it

15  before the break, but the Court left, and I just didn't have

16  the opportunity.  I am more than happy to address it now, but

17  it may take a few minutes.

18        THE COURT:  Well, it depends on how long you think it

19  would take to articulate it.  We could do that right at the

20  lunch break too.

21        MR. POLLACK:  It will take me three or four minutes to

22  present the basis and then whatever argument the Court wants to

23  hear on it.

24        THE COURT:  Okay, go ahead.

25        MR. POLLACK:  Your Honor, this relates to the issue of

2873

Robert Lewis - Redirect

 1   Mr. Lewis' testimony.  I am conscious of the Court's comments

 2   that it is not the Court's job to police the truth, and I agree

 3   with that, but a trial is supposed to be a search for the truth

 4   and that requires that each side only present evidence that it

 5   has a good-faith basis for.  In this instance, the government

 6   knowingly elicited false testimony and, in fact, knowingly

 7   elicited testimony that they knew was materially false.

 8        Mr. Torzilli asked Mr. Lewis what the average price

 9   increase was from 2014 to 2015, and Mr. Lewis said 15 cents.

10   Not happy with that answer, Mr. Torzilli then went on and

11   asked, Well, the average was 15; what was the range, and

12   elicited testimony that the range was from 15 to 20.  Well,

13   obviously if the range was 15 to 20, if that were actually

14   truthful, then the average wouldn't have been 15, but the fact

15   of the matter is all of that testimony was false.

16        Mr. Lewis already testified from J-008, which the

17   government did not object to and which the government has not

18   disputed any of the figures in J-008, and according to that

19   exhibit, Pilgrim's went up about 16 cents; Claxton about

20   14 cents; Tyson 15; Koch 11-1/2; Mar-Jac 15; Case 11; and

21   George's just under 11, about 10.9.  So the range, in fact, was

22   not 15 to 20.  The range was about 11 to 16.  The average was

23   not 15.  The average was about 13.  Again, this is material

24   testimony.

25        The 2014 to 2015 price increase is the core to the

Robert Lewis - Redirect

1    government's case.  Mr. Lewis, the government's own witness,

2    said that even a single penny is significant, and the

3    government specifically elicited that the price increase for

4    George's was between 15 and 20 cents knowing that, in fact, it

5    was less than 11 cents.  That is a difference of millions of

6    dollars.

7           Mr. Torzilli did not deny that he knew that George's

8    did not go up 15 to 20 cents when he elicited this testimony.

9    Rather, he said he could get to that 15 to 20 percent range if

10   one made a different comparison comparing the 2015 price

11   increase with the Period 13 price.

12          Your Honor, with all due respect, generously that is

13   just sophistry.  The Period 13, as Mr. Lewis testified in the

14   first trial, is wholly irrelevant to these negotiations.

15   Nobody even knew what the Period 13 prices were going to be

16   when these negotiations took place.  Of course, the defendants

17   had no opportunity to cross-examine on that point because there

18   had been no testimony about Period 13.  This was redirect.

19   There had been no testimony about Period 13 in the direct or in

20   the cross-examination, and that's simply not what the jury was

21   told.  The jury was not told this was a comparison with

22   Period 13 prices.

23          The jury was led to believe that George's went up

24   between 2014 and 2015 by 15 to 20 cents when the real number

25   was less than 11.  This is not subject to debate.  It is

Robert Lewis - Redirect

1    objective fact.  It was -- the government knew it was false,

2    knew it was materially false.  And I understand, Your Honor,

3    that I can argue everything I have just said in closing, but,

4    Your Honor, that simply is not the way trials are supposed to

5    work.  The government knowingly elicits false testimony, and

6    then it's up to the defendants to argue the falsity in closing

7    argument.

8         Your Honor, reluctantly I move for a mistrial, and

9    alternatively, if the Court is not inclined to grant a

10   mistrial, I do ask for a curative instruction that that was

11   false testimony.  It should be stricken and disregarded.

12        *THE COURT:*  Thank you, Mr. Pollack.

13        Mr. Torzilli?

14        *MR. TORZILLI:*  I don't appreciate the accusation that

15   it was false testimony.  I think Mr. Lewis under oath has

16   answered each and every question he was posed by every single

17   lawyer in this room truthfully and to the very best of his

18   knowledge and ability, including his recollection of the price

19   increases.

20        The range of 15 cents to 20 cents that he testified to

21   is entirely supported by his view that prices went up by

22   precisely that amount, and that's fully indicated in an exhibit

23   that was admitted at the last trial, Government's Exhibit 10-4,

24   which shows a 20-cent increase for Pilgrim's, a 17-cent

25   increase for Claxton, a 17-cent increase for Tyson, a 15-cent

Robert Lewis - Redirect

1    increase for Koch, a 16-cent increase for George's, and an

2    18-cent increase for Mar-Jac.  That's his recollection.  That's

3    what he testified to.

4          And what's important about that is that's what the KFC

5    franchisees actually wound up experiencing as a price increase,

6    of course, because that was the price on December 31st, 2014

7    versus the price on January 1st, 2015.  So I think that's his

8    recollection of it, and that's what he was testifying to.  And

9    I am not sure really beyond that what I can say other than I

10   think Mr. Lewis answered all the questions truthfully to the

11   best of his ability.

12          THE COURT:  Mr. Pollack?

13          MR. POLLACK:  Your Honor, Mr. Torzilli is citing an

14   exhibit that was entered in the last trial that has not been

15   entered in this trial.  So this jury certainly did not

16   understand that he was comparing something to 1041, something

17   that has not been an exhibit at this trial, and there's a

18   reason it hasn't been an exhibit at this trial, because it

19   makes this false comparison to Period 13.

20          Mr. Torzilli could have presented it, could have

21   argued it was a valid comparison.  But what he knows from the

22   first trial and the jury does not know is that Mr. Lewis in the

23   first trial himself agreed that Period 13 is completely

24   irrelevant to this negotiation and that that is not a

25   meaningful comparison.

Robert Lewis - Redirect

1          And let me be clear.  I am not suggesting that

2     Mr. Lewis understood that the testimony was false.  I am

3     suggesting that Mr. Torzilli understood that the testimony was

4     false.  Mr. Lewis was not given the opportunity by Mr. Torzilli

5     to look at the documents.  He had already looked at the

6     documents, and he had already testified as to what the

7     objective facts were.  He was asked to call up a recollection

8     without aid of the documents, and Mr. Torzilli knew that

9     recollection was false and did nothing to correct it.  He did

10    nothing to correct it because he wanted to leave that

11    misleading impression with the jury, and that is precisely why

12    I am moving for a mistrial.

13          *THE COURT:*  All right.  Thank you.

14          So for a mistrial, the district court has discretion

15    to grant one if the defendant's right to a fair and impartial

16    trial has been impaired.  Here we don't have a situation of --

17    as Mr. Pollack noted, this is not a question of false

18    testimony.  Mr. Lewis probably was not testifying falsely.  He

19    may have had a basis based upon that exhibit introduced in the

20    last trial to say what he wanted to say.  The issue is really

21    whether or not the United States presented something that was

22    purposefully misleading because that document has not been

23    introduced in this particular trial.

24          So the question is what type of prejudice inures to

25    Mr. Blake, what type of -- whether he has been denied the right

Robert Lewis - Redirect

1    to a fair trial.  And I hold that he has not.  It is true that

2    Mr. Pollack did not have an opportunity to talk about those

3    issues with Mr. Lewis, but the fact of the matter is that

4    through J-008 the -- his testimony, since the jury doesn't have

5    the benefit of that previous exhibit, the only evidence is what

6    is reflected already in J-008.

7            Why the government would want to elicit that testimony

8    which can be easily contradicted and have Mr. Lewis' testimony

9    be subject to rather easy contradiction is hard to understand,

10   but because of that fact, it seems like Mr. Lewis' credibility

11   can be called into question as to that even if he had a factual

12   basis to be able to do it.  But because Mr. Blake will have the

13   opportunity to make that argument and because that argument

14   coming as it will through numbers that even Mr. Lewis himself

15   went over, there can't be any prejudice to him, so I will deny

16   the motion for mistrial.

17           Ms. Henry?

18           *MR. POLLACK:*  I am sorry, could the Court also

19   exclusively address my request for relief of the curative

20   instruction?

21           *THE COURT:*  I am not going to do that because were I

22   to do that, I would have to essentially call the jury's

23   attention -- I would either have to strike the testimony, which

24   is arguably something that Mr. Lewis is not testifying about

25   untruthfully, or tell the jury that it's some type of testimony

Robert Lewis - Redirect

1   that's purposefully misleading.  But once again, it can be

2   contradicted through an exhibit that Mr. Lewis himself went

3   over, and for that reason I am not going to take that

4   particular step.

5          Ms. Henry?

6          *MS. HENRY:*  Your Honor, Defendant Kantola wants to be

7   clear we also join in the motion, and we wanted to point out to

8   the Court *United States v. Harris*, 498 F.2d 1164 at 1169.  It's

9   a Third Circuit case.  And I quote, "When it should be obvious

10  to the government that the witness' answer although made in

11  good faith is untrue, the government's obligation to correct

12  that statement is as compelling as it is in a situation where

13  the government knows that the witness is intentionally

14  committing perjury."

15         *THE COURT:*  That is factually distinguishable.  That's

16  not the situation that we just had.  So Mr. Kantola's motion

17  will be denied for the same reason I denied Mr. Blake's.

18         All right.  Let's bring the jury back in.

19         (Jury present.)

20         *THE COURT:*  Ms. Call, go ahead.

21         *MS. CALL:*  The government will now offer and seek to

22  publish another summary exhibit, Government's Exhibit 11.

23         *THE COURT:*  Once again, Ladies and Gentlemen, this is,

24  as Ms. Call said, this is another summary exhibit, so that

25  admonition that I read to you earlier in the day as to

Robert Lewis - Redirect

1    Exhibit 4 applies equally to Exhibit 11.

2            Exhibit 11 may be published to the jury, first page.

3            *MS. CALL:*  Thank you.

4            *THE COURT:*  All right.

5            *MS. CALL:*  Ms. Golshanara, can you move to page 2?

6            *THE COURT:*  All right.

7            *MS. CALL:*  The next exhibit is Government's

8    Exhibit 12, another summary exhibit.

9            *THE COURT:*  Another summary exhibit, Ladies and

10   Gentlemen, the same admonition as to that one.

11           You may display it.

12           *MS. CALL:*  Thank you, Your Honor.

13           *THE COURT:*  All right.

14           *MS. CALL:*  If we can turn to page 2.

15           *THE COURT:*  All right.

16           *MS. CALL:*  Now, permission to publish and I believe

17   already admitted Government's Exhibit 901 subject to a limiting

18   instruction.

19           *THE COURT:*  All right.  Ladies and Gentlemen,

20   Exhibit 901 has been admitted.  However, it is subject to the

21   following limiting instruction; namely, that it can be

22   considered against Mr. Kantola only, against Mr. Kantola only.

23           *MS. CALL:*  Permission to publish?

24           *THE COURT:*  You may.

25           *MS. CALL:*  Thank you.

Robert Lewis - Redirect

1          THE COURT:  All right.

2          MS. CALL:  Next the government seeks permission to

3  publish already admitted Government's Exhibit 933, which I

4  believe is also subject to a limiting instruction.

5          THE COURT:  Ladies and Gentlemen, so this exhibit has

6  statements from a Ms. Sheri Garland.  Her statements can be

7  considered only for the effect on the listener, not on the

8  truth of any matter that Ms. Garland asserts.

9          You may publish that.

10          MS. CALL:  Thank you.

11          THE COURT:  All right.

12          MS. CALL:  Now the government will seek to publish

13  another previously admitted document, Government's Exhibit

14  1030.

15          THE COURT:  Has that been published before?

16          MS. CALL:  No, Your Honor.

17          THE COURT:  Okay.  You may do so.

18          MR. TUBACH:  I believe, Your Honor, it may have been

19  published before, in which case we do object to it being

20  published.

21          MR. LAVINE:  It was already published, Your Honor.

22          THE COURT:  That's my recollection.  It's already been

23  published.

24          MS. CALL:  May I have a moment to check, Your Honor?

25  Because I am nearly certain it has not.

Robert Lewis - Redirect

1                THE COURT:  Sure.

2                MS. CALL:  Your Honor, our records are showing it was

3      not published.

4                THE COURT:  Any disagreement?

5                All right.  It may be published.

6                MS. CALL:  Thank you.

7                THE COURT:  All right.

8                MS. CALL:  With that, Your Honor, the government rests

9      its case.

10                THE COURT:  Ladies and Gentlemen, when the government

11      rests its case, that means that the evidentiary -- its case in

12      chief has been completed.  So at this point in time, I am going

13      to do a side bar.  Let's go ahead with that.

14           (At the bench:)

15                THE COURT:  Why don't we see if I can actually find a

16      case caption.  Why don't we do what we did before.  I will give

17      each defendant an opportunity to do what we refer to as a

18      placeholder Rule 29 motion, and remind me at some later point

19      today we will talk about when the deadline should be for the

20      filing of those.

21                First of all, on behalf of Mr. Penn, Mr. Tubach, go

22      ahead.

23                MR. TUBACH:  Thank you, Your Honor.

24                On behalf of Mr. Penn, I move for judgment of

25      acquittal under Rule 29 because the evidence is insufficient to

Robert Lewis - Redirect

1   sustain a conviction.  Pursuant to the Court's direction just

2   now, we will supplement this oral motion with a written

3   submission by the date the Court directs.

4         THE COURT:  Thank you, Mr. Tubach.

5         On behalf of Mr. Fries?

6         MR. KORNFELD:  Thank you, Your Honor.

7         On behalf of Mr. Fries, I also would make a rule -- a

8   motion for a judgment of acquittal under Rule 29 due to

9   insufficiency of the evidence of the government's case.  We

10  also, of course, will supplement this oral placeholder motion

11  in writing.

12        THE COURT:  Thank you, Mr. Kornfeld.

13        On behalf of Mr. Brady?

14        MR. LAVINE:  This is Bryan Lavine.  I move on behalf

15  of Mr. Brady for judgment of acquittal under Rule 29 based on

16  the fact that the evidence is insufficient to sustain a

17  conviction in this case, and we will supplement with the

18  written motion according to the Court's direction as far as

19  timing.

20        Thank you, Your Honor.

21        THE COURT:  Thank you, Mr. Lavine.

22        On behalf of Mr. Austin?

23        MR. FELDBERG:  Your Honor, Michael Feldberg on behalf

24  of Roger Austin.  We move pursuant to Rule 29 of the Federal

25  Rules of Criminal Procedure for judgment of acquittal on the

Robert Lewis - Redirect

1    ground that the evidence is insufficient to sustain a

2    conviction.  We will file a written motion according to the

3    schedule set by the Court.

4         THE COURT:  All right.  Thank you, Mr. Feldberg.

5         On behalf of Mr. Mulrenin?

6         MS. PREWITT:  Thank you, Your Honor.

7         Elizabeth Prewitt on behalf of Mr. Mulrenin.  On

8    behalf of Mr. Mulrenin, we move for a motion for acquittal

9    pursuant to Rule 29 based on the insufficiency of evidence to

10   sustain a conviction, and we will also file a written motion

11   and supplement.

12        THE COURT:  All right.  Thank you, Ms. Prewitt.

13        On behalf of Mr. Kantola?

14        MS. HENRY:  Thank you, Your Honor.

15        This is Roxann Henry on behalf of Mr. Kantola.

16        We move for a judgment of acquittal under Federal

17   Rules of Evidence Rule 29 because the evidence is insufficient

18   to sustain a conviction under either the per se or rule of

19   reason standard and because of a variance with the Indictment

20   and because the prosecution is unconstitutional under the

21   vagueness doctrine.  Pursuant to the Court's instructions, we

22   will file a written submission to supplement this.

23        Thank you very much.

24        THE COURT:  All right.  Thank you, Ms. Henry.

25        And on behalf of Mr. Little?

Robert Lewis - Redirect

1          MR. BYRNE:  Yes, Your Honor, this is Mark Byrne on

2    behalf of Mr. Little.

3          We move for a judgment of acquittal under Rule 29

4    because the evidence is insufficient to sustain a conviction,

5    and, of course, pursuant to your direction, we will supplement

6    our oral motion with a written submittal by the date that you

7    direct.

8          THE COURT:  Thank you, Mr. Byrne.

9          And on behalf of Mr. Lovette?

10         MR. FAGG:  Thank you, Your Honor.

11         On behalf of Bill Lovette, we move for judgment of

12   acquittal under Rule 29 on the basis that there is insufficient

13   evidence to sustain a conviction against Mr. Lovette, including

14   insufficient evidence that Mr. Lovette joined in any conspiracy

15   much less the charged conspiracy.  We also adopt the motions

16   and arguments of the other defendants pursuant to -- they have

17   made pursuant to Rule 29, and we will file a supplemental

18   motion pursuant to -- the written motion pursuant to the

19   Court's instruction.  And we also join in Mr. Blake's earlier

20   motion for a mistrial.

21         THE COURT:  As to the motion for mistrial, that will

22   be denied for the same reason that I denied the other two

23   motions for mistrial, and otherwise thank you, Mr. Fagg.

24         And on behalf of Mr. Roberts?

25         MR. GILLEN:  On behalf of Mr. Roberts, we would move

1    for judgment of acquittal pursuant to Rule 29 based upon the

2    fact that there is insufficient evidence against Mr. Roberts to

3    sustain or to find a conviction.  We also adopt the arguments

4    of other counsel regarding a variance of the Indictment and the

5    other arguments, legal arguments made herein, and we will also

6    file pursuant to the Court's direction a written request for a

7    Rule 29.

8           *THE COURT:*  Thank you, Mr. Gillen.

9           On behalf of Mr. Blake?

10          *MR. POLLACK:*  Thank you.  Mr. Pollack on behalf of

11   Mr. Blake.

12          Mr. Blake also moves for judgment of acquittal under

13   Rule 29.  The evidence even taken in the light most favorable

14   to the government is insufficient even if Mr. Pepper's

15   testimony is credited.  All that testimony was that they both

16   had an understanding that there would be a significant price

17   increase, something that the government witness, Robbie Bryant,

18   said everybody in the industry knew.  There is no evidence that

19   Mr. Blake had the ability to affect George's prices or that he

20   knowingly joined a conspiracy sharing an objective to align

21   bids or fix prices.

22          If the Court is not prepared to grant the motion

23   immediately, then Mr. Blake would like the opportunity to

24   supplement the motion in writing.

25          *THE COURT:*  I will give you that opportunity.  Thank

Robert Lewis - Redirect

1   you very much, Mr. Pollack.

2          MR. POLLACK:  Thank you, Your Honor.

3          THE COURT:  Ms. Prewitt, so is Mr. Mulrenin then

4   prepared once we end this bench conference to do his opening?

5          MS. PREWITT:  Yes, Your Honor.

6          MR. TUBACH:  I had mistakenly thought that a mistrial

7   motion by one would be deemed joined by all, but I suppose that

8   joint rule was just about objections, so I would make the same

9   motion on behalf of Mr. Penn.  I would join Mr. Blake's motion

10  on behalf of Mr. Penn.

11         THE COURT:  Anyone else wish to join the motion, in

12  which case I will give you the opportunity to make a record on

13  that?

14         MS. PREWITT:  Mr. Mulrenin joins the motion as well.

15         MR. FELDBERG:  Mr. Austin joins as well, Your Honor.

16         THE COURT:  On behalf of Mr. Fries, Mr. Kornfeld, I

17  didn't hear you.  It looks like you are nodding.

18         MR. KORNFELD:  Yes, thank you, Your Honor.

19         THE COURT:  Anyone else?

20         MR. LAVINE:  Mr. Lavine on behalf of Mr. Brady, I join

21  in the motion for mistrial.

22         THE COURT:  Anyone else?

23         MR. BYRNE:  Yes, Your Honor, Mr. Little does also.

24  Thank you.

25         THE COURT:  Okay.

Robert Lewis - Redirect

1          MR. GILLEN:  Your Honor, I think that my joining was a

2   part of the report, but I was speaking over somebody else.

3   Defendant Roberts joins the motion as well.

4          THE COURT:  Right.  I think we have got everyone now.

5   Each of those motions that I haven't already ruled on will be

6   denied for the same reasons I denied Mr. Blake's motion for

7   mistrial.  Thank you.

8      (In open court:)

9          THE COURT:  Ladies and Gentlemen, once the government

10   rests, then the defense has the opportunity, but you will

11   recall from my instruction at the very beginning of the case,

12   they don't have any obligation to present any evidence, but if

13   they wish to, they can.

14          You will also remember that Mr. Mulrenin deferred his

15   opening statement, so at this time we will inquire of

16   Mr. Mulrenin as to whether he wishes to present an opening at

17   this time.

18          Ms. Prewitt?

19          MS. PREWITT:  Thank you, Your Honor.  We do.

20          THE COURT:  Go ahead.

21          MS. PREWITT:  May I proceed, Your Honor?

22          THE COURT:  Yes, you may.

23                        **OPENING STATEMENT**

24          MS. PREWITT:  Ladies and Gentlemen of the Jury, in

25   order to fix prices, you need to have the ability to fix a

Robert Lewis - Redirect

1   price.  You need to be able to fix a price.  And I know that

2   seems very obvious, but then again, here we all are with a

3   salesman from Tyson and another salesman on trial, and these

4   salesmen came from Tyson Foods.

5          Tyson is one of the largest and most sophisticated

6   chicken suppliers in the country.  It grew to over 100,000

7   employees, and it grew because it fought in the marketplace for

8   sales.  It duked it out.  It battled with the same suppliers

9   you've heard about.

10          Mr. Mulrenin worked as a salesman at Tyson.  He worked

11  as a salesman at Tyson, but did not have the authority to come

12  up with prices to quote to customers.  That was true for all

13  the salespeople at Tyson.  That was true for Brian Roberts.

14  That was true for Carl Pepper.

15          And, Ladies and Gentlemen, the prosecution's case

16  here, it focuses on salespeople.  And you will hear that at

17  Tyson salespeople played a very small part of a much bigger

18  picture when it came to coming up with pricing that went to the

19  customers.

20          The prosecution only wants you to focus on Tyson

21  salespeople because they don't have the executives.  They don't

22  have the pricing people who actually came up with and decided

23  on price.  But that's just not enough.  It's not enough just to

24  look to salespeople.  Tim Mulrenin could not enter into an

25  agreement to fix Tyson's prices.  No one from Tyson's sales

Robert Lewis - Redirect

1   team could do that.

2          Here is the key point here, Ladies and Gentlemen.  The

3   key point here is the prosecution's case will show no evidence

4   of anyone at Tyson with authority to decide upon and set

5   prices.  You will not hear any evidence bringing them into this

6   supposedly, supposed conspiracy story as a co-conspirator, as

7   an individual who was part of what they claim happened.  The

8   evidence will show exactly why how at Tyson that just couldn't

9   happen.

10          Ladies and Gentlemen, Marci LaBranche and I are

11   privileged to stand here, to stand up for Tim Mulrenin.  And,

12   Tim, please stand for a second.  We'll show you a picture

13   because he is a masked man throughout this entire trial.  Tim

14   started to -- he worked at Tyson as a salesperson from the year

15   2000.  He was 38 years old.  And he is 59 years old now.  Aside

16   from a few years where he worked at another company, he spent

17   his whole career working at Tyson as a salesman, being somebody

18   that his customers and his co-workers could count on.

19          For much of the time he was at Tyson, he reported to

20   Brian Roberts, and Carl Pepper reported to Tim Mulrenin.  You

21   will hear about how they lived in different parts of the

22   country, how they did their day-to-day business over the phone,

23   lots of calls, calls to get the job done to make sure customers

24   were satisfied and the chicken was delivered.  Expect to see

25   many calls between them.

Robert Lewis - Redirect

1        You will learn that in 2018 Tim moved on to another

2   chicken supplier.  He moved to a chicken supplier with

3   headquarters closer to his family in the northeast, his wife

4   and three young daughters, his five sisters and his brother.

5   Tim remains employed with that supplier, that chicken supplier

6   to this day.  He remains a salesman to Chick-fil-A to this day.

7   Even with the dark cloud of this criminal indictment over his

8   head, they still trust him with their business.

9        But the prosecution's story here, it doesn't focus on

10  his time now.  It focuses on when he was a salesperson at

11  Tyson.  His role at Tyson, how he earned a living was to win

12  sales contracts.  That's what he was paid for.  That's what

13  Tyson salespeople were paid to do.  It was to win contracts to

14  sell more chicken.  And how do you do that?

15       Ladies and Gentlemen, you will hear it was by quoting

16  lower prices.  That's exactly what you will hear that

17  Tim Mulrenin did.  Salesmen like Tim Mulrenin had the

18  motivation, had the motive to quote lower prices, to win sales

19  contracts, to secure more volume for Tyson, not raise prices

20  and risk sales volume.  That's not what salesmen focused on.

21       You will even hear from one witness that complained

22  that Tim Mulrenin and Brian Roberts were actually siding with

23  the customer because they kept quoting lower prices.  They kept

24  pushing back against the pricing team wanting to secure higher

25  prices.  They did this why?  They did this to win business away

Robert Lewis - Redirect

1    from the rivals that you've heard about because Tim and Tyson

2    were always competing.

3            Now, Ladies and Gentlemen, you have heard about the

4    burden of proof here.  The burden of proof, standard the

5    prosecution has to prove its case by, the standard it is held

6    to is the highest one.  It is the highest standard of proof

7    under the law and for good reason.  For this felony criminal

8    charge, they must prove Tim Mulrenin guilty, guilty beyond a

9    reasonable doubt, guilty of knowingly joining an agreement to

10   fix prices and rig bids.

11           We are standing before you now as a choice.  We don't

12   have to stand up at all, but we are choosing to do that.  We

13   are choosing to do that so that you have the fuller picture so

14   that you are not misled, because there is just so much at stake

15   here.

16           Now, the prosecution cannot, they cannot prove that

17   Tim Mulrenin agreed with anybody, anybody to fix prices or rig

18   bids, because it just did not happen.  The bottom line and the

19   truly scary part of all of this is we are here today because

20   the prosecution fundamentally did not understand how Tyson

21   worked.  It didn't know how the market worked.  And they didn't

22   try to figure out more to understand what they misunderstood.

23   They didn't understand the reality.

24           And by the time they talked to some of the individuals

25   that we will bring to you as the defense, by the time they

Robert Lewis - Redirect

1    talked to the actual people who did the work so that they could

2    understand how far off the mark they were, it was too late.

3    The charge against Tim Mulrenin had already been filed and

4    there was no turning back.  And this is why Tim Mulrenin has

5    been unjustly forced to stand trial here.  This trial is a

6    nightmare with his reputation, his career, and so, so much more

7    are at stake.

8          And it's important to level set on a critical point

9    here.  It's one you have heard about before, but it's key, and

10   Judge Brimmer will instruct you on the law, but there are

11   things to focus on, key points.  There is nothing unlawful

12   about salespeople talking to each other, talking to each other

13   about finding out what's going on in the market, to get the

14   pulse, understand what the competition is doing, to feel

15   comfort that their price was not out of whack with the market.

16   This information gave them ammunition, ammunition to push back

17   against their pricing unit when they wanted to secure high

18   prices, prices that they thought were too high and might lose

19   sales, might risk sales.

20         And that's what you heard and you will hear

21   Tim Mulrenin did, he pushed back, reacting to the competition

22   by pushing down prices.  Customers like the buyers for KFC,

23   Popeye's, Church's, you will see evidence they all talked to

24   each other.  They did it to get an edge.  They did it to drive

25   a harder bargain with suppliers.  They did it to compete.  And,

2894

Robert Lewis - Redirect

1    Ladies and Gentlemen, there is nothing illegal about that

2    either.  Knowing what the competition might do or will do and

3    then pricing independently, that is not an agreement.  It's not

4    an agreement to fix prices.

5            Now, at Tyson it was the pricing people that set the

6    prices and the price ranges that the salesmen could then take

7    to the customer.  You will hear about there were several units

8    at Tyson with many people.  You will hear about the supply and

9    demand department, the forecasting department, the pricing

10   unit, the business unit.  The business unit owned the price.

