1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn III

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,
     MIKELL REEVE FRIES,
8    SCOTT JAMES BRADY,
     ROGER BORN AUSTIN,
9    WILLIAM WADE LOVETTE,

10        Defendants
     _____

11
                     REPORTER'S TRANSCRIPT
12                    Trial to Jury, Vol. 12
     _____

13

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:31 a.m., on the 30th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24    Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Therese Lindblom, 901 19th Street,
25          Room A257, Denver, Colorado, 80294, (303) 335-2105

1                              APPEARANCES

2            Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5            Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10           David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13           Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16           Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19           Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22           Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25

APPEARANCES (Continued)

1
2          Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive
3    South, Suite 720, Denver, CO 80209;
4          John Anderson Fagg, Jr. and Frank Schall of
5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,
6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.
7                         *   *   *   *   *
8                             PROCEEDINGS
9          (In open court at 8:31 a.m.)
10          THE COURT:  Thank you.  Please be seated.
11          All right.  Are we ready for the jury?
12          MR. HART:  The Government is ready, Your Honor.
13          THE COURT:  Okay.  Let's go ahead and bring the jury
14    in.
15          (Jury in at 8:33 a.m.)
16          THE COURT:  All right.  Thank you.  Please be seated.
17          Good morning, ladies and gentlemen.  Great job getting
18    in, although I heard that many of you were subjected to
19    extortion at the parking rates today.  We'll work on that, and
20    hopefully we can reimburse you.  There are rules and things, I
21    don't know, but we'll work on that.
22          All right.  We are ready at this time for the next
23    witness.  Mr. Fagg.
24          MR. FAGG:  Thank you, Your Honor.
25          At this time, we'd call Brenda Ray.

Brenda Ray – Direct

1          *THE COURT:* All right.

2          Ms. Ray, if you will, please come forward and stand

3     next to the witness stand, Ms. Grimm, who is there, will

4     administer an oath to you.

5          (**BRENDA RAY, DEFENDANTS' WITNESS, SWORN**)

6          *COURTROOM DEPUTY:* Please state your name and spell

7     your first and last name for the record.

8          *THE WITNESS:* Brenda Ray, B-R-E-N-D-A, R-A-Y.

9                         **DIRECT EXAMINATION**

10    *BY MR. FAGG:*

11    *Q.* Good morning, Ms. Ray.  My name is John Fagg, and I

12    represent Bill Lovette.  Where do you currently work?

13    *A.* Pilgrim's.

14    *Q.* And when did you start working at Pilgrim's, ma'am?

15    *A.* 1985.

16    *Q.* What's your current position at Pilgrim's?

17    *A.* Customer service for food service sales.

18    *Q.* Have you always been in customer service?

19    *A.* I have not.

20    *Q.* Have you worked at Pilgrim's for that entire time period

21    that you talked about?

22    *A.* Yes, sir.

23    *Q.* Was there a period when you retired?

24    *A.* Yes, sir.

25    *Q.* And so just briefly, when can -- can you framework for us

2306

Brenda Ray – Direct

1    the time period when you started until your retirement and when

2    you came back?

3    A.   Yes, sir.  I started in 1985.  I worked in cold storage;

4    moved to international sales, became a manager in international

5    sales; moved to domestic sales, became a manager in domestic

6    sales; moved to food service sales, became a manager in food

7    service sales, and then moved to director in food service

8    sales, and then moved to vice president in food service sales.

9    Due to health issues in my family, I had to retire early from

10   Pilgrim's.  Those issues have been somewhat resolved, so I went

11   back as a customer service representative for something to do.

12   Q.   When did you retire?

13   A.   2018.

14   Q.   And when did you go back?

15   A.   After one year, 2019.

16   Q.   2019.  Okay.  And are you back full-time now?

17   A.   I work predominantly full-time, yes.

18   Q.   I want to talk to you about the time period prior to your

19   retirement.  And when you -- before you retired, am I correct

20   that you worked in broad-line -- broad-line division?

21   A.   Correct.

22   Q.   At Pilgrim's?

23   A.   Correct.

24   Q.   And when you were in the broad-line distribution group, was

25   Sysco one of your customers that you oversaw?

Brenda Ray – Direct

1   A.  Yes, sir.

2   Q.  What was your role as it related to Sysco?

3   A.  I was the vice president over the entire broad-line group,

4   and Sysco fell under my area of responsibility, and I had an

5   individual who specifically managed the Sysco account.

6   Q.  Who was that individual?

7   A.  Janine Nollkamper.

8   Q.  Ms. Ray, do you recall a time in the spring of 2016 when

9   Sysco made a demand to Pilgrim's to change the credit terms

10  that Sysco had in place?

11  A.  I do recall that.

12  Q.  When Sysco made that demand in the spring of 2016, was it

13  associated with any RFP?

14  A.  No, sir.

15  Q.  Was it associated with any sort of bid?

16  A.  No, sir.

17  Q.  Was it associated with any sort of contract negotiation?

18  A.  No, sir.

19  Q.  How do you recall hearing about that demand from Sysco to

20  change the credit term?

21  A.  I recall receiving notice via email communication, I

22  believe, from Melissa Hoyt from Sysco.

23  Q.  Who is Melissa Hoyt?

24  A.  Melissa Hoyt works in the Sysco corporate office, and she

25  is over sourcing, which is purchasing.

2308

Brenda Ray - Direct

1    Q.   And do you recall when that was, ma'am?

2    A.   Specifically?

3    Q.   If you recall.

4    A.   I don't.

5    Q.   Okay.  Would it help refresh your recollection to, perhaps,

6    see a document?

7    A.   Yes.

8         MR. FAGG:  Your Honor, may I hand some binders up?

9         THE COURT:  Yes, you may.

10   BY MR. FAGG:

11   Q.   Ma'am, if you look at tab 7 of your binder -- we could also

12   pull it up on the screen if that's easier for you.  That's in

13   E-221.

14        Do you see that?

15   A.   Yes, I do.

16   Q.   Does that refresh your recollection as to when you received

17   it?

18   A.   Yes.  April of 2016.

19   Q.   And does it refresh your recollection that it was on

20   April 25 of 2016?

21   A.   Correct.

22   Q.   Okay.  You can put that aside.

23        Do you recall, ma'am, when you received that demand --

24   you said you received it from Ms. Hoyt at Sysco; is that right?

25   A.   That's correct.

Brenda Ray - Direct

1    *Q.*  Did you call Ms. Hoyt?

2    *A.*  I did not call Ms. Hoyt.

3    *Q.*  Did you do anything else when you received it?

4    *A.*  I recall having a discussion with Janine, and I asked

5    Janine to call Ms. Hoyt or get in contact with Ms. Hoyt, Janine

6    lived in the Houston area, and find out if others besides

7    Pilgrim's was receiving -- was receiving -- any other vendors

8    was receiving this demand.

9    *Q.*  What was your understanding about whether or not others

10   were receiving the demand?

11   *A.*  My understanding was yes.

12   *Q.*  And -- meaning other -- Pilgrim's wasn't being singled out?

13   *A.*  That's correct.

14   *Q.*  This was being rolled out more broadly?

15   *A.*  Yes.

16   *Q.*  Where did that information come from?

17   *A.*  That Pilgrim's' wasn't being singled out?

18   *Q.*  Yes.

19   *A.*  It came from Ms. Hoyt.

20   *Q.*  At Sysco?

21   *A.*  At Sysco corporate.

22   *Q.*  So if you look at your binder, ma'am, at tabs 1 and 2, and

23   this is GX-843 and 844.  Do you see those documents?

24   *A.*  Yes.

25   *Q.*  Are those the demands that you just referenced that Sysco

Brenda Ray – Direct

1    sent?

2    A.  Yes, it is.

3         MR. FAGG:  Your Honor, at this time, we move to admit

4    Government Exhibits 843 and 844.

5         THE COURT:  Any objection to the admission of

6    Exhibits 843 and 844?

7         MR. HART:  May I have a minute, Your Honor?

8         THE COURT:  You may.

9         MR. HART:  Yes, Your Honor, objection to the admission

10   of 843 for hearsay.

11        THE COURT:  Response, Mr. Fagg.

12        MR. FAGG:  Sure, Your Honor.  This is the demand that

13   Sysco sent to Pilgrim's to change the credit terms, and we

14   offer this for the effect on the listener, Ms. Ray, which has

15   just been established, when she received this, the steps she

16   took following that.

17        THE COURT:  Mr. Hart, response.

18        MR. HART:  If it's not for the truth, then with a

19   limiting instruction, no objection.

20        THE COURT:  Okay.  Then what about, Mr. Hart, 844?

21        MR. HART:  No objection to 844, Your Honor.

22        THE COURT:  Okay.  Then, ladies and gentlemen -- so

23   843 will be admitted but with the following limiting

24   instruction, namely, that it is admissible not for the truth of

25   the matters in it, in other words, the truth of the matters

Brenda Ray - Direct

1  asserted, but only the effect on the listener; and 844 will be

2  admitted.  And both may be published if you wish, Mr. Fagg.

3             (Exhibit 843 admitted.)

4             (Exhibit 844 admitted.)

5        *MR. FAGG:*  Thank you.  Yes, if we could publish those

6  side by side, please.

7  *BY MR. FAGG:*

8  *Q.*  So on April 25 of 2016, Ms. Ray, you received this demand

9  from Sysco.  Is this something that normally you had

10  experienced in the course of your decades of working --

11  *A.*  It was not.

12  *Q.*  It was not?

13  *A.*  It was not.

14  *Q.*  Why do you say that?

15  *A.*  I had never received a letter from one of the corporate

16  entities demanding a change in credit terms that I can recall

17  in my handling of the accounts.

18  *Q.*  And is that why you asked Ms. Nollkamper to reach out to

19  Sysco?

20  *A.*  Yes.

21  *Q.*  Did you understand -- can you tell the jury just a little

22  bit about what this means to change the credit terms from

23  Pilgrim's perspective?

24  *A.*  Yes.  So when you negotiate an RFP, a part of that RFP is

25  product, specs, and terms.  Credit terms are also involved in

Brenda Ray – Direct

 1   that document, in that RFP document.  And when an award is

 2   made, if it is made to you, then the customer, as well as the

 3   supplier, are accepting the terms and conditions of that RFP

 4   document.  It is very -- it's just not something that you would

 5   commonly see that after the fact you would receive a letter

 6   from the customer requesting or demanding to change their

 7   credit terms.

 8   Q.  And this wasn't part of any RFP?

 9   A.  No, sir, it wasn't.

10   Q.  And was the demand to change the credit terms advantageous

11   to Pilgrim's or advantageous to Sysco?

12   A.  Advantageous to Sysco.

13   Q.  And why was that?

14   A.  Because Sysco was requesting a larger credit term.  They

15   wanted to have more days before they were required to pay for

16   the purchases of the product.

17   Q.  They wanted to extend the payment term to Pilgrim's for the

18   products they were purchasing?

19   A.  That is correct.

20   Q.  But do so outside of any sort of contract negotiation or

21   RFP?

22   A.  That is correct.

23   Q.  And so, then, were you involved in the discussions within

24   Pilgrim's about this demand from Sysco?

25   A.  No.  At that point when a customer requests those types of

Brenda Ray – Direct

1    changes in credit terms, they go to finance, to the credit

2    department, and then from that point, the credit department

3    within the company determines whether they're going to make any

4    changes to the terms of a particular customer's payment.

5    Q.  When you say "they go to the finance department," do you

6    mean the proposal --

7    A.  The proposal.

8    Q.  The demand?

9    A.  The document, the demand, yes, the request.

10   Q.  Okay.  Let's talk a little bit about that.  When you say

11   the "finance department" at Pilgrim's, is Mr. Lovette part of

12   the finance department?

13   A.  No, he isn't.

14   Q.  And so who made the decision, if you know, about these

15   credit terms?

16   A.  That would have gone to Fabio Sandri, who was in charge of

17   that particular portion of our business, and the gal that works

18   for him, Karen Schroeder.

19   Q.  And just backing up for just a moment, if we can, ma'am,

20   on --

21         MR. FAGG:  If we can pull up Exhibit 844 and highlight

22   that.

23   BY MR. FAGG:

24   Q.  You said this was the first proposal or demand that came

25   from Sysco.  And was there a demand from Sysco in that for

Brenda Ray – Direct

1   65-day terms?

2   *A.*   That isn't stated on this particular document, but I do

3   recall that being in some communication or some verbiage.

4   *Q.*   But this request that you received was for 14 days, right?

5   *A.*   That is correct.

6   *Q.*   And this was the first demand that you received?

7   *A.*   I believe that to be correct, yes.

8   *Q.*   By the way, did Pilgrim's know that this was coming?

9   *A.*   No, we did not.

10  *Q.*   And so you said that you asked Ms. Nollkamper to reach out

11  to Sysco, right?

12          *MR. HART:*   Objection.   Leading.

13          *THE COURT:*   Overruled.

14          *THE WITNESS:*   Yes.

15  *BY MR. FAGG:*

16  *Q.*   Did you ask her to reach out to anyone else outside of

17  Pilgrim's?

18  *A.*   Not other than Sysco, no.

19  *Q.*   And are you aware that she reached out or anybody else

20  reached out to anyone else outside of Pilgrim's, other than

21  Sysco?

22  *A.*   I am not.

23  *Q.*   Did you ever ask her to find out how any other suppliers

24  were responding to --

25  *A.*   I did not.

Brenda Ray – Direct

1  *Q.* Are you aware of anybody ever asking anybody to find out

2  how other suppliers were responding to this?

3  *A.* No.

4  *Q.* When Pilgrim's received this demand, did it immediately

5  tell Sysco no?

6  　　　　*MR. HART:* Objection. Leading.

7  　　　　*THE COURT:* Sustained.

8  *BY MR. FAGG:*

9  *Q.* So Ms. -- I'll rephrase.

10  　　　　After you received this demand, you said it was

11  referred on to the credit department; is that right?

12  *A.* Correct.

13  *Q.* And as the person that --

14  　　　　*MR. HART:* Objection. Leading.

15  　　　　*THE COURT:* Sustained -- I mean, overruled. She's

16  already testified. He's just looping it in.

17  　　　　Go ahead.

18  *BY MR. FAGG:*

19  *Q.* So as the person who was responsible for Sysco, were you

20  kept in the loop about where things stood with these

21  negotiations?

22  *A.* I believe that I was copied on email correspondence as to

23  what was being decided and what was being communicated to

24  Sysco.

25  *Q.* Okay. And so, again, this is May 25 -- I'm sorry.

Brenda Ray - Direct

1    April 25?

2    A.  Yes, that's correct.

3    Q.  Do you recall when Pilgrim's responded to Sysco?  And if

4    you don't, that's okay.

5    A.  Sometime after that.

6    Q.  Okay.  Do you recall when it was?

7    A.  Most likely within 30 days.

8    Q.  Okay.  Would it, perhaps, refresh your recollection to see

9    a document on that?

10   A.  Yes.

11   Q.  Okay.

12       MR. FAGG:  So if we can call up D-989, please.

13       And can we scroll down.

14   BY MR. FAGG:

15   Q.  You mentioned Ms. Schroeder earlier; is that right?

16   A.  Yes.

17   Q.  You said she worked for Mr. Sandri?

18   A.  Yes.

19   Q.  Let's take a look really quickly, and we'll come back to

20   this at D-990, which is at tab 8 in your binder if you'd like

21   to see it.

22       MR. FAGG:  Your Honor, at this time, we would move to

23   admit D-990, which is subject to an agreement of the parties.

24       THE COURT:  Any objection to the admission of D-990?

25       MR. HART:  No, Your Honor.

Brenda Ray - Direct

1          THE COURT:  All right.  D-990 will be admitted and may

2     be published.

3               (Exhibit D-990 admitted.)

4     BY MR. FAGG:

5     Q.  And so do you see this letter, ma'am?

6     A.  Yes.

7     Q.  And we were just looking at D-989, which is the exhibit

8     that comes immediately before that, which was the email from

9     Ms. Schroeder attaching this letter.  Do you recall that this

10    letter was Pilgrim's' response to Sysco?

11    A.  Yes.

12    Q.  And if we can look back at D-989, which should be on your

13    screen.

14          MR. FAGG:  Which is also subject to an agreement from

15    the parties, and we would ask to admit D-989.

16          THE COURT:  Any objection to the admission of D-989?

17          MR. HART:  No, Your Honor.

18          THE COURT:  D-989 will be admitted.

19               (Exhibit D-989 admitted.)

20    BY MR. FAGG:

21    Q.  And so, Ms. Ray, what's the date of that email --

22          MR. FAGG:  May it be displayed, please?

23          THE COURT:  Yes, it may.

24          THE WITNESS:  May 13, 2016.

25

Brenda Ray – Direct

1    *BY MR. FAGG:*

2    *Q.*  Okay.  And you just said that -- we can flip back to D-990,

3    you recalled that that was Pilgrim's' response to Sysco?

4    *A.*  Yes.

5    *Q.*  That came from the credit department or finance?

6    *A.*  Yes.

7    *Q.*  And in that response from Mr. Sandri, did Pilgrim's tell

8    Sysco no?

9          *MR. HART:*  Objection.  Leading.

10         *THE COURT:*  Sustained.

11   *BY MR. FAGG:*

12   *Q.*  Do you recall what -- tell you what, why don't we take a

13   look at D-989 and the first paragraph of it.

14         I'm sorry, I called up the wrong one.  It's D-990.

15         Do you recall, Ms. Ray, whether or not Pilgrim's told

16   Sysco, No, we're not going to negotiate?

17   *A.*  No, they didn't tell them that they were not going to

18   negotiate.

19   *Q.*  And if you look at the first paragraph, what did Pilgrim's

20   say?

21         *MR. HART:*  Objection.  Reading from the document.

22         *THE COURT:*  Sustained.

23   *BY MR. FAGG:*

24   *Q.*  Ms. Ray, do you know what the message was that Pilgrim's

25   delivered to Sysco about these negotiations?

Brenda Ray - Direct

1    *A.*  That they had reviewed them, and they discussed some of the

2    things that Sysco had wanted to -- had requested to have done.

3    And then they explained what it was that Sysco -- what they

4    were going to grant Sysco.

5                *MR. HART:*  Objection.  The witness is just reading

6    from the document.

7                *THE COURT:*  Sustained.

8    *BY MR. FAGG:*

9    *Q.*  Ms. Ray, do you recall whether or not following this

10   initial response, whether or not Pilgrim's engaged in further

11   negotiations with Sysco about the proposed terms?

12   *A.*  I do recall on the fresh line of the business that Sysco

13   was granted 14-day terms versus 10-day terms on payment.

14   *Q.*  And you said Sysco was granted --

15   *A.*  That's right.

16   *Q.*  -- meaning that eventually Pilgrim's agreed to some revised

17   terms?

18   *A.*  Yes.

19                *MR. HART:*  Objection.  Leading.

20                *THE COURT:*  Sustained.

21   *BY MR. FAGG:*

22   *Q.*  Can you tell us what you mean by "Sysco was granted"?

23   *A.*  Yes, so previously the Sysco terms on fresh chicken was ten

24   days upon invoice.  And Mr. Sandri did grant them -- he gave

25   them 14 days, he gave them four additional days of time before

Brenda Ray - Direct

1  they had to pay for the fresh chicken.

2  Q.  And is Sysco a fast-food restaurant?

3  A.  No, they're not.

4  Q.  So you said that they -- that Pilgrim's eventually granted

5  them four additional days.  Did I hear you right?

6  A.  That's correct.

7  Q.  Do you recall when that occurred?

8  A.  During this same time period.

9  Q.  But you don't recall exactly?

10  A.  I don't recall exactly.

11  Q.  Okay.  So I'd like to show you what has been marked as

12  Exhibits 850, 851, and 9700, which are at tabs 9, 10, and 11 of

13  your binder.

14        Can you take a quick look at those and tell me if you

15  identify those -- if you recognize those?

16  A.  Yes, I do.

17  Q.  Okay.  So starting with Exhibit 850, and 851, can you

18  please tell us what those are?

19  A.  It's an email addressed to Melissa Swain, Melissa Hoyt

20  Swain, and the team at Sysco corporate.  It's from Janine, who

21  reports to me.  And she is sending to the team at Sysco

22  corporate the supplier payment terms change form.

23  Q.  And is it signed by Pilgrim's?

24  A.  It is signed by myself, who worked at Pilgrim's at the

25  time.

Brenda Ray – Direct

1    Q.  Okay.

2          MR. FAGG:  So, Your Honor, at this time, we would move

3    to offer 850 and 851.

4          THE COURT:  Again, any objection to the admission of

5    Exhibits 850 and 851?

6          MR. HART:  Your Honor, objection to 850, hearsay; and

7    851, no objection.

8          THE COURT:  Response, Mr. Fagg, as to 850?

9          MR. FAGG:  Sure, Your Honor.  850 is the type of

10   cover email response that we have -- that have been admitted

11   throughout this case, attaching documents like 851.  If it --

12   and so we don't think it requires any redactions or is hearsay.

13         THE COURT:  Okay.  Anything else on this one,

14   Mr. Hart?

15         MR. HART:  Yes.  There are out-of-court statements.

16   Our objection is -- if it was for effect on the listener, we

17   would not have an objection to it, with a limiting instruction.

18         THE COURT:  Okay.  Then Exhibit 850 will be admitted

19   as a transmittal email.  However, the statements in it should

20   be considered only for effect on the listener.  And Exhibit 851

21   will be admitted.

22              (Exhibit 850 admitted.)

23              (Exhibit 851 admitted.)

24         MR. FAGG:  Thank you.

25              If it could be displayed, Your Honor.

Brenda Ray – Direct

1          THE COURT:  It may.

2    BY MR. FAGG:

3    Q.  This was a transmittal email from Janine Nollkamper, who

4    worked for you and copied you; is that right?

5    A.  Yes.

6    Q.  Okay.  And that was sent on what day?

7    A.  July 5.

8    Q.  Okay.  And did it have an attachment to it?

9    A.  It did.

10   Q.  And is that attachment the next exhibit, which is 851?

11   A.  Yes.

12   Q.  Is that your signature, ma'am?

13   A.  Yes.

14   Q.  And so this was, I think you said, Pilgrim's agreeing to

15   the revised terms -- renegotiated terms?

16   A.  Yes.

17   Q.  Now, you signed this.  Do you recall who gave you authority

18   to sign this?

19   A.  Fabio Sandri.

20   Q.  Did you have any discussions with Mr. Lovette about this?

21   A.  No.

22   Q.  To your knowledge, did anybody have any discussions with

23   Mr. Lovette about any of these negotiations?

24          MR. HART:  Objection.  Foundation.

25          THE COURT:  Overruled.

Brenda Ray - Direct

1              THE WITNESS:  Not to my knowledge.

2      BY MR. FAGG:

3      Q.  So I just want to make sure I have the timeline correct

4      here, ma'am.  You said that the first request came in when?

5      A.  April 25.

6      Q.  And so, then -- and this document is dated when?

7      A.  The final date is July 5.

8      Q.  And so do you have an understanding of whether or not

9      during that eight-week intervening period Pilgrim's and Sysco

10     has discussions about these terms to eventually land on these

11     amended terms?

12             MR. HART:  Objection.  Leading.

13             THE COURT:  Sustained.

14     BY MR. FAGG:

15     Q.  Do you have an understanding, ma'am, of what happened in

16     these -- in the eight-week intervening time period between

17     April 25 and July the 5th?

18     A.  I believe there was some discussion on terms.

19     Q.  Between who?

20     A.  Between Sysco corporate and Pilgrim's finance.

21     Q.  Okay.  And so, again, I want to circle back specifically,

22     ma'am, on Mr. Lovette.  Did you ever talk to Mr. Lovette about

23     these credit terms?

24     A.  No.

25     Q.  Did you ever talk to Mr. Lovette about the negotiations

Brenda Ray - Direct

1    with Sysco?

2    *A.* No.

3    *Q.* And to your knowledge, was he involved in any way with the

4    negotiations about Sysco?

5    *A.* Not to my knowledge.

6    *Q.* To the best of your recollection, did anyone ever provide

7    you with any feedback or information that came from

8    Mr. Lovette?

9         *MR. HART:* Objection. Leading.

10         *THE COURT:* Overruled.

11         *THE WITNESS:* No.

12   *BY MR. FAGG:*

13   *Q.* And did you ever speak with anyone outside of Pilgrim's

14   related to these negotiations?

15   *A.* No.

16   *Q.* And other than the discussion that you asked Ms. Ray -- I'm

17   sorry -- Ms. Nollkamper to have with the customer, did you ask

18   anybody to have any discussions with anybody else outside of

19   Pilgrim's?

20   *A.* No.

21         *MR. FAGG:* May I have one moment to confer, Your

22   Honor?

23         *THE COURT:* You may.

24         *MR. FAGG:* Thank you very much, Ms. Ray.

25         That's all I have.

2325

Brenda Ray - Cross

1           THE COURT:  Mr. Tubach.

2                        **CROSS-EXAMINATION**

3    BY MR. TUBACH:

4    Q.  Good morning, Ms. Ray.  My name is Michael Tubach.  I

5    represent Jayson Penn.  I'd like to ask you some questions, if

6    I could.

7           First, you testified on examination by Mr. Lovette's

8    counsel that you had become, I believe you said it was a vice

9    president by 2018 at Pilgrim's?

10   A.  Yes.

11   Q.  And then you retired for family medical reasons?

12   A.  Correct.

13   Q.  And I don't want to get into those.  You said you came back

14   in 2019.  What position did you come back to?  Did you come

15   back to the same position you had when you left?

16   A.  No, sir.

17   Q.  What kind of position was it?

18   A.  Customer service representative, entering customer orders.

19   Q.  Was that -- I'm sorry I interrupted you.

20   A.  Entering customer orders.

21   Q.  Okay.  Would it be fair to say that's several levels below

22   where you were when you retired in 2018?

23   A.  Absolutely.

24   Q.  Why would you do that?

25   A.  Because I had -- at that time had corrected some of the

Brenda Ray - Cross

1    health issues that required me to retire, but I still needed to

2    be at home every day, but I needed something to do to fill some

3    space of time.  And the director of customer service contacted

4    me to see if I would have interest to help her out and to come

5    in and do some customer service work.

6    Q.   So you're basically helping fill orders now?

7    A.   That's right.

8    Q.   I want to ask you about Government Exhibit 3037.

9         MR. TUBACH:  If we could pull that up.

10   BY MR. TUBACH:

11   Q.   It's in your binder, I believe -- oh, you don't have a

12   binder.

13        MR. TUBACH:  Your Honor, may I approach?

14        THE COURT:  Yes, you may.

15        MR. TUBACH:  Your Honor, these have been previously

16   provided to Government counsel.

17   BY MR. TUBACH:

18   Q.   If you could take a look at Exhibit 3037.

19        If we could have it pulled up on the screen.

20        I want to focus on the email that Ms. Ray wrote at the

21   bottom.

22        Your Honor, I believe this is in evidence.  I'd like

23   to publish this to the jury, if I could.

24        THE COURT:  Let me just check that.

25        Yes, you may.

Brenda Ray – Cross

1          *MR. TUBACH:*  Thank you, Your Honor.

2     *BY MR. TUBACH:*

3     *Q.*  Can you see that on the screen, ma'am?  It's in your

4     binder, if it's easier for you, under the tab marked 3037, or

5     you can read it on the screen.

6     *A.*  I'll read it on the screen.

7     *Q.*  Did you write this email?

8     *A.*  Yes, I did.

9     *Q.*  And at the time you wrote it, in 2012, what was your

10    title -- or your role at Pilgrim's?

11    *A.*  I was a manager over -- I was manager over a team of food

12    service sales folks.

13    *Q.*  And those food service sales folks, was that in what is

14    called broad-line?

15    *A.*  That's correct.

16    *Q.*  What is broad-line?  Could you explain that to us, please.

17    *A.*  Broad-line is a customer that sells to restaurants,

18    individual restaurants.  So the broad-liner, as they're

19    referred to, sells all of the types and sundry items a

20    restaurant would need, glasses, forks, foods, napkins, rugs,

21    including, then, the food products, poultry, beef, pork,

22    vegetables, produce.  That's why they're referred to as

23    broad-line, they sell it all.  They're not specific to one

24    item.

25    *Q.*  Understood.  Is US Foods an example of broad-line?

Brenda Ray - Cross

1    A.   That's an example.

2    Q.   Sysco?

3    A.   Another example, yes.

4    Q.   Like the big trucks that pull up to restaurants and deliver

5    a bunch of stuff; is that correct?

6    A.   That is correct.

7    Q.   Okay.  If you could just orient us.  Read the first

8    sentence of your email of August 31, 2012, into the record,

9    please.

10   A.   "I received a call today from a friendly competitor telling

11   me it's all over the marketplace that Pilgrim's is taking

12   contract pricing up."

13   Q.   Let me stop you right there.  Who is the person that called

14   you?

15   A.   Greg Nelson.

16   Q.   Where does Greg Nelson work at that time?

17   A.   George's --

18        MR. HART:  Objection, Your Honor.  This is outside the

19   scope of the direct.

20        THE COURT:  Overruled.

21        MR. TUBACH:  Your Honor, this is direct.

22        THE COURT:  We're calling it cross, but you have

23   leeway to go outside of the scope.

24        MR. TUBACH:  Thank you.

25        THE COURT:  Go ahead.

Brenda Ray - Cross

1   *BY MR. TUBACH:*

2   *Q.*  Where did Mr. Nelson work, ma'am?

3   *A.*  He worked at George's.

4           Can I correct something that I said earlier?

5   *Q.*  Of course.

6   *A.*  Relative to the time of 2012, which is ten years ago, at

7   that time, I did handle those sales folks that were responsible

8   for broad-line, but I also at that time was responsible for a

9   few of the plant sales managers, and those would also be

10  those -- those folks are also copied on this email, and I

11  needed to clarify that.

12  *Q.*  Thank you, ma'am.  I will definitely ask you about the

13  recipients of the email.  Thank you.

14          Again, so Mr. Nelson worked at George's?

15  *A.*  Correct.

16  *Q.*  Okay.  Is George's another supplier of chicken?

17  *A.*  Yes.

18  *Q.*  So this email, you were summarizing conversations you had

19  with Mr. Nelson?

20          *MR. HART:*  Objection.  Leading.

21          *MR. TUBACH:*  Now it's cross-examination.  I think I

22  can lead.

23          *THE COURT:*  Actually, it's not.  It's a little bit

24  unusual when we have five defendants and then a witness is

25  called.  So technically, there is an issue about, is it direct

Brenda Ray - Cross

1  examination, cross-examination.  To the extent that a person

2  who like Mr. Tubach is following another attorney who called a

3  witness, obviously, that attorney can ask some questions

4  outside of the scope of what was asked on the original

5  examination.  But to the extent that that happens, those

6  questions have -- have to be non-leading.  So that objection is

7  sustained.

8         MR. TUBACH:  Happy to do so.  Thank you, Your Honor.

9  BY MR. TUBACH:

10 Q.  What was this email summarizing?

11 A.  I had received a call from Greg Nelson at George's, and he

12 was indicating to me that he was hearing from the marketplace

13 that Pilgrim's had taken pricing up.

14 Q.  That phone call that you received from Mr. Nelson, was that

15 part of a prearranged call, or did he just call you out of the

16 blue?

17 A.  No, he just called.

18 Q.  Your email mentioned that Pilgrim's had taken up contract

19 pricing.  Do you know to what customer or market that related?

20 A.  At this particular time, it was in the Northeast

21 marketplace.

22 Q.  Okay.  And was it any particular type of product in the

23 Northeast marketplace?

24 A.  It was.

25 Q.  What was it?

Brenda Ray - Cross

1    *A.*   It was nine-piece Halal cut-up chicken.

2    *Q.*   Okay.  Nine-piece halal.  Let's start with nine-piece --

3    we've heard a lot about eight-piece in this courtroom; we

4    haven't heard about nine-piece.  Could you explain to us what a

5    nine-piece cut-up chicken is?

6    *A.*   It's a whole bird that is cut into nine separate pieces,

7    versus eight separate pieces.  So the breast portion of the

8    bird is cut into three, which gives you the extra piece of

9    meat, that, then, gives you nine pieces.

10   *Q.*   And as far as you know, do fast-food restaurants buy

11   nine-piece chicken?

12   *A.*   By fast-food restaurants, are you talking specifically

13   about a type?

14   *Q.*   Popeyes, KFC, Church's, do you know if they buy nine-piece

15   chicken or eight-piece chicken?

16   *A.*   They buy eight-piece chicken, to my knowledge.

17   *Q.*   Thank you.  You also mentioned halal meat.  Could you

18   explain to the jury what halal meat is.

19   *A.*   Yes.  This is product that the consumer requires to have --

20   it's -- it goes to the Muslim markets.  So they want to

21   understand that the product that they're buying has been

22   blessed by their imam, their mullah, so that in their religious

23   rights, then it's safe and okay for them to consume that.  So

24   it is a specific type of product, in that it's marked as halal,

25   and it's labeled as such when it goes to the marketplace.

Brenda Ray - Cross

1  *Q.*  This nine-piece halal meat sold in the Northeast, who at

2  Pilgrim's made the decision to take up that contract pricing?

3  *A.*  Specifically who made the decision?

4  *Q.*  Within Pilgrim's at this time period.

5  *A.*  Well, that would have been myself.  Under our direction --

6  I mean, our direction is to have pricing courage to be paid

7  what the product is worth in the marketplace, so I gave the

8  direction to my sales team that we needed to take pricing up.

9  *Q.*  Was that decision to take up the pricing, was that your

10  decision to make?

11  *A.*  It was my decision to make.

12  *Q.*  And you made it?

13  *A.*  I made it.

14  *Q.*  Was Mr. Penn involved in any way to increase that contract

15  pricing?

16  *A.*  No, he wasn't.

17  *Q.*  At the time you had this conversation with Mr. Nelson, as

18  reflected in the email that you wrote, had Pilgrim's already

19  taken up its contract prices?

20  *A.*  Yes, we had.

21  *Q.*  Did you know whether or not at the time George's had taken

22  up its contract prices?

23          *MR. HART:*  Objection.  Leading.

24          *MR. TUBACH:*  I asked if she knew.

25          *THE COURT:*  Overruled.

Brenda Ray - Cross

1          *THE WITNESS:*  No, I didn't.

2     *BY MR. TUBACH:*

3     *Q.*  Was your decision to raise the price of nine-piece chicken

4     to halal customers in the Northeast part of any prearranged

5     plan with George's to raise prices for the meat?

6     *A.*  No, it wasn't.

7     *Q.*  Did you coordinate Pilgrim's' decision to raise its prices

8     with George's?

9     *A.*  We did not.

10    *Q.*  Ms. Ray, was this conversation you had with Mr. Nelson part

11    of any agreement or conspiracy to fix prices?

12          *MR. HART:*  Objection.  Foundation.

13          *MR. TUBACH:*  I'm asking her personal knowledge.

14          *THE COURT:*  Overruled.

15          *THE WITNESS:*  No, it wasn't.

16    *BY MR. TUBACH:*

17    *Q.*  Was it part of any agreement or conspiracy to fix bids --

18    rig bids?

19          *MR. HART:*  Objection.  Ultimate issue.

20          *THE COURT:*  Overruled.

21          *THE WITNESS:*  No, it wasn't.

22    *BY MR. TUBACH:*

23    *Q.*  Okay.  Now, to whom did you send this email?  You

24    mentioned this briefly before.  Who were the recipients of

25    this email?  And why don't we start with the people in the

Brenda Ray - Cross

1    "to" line.

2    *A.*  In the "to" line is Rob Alsberg, who reported directly to

3    me -- he was a regional sales manager -- Ken Joyner, also a

4    regional sales manager.  And Larry Pate and then Craig Kasmier

5    and Lonnie Justice.  They all handled the plants with which

6    this product would have been produced and shipped from.

7    *Q.*  I understand.  And so some of the people were directly on

8    your team, and some were at the plant responsible for the meat

9    that was going to be sold?

10   *A.*  That's correct.

11   *Q.*  Okay.  You also copied Jayson Penn; is that correct?

12   *A.*  That's correct.

13   *Q.*  Why did you copy Mr. Penn?

14   *A.*  So that he was aware that we -- we, as a sales team -- were

15   taking our pricing up, and we had the pricing courage, and we

16   were going to go out and sell it in the market.  If we lost the

17   business, we lost the business, but we were going to take a

18   price increase.

19   *Q.*  You mentioned earlier something about pricing courage.  I

20   want to follow up on that.  Was pricing courage something that

21   Mr. Lovette and Mr. Penn talked about at Pilgrim's?

22   *A.*  Yes, they did.

23   *Q.*  What did that mean to you?

24   *A.*  That meant, as a salesperson, to have the courage to go out

25   and sell your product for what it was worth in the marketplace.

Brenda Ray - Cross

1  Q.  And what gave you the courage if you thought it was

2  appropriate to raise your prices and sell the chicken for what

3  it was worth?

4  A.  That we weren't going to be admonished if we actually lost

5  business.  We would sell it somewhere else.

6  Q.  And did you have an opinion about whether or not Pilgrim's

7  service to its customers, how it compared to other suppliers?

8       MR. HART:  Objection.  701.  Opinion.

9       THE COURT:  Overruled.  It's something that she would

10  know as part of her job duties.

11       THE WITNESS:  Would you repeat that question?

12  BY MR. TUBACH:

13  Q.  Of course, of course.  Yeah.

14       Did you have an opinion about, based on your years of

15  experience working for Pilgrim's, whether Pilgrim's' service

16  was better or worse than other suppliers in the industry?

17  A.  My opinion is, it was the best.

18  Q.  Is that what you tried to do?

19  A.  That's exactly what we tried to do.

20  Q.  What about reliability?  Did Pilgrim's try to be more or

21  less reliable than suppliers?

22  A.  We tried to be more reliable.

23  Q.  Do you believe that you were?

24  A.  I believe that we were.

25  Q.  This pricing courage that you talked about, is that -- was

Brenda Ray – Cross

1  that Pilgrim's' pricing strategy?

2  *A.*  Yes, it was.

3  *Q.*  Was that the start of any agreement to fix prices or rig

4  bids with competitors?

5           *MR. HART:*  Objection, Your Honor.

6           *THE COURT:*  Overruled.

7           *THE WITNESS:*  Are you asking me if having pricing

8  courage was part of a price-fixing strategy?  Is that the

9  question?

10  *BY MR. TUBACH:*

11  *Q.*  Yeah, price-fixing strategy with other suppliers.

12  *A.*  No.

13           *MR. HART:*  Objection.

14           *THE COURT:*  Yeah.  I'm going to sustain that.  She can

15  only answer as to her personal knowledge as to her job duties,

16  but not generally.

17           *MR. TUBACH:*  I apologize.  That was the focus of my

18  question.

19  *BY MR. TUBACH:*

20  *Q.*  Based on your knowledge, ma'am, was this pricing-courage

21  strategy part of any agreement with any other suppliers about

22  bids or prices?

23           *MR. HART:*  Objection, Your Honor.  Leading.

24           *THE COURT:*  Sustained.

25

Brenda Ray - Cross

1    *BY MR. TUBACH:*

2    *Q.*  When you had this conversation with Mr. Nelson, did you

3    have any concerns whatsoever about whether this conversation

4    you had was illegal?

5    *A.*  No.

6    *Q.*  As you sit here today, do you have any concerns about

7    whether or not that conversation was illegal?

8            *MR. HART:*  Objection, Your Honor.

9            *THE COURT:*  Overruled.

10           *THE WITNESS:*  No.

11   *BY MR. TUBACH:*

12   *Q.*  Ms. Ray, you were interviewed by the Government once

13   before; is that correct?

14   *A.*  Yes.

15   *Q.*  And the interview was about July of 2021, does that sound

16   about right?

17   *A.*  Yes.

18   *Q.*  And did they show you this email, Government

19   Exhibit 3037?

20   *A.*  Yes.

21   *Q.*  And they asked you questions about it?

22   *A.*  Yes.

23   *Q.*  And you answered their questions?

24   *A.*  I did.

25   *Q.*  Did the Government ever attempt to interview you again?

Brenda Ray - Cross

1   A.  No.

2   Q.  Did the Government ever contact you to be a witness in this

3   case?

4   A.  No.

5   Q.  I want to switch gears, Ms. Ray.  You talked a little bit

6   about service and reliability.  I want to direct your attention

7   to 2012.  Did you get an inquiry from Mr. Penn about who you

8   considered to be best-in-class in fresh food service?

9        I can show you a document if you don't remember that.

10  A.  2010?  Please.

11  Q.  2012.

12  A.  '12.

13  Q.  Take a look at D-930 in your binder.

14       MR. TUBACH:  We can also put it up on the screen, just

15  for the parties and counsel and the Court.

16  BY MR. TUBACH:

17  Q.  It may be easier for you, Ms. Ray -- there is the whole

18  email you can read in the binder, if that's easier for you to

19  find.

20  A.  Did you say 930?

21  Q.  D.  It has a D in front.

22  A.  D-930.  Yes, sir.  I'm here.  Yes.

23  Q.  Okay.  Do you recall receiving a request from Mr. Penn

24  about your view of who was best-in-class in fresh food service?

25  A.  I do.

Brenda Ray - Cross

1  *Q.* Do you know where Mr. Penn worked before he came to

2  Pilgrim's?

3  *A.* Case Farms.

4  *Q.* As far as you know, did Case Farms sell small-bird chicken

5  at the time that Mr. Penn worked there?

6  *A.* Not that I'm aware.

7  *Q.* Okay. Do you know when Case started selling small birds?

8  *A.* Case acquired a company that put them in small birds. It

9  may have been around 2012, 2013, maybe.

10  *Q.* Okay. So would you -- is it fair to say that as of 2012

11  you had more experience in small-bird sales than Mr. Penn did?

12  Not to be modest, Ms. Ray.

13  *A.* Yes.

14  *Q.* Okay. Why don't you take a look at D-930. And have you

15  had a chance to look at that?

16  *A.* Okay.

17  *Q.* And this is an email chain in which you wrote a number of

18  the emails; is that correct?

19  *A.* That is correct.

20  *Q.* And in writing these emails, you are responding to

21  Mr. Penn's inquiry; is that correct?

22       *MR. HART:* Objection. Leading.

23       *MR. TUBACH:* I'm laying a foundation. I can do it in

24  a non-leading way.

25       *THE COURT:* Sustained.

Brenda Ray - Cross

1    *BY MR. TUBACH:*

2    *Q.*   In these emails, whose emails were you responding to?

3    *A.*   To Jayson Penn's.

4          *MR. TUBACH:*   I move Exhibit D-930 into evidence.

5          *THE COURT:*   Any objection to the admission of D-930?

6          *MR. HART:*   Yes.   Hearsay.

7          *THE COURT:*   Response.

8          *MR. TUBACH:*   Ms. Ray can obviously adopt the

9    statements of her own, and the statements of others,

10   particularly Mr. Penn, they're not admitted for the truth of

11   the matter but for the effect on the listener, which is going

12   out and responding and finding evidence -- getting response

13   from Mr. Penn.

14         *MR. HART:*   If it's not for the truth of the matter

15   asserted and for a limited purpose, no objection with a

16   limiting instruction.

17         *THE COURT:*   And only as to effect on the listener as

18   to any statements of Mr. Penn; is that right, Mr. Hart?

19         *MR. HART:*   Statements as to -- yes.

20         *THE COURT:*   As opposed to Ms. Ray's statements?

21         *MR. TUBACH:*   Also a man named Mr. Alsberg, that could

22   also be effect on the listener.

23         *MR. HART:*   Yes, Your Honor.

24         *THE COURT:*   All right.   Ladies and gentlemen, D-930,

25   we can display that to the jury, will be admitted.   However,

Brenda Ray - Cross

1   the statements from Mr. Penn and the statements of Mr. Alsberg

2   may be considered by you only for the -- their effect on the

3   listener, not for the truth of the matters asserted.

4           (Exhibit D-930 admitted.)

5           *MR. TUBACH:*  I'd like to publish this to the jury, if

6   I could.

7           *THE COURT:*  You may.

8           *MR. TUBACH:*  If we could just focus on the very top

9   part of the email.  Very last email, top of the first

10  page there.

11  *BY MR. TUBACH:*

12  *Q.*  This is an email you wrote to Mr. Penn?

13  *A.*  Yes, it is.

14  *Q.*  What are you conveying to Mr. Penn in this email?

15  *A.*  Whom I considered to be best-in-class as a small-bird,

16  fresh chicken supplier to the marketplace.

17  *Q.*  And who did you consider to be best-in-class?

18  *A.*  Mar-Jac.

19  *Q.*  Why is that?

20  *A.*  Because of their quality, because of their service, because

21  of their flexibility to the marketplace, to the customer.

22  *Q.*  So at this point, did you consider Mar-Jac to be a solid

23  competitor?

24  *A.*  Yes, I did.

25  *Q.*  I'd like to change topics, again, Ms. Ray, and ask you

Brenda Ray - Cross

1  about US Foods.  We talked about that just a little bit earlier

2  today.  In 2017, were you responsible for sales to US Foods?

3  A.  Yes.

4  Q.  You and your team?

5  A.  Yes.

6  Q.  And who on your team had responsibility for US Foods, do

7  you recall?

8  A.  2017?  Perhaps Tom DeTaeye.

9  Q.  Do you want to take a look at a document?

10  A.  Yes, I do.

11       MR. TUBACH:  J-398, if you could pull that up for the

12  Court and the witness and the parties.

13  BY MR. TUBACH:

14  Q.  And take a look at this --

15       MR. TUBACH:  We can take that down.  Thank you.

16  BY MR. TUBACH:

17  Q.  Having looked at this document, do you recall who is

18  responsible for US Foods, sales to -- in 2017 from Pilgrim's?

19  A.  Eric Oare who reported to Tom DeTaeye.

20  Q.  Okay.  And was there a point in 2017 when you decided to

21  increase or try to increase the price for boneless breast sales

22  to US Foods?

23  A.  Yes.

24  Q.  Take a look again at J-398, if you would.

25       MR. TUBACH:  Put that back up on the screen.

Brenda Ray - Cross

1  BY MR. TUBACH:

2  Q.  Is the initial email at the bottom there, is that an

3  email that you wrote on May 6?

4  A.  Yes.

5          MR. TUBACH:  I move the admission of J-398.

6          THE COURT:  Any objection to the admission of J-398?

7          MR. HART:  No objection, Your Honor.

8          THE COURT:  J-398 will be admitted and may be

9  published.

10         (Exhibit J-398 admitted.)

11         MR. TUBACH:  Thank you, Your Honor.  If we could

12  publish that.

13  BY MR. TUBACH:

14  Q.  So, Ms. Ray, this email was sent on May 6, 2017; is that

15  right?

16  A.  Yes.

17  Q.  And what -- who did you send this email to?

18  A.  Eric Oare and Tom DeTaeye.

19  Q.  And what are you asking Eric Oare to do and Tom DeTaeye to

20  do in this email on May 6, 2017?

21  A.  To present the price increases for boneless, skinless

22  breasts and give formal notice to US Foods that we would like

23  to take that price increase.

24  Q.  Is it fair to say that as of May 6, 2017, Pilgrim's had not

25  submitted any price increase to US Foods for boneless breasts

Brenda Ray - Cross

1   yet?

2            *MR. HART:*  Objection.  Foundation.

3            *THE COURT:*  She can answer if she knows.  Overruled.

4            *THE WITNESS:*  Not to my knowledge.

5   BY MR. TUBACH:

6   Q.  Okay.  This was your business, right?

7   A.  That's my business.

8   Q.  In fact, are you asking Mr. Oare to make the presentation?

9   A.  I am asking him to make the presentation.

10  Q.  As of May 6, no such presentation had been made?

11  A.  Not -- no.

12  Q.  Thank you.

13           Finally, Ms. Ray, during your time at Pilgrim's Pride,

14  you worked with Mr. Penn; is that correct?

15  A.  That's correct.

16  Q.  Did you have a fair amount of interaction with him?

17  A.  Yes, I did.

18  Q.  email?

19  A.  Yes.

20  Q.  Telephone?

21  A.  Yes.

22  Q.  In person?

23  A.  Yes.

24  Q.  You worked with Mr. Penn for almost ten years?

25  A.  That's correct.

Brenda Ray - Cross

1   *Q.*  Based on your many interactions with him over the years,

2   did you form an opinion about his reputation for a competitive

3   spirit?

4   *A.*  Yes.

5   *Q.*  What is that opinion, Ms. Ray?

6   *A.*  He's very competitive.

7   *Q.*  What makes you say that?

8   *A.*  Jayson encouraged us and pushed us to, A, be the best --

9          *MR. HART:*  Objection, Your Honor.  Improper character

10  witness, specific instances.

11         *THE COURT:*  Sustained.

12  *BY MR. TUBACH:*

13  *Q.*  What is it about your interaction with Mr. Penn that led

14  you to believe that he had a competitive spirit?

15  *A.*  His ability to motivate us --

16         *MR. HART:*  Objection, Your Honor.

17         *THE COURT:*  Overruled.

18  *BY MR. TUBACH:*

19  *Q.*  You can answer, ma'am.

20  *A.*  Okay.  His ability to motivate his team to want to be the

21  best, do what it takes to be the best, as in, you know, your

22  service, your knowledge, servicing the customer.  He challenged

23  us to have courage, and he was -- he understood, he knew the

24  marketplace, and he allowed us to go out and do our job and

25  build the relationships with the customer and not be afraid to

Brenda Ray - Cross

1   make decisions and carry on with business.

2   Q.  That's how you came to know Mr. Penn after many years of

3   working with him?

4   A.  Yes.

5           MS. WITHERS:  Thank you, Your Honor.  I have no

6   further questions.

7           THE COURT:  Thank you.

8           Additional questioning by defendants?

9           (No response.)

10          Mr. Hart, cross-examination.

11          MR. HART:  Yes.

12                      **CROSS-EXAMINATION**

13  BY MR. HART:

14  Q.  Good morning, Ms. Ray.

15  A.  Good morning.

16  Q.  Ms. Ray, you've known Defendant Penn and Defendant Lovette

17  for about over a decade?

18  A.  Yes.

19  Q.  You were colleagues for most of this time?

20  A.  With Mr. Penn, I would say, yes, colleagues.

21  Q.  You worked together?

22  A.  Yes.

23  Q.  You worked closely together?

24  A.  I reported to Mr. Penn, so, yes.

25  Q.  You were also friends, right?

Brenda Ray - Cross

1    A.   That's correct.

2    Q.   In fact, wasn't Mr. Penn the one who asked you to come back

3    to Pilgrim's after your brief retirement?

4    A.   I don't recall him asking me to come back to Pilgrim's.

5    Q.   But he was involved in you coming back, correct?

6    A.   My understanding?

7    Q.   Yes, ma'am.

8    A.   Okay.  My understanding is, when Mary Swecker, who is the

9    director of customer service, asked me to come back, that she

10   did request of her boss -- or checked with Jayson to make sure

11   that that would be okay.

12   Q.   So she checked with Defendant Penn, correct?

13   A.   She checked with someone.  I can't verify that for you,

14   sir.

15   Q.   And, Ms. Ray, you worked for Pilgrim's for many years,

16   haven't you?

17   A.   Yes.

18   Q.   And over decades and decades, right?

19   A.   Yes.

20   Q.   Pilgrim's has sort of been your other family, right?  You

21   work closely with them?

22   A.   Yes.

23   Q.   You're loyal to the company?

24   A.   Yes.

25   Q.   You're loyal to your co-workers?

Brenda Ray - Cross

1    A.   Yes.

2    Q.   You don't want to see anything bad happen to your

3    co-workers, right?

4    A.   Explain.

5    Q.   You wouldn't want to see any of your co-workers convicted

6    of a crime, would you?

7    A.   I want to see what is fair and just, sir.

8    Q.   Absolutely, ma'am.

9         And one of the ways -- I want to switch topics a

10   little bit, if we can.

11   A.   Sure.

12   Q.   One of the ways that you knew Defendant Penn was through

13   weekly sales meetings, right?

14   A.   That's correct.

15   Q.   And sometimes Defendant Lovette went to these weekly sales

16   meetings too?

17   A.   I believe so.

18   Q.   And during these sales meetings, there were discussions

19   about upcoming business, right?

20   A.   I'm sure.  Yes.

21   Q.   And bids regarding your broad-line business that you

22   oversaw?

23   A.   Yes.

24   Q.   Business for QSR bids?

25   A.   May I explain something?

Brenda Ray - Cross

1   Q.  Of course.

2   A.  So in our weekly sales meetings, those of us who were

3   responsible for certain business channels, we would give

4   top-line reports on what was -- what was coming up, what was

5   going to happen.

6   Q.  Absolutely.

7   A.  Yeah, so --

8   Q.  Some of the --

9   A.  So, yes.

10  Q.  Some of the things that were coming up happened to do with

11  QSR bids, right?

12  A.  Yes.

13  Q.  And KFC was one of Pilgrim's largest QSR customers during

14  that time, right?

15  A.  I believe so.

16  Q.  And KFC was an important customer to Pilgrim's, wasn't it?

17  A.  Yes.

18  Q.  And they were an important customer because they bought so

19  much chicken, right?

20          MR. FAGG:  Objection, Your Honor.  Outside the scope.

21          THE COURT:  Overruled.

22          THE WITNESS:  They bought a lot of chicken, yes.

23  BY MR. HART:

24  Q.  And as one of the most important QSR customers, bids

25  related to KFC were discussed during these sales meetings,

Brenda Ray - Cross

1    right?

2    A.   Not specifically.  These sales meetings were very top line,

3    so nuts and bolts wasn't discussed, but top line, customer

4    volume, that type of thing, yes, sir.

5    Q.   Exactly, top-line discussions regarding KFC bids were

6    discussed, right, ma'am?

7    A.   Yes.

8    Q.   Now, I want to change topics a little bit, if we could.

9    You were at Pilgrim's when Defendant Lovette and Penn first

10   came in 2011, correct?

11   A.   Yes, sir.

12   Q.   And they tried to change the culture of Pilgrim's, correct?

13   A.   Yes, sir.

14   Q.   And it's fair to say that at that time Pilgrim's was a more

15   customer-focused company?  What I mean by that -- maybe to

16   qualify -- they would do things that may not make dollars and

17   cents to enhancing relations with a customer?

18   A.   At that time?

19   Q.   Yes, ma'am.

20   A.   Pilgrim's would sell anything to any customer just to sell

21   product.

22   Q.   Exactly.  And then when Defendant Lovette and Defendant

23   Penn came, that changed, didn't it?

24   A.   Yes, it did.

25   Q.   How did it change?

Brenda Ray - Cross

1   A.   We became more focused with a plan.

2   Q.   Right, so there was more focus on the bottom line?

3   A.   There was more focus on profitability, bottom line, that's

4   correct.

5   Q.   And if decisions didn't make sense, dollars and cents,

6   they'd get challenged, right?

7   A.   That's correct.

8   Q.   When they first came on, Defendants Lovette and Penn, they

9   cut costs, right, that was one of the things that they did?

10  A.   Yes.

11  Q.   They had zero balance budgeting, that type of policies?

12  A.   Yes, we had a zero-based budget.

13  Q.   Even measured the number of squirts in a soap dispenser?

14  A.   Perhaps.  I don't know.

15  Q.   So it's fair to say that Defendants Lovette and Penn were

16  really focused on the bottom line, correct?

17  A.   That's correct.

18  Q.   And they also, though -- they also wanted to increase the

19  price of the chicken to customers, correct?

20  A.   That's correct.

21  Q.   And sort of their mantra, price courage, you talked about

22  it earlier, right?

23  A.   That's correct.

24  Q.   When they came on, price courage was a big thing; it was an

25  emphasis for Pilgrim's, right?

Brenda Ray - Cross

 1   A.   Yes, it was.

 2   Q.   It was sort of their idea when they came to Pilgrim's to do

 3   that, right?

 4   A.   Can I explain something?

 5   Q.   Of course.

 6   A.   Yes.  Yes, it was.  You see, when they came onboard with

 7   Pilgrim's, as you know, because you have the dates, I had been

 8   with that company for 20 years, I had seen us go through two

 9   bankruptcies, I had seen what happens when, perhaps, we don't

10   have a structure, so to speak, and a plan.  So -- we spent a

11   lot of money, so, yes, they did come in with a focus and a

12   plan.

13   Q.   Thank you.  Thank you very much for that.

14        And another way you got to know Defendants Penn and

15   Lovette was through management meetings, right?  You were a

16   senior executive at Pilgrim's?

17   A.   Yes.

18   Q.   And after Defendant Lovette came onboard, many of these

19   management meetings were sort of focused on changing the

20   culture, right?

21   A.   Yes.

22   Q.   And one of these sort of meetings was sort of yearly

23   kickoff events, right?

24   A.   Yes.

25   Q.   Sort of rah, rah customer events -- company events, sort of

Brenda Ray - Cross

1    extolling company results and sort of setting goals for the

2    future?

3    A.   Yes.

4    Q.   And as the head of Pilgrim's, Defendant Lovette -- well, he

5    presided over some of these meetings, right?

6    A.   Yes.

7    Q.   And you attended some of these meetings?

8    A.   Yes.

9          MR. TUBACH:   This is way beyond the scope of

10   cross-examination.

11         THE COURT:   Response.

12         MR. HART:   Your Honor, we're just -- I'm just

13   discussing what -- the culture of the company when Defendants

14   Lovette and Penn came on.  I think it's relevant, probative.

15         THE COURT:   Some of that is relevant, but I'm not sure

16   how many more questions you have on this.

17         MR. HART:   Not many more.

18         THE COURT:   Go ahead.  Overruled.

19   BY MR. HART:

20   Q.   And then after Defendant Penn -- I mean, Defendant Lovette

21   left, Defendant Penn started doing these yearly kickoffs --

22         MR. TUBACH:   Again, Your Honor, this is outside the

23   scope.  Well beyond the scope.

24         THE COURT:   Overruled.

25         THE WITNESS:   Yes.

Brenda Ray - Cross

1   *BY MR. HART:*

2   *Q.*  And do you recall attending a kickoff event in 2019?

3          *MR. TUBACH:*  Could we have a sidebar, please?

4          *THE COURT:*  Yes.

5          (Hearing commenced at the bench.)

6          *THE COURT:*  Mr. Tubach, go ahead.

7          *MR. TUBACH:*  Your Honor, this is clearly trying to get

8   in the back door what the Government could not get in the front

9   door.  There is no foundation to ask this witness that

10  question.  She testified she retired in 2018, and the

11  presentation was made in 2019.  She was a customer service

12  representative when she came back.  They're just trying to get

13  in under the guise of asking Ms. Ray cross-examination

14  questions on this "I'm in" presentation they couldn't get in.

15         *THE COURT:*  Mr. Hart.

16         *MR. HART:*  Your Honor, during direct, she testified to

17  Defendant Penn's leadership and culture.  Mr. Tubach himself

18  asked about reputation in the community.  And he asked her a

19  series of questions, over objection, regarding Jayson Penn's

20  leadership and character.  So the door would be open to this,

21  Your Honor, and --

22         *THE COURT:*  Well, what specifically are you going to

23  ask her about --

24         *MR. HART:*  Your Honor, I would be asking whether she

25  attended the meeting and whether she recalls him saying certain

Brenda Ray - Cross

1    things.

2         THE COURT:  What certain things are those?

3         MR. HART:  The questions would be focused on -- in

4    terms if she recalls him talking about results of the company.

5         THE COURT:  And what would that -- and what subject

6    matters -- I mean, it is true on the questioning of Mr. Tubach,

7    she talked about the defendant's character in terms of his

8    competitive spirit.  How would these questions relate to -- do

9    you anticipate that she attended this meeting?

10        MR. HART:  I would ask her, first question, whether

11   she attended it.  Then depending on what she says, Your Honor,

12   that would depend on the next series of questions.  If she does

13   remember attending it, I'll ask if she recalls him talking

14   about performance.  She already testified about two

15   bankruptcies, so I think it's proper area for us to question,

16   Your Honor.

17        THE COURT:  All right.  But, I mean, what -- are the

18   questions that you have for her things that would rebut the

19   answers that she gave to Mr. Tubach's questions, or is this

20   just evidence about kind of confirming his competitive spirit?

21   I'm not quite sure what the purpose of the questions is.

22        MR. HART:  Well, Your Honor, the focus of the

23   questions would be whether she recalls him saying that -- this

24   is during a corporate event to 140 of the top leaders.  It

25   speaks to his -- to his competitiveness, and I think it's

Brenda Ray - Cross

1   relevant for us to probe.

2          THE COURT:  Yeah, I'm not sure you answered my

3   question.  Is it -- are you kind of confirming his competitive

4   spirit, or are you trying to confront her with statements that

5   would undermine her -- you know, ask her whether her opinion as

6   to his competitive spirit has changed by examples from comments

7   made during the presentation?

8          MR. HART:  I would not be asking questions regarding

9   that, Your Honor.

10          THE COURT:  Mr. Tubach.

11          MR. TUBACH:  Your Honor, this has absolutely no

12   relevance.  They're trying to get in the fact that Pilgrim's

13   made a lot of money.  They're trying to ask her whether

14   Mr. Penn may have in a kick-off meeting said, Pilgrim's has

15   made X amount of money.  It has no evidence of competitive

16   spirit.  It's clear the Government is trying to do this because

17   they couldn't get the "I'm in" presentation in.  This is not in

18   any way impeaching of what Ms. Ray had said.

19          THE COURT:  Mr. Hart, anything else?

20          MR. HART:  No, Your Honor.

21          THE COURT:  Okay.  Yeah, I'm going to sustain the

22   objection.  I just haven't gotten a good sense of what the

23   Government is after on this.  It doesn't sound like this -- any

24   questions along these lines, assuming, once again, that she

25   attended the presentation, actually remembered anything from

Brenda Ray - Cross

1    the presentation, that it would be directed towards her opinion

2    as to competitive spirit, and as a result, it does not seem

3    relevant to anything that was asked of her by Mr. Tubach.

4            Thank you.

5            *MR. FAGG:*  Your Honor, John Fagg.  Just to prevent

6    another sidebar here, I'm not sure where the rest of this

7    cross-examination is going to go.  But, obviously, we have the

8    party who called the witness do a redirect.  I don't know how

9    much of the Government's focus is going to continue to be on

10   Mr. Penn and issues related to Mr. Penn, but I just wanted to

11   flag that, that there may be issues here that Mr. Tubach is far

12   better to respond to than am I, depending on the area of the

13   scope.  So I would ask for some latitude.

14           *THE COURT:*  He's got a pen and paper, and you can

15   read.

16           *MR. HART:*  Thank you, Your Honor.

17           *THE COURT:*  All right.  Thank you.

18           (Hearing continued in open court.)

19           *MR. HART:*  Thank you, Your Honor.

20   *BY MR. HART:*

21   *Q.*  Ms. Ray, let's change topics.  During your direct

22   examination, you said you were aware of price-fixing and

23   bid-rigging agreements; is that true?

24           *MR. TUBACH:*  Objection, Your Honor.

25           *THE COURT:*  Sustained.

Brenda Ray - Cross

1      MR. HART:  Your Honor, may I have a sidebar?

2      THE COURT:  Sure.

3      (Hearing commenced at the bench.)

4      MR. HART:  Perhaps I can diffuse most of this.  I

5  think I misspoke by not saying "not."  I apologize.

6      THE COURT:  Your Honor, that absent "not" did change

7  the complexion of the question quite a bit.

8      Then the objection -- I sustain the objection, so

9  we'll move on.  Thank you.

10      (Hearing continued in open court.)

11      MR. HART:  Thank you, Your Honor.  I think I misspoke

12  on my last question, so I'll rephrase the question.

13  BY MR. HART:

14  Q.  Ms. Ray, during your direct examination, you said you were

15  unaware of any price-fixing and bid-rigging agreement, correct?

16  A.  That's correct.

17  Q.  So let's talk about price fixing, what you meant when you

18  said it.

19      Ms. Ray, you would agree with me, would you not, that

20  if one company shares confidential pricing information with

21  another company in furtherance of a plan to raise prices that

22  would be price fixing?

23      MR. TUBACH:  That's a legal question, lacks

24  foundation.

25      MR. KORNFELD:  Objection, Your Honor.

Brenda Ray - Cross

1      THE COURT:  Sustained.  She can be asked what she

2  understood the term to mean when she answered questions that

3  Mr. Tubach or Mr. Fagg asked her.

4      MR. HART:  Okay.  May I have a sidebar, Your Honor?

5      THE COURT:  Sure.

6      (Hearing commenced at the bench.)

7      THE COURT:  Go ahead, Mr. Hart.

8      MR. HART:  Yes, Your Honor.  During direct, she was

9  asked questions regarding price fixing and bid rigging.  I

10  think it would be appropriate for the Government to probe what

11  she meant by that in a leading fashion.  Asking her what she

12  meant in an open-ended thing is -- I think that it would be

13  appropriate for us to probe on what exactly she meant.

14      THE COURT:  Well, the problem is that by asking her a

15  question -- especially posing them in terms of different

16  factual scenarios and then asking whether that fits her

17  definition, I think is -- it's just way too suggestive.  You

18  can ask her what she thought was meant by it.  And, you know,

19  it seems to me that could be highly probative of whether she

20  has any understanding of the concept whatsoever.  But proposing

21  questions almost like hypotheticals to her I think is -- I just

22  don't think that's an appropriate way to proceed.  You can ask

23  her what she thought -- you know, when she answers the

24  questions, what she thought the terms meant.

25      MR. TUBACH:  Just to clarify.  The shorthand term for

Brenda Ray - Cross

1    witnesses that we're confident the answer would be no, we don't

2    have the information, even probed for the basis of what she

3    believes price fixing, bid rigging means.  The Court has

4    allowed defense counsel in the past to ask questions like this,

5    knowing the answer was going to be no, as opposed to giving it

6    a long discussion as to what her understanding was.  That's why

7    we've been using the shorthand that we are.

8          THE COURT:  I think it's appropriate the Government

9    can ask her questions of what she understood it meant because

10   she answered the questions.

11         All right.  Thank you.

12         (Hearing continued in open court.)

13         MR. HART:  Thank you, Ms. Ray.

14         Thank you, Your Honor.

15   BY MR. HART:

16   Q.  Do you remember being asked questions on direct examination

17   regarding price fixing and bid rigging?

18   A.  This morning?

19   Q.  Yes, ma'am.

20   A.  Yes.

21   Q.  And you testified that you were unaware of any price

22   fixing --

23   A.  Yes.

24   Q.  -- correct?

25         What did you mean when you said price fixing?

Brenda Ray - Cross

1   A.  That -- that I would be aware of a specific competitor or

2   my telling a specific competitor that we as a company were

3   raising pricing 5 cents a pound, 10 cents a pound, specific

4   detailed information about pricing to the marketplace.

5           MR. HART:  One minute, Your Honor.

6           THE COURT:  Sure.

7   BY MR. HART:

8   Q.  Thank you, Ms. Ray.

9           Just to clarify, you were not aware of any specific

10  sharing of prices to competitors, correct?  Is that what you're

11  saying?  I want to make sure I understand.

12  A.  Yeah.  No sharing of pricing.

13  Q.  And bid rigging, what did you understand bid rigging to

14  mean?

15  A.  To share bid information with a competitor.

16  Q.  Okay.  Let's turn to another subject, Ms. Ray, if we can.

17  A.  Sure.

18  Q.  Okay.  We talked about Sysco during your direct

19  examination, right?

20  A.  Yes.

21  Q.  You would agree that Sysco was a customer that bought

22  chicken from Pilgrim's, right?

23  A.  Yes.

24  Q.  In fact, Sysco was a large customer for Pilgrim's in your

25  broad-line distribution, right?

Brenda Ray - Cross

 1   A.   Yes.

 2   Q.   It was your second or third largest customer?

 3   A.   Second or third, yes.

 4   Q.   An important customer to Pilgrim's?

 5   A.   Yes.

 6   Q.   And since you sold so much chicken to Sysco, there were a

 7   lot of account receivables, right?

 8   A.   Yes.

 9   Q.   Sysco owed you money after you delivered chicken to them,

10   right?

11   A.   Correct.

12   Q.   And the reason why they owed Pilgrim's a lot of money is

13   because when a customer buys chicken from a supplier, they have

14   a term by which to pay for that product, right?

15   A.   Yes.

16   Q.   Sysco doesn't just plop down a credit card or pay out cash,

17   right?

18   A.   No.

19   Q.   Pilgrim's gives its customers time to pay its bills, right?

20   A.   Correct.

21   Q.   That's what you mean when you say credit terms?

22   A.   Correct.

23   Q.   And as -- credit terms is a term that is related to price,

24   right, Ms. Ray?

25   A.   It would be in consideration, yes.

Brenda Ray - Cross

1    *Q.*   That's because time is money, right, Ms. Ray?

2    *A.*   Yes.

3    *Q.*   It's when you get your money, right?

4    *A.*   Correct.

5    *Q.*   And you want to get paid for your chicken?

6    *A.*   Yes.

7    *Q.*   You were asked questions about the change of credit terms

8    on direct examination.

9    *A.*   Yes.

10   *Q.*   And do you remember that?

11   *A.*   I do.

12   *Q.*   And if Pilgrim's provided an extension of credit terms,

13   meaning, more time to pay, that meant money out of Pilgrim's

14   pocket, right?

15   *A.*   Correct.

16   *Q.*   So the longer Sysco has to pay, the longer Pilgrim's has to

17   wait for its money, right?

18   *A.*   Correct.

19   *Q.*   And during that time, Sysco can do stuff with that money,

20   earn interest, buy other things, that kind of thing; whereas,

21   Pilgrim's can't, right?

22   *A.*   Correct.

23   *Q.*   They're sort of stuck until Pilgrim's pays its bills,

24   right?

25   *A.*   Yes.

Brenda Ray – Cross

1   Q.  And you would agree with me that a large customer -- for a

2   large customer, an extension of time to pay this thing, it's a

3   bigger deal than it was a smaller company, meaning the larger

4   the customer, the more -- more of a deal it was if they

5   extended their credit terms than if it was a smaller customer,

6   right?  It involved more money.

7   A.  Yes.

8   Q.  So when a company like Sysco, a customer like Sysco wants

9   to lengthen its payment terms, it's a big deal, even if it's

10  for a few days, right?

11  A.  Yes.

12  Q.  It could affect a lot of money?

13  A.  Potentially.

14  Q.  And you would agree with me that changing credit terms is

15  something that has to be approved at senior levels at

16  Pilgrim's, right?

17  A.  Yes.

18      MR. HART:  Okay.  Ms. Pearce, will you please pull up

19  GX-803, which has already been received into evidence.

20      Permission to publish, Your Honor.

21      THE COURT:  You may.

22  BY MR. HART:

23  Q.  And if you could just take a moment to look at that,

24  Ms. Ray, that would be helpful.

25      MR. HART:  I'm happy to hand out hard copies if that

Brenda Ray - Cross

1   would be easier.

2   *BY MR. HART:*

3   Q.   Ms. Ray, would you prefer a hard copy?

4   A.   No, I'm good.   Thank you.

5   Q.   Okay.   Thank you, ma'am.

6           And if you could just look at me when you're ready to

7   proceed, that would be great.

8   A.   Okay.

9   Q.   Okay.   This is a string of emails, right?

10  A.   Yes, it is.

11  Q.   And the emails are dated on -- in May of 2016?

12  A.   They are.

13  Q.   And the name on top of the "to" line says Bill Lovette,

14  correct?

15  A.   The "to" line says Bill Lovette.

16  Q.   And Defendant Bill Lovette was CEO of Pilgrim's in May of

17  2016?

18  A.   Yes.

19  Q.   And as CEO of Pilgrim's Defendant Lovette oversees the

20  billing department at Pilgrim's?

21  A.   He oversees every department at Pilgrim's.

22  Q.   Absolutely.   So he -- he oversees finance?

23  A.   Yes.

24  Q.   And Mr. Sandri was the CFO of Pilgrim's at that time,

25  right?

2366

Brenda Ray - Cross

1    *A.*  Yes.

2    *Q.*  And he reported to Defendant Lovette?

3    *A.*  Yes.

4    *Q.*  Now, the name on the "from" line is Joe Grendys, correct?

5    *A.*  Correct.

6    *Q.*  And on May 1, 2016, Joe Grendys was the president of Koch

7    Foods?

8    *A.*  Yes.

9    *Q.*  And Pilgrim's competes against Koch Foods to sell chicken

10   to Sysco, does it not?

11   *A.*  They're a competitor.

12   *Q.*  At the bottom-most line of the email, it says, Have you

13   heard that Sysco is going to 65-day terms with their supplies?

14   Does it say that?

15          *MR. FAGG:*  Objection, Your Honor.  The witness is not

16   on this document.  The document is already in evidence.

17          *THE COURT:*  Sustained.

18   *BY MR. HART:*

19   *Q.*  Now, Ms. Ray, you never called your competitor to discuss

20   the -- your customer's credit terms, did you?

21   *A.*  No.

22   *Q.*  And you never called your competitor and agreed to resist

23   extending credit terms for a mutual customer, did you?

24          *MR. FAGG:*  Objection, Your Honor.  I'd ask that the

25   exhibit be taken down since we're not talking to anything

2367

Brenda Ray - Cross

1  related to it.

2          *THE COURT:* Agreed.  Otherwise, go ahead, Mr. Hart.

3  *BY MR. HART:*

4  Q.  Do you need me to repeat the question, ma'am?

5  A.  Please.

6  Q.  Now, Ms. Ray, you never called your competitor and agreed

7  to resist extending credit terms for a mutual customer, did

8  you?

9  A.  No.

10  Q.  You never did that?

11  A.  No.

12  Q.  Okay.  If we can change topics again, ma'am.

13  A.  Yes.

14  Q.  Okay.  Now, during your direct, you told this jury you

15  thought Defendant Penn had the reputation for

16  competitiveness -- competitive spirit, right?

17  A.  Yes.

18  Q.  And you claim it was based on your years of experience in

19  dealing with him?

20  A.  Yes.

21  Q.  But you don't know how he interacted with competitors all

22  the time, do you?

23  A.  No, just what I was involved in.

24  Q.  Right.  In 2014, Mar-Jac competed with Pilgrim's?

25  A.  Yes.

2368

Brenda Ray - Cross

1   Q.  You were not in any of the phone calls between Pete Martin

2   of Mar-Jac and Defendant Jayson Penn --

3          MR. TUBACH:  Objection, Your Honor.  That question

4   lacks foundation.

5          THE COURT:  Sustained.  If you could rephrase.

6          MR. HART:  Yes, Your Honor.

7   BY MR. HART:

8   Q.  Ms. Ray, you weren't on any of the phone calls between

9   Defendant Penn and any of his competitors, were you?

10          MR. TUBACH:  Same objection.

11          THE COURT:  Overruled.

12          THE WITNESS:  No.

13   BY MR. HART:

14   Q.  And even if these phone calls happened at or around when

15   bids were due, you weren't on any of those phone calls, were

16   you?

17          MR. TUBACH:  Objection.

18          THE COURT:  I'm going to sustain that.  She can be

19   asked generally about things but not imply that certain phone

20   calls or other things took place.

21   BY MR. HART:

22   Q.  Were you aware of any phone calls between Defendant Jayson

23   Penn and any of his competitors?

24   A.  No, sir, I was not.

25   Q.  And if any of these phone calls happened at or around the

Brenda Ray - Cross

1    time of bids, you weren't aware of them?

2    *A.*   No, sir.

3    *Q.*   In 2014, Tyson competed with Pilgrim's, correct?

4    *A.*   Yes.

5    *Q.*   In fact, Tyson is one of Pilgrim's' main rivals, right?

6    *A.*   Yes.

7    *Q.*   Ms. Ray, you weren't aware of any phone calls in August of

8    2014 between Defendant Penn and Brian Roberts of Tyson's?

9           *MR. TUBACH:*   Again, objection.

10          *THE COURT:*   Sustained.

11   *BY MR. HART:*

12   *Q.*   You weren't aware of any phone calls between Defendant Penn

13   and any of his competitors in 2014, were you?

14          *MR. TUBACH:*   Objection.

15          *THE COURT:*   It shouldn't be specific as to date.   That

16   implies that -- something that took place.   She can be asked

17   generally as to her awareness of communications but not

18   specific dates.   Sustained.

19   *BY MR. HART:*

20   *Q.*   Ms. Ray, were you aware of any communications between

21   Defendant Penn and any of his competitors in 2014?

22   *A.*   No, no, sir.

23   *Q.*   Okay.   Let's talk about something we touched upon earlier

24   or you talked about during your direct examination, price

25   courage.   Ms. Ray, would you agree with me that price courage

Brenda Ray - Cross

1   is about keeping prices up, not conceding on price?

2   *A.* My definition of price courage is seeking -- seeking what

3   the product is worth in the marketplace and taking a price

4   increase, not being afraid, having that courage to take a price

5   increase.

6   *Q.* Right, so that meant not conceding on price, right,

7   Ms. Ray?

8   *A.* That's correct.

9   *Q.* It means about maintaining prices, right?

10  *A.* Could -- yes, it could.

11  *Q.* You testified on direct that this might even mean losing

12  business, right?

13  *A.* That's correct.

14  *Q.* And price courage, that was Defendant Penn's mantra, right?

15  It was something that he preached at Pilgrim's?

16  *A.* Yes, it was something he supported.

17  *Q.* And price courage was part of Defendant Lovette's shift in

18  culture, correct?

19  *A.* Yes, it is.

20  *Q.* And when they came into Pilgrim's after bankruptcy, they

21  focused on the culture of the bottom line, right?

22  *A.* Yes, sir.

23          *MR. KORNFELD:* Your Honor, I'm going to object. Asked

24  and answered.

25          *THE COURT:* Overruled.

Brenda Ray - Cross

1   *BY MR. HART:*

2   *Q.*  I'm sorry.  You may answer.

3   *A.*  Yes.

4   *Q.*  Okay.  Would you agree with me that competition is about

5   winning business, right?

6          *MR. TUBACH:*  Object, Your Honor.  Vague and ambiguous.

7          *THE COURT:*  Overruled.

8          *THE WITNESS:*  Competition is about being awarded

9   business, is that what --

10  *BY MR. HART:*

11  *Q.*  About winning business.  Competition is about winning

12  business.  That's what competitiveness is, right?

13  *A.*  Yes.

14  *Q.*  Beating other chicken suppliers, right?  That's what

15  competitiveness is, right?

16  *A.*  Yes.

17  *Q.*  It's about taking their business from them, right?

18  *A.*  Sure.

19  *Q.*  Chicken is a hard-nosed business, right?

20  *A.*  It is.

21  *Q.*  And you would agree with me that the chicken supply

22  business means winning more business by lowering your prices,

23  that's what competitiveness is, right?

24  *A.*  By lowering your price?

25  *Q.*  Right, that's how you win business; that's how you get

Brenda Ray - Cross

1   volume?

2   A.   Yes, if volume is what you're after.

3   Q.   Right.  So that's being competitive, right?  Lowering your

4   prices?  Chicken is a commodity.  You lower your prices, you

5   get more business --

6        MR. TUBACH:  Your Honor, there are three or four

7   questions there.  If we could one question at a time.

8        THE COURT:  Sustained.  If you could rephrase.

9        MR. HART:  I'm sorry.

10  BY MR. HART:

11  Q.   So competitiveness is about winning business from your

12  competitor?

13  A.   Yes.  It's about gaining business, building your business.

14  Q.   Right.  And part of that is lowering your prices so you'll

15  get business from your competitor.

16  A.   Not always.

17  Q.   Okay.  But when a -- when a customer puts you into a

18  competition with other suppliers to win business, you win

19  business by lowering prices, right?

20  A.   In my line of business, it was always RFP business, so you

21  submitted, and it was either awarded or it wasn't.  It was

22  about -- it was about -- it was about bidding prices to the

23  customer for the basket of service that you would provide.  How

24  do I say this?  It was -- it wasn't about lowering your price

25  in the broad-line distribution, which is what I handled for our

Brenda Ray - Cross

1  company.  It was about -- it was about bidding, putting your

2  prices in the -- the total package of what you were going to

3  provide.  I wasn't involved in bidding wars, so to speak, so

4  I'm a little out of school in the questions that you're asking.

5  Q.  No, I understand, ma'am.  But when you put in your RFPs,

6  other companies wanted that business, right?

7  A.  Yes, they did.

8  Q.  And one of the bases by which customers made their

9  determination is how low your prices were, right?

10  A.  Not always.  It was in comparison to other services that

11  you provided.

12  Q.  Understood, but --

13  A.  The price wasn't always the key.

14  Q.  Understood.  But --

15  A.  It's important.

16       MR. TUBACH:  The witness had not finished her answer.

17       THE COURT:  She can finish.

18  BY MR. HART:

19  Q.  I'm sorry, I didn't mean to interrupt.

20  A.  That's okay.  That's all right.

21       It was like a total package.  So -- in my RFP world,

22  it wasn't a bidding war.  It wasn't about lowering your price

23  to the point that -- sometimes business is better to let it go

24  than to be awarded it, because you have other options.

25  Q.  Understood.

2374

Brenda Ray - Cross

1    *A.*   That's the world I lived in.

2    *Q.*   Okay.  But one of the factors in that basket would be

3    price, right?

4    *A.*   That's correct.

5    *Q.*   And price would be important to the customer, right?

6    *A.*   It is important.

7    *Q.*   So when you say price courage, that's sort of the exact

8    opposite of price competition, right?

9    *A.*   I don't see it that way.

10   *Q.*   Okay.  So maybe we can unpack that.  Price courage is about

11   maintaining the prices or increasing them, right?

12   *A.*   That's right.  Having the courage to go out and request of

13   the customer what you believe that your product is worth.

14   *Q.*   Right.  Price competition is about lowering prices, right?

15          *MR. TUBACH:*  Objection.  Misstates her testimony.

16          *THE COURT:*  Overruled.  She can answer.

17          *THE WITNESS:*  Repeat that question, please.

18   *BY MR. HART:*

19   *Q.*   Sure.  Price competition is about lowering prices, correct?

20   *A.*   It's about being competitive, where you believe your

21   competitive point is.  You may lower it; you may not.

22   *Q.*   Competition is not raising your prices together with your

23   competitors, right?

24          *MR. TUBACH:*  Objection.  May we have a sidebar?

25          *THE COURT:*  Yes.

Brenda Ray - Cross

1            (Hearing commenced at the bench.)

2            THE COURT:  Mr. Tubach, go ahead.

3            MR. TUBACH:  He's going way beyond the scope of

4    direct, asking about what price competition means, well beyond

5    the scope.  Asking her to define various terms, well beyond

6    what anyone asked her in direct.

7            THE COURT:  Mr. Hart, response.

8            MR. HART:  Quite frankly, I'm stunned by that.  He

9    injected this competitiveness into the direct.  I'm probing

10   what competitiveness is.

11           THE COURT:  Mr. Tubach, anything else?

12           MR. TUBACH:  But specific objection on this question

13   is, is that raising prices together, that there is something

14   inherently wrong with that, there is absolutely nothing wrong

15   with that, it's just not.  Improper question.

16           THE COURT:  What I'm worried about, I think we're

17   about ready to start going into all sorts of hypotheticals as

18   to what price courage is or is not or what competition is or is

19   not.  And that raises the same issues as the -- one of the

20   previous sidebars, where she was being asked, you know,

21   hypotheticals regarding what may constitute price fixing or bid

22   rigging.  So I don't think that, you know, it's -- it's

23   perfectly fair to ask her what she understood the philosophy of

24   Mr. Lovette, Mr. Penn was in terms of price courage.

25   Hypotheticals talking about what price courage wasn't is

Brenda Ray - Cross

1    raising the exact same rhetorical problems that we -- that I

2    disallowed in terms of, you know, asking her about what bid

3    rigging or price fixing was.

4         So I'm not going to allow you to go into that line of

5    questioning, assuming that you were, Mr. Hart.  Maybe you

6    weren't.

7         MR. HART:  Your Honor, very briefly.  Mr. Tubach

8    brought up his reputation for competitiveness.  The witness

9    testified that price courage was maintaining prices or

10   increasing prices.  Competitiveness in a commodity setting is

11   lowering prices.  I was just making the point in trying to

12   rebut his reputation for competitiveness when he's maintaining

13   that there is price courage.  It -- it flies in the face of

14   what price competition is.  And that, ultimately, is what he

15   tried to have this witness tell this jury, that he was

16   competitive.  And I'm just trying to give a more fulsome,

17   complete picture to the jury so they can assess whether he did

18   display traits of competitiveness in the industry.

19        THE COURT:  All right.  But the issue is whether or

20   not this witness would have any knowledge of that as opposed to

21   posing to her certain questions perhaps based really on a

22   hypothetical or things that, you know, are outside of the scope

23   of her knowledge.  And that to me is the danger of it.

24        Do you think, Mr. Hart, she's going to have any

25   knowledge of what you're about ready to ask her?

Brenda Ray - Cross

1          MR. HART:  Knowledge in terms of whether or not she

2    agrees that in the commodity industry of selling chickens that

3    being competitive means lowering your prices, yes, I think she

4    definitely should know that.  She's vice president of a huge

5    business unit.  She went to the sales meetings --

6          THE COURT:  That wasn't -- you asked those questions

7    but seems like you were about ready to go into questions in

8    terms of, would it be competitive if someone colluded with, you

9    know, his competitors or things of that, that sort of seemed

10   like it was about ready to go.

11         MR. HART:  No, Your Honor, I wasn't going to go down

12   that path.  I have a few more questions, and then I was going

13   to move on.

14         THE COURT:  Why don't you do those few more questions.

15         MR. KORNFELD:  Your Honor, may I raise --

16         THE COURT:  Why don't we talk about that in open

17   court, if you don't mind, because it's time for the break.

18              (Hearing continued in open court.)

19         THE COURT:  It's 10:15.  We'll go ahead and take the

20   mid-morning break at this time and plan on reconvening at

21   10:30.

22              Jury is excused.

23              (Jury out at 10:14 a.m.)

24         THE COURT:  All right.  Ms. Ray, you're excused until

25   10:30.  Thank you very much.  Everyone else may be seated.

Brenda Ray - Cross

1          Mr. Kornfeld, go ahead.

2          *MR. KORNFELD:*  Thank you, Your Honor.  I'll be brief.

3   But I do want to raise the concern, I think these questions are

4   so far afield that the jury is now left with the misimpression

5   of what competition or more fundamentally what anticompetitive

6   activities are.  I mean, the Government is -- essentially, the

7   questions are implying that refusing to sell a customer a

8   product at a price you, as the producer, don't believe is fair

9   is somehow anticompetitive, and that obviously is factually

10  untrue, and it's legally untrue.

11         So, you know, I would ask the Court -- I believe the

12  Court at this point, it would be appropriate to, essentially,

13  give a curative instruction either defining legally what price

14  fixing is or reminding the jury what the elements of the

15  Sherman Act violation are, because, you know, we've gone down

16  this rabbit hole as if it's improper or more fundamentally

17  illegal if I don't want to sell you a product that I produce

18  for what I think it's worth.

19         And I am very, very concerned on behalf of Mr. Fries,

20  frankly, on behalf of all of the defendants, that the jury is

21  under the misimpression of what anticompetitive behavior is or

22  isn't under the Sherman Act.

23         So that would be my request, Your Honor.

24         *THE COURT:*  Mr. Fagg.

25         *MR. FAGG:*  Sure, Your Honor, just to follow up on that

Brenda Ray - Cross

1    point and echo our earlier objections, in looking back at the

2    transcript, when Mr. Tubach actually asked Ms. Ray the

3    questions about price fixing, the Government objected to that,

4    and that objection was sustained.  And so now we're down this

5    rabbit hole where the Government is suggesting in their

6    questions to her something that is or isn't improper.  And

7    they've basically suggested to the jury that if you don't

8    continue to concede on price, you're not competing, and they've

9    created this paradigm whereby basically 100 percent of

10   companies would go bankrupt because they would keep competing

11   with each other until they were giving away their products.

12          So I very much echo what Mr. Kornfeld said but also

13   note the objections were sustained when Mr. Tubach actually

14   tried to go down this line of questioning.

15          THE COURT:  That's not quite accurate.  The bottom

16   line is that Ms. Ray, by Mr. Tubach, was asked about this price

17   courage thing.  You can ask yourselves, what relevance does

18   that have to anything regarding the Sherman Act.  But to the

19   extent, you know, it does, certainly, the Government has the

20   right to ask her about it.  And that's what Mr. Hart was doing.

21          Now, to Mr. Fagg's point, is it relevant?  You know,

22   is it -- does it have anything to do with, you know, the

23   Sherman Act or the charges in this case that, you know, you can

24   only compete, you know, by lowering prices?  No, probably

25   preposterous.  But, once again, the jury is going to get

Brenda Ray - Cross

1    instructions on defining the Sherman Act, what the charge is in

2    this particular case, and I'm quite convinced that the jury

3    will be able to separate the wheat from the chaff in terms of

4    price courage and all of the things that we're spending way too

5    much time on right now.

6            All right.  We'll be in recess until 10:30.

7            MR. TORZILLI:  One question.  When would you like to

8    take up the jury instruction issue that was raised at the end

9    of yesterday by counsel for the defendant?

10           THE COURT:  I would say lunch hour.  Think about

11   whether we should take it up at the end of the lunch hour or

12   beginning, doesn't matter to me.

13           MR. TORZILLI:  Thank you.

14           THE COURT:  We're in recess.  Thank you.

15           (Recess at 10:20 a.m.)

16           (In open court at 10:33 a.m.)

17           THE COURT:  Thank you.  Please be seated.

18           Let's get Ms. Ray -- did you have an issue, Mr. Hart?

19           MR. HART:  No, I was just being --

20           THE COURT:  Why don't we go ahead and bring Ms. Ray

21   back in.

22           (Jury in at 10:35 a.m.)

23           THE COURT:  Thank you.  Please be seated.

24           Mr. Hart, whenever you're ready.

25           MR. HART:  Thank you, Your Honor.

Brenda Ray – Cross

1    *BY MR. HART:*

2    *Q.*  Hi, Ms. Ray.

3    *A.*  Yes.

4    *Q.*  I want to talk about an exhibit you talked about on direct

5    examination, if we could.

6            *MR. HART:*  Would you call up GX-3037, which has been

7    received in evidence, and if we could publish, Your Honor.

8            *THE COURT:*  You may.

9            *MR. HART:*  If we could focus on the bottom part of

10   the email, Ms. Pearce.

11   *BY MR. HART:*

12   *Q.*  Now, Ms. Ray, I'm going to read this to you, then I'm going

13   to ask you if I read it correctly.  I received a call today

14   from a friendly competitor telling me it's all over the market

15   that Pilgrim's is taking contract pricing up.  They thanked us

16   for taking the lead and told me that contrary to what you might

17   hear regarding their company, they're following us, as are

18   others.  Courage, keep it up guys.

19           Did I read that correctly?

20   *A.*  Yes.

21   *Q.*  Okay.  At the time you wrote this, Pilgrim's competed

22   against George's for customers who purchased chicken, right?

23   *A.*  Yes.

24   *Q.*  Your competitor?

25   *A.*  Yes.

Brenda Ray - Cross

1    *Q.*  You wrote, I received a call today from a friendly

2    competitor, and this friendly competitor was George's?

3    *A.*  Yes.

4    *Q.*  You would agree with me, would you not, that it would be

5    helpful information to know whether your competitor was going

6    to raise, maintain, or lower prices, right?  It would be

7    helpful?

8    *A.*  Yes.

9    *Q.*  And the reason why it could be of help to you is for future

10   prices, because it could affect the way that you bid, correct?

11        *MR. TUBACH:*  If this is not about the document, the

12   document should be taken down.

13        *THE COURT:*  Overruled.

14   *BY MR. HART:*

15   *Q.*  It would be helpful to you to know what your competitors

16   are doing in the marketplace?

17   *A.*  If it made a difference, yes.

18   *Q.*  And you would agree with me, if you knew that a competitor

19   was going to raise prices, Pilgrim's wouldn't need to sharpen

20   its pencil and submit a lower rate, right, if you knew your

21   competitors were raising prices?

22        *MR. TUBACH:*  Pertaining to a hypothetical, I object.

23        *THE COURT:*  Overruled.

24        *THE WITNESS:*  Ask that question once more, please.

25

Brenda Ray - Cross

1    *BY MR. HART:*

2    *Q.*  Sure.  And you would agree with me, if you knew that a

3    competitor was going to raise its price, Pilgrim's wouldn't

4    need to sharpen its pencil and put on their best price for the

5    customer, if you knew that everyone else was going to raise

6    prices, right?

7    *A.*  If that knowledge was had, correct.

8    *Q.*  And then you continued, Telling me it's all over the market

9    that Pilgrim's is taking contract prices up.  Now, "all over

10   the market" includes other chicken supply companies?

11   *A.*  No.

12   *Q.*  What does that mean?

13   *A.*  No.  In this conversation?  It was relative to the

14   Northeast marketplace.

15   *Q.*  Okay.  And you also wrote, They thanked us for taking the

16   lead.  You wrote that?

17   *A.*  Yes, I did.

18   *Q.*  And George's is the one who was thanking you for taking the

19   lead?

20   *A.*  Yes.

21   *Q.*  And at that time, George's was a competitor of Pilgrim's?

22   *A.*  Yes.

23   *Q.*  And you also wrote, Contrary to what you might hear

24   regarding their company, they are following.  Now, the "we" in

25   that is Pilgrim's, right?

Brenda Ray - Cross

1   A.   The "we" in that would be myself and the plant sales

2   managers that was selling -- this is relative to that

3   nine-piece halal that we had talked about earlier.

4   Q.   Absolutely.  The "we" would be that for Pilgrim's?

5   A.   That would be for Brenda and her team.

6   Q.   Your team and Brenda work for Pilgrim's; is that right?

7   A.   That's right.  That's correct.

8   Q.   The "their company" is George's, right?

9   A.   That's right.

10  Q.   And would you agree with me that "contrary to what you

11  might hear" is another way of saying, don't worry?

12  A.   What it meant in this regard is --

13  Q.   I'm sorry, I couldn't hear you, ma'am.

14  A.   What it meant in this regard --

15  Q.   Sure.

16  A.   -- is the customers.  The customers would then call back to

17  our salespeople, or myself, and they would say, so-and-so is

18  lower their price; you're charging too much for your chicken.

19  So what -- what Mr. Nelson was saying to me is, you know, what

20  you might hear from the customers is not correct.

21  Q.   Okay.  Now, you finish your email by repeating something

22  that Defendant Lovette and Defendant Penn were saying about

23  courage, right?

24  A.   That's correct.

25  Q.   And you sent this -- this email to many people, including

Brenda Ray - Cross

1   Defendant Penn?

2   A.   That is also correct.

3   Q.   Now, when you wrote "friendly competitor," you meant sort

4   of buddy-buddy.  What would --

5   A.   It was -- it was someone that I knew.

6   Q.   Someone that you could get information from?

7   A.   No.  It was a gentleman I used to work with, and -- at

8   Pilgrim's but it wasn't Pilgrim's at the time, it was actually

9   Wampler Foods.

10  Q.   Now, Ms. Ray, you would agree with me that you don't want

11  to intentionally hurt someone you're friendly with, right?

12  A.   Meaning?

13  Q.   Meaning, in terms of a friendly competitor, it's someone

14  that you wouldn't want to hurt, right?

15  A.   Well, I've never really thought of it that way.  I mean,

16  this was just someone I knew.  It was Brenda Ray's way of

17  speaking.

18  Q.   Okay.  Would you agree with me that a friendly competitor

19  is a company that you work with?  Right?

20  A.   Nope, it's someone that I knew.

21  Q.   Okay.  Now I want to show you part of this exhibit or talk

22  about part of the exhibit that the defense didn't question you

23  about.  Okay?  If you could turn your attention to the top part

24  of this exhibit.

25            A day after receiving the email about a friendly

Brenda Ray - Cross

1   competitor, Defendant Penn chose to forward it to the guy

2   responsible for KFC bids, correct?

3          MR. TUBACH:  Objection, Your Honor.  Lack of

4   foundation.

5          THE COURT:  Sustained.

6   BY MR. HART:

7   Q.  Do you know who Jason McGuire is?

8   A.  I do.

9   Q.  And Jason McGuire worked at Pilgrim's?

10  A.  He did.

11  Q.  And Jason McGuire, when he worked at Pilgrim's, he worked

12  for QSRs?

13  A.  He worked -- he was in charge of all of the small-bird

14  inventory of our company.

15  Q.  Right, and small birds are sold to fast-food restaurants?

16  A.  Some of them are, that's correct.

17  Q.  So the day after receiving the email about a friendly

18  competitor, Defendant Penn chose to forward it to Mr. McGuire,

19  correct?

20         MR. TUBACH:  Lack of foundation.  She's not on the

21  email.

22         THE COURT:  Sustained.

23  BY MR. HART:

24  Q.  Okay.  When Defendant Penn forwarded the information, "FYI,

25  do not forward.  Not exactly a legal conversation" --

Brenda Ray - Cross

1          MR. TUBACH:  I object.  He's reading the document of

2     an email that she was not on.

3          MR. HART:  I haven't asked the question yet, Your

4     Honor.

5          MR. TUBACH:  Objection.  It's improper to simply read

6     the document.

7          THE COURT:  Let's hear the question.  The objection is

8     overruled for the time.

9     BY MR. HART:

10    Q.  Did I read that properly?

11         MR. TUBACH:  Objection.

12         THE COURT:  Yeah.  The objection is sustained.  There

13    is no foundation for her knowledge of the rest of the email.

14    BY MR. HART:

15    Q.  Defendant Penn wrote that, ma'am?

16         MR. TUBACH:  Again, same objection.

17         THE COURT:  Sustained.

18    BY MR. HART:

19    Q.  Defendant Penn never told you that he forwarded to

20    Mr. McGuire not -- Defendant Penn never told you that he told

21    Mr. McGuire not to forward your email to anyone, did he?

22    A.  Not that I can recall.

23    Q.  Defendant Penn never told you that he told Mr. McGuire that

24    your email was not exactly a legal conversation, did he?

25    A.  He didn't share that opinion with me.

Brenda Ray - Cross

1  *Q.* And at no point in time did Defendant Penn ever tell you

2  that he viewed your conversation with a friendly competitor as

3  not exactly legal, did he?

4  *A.* No.

5       *MR. HART:* May I have a moment, Your Honor?

6       *THE COURT:* Yes, you may.

7  *BY MR. HART:*

8  *Q.* Just a few more questions, ma'am.

9  *A.* Okay.

10 *Q.* Earlier you testified that bid rigging meant to share bid

11 information with a competitor.  Remember that?

12 *A.* I thought I said pricing --

13      *MR. LAVINEj:* Your Honor, if he's not talking about

14 the exhibit, it should be taken down.

15      *THE COURT:* It has been taken down.

16      Go ahead, Mr. Hart.

17      *MR. HART:* May I reask the question?

18      *THE COURT:* Sure.

19 *BY MR. HART:*

20 *Q.* Earlier you testified that bid rigging meant to you, quote,

21 to share bid information with a competitor, quote, you said

22 that?

23 *A.* I thought I said bid pricing.

24 *Q.* If I show you something, would it refresh your recollection

25 as to what you said earlier?

Brenda Ray - Redirect

1   A.   Sure.

2          MR. HART:   May I approach the witness with the

3   transcript?

4          THE COURT:   Yeah.   I don't want to get into that,

5   Mr. Hart.   But you can represent to her what the transcript

6   reflects.

7   BY MR. HART:

8   Q.   Okay.   Would you -- will you accept my representation --

9   A.   Yes.

10  Q.   Thank you, ma'am.

11         So you -- I just want to confirm, so you were not

12  aware of any instance of Pilgrim's sharing its bid information,

13  correct?

14  A.   Correct.

15         MR. HART:   Okay.   No more questions, Your Honor.

16         THE COURT:   Thank you.

17         Redirect, Mr. Fagg.

18                  **REDIRECT EXAMINATION**

19  BY MR. FAGG:

20  Q.   Ms. Ray, there was a lot to cover there, so I might jump

21  around with you a little bit.   I apologize.

22         You're not a lawyer, are you?

23  A.   Oh, no.

24  Q.   And you don't know what the legal definition of price

25  fixing is, do you?

Brenda Ray - Redirect

1           MR. HART:  Objection.  Leading.

2           THE COURT:  Overruled.

3           THE WITNESS:  No, I don't.

4  BY MR. FAGG:

5  Q.  Have you ever seen or read the legal definition of price

6  fixing?

7  A.  No, I have not.

8  Q.  Do you know what the legal definition of bid rigging is?

9  A.  I do not.

10 Q.  Have you ever read the legal definition?

11 A.  I have not.

12 Q.  You were just giving your understanding, right?

13 A.  Yes, I was.

14 Q.  I want to ask you about some of the questions that Mr. Hart

15 was asking you earlier, the prosecutor.

16           Is Pilgrim's a for-profit company?

17 A.  No.

18 Q.  Is it a for-profit company?

19 A.  Yes.

20 Q.  Okay.  Is it in the business of making money?

21 A.  Yes, sir, it is.

22 Q.  And I believe you testified earlier that before Mr. Lovette

23 arrived, it wasn't very good at that?

24 A.  No.

25 Q.  No, it wasn't; or, no, you didn't say it?

2391

Brenda Ray - Redirect

1    A.  No, it was not very good at making money.

2    Q.  And I believe you said that was because Pilgrim's was just

3    chasing volume?

4    A.  Yes.

5    Q.  Meaning that it would sell chicken to I think you said --

6            MR. HART:  Objection.  Leading.

7            THE COURT:  Let's hear the question, first.

8    BY MR. FAGG:

9    Q.  Is it -- what did you mean by that?

10   A.  We didn't -- we didn't have a plan.  We didn't have a road

11   map with which we were going to execute to plan in order to

12   improve our bottom line.

13   Q.  And did you feel like Pilgrim's needed a plan?

14   A.  Yes.

15   Q.  And prior to Pilgrim's having a plan, it was willing to

16   sell product to fill volume wherever it could?

17   A.  That's correct.

18   Q.  And that meant that the thing that you were focused on was

19   acquiring that volume?

20           MR. HART:  Objection.  Leading.

21           THE COURT:  Sustained.

22   BY MR. FAGG:

23   Q.  And so when you talk about acquiring -- you know, trying to

24   sell it wherever we can, is that -- are you talking there

25   about -- what factors are you taking into account and what are

Brenda Ray - Redirect

1   you not taking into account?  Let me ask it that way.

2   A.  For instance -- I will give you a "for instance" that is in

3   my box that may help explain this.

4   Q.  Sure.  Thank you.

5   A.  So I was in charge of broad-line distribution.  Prior to

6   Mr. Lovette and Mr. Penn coming to Pilgrim's, we didn't even --

7   we barely even played in that area of sales.  So, therefore, by

8   participating in that sales channel, so to speak, we were able

9   to build our business hundreds of millions of pounds in a

10  different direction, which made our company a more broader

11  company, participating in more than one sales channel,

12  participating with more than other types of customers.  We

13  increased our type of customer base.

14  Q.  You increased your type of customer base to broaden it

15  to --

16  A.  That's right.

17  Q.  -- max --

18  A.  Maximize the dollars and the values of the chickens that we

19  were producing.

20  Q.  And so under this plan, did Pilgrim's then try to sell to

21  the customer that made the most financial sense to Pilgrim's?

22  A.  Yes.

23  Q.  Are you familiar with the phrase "opportunity cost"?

24  A.  Yes.

25  Q.  And was -- as you're describing this plan, is it seizing on

Brenda Ray - Redirect

1   opportunity -- trying to take advantage of any opportunity

2   costs that are out there?

3   *A.*   That's correct.

4   *Q.*   And Mr. Hart asked you some questions about lowering price

5   related to competition.  Do you remember that?

6   *A.*   Yes.

7   *Q.*   Is that what you were doing if you were chasing volume?

8   *A.*   Yes.

9   *Q.*   And if you kept lowering price time and time and time

10  again, where would that lead?

11          *MR. HART:*  Objection.  Speculative.

12          *THE COURT:*  Overruled.

13          *THE WITNESS:*  It would lead to unprofitable sales and

14  unprofitable company and potentially bankruptcy.

15  *BY MR. FAGG:*

16  *Q.*   And you said that the plan -- I believe you testified

17  earlier -- was to get a fair market price --

18  *A.*   That's correct.

19  *Q.*   -- for your product.  And if you're just chasing volume, do

20  you get a fair market price?

21  *A.*   No.

22  *Q.*   And so is it fair, ma'am, to say that --

23          *MR. HART:*  Objection.

24          *THE COURT:*  Let's hear the question.

25

Brenda Ray - Redirect

1    *BY MR. FAGG:*

2    *Q.*   Is it fair that the plan was, in fact, not focused on

3    chasing volume?

4    *A.*   Correct.

5    *Q.*   And as you talk about this plan that Mr. Lovette and

6    Mr. Penn implemented, was there anything wrong with that plan

7    in your mind?

8    *A.*   Not in my mind.

9    *Q.*   Did you think Pilgrim's needed that plan?

10   *A.*   Yes, I did.

11   *Q.*   And as you understood the plan, was it part of any

12   agreement with any competitors?

13   *A.*   No.

14   *Q.*   Were pricing -- as you understood this plan, were pricing

15   decisions made within Pilgrim's?

16   *A.*   Yes.

17   *Q.*   And were those decisions made based on the best interest of

18   Pilgrim's?

19   *A.*   Yes.

20   *Q.*   Do you have any knowledge, ma'am, of Pilgrim's making any

21   sort of decisions or any individuals at Pilgrim's making any

22   sort of decisions that weren't in the best interest of

23   Pilgrim's?

24   *A.*   I'm not.

25   *Q.*   You don't have any knowledge?

Brenda Ray - Redirect

1   A.  I have no knowledge.

2   Q.  Was part of the plan that was implemented driving ownership

3   and accountability?

4   A.  Yes, it was.

5   Q.  And can you tell the jury what ownership and accountability

6   means to you?

7   A.  It means under your area of responsibility, you own that

8   business channel, or you own that sales channel, and you are

9   responsible for growing it profitably.  And among all of those

10  different business units that we had across all of the

11  different bird types, within those business units, we would

12  make decisions on what was more profitable for our company and

13  which business that we should -- we should go after.

14  Q.  And you as the owner of one of those business units had the

15  authority to make those sort of decisions?

16  A.  Yes.  Yes, that's correct.

17  Q.  And did ownership and accountability, did that have

18  anything to do with any sort of agreement with competitors?

19  A.  No.

20  Q.  And when you were at Pilgrim's in the broad-line

21  distribution group, did Pilgrim's measure itself against its

22  competitors?

23  A.  Yes.

24  Q.  And were there metrics of how Pilgrim's did that?

25  A.  Yes.

Brenda Ray - Redirect

1   Q.   And can you tell us what that was.

2   A.   We would participate in Agri Stats' reporting, and in the

3   Agri Stats' reporting, specifically the sales book, which I was

4   a participant of, we would benchmark ourselves against where

5   the competition was relative to the reports that were generated

6   so that you could see in the books where you ranked versus the

7   type of product you were selling and where your competitors

8   ranked with like product.

9   Q.   And in these reports, ma'am -- this is the service that

10  Pilgrim's subscribed to; is that fair?

11  A.   That's correct.

12  Q.   And I think that you said that you would measure yourself

13  against the competition?

14  A.   That's correct.

15       MR. HART:  Objection, Your Honor.  This is outside the

16  scope.

17       THE COURT:  It seems close to that.  How many more

18  questions along these lines do you have, Mr. Fagg?

19       MR. FAGG:  Not many, Your Honor.  Just two.

20       THE COURT:  Overruled.

21  BY MR. FAGG:

22  Q.   And Pilgrim's measured itself based on how well it did in

23  beating the competition?

24       MR. HART:  Objection.  Leading.

25       THE COURT:  Sustained.

Brenda Ray - Redirect

1   *BY MR. FAGG:*

2   *Q.*  How did Pilgrim's measure itself using these Agri Stats

3   reports versus the competition?

4   *A.*  The reports would be reviewed, and we would see where we

5   ranked in specifically sales and where we would need to make

6   improvements in order to improve our ranking against the

7   competition.

8   *Q.*  If you improve your ranking against the competition, does

9   that mean you're beating the competition?

10  *A.*  That means you're beating the competition.

11  *Q.*  And this was part of the plan?

12  *A.*  That's correct.

13  *Q.*  And was that part of the plan, did it have anything to do

14  with any sort of agreement with any competitors?

15  *A.*  No.

16  *Q.*  You were asked some questions, ma'am, on cross-examination

17  about price courage, quite a few questions, do you recall that?

18  *A.*  Yes.

19  *Q.*  Price courage, does that have anything to do with any

20  agreement with competitors?

21  *A.*  No.

22  *Q.*  Do customers bluff?

23       *MR. HART:*  Objection.  This is clearly outside the

24  scope.

25       *THE COURT:*  Response, Mr. Fagg.

Brenda Ray - Redirect

1        MR. FAGG:  It's absolutely not outside the scope.  He

2   asked a number of questions about being willing to maintain a

3   price under this price courage theory and why Pilgrim's

4   wouldn't lower its price, and I'm asking her about the

5   negotiations and the discussions with customers about this

6   price courage theory.

7        THE COURT:  Sustained.

8   BY MR. FAGG:

9   Q.  Ma'am, let's take a look, if we can, at Exhibit 3037.  And

10  if we look at the last line of that.

11  A.  Which book?

12  Q.  I'm sorry -- yeah, 3037.  If we look at the last line of

13  this email, it will be on the screen.

14  A.  Yes.

15  Q.  When you wrote --

16        THE COURT:  Mr. Fagg, do you want that displayed?

17        MR. FAGG:  Yes.  Thank you, Your Honor.

18        THE COURT:  You may.

19        MR. FAGG:  Just if we can focus on the last line

20  there, Brian.

21  BY MR. FAGG:

22  Q.  When you wrote, Courage, keep it up guys, what were you

23  referring to?

24  A.  I was referring to the plant sales managers who had taken

25  my direction to increase pricing in the Northeast marketplace

2399

Brenda Ray - Redirect

1  on the nine-piece halal chicken, to continue to move forward

2  with their price increases, because they were, A, doing a good

3  job, and they were -- they were getting their job done.

4  Q.  Is this an example of price courage?

5  A.  Yes, it is.

6  Q.  And in your -- did this have anything to do with any

7  agreement with any competitor?

8  A.  No.

9       MR. FAGG:  We can take that down.  Thank you.

10 BY MR. FAGG:

11 Q.  And, ma'am, in your opinion, as it relates to price fixing

12 and bid rigging, does a competitor following Pilgrim's lead --

13      MR. HART:  Objection, Your Honor.

14      THE COURT:  I haven't heard the question yet.

15 Overruled.

16 BY MR. FAGG:

17 Q.  You were asked earlier about your opinion about price

18 fixing and bid rigging.  Do you remember that?

19 A.  Yes.

20 Q.  Now, in your opinion, ma'am, does a competitor of Pilgrim's

21 following Pilgrim's lead, does that mean there's an agreement

22 between Pilgrim's and the competitor?

23      MR. HART:  Objection, Your Honor.

24      THE COURT:  Overruled.  She can answer based upon her

25 personal knowledge of Exhibit 3037.

2400

Brenda Ray - Redirect

1    *BY MR. FAGG:*

2    Q.  Would you like me to rephrase it?

3    A.  Yes.

4    Q.  If a competitor simply follows Pilgrim's lead, in your

5    mind, does that indicate there is any sort of agreement between

6    Pilgrim's and that competitor?

7    A.  Not to me.  In this case, it didn't matter.  We were going

8    to take our price up.  If the customer wanted to leave, we

9    would sell the chicken in another direction.

10   Q.  And when you say you would sell it in another direction --

11   A.  That's correct.

12   Q.  -- is that because Pilgrim's had other places where it

13   could sell its chicken?

14   A.  That is correct.

15   Q.  And it wasn't beholden to the customer, say, we'll go get a

16   fair market price somewhere else?

17   A.  That is correct.

18   Q.  And along that line, the prosecutor asked you a lot of

19   questions about your earlier version of Pilgrim's that was so

20   customer focused, and I think you said something like customer

21   friendly.  Do you remember that?

22   A.  Yes.

23   Q.  Where did that lead Pilgrim's?

24   A.  In my earlier days with the company, when we did not have

25   sales programs, we sold chicken on the commodity market at

Brenda Ray - Redirect

1    discounted prices, because we had no programs, we had no

2    programs.  We had not -- we did not have multiple sales

3    channels with which to sell the product, and it led us to

4    bankruptcy.

5    Q.  On -- circling back on this Exhibit 3037, you were asked

6    about the -- whether -- what -- language not exactly a

7    conversation.  Do you remember that?

8    A.  Yes.

9    Q.  Did you and George's ever enter into an agreement on

10   pricing --

11   A.  No.

12   Q.  -- that you were going to charge to anybody?

13   A.  No.

14   Q.  At any time?

15   A.  No.

16   Q.  And even if you knew what George's was going to do, was

17   that an agreement, in your mind, between you and George's?

18   A.  No.

19   Q.  Did you ever have any sort of *quid pro quo* with George's?

20   A.  No.

21   Q.  Did you ever have any *quid pro quo* with any other

22   competitor?

23   A.  No.

24   Q.  Are you aware that anyone else ever had any *quid pro quo*

25   with a competitor?

Brenda Ray - Redirect

1    *A.*  Not that I'm aware of.

2    *Q.*  Would that be consistent with trying to beat the

3    competition, having an agreement with the competition what you

4    were going to charge?

5    *A.*  Yes.

6    *Q.*  Would that be consistent with trying to beat them, if

7    you're going to charge the same price?

8    *A.*  No.

9             *MR. HART:*  Objection, Your Honor.

10            *THE WITNESS:*  No, that would not be, if you're going

11   to charge the same price.

12            *THE COURT:*  She already answered.

13   *BY MR. FAGG:*

14   *Q.*  And the decisions that were made about pricing at

15   Pilgrim's, were those made independently at Pilgrim's?

16   *A.*  Yes.

17   *Q.*  And what was in Pilgrim's best interest?

18   *A.*  That's correct.

19   *Q.*  And not based on any agreement with any competitor?

20   *A.*  No.

21            *MR. FAGG:*  Moment to confer, Your Honor?

22            *THE COURT:*  You may.

23            *MR. FAGG:*  Thank you very much, Ms. Ray.

24            *THE WITNESS:*  You're welcome.

25            *THE COURT:*  All right.  Any request by the

Richard Eddington – Direct

1    United States to have Ms. Ray subject to recall?

2           *MR. HART:*  No, not at all.  Thank you very much.

3           *THE COURT:*  All right.  Thank you, Ms. Ray.  You are

4    excused.

5           All right.  Next witness.

6           Ms. Rahman.

7           *MR. TUBACH:*  Court's indulgence.

8           *THE COURT:*  No problem.

9           *MS. RAHMAN:*  Your Honor, Mr. Brady would call Richard

10   Eddington.

11          *THE COURT:*  Okay.  Mr. Eddington, if you'll please

12   come forward and stand next to the witness stand, Ms. Grimm

13   will administer an oath to you.

14          (**RICHARD EDDINGTON, DEFENDANTS' WITNESS, SWORN**)

15          *COURTROOM DEPUTY:*  Please be seated.

16          Please state your name and spell your first and last

17   name for the record.

18          *THE WITNESS:*  Richard Eddington, R-I-C-H-A-R-D,

19   E-D-D-I-N-G-T-O-N.

20          *THE COURT:*  Go ahead, Ms. Rahman.

21                          **DIRECT EXAMINATION**

22   *BY MS. RAHMAN:*

23   *Q.*  Good morning, Mr. Eddington.  My name is Megan Rahman, and

24   I represent Scott Brady.

25          Mr. Eddington, are you currently employed?

Richard Eddington – Direct

 1   *A.*   I am.

 2   *Q.*   Where do you currently work?

 3   *A.*   Inspire Brands.

 4   *Q.*   Where is Inspire Brands located?

 5   *A.*   It is located in Atlanta, Georgia.

 6   *Q.*   And what is Inspire Brands?

 7   *A.*   We are a restaurant company.  We own Arby's, Buffalo Wild

 8   Wings, Sonic, Jimmy John's, Dunkin', and Baskin-Robbins.

 9   *Q.*   Is Inspire Brands a restaurant holding company?

10   *A.*   Yes.  We own and operate some restaurants, and we're the

11   franchisor for the rest.

12   *Q.*   And when did you start at Inspire Brands?

13   *A.*   In July of 2019.

14   *Q.*   And what's your current position at the company?

15   *A.*   Currently I'm senior vice president of procurement.

16   *Q.*   And how long have you held that position?

17   *A.*   Since April of this year.

18   *Q.*   So, generally, what are your responsibilities as senior

19   vice president of procurement?

20   *A.*   My team is responsible for all food, beverage, packaging,

21   and services procurement, as well as I oversee the commodity

22   risk management team.

23   *Q.*   Have you held any other positions at Inspire Brands?

24   *A.*   I have.

25   *Q.*   What positions were those?

2405

Richard Eddington - Direct

1    A.   When I first started in 2019, I was vice president of

2    protein procurement, specifically responsible for protein only.

3    In July -- approximately July of last year, I became vice

4    president of procurement over all procurement categories.   I

5    just didn't have the commodity team at that point.

6    Q.   And since you've been employed at Inspire Brands, have your

7    responsibilities included negotiating contracts with chicken

8    suppliers?

9    A.   They have.

10   Q.   How long have you worked in the chicken industry?

11   A.   I began in the poultry industry in 1991.

12   Q.   What was your first position?

13   A.   I was a manager trainee and then a sales representative at

14   Seaboard Farms in Canton, Georgia.

15   Q.   What is Seaboard Farms?

16   A.   Seaboard Farms, which is -- at that point in time, had a

17   poultry operation, it was a subsidiary of the Seaboard

18   Corporation.   We had multiple integrated poultry operations.

19   Q.   And how long were you at Seaboard Farms?

20   A.   Approximately eight years.

21   Q.   What did you do during your eight years there?

22   A.   I was in sales and then, ultimately, in sales management.

23   Q.   Where did you go after Seaboard Farms?

24   A.   I spent a little bit of time at Koch Poultry in

25   Gainesville, Georgia.

Richard Eddington - Direct

1    *Q.*  How long were you at Koch?

2    *A.*  Just over a year.

3    *Q.*  What did you do at Koch?

4    *A.*  It was national accounts management for poultry.

5    *Q.*  After that year at Koch, where did you go?

6    *A.*  Gold Kist Poultry in Atlanta, Georgia.

7    *Q.*  And what is Gold Kist?

8    *A.*  Gold Kist was another fully integrated poultry company

9    based in Atlanta.

10   *Q.*  How long were you at Gold Kist?

11   *A.*  From between 2000 and, ultimately, 2007 when it became part

12   of Pilgrim's.  In between, I did take a small hiatus to go work

13   at my family's restaurant company.

14   *Q.*  What did you do for Gold Kist?

15   *A.*  I was in poultry sales.

16   *Q.*  Where did you go after Gold Kist?

17   *A.*  After Gold Kist, went to Bell & Evans Poultry.  Bell &

18   Evans is another fully integrated poultry company based in

19   Pennsylvania, and I did sales and sales manager.

20   *Q.*  And after Bell & Evans, where did you head?

21   *A.*  AJC International, which is -- I was in Chattanooga.  The

22   company is based in Atlanta.  AJC is a major import/export

23   company, including one of if not the largest poultry exporters

24   based in the U.S.

25   *Q.*  How about after AJC?

Richard Eddington - Direct

1    A.   Marshall Durbin.

2    Q.   About when did you go to Marshall Durbin?

3    A.   Marshall Durbin was in December of 2011.

4    Q.   What is Marshall Durbin?

5    A.   Marshall Durbin was a fully integrated poultry company

6    based in Birmingham, Alabama.

7    Q.   What did you do for Marshall Durbin?

8    A.   Initially, I was over distribution -- their distribution

9    center, as well as some limited -- which included some limited

10   poultry procurement and sales.  And then within the year, moved

11   into corporate sales manager position.

12   Q.   You said "Marshall Durbin was."

13   A.   That's correct.

14   Q.   What do you mean by that?

15   A.   That's correct.  In approximately early 2014, Mar-Jac

16   Poultry purchased the assets of Marshall Durbin, and my

17   employment moved along with the sale of the company to Mar-Jac.

18   Q.   And how long were you at Mar-Jac?

19   A.   I was at Mar-Jac until July of 2019, in which case I left

20   and went to Restaurant Supply Chain Solutions in Louisville,

21   Kentucky, beginning on August 4.

22   Q.   Restaurant Supply Chain Solutions, also known as RSCS?

23   A.   That's correct.

24   Q.   What did you do at RSCS?

25   A.   I was senior director of poultry procurement at RSCS.

Richard Eddington - Direct

1   *Q.*  Were you at RSCS until your present employment at Inspire

2   Brands?

3   *A.*  I was.

4   *Q.*  Were you at RSCS from about July -- August of 2014 until

5   about July 2019?

6   *A.*  That's correct.

7   *Q.*  When you were on the supplier side -- we just went through

8   the long list of companies -- did you negotiate contracts with

9   QSRs?

10  *A.*  Some, yes.

11  *Q.*  Which QSRs?

12  *A.*  As an example, Arby's, Church's, Zaxby's, companies like

13  that.

14  *Q.*  Was your job at RSCS the first time you worked on the

15  procurement side of the chicken industry?

16  *A.*  Not specifically to that level of scale, yes; but I did

17  poultry procurement both at AJC, as well as Marshall Durbin.

18  *Q.*  Generally, let's talk about your job responsibilities at

19  RSCS.  What were your job responsibilities generally at RSCS as

20  senior director of poultry procurement?

21  *A.*  My team was responsible for contracts with poultry

22  suppliers, for ensuring that supply flowed to the restaurants

23  as needed on a daily basis, and we also worked with the

24  brands -- we supported KFC, Pizza Hut, Taco Bell, in

25  particular -- worked with the brands on any promotional

2409

Richard Eddington - Direct

 1   activities or new product development.

 2   Q.  And as part of your job responsibilities at RSCS, did you

 3   negotiate contracts with chicken suppliers?

 4   A.  I did.

 5   Q.  Okay.  When you got to RSCS in August of 2014, who was on

 6   your team?

 7   A.  Reporting to me were Steve Campisano, Mary Hester, and

 8   Carol Knight.  And I reported to Pete Suerken.  We also for the

 9   balance of 2014 had a contractor on -- on the team named Bob

10   Lewis.

11   Q.  Okay.  What was Mr. Suerken's position?

12   A.  He was at that point executive vice president of

13   procurement.

14   Q.  And he was your boss?

15   A.  He was.

16   Q.  What was Mr. Lewis' role?

17   A.  Mr. Lewis had been brought in after my predecessor, Mike

18   Ledford, left in May, I believe, of 2014, to help stabilize and

19   transition the category into whomever would be the replacement

20   for Mr. Ledford, who turned out to be me.

21   Q.  Okay.  You mentioned Mr. Campisano.  What was

22   Mr. Campisano's role?

23   A.  At that point, Steve was responsible for ensuring that

24   specifically the eight-piece chicken on the bone -- or COB, as

25   we referred to it -- loads on a day-to-day basis flowed

Richard Eddington – Direct

1   correctly from the suppliers through our distribution network

2   and into the stores.

3   Q.   Did Mr. Campisano negotiate contracts?

4   A.   No.

5   Q.   What about Ms. Hester?

6   A.   Mary Hester was the category manager for what we referred

7   to as further-processed poultry, which, essentially, was

8   everything not chicken on the bone.

9   Q.   Okay.  And what about Ms. Knight?

10  A.   Carol was our administrative manager, and she ensured that

11  pricing on a monthly basis was -- or period basis was correct.

12  She did reports, analyzed numbers, and made sure that

13  contracts, insurance was kept up-to-date, things of that

14  nature.

15  Q.   Okay.  Mr. Eddington, I want to talk to you about the

16  contract negotiations for the 2015 contract, okay?

17  A.   Okay.

18  Q.   When I say the 2015 contract, just so we're on the same

19  page, I'm talking about the three-year contract negotiated by

20  KFC in 2014 -- or 2015, 2016, and 2017.

21  A.   Okay.

22  Q.   Okay.  Great.

23       Were you involved in the negotiations for the 2015 KFC

24  contract at RSCS?

25  A.   I was.

Richard Eddington – Direct

1    *Q.*  Let's remind the jury.  When did you start at RSCS?

2    *A.*  August 4 of 2014.

3    *Q.*  Now, when you started at RSCS, what stage were the

4    negotiations at?

5    *A.*  There had been some conversations, but we -- they had set

6    up in-person meetings that began the week that I arrived.

7    *Q.*  And did you participate in some of the initial in-person

8    meetings?

9    *A.*  I did.

10   *Q.*  Okay.  Who else at RSCS was involved in the contract

11   negotiations for the 2015 KFC contract?

12   *A.*  The three primary participants were Pete Suerken, Bob

13   Lewis, and me.  And then Steve Campisano was at least part of

14   the team in terms of ensuring that some of the numbers were

15   appropriate or that the loads -- and making sure that they

16   matched up to what his needs were in the system.  And then Todd

17   Imhoff was Pete Suerken's boss, and he was involved behind the

18   scenes to help us set strategy and communicate that strategy to

19   RSCS and franchisees' leadership.

20   *Q.*  What was Mr. Imhoff's position, title?

21   *A.*  Chief procurement officer.

22   *Q.*  Was Sara Fisher involved in the negotiations at all for the

23   2015 contract?

24   *A.*  No, she was not in procurement at this time.

25   *Q.*  Was this Mr. Suerken's first time negotiating contracts

Richard Eddington – Direct

1  with chicken suppliers?

2  A.  To the best of my knowledge, yes.

3  Q.  Okay.  Were you aware whether RSCS was taking a different

4  approach to the negotiations for the 2015 contract?

5  A.  Yes.

6  Q.  How are you aware of this?

7  A.  Because that was part of the initial strategy sessions that

8  we held internally upon my arrival.

9  Q.  Okay.  So was RSCS taking a different approach to the

10  negotiations?

11  A.  Yes.

12  Q.  In the 2015 contract?

13  A.  Yes.

14  Q.  Why were they taking a different approach?

15  A.  Previously, for years to even decades, KFC had been the

16  largest user of chicken on the bone and had always had, by and

17  large, the luxury of having the leverage and pretty much being

18  able to not necessarily set the price, but certainly set the

19  tone of the negotiations.  And in 2014, that landscape had

20  shifted.  So the old ways of, essentially, taking a hammer to

21  the suppliers and trying to beat the price down was no longer

22  going to work.

23  Q.  So what was the approach?

24  A.  We felt that over the course of time the relationships with

25  the suppliers had deteriorated and KFC was no longer that

Richard Eddington - Direct

1    customer of choice for eight-piece chicken on the bone, so we

2    felt we needed to reset some of those relationships to

3    understand from the suppliers' standpoint, you know, how --

4    where the main points were in doing business with KFC, and

5    certainly to understand the changing supply landscape and how

6    we could continue ensuring supply to the KFC system.

7    Q.  You mentioned the changing supply landscape.  What are you

8    referring to?

9    A.  Over the course of a number of years, the number of plants

10   and suppliers who produced the appropriate-sized bird and then

11   had the right process to produce the eight-piece had dwindled.

12   And especially in 2014, there was a -- there was a change that

13   larger birds -- essentially, the 9-pound -- the largest birds

14   in the industry, which weighed 9 pounds, were significantly

15   more profitable.  And it was our fear that that supply erosion

16   was going to continue, if not increase, and ultimately leave us

17   with a lack of supply.  On top of the fact that the -- our

18   competition for the birds that remained from, whether it be

19   Popeyes or specifically rotisserie WOGs or deli WOGs, as we

20   called them, that you get in retail stores, that segment was

21   growing, and it was putting the squeeze on KFC.  So we really

22   needed to do something different than we had previously -- they

23   had previously.

24   Q.  Did part of this approach involve a move to a three-year

25   contract?

Richard Eddington – Direct

1    A.   Yes, it did.

2    Q.   Why did RSCS want to move to a three-year contract?

3             MS. WULFF:   Objection.  Foundation.  He joined the

4    company in early August 2014.

5             THE COURT:   Overruled.

6    BY MS. RAHMAN:

7    Q.   You can answer.

8    A.   Every year -- the year-over-year contracts had -- as I

9    mentioned previously, the perception had been that KFC was

10   bringing the suppliers in and just trying to beat the price

11   down.  So as part of this renewed partnership effort, we wanted

12   to not only ensure supply over a longer period of time --

13   because earlier in 2014, they had actually ran out of

14   chicken -- but also we wanted to demonstrate in good faith to

15   the suppliers that, hey, you know, if we can help make your

16   process more efficient, if there is things -- capital

17   investments you need to make, then having a three-year deal is

18   something that we could view as win-win.  They could have the

19   assurety (ph) of knowing they had a contract for three years,

20   and certainly we would have supply for three years.

21   Q.   Were you aware of the market conditions at the time of

22   these negotiations?

23   A.   I was.

24   Q.   How were you aware of these market conditions?

25   A.   Well, I -- having come from the supplier side immediately

Richard Eddington - Direct

1    prior to that, as well as then in the -- during the

2    negotiations, plus having access to Agri Stats' information,

3    specifically on the suppliers' side, I was very well aware of

4    the difference in the profitability of some segments of the

5    market versus the small-bird COB segment of the market.

6    Q.  Were the market conditions favorable for RSCS?

7    A.  No, not at all.

8    Q.  How so?

9    A.  We had as -- as I mentioned, KFC had just recently,

10   Mother's Day of 2014, ran out of chicken, and in the months

11   between May and when I started in August, they had to go out

12   and buy non-contract spot loads at upwards of 40 to 50 cents

13   per pound above what their then-current contracts were just to

14   keep supply.  So that was one strike against us coming into the

15   negotiations, right off of those spot purchases.

16          Certainly, the other competitive set, such as Popeyes,

17   such as the deli WOGs, they were growing, trying to take share.

18   We had already -- Chick-fil-A was another competitor who was

19   growing, and approximately one chicken plant per year -- this

20   was common industry knowledge, approximately one chicken plant

21   per year was converting over to produce pretty much

22   specifically for them.  And then certainly at that point, the

23   Agri Stats data showed that big birds in profitability were

24   yielding about a dollar per bird more than the small birds KFC

25   purchased at that particular point in time.  So from both

Richard Eddington - Direct

1    supply and demand, the deck was pretty well stacked against us.

2    Q.  Is buying incremental loads in the spot market reflective

3    of market conditions?

4    A.  It was at that time, yes.

5    Q.  Are you aware of whether the suppliers were trying to close

6    the gap between the big-bird and the small-bird profit?

7    A.  Yes.

8    Q.  How are you aware of that?

9    A.  Not because they said that -- at least in certain

10   conversations, some of them said that, hey --

11           MS. WULFF:  Objection.  Hearsay.

12           THE COURT:  Sustained.

13   BY MS. RAHMAN:

14   Q.  Without telling me -- I don't want to know what the

15   suppliers told you, but how are you aware of whether suppliers

16   were trying to close the gap between the big-bird and

17   small-bird profit?

18   A.  They said they were.

19   Q.  Could a supplier close the gap by converting a small-bird

20   plant to a big-bird plant?

21           MS. WULFF:  Objection.  Foundation, Your Honor.

22           THE COURT:  Overruled.  He can answer if he knows.

23           THE WITNESS:  I mean, if a supplier chose to move

24   their production to a larger bird, yes, that would then put

25   them in a different product mix, which would yield a different

Richard Eddington - Direct

1    return.

2    *BY MS. RAHMAN:*

3    *Q.*  And when plants converted, did they change back?

4    *A.*  Generally speaking, no.  I'm only aware of one particular

5    plant that moved from a larger bird into the KFC-specific

6    process over the course of many years.

7    *Q.*  And how did RSCS view this possible conversion of

8    small-bird plants to big-bird plants?

9    *A.*  We believed it was a risk --

10            *MS. WULFF:*  Objection.  Foundation, Your Honor.

11            *THE COURT:*  Overruled.  He can answer if he knows.

12            *THE WITNESS:*  We believed it was a risk to both

13    short-term and long-term supply.

14    *BY MS. RAHMAN:*

15    *Q.*  So did the market conditions we've just been talking about,

16    did they have any impact on the negotiations that you were

17    involved in?

18    *A.*  Yes.

19    *Q.*  What was the impact on the negotiations?

20    *A.*  Well, the most specific impact was that as we were having

21    conversations and negotiations, we asked the suppliers or

22    allowed each of the suppliers to break out their margin in

23    terms of a standard margin and then a big-bird profitability

24    type margin.  It's an incremental margin.

25    *Q.*  What do you mean by break out this margin?

Richard Eddington - Direct

1    *A.*   The standard or I guess, more or less, traditional margin

2    range for the eight-piece chicken on the bone had been --

3              *MS. WULFF:*  Objection.  Foundation.

4              *THE COURT:*  Overruled.

5              *THE WITNESS:*  -- had been in the 7- to

6    8-cents-per-pound range.  So as suppliers came in and wanted to

7    change the margin structure and become more competitive with

8    other segments of the industry, then we asked them to -- didn't

9    specifically tell them to leave the traditional margin alone,

10   but asked them to split out how they -- what they believed

11   would be this new or true-up tight margin to the big birds.

12   *BY MS. RAHMAN:*

13   *Q.*   And was RSCS having this discussion with all of its

14   suppliers?

15   *A.*   It was.

16   *Q.*   Had these discussions started by the time you arrived at

17   RSCS in August?

18   *A.*   They had had initial conversations, yes.

19   *Q.*   And was RSCS willing to pay a premium to the suppliers to

20   bridge this gap between the small-bird margin and the big-bird

21   margin?

22   *A.*   We were.

23   *Q.*   And you talked about the margin, breaking out that margin.

24   Can you explain to the jury what the margin number is in the

25   cost model?

Richard Eddington – Direct

1    *A.*  The margin essentially is -- is their profitability.

2    Everything else leading up to that line in our model is about

3    what it takes to produce chicken feed, to grow the live bird,

4    to transport and process the live bird, to then take the -- the

5    product and put it into KFC-specific product or specifications.

6    And then at the end of that, there would be a -- the return or

7    the margin profitability for the supplier for doing that.

8    *Q.*  And are you aware of whether margin is an accurate

9    reflection of the suppliers' profit?

10   *A.*  I would believe -- say that it is an approximate.  It's not

11   necessarily specific.

12   *Q.*  And why do you say that?

13   *A.*  Because most of the numbers in the model were fixed for --

14   you know, in this case, the contract we did for three years.

15   We all know that over the course of three years that things

16   such as electricity, things such as labor, types of -- things

17   like that are going to change, so, therefore, the margin and

18   their actual true return also would change to some degree over

19   the course of that time.

20   *Q.*  So we just were talking about how RSCS asked the suppliers

21   to take their margin and split out what this big-bird premium

22   would look like.  Did all of the suppliers do that?

23   *A.*  Yes.

24   *Q.*  Okay.  And how did RSCS determine whether the big-bird

25   premium was reasonable?

Richard Eddington - Direct

 1  A.  I --

 2  Q.  Go ahead.

 3  A.  I believe there was one that didn't, if I remember

 4  specifically.  But most did.

 5  Q.  Okay.  How did RSCS determine whether this big-bird premium

 6  was reasonable or not?

 7  A.  Well, we -- knowing that the gap at that time in

 8  profitability per bird between the jumbo birds and the KFC

 9  birds was approximately a dollar per chicken, and if you take a

10  dollar and divide it by 4 pounds, which is what the approximate

11  live pound -- live weight was for the KFC birds, that's

12  25 cents per live pound.  Since we did not buy live chickens,

13  we had to convert that into a processed bird or what we called

14  a WOG, without giblets.  And that's approximately 73 percent

15  yield of live.  So that means that the 25 cent per live pound

16  becomes 34 cents per WOG pound.

17          So at that point in time, the worst-case scenario

18  would have been that we would have paid 34 cents per pound

19  above what we were then currently paying in 2014.

20          Now, we didn't expect to have to pay that, but in

21  terms of understanding what -- what the parameters were, that

22  was the way that I at least viewed it.

23  Q.  Okay.  You have thrown out a lot of numbers, and I always

24  say I went to law school so I didn't have to do math.

25          How is that 34 cents -- how is that going to impact

Richard Eddington - Direct

1   the bottom line?

2   *A.* Well, if you figure that, you know, at that point in time,

3   we were buying approximately -- between eight-piece and dark

4   meat, we were buying just a little over 400 million pounds on

5   an annualized basis of COB, each and -- at that point in time,

6   there were I think approximately 4300 KFC stores, I think at

7   the end of 2014, the actual number was 4,370.  But at that

8   point, each penny -- so we would take 400 -- 400 million pounds

9   and each -- divided by -- each penny was worth

10  4 million pounds, so on an annualized basis, so 4 million, if

11  we had to take the entire -- whoops.  Sorry.

12  *Q.* That's why we have a calculator.

13  *A.* That would have been -- actually it's -- not giving me

14  enough decimal places here, but we would have had to have -- it

15  would have been well over $100 million if we have had to have

16  taken all of that.

17  *Q.* Worst case?

18  *A.* Worst-case scenario.

19  *Q.* So -- but how did you anticipate that was going to impact

20  on a cost model -- so the 34 cents, how did you anticipate --

21  how is that going to anticipate each suppliers' bottom line,

22  where did you expect to see the impact of that 34 cents?

23        *MS. WULFF:*  Objection, Your Honor.  Compound and lacks

24  foundation as to the -- how -- I believe she asked how the

25  margin would impact the suppliers' bottom line, I think that's

Richard Eddington - Direct

1    RSCS at that time.

2              *THE COURT:*  Overruled.

3    *BY MS. RAHMAN:*

4    *Q.*  How did RSCS -- where did RSCS expect to see the 34 cents

5    in the cost model that they were receiving from the suppliers,

6    where did they expect to see this impact?

7    *A.*  Any impact from the big-bird true-up, as we called it,

8    would have been in this additional margin line.

9    *Q.*  Switching gears for a second, are you familiar with Claxton

10   Poultry?

11   *A.*  I am.

12   *Q.*  What type of plant does Claxton have?

13   *A.*  Claxton has one plant that has two different live weights.

14   One is the approximate 4-pound for KFC -- that produces for the

15   KFC COB-type product, and I believe they have a slightly larger

16   bird to do some various other products with.

17   *Q.*  Does Claxton sell this big bird we've been talking about?

18   *A.*  No, they do not.  Their larger bird is between 5 and

19   6 pounds, I believe.

20   *Q.*  Did RSCS ask Claxton to provide a number for the big-bird

21   premium?

22   *A.*  We did.

23   *Q.*  Why is that?

24   *A.*  We gave every supplier that opportunity.

25   *Q.*  Why?

Richard Eddington - Direct

1    A.  Well, we did not know who was and was not planning on --

2    moving or considering moving product to a larger bird or moving

3    their plants to a larger bird.  In some cases, there were

4    conversations where they indicated that they were

5    considering --

6              MS. WULFF:  Objection, Your Honor.  Hearsay.

7              THE COURT:  Overruled -- sorry, I mean sustained.

8    BY MS. RAHMAN:

9    Q.  You can answer the question without telling the jury about

10   any specific conversations.

11   A.  Some suppliers -- we gave -- we gave every supplier the

12   opportunity, because we did not know at the end of the day

13   which suppliers were considering or not considering moving to a

14   larger bird.

15   Q.  Did Claxton threaten to convert to a big bird?

16   A.  No, they did not.

17   Q.  Was Claxton the only supplier for RSCS who didn't have a

18   big-bird plant?

19   A.  No.

20   Q.  Who are the other suppliers?

21   A.  Mar-Jac did not have larger -- the 9-pound jumbo birds at

22   that time.

23   Q.  Did Mar-Jac also get a big-bird premium?

24   A.  They did.

25   Q.  Did you attend any meetings with Claxton during the

Richard Eddington – Direct

1    negotiations?

2    *A.*  I did.

3    *Q.*  Who from Claxton attended the meeting?

4    *A.*  Depending on the meeting, it was either -- Scott Brady and

5    I believe on one occasion Mikell Fries.

6    *Q.*  Do you know if Mr. Brady had pricing authority?

7    *A.*  No, I do not believe he did.

8    *Q.*  Was Mr. Suerken at these meetings?

9    *A.*  He was.

10   *Q.*  Are you aware of Claxton's negotiating strategy?

11   *A.*  I am.

12   *Q.*  How are you aware?

13   *A.*  They told me.

14   *Q.*  What is Claxton's negotiating strategy?

15   *A.*  They asked that they be priced --

16          *MS. WULFF:*  Objection, Your Honor.  Hearsay.

17          *THE COURT:*  Response.

18          *MS. RAHMAN:*  Well, he's aware of their negotiating

19   strategy because he negotiated with them, Your Honor.  I'm

20   asking him the negotiating strategy based on his negotiations

21   with Claxton.

22          *THE COURT:*  What about the hearsay objection?

23          *MS. RAHMAN:*  I'm not asking Mr. Eddington what either

24   Mr. Brady or Mr. Fries told them; I'm asking about the strategy

25   in general based on his negotiations with them.

Richard Eddington – Direct

1              *THE COURT:*  Sustained.

2      *BY MS. RAHMAN:*

3      *Q.*  Do you have an understanding of Claxton's negotiating

4      strategy?

5      *A.*  I do.

6      *Q.*  What is your understanding of Claxton's negotiating

7      strategy?

8      *A.*  They did not want to be the highest price, they did not

9      want to be the lowest price, they wanted to be somewhere in the

10     middle.

11     *Q.*  What does that mean to you?

12     *A.*  That meant that at -- as we came to the end of our

13     negotiations, that there was some good faith on both -- you

14     know, on their part, specifically, that as we gave them any

15     final directional ask or guidance, that's where their ultimate

16     pricing would land.

17     *Q.*  Was there anything odd about Claxton's negotiating

18     strategy?

19     *A.*  Not to me.

20     *Q.*  Anything unusual?

21     *A.*  No.

22     *Q.*  Are you aware of the negotiating strategies of other

23     suppliers?

24     *A.*  Yes.

25     *Q.*  Do you have an understanding of the negotiating strategies

2426

Richard Eddington - Direct

1   of other suppliers?

2   A.   For the most part, yes.

3   Q.   How did Claxton's strategy compare to a supplier like

4   Pilgrim's?

5        MS. WULFF:   Objection, Your Honor.   Foundation.   He

6   hasn't actually stated how he's aware of the negotiating

7   strategies of other suppliers.

8        THE COURT:   Sustained.

9   BY MS. RAHMAN:

10  Q.   How are you aware of the negotiating strategies of the

11  other suppliers, Mr. Eddington?

12  A.   Because I negotiated with them over multiple contracts.

13  Q.   How did it compare to supplier like Pilgrim's?

14  A.   Pilgrim's, specifically for COB, was pretty adamant that

15  they be the highest price.   They wanted to be the -- they

16  wanted to -- they had the highest level of supply, and they

17  were the -- you know, they were the most forward about pushing

18  the negotiations in their favor for the product or they would

19  threaten to pull supply.

20  Q.   Did the suppliers all have different negotiating

21  strategies?

22  A.   To some degree.

23  Q.   How would you compare the strategies of the suppliers,

24  generally?

25       MS. WULFF:   Objection, Your Honor.   Foundation and

Richard Eddington - Direct

1    vague.

2              THE COURT:  Overruled.

3              THE WITNESS:  There were some who wanted similarly to

4    Claxton to just not be at the top or the bottom at the end.

5    There were some who wished to push additional volume in

6    cases -- in some situations, in exchange for either a higher or

7    lower price.  And then there were some who, as mentioned, who

8    either really pushed their -- their agenda in pricing or if we

9    couldn't come to an agreement, more or less, on their terms,

10   then we may or may not have the supply that we needed or asked

11   for.

12   BY MS. RAHMAN:

13   Q.  Did Claxton ever threaten to take business elsewhere?

14   A.  No, they did not.

15   Q.  Did Claxton ever refuse to negotiate?

16   A.  No.

17   Q.  During the negotiations, did Claxton refuse to come off its

18   initial price?

19   A.  No, they did not.

20   Q.  Did Claxton ever say, The price is the price?

21             MS. WULFF:  Objection.  Calls for hearsay.

22             THE COURT:  Overruled.

23             THE WITNESS:  No, they did not.

24   BY MS. RAHMAN:

25   Q.  Did you have an expectation of pricing from suppliers for

Richard Eddington – Direct

1   the 2015 contract?

2   *A.* You mean --

3   *Q.* Yes --

4   *A.* Prior to the -- as I entered the negotiations?

5   *Q.* Yes. When you were entering the negotiations, did you have

6   an expectation of pricing?

7   *A.* Yes, I did.

8   *Q.* What was it?

9           *MS. WULFF:* Objection, Your Honor. Foundation. He

10  just arrived at RSCS.

11          *THE COURT:* Overruled.

12          *THE WITNESS:* I anticipated that there would be a

13  price increase of approximately 8 to 10 cents over the

14  current -- then-current contract.

15  *BY MS. RAHMAN:*

16  *Q.* Was your expectation of pricing different from others at

17  RSCS?

18  *A.* Yes.

19  *Q.* How so?

20  *A.* When I arrived at RSCS, Pete Suerken said that he

21  anticipated a price increase of 3 to 5 cents per pound for the

22  next year.

23  *Q.* Did you think that was realistic?

24  *A.* No, I did not.

25  *Q.* Why not?

Richard Eddington - Direct

1   *A.*  I had just moved into this role from these -- a supplier

2   who was selling this type of product not only to KFC but also

3   to other customers, and I had no expectation that the pricing

4   increases were going to be limited to something as small as a

5   nickel or less per pound and maintain full supply.

6   *Q.*  When you say 8 to 10 cents, are you talking about the final

7   eight-piece cost?

8   *A.*  No, I'm talking about the incremental increase in margin.

9   *Q.*  You were expecting the 8 to 10 cent increase to be in the

10  margin category?

11  *A.*  On top of the then-standard margin of 7 to 8 cents per

12  pound, yes.

13  *Q.*  Do you recall when the first bids came into RSCS?

14  *A.*  I don't recall the specific date.  Mid August.

15  *Q.*  How were the bids received at RSCS?

16  *A.*  There was surprise.

17  *Q.*  Would it be fair to say it was a worst-case scenario for

18  RSCS?

19          *MS. WULFF:*  Objection, Your Honor.  Leading.

20          *THE COURT:*  Sustained.

21  *BY MS. RAHMAN:*

22  *Q.*  Why was RSCS surprised?

23  *A.*  Because all of us, myself included, expected increases in

24  the margin line, but we were not expecting increases to the

25  level in which suppliers submitted their bids.

2430

Richard Eddington - Direct

1    Q.  Were you surprised by the increase in the margin in the

2    cost-plus models?

3    A.  I was, somewhat.

4    Q.  Was it the largest margin increase you had seen?

5    A.  Yes.

6         MS. WULFF:  Objection --

7    BY MS. RAHMAN:

8    Q.  Are you aware of the primary reason for the increase in the

9    margin?

10   A.  Yes.

11   Q.  And how are you aware of this?

12   A.  Because I saw the models.

13   Q.  Do you know the reason for the increase in the margin?

14   A.  I do.

15   Q.  And what was it?

16   A.  It was incremental big-bird profit, or the extra margin

17   line.

18   Q.  Now, did pricing for the 2015-2017 contract end up where

19   you thought it would?

20   A.  It ended up on the highest side of where I thought it

21   might, to slightly higher.  But I can't say that at the end I

22   was completely surprised.

23   Q.  Are you aware of whether the increase in contract price had

24   any effect on future years?

25   A.  In terms of?

Richard Eddington – Direct

1   *Q.*   In terms of the small-bird market?

2   *A.*   Yes.  I do believe that --

3          *MS. WULFF:*  Objection, Your Honor.  Foundation.

4   *BY MS. RAHMAN:*

5   *Q.*   How are you aware, Mr. Eddington?

6   *A.*   Because I'm aware because I stayed at RSCS, and I

7   negotiated future contracts and was part of the supply/demand

8   in the industry as a customer.

9   *Q.*   So what effect did the increase in contract prices have on

10  the small-bird market for two years?

11  *A.*   I believe it stabilized the small-bird market to some

12  degree, up to and including bringing in in, I believe, 2016 --

13  late 2015, 2016, we actually had a new competitor in the set.

14  OK Foods did move the plant into KFC production, the one plant

15  that I referenced earlier that I was aware of that was -- kind

16  of went against the grain.

17  *Q.*   Do you think that the increases helped incentivize

18  suppliers to stay in the small-bird industry?

19  *A.*   I do.

20  *Q.*   Now, Mr. Eddington, we just talked about the three-year

21  contract that was negotiated in '14 for '15 through '17.  Did

22  RSCS and Claxton renegotiate that contract before its

23  expiration in 2017?

24  *A.*   We did.

25  *Q.*   Okay.

Richard Eddington – Direct

1       MS. RAHMAN:  Your Honor, may I approach?

2       THE COURT:  Yes, you may.

3       MS. RAHMAN:  Your Honor, if we could publish Exhibit

4   F-754.  It's already been admitted.

5       THE COURT:  Yes, you may.

6       MS. RAHMAN:  Thank you.

7   BY MS. RAHMAN:

8   Q.  Mr. Eddington, if you could look at F-754 in your binder,

9   please.  Do you recognize this document?

10  A.  Yes, I do.

11  Q.  What is this?

12  A.  This is an -- this is an eight-piece pricing model for

13  Claxton Poultry, up -- it was from December 2, 2015, but it was

14  an update for the period of January 1, 2016 through

15  December 31, 2017.

16  Q.  So this is one year after the 2014 negotiations for the

17  2015 contract had been completed?

18  A.  Yes, that's correct.

19  Q.  And who signed this contract on behalf of Claxton?

20  A.  Mikell Fries.

21  Q.  Who signed on behalf of RSCS?

22  A.  I did.

23  Q.  And this is a new contract?

24  A.  It was an updated, yes, contract.  Yes.

25  Q.  Okay.  And what is the term of this contract?

Richard Eddington – Direct

1    *A.*  It is for January 2016 through December 2017, so two years.

2         *MS. RAHMAN:*  Can we look at the second page of the

3    contract, please.

4    *BY MS. RAHMAN:*

5    *Q.*  You see the term "big-bird adjustment"?

6    *A.*  I do.

7    *Q.*  We have talked about big-bird true-up and big-bird premium

8    and big-bird adjustment.  Are those all terms for the exact

9    same thing?

10   *A.*  Yes, they are.

11   *Q.*  Okay.  What's the total FOB cost?

12   *A.*  1.0369 cents per pound -- $1.0369 per pound.

13   *Q.*  Do you know if that's more than the price negotiated in

14   2014 for the '15-'17 contract?

15   *A.*  I believe it is, yes.

16   *Q.*  Okay.

17        *MS. RAHMAN:*  Can we please bring up GX-1119.

18        Your Honor, that has already been admitted, and I

19   would ask to publish that as well.

20        *THE COURT:*  What was the number again?

21        *MS. RAHMAN:*  GX-1119.

22        *THE COURT:*  You may.

23   *BY MS. RAHMAN:*

24   *Q.*  Mr. Eddington, if you could look at GX-1119 in your binder,

25   please.  If we could look at page 2 of that document.

Richard Eddington - Direct

1          Do you recognize -- I'll wait until you get to it.

2   A.  I apologize.

3   Q.  That's fine.  There is a lot of documents in there.  It's

4   also up on the screen.

5   A.  I don't know if I see it specifically in the book.  If I

6   may look at the screen.

7   Q.  Yeah.  Do you recognize this document?

8   A.  Can you scroll up, please?  Okay.  There you go.

9          Yes, I do.

10  Q.  What's this?

11  A.  This would be the initial cost model that we signed with

12  Claxton in 2014 for the --

13  Q.  And --

14  A.  I'm sorry.

15  Q.  Go ahead.

16  A.  For the three-year period beginning 2017 -- yeah -- sorry.

17  For the three-year period beginning 2015 through 2017.

18  Q.  And what's the price that Claxton and RSCS negotiated for

19  eight-piece in 2014?

20  A.  1.0669 cents per -- $1 6.69 cents per pound.

21  Q.  So what's -- I'm going to ask you to do some math.  What's

22  the reduction between the two years?

23          I can ask you a better -- oh, you've got it right

24  there.  Okay.

25  A.  Exactly 3 cents per pound.

Richard Eddington - Direct

1   Q.  What's the approximate cost savings on eight-piece to KFC

2   of the 3-cent reduction for two years?

3   A.  If this were -- just specifically for Claxton or across?

4   Q.  Claxton.

5   A.  For Claxton?  I would have to see exactly how many pounds

6   that we --

7          MS. RAHMAN:  Could we show Mr. Eddington the volume,

8   please, Mr. Brian?

9          THE WITNESS:  So for eight-piece, 536,000 pounds per

10  period, there were 13 periods in a year, so that was

11  6,968,000 pounds per year times two, 13,936,000 pounds

12  times .03.  That would be $418,080 savings to the system.

13  BY MS. RAHMAN:

14  Q.  Of this weekly volume commitment --

15  A.  I -- yes.

16  Q.  Did Claxton have to renegotiate the contract?

17  A.  No, they did not.

18  Q.  Was this done at the request of RSCS?

19  A.  Yes.

20         MS. RAHMAN:  We can take that down.  Thank you.

21  BY MS. RAHMAN:

22  Q.  I'll ask you a couple of questions about the volume that

23  was allocated between the suppliers during the 2014

24  negotiations for the 2015 contract.

25             In 2014, did RSCS have a strategy when allocating

Richard Eddington - Direct

1    volume amongst suppliers?

2    A.   Yes, we did.

3    Q.   Were you aware of the strategy?

4    A.   I was.

5    Q.   How were you aware of it?

6    A.   Because I was part of the strategy development and part of

7    the team negotiating.

8    Q.   What was the strategy?

9    A.   We wanted to, No. 1, secure supply; No. 2, we wanted to

10   limit to the degree possible the anticipated cost increases;

11   and then if at all possible, we wanted to move volume away from

12   Pilgrim's and into other suppliers.

13   Q.   Why did RSCS want to move volume away from Pilgrim's?

14   A.   Pilgrim's -- Pilgrim's was at that time the largest COB

15   supplier.  They had been an even larger volume supplier

16   historically, but we believed that they still had a higher

17   share of our business than we were comfortable with.  And

18   certainly they were leveraging that position as the -- the

19   leading supplier to the best of their ability.

20   Q.   Did price also factor into how RSCS determined how to

21   allocate its volume?

22   A.   Absolutely.

23   Q.   How so?

24   A.   Well, all other things equal, meaning supplies -- securing

25   the supply, meaning the performance historically of how the --

Richard Eddington – Direct

1    the suppliers filled their loads, equality issues that the

2    brand KFC may have, all things aside, with that -- or all sides

3    equal, then certainly we would try to allocate loads to the --

4    to any lower-priced suppliers first.

5    Q.  And in allocating volume, generally, not just in 2014 but,

6    you know, at your time at RSCS, did the higher-priced suppliers

7    lose volume?

8    A.  More often than not, yes.

9    Q.  And would RSCS allocate volume to the lower-priced

10   suppliers?

11   A.  Whenever possible, yes.

12   Q.  Are you aware of whether KFC actually purchased all of the

13   chicken allocated to the suppliers in the 2015 contract?

14   A.  We did not.

15   Q.  So KFC did not purchase all of the loads that were

16   allocated for '15, '16, and '17 from the suppliers?

17   A.  That's correct.

18   Q.  So since they didn't purchase all of the loads, the

19   suppliers -- KFC did not pay the suppliers for the volume

20   allocations in those contracts; is that correct?

21        MS. WULFF:  Objection, Your Honor.  Leading.

22        THE COURT:  Sustained.

23   BY MS. RAHMAN:

24   Q.  Do you know whether KFC paid the suppliers for the volume

25   allocations in those contracts?

Richard Eddington – Direct

1    *A.*  KFC only pays for product that KFC purchased and uses in

2    their system.

3    *Q.*  And did KFC buy all of the volume allocated in the 2015

4    contract?

5    *A.*  We did not.

6    *Q.*  Do you view the suppliers as competitors?

7    *A.*  Yes.

8    *Q.*  What are they competing for?

9    *A.*  They're ultimately competing for the privilege to sell

10   chicken to KFC in terms of price and volume.

11   *Q.*  And generally, during the negotiations, what's your goal?

12   *A.*  Our goal is to, first and foremost, ensure that KFC has the

13   supply they need, when they need it, it -- at the lowest

14   possible price, and by product that is -- that meets KFC

15   specifications, and hopefully with suppliers who are willing to

16   partner with the brand on any promotional activity or in some

17   cases, you know, development of new or changing products.

18   *Q.*  And how does RSCS meet those goals?

19   *A.*  By ultimately finding the best partner -- supplier partners

20   we can and making the best possible deals with those partners.

21   *Q.*  Do you give feedback to the suppliers on their pricing

22   models during the negotiations?

23   *A.*  Yes.

24   *Q.*  What kind of feedback do you give?

25   *A.*  Earlier in the negotiations, because there are usually

Richard Eddington - Direct

1    multiple rounds of negotiations, we would give -- at least I

2    would give more directional feedback, such as, your range of

3    percentages -- range of percentage, say, 12 to 15 percent too

4    high or -- you might be -- I like to use the phrase, you're

5    silver change out of the money, and it was up to them if I was

6    talking about a nickel or a quarter or whatever in between.

7              As the negotiations got into the final rounds, we

8    would be a little more specific or targeted with our feedback,

9    sometimes asking if a supplier could get to a specific price or

10   asking for a specific reduction in price.

11   Q.  Would you tell a supplier what they needed to do to get a

12   certain amount of loads or win business?

13   A.  Sometimes, yes.

14   Q.  Was the first bid you received from a supplier, did RSCS

15   consider that the final bid?

16   A.  No.

17   Q.  Why not?

18   A.  Because, again, there are usually multiple rounds.  And in

19   my sales and procurement background covering a lot of years, I

20   can't recall a situation where the first bid price that I

21   either gave or received ended up being specifically the final

22   price.

23   Q.  With --

24         MS. RAHMAN:  I'm sorry, go ahead.

25         THE COURT:  Can you look for a convenient breaking

1    spot?

2           *MS. RAHMAN:*  Your Honor, this is just fine.

3           *THE COURT:*  Okay.  Ladies and gentlemen, we'll take

4    our lunch break.  Let's plan on reconvening the same time we

5    usually do, 1:30.  Keep the admonitions in mind, avoid being

6    trampled if you go down towards the mall, and I'll see you back

7    at 1:30.

8           (Jury out at 11:59 a.m.)

9           *THE COURT:*  Thank you, Mr. Eddington.  You're excused

10   until 1:30.

11          *THE WITNESS:*  Thank you.

12          *THE COURT:*  Everyone else may be seated.

13          All right.  So it seems like we have two issues to

14   discuss.  One is the jury instruction that Ms. Carwile tendered

15   yesterday evening.  The second is the Government's brief on

16   rebuttal testimony by Mr. Bryant.

17          We could talk about those now; we can talk about those

18   issues at 1:15, whatever.

19          *MR. HART:*  The Government requests at 1:15.  Ms. Cheng

20   will be here at 1:15.

21          *THE COURT:*  For the jury instruction issue?

22          *MR. HART:*  Yes.

23          *THE COURT:*  Any problem with that?

24          *MS. CARWILE:*  No, Your Honor.

25          *THE COURT:*  Let's talk about that at that time.  I

1    think that should be sufficient time to talk about both.

2              Mr. Feldberg, you raised a finger.

3              *MR. FELDBERG:*  Thank you, Your Honor, but nothing from

4    me.  Thank you.

5              *THE COURT:*  We'll reconvene at 1:15.  Thank you.

6              (Recess at 12:01 p.m.)

7              (In open court at 1:16 p.m.)

8              *THE COURT:*  We're going to talk about the jury

9    instructions and then about Mr. Bryant.

10             *MS. CARWILE:*  Thank you.  I'm going to stay away from

11   that side of the bench so I can remain in my seat.

12             I would like to start off by acknowledging that the

13   cases I cited to support the language in the instruction

14   obviously do not contain quotes from those cases.  They're not

15   antitrust cases.  They don't have precedential binding value on

16   the court.  I understand that, but they were included only

17   because some of the reasoning is somewhat analogous to the case

18   here.

19             I think the more important point, though, is that we

20   look at what has actually occurred in this particular trial,

21   and I think a change in circumstances in this trial warrants

22   the added language.

23             The first change in circumstances, the Government only

24   called four fact witnesses in this case, unlike in other

25   trials.  And three of those were customers from RSCS.

 1          And the second changed circumstance is the inordinate

 2     focus that the Government has -- well, the fact that the

 3     Government has inordinately focused on the customers' desire

 4     for confidentiality in RSCS's bidding process.  All four of the

 5     fact witnesses, including Mr. Bryant, who is, obviously, not an

 6     employee of RSCS, testified extensively about blind bids,

 7     multiple discussions about one-on-one communications between

 8     customer and buyer, the pro customer reasons for the

 9     confidential bid, all of that.

10          In fact, Sara Fisher on her redirect was specifically

11     asked if she had ever disclosed where feedback information had

12     come from, she said no, and was asked why, and she answered,

13     because that's part of the blind-bidding process where we want

14     everything to stay confidential to negotiate.  At which point,

15     I objected, and the Court overruled the objection, and she

16     finished her answer, We want everything to remain confidential

17     so it creates competition, and we can deliver the lowest-landed

18     cost to our restaurants.

19          I think it's been made clear in this trial that the

20     Government is intending to use even more so than it has in

21     prior trials the fact that RSCS wanted its bidding process to

22     be confidential, to somehow intimate or argue that the

23     defendants here violated the Sherman Act.  But the Court has

24     already ruled, and it has been made perfectly clear throughout

25     these trials that this is a *per se* -- the allegation by the DOJ

1    is that this is *a per se* violation of the Sherman Act.  The

2    Court is well aware of that.

3         And I will quote from a previous trial, Mr. Barry

4    Pollack, that it is, quote, irrelevant whether that agreement

5    had pro-competitive effects and irrelevant whether it had

6    anticompetitive effects.  And those rulings were made based on

7    that legal grounding.

8         So the concern for the defendants is that there is

9    currently no information in the jury instructions that

10   addresses this issue.  And I'll -- I have provided potential

11   draft language.  Obviously, if the Court takes issue with any

12   of it, I'm open to changing it -- we're open to changing it.

13   But the concern is that the Government is going to either

14   directly or -- argue either directly or indirectly that the

15   potential violation of RSCS's confidentiality resulted in a

16   less competitive price, and given that likely line of argument,

17   I believe the defendants are entitled to a correct statement of

18   the law, which I have attempted to write -- draft in this jury

19   instruction.

20        The concern in terms of simply arguing it to the jury

21   without the benefit of a jury instruction is, as the Court

22   knows, the words of the attorneys are not evidence, they're not

23   the law, the jury is only to listen to the Court when it comes

24   to legal instruction.  And without a legal instruction of this

25   type, they're left to potentially confuse the importance or the

1    relevance of that testimony, especially given how much the

2    Department of Justice has focused on asking every witness many

3    questions about that.

4          So, certainly, as I started -- when I started, I said,

5    you know, there may not be precedent on point in the case law,

6    but I think it's relatively inarguable that the way I have

7    drafted the language is essentially what the law says, and I

8    think there is a true concern about confusion of the issues and

9    potentially misleading the jury about what the law is without

10   it.

11         Thank you.

12         *THE COURT:*  All right.  Thank you, Ms. Carwile.

13         Response, Ms. Cheng.

14         *MS. CHENG:*  Your Honor, I think the dispute at the

15   heart of what we're talking about here has been well trodden.

16   The Government's position remains that the blind-bidding

17   process is, of course, relevant to the terms of how competition

18   takes place within this industry.  And any concerns to the

19   extent the defendants have about potential confusion or

20   overstatement of the importance of some of this evidence has

21   already been addressed via motions in *limine* and the Court's

22   other rulings, which are meant to already keep out stuff that

23   is unduly prejudicial under the 401, 403 weighing test.  So I

24   think the factual predicate for why this instruction is

25   necessary is not here.

1          And, second, the fact that there is no precedent here

2     is very telling.  In both of these cases, I believe Ms. Carwile

3     admitted that they're not antitrust cases, but they're so far

4     afield of the situation we're dealing with.  The D.C. Circuit

5     case is about a personal representative of a shooting victim's

6     estate, who sued the District of Columbia in order to recover

7     damages for the death of a victim who was shot by a police

8     detective.  And the question here was in response to a

9     motion -- the issue the D.C. Circuit was confronting is whether

10    the court properly exercised its discretion to exclude a

11    report, which concluded by -- via an internal policy that the

12    deadly force was inappropriate.  So that's the type of case

13    law --

14         *THE COURT:*  Right.  The case law is distinguishable.

15    But I guess Ms. Carwile is worried that the Government is going

16    to argue that the suppliers' -- the defendants', I should say,

17    violation of the rules of the blind-bidding process is evidence

18    of a Sherman Act violation.  Is the Government going to argue

19    that?

20         *MS. CHENG:*  We would not argue that that would be

21    evidence of a violation of the law merely because of the

22    customers' expectation standing alone.  The jury has all of the

23    elements set forth very clearly in these jury instructions.  It

24    requires an agreement, it requires very specific --

25         *THE COURT:*  An agreement to do what?

1          MS. CHENG:  An agreement to fix prices, as defined in

2    the --

3          THE COURT:  What about an agreement to violate the

4    rules of the blind-bidding process?

5          MS. CHENG:  That would not on its own qualify as the

6    type of agreement that would violate the Sherman Act here

7    but --

8          THE COURT:  When you say "not on its own," what do you

9    mean?

10         MS. CHENG:  I mean, we certainly -- our position

11   remains, of course, that customer want or desires and

12   understanding of the blind-bidding process, that is part of

13   important factual background information in this case for the

14   jury to understand the type of competition that was taking

15   place, to understand, you know, what is blind bidding, what is

16   bidding, et cetera, in this particular industry.  It is not

17   going to be essential for an element of the case that we need

18   to prove.

19         THE COURT:  But you think it's relevant to an element

20   of the case?

21         MS. CHENG:  Well, the position is that it is relevant,

22   but Your Honor has already excluded the pieces of evidence that

23   we know that the Court might think is irrelevant.  So to the

24   extent that there is even anything in the record, we're -- that

25   certainly won't be a concern because Your Honor has already

1    ensured that those pieces of evidence are not included.  We

2    don't have policy violations that we're planning to argue, for

3    example.  And we're not planning to talk about any rules being

4    violated, as opposed to simply arguing that competition will be

5    reduced in the context of this blind-bidding process.

6            THE COURT:  It will be reduced because of the

7    blind-bidding process?

8            MS. CHENG:  Sorry, Your Honor.  May we have a moment?

9            THE COURT:  Sure.

10           (Off-the-record discussion.)

11           MS. CHENG:  Your Honor, so we aren't arguing here that

12   violations of the rules constitute bid rigging or violations of

13   customer expectations constitute bid rigging.

14           THE COURT:  What about if you violate -- if the

15   defendants violated the rules of the blind-bidding game and as

16   a result reduced competition, does that then constitute some

17   type of a Sherman Act violation?  Is that going to be argued?

18           MS. CHENG:  That's not going -- it's not going to be

19   our argument that there are any rules being violated at all;

20   our argument will be that there is an agreement among the

21   competitors to fix prices.  We're not going to approach it from

22   the angle of did they break certain rules or not.  That's not

23   our intention.  Frankly, I believe this Court has already kept

24   out evidence that would go towards customer rules and

25   expectations and company policy, et cetera.

1           If I can make one more quick point here.  I have a

2    Tenth Circuit case from 1992.  This is *United States v.*

3    *Reicher*.  And in that case -- this was a criminal bid-rigging

4    case.  The criminal --

5           THE COURT:  Do you mind spelling that or giving a

6    citation, just so we have it?

7           MS. CHENG:  Of course.  This is *US-v-Reicher,*

8    R-E-I-C-H-E-R.  This is at 983 F.2d 168.  And in that case, the

9    Court affirmed the conviction of a bidder who was convicted by

10   the jury of conspiring to rig bids.  And the Court, at least in

11   dicta, talked about the expectations of the bidder in that case

12   as being relevant to why -- to why the conviction should be

13   upheld.  Of course, that's not even the path that the

14   Government intends to go down, but I'm just using this case to

15   illustrate, even as a matter of law, that it's -- maybe more of

16   a question of -- as a matter of law, that the addition is not

17   correct.

18          And the Court has said in this Tenth Circuit case, The

19   lab was obliged to consider all of the bids it received and was

20   entitled to assume that bids actually submitted were bona fide.

21   In a negotiated contract, it would have scrutinized the cost in

22   a matter presumed to be unnecessary when there were competitive

23   bids.  As a result, these defendants through their agreement

24   were able to manipulate the bidding and lull the lab -- which

25   is the victim -- into the belief it had the benefit of true

1    competition, having bid on the job and having created the

2    appearance of legitimate competition in an open bidding

3    process, they cannot now escape the inevitable conclusion in

4    that case that what they did in that case was, in fact,

5    something they should have been convicted for.

6           I think in the case law there is certainly some

7    support for the idea customer expectations are irrelevant.  But

8    regardless of that -- and I know that this is well-trod ground

9    already in this case -- the Government does not intend to argue

10   that rules are being violated and, therefore, there is a loss

11   of competition here.

12          THE COURT:  Well, if that's true, then why not -- then

13   do you oppose the language that the defense suggests?

14          MS. CHENG:  Well, I -- we do continue to oppose, Your

15   Honor, because it implies that, you know, a customer's wants or

16   desires, that there is stuff in evidence now that is

17   irrelevant.  And to the extent that there is any of it that is

18   irrelevant, it would have been excluded under 401 in the first

19   instance or 403 because it was unduly prejudicial.  It's

20   superfluous and confusing, and I think it infringes on what

21   types of inferences the jury is permitted to make within the

22   bounds of the actual law which is in other paragraphs of this

23   very instruction.

24          THE COURT:  Thank you.

25          Ms. Carwile.

2450

 1          *MS. CARWILE:*  Your Honor, I would just note that if

 2    the Government isn't intending to argue that rules were

 3    violated and, therefore, there is some relevance to them, I'm

 4    not sure why every single witness, including defense witnesses,

 5    has been asked many questions about the confidentiality and

 6    why -- and what the purpose is over the course of this two-week

 7    trial.  I think that there was some hesitation in what the

 8    Government will be arguing in that response that still concerns

 9    me.  And I agree with the Court that if the Government is not

10    intending to argue anything to that effect, I don't see the

11    harm in this very clearly correct language in the instruction.

12          And if the Court has issues with any of the wording,

13    we are open to changing it.  And I'll just leave it there.

14          *THE COURT:*  All right.  Thank you.

15          I'm going to reject that paragraph.  The fact of the

16    matter is that other language in the instruction -- in fact, in

17    the paragraph immediately above it -- preclude -- at least I

18    think would keep the jury from being confused about the

19    testimony.  There was a lot of questions that were being asked

20    about that.  But as Ms. Cheng articulated, there is some

21    relevance to it.  It doesn't in and of itself indicate a

22    violation of the Sherman Act, and the jury won't be confused

23    about that, because it says at the top of the page of the

24    tendered instruction, It is not unlawful for competitors to

25    meet and exchange information necessary to -- I'm not sure --

1    hopefully the instruction doesn't say this -- but necessary --

2    maybe it does -- necessary to preparation of a bid or discuss

3    common aims or objectives or to exchange information on

4    independently derived prices.

5         And then it goes on to say, it's not illegal for a

6    competitor to obtain, rely upon, and act on pricing and other

7    information received from competitors, et cetera, et cetera.

8    All of those would provide a basis for the defendants to point

9    out to the jury that simply not following the blind-bidding

10   rules that some particular customer established does not meet

11   the definition of the violation charged against the defendants.

12        So ultimately, that language, I find, is not needed,

13   and I think it could be confusing -- be more confusing to the

14   jury, because I think, once again, Ms. Cheng is right, the

15   first sentence, you know, essentially tells the jury that some

16   of the information that came into the trial is just irrelevant.

17   As Ms. Cheng point out, it has some relevance; it just doesn't

18   by itself constitute a violation of the Sherman Act as the

19   instruction that it is being proposed to be part of already

20   indicates.

21        So, of course, Ms. Carwile on behalf of Mr. Austin can

22   tender this, but that proposed language I'm going to reject.

23        *MS. CARWILE:*  Can you repeat the last sentence?

24        *THE COURT:*  Yeah.  When we have our final jury

25   instruction conference, which will probably take place on

1       Tuesday, you can obviously tender this as an instruction.

2              MS. CARWILE:  Understood.

3              THE COURT:  But I'm going to reject that proposed

4       language.

5              MR. FAGG:  Just for point of clarification, there were

6       other objections, other than what Ms. Carwile was tendering in

7       our view -- Mr. Lovette would obviously join in.

8              THE COURT:  I said, theoretically, if Mr. Hart or

9       anyone else issued, it could be tendered at the final jury

10      instruction conference.  It hadn't been tendered yet.  I'm

11      saying, formally, if anyone wants to tender it, that is, of

12      course, appropriate so we can make an adequate record as to

13      this particular language.

14             MR. FAGG:  Okay.

15             THE COURT:  We don't have time to talk about the

16      Bryant issue right now.  Let's play it by ear.  We're going to

17      be having a break after Mr. Eddington, as we had discussed

18      yesterday.  Maybe we can make that break a little bit longer if

19      we need to to talk about Mr. Bryant.

20             MR. TUBACH:  The only thing we want to do after

21      Mr. Eddington is introduce documents without a sponsoring

22      witness.

23             THE COURT:  I believe it was Mr. Beller who made the

24      suggestion that there would -- defense counsel may want an

25      opportunity to confer with their clients.

1      MR. TUBACH:  Yes.  We can do that before or after the

2  document --

3      THE COURT:  It doesn't matter to me, obviously.  I

4  appreciate you letting know there are also some documents to

5  move the admission of.  Is there any preference, after

6  Mr. Eddington, should we take that break, or do you want to go

7  ahead with the introduction of some documents, or do you want

8  me to play it by ear by the clock?

9      MR. TUBACH:  Play it by ear.  Depending on the break,

10  that may be a natural spot.

11      THE COURT:  Ms. Cheng.

12      MS. CHENG:  I was going to flag an issue not for

13  discussion now but perhaps later.

14      THE COURT:  Go ahead.

15      MS. CHENG:  I'm flagging Instruction No. 22 on the

16  statute of limitations.  I believe in our discussion last time

17  with the Court, the Court had agreed to insert language from

18  our prior response to the jury, which is just to confirm that

19  it's not necessary that the Government prove that each

20  defendant performed some act in furtherance of the conspiracy,

21  and I have the page citation of the Court's ruling if that

22  would be helpful.  We can discuss on Tuesday if necessary.

23      THE COURT:  Yeah.  The first paragraph -- sorry, first

24  sentence of the fourth paragraph was what I had been -- that is

25  what I was contemplating.

Richard Eddington - Direct

1          MS. CHENG:  Could you say that one more time?

2          THE COURT:  First sentence of the fourth paragraph in

the version that I handed out of the June 30 --

4          MS. CHENG:  I see.  Thanks, Your Honor.  I realize

that I'm looking at the wrong number here.

6          THE COURT:  Did everyone get the new packet I was --

okay.

8          MS. CHENG:  I see it now, Your Honor, sorry.

Apologies for that.

10          THE COURT:  No problem.  Let's go ahead and bring the

jury back in.

12          MS. RAHMAN:  Your Honor, should I bring Mr. Eddington

back in?

14          THE COURT:  That would be great.  Thank you.

15          (Jury in at 1:37 p.m.)

16          THE COURT:  Thank you.  Please be seated.

17          Ms. Rahman, whenever you're ready, go ahead.

18          MS. RAHMAN:  Thank you, Your Honor.

19                    **DIRECT EXAMINATION CONTINUED**

20  BY MS. RAHMAN:

21  Q.   Welcome back, Mr. Eddington.

22  A.   Thank you.

23  Q.   Before we broke for lunch, we were talking about whether

24  RSCS expected the initial bid from the suppliers to be their

25  final bid.  Was RSCS's counterproposal their final offer?

Richard Eddington - Direct

1   A.   No.

2   Q.   And why was that?

3   A.   Well, it's a negotiation.  You're always trying to ask for

4   more than you expect to give, at least in the -- 99 percent of

5   the cases.

6   Q.   When you were providing feedback to the suppliers and you

7   used the term "competitive price," what did that mean?

8   A.   In most instances, a competitive price is either the price

9   that the lowest supplier -- the lowest bid we have received

10  would be, or in some cases, if we were talking to the supplier

11  who had submitted that lowest bid, then we might even slightly

12  embellish or lead them to believe that there was a lower price

13  than they had submitted, a bluff.

14  Q.   So you push back on the supplier with the lower price -- or

15  would you push back on the supplier with the lowest price?

16  A.   Yes.

17  Q.   Did you use volume as a negotiating tool?

18  A.   Yes.

19  Q.   What does that look like?

20  A.   Depending upon the circumstance and depending upon what we

21  believed the supplier wanted out of the negotiations, if we

22  believed a supplier was interested in increasing their volume

23  with KFC, then we would certainly try to offer additional

24  volume in return for a lower price.

25  Q.   Now, during your negotiations with Claxton, did they

Richard Eddington - Direct

1   respond to this feedback?

2   A.  They did.

3   Q.  Now, you just mentioned a bluff.  What is bluffing in the

4   context of contract negotiations?

5   A.  I mean, generally speaking, you would like for your

6   negotiating opponent to believe that your position is slightly

7   stronger than maybe it is.

8   Q.  Are you aware of suppliers bluffing?

9   A.  Yes.

10  Q.  Did you bluff?

11  A.  Yes.

12  Q.  Are you aware of others on your team bluffing?

13  A.  Yes.

14  Q.  What did that look like?

15  A.  It could be, as mentioned, feedback that we gave.  It could

16  be in the form of a written communication discussing, you know,

17  where we were in the negotiations that we weren't necessarily

18  at that point.  Things of that nature.

19          MS. RAHMAN:  Could we pull up Exhibit 1801?

20          Your Honor, this has already been admitted, so if we

21  could publish that to the jury, I would appreciate it.

22          THE COURT:  Yes, you may.

23          MS. RAHMAN:  Thank you.

24  BY MS. RAHMAN:

25  Q.  Mr. Eddington, do you recognize this document?

Richard Eddington - Direct

1   A.   I do.

2   Q.   Were you copied on this document?

3   A.   I was.

4   Q.   What is this?

5   A.   This is an email that Pete Suerken sent out to the bidding

6   suppliers for our -- in our 2017 negotiations for the calendar

7   year 2018 through 2020 supply, where he is telling them that we

8   had already purchased some amount of volume and, essentially,

9   how the rest of the negotiations were going to go.

10  Q.   Had RSCS purchased some volume in the initial meetings?

11  A.   At that point, no, we had not.

12  Q.   Was this an example of bluffing by Mr. Suerken?

13  A.   I would say so, yes.

14  Q.   Would you bluff on prices that you already had in the door?

15  A.   Yes.

16  Q.   Now, did RSCS generally want to have prices in as close a

17  range of possible?

18  A.   To the degree possible, yes, we did.

19  Q.   And why was that?

20  A.   Because our system did not have the ability to blend

21  multiple prices into one, say, national price that all stores

22  would pay.  So whatever supplier was -- was in the -- was

23  supplying to the distribution center that any given store

24  purchased from, their particular price would flow through into

25  those stores.  And as we had a lot of franchisees who had

Richard Eddington – Direct

1    stores in multiple parts of the country, they would see these

2    various prices.  And if there was what they perceived to be a

3    significant difference in the price, then they would complain.

4    And, of course, they would ask that all of their stores receive

5    the lowest possible price, which, of course, was impossible to

6    do.

7    Q.  You mentioned a blended price.  What does that mean?

8    A.  A blended price would be, if we had seven suppliers, they

9    had seven individual prices that we averaged into one price

10   that all would pay, versus having seven prices in the system.

11   Q.  Now, did you use the feedback we were just talking about to

12   narrow the range of pricing between the suppliers?

13   A.  When possible, yes.

14   Q.  Switching gears.  You worked for a lot of suppliers?

15   A.  Yes.

16   Q.  When you worked for those suppliers, did you discuss

17   pricing information with other competitors?

18   A.  No.

19   Q.  While you worked at RSCS, did you ask suppliers to discuss

20   their bids or pricing proposals with each other?

21   A.  No.

22   Q.  Now, Mr. Eddington, I've asked you to do some math before

23   the break, and I -- to refresh your recollection, I had asked

24   you to multiply that 3 cents in the Claxton contract to see

25   what the impact would be across a year, and you had mentioned

Richard Eddington - Direct

1    that you multiplied that by 13 for period pricing.  Should that

2    have been multiplied by 13 or, since it's a weekly price, by

3    52?

4    A.  Can you pull the document back up?

5    Q.  I sure can.

6         MS. RAHMAN:  Can we pull up Exhibit 1119, please.

7         Actually, I'm sorry.  I want to pull up F-754.  If we

8    could go to the page with the volume on it, which I believe --

9    thank you.  You're a step ahead of me.

10   BY MS. RAHMAN:

11   Q.  If we were trying to determine what the impact of a 3 cent

12   reduction would be, what would be the multiplication --

13   A.  My apologies.  I took that by the period, and that should

14   have been -- that was a weekly volume.  So 536,000 pounds per

15   week of eight-piece is 27,872,000 pounds per year, times two is

16   55,744,000 pounds.  And at 3 cents a pound, that's $1,672,320

17   over the course of two years.  My apologies.

18   Q.  No.  That's why I asked you to do the math and not me.

19   Thank you.

20        Okay.  We're going to switch gears again, and I'd like

21   to talk to you about the negotiations in 2017 for the 2018

22   contract.

23   A.  Okay.

24   Q.  First, though, I want to ask, are you familiar with period

25   pricing?

Richard Eddington - Direct

1   A.   I am.

2   Q.   What is period pricing?

3   A.   In the Yum system, instead of having a monthly price, they

4   divided the calendar year into 13 four-week periods.  So as it

5   relates to chicken on the bone, COB, each period was considered

6   its -- its own pricing segment.

7        MS. RAHMAN:  Could we please pull up Exhibit I-054.

8        Your Honor, I believe this has already been

9   published -- admitted.  I'd ask that it be published, please.

10       THE COURT:  Yes, you may.

11       MS. RAHMAN:  Thank you.

12   BY MS. RAHMAN:

13   Q.   Mr. Eddington, do you recognize this document?

14   A.   Yes, I do.

15   Q.   What is this?

16   A.   This was an internal RSCS report, it's reflective of

17   period 2 in 2017, that my team would have put together showing

18   all of the COB prices across all of our suppliers for that

19   period.

20   Q.   And this would be the period -- would this be the period

21   pricing of the suppliers in February 2017?

22   A.   Yes, the dates might overlap slightly with a calendar, but,

23   yes.

24   Q.   What was Claxton's period 2 price?

25   A.   For eight-piece?

Richard Eddington - Direct

1    *Q.*  Yes.  Thank you.

2    *A.*  Was 99.43 cents per pound.

3    *Q.*  Great.

4          *MS. RAHMAN:*  We can take that down.

5    *BY MS. RAHMAN:*

6    *Q.*  Now, were you involved in 2017 on behalf of RSCS in

7    negotiations for the 2018, 2020 KFC contract?

8    *A.*  I was.

9    *Q.*  And what was your role?

10   *A.*  At that point in time, Pete Suerken started the

11   negotiations, along with me.  He left the company in February

12   of 20 -- 2017, so I took the lead completely at that point in

13   those negotiations.

14   *Q.*  And we just looked at Claxton's eight-piece price on F-754.

15   Was Claxton's eight-piece price on 754 their contract price

16   going into the negotiations?

17   *A.*  It wasn't the number that was reflective on that paper, no.

18   *Q.*  Not the -- let me pull up --

19          *MS. RAHMAN:*  Mr. Brian, could you pull up F-754.

20          Your Honor, that's been admitted, and we've published

21   it already.  If I could publish it again.

22          *THE COURT:*  You may.

23          *MS. RAHMAN:*  Thank you.

24   *BY MS. RAHMAN:*

25   *Q.*  Mr. Eddington, was this Claxton's contract price at the

Richard Eddington - Direct

1    time of the negotiations in 2017?

2    A.   Yes, that was the contract price.

3    Q.   And that price was what?

4    A.   $1, 3.69 cents per pound.

5    Q.   And we just looked at their period 2 pricing at that time.

6    A.   Correct.

7    Q.   So what accounts for the difference --

8             And we can take that down.  Thank you.

9             What accounts for the difference between the period 2

10   pricing we just looked at and that contract price?

11   A.   Grain.

12   Q.   Can you explain that?

13   A.   Yes.  Grain, corn, and soy meal, in particular, are the

14   largest input costs into growing a chicken.  And RSCS managed

15   the grain -- we worked with the suppliers and their commodity

16   teams, so that the model was set up for us to hedge our own

17   grain through their books.  And on any given period, depending

18   on where the grain hedges were, that could impact the final

19   price by several cents a pound.

20   Q.   And did all of the suppliers have the same input for grain

21   and feed?

22   A.   Not necessarily.

23   Q.   Can you explain how that would vary?

24   A.   In some cases, we had agreements with suppliers that would

25   allow us to hedge that grain farther out than others.  Some,

Richard Eddington - Direct

1  for example, limited us to no more than nine months or a year

2  out front.  Others potentially would let us go 15 months or

3  more, depending upon the liquidity of the market in the future,

4  and at times, depending upon what our ability was to hedge that

5  grain, there could be some significant differences in what the

6  suppliers actually booked on our behalf.

7  Q.  So during the negotiations, how would RSCS account for

8  these variations in grain and feed among all of the suppliers?

9  A.  We neutralized the grain by giving the suppliers the

10  numbers to plug into the model for corn and soy meal.

11  Q.  Now, once you negotiate a COB contract price, how does that

12  contract price change throughout the year, if at all?

13  A.  Aside from the grain that we just mentioned, there is also

14  freight and basis on that grain, what it takes to get that

15  grain to the suppliers' feed mill.  That could change.  There

16  were feed conversion rates, in other words, how much chicken

17  feed a chicken had to eat in order to grow an extra pound of

18  live weight.  Sometimes those numbers could change.  The cost

19  of other feed ingredients which the suppliers managed could

20  change.  Those were the major drivers that would change during

21  the course of a contract period.

22  Q.  And did all of the other costs in the model stay the same

23  throughout the contract period?

24  A.  Yes.

25  Q.  Okay.  Back to the negotiations.  Who was on your team at

2464
Richard Eddington - Direct

1    RSCS for these negotiations in 2017?

2    *A.*  As mentioned, Pete Suerken started and then left during the

3    negotiations.  On my team reporting to me were Sara Fisher,

4    Steve Campisano, and Carol Knight, still.

5    *Q.*  And what were their roles at that time with respect to the

6    2017 negotiations?

7    *A.*  Sure.  Steve Campisano had become the further --

8    further-processed poultry category manager, so he had a

9    lessened influence into -- into the 2017 negotiations.  Sara

10   Fisher had moved into procurement within or approximately a

11   year prior to these negotiations, and she was now the COB or

12   chicken-on-the-bone category manager, so she was doing a lot of

13   the initial -- would be setting up meetings, gathering data,

14   receiving the bids from the suppliers, putting information

15   together.  And Carol retained her same administrative job as

16   previously outlined.

17   *Q.*  When you say further processed, what do you mean by further

18   processed?

19   *A.*  In KFC terms, that would be the chicken tenders, it would

20   be popcorn chicken, chicken breast fillets for sandwiches,

21   anything of that nature.  Essentially anything that wasn't an

22   eight-piece or supplemental parts to the eight-piece chicken on

23   the bone.

24   *Q.*  Is that negotiated separately from the COB?

25   *A.*  Yes.

Richard Eddington - Direct

1    *Q.*   When did the negotiations begin for the 2018 contract?

2    *A.*   We -- we initially engaged with the suppliers in December

3    of 2016, letting them know that we wanted to set up meetings in

4    early 2017.

5    *Q.*   Did these negotiations start earlier than in previous

6    years?

7    *A.*   Much earlier.

8    *Q.*   And why was that?

9    *A.*   We saw an opportunity to try to get ahead of our

10   competition, and, you know, anybody who was also trying to buy

11   these COB birds or this size birds, and -- and we felt that

12   some of those had -- those competitors had probably stayed on

13   one-year contracts, so we were on a three-year contract.  At

14   that time, the market landscape had also changed back towards

15   KFC's favor.  So, certainly, we wanted to start early in order

16   to have the best choice of the available loads, as well as

17   hoping to claw back some of those high prices from the --

18   ending in this current contract for the balance of the 2017

19   year.

20   *Q.*   What do you mean about the market conditions had changed

21   back to KFC's favor?

22   *A.*   KFC was no longer purchasing or needing as many pounds or

23   loads of eight-piece of COB at that point in time, partially

24   because of mix shift within their sales, partially because of,

25   you know, just some, you know, additional stores had closed

2466

Richard Eddington - Direct

1   over the previous years, that -- and so, therefore, we did not

2   need to buy as much.  But also we had a new supplier that had

3   entered the mix during the course of, I believe it was 2016, so

4   we believed that there was more supply available.

5        The large birds, which were so much more profitable

6   and we were so concerned about in 2015, we weren't as concerned

7   about suppliers moving into that space in 2017 because there

8   had been multiple new plants either built or being built to

9   take some of that extra -- to take that demand.  And, frankly,

10  the largest concern we had was that our competitor,

11  Chick-fil-A, continued to need additional plants.

12       But all in all, including that we felt that our

13  relationships were much improved and that we were in a better

14  place with our suppliers over the course of between 2014 and

15  then 2017, we felt that it was in our best interest to go ahead

16  and go early and see how much we could pull back.

17  Q.  You mentioned mix shift.  Can you explain what you mean by

18  mix shift?

19  A.  The sales for KFC were trending more towards the tenders --

20  the boneless-type items, the popcorn chicken, the tenders,

21  chicken sandwiches, that type of thing, and less towards the

22  bone-in chicken.

23  Q.  Did you have initial meetings with the suppliers prior to

24  receiving prices for this contract?

25  A.  We did.

Richard Eddington - Direct

1   Q.   Was any pricing exchanged at these initial meetings?

2   A.   No.

3   Q.   Okay.  Did RSCS schedule the initial meetings with the

4   suppliers?

5   A.   We did.

6   Q.   Was there any strategy that RSCS used in scheduling these

7   initial meetings?

8   A.   Yes.

9   Q.   What was that?

10  A.   We set the meetings up wherever possible in a particular

11  order so that the first -- the earlier meetings would be with

12  suppliers that we believed would be more accepting and

13  responsive to our message that this time the price was going to

14  come down instead of going up, and that we weren't going to

15  need quite as much eight-piece as we had bought the last

16  contract.  So we wanted them to hear that and prepare their

17  bids accordingly.

18          And we also thought that maybe by the time that the

19  suppliers we felt would be more resistant to that message came

20  in for their meetings, that any normal course of business

21  conversations that may take place among suppliers, that that

22  message would migrate its way into some of these more resistant

23  suppliers so that they would have already heard that by the

24  time they came to our meeting and be prepared.

25  Q.   When you say more resistant suppliers, were there any

2468

Richard Eddington – Direct

1   suppliers in particular you're referring to?

2   A.   Pilgrim's.

3   Q.   Where was Pilgrim's scheduled that year?

4   A.   I believe they were the last meeting that we scheduled.

5   Q.   As part of the bidding process, did RSCS consider the

6   identity of the suppliers that were bidding on COB

7   confidential?

8   A.   No.

9   Q.   Did you negotiate with Scott Brady on behalf of Claxton in

10  2017?

11  A.   I did.

12  Q.   And had Claxton's strategy of wanting to be in the middle

13  changed at all?

14  A.   No.

15  Q.   Now, you talked about the volume changing for KFC.  Does

16  that impact the negotiations in any way?

17  A.   It did, from the standpoint that we weren't as concerned

18  about how we were going to secure supply.  We felt that we

19  could pick and choose which loads we purchased more freely in

20  2017 than we had the ability to do in the previous contract.

21  Q.   Okay.  Were you still able to use volume as a negotiating

22  tool?

23  A.   Yes.

24  Q.   Now, in those initial meetings, was the message you

25  delivered to the suppliers any different between all the

Richard Eddington – Direct

 1   suppliers?

 2   *A.*   No.

 3   *Q.*   During the 2017 negotiations, was there a particular price

 4   per case that you were trying to get the suppliers to agree to?

 5   *A.*   As the negotiations went on, we targeted $49 per case as

 6   the target.

 7   *Q.*   Did you communicate this to Mr. Brady?

 8   *A.*   I did.

 9   *Q.*   Do you know when you communicated it to Mr. Brady?

10   *A.*   Would have been mid to late February of 2017, but I don't

11   remember the exact date.

12   *Q.*   Is there a document that I could show you that would

13   refresh your recollection?

14   *A.*   Potentially.

15         *MS. RAHMAN:*   Could we pull up Exhibit F-917, please,

16   just for Mr. Eddington, counsel, and the Court.

17   *BY MS. RAHMAN:*

18   *Q.*   Mr. Eddington, does this refresh your recollection

19   regarding when you communicated to Mr. Brady?

20   *A.*   Yes.

21         *MS. RAHMAN:*   Could you please put the document down.

22   Thank you.

23   *BY MS. RAHMAN:*

24   *Q.*   When did you communicate the $49 case price to Mr. Brady?

25   *A.*   February 22, 2017.

2470
Richard Eddington - Direct

1    *Q.*  Do you recall whether Claxton agreed to the $49 case price

2    as you requested?

3    *A.*  They did.

4    *Q.*  Do you know when Claxton agreed to that?

5    *A.*  February 23, 2017.

6    *Q.*  Do you know whether Mr. Brady asked for more volume at that

7    time?

8    *A.*  He did.

9    *Q.*  Now, is reducing the case price beneficial for KFC?

10   *A.*  Yes.

11   *Q.*  Why is that?

12   *A.*  The case price is a -- well, I mean, the straightforward

13   answer is that the lower the case price, the less the KFC

14   franchisees or the KFC system has to pay, and theoretically the

15   more money that they can keep.

16   *Q.*  During the negotiations, did RSCS also propose stair-step

17   pricing?

18   *A.*  We did.

19   *Q.*  And what was the purpose of the stair-step pricing?

20   *A.*  As I mentioned, one of our goals going into these

21   negotiation was to try to call back some of the pricing for the

22   remainder of 2017, part of that initial three-year contract.

23   And the stair-step pricing we introduced was our way of trying

24   to pull forward some of the benefits in this new contract and

25   get them into -- pull them into 2017 so that our 2017 price

Richard Eddington - Direct

 1   would go down prior to the new contract.

 2   Q.   Was this a benefit for RSCS?

 3   A.   Yes.

 4   Q.   Did Claxton agree to the stair-step pricing proposal?

 5   A.   They did.

 6   Q.   Did RSCS also ask Claxton to renegotiate the last six

 7   months of the contract?

 8   A.   That's part of the stair-step, yes.

 9   Q.   Did Claxton have to do that?

10   A.   No.

11   Q.   Did Claxton do that?

12   A.   Yes.

13   Q.   Now, Mr. Eddington, prior to the defense calling you as a

14   witness, did you give an interview to the Government?

15   A.   I did.

16   Q.   Do you recall that interview occurring on September 17,

17   2021?

18   A.   That sounds correct, yes.

19   Q.   Was that your only interview with the Government?

20   A.   It was.

21   Q.   Following that interview, did you ever receive a subpoena

22   from the Government to testify at any hearing?

23   A.   I did not.

24   Q.   Did you receive a subpoena from the Government to testify

25   at this trial?

Richard Eddington - Cross

1    A.   No.

2              MS. RAHMAN:  One moment, Your Honor.

3              THE COURT:  Sure.

4              MS. RAHMAN:  Thank you, Mr. Eddington.

5              No further questions.

6              THE COURT:  Thank you, Ms. Rahman.

7              Mr. Feldberg.

8                        **CROSS-EXAMINATION**

9    BY MR. FELDBERG:

10   Q.   Mr. Eddington --

11   A.   Yes, sir.

12   Q.   I'm Roger Austin's lawyer.  You know Mr. Austin, don't you?

13   A.   I do.

14   Q.   How long have you known him?

15   A.   Since, gosh, approximately 2000, when I first began working

16   at Gold Kist.

17   Q.   And how did you and Mr. Austin meet?

18   A.   At that point in time, he was still employed at Gold Kist.

19   Q.   And do you know whether Mr. Austin has had a long career

20   selling chicken to KFC?

21   A.   He has.

22   Q.   Do you know whether or not he's close to KFC and its

23   franchisees?

24   A.   Very close.

25   Q.   Has he been in your experience an advocate for KFC?

Richard Eddington - Cross

1    A.   Yes.

2    Q.   In the 22 years or so that you've known Mr. Austin, has KFC

3    been his main customer?

4    A.   Yes.

5    Q.   And has his main business interest in your experience been

6    selling chicken to KFC?

7    A.   Yes.

8    Q.   Do you Mr. Austin is retired?

9    A.   Yes, I do.

10   Q.   Do you know when he retired?

11   A.   I don't remember the exact date.  I was still at RSCS, so

12   it was 2018 or 2019, whenever he retired.

13   Q.   Fair enough.  And you -- when Mr. Austin was at Pilgrim's

14   and you were dealing with him when you were at RSCS, you knew

15   Mr. Austin wasn't the last word on pricing for Pilgrim's to

16   KFC, correct?

17           MS. WULFF:  Objection, Your Honor.  Leading.

18           THE COURT:  Sustained.

19   BY MR. FELDBERG:

20   Q.   Was Mr. Austin at that time the last word on pricing for --

21   pricing for Pilgrim's to KFC?

22           MS. WULFF:  Objection.  Asked and answered.

23           THE COURT:  He may answer if he knows.

24           THE WITNESS:  Roger did not have pricing authority on

25   behalf of Pilgrim's.  He had to go back to the team in Greeley

2474
Richard Eddington - Cross

1    for alignment.

2    *BY MR. FELDBERG:*

3    Q.  Now, let's talk about the negotiations in the summer and

4    fall of 2014 for the 2015 contract, okay?

5           In those negotiations, some of the suppliers lowered

6    their bids in the course of the negotiations, correct?

7           *MS. WULFF:*  Objection.  Leading.

8           *THE COURT:*  Overruled.  I don't think -- I think

9    that's within the scope of the direct.

10          *THE WITNESS:*  Yes.

11   *BY MR. FELDBERG:*

12   Q.  Pilgrim's did not, did it?

13   A.  Very incrementally, if any at all.  They were the holdout.

14   Q.  So Pilgrim's had a different strategy than some of the

15   others, correct?

16          *MS. WULFF:*  Objection.  Leading.

17          *THE COURT:*  Overruled.

18          *THE WITNESS:*  Yes.

19   *BY MR. FELDBERG:*

20   Q.  And, in fact, the only reduction that Pilgrim's made was

21   actually an elimination by RSCS of a 1.7 cent administrative

22   fee, correct?

23   A.  I can't remember that specifically.

24   Q.  If I showed you a document, might that refresh your

25   recollection?

2475
Richard Eddington - Cross

1    A.  Yes.

2              MR. FELDBERG:  Could we call up, please, Exhibit 1226,

3    just for the witness and the Court and the parties.

4              And could we turn, please, to page -- well, the first

5    substantive page of the document that has total FOB cost.

6    BY MR. FELDBERG:

7    Q.  Do you see that, sir?

8    A.  I do.

9    Q.  By the way, is this the contract between Pilgrim's and RSCS

10   for the three-year period, January 1, 2015, to December 31,

11   2017?

12   A.  Could you -- you flipped through some of that pretty

13   quickly.

14   Q.  For the three-year period, January 1 --

15   A.  Yes, I see the top now.  Yes.

16             MR. FELDBERG:  Your Honor, according to my notes, this

17   is not yet admitted.  I may be wrong on that.  But if it has

18   not been admitted, we'd offer it.

19             THE COURT:  Any objection to the admission of

20   Exhibit 1226?

21             MS. WULFF:  First of all, is there a copy --

22             MR. FELDBERG:  I'm sorry.

23             MS. WULFF:  No problem.

24             Your Honor, I -- one moment so I can look at the

25   document.

Richard Eddington - Cross

1          THE COURT:  Yeah.  No problem.

2          MS. WULFF:  I think, Your Honor, off the top of my

3   head, it's not actually the signed contract; and, moreover,

4   there is hearsay.  Hopefully, Mr. Feldberg can establish

5   business record foundation.

6          MR. FELDBERG:  We have a signed -- did we not give you

7   a signed copy?

8          THE COURT:  You can't have side conversations.  You

9   can ask for permission to confer with opposing counsel.

10         MR. FELDBERG:  May I have permission to confer with

11   counsel?

12         THE COURT:  Of course.

13         MR. FELDBERG:  Your Honor, may I just back up a step,

14   please?

15         THE COURT:  Sure.

16         MR. FELDBERG:  Can we call up, please -- I have the

17   wrong exhibit number.  I apologize.  Can we call up, please,

18   1126, which I do believe is in evidence.

19         THE COURT:  Yes, that is in evidence.  And it may be

20   published, if you wish.

21         MR. FELDBERG:  Thank you, Your Honor.

22   BY MR. FELDBERG:

23   Q.  And in looking at the page that has the number one at the

24   bottom, Mr. Eddington, do you see the total FOB cost?

25   A.  I do.

2477

Richard Eddington - Cross

1   *Q.*  And what is that?

2   *A.*  $1.856 cents per pound.

3         *MR. FELDBERG:*  I'd like to call up just for the

4   witness and the Court and the parties Exhibits F-390 and F-391.

5   *BY MR. FELDBERG:*

6   *Q.*  Do you see those documents, sir?

7   *A.*  Yes.

8   *Q.*  And if you look at F-390 and F-391, do those documents

9   refresh your recollection about the reduction of a 1.7 cent

10  administrative fee?

11        *MS. WULFF:*  Objection, Your Honor.  Improper question.

12        *THE COURT:*  Sustained.

13  *BY MR. FELDBERG:*

14  *Q.*  Having looked at those documents, Mr. Eddington, is your

15  recollection --

16        *MS. WULFF:*  Objection --

17        *MR. FELDBERG:*  Let's take those documents down.

18  *BY MR. FELDBERG:*

19  *Q.*  Having looked at those documents, is your recollection

20  refreshed?

21  *A.*  Yes.

22  *Q.*  And what do you now remember?

23  *A.*  Pilgrim's did not change their price, and that the

24  1.7-cents-per-pound fee for RSCS, which we managed, that had

25  nothing to do with the negotiations.  That was 100 percent on

Richard Eddington - Cross

1    RSCS.  We chose to take that off.

2    *Q.*  So Pilgrim's did not reduce its price --

3    *A.*  That's right.

4    *Q.*  -- during those negotiations; other suppliers did?

5    *A.*  Yes.

6    *Q.*  Now, what happened to Pilgrim's volume as a result of the

7    three-year contract that began on January 1, 2015?

8    *A.*  They lost volume.

9    *Q.*  Do you recall about how much?

10   *A.*  Not specifically.

11   *Q.*  Did Pilgrim's continue to lose volume not just in 2015, but

12   in 2016, 2017, and 2018?

13   *A.*  Any volume that Pilgrim's lost beyond the initial

14   contract-allocated loads would have been because of lack of

15   demand from KFC, by and large.

16   *Q.*  But did you, in fact, continue to take volume away from

17   Pilgrim's and give it to other suppliers?

18          *MS. WULFF:*  Objection, Your Honor.  Asked and

19   answered.

20          *THE COURT:*  Overruled.

21          *THE WITNESS:*  Within the constraints of our contract,

22   wherever we had ability to move a load away from Pilgrim's, we

23   would do that.

24   *BY MR. FELDBERG:*

25   *Q.*  If you would take a look, sir, at 1126, which is --

2479

Richard Eddington - Cross

1    Government Exhibit 1126, which is in evidence.

2           And if you turn to page 3, what was the RSCS weekly

3    volume commitment to Pilgrim's for --

4           MR. FELDBERG:  Can we publish it, please, Your Honor?

5           THE COURT:  Yes, you may.

6    BY MR. FELDBERG:

7    Q.  -- for Pilgrim's to KFC?

8    A.  For eight-piece, it was 2.1 million pounds per week.

9    Q.  That's 63 truckloads?

10   A.  Approximately, yes.

11   Q.  Okay.  That was nominally for the three-year period

12   beginning January 1, 2015, correct?

13   A.  That's correct.

14   Q.  And then -- and then could you --

15          MR. FELDBERG:  Could we call up, please, just for the

16   witness and the Court and the parties -- withdrawn.

17   BY MR. FELDBERG:

18   Q.  Was there a renegotiation of volume as of -- in 2016

19   between RSCS and Pilgrim's?

20   A.  I don't specifically recall that.

21          MR. FELDBERG:  Could we call up, please, Exhibit F-794

22   and take a look at page 3, just for the witness and the parties

23   and the Court.

24          MS. WULFF:  Mr. Feldberg, may I have a copy?

25          MR. FELDBERG:  Sure.  Sorry.

Richard Eddington - Cross

1              *MS. WULFF:*  Thank you.

2              Your Honor, I don't believe I've been provided with a

3      copy of the entire exhibit.

4              *THE COURT:*  An additional page is on its way.

5              *MS. WULFF:*  Understood.  Thank you.

6              *MR. FELDBERG:*  Sorry.

7      *BY MR. FELDBERG:*

8      *Q.*  Mr. Eddington, does this document refresh your

9      recollection?

10             *MS. WULFF:*  Objection, Your Honor.  Improper

11     refreshment.

12             *MR. FELDBERG:*  I'm just asking him if it refreshes his

13     recollection.  But happy to take the document down.

14             *THE COURT:*  It's down now.

15             Go ahead, Mr. Feldberg.

16     *BY MR. FELDBERG:*

17     *Q.*  Does it refresh your recollection, sir?

18     *A.*  I couldn't see a date on that document, but there was a

19     change in volume at some point during that -- that contract.

20     *Q.*  Was the change a reduction?

21     *A.*  Yes.

22     *Q.*  And do you recall what the reduction was down to?

23     *A.*  Just under 1.7 million.

24     *Q.*  Down to 50 truckloads?

25     *A.*  Approximately.

Richard Eddington - Cross

1    *Q.*  From the 63 in the prior year?

2    *A.*  From the initial contract, yes.

3    *Q.*  Okay.  I want to turn to the negotiations that began in

4    2017 for the contract beginning in 2018.  Okay?

5    *A.*  Okay.

6    *Q.*  You told us in Ms. Rahman's exam that Pilgrim's was the

7    last -- was scheduled for the last meeting, correct?

8    *A.*  Yes.

9    *Q.*  Was that different from what had happened in the past?

10   *A.*  To some degree, yes.

11   *Q.*  In what way?

12   *A.*  You know, Pilgrim's had usually been one of the earliest to

13   be engaged with.

14   *Q.*  And why was Pilgrim's scheduled last in 2017?

15   *A.*  Because Pilgrim's was the one who had been the most

16   difficult to work with in the previous negotiations, and

17   Pilgrim's had the highest priced and -- price at that point,

18   and we anticipated that Pilgrim's may yet continue to be the

19   most difficult to work with going forward in terms of

20   negotiating price.

21   *Q.*  And you wanted to begin the negotiations with others first

22   so you might be able to negotiate better with Pilgrim's,

23   correct?

24   *A.*  Potentially, yes.

25   *Q.*  And I think you told us in Ms. Rahman's examination that

Richard Eddington - Cross

1   you anticipated that the suppliers would have

2   ordinary-course-of-business conversations about their meetings

3   with you, correct?

4           MS. WULFF:  Object, Your Honor.  I believe that

5   misstates prior testimony.

6           THE COURT:  Overruled.

7           THE WITNESS:  Yes.

8   BY MR. FELDBERG:

9   Q.  That's something you expected, correct?

10  A.  I don't know that I would say expected, but certainly

11  something that we anticipated could happen and weren't opposed

12  to.

13  Q.  Do you recall what Pilgrim's initial bid was in February of

14  2017?

15  A.  No, not specifically.

16          MR. FELDBERG:  Could we call up, please, Exhibit 1826,

17  which, Your Honor, if I -- my notes are correct, is in

18  evidence.

19          THE COURT:  Yes, it is.  It may be displayed.

20          MR. FELDBERG:  Thank you.

21  BY MR. FELDBERG:

22  Q.  Sir, looking at the page that says page 1, what was

23  Pilgrim's initial bid for eight-piece?

24          MS. WULFF:  Objection, Your Honor.  Improper

25  refreshment.

Richard Eddington - Cross

1          *THE COURT:*  Sustained.

2          *MR. FELDBERG:*  We will take the exhibit down.

3     *BY MR. FELDBERG:*

4     *Q.*  Mr. Eddington, do you now recall what Pilgrim's' initial

5     bid for eight-piece was?

6     *A.*  98.4 cents per pound.

7     *Q.*  Did Pilgrim's agree to reduce its bid thereafter?

8     *A.*  To the best of my recollection, they did somewhat, yes.

9     *Q.*  Do you recall whether Pilgrim's agreed with RSCS to a

10    stair-step approach for a reduction in price for the 2018

11    contract?

12    *A.*  Yes.

13    *Q.*  And do you recall the details of that stair-step?

14    *A.*  What are you defining as details?

15    *Q.*  The numbers.

16    *A.*  No, not specifically.

17         *MR. FELDBERG:*  Okay.  Let's call up, please,

18    Exhibit 1918, just for the witness, the Court, and the parties.

19    *BY MR. FELDBERG:*

20    *Q.*  Could you take a look at Exhibit 1918, sir.

21         *MR. FELDBERG:*  Let's take it down.

22    *BY MR. FELDBERG:*

23    *Q.*  Having looked at Exhibit 1918 for identification, does that

24    refresh your recollection, sir?

25    *A.*  It does.

Richard Eddington - Cross

1    *Q.* And what happened with the numbers?

2    *A.* In 2017, the latter part of 2017, they reduced their

3    eight-piece price by 2 cents per pound.

4    *Q.* How about the beginning of 2018?

5    *A.* It was reduced even further. I don't, again, specifically

6    remember how much.

7    *Q.* Was it another approximately 6.8 cents per pound.

8         *MS. WULFF:* Objection. The witness said he doesn't

9    recall.

10        *THE COURT:* Sustained.

11        *MR. FELDBERG:* Let's call up 1918 for identification,

12   again, please, just for the Court and the witness and the

13   parties.

14        *THE WITNESS:* Can we scroll down?

15   *BY MR. FELDBERG:*

16   *Q.* Okay.

17   *A.* Okay.

18        *MR. FELDBERG:* Can you take it down, please.

19   *BY MR. FELDBERG:*

20   *Q.* Mr. Eddington, do you recall what the reduction -- the

21   additional reduction was in 2018?

22   *A.* 5.8 cents per pound.

23   *Q.* So 2 cents per pound the second half of 2017, and an

24   additional 5.8 cents per pound in 2018?

25   *A.* Yes.

Richard Eddington - Cross

1   Q.  Did you request that Pilgrim's reduce its price to $49 per

2   case?

3   A.  Yes.

4   Q.  Did it agree to do so?

5   A.  I believe they did.

6   Q.  Pilgrim's -- did Pilgrim's have to reduce its price in the

7   middle of this 2017 calendar year?

8   A.  No, they did not.

9   Q.  Did they agree to do so?

10  A.  Yes.

11  Q.  Did all of the suppliers agree to do so?

12  A.  I believe there was one who may not have, but pretty

13  much -- the vast majority did, yes.

14  Q.  Was the one who did not agree to it Tyson?

15  A.  Yes.

16  Q.  Is Tyson the largest chicken supplier in the country?

17  A.  Generically speaking, yes.

18  Q.  Do you know if despite these price concessions Pilgrim's

19  still lost volume in 2018 pursuant to the three-year contract,

20  beginning January 1, 2018?

21  A.  That's correct.

22  Q.  Do you recall what the volume commitment was?

23  A.  I don't recall the specific amount that they were reduced

24  to.

25          MR. FELDBERG:  Could we call up, please, F-796, which

2486
Richard Eddington - Cross

1    I believe is in evidence, Your Honor.

2         THE COURT:  Yes, it is.  It may be displayed.

3         MR. FELDBERG:  And could we take a look, please, at

4    page 17.

5         Ms. Wulff.

6    BY MR. FELDBERG:

7    Q.  Do you see page 17, Mr. Eddington?

8    A.  I do.

9         MR. FELDBERG:  Let's take that down.

10   BY MR. FELDBERG:

11   Q.  What was the volume commitment -- I'm sorry.  I'm looking

12   at the wrong page.

13        No.  That page.

14        What was the volume commitment for the period from

15   May 21, 2017, through December 31, 2017?

16   A.  1,675,000 pounds per week.

17   Q.  And that's down to 50 truckloads?

18   A.  Approximately, yes.

19   Q.  And do you recall whether RSCS once again reduced its

20   volume commitment to Pilgrim's as of January 1, 2018?

21   A.  I don't recall specifically, no.

22        MR. FELDBERG:  Could we once again call up F-796 in

23   evidence and turn to page 18.  Could we take that down, please.

24   BY MR. FELDBERG:

25   Q.  Mr. Eddington, does page 18 of F-796 refresh your

Richard Eddington - Cross

1    recollection?

2    *A.*   It does.

3    *Q.*   What was the volume commitment as of January 1, 2018?

4    *A.*   1.34 million pounds per week of eight-piece.

5    *Q.*   40 truckloads?

6    *A.*   Approximately.

7    *Q.*   Down from 50 the prior year, correct?

8    *A.*   Correct.

9            *MR. FELDBERG:*  Your Honor, could we call up, please,

10   Exhibit J-237 at this point just for the Court and counsel and

11   the parties.

12           Your Honor, this -- the left-hand portion of this was

13   published as a demonstrative during the testimony of another

14   witness, and we'd like to complete the record on that.

15           *THE COURT:*  Right.  The -- that -- what is being

16   displayed right now is what had been previously displayed for

17   demonstrative purposes only, and it may be shown -- this

18   page may be shown now as well.

19           *MR. FELDBERG:*  Thank you.  May we publish, please?

20   Just the --

21           *THE COURT:*  Just 2012 through 2014.

22           *MR. FELDBERG:*  Now, could we show just to the witness

23   and the Court and the parties J-237 in its entirety.

24           Please take down what is before the jury and -- 237 in

25   its entirety.

Richard Eddington - Cross

1    *BY MR. FELDBERG:*

2    *Q.*  Do you see J-237, Mr. Eddington?

3    *A.*  I do.

4    *Q.*  And looking at the volume numbers for the years 2015, 2016,

5    2017, and 2018, do those numbers accurately reflect the weekly

6    commitment by RSCS to Pilgrim's for eight-piece?

7    *A.*  Yes.

8         *MR. FELDBERG:*  Your Honor, at this point, we offer

9    J-237 as a demonstrative -- we'd actually offer it as an

10   exhibit, Your Honor.

11        *THE COURT:*  Okay.  Any objection to the admission of

12   J-237 as currently displayed?

13        *MS. WULFF:*  The only objection, Your Honor, is that

14   the Government's record-keeping exhibit, E-014, has not yet

15   been admitted, one of the underlying source material;

16   therefore, the document is not yet admissible.

17        *THE COURT:*  Response, Mr. Feldberg.

18        *MR. FELDBERG:*  Is that on -- Your Honor, I'm advised

19   that on -- that's one of the documents that the parties have

20   stipulated to the admissibility of, and at this point, I would

21   offer it.

22        *THE COURT:*  Any objection to the admission of E-014?

23        *MS. WULFF:*  No objection, and then no objection to

24   J-237.

25        *THE COURT:*  Okay.  E-014 will be admitted and J-237,

Richard Eddington - Cross

1    ladies and gentlemen, which had in part been previously shown

2    to you as a demonstrative.  But at this point it will be

3    admitted for all purposes.  That will be admitted, as well.

4              (Exhibit E-014 admitted.)

5              (Exhibit J-237 admitted.)

6         MR. FELDBERG:  May we publish, Your Honor?

7         THE COURT:  Yes, both of them, if you wish.

8         MR. FELDBERG:  At this point, just J-237.

9         THE COURT:  That's fine.

10        MR. FELDBERG:  Thank you.

11   BY MR. FELDBERG:

12   Q.  Mr. Eddington, as you told us, this accurately reflects

13   RSCS's weekly volume commitment to Pilgrim's for the years 2015

14   through 2018, correct?

15   A.  Correct.

16   Q.  And those numbers went down, did they not?

17   A.  They did.

18   Q.  And some of that volume that was taken from Pilgrim's was

19   awarded to other suppliers, correct?

20        MS. WULFF:  Objection, Your Honor.  Leading.

21        THE COURT:  Overruled.

22        THE WITNESS:  Yes.

23        MR. FELDBERG:  I have nothing further.  Thank you,

24   Mr. Eddington.

25        THE COURT:  Additional questions by any of the

Richard Eddington – Cross

1    defendants?

2              (No response.)

3              Ms. Wulff, cross-examination.

4              *MS. WULFF:*  Thank you, Your Honor.

5                         **CROSS-EXAMINATION**

6    *BY MS. WULFF:*

7    *Q.*  Good afternoon, Mr. Eddington.

8    *A.*  Good afternoon.

9    *Q.*  All right.  To get started, I want to talk a little bit

10   about some of your relationships with the defendants in this

11   case.  You already testified to your relationship with

12   Defendant Austin, but you also have known Defendant Brady since

13   the '90s, I believe?

14   *A.*  That is correct.

15   *Q.*  And you'd consider him a friend as well?

16   *A.*  Yes.

17   *Q.*  And I believe you've also known Defendant Fries since

18   sometime in the '90s?

19   *A.*  That's correct.

20   *Q.*  And you knew Defendant Fries' dad?

21   *A.*  Correct.

22   *Q.*  Is it fair to say you wouldn't want anything bad to happen

23   to any of the three gentlemen you know?

24   *A.*  I mean, that's assumptive.  I think, depending upon the

25   circumstances, is how I would answer that.

Richard Eddington - Cross

1   Q.  Fair enough.  Thank you, Mr. Eddington.

2       All right.  Before we talk about your experience at

3   KFC, I want to talk a little bit about your experience working

4   at chicken suppliers.

5   A.  Okay.

6   Q.  You went through your background extensively with

7   Ms. Rahman, and I'm not going to have you complete that.  You

8   came to KFC from Mar-Jac?

9   A.  To RSCS, yes, specifically.  Yes, from Mar-Jac.

10  Q.  Sure.  And before you were at Mar-Jac, you were at Marshall

11  Durbin?

12  A.  True, which became part of Mar-Jac.

13  Q.  My next question, that is how you ended up at Mar-Jac.  And

14  you were at either Mar-Jac or Marshall Durbin in one form or

15  another for about three years?

16  A.  Yes.

17  Q.  And Mar-Jac -- both Mar-Jac and Marshall Durbin are chicken

18  suppliers?

19  A.  They are.

20  Q.  They compete with business -- I should say -- I should be

21  more precise in my verb tense here, Mr. Eddington.  Mar-Jac,

22  since that's the company that's still in existence, is a

23  chicken supplier that competed with Pilgrim's for business at

24  fast-food restaurants in 2014?

25  A.  Yes.

Richard Eddington - Cross

1    *Q.*  Mar-Jac also competed for business with Claxton at

2    fast-food restaurants in 2014?

3    *A.*  Correct.

4    *Q.*  Again, 2014 was the year you moved from Mar-Jac to RSCS,

5    right?

6    *A.*  Correct.

7    *Q.*  And while you were at Mar-Jac, you understood that

8    Pilgrim's and Claxton were also competing against each other

9    for business at KFC?

10   *A.*  Yes.

11   *Q.*  And then, again, when you were at RSCS or KFC, you

12   understood that Pilgrim's and Claxton were competing against

13   each other for KFC's business?

14   *A.*  Yes.

15   *Q.*  Okay.  And I believe you testified to this on direct

16   examination, but while you were at Mar-Jac, you never discussed

17   future -- Mar-Jac's future bid information with its

18   competitors?

19   *A.*  That's correct.

20   *Q.*  And that meant you never gave Mar-Jac's bid to another

21   chicken supply company?

22   *A.*  I did not.

23   *Q.*  And you never got another chicken supplier's bid before

24   they were submitted to a customer?

25   *A.*  No.

Richard Eddington - Cross

 1  *Q.*  Okay.  And if we could shift gears now and talk about your

 2  experience on the customer side.  First at -- on buying chicken

 3  on behalf of KFC, okay?

 4  *A.*  Okay.

 5  *Q.*  So you started at KFC, I believe you said, like the first

 6  week of August 2014, right?

 7  *A.*  August 4.

 8  *Q.*  August 4.  And when you started, you testified on direct

 9  examination that the bidding process for that 2015 contract was

10  already starting to get underway, right?

11  *A.*  That's true.

12  *Q.*  And that was, again, the contract that was set to run from

13  2015 to 2017?

14  *A.*  Yes.

15  *Q.*  Okay.  And that three-year 2015 to 2017 contract was your

16  very first time buying chicken on behalf of KFC, right?

17  *A.*  On behalf of KFC, yes.

18  *Q.*  And you joined RSCS after the process had already gotten

19  started?

20  *A.*  It was still early in the process, but it had started.

21  *Q.*  Right.  The request for bids had already gone out?

22  *A.*  Correct.

23  *Q.*  And the decision to have a three-year contract had already

24  been made?

25  *A.*  The desire to have a three-year contract had already

Richard Eddington - Cross

1    been -- as part of our strategy had been made.  We had not

2    finalized that there, absolutely, would be a three-year

3    contract.  But that was part of the strategy development, yes.

4    Q.  And that strategy had been built into the request for bids

5    that had already been sent out?

6    A.  Yes.

7    Q.  Now, not only was this your first time buying chicken for

8    KFC, but it was also your first time buying chicken for any

9    fast-food restaurant?

10   A.  Correct.

11   Q.  And, Mr. Eddington, would it be fair to say that because of

12   that, you had the least amount of experience working for a

13   fast-food purchasing co-op of anyone else on the KFC team?

14   A.  Working specifically -- being employed by a fast-food

15   company or co-op, yes.

16   Q.  Thank you.  That was my question, Mr. Eddington.  Thank

17   you.

18          Now, you also testified on direct examination that the

19   first-round bids that you received on behalf of KFC were the

20   worst-case scenario for KFC?

21   A.  It was -- it was worse than we had anticipated them being,

22   yes.  The worst -- so -- worse than we had anticipated.

23   Q.  And, in fact, I believe you testified that you were

24   surprised by the increase in margins that the suppliers

25   submitted, right?

Richard Eddington - Cross

1    *A.*  Yes.

2    *Q.*  And in part, you testified to -- excuse me.  That was also

3    because, as you testified in part, that was the largest margin

4    increase you had ever seen?

5    *A.*  Yes.

6    *Q.*  And --

7         *MS. WULFF:*  Just one moment, Your Honor.  May I hand

8    up a document?

9         *THE COURT:*  Sure.

10        *MS. WULFF:*  Ms. Grimm.

11        Your Honor, would the Court switch the monitors to the

12   Government's control?  Thank you.

13   *BY MS. WULFF:*

14   *Q.*  And, Mr. Eddington, you have a redacted document there in

15   front of you, which is Exhibit 9703.  Mr. Eddington, is this an

16   email chain that contains an email from you to Brian Roberts?

17   *A.*  It is.

18        *MS. WULFF:*  The Government moves to admit and publish

19   Exhibit 9 -- 9703 as redacted.

20        *THE COURT:*  Any objection to the admission of

21   Exhibit 9703?

22        Exhibit 9703 --

23        *MS. RAHMAN:*  Your Honor, may I confer with counsel?

24        *THE COURT:*  Yes, you certainly may.

25        *MS. RAHMAN:*  Your Honor, I think it's hearsay at the

Richard Eddington - Cross

1    bottom --

2         MS. WULFF:  Your Honor, I should have specified, the

3    bottom email we'll admit for the effect on the listener.  But

4    Mr. Eddington's email is his statement as he's here in court.

5         THE COURT:  Okay.  So what's being displayed now is

6    the second page of this?

7         MS. WULFF:  Correct, Your Honor -- well, the third

8    page of the document, but it's the second page that is

9    unredacted.  And this email that's being displayed, Your

10   Honor, the Government would admit for the effect on the

11   listener, being Mr. Eddington.

12        The next email in the email chain is

13   Mr. Eddington's statement, which he could adopt by being here

14   in court.

15        THE COURT:  Let's do a sidebar on this one.

16        (Hearing commenced at the bench.)

17        THE COURT:  So I think that we had talked about this

18   one before, although maybe the Government has redacted some of

19   the portions that we talked about.  But, Ms. Rahman, do you

20   have anything else on this document?

21        MS. RAHMAN:  Your Honor, I would also object, it's

22   outside the scope of direct.

23        THE COURT:  All right.  Ms. Wulff.

24        MS. WULFF:  Yes, Your Honor, I'm not sure what prior

25   conversation the Court is referencing, whether it's a current

Richard Eddington - Cross

1    hearing or this current hearing, but as to Ms. Rahman's

2    specific objection, the part of this document that I'm

3    interested in is the part that says, You trying to get me fired

4    before I even move here.  This goes to Mr. Eddington's reaction

5    to the bids which were submitted to RSCS, which is squarely

6    within the scope of the direct examination.

7          THE COURT:  Okay.  Ms. Rahman, anything else?

8          MS. RAHMAN:  No, Your Honor.

9          THE COURT:  Okay.  Then I will admit this exhibit.

10   However, the email on the second page, apparently may have

11   been the third page in the original, which is from

12   Mr. Roberts -- is that right -- that will only be admitted not

13   for the truth of the matter asserted, but only on the effect on

14   the listener.

15         MS. NIELSEN:  This is Dru Nielsen on behalf of

16   Mr. Lovette.  We would object to the email from Mr. Roberts

17   being admitted at all.  There is no indication that

18   Mr. Eddington took any action after receiving this email from

19   Mr. Roberts.

20         THE COURT:  That may be true.  But he is reacting,

21   Mr. Eddington, in the email itself, is reacting to that.  So

22   it's -- I've -- that establishes the relevance, so that

23   objection is overruled.

24         All right.  Thank you.

25         (Hearing continued in open court.)

Richard Eddington – Cross

1          THE COURT:  So Exhibit 9703 will be admitted as

2     redacted.

3              (Exhibit 9703 admitted.)

4          THE COURT:  Ladies and gentlemen, the statements of

5     Mr. Roberts in this email chain are not to be considered by

6     the jury for the truth of the matters asserted but, rather,

7     only for their effect on the listener, Mr. Eddington.

8              You may display that, if you wish.

9          MS. WULFF:  Thank you, Your Honor.

10             Ms. Pearce, if you could zoom in on Mr. Eddington's

11     email there at the bottom of the page.

12             Thank you.

13     BY MS. WULFF:

14     Q.  Okay.  Mr. Eddington, this is an email from you to Brian

15     Roberts, right?

16     A.  Correct.

17     Q.  And the date is August 11, 2014?

18     A.  Yes.

19     Q.  And Mr. Roberts was one of the people running the bidding

20     process on behalf of Tyson?

21     A.  Correct.

22     Q.  And Tyson is another chicken supplier?

23     A.  Yes.

24     Q.  That competes with Pilgrim's and Claxton?

25     A.  Yes.

Richard Eddington - Cross

1    *Q.*   For KFC's business?

2    *A.*   Correct.

3    *Q.*   You also have a personal relationship with Mr. Roberts?

4    *A.*   I do.

5    *Q.*   I believe you used to work with him?

6    *A.*   I have.

7    *Q.*   When you came to KFC, he worked for one of your suppliers,

8    right?

9    *A.*   He did.

10   *Q.*   You moved to opposite sides of the negotiating table?

11   *A.*   Yes.

12   *Q.*   If you could look at the very first line, you wrote, I

13   believe, If I get this right, parentheses, before I speak to

14   Pete...

15           Do you see that?

16   *A.*   I do.

17   *Q.*   The Pete there, does that refer to Mr. Suerken?

18   *A.*   Correct.

19   *Q.*   He was your boss?

20   *A.*   He was.

21   *Q.*   If you look at bullet point 1, you wrote, You want an

22   increase in margin from .075 cents per pound to -- my chicken

23   math.  Portions of decimals are very hard -- $.075 per pound

24   to $.16 per pound.

25           Did I read that correctly?

Richard Eddington - Cross

1    *A.*   Yes.

2    *Q.*   You go on to list three other asks that Tyson is making?

3    *A.*   Correct.

4    *Q.*   Tyson in this math is looking to more than double their

5    margin on the contract, right?

6    *A.*   Yes.

7    *Q.*   And do you see below these numbered bullet points, below

8    that you write, You trying to get me fired before I even move

9    here, question mark, question mark?

10   *A.*   Yes.

11   *Q.*   That was a comment on your behalf about how high Tyson's

12   bid was, right?

13   *A.*   That was me being a smart-aleck back to Mr. Roberts,

14   saying, you know there is no way going for this.  Are you

15   kidding me?

16   *Q.*   And the whole point of that joke is Tyson's bid is so high

17   it allows you to make a smart-aleck comment, right?

18   *A.*   Their asks were above and beyond what we would consider,

19   yes.

20   *Q.*   Okay.  Thank you, Mr. Eddington.

21          MS. WULFF:  You can take that down, Ms. Pearce.

22   *BY MS. WULFF:*

23   *Q.*   Let's dig a little bit deeper into the bidding process and

24   the state of play at that time.  I believe you testified on

25   direct, but Pilgrim's was the largest supplier to KFC for the

Richard Eddington - Cross

1    2014 contract, right?

2    *A.*   Correct.

3    *Q.*   And the largest -- being the largest supplier means they

4    were supplying the most volume?

5    *A.*   Yes.

6    *Q.*   And that 2014 contract was the contract that was already in

7    place when you started?

8    *A.*   Yes.

9    *Q.*   And as you testified on direct, going into the bidding

10   process for the next contract, that 2015 contract, KFC was

11   worried that it was buying too much volume from Pilgrim's,

12   right?

13   *A.*   Yes.

14   *Q.*   And I believe you also testified on direct that Pilgrim's

15   had a, quote, higher share of your business that we were

16   comfortable with.

17   *A.*   Correct.

18   *Q.*   And I want to talk a little bit about what it means to be

19   buying too much volume from a single supplier and why that made

20   KFC uncomfortable.   Okay?

21          And you'll have to pardon the phrase, by buying too

22   much supply from a single supplier is a little like having too

23   many eggs in one basket, right?

24   *A.*   Yes, I understand the pun.

25   *Q.*   It really means that KFC is relying too heavily on a single

Richard Eddington - Cross

1   supplier?

2   *A.*   When you say relying too heavily, there could be a lot of

3   different reasons why you felt that any given supplier has too

4   much of your volume.  In this particular case, we believed that

5   they had too much ultimate pricing power over -- over KFC.

6   *Q.*   And going into the negotiations for the 2015 contract, you

7   were looking to correct that power disparity, so to speak, by

8   taking volume away from Pilgrim's, right?

9   *A.*   To the degree that we could, yes.

10  *Q.*   Okay.  And that's what KFC ultimately did for the 2015

11  contract, right?

12  *A.*   Yes.

13  *Q.*   It bought less product from Pilgrim's.  And so before the

14  2015 contracts -- I believe you nodded there in response to my

15  question, but the court reporter does need an audible response.

16  *A.*   Yes.

17  *Q.*   So before the 2015 contracts were finalized, KFC -- RSCS on

18  behalf of KFC was already looking at reducing the amount of

19  chicken that it bought from Pilgrim's?

20  *A.*   It was part of their desire, yes.

21  *Q.*   And I believe you testified to this during Mr. Feldberg's

22  questioning, but then during the course of that three-year 2015

23  contract, KFC continued to take volume away from Pilgrim's,

24  correct?

25  *A.*   That's correct.

Richard Eddington - Cross

1    Q.  And that additional volume reduction was, I believe you

2    said, due to less demand overall in the KFC system for chicken,

3    right?

4    A.  Primarily, yes.

5    Q.  Okay.  And going a little bit more detail into Pilgrim's,

6    you were also asked some questions about Mr. Austin's pricing

7    authority or his ability -- I believe Mr. Feldberg asked you

8    some questions about Mr. Austin's pricing authority?

9    A.  He did.

10        MS. WULFF:  And if we could pull up Exhibit 1126,

11   which is already in evidence and was discussed.

12        THE COURT:  Yes, you may publish that.

13        MS. WULFF:  Thank you.

14   BY MS. WULFF:

15   Q.  And, Mr. Eddington, this is -- if you -- if Ms. Pearce

16   zooms in on sort of the top half of the screen, I guess, we

17   can -- or so -- perfect.  This what we're looking at is

18   Pilgrim's contract for 2015 to 2017, correct?

19   A.  Yes.

20   Q.  That's the three-year high-priced contract we've been

21   talking about?

22   A.  It's the three-year contract.

23   Q.  And if Ms. Pearce turns to the next page -- I'm sorry, if

24   she turns two pages ahead, Mr. Eddington, and zooms in on that

25   box, the weekly volume commitment for Pilgrim's here was how

Richard Eddington - Cross

1    much?

2    *A.*   2-point -- just over 2.1 million pounds per week.

3    *Q.*   Of the eight-piece chicken on the bone?

4    *A.*   Eight-piece, correct.

5    *Q.*   And you may want to -- you're going to do some

6    multiplication, so you may want to keep -- put that number in

7    your calculator, because if we flip back to the second page --

8    and I believe you also have a paper copy of this document in

9    the binder in front of you, if that will make this easier.

10   *A.*   Which document are we looking at, again?

11   *Q.*   This was 1126.

12   *A.*   Okay.

13   *Q.*   Okay.  So we had 2.11 -- 2.11 million pounds a week of

14   eight-piece chicken on the bone, right?

15   *A.*   That's correct.

16   *Q.*   Okay.  And if we go back to the second page, and Ms. Pearce

17   zooms in on the bottom half, the total FOB cost there is 1 -- a

18   dollar .0856, right?

19   *A.*   Correct.

20   *Q.*   And if you multiply that out by the total cost per week,

21   what number do you get?

22   *A.*   2,291,158.8 --

23   *Q.*   Dollars?

24   *A.*   -- dollars per week.

25   *Q.*   Great.  Your math matches mine.

Richard Eddington - Cross

1    If we multiply that out for a year, what number do you

2    get?

3    A.   $119,140,257.60.

4    Q.   And that's again for a single year, right?

5    A.   Correct.

6    Q.   And this contract when it was signed was a three-year

7    contract, right?

8    A.   Correct.

9    Q.   And the signature on the bottom of this page on behalf of

10   Pilgrim's, is that Mr. Austin's signature?

11   A.   It is.

12   Q.   Over there to the right, that's your signature on behalf of

13   KFC, right?

14   A.   That's correct.

15   Q.   And so you brought Mr. -- Defendant Austin had authority to

16   sign this contract on behalf of Pilgrim's?

17   A.   He signed it.  I assumed he had the authority.

18   Q.   Thank you, Mr. Eddington.

19        MS. WULFF:  You can take this document down,

20   Ms. Pearce.

21   BY MS. WULFF:

22   Q.   Now, KFC used a blind-bidding process for the 2015

23   contract?

24   A.   Yes.

25   Q.   And, again, for the 2018 to 2020 contract?

Richard Eddington - Cross

1    *A.*   Yes.

2    *Q.*   As part of that blind-bidding process, KFC asked the

3    suppliers to each submit their own bids, right?

4    *A.*   Correct.

5    *Q.*   And the goal of the blind-bidding process was to get

6    independent bids from each of the suppliers?

7    *A.*   Yes.

8    *Q.*   And that means in a blind-bidding process the competing

9    chicken suppliers aren't supposed to know each other's bids?

10           *MR. TUBACH:*  Objection, Your Honor.  We discussed this

11   at length.  If can we have a sidebar.

12           *THE COURT:*  Yes.

13           *MS. WULFF:*  I can rephrase.

14           (Hearing commenced at the bench.)

15           *MS. WULFF:*  I believe I may be able to --

16           *THE COURT:*  Be careful of the microphone.

17           *MS. WULFF:*  I can rephrase the question by saying that

18   the competing -- as a representative of KFC, his expectation

19   was that the competing chicken suppliers didn't know each

20   other's --

21           *THE COURT:*  You got cut off on the very end.

22           *MS. WULFF:*  I can rephrase by talking about his

23   expectations and asking whether his expectations on behalf of

24   KFC were that the competing chicken suppliers didn't know each

25   other's bids.

Richard Eddington - Cross

1          MR. TUBACH:  This is exactly what we've been talking

2    about the entire time.  They're citing some idea of violating

3    expectations, wants, desires, and the Court referred to rules

4    earlier, that somehow is a violation or violates the law,

5    that's not -- we think it's not relevant.  That's precisely why

6    Ms. Carwile asked for the jury instruction because they keep

7    going back to the well on this.

8          THE COURT:  The question, Ms. Wulff, has been well

9    established that that is the system that RSCS used, so why

10   isn't this cumulative to ask Mr. Eddington the same question

11   asked of many others?

12         MS. WULFF:  Thank you, Your Honor.

13         Just to clarify, I know we settled this on the

14   jury-instruction debate with Ms. Cheng, but the Government is

15   establishing that there is supposed to be a competitive bidding

16   process, and, therefore, it is a competitive bidding process

17   that can be -- you know, that such -- that a bid-rigging

18   conspiracy can take place, not that the -- the expectation --

19   not that the customer expectations or violation of the customer

20   expectations are the bid rigging, but the customer expectations

21   as to competition are relevant.

22         As to the cumulative nature of the questions, Your

23   Honor, this would be my only question, then I would move on.  I

24   believe it was Mr. Feldberg, although it could have been

25   Ms. Rahman, I apologize for not remembering, but one of them

Richard Eddington – Cross

1    asked about conversations between the suppliers starting the

2    bidding process.  This is one simple question to clarify

3    Mr. Eddington's expectations as to the bidding process.

4              THE COURT:  Anything more, Mr. Tubach?

5              MR. TUBACH:  No, Your Honor.

6              THE COURT:  I think the question is cumulative.

7    Moreover, the questions asked by Ms. Rahman or maybe

8    Mr. Feldberg were on a different subject, so, you know, the

9    jury has heard from many witnesses.  But RSCS used a

10   blind-bidding process, so there is no new information to be

11   gained on that front.  So I won't allow that question.

12             MS. WULFF:  Thank you, Your Honor.

13             THE COURT:  All right.  Thank you.

14             (Hearing continued in open court.)

15             MS. WULFF:  Thank you, Your Honor.

16   BY MS. WULFF:

17   Q.  I believe you testified on direct examination,

18   Mr. Eddington, about feedback that you gave the suppliers

19   during the bidding process?

20   A.  Yes.

21   Q.  Specifically, feedback that RSCS on behalf of KFC would

22   give the suppliers in order to try to negotiate the supplier

23   bids down, right?

24   A.  Yes.

25   Q.  And I believe you also testified on direct that KFC never

Richard Eddington – Cross

 1   signed a contract at the first price that it got from

 2   suppliers, right?

 3   *A.*   Yes, that was our goal.

 4   *Q.*   And as part of this bidding process, or this feedback

 5   process, you might also bluff to the suppliers, right?

 6   *A.*   Yes.

 7   *Q.*   And by that, you mean you might want the suppliers to think

 8   that your position -- your negotiating position was stronger

 9   than it actually was?

10   *A.*   Correct.

11   *Q.*   So in -- as part of bluffing, you might even ask for a

12   lower bid than you actually expected to receive, yes?

13   *A.*   Yes.

14   *Q.*   And on the other side of the negotiations, the chicken

15   suppliers want to hold firm in their bid, right?

16   *A.*   Yes.

17   *Q.*   They want to keep their bids at the levels they submitted

18   them, as opposed to lower them?

19   *A.*   As close as possible, yes.

20   *Q.*   And so at this stage in this negotiation, it wouldn't be in

21   KFC's interest to tell one supplier that another supplier is

22   holding firm in its price, right?

23   *A.*   That's correct.

24   *Q.*   And you never gave them feedback to increase their bids,

25   right?

Richard Eddington - Cross

1   A.   No.

2   Q.   You also testified during questioning, I believe, by

3   Mr. Feldberg about getting contract prices into a tight range.

4   Do you recall that testimony?

5   A.   I do recall being asked that, yes.

6   Q.   Now, Mr. Eddington, you never asked suppliers to exchange

7   their bids with each other in order to achieve that tight

8   range, did you?

9   A.   No.

10  Q.   And I'm -- we'll move on to the 2018 to 2020 contract.

11  Going into this bidding process, KFC wanted to lower prices,

12  right?

13  A.   Yes.

14  Q.   And like any other bidding process, the suppliers wanted to

15  keep their bids high?

16  A.   As high as possible, yes.

17          MS. WULFF:  One moment to confer, Your Honor?

18          THE COURT:  Sure.

19  BY MS. WULFF:

20  Q.   All right.  Thank you, Mr. Eddington.  Two final questions.

21          You never asked anyone at a chicken supplier to share

22  their bid prices with another chicken supplier during the

23  bidding process, did you?

24  A.   No.

25  Q.   And you would agree with me that if the competitors got

Richard Eddington - Cross

1    together and shared their bids or bidding strategy with each

2    other, then KFC would not get the full benefit of competition?

3              MR. KORNFELD:  Objection, Your Honor.  That's just a

4    hypothetical question that you've previously ruled.

5              MS. WULFF:  And your Honor has already overruled this

6    objection with regard to a prior witness.

7              THE COURT:  I think that's correct.  Overruled.

8              MS. WULFF:  Thank you, Your Honor.

9              THE WITNESS:  Could you ask the question again?

10   BY MS. WULFF:

11   Q.  Of course, Mr. Eddington.  You would agree with me that if

12   the competitors got together and shared their bids or bidding

13   strategy with each other, then KFC would not get the full

14   benefit of competition, right?

15   A.  I mean, that's somewhat assumptive; but we certainly

16   wouldn't promote that activity.  We wouldn't think it would

17   benefit us, no.

18             MS. WULFF:  Thank you, Mr. Eddington.  No further

19   questions.

20             THE COURT:  Thank you.

21             Redirect?

22             MS. RAHMAN:  One moment, Your Honor?

23             THE COURT:  Yes, sure.

24             MS. RAHMAN:  Mr. Eddington --

25             THE COURT:  When Mr. Loveland was adjusting it, I

Richard Eddington – Redirect

1    heard creaking and cracking.  I'm not sure what that means.

2              *MR. LOVELAND:*  I apologize, Your Honor.

3                        **REDIRECT EXAMINATION**

4    *BY MS. RAHMAN:*

5    *Q.*  You were asked about your relationship with Mr. Austin and

6    Mr. Brady and Mr. Fries?

7    *A.*  Yes.

8    *Q.*  Did your relationship with any of these men interfere with

9    your objectivity in negotiating with them?

10   *A.*  Absolutely not.

11   *Q.*  Or negotiating against them?

12   *A.*  Absolutely not.

13   *Q.*  Likewise, does your relationship with any of these men

14   interfere with your objectivity in testifying here today?

15   *A.*  Absolutely not.

16   *Q.*  Does your relationship with any of these same men interfere

17   with your objectivity in recalling facts in your one meeting

18   with the prosecutors two years ago?

19   *A.*  No.

20             *MS. RAHMAN:*  Now, could we call up 9703, please.

21             Your Honor, may I publish this?  This has been

22   admitted.

23             *THE COURT:*  Yes, you may.

24             *MS. RAHMAN:*  Thank you.

25

2513

Richard Eddington – Redirect

1   *BY MS. RAHMAN:*

2   *Q.*   Mr. Eddington, you were asked about this exhibit, 9703.   Do

3   you recall that?

4   *A.*   I do.

5   *Q.*   What's a marinated model?

6   *A.*   In -- if you're referring to the second bullet point --

7   *Q.*   Yes.

8   *A.*   In that particular instance, Tyson was asking to,

9   essentially, be paid for water, which in the then-current and

10   throughout my tenure models, the water portion of -- that was

11   injected into the bird to add flavor was removed from the price

12   that was paid or the weight that was paid.

13   *Q.*   And is the marinated model also reflected in the subject

14   line?

15   *A.*   Yes.

16   *Q.*   And how is a marinated model different from, say, the

17   models done by Claxton for KFC?

18   *A.*   The model that Claxton turned in did not ask for or refer

19   to being paid for that marination or water weight.

20   *Q.*   So it's comparing a marinated model that Tyson is

21   presenting to, say, the Claxton model.   Is that comparing two

22   different things?

23   *A.*   To some degree, yes.

24   *Q.*   Did the Government ask you about this document when they

25   met with you that one time two years ago?

Richard Eddington - Redirect

1    A.   Yes.

2    Q.   And you explained this to them, didn't you?

3    A.   I don't remember specifically what the conversation was

4    around the email.  I just remember that this -- every

5    conversation I seem to have, this email seems to come up in

6    it, so I know it came up.

7    Q.   But on cross-examination, you weren't asked about the fact

8    that these were two different models, were you?

9    A.   That's correct.

10   Q.   Now, you were also asked about worst-case scenario.

11   A.   Yes.

12        MS. RAHMAN:  You can take that down.  Thank you.

13   BY MS. RAHMAN:

14   Q.   What was the worst-case scenario for RSCS?

15   A.   Well, the worst-case scenario would have been that we had

16   to pay up to the 34 cents per pound that would have made the

17   small birds -- the KFC-sized birds as profitable at that time

18   as the large birds.

19   Q.   And were any of the bids you received from the suppliers

20   that worst-case scenario?

21   A.   No.

22   Q.   Now, you were also asked about Pilgrim's reduced volume.

23   A.   Yes.

24   Q.   By contracts -- contrast, did Claxton actually gain volume?

25   A.   They did.

Richard Eddington – Redirect

1    *Q.*  And was some of that volume gained as a result of Pilgrim's

2    losing volume?

3    *A.*  I can't remember specifically how the loads moved.  But

4    it's possible.

5    *Q.*  And Claxton gained volume because Claxton's price was

6    lower?

7    *A.*  Yes.

8    *Q.*  Now, you never asked suppliers to raise their bids,

9    correct?

10   *A.*  That's correct.

11   *Q.*  And during the negotiations, did any supplier, including

12   Claxton, raise their bids from round to round?

13   *A.*  I don't recall that.

14   *Q.*  Okay.  And Claxton always followed your feedback, correct?

15        *MS. WULFF:*  Objection.  Leading.

16   *BY MS. RAHMAN:*

17   *Q.*  Did Claxton always follow your feedback?

18   *A.*  Yes, whenever possible, they could, yes.

19        *MS. RAHMAN:*  One moment, Your Honor.

20        *THE COURT:*  Sure.

21   *BY MS. RAHMAN:*

22   *Q.*  Almost done.

23        You said in response to the prosecutor's last question

24   that their hypothetical was assumptive.  Do you recall that?

25   *A.*  I do.

2516

1    *Q.*  In your experience, is it effective to operate negotiations

2    with chicken suppliers based on assumptions?

3    *A.*  No, not specifically, no.

4    *Q.*  Why not?

5    *A.*  Well, I mean, assumptions can change, and, you know, you

6    may start off with assumptions, but the facts and the numbers

7    will soon bear out and oftentimes change your strategy as you

8    go along.

9    *Q.*  When you negotiate, do you rely on the facts?

10   *A.*  Yes.

11              *MS. RAHMAN:*  Thank you.  No further questions, Your

12   Honor.

13              *THE COURT:*  All right.  Thank you.

14              Any request by the Government to have Mr. Eddington be

15   subject to recall?

16              *MS. WULFF:*  No.  Thank you, Your Honor.

17              *THE COURT:*  Okay.  Then, Mr. Eddington, you are

18   excused.  Thank you very much.

19              *THE WITNESS:*  Thank you, Your Honor.

20              *MR. BELLER:*  May I have just a moment?

21              *THE COURT:*  Yes, you certainly may.

22              Additional evidence on behalf of any of the

23   defendants, Mr. Tubach?

24              *MR. TUBACH:*  At this time, Mr. Penn would move some

25   other documents into evidence.  We discussed this with the

 1    Government.  I can read off the list of documents that we're

 2    seeking to admit.  Some of them -- ten of them are subject to a

 3    limiting instruction.  But perhaps I'll read them all and give

 4    the Court which ones are limiting instruction.

 5         THE COURT:  That's fine.  Why don't you read the whole

 6    list, indicate which of those are subject to limiting

 7    instruction, without mentioning what the limiting instruction

 8    is, and at least we'll have the list to work from.

 9         MR. TUBACH:  The list is C-862, C-864, C-865, D-137

10    and D-138, and D-137 has a limiting instruction.

11         D-150 to D-152, and both D-150 and D-152 have limiting

12    instruction.

13         D-157 to D --

14         THE COURT:  I'm sorry.  May not have understood you,

15    Mr. Tubach.  D-150 through D-152, some of those are subject to

16    limiting --

17         MR. TUBACH:  Both D-150 and D-152 have limiting

18    instructions.

19         THE COURT:  But you're also moving D-151?

20         MR. TUBACH:  With no limiting instruction.

21         THE COURT:  Understood.  Sorry, go ahead.

22         MR. TUBACH:  D-154, D-157 through D-162, and in that

23    list, D-157, D-159, and D-161 have limiting instructions.

24         THE COURT:  Okay.

25         MR. TUBACH:  D-164 and D-165, and D-164 has a limiting

1    instruction.

2           Then D-407 through D-410.  And in that list, D-407 and

3    D-409 have limiting instructions.

4           And then D-789, and then E-545 and E-546, and E-545

5    has a limiting instruction.  And that's the entirety of the

6    list for Mr. Penn.

7           THE COURT:  Understood.  Why don't we start with

8    C-862, any objection to the admission of C-862?

9           MR. TORZILLI:  No, Your Honor.

10          MR. TUBACH:  I've spoken to Mr. Torzilli, and the

11   documents that I just read off, there is no objection to their

12   admissibility as long as the limiting instruction for the ten

13   documents are included.

14          THE COURT:  Okay.  Let me keep up with the book here,

15   and I will go through those just so we make sure.

16          All right.  And let's display D-137, which Mr. Tubach

17   said was subject to a limiting instruction.

18          MR. TUBACH:  Yes, that's the first one, Your Honor.

19          THE COURT:  And, Mr. Torzilli, do you believe that

20   limiting instruction is appropriate as to this one?

21          MR. TORZILLI:  Yes, Your Honor.

22          THE COURT:  Which is?

23          MR. TORZILLI:  That's -- want me to say it?

24          THE COURT:  Yeah.

25          MR. TORZILLI:  That the cover email can be

2519

1    considered for the time and the fact of transmission but not

2    others.

3                THE COURT:  Any objection to that limiting

4    instruction?

5                MR. TUBACH:  No.

6                THE COURT:  Mr. Torzilli, it was, it can be considered

7    for the time and manner of transmission, is that it?

8                MR. TORZILLI:  The time and fact of the transmission.

9                THE COURT:  Time and fact of transmission.

10               Let's go ahead and display D-137 so the jury knows

11   what we're talking about here.

12               Ladies and gentlemen, this will be admitted.  However,

13   it may be considered only for the time and the fact of

14   transmission.

15               (Exhibit D-137 admitted.)

16               THE COURT:  All right.  Why don't we go ahead and take

17   our afternoon break at this time.  And then we'll continue --

18   I'll pick up with D-138 when we reconvene.  All right.

19               Ladies and gentlemen, we'll recess for the

20   mid-afternoon break and reconvene, usual time, 3:30.  The jury

21   is excused.

22               (Jury out at 3:13 p.m.)

23               THE COURT:  All right.  Thank you.  Please be seated.

24               In terms of the defendants conferring about anything

25   they wish before the close of the defense case, do you think

 1    you'll be able to accomplish that over the break or how would

 2    you like to work that?

 3        MR. BELLER:  Your Honor, I think the break should be

 4    sufficient time, unless somebody speaks up behind me.

 5        THE COURT:  Right.  If for some reason, it's not, just

 6    let Ms. Grimm know, we'll reconvene a little bit later, then.

 7        We'll be in recess until 3:30.  Thank you.

 8        (Recess at 3:14 p.m.)

 9        (In open court at 3:31 p.m.)

10        THE COURT:  Assuming that the defense rests shortly,

11    would it, then, be the Government's intention to call

12    Mr. Bryant in rebuttal.

13        MR. HART:  Yes, it would, Your Honor.

14        THE COURT:  How long do you anticipate the discussion

15    regarding Mr. Bryant would take?  Because I would assume that I

16    would have the jury go into the jury deliberation room for a

17    period of time, we could talk about Mr. Bryant, and then -- any

18    idea?

19        MR. BELLER:  Your Honor, we think that the issues are

20    relatively simple.  So Ms. Pletcher and I are anticipating it's

21    going to be a very brief argument.

22        THE COURT:  Okay.  Then -- I think we can probably do

23    it in ten minutes, frankly.

24        Let's bring the jury back in.

25        MR. TUBACH:  This may simplify things.  I can give the

1    Court the limiting instruction, the next nine -- the only other

2    exhibits that are for limiting instruction have the same

3    limiting instruction.

4            THE COURT:  Which is?

5            THE WITNESS:  The exhibit can be considered for the

6    time and fact of the transmission but not otherwise for its

7    truth.  I spoke to Mr. -- Mr. Quinn spoke to Mr. Torzilli, and

8    he is fine with the idea of giving that instruction one time

9    and then showing each of the nine documents.

10           THE COURT:  Can be considered -- what was it, again,

11   Mr. Tubach?

12           MR. TUBACH:  Can be considered for the time and fact

13   of the transmission but not otherwise for its truth.

14           THE COURT:  For its truth?

15           MR. TUBACH:  Yes.

16           THE COURT:  Is that right, Mr. Torzilli?

17           MR. TORZILLI:  Yes, we agree with that formulation,

18   Your Honor.

19           THE COURT:  Yeah.  That would be helpful.

20           Mr. Tubach, let me review those ones that are subject

21   to limiting instruction, 150, 152, 157, 159, 161, 164 -- these

22   are all D -- D-407 and D-409, and E-545.

23           MR. TUBACH:  That's correct.  After I read it to you,

24   we had someone print out the limiting instruction, if that

25   would be helpful for the Court.

 1          THE COURT:  I think I got it, but cues are also good.

 2          Okay.  We can bring the jury in.

 3          (Jury in at 3:36 p.m.)

 4          THE COURT:  All right.  I think we left off,

 5     Mr. Tubach, at D-138.  That would be admitted.  And no limiting

 6     instruction with that one, right?

 7          MR. TUBACH:  Correct.

 8          THE COURT:  And next was D-150, and I believe you said

 9     that that does have a limiting instruction.

10          And, ladies and gentlemen, I've been informed what

11     that limiting instruction is.  So D-150 may be displayed to the

12     jury.

13          Ladies and gentlemen, the limiting instruction as to

14     this exhibit is it may be considered for the time and fact of

15     the transmission but not otherwise for its truth.  So consider

16     it for the time and fact of the transmission but not otherwise

17     for its truth.

18          Did you want that displayed --

19          MR. TUBACH:  I'm not asking for any of the documents

20     to be displayed.

21          THE COURT:  Obviously, the jury has to see it so they

22     know what limiting instruction is associated with it.  But we

23     won't spend time looking at it.

24          (Exhibit D-150 admitted.)

25          THE COURT:  And then -- so that is admitted.  And

1    D-151 is admitted.

2            (Exhibit D-151 admitted.)

3            *THE COURT:*  D-152, Mr. Tubach, you said there is a

4    limiting instruction, the same one as to that exhibit, correct?

5            *MR. TUBACH:*  Correct.

6            *THE COURT:*  Why don't we go ahead and display D-152 to

7    the jury.

8            Ladies and gentlemen, D-152 is subject to that same

9    limiting instruction.  This can be considered for the time and

10   fact of the transmission but not others for its truth.

11           (Exhibit D-152 admitted.)

12           *THE COURT:*  All right.  And the next exhibit is D-154.

13   That is admitted.

14           (Exhibit D-154 admitted.)

15           *THE COURT:*  And then D-157, let's go ahead and -- I'll

16   admit D-157 through D-162, but let's display D-157.  That is

17   subject to a -- the same limiting instruction, ladies and

18   gentlemen.  It can be considered for the time and fact of the

19   transmission but not otherwise for its truth.

20           (Exhibit D-157 admitted.)

21           *THE COURT:*  And --

22           *MR. TORZILLI:*  I'm not sure that the exhibit that you

23   were discussing was published.

24           *THE COURT:*  Sorry.  This is D-157, ladies and

25   gentlemen.

1           Okay.  D-158, we've admitted.

2           (Exhibit D-158 admitted.)

3           *THE COURT:*  D-159, let's display that one now.

4           Okay.  And this one, ladies and gentlemen, same

5      admonition, this is going to be the same admonition over and

6      over again, can be considered for the time and fact of the

7      transmission but not otherwise for its truth.

8           (Exhibit D-159 admitted.)

9           *THE COURT:*  All right.  And now, ladies and gentlemen,

10     let's take a look at D-161.

11          *MR. TUBACH:*  Has the Court admitted D-160 also?

12          *THE COURT:*  I've admitted 157 through D-162.

13          (Exhibit D-160 admitted.)

14          *THE COURT:*  D-161 is subject to that same limiting

15     instruction, ladies and gentlemen.  That's being displayed now.

16          (Exhibit D-161 admitted.)

17          (Exhibit D-162 admitted.)

18          *THE COURT:*  Okay.  Now let's -- I will admit D-164 and

19     D-165.  Let's display D-164.  D-164 is subject to that limiting

20     instruction, ladies and gentlemen.

21          (Exhibit D-164 admitted.)

22          (Exhibit D-165 admitted.)

23          *THE COURT:*  And now I will admit D-407 to D-410.  And

24     let's display D-407.

25          (Exhibit D-407 admitted.)

1            (Exhibit D-408 admitted.)

2            (Exhibit D-409 admitted.)

3            (Exhibit D-410 admitted.)

4            *THE COURT:*  The same admonition, ladies and gentlemen,

5     namely, that it can be considered for the time and fact of the

6     transmission but not otherwise for its truth.

7            Okay.  And let's also display D-409.  Same admonition,

8     ladies and gentlemen, to this exhibit.

9            Okay.  Now let's -- then D-789.

10           *MR. TUBACH:*  That's admitted and no limiting

11    instruction.

12           *THE COURT:*  So D-789 will be admitted.

13           (Exhibit D-789 admitted.)

14           *THE COURT:*  And E-545 and E-546 will be admitted.

15           (Exhibit D-545 admitted.)

16           (Exhibit D-546 admitted.)

17           *THE COURT:*  Let's display E-545.

18           Ladies and gentlemen, this exhibit is subject to that

19    same limiting instruction, namely, it can be considered for the

20    time and fact of the transmission but not otherwise for its

21    truth.

22           *MR. TUBACH:*  Thank you.  That is all for Mr. Penn.

23           *THE COURT:*  Thank you, Mr. Tubach.

24           Additional evidence on behalf of any of the

25    defendants?  Yes, Ms. Kuykendall.

 1          MS. KUYKENDALL:  Mr. Brady would also move for the

 2     admission of four documents.  We're not seeking to publish them

 3     at this time.  I've conferred with the Government and

 4     understand there is no objection.  I'll, of course, let them

 5     confirm that fact.  J-221, J-257, J-258, J-424.

 6          THE COURT:  All right.  Any objection to the admission

 7     of those exhibits?

 8          MR. TORZILLI:  No objection, Your Honor.

 9          THE COURT:  All right.  Then J-221, J-257, J-258, and

10     J-424 be admitted.

11          (Exhibit J-221 admitted.)

12          (Exhibit J-257 admitted.)

13          (Exhibit J-258 admitted.)

14          (Exhibit J-424 admitted.)

15          MS. KUYKENDALL:  Thank you.

16          THE COURT:  Thank you.

17          Ms. Carwile.

18          MS. CARWILE:  Thank you, Your Honor.

19          Mr. Austin would like to move approximately 20

20     documents into evidence at this time.  I have a binder for the

21     Court, if that would be acceptable.

22          THE COURT:  Yes, that's fine.

23          MS. CARWILE:  Okay.  In addition, Your Honor, the

24     Government has been provided this list of documents in advance.

25          THE COURT:  Okay.

1       *MS. CARWILE:*  And I'm only seeking to publish four of

2   these documents, so I'll start by referencing the list which

3   I'm moving into evidence but do not seek to have published

4   before the jury.  Would that work for the Court?

5       *THE COURT:*  Yes.  Go ahead.

6       *MS. CARWILE:*  That would be Exhibits 1527, 1529, 1530,

7   Defense Exhibit C-020, C-021-1, C-022, C-023, and C-024, C-464,

8   D-530, D-835, F-745 and F-746, and F-848 and F-849.  And those,

9   again, are the documents which Mr. Austin requests be moved

10  into evidence.  They are all subject to prior agreement by the

11  parties.

12      *THE COURT:*  Okay.  And any objection to the admission

13  of those exhibits, Mr. Torzilli?

14      *MR. TORZILLI:*  May I have a moment to check, Your

15  Honor?

16      *THE COURT:*  Of course.

17      *MR. TORZILLI:*  The Government has no objection to the

18  admission of those exhibits.

19      *THE COURT:*  All right.  Then each of those exhibits

20  will be admitted.

21          (Exhibit 1527 admitted.)

22          (Exhibit 1529 admitted.)

23          (Exhibit 1530 admitted.)

24          (Exhibit C-020 admitted.)

25          (Exhibit C-021-1 admitted.)

 1              (Exhibit C-022 admitted.)

 2              (Exhibit C-023 admitted.)

 3              (Exhibit C-024 admitted.)

 4              (Exhibit C-464 admitted.)

 5              (Exhibit D-530 admitted.)

 6              (Exhibit D-835 admitted.)

 7              (Exhibit F-745 admitted.)

 8              (Exhibit F-746 admitted.)

 9              (Exhibit F-848 admitted.)

10              (Exhibit F-849 admitted.)

11         *MS. CARWILE:*  Thank you.

12         The next exhibit that Mr. Austin moves to have

13    admitted is B-881.  My understanding is the limiting

14    instruction on this exhibit is that pages 11 and 12 only are to

15    be admitted.  And for that reason, I would be fine having this

16    displayed for the jury, with that --

17         *THE COURT:*  Okay.  In other words, you're moving the

18    admission of just pages 11 and 12 of Exhibit B-881?

19         *MS. CARWILE:*  That is correct.

20         *THE COURT:*  Okay.  Any objection to the admission of

21    pages 11 and 12 of that exhibit?

22         *MR. TORZILLI:*  No objection.

23         *THE COURT:*  Pages 11 and 12 of B-881 will be admitted.

24              (Exhibit B-881, pages 11 and 12 admitted.)

25         *MS. CARWILE:*  Does Your Honor wish I publish --

1          THE COURT:  Whatever you want to do.

2          MS. CARWILE:  Why don't we publish these.

3          THE COURT:  The two pages?

4          MS. CARWILE:  Yes, Your Honor.  Thank you.

5          MR. LOVELAND:  Your Honor, the Government's screen is

6   not working.  We can probably make due.

7          THE COURT:  Let me know if it becomes a problem.  I'm

8   not sure what the problem is, maybe turning on, off.

9          MS. CARWILE:  I'm being told that if the monitors are

10  unplugged and plugged back in, that might help.

11         THE COURT:  That's coming from Mr. Fronzaglia.

12         MS. CARWILE:  Not from me.

13         THE COURT:  I want to make sure we attribute the

14  success or failure.

15         MR. LOVELAND:  Your Honor, I don't know that the

16  Government wants to hold up the process.  We can see it okay.

17         THE COURT:  Let me know if the big screen or smaller

18  monitor don't work for the Government.  If someone needs to

19  reposition him or hers to be able to see another screen, feel

20  free to do so.

21         MR. LOVELAND:  Thank you.

22         THE COURT:  All right.  Ladies and gentlemen, have you

23  had a chance to look at -- was this page 11, Ms. Carwile?

24         MS. CARWILE:  Your Honor, this was actually page 12.

25         THE COURT:  Page 12.  Okay.

1          *MS. CARWILE:*  Thank you.

2          Mr. Austin has three final exhibits that he would

3     tender, and I would ask that each be published in turn to the

4     jury.

5          I'll start with Defense Exhibit J-203.  I would move

6     at this time for its admission, and if the Court needs further

7     argument, I can be heard on sidebar.

8          *THE COURT:*  Any objection to the admission of J-203?

9          *MR. TORZILLI:*  Can I look at the monitor?

10         *THE COURT:*  Yes.

11         *MR. TORZILLI:*  No objection, Your Honor.

12         *THE COURT:*  All right.  J-203 will be admitted, and it

13    may be published.

14         (Exhibit J-203 admitted.)

15         *MS. CARWILE:*  Thank you, Your Honor.

16         *THE COURT:*  All right.  We're good on that one.

17         *MS. CARWILE:*  Thank you.

18         We would now seek to admit and publish Defense Exhibit

19    J-235.

20         *THE COURT:*  Any objection to the admission of Exhibit

21    J-235?

22         *MR. TORZILLI:*  May I --

23         *THE COURT:*  Yes.

24         *MR. TORZILLI:*  Thank you.  No objection, Your Honor.

25         *THE COURT:*  Okay.  J-235 may be admitted, and it may

 1    be published.

 2              (Exhibit J-235 admitted.)

 3              *MS. CARWILE:*  Thank you, Your Honor.

 4              *THE COURT:*  All right.

 5              *MS. CARWILE:*  Thank you.

 6              And, finally, Your Honor, Mr. Austin would move for

 7    the admission of Defense Exhibit J-236, and we would ask that

 8    it be published to the jury.

 9              *THE COURT:*  Any objection to the admission of J-236?

10              *MR. TORZILLI:*  No, Your Honor.

11              *THE COURT:*  All right.  J-236 will be admitted and may

12    be published.

13              (Exhibit J-236 admitted.)

14              *THE COURT:*  All right.

15              *MS. CARWILE:*  Thank you, Your Honor.

16              *THE COURT:*  Mr. Tubach, go ahead.

17              *MR. TUBACH:*  Just briefly, we were looking at the

18    transcript.  It didn't appear that the Court had admitted

19    C-862, C-864, and C-865.  We just want to make sure they've

20    been admitted.

21              *THE COURT:*  Yeah, and just in case the transcript is

22    vague on that, each of those is admitted.

23              (Exhibit C-862 admitted.)

24              (Exhibit C-864 admitted.)

25              (Exhibit C-865 admitted.)

1          *MR. TUBACH:*  Thank you.

2          *THE COURT:*  All right.  Additional evidence on behalf

of any of the defendants?  Mr. Beller.

4          *MR. BELLER:*  Thank you, Your Honor.

5          At this time, the defense rests.

6          *THE COURT:*  All right.  Ladies and gentlemen, you

7   heard the Government at one point rested, so now the defendants

8   have each rested as well meaning that their evidentiary

9   presentation has been concluded.

10          At this time, ladies and gentlemen, I'm going to have

11   you go into the jury room.  I'll need about ten minutes to talk

12   to the attorneys about a matter, and why don't we plan on

13   reconvening at about 5 after 4:00.  I think that should do it.

14   If you could be ready at that time.  All right?

15          Jury is excused.

16          (Jury out at 3:56 p.m.)

17          *THE COURT:*  All right.  Thank you.  Please be seated.

18          Yes, Mr. Beller.

19          *MR. BELLER:*  As a preliminary housekeeping matter,

20   Mr. Feldberg reminds me we also need to renew Rule 29s.  We're

21   happy to do so in a very condensed fashion.  And we will simply

22   take the Court's direction on how it wishes to receive those

23   motions.

24          *THE COURT:*  I'm open to suggestion, and I think, as I

25   recall, when we were setting the deadline for the original

2533

1    submission of the Rule 29 motions, we set that deadline down

2    the road a bit, I thought to enable potentially the

3    consolidation of the defendants' Rule 29 briefing.  So that,

4    subject to the Government's input, of course, sounds fine to

5    me.  If we need to adjust the deadline based on where we are --

6    what the date is today, we can talk about that, too.

7           But, first of all, let me ask the Government, any

8    objection?  Assuming that the defendants wish to, perhaps,

9    combine their submissions, or at least submit one thing that

10   talks about each part of it, they may wish to do that.

11          MR. HART:  No objection.

12          THE COURT:  So next question is whether the defendants

13   wish to do something like that.  Once again, I'm perfectly open

14   to suggestion, if anyone wants to be the first to propose

15   something.

16          MR. BELLER:  Your Honor, that is certainly acceptable.

17   I think it makes sense for judicial economy, as well as our own

18   resources.

19          If the Court would simply allow us to, I suppose,

20   renew -- or, rather, make the motion at this time, I believe we

21   can do so collectively, with this being a placeholder.  The

22   Court had previously given a deadline of July the 11th for

23   those combined motions.  And certainly I think depending on the

24   next week, we may want to revisit that deadline.  But I think

25   for our purposes at this point, July 11 is appropriate.

1          THE COURT:  Why don't we set the deadline for July 11

2     at this time.  And then ask -- I'll ask each defendant, just so

3     we make a record on it, whether he makes a Rule 29 motion at

4     this time.

5          On behalf of Mr. Penn?

6          MR. TUBACH:  Yes, Your Honor.

7          THE COURT:  On behalf of Mr. Fries?

8          MR. KORNFELD:  Yes.

9          THE COURT:  On behalf of Mr. Brady?

10          MR. LAVINE:  Yes.

11          THE COURT:  On behalf of Mr. Austin?

12          MR. FELDBERG:  Yes, Your Honor.

13          THE COURT:  On behalf of Mr. Lovette?

14          MR. FAGG:  Yes, Your Honor.

15          THE COURT:  We'll have the briefing and set that for

16     combined briefing.  Once again, I'm not suggesting how the

17     defendants present that, but they can combine their motions

18     with a submission due on that date.  Then, as Mr. Beller says,

19     if for some reason there may be a need to extend the deadline,

20     then a request to that effect can be submitted.

21          I'm not sure if -- did we -- I don't think we set the

22     Government's response date.

23          MR. HART:  I don't think so.  But I think we asked for

24     equal time to respond.

25          THE COURT:  Right.  So maybe you can -- I'm not sure

1    what equal time means at this point, with the combined one, but

2    why don't you think about that, Mr. Hart, and come up with a

3    suggestion.  You don't have to do it right now, but we'll put

4    it on the to-do list so we don't forget.

5              *MR. HART:*  Sounds good.

6              *THE COURT:*  Why don't we talk about -- the Government

7    submitted a document, Docket No. 1409, that is in support of

8    calling Mr. Bryant in its rebuttal case.

9              Why don't we skip right ahead to defendants' response

10   to that, and then I'll, of course, let the Government respond.

11             Ms. Pletcher, go ahead.

12             *MS. PLETCHER:*  Thank you, Your Honor.

13             Defendants oppose the Government's proposal of

14   rebuttal testimony from Robbie Bryant for three main reasons:

15   First, as an initial matter, there is no door that has been

16   opened.  As the Court noted yesterday, defendants did not open

17   the door with general evidence that has come up in previous

18   trials and should have been clearly anticipated by the

19   Government.  There is no new issue, new evidence, a new theory

20   that the Government raises here.  Instead, the Government --

21   the issue the Government wants to rebut is whether a

22   price-fixing agreement existed, and that door has always been

23   open.  That's the ultimate issue in the case.  And the whole

24   concept that the door has been opened by some new evidence as

25   to whether there was a price-fixing agreement is just totally

1    misplaced.

2          The second point is that Professor Snyder's testimony

3    is no grounds for rebuttal by Mr. Bryant.  Professor Snyder's

4    testimony was both functionally and substantially

5    indistinguishable from the last trial, so the Government has a

6    clear, detailed forecast of Professor Snyder's testimony,

7    including his charts.  Mr. Bryant's proper rebuttal testimony

8    does not rebut Professor Snyder, and Professor Snyder was very

9    clear that he was not opining about communications and conduct.

10   So to the extent that Mr. Bryant's testimony is being proffered

11   to discuss communications and conduct, it just does not rebut

12   what Professor Snyder said.

13         In fact, we agreed -- last trial, we spoke extensively

14   about the extent of Professor Snyder's ability to discuss

15   communications and texts.  And he explained to the Court that

16   that was not the basis for Professor Snyder's testimony and

17   that the Government would not ask him about any specific

18   instances of communications and contact.

19         Now, with respect to the definition of price fixing,

20   Professor Snyder was never asked on direct examination to

21   define that term.  He was asked on cross-examination whether

22   that term meant that there was an agreement, and Professor

23   Snyder responded on redirect with a definition of an

24   economist's perspective on the term price fixing.  And

25   Mr. Bryant is not an economist.  He's not qualified to rebut

1    Professor Snyder's economic definition of what price fixing

2    means.

3          To that point, Mr. Bryant is not qualified to rebut

4    Professor Snyder's economic analysis at all, let alone the

5    benchmarking that the Government specifically called out as a

6    piece they wanted Mr. Bryant to discuss.

7          Mr. Bryant's vague proffered testimony about spot

8    prices is improper under Federal Rule of Evidence 602.  He has

9    no personal knowledge of the spot transactions incorporated in

10   Professor Snyder's analysis.  Even if he did, he's never done

11   any analysis of the spot market, so he cannot opine on how

12   those prices in a particular period compared to competitor

13   prices.  Professor Snyder was very clear about Pilgrim's prices

14   in the benchmark analysis also included spot sales.

15         So Mr. Bryant's testimony that spot prices drove up

16   prices doesn't rebut or undermine Professor Snyder's analysis.

17   In Mr. Bryant's opinion about his personal knowledge of the

18   ultimate issue, whether a price-fixing agreement existed, does

19   not rebut Professor Snyder's opinion as to whether a

20   price-fixing agreement is evidence in the economic data.  And

21   the Government conducted extensive cross-examination of

22   Professor Snyder, and they can't and they don't argue that they

23   didn't have that opportunity.

24         And, finally, my third point, the issue that

25   Mr. Bryant would opine on, again, whether there was a

1    price-fixing agreement is not a new, unanticipated issue but a

2    classic issue of personal knowledge of a fact witness.  It's

3    his observations about the alleged agreement.

4         Mr. Bryant was on the stand for three days for

5    approximately 14 hours of testimony.  He testified extensively

6    about his personal knowledge about the alleged price-fixing

7    agreement.  Any additional testimony on that point would be

8    cumulative and improper rebuttal testimony.

9         At the end of the day, the Government cannot use

10   rebuttal testimony to remedy defects in its case in chief.

11   That is what they're attempting to do with Robbie Bryant's

12   testimony.  For that reason and the reasons I just articulated

13   here, the defendants object to rebuttal testimony of Robbie

14   Bryant.

15        THE COURT:  Thank you, Ms. Pletcher.

16        Mr. Beller.

17        MR. BELLER:  Thank you, Your Honor.

18        Dovetailing with Ms. Pletcher, my intention is to

19   address the rebuttal of both Mr. Finch and also of Mr.

20   Kronauge.

21        Your Honor.  I would draw the Court's attention to

22   Tanberg v. Sholtis.  That's at 401 F.3d 1151.  Your Honor,

23   that's a 2005 Tenth Circuit opinion that discusses what is

24   appropriate for rebuttal evidence.  And specifically, in order

25   to have a rebuttal witness, there must be a nexus between the

1    purported rebuttal evidence and the evidence purported --

2    excuse me -- and the evidence that that rebuttal evidence is

3    purported to actually rebut.  So I guess, simply put, it has to

4    be reasonably tailored, Your Honor.  My words, not the Court's.

5         The nexus is what the Court uses.

6         Your Honor, my understanding of the Government's use

7    of Mr. Bryant as to Mr. Finch is twofold:  No. 1, that

8    Mr. Finch testified, according to the Government's summation,

9    that Claxton set its prices independently; and No. 2, that

10   Mr. Finch denied the existence of a price-fixing conspiracy.

11        Your Honor, I want to be very clear that Mr. Finch

12   testified regarding -- pursuant to Rule of Evidence 602, and

13   that is his personal knowledge.  And those questions of

14   Mr. Finch were always predicated based on his own personal

15   knowledge.

16        What Mr. Bryant is now, as the Government requests,

17   being called to testify to is that Claxton did not, in fact,

18   set their prices independently.  This, of course, is belied by

19   the fact that Mr. Bryant himself testified that Pilgrim's set

20   their prices independently, and so, certainly, there is not a

21   nexus between Mr. Bryant's belief of how Claxton set its prices

22   and Mr. Finch's 602 knowledge of what he believed to be the

23   case.

24        Mr. Finch was not asked conclusively whether or not

25   Claxton -- excuse me -- set their prices independently.  It

 1    was, to the best of his knowledge, did that happen.  And

 2    simply, Mr. Bryant is without his own knowledge to testify

 3    about Mr. Finch's knowledge.

 4         Your Honor, turning gears -- turning the corner to

 5    Mr. Kronauge, there is the exact same problem with

 6    Mr. Kronauge.  Mr. Kronauge, of course, as the Court knows,

 7    Popeyes, testified regarding his own personal knowledge

 8    regarding how he negotiated with the different suppliers.  Your

 9    Honor, again, Mr. Kronauge was asked pursuant to 602 about his

10    own personal knowledge.

11         My understanding of the Government's pleading is that

12    they want to call Mr. Bryant in order to rebut Mr. Kronauge's

13    testimony that he had an ability to go to confidant suppliers,

14    who, in the Government's words, were not participants in the

15    conspiracy.

16         Further, Mr. Kronauge, according to the Government's

17    summation, testified about his ability to call a supplier's

18    bluff.

19         Your Honor, if you look at the Government's pleading,

20    what the Government is now wanting to do is rebut Mr. Kronauge

21    of Popeyes by extrapolating and contradicting that against

22    Mr. Bryant's knowledge of KFC.  Certainly, I believe that there

23    is not that necessary nexus, because, again, Mr. Bryant is

24    without that 602 knowledge.

25         Finally, Your Honor, I would draw the Court's

2541

1     attention to *U.S. v. Rodella*, R-O-D-E-L-L-A.  Your Honor, this

2     is a District Court decision out of New Mexico that's 2014

3     Westlaw 6634310.  And *Rodella* talks about the fact that a party

4     cannot use a rebuttal witness to simply have the last word in a

5     presentation of their case.  Certainly, the Government could

6     have and, in fact, did anticipate the testimony of both

7     Mr. Finch and Mr. Kronauge, because, of course, they testified,

8     both of them, in trial 2 and testified very consistently with

9     what they testified to in chicken 3 or trial 3.

10          So the Government certainly could anticipate their

11    testimony and, in fact, did so.  How do we know that the

12    Government did so?  Because the Government has identified a

13    series of exhibits that they plan on using with Mr. Finch --

14    excuse me -- with Mr. Bryant.  Of those that they are planning

15    on using with Mr. Bryant, Your Honor, all of them, every single

16    one of them he identified and/or testified about in the

17    Government's direct examination with the exception of three

18    documents:  Exhibit 1930, which is in evidence.  That 1930,

19    Your Honor, is an email from Tim Mulrenin of Tyson's to Sara

20    Fisher of RSCS.  Mr. Bryant is not a participant in that

21    discussion.

22          The Government is also proposing using F-668.  Your

23    Honor, that is not currently in evidence, although the Court

24    may be familiar with that exhibit.  That is the organizational

25    chart from Pilgrim's Pride.

1          And then, finally, Your Honor, the Government is

2   proposing using D-925.  D-925 is not in evidence, although the

3   Court may be familiar with that one as well.  That is the

4   email regarding the Natchitoches plant,

5   N-A-T-C-H-I-T-O-C-H-E-S.

6          Your Honor, Mr. Bryant was asked at trial 2 about that

7   particular email.  I'm sorry I don't have the transcript in

8   front of me.  However, the Court sustained all of the

9   objections to that particular email.

10          So what we don't have, of course, is suddenly evidence

11   that is being rebutted, but, rather, we have the Government

12   attempting to use Mr. Bryant to have the last word when

13   Mr. Bryant himself does not have that 602 personal knowledge.

14          Your Honor, finally, in closing, I would simply note

15   that as to Mr. Finch, Mr. Finch -- excuse me -- Mr. Bryant has

16   already testified that he has no knowledge of how Claxton

17   Poultry prices its chicken, and because Mr. Bryant testified to

18   that particular fact, on its face he cannot be used to rebut

19   Mr. Finch, Mr. Bryant's testimony was also limited to KFC, with

20   little to no knowledge about Popeyes, and, therefore, he is not

21   with any knowledge to be able to properly rebut Mr. Kronauge's

22   knowledge of his own opinion on his abilities regarding alleged

23   price-fixing conspiracy.

24          And for these reasons, I do not believe that

25   Mr. Bryant is proper rebuttal for the reasons articulated by

1    the Government.

2              THE COURT:  All right.  Thank you, Mr. Beller.

3              MR. BELLER:  Thank you.

4              THE COURT:  Any other defendant?

5              (No response.)

6              All right.  Mr. Torzilli.

7              MR. TORZILLI:  Just briefly.

8              First, just so the record is clear, just to clear up a

9    misrepresentation of what counsel said, I don't think we've

10   ever said what documents we're, quote-unquote, planning to use

11   with Mr. Bryant when he's recalled in our rebuttal case.

12             I think what we have is an agreement with the other

13   side to provide them documents that we may use in a direct

14   examination, and that's what we provided.  We haven't indicated

15   what we plan to use.

16             But I think the key point here, Your Honor, is we've

17   got one witness and two issues, so one witness who actually has

18   knowledge about a price-fixing conspiracy, not Mr. Ledford,

19   apparently not Mr. Finch, not Mr. Kronauge.  We have

20   Mr. Bryant.  Mr. Bryant has personal knowledge of a

21   price-fixing conspiracy.  Why?  Because he personally witnessed

22   it, and he personally participated in it.

23             Two, we have one witness who has been prevented from

24   providing testimony about his personal knowledge about -- and

25   understanding of the existence of a price-fixing agreement --

1          THE COURT:  I don't know what you're talking about

2     there.

3          MR. TORZILLI:  Sure.

4          THE COURT:  There is that claim, but why was he

5     precluded from testifying about his personal knowledge?

6          MR. TORZILLI:  In the second trial, he was prevented

7     from -- we were prevented from using the term price fixing in

8     our examinations of Mr. Bryant.

9          THE COURT:  Right.  But that was because of concern

10    that it would be confusing to the jury, because all of a sudden

11    he's using a term that was going to be, of course, defined in

12    the jury instructions.

13         MR. TORZILLI:  Right.

14         THE COURT:  So, you know, I -- I don't think it's

15    quite accurate to say that he was precluded from testifying

16    about his personal knowledge.  And, you know, I can't think of

17    a single instance when he testified in this case of him being

18    precluded from testifying about his personal knowledge.

19         MR. TORZILLI:  Of his understanding of a price-fixing

20    agreement.  So we've been --

21         THE COURT:  He's been able to testify about his

22    understanding of what agreement existed.  But there was -- in

23    the second trial, his use of the term "price fixing" -- because

24    it has legal significance in the case, it's going to be defined

25    as part of the case --

1          MR. TORZILLI:  Right.  And now numerous witnesses in

2     the case have been asked, you know, do you know anything about

3     price fixing, which is precisely our point, it's opened the

4     door to asking someone who actually knows about the existence

5     of price fixing to ask if he knows about the existence of a

6     price-fixing agreement.

7          THE COURT:  Right.  But my question is, in what way

8     has he been precluded from explaining that?  You know, I

9     understand he hasn't been asked about the term "price fixing,"

10     but, you know, in other terms or descriptors or whatever, how

11     has he been limited from explaining his personal knowledge

12     about existence of an agreement?

13          MR. TORZILLI:  We haven't been able to ask him about

14     what his understanding what the term "price fixing" is and

15     whether he has any knowledge of whether he or anyone else

16     participated in a price-fixing agreement.

17          THE COURT:  I don't understand that last part of it.

18     He's been able to describe any personal knowledge he has about

19     existence of an agreement.  Always has been.

20          MR. TORZILLI:  He's been able to describe events he

21     has personal knowledge of.  He -- unlike Mr. Ledford and

22     Kronauge and witness after witness, we have been unable to ask

23     whether, sir, do you have personal knowledge about price

24     fixing?  And he's the only person --

25          THE COURT:  When?  I mean, I cannot think of a single

1    solitary time he's been excluded from testifying about his

2    personal agreement to fix prices.  That's what he testified

3    about every time.

4            *MR. TORZILLI:*  Well, I'm not sure that the jury

5    understands that, although the jury --

6            *THE COURT:*  Whose fault is that?  Once again, you're

7    right, because the term "price fixing" has legal significance,

8    he has been limited, and you're also quite correct that

9    numerous witnesses have been asked, using the term "price

10   fixing," are you aware of any price fixing, no, although there

11   may be a difference between a person who has knowledge and a

12   person who doesn't.  But, you know, I still can't think of at

13   any point in time that Mr. Bryant has ever been limited from

14   describing his personal knowledge of an agreement to fix prices

15   or rig bids in this case.

16           *MR. TORZILLI:*  We have been unable to pose questions

17   to him using the term "price fixing."  It seems incredibly

18   unfair that the one person who actually has knowledge, using

19   that terminology, we can't ask the question --

20           *THE COURT:*  I mean, that's what I'm trying to figure

21   out, what the purpose of this filing even is.  If he hadn't

22   been limited in his ability to describe, you know, his personal

23   knowledge of any agreement to fix prices, other than, perhaps,

24   not use a buzz word, then, you know, are you asking -- which

25   seems to be the case -- that he now be able to opine on the

1    existence of a conspiracy outside of his personal knowledge?

2         MR. TORZILLI:  No, we'd be asking him questions about

3    his personal knowledge.  But we would like to, as Your Honor

4    used the term "buzz phrase," we would like to, like other

5    witnesses have been asked about their knowledge of price

6    fixing, quote-unquote, we would like to ask that same question

7    of Mr. Bryant that's been asked of witness after witness after

8    witness.  That's, in essence, to boil it all the way down,

9    essentially, what I'm asking.

10        THE COURT:  Okay.  But that is not responsive to

11   anything that has -- that the defendants have mentioned, and

12   it's -- that was one part of the Government's submission.  But

13   what they're arguing is that there is no door opened.

14   Curiously, the Government is making a lot of the same

15   arguments, doors have been opened, you know, Professor Snyder,

16   what does that have to do with, you know, just the use of the

17   so-called buzz term.

18        MR. TORZILLI:  Yeah.  I think the -- similar with

19   Professor Snyder who is using a certainly confusing and

20   misleading definition of the term, as was, you know, sussed out

21   on cross-examination and, obviously, has no personal knowledge,

22   to be able to ask Mr. Bryant, who does have personal knowledge

23   about the term "price fixing," what it means to him and whether

24   he has personal knowledge.

25        THE COURT:  What is he going to say when he's asked,

1    what does the term "price fixing" mean?

2         MR. TORZILLI:  I think, in essence, a combination of

3    competitors getting together to raise price together or resist

4    price decreases together against a common customer.

5         THE COURT:  Okay.

6         MR. TORZILLI:  In essence.

7         THE COURT:  Assuming he gives that, why is that some

8    material difference in terms of what Mr. Bryant has already

9    testified?  I mean, why is that some revelatory testimony, you

10   know, testimony to the jury that would help them out, as

11   opposed to Mr. Bryant, you know, on direct, when he was called

12   by the Government as a witness, explaining his personal

13   knowledge about any agreements to fix prices or rig bids?

14        MR. TORZILLI:  Well, we weren't able to ask the

15   question in that formulation.

16        THE COURT:  I know.  But what I'm saying, if

17   Mr. Bryant is going to give that definition, why is that going

18   to be so materially different, that the Government has been --

19   somehow been unfairly precluded from him, you know, testifying

20   about what price fixing means to him?

21        MR. TORZILLI:  Because the people have answered the

22   question, no, I have no personal knowledge, have answered that

23   same question.  That's the fundamental unfair asymmetry that is

24   going on here.

25        THE COURT:  Okay.  But as has been mentioned, hasn't

1    been mentioned today, but do you think there is a difference

2    between someone who would testify about -- who believes it

3    exists, and as opposed to someone who, you know, like, for

4    instance, Ms. Ray, she's not a lawyer, she doesn't know exactly

5    what price fixing is, but she knows enough to be able to say,

6    no, I have no personal knowledge of it?  There is a difference

7    between a person who says I'm not aware of any, and someone who

8    is going to, then, you know, elaborate on the existence of

9    that, when that's a term the Court is going to define for the

10   jury.

11        *MR. TORZILLI:*  I think it comes down to the response

12   to the formulation of a specific question that's been asked of,

13   as I said, witnesses who basically have no knowledge, no

14   purported knowledge, and someone who does.

15        *THE COURT:*  Okay.  Sorry, Mr. Torzilli, I interrupted

16   you.  Go ahead with the rest.

17        *MR. TORZILLI:*  Just one other smaller point is,

18   Mr. Bryant also has personal knowledge, and I think the defense

19   counsel's treatment of the subject was kind of confused in

20   terms of what Mr. Bryant can offer.  But in terms of the

21   benchmarking slide, J-236, when called, we would ask Mr. Bryant

22   about whether the -- for lack of a better term, the number

23   above the bar all the way on the left is accurate based on his

24   personal knowledge and why not, to rebut Professor Snyder's

25   benchmark analysis.

1          THE COURT:  Okay.  Remind me, what did that bar show?

2          MR. TORZILLI:  Sure.  The benchmarking analysis.

3          If we could call up J-236, just so we can all see it.

4          Thank you, Ms. Pearce -- I'm sorry, that's the wrong

5    number.  J-256.  Apologies, Your Honor, I am going from memory

6    here on the exhibits, which all do run the same at this point,

7    but --

8          THE COURT:  That's fine.

9          MR. TORZILLI:  The numbers -- just to remind you about

10   the way this benchmarking purportedly works is the numbers on

11   the right are higher than the numbers on the left, and that's,

12   you know, required for the conclusion that Professor Snyder

13   wants to provide.

14         THE COURT:  Sure.  What do you anticipate that

15   Mr. Bryant would testify to as to the bar on the far --

16         MR. TORZILLI:  On the left, which he has personal

17   knowledge of because he worked at Pilgrim's in 2015, and would

18   say that number ought to be considerably higher, based on his

19   personal knowledge.

20         THE COURT:  It would be higher if you mixed in spot

21   sales?

22         MR. TORZILLI:  I think he would say -- he would say

23   that all in, it would be considerably higher.  That has nothing

24   to do with specifically spot sales, because we're talking about

25   Pilgrim's now, but it should be considerably higher, that

1    number should be considerably higher than the 1.03 number that

2    is reflected there.

3              THE COURT:  Okay.  And he knows that -- he has

4    personal knowledge?

5              MR. TORZILLI:  He worked at Pilgrim's and had -- as

6    he's testified to, you know, had involvement in the KFC

7    account, including in 2015.

8              THE COURT:  Okay.

9              MR. TORZILLI:  So, I mean, he has personal knowledge

10   at that level.

11             THE COURT:  Understood.  Anything else, Mr. Torzilli?

12             MR. TORZILLI:  No, Your Honor.  Thank you.

13             THE COURT:  I'll hear -- if Ms. Pletcher, Mr. Beller

14   have something real quick, but we've gone past my bad estimate.

15             MS. PLETCHER:  There is no indication that Robbie

16   Bryant had access to the data Professor Snyder used, that he

17   evaluated the data, that he heard Professor Snyder's testimony

18   that the bar second from the left actually contains spot prices

19   in it.  This is just going really far afield.  It's

20   spit-balling, compared to rigorous economic data; and he's not

21   qualified to comment on that.

22             THE COURT:  Okay.  Mr. Beller.

23             MR. BELLER:  No.  Thank you, Your Honor.

24             THE COURT:  All right.  So the question is whether the

25   Government can call Mr. Bryant as a witness.  I don't think --

2552

 1    this is not a question of could the Government have anticipated

 2    it.  If that were the standard, then the Government in a

 3    retrial couldn't call anyone in rebuttal.  That's, frankly,

 4    preposterous.  Mr. Bryant is a perfect example of a witness who

 5    often gets called by the Government in a rebuttal argument, and

 6    there is many witnesses whose testimony that Mr. Bryant, once

 7    again, based upon his testimony that he has personal knowledge

 8    of an agreement can rebut.

 9            Professor Snyder, to some extent, Ms. Pletcher is

10    right, he can't directly rebut Professor Snyder because

11    Mr. Bryant is not an economist like him.  But on the other

12    hand, you know, he would be able to put in perspective a fact

13    that the Government was trying to bring out on -- with

14    Professor Snyder on cross-examination, namely, that, you know,

15    whether or not Professor Snyder sees signs, objectively, of a

16    price fixing.  The issue for the jury in this case is not

17    whether they managed to pull it off; it's whether an agreement

18    existed.  And so having the Government put that type of

19    testimony on is perfectly appropriate.

20            So the fact that the Government have anticipated it is

21    not relevant.  I do believe that Mr. Bryant can rebut testimony

22    that has been presented by the defendants.  However, I am still

23    going to limit him.  He can't use the term "price fixing."  I

24    just don't see that that is a material distinction at all.  I

25    fail to understand, you know, why his inability to use the term

```
 1    "price fixing" -- he can describe his knowledge of the

 2    agreement, he can describe all of the details about it, but I

 3    do think that there is a distinction between a witness who

 4    believes that it existed and is using that as a term that is

 5    going to be defined and that the jury ultimately needs to apply

 6    my definition of price fixing as compared to him describing

 7    that there is price fixing using his definition of it.  There

 8    is a difference there, and he just doesn't need to use that

 9    term, and there is no prejudice to the Government of him not

10    being able to do so, even though witnesses were asked, and the

11    term was used.  But that was simply, like Ms. Ray, to say, no,

12    not aware of any.  I think that that's the difference.

13            Moreover, to the extent that the Government may try to

14    ask Mr. Bryant anything outside of his personal knowledge, that

15    is absolutely inappropriate.

16            Now, Mr. Torzilli said that's not going to happen, and

17    I'm sure that it won't, but I -- I was suspicious of the

18    Government's brief, that he would be asked something maybe in

19    the form of an opinion, and he's not an opinion -- he's not an

20    expert.  He's a fact witness.  So he can't opine on things.  He

21    can testify, once again, about his personal knowledge.  That's

22    perfectly appropriate.

23            All right.  So Mr. Bryant's queued up.  Mr. Torzilli.

24            MR. TORZILLI:  He is here.

25            THE COURT:  Mr. Feldberg.
```

1            *MR. FELDBERG:*  One more point.  In terms of the

2     personal observations that Mr. Bryant claims to have had, which

3     are three conversations in 2014 and one in 2017, which led to

4     his notes, extensively litigated.  He has testified at length

5     and been subject to cross-examination at length about all of

6     his personal observations.  This is nothing more than a repeat.

7            *THE COURT:*  Once again, I think the Government can put

8     a witness on, even though the witness has testified in the case

9     in chief, to rebut by bringing up, even though it may be the

10    same testimony -- some of it can be the same testimony because

11    it is rebutting what -- the evidence that came in by the

12    defendants.

13           *MR. FELDBERG:*  I -- Your Honor, I apologize, I'm

14    puzzled by how anything the defense put on could be rebutted by

15    Mr. Bryant repeating his, you know, I -- I was pacing in and

16    out of Mr. Austin's office and I heard him say, The price is

17    the price.  There is a disconnect in my mind, and I apologize,

18    I can't follow the logic of that argument.

19           *THE COURT:*  Well, the Government is, you know, going

20    to call him.  We'll see, but I think that he is a witness who

21    can rebut testimony that was introduced and evidence introduced

22    by the defendants, and as a result, he's an appropriate

23    rebuttal witness.

24           *MR. FELDBERG:*  Thank you, Your Honor.

25           *THE COURT:*  All right.  Let's bring the jury back in.

1          (Jury in at 4:33 p.m.)

2          THE COURT:  Please be seated.

3          Well, so much for my estimate, ladies and gentlemen.

4     Thanks very much for your patience.

5          So, ladies and gentlemen, you will recall way back

6     when, beginning of the case, I indicated that in the event that

7     the defendants present evidence, the Government would have the

8     opportunity for rebuttal evidence.

9          At this time, I will ask the United States if it

10    wishes to put on any rebuttal evidence.  Mr. Torzilli.

11         MR. TORZILLI:  Yes, we do, Your Honor.

12         THE COURT:  All right.  Would you like to call a

13    witness or introduce evidence?

14         MR. TORZILLI:  Yes, Your Honor, we'd to call the

15    witness.

16         THE COURT:  All right.

17         MR. TORZILLI:  The United States would like to recall

18    Mr. Robert Bryant.

19         THE COURT:  All right.  Mr. Bryant, if you'll please

20    come forward, and you can go ahead and resume the witness

21    stand.

22       (**ROBERT BRYANT, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**)

23         THE COURT:  Mr. Bryant, do you understand you're still

24    under oath?

25         THE WITNESS:  Yes.

Robert Bryant – Direct

1          THE COURT:  Thank you, you may have a seat.

2                    **DIRECT EXAMINATION**

3     BY MR. TORZILLI:

4     Q.  Good afternoon, Mr. Bryant.

5     A.  Good afternoon.

6     Q.  Could you reintroduce yourself to the ladies and gentlemen

7     of the jury, please?

8     A.  Yeah, Robert Bryant.  I was with Pilgrim's for about 30

9     years until --

10    Q.  And how long -- can you remind the ladies and gentlemen of

11    the jury how long you were you in the chicken industry in

12    total?

13    A.  Oh, about 30 years total.

14    Q.  And how long did you work for Pilgrim's Pride company?

15    A.  Probably 15 to 20 years.

16    Q.  You -- did you work in the sales department?

17    A.  Yes.

18    Q.  Did you during your time in the sales department work on

19    bidding and negotiations for customers of Pilgrim's Pride?

20    A.  Yes.

21    Q.  And approximately how many bidding and negotiating events

22    in total during your career did you personally participate in?

23          MR. TUBACH:  Your Honor, I'm going to object as

24    cumulative and asked and answered.

25          THE COURT:  Overruled.

1          THE WITNESS:  Probably thousands, in total.

2    BY MR. TORZILLI:

3    Q.  Did you during your career work on bidding and negotiations

4    for fast-food restaurant customers of Pilgrim's Pride?

5    A.  Yes.

6    Q.  And approximately how many bidding and negotiating events

7    were you personally involved in with respect to fast-food

8    restaurant customers of Pilgrim's Pride?

9    A.  Probably hundreds.

10   Q.  Sir, do you have personal knowledge of whether there was an

11   agreement between you, anyone else at Pilgrim's Pride, and any

12   competitors of Pilgrim's Pride with respect to bidding or

13   prices for fast-food restaurant customers?

14          MR. BELLER:  Objection.  Foundation, vague, compound.

15          THE COURT:  Overruled.

16   BY MR. TORZILLI:

17   Q.  You can answer, Mr. Bryant.

18   A.  Yes.

19   Q.  Is your understanding based at least in part on events you

20   personally witnessed that you have personal knowledge in the

21   year 2014?

22   A.  Yes.

23   Q.  What events in 2014?

24   A.  The instruction to share the basis for price increases with

25   our competitors, confirmation emails that our competitors, in

Robert Bryant – Direct

1   fact, did raise prices with us, sharing Pilgrim's position on

2   subsequent rounds of bids, not to lower prices, and hold those

3   prices -- overheard phone calls between Mr. Austin and

4   competitors, and conversations with my boss and Mr. Austin.

5   *Q.*  Any meetings?

6   *A.*  Yes.  We were at KFC meetings where the same information

7   that was shared with competitors was shared with KFC.

8   *Q.*  Okay.  I want to break some of that down.  First, you

9   mentioned a confirmation email?

10  *A.*  Correct.

11  *Q.*  Okay.

12       *MR. TORZILLI:*  Ms. Pearce, if we could call up

13  Government Exhibit 1066.

14       And, Your Honor, this has been received into evidence,

15  and permission to publish Government Exhibit 1066 to the jury,

16  please.

17       *THE COURT:*  You may.

18       *MR. LAVINE:*  I would object based on the cumulative

19  nature of this.  This exhibit was discussed for probably an

20  hour.

21       *THE COURT:*  Overruled.

22  *BY MR. TORZILLI:*

23  *Q.*  Okay.  Mr. Bryant, do you see the first page of Government

24  Exhibit 1066 on the screen in front of you?

25  *A.*  Yes.

Robert Bryant - Direct

1    Q.  Okay.  Now, you -- this is -- let me strike that and ask

2    you, sir, is this the confirmation email that you identified

3    as one of the events in 2014 that led to you having personal

4    knowledge of an agreement to raise price?

5    A.  Yes.

6    Q.  Okay.  Now, can you explain to the ladies and gentlemen of

7    the jury why this email is one of the events in 2014 that

8    contributes to your personal knowledge of that agreement?

9    A.  It confirms that our -- all of our competitors are --

10   increased prices at the same time that Pilgrim's did.

11           MR. TORZILLI:  Ms. Pearce, if we can focus in on the

12   bottom half of the first page of Government Exhibit 1066,

13   please.  And the top -- yeah, thank you, that's perfect.  The

14   bottom half, a little more.  A little bit lower, please.

15           Perfect.  Thank you.

16   BY MR. TORZILLI:

17   Q.  Mr. Bryant, you're not on any of the emails that are

18   being displayed presently; is that fair to say?

19   A.  Correct.

20   Q.  Did you, though, at some point receive the set of emails

21   contained in Government Exhibit 1066?

22   A.  Yes.

23   Q.  Okay.  When approximately did you receive the set of emails

24   contained in Government Exhibit 1066?

25   A.  Near the dates that are on there.  I don't remember the

Robert Bryant - Direct

 1   exact date.

 2   Q.  Had -- at the time you received the emails contained in

 3   Government Exhibit 1066, had Pilgrim's submitted its

 4   first-round bid to KFC in 2014?

 5   A.  Yes.

 6   Q.  Did Pilgrim's competitors submit, to the best of your

 7   understanding, its first-round bids to KFC in 2014?

 8   A.  Yes.

 9   Q.  Had Pilgrim's met with KFC yet to discuss its first-round

10   bid with KFC for feedback?

11   A.  Not yet.

12   Q.  Okay.  Do you recall when relative to the receipt of this

13   email Pilgrim's was going to meet with KFC to discuss

14   Pilgrim's first-round bid?

15   A.  I believe it was the next day.

16   Q.  Did you personally attend the meeting with KFC that was

17   going to occur the day after you received the set of emails in

18   Government Exhibit 1066?

19   A.  Yes.

20   Q.  Did your receipt of the emails contained in Government

21   1066 help you prepare for the meeting you were going to attend

22   the next day?

23   A.  Yes.

24   Q.  Okay, sir.  I'd like to focus on the email that is at the

25   bottom of page 1 there.  It's -- it's an email that says --

Robert Bryant – Direct

1   it's Jason McGuire at Pilgrim's.com wrote.  Do you see that?

2   *A.*  Yes.

3   *Q.*  Can you remind the ladies and gentlemen of the jury who

4   Mr. McGuire was at the time?

5   *A.*  My manager.

6   *Q.*  Did Mr. McGuire plan to attend the meeting that was going

7   to occur after you received Government Exhibit 1066?

8         *MR. BELLER:*  Your Honor, objection.  This line of

9   questioning is outside the scope of the defendants' case.

10         *THE COURT:*  Overruled.

11  *BY MR. TORZILLI:*

12  *Q.*  Sir, can you read the email that Mr. McGuire wrote there

13  at the bottom?

14  *A.*  The subject line?

15  *Q.*  Yeah, and then the text that begins with the word

16  "surprised."

17         *MR. FAGG:*  Objection, Your Honor.  The document speaks

18  for itself.

19         *THE COURT:*  Yeah.  We've talked about this before, so

20  I think that should be more abbreviated.

21         *MR. TORZILLI:*  Sure.

22  *BY MR. TORZILLI:*

23  *Q.*  Now, Mr. Bryant, the email that Mr. McGuire wrote there

24  that begins with the word "surprised," is that one of the

25  emails that is part of the events in 2014 that leads to your

2562

Robert Bryant - Direct

1    personal knowledge of an agreement among competitors to raise

2    prices?

3    A.  Yes.

4    Q.  Could you explain to the jury how that fits into your

5    personal knowledge about an agreement to raise price?

6    A.  Well, it's the confirmation that our competitors, in fact,

7    did submit increased prices along with Pilgrim's.

8    Q.  All of Pilgrim's competitors?

9    A.  Correct.

10           MR. BELLER:  Objection.  Foundation.

11           THE COURT:  Overruled.

12   BY MR. TORZILLI:

13   Q.  I'm sorry?

14   A.  Correct.

15   Q.  Okay.

16           MR. TUBACH:  Can we have a brief sidebar?

17           THE COURT:  Sure.

18           (Hearing commenced at the bench.)

19           THE COURT:  Mr. Tubach, go ahead.

20           MR. TUBACH:  I don't want to keep making objections,

21   but I have a continuing objection that all of this is

22   duplicative, cumulative, unnecessary.  There hasn't been a

23   single question he wasn't asked the first time around in his

24   12 hours of testimony.  I don't want to keep standing up on

25   every question in that it's cumulative.  Standing objection,

Robert Bryant - Direct

 1    this line is cumulative.

 2           MR. FELDBERG:  Join in it.  I join that objection,

 3    Your Honor.  This is entirely duplicative.

 4           THE COURT:  Any defendant not join that?

 5           MR. LAVINE:  I do join in it.  I also have to say,

 6    this is clearly not rebuttal testimony.  This is merely a

 7    repeat of what he testified to for three days in this

 8    courtroom.  I object to any continued aspect of this testimony.

 9           THE COURT:  Cumulative objections are overruled.  It's

10    going to be -- it's going to be similar to what he was asked

11    already.  That's not the point.  The point is whether it

12    rebuts -- this rebuts testimony that the -- evidence that the

13    defense brought in.

14           However, Mr. Torzilli, you can't -- I mean, Mr. Lavine

15    is ultimately right, and that is, we spent a lot of time on

16    these things; therefore, appropriately, this needs to be

17    abbreviated and quick.  It needs to, perhaps, you know, go over

18    a few of the things that Mr. Bryant testified before, but not

19    to, you know, re-create the direct from the Government's case

20    in chief.

21           MR. LAVINE:  The point about it needing to rebut what

22    the defense case put on, there is nothing about what

23    Mr. McGuire's role was in this.  The fact he received this

24    email doesn't in any way rebut what the defense put on.

25           THE COURT:  Ultimately, I think it is.  That doesn't

2564

Robert Bryant - Direct

 1   preclude Mr. Torzilli from reminding the jury through

 2   Mr. Bryant's testimony about some of the context of this

 3   particular document.  So that's not inappropriate to do,

 4   whether something specifically came out in the defense case

 5   that would -- about Mr. McGuire that would necessitate

 6   rebuttal, so that's just an -- to give the jury the context to

 7   provide the rebuttal testimony.

 8            All right.

 9            MR. TORZILLI:  If I may, just a question in terms of

10   guidance because I want to be mindful of your point about being

11   abbreviated.  I take it that the direct exam testimony -- and

12   I'll include cross and redirect as well.  I take it, then, Your

13   Honor, that that would be -- I'll call it transported into this

14   in terms of setting foundation for questions as opposed to

15   having to rehash things to reestablish foundation.

16            THE COURT:  I don't understand what you mean,

17   although, are you suggesting that if you -- the process to be

18   abbreviated?  I'm not sure.

19            MR. TORZILLI:  No, not in that sense.  If this direct

20   exam is abbreviated, of course, that would mean foundational

21   questions and issues would be -- you know, would not be posed.

22   And so I guess my question is whether that, you know, is, in

23   fact, an appropriate way to look at it, that foundation has

24   already been established in the previous examination.

25            THE COURT:  Like I say, I still don't quite know what

Robert Bryant - Direct

 1   you're talking about.  I mean, obviously, the jury has heard

 2   his direct, heard his redirect.  You may, you know, ask

 3   questions regarding some of the same issues to rebut testimony.

 4   But it doesn't seem like, given the fact that the jury has

 5   heard him testify before, that, you know, it's -- simply going

 6   back through that same outline would be appropriate or

 7   necessary.  Rather, it would just be -- for him to bring out

 8   some of the things that he may have already testified to but

 9   which rebut testimony provided by the defense.  That seems like

10   it could be done in abbreviated fashion.

11        MR. LAVINE:  Your Honor, this is Mr. Lavine.  If I may

12   comment for a second, please.

13        THE COURT:  Go ahead.

14        MR. LAVINE:  What they're doing is putting on

15   conclusory statements as far as personal knowledge.  And we

16   know from the three days of examination of this individual he

17   doesn't have personal knowledge.  He has very, very limited

18   personal knowledge.  What they're able to do here is just use

19   the general terms of personal knowledge.  That means the

20   defense is going to have to take it step by step to show he has

21   no personal knowledge of what he's talking about.

22        THE COURT:  It may be.  But we're not there yet.

23        All right.  We're done.

24        (Hearing continued in open court.)

25        MR. TORZILLI:  If we can please display Government

Robert Bryant - Direct

1    Exhibit 1066 again.

2            If we can scroll up to the next email from

3    Mr. McGuire where it says, Can you smell, and then the response

4    to that.

5    BY MR. TORZILLI:

6    Q.  Do you see that, Mr. Bryant?

7    A.  I do.

8    Q.  Now, does that -- does that exchange of emails within

9    Government Exhibit 1066, is that also part of the events that

10   give you knowledge about an agreement amongst competitors to

11   raise pricing in 2014?

12   A.  Yes.

13   Q.  And who wrote the top email of the ones being displayed

14   on your screen right now?

15   A.  Mr. Austin.

16   Q.  Did -- and that's Defendant Roger Austin?

17   A.  Correct.

18   Q.  Did Defendant Roger Austin participate in the agreement

19   amongst competitors to raise price in 2014?

20           MR. FELDBERG:  Objection.

21           THE COURT:  Overruled.

22           MR. FELDBERG:  Just for -- so the record is clear,

23   it's a conclusion; it's not a statement of fact.

24           THE COURT:  Overruled.

25           THE WITNESS:  Yes.

Robert Bryant - Direct

1    *BY MR. TORZILLI:*

2    *Q.*  What's your basis for concluding that Defendant Roger

3    Austin participated in an agreement among competitors to raise

4    price in 2014?

5    *A.*  Like I said before, the sharing of the basis for the price

6    increase with our competitors, or he was instructed to do that;

7    confirmation email we have on the screen, that they, in fact,

8    did raise prices; and then overheard phone calls between

9    Mr. Austin and competitors where Pilgrim's -- where Pilgrim's

10   was not going to concede price in the next round of the

11   bidding; and delivering that same message to the customer as

12   our official response to that next round of bids.

13           *MR. TORZILLI:*  Okay.  We can take this exhibit down.

14           Thank you, Ms. Pearce.

15   *BY MR. TORZILLI:*

16   *Q.*  You mentioned two overheard phone calls.  Can you just

17   briefly summarize for the jury what happened when you overheard

18   the two phone calls that are part of the events that lead you

19   to your understanding there was an agreement among competitors

20   to raise price in 2014?

21   *A.*  It was the two phone calls where he told Scott Brady and

22   Bill Kantola that the price is the price, I just need to know

23   how many loads they want at that price.

24   *Q.*  Okay.  And it was Defendant Roger Austin who was on the

25   phone for both of those two overheard calls?

Robert Bryant - Direct

1   A.  Correct.

2   Q.  Where did the two calls that you overheard take place?

3   A.  Mr. Austin's office.

4   Q.  Located in what city?

5   A.  Louisville, Kentucky.

6   Q.  On what date?

7   A.  It was on the same date of this email.

8   Q.  And was there another event that was occurring or was going

9   to occur on the same day as the two overheard phone calls?

10  A.  Yes.

11  Q.  What was that event?

12  A.  The meeting with KFC.

13  Q.  And is that one of the events you identified as forming

14  your understanding that there was an agreement that included

15  Defendant Austin and others and competitors to raise price in

16  2014?

17  A.  Yes.

18  Q.  So for the first phone call of the two, who was Defendant

19  Austin communicating with?

20  A.  I don't remember the order.

21  Q.  Okay.  Well, putting aside the order, who were the two

22  individuals that were on the phone calls that Defendant Austin

23  had on that day?

24  A.  Scott Brady and Bill Kantola.

25  Q.  Defendant Scott Brady?

Robert Bryant - Direct

1   *A.* Correct.

2   *Q.* Now, at the time of those phone calls, Defendant Scott

    Brady was working for a competitor of Pilgrim's?

4   *A.* Correct.

5   *Q.* What did you overhear during the phone call between

6   Defendant Roger Austin and Defendant Scott Brady?

7        *MR. LAVINE:* Objection, Your Honor. I think it's

8   already been asked and answered.

9        *THE COURT:* Overruled.

10       *THE WITNESS:* The part I remember was him telling him

11  that the price is the price, I just need to know how many loads

12  you want at that price.

13  *BY MR. TORZILLI:*

14  *Q.* Defendant Austin stated that to Defendant Brady?

15  *A.* Correct.

16  *Q.* Now, how does that statement help form your understanding

17  there was an agreement between competitors to raise price in

18  2014?

19  *A.* It was conveying Pilgrim's response to KFC. So they

20  didn't -- they knew what we were going to do in the next round

21  so that gave them --

22       *MR. TUBACH:* Objection. Speculation on what they

23  would be doing.

24       *THE COURT:* Overruled.

25       *THE WITNESS:* That would -- they knew that we weren't

Robert Bryant - Direct

1  going to concede price, and that would allow them to be able

2  to -- not to concede price or hold firm on those -- those next

3  round.

4  *BY MR. TORZILLI:*

5  *Q.*  Did Defendant Brady participate in the agreement to raise

6  price in 2014?

7      *MR. LAVINE:*  Objection.  Foundation, vague.

8      *MR. BELLER:*  Speculation.

9      *THE COURT:*  Sustained.  Foundation.

10  *BY MR. TORZILLI:*

11  *Q.*  Do you have an understanding of whether -- just yes or no,

12  whether or not Defendant Brady participated in an agreement

13  among competitors to raise price in 2014?

14  *A.*  Yes.

15  *Q.*  What is your -- the basis for your understanding that

16  Defendant Brady participated in an agreement among competitors

17  to raise price in 2014?

18  *A.*  I mean, the conversations with Mr. Austin and the overheard

19  phone call between Mr. Austin and Mr. Brady.

20  *Q.*  You mentioned a moment ago a set of emails, and we looked

21  at some of them, that gave you, I think you said, confirmation

22  that all of the competitors had raised price or put in a high

23  bid?

24  *A.*  Correct.

25  *Q.*  Did the "everyone" or "all competitors" include Claxton?

Robert Bryant - Direct

1    A.   That's my understanding, yes.

2    Q.   And who was the lead negotiator or negotiators to the best

3    of your understanding for Claxton with respect to KFC in August

4    of 2014?

5            MR. BELLER:  Objection.  Foundation, 602.

6            THE COURT:  Overruled.

7            THE WITNESS:  Scott Brady.

8    BY MR. TORZILLI:

9    Q.   Did that information, as well, form the basis for an

10   understanding of whether or not you have an understanding of

11   Defendant Scott Brady participating in an agreement among

12   competitors to raise price?

13           MR. LAVINEj:  Objection.  Vague and no foundation.

14           THE COURT:  Sustained.  Foundation.

15   BY MR. TORZILLI:

16   Q.   Is the fact that -- is the fact that Claxton submitted a

17   high bid to the best of your understanding also inform your

18   understanding about whether or not Scott Brady participated in

19   an agreement among competitors to raise price in 2014?

20           MR. BELLER:  Objection.  Leading.

21           THE COURT:  Overruled.

22           MR. BELLER:  There is also a foundation objection.

23           THE COURT:  Sustained.

24   BY MR. TORZILLI:

25   Q.   How did the overheard phone call between Defendant Roger

Robert  Bryant  -  Direct

1   Austin and Defendant Scott Brady affect your understanding

2   about whether defendant -- whether or not Defendant Brady

3   participated in an agreement among competitors in 2014 to raise

4   price?

5           MR. BELLER:  Objection.  Relevance.

6           MR. LAVINEj:  Asked and answered, Your Honor.

7           THE COURT:  Both objections are overruled.

8           MR. TUBACH:  And foundation, Your Honor.

9           THE COURT:  Actually, I'm going to sustain the

10  relevance objection, his understanding, why is that relevant?

11  BY MR. TORZILLI:

12  Q.  So you had an overheard phone call between Defendant Austin

13  and Defendant Brady, and you had a second overheard -- second

14  call that you overheard between Defendant Austin and

15  Mr. Kantola?

16  A.  Correct.

17  Q.  What was the -- what occurred that you recall on the

18  overheard phone call between Defendant Austin and Mr. Kantola?

19  A.  The same information was exchanged, The price is the price,

20  I just need to know how many loads you want at that price.

21  Q.  The same basic message on both calls?

22  A.  Correct.

23  Q.  Okay.  Now, how did the --

24          THE COURT:  Mr. Torzilli, sorry.  But we're now at

25  5:00.  Can you look for a breaking spot?

1          MR. TORZILLI:  No better time than the present, Your

2     Honor.

3          THE COURT:  Okay.  Ladies and gentlemen, we won't have

4     trial tomorrow, tomorrow being Friday.  And Monday is the

5     4th of July, or 4th of July holiday, so we won't be having

6     trial then either.  So it won't be until Tuesday, 8:30, that

7     I'll see you again.

8          In that long intervening period, once again, keep up

9     what I'm sure are your good efforts to prevent anyone from

10    talking to you about the case.  Don't look up any information.

11    Don't deliberate or, you know, converse among yourselves about

12    the trial.  You have to wait until after you've heard the

13    instruction and the arguments of the attorney and I release you

14    to begin your deliberations, then you can go ahead and do those

15    things.

16         Hope you have a great holiday weekend, ladies and

17    gentlemen.

18         I'll see you back here Tuesday, 8:30.

19         The jury is excused.

20         (Jury out at 5:00 p.m.)

21         THE COURT:  Thank you, Mr. Bryant.  You're excused

22    until Tuesday at 8:30.

23         Everyone else may be seated.  Thank you.

24         All right.  So I think we've three things that we

25    should talk about.  First of all, give anyone else an

 1   opportunity to talk about Mr. Bryant's testimony if you want.

 2   Then we will talk about -- just a little bit about jury

 3   instruction issues, because it sounds like we're going to have

 4   our final jury instruction conference on Tuesday, so we'll talk

 5   about that.  And then I -- then we'll talk about the length of

 6   the Government's cumulative closing argument.  All right.

 7           First of all, let's go to Mr. Bryant.  Anything more

 8   on Mr. Bryant, Mr. Feldberg?

 9           MR. FELDBERG:  Your Honor, what we just heard rebuts

10   absolutely nothing that was presented in the defense case,

11   and --

12           THE COURT:  What about the character witnesses for

13   Mr. Austin?

14           MR. FELDBERG:  We had character witnesses, Your Honor.

15           THE COURT:  Why doesn't testimony of Mr. Bryant

16   talking about what, you know, he overheard being said rebut

17   that?

18           MR. FELDBERG:  It doesn't.  It has nothing to do with

19   character.  He overheard Mr. Austin -- he says he overheard

20   Mr. Austin say the same thing twice.  It has nothing to do with

21   character.  There is a lot of reason not to believe his

22   testimony.  But assuming one takes it at face value, it doesn't

23   have anything to do with character, plus he's testified to it.

24           Then it gets worse, because he goes from the claim, I

25   told him the price is the price, this is just how many loads,

1    to a conclusion that that somehow is an agreement, which is a

2    total disconnect.  One has nothing to do with the other.

3            Plus -- and from the point of view of rebutting

4    character evidence, a claim the Government has not made,

5    people -- customers, the alleged victims of the alleged crime,

6    came in and testified, we've known this man for a long time, he

7    has a great reputation for honesty and integrity.  Nothing

8    Mr. Bryant testified to in his direct, nothing he testified to

9    today rebuts that.  It's entirely conclusory, and it's -- it's

10   certainly repetitive, but Your Honor has rejected that argument

11   before.  But now it doesn't rebut anything.  We object --

12           THE COURT:  Understood.

13           MR. FELDBERG:  We would move to strike it.

14           THE COURT:  I'll deny the motion.  I do think it

15   rebuts the character evidence.  If -- and like I said, it came

16   up at the very end, Mr. Bryant's understanding is irrelevant,

17   so if that question is asked of him in the future by the

18   Government, objection to that will be sustained.  But personal

19   knowledge about what he believes was an agreement is relevant,

20   and he can testify to that.  I'm not going to repeat all the

21   things I said on the bench conference, but I do believe that

22   it's proper rebuttal testimony.

23           MR. FELDBERG:  I'll go back over the transcript over

24   the break.  But I understand that he can testify, I heard

25   Mr. Austin say, or I allege I heard Mr. Austin say.  But to go

2576

 1   from that to a conclusion that that is an agreement, that's an

 2   understanding, whether he uses the word or not.  That is his

 3   understanding.  The event he claims to have witnessed is the --

 4   is the sentence in the conversation.

 5           THE COURT:  I think --

 6           MR. FELDBERG:  What follows from that is his

 7   understanding.

 8           THE COURT:  We have to distinguish -- there is a

 9   semantic difference between -- the word "understanding" can

10   have multiple meanings.  You know, if the word "understanding"

11   is simply Mr. Bryant's post-facto conclusion about what

12   existed, that's irrelevant.  If Mr. Bryant is asked whether

13   there was an understanding among competitors and then he has

14   personal knowledge of that existing, you know, if he's being

15   asked about an understanding tantamount to an agreement, then

16   that would be, you know, highly relevant.  It's perfectly

17   relevant.

18           MR. FELDBERG:  I take Your Honor's point; I agree with

19   Your Honor's point.  I think what he testified to was in the

20   former category, not the latter.

21           THE COURT:  Well, I agree with the last question, but

22   I sustain the relevancy objection --

23           MR. FELDBERG:  That was with respect to Mr. Brady, but

24   I think it was the same question with respect to Mr. Austin.

25   Respectfully, Your Honor, I think you overruled my objection.

1          THE COURT:  I'd have to look at the question again,

2     but I do agree that his post-facto understanding is irrelevant.

3          MR. FELDBERG:  Then, after we've looked at the

4     transcript, Your Honor, I may submit a motion to strike.

5          THE COURT:  I understand.

6          MR. FELDBERG:  Thank you.

7          THE COURT:  Mr. Beller.

8          MR. BELLER:  Thank you, Your Honor.  I won't belabor

9     the points.

10          Your Honor, Mr. Bryant has testified that he has no

11     personal knowledge of the way Claxton prices its chicken, no

12     personal knowledge of the different factors that can -- that

13     Claxton considers in pricing its chicken.  Despite that

14     testimony, Mr. Bryant is repeatedly asked about all competitors

15     being a part of an underlying conspiracy, and he is not being

16     asked about his personal knowledge of the different

17     competitors.  And so I believe that alone coupled with -- so

18     this broad sweeping statement of, all the different competitors

19     entered into or were a participant in a conspiracy, I think is

20     completely counter to his very specific testimony regarding his

21     personal knowledge as to Claxton and how Claxton prices its

22     chicken.

23          And based on that, I continue to object, quite

24     respectfully, understanding the Court's rulings, of this

25     ongoing testimony of any part of Mr. Bryant as it relates to my

1    client specifically, and if I may add, on behalf of my

2    colleagues representing Mr. Brady.

3         Your Honor, I believe that this is also outside the

4    scope of the defense case in that Mr. Finch, Mr. Kronauge, and

5    Mr. Ledford were all asked about their own personal knowledge,

6    not to the ultimate issue -- which is 704, which in certain

7    circumstances, which the Court knows as well as I, is

8    absolutely permissible.  But nonetheless, I believe that there

9    is still a 602 issue.  This lack of nexus between the evidence

10   presented on defense and this now exhaustive rehashing of the

11   Government's case in chief, I do believe it's a due process

12   violation, and I do object on that ground.

13        *THE COURT:*  All right.

14        *MR. BELLER:*  Thank you.

15        *MR. LAVINE:*  I'd also like to add to that.  We talk

16   about character witness as far as rebutting that, Mr. Brady

17   didn't put a character witness in here.  There is nothing in

18   here --

19        *THE COURT:*  Doesn't matter.  If Mr. Bryant can rebut

20   Mr. Austin's character, then the testimony is admissible.

21        *MR. LAVINE:*  I think on cumulative basis, this is

22   highly prejudicial.  This is nothing more than a repeat.

23        *THE COURT:*  I've ruled on that, and you made the

24   record on that already.

25        *MR. LAVINE:*  I'll continue to object, Your Honor.

1        THE COURT:  I understand, but saying it over and over

2   again doesn't help.

3        MR. LAVINE:  I respectfully --

4        THE COURT:  Mr. Fagg, do you have anything new?

5        MR. FAGG:  Something different, Your Honor.  Very

6   briefly on behalf of Mr. Lovette.

7        Mr. Lovette called two witnesses in the defense case.

8   We don't believe Mr. Bryant rebuts either of those.  Mr. Bryant

9   has already said on the direct case that he has no personal

10  knowledge that Mr. Lovette was involved in any agreement to

11  raise prices.  So, frankly, we would ask for an instruction to

12  the jury that Mr. Bryant's rebuttal testimony cannot be

13  considered against Mr. Lovette.

14       THE COURT:  I'm going to reject that too.  If we did

15  that type of thing, our instructions would double, if we told

16  the jury about each little nuance of relevancy or whatnot.  I

17  mean, it's -- you know, the jury can consider Mr. Bryant's

18  direct testimony as it wishes to do so as to its relevancy for

19  a variety of different defendants, and they can consider his

20  rebuttal testimony as it sees fit to do so as well.  But I'm

21  not going to instruct the jury who they can consider testimony

22  as to, especially if it's -- as we've talked about, it's not

23  new testimony.  It is testimony that rebuts evidence that was

24  brought out by the defendant.

25       MR. FAGG:  Thank you, Your Honor.

2580

1          THE COURT:  Ms. Pletcher.

2          MS. PLETCHER:  I think I am the last one, Your Honor.

3          Similarly, Mr. Bryant has no personal knowledge of

4     Mr. Penn agreeing with anyone to fix prices or rig bids, so

5     this testimony is not relevant to Mr. Penn, and the rehash is

6     prejudicial to him.

7          Secondly, in anticipation of potential testimony with

8     respect to Professor Snyder's benchmarking analysis, I have not

9     heard so far any testimony from Mr. Bryant that would qualify

10    him to opine on that, and certainly no testimony yet about any

11    personal knowledge that he's had with respect to spot prices in

12    2014.  And Your Honor suggested that perhaps Mr. Bryant could

13    provide some context for Professor Snyder's analysis by --

14    anticipating from the Government's brief -- suggesting that

15    prices in the spot market were high; therefore, Professor

16    Snyder's analysis could have shown higher numbers.

17         But I want to point out that the Government witnesses,

18    Mr. Lewis and Mr. Suerken both discussed the high level of spot

19    prices in 2014, and so Mr. Bryant has nothing new to say on

20    that point.  So his testimony that he has would be cumulative.

21    Of course, he would have to establish the proper foundation.

22         THE COURT:  Well, we went over this, and

23    Mr. Torzilli -- Mr. Torzilli asserts that Mr. Bryant has

24    personal knowledge to be able to rebut that last -- far

25    left-hand column.  Do I know whether he does?  No, but that is

 1   a sufficient basis for Mr. Torzilli to explore it.  If he

 2   doesn't, he can be cross-examined.  But we'll see.

 3          All right.  Let's move -- Mr. Torzilli, I didn't want

 4   to preclude you from anything that you may want to say.  If you

 5   wish to make a record on things, go ahead.

 6          MR. TORZILLI:  I'll bite my tongue and sit down.

 7          THE COURT:  So on the jury instructions, you know, for

 8   instance, I just -- in the packet that I handed out, I just

 9   copied the defendants' statements of the case, but those could

10   vary, and I don't know, but if you do have some changes to the

11   theories of the case, try to submit those as soon as possible.

12   Would it be possible to submit those tomorrow, or -- by the end

13   of the day or -- when do you think would be reasonable if there

14   are any changes?

15          MR. FAGG:  Your Honor, my only concern with submitting

16   them tomorrow is that we're -- I don't know where we are in

17   Mr. Bryant's testimony.

18          THE COURT:  That's true.

19          MR. FAGG:  And so I would ask -- I would request that

20   we be permitted to submit them after Mr. Bryant's testimony.

21          THE COURT:  Well, I think you know what he's going to

22   say.  But if -- if there are any changes other than things that

23   you anticipate could come up in Mr. Bryant's testimony, then

24   maybe you can submit that aspect of it so we can look at them.

25   But what I -- what I really want to minimize is, you know, for

 1    instance, getting a new theory of the case instruction,

 2    something completely rewritten, which, once again, defendants

 3    have a perfect right to do.  It's just that that would bog us

 4    down on Tuesday.  And if you already know what is going to be

 5    submitted, it would be handy to have it earlier than later.

 6         But, certainly, some change based upon testimony that

 7    Mr. Bryant may give on Tuesday, that would be perfectly

 8    appropriate to, you know, further amend a theory-of-the-case

 9    instruction, which we can do on the fly on Tuesday, on this

10    one.

11         MR. FAGG:  Sure, Your Honor.

12         THE COURT:  So if you can, let's submit them by the

13    end of the day tomorrow.  But, obviously, depending on the

14    testimony of Mr. Bryant or other rebuttal witnesses, they can

15    certainly be amended.

16         And if you have any other comments on the jury

17    instructions, you know, for instance, you see typos or you

18    notice a problem or you look back at the transcript, like

19    Mr. Feldberg was going to do, if there is just something like

20    that that it would be good to flag, let's try to do that by the

21    end of the day tomorrow, too.  That would be helpful.  If you

22    have additional instructions to tender -- we've got

23    Ms. Carwile's already, and she can obviously make a record at

24    our final jury instruction as to that instruction, but if you

25    have additional instructions to tender, it would be handy to

1    have those too.

2            Mr. Beller, did you have something?

3            *MR. BELLER:*  Yes, Your Honor.  And I will concede that

4    my objection is late, but it's regarding the verdict forms.

5            *THE COURT:*  Uh-huh.

6            *MR. BELLER:*  Your Honor, they are -- as best as I can

7    tell, identical to what the Court has given in trials 1 and 2

8    but upon reflection and upon consideration of two hung juries,

9    I am requesting that the Court consider offering the verdict

10   forms for each defendant on separate pages, instead of

11   condensing them down to two.  I believe that it encourages the

12   jury to give each defendant individual consideration, as

13   earlier instructions dictate.  And so I just want to make sure

14   that that -- that the jury is, in fact, doing so.  That is my

15   late request.

16           *THE COURT:*  Response on behalf of the United States?

17           *MS. WULFF:*  While the Government does not think that

18   this is a necessary change and thinks that the verdict form as

19   drafted is appropriate, we would defer to the Court on its

20   ultimate decision.

21           *THE COURT:*  I'm going to deny that, partly because I

22   just don't want people in the future to ask to have a separate

23   verdict form, because, really, I don't think that there is any

24   prejudice to it, and I don't think that in any way, shape, or

25   form hung juries in the other two cases had to do with the fact

1    that the defendants were all included on the same verdict form.

2    I really don't think that that makes any material difference,

3    so I will deny that request.

4         Anything else on jury instructions that we should

5    mention?

6         (No response.)

7         All right.  And here is my decision -- so I think --

8    this is correct, but the defendants in the previous two trials

9    each had 45 minutes for their closing, correct?

10        MR. TUBACH:  I believe the first closing had

11   55 minutes.

12        THE COURT:  But did you amend that, Mr. Tubach, in

13   this case by -- or was that just for the openings that there

14   was no adjustment?

15        MR. TUBACH:  The opening, there is no adjustment.  The

16   55 minutes wasn't a reallocation among us.  The Court had

17   simply given the initial closing an additional ten minutes.

18        THE COURT:  We can do that.  Whoever gives the initial

19   one, 55 minutes, the other four 45 minutes.  The Government I'm

20   going to give an hour and 45 minutes cumulatively.  I think

21   that that's -- would be an appropriate allocation, 45 minutes

22   less because there are five fewer defendants' arguments to

23   rebut.  So that's what I'm going to give for the Government.

24        Mr. Beller.

25        MR. BELLER:  Thank you, Your Honor.

1          Your Honor, the defendants are considering but have

2    not yet decided on doing one closing that I'm going to call a

3    table-setting closing on behalf of all defendants before each

4    individual defendant gives their closing.  It would not be any

5    additional time.  Each defendant's would be -- each defendant

6    would discuss the amount of time, but I flag that, you know, to

7    see if that would be acceptable to the Court.

8          *THE COURT:*  How would that work?  I've never heard of

9    such a thing, but -- how would that take place?

10         *MR. BELLER:*  For example, Your Honor, instead of the

11   traditional five closings, one defendant would be willing to

12   give up their time -- or, rather, split the closing, so, for

13   example, I give a 15 or a 20-minute sort of table-setting

14   closing on behalf of all defendants.  Certainly, I would be

15   representing my individual client, but it would cover issues

16   that are universal to all five defendants.  And then each

17   defendant after that would be giving their closing, so it's

18   almost like Mr. Fries would be splitting his closing or

19   splitting his closing between counsel.

20         *THE COURT:*  So let me see if I follow this.  So let's

21   say that Mr. Fries is the one who does -- is tasked with the

22   table-setting close.  A portion of the time allotted to

23   Mr. Fries would be the table-setting one on behalf of all of

24   the defendants.  But then there would be some demarcation, the

25   rest of it would then be on behalf of Mr. Fries.

 1              MR. BELLER:  That's correct.  And given by

 2     Mr. Kornfeld, in this example.

 3              THE COURT:  So potentially, then, two different

 4     attorneys for Mr. Fries being allowed to present, in other

 5     words, one giving the table-setting one and one just on behalf

 6     of Mr. Fries.

 7              MR. BELLER:  That's correct, Your Honor.

 8              THE COURT:  Okay.  Reaction by the Government,

 9     Mr. Loveland.

10              MR. LOVELAND:  Yes, Your Honor, if the Court would

11     indulge me.  I think that what this would do, while it would be

12     the same number of time, obviously, the shifting of it would

13     create more things for the Government to have to address in

14     rebuttal.

15              I just want to flag for the Court that the total

16     breakdown now I think would be 235 for the total defendants and

17     105 for the Government in terms of minutes.

18              Your Honor, the Government did take substantial steps

19     to streamline its case both in terms of witnesses and the way

20     that it published documents to the jury.  But ultimately, as

21     Your Honor acknowledged, this is the same conspiracy, and I

22     would also point out that the defense case was substantial here

23     and, in some ways, was more substantial than at previous

24     trials.

25              So I think the Government's reaction is twofold.  I

1    don't want to spend 15 minutes arguing for 15 minutes, but even

2    an additional 15 minutes in cumulative for the Government to be

3    able to split between closing and rebuttal would permit the

4    Government to walk the jury through an eight-year conspiracy

5    and five defendants.  But more than that, if there is this

6    proposal for the defense to have six bites with five

7    defendants, I think that that just makes it even more

8    complicated for the Government to be able to rebut.  And it

9    gives them a first and second bite at the apple.

10           Your Honor, the Government would submit that two and a

11   half hours for a case this complicated, a white-collar case

12   this complicated, is not at all too much.  But if the -- but if

13   the Court is inclined -- and I understand the Court's

14   perspective, absolutely, to focus on the narrowing of the

15   defendants -- I would submit cutting 15 minutes would be more

16   than enough, but certainly an hour and 45 would just be really

17   difficult for the Government to walk through this case and

18   especially because the defense case was substantial.  They

19   called fact witnesses, not just character witnesses.  And those

20   fact witnesses testified over the course of two weeks.  It

21   just -- at this point, it makes it more difficult for the

22   Government to be able to address all of those things.

23           And the jury will have sat with this case for a month

24   by the time they hear argument, so they're -- their memories

25   are going to be -- need to be refreshed of the evidence in the

1    Government's open close, and then for the Government to have to

2    respond to five different arguments in whatever the breakdown,

3    hour and 45 minutes would be, it would be shooting from the hip

4    for, like, five minutes per defendant.  I don't think it would

5    put the jury in the best place to understand the Government.

6    So in candor, Your Honor, the Government would just submit, an

7    hour and 45 is really not sufficient for a case of this

8    magnitude.

9           Thank you.

10          THE COURT:  All right.  Here is what I am going to do,

11   I will allow the so-called table-setting argument as long as

12   there is no additional cumulative time, and I will allow a

13   different attorney for Mr. Fries to do that.  I don't think

14   that Mr. Loveland is correct that that will somehow create a

15   different bite or anything of that nature.

16          You know, once again, this is all going to come from

17   the -- you know, it will all be during a block of the

18   defendants giving their closing arguments.

19          And moreover, despite the fact that there was a

20   refinement in the second trial, in terms of the closings, and

21   there are different demonstratives and things of that nature,

22   fundamentally, there is not really any great change in what

23   arguments were made.  So in particular, on the third trial, I

24   think both sides have pretty good anticipation of what the --

25   what the arguments are going to be.  And unlike almost -- you

1    know, unlike a trial taking place for the first time, have the

2    ability to prepare to be efficient, to think it through, and

3    having sat through the arguments twice, I don't think that an

4    hour and 45 minutes shortchanges the Government at all.

5         The ratio -- I mean, as compared to the first two

6    trials, the ratio of the defendant -- the Government's argument

7    to the defendants was one to three.  Now it's down to one to

8    two.  So it's not -- I don't believe that it shortchanges the

9    Government.  I think the Government -- I mean, the bottom line

10   is that with this case especially, given the fact that both

11   sides have dumped all sorts of exhibits on the jury without

12   even their opportunity to even really look at them, you know,

13   unsponsored exhibits, you know, you could have an -- give each

14   side a day, and you wouldn't be able to cover all of the

15   evidence in this case.

16        The name of the game is not to spend more time trying

17   to explain things to the jury.  The name of the game is try to

18   help the jury understand it in a way that it doesn't overwhelm

19   the jury.  So I don't -- I think, if anything, there is a real

20   negative tradeoff to more time for the argument.  So I don't

21   think that there is any prejudice to the Government from that

22   type of a time limitation.

23        And given the fact that there are five fewer

24   defendants and, therefore -- and that -- it's true, and I don't

25   mean to criticize the Government at all of this, it's good, but

1    the Government's case is more focused this time, and as a

2    result, because of that focus, there is less need for as much

3    time during the closing.  So I'll stick with that.

4            Anything else that we should talk about before we

5    recess today?

6            MR. KORNFELD:  Your Honor, just to clarify, let me be

7    clear, the table-setting idea is something we're considering;

8    it's not something we've decided to do.

9            THE COURT:  Sure.

10           MR. KORNFELD:  But, again, my understanding of the

11   Court's ruling, the Court has been gracious in allowing the

12   defendants to divvy up the time, forget the table-setting

13   closing, as we see fit.  So my understanding of the Court's

14   ruling, that's kind of the law of the case, so to speak, were

15   we to do that, were hypothetically Mr. Beller and I dividing up

16   our time, if our colleagues were able to lend us time as in the

17   past, that would be okay with the Court so long as cumulatively

18   the defendants do not exceed the cumulative time.

19           THE COURT:  I agree.  I mean, I'm fine with that.

20   What we should try to avoid as best as possible is, you know,

21   doing something like the floor of the Senate, where, you know,

22   it's difficult for me to try to figure out who has got what.

23   We were down to, you know, splitting three minutes in half

24   and -- like my computer up here doesn't have seconds on it, and

25   it makes it really tough.

1          *MR. KORNFELD:*  I understand, Your Honor.

2          *THE COURT:*  As long as there is -- you know, we avoid

3     complications like that, I don't have a problem with that.

4          *MR. KORNFELD:*  Thank you.

5          *THE COURT:*  Anything else that we should talk about

6     tonight?

7          Mr. Fagg.

8          *MR. FAGG:*  One question.  The Government filed its

9     witness list for the rebuttal case last night.  It doesn't

10    include time estimates on it.  I'm wondering if, in fact, we

11    can do closings on Tuesday is still accurate.

12         *THE COURT:*  Well, you can ask them off-line, but, you

13    know, they're pretty conservative estimates, no matter what.

14    We're going to have to play Tuesday by ear.  I don't know what

15    is going to happen.  But, you know, that's why -- hopefully,

16    our jury instruction conference will be fairly brief.  And I

17    don't know how all of this is going to play out in terms of the

18    lunch break and whatnot.  Once again, who knows.  We'll have to

19    see.  I'm hopeful we'll at least be able to get most of the

20    closings done on Tuesday.  But I -- we probably won't get them

21    all done.  As a result, some of them may go into Wednesday.

22    We'll just see.

23         Okay?  Anything else to bring up?

24         All right.  Have a good Fourth of July, everyone.

25    We'll reconvene Tuesday at 8:30.  Thank you.

1          (Recess at 5:29 p.m.)

2

3                        **I N D E X**

4    **Item**                                              **Page**

5

        BRENDA RAY
6            Direct Examination By Mr. Fagg              2305
             Cross-examination By Mr. Tubach             2325
7            Cross-examination By Mr. Hart               2346
             Redirect Examination By Mr. Fagg            2389
8        RICHARD EDDINGTON
             Direct Examination By Ms. Rahman            2403
9            Direct Examination Continued By Ms. Rahman  2454
             Cross-examination By Mr. Feldberg           2472
10           Cross-examination By Ms. Wulff              2490
             Redirect Examination By Ms. Rahman          2512
11       ROBERT BRYANT
             Direct Examination By Mr. Torzilli          2556

12

13                   GOVERNMENT'S EXHIBITS

14   Exhibit        Offered  Received  Refused  Reserved  Withdrawn

15   843                      2311
     844                      2311
16   850                      2321
     851                      2321
17   1527                     2527
     1529                     2527
18   1530                     2528
     9703                     2498

19

20

21

22

23

24

25

```
 1                          DEFENDANTS' EXHIBITS

 2    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

 3    B-881, pages 11 and 12 2529
      C-020                   2528
 4    C-021-1                 2528
      C-022                   2528
 5    C-023                   2528
      C-024                   2528
 6    C-464                   2528
      C-862                   2532
 7    C-864                   2532
      C-865                   2532
 8    D-137                   2519
      D-150                   2522
 9    D-151                   2523
      D-152                   2523
10    D-154                   2523
      D-157                   2523
11    D-158                   2524
      D-159                   2524
12    D-160                   2524
      D-161                   2524
13    D-162                   2524
      D-164                   2524
14    D-165                   2524
      D-407                   2524
15    D-408                   2525
      D-409                   2525
16    D-410                   2525
      D-530                   2528
17    D-545                   2525
      D-546                   2525
18    D-789                   2525
      D-835                   2528
19    D-930                   2341
      D-989                   2317
20    D-990                   2317
      E-014                   2489
21    F-745                   2528
      F-746                   2528
22    F-848                   2528
      F-849                   2528
23    J-203                   2530
      J-221                   2526
24    J-235                   2531
      J-236                   2531

25
```

1                            (Exhibits Continued)

2    J-237                    2489
     J-257                    2526
3    J-258                    2526
     J-398                    2343
4    J-424-                   2526

5

6                       REPORTER'S CERTIFICATE

7              I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

8
               Dated at Denver, Colorado, this 30th day of June,
9    2022.

10

11                        _____

12                        Therese Lindblom, CSR, RMR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25