11   They made the final decision.  They made the final call.

12           And you will hear how the business unit set prices or

13   price ranges taking into account a number of factors, even

14   knowledge that the salespeople share about their customer and

15   how their customer might react.  But conspiring with

16   competitors to fix prices was not one of those factors.  It was

17   not something they took into forming that decision when they

18   made that decision.

19           So at Tyson when the sale team was given a quote to go

20   to the customer with, that's what they did.  You will hear from

21   the witnesses that the defense puts on, the people at Tyson

22   with the calculator and the pencils, Excel spreadsheets, those

23   are the ones that worked up prices.  You will hear from the

24   executives who actually made the call, and they will testify

25   that they made their decisions independently, not based on any

Robert Lewis - Redirect

1    conspiratorial agreement.

2         So let's talk about discussions among suppliers, among

3    competitors.  They needed to happen.  They needed to happen

4    because we are talking about a food distribution network.  We

5    are talking about a lot of calls.  Expect to see them.  There

6    were discussions between salespeople covering lots of topics,

7    including any intelligence about where the market was.

8         And when it came to Carl Pepper, the salesman at

9    Tyson, his conversations were about learning what the market

10   was or where it would be going.  And the evidence will show

11   when it came to Carl Pepper, we are talking about all talk and

12   no action.

13        Carl Pepper's gossip, water-cooler conversation,

14   discussions, whatever it was, market intelligence, whatever

15   label you want to put on it, it's just that.  It's just talk.

16   You will not see or hear any evidence that connects Carl Pepper

17   to a fixed price or a rigged bid.  You will not see or hear any

18   evidence that connects any discussions from -- with anybody at

19   Tyson to a fixed price or a rigged bid.

20        Let's talk about that KFC 2015 contract.  You've heard

21   a lot about that.  You will hear more, the one that was

22   negotiated in the summer of 2014.  You are going to hear -- you

23   are going to hear from the witnesses we will bring to you who

24   will testify that sales had nothing to negotiate over.  The

25   role of sales is to get the customer comfortable with the

Robert Lewis - Redirect

1    19-cent increase which had already been decided by the business

2    unit months before.

3            And any conversations that Carl Pepper did or didn't

4    have just didn't matter.  Even for other contract negotiations

5    where the sales team was given a range that they could go to

6    the customer with, you will hear that they almost always came

7    out at the lower end of the range.  And, Ladies and Gentlemen,

8    you will understand why that makes sense.

9            Let's talk about cost.  You will learn how these are

10   just strange events to be included in the government's case.

11   It just doesn't add up.  You will hear from a witness about --

12   from Tyson's business unit, the people that actually decided on

13   the costs, how they priced cost at Tyson as a straight cost

14   pass-through, no profit added, no markup to the customer.

15           Remember the freezing charges, the quality assurance

16   requirement cost, the Chick-fil-A no antibiotic-free.  Those

17   costs, whole teams at Tyson were involved in working up those

18   costs.  Tyson simply figured out what the cost was to freeze

19   the chicken, what the cost was of conducting the quality

20   assurance audit, the cost of producing the antibiotic-free

21   chicken, and then pass it along to the customer.  The evidence

22   will show that any competitive intelligence that was sourced

23   could not lead to Tyson quoting above actual costs.

24           But the sales team did try to push for quotes below

25   actual costs.  Why?  To make the customer happy.  You will hear

Robert Lewis - Redirect

1    how Tyson competed against the other suppliers to win

2    contracts.  At the very same time, the prosecution wants you to

3    believe that Tyson was acting as a partner in crime with these

4    other companies.  They were duking it out in the marketplace.

5    They were fighting, fighting for sales.  How does that theory

6    make sense, the government's theory of collusion with that at

7    play?  Even during the negotiations the prosecution says are

8    part of its theory of a conspiracy, you will see evidence of

9    Tyson lowering prices to win more sales, to win more volume.

10          That KFC 2018 contract you have heard about, the one

11   that was negotiated in 2017, that's the one where Tim Mulrenin

12   on behalf of Tyson pushed for large volumes of discounts,

13   grabbed nine truckloads a week from its competitors, millions

14   of pounds of chicken over the course of that contract with

15   lower prices.  What kind of conspiracy is that?

16          Ladies and Gentlemen, let's talk about customers.

17   You're going to hear how customers, buyers used competitive

18   intelligence to beat down Tyson on price.  That's hard-nosed

19   business.  You will hear about Kent Kronauge from Popeye's,

20   really from SMS, buying cooperative for Popeye's, that he used

21   competitive intelligence, and he called the shots on prices.

22   When it came to Kent Kronauge, you will come to learn that the

23   customer is king.  Tyson wasn't fixing prices.  Its own

24   customer, Popeye's, was fixing the price it was willing to pay

25   to suppliers.

Robert Lewis - Redirect

1    The prosecution has built that case around the fact

2    that customers -- the prices went up to customers in 2014.  The

3    prosecution wants to mislead you into believing that this price

4    increase is because of price fixing.  It is not.  The price

5    increase, as we've heard a lot about, is about supply and

6    demand in a free market economy.

7    You will hear testimony the decision-makers at Tyson

8    were concerned about profitability, not just selling more

9    chicken.  That is why they had dozens of people working these

10   different groups to come up with prices to quote to customers,

11   prices that the business unit decided on, not salesmen, and

12   that is why Tyson did not leave pricing to the sales team.

13   What would happen if they left pricing to the sales team?

14   The evidence will show that the prosecution's theory

15   of Tyson salespeople fixing prices doesn't add up.  And during

16   the course of this trial, this will all become increasingly

17   clear to you.  You will see how this story is the hypothetical,

18   stitched-together one that actually couldn't work, it didn't

19   work, because that is not how Tyson in reality operated.  That

20   is not how the market operated.

21   It's a hypothetical that only works if you imagine

22   some connection between Carl Pepper's informal chats on one

23   hand and pricing decisions on the other.  But the evidence will

24   show that there is just no link between the two.  It's a

25   hypothetical that only works if you just ignore all of that

2899

Robert Lewis - Redirect

1    evidence, that inconvenient evidence of Tyson competing and

2    taking volume away from other suppliers.  It's a hypothetical

3    that only works if you leave out key facts, parts of e-mails,

4    certain phone calls.

5         This is the information that the -- the facts that the

6    government doesn't want to show you or doesn't want you to

7    focus on.  And you are going to learn during this trial that

8    the government had access to important evidence that it chose

9    not to show you, witnesses it decided not to call.  That will

10   be some of the most important evidence in this case.

11        The Court will instruct you that the burden of proof

12   rests with the prosecution the whole time, that Tim Mulrenin,

13   no defendant here needs to put on any evidence at all.  It's

14   the prosecutors that must prove their case against Tim Mulrenin

15   separately from all the other defendants here, and it must do

16   so beyond a reasonable doubt.

17        But the evidence will reveal how the prosecution's

18   case against Tim and the others here just doesn't meet that

19   standard.  It doesn't even come close.  The prosecution cannot

20   show you proof that doesn't exist.  You will not see one single

21   document.  You will not see one single text.  You will not hear

22   a snippet of a phone call.  You will not see an e-mail that

23   shows that Tim Mulrenin entered into an agreement with anybody

24   to fix prices or rig bids.  You won't see that with

25   Brian Roberts, and you will understand why that could not be.

Robert Lewis - Redirect

1      You will see that no one has Tyson's actual future

2  prices or costs.  Think about that.  No one knew Tyson's future

3  bid prices.  How could it be a partner in crime?  How could

4  Tyson or anyone with Tyson be a partner in crime and a

5  co-conspirator to rig bids if no one knew what they were going

6  to bid?  Look carefully at every price the prosecution puts

7  before you and claims comes from Tyson.  It's either current

8  pricing or it's plain wrong.  Do not be misled.

9      THE COURT:  Two minutes.

10      MS. PREWITT:  You are going to see summary charts.

11  You heard they are not evidence.  I am going to ask you to be

12  on guard for something else.  Let's call it the throw it up on

13  the wall and let's see what sticks.  You will see in the charts

14  that have documents and texts that absolutely nobody testified

15  about.  They just throw it in a chart and they ask you to

16  speculate.  They ask you to just go along with it.  Ask

17  yourselves, why didn't I hear a witness?  Why didn't I have

18  evidence about this?  Ladies and Gentlemen, look carefully.

19      There is some things not in dispute here.  Do

20  competing suppliers or even competing buyers talk to each

21  other?  Yes, of course, a lot.  We understand why that is.  It

22  was talk.  When it came to Tyson, it never amounted to an

23  agreement.  The business units and pricing units priced

24  independently.  Did the customer pay more for small-bird

25  products?  Sure, yes.  That's the free market, and that's not a

Robert Lewis - Redirect

1   crime.

2          The prosecution in this case wants you to put the two

3   things together, competitor conversations and price increases,

4   and say, oh, conspiracy.  The evidence is missing.  There is

5   not -- there is a critical missing piece they cannot show you.

6   They cannot show you the agreement to fix prices or rig bids.

7   It did not happen.

8          So why is Tim standing here?  Why is he facing trial?

9   Ladies and Gentlemen, he shouldn't be.  None of these men

10  should be facing trial right now.  But why are we here?  In

11  moments like this, there can be a tendency to fill in that gap,

12  to answer that question by assuming that somebody did something

13  wrong to be facing trial, because to leave that open, to not

14  answer that question is very uncomfortable.  How could that

15  happen?  After all, the world seems like a much less scary

16  place if we assume only unhealthy people get sick, only

17  reckless people end up in accidents, and only guilty people

18  have to face trial.  But we know that's not true.  We know

19  that's not true.

20         And that is why the law requires that we must presume

21  that those who stand accused are innocent, and that's what I

22  know you will -- what you will do for Tim.  And when you do

23  that for Tim, when you hold the prosecution to their burden,

24  you will see that the prosecution's case is missing the proof,

25  proof showing that Tim Mulrenin agreed with anybody to rig bids

2902

Robert Lewis - Redirect

1    or fix prices, proof that they can present to you beyond a

2    reasonable doubt.

3         It is the prosecution's burden to prove their case to

4    you.  It is a burden that is grounded in bedrock constitutional

5    principles, principles of justice that we hold dear as an

6    expression of who we are.

7         Ladies and Gentlemen, we know that you will hold them

8    to this burden, and at the end of the trial, we know that you

9    will find Tim Mulrenin not guilty.

10        On behalf of Tim Mulrenin, I thank you.

11        THE COURT:  Thank you, Ms. Prewitt.

12        Let's have a brief side bar.

13     (At the bench:)

14        THE COURT:  I forgot to look this up, but I think now

15   might be an appropriate time to let the jurors know that I may

16   use the term "defendants may call their next witness," but in

17   reality, each defendant has a right to call his own witnesses

18   without regard to what others may choose to do.

19        And I can't remember, Mr. Pollack may have suggested

20   some language at the last trial, but any other request by the

21   defense in terms of defendants may cooperate for the sake of

22   convenience or practicality or things of that nature?  I am

23   open to suggestion.

24        MS. HENRY:  Your Honor, this is Roxann Henry.  We do

25   believe it's critical that you be clear that it is -- when a

2903

Robert Lewis - Redirect

 1    witness is called, it is called by that particular defendant.

 2         THE COURT:  Okay.  Anyone else?  Someone may be trying

 3    to talk, but I can't hear if so.

 4         Mr. Lavine?

 5         MR. GILLEN:  Your Honor, I am a little bit concerned

 6    about that in the sense that we have been working with people

 7    to kind of coordinate on witnesses.  And so, for example, I am

 8    a little uncertain about whether an instruction that the

 9    specific lawyer is the one calling the witness is accurate.

10    Technically, it is, but I have a concern about that, so I don't

11    know what to do about it, but I have a concern.

12         THE COURT:  Yeah, I wouldn't suggest that the evidence

13    can only be considered by -- concerning that one defendant.  I

14    would just say that when I use the term "defendants may call

15    their next witness," what I am really saying is suggesting that

16    any given defendant can call a witness at that time, that I am

17    just using it as a convenient shorthand.

18         MR. GILLEN:  My suggestion if counsel has been working

19    jointly with other counsel and for a particular witness that

20    the Court may say "with approval of the other counsel," that,

21    for example, Defendant Roberts in conjunction with Defendant

22    So-and-So calls a particular witness.  That way at least it's

23    understood that we really are working jointly on that and

24    actively calling that person.  Whether we go first or second,

25    it doesn't matter.

Robert Lewis - Redirect

1          THE COURT:  Thoughts on that?

2          MR. FELDBERG:  Sounds reasonable to us, Your Honor.

3   This is Michael Feldberg.

4          MR. TUBACH:  That's fine with team Penn.

5          MS. HENRY:  That is fine with team Kantola.

6          THE COURT:  Can you repeat that again just so I get

7   that phrasing down?

8          MR. GILLEN:  For example, if Witness A is to be called

9   and that witness is essentially being called on behalf of the

10  coordination between, for example, the Roberts team and the

11  Mulrenin team and the Brady team, for example, then it could

12  be, with permission of counsel, the attorney doing the lead on

13  that examination can say, "And now on behalf of defendants, you

14  know, Brady, Mulrenin, Roberts, we call so and so."

15         THE COURT:  Okay.  Did someone else --

16         MR. TUBACH:  Your Honor, the other possibility is

17  rather than having to spell all that out in front of the jury,

18  which honestly they won't have any idea what that means, why

19  that is, I was going to suggest if -- for example, if counsel

20  for Kantola doesn't want to be perceived as calling witnesses,

21  we can simply have her make a record of not calling that

22  particular witness outside the presence of the jury.  The

23  jury's knowledge of that is sort of irrelevant as long as the

24  record is clear that Mr. Kantola isn't calling a particular

25  witness, and I think that solves the problem.  We don't need to

Robert Lewis - Redirect

1    get into having everyone stand up and say, Yeah, I would like

2    to sponsor that witness too.

3         THE COURT:  The other thing I can do to avoid that

4    problem is simply instead of saying "defendants may call their

5    next witness," I can just say "next witness" or something like

6    that.  That probably solves the problem.  That may be a better

7    way to do it.

8         MR. FAGG:  Your Honor, this is John Fagg.  I am a

9    little concerned about Mr. Gillen's approach and how the

10   defense have done this where certain witnesses have been

11   coordinated through certain counsel.  I wouldn't want there to

12   be a suggestion for a particular witness that Mr. Lovette

13   wasn't going to call that witness or that we want the jury to

14   have the perception that that evidence shouldn't be considered

15   against Mr. Lovette, so I think there are dangers with calling

16   out specific defendants.

17        THE COURT:  Right.  Why don't we do this.  I will

18   avoid using the phrase "defendants may call their next

19   witness," and also to the extent that an attorney may at the

20   time a witness is called indicate, you know, calling on behalf

21   of defendant X and Y, you can do what you want, but I won't say

22   anything about that just to avoid there being some judicial

23   gloss on it.

24        MR. POLLACK:  Your Honor, I think we had previously

25   discussed an instruction something to the effect that -- and I

Robert Lewis - Redirect

 1   think this was during the government's case, but regardless of

 2   on whose behalf a witness is called, that the jury can consider

 3   that testimony to be -- it's up to the jury to decide what

 4   relevance that witness' testimony has, if any, with respect to

 5   any particular defendant.

 6         And so I would -- I am fine with the Court's approach

 7   in terms of just saying "next witness" and allowing counsel to

 8   identify on whose behalf the witness is being called if they

 9   choose to do so.  But I would like it to be clear to the jury

10   that regardless of who is calling the witness, it's entirely up

11   to the jury to decide how to consider that testimony or if to

12   consider that testimony with respect to each defendant.

13         THE COURT:  As you will recall, we had an instruction

14   along those lines at the last trial, and presumably we would

15   have that same one now.  So I am not sure if people want me to

16   make some type of -- give the jury some type of direction along

17   what Mr. Pollack suggested at this point in the trial.

18         MS. HENRY:  Your Honor, this is Roxann Henry.  I do

19   just want to be clear that technically the witnesses are being

20   called by a particular defendant.

21         THE COURT:  Yeah, that's why I think what I'll do --

22   actually, let's have the government weigh in.

23         Mr. Koenig?

24         MR. KOENIG:  Yes, Your Honor.  I don't know that the

25   government has real strong feelings about this, although there

Robert Lewis - Redirect

1   is a very closely related issue we would like to raise.  So as

2   far as the wording and so forth, we don't really take a

3   position.

4         I did -- I must confess, though, that I am having

5   trouble locating Mr. Pollack's proposed instruction on the

6   real-time, and so maybe if we could get that repeated, because

7   I don't want to -- when it comes to a jury instruction, I want

8   to make sure I have heard the whole thing accurately.

9         THE COURT:  Mr. Pollack, did you want to repeat your

10  proposal?  We still haven't figured out what the other

11  defendants' position on that was, but if you have some

12  language.

13        MR. POLLACK:  Yes, Your Honor.  The Court would

14  instruct that regardless of who it is that is calling or

15  examining a witness, it is entirely up to the jury to decide

16  what relevance, if any, that witness' testimony has with

17  respect to any given defendant.

18        THE COURT:  Mr. Koenig?

19        MR. KOENIG:  We just heard this on the fly.  I am not

20  sure, but I don't think that's at all necessary and just is

21  going to be confusing.  It just seems, you know, Your Honor's

22  instructions at the end of the closing evidence are going to

23  cover that amply, so I don't see a need for that right now.

24        THE COURT:  Okay.  Any other defendants want to weigh

25  in on Mr. Pollack's proposal?

Richard Eddington - Direct

1              MR. FAGG:  John Fagg for Bill Lovette.  I agree with

2      Mr. Pollack's proposal and also agree with the Court's earlier

3      proposal about "the next witness may be called" rather than

4      calling out who specifically it is.

5              THE COURT:  Yeah.  I am going to refuse Mr. Pollack's

6      proposed instruction at this time.  The jury will be instructed

7      at the end of the case, and I will, as I indicated, not do

8      anything other than say "next witness," okay?

9              Thank you.

10        (In open court:)

11             THE COURT:  All right.  Next witness?

12             MR. LAVINE:  We would call Rich Eddington, Your Honor.

13             THE COURT:  Yes.

14        (**Richard Eddington** was sworn.)

15             THE WITNESS:  I do.

16             COURT DEPUTY CLERK:  Please state your name and spell

17     your first and last name for the record.

18             THE WITNESS:  Richard Eddington; R-I-C-H-A-R-D,

19     E-D-D-I-N-G-T-O-N.

20                       **DIRECT EXAMINATION**

21     BY MS. RAHMAN:

22     Q.  Good morning, Mr. Eddington.

23     A.  Good morning.

24     Q.  Mr. Eddington, are you currently employed?

25     A.  Yes.

Richard Eddington - Direct

1    Q.   And where do you currently work?

2    A.   Inspire Brands.

3    Q.   What is Inspire Brands?

4    A.   Inspire Brands is a restaurant holding company.  We're the

5    parent company for Jimmie John's, Buffalo Wild Wings, Sonic,

6    Arby's, Baskin-Robbins, and Duncan.

7    Q.   When you say it's a "restaurant holding company," what does

8    that mean?

9    A.   We are the parent company.  We own those brands.  We are --

10   in some cases, we operate restaurants; in other cases, we are

11   the franchisor.

12   Q.   About when did you start at Inspire Brands?

13   A.   July of 2019.

14   Q.   What's your current position at the company?

15   A.   Vice-president of procurement.

16   Q.   And how long have you held that position?

17   A.   Vice-president of procurement, since July of 2021.  Prior

18   to that, I initially came as vice-president of protein

19   procurement.

20   Q.   Generally, what are your responsibilities as vice-president

21   of procurement?

22   A.   I oversee a team of 21, and we are responsible for the

23   procurement of all food, beverage, packaging, and services

24   used, and for my team, it's Buffalo Wild Wings, Sonic,

25   Jimmie John's, and Baskin-Robbins.

Richard Eddington - Direct

1   Q.  Does that include negotiating contracts with chicken

2   suppliers?

3   A.  It does.

4   Q.  And how do those responsibilities differ from your

5   responsibilities as vice-president of protein procurement, your

6   former position?

7   A.  As the leader of protein procurement, I only had poultry,

8   beef, pork, seafood, and dairy.  Now I have all categories.

9   Q.  And as vice-president of protein procurement, did your

10  responsibilities still include negotiating contracts with

11  chicken suppliers?

12  A.  It did, yes.

13  Q.  How long have you worked in the chicken industry?

14  A.  I began in the chicken industry in May of 1991.

15  Q.  And what was your first position?

16  A.  My first position was as a manager trainee and then sales

17  representative for Seaboard Farms.

18  Q.  How long were you at Seaboard Farms?

19  A.  I was at Seaboard Farms until sometime in late 1999.

20  Q.  And what did you do at Seaboard Farms?

21  A.  I started off as sales representative, and when I left I

22  was sales manager over three locations.

23  Q.  And where did you go after Seaboard Farms?

24  A.  I spent a little over a year with Koch Poultry in national

25  account sales, and then moved to Gold Kissed Poultry where I

Richard Eddington - Direct

1    spent from between 2000 and sometime in late 2007, there as a

2    sales manager, split a little bit in between where I left to go

3    and run -- help run a family restaurant operation.

4    Q.  And in 2007 after you left Gold Kissed, where did you head

5    next?

6    A.  I worked for a little over two years for a poultry company,

7    Bell & Evans, they were based out of the Northeast, and I was a

8    regional sales manager for them.

9    Q.  And after Bell & Evans, where did you head after Bell &

10   Evans?

11   A.  Worked for a company, it's called AJC, which stands for

12   Allison, Joiner & Chambers, I believe.  It is the leading

13   poultry export company in the U.S.  I worked for them in their

14   Chattanooga, Tennessee, kind of U.S.-based operations where I

15   was buying poultry as well as overseeing some street

16   distribution sales.

17   Q.  When did you leave AJC International?

18   A.  Left there in summer of 2011.

19   Q.  Where did you go after AJC International?

20   A.  Marshall Durbin Poultry in Birmingham, Alabama.

21   Q.  How long were you at Marshall Durbin?

22   A.  Marshall Durbin was purchased by Mar-Jac during my tenure.

23   I left that company in 2014.

24   Q.  And in 2014, where did you land?

25   A.  Restaurant Supply Chain Solutions in Louisville, Kentucky.

Richard Eddington - Direct

1   Q.   Otherwise known as RSCS?

2   A.   That's correct.

3   Q.   What was your position at RSCS?

4   A.   Senior director of poultry procurement.

5   Q.   And were you at RSCS until your current position at

6   Inspire Brands?

7   A.   That's correct.

8   Q.   When you were on the supplier side, did you negotiate

9   contracts with QSRs?

10  A.   Some, yes.

11  Q.   Which QSRs did you negotiate contracts with?

12  A.   I have negotiated with Arby's, with Zaxbys, with Church's

13  to name a few.

14  Q.   Was your job at RSCS the first time you worked on the

15  procurement side of the industry?

16  A.   Not -- no, not specific -- to that level, yes, but I had

17  procurement responsibilities at AJC.  And then whenever I first

18  came to Marshall Durbin, I was over their distribution.  So I

19  had procurement from that standpoint on both internal and

20  external poultry procurement.

21  Q.   Generally, what were your job responsibilities at RSCS?

22  A.   I led a team who we were responsible for the poultry

23  contracts, for supplier selection, for managing those contracts

24  once they were in place to ensure that product flowed into the

25  restaurants as needed, as well as working with the various

Richard Eddington - Direct

1    brands KFC, Pizza Hut, and Taco Bell on any LTO activity and on

2    development needs.

3    Q.   What's LTO activity?

4    A.   Limited time offer.  If they had a promotion going for a

5    product, whether that was part of our standard offerings or

6    whether it was a unique offering, then my team would work with

7    the supplier base and the development teams at the brand to

8    help bring those products to life.

9    Q.   And as part of your job responsibilities at RSCS, did you

10   negotiate contracts with the chicken suppliers?

11   A.   I did.

12   Q.   Who was on your team at RSCS when you first got there in

13   August of 2014?

14   A.   In August of 2014, Mary Hester, Steve Campisano, and

15   Carol Knight were direct reports on my team.  And then I worked

16   directly for Pete Suerken, and we also had a contractor at that

17   time named Bob Lewis.

18   Q.   When you say Ms. Hester and Mr. Campisano and Ms. Knight

19   were direct reports, did they directly report to you?

20   A.   That's correct.

21   Q.   Now, you mentioned Mr. Suerken.  What was Mr. Suerken's

22   position?

23   A.   When I arrived, his position was executive vice-president

24   of procurement.

25   Q.   And you reported to Mr. Suerken?

Richard Eddington - Direct

1    A.  I did.

2    Q.  He was your boss, correct?

3    A.  Yes.

4    Q.  What was Mr. Lewis' role?

5    A.  Mr. Lewis had previously approximately five years prior

6    retired from the role that I was coming into.  And whenever my

7    predecessor left the company, Mr. Lewis was engaged to return

8    as a contractor to help bridge the gap until the new person who

9    turned out to be me came in, as well as to help onboard and

10   just kind of help stabilize what was going on with chicken in

11   2014.

12   Q.  What about Mr. Campisano, what was his role on the team?

13   A.  Mr. Campisano had primarily been working in the day-to-day

14   management of ensuring that chicken on the bone or COB loads

15   were produced and were sent where they needed to be, worked

16   with partners with our distribution network to make sure that

17   product flowed into the restaurants.

18   Q.  How about Ms. Hester, what was her role on the team?

19   A.  She at that point was the category manager over what we

20   considered further-processed poultry, which was really anything

21   not part of the chicken-on-the-bone category.

22   Q.  And finally, Ms. Knight, what was her role?

23   A.  She was an administrative support person who received data,

24   compiled reports, ensured that monthly pricing or period

25   pricing was correct and, you know, analyzed, provided to myself

Richard Eddington - Direct

1    and the team.

2    Q.  Were you involved in the negotiations for the 2015 KFC

3    contract at RSCS?

4    A.  I was.

5    Q.  And remind the jury, when did you start at RSCS?

6    A.  I believe August the 3rd, I believe.  It was the 3rd or

7    4th, whatever that Monday was, of 2014.

8    Q.  And when you started at RSCS, what stage were the

9    negotiations in?

10   A.  The negotiations had started.  I would consider them still

11   in, you know, to some degree the initial stages.  There had

12   been some e-mail communications and there had been meetings,

13   in-person meetings set up soon after my arrival.

14   Q.  Did you participate in those initial in-person meetings?

15   A.  Yes.

16   Q.  Who else at RSCS was involved in the contract negotiations

17   for the 2015 KFC contract?

18   A.  Pete Suerken, Bob Lewis, and myself were the three

19   primaries, and then to a lesser degree Todd Imhoff, who was the

20   chief procurement officer and Pete Suerken's boss, and then

21   Steve Campisano and Mary Hester to a very small degree.

22   Q.  And what was Mr. Imhoff's role?

23   A.  Mr. Imhoff was the chief procurement officer.  He was over

24   all procurement for RSCS at that time.

25   Q.  And what was his role in the negotiations?

Richard Eddington - Direct

1   A.  Todd's role really was to help us develop high-level

2   strategy and to help us, you know, properly portray what the

3   strategy was and the outcome to our stakeholders, whether that

4   be executives within RSCS, Yum Brands, or ultimately franchisee

5   leadership.

6   Q.  Was this Mr. Suerken's first time negotiating contracts

7   with chicken suppliers?

8   A.  To the best of my knowledge, yes.

9   Q.  What were the market conditions going into these

10  negotiations?

11  A.  The market conditions were not favorable for RSCS in terms

12  of both supply and demand.  From a demand side, KFC, who the

13  COB product was procured for, had recently ran out of chicken

14  as part of a Mother's Day promotion.  And RSCS in order to try

15  to supply the gap had gone out in the months prior to these

16  negotiations and paid between $1.30, $1.40 per pound to try to

17  get incremental product.

18          Also, we had a lot of competition in terms of

19  Popeye's, another COB customer, was -- was in growth stages, so

20  they needed more.  And at that point in time, the retail, what

21  we call the deli WOGs or the rotisserie chickens from the

22  retail deli stores, they were really gaining a tremendous

23  amount of popularity and were competing for that same small

24  bird.

25          Also, at the same time the larger birds -- the smaller

Richard Eddington - Direct

1   bird niche of the market or segment of the market had been

2   contracting to some degree anyway, so supply overall had been

3   somewhat reduced.  And at the same time, the larger birds had

4   really in addition to gaining in popularity, their

5   profitability was significantly higher at that period of time

6   than small birds, so there was a lot of pressure that supply

7   may move even faster towards a larger bird.

8   Q.  What do you mean when you say that the large bird's

9   profitability was significantly higher?

10  A.  At that point in time, the net return for a -- when I say a

11  large bird, I am referring to approximately a 9-pound live

12  weight chicken versus approximately a 4 --

13       MR. KOENIG:  Objection.  Can we lay some foundation

14  for his knowledge here?

15       THE COURT:  Overruled.  He wasn't asked that question.

16       MS. RAHMAN:  Go ahead.

17  A.  At that point in time, a large bird or a 9-pound chicken

18  was yielding a profit of approximately $1 per bird more than

19  what that 4-pound live weight chicken was yielding.

20       MR. KOENIG:  Objection, foundation for how he knows

21  this.

22       THE COURT:  Overruled.

23  BY MS. RAHMAN:

24  Q.  And KFC was buying the 4-pound bird, correct?

25  A.  That is correct.

Richard Eddington - Direct

1    Q.  Was RSCS taking a different approach to this year's

2    negotiations?

3    A.  In 2014 compared to previous years, yes.

4    Q.  Why were they taking a different approach?

5    A.  Previously, the approach had been, you know, KFC for years,

6    even decades, had always been the largest user of eight-piece

7    chicken on the bone, and they really flexed their purchasing

8    power in terms of spec, in terms of, you know, the suppliers.

9    Especially whenever there was a lot more small birds, they had

10   really needed to sell some of that to KFC, and KFC really tried

11   to take advantage of every opportunity to lower the price.

12        It had gotten to a point where the pendulum was

13   swinging the other way in terms of available supply.  KFC's

14   volume had -- you know, they had been closing stores, and their

15   volume had -- they were still certainly very, very large in

16   terms of a buyer.  They had -- their volume had slipped, and,

17   you know, I think that it was recognized that additionally the

18   QA specs were very difficult, and, frankly, even working with

19   the Kentucky Fried Chicken QA team was onerous at times.

20        And, you know, I think it was recognized that given

21   the landscape that I just discussed and given some of the

22   changes of where the leverage was that the old ways of doing it

23   up to and including having franchisees in the negotiations in

24   previous years, having a supplier walking into a room filled

25   with people to negotiate a group on one or two people was just

Richard Eddington - Direct

1    not going to work, and we had to change tactics.

2            THE COURT:  Ms. Rahman, can you look for a convenient

3    breaking spot?

4            MS. RAHMAN:  Your Honor, this is as good of time as

5    any.

6            THE COURT:  Ladies and Gentlemen, we will go ahead and

7    take the lunch break.  Keep the admonitions in mind, yellow

8    juror buttons visible, and we will be in recess until 1:30.

9    Thank you.  The jury is excused.

10           (Jury excused.)

11           Mr. Eddington, you can be excused.  And if you can be

12   ready to go at 1:30.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Great.  Thank you.

15           Ms. Call.

16           MS. CALL:  Yes, Your Honor.  I hate to be a broken

17   record, but so as of now that it's noon, we have heard from

18   three defense teams that they will not be introducing summary

19   exhibits.  That's Defendant -- sorry, four, Defendant Mulrenin,

20   Austin, Brady, and Fries.  I believe Mr. Gillen said he may

21   have an update at noon.

22           At this point, we are going to have to be reviewing

23   the summaries while we sit here in court, so we are hoping to

24   have some disclosure from the defendants.

25           THE COURT:  Let's do an update at -- why don't we plan

2920

Richard Eddington - Direct

1    on reconvening at 1:25, and then we will get the update at that

2    time, all right?

3              Anything else to take up?

4         MR. KOENIG:  When we were at side bar, I mentioned I

5    had another related issue.  Would it be okay if I raised it

6    now?

7         THE COURT:  Yes.

8         MR. KOENIG:  The issue, it came up last trial, when

9    the defendants call a witness, the United States is concerned

10   that it's going to be one direct examination and then nine

11   cross-examinations when in reality they have congruent

12   interests in questioning the witness.  And we would ask that

13   they be limited to direct questions during their -- it's cross

14   in name only really.

15        THE COURT:  Well, two things:  No. 1, in the last

16   trial, that really didn't play out; and, secondly, I am not

17   aware of any case law, and I don't think the government has

18   cited any for me, that would cause me to impose a no-leading

19   question requirement against them.  So, you know, if there were

20   case law on that, but --

21        MR. KOENIG:  I believe if Your Honor looks at 611, the

22   notes to Rule 611, it does address that issue.

23        THE COURT:  I will take a look at it.

24        MR. KOENIG:  Thank you.

25        THE COURT:  Like I said, it didn't really seem to be

Richard Eddington - Direct

1    much of a problem last time, and the defendants have shown more

2    coordination and efficiency, so --

3              MR. KOENIG:  I guess that's sort of the point, right,

4    because they were coordinating so they have these congruent

5    interests.

6              THE COURT:  Right.  But the question is whether they

7    have to.  I don't think that it will necessarily become a

8    problem.  I will take a look at those notes, though, and we

9    will go from there.

10             Anything else we should take up?

11             We will be in recess.  Thank you.

12        (Recess at 12:03 p.m. until 1:28 p.m.)

13             THE COURT:  Are we ready for the jury?

14        Oh, yes, we were going to talk about that important

15   subject.  So what's the update?  Did you learn any more

16   information, Ms. Call?

17             MS. CALL:  We did learn we'll at least be getting an

18   updated witness list by 2:00 p.m. this afternoon.  I think

19   there is going to be one witness moved up again, but we are

20   waiting to see the final of that.

21             THE COURT:  Mr. Kornfeld.

22             MR. KORNFELD:  The witness list, we met over lunch,

23   and we will be filing an updated one.  And several of us spoke

24   with Ms. Call sort of to preview soon to be coming attractions.

25             On the summaries, we are -- Team Fries is one of the

Richard Eddington - Direct

1   teams that indicated we are not doing summaries.  I don't know

2   that any teams are, but I don't want to speak out of turn for

3   any of my colleagues.

4        MR. GILLEN:  I indicated that we would let the Court

5   know by 1:30 today, and it's 1:30, so we made the decision to

6   not use summaries.  So Team Roberts will not use summary

7   charts.

8        MS. JOHNSON:  Your Honor, Team Blake is not using

9   summary charts to be introduced.

10        MR. LAVINE:  Your Honor, I think I can clarify this,

11   tell me if I am wrong, but we are not going to be using summary

12   charts to be moved into evidence.  We are not going to be

13   presenting any summary charts to the Court.

14        THE COURT:  And if we define "summary charts" as

15   something similar to the government, a list of admitted

16   exhibits on the side, that type of thing.

17        MR. LAVINE:  Precisely, Your Honor.

18        THE COURT:  I don't mean to single out Mr. Pollack,

19   but, for example, one or maybe more that Mr. Pollack did where

20   you walk a witness through admitted exhibits and then write

21   some things in, started off last trial with Ms. Carwile's

22   excellent numbering over at the document viewer as I recall.

23        MR. LAVINE:  I think I can represent to the Court we

24   will not be presenting summary charts similar to the

25   government's to be moved into evidence.  It doesn't prohibit us

Richard Eddington - Direct

1  from using demonstratives during testimony or even closing, but

2  we are not going to be submitting any summary charts.

3      THE COURT:  Okay.  Yeah, we still have the issue,

4  though, if a demonstrative is used that lists a bunch of

5  exhibits and the government doesn't have any advance notice and

6  as a result can't tell whether the -- there is some need to

7  check the accuracy of the demonstrative against exhibits, not

8  ones that are being shown to the witness and the witness writes

9  something in --

10      MR. LAVINE:  Right.

11      THE COURT:  -- but rather there is some presumption

12  that the numbers, or whatever they are, are derived from an

13  exhibit, then the government would have the exact same problem

14  with the demonstrative too.

15      MR. LAVINE:  Let me have one moment, Your Honor.

16      THE COURT:  Sure.

17      MR. LAVINE:  If we are going to use any type of

18  demonstrative like that, I think the agreement is we will give

19  them 48 hours' notice and present it within 48 hours, but I

20  think the only exception to that may be with Professor Snyder.

21  And I believe that we have already produced to the government

22  documents relating to Mr. Snyder, Professor Snyder.

23      I would like to address the Court on that one issue.

24  I don't think we were clear enough here today considering

25  government counsel's comments regarding Professor Snyder.

Richard Eddington - Direct

1   Moving him up was not our choice, Your Honor.  This was a

2   personal family issue, and we had to move him up just the same

3   as the government has moved up some of their witnesses because

4   of health issues.  It was not because we were trying to jockey

5   around witnesses.  It was specifically because of Professor

6   Snyder's personal issues.

7           THE COURT:  Mr. Torzilli?

8           MR. TORZILLI:  There is a lot of qualifiers and

9   caveats, and very simply our request is anything that's going

10  to be used with Professor Snyder, who is going on Thursday, we

11  need to have immediately.

12          MR. TUBACH:  Unequivocally they have it, Your Honor.

13          MR. TORZILLI:  As long as Mr. Tubach's comment is on

14  the record.

15          MR. TUBACH:  I will say it again to make sure it's on

16  the record.

17          THE COURT:  We have got to ratchet this down.  It

18  seems like the representation has been made.  It sounds like

19  the material for Professor Snyder has been provided.

20          MR. TORZILLI:  One other thing on that.  So we are

21  working through the exhibits that we received earlier today,

22  this morning.  There are a lot of references to the data set

23  that was used, but we don't have any backup, any programs, any

24  indication of what was done to derive the information from the

25  data.  So depending on whether we get more information or not,

Richard Eddington - Direct

1    I think we still -- we need the backup and the programs and so

2    forth to be able to replicate what Professor Snyder has done.

3          We may still be in a position where we are going to

4    need time after his direct to be able to go through the

5    information that he testifies to on direct to be able to

6    conduct a reasonable and proper and thorough cross.

7          THE COURT:  Mr. Lavine?

8          MR. LAVINE:  On October the 6th, we presented all the

9    data that he will be using, and they have a full record of

10   that, Your Honor.  And I believe that was referenced in an

11   e-mail that was sent out this morning to government counsel.

12         MR. TORZILLI:  Just to be clear, I am not talking

13   about the data now.  I am talking about the underlying

14   methodology including the programs and what was done to be able

15   to come up with the information that appears on the exhibit so

16   that we have a reasonable opportunity to replicate to determine

17   whether the computations are accurate.

18         THE COURT:  Ms. Pletcher?

19         MS. PLETCHER:  Thank you, Your Honor.

20         We have fully disclosed Professor Snyder's conclusions

21   and his analyses and all of the underlying data.  I don't

22   believe the government is entitled to any further disclosure

23   and any further detail.  We have done it all.  And at this

24   point, anything else they have to address can be done on

25   cross-examination.

Richard Eddington - Direct

1          THE COURT:  Yeah, I think that ultimately some of

2    these issues may be resolved by what obligations the respond --

3    well, in this case, a defendant has to produce materials under

4    the rule to allow for cross-examination, different than in the

5    civil context.  The "how different" will be the issue, but we

6    will have to see how it plays out when he is called.

7          Are we ready to bring the jury back in?

8          Ms. Rahman?

9          MS. RAHMAN:  I was just approaching the podium for

10   Mr. Eddington, Your Honor.

11         THE COURT:  That's what I meant.  So let's go ahead

12   and get Mr. Eddington.

13         (Jury present.)

14         THE COURT:  Ms. Rahman, go ahead.

15         MS. RAHMAN:  Thank you, Your Honor.

16   BY MS. RAHMAN:

17   Q.  Welcome back, Mr. Eddington.

18   A.  Thank you.

19   Q.  Before the lunch break, we were talking about the

20   negotiations for the 2015 KFC contract.  And you had explained

21   that RSCS was taking a different approach to this year's

22   negotiations.

23   A.  Correct.

24   Q.  So what was the approach that RSCS was taking to the

25   negotiations this year?

Richard Eddington - Direct

1   *A.*  We were attempting to regain the -- what we perceived as

2   the lost status as the customer of choice for COB.  In order to

3   do that, we certainly needed to secure supply.  We needed to

4   try to get back in the, you know, what we considered

5   good-standing partnerships with suppliers.

6          So we brought suppliers in and basically gave them an

7   opportunity to list out some of the things that had made the

8   KFC business more difficult or less favorable for them in the

9   past years and asked them to provide areas that we could

10  possibly look at, whether it be specifications, whether it be

11  in dealings with QA, whether it be in costs, case weights,

12  things like that, what could we do to try to partner with them

13  making production more even instead of heavy Monday, heavy

14  Friday, throughout the week, things like that to try to work on

15  even a longer term deal instead of it being a year-over-year

16  negotiation.

17  *Q.*  You mentioned the longer term deal.  Did the approach

18  involve a move to a three-year contract?

19  *A.*  Yes, it did.

20         *MS. RAHMAN:*  Your Honor, may I approach with some

21  notebooks?

22         *THE COURT:*  Yes.

23  *BY MS. RAHMAN:*

24  *Q.*  Mr. Eddington, could you turn to tab 1 in your binder?

25  It's marked as Exhibit F-811.

Richard Eddington - Direct

1      *MS. RAHMAN:*  And if we could show that just for the

2  witness, counsel, and the Court at this time, please.

3  *BY MS. RAHMAN:*

4  Q.  You can keep it down.  It will be on the screen.  When I

5  say "show," I meant on the screen, but you can just look at it

6  on -- thank you.  I do appreciate you showing it, though.

7          Do you recognize this document?

8  A.  I do.

9  Q.  What is this document?

10  A.  This is a negotiations update presentation deck that the

11  RSCS negotiating team put together to update our internal

12  executive team, as well as franchisee leadership, in terms of

13  how the COB negotiations were going.

14  Q.  So you have seen it before?

15  A.  Yes, I have.

16  Q.  Were you involved in the preparation of this document?

17  A.  Yes, I was.

18  Q.  Is this a document that you and RSCS used in the ordinary

19  course of business at RSCS?

20  A.  It is.

21  Q.  And did you and RSCS rely on this document in conducting

22  business?

23  A.  Yes.

24  Q.  Was this document prepared in the ordinary course of

25  business for RSCS?

Richard Eddington - Direct

1   *A.*  Yes.

2   *Q.*  And did RSCS maintain this document in the ordinary course

3   of business?

4   *A.*  Yes.

5   *Q.*  And to the best of your knowledge, is this document

6   accurate and reliable?

7   *A.*  It is.

8           *MS. RAHMAN:*  Your Honor, I would move to admit

9   Exhibit F-811.

10          *THE COURT:*  Any objection to the admission of F-811?

11          *MR. KOENIG:*  Objection, hearsay.  We went through this

12  same document yesterday.

13          *THE COURT:*  Response?

14          *MS. RAHMAN:*  Yesterday Mr. Lewis actually didn't

15  recognize the document.  Mr. Eddington actually had a hand in

16  the preparation of the document.  He has also testified that

17  he, along with RSCS, relied on the document and that RSCS used

18  it in preparation of the negotiations.  And it was a business

19  record.  He has actually laid a foundation Mr. Lewis was not

20  able to lay yesterday.

21          *THE COURT:*  The objection will be sustained.  In order

22  for a document to qualify as a business record, each actor in

23  the chain of information has to be under a business duty or a

24  compulsion to provide accurate information.  There is no such

25  foundation that has been laid by Mr. Eddington.

Richard Eddington - Direct

1   *BY MS. RAHMAN:*

2   *Q.*  Mr. Eddington, you talked about market conditions.  Was one

3   of the market conditions a concern that the big-bird plants --

4   or the small-bird plants were converting to big-bird plants?

5   *A.*  Yes.

6   *Q.*  Was that a realistic concern for RSCS?

7   *A.*  It was.

8          *MR. KOENIG:*  Objection, leading.

9          *THE COURT:*  Sustained.

10  *BY MS. RAHMAN:*

11  *Q.*  How did RSCS view the concern of the conversion from small

12  birds to big birds?

13  *A.*  We knew that there were plants that had already moved away

14  from small bird.  For instance, George's, one of our then

15  current COB suppliers, had made plans to move a small-bird

16  plant into larger birds.  There were others that had happened

17  or were in the process of happening.

18          And by the way, moving doesn't necessarily have to

19  mean specifically moving out of in order to harm KFC.  It

20  didn't specifically have to mean moving all the way up to a,

21  for example, 9-pound live weight.  If, for instance, a plant,

22  Chick-fil-A, was a competitor who still used a larger-than-KFC

23  bird, but still considered small bird, they were moving over at

24  a pace of about one plant per year, and that was a direct

25  threat to the KFC COB supply.

Richard Eddington - Direct

1   Q.  And when a plant converted from small bird to big bird, was

2   the plant going to convert back?

3   A.  In order to move from small bird to big bird, it completely

4   changes out your grow-out.  You have to have more growers.  You

5   have to change out all of the shackle lines, the processing

6   equipment within the plant, and it takes a very significant

7   investment to do that.

8        And generally speaking -- I know of only one plant

9   that once -- that moved from a larger bird, a medium-sized

10  bird, actually, to a small bird.  Other than that, it's pretty

11  straightforward that once it goes larger, it will not turn

12  back, especially to a 4-pound live weight.

13  Q.  Turning back to the negotiations for the 2015 contract, how

14  did RSCS address these market conditions when they were

15  negotiating with suppliers?

16  A.  During the -- I am sorry.

17  Q.  During the negotiations for the 2015 contract, how was RSCS

18  addressing these market conditions during the negotiations?

19  A.  We -- as mentioned previously, we sat down with suppliers

20  and asked them to tell us things that we could do to help them.

21  As for -- for an example, we talked about adding shelf life.

22  We had a 10-day shelf life for most of the country, would go

23  into 12-day shelf life, be of a benefit if we could work that

24  through with our QA partners.  Were there things that we could

25  do -- we asked them about changing -- slightly changing the

Richard Eddington - Direct

1    size of the bird.

2            And then certainly we asked them or provided them the

3    opportunity to show us what they believed a fair margin would

4    be in order to compete against that big-bird segment or coming

5    closer to competing against that big-bird segment in terms of

6    profitability in order to secure our supply.

7    Q.  When you talk about this "fair margin," what do you mean by

8    a fair margin?

9    A.  At the time of these negotiations, big birds were returning

10   approximately a dollar-per-bird profit more than the small

11   birds were.  So while -- and if you think about it, that's on

12   an approximate 9-pound live.  In order for a 4-pound live

13   weight bird to make up that dollar on a live-pound basis, that

14   would be 25 cents per live pound that we would have to make up.

15           Now, we don't -- KFC does not buy live birds, so we

16   have to take into consideration the initial processing and get

17   down to what we would call a WOG, without giblets.  That's the

18   sellable portion of that live bird.  And that's approximately

19   73 percent of live weight.

20           So when you take that 25 cents and you convert it, it

21   really becomes 34 cents a pound that -- the alternate potential

22   avenue for suppliers to go that they could yield out better

23   than what KFC was paying.

24           So that big-bird margin that we discussed was really

25   saying, hey, listen, we know we can't go there, but we want to

Richard Eddington - Direct

 1   understand what number could work so that you guys would not go

 2   through all the hassle, the investment, everything else of

 3   moving those birds into a larger bird and be happier staying

 4   with KFC.

 5   Q.   Was RSCS willing to pay a premium to the suppliers to

 6   bridge this gap between the small-bird margin and the big-bird

 7   margin?

 8   A.   We were.

 9   Q.   Did RSCS ask the suppliers to sort of take their margin and

10   split out what this big-bird premium would look like?

11   A.   Yes.

12   Q.   And why did you ask them to do that?

13   A.   Well, I think it's, you know, if -- we certainly needed to

14   be able to split out what the standard margin had been in our

15   cost model versus where this new line, if you will, would be,

16   not only so that in the future we could potentially claw back

17   at it or just know what it is, but also in order to be able to

18   go in with our own stakeholders, our own franchisees, and be

19   able to explain why we were doing what we would ultimately have

20   to do.

21   Q.   Are you familiar with Claxton Poultry?

22   A.   I am.

23   Q.   What type of plant does Claxton have?

24   A.   Claxton has a -- mostly small birds.  They do have a few

25   slightly larger birds, but not what we would consider jumbo

2934

Richard Eddington - Direct

1   birds.

2   Q.  When you say "slightly larger birds," not the big birds you

3   are talking about?

4   A.  No, not the 9 pounds.

5   Q.  So Claxton doesn't sell a big bird.

6   A.  That's correct.

7   Q.  Did RSCS ask Claxton to provide a number for this big-bird

8   premium?

9   A.  We allowed all of our suppliers to provide that, so yes.

10  Q.  Why is that?

11  A.  Well, while Claxton didn't currently have 9-pound birds,

12  that's not to say that a strategy within Claxton couldn't have

13  been over the course of time to move to that.  So we absolutely

14  wanted to provide opportunity for all of our suppliers, whether

15  they currently participated in that large-bird arena or not, to

16  have the same opportunity.  And, frankly, we needed all of our

17  suppliers to stabilize supply whether they had large birds or

18  not, so we offered it to everyone.

19  Q.  Did Claxton threaten to convert to a big-bird during the

20  negotiations?

21  A.  No, not to my knowledge.

22  Q.  Was Claxton the only supplier for RSCS who did not have a

23  big-bird plant?

24  A.  No.

25  Q.  Who is the other suppliers?

Richard Eddington - Direct

1    A.  Of the seven at that time COB suppliers that we had,

2    Claxton and Mar-Jac were the two who were strictly smaller

3    birds.

4    Q.  And did Mar-Jac get the big-bird premium?

5    A.  They did.

6    Q.  How did RSCS determine whether this big-bird premium was

7    reasonable?

8    A.  You know, obviously we were trying to minimize it to the

9    degree possible, but at the end of the day, the math that I

10   just laid out was really the worst -- you know, was the math

11   that we were fighting against.  So we were trying to understand

12   what those supply -- each supplier felt was a fair incremental

13   margin in order to stay in small birds and specifically stay in

14   KFC COB.

15   Q.  So you just said "worst case."  So what was the worst case

16   premium you --

17   A.  Absolute worst case big-bird premium would have been that

18   we had to pay as close to or equal to what -- the .34 cents per

19   WOG bid that I referenced.  That would have been the absolute

20   worst case.  Now, we never anticipated having to get close to

21   that, but that would have been the ultimate worst case

22   scenario.

23   Q.  Now, did RSCS generally want to have prices in as close a

24   range as possible?

25   A.  Yes.

Richard Eddington - Direct

1    Q.  And why is that?

2    A.  We did not have the ability within our distribution network

3    to blend prices, in other words, each supplier, you know, there

4    are various prices coming in, a mechanism where the franchisee

5    or the KFC store would be able to have one nationalized price.

6    Even if you take freight from distribution to the store out of

7    that, we didn't have the ability to do that, so we had a

8    franchisee network that definitely communicated with one

9    another.

10            In a lot of cases, they had stores, they crossed a lot

11   of parts of the country, and saw the various pricing.  And

12   whenever there was or if there was any kind of significant

13   delta, more than just a very few cents per pound, then they

14   pushed back on us to try to do better.  So it was certainly --

15   I am not saying it always a hundred percent worked out that

16   way, but to the best of our ability, all things equal, we

17   wanted to try to keep things within a pretty narrow band.

18   Q.  Who was pushing the suppliers in this close range of

19   pricing?

20   A.  RSCS.

21   Q.  Now, back to the negotiations.  Did you attend any meetings

22   with Claxton during the negotiations?

23   A.  I did.

24   Q.  And who from Claxton attended these meetings?

25   A.  Depending upon the meeting, Scott Brady and Mikell Fries.

Richard Eddington - Direct

1    Q.  Do you know if Mr. Brady had pricing authority for Claxton?

2    A.  I do not believe he did, no.

3    Q.  Was Mr. Suerken at these meetings?

4    A.  Yes.

5    Q.  Are you aware of Claxton's negotiating strategy?

6    A.  Yes.

7    Q.  And how are you aware of their strategy?

8    A.  Because they engaged me with this strategically.

9    Q.  What was Claxton's negotiation strategy?

10   A.  Claxton, being a relatively small player in the industry

11   and even within that COB arena compared to some of their

12   competitors, they made it pretty clear that they didn't expect

13   to be the highest price at the end of the negotiation.  They

14   would ask that they were not the lowest price at the end of the

15   negotiations, but just keep us competitive, somewhere in the

16   middle.

17   Q.  And what did that mean to you?

18   A.  That meant a bit of a good-faith trust, that as we were

19   working through this, that at the very end that we were just

20   going to work out something that we could, you know, maybe not

21   each of us or together love, but we could both live with and

22   that it would be competitive, you know, certainly competitive

23   within our overall purchases.

24   Q.  Did you find anything odd about Claxton's negotiating

25   strategy?

Richard Eddington - Direct

1    A.  Not particularly, no.

2    Q.  Anything unusual?

3    A.  No, not specifically for that type of size of supplier, no.

4    Q.  Did Claxton threaten to take their business elsewhere?

5    A.  No.

6    Q.  Did they refuse to negotiate with RSCS?

7    A.  No.

8    Q.  During the negotiations, did Claxton refuse to come off its

9    initial price?

10   A.  No.

11   Q.  During the negotiations, did all of the suppliers negotiate

12   their price with RSCS?

13   A.  To some incremental degree, yes.

14   Q.  And did all of the suppliers come off their initial bids in

15   some amount?

16   A.  In some amount, yes.

17   Q.  I would like to show you two exhibits.

18        MS. RAHMAN:  If we could put page 6 of H-684 and

19   GX-10023 up on the screen next to each other.

20        Your Honor, these have both been admitted, so I would

21   ask for permission to publish them.

22        THE COURT:  What was the last exhibit, Ms. Rahman?

23        MS. RAHMAN:  Government's Exhibit 10023.

24        THE COURT:  You may.

25        MS. RAHMAN:  Thank you, Your Honor.

Richard Eddington - Direct

1    *BY MS. RAHMAN:*

2    *Q.*  So, Mr. Eddington, do you see these two exhibits in front

3    of you?

4    *A.*  I do.

5    *Q.*  Do you see what those are?

6    *A.*  I do.

7    *Q.*  And what are those two exhibits?

8    *A.*  I am sorry, could you repeat?

9    *Q.*  What are those two exhibits?

10            *MR. KOENIG:*  Objection, foundation.

11            *THE COURT:*  Overruled.

12   *A.*  These are initial -- these are initial bids and then our

13   final contract bids for six of the seven COB suppliers that we

14   worked with in the 2014 negotiations for 2015.

15   *BY MS. RAHMAN:*

16   *Q.*  Do you see the bars for Claxton Poultry?

17   *A.*  I do.

18   *Q.*  Can you tell me the difference between Claxton's initial

19   bid and final contract price?  And I do believe there is a

20   calculator on the stand if that would be helpful for you.

21   *A.*  4.3 cents per pound.

22   *Q.*  And is that 4.3 cents a pound still 4.3 cents a pound no

23   matter how those bars are depicted on the chart?

24   *A.*  That's correct, they are.

25   *Q.*  And is that 4.3 cents a pound a significant number for

Richard Eddington - Direct

1    RSCS?

2    A.   Yes.

3    Q.   And is even 1 cent a significant number for RSCS?

4    A.   It is.

5    Q.   And how so?  How is it a significant number?

6    A.   In round numbers, we procured approximately

7    400 million pounds per year of KFC eight-piece, not even

8    including any supplemental dark meat or other parts.  So

9    400 million -- across the entire system, 400 million pounds, a

10   penny on that is $4 million across the system, so each penny is

11   absolutely impactful.

12   Q.   So a penny reduction would result in about a $4 million

13   savings to RSCS?

14   A.   That's correct.

15   Q.   Do you know what savings that would result to on a

16   per-store basis?

17   A.   At that point in time, there were approximately 4300 KFC

18   stores.  I don't have the exact number.  So on an annualized

19   basis, 4 million divided by 4300 equals $930 per store over the

20   course of the year approximately.

21   Q.   Did you have an expectation of pricing from suppliers for

22   the 2015 contract?

23   A.   We did.

24   Q.   And what was that?

25   A.   Well, I say "we did."  I had an expectation that the

Richard Eddington - Direct

1    pricing, given the landscape that was going on in both supply

2    and demand, that we were going to see approximately a 5- to

3    10-cent-per-pound profit increase or increase to that line

4    compared to what we had been.  I know that there were others

5    within my RSCS team who thought that number was going to be

6    lower.

7    Q.  And when you say a 5- to 10-percent profit to that line,

8    what --

9    A.  5 to 10 cents per pound, not percent.  I'm sorry.

10   Q.  What do you mean when you say 5- to 10-cent profit?

11   A.  That the margin line was going to go up at the end of the

12   day between 5 and 10 cents per pound.  We certainly recognized

13   the worst case could be higher, but that's what I was

14   anticipating hoping that we could keep it within.

15   Q.  And what would that 5- to 10-cent per pound, what would

16   that be over a -- what would your expectation be of the margin

17   that it would be over?  So what would be the all-in sort of

18   margin number you were looking at?

19   A.  At that point in time, the average margin was in

20   approximately the 7- to 8-cent-per-pound range, so if you say

21   8 cents, 10 cents on top of that, it would be approximately

22   18 cents per pound on the top end, so, say, 15 to 18, 14 to 18

23   cents per pound.

24   Q.  And you mentioned that your expectation of pricing was

25   different from those at RSCS.

Richard Eddington - Direct

1    *A.*   That's correct.

2    *Q.*   In what way?

3    *A.*   When I came to RSCS, there was an assumption, a belief, a

4    desire that they -- the incremental cost would be closer to 3

5    to 5 cents per pound on top of that then current 7 to 8 cents

6    per pound.

7    *Q.*   Do you recall when the first bids came in to RSCS?

8    *A.*   The first official bids came in to RSCS in approximately

9    mid August.  I don't remember the exact -- the exact date.

10   *Q.*   How were the bids received by RSCS?

11   *A.*   Via e-mail.

12   *Q.*   And what was the reaction to the bids at RSCS?

13   *A.*   There was a bit of surprise, some disappointment.

14   *Q.*   Would it be fair to say it was worst case scenario for

15   RSCS?

16   *A.*   To some degree, yes.

17   *Q.*   In what way was it worst case scenario?

18   *A.*   The hope for others prior to my arrival was that grain,

19   which was coming down at that point in time, and grain was

20   something RSCS controlled as part of our cost model, and

21   chicken feed being a significant input into the price of

22   growing a chicken, was that the improvement in grain prices

23   would be able to mostly, if not completely, offset some of the

24   incremental pricing as part of the cost model.  So, obviously,

25   the initial -- the initial models that came back certainly

Richard Eddington - Direct

1    showed that that was not going to be the case.

2    Q.  And how come the grain prices were not able to offset the

3    cost models?

4    A.  Because we anticipated that, again, those grain models

5    might be able to offset approximately 5 cents per pound at

6    least for 2015 for what we could see out front in terms of the

7    grain markets and futures at that point in time, and we were

8    seeing, you know, asks in the upwards of 20 cents or more.

9    Q.  Was it a result of the market conditions that the grain

10   models weren't able to offset the cost models?

11          MR. KOENIG:  Objection, leading.

12          THE COURT:  Sustained.

13   BY MS. RAHMAN:

14   Q.  Why were the grain models unable to offset the cost models?

15   A.  Because the landscape --

16          MR. KOENIG:  Objection, stating a fact that's not in

17   evidence.

18          THE COURT:  He can answer.  Overruled.

19   A.  Because at that point in time, the supply-and-demand

20   scenario that I previously testified to for poultry was

21   definitely going to more than overcome any benefit that the

22   grain markets, at least as far as we could see into 2015, were

23   going to provide RSCS.

24   BY MS. RAHMAN:

25   Q.  Were you surprised by the increase in the margin in the

Richard Eddington - Direct

 1   cost-plus models?

 2   A.   To some degree, yes.

 3   Q.   Was it the largest margin increase you had seen?

 4   A.   Yes.

 5   Q.   Do you know the primary reason for the increase in the

 6   margin?

 7            MR. KOENIG:   Objection, foundation.

 8            THE COURT:   Overruled.   He can answer.

 9   A.   The reason that we saw the vast majority -- now, certainly,

10   the profit piece of it or the margin piece of it that was

11   needed to try to help compete with big birds was the lion's

12   share of that.   But there were other changes within the model,

13   things that, you know, labor, chick cost, grower pay, things

14   like that that also in normal -- what we would consider within

15   normal confines increased as well, but the grand total of it

16   was -- the majority of that was based on just the incremental

17   margin needed to keep supplying KFC COB.

18   BY MS. RAHMAN:

19   Q.   Now, you testified that supply was tight, that big birds

20   were yielding more profit than small birds.

21   A.   Correct.

22   Q.   Was that true?

23   A.   Yes.

24   Q.   Did the pricing for the 2015-2017 contract end up where you

25   thought it would?

Richard Eddington - Direct

1   A.  They ended up at the very top end of where I maybe thought

2   that they could go.  Certainly, you know, we were hoping and I

3   was hoping they would be less than that, but, no, I wasn't

4   overly -- at the end of the day, I wasn't overly surprised.

5   Q.  And what did you attribute the high prices to in the final

6   contracts?

7   A.  Well, we did have to reset our supply.  We did need to --

8   KFC previously, you know, had taken -- had always taken the

9   hammer to suppliers, as I laid out previously, and every chance

10  they had.  And we were in a short supply.  The landscape, the

11  supply availability was changing.  And, you know, at the end of

12  the day, I think we really were in -- for that 2015 contract

13  cycle, we were at a crossroads for the KFC business.

14          And, you know, either we were going to make some

15  significant changes, which were very painful for this system,

16  you know, no question about that, although I will say that, you

17  know, the brand obviously performed very well after that.  So

18  it's not like we bankrupted KFC by any stretch, but we had to

19  really -- if we didn't change what we were doing, we were going

20  to find ourselves -- whether it was in 2015 or somewhere down

21  the road, we were eventually going to find ourselves in a

22  position to where we couldn't supply COB.

23          So as painful as it was, what we had to do, I honestly

24  believe that we stabilized the landscape of COB for the years

25  that followed, even into the next contract cycle.  And had we

Richard Eddington - Direct

1    not done that, I honestly don't know what it would have looked

2    like.

3    Q.  What do you mean by "stabilizing" the market or the

4    landscape?

5    A.  You know, we were successful in showing suppliers that we

6    did want to kind of look at the partnership in a new way.  Yes,

7    part of that was absolutely in terms of paying them more to

8    allow them to make a reasonable margin compared to what other

9    alternate aspects of the industry were making, but also, you

10   know, we put in an everyday -- what we called an everyday

11   frozen program where we were sending some amount of frozen into

12   the stores every week so that suppliers could have more

13   consistent production patterns.

14        We were able to ultimately get the extra couple of

15   days of shelf life, and which on a fresh chicken 10- to 12-day

16   supply chain, that is extremely tight.  And everything pretty

17   well has to go to plan, because the stores at the end of the

18   day still have to have so many days in order to be able to work

19   through that product.

20        So things like that that we worked into that contract,

21   you know, really took a lot of the pressure off of, I think,

22   suppliers, you know, even really considering moving some of the

23   plants -- at least at that point in time moving plants away

24   from our business.

25   Q.  Did the increase in prices -- you talked about the increase

Richard Eddington - Direct

 1    in prices.  Did that have any effect on the stabilization that

 2    you just discussed?

 3    A.  Oh, absolutely.

 4    Q.  In what way?

 5    A.  Well, I mean, as I mentioned, the suppliers were, you know,

 6    considered and for all practical purposes, you know, they were

 7    at a bit of a disadvantage compared to other outlets for the

 8    product, so much less the fact that they were selling what

 9    could be perceived as at a bit of a discount to someone who

10    wasn't really even treating them that well for several years.

11         So I think that what we were able to do is, you know,

12    to some extent -- we certainly didn't at that point in time

13    completely level up to what those other larger birds were

14    yielding in terms of profit, but I think that just even getting

15    them partway there, I think that it helped obviously their

16    returns to their stakeholders, and, you know, in some cases I

17    think we also helped ourselves by being able to within a year

18    or two actually bring another competitor into the COB realm who

19    up to that point was not there.

20    Q.  Who was that competitor?

21    A.  OK Foods.

22    Q.  Now, we just talked about the three-year contract that was

23    negotiated in 2014 for 2015 through 2017.  Did RSCS and Claxton

24    renegotiate that contract before it expired in 2017?

25    A.  Yes.

Richard Eddington - Direct

1              *MR. KOENIG:*  Objection, leading.

2              *THE COURT:*  Overruled.

3    *A.*  Yes.

4    *BY MS. RAHMAN:*

5    *Q.*  Could you please turn to tab 4 in your binder which is

6    marked as Exhibit F-754.

7              *MS. RAHMAN:*  Your Honor, this exhibit has already been

8    admitted, and I would ask if it could be published, please.

9              *THE COURT:*  What was the exhibit number again?

10             *MS. RAHMAN:*  F-754.  I think it was admitted on

11   March 8, Your Honor.

12             *THE COURT:*  Yes, it has been, and you may publish it.

13   *BY MS. RAHMAN:*

14   *Q.*  Do you recognize this document, Mr. Eddington?

15   *A.*  I do.

16   *Q.*  And what is this?

17   *A.*  This is an updated cost model with Claxton Poultry dated

18   December 2nd, 2015 that would take effect on January 1st, 2016

19   through the end of the current contract cycle of December 2017.

20   *Q.*  And so did this contract get signed the year after the 2014

21   negotiations?

22   *A.*  Yes.

23   *Q.*  And who signed this contract on behalf of Claxton?

24   *A.*  Mikell Fries.

25   *Q.*  And who signed the contract on behalf of RSCS?

Richard Eddington - Direct

1   *A.*  I did.

2   *Q.*  Let's look at the second page of the contract.  Do you see

3   the total FOB cost?

4   *A.*  I do.

5   *Q.*  And what is it?

6   *A.*  1.0369 cents per pound.

7   *Q.*  And is that less than the price that was negotiated in 2014

8   by Claxton for the 2015-17 contract?

9   *A.*  I believe it was, yes.

10  *Q.*  And we saw in the bar chart earlier that we looked at that

11  Claxton's price negotiated in 2014 initially was 1.0669.  So is

12  that a 3-cent reduction from the initial contract price?

13  *A.*  That's correct.

14  *Q.*  Did Claxton have to renegotiate the contract?

15  *A.*  They did not.

16  *Q.*  Was it done at the request of RSCS?

17  *A.*  Yes.

18  *Q.*  So, Mr. Eddington, I want to ask you about the volume that

19  was allocated between the suppliers during the 2015

20  negotiations.  Did RSCS have a strategy when it was allocating

21  its volume among the suppliers?

22  *A.*  We did.

23  *Q.*  And what was that?

24  *A.*  First and foremost, we certainly needed to contract for the

25  number of loads that the brand KFC had forecasted that we

Richard Eddington - Direct

1    needed to secure.  And after that, we believed that we were a

2    little over-indexed with one particular supplier, so we were

3    trying to move loads away to some degree from that supplier

4    into others.

5    Q.  And who was that supplier?

6    A.  Pilgrim's.

7    Q.  And so why was RSCS diversifying away from Pilgrim's?

8    A.  Pilgrim's in previous years had been even a higher percent

9    of the supply, but we just really believed that we still had

10   too much of our business in one place, and, you know, to some

11   degree, they were pretty high.  Frankly, they were the most

12   difficult to work with and pretty well --

13          MR. KOENIG:  Your Honor, I need to object on

14   foundation grounds.  He had been at RSCS -- he arrived, like,

15   the day before negotiations began, and now he is testifying to

16   the historical relationship between Pilgrim's and RSCS, and he

17   has never worked at either place in that time period.

18          THE COURT:  Sustained.  If you could lay foundation.

19   BY MS. RAHMAN:

20   Q.  Mr. Eddington, when you arrived at RSCS, did you become

21   aware of RSCS's prior negotiation history?

22   A.  Yes.

23   Q.  And did you become aware of that prior negotiation history

24   in order to prepare yourself for the negotiations for 2015?

25   A.  Yes.

Richard Eddington - Direct

1    *Q.* And as part of becoming aware of the prior negotiation

2    history, did you become aware of negotiations with Pilgrim's?

3    *A.* Yes.

4    *Q.* And as becoming aware of the negotiations with Pilgrim's,

5    did you learn about Pilgrim's prior negotiation strategy before

6    you arrived at RSCS?

7    *A.* Yes.

8    *Q.* So, again, I ask you, Mr. Eddington, why was RSCS

9    diversifying away from Pilgrim's?

10            *MR. KOENIG:* Objection, foundation, calls for hearsay.

11            *THE COURT:* Overruled.

12   *A.* Because we wanted to move some percentage of our business

13   away, and even as the 2015 negotiations unfolded in 2014,

14   Pilgrim's was absolutely adamant that, you know, it was to some

15   degree going to be their way or they were going to -- they

16   didn't believe that we could cover loads without them and that

17   they were pretty determined to push through the highest price

18   increase compared to others.  So, therefore, it only made sense

19   for us to try to and desire to move some amount of business

20   away from Pilgrim's.

21   *BY MS. RAHMAN:*

22   *Q.* Was Pilgrim's the only --

23            *MR. LAVINE:* Your Honor, can we have a side bar,

24   please, Your Honor?

25            *THE COURT:* Yeah.

Richard Eddington - Direct

1          (At the bench:)

2               MS. RAHMAN:  Your Honor, I am being told we need a

3     stretch break.

4               THE COURT:  Yes.  I will call one.  Thanks.

5          (In open court:)

6               THE COURT:  Why don't we all take a stretch break as

7     we finish this conference up, so everyone can stand up and

8     stretch if you would like.

9          (At the bench:)

10              THE COURT:  I guess we really don't need to go through

11    the pretext of going through a bench conference.

12              MR. TUBACH:  I could ask the Court why did the chicken

13    cross the road.

14              THE COURT:  Do you have a good answer on that,

15    Mr. Tubach?

16              MR. TUBACH:  It's because the price was better on the

17    other side.

18              MR. FAGG:  Your Honor, can we get a response from the

19    government on that, please?

20              THE COURT:  They can reserve until the end of the

21    defendants' case.

22              MR. KOENIG:  I actually do have a response, so why did

23    the chicken cross state lines?  To create interstate commerce.

24              THE COURT:  We will not be sharing any of those with

25    the jury for fear of them not understanding the legal context

Richard Eddington - Direct

```
 1   and also for fear of them not laughing.

 2           Okay.  Seventh-inning stretch over.  Thanks.

 3        (In open court:)

 4   BY MS. RAHMAN:

 5   Q.  All right.  So you were talking about RSCS moving away from

 6   Pilgrim's.

 7           MS. RAHMAN:  I am sorry if I repeat this question,

 8   Your Honor.

 9   BY MS. RAHMAN:

10   Q.  But was Pilgrim's the only supplier that took this position

11   during the negotiations?

12   A.  Pilgrim's wasn't necessarily the only company that took

13   that position, but they were the staunchest in taking that

14   position.

15   Q.  Was price also a factor in how RSCS determined where its

16   volume was?

17           MR. KOENIG:  Objection, leading.

18           THE COURT:  Overruled.

19   BY MS. RAHMAN:

20   Q.  And how was price a factor?

21   A.  Price is always a factor in negotiations whenever we are

22   buying product.  So, you know, all things equal, price, quality

23   of the product, and past performance, things such as previously

24   how has that supplier covered their orders, their PO's or not,

25   have they had issues in supplying, you know, all of those
```

Richard Eddington - Direct

1    things, and, frankly, at some degree even into whether that

2    supplier was a good partner to our brands in terms of

3    developing new items or different items, all of those things

4    went into -- you know, freight -- to the overall allocation.

5    But, yes, price was a significant driver.

6    Q.   And generally, were all of the suppliers requesting

7    additional volume for the 2015 KFC contract?

8    A.   In 2015, most were not at that point requesting additional

9    volume.  A lot were wanting to just stay where they were, but

10   we did have some who requested additional.

11   Q.   And who was requesting additional volume?

12   A.   Koch Foods in particular.

13   Q.   And in allocating the volume for RSCS, generally were the

14   highest priced suppliers, were those the ones who lost volume?

15   A.   Whenever possible, yes.

16   Q.   And RSCS would allocate volume to the lower priced

17   suppliers?

18   A.   Whenever possible, yes.

19   Q.   Did you view the suppliers as competitors?

20   A.   Yes.

21   Q.   And what were they competing for?

22   A.   They were competing for volume, for business with

23   Yum Brands, KFC in particular for this negotiation.

24   Q.   And during the negotiations, what was your goal?

25   A.   My goal was to, No. 1, secure the supply that we needed for

Richard Eddington - Direct

1    the next three years as the negotiation went along.  It was

2    to -- certainly to minimize the price increases that we

3    anticipated and we were going to have to take, and, frankly, it

4    was about kind of resetting the relationships and just kind of

5    resetting our partnerships with the supplier base.

6    Q.  And how did you do that?

7    A.  With the -- you know, I think that, again, we were open, at

8    least to a degree, to what their needs were or allowed them to

9    air grievances, and I think we did try to incorporate and did

10   incorporate certain aspects.

11          In addition to just paying them more, you know, we

12   also worked with them as mentioned previously on having an

13   everyday frozen program, things to streamline, make their

14   process more efficient in terms of giving them an extra day or

15   two to produce such that in that world Wednesday is the worst

16   production day in a COB plant, because orders are heavy early

17   in the week, orders are heavy late in the week, and Wednesday a

18   lot of times the plant is standing around looking for something

19   to do.  They've got the same number of birds coming at them.

20   And anything that we could do to streamline that order pattern

21   over five days instead of three to four was something that was

22   win-win in our book.

23   Q.  Did RSCS give feedback to the suppliers on their pricing

24   models?

25   A.  We did.

Richard Eddington - Direct

1    Q.   Did your feedback include directional guidance?

2    A.   Yes.

3    Q.   What did that directional guidance look like?

4    A.   It could vary depending upon the circumstance.  It could be

5    everything from a range of percentages.  It could be -- you

6    know, one of the things that I personally liked to do in giving

7    feedback was telling people, you know, if they are more than a

8    penny or two off, or we wanted them at least to believe they

9    were more than a penny or two off, that we would say, You are

10   silver change out of the running, or you are silver change out,

11   which could be a nickel, could be a dime, could be a quarter.

12   That was up to them to figure out.  In certain cases, we would

13   give them potentially a target to go after.

14   Q.   Did you provide the suppliers with competitors' pricing

15   during negotiations?

16   A.   No.

17   Q.   When you gave ranges or percentages, would you disclose a

18   supplier's price?

19   A.   No.

20   Q.   Would you tell the supplier what they needed to do to win

21   the business from RSCS?

22   A.   We would give them -- tell them that if they -- at the last

23   round, if you can be either -- depending upon the conversation,

24   and, again, not every conversation was exactly the same, if

25   they could get to a certain point, they would be successful; or

2957

Richard Eddington - Direct

1   in some cases, again, it would be a percentage or a range of

2   percentages that we would give them that if they were to come

3   back to us within that certain range, then they would be

4   successful.

5   Q.   And was the first bid you received from a supplier the

6   final bid?

7   A.   No.

8   Q.   When RSCS used the term "competitive price" in feedback,

9   what did that mean?

10  A.   We were -- depending on which round it was, we would give

11  feedback based on where the negotiations were across the board

12  at that particular time.  Again, we may -- we may tell someone

13  that, Hey, listen, based on what we're seeing elsewhere, it

14  looks like you're 3 to 5 percent too high, in general guidance.

15  It could, frankly, also come in something as specific as

16  saying, Hey, we've looked at your model and your labor, or,

17  hey, your grow-out or one of your -- your yield, one of your

18  yields in the models, it seems to be out of whack compared to

19  your competitors.  Would you go back and take a look at that?

20  Q.   Would you also push back on the supplier who had the lowest

21  price?

22  A.   Yes.

23  Q.   Did you use volume as a negotiating tool?

24  A.   At times, yes.

25  Q.   What did that look like?

Richard Eddington - Direct

1  *A.*  For those who we deemed -- especially as we were getting

2  closer to the end, we may say, Hey, listen, you're certainly

3  going to get some volume, but if you could help us out another

4  couple of cents, you know, we might be able to give you X

5  number more loads, if that was something that that supplier

6  would have been interested in.

7  *Q.*  And did Claxton respond to your directional guidance?

8  *A.*  They did.

9  *Q.*  What is bluffing in the context of contract negotiations?

10  *A.*  Ultimately leading your -- you know, the person on the

11  other side of the table, wanting them to believe that your

12  position is stronger or slightly different or that you may have

13  a little more leverage than you actually do.

14  *Q.*  Do suppliers bluff?

15  *A.*  Yeah, they do.

16  *Q.*  Did you bluff?

17  *A.*  Yes.

18  *Q.*  Did others on your team bluff?

19  *A.*  Yes.

20  *Q.*  What does that really look like?

21  *A.*  You know, that is -- as an example, you know, if a supplier

22  believes that we don't have the ability to move away from them

23  or at least move significantly away from buying from them to go

24  to someone else, we may not -- at least at that particular

25  moment, we may not have those loads or that volume of product

Richard Eddington - Direct

1    kind of tucked away and ready to claim.

2        But we would absolutely, you know, lead a supplier to

3    believe that, you know, Hey, I wouldn't get too proud of your

4    product over there because we've got some other folks who are

5    ready to take it if we can't work something out.  That would be

6    one example of bluffing.

7    Q.  Would you bluff on prices that you had in the door?

8    A.  Yes.

9    Q.  Now, when you worked for suppliers when you were on the

10   supply side, did you discuss pricing information with other

11   competitors?

12   A.  No.

13   Q.  Moving back to the RSCS, the procurement side, did you ask

14   suppliers to discuss their bids or any specific pricing

15   proposals with each other?

16   A.  No.

17   Q.  Do you know what a cover and short is?

18   A.  Yes.

19   Q.  Can you explain what that means to the jury?

20   A.  You know, over the chickens, you know, we like to say

21   chickens aren't widgets, so that you can plan, you know, all

22   you want to, but at the end of the day whenever the birds come

23   into the plant, they may or may not be the exact right size,

24   enough of them.  There could be processing plant issues.  There

25   could be things that prevent you from processing your orders

Richard Eddington - Direct

1    and producing your orders the way that you planned.

2            And, you know, obviously, the restaurants still needed

3    that product.  Just because a particular plant that was issued

4    a purchase order couldn't produce it, we still had to get that

5    somewhere else.  So there were times whenever one of the

6    suppliers would be short for whatever reason and they couldn't

7    cover our PO's, and they would work with us and potentially

8    with each other at times to find someone who could help us

9    cover that purchase order.

10   Q.  Did you expect the suppliers to work together to cover

11   shorts?

12   A.  To some degree, yes.

13   Q.  And did suppliers learn pricing information when buying

14   chicken from one another?

15   A.  On occasion they had to, yes.

16   Q.  And that was to be expected?

17   A.  Yes.

18   Q.  Are you aware that some chicken suppliers routinely

19   purchase chicken parts from other chicken suppliers in order to

20   supplement the chickens which come from the chickens that the

21   supplier grows and processes?

22   A.  Absolutely, yes.

23   Q.  And are you aware that this is done particularly by those

24   suppliers --

25           MR. KOENIG:  Objection, leading, foundation.

Richard Eddington - Direct

1          MS. RAHMAN:  Let me rephrase the question, Your Honor.

2          THE COURT:  Go ahead.

3   BY MS. RAHMAN:

4   Q.  Are these typically -- what type of transactions are these

5   between suppliers?

6   A.  There is -- over the course of the industry, there are

7   certain companies who absolutely do not grow enough chickens of

8   their own, but yet say, for instance, in order to produce

9   chicken nuggets, chicken strips, chicken wings, things like

10  that, or fully cooked wings, that they have to go and buy that

11  what would be considered raw material to them from somewhere

12  else, and obviously that would be buying from their competitive

13  set and bringing into their own plants to then further process.

14  Q.  Would this require communications between companies?

15  A.  Yes.

16  Q.  Are you aware of a buy versus grow strategy at Tyson's?

17  A.  I am.

18  Q.  And what is that?

19  A.  Tyson several years ago decided that it --

20          MR. KOENIG:  Objection, foundation.

21          THE COURT:  He said he was aware of it.  Can you lay

22  further foundation as to what knowledge he has?

23          MS. RAHMAN:  Certainly.

24  BY MS. RAHMAN:

25  Q.  How are you aware of the buy versus grow strategy at Tyson,

Richard Eddington - Direct

1   Mr. Eddington?

2   *A.*   Because I have purchased product of all types from

3   Tyson Foods over the past eight years up to and including today

4   and as comes out directly from Tyson in my negotiations and

5   dealings with them.

6   *Q.*   So what is the buy versus grow strategy?

7   *A.*   Tyson, in order to stay -- keep product off of the

8   commodity markets, which generally speaking does not yield as

9   high of a return, Tyson wanted to take advantage of other

10  companies who were growing more birds than they could consume,

11  process internally, so, therefore, they did not grow all of the

12  chickens that they need to run specifically their further

13  processing plants, again, chicken nuggets, chicken patties,

14  things of that nature.  So they purposefully went out and had

15  contracts set up on anything from an annualized basis to a spot

16  basis to buy that needed raw material from others, competitors

17  in the industry.

18  *Q.*   So if a supplier like Tyson is selling its customer chicken

19  parts as you just discussed and the parts exceed the amount of

20  the parts that they produce, do they have to buy from another

21  supplier?

22  *A.*   They are either going to buy from somewhere else or they

23  are going to short their customer, which is not generally good

24  business practice.  So, yes, they have to buy that product

25  somewhere.

2963

Richard Eddington - Direct

1    Q.  Are you aware whether they would have to plan to buy those

2    chicken parts from other suppliers?

3    A.  In the buy versus grow, absolutely.  There was planned

4    procurement from the outside to come in to match up to the

5    sales that they had made.

6    Q.  And would this require the suppliers to communicate with

7    one another?

8    A.  Yes.

9    Q.  Now, Mr. Eddington, I want to switch gears, and I want to

10   talk about the negotiations for the 2018 KFC contract.

11   A.  Okay.

12   Q.  Are you familiar with period pricing?

13   A.  I am.

14   Q.  What is period pricing?

15   A.  At Yum in general and KFC, we had instead of a January,

16   February, March monthly pricing, we had 13 four-week periods,

17   so that when we were pricing chicken on the bone, each of those

18   four-week periods was considered its own in terms of pricing,

19   and that's what the model was based off of.  And mostly that

20   goes back into the grain and chicken feed aspect of it, so that

21   our RSCS risk management team would work with suppliers to

22   hedge or book grain based on those four-week increments.

23   Q.  And do the suppliers submit their period pricing to RSCS in

24   advance of every period?

25   A.  That's correct.

Richard Eddington - Direct

1    *Q.*   What does RSCS do with the period pricing?

2    *A.*   Carol Knight, who I referenced earlier on my team, she

3    would receive that pricing, and she would first go through it

4    to make sure there were no calculation errors.  She would make

5    sure that the grain numbers that RSCS had booked with that

6    supplier for that period of time matched up.  And then she

7    would -- if there was any questions, she would bring it to me.

8    If there were no questions, then she would publish a report out

9    to our distribution partners so that they would then be able to

10   know what -- at what values to place PO's for that next period

11   to the suppliers.

12           And then ultimately, every franchisee in the system

13   received a customized report based on what their pricing was

14   going to be for each distribution center that they purchased

15   out of for that next period.

16   *Q.*   You mentioned "distribution partners."  What's a

17   distribution partner?

18   *A.*   We, KFC or Yum, did not -- when we buy product from a

19   supplier, we don't take it -- in some cases, the supplier, the

20   chicken suppliers actually did distribute that directly or get

21   it directly to the stores, but in most cases, there is a

22   third-party intermediary that we would have a contract with who

23   would buy on our behalf.  We never took title to the product.

24   They would buy off of our master contracts.  And the supplier

25   would either deliver to that distribution center or the

Richard Eddington - Direct

1    distributor would arrange transportation from the supplier to

2    the distributor.

3            They would then bring every other item needed for,

4    say, a KFC store, bring it all in and then put it on one of

5    their what we called a route truck which would then go to the

6    KFC stores and deliver all of the goods that that store needed

7    to operate for a period of time, anywhere from two to four days

8    usually.

9    Q.  Can I ask you to look at tab 13 in your binder?  And that's

10   Exhibit I-054.

11           MS. RAHMAN:  Your Honor, I believe that was admitted

12   on March 8th.

13           THE COURT:  Yes, it has been admitted.

14           MS. RAHMAN:  May I please publish, Your Honor?

15           THE COURT:  You may.

16   BY MS. RAHMAN:

17   Q.  Mr. Eddington, what is this document?

18   A.  That is a document, a report showing that for Period 2 of

19   2017, it's an internal report showing what all of the FOB or

20   what the prices for our KFC eight-piece and then the

21   supplemental parts would be based off of -- without freight at

22   the suppliers' dock, what we called FOB supplier at that point.

23   Q.  Was this document created by RSCS?

24   A.  It was.

25   Q.  Do you see Claxton's Period 2 pricing on that sheet?

Richard Eddington - Direct

1    A.   I do.

2    Q.   And what was Claxton's Period 2 pricing?

3    A.   For eight-piece, we called it Purple, chicken on the bone,

4    it was .9943 cents per pound.

5    Q.   Was this sheet used in the distribution by RSCS to the

6    distributors and franchisees of the period pricing?

7    A.   Yes.  It would have -- the information to the distributors

8    might have been slightly edited based on any freight nuances

9    with that, but all of that information was based off of this,

10   yes.

11   Q.   Now, you were involved in 2017 on behalf of RSCS in

12   negotiations for the '18-'20 contract, correct?

13   A.   That's correct.

14   Q.   What was your role?

15   A.   My role was as the lead in those negotiations.

16   Q.   Do you know what Claxton's 2017 contract price was for

17   eight-piece at the time of the negotiations?

18   A.   Not specifically.

19   Q.   I am going to ask you to look at tab 4 in your binder.

20   That's been marked F-754.

21        MS. RAHMAN:  Your Honor, I believe this also has been

22   admitted on March 8th.

23        THE COURT:  Yes.

24        MS. RAHMAN:  May I please publish it?

25        THE COURT:  You may.

Richard Eddington - Direct

1    *BY MS. RAHMAN:*

2    *Q.*  Do you recognize this document?

3    *A.*  I do.

4    *Q.*  So let's look at the eight-piece price.  What was Claxton's

5    eight-piece price going into the negotiations for 2017?

6    *A.*  It's 1.0369 per pound.

7    *Q.*  We just saw that Claxton's period pricing was .9943?

8    *A.*  Correct.

9    *Q.*  So what accounts for the difference between the Period 2

10   pricing and the actual contract price for 2017?

11          *MR. KOENIG:*  Your Honor, I could be wrong, but

12   according to my list, this was not admitted.  I could be wrong.

13          *THE COURT:*  Yeah, I show it has been admitted.

14          *MR. KOENIG:*  Okay.  Sorry.

15          *THE COURT:*  That's all right.

16          Go ahead, Ms. Rahman.

17   *BY MS. RAHMAN:*

18   *Q.*  Mr. Eddington, what accounts for the difference between the

19   Period 2 pricing and the actual contract price?

20   *A.*  That would be generally grain.

21   *Q.*  And did all of the suppliers have the exact same inputs for

22   the grain and the feed?

23   *A.*  Not necessarily.

24   *Q.*  And explain how that would vary.

25   *A.*  Some suppliers, especially those that were publicly traded,

2968

Richard Eddington - Direct

1    they had certain internal covenants that they had to abide by

2    in terms of how far their risk management program could go out

3    and allow us to book grain.  Other companies, the privately

4    held companies, didn't necessarily have the exact same

5    limitations.

6          So there were times where we would be able to go,

7    depending upon what the grain futures were and whether we

8    thought they were beneficial to us, to go ahead and book as

9    long as possible.  There were times that we would be able to

10   book out front farther with one supplier than another supplier.

11   There were times that our risk management team -- because they

12   didn't always just book a hundred percent at any given time.

13   Sometimes it would be in 25 percent coverage here, 50 percent

14   coverage there, and sometimes just even whenever the orders got

15   confirmed, the market could potentially change a little bit.

16         So at the end of it, those numbers wouldn't

17   necessarily be the same, but even if those base corn and soy

18   meal numbers were, freight and basis numbers, which is another

19   cost of the grain, would definitely be different, and we did

20   not control that aspect of it.

21   Q.  Back to the negotiations.  Who was on your team for these

22   negotiations in 2017?

23   A.  Initially, Pete Suerken was there, but Pete Suerken left

24   RSCS in February of 2017, so -- but Sara Fisher was part of my

25   team at that point.  She was what we call the category lead

Richard Eddington - Direct

1    over COB.  And Steve Campisano was still there.  And Todd

2    Imhoff took a little more active role especially on Pete's

3    departure.

4    Q.  What was Ms. Fisher's role in the negotiations?

5    A.  She was -- she was the category manager over COB.  She had

6    really just moved into procurement within the previous year, so

7    we were -- she was still learning.  You know, absolutely, she

8    would be the person who would send out communications to

9    suppliers, who would help set up meetings, who would gather

10   data, some degree of analyzing.  But at the end of the day, the

11   information that she received, put out, went to Todd --

12   Todd Imhoff, myself and Todd.

13   Q.  Did Ms. Fisher have a role in the decision-making process

14   for the negotiations?

15   A.  She had input, but she did not have decision-making

16   authority.

17   Q.  So when did these negotiations begin for the 2018 to

18   '20 contract?

19   A.  We signaled to suppliers in December of 2016 that we wished

20   to begin getting together and talking about the new contract

21   right after the beginning of the year.

22   Q.  Did these negotiations start earlier than in previous

23   years?

24   A.  Absolutely.

25   Q.  And why was that?

2970
Richard Eddington - Direct

1   A.  We wanted to get ahead of the competition, and by

2   "competition," I am referring to Popeye's, Church's, you know,

3   potentially even maybe some of the deli folks.  But, you know,

4   we had been on a three-year basis.  I don't know specifically

5   what all of our competitors were doing, but my guess was that

6   at least some of them had stayed on annual contracts.

7        So, you know, we believed that we had made strides in

8   repairing the relationship and becoming closer again to that

9   customer of choice.  The landscape that was, you know, almost

10  the perfect storm against us in 2014 had leveled itself out

11  somewhat and, if anything, come back a little bit in our favor.

12       And, you know, we also wanted to ultimately see if

13  there was a way that we could potentially claw back a little

14  bit in the latter part or the last part of 2017 in that

15  contract as part of those negotiations.

16  Q.  Did you have initial meetings with the suppliers?

17  A.  In the early part of 2017, yes.

18  Q.  Did RSCS schedule these initial meetings with the

19  suppliers?

20  A.  We did.

21  Q.  Was there any strategy involved in the scheduling of the

22  meetings with the suppliers?

23  A.  To some degree, yes.  You know, we certainly wanted to set

24  those meetings up as a way of just making sure that suppliers

25  understood that, you know, it was a bit of a new day, that we

Richard Eddington - Direct

1    hoped that we had come a long way over the previous -- at that

2    point almost three years, but also that we wanted to set the

3    expectations that, you know, we were expecting the price to go

4    down for the next round of -- you know, of negotiations.

5           And, you know, as I mentioned before, we had another

6    COB supplier come into the mix over the course of between 2015

7    and 2017, so supply was a little more plentiful, and, frankly,

8    KFC's business was down a little bit, so we didn't need quite

9    as much as we thought we did previously.  And, you know, we

10   wanted to get ahead of the messaging to suppliers, so to some

11   degree we brought suppliers in and where possible in a

12   particular order.

13   Q.   When you say "get ahead of the messaging" --

14   A.   We wanted the messaging that we weren't going to -- that

15   while we appreciated our renewed partnership, that we planned

16   on clawing back some of the gains that -- you know, some of the

17   profit that they needed, at least to a degree over the past

18   three years, but that we were going to bring some of that back.

19   And, again, we weren't going to be quite as beholden to the

20   supply aspect.

21          So we would bring folks in to a degree in terms of

22   knowing that there are, you know, relationships across the

23   industry, that sometimes we would bring people in who we knew

24   might be able to help us get that messaging out to other folks

25   who might be more resistant to that message and by the time

Richard Eddington - Direct

1    they came to us, that they had already at least heard it by the

2    time they got to us.

3    Q.  When you say "helped you get the message out," what do you

4    mean by that?

5    A.  In general terms, it's not unusual for competitors to talk

6    about, Hey, wow, went to RSCS today.  How did that go?  Well,

7    these guys are -- you know, these guys are expecting us to come

8    back and really sharpen our pencils this time; or, hey, these

9    guys are -- you know, they've got more supply than what they

10   had before, so, you know, everybody better be ready, that type

11   of thing.

12   Q.  And you didn't ask them to talk.

13   A.  Oh, absolutely not.

14   Q.  But you scheduled, you said, the -- you scheduled the

15   meetings in a particular order.

16   A.  Yes.

17   Q.  And was that to help with the messaging?

18   A.  If -- one way or the other we were going to get the message

19   out.  If there had been -- if there are no conversations, no

20   problem.  You'll hear it when you get here.  If there happen to

21   be a bit of a, you know, Hey, these guys are expecting us to --

22   expecting things to be a little different this time before

23   people came in, that's okay too.

24   Q.  Was there any pricing exchanged at these initial meetings?

25   A.  Not that I recall, no.

Richard Eddington - Direct

1   *Q.*  You mentioned the perfect storm and the landscape changing.

2   So what were the market conditions like going into these

3   negotiations?

4   *A.*  In 2017?

5   *Q.*  Yes, 2017.

6   *A.*  As mentioned, KFC first off, we -- in hindsight, we

7   probably bought more loads in 2015 based off the forecast given

8   by the brand than we actually had to, so we frankly didn't do

9   ourselves any favors.  So we were trying to -- and KFC's

10  business had mix shifted over the course of even that three

11  years to more popcorn chicken, tenders, some of the boneless

12  items, and a way, to some degree, the newer consumer coming

13  into KFC didn't want the bone-in chicken quite as much as what

14  we kind of considered the legacy 50-year-old-and-up KFC

15  customer did.  So that mix shift had caused us to need even

16  fewer loads, so we were trying to right size that.

17         And also, as mentioned, the OK Foods, the newer

18  competitor came in, and so we were able to kind of off contract

19  do just a little incremental work to get them approved into the

20  system.  So we knew that we had incremental supply that

21  previous we didn't have access to.

22         Plus, frankly, at that point the big-bird margins that

23  really helped drive a lot of the margin need in 2014, that

24  had -- it was generally still maybe higher than small bird, but

25  that had stabilized itself, so that wasn't nearly as much of an

Richard Eddington - Direct

1   issue or topic of conversation in the next contract.

2   Q.  During these negotiations, did you negotiate with Mr. Brady

3   on behalf of Claxton?

4   A.  I did.

5   Q.  Had Claxton's negotiation strategy changed at all from the

6   2014 negotiations for '15?

7   A.  No.

8   Q.  You talked about the product mix or the volume mix

9   changing.  Did that impact your negotiations in any way?

10  A.  Only from the standpoint that, you know, we didn't need to

11  buy as much, so again we could be a little pickier in terms of

12  if someone was trying to play hard ball.  It made it easier for

13  us to kind of stand our ground and not have to give in as we

14  might have done previously.

15  Q.  Were you still able to use volume as a negotiating tool

16  there?

17  A.  Oh, absolutely.

18  Q.  During the 2017 negotiations, was there a particular price

19  per case you were trying to get the suppliers to agree to?

20  A.  As we got towards the latter stages, you know, we had kind

21  of honed in on $49 per case, so that kind of became a base

22  benchmark.

23  Q.  Did you communicate this to Mr. Brady?

24  A.  I believe I did, yes.

25  Q.  Do you know when you communicated it to Mr. Brady?

Richard Eddington - Direct

1  *A.*  I don't remember specifically.

2  *Q.*  Is there a document I could show you that would refresh

3  your recollection?

4  *A.*  Potentially.

5  *Q.*  Can you look at tab 17 in your binder?

6        *MS. RAHMAN:*  This is F-917, just for the Court and the

7  witness and counsel.  I am showing Mr. Eddington what's

8  previously been marked F-917.

9  *BY MS. RAHMAN:*

10  *Q.*  If you could review that by reading it to yourself, please.

11  *A.*  Okay.

12  *Q.*  You can put it away now.  Does this refresh your

13  recollection regarding whether you communicated that to

14  Mr. Brady?

15  *A.*  It does, and I did.

16  *Q.*  And when did you communicate that to Mr. Brady?

17  *A.*  February 22nd, 2017.

18  *Q.*  And do you recall whether Claxton agreed to the $49-a-case

19  price as you requested?

20  *A.*  They did.

21  *Q.*  Do you know when Claxton agreed to that?

22  *A.*  February 23rd, 2017.

23  *Q.*  Do you know whether Mr. Brady asked for more volume at that

24  time?

25  *A.*  He did.

Richard Eddington - Direct

1  Q.  Now, during the negotiations did RSCS propose stair-step

2  pricing?

3  A.  We did.

4  Q.  What was the purpose of the stair-step pricing?

5  A.  As I mentioned, one of the things that had -- we didn't

6  bring it up initially, but as the negotiations came on, because

7  the landscape had changed, because we were still in the third

8  year of this, you know, relatively high-priced COB contract,

9  our system, our franchisees, our stakeholders, they really

10 desired to see some benefit sooner than 2018.

11        So it was our desire to try to work with suppliers to

12 bring at least some, you know, pull forward pricing decreases

13 into the back half of 2017, and then, you know, we would work

14 into the new contract.  And it turned out that that meant that

15 we were getting benefit in 2017, then we had incremental

16 benefit in 2018, and then the full, you know, final contract

17 numbers took place in 2019 through 2020.

18 Q.  Did Claxton agree to the stair-step pricing proposal?

19 A.  They did.

20 Q.  Did RSCS also ask Claxton to renegotiate the last six

21 months of its current contract?

22        MR. KOENIG:  Objection, leading.

23        THE COURT:  Overruled.

24 A.  Yes.  That was part of this process, yes.

25 BY MS. RAHMAN:

Richard Eddington - Direct

1   *Q.*  Did Claxton have to do that?

2   *A.*  No.

3   *Q.*  Did Claxton do that?

4   *A.*  Yes.

5   *Q.*  Was RSCS able to claw back some of the price increases from

6   the 2015 negotiations -- the 2015 contract?

7   *A.*  In the second half of 2017, yes.

8           *MS. RAHMAN:*  One moment, Your Honor.

9           *THE COURT:*  Sure.

10  *BY MS. RAHMAN:*

11  *Q.*  Would you consider the negotiations successful for the

12  2018-20 contract?

13  *A.*  Yes.

14  *Q.*  Why?

15  *A.*  Because we were able to -- everything from incorporating,

16  fully incorporating a new supplier, we were able to claw back

17  on some of the pricing versus the previous contract.  I think

18  our overall relations with the supply base was, you know, still

19  improving, but much better than it had been three years past

20  even after at least -- for the most part at least after those

21  contracts, so, yeah, I think it absolutely was a win-win for

22  all parties.

23  *Q.*  Was RSCS able to negotiate savings to the system?

24  *A.*  We were.

25  *Q.*  Do you recall what those savings were?

Richard Eddington - Cross

1   A.   I don't recall the specific savings, no.

2   Q.   Now, Mr. Eddington, you and I have met before today,

3   haven't we?

4   A.   Yes.

5   Q.   And we've discussed several of the things we talked about

6   today, haven't we?

7   A.   Correct.

8   Q.   And, Mr. Eddington, prior to the defense calling you as a

9   witness, you gave an interview to the government, correct?

10  A.   I did.

11  Q.   Do you recall that interview occurred on September 17th,

12  2021?

13  A.   That sounds correct, yes.

14  Q.   Was that your own interview with the government?

15  A.   It was.

16  Q.   Following this interview, did you ever receive a subpoena

17  from the government to testify at any hearing?

18  A.   I did not.

19  Q.   Did you receive a subpoena from the government to testify

20  at this trial?

21  A.   No.

22        MS. RAHMAN:   Thank you very much, Mr. Eddington.

23                        **CROSS-EXAMINATION**

24  BY MR. GILLEN:

25  Q.   Good afternoon, Mr. Eddington.   How are you?

Richard Eddington - Cross

1    *A.*   Fine.

2    *Q.*   Craig Gillen.  I represent Brian Roberts.  We have met

3    before, haven't we?

4    *A.*   Yes, sir.

5    *Q.*   A few follow-up questions.  When you came in the summer of

6    2014 to RSCS, you had come from a supplier, correct?

7    *A.*   Correct.

8    *Q.*   And what was the name of that supplier again?

9    *A.*   At that point, it was Mar-Jac Poultry.

10   *Q.*   Now, when you were at Mar-Jac, are you aware of these

11   conditions that you described on direct examination earlier

12   concerning the market conditions for small bird in 2014?

13   *A.*   Yes.

14   *Q.*   When you arrived, you indicated that Pete Suerken was your

15   boss, correct?

16   *A.*   That's correct.

17   *Q.*   I think you also indicated that Mr. Suerken had not had, to

18   your knowledge, any experience in chicken, specifically

19   small-bird negotiations prior to the summer of 2014; is that

20   right?

21   *A.*   That's correct, to the best of my knowledge.

22   *Q.*   In addition to Mr. Suerken and you, there was also

23   Mr. Lewis, correct?

24   *A.*   That's right.

25   *Q.*   Now, Mr. Lewis, were you aware that he had come out of

Richard Eddington - Cross

1    retirement and had been essentially out of the chicken business

2    for five years?

3    A.  Yes.

4    Q.  A lot had changed in five years, correct?

5            MR. KOENIG:  Leading.

6            THE COURT:  Overruled.

7    A.  Yes, sir.

8    BY MR. GILLEN:

9    Q.  Now, on earlier examination, you indicated, used the phrase

10   "perfect storm," okay?  What do you mean by perfect storm in

11   the summer of 2014?

12   A.  By that, I mean that KFC had run out of chicken in Mother's

13   Day of 2014, May 2014, partially because they were in a

14   buy-one-get-one-free on their busiest sales day of the year,

15   which we won't get into that, but even after that there is --

16   still demand was up.  They started this $5 Fill Up campaign, so

17   their need for COB had come back up, and at the same time the

18   industry supply was down.

19           We had other competitors such as Popeye's who were

20   growing.  The deli WOG segment of the market was absolutely

21   growing.  And then as mentioned, you know, even with all of

22   that, there was still a margin crunch for small birds compared

23   to what was available in the large-bird segment of the

24   industry.  So we needed more demand.  Supply was limited and

25   more expensive.  It doesn't get a whole lot worse than that.

Richard Eddington - Cross

1    *Q.*  Perfect storm being growing demand for small birds, but at

2    the same time a restriction in the production of small bird due

3    to market conditions, correct?

4    *A.*  Yes.

5    *Q.*  Now, that perfect storm that was in place, is that

6    something that you would consider to be market conditions which

7    drove up the prices that we saw in 2014?

8              *MR. KOENIG:*  Objection, leading.

9              *THE COURT:*  Overruled.

10   *A.*  Yes.

11   *BY MR. GILLEN:*

12   *Q.*  When you arrived, you had indicated early on examination

13   that the RSCS expectation for increase was somewhere between

14   3 and 5 cents, correct?

15   *A.*  That's correct.

16   *Q.*  Did you based upon what you knew from Mar-Jac and your

17   knowledge of the marketplace in terms of specialists in

18   small-bird chickens, did you think that that was realistic of

19   them?

20   *A.*  No.

21   *Q.*  Now, you indicated that -- when you were talking about the

22   economics that took place in the summer of 2014, you were

23   giving us an example of the large bird being worth essentially

24   $1 more; is that correct?

25   *A.*  That's correct.

Richard Eddington - Cross

1   Q.  Then you were explaining how in terms of the profit or the

2   margin to a supplier that might end up being -- the difference

3   might end up being somewhere in the neighborhood of 34 cents a

4   pound; is that right?

5   A.  Well, in order for a yielded or dressed small bird to -- a

6   4-pound live weight to make up that delta, it would take

7   approximately an additional return of 34 cents per WOG pound or

8   25 cents per live pound in order to make up that difference.

9   Q.  We are talking about per pound?

10  A.  Per pound, that's correct -- no, I'm sorry.  My mistake.

11  That is per bird.  It's a dollar per bird delta.  So in order

12  to do that, that would be 25 cents per bird, 25 cents per bird

13  live, 34 cents per bird dressed or WOG weight in order to make

14  up that $1 delta per bird.

15  Q.  Per bird?

16  A.  Per bird.

17  Q.  And so is that when you -- is this knowledge that you had

18  in the summer of 2014?

19  A.  Yes.

20  Q.  When you were thinking about what the realistic expectation

21  should be, did you factor in in your analysis this huge

22  disparity between big-bird and small-bird profitability for

23  suppliers?

24  A.  Could you repeat the question, please?

25  Q.  When you were factoring in what you thought was realistic

Richard Eddington - Cross

1   for increases in the summer of 2014, did you factor in this

2   huge disparity between profitability on big bird and small

3   bird?

4   A.   I didn't factor in the complete difference in there, but I

5   definitely factored in some of that.

6   Q.   It was in the back of -- it was sort of in the larger

7   picture.

8   A.   That's correct.

9   Q.   Now, when the strategy was being developed with RSCS about

10  how to deal with the contract, we talked about the three years,

11  correct?

12  A.   Correct.

13  Q.   To get some consistency and something that KFC could rely

14  upon, right?

15  A.   Correct.

16  Q.   Now, in addition, was there a -- part of the strategy an

17  effort to incentivize the suppliers to stay in the small-bird

18  business?

19  A.   Yes.

20  Q.   Tell us about that.

21  A.   We, as I mentioned earlier, we needed to be able to secure

22  that supply for not just one year, but we needed to be sure

23  that that supply was going to be available for multiple years.

24  So, again, working with suppliers, in addition to the

25  profit-margin aspects of it which had to change, we also wanted

Richard Eddington - Cross

1   to do things which would make it more efficient for them to

2   process and more efficient for -- such as the two extra days of

3   shelf life, such as using the frozen product which would help

4   kind of streamline and take some of the -- you know, not only

5   the daily, but some of the seasonality out of this boom/bust

6   order pattern.

7   Q.   Now, when this strategy -- you arrived the first part of

8   August, correct?

9   A.   That's correct.

10  Q.   Were you aware of whether RSCS had engaged earlier in the

11  summer the suppliers and engaged in discussions about their

12  expectations and some of their cost models even before there

13  were meetings in August?

14  A.   Yes, yes, I'm aware that that happened.

15  Q.   Now, were you also aware that during the July period, June

16  and July period, that RSCS for specific loads was paying in the

17  neighborhood of $1.30 to $1.45 a pound for chicken?

18  A.   I am because I sold some of those loads to RSCS.

19  Q.   I am sorry, I couldn't hear you.

20  A.   I sold some of those loads to RSCS on a spot basis, so I am

21  absolutely aware.

22  Q.   So when you were at Mar-Jac, you were filling some of

23  those.

24  A.   That's correct.

25  Q.   And at that point in time, some of the price might be even

Richard Eddington - Cross

1    less than a dollar per pound on the contract that was in

2    existence in 2014?

3    *A.*  Yes, it was less than a dollar on the model at that point

4    in 2014, at least the model that my then company supplier was

5    working off of.

6    *Q.*  Was it your understanding that the negotiations with RSCS

7    for the KFC contract started earlier in the year than what

8    usually happens in annual negotiations?

9    *A.*  Yes.

10   *Q.*  Now, given the RSCS purchase of chicken at up to $1.45 per

11   pound in the summer and then accelerating up the bidding

12   process, around that time period they were paying that kind of

13   money, what impact, if any, do you think that had on the

14   suppliers' analysis of where the marketplace might go?

15           *MR. KOENIG:*  Objection, foundation.

16           *THE COURT:*  Overruled.

17   *A.*  I know that suppliers or at least one supplier at that

18   point was thinking, Hey, well, the negotiations start at about

19   $1.30 per pound because that's what they have been offering us.

20   *BY MR. GILLEN:*

21   *Q.*  So in other words --

22   *A.*  The supplier that I worked for at that point in time is how

23   I know that.

24   *Q.*  Mar-Jac.

25   *A.*  Yes.

2986

Richard Eddington - Cross

1    *Q.* So at Mar-Jac when you're getting -- selling chicken for

2    $1.30, was it reasonable to think we might ask $1.30 because

3    that's what they're paying?

4    *A.* Yes.

5    *Q.* Now, we do understand that wasn't on an annual basis, but

6    on specific loads for the summer, correct?

7    *A.* That's correct.

8    *Q.* You said something earlier about stabilizing the small-bird

9    market.  I want to ask you some questions about that.  Do you

10   believe that the increases that were paid by RSCS to the

11   suppliers for the 2015 through 2017 contracts actually helped

12   save or stabilize the small-bird industry and stopped it from

13   going even higher?

14        *MR. KOENIG:*  Your Honor, can we have a side bar?

15        *THE COURT:*  Yes.

16     (At the bench:)

17        *THE COURT:*  Mr. Koenig, go ahead.

18        *MR. KOENIG:*  Thank you, Your Honor.

19        This is precisely turning into the type of

20   cross-examination that I raised my concerns about before lunch.

21   It's getting to the point now where Mr. Gillen is the one

22   testifying.  And I think it's just inappropriate given that,

23   you know, they have aligned incentives with Mr. Brady, and they

24   did direct.  I think that Mr. Gillen should have to do direct

25   exam questions, nonleading.

Richard Eddington - Cross

1          THE COURT:  Any response, Mr. Gillen?

2          MR. GILLEN:  Your Honor, I believe I am following up

3   on areas with more specificity that were raised by this witness

4   during the previous examination, and I believe that I have the

5   right to engage in the examination as I have been conducting it

6   and would ask that the Court overrule the government's

7   objections.

8          THE COURT:  Any other defendants want to comment?

9   This is somewhat of a general topic that may apply to other

10  examinations by other defendants.

11         Okay.  Go ahead, Mr. Koenig.

12         MR. KOENIG:  The one thing I just wanted to point out

13  was this last question, if you look at it, it's, Do you believe

14  the increases that were paid by RSCS to the suppliers in that

15  long time period helped save or stabilize the small-bird

16  industry and stopped it from going even higher.  I mean, that

17  is a very, very leading question, and it's just -- it's him

18  testifying basically, Mr. Gillen.

19         THE COURT:  Well, the question, it's a leading

20  question, there is no doubt about it.  Here is the deal.  I

21  looked at the notes to Rule of Evidence 611.  That

22  particular -- the notes are not exactly on point.  I think what

23  you can draw from the notes is that the Court would have the

24  discretion to determine whether or not given parties that are

25  so closely aligned that cross-examination would be

2988

Richard Eddington - Cross

1  inappropriate by one as to questions that the other asked.

2      The problem, though, is that that becomes a difficult

3  rule for the Court to try to police essentially in terms of

4  identity of interest, because the identity of interest could in

5  some cases be various to different defendants.  And, for

6  instance, here I agree with Mr. Koenig that that follow-up

7  question is kind of almost piggybacking on something Ms. Rahman

8  asked.

9      And if there is that type of setups, if I determine

10  those to be setup questions where the first party who calls a

11  witness asks a question like that and then someone hops up and

12  then seems to follow it up with a highly loaded leading

13  question, I may step in.  But as I said, I am choosing to

14  exercise my discretion not to do that.

15      We didn't have much of a problem in the first trial

16  with that issue, and so I am going to allow leading questions

17  by other defendants.  But once again, if the government

18  believes that there is some -- there is a setup that's going on

19  by parties with closely aligned interest, then it's free to

20  object.

21      Any questions about that?

22      MR. KOENIG:  Your Honor, I do believe that you hit the

23  nail on the head with this one.  It does appear that it was set

24  up that way, and so I would ask that, you know -- I understand

25  your ruling -- that they can ask leading questions, but I would

Richard Eddington - Cross

1   still ask that the objection to that last question be

2   sustained.

3           THE COURT:  Any response on that, Mr. Gillen?

4           MR. GILLEN:  Your Honor, I can rephrase, but the

5   general nature of the question ...

6           THE COURT:  All right.  Mr. Gillen will rephrase.

7   Thank you.

8           MR. BELLER:  Your Honor, the jury, Daylight Savings

9   Time issue, is unusually sleepy today.  Other than that, it's

10  unfortunately not --

11          THE COURT:  Why don't we do this --

12          MR. BELLER:  It's not limited to a single one.

13          THE COURT:  Why don't we take the mid-afternoon break

14  five minutes early.  I think maybe the courtroom may be a

15  little bit hotter today.  Hopefully tomorrow and the next day

16  with the cooler temperatures we won't have that problem.  We

17  will go ahead and take the afternoon break.  Thanks.

18      (In open court:)

19          THE COURT:  Ladies and Gentlemen, rather than keep

20  you, why don't we take the mid-afternoon break.  Why don't we

21  plan on coming back at 3:25, all right?  3:25.  The jury is

22  excused.

23      (Jury excused.)

24          THE COURT:  We will be in recess.  Thank you.

25      (Recess at 3:11 p.m. until 3:26 p.m.)

1          *THE COURT:*  Yes, Mr. Eddington can come in.

2          All right.  Oh, yes, Ms. Grimm was wanting to remind

3    me, Mr. Eddington had mentioned to her that he had something to

4    amend regarding his testimony, so I just put you on notice of

5    that fact.

6          Okay.  Let's bring the jury in.

7       (Jury present.)

8          *MR. GILLEN:*  May I ask the question about his comment

9    about amendment?

10         *THE COURT:*  Go right ahead.

11   *BY MR. GILLEN:*

12   *Q.*  During the break, Mr. Eddington, did you indicate to a

13   court representative that you wish to amend a previous answer

14   that you gave?

15   *A.*  I did.

16   *Q.*  Could you please tell us what the question was and how you

17   wish to amend?

18   *A.*  Yes, absolutely.  When you asked me about the

19   dollar-per-bird difference between small bird and the larger

20   birds, I indicated to you that that came out to be a 25-cent

21   per bird or 34-cent per bird based on live pounds or WOG

22   pounds, and that is incorrect.  I apologize.  Even those of us

23   who do chicken math for 30 years sometimes still get a little

24   discombobulated.

25         In order to make up a $1 delta 4-pound bird to 9-pound

Richard Eddington - Cross

 1   bird, it is indeed a 25-cent per pound live pound or 34 cents

 2   per WOG pound in order to do that.  And I just -- it hit me

 3   after I said that, and I just needed to set the record

 4   straight.

 5   Q.  Well, thank you.

 6        So you are talking here, just to clarify that, that's

 7   about per pound, 34 cents per pound difference in terms of the

 8   money that a supplier could make from a big bird to the small

 9   bird in that marketplace in 2014.

10   A.  Yes.

11   Q.  And so back to what we were talking about, I want to talk

12   to you a little bit about what you mean by "stabilize," okay?

13   A.  Okay.

14   Q.  When you used the term "stabilizing" the small-bird market

15   or industry with the prices in 2014, the increases, I want to

16   ask you about that.  Do you believe that the increases that

17   were agreed upon and signed between RSCS and the suppliers, did

18   that help incentivize suppliers to stay in the small-bird

19   industry?

20   A.  I do.

21   Q.  Do you believe that the increases that were negotiated and

22   signed and agreed upon between RSCS and the suppliers in 2014

23   for the 2015-2017 contract, do you believe that those increase

24   in prices incentivized others to come into the small-bird

25   market?

Richard Eddington - Cross

1        *MR. KOENIG:*  Objection, foundation.

2        *THE COURT:*  Overruled.

3    A.  I know it did in one specific case of OK Foods.

4    *BY MR. GILLEN:*

5    Q.  So as is the case of OK Foods, that's an example of someone

6    coming into the small-bird market.

7    A.  That's correct.

8    Q.  And they weren't in the small-bird market in 2014, were

9    they?

10   A.  That is the -- early in my testimony, I referenced one

11   example that I knew of a larger bird going backwards, and this

12   OK Foods is really that example.  They weren't the 9-pound

13   live, but to the best of my recollection, it was a medium bird

14   of some sort, I don't remember the exact live weight they were

15   targeting, and they either were going to move up or move down,

16   but they saw opportunity in coming into the COB space after --

17   during that period of time between 2015 and 2017.

18   Q.  And with your experience coming from the supply, the

19   supplier, and your experience in the specialization in the

20   chicken market, you testified, I believe, that what your

21   expectation was in terms of the increases, that these increases

22   were within the range of your expectation, but at the high end.

23   A.  It was certainly at the high end.

24   Q.  But within your range of expectation.

25   A.  Yes.

Richard Eddington - Cross

1    *Q.* Because the worst case scenario would have been that

2    34 cents per pound that you told us about.

3    *A.* That's correct.

4    *Q.* And that would have been way, way up, much higher than what

5    was agreed upon by RSCS and the suppliers in this contract.

6    *A.* Correct.

7    *Q.* I want to now ask you a little bit about, you know, you

8    come in in August 2014.  Things are already happening, correct?

9    *A.* That's correct.

10   *Q.* You indicated, I believe, that you attended some meetings,

11   and you were hitting the ground running and getting acclimated

12   there to represent RSCS, correct?

13   *A.* That's correct.

14   *Q.* Now, I think earlier you may have indicated that the bid

15   request was for August the 19th; is that accurate?

16   *A.* I don't specifically remember August 19th, but I know it

17   was in the mid part of August.

18   *Q.* As it relates to Tyson, do you have a recollection that

19   Tyson, the Tyson bid to RSCS was -- had some unique features to

20   it that others did not have?

21   *A.* It did.

22   *Q.* No. 1, would you agree that the Tyson bid was actually

23   submitted eight days before the request for the -- by RSCS to

24   get the bid in?

25   *A.* It was submitted approximately a week early.  I can't

Richard Eddington - Cross

1   remember specifically eight days, but yes.

2   Q.  And they were the first one in?

3   A.  Yes, that is correct.

4   Q.  And so I would like for you to, if you would --

5        MR. GILLEN:  Your Honor, I believe that 1190 is in

6   evidence, and I would like to publish that, please.

7        THE COURT:  Yes, you may.

8        MR. GILLEN:  Thank you, Your Honor.

9   BY MR. GILLEN:

10  Q.  Now, Mr. Eddington, do you recognize this as an e-mail that

11  Mr. Brian Roberts sent to you on August the 11th, 2014 as a

12  cover to their cost model?

13  A.  Yes, I do.

14  Q.  Now, keeping in mind that this is August the 11th, do you

15  see the part where it says, Do you think the possibility is

16  that we can get some level of commitment on what you want to do

17  by the end of the week?

18        Do you see that?

19  A.  I do.

20  Q.  So Tyson not only submitted an early bid, but they wanted

21  to get a deal with you before anybody else submitted it, right?

22  A.  That was their desire.

23  Q.  But you didn't do that, right?

24  A.  No, sir.

25        MR. GILLEN:  And then if we can turn to 1191,

Richard Eddington - Cross

1    Your Honor, which is -- I believe also been admitted.  And if

2    we could publish that, please.

3           THE COURT:  Yes, you may.

4    BY MR. GILLEN:

5    Q.  Now, do you remember receiving this as the attachment to

6    Mr. Roberts' e-mail?

7    A.  I do.

8    Q.  Now, is it correct that another unique component of the

9    Tyson bid was that they wanted to get -- they wanted to get

10   paid on the marination weight, correct?

11   A.  That's correct.

12   Q.  Explain that to the jury just briefly, if you can, please.

13   A.  The way that -- the KFC eight-piece product is what we call

14   marinated; in other words, it has 10 to 12 percent flavored

15   water injected into the product before it's put into the final

16   case and sealed.  It had been and remained KFC's and RSCS's

17   position that we would not pay suppliers for that water weight.

18   We would pay for the ingredients that it took as part of that

19   marination component, but we would not pay for that incremental

20   weight.  And in Tyson's proposal, they asked to be paid for

21   that weight.

22   Q.  They want to be paid for the weight of the marination

23   liquid, right?

24   A.  That's correct.

25   Q.  And another part or unique part of the Tyson proposal and

Richard Eddington - Cross

1   cost model involved the 48-hour -- what they call 48-hour drain

2   tare weight, correct?

3   A.   That's correct.

4   Q.   Please tell briefly the jury what that means.

5   A.   As part of the process to chill chickens and, you know,

6   processing from when they are -- from harvest until they get

7   down to approximately 32, 36, 38 degrees is to submerse them in

8   water.  And along the way, while they are in the chiller, is

9   the name of that piece of equipment, and when they come out,

10  they have absorbed some of that chiller water.  We call it

11  chiller moisture.  And, again, it's water weight.  It wasn't

12  part of the native chicken weight, if you will.

13          So we asked suppliers to do a test for 48 hours where

14  they would take birds, weigh them at the beginning of the

15  48-hour period.  They would weigh them again after the 48-hour

16  period.  And then that would become a factor that they had to

17  subtract from the case weight.  And we would not pay them for

18  that water weight.

19  Q.   So Tyson wanted to do away with -- they wanted to

20  subtract -- they didn't want the subtraction on the tare

21  weight, the drain, and on the marination; is that right?

22  A.   That's correct.

23  Q.   And that was unique among Tyson.

24  A.   Yes.

25  Q.   No one else did that, right?

Richard Eddington - Cross

1    *A.*  No one else asked for that.

2    *Q.*  Now, when you received this on August the 11th from

3    Mr. Roberts, you took a look at this and saw what they were

4    asking, right?

5    *A.*  Correct.

6    *Q.*  Now, this wasn't the first time that RSCS became aware of

7    what the Tyson model was, correct?

8    *A.*  That's correct.

9    *Q.*  And is it not correct that RSCS knew back in July what the

10   Tyson model was going to be concerning the marination, the

11   48-hour drain weight, and what they wanted for the price of the

12   bird?

13   *A.*  There was a model submitted in July prior to my arrival.  I

14   saw a copy of it after I arrived.  But there was a model

15   initially submitted in July by Tyson, that's correct.

16   *Q.*  Which is essentially the model they submitted on August the

17   11th, right?

18   *A.*  To the best of my recollection, yes.

19   *Q.*  Now, once you get this, you write back to Mr. Roberts,

20   don't you?

21   *A.*  I did.

22   *Q.*  Let's take a look at that.  I think that's at Government

23   9703.

24        *MR. GILLEN:*  Your Honor, I believe that's in evidence,

25   and I would like to ask to publish that.

Richard Eddington - Cross

1          THE COURT:  You may.

2          MR. GILLEN:  Thank you, Your Honor.

3          And if we can go to the second page of that exhibit.

4   BY MR. GILLEN:

5   Q.  Do you see there from -- Mr. Eddington, from you?

6   A.  Yes, I do.

7   Q.  So same day that you're getting the proposal from

8   Mr. Roberts you then get back with him, right?

9   A.  I did.

10  Q.  And let's kind of go over what you say, and then you can

11  explain to us what you were doing.

12          If I get this right, paren, before I speak to --

13          MR. KOENIG:  I believe there's a limiting instruction

14  here for Mr. Eddington's statements, so I wanted to alert the

15  Court of that, and I don't know if you want to give an

16  admonition to the jury.  But the other thing is we would be --

17  since he is here to testify, we would be happy to, you know,

18  try to admit it without the limiting instruction as to

19  Mr. Eddington's statements.

20          THE COURT:  It's true that there is a limiting

21  instruction regarding Mr. Milbrodt's statements and also

22  Mr. Eddington.  In light of the fact that Mr. Eddington is now

23  here to answer questions about this particular exhibit, I think

24  it would be appropriate to drop that aspect of the limiting

25  instruction regarding Mr. Eddington's statements.

Richard Eddington - Cross

1          Any disagreement with that?

2          MR. GILLEN:  We are fine with that, Your Honor.

3          THE COURT:  I just opened it up for everyone in case

4   anyone else had a statement.

5          So, Ladies and Gentlemen, as I just recounted, there

6   was a limiting instruction for this exhibit.  The limiting

7   instruction regarding Mr. Eddington's statements only being

8   considered for their effect on the listener is now removed, so

9   you can consider his statements for all purposes.

10          But it still holds as to Mr. Milbrodt's statements,

11   which there are some statements, not in what's being displayed

12   to you now, but there are some statements.  Once again, for

13   Milbrodt, just for the effect on the listener, not for the

14   truth of the matter asserted.

15          Go ahead, Mr. Gillen.

16          MR. GILLEN:  Thank you, Your Honor.

17   BY MR. GILLEN:

18   Q.  You are indicating here, if I get this right, Before I

19   speak to Pete -- that's Pete Suerken, correct?

20   A.  Correct.

21   Q.  Are you here trying to sort of lay out sort of a response

22   to the Tyson bid that's come in?

23   A.  I am essentially telling him he's nuts, if you just want me

24   to be straightforward.

25   Q.  Well, you didn't write that down.  So what you're saying to

Richard Eddington - Cross

 1   him, are you telling him here, We're not doing the marination,

 2   the weight thing?  Right?

 3   A.  That's correct.

 4   Q.  We're not doing the 48-hour tare thing either, right?

 5   A.  That's correct.

 6   Q.  So you are going through the different elements here that

 7   you see in his proposal, and you say, You trying to get me

 8   fired before I even move here?

 9          Do you see that part?

10   A.  I do.

11   Q.  Was that serious, or was that just kind of joking?

12   A.  It was sarcasm.  I am, especially to those who know me, I

13   am a relatively sarcastic person.  And that was just right in

14   line with the typical type of response that I would have with

15   business associates and/or friends in this type of situation.

16   It was just a way of trying to say again, Are you serious?  Are

17   you nuts?  You know, there is no way that we're going to do

18   this.

19   Q.  And did you then consider Mr. Roberts a business associate

20   and a friend?

21   A.  That's correct.

22   Q.  So you're kind of just needling him a little bit here,

23   right?

24   A.  Yes.

25   Q.  Now, so inside RSCS, you've gotten this proposal.  It's

Richard Eddington - Cross

1   unique.  It's different.  Are you going to do it or not?

2   A.  No.

3   Q.  So you're not going to do it.  And is this a standard kind

4   of beginning opening to discussions with suppliers about where

5   you're going to finally end up?

6   A.  It's not atypical.

7   Q.  So what you have got here is you have a situation where you

8   tell them no.  And then what they do is they come back to you

9   on a second round, and they end up taking out the marination

10  and the 48-hour tare weight, right?

11  A.  Are you asking specifically in this situation?

12  Q.  Yeah, with Tyson.

13  A.  In this situation, yes, they did come back with a revised

14  model that removed those elements.

15  Q.  And what Tyson did is it moved its profit margin up from 16

16  that they had when they wanted to weigh the marination and keep

17  the liquid to a 19-cent increase on the profit margin, right?

18  A.  Yes, to the best of my recollection, that is correct.

19  Q.  And that is essentially -- the 19-cent is basically kind of

20  what you ended up, bottom line, in your deal with Tyson at the

21  end of the day in 2014, right?

22  A.  It was very close.

23  Q.  Not .1931?  Is that --

24  A.  That sounds correct, but I would have to see it to confirm

25  the exact number.

Richard Eddington - Cross

1    *Q.* And not only that, but after the second bids, you're aware,

2    are you not, that Tyson -- that RSCS not only didn't want to

3    reject Tyson, but they wanted, If we can hit your number, that

4    is the proposal that was sent in on the second bid, can you

5    handle -- can you get us 11 more loads.  Do you remember that?

6    *A.* Yes.

7    *Q.* So you mentioned earlier on examination today that one of

8    the ways that you would reward people who had the lower price

9    was to try to give them more volume, right?

10   *A.* Correct.

11   *Q.* Is this an example of trying to do that, of saying, All

12   right, we like this price compared to the others.  We want you

13   to take 11 more loads a week?

14   *A.* In this particular situation, it had an element of that.  I

15   think certainly, you know, it wasn't so much that we just loved

16   even the revised price, but it was better than some we had.

17   And, again, it also met our desire to be able to potentially

18   pull loads away from other -- another supplier.  So yes is the

19   answer to your question with the caveat.

20   *Q.* Okay, yes with a caveat.

21        Just one moment.  I am going to go see if I need to

22   ask more questions.

23        *MR. GILLEN:*  That's all the questions I have.  Thank

24   you, sir.

25        *THE COURT:*  Additional questions, Mr. Pollack?

Richard Eddington - Cross

1          MR. POLLACK:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3     BY MR. POLLACK:

4     Q.   Mr. Eddington, my name is Barry Pollack, and, along with

5     Wendy Johnson, we represent Ric Blake.  Good afternoon.

6     A.   Good afternoon.

7     Q.   I would like to start by putting up the two bar graphs that

8     Ms. Rahman asked you about, H-684 alongside Government 10023.

9          MR. POLLACK:  Your Honor, do I have permission to

10    publish those two side by side?

11         THE COURT:  Yes, you may.

12    BY MR. POLLACK:

13    Q.   And, Mr. Eddington, I am going to put you to work again if

14    you still have the calculator up there.  What was the

15    difference between George's initial bid and the contract price

16    that it ultimately negotiated with RSCS for the 2015 contract?

17    A.   6.06 cents per pound.

18    Q.   A little more than 6 cents a pound?

19    A.   Correct.

20    Q.   And is that true regardless of whether you use the bar

21    graph on the left or the bar graph on the right?

22    A.   The numbers are the same in both, so, yes.

23    Q.   And you had indicated that even a single penny, 1 cent, was

24    a significant number, correct?

25    A.   Yes.

Richard Eddington - Cross

1   *Q.*  And, in fact, a single cent could be worth a million

2   dollars.

3   *A.*  A single cent could be worth -- across all the volume,

4   across all of the system on eight-piece, it could be worth

5   approximately $4 million.

6   *Q.*  I am sorry, $4 million, okay.

7           And you indicated Claxton had gone down during the

8   negotiations about 4.3 cents.  And so if a single cent is

9   significant, 4.3 cents is really significant, correct?

10  *A.*  I mean, it is.  Again, as we are talking individually, of

11  course, it's about their percentage of the business; but, yes,

12  as it relates to the entire system as a net, every penny is

13  certainly impactful.

14  *Q.*  And then to state the obvious, the slightly more than

15  6 cents that George's moved was a significant number.

16  *A.*  Yes.

17  *Q.*  And putting aside systemwide, just as between George's and

18  RSCS, going down 6 cents during the course of a single

19  negotiation, does that indicate that the supplier is taking a

20  take-it-or-leave-it, the-price-is-the-price attitude or the

21  supplier is negotiating?

22  *A.*  No.  In the case of George's, I believe they were

23  negotiating in good faith.

24  *Q.*  And, in fact, they came down off their initial price more

25  than any of the other suppliers on those bar graphs, correct?

Richard Eddington - Cross

 1   A.   May I look at the numbers one more time prior to answering?

 2   Q.   Of course; of course.

 3   A.   That is correct.

 4   Q.   And each of the suppliers started out at a different

 5   amount?

 6   A.   Yes.

 7   Q.   And each of them ended up at a different amount.

 8   A.   Yes.

 9   Q.   So when you were asked some questions about how things

10   turned out at the end of the day, whether the suppliers ended

11   up about where you had anticipated going into the negotiations,

12   you were talking about the suppliers generally, correct?

13   A.   That's correct.

14   Q.   Because each one of them was, in fact, in a different

15   place?

16   A.   Yes.

17   Q.   Your testimony was generally they were in the range of what

18   you anticipated, but on the high end of that range, correct?

19   A.   In general terms, yes.

20   Q.   And you were familiar with the market conditions in 2014

21   throughout this negotiation process?

22   A.   I was.

23   Q.   And you had stated in response to a question to Ms. Rahman,

24   the margin line was going to go up at the end of the day

25   between 5 and 10 cents a pound.  Was that your expectation

Richard Eddington - Cross

1  going into these negotiations?

2  A.  That was my initial hope and, slash, expectation, yes.

3  Q.  And just so I understand that, when you say an increase of

4  5 to 10 cents, what are we comparing?  What would be 5 to 10

5  cents higher than what else?

6  A.  Well, the vast majority of that would be in the margin.

7  Certainly there could be some incremental changes in other

8  elements of the cost model, but the vast majority of it would

9  be in margin.

10  Q.  To be clear, you are comparing the margin from the 2014

11  contracts that were then in place with the margin in the 2015

12  contracts as they were ultimately negotiated?

13  A.  That's correct.

14  Q.  And that's what you expected would go up 5 to 10 cents?

15  A.  The primary driver of that, yes.

16  Q.  So, for example, you weren't comparing the final contract

17  price with some period price during 2014.  Your comparison was

18  how was the 2015 contract going to be different from the 2014

19  contract.

20  A.  That's correct.  We had to neutralize the corn and soy meal

21  grain inputs in order to be able to make an apples-to-apples

22  comparison.

23  Q.  So the significant comparison was to the prior contract

24  year, not to any particular period price.

25  A.  That's correct.

Richard Eddington - Cross

1   Q.  And you expected the margin from the 2014 -- ultimately,

2   where you thought you would end up is that in 2015 you would

3   see a margin that was 5 to 10 cents higher than the 2014

4   margin.

5   A.  Yes.

6   Q.  And so I know you have made some statements about the

7   suppliers generally, but if a particular supplier went up

8   8 cents in their margin from 2014 to the ultimate 2015

9   negotiated contract, that supplier would be right in the sweet

10  spot of what you had anticipated to begin with.

11  A.  Well, I don't think there were any sweet spots in terms of

12  just the overall outcome of that because we were taking a

13  significant price increase.  I think that, you know, certainly

14  comparatively speaking it was better than a lot of others,

15  but -- so I would characterize it that way.

16  Q.  I am not trying to compare it to where you would have liked

17  to have ended up.  I am trying to compare to where you expected

18  you were going to end up based on your knowledge of the market

19  conditions going into the negotiation.  And you would agree

20  with me that an 8-cent increase is smack in the middle between

21  5 and 10, correct?

22  A.  It is in the middle between 5 and 10, but it's still a

23  significant increase.

24  Q.  Sure, it's a significant increase, and you expected

25  significant increases?

Richard Eddington - Cross

1    A.   Yes.

2    Q.   Based on the market conditions?

3    A.   I would characterize it as it would have been appropriate

4    from my expectations.  I am not crazy about the word "sweet

5    spot," I am sorry.

6    Q.   That's fine.  That's obviously my term, and I want your

7    answer, not my answer.

8         Your answer is that an 8-cent increase would be

9    appropriate based on your expectations given the market

10   conditions?

11   A.   That's correct.

12   Q.   Thank you, Mr. Eddington.

13        I am going to shift gears to something else that was

14   not covered in your earlier testimony, but that I wanted to

15   talk to you about.

16        I would like to show you --

17        MR. POLLACK:  And I don't believe this is in evidence.

18   This is just for the witness and counsel at the moment.

19        MR. KOENIG:  Objection, scope.  He is crossing.  It

20   should be within the scope.

21        THE COURT:  Well, let's see what the exhibit is first.

22   Go ahead, Mr. Pollack.

23        MR. POLLACK:  I would like to show the witness I-267.

24   BY MR. POLLACK:

25   Q.   And, Mr. Eddington, I will give you as much time as you

Richard Eddington - Cross

1    need to read that, but my first question is just going to be a

2    general one.  This is an e-mail.  Who is the author of this

3    e-mail?

4    A.  I was.

5    Q.  And you were writing this e-mail to whom?

6    A.  To Judy Hall, an employee at George's.

7    Q.  And just generally, what was the subject matter of the

8    e-mail that you wrote?

9    A.  We were trying to get an update on a further processed

10   nugget item that we had been working with George's on.

11         MR. POLLACK:  Move the admission of I-267.

12         THE COURT:  Any objection to the admission of I-267?

13         MR. KOENIG:  Yes, it appears to deal with chicken

14   nuggets, which is the first time we heard about that.  It's

15   outside the scope, and I think that's about it.

16         THE COURT:  Response?

17         MR. POLLACK:  With respect to outside the scope, we

18   can consider Mr. Eddington my witness for this purpose.  I

19   don't see any benefit to having him leave the stand and then

20   immediately come back.

21         With respect to relevance, I can tie it up in a

22   question or two.  I am also happy to explain at side bar the

23   relevance, but I will tie it up pretty quickly.

24         THE COURT:  I will overrule the motion as to scope.  I

25   think ultimately Mr. Pollack is right that if I were to sustain

Richard Eddington - Cross

1    it on scope, the witness could be called again.

2          In terms of relevance, I will allow Mr. Pollack a few

3    questions to establish that.  Mr. Koenig can object if he

4    continues to believe that the subject matter is irrelevant.

5          MR. KOENIG:  May I also request, then, that there is

6    not leading questions since this is a new direct examination?

7          THE COURT:  On this subject, yes.

8          MR. POLLACK:  So, Your Honor, is the Court admitting

9    it subject to me tying it up?

10         THE COURT:  No.  You were going to ask some questions

11   to establish the relevance, so I am holding --

12         MR. POLLACK:  I understand.

13         THE COURT:  Go ahead.

14   BY MR. POLLACK:

15   Q.  What was the date of this e-mail, Mr. Eddington?

16   A.  August 18th, 2014.

17   Q.  And do you recall what day of the week August 18th, 2014

18   was?

19   A.  No, sir, I do not.

20         MR. POLLACK:  Your Honor, I would like to show

21   Mr. Eddington what has been marked as J-220 to see if it

22   refreshes his recollection.  Or for that matter, I can hand one

23   up to the Court.

24   BY MR. POLLACK:

25   Q.  Mr. Eddington, does J-220 help you in terms of what day of

Richard Eddington - Cross

1   the week August 18 was?

2   *A.*   August 18th was a Monday.

3   *Q.*   And let's look at Government's Exhibit 10, which is in

4   evidence, and specifically I am going to be looking at page 3,

5   an entry for August 18, 2014 at 1:52 p.m.

6        *MR. POLLACK:*   Permission to publish that to the jury,

7   Your Honor?

8        *THE COURT:*   Exhibit 10, page 3?

9        *MR. POLLACK:*   Yes, the entry at 1:52 p.m. on the 18th.

10  *BY MR. POLLACK:*

11  *Q.*   Is that on your screen, Mr. Eddington?

12  *A.*   It is.

13  *Q.*   Okay.  And on August 18th at 1:52 p.m., it shows a phone

14  call from Roger Austin at Pilgrim's to George's, a two-minute

15  phone call.  Do you see that?

16  *A.*   I do.

17  *Q.*   And it does not specify any particular individual at

18  George's, correct?

19  *A.*   That's correct.

20  *Q.*   On August 18, 2014, was Mr. Blake in the office at

21  George's?

22  *A.*   Per the e-mail that I authored, no.

23  *Q.*   Where was he on August 18th?

24  *A.*   According to that e-mail, he was on vacation.

25  *Q.*   And that was your understanding at the time?

Richard Eddington - Cross

1    A.  Yes.

2              MR. POLLACK:  Your Honor, I would move to admit I-267.

3              THE COURT:  Any objection to the admission of I-267?

4              MR. KOENIG:  No.

5              THE COURT:  I-267 will be admitted.

6              MR. POLLACK:  If I can publish that to the jury.

7              THE COURT:  You may.

8    BY MR. POLLACK:

9    Q.  Mr. Eddington, you had spoken to Mr. Blake on Friday, which

10   would have been August 15th?

11   A.  I don't specifically recall that.

12   Q.  Is that what you say in the e-mail that you authored?

13   A.  Well, yes, we did.  I spoke to Mr. Blake on Friday, the

14   15th.

15   Q.  And I take it you would not have said that if that was not

16   accurate?

17   A.  True.

18   Q.  And you needed to follow up on this issue related to

19   nuggets, right?

20   A.  Yes.

21   Q.  But you knew you couldn't follow up with him on Monday, the

22   18th, because you knew he was going to be on vacation that day?

23   A.  That's correct.

24              MR. KOENIG:  Objection, leading.

25              THE COURT:  He can lead now because this is -- the

3013
Richard Eddington - Cross

 1   relevance of it was established, and it's inside the scope.

 2   *BY MR. POLLACK:*

 3   Q.  Mr. Eddington, you knew that you could not follow up with

 4   him on August 18th, 2014, because he wouldn't be in the office

 5   that day because he was on vacation?

 6   A.  That's correct.

 7   Q.  You can put that aside.

 8          The last thing I wanted to ask you about,

 9   Mr. Eddington, related to the negotiations in 2017 for what

10   became the 2018 contract.  And Ms. Rahman had asked you whether

11   Claxton had been willing to and, in fact, did negotiate a new

12   price for the latter part of 2017 even though they already had

13   a contract in place for 2017 at a higher price.  Do you recall

14   that?

15   A.  I recall.

16   Q.  And you indicated that Claxton didn't have to do that, but

17   they did.

18   A.  That's correct.

19   Q.  Market conditions had changed, and they agreed to a lower

20   price for that latter part of the year.

21   A.  That's correct.

22   Q.  The same was true for George's, was it not?

23   A.  That's correct.

24   Q.  In other words, George's also had a contract that went

25   through the end of 2017.

Richard Eddington - Cross

1    A.   Yes.

2    Q.   It didn't have to renegotiate the price, correct?

3    A.   They didn't have to, no.

4    Q.   But they did negotiate and agreed to a lower price to cover

5    the latter part of 2017.

6    A.   They did.

7            MR. POLLACK:   Thank you, Mr. Eddington.   I don't have

8    anything else.

9            THE COURT:   Thank you, Mr. Pollack.

10           Mr. Feldberg.

11                        **CROSS-EXAMINATION**

12   BY MR. FELDBERG:

13   Q.   Mr. Eddington, I am Michael Feldberg.   I represent

14   Mr. Austin.   You know Mr. Austin, don't you?

15   A.   I do.

16   Q.   And you negotiated with Mr. Austin in 2014 and 2017,

17   correct?

18   A.   That's correct.

19   Q.   You knew, did you not, that Mr. Austin did not have pricing

20   authority for Pilgrim's?   Correct?

21   A.   I knew that Mr. Austin had to go back to others within the

22   corporation for alignment, approval, I am not sure exactly

23   where the line was, but for at least alignment on pricing.   He

24   could not arbitrarily agree to pricing.

25   Q.   And Mr. Austin was -- when you were negotiating with him,

Richard Eddington - Cross

1    his office was in Louisville, Kentucky, correct?

2    A.   That's correct.

3    Q.   And you knew he had to go back to Pilgrim's headquarters in

4    Greeley to get approval for any bid or price, correct?

5    A.   He had to align in Greeley, yes.

6    Q.   And you knew that Mr. Austin had a long relationship with

7    KFC, correct?

8    A.   That is correct.

9    Q.   And you knew he was close to KFC?

10   A.   Yes.

11   Q.   And you knew he was an advocate for KFC, did you not?

12   A.   He was.

13   Q.   Now, you talked a little bit earlier today about Pilgrim's

14   strategy in 2014 and Claxton's strategy in 2014, and I think

15   Mr. Pollack asked you about George's strategy.  From your

16   perspective in 2014, did the suppliers have different

17   negotiating strategies?

18   A.   In some ways, yes.

19   Q.   And in what ways were they different?

20   A.   I mean, there were some who were very adamant that that

21   pricing was going to go up, and even if they incrementally

22   moved down at the very end, that they were pretty adamant that

23   it was going to be, you know, very close to what they initially

24   offered.  And certainly, there are others who were willing to

25   work a little bit more; and some, one or two, who offered

Richard Eddington - Cross

1  incremental volume if we could work out a deal; and others who

2  said, no, they absolutely had no more volume to give or wanted

3  to even back out of a load or two.  So there was some

4  differences within the supplier base.

5  Q.  Fair enough.

6       Now, let's turn to the negotiations in early 2017 for

7  the 2018 contract, correct?

8  A.  Okay.

9  Q.  Pilgrim's made an initial bid in February of 2017?

10 A.  I believe that's correct, yes.

11 Q.  And do you recall that Pilgrim's came down from their

12 initial bid?

13 A.  They did.

14 Q.  And do you recall that ultimately Pilgrim's agreed to the

15 $49-per-case price that you requested?

16 A.  For a number of loads, yes.

17 Q.  And do you know whether Pilgrim's, like Claxton and

18 George's, reduced its price on the three-year 2015 to 2017

19 contract for the latter half of 2017?

20 A.  They did.

21 Q.  And just like Claxton and George's, they didn't have to,

22 but they did, correct?

23 A.  That's correct.

24       MR. FELDBERG:  I don't think I have anything further,

25 Your Honor.

Richard Eddington - Cross

1          *THE COURT:*  Thank you, Mr. Feldberg.

2          Additional questions?  Ms. Henry?

3                        **CROSS-EXAMINATION**

4    *BY MS. HENRY:*

5    *Q.*  Mr. Eddington, my name is Roxann Henry, and I represent

6    Mr. Bill Kantola.

7          *MS. HENRY:*  Your Honor, may I approach to hand up some

8    binders?

9          *THE COURT:*  Yes, you may.

10   *BY MS. HENRY:*

11   *Q.*  Mr. Eddington, I am going to have you help me fill in some

12   blanks on an exhibit here, if you don't mind.

13         *MS. HENRY:*  And if we could pull up J-008.  It's the

14   first tab.

15         Your Honor, this has already been admitted.

16         *THE COURT:*  Yes, it has.

17         *MS. HENRY:*  May I please publish it?

18         *THE COURT:*  You may.

19   *BY MS. HENRY:*

20   *Q.*  So just very quickly, you will see here where there is some

21   blanks.  And that's what we're going to be doing, to try to

22   help fill those in and figure out what we need to do.

23         *MS. HENRY:*  So we can take that down.  And if we could

24   pull up F-788.

25         I would move for admission of this.  I am not certain

Richard Eddington - Cross

 1   it's already been admitted, but I think it is per agreement,

 2   F-788.

 3            THE COURT:  Not admitted.  Do you move the admission?

 4            MS. HENRY:  Yes.

 5            THE COURT:  Any objection to the admission of F-788?

 6            MR. KOENIG:  May I have just a second, please?

 7            THE COURT:  You may.

 8            MR. KOENIG:  No objection.

 9            THE COURT:  F-788 will be admitted.

10            MS. HENRY:  If we could pull that up and turn to -- I

11   think it's the third page if you count the cover sheet.

12   BY MS. HENRY:

13   Q.   And this, do you recognize this document?

14   A.   I do.

15   Q.   It's the Marshall Durbin 2014 contract?

16   A.   Yes, that's correct.

17   Q.   And the eight-piece price was .9204?

18   A.   That's correct.

19   Q.   And the margin was .1050?

20   A.   That's correct.

21   Q.   And if we turn to page 8 on that, the 2014 volume was

22   611,550 pounds per week?

23   A.   For eight-piece, yes.

24   Q.   Yes.

25            MS. HENRY:  And if we could pull up J-008-1, just for

Richard Eddington - Cross

1    the lawyers and the Court, and just pull to the -- only the

2    line for Mar-Jac.  And I would like to, if I may, publish that

3    as a demonstrative, just that one line with the addition of the

4    numbers that the witness has just read out.

5         THE COURT:  Any objection to the use of what's marked

6    as J-008-1, first line?

7         MS. HENRY:  The line just for Marshall Durbin.

8         THE COURT:  Just the Marshall Durbin line.  Any

9    objection?  This appears to be a new exhibit.

10        MR. KOENIG:  May I just have one second?

11        THE COURT:  You may.

12        MR. KOENIG:  Your Honor, in the 2014 contract volume

13   column, it is off by 50 pounds, but --

14        MS. HENRY:  You are correct.

15        MR. KOENIG:  -- we don't object.

16        THE COURT:  Okay.  Let me ask you this, Ms. Henry.  Is

17   this exhibit otherwise identical at least in the current form

18   to J-008?

19        MS. HENRY:  Yes, Your Honor.

20        THE COURT:  Okay.  So you may display that line, if

21   you wish, at this time for demonstrative purposes only,

22   Ms. Henry.

23        MS. HENRY:  And let me just point out for the

24   correction here, the actual 2014 contract volume is 611,550.

25        Can we also now pull up Exhibit 1124?  And I believe

Richard Eddington - Cross

1    that one is already in evidence, but I am not positive.

2          THE COURT:  That is in evidence, and you may -- did

3    you want to publish that?

4          MS. HENRY:  Yes, please.  May I?

5          THE COURT:  You may.

6    BY MS. HENRY:

7    Q.  This is tab 3 in the binder there, Mr. Eddington.  And with

8    the cover sheet, I believe if we look at page 8, what is the

9    Mar-Jac volume there for 2014?

10   A.  I do not have -- or with the cover sheet, okay.  All right.

11   I apologize.  It shows slide 7.

12          599,700 pounds estimated per week.

13   Q.  Per week, okay.

14          And if you then combine, and I know you have that

15   calculator real handy there, if you combine the 2014 volume of

16   Mar-Jac and Marshall Durbin, I believe the number would be

17   1,211,250 pounds.

18   A.  1,211,250 pounds.

19   Q.  Got that one right.

20          And if we go to -- the Mar-Jac volume was

21   1,172,500 pounds.  Can you double-check that?  That's going

22   back to 1125, tab 4.

23   A.  Where is that again?

24   Q.  It's tab 4, 1125, and let's go to page 4 with the cover

25   sheet of 5, and that's the Mar-Jac volume.

Richard Eddington - Cross

1   A.   Okay.  1,172,500 pounds per week.

2   Q.   And the difference between that number and the combined

3   number for Mar-Jac and Marshall Durbin, which was 1,211,250.

4   A.   And the other number we agreed upon was 1 million 2 --

5   Q.   211,250.

6   A.   38,750 pounds.

7   Q.   And that's a loss, isn't it?

8   A.   That's correct.

9        MS. HENRY:  So if we could pull up J-008-1.

10  BY MS. HENRY:

11  Q.   Do you see where those numbers are now on the exhibit?  And

12  we have combined the Mar-Jac and Marshall Durbin volume because

13  Mar-Jac, I believe you noted earlier in your testimony --

14       MR. KOENIG:  Objection.  Is there a question here?

15       THE COURT:  I think we are leading up to one.

16  Overruled.

17  BY MS. HENRY:

18  Q.   And would it be correct to combine the Mar-Jac and

19  Marshall Durbin volume, because, as I believe you testified

20  earlier, Mar-Jac acquired Marshall Durbin in 2014?

21  A.   Yes.

22       MS. HENRY:  Your Honor, we would move to admit

23  J-008-1.

24       THE COURT:  Okay.  And not just for demonstrative, but

25  for all purposes?

Richard Eddington - Cross

1           *MS. HENRY:*  Yes, Your Honor.

2           *THE COURT:*  Any objection to the admission of J-008-1?

3           *MS. HENRY:*  And we would move to admit it with the

4    correction that Mr. Koenig so carefully pointed out.

5           *THE COURT:*  Okay.  Then you will substitute,

6    Ms. Henry, a corrected version identical other than for that

7    correction?

8           *MS. HENRY:*  Correct.

9           *THE COURT:*  With that proviso, Mr. Koenig, any

10   objection to J-008-1?

11          *MR. KOENIG:*  No.

12          *THE COURT:*  All right.  That will be admitted.

13   *BY MS. HENRY:*

14   *Q.*  And if we are looking at that exhibit, is it correct that

15   Koch Foods was the one who received the most volume?

16   *A.*  As related to?

17   *Q.*  The most volume increase, excuse me.

18   *A.*  Okay.  Yes.

19          *MS. HENRY:*  Your Honor, may we publish this to the

20   jury?

21          *THE COURT:*  You may.

22   *BY MS. HENRY:*

23   *Q.*  And it was also among one of the lowest prices.

24   *A.*  That's not -- I am sorry, yes, that is correct.

25   *Q.*  And in both the 2014 and 2017 negotiations, Mr. Kantola

Richard Eddington - Cross

1    consistently was eager to increase the volume of sales for

2    Koch Foods?

3    A.   He was.

4    Q.   And you've talked about various suppliers had some unique

5    positioning, but in the 2014 negotiations, you also understood

6    that Koch Foods was investing to increase capacity at that

7    time, correct?

8    A.   They were expanding their Gadsden, Alabama, plant, yes.

9    Q.   And it was seeking in its price financial support for that

10   investment, true?

11   A.   That's what they said, that part of their margin increase

12   would go towards that investment.

13   Q.   And you understood that Mr. Kantola was not the person at

14   Koch Foods who was deciding its price?

15   A.   That's correct.

16          MS. HENRY:   I have no further questions.   Thank you.

17          THE COURT:   Thank you, Ms. Henry.

18          Ms. Prewitt, go ahead.

19                        **CROSS-EXAMINATION**

20   BY MS. PREWITT:

21   Q.   Hello, Mr. Eddington.   I represent Timothy Mulrenin.   I am

22   just going to ask you some questions based on your experience

23   negotiating with Tyson.

24   A.   Okay.

25   Q.   Based on your experience negotiating contracts with Tyson

Richard Eddington - Cross

1    at RSCS, isn't it true that the salespeople aren't the ones who

2    actually decide the price that can be quoted to RSCS?  Correct?

3    A.  That is correct.

4    Q.  And, in fact, I mean, do you know who actually decided

5    those prices at Tyson based on your experience?

6    A.  The business unit/pricing unit, however you want to refer

7    to it, they were the ones who ultimately had to agree or land

8    upon pricing pretty much anything from Tyson.

9    Q.  You knew this at the time when you were negotiating these

10   contracts.  It was clear to you at the time?

11   A.  I was learning it at 2014.  I certainly knew it by the time

12   2017 came around, but yes.

13   Q.  It was during that whole period?

14   A.  During that period of time, that was correct.

15        MS. PREWITT:  That's all I have.  Thank you very much,

16   Mr. Eddington.

17        THE COURT:  Thank you.

18        Additional questions?

19        All right.  Mr. Koenig?

20                        **CROSS-EXAMINATION**

21   BY MR. KOENIG:

22   Q.  Good afternoon.

23   A.  Good afternoon.

24   Q.  So you mentioned on direct that you were friends with

25   Defendant Roberts?

Richard Eddington - Cross

1    *A.*   That's correct.

2    *Q.*   And you have known him since 2005 when he was your boss at,

3    what was it, Gold Kissed?

4    *A.*   Gold Kissed, yes.

5    *Q.*   And at one point, he left Gold Kissed and went to

6    Marshall Durbin?

7    *A.*   That's right.

8    *Q.*   And these are all chicken suppliers we are talking about?

9    *A.*   Yes, they are.

10   *Q.*   And then he hired you to work at Marshall Durbin with him.

11   *A.*   He did.

12   *Q.*   And at some point, Defendant Roberts went to Tyson in 2012,

13   I think?

14   *A.*   Approximately.  It sounds correct.

15   *Q.*   So you worked with him fairly closely from that '05 to 2012

16   period?

17   *A.*   There was from 20 -- 2007 through 2011 we didn't work

18   together, but, yes, we worked together during two stints from,

19   like, 2005 to 2007 and then '11 and '12 until he left.

20   *Q.*   And you were friends the whole time.

21   *A.*   Yes.

22   *Q.*   And you continue to be friends till today.

23   *A.*   That's correct.

24   *Q.*   And at some point you worked at Mar-Jac; is that right?

25   *A.*   In late 2013, early 2014, Mar-Jac purchased the assets of

Richard Eddington - Cross

1    Marshall Durbin, so yes.

2    Q.  So you just kind of got absorbed?

3    A.  Yes.  I was part of the acquisition we'll say.

4    Q.  Sure.

5            Do you know someone at Mar-Jac named Tommy Francis?

6    A.  I do.

7    Q.  And he has a general, like, sales negotiating type role

8    there?

9    A.  Yes.

10   Q.  Was he still at Mar-Jac in August, September of 2014 when

11   the KFC contracts were being negotiated?

12           MR. GILLEN:  Objection, outside the scope, Your Honor.

13           THE COURT:  Response?

14           MR. KOENIG:  I am asking about -- we have been talking

15   a lot about 2014 negotiations and, you know, who was

16   negotiating, and Mar-Jac was one of the suppliers.

17           THE COURT:  Overruled.

18   BY MR. KOENIG:

19   Q.  And also when you were at Mar-Jac, did you know somebody

20   named Pete Martin?

21   A.  I did.

22   Q.  And was he still at Mar-Jac in August, September of 2014?

23   A.  He was.

24   Q.  And he was involved in the negotiations?

25   A.  Pete wasn't directly involved in the negotiations, but

Richard Eddington - Cross

1    Pete, behind the scenes, I am sure, was -- based on my

2    experience with Mar-Jac, Pete certainly would have been

3    involved in terms of -- we might have met with Pete one time,

4    but he wasn't the primary negotiators we were working with with

5    Mar-Jac.

6    Q.   Okay.  But he had a role.

7    A.   Yes, yes, he had a role on Mar-Jac's behalf.

8    Q.   The first name I asked you, did I ask you Jared Mitchell or

9    did I ask you Tommy Francis?

10   A.   You asked me Tommy Francis.

11   Q.   Okay, great.

12         So you have been friends with Brian Roberts for many

13   years.  And he is very good friends with Tommy Francis, isn't

14   he?

15   A.   To the best of my understanding, yes.

16   Q.   Okay, thank you.

17         Now, you were asked on direct examination about

18   George's and whether Defendant Blake was on vacation; isn't

19   that right?

20   A.   That's correct.

21   Q.   You never gave the bid information that George's submitted

22   to RSCS to any of the other suppliers, did you?

23   A.   Can you repeat the question?

24   Q.   Sure.  When George's submitted its price increases, its

25   bid --

Richard Eddington - Cross

1    A.  Yes.

2    Q.  -- did you give any of that information -- you didn't, did

3    you, give any of that information to the competing suppliers?

4    A.  No.

5         MR. KOENIG:  If we could please pull up Government's

6    Exhibit 1036-1 -- I am sorry, 1035.  This is in evidence, and I

7    request permission to publish.

8         THE COURT:  You may.

9    BY MR. KOENIG:

10   Q.  All right.  So this is an e-mail on August 18th, 2014 from

11   Jason McGuire to Defendant Penn, correct?

12   A.  Yes.

13   Q.  And you know Jason McGuire.  You know him, right?

14   A.  I do.

15   Q.  And they both at the time worked at Pilgrim's?

16   A.  That's correct.

17   Q.  And you have never seen this e-mail before, have you?

18   A.  Sir, all I see is a heading.  I would say no, but there is

19   nothing --

20        MR. KOENIG:  Can we go to attachment 1036-1?

21        MR. TUBACH:  I object.  There is lack of foundation to

22   show this witness.  He has already said he has never seen it.

23        MR. KOENIG:  I believe there has been a lot of

24   documents shown to him by the defendants that he hasn't seen

25   before.

Richard Eddington - Cross

1          THE COURT:  Can you show just for my benefit 1036 --

2          MR. KOENIG:  Dash 1.

3          THE COURT:  -- dash 1.

4          MR. TUBACH:  It's also outside the scope.

5          MR. KOENIG:  It directly relates to Mr. Pollack's

6   direct, whatever it is, his questions.

7          THE COURT:  What's the date of this, Mr. Koenig?

8          MR. KOENIG:  August 18, 2014.

9          THE COURT:  Objection is overruled.

10         MR. KOENIG:  May I publish?

11         THE COURT:  You may.

12         MR. KOENIG:  All right.  If we could just zoom in on

13  that left part above row 37.

14         MR. TUBACH:  I am going to object on lack of

15  foundation grounds, Your Honor.

16         THE COURT:  He hasn't asked a question yet.

17  Overruled.

18  BY MR. KOENIG:

19  Q.  Have you ever seen cost models like this before?

20  A.  I have.

21  Q.  If we could go down to below line 37.  It's a little off.

22  So that's the part below line 37.  Have you ever seen anything

23  like this included in a cost model?

24         MR. TUBACH:  I object.  There is no foundation to show

25  this to the witness.  It's pure argument.

Richard Eddington - Cross

1           THE COURT:  Response?

2           MR. KOENIG:  It goes to what the implication of

3    Mr. Pollack's questions were.

4           MR. POLLACK:  Your Honor, can we be heard on side bar?

5           THE COURT:  Yes.

6        (At the bench:)

7           THE COURT:  Mr. Tubach, go ahead.

8           MR. TUBACH:  Your Honor, there is no foundation to

9    show this witness this document at all.  This is pure argument.

10   He already said he hasn't seen it.  This was an internal

11   Pilgrim's document that was never sent to Mr. Eddington and

12   he's never seen it before.  It is simply asking him to talk

13   about a document he has never seen.

14          MR. POLLACK:  Your Honor, can I be heard on this?

15          THE COURT:  I will hear what Mr. Koenig says, and I

16   will go back to you since he referenced your questions.

17          Mr. Koenig, go ahead.

18          MR. KOENIG:  Sure.  Mr. Pollack showed the witness

19   Government's Exhibit 10, which he has never seen before, and

20   the obvious purpose of his question was to show that Mr. Blake

21   was on vacation so he couldn't have given the information about

22   George's upcoming bid and margin information.  And I think this

23   is highly relevant to rebut the inference that it wasn't given

24   over.

25          So I think it's really pretty simple that if they are

Richard Eddington - Cross

1    able to show documents that people have never seen to make a

2    point, for lack of a better point, then we should be able to

3    rebut that.

4         THE COURT:  How does it rebut it?  I guess I am not

5    quite sure about why this would rebut the Blake being on

6    vacation point.

7         MR. BELLER:  Excuse me for interrupting.  I can hear

8    Mr. Koenig without the headset, and I am sitting much further

9    from the jury than Mr. Koenig is.

10        THE COURT:  Of course, Mr. Beller is also more --

11   Mr. Koenig is more facing him, but Mr. Beller makes a good

12   point.  These microphones are extremely sensitive, so if you

13   could lower your voice, Mr. Koenig.  Go ahead.

14        MR. KOENIG:  Will do.  And I believe the question was

15   how does this re --

16        THE COURT:  I am having trouble hearing you,

17   Mr. Koenig.

18        MR. KOENIG:  Yeah.  Certainly it -- you know, the

19   showing of Government's Exhibit 10 to the witness and showing a

20   communication, you know, it certainly is relevant to rebut that

21   even if it's not on the vacation point, he reached out to

22   George's and yet somehow they say he was on vacation, but

23   somehow the pricing information ends up in Pilgrim's hands, so

24   I think it's very relevant to that.

25        You know, they also elicited testimony about supplier

Richard Eddington - Cross

1   discussions during negotiations and, you know, their whole

2   theory of this case that it's all, you know, innocent and fine,

3   and I think we get to rebut that.

4        THE COURT:  All right.  I am going to sustain the

5   objection.  Well, Mr. Pollack, sorry, I didn't want to cut you

6   off.  Do you want to add anything?

7        MR. POLLACK:  Not after I heard the word "sustained,"

8   Your Honor.

9        THE COURT:  Yeah, No. 1, it could be true that showing

10  a line from the demonstrative was argumentative.  However, this

11  is now a different issue, and this is the issue about whether

12  or not showing this witness something that at most he has seen

13  something like it, whether it really rebuts anything that was

14  brought up through Mr. Blake's cross-examination or examination

15  as the case may be.  The argued relevance is so tenuous that

16  there is really no justification for it, so I will sustain the

17  objection.

18       (In open court:)

19  BY MR. KOENIG:

20  Q.  Let's pivot just a little bit to the submission of bids by

21  the various competitors.  And they were like those cost models

22  that we just saw, right?

23  A.  Yes, that's correct.

24  Q.  Did any of the submissions you received contain multiple

25  competitors' margin numbers like -- other than the submitter's

Richard Eddington - Redirect

1    margin numbers?

2    *A.*  No, they did not.

3    *Q.*  They did not.  And did you ever ask anyone, anyone at a

4    chicken supplier to telephone, text, e-mail, contact each other

5    regarding the negotiations in 2014?

6    *A.*  No.

7    *Q.*  In 2014, you had no personal knowledge of whether any

8    communications like that happened, do you?

9    *A.*  That's correct.

10         *MR. KOENIG:*  May I confer?

11         *THE COURT:*  Yes.

12         *MR. KOENIG:*  Nothing further.

13         *THE COURT:*  Ms. Rahman, redirect?

14         *MS. RAHMAN:*  Thank you, Your Honor.

15                        **REDIRECT EXAMINATION**

16   *BY MS. RAHMAN:*

17   *Q.*  Mr. Eddington, does your history with Mr. Roberts and your

18   friendship interfere with your ability to recall the facts you

19   testified to today?

20   *A.*  Absolutely not.

21   *Q.*  Does your friendship with Mr. Roberts and your history with

22   him interfere with your ability to negotiate with Tyson's in

23   2014?

24   *A.*  Absolutely not.

25   *Q.*  And, again, does your friendship with Mr. Roberts or your

3034

Darrell Bowlin - Direct

 1    history with Mr. Roberts interfere with your ability to recall

 2    what happened with Claxton in 2014?

 3    A.  Absolutely not.

 4         MS. RAHMAN:  Thank you.

 5         THE COURT:  All right.  Is Mr. Eddington subject to

 6    recall?

 7         MR. KOENIG:  No, Your Honor.

 8         THE COURT:  Mr. Eddington, you are excused.

 9         THE WITNESS:  Thank you, sir.

10         Next witness may be called.

11         MS. PREWITT:  Thank you, Your Honor.

12         We call Darrell Bowlin.  I will just check,

13    Your Honor.

14         THE COURT:  Sure.

15       (**Darrell Bowlin** was sworn.)

16         THE WITNESS:  Yes, ma'am.

17         COURT DEPUTY CLERK:  Please state your name and spell

18    your first and last name for the record.

19         THE WITNESS:  My name is Darrell Bowlin,

20    D-A-R-R-E-L-L, B-O-W-L-I-N.

21                        **DIRECT EXAMINATION**

22    BY MS. PREWITT:

23    Q.  Mr. Bowlin, I represent Timothy Mulrenin.  And you have

24    testified previously, correct?

25    A.  Yes, ma'am.

Darrell Bowlin - Direct

1  *Q.*  But we have not met to prepare for your testimony today;

2  isn't that right?

3  *A.*  No, ma'am.

4  *Q.*  And you have met with the government before today; isn't

5  that right?

6  *A.*  Yes, ma'am.

7  *Q.*  And, in fact, the prosecutors sitting at this table more

8  than once, correct?

9  *A.*  Yes, ma'am.

10  *Q.*  Now, Mr. Bowlin, I am going to ask you some questions about

11  your involvement in pricing at Tyson, okay?  All right?  Just

12  to sort of let you know where I'm going, let's just start from

13  the beginning.  Where do you currently work?

14  *A.*  I work for Tyson Foods in the small-bird BU.  Small-bird BU

15  is a poultry set of customers that we take care of whether it

16  be poultry.  I'm the cut-up manager, director of cut-up manager

17  for whole-body business for that BU.

18  *Q.*  When you say "BU," are you saying business unit just to be

19  clear?

20  *A.*  Yes, ma'am, business unit.

21  *Q.*  And so how long, Mr. Bowlin, have you been in the chicken

22  business?

23  *A.*  I have been in the chicken business around 34 years.

24  *Q.*  And how long have you been -- you are a cut-out manager at

25  Tyson; is that right?

Darrell Bowlin - Direct

1    A.   Yes, ma'am.

2    Q.   In the business unit?

3    A.   Yes, ma'am.

4    Q.   Is it specifically small bird?

5    A.   Yes, ma'am.

6    Q.   How long have you had that role?

7    A.   Some form around 21 years.

8    Q.   Now, in general terms, can you just describe for the jury

9    your duties and responsibilities in that role?

10   A.   Oh, my.  We own the P and L, the profit and loss.  We also

11   managed the customer list from a fill-like perspective.  We had

12   multiple people within that team.  Everybody had different

13   roles and responsibility.  But ultimately, we own the P and L.

14   Q.   When you say you "own the P and L," you said profit and

15   loss, correct?

16   A.   Yes, ma'am.

17   Q.   What does that mean?

18   A.   That means we determined the final say on pricing, for

19   example.

20   Q.   And based on what?

21   A.   Based on return on sales.

22   Q.   What is return on sales?

23   A.   The profit.

24   Q.   So you determine price based on profit, correct?

25   A.   Yes, ma'am.

Darrell Bowlin - Direct

1  Q.  Thank you.

2       Now, how many business units are there in Tyson?

3  A.  I think of three.  I think of the small-bird BU; I think of

4  the tray pack fresh BU, per se; and I also think of the

5  big-bird, value-added BU.

6  Q.  If you were to take all these business units, BU as you

7  call them, together, how many people would they employ?

8  A.  Oh, my, it's a lot.

9  Q.  A number?

10  A.  It's a lot.

11  Q.  What's the scale of a lot in your view?

12  A.  75 maybe.

13  Q.  75, sir?

14  A.  75, just guessing.

15  Q.  Okay.  But you are in the small-bird unit, right?

16  A.  Yes, ma'am.

17  Q.  Now, let's talk for a moment.  What are the categories of

18  customers the small-bird unit services?

19  A.  I think in our BU I divide it up in three different

20  buckets.  I call it a -- deli customers.  I think of national

21  account customers or QSR even.  And then the third one would be

22  like a distribution customer.

23  Q.  So when you refer to "QSRs," you are referring to

24  quick-service restaurants?

25  A.  Yes, ma'am.

Darrell Bowlin - Direct

1  Q.  Which quick-service restaurants do you work up pricing for?

2  A.  I think of KFC.  I think of Popeye's as well.

3  Q.  But there are others.

4  A.  Yes, ma'am.

5  Q.  Now, let's just -- when it comes to the business unit and

6  pricing, what -- I am going to ask you some questions about

7  what you do, okay?  So we'll break it down a little bit in

8  terms of RFPs, all right?  To you, what are RFPs?

9  A.  Basically renewal of a contract, and historically, it would

10  be an annual contract.

11  Q.  Okay.  And I'm going to focus my questions to the time

12  period from 2013 through 2019, okay?

13  A.  Okay.

14  Q.  So in this period, I would like for you to walk us through

15  the process by which prices are developed to submit to QSR

16  customers like the KFCs, the Popeye's of this world, okay?

17  A.  Okay.

18  Q.  So when an RFP from a customer comes in, which departments

19  are involved?  If you could just walk us through that.

20  A.  Oh, my.  Obviously, the sales I think of supply and demand

21  balance.  I think of pricing.  Obviously, the BU.  I would say

22  that's the most of it.

23  Q.  Is marketing involved at all?

24  A.  Sometimes marketing would be involved if something was

25  changing from a customer perspective, but, yes, it is a

Darrell Bowlin - Direct

 1   potential that we would engage marketing.

 2   Q.  And so that's the early part of the process, correct?

 3   A.  Yes, ma'am.

 4   Q.  Now, let's talk about the pricing department.  You

 5   mentioned them, okay?  What did they do when it came to pricing

 6   in these sort of early stages right after an RFP came in and

 7   you are considering what to price for that bid?

 8   A.  When I think of pricing, I think of a group of people that

 9   look at our cost structure, and then they come back and

10   recommend pricing, what we should get based on costing as well.

11   Q.  Do they have guidelines to go by in terms of margins or

12   profit?

13   A.  Yes, ma'am, I would say that.

14   Q.  Just generally speaking, what are those?

15   A.  At that period of time, we were trying to target a

16   4 percent return on sales.

17   Q.  And that would be across all the customers?

18   A.  Somewhat, yes, ma'am, from the total BU as it related to

19   whole-body business.

20   Q.  So that is something the business unit would come up with,

21   that return on sales number?

22   A.  That's what we were striving to achieve.

23   Q.  What, if anything, would pricing do with that?

24   A.  They would also, again, look at our cost structure.  They

25   have the data.  They have the information.  Then they would

Darrell Bowlin - Direct

1   come back -- and the increase in price or decrease, never an

2   increase, but in that scenario with the pricing, they would

3   come in with a price recommended to meet that 4 percent return

4   or more.

5   Q.   And who did you work with in the pricing department at this

6   time?

7   A.   During that time, I worked with Rollin Barnes.  I worked

8   with Brandon Campbell.  I don't know if Shane Free would have

9   been one of them.  I don't know the time frame.

10  Q.   What about Ritchey --

11  A.   Ritchey Collyar, actually.  So in this scenario, Rollin I

12  believe would have reported to Ritchey Collyar, and Ritchey

13  would report to Joey White.

14  Q.   Was Joey White the most senior person?

15  A.   Joey White was a senior vice-president for that group.

16  Q.   For that pricing unit?

17  A.   Yes, ma'am.

18  Q.   So just over this period of time, roughly how many people

19  would sit within this pricing unit, just ballpark?

20  A.   How many worked in that department?

21  Q.   Yeah.

22  A.   I reckon -- I can remember maybe seven, seven or eight.  I

23  don't know for sure.

24  Q.   So would it be fair to say that pricing is there to sort of

25  support the goals set forth by the business unit?

Darrell Bowlin - Direct

1    A.   Yes, ma'am.

2    Q.   Including profitability?

3    A.   Yes, ma'am.

4    Q.   Now, let's talk a little bit about the -- tell us how, how

5    did they support the goals of the business unit in terms of the

6    profitability, the pricing team?

7    A.   In my mind, they would come up with our true cost, and then

8    they would also evaluate that scenario and then add to make a

9    4 percent return on sale if that makes sense.

10   Q.   That return on sale, that profit percentage?

11   A.   Yes, ma'am.

12   Q.   Who set that?

13   A.   Who?

14   Q.   Who?

15   A.   The BU set that standard.

16   Q.   Was it always 4 percent, or would it vary over time

17   depending upon --

18   A.   During that time, it may have varied, but, yes, ma'am.

19   Q.   Now, you mentioned the supply and demand --

20   A.   Yes.

21   Q.   -- department.  What is that?

22   A.   When I think of supply and demand, they are counting

23   chickens, literally how many we slaughter on a weekly basis.

24   And we have to ensure that we have enough demand to consume the

25   birds that we are slaughtering on a weekly basis average.

Darrell Bowlin - Direct

1  Q.  And would that require sort of short-term or long-term

2  forecasting?

3  A.  It's both.

4  Q.  So who within that department did you work with?

5  A.  Debbie Baker would be the first person that comes to mind.

6  Q.  Anyone else?

7  A.  We had during that time -- oh, my, I am forgetting.

8  Q.  Maybe not names, sir, but just how many people would work

9  within that department and assist you?

10 A.  We would have around four on a regular basis.

11 Q.  What about marketing?  Would they help you with respect to

12 certain RFPs in responding to them?

13 A.  I really didn't bring marketing in from a return-on-sale

14 perspective.

15 Q.  But they would generally work with you?

16 A.  Yes, ma'am, they would work with us depending on the

17 customer's needs.

18 Q.  And how many people were in that department just roughly

19 speaking?

20 A.  Oh, my goodness, I had no clue.  I mean, it's --

21 Q.  More than a few.

22 A.  Yes, ma'am.  I would say at least 20.

23 Q.  At least 20, okay.  Thank you.

24       Let's talk about the business unit.  Who do you recall

25 being in the small-bird business unit?  I am talking about

Darrell Bowlin - Direct

1   small bird, sir, but who do you recall being in the small-bird

2   unit at the time?

3   A.  In that time frame that we are referencing, I think of

4   Charlie Solomon.  He would have been our senior vice-president.

5   Steven Cullen would have been the business manager, and I

6   reported directly to Steven Cullen during that time.

7   Q.  Okay.  Were there other people who also worked in the

8   business unit?

9   A.  Yes, ma'am.  We had -- we kind of divided it up from a

10  whole-body business versus a debone business.  We also debone

11  as well, and we had Melinda Mayo comes to mind managing that

12  side of the business.

13  Q.  So in a nutshell, what was the business unit's role in

14  setting price for these QSRs in those bids?

15  A.  The goal was to meet or exceed a 4-percent return, and we

16  would engage every -- from a pricing perspective, from a sales

17  perspective, all of that.  We would collaborate, and then the

18  final decision would be the BU.

19  Q.  Who do you recall being in the sales unit at the time, that

20  sort of 2013 to 2019 period of time?

21  A.  I think of Andy Lubert, he would have been the senior

22  vice-president at that time.  I think of Brian Roberts.  I

23  think of Mulrenin.  I think of Tim Scheiderer.  I think of

24  Carl Pepper.

25  Q.  But, in fact, Mr. Roberts, you recall him leaving in, I

Darrell Bowlin - Direct

1   think it was, 2018?

2          *MS. CALL:*  Objection, leading.

3          *THE COURT:*  Sustained.

4   *BY MS. PREWITT:*

5   *Q.*  I will ask him, do you recall Mr. Roberts leaving

6   Tyson Foods at a period of time?

7   *A.*  Yes.  I can't recall the date, but I do remember him

8   leaving.

9   *Q.*  Actually, does 2016 sound right?  Yes or no?

10  *A.*  Sounds fair.

11  *Q.*  Okay.  Now, in terms of dealing with the QSR customers

12  day-to-day, what did sales do?

13  *A.*  Say that again, please.

14  *Q.*  In terms of dealing with the quick-service restaurant

15  customers, what did the sales team do?  What was their function

16  with dealing with the customers?

17  *A.*  To me, they represented the customer back to Tyson.

18  *Q.*  So when you say "represented the customer," what do you

19  mean?

20  *A.*  They are talking with our customers.  They know what the

21  customer is asking and needing, and then they come back to the

22  BU and ask for things.

23  *Q.*  To your recollection, were there ever times when the

24  salespeople pushed you to go lower than the price that you

25  wanted to quote?

Darrell Bowlin - Direct

1   A.  Yes, ma'am.

2   Q.  And did that happen often?

3   A.  Yes, ma'am, in my opinion.

4   Q.  Were there ever times to your recollection where sales told

5   you to increase the prices above where you wanted to quote?

6   A.  I would never say never, right, but I don't recall.

7   Q.  You don't have any recollection of that?

8   A.  I don't have any recollection.  That doesn't mean they

9   haven't, but I don't have any recollection of it.

10  Q.  Now, you testified that on occasion sales would try to push

11  down the price that you wanted to quote to a customer, right?

12  A.  Yes, ma'am.

13  Q.  What do you recall about that?

14  A.  During collaboration, I can remember multiple times where

15  we would have difficult conversations about pricing, and what I

16  mean is basically pushing down the price on a regular basis

17  somewhat.

18  Q.  And when you say "pushing down price on a regular basis,"

19  you are referring to sales, correct?

20  A.  Yes, ma'am.

21  Q.  In fact, you are referring to Mr. Mulrenin and Mr. Roberts

22  trying to push down price?

23          MS. CALL:  Objection leading.

24          THE COURT:  Sustained.

25  BY MS. PREWITT:

Darrell Bowlin - Direct

1    Q.  Who in sales do you recall urging you to push down the

2    price from what you wanted to quote?

3    A.  It would be Brian.  It would be Tim.  It would be -- to

4    include Carl Pepper for that matter.

5    Q.  Okay.  Now, how would they try to do that in these

6    discussions?

7    A.  Well, we would have collaboration, and during that process,

8    we would have difficult conversations.  It got heated multiple

9    times, I do remember that.  I can't give you all the details,

10   but I remember that.

11   Q.  How do you mean "heated"?

12   A.  Heated, just frustrated.

13           MS. CALL:  Objection, soliciting hearsay.

14           THE COURT:  Overruled.  He is just describing the

15   nature of the discussions.

16   BY MS. PREWITT:

17   Q.  So if you would just describe the nature of the discussion,

18   then.

19   A.  The point I am trying to make is the BU was fighting back

20   with our sales team on the price.  We were trying to get a

21   4-percent return.  Multiple times there were arguments about,

22   Hey, if you take that price, you're going to lose business.  I

23   mean, just comments like that.

24   Q.  And why do you think that was being pushed by sales, just

25   your belief?

Darrell Bowlin - Direct

1   A.  Since then, I have made accusations to them, Hey, sometimes

2   it feels like you work for the customer and not Tyson Foods.

3   Q.  Why?  Why is that?

4   A.  Because you are beating me down.  I mean, we argue back and

5   forth on the pricing, and every time I try to take price up,

6   all you want to do is take price down.

7   Q.  And that's what you recall as being typical, in fact.

8   A.  Very frequent.

9   Q.  Now, why?  Why did you at that time understand this was

10  happening?

11  A.  Since then I have learned that their bonuses are based on

12  pounds that they sell.

13  Q.  And that's something that you knew at the time.

14  A.  I didn't know that for sure, but since then, I have learned

15  that sales is graded on pounds.

16          MS. CALL:  Objection, foundation.

17          THE COURT:  Overruled.

18  BY MS. PREWITT:

19  Q.  But at the time you had a sense that they were trying to

20  push for lower prices for pounds.  Is that what you are saying?

21  A.  Yes, ma'am.

22  Q.  When you say "pound," what are you referring to?

23  A.  I am talking about the customer pounds that we sell, the

24  number of pounds that we sell to these customers.

25  Q.  Yes.

Darrell Bowlin - Direct

1   A.  They get credit for those pounds in that sense.

2   Q.  And so what was your sense at the time that they were

3   trying to do?

4   A.  Hang on to their volume literally.

5   Q.  So, Mr. Bowlin, what is or was your performance based on

6   when you were at Tyson?  How was it evaluated at Tyson?

7   A.  My bonus, is that what you are asking?

8   Q.  Yes, sir.

9   A.  My bonus would be based on the P and L, making money.

10  Q.  Based on price, for example.

11  A.  Yes, ma'am.  It's multiple things within the BU, but one of

12  them is pricing or return on sale.

13  Q.  Return on sale.  So in other words, if the prices were

14  pushed below the return on sale that you were tasked with

15  getting, that wouldn't be good for you in terms of your

16  performance?

17  A.  You could make that argument.

18  Q.  Ultimately, at Tyson, did salespeople have the ability to

19  decide and set the prices?

20  A.  No, ma'am.

21  Q.  Who did?

22  A.  The BU.

23  Q.  When you say the "BU," you say the business unit, right?

24  A.  Yes, ma'am.

25  Q.  That's you, correct, when you were the person deciding?

Darrell Bowlin - Direct

1   A.   Yes, ma'am.  I was part of the team that made that

2   decision.

3   Q.   Okay.  Now, did you always give the sales team a particular

4   price, or did you give them a price range when they were

5   supposed to go back to the customer?

6   A.   I do recall there was a time where we would say, Hey, go

7   get this, you know, go get X.  I will say that we kind of

8   morphed and we started doing a range, and then I would give

9   them a floor to meet.

10  Q.   Now, were you involved in the negotiations between the

11  sales team and the customers?

12  A.   No, ma'am.

13  Q.   You weren't in the room?

14  A.   Not that I recall, no, ma'am.

15  Q.   Or on the call?

16  A.   Not that I recall.

17  Q.   Okay.  Now, for these QSR customers that were your

18  responsibility, did you know the prices the sales were allowed

19  to take into the negotiations?

20  A.   Say that again, please.

21  Q.   So when you were -- for a customer, a QSR customer where

22  you were the business person, the business unit person

23  responsible, thinking about that, did you know the price or the

24  price range the salespeople were allowed to take into

25  negotiations?

Darrell Bowlin - Direct

1    A.   Well, I would have given them that range.

2    Q.   So you knew what it was.

3    A.   Yes, ma'am.

4    Q.   On those occasions, did you find out after the fact that

5    the prices that came out of the negotiations, in other words,

6    what the customer and the sales team had come -- agreed to?

7    A.   There was an agreement after that position.

8    Q.   So you knew kind of what the input was to that negotiation,

9    and you knew the output, what they came out of the negotiation

10   with; is that right?

11   A.   I believe that to be true.

12   Q.   So did you observe anything about the prices they came out

13   with versus the prices they went in with, whether they were up

14   or down from what you had given them?

15   A.   I would say they hit the floor more than they did anything

16   else.

17   Q.   Okay.  Now, I want to focus you now on your role in

18   developing prices to quote to certain quick-service

19   restaurants, so I am going to focus more on one quick-service

20   restaurant at the time in particular negotiations, okay,

21   Mr. Bowlin?

22   A.   Yes, ma'am.

23   Q.   I am going to ask you some questions now about negotiations

24   with RSCS for a contract to supply KFC restaurants in 2015 to

25   2018, okay?

Darrell Bowlin - Direct

1    *A.*  Yes, ma'am.

2    *Q.*  Now, do you know the buying cooperative for the KFC

3    franchisees?

4    *A.*  RSCS.

5    *Q.*  Thank you.

6          And do you recall a period of time like in the summer

7    of 2014 when the negotiations were -- let me just back up a

8    second.

9          Do you remember a time in the summer of 2014 when a

10   model was developed to submit to RSCS for that KFC 2015

11   contract?

12   *A.*  After reviewing the e-mails, yes, ma'am.

13   *Q.*  Okay.  But you recall it.

14   *A.*  Yes, ma'am.

15   *Q.*  Now, do you remember the length of the contract, that 2015

16   contract?

17   *A.*  I believe based on the e-mails it was for a three-year

18   period.

19   *Q.*  And you recall that sitting here today.

20   *A.*  Yes, ma'am.

21   *Q.*  Okay.  Now, was a three-year contract typical?

22   *A.*  No, ma'am.

23   *Q.*  At the time, it was not?

24   *A.*  Not at that time.

25   *Q.*  Now, do you know how this three-year contract -- sorry, the

Darrell Bowlin - Direct

1   three-year -- the RFP for the three-year contract came about?

2   Do you know how it came to be?

3   A.  I believe the customer was wanting to lock up three years

4   of business.

5   Q.  What was your understanding as to why that was?

6   A.  I would say at that time, again, going back to e-mails and

7   reviewing, we were in a short supply and a high demand.

8   Q.  Now, if you recall, did KFC have its own type of pricing

9   model?

10  A.  Yes, ma'am.  I call it a cost-plus model.

11  Q.  Thank you.

12       And how would you compare the KFC cost model to the

13  models used by other quick-service restaurants you work with?

14  A.  I would say it's a different -- it's a cost-plus model, but

15  it had different stipulations versus a Popeye's cost-plus

16  model.

17  Q.  So just -- please just describe that for the jury.  You

18  could just take Popeye's and KFC or even another quick-service

19  restaurant, but taking the KFC model and comparing it.

20  A.  I will focus on KFC first.

21  Q.  That sounds fine.

22  A.  If you look at their cost-plus model, it's based on grains.

23  So as grains go up, so does their price inherently.  And the

24  one thing about KFC that's different than the others is you

25  have to tare, T-A-R-E, both marination and moisture.

Darrell Bowlin - Direct

1   Q.   And what does that actually mean in terms of what you have

2   to consider when you're pricing?

3   A.   So in this scenario, and I am just giving you pounds, it's

4   not actual, but in this scenario we would pack 65 pounds in a

5   box but only get credit for 59 pounds, because, again, we

6   tared, T-A-R-E, we tared out the moisture and the injection

7   percentage.  That was their model.

8   Q.   So in a nutshell, what did that mean for Tyson?

9   A.   That means we got paid less, and they didn't pay for all

10  pounds in the box.

11  Q.   Did there come a time when Tyson made an effort to change

12  this model?

13  A.   Yes, ma'am.  That would have been that 2014-2015 period.

14  Q.   And who was responsible for that at Tyson?

15  A.   I believe we engaged Brandon Campbell.  He would have

16  helped us put together that model.

17  Q.   Okay.  So when you said "helped us," do you mean helped the

18  business unit?

19  A.   I am sorry, helped the BU, yes, ma'am.

20  Q.   Thank you, sir.

21        Now, what did Tyson try to do in terms of changing the

22  model?

23  A.   I believe the first step was to get credit for all pounds

24  in the box, meaning no more tare applied.  And then -- I

25  believe that was rejected.  And so the next step was we took

3054

1  our price up to compensate not getting paid for everything in

2  the box.

3  *Q.*  So in other words, the attempt to change the model didn't

4  work?

5  *A.*  The attempt to change the model did not work.

6          *THE COURT:*  Ms. Prewitt, can you look for a convenient

7  breaking spot?  We are at 5:00 now.

8          *MS. PREWITT:*  Your Honor, this would be just fine.

9          *THE COURT:*  Ladies and Gentlemen, we will break for

10  the evening.  We will resume same time tomorrow.  Keep the

11  admonitions in mind, Ladies and Gentlemen.  Don't look up any

12  information, obviously.  You heard a few new terms today.

13  Don't try to look up any of that.  Whatever new term comes up,

14  it has to be defined through the testimony in the case or

15  through the exhibits.  You can't do your own research, all

16  right?

17          We will see you tomorrow at 8:30.  The jury is

18  excused.

19          (Jury excused.)

20          *THE COURT:*  Mr. Bowlin, you can be excused.  Be ready

21  to go at 8:30 tomorrow.

22          *THE WITNESS:*  Yes, sir.

23          *THE COURT:*  Thank you.

24          All right.  The government filed Docket No. 1180.

25  This is a motion to exclude two franchisee witnesses.  Did the

1    defendants want to respond to that in writing; and if so, when

2    given the fact it looks like those witnesses will be called

3    tomorrow perhaps, even tomorrow morning?

4         Mr. Feldberg, go ahead.

5         MR. FELDBERG:  Your Honor, we do plan to call

6    Mr. Bagshaw and Mr. Shelton tomorrow, and if Your Honor wants a

7    writing, we will submit one.  I think we can handle this

8    orally.

9         THE COURT:  I am not suggesting otherwise.  So go

10   ahead, Mr. Feldberg.

11        MR. FELDBERG:  Docket 1180 filed by the government

12   argues at page 2, and I think this is the heart of their

13   argument, that the government is not aware of any evidence

14   showing that franchisees and suppliers interacted on a regular

15   basis for business purposes.  And then they note in a footnote

16   that they called, and, in fact, he was their first witness at

17   the first trial, a franchisee.

18        In this case, both Mr. Bagshaw and Mr. Shelton, who

19   were franchisees, interacted regularly with Mr. Austin, and

20   those interactions will be the subject of their testimony.

21   They are not planning to testify and we are not planning to

22   elicit what the government seems to be concerned about, that

23   they wanted and received pricing within a reasonably tight band

24   from suppliers.  That's not the thrust of their testimony.  And

25   we offer their testimony pursuant to Rules 404(a) and 405(a).

1    I don't see what the issue is.

2            THE COURT: Response by the government?  Ms. Sweeney?

3            MS. SWEENEY: Yes, Your Honor.  So -- well, two

4    points.  First, we've seen --

5            THE COURT: Do you mind going to the microphone just

6    to get some more amplification?

7            MS. SWEENEY: Sorry.

8            So we have seen no documents, received no documents or

9    notes of any sort as to what they were testifying about.  And I

10   believe Mr. Feldberg mischaracterized what we were arguing,

11   which was not that franchisees do not have any interactions

12   with the suppliers, but the point was rather they did not have

13   any negotiations with the suppliers.

14           If you recall in the last trial, Mr. Olson testified

15   about a negotiation, I believe it was a volume discount on

16   might have been payment terms, I don't recall specifically,

17   that he had specifically with two of the chicken suppliers as

18   part of this 2015 contract negotiations process.  And the

19   suppliers were uncharacteristically inflexible.

20           I did not hear Mr. Feldberg say that there is any

21   negotiations related to the antitrust conspiracy that's charged

22   in this case, simply interactions, which in the last trial the

23   defendants argued were irrelevant, and we agreed that any

24   interactions that are not negotiations that go to the existence

25   of an antitrust conspiracy would be irrelevant in this case.

1          THE COURT:  Okay.  Mr. Feldberg?

2          MR. FELDBERG:  Your Honor, we have advised the

3     government that we are not planning to offer any documents

4     through either witness.  Mr. Bagshaw, as it turns out, was

5     mentioned in the first trial by Mr. Ledford in his testimony.

6     And, once again, we are offering these witnesses pursuant to

7     Rule 404(a)(2) and Rule 405(a).

8          Anything else, Ms. Sweeney?

9          MS. SWEENEY:  No.  I just wanted to apologize.  I had

10    not heard that part of Mr. Feldberg's earlier note about

11    404(a)(2) and 405(a), and we would agree that puts them in a

12    separate category.

13         THE COURT:  We will have to play it by ear, but the

14    fact that a witness may not have any documents associated with

15    him or her doesn't really matter.  Maybe they just don't.

16         So I will deny Docket No. 1180 but without prejudice

17    to the government objecting to anything that it believes may be

18    an appropriate objection.

19         Ms. Call, did you have other matters?

20         MS. CALL:  Very briefly.  I hope it's the last time I

21    bring it up.  But I do think what happened during Ms. Henry's

22    examination this afternoon where she handed the government a

23    revised summary of one that had already been admitted along

24    with a stack of paper with Post-it notes and the summary had

25    errors in it, which is just a real example of why we need an

1    order on the government's request for advance disclosure of

2    summaries, and apparently probably now demonstratives would be

3    helpful, because clearly defense counsel thinks each other's

4    summaries are either misleading or missing information by the

5    fact that they just amended one in the middle of court and then

6    sought its admission.  The government was scrambling and found

7    errors while sitting there.

8         So I do think we need an order.  We need disclosure of

9    demonstratives and summaries before they are shown in the

10   middle of court and thrown at the government.

11        THE COURT:  Ms. Henry?

12        MS. HENRY:  Your Honor, I did, in fact, have the

13   witness look through each number prior to actually putting it

14   in the exhibit.  And I apologize for the fact that I somehow

15   had that wrong, but that was exactly the type of thing that we

16   would see as the witness does, in fact, read off the number

17   before it is put onto the demonstrative.  It was an exhibit

18   that he put in a few numbers, but I don't think there was any

19   concern or a need for an earlier review of it as we went

20   through it specifically one number at a time.

21        THE COURT:  Had the government had that earlier, the

22   whole correction part would have been obviated, so it is a good

23   idea and I agree with Ms. Call that does illustrate exactly why

24   it would be good to provide those to the government in advance.

25        Anything else to take up before we recess?

1          Mr. Tubach?

2          MR. TUBACH:  Yes, Your Honor.  I think we just need to

3    have a schedule for filing our Rule 29 motions.

4          THE COURT:  Yes, good point.  Have you, Mr. Tubach,

5    since you deigned to -- since you volunteered to bring that

6    subject up, ideas on that subject?

7          MR. TUBACH:  I do.  And I think trying to divine a

8    consensus among the group, we were thinking perhaps Monday, if

9    that would be sufficient for the Court.

10         THE COURT:  Any objection to a deadline of Monday for

11   the Rule 29 motions by the United States?

12         MR. KOENIG:  Well, as long as our deadline isn't

13   Tuesday, I guess.

14         THE COURT:  Why don't we talk first about the

15   defendants' deadline.

16         MR. KOENIG:  I think that's fine.

17         THE COURT:  Okay, Monday.

18         MR. TUBACH:  Wednesday response is fine from the

19   government.

20         THE COURT:  Mr. Koenig, what would you then suggest

21   for the government's response to those 10 motions?

22         MR. KOENIG:  The 28th, the following Monday.

23         THE COURT:  Okay.  Any objection to that?

24         MR. TUBACH:  No, Your Honor.  That seems reasonable.

25         THE COURT:  Yeah, the 28th, then, for the government's

1    deadline.

2            Anything else to take up today?

3            All right.  We will be in recess until 8:30 tomorrow.

4    Thank you.

5        (Recess at 5:10 p.m.)

6                              **INDEX**

7    OPENING STATEMENT

8        By Ms. Prewitt                                    2888

9    WITNESSES

10       Robert Lewis

11           Redirect Examination Continued By Mr. Torzilli   2843

12       Richard Eddington

13           Direct Examination By Ms. Rahman                 2908

14           Cross-examination By Mr. Gillen                  2978

15           Cross-examination By Mr. Pollack                 3003

16           Cross-examination By Mr. Feldberg                3014

17           Cross-examination By Ms. Henry                   3017

18           Cross-examination By Ms. Prewitt                 3023

19           Cross-examination By Mr. Koenig                  3024

20           Redirect Examination By Ms. Rahman               3033

21

22

23

24

25

**INDEX (Continued)**

WITNESSES

    Darrell Bowlin

       Direct Examination By Ms. Prewitt      3034

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| 4 | | 2860 | | | |
| J-008-1 | | 3022 | | | |
| 9 | | 2868 | | | |
| 10 | | 2870 | | | |
| I-267 | | 3012 | | | |
| 424 | | 2861 | | | |
| F-788 | | 3018 | | | |
| 900 | | 2871 | | | |
| 9711 | | 2865 | | | |
| 9712 | | 2866 | | | |
| 9713 | | 2866 | | | |
| 9991 | | 2859 | | | |
| 10023 | | 2845 | | | |

REPORTER'S CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  Dated at Denver, Colorado, this 30th day of May, 2022.


                          S/Janet M. Coppock